# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PLANNED PARENTHOOD SOUTH ATLANTIC; BEVERLY GRAY, M.D, on behalf of themselves and their patients seeking abortions,

                Plaintiffs,

v.

JOSHUA STEIN, Attorney General of North Carolina, in his official capacity; TODD M. WILLIAMS, District Attorney ("DA") for Prosecutorial District ("PD") 40, in his official capacity; JIM O'NEILL, DA for PD 31, in his official capacity; SPENCER B. MERRIWEATHER III, DA for PD 26, in his official capacity; AVERY CRUMP, DA for PD 24, in her official capacity; JEFF NIEMAN, DA for PD 18, in his official capacity; SATANA DEBERRY, DA for PD 16, in her official capacity; WILLIAM WEST, DA for PD 14, in his official capacity; LORRIN FREEMAN, DA for PD 10, in her official capacity; BENJAMIN R. DAVID, DA for PD 6, in his official capacity; KODY H. KINSLEY, M.P.P., Secretary of the North Carolina Department of Health and Human Services, in his official capacity; MICHAUX R. KILPATRICK, M.D., PhD., President of the North Carolina Medical Board, in her official capacity, on behalf of herself, the board and its Members; RACQUEL INGRAM, PhD., R.N., Chair of the North Carolina Board of Nursing, in her official capacity, on behalf of herself, the Board and its members; and their employees, agents, and successors,

                Defendants.

CIVIL ACTION

Case No. 1:23-cv-480

## VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs, by and through their undersigned attorneys, bring this complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following:

## I.       INTRODUCTORY STATEMENT

1.       Plaintiffs bring this civil rights action, on behalf of themselves and their patients, under the U.S. Constitution and 42 U.S.C. § 1983 to challenge the constitutionality of certain provisions of North Carolina Session Law 2023-14 ("S.B. 20" or "the Act"), attached as Exhibit 1.[1]

2.       The Act bans abortion after twelve weeks of pregnancy, with narrow exceptions, and imposes other significant restrictions on abortion access that will harm patients and impede health care professionals from providing quality care. The Act was negotiated by politicians behind closed doors and passed with almost no time for public input or debate. The time between S.B. 20's introduction of abortion restrictions and its passage was less than 72 hours, which is the mandatory waiting period for abortion in North Carolina. Likely as a result of this hurried process, S.B. 20 has injected requirements that are unintelligible, inherently contradictory, irrational, and/or otherwise unconstitutional into every part of the abortion process, including into the informed consent requirements that were construed by the court in *Stuart v. Loomis*, 992 F. Supp. 2d 585, 611 (M.D.N.C.), *aff'd sub nom. Stuart v. Camnitz*, 774 F.3d 238 (4th Cir. 2014).

---

[1] All citations to the Act herein refer to the sections that are to be codified in the General Statutes of North Carolina on the Act's effective date.

2

3. The Act contains numerous inconsistencies and irrationalities in the 12-week ban itself. Notably, the Act repeals section 14.45.1 of the General Statutes of North Carolina, which listed the conditions under which abortion was lawful and was a critical cross-reference in North Carolina's fetal homicide statute, which makes it a crime, punishable by life in prison, to willfully cause the death of an "unborn child." *See* N.C. Gen. Stat. § 14-23.2. Accordingly, the Act creates confusion about whether lawful abortion remains exempted from the fetal homicide statute.

4. The Act's requirements as to medication abortion are also nonsensical. In one section, the Act explicitly states that abortion is lawful "during the first 12 weeks of a woman's pregnancy when a medical abortion is procured," S.B. 20 § 90-21.81B(2), but in another section, the Act requires physicians who provide medication abortion to "[v]erify that the probable gestational age of the unborn child is no more than 70 days," or ten weeks, *id.* § 90-21.83B(a)(6). The Act similarly requires the physician to "[d]ocument in the woman's medical chart the . . . intrauterine location of the pregnancy." *Id.* § 90-21.83B(a)(7). It is therefore unclear whether Plaintiffs are prohibited from providing medication abortion at ten weeks or after the twelfth week of pregnancy and whether they can provide early medication abortion when a patient has a positive pregnancy test but it is too soon to visualize an intrauterine pregnancy.

5. And although the Act provides an exception to the 12-week ban in cases of rape or incest, it limits the provision of those procedures to hospitals. *Id.* §§ 90-21.81B(3), 90-21.82A. This irrational limitation on one of the safest medical procedures will further harm to survivors of sexual assault without increasing abortion safety.

3

6.     Furthermore, under the Act, patients must make an in-person visit to receive certain state mandated information at least 72 hours before an abortion, but the Act is internally inconsistent about whether a provider must restart the 72-hour waiting period if certain information is not available at the time of the initial state-mandated visit. *Compare id.* §§ 90-21.82(b)(1a) & (a); 90-21.83A(b)(2) & (a) *with* § 90-21.83C. The Act's new section 90-21.83C also requires the provider to give information that in many circumstances will be impossible to know 72 hours in advance of the abortion (and sometimes even on the day of the abortion itself) such as whether the abortion is covered by insurance. Moreover, that new section does not explicitly incorporate the medical emergency exception, suggesting that providers must wait 72 hours after providing the information required by section 90-21.83C—even when there is a medical emergency.

