# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PLANNED PARENTHOOD SOUTH ATLANTIC, *et al.*,

             Plaintiffs,

v.

JOSHUA STEIN, *et al.*,

             Defendants.

CIVIL ACTION
Case No. 1:23-cv-480

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## INTRODUCTION

The North Carolina legislature radically rewrote the state's abortion restrictions over the span of mere days, resulting in a law that is riddled with inconsistencies, irrational requirements, and unconstitutional restrictions. Parts I and II of North Carolina Session Law 2023-14 ("S.B. 20" or "the Act"), DE 1-1, bans abortion after the twelfth week of pregnancy with a few narrow exceptions, makes existing restrictions on abortion more onerous, and adds new, burdensome restrictions. Plaintiff Planned Parenthood South Atlantic ("PPSAT") and Plaintiff Beverly Gray, M.D., (together, "Plaintiffs") seek a temporary restraining order and preliminary injunction against the Act. Plaintiffs are likely to succeed on the merits of their claims that the Act violates the First and Fourteenth Amendments to the U.S. Constitution because the challenged provisions either impose

1

vague standards on Plaintiffs, are impossible to comply with, are irrational, or violate the Plaintiffs' free speech rights. The provisions of the Act that go into effect on July 1, 2023, should be enjoined in their entirety because Plaintiffs' claims either reach the constitutionality of the Act as whole, or would require enjoining unconstitutional provisions that are so thoroughly intertwined with the core purpose of the Act, that their omission would leave a statute unlike what the legislature intended to be enforced on its own.

If not enjoined before it goes into effect, the Act will impose irreparable harm to Plaintiffs and their patients. Plaintiffs' patients will be subject to unnecessary delays and additional burdens in accessing care, in some cases, denying that care entirely. The Act exposes Plaintiffs to potential criminal liability and disciplinary action, and chills their free speech rights. The other preliminary injunction factors—the balance of equities and public interest—likewise weigh heavily in favor of injunctive relief. For the foregoing reasons, this Court should enjoin Parts I and II of North Carolina Session Law 2023-14 that go into effect on July 1, 2023.[1]

## STATEMENT OF FACTS

### I.  Abortion Is Common, Safe, and Essential Health Care.

Abortion is a basic component of comprehensive health care and is one of the safest medical procedures in the United States. There are two main methods of outpatient

---

[1] It is unclear whether section 90-21.82A takes effect on July 1, 2023, or October 1, 2023. If this provision does not take effect until October 1, 2023, Plaintiffs move only for a preliminary injunction and not a temporary restraining order on this provision.

2

abortion: procedural and medication. Although certain abortion methods (e,g., aspiration abortion) are sometimes referred to as "surgical abortion," and are referred to as such in the Act, that is a misnomer, as they do not entail the typical characteristics of surgery, such as an incision into bodily structures. Farris Decl. ¶ 15, attached as Exhibit 1; Compl. ¶ 54, DE 1. These methods are more appropriately characterized as a procedure, or "procedural abortion."[2] Procedural abortion is analogous to other gynecological procedures that take place in outpatient settings in terms of risks, invasiveness, and duration. Farris Decl. ¶¶ 22, 37; Compl. ¶ 55. In addition to being identical to the procedure used to manage miscarriage, procedural abortions are also identical to certain outpatient diagnostic procedures that are used to remove tissue from the uterus for testing. Farris Decl. ¶¶ 22, 37; Compl. ¶ 55. Procedural abortion is far safer than, for example, colonoscopies, and has been provided in an outpatient setting in North Carolina for decades.[3]

The medication abortion regimen in the first trimester typically involves two medications: mifepristone and misoprostol. Farris Decl. ¶ 17; Compl. ¶ 45. The patient first takes the mifepristone and then, several hours or days later (usually 24 to 48 hours), takes the misoprostol. Farris Decl. ¶ 17; Compl. ¶ 45. Mifepristone can be provided pursuant to an evidence-based regimen as soon as pregnancy is detected, and although mifepristone's

---

[2] Am. Coll. of Obstetricians & Gynecologists, Definition of "Procedures" Related to Obstetrics and Gynecology (reaffirmed Mar. 2023), https://www.acog.org/clinical-information/policy-and-position-statements/position-statements/2018/definition-of-procedures-related-to-obstetrics-and-gynecology.

[3] Elizabeth G. Raymond et al., *Mortality of Induced Abortion, Other Outpatient Surgical Procedures and Common Activities in the United States*, 90 Contraception 476 (2014); Farris Decl. ¶¶ 29, 37.

3

FDA-approved label reflects its usage through 70 days of gestational age, it is safely used off-label at more advanced gestations. Farris Decl. ¶ 41.[4]

Medication abortion and procedural abortion can both be safely provided in an outpatient setting. Farris Decl. ¶¶ 14–15, 32–40; Compl. ¶¶ 55–58. Only 3% of abortions nationwide are performed in hospitals, and abortions at outpatient clinics are often more affordable, easier to navigate, and require less time for patients. Farris Decl. ¶ 32. There is no medical reason to require abortions to take place in hospitals. *Id*. To the contrary, as is true for nearly every medical procedure, fewer complications are seen in settings that perform higher volumes of the same procedure, making abortion clinics like PPSAT safer than hospitals for most abortion patients. *Id.* ¶ 34. Further, in the rare event that a complication arises during a procedural abortion, the complication can nearly always be managed in a clinic. *Id.* ¶ 38. And in the exceedingly rare event of a complication requiring hospital-based care, established policies and protocols ensure the patient's care is safely transferred to a hospital-based provider. *Id.* ¶ 40; Compl. ¶ 60. These are the same policies and protocols that are followed for comparable outpatient gynecological or other procedures, as well as for those that carry greater risks. Compl. ¶ 60.

Abortion is far safer than continuing a pregnancy to term and childbirth. Indeed, the mortality rate for childbirth is approximately 12–14 times greater than that associated with

---

[4] Am. Coll. of Obstetricians & Gynecologists, Medication Abortion Up to 70 Days of Gestation (Reaffirmed 2023), https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2020/10/medication-abortion-up-to-70-days-of-gestation; Farris Decl. ¶ 18.

abortion. Farris Decl. ¶¶ 28–30. For medication abortion in particular, adverse events (including death, hospitalization, serious infection, and bleeding requiring transfusion) among mifepristone patients are "exceedingly rare, generally far below 0.1% for any individual adverse event."[5] Complications related to carrying a pregnancy to term and childbirth are much more common than abortion-related complications. Farris Decl. ¶¶ 30–31; Compl. ¶ 59.

