**H**                                                             **5**

**HOUSE BILL 190**
Committee Substitute Favorable 3/14/23
Committee Substitute #2 Favorable 3/28/23
Senate Health Care Committee Substitute Adopted 5/31/23
Fifth Edition Engrossed 6/26/23

| | |
|---|---|
| Short Title:    Dept. of Health and Human Services Revisions.-AB | (Public) |

Sponsors:

Referred to:

February 27, 2023

1                                 A BILL TO BE ENTITLED
2   AN ACT MAKING TECHNICAL, CONFORMING, AND OTHER MODIFICATIONS TO
3       LAWS PERTAINING TO THE DEPARTMENT OF HEALTH AND HUMAN SERVICES
4       AND TO MAKE TECHNICAL AND CONFORMING CHANGES TO SESSION LAW
5       2023-14.
6   The General Assembly of North Carolina enacts:
7
8   **PART I. LAWS PERTAINING TO THE DIVISION OF AGING AND ADULT**
9   **SERVICES**
10
11   **AUTHORIZATION FOR SECRETARY OF HEALTH AND HUMAN SERVICES TO**
12   **ADOPT AND ENFORCE RULES TO IMPLEMENT EMERGENCY SOLUTIONS**
13   **GRANT PROGRAM**
14           **SECTION 1.1.** Article 3 of Chapter 143B of the General Statutes is amended by
15   adding a new section to read:
16   "**§ 143B-139.1A.   Secretary of Health and Human Services; rules to implement the**
17                 **Emergency Solutions Grant Program.**
18   The Secretary of Health and Human Services may adopt rules to implement the Emergency
19   Solutions Grant Program. The Department of Health and Human Services shall enforce any rules
20   adopted under this section."
21
22   **ALIGNMENT OF STATE-COUNTY SPECIAL ASSISTANCE PROGRAM WITH**
23   **FEDERAL REGULATIONS/REMOVAL OF PROPERTY TAX THRESHOLD WHEN**
24   **DETERMINING ELIGIBILITY**
25           **SECTION 1.2.** G.S. 108A-41 reads as rewritten:
26   "**§ 108A-41.   Eligibility.**
27     …
28     (c)      When determining whether a person has insufficient resources to provide a reasonable
29   subsistence compatible with decency and health, there shall be excluded from consideration the
30   person's primary place of residence and the land on which it is situated, and in addition there
31   shall be excluded real property contiguous with the person's primary place of ~~residence in which~~
32   ~~the property tax value is less than twelve thousand dollars ($12,000).~~residence.
33     …."



**EQUALIZATION OF STATE-COUNTY SPECIAL ASSISTANCE PAYMENTS FOR RECIPIENTS RESIDING IN LICENSED FACILITIES APPROVED TO ACCEPT STATE-COUNTY SPECIAL ASSISTANCE AND RECIPIENTS RESIDING IN IN-HOME LIVING ARRANGEMENTS**
   **SECTION 1.3.**  G.S. 108A-47.1(a) reads as rewritten:
  "(a) The Department of Health and Human Services ~~may~~ shall use funds from the existing State-County Special Assistance budget to provide Special Assistance payments to eligible individuals 18 years of age or older in in-home living arrangements. The standard monthly payment to individuals enrolled in the Special Assistance in-home program shall be one hundred percent (100%) of the monthly payment the individual would receive if the individual resided in an adult care home and qualified for Special ~~Assistance, except if a lesser payment amount is appropriate for the individual as determined by the local case manager.~~ Assistance. The Department shall implement Special Assistance in-home eligibility policies and procedures to assure that in-home program participants are those individuals who need and, but for the in-home program, would seek placement in an adult care home facility. The Department's policies and procedures shall include the use of ~~a functional~~ an assessment."

**PART II. LAWS PERTAINING TO THE DIVISION OF CENTRAL MANAGEMENT AND SUPPORT**

**CONTRACTING REFORM**
   **SECTION 2.1.**  Section 2 of S.L. 2022-52 reads as rewritten:
  "**SECTION 2.(a)**  Contract Time and Continuity. – In efforts to support the continuity of services provided by ~~nonprofit grantees receiving state and federal funds,~~ a nonprofit grantee receiving State or federal funds or any combination of State and federal funds through a financial assistance contract, the Department of Health and Human Services (Department) shall enter into a contract agreement for a minimum of ~~a two-year contract agreement~~ two years with such nonprofit ~~grantees/recipients~~ grantee if ~~all of~~ the following requirements are met:
    (1) The nonprofit ~~grantee/recipient~~ grantee is receiving nonrecurring ~~funding~~ funds for each year of a fiscal biennium.
    (2) The nonprofit ~~grantee/recipient~~ grantee is receiving recurring ~~funding.~~ funds for each year of a fiscal biennium.
    <u>(3) The nonprofit grantee is receiving any combination of recurring and nonrecurring funds for each year of a fiscal biennium.</u>
    ~~(3)~~(4) Multiyear contracts are not otherwise prohibited by the funding source.
  "**SECTION 2.(a1)**  ~~Nonprofit grantees/recipients~~ Option for Contract Extension. – A nonprofit grantee receiving recurring federal grant ~~funding shall have~~ funds through a financial assistance contract has the option to extend the contract ~~for~~ up to one additional year at the end of the ~~contract's~~ initial term of the contract if all of the following requirements are met:
    (1) The extension is mutually agreed upon by the Department and the nonprofit grantee, through a written amendment as provided for in the ~~General Terms and Conditions.~~ terms and conditions of the contract.
    (2) Funding for the contract remains available.
  "**SECTION 2.(a2)**  Automatic Contract Extension. – The Department shall allow any nonprofit ~~grantee/recipient~~ grantee receiving recurring or nonrecurring ~~state and/or~~ State or federal ~~funding~~ funds, or any combination of State and federal funds, through a financial assistance contract for each year of a fiscal biennium to automatically activate a limited-time ~~extensions~~ contract extension for a period of up to three months ~~for~~ to preserve continuity of services when a formal contract extension or renewal process has not been completed within 10

Case 1:23-cv-00480-CCE-LPA   Document 26-1   Filed 06/27/23   Page 2 of 28

1  business days ~~of~~ after the ~~subsequent contract start date if all of~~ expiration of the original contract;
2  provided, however, that all of the following requirements are met:
3       (1)    The nonprofit ~~grantee/recipient~~ grantee is receiving recurring ~~funding~~ funds,
4              or nonrecurring ~~state and/or federal funding~~ State or federal funds, or any
5              combination of nonrecurring State and federal funds, for each year of a fiscal
6              biennium.
7       (2)    The nonprofit ~~grantee/recipient~~ grantee has received an unqualified audit
8              report on its most recent financial audit when an audit is required by
9              G.S. 159-34 or 09 NCAC 03M.
10       (3)    The nonprofit ~~grantee/recipient~~ grantee has a track record of timely
11              performance and financial reporting to the Department as required by the
12              contract.
13       (4)    The nonprofit ~~grantee/recipient~~ grantee has not been identified by the
14              Department as having a record of noncompliance with requirements of any
15              funding source used to support the contract and has not received an undisputed
16              notice of such noncompliance from the Department. For purposes of this
17              requirement, noncompliance does not include issues stemming from late
18              execution of a contract or mutually agreed upon changes to scope of work or
19              deliverables, and undisputed notice of noncompliance does not include notice
20              of noncompliance where the nonprofit grantee has provided written evidence
21              of actual compliance to the Department within 30 days ~~of~~ after receipt of a
22              notice of noncompliance.
23       (5)    The nonprofit ~~grantee/recipient~~ grantee has been in operation for at least five
24              years.
25      In the event of an automatic contract extension pursuant to this subsection, the terms of the
26  expired contract shall govern the relationship and obligations of the party until the end of the
27  three-month contract extension period or until the execution of a formal contract extension or
28  renewal, whichever occurs first.
29      …
30      "**SECTION 2.(c)**   Negotiated Overhead Rates. – The negotiation, determination, or
31  settlement of the reimbursable amount of overhead under cost-reimbursement type contracts is
32  accomplished on an individual contract basis and is based upon the federally approved indirect
33  cost rate. For ~~vendors who~~ grantees, including nonprofit grantees, that (i) are receiving financial
34  assistance and do not have a federally approved indirect cost ~~rate,~~ rate from a federal agency or
35  (ii) have a previously negotiated but expired rate, the Department may allow the grantee, in
36  accordance with 2 C.F.R. § 200.332(a)(4) or 2 C.F.R. § 200.414(f), ~~the de minimis rate of ten~~
37  ~~percent (10%) of modified total direct costs shall apply.~~ to use the de minimis rate or ten percent
38  (10%) of modified total direct costs. Alternatively, the grantee may negotiate or waive an indirect
39  cost rate with the Department. If State or federal law or regulations establish a limitation on the
40  amount of funds the grantee may use for administrative purposes, then that limitation controls,
41  in accordance with 2 C.F.R. § 200.414(c)(3)."
42
43  **PART III. LAWS PERTAINING TO THE DIVISION OF CHILD AND FAMILY**
44  **WELL-BEING**
45
46  **CONFORMING CHANGES RELATED TO ESTABLISHMENT OF NEW DIVISION**
47      **SECTION 3.1.**  G.S. 7B-1402 reads as rewritten:
48  "**§ 7B-1402.  Task Force – creation; membership; vacancies.**
49     (a)    There is created the North Carolina Child Fatality Task Force within the Department
50  of Health and Human Services for budgetary purposes only.