7.     The Act also changes providers' responsibilities with respect to sending reports related to abortion to the State in ways that make compliance impossible. For example, the Act states that a "report *completed* under this section for a minor shall be sent to the Department and the Division of Social Services *within three days* of the surgical or medical abortion." *Id.* § 90-21.93(a) (emphasis added). But the Act requires information to be included in the report that will not be known within three days, including whether a minor who had a medication abortion returned for the follow-up appointment that is required to be schedule seven to fourteen days later (*id.* § 90-21.83B(b)) and information about the physician's reasonable efforts to encourage the minor to attend her follow-up appointment if the minor did not attend. *Id.* § 90-21.93(b)(8) & (9). Similarly, the report must indicate the amount of money billed to cover

4

treatment for complications, *id.* § 90-21.93(b)(11), but complications may arise after three days.

8.      Finally, if a person seeking an abortion is past 12 weeks gestation and does not meet one of the narrow exceptions, the Act is not clear as to whether Plaintiffs can assist these individuals in seeking lawful abortion in other states. The Act states that "[i]t shall be unlawful after the twelfth week of a woman's pregnancy to advise, procure, or cause a miscarriage or abortion." *Id.* § 90-21.81A(a). It is not clear if this prohibition applies to helping people access lawful abortion in another state. If that were the case, this provision would violate the First Amendment

9.      Plaintiffs who fail to comply with the Act face disciplinary action and, for violation of some sections of the Act, felony penalties.

10.     While the U.S. Supreme Court last year held that the right to abortion is no longer a fundamental right under the Fourteenth Amendment, the Constitution nonetheless protects other rights guaranteed to Plaintiffs and their patients by the First and Fourteenth Amendments to the United States Constitution. The Supreme Court's decision did not insulate abortion restrictions from court review if, as here, those restrictions are vague, impossible to comply with, irrational, inflict a high risk of suffering and death for no legitimate governmental purpose, and potentially violate the First Amendment.

11.     Plaintiffs seek declaratory and injunctive relief from those constitutional deprivations, which, without relief from this Court, will begin when the portions of the Act challenged in this case take effect on July 1, 2023.

5

## II. JURISDICTION AND VENUE

12.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343(a)(3).

13.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

14.     Venue is appropriate under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district and because Defendants Jim O'Neill, Jeff Nieman, Satana Deberry, and Avery Crump reside in this district.

## III. PLAINTIFFS

15.     Plaintiff Planned Parenthood South Atlantic ("PPSAT") is a not-for-profit corporation organized under the laws of North Carolina, operating nine health centers throughout the state, located in Asheville, Chapel Hill, Charlotte, Durham, Fayetteville, Greensboro, Raleigh, Wilmington, and Winston-Salem, as well as in South Carolina, Virginia, and West Virginia. Depending on the location, PPSAT health centers provide a broad range of reproductive and sexual health services, including cervical cancer screenings; breast and annual gynecological exams; family planning counseling; pregnancy testing and counseling; reproductive health education; testing and treatment for sexually transmitted infections; contraception; procedural and medication abortion services and related care; prenatal consultation and care; primary care; gender affirming hormone therapy; and health care related to miscarriage. PPSAT sues on behalf of itself, its staff, and its patients.

6

16.     Plaintiff Beverly Gray, M.D., is a physician licensed to practice medicine in the State of North Carolina and is board-certified in obstetrics and gynecology. She currently provides a range of obstetric and gynecological services, including abortion care, in Durham and provides contraceptive and gynecological care, including abortion care, in Chapel Hill and Fayetteville. Dr. Gray sues on behalf of herself and her patients.

## IV.     DEFENDANTS

17.     Defendant Joshua Stein is the Attorney General of North Carolina. Defendant Stein is authorized to seek injunctive relief against willful violations of the Act. N.C. Gen. Stat. § 90-21.88. Defendant Stein also bears the duty of consulting with and advising prosecutors, upon request, and represents the State of North Carolina in certain criminal proceedings. *Id.* § 114-2(1), (4).  Defendant Stein is sued in his official capacity.

18.     Defendant Todd M. Williams is the District Attorney for Prosecutorial District 40, which includes the city of Asheville. Defendant Williams has the authority to prosecute violations of the twelve-week ban. N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B. Defendant Williams is sued in his official capacity.

19.     Defendant Jim O'Neill is the District Attorney for Prosecutorial District 31, which includes the city of Winston-Salem. Defendant O'Neill has the authority to prosecute violations of the twelve-week ban. N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B. Defendant O'Neill is sued in his official capacity.

20.     Defendant Spencer B. Merriweather III is the District Attorney for Prosecutorial District 26, which includes the city of Charlotte. Defendant Merriweather

has the authority to prosecute violations of the twelve-week ban. N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B. Defendant Merriweather is sued in his official capacity.

21.     Defendant Avery Crump is the District Attorney for Prosecutorial District 24, which includes the city of Greensboro. Defendant Crump has the authority to prosecute violations of the twelve-week ban. N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B. Defendant Crump is sued in her official capacity.

22.     Defendant Jeff Nieman is the District Attorney for Prosecutorial District 18, which includes the city of Chapel Hill. Defendant Nieman has the authority to prosecute violations of the twelve-week ban. N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B. Defendant Nieman is sued in his official capacity.