## II. The Legislature Rushed to Enact S.B. 20, Resulting in Contradictory, Irrational, and Unconstitutional Restrictions on Abortion Care.

Prior to the Act, abortion was broadly lawful in North Carolina before 20 weeks of pregnancy. N.C. Gen. Stat. § 90-21.82 (2015). Patients seeking abortion were required to obtain certain state-mandated information from a "qualified professional" 72 hours in advance of the procedure, which could be given either in person or by telephone, and providers were subject to certain reporting requirements. *Id.*

S.B. 20 was passed with breathtaking speed and radically changes North Carolina's abortion restrictions in numerous ways: banning abortion after twelve weeks of pregnancy with a few narrow exceptions, making the mandated counseling requirement more onerous and requiring that it be done in person, and imposing much more burdensome reporting requirements. The Act was negotiated by politicians behind closed doors and passed in less than 72 hours with almost no time for public input or debate. Compl. ¶ 2.

---

[5] U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Rsch., Medical Review, Application No. 020687Orig1s020, at 47 (Mar. 29, 2016), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020MedR.pdf; *accord* Farris Decl. ¶ 28.

5

The Act provides: "It shall be unlawful after the twelfth week of a woman's pregnancy to advise, procure, or cause a miscarriage or abortion." S.B. 20 § 90-21.81A (the "Twelve-Week Ban").[6] After twelve weeks, there are limited exceptions, which include: a) when a physician determines there is a medical emergency, *id.* § 90-21.81B(1); b) through the twentieth week of pregnancy, when the pregnancy is a result of rape or incest, *id.* § 90-21.81B(3); and c) during the first twenty-four weeks of pregnancy if a qualified physician determines there exists a life-limiting anomaly, *id.* § 90-21.81B(4).

The Act contains numerous inconsistencies, internal conflicts, and irrationalities in the Twelve-Week Ban itself. Notably, the Act repeals N.C. Gen. Stat. § 14.45.1, which listed the conditions under which abortion was lawful and was a critical cross-reference in North Carolina's fetal homicide statute, which makes it a crime, punishable by life in prison, to willfully cause the death of an "unborn child." N.C. Gen. Stat. § 14-23.2 (2011). Accordingly, the Act creates confusion about whether lawful abortion remains exempted from the fetal homicide statute.

A physician providing an abortion-inducing drug[7] must follow a host of restrictions, including some that are contradictory. In one section, the Act states that abortion is lawful "during the first 12 weeks of a woman's pregnancy when a medical abortion is procured,"

---

[6] All citations to the Act herein refer to the sections that are to be codified in the General Statutes of North Carolina on the Act's effective date.

[7] The Act defines "Abortion-inducing drug" as "A medicine, drug, or any other substance prescribed or dispensed with the intent of terminating the clinically diagnosable pregnancy of a woman . . . . This includes the off-label use of drugs such as mifepristone (Mifeprex), misoprostol (Cytotec), and methotrexate." S.B. 20 § 90-21.81(1a).

6

S.B. 20 § 90-21.81B(2), but in another section, it requires physicians who provide medication abortion to "verify the probable gestational age of the unborn child is no more than 70 days," or ten weeks, *id.* § 90-21.83B(a)(6) (the "Ten-Week Verification Requirement"). Compl. ¶ 49. The Act similarly requires physicians to "[d]ocument in the woman's medical chart the . . . intrauterine location of the pregnancy," S.B. 20 § 90-21.83B(a)(7) (the "Pregnancy Location Requirement"), but it is unclear whether physicians can provide early medication abortion when a patient has a positive pregnancy test but it is too soon to view the location of an intrauterine pregnancy.

And although the Act provides an exception to the Twelve-Week Ban in cases of rape or incest, it limits the provision of those procedures to hospitals. *Id.* §§ 90-21.81B(3), 90-21.82A(c) (the "Hospitalization Requirement"). This irrational limitation on one of the safest medical procedures will further harm survivors of sexual assault without increasing abortion safety.

The Act also creates a host of new requirements for health care providers both before and after an abortion. Under the Act, patients must make an in-person visit to receive certain state-mandated information at least 72 hours before an abortion, but the Act is internally inconsistent about whether that waiting period restarts if certain information is not available 72 hours before the abortion. *Compare* S.B. 20 §§ 90-21.82(b)(1a) & (a), 90-21.83A(b)(2) & (a) *with* § 90-21.83C (the "Additional 72-Hour Mandate"). The Additional 72-Hour Mandate does not explicitly incorporate the medical emergency exception included in the other 72-hour waiting period sections, *see id.* §§ 90-21.82(b), 90-21.83A(b),

7

suggesting that providers must wait 72 hours after providing the information required by the section, even when there is a medical emergency.[8] The Additional 72-Hour Mandate also requires the provider to give information that in many circumstances will be impossible to know 72 hours in advance of the abortion, such as whether the abortion is covered by insurance.

The Act also changes the reporting requirements in ways that make compliance impossible. For example, it states that a "report *completed* under this section for a minor shall be sent to the Department and the Division of Social Services *within three days* of the surgical or medical abortion." *Id.* § 90-21.93(a) (emphasis added) (the "Reporting Requirement"). But the Act requires information to be included in the report that will not be known within three days, Compl. ¶¶ 38, 68, including whether a minor who had a medication abortion returned for the scheduled follow-up appointment fourteen days later (S.B. 20 § 90-21.83A(b)(4)(*l.*)), and if the minor did not return, what reasonable efforts were made to encourage them to do so, *id.* § 90-21.93(b)(8) & (9). Similarly, the report must contain the amount of money billed for treatment of complications, *id.* § 90-21.93(b)(11), but complications may not arise in three days, Compl. ¶ 68.

Finally, if a person seeking an abortion is past twelve weeks in pregnancy and does not meet one of the narrow exceptions, the Act is not clear as to whether people can assist

---

[8] The informed consent provisions contain other inconsistencies that are nearly identical to those litigated before and construed by the district court in *Stuart v. Loomis*, 992 F. Supp. 2d 585, 611 (M.D. N.C. 2014), and, therefore, PPSAT has made a motion pursuant to Federal Rule of Civil Procedure 60(b) to amend the judgment in that case to address those provisions.

these individuals in seeking lawful abortion in other states. The Act states that "[i]t shall be unlawful after the twelfth week of a woman's pregnancy to advise, procure, or cause a miscarriage or abortion." S.B. 20 § 90-21.81A(a) (the "Advising Ban"). It is not clear if this applies to, for example, providing information about how to obtain legal, out-of-state abortions.