Case 1:23-cv-00480-CCE-LPA   Document 26-1   Filed 06/27/23   Page 3 of 28

1     (b)    The Task Force shall be composed of 36 members, 12 of whom shall be ex officio
2 members, four of whom shall be appointed by the Governor, 10 of whom shall be appointed by
3 the Speaker of the House of Representatives, and 10 of whom shall be appointed by the President
4 Pro Tempore of the Senate. The ex officio members other than the Chief Medical Examiner may
5 designate representatives from their particular departments, divisions, or offices to represent
6 them on the Task Force. In making appointments or designating representatives, appointing
7 authorities and ex officio members shall use best efforts to select members or representatives
8 with sufficient knowledge and experience to effectively contribute to the issues examined by the
9 Task Force and, to the extent possible, to reflect the geographical, political, gender, and racial
10 diversity of this State. The members shall be as follows:
11            (1)    The Chief Medical Examiner.
12            (2)    The Attorney General.
13            (3)    The Director of the Division of Social ~~Services.~~Services, Department of
14                   Health and Human Services.
15            (4)    The Director of the State Bureau of Investigation.
16            (5)    The Director of the ~~Maternal and Child Health Section of the~~ Division of
17                   Public Health, Department of Health and Human Services.
18            (6)    The chair of the Council for Women and Youth Involvement.
19            (7)    The Superintendent of Public Instruction.
20            (8)    The Chairman of the State Board of Education.
21            (9)    The Director of the ~~Division of Mental Health, Developmental Disabilities,~~
22                   ~~and Substance Abuse Services.~~Division of Child and Family Well-Being,
23                   Department of Health and Human Services.
24            …."
25       **SECTION 3.2.** G.S. 7B-1404(b) reads as rewritten:
26 "(b)    The State Team shall be composed of the following 11 members of whom nine
27 members are ex officio and two are appointed:
28            (1)    The Chief Medical Examiner, who shall chair the State ~~Team;~~Team.
29            (2)    The Attorney ~~General;~~General.
30            (3)    The Director of the Division of Social Services, Department of Health and
31                   Human ~~Services;~~Services.
32            (4)    The Director of the State Bureau of ~~Investigation;~~Investigation.
33            (5)    The Director of the Division of ~~Maternal and Child Health of the~~ Public
34                   Health, Department of Health and Human ~~Services;~~Services.
35            (6)    The Superintendent of Public ~~Instruction;~~Instruction.
36            (7)    The Director of the Division ~~of Mental Health, Developmental Disabilities,~~
37                   ~~and Substance Abuse Services,~~of Child and Family Well-Being, Department
38                   of Health and Human ~~Services;~~Services.
39            (8)    The Director of the Administrative Office of the ~~Courts;~~Courts.
40            (9)    The pediatrician appointed pursuant to G.S. 7B-1402(b) to the Task
41                   ~~Force;~~Force.
42            (10)   A public member, appointed by the ~~Governor; and~~Governor.
43            (11)   The Team Coordinator.
44       The ex officio members other than the Chief Medical Examiner may designate a
45 representative from their departments, divisions, or offices to represent them on the State Team."
46       **SECTION 3.3.** G.S. 122C-113(b1) reads as rewritten:
47 "(b1)   The Secretary shall cooperate with the State Board of Education and the Division of
48 Juvenile Justice of the Department of Public Safety in coordinating the responsibilities of the
49 Department of Health and Human Services, the State Board of Education, the Division of
50 Juvenile Justice of the Department of Public Safety, and the Department of Public Instruction for
51 adolescent substance abuse programs. The Department of Health and Human Services, through

Case 1:23-cv-00480-CCE-LPA   Document 26-1   Filed 06/27/23   Page 4 of 28

1   its Division of Mental Health, Developmental Disabilities, and Substance Abuse ~~Services,~~
2   Services and its Division of Child and Family Well-Being, in cooperation with the Division of
3   Juvenile Justice of the Department of Public Safety, shall be responsible for intervention and
4   treatment in non-school based programs. The State Board of Education and the Department of
5   Public Instruction, in consultation with the Division of Juvenile Justice of the Department of
6   Public Safety, shall have primary responsibility for in-school education, identification, and
7   intervention services, including student assistance programs."
8        **SECTION 3.4.** G.S. 122C-142.2(g) reads as rewritten:
9        "(g)    The Rapid Response Team shall be comprised of representatives of the Department
10  of Health and Human Services from the Division of Social Services; the Division of Mental
11  Health, Developmental Disabilities, and Substance Abuse Services; the Division of Child and
12  Family Well-Being; and the Division of Health Benefits. Upon receipt of a notification from a
13  director, the Rapid Response Team shall evaluate the information provided and coordinate a
14  response to address the immediate needs of the juvenile, which may include any of the following:
15          (1)    Identifying an appropriate level of care for the juvenile.
16          (2)    Identifying appropriate providers or other placement for the juvenile.
17          (3)    Making a referral to qualified services providers.
18          (4)    Developing an action plan to ensure the needs of the juvenile are met.
19          (5)    Developing a plan to ensure that relevant parties carry out any responsibilities
20              to the juvenile."
21
22  **PART IV. LAWS PERTAINING TO THE DIVISION OF HEALTH SERVICE**
23  **REGULATION**
24
25  **MEDICAL CARE COMMISSION CLARIFICATION OF POWERS AND DUTIES**
26       **SECTION 4.1.** G.S. 143B-165 reads as rewritten:
27  "**§ 143B-165.  North Carolina Medical Care Commission – creation, powers and duties.**
28       There is hereby created the North Carolina Medical Care Commission of the Department of
29  Health and Human Services with the power and duty to ~~promulgate~~ adopt rules ~~and regulations~~
30  to be followed in the construction and maintenance of public and private hospitals, medical
31  centers, and ~~related~~ facilities ~~with the power and duty~~ regulated under Chapters 131D and 131E
32  of the General Statutes; to adopt, amend and rescind rules ~~and regulations~~ under and not
33  inconsistent with the laws of the State as necessary to carry out the provisions and purposes of
34  this ~~Article.~~Article; and to protect the health, safety, and welfare of the individuals served by
35  these facilities.
36          (1)    The North Carolina Medical Care Commission ~~has the duty to~~ shall adopt
37              statewide plans for the construction and maintenance of hospitals, medical
38              centers, and ~~related facilities,~~ facilities regulated under Chapters 131D and
39              131E of the General Statutes, or such other plans as may be found desirable
40              and necessary ~~in order~~ to meet the requirements and receive the benefits of
41              any applicable federal ~~legislation with regard thereto.~~legislation.
42          (2)    The Commission ~~is authorized to~~ may adopt such rules ~~and regulations~~ as may
43              be necessary to carry out the intent and purposes of Article ~~13~~ 4 of Chapter
44              ~~131~~ 131E of the General ~~Statutes of North Carolina.~~Statutes.
45          ~~(3)~~    ~~The Commission may adopt such reasonable and necessary standards with~~
46              ~~reference thereto as may be proper to cooperate fully with the Surgeon~~
47              ~~General or other agencies or departments of the United States and the use of~~
48              ~~funds provided by the federal government as contained and referenced in~~
49              ~~Article 13 of Chapter 131 of the General Statutes of North Carolina.~~
50          (4)    The Commission ~~shall have~~ has the power and duty to approve projects in the
51              amounts of grants-in-aid from funds supplied by the federal and State

governments for the planning and construction of hospitals and other related medical facilities ~~according to the provisions of Article 13~~ in accordance with Articles 4 and 5 of Chapter ~~131~~ 131E of the General ~~Statutes of North Carolina.~~ Statutes.

(5)    Repealed by Session Laws 1981 (Regular Session, 1982), c. 1388, s. 3.

(6)    The Commission ~~has the duty to~~ shall adopt rules ~~and regulations and standards with respect to~~ establishing standards for the licensure, inspection, and operation of, and the provision of care and services by, the different types of hospitals to be licensed under ~~the provisions of Article 13A~~ Articles 2 and 5 of Chapter ~~131~~ 131E of the General ~~Statutes of North Carolina.~~ Statutes.

(7)    The Commission ~~is authorized and empowered to~~ may adopt such ~~rules and regulations,~~ rules, not inconsistent with the laws of this State, as may be required by the federal government ~~for~~ to secure federal grants-in-aid for medical facility services and ~~licensure which may be made available to the State by the federal government.~~ licensure. This section ~~is to~~ shall be liberally construed in order that the State and its citizens may benefit from such grants-in-aid.

(8)    The Commission shall adopt such ~~rules and regulations,~~ rules, consistent with the provisions of this Chapter. All rules ~~and regulations not inconsistent with the provisions of this Chapter heretofore~~ adopted by the ~~North Carolina Medical Care~~ Commission since the enactment of Chapter 131E of the General Statutes that are not inconsistent with the provisions of this Chapter shall remain in full force and effect ~~unless and~~ until repealed or superseded by action of the ~~North Carolina Medical Care~~ Commission. All rules ~~and regulations~~ adopted by the Commission shall be enforced by the Department of Health and Human Services.

(9)    The Commission ~~shall have the power and duty to~~ may adopt rules ~~and regulations with regard to~~ concerning emergency medical services in accordance with the provisions of Article ~~26~~ 7 of Chapter ~~130~~ 131E and Article 56 of Chapter 143 of the General ~~Statutes of North Carolina.~~ Statutes.

(10)    The Commission ~~shall have the power and duty to~~ shall adopt rules for the operation of nursing homes, as defined by Article 6 of Chapter 131E of the General Statutes.

(11)    The Commission ~~is authorized to~~ may adopt ~~such~~ rules as ~~may be~~ necessary to ~~carry out the provisions of Part C of Article 6, and Article 10,~~ establish standards for the licensure, inspection, and operation of, and the provision of care and services by, facilities licensed under Articles 6 and 10 of Chapter 131E of the General ~~Statutes of North Carolina.~~ Statutes.

(12)    The Commission shall adopt ~~rules, including temporary rules pursuant to G.S. 150B-13,~~ rules providing for the accreditation of facilities that perform mammography procedures and for laboratories evaluating screening pap smears. Mammography accreditation standards shall address, but are not limited to, the quality of mammography equipment used and the skill levels and other qualifications of personnel who administer mammographies and personnel who interpret mammogram results. The Commission's standards shall be no less stringent than those established by the United States Department of Health and Human Services for Medicare/Medicaid coverage of screening mammography. These rules shall also specify procedures for waiver of these accreditation standards on an individual basis for any facility providing screening mammography to a significant number of patients, but only if there is no accredited facility located nearby. The Commission may

Case 1:23-cv-00480-CCE-LPA   Document 26-1   Filed 06/27/23   Page 6 of 28

1            grant a waiver subject to any conditions it deems necessary to protect the
2            health and safety of patients, including requiring the facility to submit a plan
3            to meet accreditation standards.
4      (13)    The Commission ~~shall have the power and duty to~~ <u>shall</u> adopt rules
5            <u>establishing standards</u> for the ~~inspection and licensure of~~ <u>licensure, inspection,</u>
6            <u>and operation of, and the provision of care and services by,</u> adult care ~~homes~~
7            ~~and operation of adult care~~ homes, as defined by Article 1 of Chapter 131D of
8            the General Statutes, and for personnel requirements of staff employed in
9            adult care homes, except ~~where~~ <u>when</u> rule-making authority is assigned <u>by</u>
10            <u>law</u> to the Secretary.
11      <u>(14)</u>    <u>The Commission shall adopt rules establishing standards for the following</u>
12            <u>with respect to facilities used as multiunit assisted housing with services, as</u>
13            <u>defined by Article 1 of Chapter 131D of the General Statutes:</u>
14            <u>a.</u>      <u>Registration and deregistration.</u>
15            <u>b.</u>      <u>Disclosure statements.</u>
16            <u>c.</u>      <u>Agreements for services.</u>
17            <u>d.</u>      <u>Personnel requirements.</u>
18            <u>e.</u>      <u>Resident admissions and discharges.</u>"
19

20 **PART V. LAWS PERTAINING TO THE DIVISION OF MENTAL HEALTH,**
21 **DEVELOPMENTAL DISABILITIES, AND SUBSTANCE ABUSE SERVICES**
22