23.     Defendant Satana Deberry is the District Attorney for Prosecutorial District 16, which includes the city of Durham. Defendant Deberry has the authority to prosecute violations of the twelve-week ban. N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B. Defendant Deberry is sued in her official capacity.

24.     Defendant William West is the District Attorney for Prosecutorial District 14, which includes the city of Fayetteville. Defendant West has the authority to prosecute violations of the twelve-week ban. N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B. Defendant West is sued in his official capacity.

25.     Defendant Lorrin Freeman is the District Attorney for Prosecutorial District 10, which includes the city of Raleigh. Defendant Freeman has the authority to prosecute violations of the twelve-week ban. N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B. Defendant Freeman is sued in her official capacity.

26.    Defendant Benjamin R. David is the District Attorney for Prosecutorial District 6, which includes the city of Wilmington. Defendant David has the authority to prosecute violations of the twelve-week ban. N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B. Defendant David is sued in his official capacity.

27.    Defendant Kody H. Kinsley is the Secretary of the Department of Health and Human Services. The Department regulates abortion clinics in North Carolina and is authorized to investigate complaints "relative to the care, treatment or complications of any patient." 10A N.C. Admin. Code 14E.0111. Defendant Kinsley is sued in his official capacity.

28.    Defendant Michaux R. Kilpatrick is the President of the North Carolina Medical Board. The Medical Board licenses physicians and other health care professionals. Doctors who violate the Act are subject to discipline by the Medical Board. N.C. Gen. Stat. § 90-21.88A. Furthermore, the Medical Board has the power to place health care professionals on probation, impose other sanctions, or suspend or revoke their licenses for a variety of acts or conduct, including "[p]roducing or attempting to produce an abortion contrary to law." N.C. Gen. Stat. §§ 90-14(a)(2), 90-14(h), 90-14.5(c); 21 N.C. Admin. Code 32N.0111(b). Defendant Kilpatrick is sued in her official capacity.

29.    Defendant Racquel Ingram is the Chair of the North Carolina Board of Nursing. The Board of Nursing regulates the practice of nursing in the state and oversees licensing for the various nursing professions. Nurses who violate the Act are subject to discipline by the Board of Nursing. N.C. Gen. Stat. § 90-21.88A. Defendant Ingram is sued in her official capacity.

## V.    STATUTORY FRAMEWORK

30.    Prior to the Act, abortion was broadly lawful in North Carolina before 20 weeks of pregnancy. Patients seeking abortion were required to obtain certain state-mandated information from a "qualified professional" 72 hours in advance of the procedure. The information could be given either in person or by telephone, and providers were subject to certain reporting requirements. *See* N.C. Gen. Stat. § 90-21.82.

31.    Enacted with limited debate and over the Governor's veto, the Act radically overhauls North Carolina's abortion restrictions in numerous ways: banning abortion after the twelfth week of pregnancy with a few narrow exceptions, making the mandated counseling requirement more onerous and requiring that it be done in person, and imposing much more burdensome reporting requirements. Presumably because the Act moved so quickly through the General Assembly, several provisions of this new scheme are contradictory, irrational, or nonsensical, leaving providers unable to determine their obligations and putting patients at risk of being unable to access care under the new scheme.

32.    For the purposes of this case, the relevant changes to the law are as follows.

33.    The Act repeals section 14-45.1 of the General Statutes of North Carolina, which included a long list of conditions under which abortion was lawful, and newly provides: "It shall be unlawful after the twelfth week of a woman's pregnancy to advise, procure, or cause a miscarriage or abortion." S.B. 20 § 90-21.81A(a).

34. After twelve weeks, there are limited exceptions, which include:

    a. When a physician determines there is a medical emergency, *id.* § 90-21.81B(1);

    b. Through the twentieth week of pregnancy, when the procedure is performed by a qualified physician in a suitable facility and when the pregnancy is a result of rape or incest, *id.* § 90-21.81B(3); and

    c. During the first twenty-four weeks of pregnancy, if a qualified physician determines there exists a life-limiting anomaly, *id.* § 90-21.81B(4).

35. Despite the section providing that abortions in the case of rape or incest may be provided in a "suitable facility," *id.* § 90-21.81B(3), the Act elsewhere states that "[a]fter the twelfth week of pregnancy, a physician licensed to practice medicine under this Chapter may not perform a surgical abortion as permitted under North Carolina law in any facility other than a hospital." *Id.* § 90-21.82A(c).

36. A physician providing an abortion-inducing drug[2] must follow a host of restrictions, including some that are contradictory. One provision of the Act states that medication abortion is lawful "during the first 12 weeks of a woman's pregnancy," *id.* § 90-21.81B(2). Yet a separate provision compels physicians providing medication abortions to "[v]erify that the probable gestational age of the unborn child is no more than 70 days." *Id.* § 90-21.83B(a)(6). These physicians are also required to "[d]ocument

---

[2] The Act defines "Abortion-inducing drug" as "A medicine, drug, or any other substance prescribed or dispensed with the intent of terminating the clinically diagnosable pregnancy of a woman . . . . This includes the off-label use of drugs such as mifepristone (Mifeprex), misoprostol (Cytotec), and methotrexate." S.B. 20 § 90-21.81(1a).