A physician who violates the Act is subject to discipline by the North Carolina Medical Board, and any other licensed health care provider who violates the Act is subject to discipline under their respective licensing agency or board. *Id.* § 90-21.88A. Moreover, certain provisions of the Act carry criminal penalties. Relevant here, providing an abortion that does not fit within the Act's exceptions to the Twelve-Week Ban is a felony. *Id.* § 90-21.81B; *see also id.* §§ 14-44 and 14-45.

## III. The Act's Restrictions Inflict Irreparable Harm on Plaintiffs and Their Patients.

Due to inconsistent, vague, and impossible-to comply-with provisions, the Act will harm Plaintiffs and their patients by delaying—and even, at times, denying them—necessary health care. For example, under the Additional 72-Hour Mandate, the patient must be provided with the physician's name and hospital admitting privileges and told whether the abortion is covered by the patient's insurance. S.B. 20 § 90-21.83C. But given Plaintiffs' busy medical practices as well as the complexity of their patients' lives, the name of the doctor sometimes changes in the 72 hours before the abortion, including when a doctor has an urgent matter with another patient at another facility, when a doctor or patient is ill, or when a patient is unable to attend their appointment as initially scheduled.

9

Compl. ¶ 63. Additionally, it is often impossible to tell the patient whether an abortion will be covered by insurance because many insurance companies do not determine coverage until after the abortion. *Id.* ¶ 67. Others may deny coverage weeks after the fact for myriad reasons. *Id.*

The Act is inconsistent as to whether the 72-hour period must be restarted if the name of the physician changes or whether the waiting period cannot start at all if the physician's name is not known 72 hours in advance, and is silent as to how to proceed if insurance coverage information is unknown. Forcing patients to wait another 72 hours in these circumstances will push the patient further into their pregnancy and possibly beyond the new 12-week limit. Compl. ¶ 64. Patients would be forced to reschedule their appointment and rearrange time off from work, childcare, and/or transportation. *Id.* Relatedly, to the extent that the Additional 72-Hour Mandate compels physicians to withhold life- or health-saving abortion care to a patient because the patient was not provided with, *e.g.*, information about the physician's hospital admitting privileges 72 hours earlier, it subjects patients to gratuitous suffering, severe injury, or even death. *Id.* ¶ 66.

The Act's inconsistencies as to when medication abortion is permitted will also harm patients if they are prohibited from accessing medication abortion either before an intrauterine pregnancy can be seen on ultrasound or between ten and twelve weeks of pregnancy. For some patients, medication abortion offers important advantages over procedural abortion. Compl. ¶¶ 46–47. For example, victims of rape and people who have

10

experienced sexual abuse, molestation, or other trauma may choose medication abortion to feel more in control of the experience and avoid further trauma from having instruments placed in their vagina. *Id.* ¶ 46. Additionally, some health care providers charge more for procedural abortions. *Id.* ¶ 47. And some patients, especially victims of intimate partner violence, may struggle to find necessary support, such as a ride home after a procedure involving sedation. *Id.*

The Hospitalization Requirement will also have devastating consequences for sexual violence survivors. Thousands of North Carolinians suffer sexual abuse each year and desperately need access to abortion. Farris Decl. ¶ 43. For many survivors of rape or incest, pregnancy can trigger flashbacks, dissociative episodes, and other symptoms of trauma. *Id.* The Hospitalization Requirement will limit the number of providers available to these survivors and will increase the cost of abortion, thereby hampering access to abortion. *Id.* ¶¶ 48–51. Further, survivors who present at an outpatient clinic after their twelfth week of pregnancy will be forced to go to a hospital, causing further delays, even though the outpatient clinic would be able to safely provide care. *Id.* ¶ 46.

## QUESTIONS PRESENTED

1.     Are Plaintiffs likely to prevail on their claims that the Act violates the constitutional rights of due process, equal protection, and speech?

2.     Will Plaintiffs and their patients suffer irreparable injury without preliminary injunctive relief?

3.     Does the injury to Plaintiffs and their patients outweigh any injury to Defendants?

11

4.    Is preliminary injunctive relief in the public interest?

## ARGUMENT

A temporary restraining order or preliminary injunction is warranted upon a showing that: "(1) the party is likely to succeed on the merits of the claim; (2) the party is likely to suffer irreparable harm in the absence of an injunction; (3) the balance of hardships weighs in the party's favor; and (4) the injunction serves the public interest." *HIAS, Inc. v. Trump*, 985 F.3d 309, 318 (4th Cir. 2021). To satisfy the first prong, Plaintiffs "need not establish a certainty of success," but only "a clear showing that they are likely to succeed at trial." *Roe v. U.S. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020) (cleaned up). Plaintiffs readily meet this test.

## I.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims That the Act Violates Plaintiffs' and Their Patients' Constitutional Rights.

Plaintiffs are likely to succeed on the merits of their claims. *First*, several of the Act's provisions are vague in violation of the Due Process Clause: a) the Act effectively repeals a cross-reference in the fetal homicide statute that exempts lawful abortions, b) the Ten-Week Verification Requirement contradicts the Act's primary provision permitting both surgical and medication abortion through twelve weeks of pregnancy, c) the Pregnancy Location Requirement is unclear as to whether physicians can provide medication abortion when a patient has a positive pregnancy test but an intrauterine pregnancy cannot yet be seen on an ultrasound, d) the Additional 72-Hour Mandate fails to incorporate a medical emergency exemption, and e) the Additional 72-Hour Mandate also creates confusion about whether the 72-hour period restarts if some of the required

12

disclosures are not available at the initial visit.

*Second*, two sections of the Act violate the Due Process Clause because they are impossible to comply with: a) the Additional 72-Hour Mandate requires disclosure of whether the abortion is covered by health insurance—information frequently unavailable before a treatment or procedure—and b) the Reporting Requirement mandates information on a deadline when that information is not yet available.

*Third*, the Advising Ban is unconstitutionally vague under the Due Process Clause, and, if interpreted to prohibit assisting people accessing lawful out-of-state abortion, it violates the First Amendment.

*Finally*, the Hospitalization Requirement and the Pregnancy Location Requirement are irrational in violation of the Due Process and Equal Protections Clauses because there is no rational basis for denying North Carolinians access to these evidence-based and safely performed procedures, including in outpatient facilities.