23 **TECHNICAL CHANGES/POPULATIONS COVERED BY LME/MCOS**
24        **SECTION 5.1.(a)** G.S. 122C-115 reads as rewritten:
25 "**§ 122C-115.  Duties of counties; appropriation and allocation of funds by counties and**
26        **cities.**
27      …
28     (e)       Beginning ~~on the date that capitated contracts under Article 4 of Chapter 108D of the~~
29 ~~General Statutes begin,~~ <u>July 1, 2021,</u> LME/MCOs shall cease managing Medicaid services for
30 all Medicaid recipients ~~other than recipients described in G.S. 108D-40(a)(1), (4), (5), (6), (7),~~
31 ~~(10), (11), (12), and (13).~~ <u>who are enrolled in a standard benefit plan.</u>
32     <u>(e1)</u>     Until BH IDD tailored plans become operational, all of the following shall occur:
33      (1)     LME/MCOs shall continue to manage the Medicaid services that are covered
34            by the LME/MCOs under the combined 1915(b) and (c) waivers for Medicaid
35            recipients ~~described in G.S. 108D-40(a)(1), (4), (5), (6), (7), (10), (11), (12),~~
36            ~~and (13).~~ <u>who are covered by the those waivers and who are not enrolled in a</u>
37            <u>standard benefit plan.</u>
38      (2)     The Division of Health Benefits shall negotiate actuarially sound capitation
39            rates directly with the LME/MCOs based on the change in composition of the
40            population being served by the LME/MCOs.
41      (3)     Capitation payments under contracts between the Division of Health Benefits
42            and the LME/MCOs shall be made directly to the LME/MCO by the Division
43            of Health Benefits.
44     (f)       ~~Entities~~ <u>LME/MCOs</u> operating the BH IDD tailored plans under G.S. 108D-60 may
45 continue to manage the behavioral health, intellectual and developmental disability, and
46 traumatic brain injury services for any Medicaid recipients ~~described in G.S. 108D-40(a)(4), (5),~~
47 ~~(7), (10), (11), (12), and (13) under any contract with the Department in accordance with~~
48 ~~G.S. 108D-60(b).~~ <u>who are not enrolled in a BH IDD tailored plan.</u>"
49        **SECTION 5.1.(b)** G.S. 108D-60(b) reads as rewritten:
50    "(b)     The Department may contract with entities operating BH IDD tailored plans under a
51 capitated or other arrangement for the management of behavioral health, intellectual and

Case 1:23-cv-00480-CCE-LPA   Document 26-1   Filed 06/27/23   Page 7 of 28

1 developategorization disability, and traumatic brain injury services for any recipients ~~excluded from~~
2 ~~PHP coverage under G.S. 108D-40(a)(4), (5), (7), (10), (11), (12), and (13).~~who are not enrolled
3 in a BH IDD tailored plan."
4         **SECTION 5.1.(c)**  G.S. 122C-3 reads as rewritten:
5 "**§ 122C-3.  Definitions.**
6         The following definitions apply in this Chapter:
7                 …
8         (2b)    "~~Behavioral~~ Behavioral health and intellectual/developmental disabilities
9                 tailored ~~plan"~~ plan or "~~BH~~ BH IDD tailored ~~plan" has the same meaning as~~
10                 plan. – As defined in G.S. 108D-1.
11                 …
12         (29b)   "~~Prepaid~~ Prepaid health ~~plan" has the same meaning as~~ plan. – As defined in
13                 G.S. 108D-1.
14                 …
15         (35b)   Specialty services. – Services that are provided to consumers from
16                 low-incidence populations.
17         ~~(35c)   State or Local Consumer Advocate.    The individual carrying out the duties~~
18                 ~~of the State or Local Consumer Advocacy Program Office in accordance with~~
19                 ~~Article 1A of this Chapter.~~
20         (35d)   Standard benefit plan. – As defined in G.S. 108D-1.
21         (35e)   State Plan. – The State Plan for Mental Health, Developmental Disabilities,
22                 and Substance Abuse Services.
23         ~~(35e)~~(35f) State resources. – State and federal funds and other receipts administered
24                 by the Division.
25                 …."

27 **CHANGES TO EFFECTUATE RENAMING OF DIVISION**
28         **SECTION 5.2.(a)**  G.S. 143B-138.1(a)(4) reads as rewritten:
29         "(4)    Division of Mental Health, Developmental Disabilities, and Substance ~~Abuse~~
30                 Use Services."
31         **SECTION 5.2.(b)**  Throughout the General Statutes, the Revisor of Statutes shall
32 replace the phrase "Division of Mental Health, Developmental Disabilities, and Substance Abuse
33 Services" with the phrase "Division of Mental Health, Developmental Disabilities, and Substance
34 Use Services."
35         **SECTION 5.2.(c)**  Throughout the General Statutes, the Revisor of Statutes shall
36 replace the phrase "MH/DD/SAS" with the phrase "MH/DD/SUS."

38 **PART VI. LAWS PERTAINING TO THE DIVISION OF PUBLIC HEALTH**

40 **EXPANSION OF PERMISSIBLE USES FOR NEWBORN SCREENING EQUIPMENT**
41 **REPLACEMENT AND ACQUISITION FUND**
42         **SECTION 6.1.**  G.S. 130A-125(d) reads as rewritten:
43         "(d)    The Newborn Screening Equipment Replacement and Acquisition Fund (Fund) is
44 established as a nonreverting fund within the Department. Thirty-one dollars ($31.00) of each
45 fee collected pursuant to subsection (c) of this section shall be credited to this Fund and applied
46 to the Newborn Screening Program to be used as directed in this subsection. The Department
47 shall not use monies in this Fund for any purpose other than to ~~purchase or replace~~ purchase,
48 replace, maintain, or support laboratory instruments, equipment, and information technology
49 systems used in the Newborn Screening Program. The Department shall notify and consult with
50 the Joint Legislative Commission on Governmental Operations whenever the balance in the Fund
51 exceeds the following threshold: the sum of (i) the actual cost of new equipment necessary to

Case 1:23-cv-00480-CCE-LPA   Document 26-1   Filed 06/27/23   Page 8 of 28

1  incorporate conditions listed on the RUSP into the Newborn Screening Program and (ii) one
2  hundred percent (100%) of the replacement value of existing equipment used in the Newborn
3  Screening Program. Any monies in the Fund in excess of this threshold shall be available for
4  expenditure only upon an act of appropriation by the General Assembly."
5
6  **EXPANSION OF QUALIFIED PROFESSIONALS ELIGIBLE TO SERVE AS COUNTY**
7  **MEDICAL EXAMINERS**
8          **SECTION 6.2.**  G.S. 130A-382 reads as rewritten:
9  "**§ 130A-382.  County medical examiners; appointment; term of office; vacancies; training**
10         **requirements; revocation for cause.**
11      (a)      The Chief Medical Examiner shall appoint two or more county medical examiners for
12  each county for a three-year term. In appointing medical examiners for each county, the Chief
13  Medical Examiner shall give preference to physicians licensed to practice medicine in this State
14  but may also appoint ~~licensed~~ the following professionals:
15          (1)      Dentists, physician assistants, nurse practitioners, nurses, or ~~emergency~~
16                   ~~physical therapists~~ as long as the appointee is licensed to practice in this State.
17          (2)      Emergency medical ~~technician~~ technicians or paramedics credentialed under
18                   G.S. 131E-159.
19          (3)      Pathologists' assistants certified by the American Society for Clinical
20                   Pathology.
21          (4)      Pathologists' assistants or medicolegal death investigators certified by a
22                   nationally recognized certifying body determined by the Chief Medical
23                   Examiner to have an appropriate certification process for pathologists'
24                   assistants or medicolegal death investigators to demonstrate readiness to serve
25                   as a county medical examiner.
26      A medical examiner may serve more than one county. The Chief Medical Examiner may take
27  jurisdiction in any case or appoint another medical examiner to do so.
28      (a1)      During a state of emergency declared by the Governor or by a resolution of the
29  General Assembly pursuant to G.S. 166A-19.20, or by the governing body of a municipality or
30  county pursuant to G.S. 166A-19.22, the Chief Medical Examiner may appoint temporary county
31  medical examiners to serve until the expiration of the declared state of emergency. In appointing
32  temporary county medical examiners pursuant to this subsection, the Chief Medical Examiner
33  may appoint any individual determined by the Chief Medical Examiner to have the appropriate
34  training, education, and experience to serve as a county medical examiner during a declared state
35  of emergency.
36      …."
37
38  **PART VII. LAWS PERTAINING TO THE DIVISION OF SOCIAL SERVICES**
39
40  **ALIGNMENT OF TIME LINE FOR COUNTY TANF PLAN SUBMISSIONS**
41          **SECTION 7.1.(a)**  G.S. 108A-24(1e) reads as rewritten:
42      "(1e)    "County Plan" is the ~~biennial~~ triennial Work First Program plan prepared by
43                each Electing County pursuant to this Article and submitted to the Department
44                for incorporation into the State Plan that also includes the Standard Work First
45                Program."
46          **SECTION 7.1.(b)**  G.S. 108A-27.3(a)(12) reads as rewritten:
47      "(12)    Develop, adopt, and submit to the Department a ~~biennial~~ triennial County
48                Plan;"
49          **SECTION 7.1.(c)**  G.S. 108A-27.4(a) reads as rewritten:

Case 1:23-cv-00480-CCE-LPA   Document 26-1   Filed 06/27/23   Page 9 of 28

"(a)    Each Electing County shall submit to the Department, according to the schedule established by the Department and in compliance with all federal and State laws, rules, and regulations, a ~~biennial~~ triennial County Plan."

**AMENDMENT OF CHILD ABUSE AND NEGLECT SCHOOL POSTERS**
**SECTION 7.2.(a)**  G.S. 115C-12(47) reads as rewritten:
"(47)  Duty Regarding Child Abuse and Neglect. – The State Board of Education, in consultation with the Superintendent of Public Instruction, shall adopt a rule requiring information on child abuse and neglect, including age-appropriate information on sexual abuse, to be provided by public school units to students in grades six through 12. This rule shall also apply to high schools under the control of The University of North Carolina. Information shall be provided in the form of (i) a document provided to all students at the beginning of each school year and (ii) a display posted in visible, high-traffic areas throughout each public secondary school. The document and display shall include, at a minimum, the following information:
    a.    Likely warning signs indicating that a child may be a victim of abuse or neglect, including age-appropriate information on sexual abuse.
    b.    The telephone number used for reporting abuse and neglect to the department of social services in the county in which the school is located, in accordance with G.S. 7B-301.
    c.    A statement that information reported pursuant to sub-subdivision b. of this subdivision shall be held in the strictest confidence, to the extent permitted by law, pursuant to G.S. 7B-302(a1).
    d.    ~~Available resources developed pursuant to G.S. 115C-105.51, including the anonymous safety tip line application.~~"
**SECTION 7.2.(b)**  This section is effective when it becomes law and applies beginning with the 2023-2024 school year.