Case 1:23-cv-00480-CCE-LPA   Document 1   Filed 06/16/23   Page 11 of 32

in the woman's medical chart the . . . intrauterine location of the pregnancy." *Id.* § 90-21.83B(a)(7).

37.     The Act includes a requirement that "[a]t least 72 hours prior to any medical or surgical abortion performed in accordance with this Article, the physician providing [the abortion] . . . shall provide the pregnant woman the physician's full name and specific information for the physician's hospital admitting privileges and whether the treatment or procedure to be performed is covered by the pregnant woman's insurance." *Id.* § 90-21.83C. But availability or extent of insurance coverage cannot be determined definitively prior to an abortion.

38.     Furthermore, the Act increases the reporting requirements to Department of Health and Human Services after every abortion. The "report shall be transmitted to the Department within 15 days after either the (i) date of the follow-up appointment following a medical abortion, (ii) date of the last patient encounter for treatment directly related to a surgical abortion, or (iii) end of the month in which the last scheduled appointment occurred, whichever is later." *Id.* § 90-21.93(a). The Act also provides that a "report *completed* under this section for a minor shall be sent to the Department and the Division of Social Services *within three days* of the surgical or medical abortion." *Id.* (emphasis added). But the Act requires the report to include information that cannot possibly be known within three days, including whether the minor returned for the follow-up appointment that is required to be scheduled "approximately seven to 14 days" after the medication abortion (*id.* § 90-21.83B(b)) and, if the minor did not return, what

reasonable efforts the physician made to encourage them to do so. *Id.* § 90-21.93(b)(8) & (9).

39.     The Act was ratified by the General Assembly on May 4, 2023; vetoed by Governor Roy Cooper on May 16, 2023; and, upon legislative override of the veto, enacted on May 17, 2023. The provisions of the Act relevant to this action become effective July 1, 2023.

40.     A physician who violates any provision of the Act shall be subject to discipline by the North Carolina Medical Board, and any other licensed health care provider who violates any provision of the Act shall be subject to discipline under their respective licensing agency or board. *Id.* § 90-21.88A.

41.     Moreover, certain provisions of the Act carry criminal penalties. For example, relevant to the instant action, providing an abortion that does not fit within the Act's exceptions to the twelve-week ban is a felony. *Id.* § 90-21.81B (providing that, "[n]otwithstanding any of the provisions of G.S. 14-44 and G.S. 14-45, and subject to the provisions of this Article, it shall not be unlawful" to provide an abortion when the exceptions apply). Sections 14-44 and 14-45 of the General Statutes of North Carolina provide, *inter alia*, that prescribing medicine or employing any instrument with the intent to destroy a pregnancy is a Class G or Class I felony. By cross-referencing these provisions, the Act imposes criminal penalties for violating the twelve-week ban.

13

## VI.    FACTUAL ALLEGATIONS

<u>Whether Lawful Abortion is an Exception to the Fetal Homicide Statute</u>

42.    The Act repeals section 14.45.1 of the General Statutes of North Carolina, which listed the conditions under which abortion was lawful.

43.    That repealed statute is a critical cross-reference in North Carolina's fetal homicide statutes, which make it a crime, punishable by life in prison without parole, to willfully cause the death of an "unborn child." *See* N.C. Gen. Stat. § 14-23.2. The fetal homicide statutes contain exceptions for lawful acts "pursuant to the provisions of G.S. 14-45.1," which are the conditions under which abortion is lawful. *See* N.C. Gen. Stat. § 14-23.7(1). Yet, under the Act, section 14-45.1 will no longer exist.

44.    Accordingly, the Act creates confusion about whether lawful abortion remains an exception to the fetal homicide statute.

<u>Whether the Act Bans Medication Abortion After the</u>
<u>Twelfth Week of Pregnancy or at Ten Weeks and Whether it Allows Early Medication</u>
<u>Abortion</u>

45.    The medication abortion regimen in the first trimester typically involves two medications: mifepristone and misoprostol. The first drug, mifepristone, is a progesterone antagonist, which means that it blocks the body's receptors for progesterone, a hormone required for the continuation of the pregnancy. The patient first takes the mifepristone and then, several hours or days later (usually 24 to 48 hours), takes the misoprostol. Misoprostol causes the uterus to contract and expel its contents, generally within hours. While mifepristone's FDA-approved label reflects its usage through 70 days of gestational age, it is safely used off-label at more advanced

14

gestations.[3] Plaintiffs currently provide this first-trimester medication abortion regimen through 77 days. It is also safely provided to patients who have a positive pregnancy test but who are too early in their pregnancies for an intrauterine pregnancy to appear on ultrasound.

46.     For some patients, medication abortion offers important advantages over procedural abortion. Some patients prefer medication abortion because it feels more "natural" to them to have their body expel the pregnancy rather than to have a provider use aspiration or instruments to empty the uterus. Some patients choose medication abortion because of fear or discomfort around a procedure involving aspiration or instruments. For example, victims of rape and people who have experienced sexual abuse, molestation, or other trauma may choose medication abortion to feel more in control of the experience and to avoid further trauma from having instruments placed in their vagina.