## A. The Act's Requirements Are Unconstitutionally Vague.

"To survive a vagueness challenge, a statute must give a person of ordinary intelligence adequate notice of what conduct is prohibited and must include sufficient standards to prevent arbitrary and discriminatory enforcement." *Manning v. Caldwell for Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019) (en banc); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (explaining that a law must provide "fair warning" by giving "[a] person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly"); *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212

(2018) (beyond guaranteeing "fair notice," the void-for-vagueness doctrine also "guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges"). The Act may be unconstitutionally vague under either theory: lack of notice or lack of standards. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Here, where several sections of the Act "fail[] to provide any standard of conduct by which persons can determine whether they are violating the statute," the Act is "unconstitutionally vague." *Manning*, 930 F.3d at 274.[9]

### 1. The application of the fetal homicide statute to lawful abortion is unconstitutionally vague.

North Carolina's fetal homicide statute makes it a crime, punishable by life in prison without parole, to willfully and maliciously cause the death of an unborn child. N.C. Gen. Stat. § 14-23.2. The statute currently exempts from the definition of fetal homicide "[a]cts which cause the death of an unborn child *if those acts were lawful*," N.C. Gen. Stat. § 14-

---

[9] "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). Although "[l]ess clarity is required in purely civil statutes . . . laws that nominally impose only civil consequences warrant a 'relatively strict test' for vagueness if the law is 'quasi-criminal' and has a stigmatizing effect." *Manning*, 930 F.3d at 272–73. Where, as here, some sections of the Act carry criminal penalties and others carry livelihood-threatening licensing penalties, a stricter standard of review is applied. *See id.*; *see also, e.g.*, *Little Rock Fam. Plan. Servs. v. Rutledge*, 398 F. Supp. 3d 330, 415 (E.D. Ark. 2019) (finding systemic harassment and stigma against abortion providers); *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1339 n.4, 1349–52 (M.D. Ala.) (same), *as corrected* (Oct. 24, 2014), *supplemented*, 33 F. Supp. 3d 1381 (M.D. Ala. 2014), and *amended*, No. 2:13CV405-MHT, 2014 WL 5426891 (M.D. Ala. Oct. 24, 2014).

23.7(1) (emphasis added), with a cross-reference to N.C. Gen. Stat. § 14-45.1. Section 14-45.1, in turn, lists the conditions under which abortion is lawful. The Act repeals Section 14-45.1 but fails to replace the fetal homicide statute's cross-reference to 14-45.1 with a reference to the Act. S.B. 20(I) § 1.1. Due to this drafting error, the fetal homicide statute will no longer include a reference to another law outlining when abortion is lawful and therefore exempted from the fetal homicide statute.

Once the repeal of Section 14-45.1 takes effect on July 1, Plaintiffs will lack notice as to whether the fetal homicide statute applies to lawful abortion care. *Fox*, 567 U.S. at 253. Further, the Act leaves prosecutors without "explicit standards" to evaluate the conduct of health care providers, risking "arbitrary and discriminatory" enforcement. *Grayned*, 408 U.S. at 108. Particularly where, as here, criminal penalties apply, "a stricter standard is applied in reviewing the statute for vagueness." *Manning*, 930 F.3d at 272–73; *see also id.* 276–77 (prohibiting "consign[ing] a person to the risk of significant penal consequences without first providing sufficiently definite notice of prohibited activities"). Accordingly, Plaintiffs are likely to succeed on the merits of their due process claim and are entitled to an injunction against the Act.

> **2.** *The Ten-Week Verification and Pregnancy Location Requirements are unconstitutionally vague.*

The Act fails to provide notice as to when medication abortion is lawful. First, in the principal section, the Act states that abortion is lawful "during the first 12 weeks of a woman's pregnancy when a medical abortion is procured." S.B. 20 § 90-21.81B(2). However, when outlining requirements for medication abortion, the Ten-Week

15

Verification Requirement mandates physicians "verify the probable gestational age of the unborn child is no more than 70 days," or ten weeks. *Id.* § 90-21.83B(a)(6). This provision suggests that medication abortion is not permitted after ten weeks, despite the general authorization of medication abortion for the first twelve weeks of pregnancy. Similarly, the Pregnancy Location Requirement requires physicians to "[d]ocument in the woman's medical chart the . . . intrauterine location of the pregnancy," *id.* § 90-21.83B(a)(7), even though medication abortion is safely provided when a patient has a positive pregnancy test but the pregnancy cannot yet be seen via ultrasound. Farris Decl. ¶ 41.

This is not a situation of "uncertainty about the normal meaning of the term at issue, but [is] rather about what specific conduct is covered by the statute and what is not," which is the core of a vagueness challenge. *Manning*, 930 F.3d at 274–75 (quoting *Lytle v. Doyle*, 326 F.3d 463, 469 (4th Cir. 2003)). By including two disparate standards, the Act "specifies no standard of conduct," giving Plaintiffs no notice as to whether they can provide early medication abortion and medication abortion between the tenth and twelfth weeks of pregnancy. *See id.* at 278. Further, the Act is vague, because these inconsistencies "invite[] the very type of arbitrary enforcement that the Constitution's prohibition against vague statutes is designed to prevent." *Id.* at 278.

Allowing medication abortion to be provided from a positive pregnancy test through the twelfth week of pregnancy is consistent with the structure and history of the Act. The Act is framed as permitting abortion through the twelfth week of pregnancy, with limited exceptions after that. S.B. 20 § 90-21.81B. Throughout the Act, restrictions on abortion

16

hinge on that twelve-week mark. *See, e.g.*, *id.* § 131E-153.1 (defining abortion clinic as "[a] freestanding facility . . . for the performance of abortions *during the first 12 weeks of pregnancy*" (emphasis added)); *id.* § 90-21.81A(a) ("It shall be unlawful *after the twelfth week of a woman's pregnancy* to advise, procure, or cause a miscarriage or abortion." (emphasis added)); *id.* § 90-21.81C(a), (b). Indeed, legislators supporting the Act confirmed their intent to permit medication abortion through twelve weeks. Compl. ¶¶ 50–51. Accordingly, Plaintiffs are likely to succeed on their claim that the Act violates their due process rights.

### 3. *The Additional 72-Hour Mandate is unconstitutionally vague.*

The Additional 72-Hour Mandate requires that, "at least 72 hours prior to any medical or surgical abortion," the patient be provided with "the physician's full name and specific information for the physician's hospital admitting privileges and whether the treatment or procedure to be performed is covered by the pregnant woman's insurance." S.B. 20 § 90-21.83C. But that section does not incorporate the medical emergency exemption to the 72-hour wait requirement found elsewhere in the Act, and it does not clarify that the waiting period does not restart if certain information is not available 72 hours in advance.