**AUTHORIZATION FOR APPLICATION OF FEDERALLY MANDATED TOOLS TO ENFORCE CHILD SUPPORT PAYMENTS**
**SECTION 7.3.(a)**  G.S. 110-129 reads as rewritten:
"**§ 110-129.  Definitions.**
    As used in this Article:
        …
        (6a)    "Financial Management Services" (FMS) means the unit of the U.S. Department of the Treasury, which, under federal law, offsets certain federal payments to satisfy support arrears.
        …
        (9a)    "Internal Revenue Service" (IRS) means the unit of the U.S. Department of the Treasury, which, under federal law, offsets income tax refunds against certain support arrears.
        …
        (12a)   "Offset" means withholding by the IRS or FMS of all or part of an income tax refund or certain federal payments due an obligor and remitting payments to the federal Office of Child Support Enforcement for transmittal to the State.
        …."
**SECTION 7.3.(b)**  G.S. 110-129.1(a) reads as rewritten:
"(a)    In addition to other powers and duties conferred upon the Department of Health and Human Services, Child Support Enforcement Program, by this Chapter or other State law, the Department shall have the following powers and duties:

…

(10)     Certify obligors to the federal Office of Child Support Enforcement for the Passport Denial Program under G.S. 110-143.

(11)     Certify to the federal Office of Child Support Enforcement determinations that an obligor in a IV-D case owes support arrears in an amount equal to or greater than the federally mandated thresholds for offset of federal income tax refunds under 42 U.S.C. § 664(b)(2) if the arrears are assigned to the State and 45 C.F.R. § 303.72(a)(2) if the arrears are not assigned to the State.

(12)     Certify obligors to the federal Office of Child Support Enforcement for the Administrative Offset Program under G.S. 110-144."

**SECTION 7.3.(c)**  Article 9 of Chapter 110 of the General Statutes is amended by adding the following new sections to read:

"**§ 110-143.  Passport Denial Program.**

(a)     Participation. – The Department of Health and Human Services shall participate in the federal Passport Denial Program for the denial, revocation, or limitation of an obligor's passports under 42 U.S.C. § 654(31) and 42 U.S.C. § 652(k).

(b)     Certification. – The Department shall annually certify to the federal Office of Child Support Enforcement (OCSE) an obligor in a IV-D case whose support arrears exceed the federally mandated threshold in 42 U.S.C. § 654(31). The OCSE shall transmit the certification to the U.S. Department of State pursuant to the federal Passport Denial Program.

(c)     Notice. – The Department shall send written notice of the certification to the obligor at the obligor's last known address. The notice shall advise the obligor of all of the following:

(1)     The amount of the arrears as of the date of the notice.

(2)     The possibility that the obligor's passport may be denied, revoked, or restricted by the U.S. Department of State.

(3)     The procedure to contest the certification.

(d)     Appeal. – Within 60 days of the date the notice is placed in the mail to the obligor, the obligor may file a contested case petition with the North Carolina Office of Administrative Hearings to contest the certification. The contested case shall be conducted in accordance with Article 3 of Chapter 150B of the General Statutes. The obligor may contest the certification only if one of the following applies:

(1)     An arrearage does not exist.

(2)     An arrearage does exist, but never exceeded the federally mandated threshold.

(3)     There is a claim of mistaken identity.

(e)     Withdrawal of Certification. – The Department shall notify the OCSE if the obligor's support arrears are paid in full.

"**§ 110-144.  Administrative Offset Program.**

(a)     Participation. – The Department of Health and Human Services shall participate in the federal Administrative Offset Program for the offset of certain federal payments under 31 C.F.R. § 285.1.

(b)     Certification. – The Department shall annually certify to the federal Office of Child Support Enforcement (OCSE) an obligor in a IV-D case whose support arrears are (i) equal to or greater than one hundred fifty dollars ($150.00) if the arrears are assigned to the State and (ii) equal to or greater than five hundred dollars ($500.00) if the arrears are not assigned to the State.

(c)     Notice. – At least 30 days before certification, the Department shall send written notice of the certification to the obligor at the obligor's last known address. The notice shall advise the obligor of all of the following:

(1)     The amount of the arrears as of the date of the notice.

(2)     The possibility that the obligor may have certain federal payments offset by FMS.

(3)     The procedures to contest the certification.

1     Without further notice to the obligor, the Department shall provide OCSE with updates to
2     adjust the amount of arrears to reflect any payments or additional arrears that accrue after the
3     date of certification.
4          (d)      Appeal. – Within 60 days of the date the notice is placed in the mail to the obligor,
5     the obligor may file a contested case petition with the North Carolina Office of Administrative
6     Hearings to contest the certification. The contested case shall be conducted in accordance with
7     Article 3 of Chapter 150B of the General Statutes. The obligor may contest the certification only
8     if either of the following applies:
9               (1)      The amount of arrears stated in the notice is incorrect.
10              (2)      There is a claim of mistaken identity."
11
12    **AUTHORIZATION FOR DSS TO GRANT EXCEPTIONS FOR EQUIVALENT CHILD**
13    **WELFARE TRAINING COMPLETED IN ANOTHER STATE**
14          **SECTION 7.4.**  G.S. 131D-10.6A reads as rewritten:
15    "**§ 131D-10.6A.  Training by the Division of Social Services required.**
16          …
17          (b)      The Division of Social Services shall establish minimum training requirements for
18    child welfare services staff. The minimum training requirements established by the Division are
19    as follows:
20              (1)      Child welfare services workers shall complete a minimum of 72 hours of
21                       preservice training before assuming direct client contact responsibilities. In
22                       completing this requirement, the Division of Social Services shall ensure that
23                       each child welfare worker receives training on family centered practices and
24                       State and federal law regarding the basic rights of individuals relevant to the
25                       provision of child welfare services, including the right to privacy, freedom
26                       from duress and coercion to induce cooperation, and the right to parent.
27              (2)      Child protective services workers shall complete a minimum of 18 hours of
28                       additional training that the Division of Social Services determines is necessary
29                       to adequately meet training needs.
30              (3)      Foster care and adoption workers shall complete a minimum of 39 hours of
31                       additional training that the Division of Social Services determines is necessary
32                       to adequately meet training needs.
33              (4)      Child welfare services supervisors shall complete a minimum of 72 hours of
34                       preservice training before assuming supervisory responsibilities and a
35                       minimum of 54 hours of additional training that the Division of Social
36                       Services determines is necessary to adequately meet training needs.
37              (5)      Child welfare services staff shall complete 24 hours of continuing education
38                       annually. In completing this requirement, the Division of Social Services shall
39                       provide each child welfare services staff member with annual update
40                       information on family centered practices and State and federal law regarding
41                       the basic rights of individuals relevant to the provision of child welfare
42                       services, including the right to privacy, freedom from duress and coercion to
43                       induce cooperation, and the right to parent.
44          (c)      The Division of Social Services may grant an exception in whole or in part to the
45    requirement under subdivision (1) of this subsection (b)(1) of this section to child welfare
46    workers who satisfactorily meet either of the following:
47              (1)      Satisfactorily complete or are enrolled in a masters or bachelors program after
48                       July 1, 1999, from a North Carolina social work program accredited pursuant
49                       to the Council on Social Work Education. The program's curricula must cover
50                       the specific preservice training requirements as established by the Division of
51                       Social Services.

| | (2) | Have child welfare work experience in another state and have completed child welfare training equivalent to training in this State. |

(d)      The Division of Social Services shall ensure that training opportunities are available for county departments of social services and consolidated human service agencies to meet the training requirements of ~~this subsection.~~subsection (b) of this section."

## CLARIFICATION OF WHO SETS MAXIMUM DAILY RATE FOR ADULT DAY CARE SERVICES

**SECTION 7.5.**  G.S. 143B-153(2a)b.3. reads as rewritten:

"3.      Maximum rates of payment for the provision of social services, except there shall be no maximum statewide reimbursement rate for adult day care services, adult day health services, and the associated transportation services, as these reimbursement rates shall be determined ~~at the local level~~ by the county department of social services or a designee of the board of county commissioners to allow flexibility in responding to local variables."

## PART VIII. LAWS PERTAINING TO THE DIVISION OF VOCATIONAL REHABILITATION SERVICES

## CHANGES TO EFFECTUATE RENAMING OF DIVISION

**SECTION 8.1.**  G.S. 108A-26 reads as rewritten:

"**§ 108A-26.  Certain financial assistance and in-kind goods not considered in determining assistance paid under Chapters 108A and 111.**

Financial assistance and in-kind goods or services received from a governmental agency, or from a civic or charitable organization, shall not be considered in determining the amount of assistance to be paid any person under Chapters 108A and 111 of the General Statutes provided that such financial assistance and in-kind goods and services are incorporated in the rehabilitation plan of such person being assisted by the Division of ~~Vocational Rehabilitation Services~~ Employment and Independence for People with Disabilities or the Division of Services for the Blind of the Department of Health and Human Services, except where such goods and services are required to be considered by federal law or regulations."

**SECTION 8.2.**  G.S. 111-11.1 reads as rewritten:

"**§ 111-11.1.  Jurisdiction of certain Divisions within the Department of Health and Human Services.**

For the purpose of providing rehabilitative services to people who are visually impaired, the Division of Services for the Blind and the Division of ~~Vocational Rehabilitation Services~~ Employment and Independence for People with Disabilities shall develop and enter into an agreement specifying which agency can most appropriately meet the specific needs of this client population. If the Divisions cannot reach an agreement, the Secretary of Health and Human Services shall determine which Division can most appropriately meet the specific needs of this client population."

**SECTION 8.3.**  G.S. 122C-22(a)(7) reads as rewritten:

"(7)      Persons subject to rules and regulations of the Division of ~~Vocational Rehabilitation Services.~~Employment and Independence for People with Disabilities."

**SECTION 8.4.**  G.S. 131D-2.3 reads as rewritten:

"**§ 131D-2.3.  Exemptions from licensure.**

The following are excluded from this Article and are not required to be registered or obtain licensure under this Article:

Case 1:23-cv-00480-CCE-LPA   Document 26-1   Filed 06/27/23   Page 13 of 28

1   (1)   Facilities licensed under Chapter 122C or Chapter 131E of the General
2           ~~Statutes;~~Statutes.
3           (2)   Persons subject to rules of the Division of ~~Vocational Rehabilitation~~
4           ~~Services;~~Employment and Independence for People with Disabilities.
5           (3)   Facilities that care for no more than four persons, all of whom are under the
6           supervision of the United States Veterans ~~Administration;~~Administration.
7           (4)   Facilities that make no charges for housing, amenities, or personal care
8           service, either directly or ~~indirectly; and~~indirectly.
9           (5)   Institutions that are maintained or operated by a unit of government and that
10          were established, maintained, or operated by a unit of government and exempt
11          from licensure by the Department on September 30, 1995."
12  **SECTION 8.5.** G.S. 143-545.1(a) reads as rewritten:
13  "(a)   Policy. – Recognizing that disability is a natural part of human experience, the State
14  establishes as its policy that individuals with physical and mental disabilities should be able to
15  participate to the maximum extent of their abilities in the economic, educational, cultural, social,
16  and political activities available to all citizens of the State. To implement this policy, the
17  Department of Health and Human Services shall establish and operate comprehensive and
18  accountable programs of vocational rehabilitation and independent living for persons with
19  disabilities. These programs are to be administered by the Division of ~~Vocational Rehabilitation~~
20  ~~Services~~Employment and Independence for People with Disabilities in collaboration with the
21  Division of Services for the Blind, which conducts vocational rehabilitation and independent
22  living programs for individuals who are blind or visually impaired, pursuant to Chapter 111 of
23  the General Statutes and the rules of the Commission for the Blind adopted pursuant to
24  G.S. 143B-157. The programs so provided shall be administered according to the following
25  principles:
26          …."
27  **SECTION 8.6.** G.S. 143-547 reads as rewritten:
28  "**§ 143-547.  Subrogation rights; withholding of information a misdemeanor.**
29          …
30  (b)   In furnishing a person rehabilitation services, including medical case services under
31  this Chapter, the Division of ~~Vocational Rehabilitation Services~~ Employment and Independence
32  for People with Disabilities is subrogated to the person's right of recovery from:
33          (1)   Personal insurance;
34          (2)   Worker's Compensation;
35          (3)   Any other person or personal injury caused by the other person's negligence
36          or wrongdoing; or
37          (4)   Any other source.
38  (c)   The Division of ~~Vocational Rehabilitation Services'~~Employment and Independence
39  for People with Disabilities' right to subrogation is limited to the cost of the rehabilitation services
40  provided by or through the Division for which a financial needs test is a condition of the service
41  provisions. Those services that are provided without a financial needs test are excluded from
42  these subrogation rights.
43  (d)   The Division of ~~Vocational Rehabilitation Services~~ Employment and Independence
44  for People with Disabilities may totally or partially waive subrogation rights when the Division
45  finds that enforcement would tend to defeat the client's process of rehabilitation or when client
46  assets can be used to offset additional Division costs.
47  (e)   The Division of ~~Vocational Rehabilitation Services~~ Employment and Independence
48  for People with Disabilities may adopt rules for the enforcement of its rights of subrogation.
49  (f)   It is a Class 1 misdemeanor for a person seeking or having obtained assistance under
50  this Part for himself or another to willfully fail to disclose to the Division of ~~Vocational~~
51  ~~Rehabilitation Services~~ Employment and Independence for People with Disabilities or its

Case 1:23-cv-00480-CCE-LPA   Document 26-1   Filed 06/27/23   Page 14 of 28

1  attorney the identity of any person or organization against whom the recipient of assistance has
2  a right of recovery, contractual or otherwise."
3      **SECTION 8.7.** G.S. 143-548 reads as rewritten:
4  "**§ 143-548. Vocational State Rehabilitation Council.**
5      (a)     There is established the Vocational State Rehabilitation Council (Council) in support
6  of the activities of the Division of ~~Vocational Rehabilitation Services~~ Employment and
7  Independence for People with Disabilities to be composed of not more than 18 appointed
8  members. Appointed members shall be voting members except where prohibited by federal law
9  or regulations. The Director of the Division of ~~Vocational Rehabilitation Services~~ Employment
10 and Independence for People with Disabilities and one vocational rehabilitation counselor who
11 is an employee of the Division shall serve ex officio as nonvoting members. The President Pro
12 Tempore of the Senate shall appoint six members, the Speaker of the House of Representatives
13 shall appoint six members, and the Governor shall appoint five or six members. The appointing
14 authorities shall appoint members of the Council after soliciting recommendations from
15 representatives of organizations representing a broad range of individuals with disabilities. Terms
16 of appointment shall be as specified in subsection (d1) of this section. Appointments shall be
17 made as follows:
18          …
19     (b1)    Additional Qualifications. – In addition to ensuring the qualifications for membership
20 prescribed in subsection (a) of this section, the appointing authorities shall ensure that a majority
21 of Council members are individuals with disabilities and are not employed by the Division of
22 ~~Vocational Rehabilitation Services.~~Employment and Independence for People with Disabilities.
23          …."

24
25 **PART IX. MISCELLANEOUS**
26
27 **MODIFICATION OF EDUCATIONAL REQUIREMENTS FOR REGISTERED**
28 **ENVIRONMENTAL HEALTH SPECIALISTS**
29     **SECTION 9.1.(a)** G.S. 90A-53 reads as rewritten:
30 "**§ 90A-53.  Qualifications and examination for registration as an environmental health**
31 **specialist or environmental health specialist intern.**
32     (a)     The Board shall issue a certificate to a qualified person as a registered environmental
33 health specialist or a registered environmental health specialist intern. A certificate as a registered
34 environmental health specialist or a registered environmental health specialist intern shall be
35 issued to any person upon the Board's determination that the ~~person:~~person satisfies all of the
36 following criteria:
37          (1)     Has made application to the Board on a form prescribed by the Board and paid
38                  a fee not to exceed one hundred dollars ~~($100.00):~~($100.00).
39          (2)     Is of good moral and ethical character and has signed an agreement to adhere
40                  to the Code of Ethics adopted by the ~~Board;~~Board.
41          (3)     Meets any of the following combinations of education and practice experience
42                  standards:
43                  a.      Graduated ~~from a baccalaureate~~ with a bachelor's degree or
44                          postgraduate degree from a program that is accredited by the National
45                          Environmental Health Science and Protection Accreditation Council
46                          ~~(EHAC) and has one or more years of experience in the field of~~
47                          ~~environmental health practice; or~~(EHAC).
48                  b.      Graduated ~~from a baccalaureate or postgraduate degree program that~~
49                          ~~is accredited by an accrediting organization recognized by the United~~
50                          ~~States Department of Education, Council for Higher Education~~

Accreditation (CHEA) ~~with a bachelor's degree or postgraduate degree~~ and ~~meets both of the following:~~

      1.   ~~Earned~~ earned a minimum of 30 semester hours or ~~its equivalent~~ 45 quarter hours in the ~~physical or biological sciences; and~~physical, biological, natural, life, or health sciences and has one

      2.   ~~Has two~~ or more years of experience in the field of environmental health practice.

    c.   Graduated ~~from a baccalaureate program rated as acceptable by the Board and meets both of the following:~~with a bachelor's degree or postgraduate degree in public health and has one or more years of experience in the field of environmental health practice.

      1.   ~~Earned a minimum of 30 semester hours or its equivalent in the physical or biological sciences; and~~

      2.   ~~Has two or more years of experience in the field of environmental health practice.~~

    (4)   Has satisfactorily completed a course in specialized instruction and training approved by the Board in the practice of environmental ~~health:~~health.

    (5)   Repealed by Session Laws 2009-443, s. 4, effective August 7, 2009.

    (6)   Has passed an examination administered by the Board designed to test for competence in the subject matters of environmental health sanitation. The examination shall be in a form prescribed by the Board and may be oral, written, or both. The examination for applicants shall be held annually or more frequently as the Board may by rule prescribe, at a time and place to be determined by the Board. A person shall not be registered if such person fails to meet the minimum grade requirements for examination specified by the Board. Failure to pass an examination shall not prohibit such person from being examined at subsequent times and places as specified by the ~~Board; and~~Board.

    (7)   Has paid a fee set by the Board not to exceed the cost of purchasing the examination and an administrative fee not to exceed one hundred fifty dollars ($150.00).

(b)   The Board may issue a certificate to a person serving as a registered environmental health specialist intern without the person meeting the full requirements for experience of a registered environmental health specialist for a period not to exceed ~~three~~ two years from the date of initial registration as a registered environmental health specialist intern, provided, the person meets the educational requirements in G.S. 90A-53 and is in the field of environmental health practice."

    **SECTION 9.1.(b)**  This section becomes effective October 1, 2023.

**EXTEND AUTHORIZATION TO ALIGN WITH FEDERAL LAW TO FACILITATE THE ADMINISTRATION OF COVID-19 VACCINATIONS, DIAGNOSTIC TESTS, OR OTHER TREATMENTS**

    **SECTION 9.2.(a)**  Section 9G.7(e) of S.L. 2022-74 reads as rewritten:

"**SECTION 9G.7.(e)** This section is effective when it becomes law and expires on December 31, ~~2023.~~2024."

    **SECTION 9.2.(b)**  This section is effective when it becomes law.

**CORRECT STATUTORY REFERENCE**

    **SECTION 9.3.(a)**  G.S. 90-85.15B(a), as amended by Section 3(a) of S.L. 2023-15, reads as rewritten:

Case 1:23-cv-00480-CCE-LPA    Document 26-1    Filed 06/27/23    Page 16 of 28

**"§ 90-85.15B.  Immunizing pharmacists.**
(a)      Except as provided in subsections ~~(b),~~ (a1), (b1), and (c) of this section, an immunizing pharmacist may only administer vaccinations or immunizations to persons at least 18 years of age pursuant to a specific prescription order."
          **SECTION 9.3.(b)**  This section is effective when it becomes law.

**PART X. ALLOW OPIOID TREATMENT PROGRAM MEDICATION UNITS AND MOBILE UNITS**
          **SECTION 10.1.**  G.S. 122C-3 reads as rewritten:
**"§ 122C-3.  Definitions.**
          The following definitions apply in this Chapter:
                    …
          (14)      Facility. – Any person at one ~~location~~ location, or in the case of an opioid treatment program facility licensed to operate an opioid treatment program medication unit, an opioid treatment program mobile unit, or both, any person at one or more locations, whose primary purpose is to provide services for the care, treatment, habilitation, or rehabilitation of individuals with mental illnesses or intellectual or other developmental disabilities or substance abusers, and includes all of the following:
                    …
                    i.      An opioid treatment program facility licensed to operate an opioid treatment program medication unit, an opioid treatment program mobile unit, or both.
          …
          (23b)     Mobile unit. – A motor vehicle that operates with more than three wheels in contact with the ground that may lawfully be used on the public streets, roads, or highways and from which opioid treatment program mobile unit services are provided at one or more locations.
          …
          (25a)     Opioid treatment program. – A facility with a current and valid registration under 21 U.S.C. § 823(g)(1) that meets all of the following criteria:
                    a.      Is engaged in dispensing and administering treatment medication approved by the Food and Drug Administration for the treatment of individuals with opioid use disorders.
                    b.      Has been licensed as an opioid treatment program facility by the Division of Health Service Regulation.
          (25b)     Opioid treatment program medication unit. – A unit established as part of an opioid treatment program facility that meets all of the following criteria:
                    a.      Operates at a geographically separate location from the opioid treatment program facility.
                    b.      Is a site at which treatment medication approved by the Food and Drug Administration for the treatment of opioid use disorder is dispensed or administered and samples are collected for drug testing or analysis.
                    c.      Is a site where intake or initial psychosocial and appropriate medical assessments may be conducted with a full physical examination to be completed or provided within 14 days of admission and the site provides appropriate privacy and adequate space for quality patient care, where treatment with medication approved by the Food and Drug Administration may be initiated after an appropriate medical assessment has been performed, and where other opioid treatment program services, such as counseling, may be provided directly, or

Case 1:23-cv-00480-CCE-LPA   Document 26-1   Filed 06/27/23   Page 17 of 28

when permissible, through the use of telehealth services and the site provides appropriate privacy and adequate space for quality patient care.