47.     Additionally, the logistics of a procedural abortion may be prohibitive for some patients. Some health care providers charge more for procedural abortions, meaning some patients must wait longer to get an abortion while they gather funds—if they can afford it at all. Some patients may not be able to find another person to drive them home from the procedure, which is required if a patient is sedated during a procedural abortion.

_____

[3] Am. Coll. of Obstetricians & Gynecologists, Medication Abortion Up to 70 Days of Gestation (Reaffirmed 2023), https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2020/10/medication-abortion-up-to-70-days-of-gestation.

Victims of intimate partner violence in particular may struggle to find such support, as telling their partner they are having an abortion could be dangerous.

48.     The risk of serious complications related to abortion is extremely low, including the first-trimester medication abortion regimen. According to the FDA, serious adverse events (including death, hospitalization, serious infection, and bleeding requiring transfusion) among mifepristone patients are "exceedingly rare, generally far below 0.1% for any individual adverse event."[4]

49.     The Act is internally inconsistent as to when medication abortion is prohibited. On the one hand, it provides that abortion is not unlawful if it is performed "during the first 12 weeks of a woman's pregnancy *when a medical abortion is procured*." S.B. 20 § 90-21.81B(2) (emphasis added). On the other hand, section 90-21.83B(a)(6), (7) of the Act requires a physician providing a medication abortion to "[v]erify that the probable gestational age of the unborn child is no more than 70 days" or ten weeks and to "[d]ocument in the woman's medical chart the . . . intrauterine location of the pregnancy," before "prescribing, administering, or dispensing an abortion-inducing drug."

50.     Statements made by legislators during the Act's passage support the interpretation that medication abortion is permitted through the twelfth week of pregnancy. Senator Phil Berger, President Pro Tempore of the Senate and a supporter of

---

[4] U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Rsch., *Medical Review, Application No. 020687Orig1s020* at 47 (Mar. 29, 2016), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020MedR.pdf.

the Act,[5] put out a press statement addressing this point directly, describing as "FICTION" the claim that "Senate Bill 20 would ban medical abortion after ten weeks," and answering it with the "FACT" that the "Bill language clearly states that surgical and medical abortions are legal through the first twelve weeks. . . . Senate Bill 20 requires doctors to verify the gestational age of the baby for medical abortions, but it does not prohibit physicians from prescribing abortion-inducing drugs off-label, as long as it is during the first twelve weeks of a woman's pregnancy."[6]

51.     Similarly, during a hearing about the Act, Senator Amy Galey, a champion of the Act,[7] explained that "FDA approval for the abortion pill is limited to the first ten weeks. This bill allows off label use for an additional two weeks."[8] Legislators advocating for the Act were clear that they did not intend for Act to ban medication abortion before the twelfth week of pregnancy.

---

[5] Senator Berger Press Shop, *Statement on Veto of Pro-Life Legislation*, Medium, May 13, 2023, https://bergerpress.medium.com/statement-on-veto-of-pro-life-legislation-f8945b413d78.

[6] Senator Berger Press Shop, *FACT vs. FICTION: "Care for Women, Children, and Families Act"*, Medium, May 12, 2023, https://bergerpress.medium.com/fact-vs-fiction-care-for-women-children-and-families-act-a6f50532fed2.

[7] Senator Berger Press Shop, *Joint Statement on Successful Veto Override of the Care for Women, Children, and Families Act*, Medium, May 16, 2023, https://bergerpress.medium.com/joint-statement-on-successful-veto-override-of-the-care-for-women-children-and-families-act-42b47feac20e.

[8] *Reconsideration of Vetoed Bill: Hearing on S.B. 20 Before the S.*, 2023-24 Leg., 156th Sess. (May 16, 2023).

17

<u>Unconstitutional Hospitalization Requirement for Surgical Abortions After the
Twelfth Week for Rape and Incest Survivors</u>

52.     The Act requires surgical or procedural abortions after the twelfth week of pregnancy to be provided in a hospital. Plaintiff PPSAT would provide abortions after the twelfth week of pregnancy under the rape and incest exception but for this prohibition.

53.     It is irrational to require one of the safest outpatient medical procedures in the United States to be performed in a hospital, particularly for patients who have already suffered trauma.

54.     Although certain outpatient abortion methods (e.g., aspiration abortion) are sometimes referred to as "surgical abortion," that is a misnomer, as they do not entail the typical characteristics of surgery, such as an incision into bodily structures. According to the American College of Obstetricians and Gynecologists, the leading professional organization for obstetrician-gynecologists, these methods are more appropriately characterized as a procedure, which is defined as a "short interventional technique that includes the following general categories . . . non-incisional diagnostic or therapeutic intervention through a natural body cavity or orifice" and is "generally associated with lower risk of complications."[9]

55.     The Act singles out procedural abortion, which is analogous to other gynecological procedures that also take place in outpatient settings in terms of risks,

_____

[9] Am. Coll. of Obstetricians & Gynecologists, Definition of "Procedures" Related to Obstetrics and Gynecology (Reaffirmed Mar. 2023), https://www.acog.org/clinical-information/policy-and-position-statements/position-statements/2018/definition-of-procedures-related-to-obstetrics-and-gynecology.

invasiveness, instrumentation, and duration. In addition to being identical to the procedure used to manage miscarriage, procedural abortions are also identical to certain outpatient diagnostic procedures that are used to remove tissue from the uterus for testing (though different levels of sedation may be used). There is no rational basis for mandating that procedural abortions be provided in hospitals while continuing to allow identical or nearly identical procedures to take place in outpatient settings.