In contrast to the Additional 72-Hour Mandate's silence as to whether required disclosures can be waived in a medical emergency, the two sections of the Act specifically discussing "[i]nformed consent to surgical abortion," *id.* § 90-21.82, and "[i]nformed consent to medical abortion," *id.* § 90-21.83A, explicitly waive the required disclosures "in

17

the case of a medical emergency." *Id*. §§ 90-21.82(b), 90-21.83A(b). Because the Additional 72-Hour Mandate does not explicitly incorporate by reference these medical emergency waivers, it is unclear whether it can be waived in a medical emergency. The lack of an emergency exception would be disastrous for patients' health and lives.

It is also unclear whether the Additional 72-Hour Mandate restarts if certain required information is not known 72-hours in advance, in conflict with other parts of the Act. Two sections of the Act explain that the waiting period *does not restart* if certain specified information, such as the physician's name and location of their admitting privileges, is not available 72 hours before the abortion. S.B. 20 §§ 90-21.82(b)(1a), 90-21.83A(b)(2). While the same information must be provided pursuant to the Additional 72-Hour Mandate, that section is silent as to whether the waiting period must restart when the information is not known; therefore it is unclear whether the 72-hour period would restart if the physician's name or location of admitting privileges changes in the 72 hours before the abortion. Because of this internal conflict, Plaintiffs are likely to succeed on their claim that the Additional 72-Hour Mandate is unconstitutionally vague.[10]

---

[10] The Additional 72-Hour Mandate is riddled with errors and superfluous. *See also supra* Part I.B. Indeed, there is significant overlap between the information that must be disclosed to a patient in accordance with the Additional 72-Hour Mandate and that must also be disclosed to patients pursuant to the other two informed consent sections that include the medical emergency waiver; all three provisions require disclosure of the physician's name and admitting privileges. *See* §§ 90-21.83C, 90-21.82(b)(1a)(a.) (name), 90-21.82(b)(1a)(g.) (admitting privileges), 90-21.83A(b) (b)(2)(a.) (name), 90-21.83A(b)(2)(k.) (admitting privileges).

Case 1:23-cv-00480-CCE-LPA   Document 12   Filed 06/21/23   Page 18 of 35

**B. The Reporting Requirement and Additional 72-Hour Mandate Violate Due Process Because They Are Impossible to Comply With.**

It is impossible to comply with two sections of the Act: 1) the Reporting Requirement, S.B. 20 § 90-21.93(a); and 2) the Additional 72-Hour Mandate's required disclosure about whether the abortion is covered by a patient's insurance, *id.* § 90-21.83C. "The law does not compel the doing of impossibilities." *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1530 (11th Cir. 1996) (citing Black's Law Dictionary 912 (6th ed. 1990)). Laws with which compliance is not possible fail to provide people with adequate notice as to what is prohibited and lead to absurd results; and courts have a duty to construe laws to avoid such results. *See, e.g.*, *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69–70 (1994); *Hughey*, 78 F.3d at 1529–30 (holding plaintiff's claim under the Clean Water Act failed because it was impossible for defendant to comply with the applicable standard). For example, in a case addressing abortion restrictions, the Seventh Circuit affirmed a preliminary injunction of a Wisconsin law that required doctors who provide abortion to have admitting privileges at a local hospital in part because it was impossible to comply with the law. *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 738 F.3d 786, 788–89 (7th Cir. 2013) ("[t]he impossibility of compliance with the statute even by doctors fully qualified for admitting privileges is a compelling reason for the preliminary injunction"); *see also Doe v. Snyder*, 101 F. Supp. 3d 722, 724–25 (E.D. Mich. 2015) (holding law requiring registered sex offenders to have a state identification card violates due process as applied to unhoused plaintiff because it is impossible to obtain a state identification without a residence).

19

Here, compliance with the Reporting Requirement is impossible. It requires Plaintiffs to submit a "completed report" to the Department of Health and the Division of Social Services *three days* after a minor's abortion including whether they returned for a follow-up visit that must be scheduled *seven to fourteen days* after the medication abortion, S.B. 20 §§ 90-21.93(a), b(8) & (9), 90-21.83A(b)(4)(*l.*), 90-21.83B(b), and include how much money was billed to cover treatment for complications, *id.* § 90-21.93(b)(11), which may arise more than three days after the abortion.

Additionally, for many patients it will be impossible for Plaintiffs to comply with the Additional 72-Hour Mandate's requirement that the patient be informed of whether the abortion is covered by insurance 72 hours before the abortion. Insurance companies will often not determine whether a procedure is covered until after it is performed, and initial approval of a procedure is not a final determination as to whether the procedure is actually covered; insurance companies may later reject claims they had initially indicated would be covered. Compl. ¶ 67. For these reasons, Plaintiffs are likely to succeed on their claim that it is impossible to comply with these provisions.

### C. The Advising Ban is Unconstitutional.

The Act makes it "unlawful after the twelfth week of a woman's pregnancy to advise, procure, or cause a miscarriage or abortion." S.B. 20 § 90-21.81A(a). As written, the Advising Ban is unconstitutionally vague, as it is not clear whether it prohibits people from assisting others to obtain abortions after the twelfth week of pregnancy in other states where such care is lawful. Moreover, to the extent that the Advising Ban prohibits

providing information intended to help others access abortion care in other states where it is lawful, it violates the First Amendment.

### 1. *The Advising Ban Violates the Due Process Clause.*

The Advising Ban fails to give notice as to whether Plaintiffs may assist people in obtaining abortions after the twelfth week of pregnancy in other states where such care is lawful. The Advising Ban's terms "do not explain the law's scope or limit the discretion of those charged with enforcing it," to make clear this prohibition only applies to abortions unlawful under North Carolina law. *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 783 (4th Cir. 2023). The "'test of vagueness applies with particular force in review of laws dealing with speech.'" *Id.* at 781 (quoting *Hynes v. Mayor of Oradell*, 425 U.S. 610, 620 (1976)). This provision directly implicates speech, so the "twin concerns of inadequate notice and arbitrary or discriminatory enforcement are especially pronounced." *Edgar v. Haines*, 2 F.4th 298, 316 (4th Cir. 2021) (internal quotation marks omitted).