(25c)    Opioid treatment program mobile unit. – A mobile unit established as a mobile component of an opioid treatment program facility that meets all of the following criteria:

a.    Operates at one or more geographically separate, predetermined locations from the opioid treatment program facility.

b.    Is a site at which treatment medication approved by the Food and Drug Administration for treatment of opioid use disorder is dispensed or administered and samples are collected for drug testing or analysis.

c.    Is a site where intake or initial psychosocial and appropriate medical assessments may be conducted with a full physical examination to be completed or provided within 14 days of admission and the site provides appropriate privacy and adequate space for quality patient care, where treatment with medication approved by the Food and Drug Administration may be initiated after an appropriate medical assessment has been performed, and where other opioid treatment program services, such as counseling, may be provided directly or, when permissible, through the use of telehealth services and the site provides appropriate privacy and adequate space for quality patient care.

…."

**SECTION 10.2.** Article 2 of Chapter 122C of the General Statutes is amended by adding a new section to read:

"**§ 122C-35.  Licensure of opioid treatment program medication units and opioid treatment program mobile units.**

(a)    Any licensed opioid treatment program facility that intends to establish, maintain, or operate an opioid treatment program medication unit or opioid treatment program mobile unit shall apply to the Division of Health Service Regulation on forms prescribed by the Department for certified services provided from an opioid treatment program medication unit or opioid treatment program mobile unit to be added to its license. The Commission shall adopt rules establishing the requirements for obtaining such licensure, which shall include a requirement that each opioid treatment program medication unit and each opioid treatment program mobile unit seeking to operate in this State must demonstrate satisfactory proof to the Secretary that it has (i) obtained approval from the State Opioid Treatment Authority and (ii) registered with the Department's Drug Control Unit and the federal Drug Enforcement Agency.

(b)    An opioid treatment program facility shall not submit a license application to the Division of Health Service Regulation to provide certified services at an opioid treatment program facility medication unit or opioid treatment program mobile unit prior to receiving approval from the State Opioid Treatment Authority or prior to receiving confirmation of registration with the Department's Drug Control Unit and the federal Drug Enforcement Agency.

(c)    The Department may issue a license to an opioid treatment program facility to provide certified services at an opioid treatment program medication unit or an opioid treatment program mobile unit if the Secretary finds that the program is in compliance with all rules adopted by the Commission regarding opioid treatment programs. The Secretary may approve or deny an application for a license to provide certified services based upon consideration of all of the following criteria:

(1)    The applicant's capacity, qualifications, and experience with regard to providing treatment and operating an opioid treatment program medication

Case 1:23-cv-00480-CCE-LPA   Document 26-1   Filed 06/27/23   Page 18 of 28

1  unit in compliance with applicable federal and State laws, regulations, and
2  accepted clinical standards of practice.
3  (2)  Any history of adverse regulatory actions involving the applicant in North
4  Carolina or another state.
5  (3)  Any history of suspension or revocation of, or other adverse regulatory action
6  against, any professional licenses or narcotic licenses of persons proposed to
7  be employed in the opioid treatment program medication unit or opioid
8  treatment program mobile unit, in North Carolina or in another state, or any
9  adverse regulatory action against the license of the opioid treatment program
10  facility within the 12-month period preceding the application for licensure.
11  (4)  Any additional criteria or standards established in rules adopted by the
12  Commission regarding opioid treatment programs.
13  (d)  An opioid treatment program facility shall not establish, maintain, or operate an
14  opioid treatment program medication unit or opioid treatment program mobile unit without a
15  current license from the Secretary that includes and covers that specific medication unit or mobile
16  unit and without first obtaining certification from the Substance Abuse and Mental Health
17  Services Administration.
18  (e)  An opioid treatment program mobile unit or opioid treatment program medication
19  unit added to an opioid treatment program facility license shall be deemed part of the opioid
20  treatment program facility license and may be subject to inspections the Department deems
21  necessary to validate compliance with the requirements set forth in this section, applicable rules
22  adopted by the Commission, and all applicable federal laws and regulations, including, without
23  limitation, Substance Abuse and Mental Health Services Administration regulations in Parts 8
24  and 21 of Title 42 of the Code of Federal Regulations governing opioid treatment programs, and
25  federal Drug Enforcement Agency regulations in Parts 1300, 1301, and 1304 of Title 21 of the
26  Code of Federal Regulations, including 21 C.F.R. § 1301.13(e), governing controlled substances,
27  dispensers of controlled substances, mobile narcotic treatment programs, and federal Drug
28  Enforcement Agency restraints. Substantial failure to comply with the requirements of this
29  section, applicable rules adopted by the Commission, and applicable federal laws and regulations
30  may result in an adverse action on a license under G.S. 122C-24 and administrative penalties
31  under G.S. 122C-24.1. Any required services not provided in an opioid treatment program mobile
32  unit or opioid treatment program medication unit must be conducted at the opioid treatment
33  program facility, including medical, counseling, vocational, educational, and other assessment
34  and treatment services.
35  (f)  Each license issued under this section to an opioid treatment program facility to
36  provide certified services at an opioid treatment program mobile unit or an opioid treatment
37  program medication unit shall expire on December 31 of the year for which it was issued and
38  shall be renewed annually by filing with the Division of Health Service Regulation on or after
39  December 1 an application for license renewal on forms prescribed by the Department,
40  accompanied by the required fee. License renewal shall be contingent upon (i) the applicant
41  providing all information required by the Secretary for renewal and (ii) continued compliance
42  with this Article and any applicable rules adopted by the Commission regarding opioid treatment
43  programs. The Department shall charge an opioid treatment program facility a nonrefundable
44  annual license fee plus a nonrefundable annual per-unit fee of two hundred sixty-five dollars
45  ($265.00) for each opioid treatment program medication unit or opioid treatment program mobile
46  unit.
47  (g)  The opioid treatment program facility is responsible for ensuring that opioid treatment
48  program medication units and opioid treatment program mobile medication units adhere to all
49  State and federal requirements for opioid treatment programs.
50  (h)  Notwithstanding G.S. 122C-25(a), an opioid treatment program facility with no
51  previous violations of State or federal requirements for opioid treatment programs may be subject

Case 1:23-cv-00480-CCE-LPA   Document 26-1   Filed 06/27/23   Page 19 of 28

to inspection once every other year, excluding any complaint investigation. An opioid treatment program facility with either an opioid treatment program medication unit or an opioid treatment program mobile unit may be subject to annual inspections.

(i)     The Commission shall adopt emergency, temporary, or permanent rules for the licensure, inspection, and operation of opioid treatment program medication units and opioid treatment program mobile units, including rules concerning any of the following:

(1)     Compliance with all applicable Substance Abuse and Mental Health Services Administration and federal Drug Enforcement Agency regulations governing opioid treatment program mobile units and opioid treatment program medication units.

(2)     Identification of the location of opioid treatment program medication units and opioid treatment program mobile units.

(3)     Schedules for the days and hours of operation to meet client needs.

(4)     Maintenance and location of records.

(5)     Requisite clinical staff and staffing ratios to meet immediate client needs at each opioid treatment program medication unit or opioid treatment program mobile unit, including client needs for nursing, counseling, and medical care.

(6)     Emergency staffing requirements to ensure service delivery.

(7)     Criteria for policies and procedures for a clinical and individualized assessment of individuals to receive services at an opioid treatment medication unit or opioid treatment mobile unit that consider medical and clinical appropriateness and accessibility to individuals served.

(8)     Number of clients allowed per opioid treatment program medication unit and opioid treatment program mobile unit, based on staffing ratios.

(9)     Criteria to ensure the opioid treatment program facility is providing the required counseling to individuals receiving services at an opioid treatment program medication unit or opioid treatment program mobile unit.

(10)    Criteria for the opioid treatment program facility to ensure that individuals receiving services at an opioid treatment program medication unit or opioid treatment program mobile unit receive medical interventions when necessary."

**SECTION 10.3.**  The Commission for Mental Health, Developmental Disabilities, and Substance Use Services shall adopt, pursuant to G.S. 150B-21.1A, emergency rules for the implementation of G.S. 122C-35, enacted by Section 10.2 of this act, without prior notice or hearing or upon any abbreviated notice or hearing that the agency finds practical because adherence to the notice and hearing requirements would be contrary to the public interest and that the immediate adoption of the rule is required by a serious and unforeseen threat to the public health or safety. The Commission for Mental Health, Developmental Disabilities, and Substance Use Services is further authorized to adopt temporary or permanent rules as described in G.S. 122C-35(i), enacted by Section 10.2 of this act.

**SECTION 10.4.**  Section 10.3 of this act is effective when it becomes law. Section 10.1 and Section 10.2 of this act become effective on the effective date of the emergency rules adopted by the Commission for Mental Health, Developmental Disabilities, and Substance Use Services in accordance with Section 10.3 of this act. The Secretary of the Department of Health and Human Services shall notify the Revisor of Statutes of the effective date of the emergency rules adopted by the Commission for Mental Health, Developmental Disabilities, and Substance Use Services.

**PART XI. ADD GABAPENTIN TO CONTROLLED SUBSTANCE REPORTING SYSTEM**

**SECTION 11.1.**  G.S. 90-113.73(b) reads as rewritten:

1    "(b)    The Commission shall adopt rules requiring dispensers to report the following
2    information. The Commission may modify these requirements as necessary to carry out the
3    purposes of this Article. The dispenser shall report:
4            (1)    The dispenser's DEA ~~number.~~number for prescriptions of controlled
5                   substances, and for prescriptions of gabapentin, whether the dispenser has a
6                   DEA number.
7            (2)    The name of the patient for whom the controlled substance is being dispensed,
8                   and the patient's:
9                   a.    Full address, including city, state, and zip code.
10                  b.    Telephone number.
11                  c.    Date of birth.
12           (3)    The date the prescription was written.
13           (4)    The date the prescription was filled.
14           (5)    The prescription number.
15           (6)    Whether the prescription is new or a refill.
16           (7)    ~~Metric~~ The metric quantity of the dispensed drug.
17           (8)    ~~Estimated~~ The estimated days of supply of dispensed drug, if provided to the
18                  dispenser.
19           (9)    The National Drug Code of dispensed drug.
20           (10)   ~~Prescriber's DEA number.~~The prescriber's DEA number for prescriptions of
21                  controlled substances, and for prescriptions of gabapentin, if the prescriber
22                  has a DEA number and the number is known by the dispenser.
23           (10a)  ~~Prescriber's~~ The presciber's national provider identification number, for any
24                  prescriber that has a national provider identification number. A pharmacy
25                  shall not be subject to a civil penalty under subsection (e) of this section for
26                  failure to report the prescriber's national provider identification number when
27                  it is not received by the pharmacy.
28           (11)   ~~Method~~ The method of payment for the prescription."
29    **SECTION 11.2.** G.S. 90-113.73(c) reads as rewritten:
30    "(c)    A dispenser shall not be required to report instances in which a controlled ~~substance~~
31    substance, or gabapentin, is provided directly to the ultimate user and the quantity provided does
32    not exceed a 48-hour supply."
33    **SECTION 11.2A.** G.S. 90-113.73 is amended by adding a new subsection to read:
34    "(c1)    A dispenser shall not be required to report gabapentin to the controlled substances
35    reporting system when gabapentin is a component of a compounded prescription that is dispensed
36    in dosages of 100 milligrams or less."
37    **SECTION 11.3.** G.S. 90-113.73(f) reads as rewritten:
38    "(f)    For purposes of this section, a "dispenser" includes a person licensed to practice
39    veterinary medicine pursuant to Article 11 of Chapter 90 of the General Statutes when that person
40    dispenses any Schedule II through V controlled ~~substances.~~ substance or gabapentin.
41    Notwithstanding subsection (b) of this section, the Commission shall adopt rules requiring the
42    information to be reported by a person licensed to practice veterinary medicine pursuant to
43    Article 11 of Chapter 90 of the General Statutes."
44    **SECTION 11.4.** Section 11.1, Section 11.2, and Section 11.2A of this act become
45    effective March 1, 2024. Section 11.3 of this act becomes effective March 1, 2025.
46
47    **PART XII. REQUIRE ELECTRONIC PRESCRIBING OF CODEINE COUGH SYRUP**
48           **SECTION 12.1.** G.S. 90-106 reads as rewritten:
49    "**§ 90-106.  Prescriptions and labeling.**
50           …