56. Procedural abortion is far safer than, for example, colonoscopies, and has been provided in an outpatient setting in North Carolina for decades.[10]

57. Serious complications—that is, complications requiring hospitalization, surgery, or blood transfusion—from abortion care are exceedingly rare, occurring in fewer than 1% of abortions.[11]

58. The mortality risk for abortion is lower than that of many other common procedures that are not required to be performed in a hospital. For example, one recent and robust analysis found that in the United States, the mortality rate for colonoscopy is 2.9 per 100,000 procedures; the mortality rate for tonsillectomy ranges from 2.9 to 6.3 per 100,000 procedures; and the mortality rate for plastic surgery is 0.8 to 1.7 per 100,000 procedures. By contrast, the mortality rate for legal induced abortion is only 0.7

---

[10] Elizabeth G. Raymond et al., *Mortality of Induced Abortion, Other Outpatient Surgical Procedures and Common Activities in the United States*, 90 Contraception 476 (2014).
[11] Ushma D. Upadhyay et al., *Incidence of Emergency Department Visits and Complications After Abortion,* 125 Obstetrics & Gynecology 175, 181 (2015).

per 100,000 procedures.[12]

59.     Abortion is far safer than continuing a pregnancy to term and childbirth. Indeed, the mortality rate for childbirth is approximately 14 times greater than that associated with abortion.[13] Complications related to carrying a pregnancy to term and childbirth also are much more common than abortion-related complications.[14]

60.     In the exceedingly rare event of a complication requiring hospital-based care, established policies and protocols ensure the patient's care is safely transferred to a hospital-based provider. These are the same policies and protocols that are followed for comparable outpatient gynecological or other procedures, as well as for those that carry greater risks.

61.     Given the extraordinary safety profile of procedural abortions in the outpatient setting, it is unsurprising that courts have repeatedly found that there is no medical basis for requiring procedural abortions be performed in hospitals. *See, e.g.*, *Doe v. Bolton*, 410 U.S. 179, 193–95 (1973); *City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 433–34 (1983); *Planned Parenthood Ass'n of Kan. City v. Ashcroft*, 462 U.S. 476, 481–82 (1983).

---

[12] Nat'l Acads. of Scis., Eng'g, & Med., *The Safety and Quality of Abortion Care in the United States*, 74–75 (2018).
[13] Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215, 215 (2012).
[14] *Id.*

20

<u>The Unconstitutional Changes to Informed Consent and Waiting Period Provisions</u>[15]

62.     The Act is also internally inconsistent as to whether a provider must restart the 72-hour waiting period if certain information is not available at the time of the initial state-mandated visit. In some places the Act explicitly says, for example, that if the doctor's name is not known at the time of first counseling session that starts the 72-hour clock, the clock does not reset once that information is provided to the patient. *See* S.B. 20 §§ 90-21.82(b)(1a) & (b)(1a)(a); 90-21.83A(b)(2) & (b)(2)(a). But another section of the Act requires the physician's name to be provided to the patient 72 hours before the abortion and is silent on whether the 72-hour period must be restarted if the name of the physician changes or whether the waiting period cannot start at all if the physician's name is not known 72 hours in advance. *Id.* § 90-21.83C.

63.     Given Plaintiffs' busy medical practices as well as the complexity of their patients' lives, the doctor who is scheduled to perform the abortion sometimes changes between the first visit, when patients receive the state-mandated information, and the abortion, including when a doctor has an urgent matter with another patient at another facility, when a doctor or patient is ill, or when a patient is unable to get off of work or find childcare to attend their appointment as initially scheduled.

---

[15] The informed consent provisions contain other inconsistencies that are nearly identical to those litigated before and ultimately construed by the district court in *Stuart v. Loomis*, 992 F. Supp. 2d at 611, and, therefore, PPSAT has made a motion pursuant to Federal Rule of Civil Procedure 60(b) to amend the judgment in that case to address those provisions.

Case 1:23-cv-00480-CCE-LPA   Document 1   Filed 06/16/23   Page 21 of 32

64. Forcing patients to wait another 72 hours in these circumstances will unnecessarily delay the abortion, pushing the patient further into their pregnancy and possibly beyond the gestational limits for a lawful abortion. It will also impose unnecessary burdens on the patient, who would be forced to reschedule their appointment and rearrange time off from work, childcare, and/or transportation.

65. Furthermore, section 90-21.83C, which requires certain information to be provided to the patient 72 hours prior to the abortion, does not explicitly incorporate the medical emergency exception in the other 72-hour informed consent in sections 90-21.82(b) and 90-21.83A(b). It is therefore unclear whether a physician can forgo giving a patient the information outlined in section 90-21.83C in a medical emergency.

66. If there is no medical emergency exception to the 72-hour waiting period in section 90-21.83C, this provision would be irrational, and could put patients at risk of gratuitous suffering, severe injury, and death. There is no justification for risking a patient's health and life simply because the patient was not provided information such as the physician's name or the location of the hospital where they have admitting privileges 72 hours earlier.