### 2. *Given its Vagueness, the Advising Ban Must Be Interpreted in a Manner That Avoids Violating the First Amendment.*

The government may not regulate speech because of its message, ideas, subject matter, or content, and laws that do so are presumptively unconstitutional. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Such restrictions are subject to strict scrutiny, which requires the government to prove that the restriction is narrowly tailored to serve a compelling state interest. *Id.* at 163–64. Speech restrictions are even more egregious when the government targets particular views taken by speakers on a subject (rather than targeting all views on a given subject). *Rosenberger v. Rector & Visitors of Univ. of Va.*,

515 U.S. 819, 829 (1995). Any interpretation of the Advising Ban that prohibits, for example, providing information about how to obtain legal, out-of-state abortions is a content- and viewpoint-based speech restriction that furthers no legitimate government interest, much less a compelling one, and is not narrowly tailored.[11]

There is no question that the Advising Ban is a content- and viewpoint-based restriction on speech because it silences people on the sole topic of abortion and only prohibits people from providing information and assistance to patients seeking abortion care in places where it is lawful but does not apply to other out-of-state, pregnancy-related services like prenatal care or anti-abortion counseling. It is, therefore, subject to strict scrutiny, but it furthers no legitimate state interest, much less a compelling one. North Carolina has no compelling interest in preventing people from providing information about medical treatments that are legal and available in other states or helping others access those treatments. *See Bigelow v. Virginia*, 421 U.S. 809, 827–28 (1975) (explaining that state's "asserted interest" "in shielding its citizens from information about activities outside [its] borders, activities that [its] police powers do not reach" is "entitled to little, if any weight"). North Carolina "may not, under the guise of exercising internal police powers, bar" Plaintiffs "from disseminating information about an activity that is legal" in another state.

---

[11] Plaintiffs seek an order ensuring their right to assist individuals who seek *lawful* abortions outside of North Carolina. However, to the extent that this section prohibits an individual from *advocating for or urging* another person to obtain an unlawful abortion, it likely violates the First Amendment. *See Brandenburg v. Ohio*, 395 U.S. 444, 449 (1969) (First Amendment protects "mere advocacy" of unlawful action); *United States v. Miselis*, 972 F.3d 518, 533–38 (4th Cir. 2020) (striking down statutory proscription on "urging" a riot).

Case 1:23-cv-00480-CCE-LPA   Document 12   Filed 06/21/23   Page 22 of 35

*Id.* at 824–25.

Even if the Advising Ban's content and viewpoint discriminatory censorship served a compelling interest (which it does not), Defendants cannot prove that it is narrowly tailored to further that interest because it sweeps in a large swath of obviously protected speech. *See Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (government bears burden of proof). When a plaintiff offers a plausible, less-restrictive alternative—here, that the Advising Ban does not apply to helping people obtain abortions out of state where abortion is lawful—"it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000).

### D. The Hospitalization Requirement and the Pregnancy Location Requirement are Irrational.

#### 1. The Hospitalization Requirement.

The Act's requirement that abortions for survivors of rape and incest after the twelfth and through the twentieth week of pregnancy be performed in a hospital violates substantive due process and equal protection. *See* S.B. 20 § 90-21.81B(3). These patients have the substantive due process right to medical treatment, including abortion care, and restrictions on this right are subject to rational basis review. *See Doe v. Settle*, 24 F.4th 932, 943–44, 955 (4th Cir. 2022) ("A substantive due process challenge is considered under rational-basis review unless some fundamental right is implicated."). The Hospitalization Requirement lacks any medical basis or common-sense justification, and it bears no

23

plausible relationship to any legitimate government interest.

Procedural abortion is as safe as, or safer than, a wide range of other medical procedures—including vasectomies, colonoscopies, wisdom tooth extraction, and tonsillectomies—that are routinely performed on an outpatient basis. Farris Decl. ¶ 29. Nationwide, 97% of abortions are provided in the outpatient setting, yielding an enormous volume of data establishing beyond any doubt the safety of outpatient abortion care. *Id.* ¶ 32. Consistent with this data, the National Academies of Sciences, Engineering, Medicine, as well as major medical associations, have made clear that requirements that abortions be provided in hospitals lack any scientific or medical basis. *Id.* ¶ 33. In fact, fewer complications are seen in settings that perform higher volumes of the same procedure, making abortion clinics like PPSAT safer than hospitals for most abortion patients. *Id.* ¶ 34.

The Supreme Court has repeatedly recognized that hospitalization requirements for abortion serve no legitimate health and safety interest. *See e.g.*, *Whole Woman's Health v. Hellerstedt*, 136 S.Ct. 2292, 2315 (2016) (striking ambulatory surgical center requirement for abortion and recognizing "well supported" district court finding that "requiring all abortion facilities to meet all surgical-center standards does not benefit patients and is not necessary"); *City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 435–37 & n.25 (1983) (striking down second trimester abortion hospitalization requirement); *Planned Parenthood Ass'n of Kan. City, Inc. v. Ashcroft*, 462 U.S. 476, 481–82 (1983) (same); *Doe v. Bolton*, 410 U.S. 179, 195 (1973) (same). Although these holdings that such

restrictions violate patients' Fourteenth Amendment right to choose abortion have been overruled by *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), the factual findings that hospitalization requirements for abortion do not serve any interest in patient health and safety were not. These cases demonstrate that the Hospitalization Requirement is not based on "reasonable speculation," a "plausible reason," or a "conceivable basis." *Settle*, 24 F.4th at 943–44. The irrationality of the Hospitalization Requirement is further underscored by the fact that it applies only to survivors of rape and incest, who are often the most desperate to terminate a pregnancy and who face unique barriers to accessing care, *see supra* Statement of Facts, Part III. There is no rational reason to force patients who have undergone trauma to seek abortion care at hospitals when they could go to outpatient clinics, which are generally cheaper, more accessible, and just as safe.

Absent a health-related justification or an interest in protecting potential life,[12] the only remaining justification for the Hospitalization Requirement is a "bare desire to harm" certain patients, which is not a legitimate state interest. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447, 450 (1985); *see also U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). As the Fourth Circuit has recognized, "[a]bortion may well be a special case" in some regards, "but it cannot be so special a case that all other professional rights and medical norms go out the window." *Stuart v. Camnitz*, 774 F.3d 238, 255–56 (4th Cir. 2014). Where, as here, the gulf between a legislature's action and "the realities of the

---

[12] There can be no such interest for the Hospitalization Requirement as the General Assembly has authorized abortions for survivors of rape and incest from the twelfth through the twentieth week of pregnancy.

subject addressed by the legislation" is vast, *Heller v. Doe*, 509 U.S. 312, 321 (1993), the challenged provision fails rational basis review. Because the Hospitalization Requirement fails rational basis scrutiny, it violates Plaintiffs' and their patients' substantive due process rights.