1          (a1)      Electronic Prescription Required; Exceptions. – Unless otherwise exempted by this
2     subsection, a practitioner shall electronically prescribe all targeted controlled ~~substances.~~
3     substances and all controlled substances included in G.S. 90-93(a)(1)a. This subsection does not
4     apply to any product that is sold at retail without a prescription by a pharmacist under
5     G.S. 90-93(b) through (d). This subsection does not apply to prescriptions for targeted controlled
6     substances or any controlled substances included in G.S. 90-93(a)(1)a. issued by any of the
7     following:
8                    (1)       A practitioner, other than a pharmacist, who dispenses directly to an ultimate
9                              user.
10                   (2)       A practitioner who orders a controlled substance to be administered in a
11                             hospital, nursing home, hospice facility, outpatient dialysis facility, or
12                             residential care facility, as defined in G.S. 14-32.2(i).
13                   (3)       A practitioner who experiences temporary technological or electrical failure
14                             or other extenuating circumstance that prevents the prescription from being
15                             transmitted electronically. The practitioner, however, shall document the
16                             reason for this exception in the patient's medical record.
17                   (4)       A practitioner who writes a prescription to be dispensed by a pharmacy
18                             located on federal property. The practitioner, however, shall document the
19                             reason for this exception in the patient's medical record.
20                   (5)       A person licensed to practice veterinary medicine pursuant to Article 11 of
21                             this Chapter. A person licensed to practice veterinary medicine pursuant to
22                             Article 11 of this Chapter may continue to prescribe targeted controlled
23                             substances from valid written, oral, or facsimile prescriptions that are
24                             otherwise consistent with applicable laws.
25         (a2)      Verification by Dispenser Not Required. – A dispenser is not required to verify that a
26    practitioner properly falls under one of the exceptions specified in subsection (a1) of this section
27    prior to dispensing a targeted controlled ~~substance.~~ substance or a controlled substance included
28    in G.S. 90-93(a)(1)a. A dispenser may continue to dispense targeted controlled substances and
29    controlled substances included in G.S. 90-93(a)(1)a. from valid written, oral, or facsimile
30    prescriptions that are otherwise consistent with applicable laws.
31         …."
32                   **SECTION 12.2.**  This section becomes effective January 1, 2024.
33
34    **PART XIII. OVER-THE-COUNTER OPIOID ANTAGONIST TREATMENT**
35                   **SECTION 13.1.**  G.S. 90-12.7 reads as rewritten:
36    "**§ 90-12.7.  Treatment of overdose with opioid antagonist; immunity.**
37         (a)       As used in this section, "opioid antagonist" means naloxone hydrochloride that is
38    approved by the federal Food and Drug Administration for the treatment of a drug overdose.
39         (b)       The following individuals may prescribe an opioid antagonist in the manner
40    prescribed by this subsection:
41                   (1)       A practitioner acting in good faith and exercising reasonable care may directly
42                             or by standing order prescribe an opioid antagonist to (i) a person at risk of
43                             experiencing an opiate-related overdose or (ii) a family member, friend, or
44                             other person in a position to assist a person at risk of experiencing an
45                             opiate-related overdose. As an indicator of good faith, the practitioner, prior
46                             to prescribing an opioid under this subsection, may require receipt of a written
47                             communication that provides a factual basis for a reasonable conclusion as to
48                             either of the following:
49                             a.        The person seeking the opioid antagonist is at risk of experiencing an
50                                       opiate-related overdose.

       b.    The person other than the person who is at risk of experiencing an opiate-related overdose, and who is seeking the opioid antagonist, is in relation to the person at risk of experiencing an opiate-related overdose:

           1.    A family member, friend, or other person.

           2.    In the position to assist a person at risk of experiencing an opiate-related overdose.

(2)    The State Health Director or a designee may prescribe an opioid antagonist pursuant to subdivision (1) of this subsection by means of a statewide standing order.

(3)    A practitioner acting in good faith and exercising reasonable care may directly or by standing order prescribe an opioid antagonist to any governmental or nongovernmental organization, including a local health department, a law enforcement agency, or an organization that promotes scientifically proven ways of mitigating health risks associated with substance use disorders and other high-risk behaviors, for the purpose of distributing, through its agents, the opioid antagonist to (i) a person at risk of experiencing an opiate-related overdose or (ii) a family member, friend, or other person in a position to assist a person at risk of experiencing an opiate-related overdose.

(c)    A pharmacist may dispense an opioid antagonist to a person or organization pursuant to a prescription issued in accordance with subsection (b) of this section. For purposes of this section, the term "pharmacist" is as defined in G.S. 90-85.3.

(c1)    A governmental or nongovernmental organization, including a local health department, a law enforcement agency, or an organization that promotes scientifically proven ways of mitigating health risks associated with substance use disorders and other high-risk behaviors may, through its agents, distribute an opioid antagonist obtained pursuant to a prescription issued in accordance with subdivision (3) of subsection (b) of this section or obtained over-the-counter to (i) a person at risk of experiencing an opiate-related overdose or (ii) a family member, friend, or other person in a position to assist a person at risk of experiencing an opiate-related overdose. An organization, through its agents, shall include with any distribution of an opioid antagonist pursuant to this subsection basic instruction and information on how to administer the opioid antagonist.

(d)    A person who receives an opioid antagonist that was prescribed pursuant to subsection (b) of this section or distributed pursuant to subsection (c1) of this section or obtained over-the-counter may administer an opioid antagonist to another person if (i) the person has a good faith belief that the other person is experiencing a drug-related overdose and (ii) the person exercises reasonable care in administering the drug to the other person. Evidence of the use of reasonable care in administering the drug shall include the receipt of basic instruction and information on how to administer the opioid antagonist.

(e)    All of the following individuals are immune from any civil or criminal liability for actions authorized by this section:

    (1)    Any practitioner who prescribes an opioid antagonist pursuant to subsection (b) of this section.

    (2)    Any pharmacist who dispenses an opioid antagonist pursuant to subsection (c) of this section.

    (3)    Any person who administers an opioid antagonist pursuant to subsection (d) of this section.

    (4)    The State Health Director acting pursuant to subsection (b) of this section.

    (5)    Any organization, or agent of the organization, that distributes an opioid antagonist pursuant to subsection (c1) of this section."

**SECTION 13.2.** This section is effective when it becomes law.

Case 1:23-cv-00480-CCE-LPA   Document 26-1   Filed 06/27/23   Page 23 of 28

**PART XIII-A. PARENTAL LEAVE TECHNICAL CORRECTIONS**

**SECTION 13A.1.(a)** G.S. 126-8.6, as enacted by S.L. 2023-14, reads as rewritten:
"**§ 126-8.6.  Paid parental leave.**

…

(b)        Paid Parental Leave. – The State Human Resources Commission shall adopt rules and policies to provide that a permanent, <u>probationary, or time-limited</u> full-time State employee may take the following paid parental leave:

(1)        Up to eight weeks of paid leave after giving birth to a child; or

(2)        Up to four weeks of paid leave after any other qualifying event.

(c)        Part-Time Employees. – The State Human Resources Commission shall adopt rules and policies to provide that a permanent, <u>probationary, or time-limited</u> part-time State employee may take a prorated amount of paid leave after giving birth, not to exceed ~~four~~ <u>eight</u> weeks, or paid leave after any other qualifying event, not to exceed ~~two~~ <u>four</u> weeks, in addition to any other leave available to the employee.

<u>(c1)      The State Human Resources Commission shall adopt rules and policies providing for a period of minimum service before an employee becomes eligible for parental leave, the maximum number of uses of paid parental leave within a 12-month period, and how much leave is to be provided in the event of miscarriage or the death of a child during birth.</u>

…."

**SECTION 13A.1.(b)** G.S. 126-5(c19), as enacted by S.L. 2023-14, reads as rewritten:

"(c19)    ~~The provisions of G.S. 126-8.6 shall apply to all exempt and nonexempt State employees in the executive branch; to public school employees; and to community college employees.~~ <u>Notwithstanding any other provision of this Chapter, G.S. 126-8.6 applies to all State employees, public school employees, and community college employees. G.S. 126-8.6 does not apply to employees described in subdivisions (2) and (3) of subsection (c1) of G.S. 126-5.</u> The legislative and judicial branches shall adopt parental leave policies."

**SECTION 13A.1.(c)** G.S. 115C-336.1, as amended by S.L. 2023-14, reads as rewritten:

"**§ 115C-336.1.  Parental leave.**

<u>(a)</u>        In addition to paid parental leave authorized by G.S. 126-8.6, a school employee may use annual leave or leave without pay to care for a newborn child or for a child placed with the employee for adoption or foster care. A school employee may also use up to 30 days of sick leave to care for a child placed with the employee for adoption. The leave may be for consecutive workdays during the first 12 months after the date of birth or placement of the child, unless the school employee and the local board of education agree otherwise.

<u>(b)        To the extent funds are made available for this purpose, the Department of Public Instruction shall administer funds to public school units for the payment of substitute teachers for any public school unit teacher using paid parental leave as provided in G.S. 126-8.6.</u>"

**SECTION 13A.1.(d)** G.S. 115C-218.90(a) is amended by adding a new subdivision to read:

"<u>(6)        A board of directors may provide paid parental leave consistent with the requirements of G.S. 126-8.6.  If the board provides paid parental leave, it shall be eligible to receive funds as provided in G.S. 115C-336.1(b).</u>"

**SECTION 13A.1.(e)** G.S. 115C-238.68 is amended by adding a new subdivision to read:

"<u>(8)        Paid parental leave. – Teachers employed by the board of directors shall be eligible for paid parental leave as provided in G.S. 126-8.6. The board of directors shall be eligible to receive funds as provided in G.S. 115C-336.1(b).</u>"

Case 1:23-cv-00480-CCE-LPA   Document 26-1   Filed 06/27/23   Page 24 of 28

**SECTION 13A.1.(f)**  G.S. 116-239.10 is amended by adding a new subdivision to read:

"(9)     Paid parental leave. – Teachers employed by the board of the constituent institution shall be eligible for paid parental leave as provided in G.S. 126-8.6. The constituent institution shall be eligible to receive funds as provided in G.S. 115C-336.1(b)."