67. Additionally, section 90-21.83C requires a physician to inform a patient 72 hours prior to an abortion "whether the treatment or procedure to be performed is covered by the pregnant woman's insurance." In many circumstances, this is impossible to comply with because many insurance companies do not determine whether they will cover an abortion until after it is performed. Others may deny coverage weeks after the abortion for myriad reasons.

22

Impossibility of Compliance with Reporting for Minors

68.    The Act requires health care providers to submit a report after every abortion to the Department of Health. This "report shall be transmitted to the Department within 15 days after either the (i) date of the follow-up appointment following a medical abortion, (ii) date of the last patient encounter for treatment directly related to a surgical abortion, or (iii) end of the month in which the last scheduled appointment occurred, whichever is later." *Id.* § 90-21.93(a). The Act also provides that a "report completed under this section for a minor shall be sent to the Department and the Division of Social Services within three days of the surgical or medical abortion." *Id.* But the Act requires that the "completed" report include information that cannot possibly be known within three days, including whether the minor returned for the follow-up appointment that is required to be scheduled "approximately seven to 14 days" after the medication abortion (*id.* § 90-21.83B(b)) and, if the minor did not return, what reasonable efforts the physician made to encourage them to do so. *Id.* § 90-21.93(b)(8) & (9). It is impossible to send a "completed" report to the Department of Health and the Division of Social Services three days after the abortion that includes information about whether the patient attended their scheduled follow-up appointment seven to fourteen days after their abortion. Similarly, the report must include the amount of money billed to cover treatment for complications, *id.* § 90-21.93(b)(11), which may not arise within three days.

23

<u>Whether the Act Prohibits Helping People Access Out-of-State Abortion Providers</u>

69.     The Act says: "It shall be unlawful after the twelfth week of a woman's pregnancy to advise, procure, or cause a miscarriage or abortion" except under the Act's exceptions. S.B. 20 §§ 90-21.81A(a); 90-21.81B.

70.     It is unclear whether this provision of the Act is intended to bar helping people access lawful abortion outside of North Carolina; if it is interpreted in this manner, it would violate the First Amendment.

<u>The Act's Impact on Patients' Care</u>

71.     The Act's profound inconsistencies and irrationalities will harm patient care in various ways. For example, if the Act is read to limit medication abortion at ten weeks instead of through the twelfth week of pregnancy, many patients will be prohibited from having a medication abortion. This includes people for whom medication abortion has significant advantages, including those who are a pregnant as a result of rape and would rather avoid the insertion of instruments into their vagina, as discussed above.

72.     The Act will also harm people who are pregnant as a result of rape or incest by limiting their abortion care to a hospital after twelve weeks of pregnancy. The medically unnecessary ban on outpatient clinics providing abortions to rape and incest survivors after twelve weeks not only will limit the availability of safe abortion care, but will also likely dramatically increase the cost of the procedure, as hospital-based care is usually far more expensive than the care provided by outpatient clinics. It will also reduce survivors' ability to access care, as there are a limited number of hospital-based

24

providers that will offer abortion care to rape and incest survivors, forcing patients to travel further distances.

73. Moreover, some rape and incest survivors will present to outpatient clinics for the state-mandated informed consent visit with a gestational age greater than twelve weeks, either because they are unaware of the hospitalization requirement or because they do not know their gestational age. Under the Act, such a patient would have to be referred to a hospital provider despite the clinic being able to safely provide the care, forcing the patient who has already experienced trauma to present to and share their story with another provider. And, if the hospital-based provider will not accept the state-mandated informed consent visit from the clinic (or if they cannot due the clinic not having been able to provide the name of the physician or the insurance information required by section 90-21.83C), it would force the patient to undergo the process again, restarting the 72-hour waiting period. There is no reason to impose these additional burdens on patients who have already experienced trauma.

74. The Act will jeopardize the health and lives of patients in emergencies if there is no exception to the 72-hour waiting period informed consent provision in section 90-21.83C. Time is of the essence in emergencies, and physicians should not have to wait 72 hours while their patients' health deteriorates and suffering and risk of irreversible bodily harm or death increases.

75. The Act will also put providers in the impossible position of having to choose between trying to provide care under the Act's confusing and inconsistent requirements, such as the impossible reporting requirements and the uncertainty about

25

when the 72-hour clock can be reset, discussed above, or denying that care in order to avoid disciplinary penalties (or, even worse, due to the lack of clarity as to whether the criminal fetal homicide statute has a lawful abortion exception).

76.     The Act will also chill health care providers and others from helping patients access legal abortion care in other states given its ban on "advis[ing], procur[ing] or caus[ing]" an abortion after twelve weeks in pregnancy.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### DUE PROCESS—VAGUENESS

77.     The allegations of paragraphs 1 through 76 are incorporated as though fully set forth herein.

78.     The following sections of the Act violate Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution because they fail to give Plaintiffs fair notice of the requirements of the Act and encourage arbitrary and discriminatory enforcement: the statute as a whole for failing to make clear whether there is an exception to North Carolina's fetal homicide statute for lawful abortion, N.C. Gen. Stat. § 14-23.2; sections 90-21.81B(2) and 90-21.83B(a)(6) (whether medication abortion is prohibited at ten weeks or is permitted through the twelfth week); section 90-21.83(B)(a)(7) (whether medication abortion can be provide if intrauterine pregnancy cannot be located on ultrasound); section 90-21.83C (whether the 72-hour clock must reset if the doctor's name is not known at the first state-mandated visit); section 90-21.83C (whether there is a medical emergency exception to the 72-hour waiting period);

26

and sections 90-21.81A and 90-21.81B (whether the Act prohibits people from helping patients obtain abortion in states where it is lawful).