The Hospitalization Requirement also violates equal protection because it irrationally singles out physicians who provide and patients who seek abortion for differential treatment, as compared to those providing and seeking miscarriage management. *See Van Hollen*, 738 F.3d at 790 ("An issue of equal protection of the laws is lurking in this case. For the state seems indifferent to complications from non-hospital procedures other than surgical abortion (especially other gynecological procedures), even when they are more likely to produce complications."); *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. Dep't of Health*, 64 F. Supp. 3d 1235, 1257 (S.D. Ind. 2014) ("[Supreme Court precedent] does not . . . authorize the unequal treatment of those providing the exact same procedure, without a rational basis, and equal protection demands otherwise.").

The procedures used for abortion are also used to manage miscarriage, which are routinely provided in an outpatient setting, and are permitted by the Act. Farris Decl. ¶¶ 9, 22, 26. There is no rational basis for prohibiting a procedure in an outpatient setting if the patient is experiencing an inevitable miscarriage, but fetal demise has not yet occurred, while allowing the exact same procedure, with an identical risk profile, for the same patient in an outpatient setting after demise has occurred. *Id.* There is also no rational basis for

26

prohibiting outpatient procedural abortion when analogous gynecological procedures like inserting or removing an intrauterine device (which has a higher risk of uterine perforation than aspiration abortion), and loop electrosurgical excision procedures (a technique used to diagnose and treat potentially cancerous cervical cells) are routinely performed in outpatient clinics. *Id.* ¶ 37. Under the Act, outpatient facilities will still be permitted to provide miscarriage care after twelve weeks of gestational age—which as noted above, is identical to abortion care—so there is no rational reason to prevent them from providing abortions to survivors of rape and incest at twelve to twenty weeks of pregnancy. As a result, the Hospitalization Requirement violates equal protection.

### 2. The Pregnancy Location Requirement.

If interpreted to ban early medication abortion, the Pregnancy Location Requirement is also irrational. Providing early medication abortion when a patient has a positive pregnancy test but the pregnancy cannot be visualized on ultrasound is a safe, evidence-based practice which the State would have no legitimate reason to bar.

Some patients present for abortions at very early gestational ages, and early abortion care is all the more important in light of the Twelve-Week Ban. Farris Decl. ¶ 41. At early stages of a pregnancy, it may be too soon to see an intrauterine gestational sac via ultrasound. *Id*. In such cases, abortion providers follow established protocols for safely administering medication abortion, which have been shown to be safe and effective. *Id.*

Because there is no medical reason for denying medication (but not procedural) abortion care to patients with pregnancies that are too early to see via ultrasound, doing so

27

does not serve any governmental interest in health or safety. In fact, it does the opposite: forcing patients to wait until a later gestational age before getting a medication abortion unnecessarily exposes them to increased medical risk. Farris Decl. ¶ 11. Patients will be further harmed because they may have strong reasons for choosing medication abortion over procedural abortion. Compl. ¶¶ 46–47. And the Pregnancy Location Requirement does not further any state interest in protecting potential life because a patient denied a medication abortion because the pregnancy cannot be seen via ultrasound can still get a procedural abortion or return later to get a medication abortion.

*   *   *

Accordingly, Plaintiffs are likely to succeed on the merits of their claim that the Act violates their due process and equal protection rights guaranteed under the Fourteenth Amendment.

## II. Plaintiffs Will Suffer Irreparable Harm Absent Immediate Injunctive Relief.

Absent injunctive relief, Plaintiffs and their patients will suffer irreparable harm. The Act will deprive them of their constitutional rights to free speech, due process, and equal protection, which "unquestionably constitutes irreparable injury." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc) (internal quotation marks omitted). This alone is sufficient to establish irreparable harm.

The challenged provisions also impose additional harms that "impair[] a court's ability to grant an effective remedy, such as a harm that cannot be compensated by money damages at a later trial." *Int'l Refugee Assistance Project v. Trump*, 265 F. Supp. 3d 570,

28

629 (D. Md. 2017), *aff'd*, 883 F.3d 233 (4th Cir. 2018). The Act will harm Plaintiffs and their patients by delaying, or even denying, necessary health care. Compl. ¶¶ 62–64; *see generally* Statement of Facts, Part III. If there is no medical emergency exception to the required patient disclosures, the Act could put patients at risk of gratuitous suffering, severe injury, and even death. Compl. ¶ 66. The Act will also harm patients by denying them safe, evidence-based access to medication abortion through twelve weeks of pregnancy. *See* Compl. ¶¶ 46–47. The greater logistics of a procedural abortion may be prohibitive for some patients, especially victims of intimate partner violence. Compl. ¶ 47. And the Act's Hospitalization Requirement will limit the number of providers available to survivors of rape and incest, potentially force retraumatization, and increase the cost of abortion, thereby hampering these patients' access to abortion. Farris Decl. ¶¶ 48–51.

These harms include risks to patients' health, wellbeing, and ability to access necessary health care. If allowed to go into effect in its current form, the Act will irreparably harm Plaintiffs and their patients.

## III. The Balance of Equities and Public Interest Weigh Strongly in Favor of an Injunction.

Finally, the balance of equities and public interest likewise weigh heavily in favor of injunctive relief. While Plaintiffs and their patients will suffer grave harm in the absence of an injunction, Defendants are "in no way harmed by issuance of a preliminary injunction which prevents [them] from enforcing" a law that "is likely to be found unconstitutional." *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003); *see also Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011) ("upholding

Case 1:23-cv-00480-CCE-LPA   Document 12   Filed 06/21/23   Page 29 of 35

constitutional rights is in the public interest"). Not only would an injunction preserve constitutional rights, it would also preserve North Carolinians' health and safety by allowing pregnant people to access care without these restrictions and by ensuring Plaintiffs' ability to continue to provide abortion care, as set forth above. *See Fruth, Inc. v. Pullin*, 2015 WL 9451066, at *8 (S.D. W. Va. Dec. 23, 2015) (observing that "an injunction here will safeguard the public health and thereby serve the public interest").