**SECTION 13A.1.(g)**  Section 5.1(e) of S.L. 2023-14 reads as rewritten:

"**SECTION 5.1.(e)**  There is appropriated from the General Fund to the Department of Public Instruction the sum of ten million dollars ($10,000,000) in recurring funds for the 2023-2024 fiscal year and the sum of ten million dollars ($10,000,000) in recurring funds for the 2024-2025 fiscal year to ~~fund paid parental leave authorized by this section.~~provide substitute teachers in accordance with G.S. 115C-336.1(b)."

**SECTION 13A.1.(h)**  This section becomes effective July 1, 2023, and applies to requests for paid parental leave related to births occurring on or after that date.

**PART XIII-B. IN-PERSON CONSULTATION**

**SECTION 13B.1.(a)**  G.S. 90-21.83A, as enacted by S.L. 2023-14, reads as rewritten:

"**§ 90-21.83A.  Informed consent to medical abortion.**

…

(b)     Except in the case of a medical emergency, consent to a medical abortion is voluntary and informed only if all of the following conditions are satisfied:

…

(2)     The consent form shall include, at a minimum, all of the following:

…

k.     The location of the hospital that offers obstetrical or gynecological care located within 30 miles of the location where the medical abortion is performed or induced and at which the physician performing or inducing the medical abortion has clinical privileges. If the physician who will perform the medical abortion has no local hospital admitting privileges, that information shall be communicated.

If the physician or qualified professional does not know the information required in sub-subdivision a., j., or k. of this subdivision, the woman shall be advised that this information will be directly available from the physician who is to perform the medical abortion. However, the fact that the physician or qualified professional does not know the information required in sub-subdivision a., j., or k. shall not restart the 72-hour period. The information required by this subdivision shall be provided in English and in each language that is the primary language of at least two percent (2%) of the State's population. The information shall be provided orally in person, by the physician or qualified professional, in which case the required information may be based on facts supplied by the woman to the physician and whatever other relevant information is reasonably available. The information required by this subdivision shall not be provided by a tape recording but shall be provided during ~~a consultation in which the physician is able to ask questions of the patient and the patient is able to ask questions of the physician.~~ an in-person consultation conducted by a qualified professional or a qualified physician. A physician must be available to ask and answer questions within the statutory time frame upon request of the patient or the qualified professional. If, in the medical judgment of the physician, a physical examination, tests, or the availability of other information to the physician

Case 1:23-cv-00480-CCE-LPA   Document 26-1   Filed 06/27/23   Page 25 of 28

1             subsequently indicates a revision of the information previously supplied to the
2             patient, then that revised information may be communicated to the patient at
3             any time before the performance of the medical abortion. Nothing in this
4             section may be construed to preclude provision of required information in a
5             language understood by the patient through a translator.
6             …."
7        **SECTION 13B.1.(b)** This section becomes effective July 1, 2023.
8
9 **PART XIV. TECHNICAL AND CONFORMING CHANGES TO S.L. 2023-14**
10        **SECTION 14.1.(a)** G.S. 14-23.7 reads as rewritten:
11 "**§ 14-23.7. Exceptions.**
12      Nothing in this Article shall be construed to permit the prosecution under this Article of any
13 of the following:
14          (1)     Acts which cause the death of an unborn child if those acts were lawful,
15             pursuant to the provisions of ~~G.S. 14-45.1.~~Article 1I of Chapter 90 of the
16             General Statutes.
17          (2)     Acts which are committed pursuant to usual and customary standards of
18             medical practice during diagnostic testing or therapeutic treatment.
19          (3)     Acts committed by a pregnant woman with respect to her own unborn child,
20             including, but not limited to, acts which result in miscarriage or stillbirth by
21             the woman. The following definitions shall apply in this section:
22             a.     Miscarriage. – The interruption of the normal development of an
23                  unborn child, other than by a live birth, and which is not an induced
24                  abortion permitted under ~~G.S. 14-45.1,~~Article 1I of Chapter 90 of the
25                  General Statutes, resulting in the complete expulsion or extraction
26                  from a pregnant woman of the unborn child.
27             b.     Stillbirth. – The death of an unborn child prior to the complete
28                  expulsion or extraction from a woman, irrespective of the duration of
29                  pregnancy and which is not an induced abortion permitted under ~~G.S.~~
30                  ~~14-45.1.~~Article 1I of Chapter 90 of the General Statutes."
31        **SECTION 14.1.(b)** G.S. 90-21.81A, as enacted by S.L. 2023-14, reads as rewritten:
32 "**§ 90-21.81A. Abortion.**
33      (a)     Abortion. – It shall be unlawful after the twelfth week of a woman's pregnancy to
34 ~~advise, procure, or cause~~ procure or cause a miscarriage or ~~abortion.~~abortion in the State of North
35 Carolina.
36      …."
37        **SECTION 14.1.(c)** G.S. 90-21.81B, as enacted by S.L. 2023-14, reads as rewritten:
38 "**§ 90-21.81B. When abortion is lawful.**
39      Notwithstanding any of the provisions of G.S. 14-44 and G.S. 14-45, and subject to the
40 provisions of this Article, it shall not be unlawful to ~~advise, procure, or cause~~procure or cause a
41 miscarriage or an abortion in the State of North Carolina in the following circumstances:
42      …."
43        **SECTION 14.1.(d)** G.S. 90-21.82(b), as amended by S.L. 2023-14, reads as
44 rewritten:
45     "(b)     Except in the case of a medical emergency, consent to a surgical abortion is voluntary
46 and informed only if all of the following conditions are satisfied:
47          …
48          (1a)    The consent form shall include, at a minimum, all of the following:
49             a.     The name of the physician who will perform the surgical abortion to
50                  ensure the safety of the procedure and prompt medical attention to any
51                  complications that may ~~arise.~~ arise, specific information for the

Case 1:23-cv-00480-CCE-LPA   Document 26-1   Filed 06/27/23   Page 26 of 28

1     physician's hospital admitting privileges, and whether the physician
2     accepts the pregnant woman's insurance. The physician performing a
3     surgical abortion shall be physically present during the performance
4     of the entire abortion procedure.
5   …."
6     **SECTION 14.1.(e)**  G.S. 90-21.83A(b), as enacted by S.L. 2023-14, reads as
7   rewritten:
8     "(b)     Except in the case of a medical emergency, consent to a medical abortion is voluntary
9   and informed only if all of the following conditions are satisfied:
10    …
11        (2)     The consent form shall include, at a minimum, all of the following:
12            a.     The name of the physician who will prescribe, dispense, or otherwise
13                provide the abortion-inducing drugs to ensure the safety of the
14                procedure and prompt medical attention to any complications that may
15                ~~arise.~~ arise, specific information for the physician's hospital admitting
16                privileges, and whether the physician accepts the pregnant woman's
17                insurance. The physician prescribing, dispensing, or otherwise
18                providing any drug or chemical for the purpose of inducing an abortion
19                shall be physically present in the same room as the woman when the
20                first drug or chemical is administered to the woman.
21    …."
22    **SECTION 14.1.(f)**  G.S. 90-21.83B, as enacted by S.L. 2023-14, reads as rewritten:
23  "**§ 90-21.83B.  Distribution of abortion-inducing drugs and duties of physician.**
24    (a)     A physician prescribing, administering, or dispensing an abortion-inducing drug must
25  examine the woman in person and, prior to providing an abortion-inducing drug, shall do all of
26  the following:
27    …
28        (6)     Verify ~~that~~ the probable gestational age of the unborn ~~child is no more than~~
29            ~~70 days.~~child.
30        (7)     Document in the woman's medical chart the probable ~~gestation~~ gestational age
31            and existence of an intrauterine ~~location of the~~ pregnancy, and whether the
32            woman received treatment for an Rh negative condition or any other
33            diagnostic tests.
34    …."
35    **SECTION 14.1.(g)**  G.S. 90-21.83C, as enacted by S.L. 2023-14, is repealed.
36    **SECTION 14.1.(h)**  G.S. 90-21.85(a) reads as rewritten:
37    "(a)     Notwithstanding ~~G.S. 14-45.1,~~ G.S. 90-21.81B, except in the case of a medical
38  emergency, in order for the woman to make an informed decision, at least four hours before a
39  woman having any part of an abortion performed or induced, and before the administration of
40  any anesthesia or medication in preparation for the abortion on the woman, the physician who is
41  to perform the abortion, or qualified technician working in conjunction with the physician, shall
42  do each of the following:
43    …."
44    **SECTION 14.1.(i)**  G.S. 131E-269 reads as rewritten:
45  "**§ 131E-269.  Authorization to charge fee for certification of facilities suitable to perform
46            abortions.**
47    The Department of Health and Human Services shall charge each hospital or clinic certified
48  by the Department as a facility suitable for the performance of abortions, as authorized under
49  ~~G.S. 14-45.1,~~ G.S. 90-21.81C, a nonrefundable annual certification fee in the amount of seven
50  hundred dollars ($700.00)."
51    **SECTION 14.1.(j)**  G.S. 90-21.93, as enacted by S.L. 2023-14, reads as rewritten:

Case 1:23-cv-00480-CCE-LPA   Document 26-1   Filed 06/27/23   Page 27 of 28

1  "**§ 90-21.93.  Reporting requirements.**
2          (a)        Report. – After a surgical or medical abortion is performed, the physician or health
3  care provider that conducted the surgical or medical abortion shall complete and transmit a report
4  to the Department in compliance with the requirements of this section. The report shall be
5  completed by either the hospital, clinic, or health care provider in which the surgical or medical
6  abortion was completed and signed by the physician who dispensed, administered, prescribed, or
7  otherwise provided the abortion-inducing drug or performed the procedure or treatment to the
8  woman. Any physician or health care provider shall make reasonable efforts to include all of the
9  required information in this section in the report without violating the privacy of the woman. The
10  report shall be transmitted to the Department within 15 days after either the (i) date of the
11  follow-up appointment following a medical abortion, (ii) date of the last patient encounter for
12  treatment directly related to a surgical abortion, or (iii) end of the month in which the last
13  scheduled appointment occurred, whichever is later. A report completed under this section for a
14  minor shall be sent to the Department and the Division of Social Services within ~~three~~ 30 days
15  of the surgical or medical abortion.
16          …."
17                      **SECTION 14.1.(k)**  This section becomes effective July 1, 2023.
18
19  **PART XV. EFFECTIVE DATE**
20                      **SECTION 15.1.**  Except as otherwise provided, this act is effective when it becomes
21  law.

Case 1:23-cv-00480-CCE-LPA   Document 26-1   Filed 06/27/23   Page 28 of 28