## SECOND CLAIM FOR RELIEF
## FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION
## DUE PROCESS—IMPOSSIBILITY OF COMPLIANCE

79.     The allegations of paragraphs 1 through 78 are incorporated as though fully set forth herein.

80.     The following sections of the Act violate Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution because they are impossible to comply with: the reporting requirements for minors in section 90-21.93(a); the requirement to inform the patient about whether the abortion is covered by her insurance in section 90-21.83C.

## THIRD CLAIM FOR RELIEF
## FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION
## DUE PROCESS AND EQUAL PROTECTION

81.     The allegations of paragraphs 1 through 80 are incorporated as though fully set forth herein.

82.     Sections of the Act violate Plaintiffs' and their patients' due process and equal protection rights because they will prevent Plaintiffs from providing and patients from accessing care in a manner that is not rationally related to any legitimate state interest. This includes the hospitalization requirement for survivors of rape and incest after the twelfth week of pregnancy contained in sections 90-21.81B(3) and 90-21.82A, the possible ban on early medication after 70 days in section 90-21.83(B)(a)(6), the possible ban on early medication abortion if intrauterine pregnancy cannot be

27

documented in section 90-21.83(B)(a)(7), and the seeming lack of a medical emergency exception to the 72-hour waiting period in section 90-21.83C.

83.     Moreover, requiring hospitalization for abortion in the case of rape or incest after the twelfth week of pregnancy violates the Equal Protection Clause because it singles out that one treatment, abortion, while allowing others, including the treatment of miscarriage at the same gestational age, to be provided in an outpatient setting without serving any legitimate state interest.

## FOURTH CLAIM FOR RELIEF
## DUE PROCESS VIOLATION OF FUNDAMENTAL RIGHT TO BODILY INTEGRITY AND AGAINST ARBITRARY INFLICTION OF SUFFERING AND DEATH

84.     The allegations of paragraphs 1 through 83 are incorporated as though fully set forth herein.

85.     If there is not a medical emergency exception to section 90-21.83C, Plaintiffs' patients' substantive due process rights to life, to be free of arbitrarily inflicted suffering, and to bodily integrity are violated. A law that would force health care providers to withhold otherwise lawful emergency care from a seriously ill and/or dying patient solely for the purposes of complying with section 90-21.83C's 72-hour waiting period would shock the conscience.

## FIFTH CLAIM FOR RELIEF
## FIRST AMENDMENT

86.     The allegations of paragraphs 1 through 85 are incorporated as though fully set forth herein.

28

87.    If section 90-21.81A(a)'s ban on "advis[ing], procur[ing] or caus[ing]" an abortion after the twelfth week of pregnancy reaches lawful abortion in other states, it violates Plaintiffs' First Amendment rights, as applied to the States through the Fourteenth Amendment to the U.S. Constitution.

## REQUESTED RELIEF

Plaintiffs respectfully request that this Court:

1. Issue a declaratory judgment that the Act and/or the challenged provisions of the Act is unconstitutional and unenforceable;

2. Issue preliminary and permanent injunctive relief, without security, restraining Defendants, their employees, agents, and successors in office from enforcing the Act and/or challenged provisions of the Act;

3. Grant Plaintiffs attorneys' fees, costs and expenses pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1920; and/or

4. Grant such other and further relief as this Court may deem just, proper, and equitable.

Dated: June 16, 2023

Respectfully submitted,

*s/ Jaclyn Maffetore*
_____
Kristi Graunke
NC Bar # 51216
Jaclyn Maffetore
NC Bar # 50849
American Civil Liberties Union
of North Carolina Legal Foundation
P.O. Box 28004
Raleigh, NC 27611
Tel.: (919) 834-3466
kgraunke@acluofnc.org
jmaffetore@acluofnc.org

COUNSEL FOR ALL PLAINTIFFS

Peter Im*
Helene T. Krasnoff*
Planned Parenthood Fed. of America
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
Tel.: (202) 973-4800
peter.im@ppfa.org
helene.krasnoff@ppfa.org

COUNSEL FOR PLANNED
PARENTHOOD SOUTH ATLANTIC

Brigitte Amiri*
Lindsey Kaley*
Ryan Mendias*
American Civil Liberties Union
Foundation
125 Broad Street, 18th Fl.
New York, NY 10004
Tel: 212-549-2633
bamiri@aclu.org
lkaley@aclu.org
rmendias@aclu.org

COUNSEL FOR BEVERLY GRAY, M.D.

*Special appearance to be filed

## DECLARATION

I declare under penalty of perjury that the statements contained in the Complaint pertaining to Planned Parenthood South Atlantic are true and accurate to the best of my knowledge and belief.

Paige Johnson

## **DECLARATION**

I declare under penalty of perjury that the statements contained in the Complaint except those that pertain to Planned Parenthood South Atlantic are true and accurate to the best of my knowledge and belief.

_____
Beverly A. Gray