## IV. The Bond Should Be Waived.

Because Defendants will suffer no harm under Plaintiffs' proposed preliminary injunction, and because this case implicates fundamental constitutional rights, the Court should exercise its "discretion to . . . waive the security requirement" under Federal Rule of Civil Procedure 65(c) or, in the alternative, set a nominal bond of $100.00. *Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013); *see also Sogefi USA, Inc. v. Interplex Sunbelt, Inc.*, 538 F. Supp. 3d 620, 631 (S.D. W. Va. 2021); *Citizens for a Responsible Curriculum v. Montgomery Cnty. Pub. Sch.*, 2005 WL 1075634, at *12 (D. Md. May 5, 2005).

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for a temporary restraining order and preliminary injunction restraining Defendants, their employees, agents, delegates, and successors in office, and all those acting in concert with them, from enforcing or facilitating the entirety of Part I and the Hospitalization Requirement of Part II of the Act. These provisions of the Act that will take effect on July 1 should be enjoined in their entirety because Plaintiffs' due process claim based on the application of the fetal

Case 1:23-cv-00480-CCE-LPA   Document 12   Filed 06/21/23   Page 30 of 35

homicide statute to lawful abortion reaches the constitutionality of the Act as whole, and enjoining the other unconstitutional provisions would leave a statute unlike what the legislature intended to be enforced on its own, as they are intertwined with the core purpose of the Act. Plaintiffs further request that the Court waive the requirement for bond or security.

Dated: June 21, 2023

Respectfully submitted,

s/ Peter Im

| | |
|---|---|
| Peter Im* | Brigitte Amiri* |
| Helene T. Krasnoff* | Lindsey Kaley* |
| Planned Parenthood Fed. of America | Ryan Mendias* |
| 1110 Vermont Avenue NW, Suite 300 | American Civil Liberties Union |
| Washington, DC 20005 | Foundation |
| Tel.: (202) 973-4800 | 125 Broad Street, 18th Fl. |
| peter.im@ppfa.org | New York, NY 10004 |
| helene.krasnoff@ppfa.org | Tel: 212-549-2633 |
| | bamiri@aclu.org |
| COUNSEL FOR PLANNED | lkaley@aclu.org |
| PARENTHOOD SOUTH ATLANTIC | rmendias@aclu.org |

COUNSEL FOR PLANNED
PARENTHOOD SOUTH ATLANTIC

Kristi Graunke                                 COUNSEL FOR BEVERLY GRAY, M.D.
NC Bar # 51216
Jaclyn Maffetore
NC Bar # 50849                                 *Special appearance filed
American Civil Liberties Union
of North Carolina Legal Foundation
P.O. Box 28004
Raleigh, NC 27611
Tel.: (919) 834-3466
kgraunke@acluofnc.org
jmaffetore@acluofnc.org

COUNSEL FOR ALL PLAINTIFFS

## CERTIFICATE OF WORD COUNT

Relying on the word count function of Microsoft Word, I hereby certify that this brief is 8,183 words in length and, therefore, complies with the word limitation of 8,500 words requested in the Plaintiffs' consent motion to extend word limits, dated June 21, 2023, DE 10.

*s/ Peter Im*

Peter Im
Planned Parenthood Fed. of America
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
Tel.: (202) 973-4800
peter.im@ppfa.org

## CERTIFICATE OF SERVICE

I hereby certify that, on June 21, 2023, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing, and will also serve this motion on counsel for Defendants via email, as well as via certified U.S. mail at the addresses listed below if Defendants' counsel has not agreed to email-only service:


Stephanie Brennan
sbrennan@ncdoj.gov
*Counsel for Defendant Stein*

Joshua Stein
Attorney General of North Carolina
NORTH CAROLINA DEPARTMENT OF JUSTICE
114 West Edenton Street
Raleigh, NC 27603


Michael Wood
mwood@ncdoj.gov
*Counsel for Defendant Kinsley*

Kody H. Kinsley, M.P.P.
c/o Julie Cronin, General Counsel
DEPARTMENT OF HEALTH & HUMAN SERVICES
Office of Legal Affairs
Adams Building
2001 Mail Service Center


Michael Bulleri
mbulleri@ncdoj.gov
*Counsel for Defendants Kilpatrick and Ingram*

Michaux R. Kilpatrick, M.D., PhD.

33

President, NORTH CAROLINA MEDICAL BOARD
c/o R. David Henderseon, Executive Director
1203 Front Street
Raleigh, NC 27609

Racquel Ingram, PhD., R.N.
Chair, NORTH CAROLINA BOARD OF NURSING
c/o Amy G. Fitzhugh, Chief Legal Officer
4516 Lake Boone Trail
Raleigh, NC 27607


Elizabeth O'Brien
eobrien@ncdoj.gov
*Counsel for Defendants Crump, David, Freeman, Williams, West, Nieman, O'Neill, Deberry, and Merriweather*

Avery Crump
DISTRICT ATTORNEY'S OFFICE
PROSECUTORIAL DISTRICT 24
201 S. Eugene Street
Greensboro, NC 27401

Benjamin R. David
DISTRICT ATTORNEY'S OFFICE
PROSECUTORIAL DISTRICT 6
316 Princess St., Suite 543
Wilmington, NC 28401

Jeff Nieman
DISTRICT ATTORNEY'S OFFICE
PROSECUTORIAL DISTRICT 18
Orange County Courthouse
144 East Margaret Lane
Hillsborough, NC 27278

Jim O'Neill
DISTRICT ATTORNEY'S OFFICE
31ST PROSECUTORIAL DISTRICT
Forsyth County Hall of Justice
200 North Main St.
Winston-Salem, NC 27101

Lorrin Freeman
DISTRICT ATTORNEY'S OFFICE
PROSECUTORIAL DISTRICT 10
300 S. Salisbury Street
Raleigh, NC 27601

Satana Deberry
DISTRICT ATTORNEY'S OFFICE
16TH PROSECUTORIAL DISTRICT
Durham County Courthouse
510 South Dillard Street, 8th Floor
Durham, NC 27701

Spencer B. Merriweather III
DISTRICT ATTORNEY'S OFFICE
PROSECUTORIAL DISTRICT 26
700 East Trade Street
Charlotte, NC 28202

Todd M. Williams
OFFICE OF THE DISTRICT ATTORNEY
40TH PROSECUTORIAL DISTRICT
60 Court Plaza
Asheville, NC 28801

William West
DISTRICT ATTORNEY'S OFFICE
PROSECUTORIAL DISTRICT 14
117 Dick Street, Suite 427
Fayetteville, NC 28301

*s/ Peter Im*

Peter Im
Planned Parenthood Fed. of America
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
Tel.: (202) 973-4800
peter.im@ppfa.org

35