# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### DURHAM DIVISION

| | |
|---|---|
| PLANNED PARENTHOOD SOUTH ATLANTIC; BEVERLY GRAY, M.D., on behalf of themselves and their patients seeking abortions,<br><br>       Plaintiffs,<br><br>v.<br><br>JOSHUA H. STEIN, Attorney General of North Carolina, in his official capacity; et al.<br><br>       Defendants. | No. 1:23-CV-480 |

## DEFENDANT ATTORNEY GENERAL JOSHUA H. STEIN'S MEMORANDUM OF LAW REGARDING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

This brief conveys the position of Attorney General Joshua H. Stein. Michaux R. Kilpatrick, the President of the North Carolina Medical Board, and Racquel Ingram, Chair of the North Carolina Board of Nursing, take no position on Plaintiffs' pending motion. Kody H. Kinsley, Secretary of the North Carolina Department of Health and Human Services, agrees with Plaintiffs and the Attorney General that S.B. 20, as passed, includes contradictions, uncertainties, and ambiguities that impact the ability for women to lawfully obtain an abortion and for providers to comply with the many administrative and reporting aspects of the law. However, Secretary Kinsley does not take a position on the pending motion. The district attorney defendants are still in the process of finalizing representation.

## INTRODUCTION

For half a century, *Roe v. Wade* protected the right of women across America to make their own reproductive healthcare decisions. 410 U.S. 113 (1973). Last year, the U.S. Supreme Court reversed course. *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2242 (2022). *Dobbs* invited state legislators—not women themselves—to control the decision whether to bear a child. *Id.* at 2243.

The North Carolina General Assembly quickly accepted this invitation and significantly curtailed women's reproductive freedom in this State. Last month, in a party-line vote, the legislature passed Senate Bill 20 over Governor Roy Cooper's veto.[1] Republican legislators introduced the bill outside of the normal legislative procedures, thereby avoiding the standard opportunities for public input, debate, and amendment.[2]

Not surprisingly, then, S.B. 20 is riddled with incoherence and uncertainty. Some provisions impose contradictory obligations on doctors; others cross-reference laws that are now repealed. The upshot is that doctors in North Carolina simply do not know what they can and cannot do without risking criminal liability.

---

[1] N.C. Gen. Assembly, Senate Bill 20/SL 2023-14, https://www.ncleg.gov/BillLookUp/2023/Senate%20Bill%2020/SL%202023-14 (last visited June 24, 2023).

[2] Luciana Perez Uribe Guinassi & Dawn Baumgartner Vaughan, *NC Legislature Passes Abortion Bill. Governor Will Veto, but GOP Has Supermajority*, News & Observer, May 4, 2023, https://www.newsobserver.com/news/politics-government/article275051071.html ("GOP lawmakers had revealed their 46-page abortion bill on Tuesday evening via a conference report, which allows the legislature to avoid the typical procedural requirements of multiple hearings, debate and opportunities for amendments from both parties.").

The Constitution does not permit such uncertainty. To satisfy due process, laws must be clear enough "that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

S.B. 20 cannot satisfy this standard—and the General Assembly has effectively conceded as much. Last week, the legislature introduced a series of amendments designed to revise many of the unconstitutional provisions identified in this lawsuit. Doc. 25-1 (H.B. 190). If those amendments are passed, they may remedy some of the constitutional violations that Plaintiffs allege. But unless and until the current law is repealed or significantly amended, immediate injunctive relief is necessary to avoid a due-process violation.

Moreover, even if the legislature's proposed amendments do pass, at least one constitutional problem with S.B. 20 will remain: even the currently proposed revisions to S.B. 20 fail to make clear that doctors in North Carolina can help their patients obtain abortions out of state. *See* Doc. 25-1 (H.B. 190, § 14.1.(b)) (proposing to amend § 90-21.81A). This ambiguity raises concerns under both the Due Process Clause and the First Amendment. For this reason, whether or not the General Assembly enacts its proposed changes to S.B. 20, ongoing injunctive relief will be justified.[3]

---

[3] Because all of the represented parties have stipulated that § 90-21.81B(3) does not take effect until October 1, 2023, the Attorney General understands that Plaintiffs no longer intend to address that provision at the hearing on June 28, 2023. This brief thus does not address the constitutionality of § 90-21.81B(3). The Attorney General reserves the right to address that provision at the appropriate time.

## STATEMENT OF FACTS

The ability of a woman to have an abortion directly corresponds with "[t]he ability . . . to participate equally in [this Nation's] economic and social life." *Dobbs*, 142 S. Ct. at 2318 (Breyer, Sotomayor, and Kagan, JJ., dissenting) (quoting *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 856 (1992)) (alterations in original). Retaining the freedom to choose whether to bear a child allows women to retain control over the course of their lives and their futures. *See id.* at 2317.

Abortion is also one of the safest and most common medical procedures in the United States.[4] Approximately one in four American women are estimated to have had an abortion before the age of 45. *Id.* at 2343-44.[5] The rate of complications requiring hospitalizations is generally estimated to be a fraction of 1 percent.[6] Indeed, the risk of

---

[4] Nat'l Acad. Sci., Engineering, & Med., *The Safety and Quality of Abortion Care in the United States* 10 (2018); Rachel K. Rachel K. Jones & Megan L. Kavanaugh, *Changes in Abortion Rates Between 2000 and 2008 and Lifetime Incidence of Abortion*, 117 Obstetrics & Gynecology 1358, 1365 (2011); *see also* Katherine Kortsmit, *et al.*, *Abortion Surveillance – United States, 2020*, 71 Morbidity & Mortality Wkly. Rep. 10, 8 (Nov. 25, 2022), *available at* https://www.cdc.gov/mmwr/volumes/71/ss/pdfs/ss7110a1-H.pdf ).

[5] Rachel K. Jones & Jenna Jerman, *Population Group Aboriton Rates and Lifetime Incidence of Abortion: United States, 2008-2014*, 107 Am. J. Pub. Health 1904, 1904 (2017); *see also* Katherine Kortsmit, *et al.*, *Abortion Surveillance – United States, 2019*, 70 Morbidity & Mortality Wkly. Rep. 9, 7 (Nov. 26, 2021), *available at* https://www.cdc.gov/mmwr/volumes/70/ss/pdfs/ss7009a1-H.pdf.

[6] *The Safety and Quality of Abortion Care in the United* States, *supra* n.4 at 55, 60, 63, and 67 (discussing rates of hospitalization for medication, aspiration, dilation and evacuation, and induction abortion).

Case 1:23-cv-00480-CCE-LPA   Document 27   Filed 06/27/23   Page 4 of 23

death associated with childbirth is fourteen times higher than the risk of death associated with abortion.[7]

The advent of medication abortion has only served to further increase the safety of the procedure. More than 5.6 million women are estimated to have used medication abortion to terminate a pregnancy in the United States.[8] The occurrence of "serious adverse events"—including death, hospitalization, serious infection, or severe bleeding—following the use of medication abortion is "exceedingly rare, generally far below 0.1% for any individual adverse event."[9] Even routine procedures like tonsillectomies have far higher rates of complications.[10]

Notwithstanding the profound importance of reproductive freedom and the incontrovertible evidence of abortion's safety, the Supreme Court eliminated the constitutional right to abortion one year ago, overturning nearly fifty years of precedent.

---

[7] Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215, 216 (2012).

[8] U.S. Food & Drug Admin., *Mifepristone U.S. Post-Marketing Adverse Events Summary Through 6/30/2022*, https://www.fda.gov/media/164331/download (last visited June 24, 2023).

[9] U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Research, *Medical Review Application No. 020687Orig1s020* at 47 (Mar. 29, 2016), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020RemsR.pdf; *see also supra* n.1.

[10] *See* Meena Seshamani, Emily Vogtmann, Justin Gatwood, Teresa B. Gibson, & Dennis Scanlon, *Prevalence of Complications from Adult Tonsillectomy and Impact on Health Care Expenditures*, 150(4) Otolaryngology–Head & Neck Surgery 574, 574 (2014), doi:10.1177/0194599813519972 (finding that for adult patients who undergo a tonsillectomy, 20% have a complication, 10% visit an emergency department, 1.5% are admitted to the hospital, and 6% are treated for postoperative hemorrhage).

*Dobbs*, 142 S. Ct. at 2279.  In the wake of *Dobbs*, States began enacting new abortion bans almost immediately.[11]

North Carolina was one such State.  Before the fall of *Roe*, state law expressly approved of abortions through twenty weeks, and a district-court injunction prohibited officials from prosecuting individuals for providing or obtaining abortions through twenty-four weeks.  N.C. Gen. Stat. § 14-45.1 (repealed 2023); *Bryant v. Woodall*, No. 1:16CV1368, 2019 WL 13199938, at *1 (M.D.N.C. May 23, 2019), *vacated*, 622 F. Supp. 3d 147 (M.D.N.C. 2022).  But in the first long legislative session after *Dobbs*, the Republican leadership of the North Carolina General Assembly unveiled a plan to prohibit abortion after twelve weeks with a few narrow exceptions and to impose burdensome regulations for abortions performed before twelve weeks.  Senate Bill 20, 2023-24 Leg., 156th Sess. (May 2, 2023).[12]

The Republican super-majority in the General Assembly then proceeded to pass the bill as quickly—and unilaterally—as possible.  Republican leadership introduced the

---

[11]*E.g.*, Ind. Code § 16-34-2-1 (2023); W. Va. Code § 16-2R-3 (2023).

[12]  The average pregnancy is normally calculated from the first day of the last menstrual period through 280 days.  The average length of gestation (post-conception), however, usually lasts only 266 days.  *Committee Opinion No. 700: Methods for Estimating the Due Date*, Obstetrics and Gynecology, 129(5), e150-e154 (2017) https://journals.lww.com/greenjournal/Fulltext/2017/05000/Committee_Opinion_No_700_Methods_for_Estimating.50.aspx.  As a result, when a law like North Carolina's prohibits abortions after twelve weeks, it normally requires that a pregnant woman confirm a pregnancy, decide to have an abortion, and go through with the procedure all within ten weeks of conception.

6

substance of the bill on May 2, 2023.[13]  The House passed S.B. 20 the following day, on

May 3, and the Senate passed the bill on May 4.[14]  This break-neck timing meant that the

public had virtually no notice of the bill's contents and virtually no opportunity for input

or debate.  Doc. 1, Compl. ¶ 2.

The Governor vetoed S.B. 20 on May 14, 2023,[15] and Republicans in the General

Assembly voted to override the veto two days later, on May 16, 2023.[16]

Perhaps because of the rushed nature of the bill's passage, S.B. 20 contains

numerous incoherencies, contradictions, and ambiguities.  As just one example, in § 90-

21.81B(2), S.B. 20 expressly states that medication abortion is lawful through the twelfth

week of pregnancy.  In section 90-21.83B(a)(6)-(7), however, S.B. 20 requires physicians

who prescribe medication abortions to confirm that the fetus is no more than 70 days (*i.e.*,

ten weeks).

That contradiction, among many other problems, gave rise to this lawsuit.

Plaintiffs filed their Complaint on June 16, 2023, alleging that numerous provisions

within S.B. 20 run afoul of the Constitution.  Doc. 1, Compl. ¶¶ 77-87.

---

[13] *Senate Bill 20 / SL 2023-24*, N.C. Gen. Assembly,
https://www.ncleg.gov/BillLookUp/2023/Senate%20Bill%2020 (last visited June 23, 2023).

[14] *Id.*

[15] Veto of S.B. 20 (2023) (letter from Gov. Cooper to the Clerk for the N.C. Senate, May 14, 2023) https://governor.nc.gov/news/press-releases/2023/05/16/governor-cooper-statement-republican-vote-override-sb20-veto  (last visited June 23, 2023).

[16] *Senate Bill 20 / SL 2023–24*, N.C. Gen. Assembly,
https://ncleg.gov/BillLookUp/2023/S20  (last visited June 23, 2023).

A few days after filing suit, on June 21, 2023, Plaintiffs moved for a temporary restraining order or preliminary injunction. The next day, this Court ordered a response from the defendants and set a hearing on Plaintiffs' motion for June 28, 2023.

Almost immediately after this Court issued its order, the North Carolina General Assembly introduced a bill "to make technical and conforming changes to Session Law 2023-14" (*i.e.*, S.B. 20). House Bill 190, 2023-24 Leg., 156th Sess. (June 22, 2023). House Bill 190 appears to be a direct response to Plaintiffs' lawsuit—the vast majority of the proposed amendments directly correspond to the provisions that Plaintiffs have challenged here. *Compare* Doc. 1, Compl. ¶ 3-8 *with* Doc. 25-1 (H.B. 190).

The proposed amendments were voted on and passed the North Carolina Senate the evening of June 26, 2023. It is the Attorney General's expectation that the North Carolina House of Representatives will consider whether to concur with these amendments this week. If the House concurs and the proposed amendments pass, the Governor will have ten days to sign or veto the bill. It is possible, however, that many portions of S.B. 20 will go into effect on July 1, before the legislature enacts the amendments into law.

## ARGUMENT

S.B 20 contains numerous provisions that make it impossible for doctors to know whether their conduct is lawful or instead may subject them to prosecution. The Due Process Clause forbids this kind of scenario. *See United States v. Cardiff*, 344 U.S. 174 (1952); *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 781 (4th Cir. 2023).

The General Assembly seems to have recognized S.B. 20's constitutional vulnerability and has proposed amendments that, if enacted, would address some of the problems that Plaintiffs have identified. In the meantime, however, the unconstitutional provisions in S.B. 20 must be enjoined in a manner that eliminates the law's ambiguities and prevents arbitrary enforcement.

Moreover, even assuming the proposed amendments do become law, at least one statutory provision will still require a narrowing construction: The proposed amendments fail to eliminate the prospect that individuals could be criminally charged for helping a patient secure a lawful abortion outside this State. Section 90-21.81B must be construed to avoid that result.

In short, because (1) Plaintiffs are likely to prevail on the merits of their due-process challenges and (2) every equitable factor favors an injunction to clarify the law, this Court should grant Plaintiffs' motion, as detailed further below. *See Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

## I.      Plaintiffs Are Likely To Prevail on the Merits of Their Due-Process Claims.

Because the provisions that Plaintiffs challenge fail to provide doctors with fair notice regarding what conduct can give rise to liability, Plaintiffs are likely to succeed in enjoining enforcement of those provisions on due-process grounds.

### A.  The Due Process Clause Demands Fair Notice and Clarity.

The Fourteenth Amendment prohibits States from depriving "any person of life, liberty, or property without due process of law." U.S. Const., amend. XVI, § 1. A State violates due process when it deprives someone of life, liberty, or property under an overly

vague statute. *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 781 (4th Cir. 2023). Vagueness is least tolerated in statutes that threaten the most serious deprivations, like those imposing criminal penalties or inhibiting constitutional rights. *Manning v. Caldwell ex rel. City of Roanoke*, 930 F.3d 264, 272-73 (4th Cir. 2019) (en banc). In those cases, a vague statute "can be invalidated on its face even where it could conceivably have some valid application." *See Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012).

To determine whether a statute is unconstitutionally vague, courts will ask whether the law "provide[s] a person of ordinary intelligence fair notice of what is prohibited." *Doe v. Cooper*, 842 F.3d 833, 842 (4th Cir. 2016). The fair-notice requirement is intended to "enable citizens to conform their conduct to the proscriptions of the law" and invalidate statutes that are little more than a "trap for those who act in good faith." *United States v. Ragen*, 314 U.S. 513, 524 (1942); *Manning*, 930 F.3d at 274. Thus, statutes that are confusing, ambiguous, or contradictory are impermissibly vague and must be enjoined. *Raley v. Ohio*, 360 U.S. 423, 438 (1959) (quoting *United States v. Cardiff*, 344 U.S. 174, 176 (1952)); *Manning*, 930 F.3d at 274.

*United States v. Cardiff* is illustrative. There, the Supreme Court held that § 301(f) of the Federal Food, Drug, and Cosmetic Act was void because it was in inherent tension with a different provision of the statute. 344 U.S. at 176. Section 301(f) prohibited owners of certain facilities from refusing "entry or inspection [by federal officials] as authorized by section 704." *Id.* at 174. But § 704 allowed federal officials to enter or inspect a facility only "after first making request and obtaining permission of the

10

[facility's] owner." *Id.* at 174-75. In other words, § 704 seemed to suggest that owners could deny officials permission to inspect their facilities, whereas § 301(f) seemed to indicate that they could not. The Court attempted to reconcile the two provisions but found that any reading that gave effect to both posed tricky questions to ordinary citizens attempting to comply with the law. *Id.* at 176. The Court therefore held that § 301(f) violated the Due Process Clause and, thus, that owners could not be prosecuted for refusing entry to federal inspectors. *Id.*

### B. The Lawful-Abortion Exception to the Fetal-Homicide Statute Violates Due Process.

North Carolina law makes it a crime to "unlawfully cause[ ] the death of an unborn child." N.C. Gen. Stat. § 14-23.2(a). The law carves out an exception for acts "which cause the death of an unborn child if those acts were lawful, *pursuant to the provisions of G.S. 14-45.1*." *Id.* § 14-23.7(1) (emphasis added).

When S.B. 20 takes effect, it will repeal § 14-45.1, the provision that currently governs lawful abortions. Session Law 2023-24, § 1.1. This change would not be a problem if S.B. 20 simultaneously replaced § 14-23.7's reference to § 14-45.1 with a citation to the new statutory provision in S.B. 20 addressing lawful abortions. But it does not.

This puts doctors who wish to continue providing abortions during the first twelve weeks of pregnancy in a quandary. On the one hand, S.B. 20 indicates that abortions are lawful up to twelve weeks. *See* Session Law 2023-14, § 1.2 (N.C. Gen. Stat. § 90-21.81A(a)). But on the other, as of July 1, when S.B. 20 takes effect, the fetal-homicide

11

laws will no longer contain any express carve-out for lawful abortions. Therefore, as the law currently stands, doctors who perform abortions after July 1 cannot be certain whether they are risking criminal liability for fetal homicide, no matter when the abortions are performed.

This uncertainty under the law violates due process, as the recent amendments proposed by the General Assembly seem to acknowledge. Doc. 25-1 (H.B. 190, § 14.1(a)) (proposing to amend § 14-23.7 to expressly exempt lawful abortions under Article 1I of Chapter 90 from criminal prosecutions). In H.B. 190, the legislature attempts to correct the soon-to-be-obsolete citation in the fetal-homicide statutes and make clear that providing lawful abortions continues to be innocent conduct. *Id*.

Unless and until the fetal-homicide laws are officially revised in this way, though, equitable relief is necessary. This Court should enter an injunction barring enforcement of the fetal-homicide laws against doctors who provide lawful abortions.

### C. The Gestational-Age Verification Requirement Violates Due Process.

A similar contradiction necessitates enjoining S.B. 20's gestational-age verification requirement. S.B. 20 provides that "it shall not be unlawful to advise, procure, or cause" a "medical abortion" "during the first 12 weeks of a woman's pregnancy." N.C. Gen. Stat. § 90-21.81B(2); *see also id.* § 90-21.81(A)(a) (general provision regarding the legality of abortion during the first twelve weeks of pregnancy). But in another subsection, the statute requires a doctor "prescribing, administering, or dispensing an abortion-inducing drug" to first "[v]erify that the probable gestational age of the unborn child is no more than 70 days," or 10 weeks. *Id.* § 90-21.83B(a)(6).

12

As with the fetal-homicide statutes, it is unclear how doctors are to interpret these contradictory provisions. One provision—§ 90-21.83B(a)(6)—seems to imply that doctors cannot perform medication abortions beyond ten weeks, else how are they to verify that the "probable gestational age of the unborn child is no more than 70 days"? Yet at the same time, a different provision—§ 90-21.81B(2)—expressly states that "medical abortion[s]" are lawful up to twelve weeks' gestation.

Because these laws do not provide doctors "adequate notice of what conduct is prohibited," they run afoul of the Due Process Clause. *Manning*, 930 F.3d at 272. Again, the legislature seems to realize as much. In H.B. 190, the legislature proposes amending the gestational-age verification provision to require only that the doctor "[v]erify the probable gestational age of the unborn child," without requiring that the age be no more than 70 days. Doc. 25-1 (H.B. 190, § 14.1.(f)). If enacted, this change would allow doctors to prescribe medication abortion through the twelfth week of pregnancy, consistent with other provisions in S.B. 20.

For now, however, this Court must enjoin enforcement of the gestational-age verification requirement under the currently enacted law. Any other outcome would violate the Due Process Clause.

### D. The "Advising" Ban Violates Due Process.

Plaintiffs further allege that S.B. 20 violates due process because it fails to make clear whether doctors can legally advise or assist patients in obtaining lawful abortions outside of North Carolina after the twelfth week of pregnancy. Doc. 1, Compl. ¶ 78. Here, too, Plaintiffs are likely correct on the merits of their claim. This Court should

13

therefore enter an injunction that clarifies that S.B. 20 cannot be construed to reach abortions that occur outside the State.

S.B. 20 makes it "unlawful after the twelfth week of a woman's pregnancy to advise, procure, or cause a miscarriage or abortion." N.C. Gen. Stat. § 90-21.81A(a). Section 90-21.81B carves out several exceptions to this criminal prohibition. But none of those exceptions makes clear whether doctors can tell their patients how to procure lawful abortions out of state. As a theoretical matter, a doctor who tells a patient how to procure a lawful abortion out of state has arguably "advise[d]" or "cause[d]" an abortion, in violation of § 90-21.81A, assuming the patient chooses to go forward with the procedure.

This ambiguity offends due process. *See Manning*, 930 F.3d at 274. To pass constitutional muster, laws—particularly those, like § 90-21.81A, that involve criminal penalties *and* implicate constitutionally protected conduct—must define the relevant "criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited." *Kolender*, 461 U.S. at 357. Section 90-21.81A does not satisfy this standard, at least as applied to lawful out-of-state abortions.

With respect to this provision, moreover, the amendments that the General Assembly proposes in H.B. 190 likely would not fully resolve the constitutional problem. Those amendments propose revising the language as follows: "It shall be unlawful after the twelfth week of a woman's pregnancy to ~~advise, procure, or cause~~ procure or cause a miscarriage or ~~abortion.~~abortion in the State of North Carolina." Doc. 25-1 (H.B. 190, § 14.1.(b)); *see also id.* § 14.1.(c) (revising the analogous language in § 90-21.81B).

14

Notwithstanding these proposed changes, two issues remain: First, advising a patient how to procure a lawful abortion outside of North Carolina could be viewed as "caus[ing]" an abortion, even if the word "advise" is removed from the statute. Second, the new geographic limitation ("in the State of North Carolina") is ambiguous. The amendment is likely intended to narrow the scope of the provision to include only abortions that take place "in the State of North Carolina." Doctors could thus advise patients how to obtain an abortion outside the State without subjecting themselves to criminal liability. But the proposed amendment could alternatively be read to prohibit taking action "in the State of North Carolina" that "cause[s]" an abortion anywhere, including outside the State. As a result, the line between lawful and unlawful conduct remains blurry.

This lack of clarity also gives rise to grave First Amendment concerns. If S.B. 20 is read to prohibit a doctor from advising her patient about procuring lawful abortions out-of-state after the twelfth week of pregnancy, that would likely violate the First Amendment. As the Supreme Court has emphasized, the First Amendment has special force in protecting free discourse "in the fields of medicine and public health, where information can save lives." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011). As a result, where a State purports to limit the lawful advice a healthcare professional can give her patient, courts have consistently struck those restrictions down as unconstitutional restraints on speech. *See, e.g.*, *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1310 (11th Cir. 2017) (en banc) (striking down a Florida law that prohibited doctors from asking patients about the presence of firearms as part of childproofing the home); *Conant*

15

*v. Walters*, 309 F.3d 629 (9th Cir. 2002) (striking down a federal policy that threatened doctors with revocation of their DEA prescription authority if they recommended the medicinal use of marijuana to their patients).

Moreover, because the amended statute contains an ambiguous geographic limit, it is unclear what specific forms of speech may be restricted. That is, it is unclear whether it is unlawful to cause an abortion that occurs in North Carolina after twelve weeks, or whether it is unlawful to take actions in North Carolina that may cause an abortion after twelve weeks in another State. That ambiguity has a potentially chilling effect on speech.

Consequently, even as amended, S.B. 20 remains unconstitutionally vague in at least two critical respects. And these ambiguities give rise to serious First Amendment concerns. To cure these constitutional defects, S.B. 20 must be read not to prohibit individuals from assisting women with obtaining lawful, out-of-state abortions after the twelfth week of pregnancy.

### E. The Failure To Clearly Establish a Medical-Emergency Exception to the 72-Hour Waiting Period Violates Due Process.

S.B. 20's 72-hour waiting period also gives rise to a due-process violation. Generally speaking, the new law requires patients to be provided with a range of information at least 72 hours prior to an abortion, including the name of the physician who will perform the abortion, whether that physician has malpractice insurance, and the location of the hospital where the physician has admitting privileges. N.C. Gen. Stat. §§ 90-21.82, -21.83A. Most of the provisions that refer to the waiting period make clear that doctors need not wait 72 hours to perform an abortion in the event of a medical

emergency.  *See* N.C. Gen. Stat. §§ 90-21.82(b), -21.83A(b), -21.86.  One provision, however, fails to include the same express emergency carve-out:  Section 90-21.83C requires doctors to provide certain information, including details about insurance coverage, "[a]t least 72 hours prior to any medical or surgical abortion."  And § 90-21.83C is silent as to any exception for medical emergencies.

This silence denies doctors adequate notice as to whether they can legally perform an abortion in a medical emergency if they lack the time to wait 72 hours after providing the information in § 90-21.83C.  Though some provisions in S.B. 20 provide some comfort that doctors will be safe from criminal liability, § 90-21.83C provides no such reassurance.  To avoid a due-process problem, then, this Court should enjoin enforcement of § 90-21.83C in the event of a medical emergency.

In H.B. 190, the legislature suggests repealing § 90-21.83C altogether.  Doc. 25-1 (H.B. 190, § 14.1.(g)).  Until a remedial amendment like that one becomes law, however, equitable relief is clearly necessary to prevent a constitutional violation.

### F.  The Other Challenged Provisions Likely Violate Due Process.

Plaintiffs allege several other provisions within S.B. 20 that, in their view, are not sufficiently clear to satisfy due process.  These provisions include:

- The requirement that physicians "[d]ocument in the woman's medical chart the . . . intrauterine location of the pregnancy" before a medication abortion.  N.C. Gen. Stat. § 90-21.83B(a)(7).

- The requirement that doctors tell patients 72 hours before an abortion whether insurance will cover the procedure.  *Id.* § 90-21.83C.

17

- The requirement that doctors tell patients 72 hours before an abortion the full name of the doctor who will be performing their abortion and information about that doctor's admitting privileges. *Id.*

- The requirement that physicians submit a report within three days of a minor's abortion that confirms whether the minor returned for a follow-up visit seven to fourteen days after the abortion. *Id.* §§ 90-21.93(a), -21.83A(b)(4)(*l*).

The Attorney General does not claim to have the specialized knowledge to evaluate Plaintiffs' factual allegations on these points. To the extent that Plaintiffs are correct that these provisions are in inherent conflict with other provisions in S.B. 20, they, too, would seem to violate due process.

## II. The Remaining *Winter* Factors Favor Entering an Injunction that Remedies the Constitutional Violations.

Not only are Plaintiffs likely to prevail on the merits of their claims, each of the remaining *Winter* factors supports their desired relief. *See Winter*, 555 U.S. at 20. The balance of the equities and the public interest underscore the need for an injunction. And Plaintiffs are likely to suffer irreparable harm unless this Court acts.

First, the balance of the equities and public interest support enjoining or construing these ambiguous and contradictory provisions to bring them into constitutional compliance. Until last year, millions of women in North Carolina relied on having access to healthcare—and, specifically, abortion care—through the 24th week of pregnancy. No woman of childbearing age in North Carolina has ever before lived in a reality without this fundamental right. In 48 hours, and without the opportunity for public awareness or debate, the General Assembly stripped these millions of women of this right, forcing them to access necessary healthcare in *half* the time afforded before. In addition, the

18

legislature added onerous and unnecessary restrictions that make it harder for doctors to offer reproductive services and for patients—particularly those who are economically vulnerable—to access them.

This sea change would have wrought confusion even if the implementing legislation were a model of clarity. But S.B. 20 is the opposite, replete with inconsistencies and ambiguities, and with women and doctors in this State bearing the costs. Particularly in these circumstances, the public interest is served by preserving the status quo, at least until women and doctors have the clarity they need to continue accessing and providing reproductive healthcare. *See, e.g.*, *Mayor of Baltimore v. Azar*, 392 F. Supp. 3d 602, 619 (D. Md. 2019); *FemHealth USA, Inc. v. City of Mount Juliet*, 458 F. Supp. 3d 777 (M.D. Tenn. 2020). Moreover, resolving the ambiguities in S.B. 20 will provide clarity to the executive-branch defendants who are charged with enforcing these criminal provisions.

Meanwhile, enjoining these provisions does not prejudice the Legislative Intervenors in any way. "[A] state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013) (en banc) (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)). Particularly where, as here, the Legislative Intervenors have proposed amendments that largely mirror the injunctive relief that Plaintiffs seek, they can hardly argue that injunctive relief would cause them any meaningful harm.

Plaintiffs, by contrast, will suffer irreparable harm absent an injunction. *See Winter*, 555 U.S. at 22. Start with the advising ban, which H.B. 190 does not adequately address. That ban threatens to chill—or, worse, silence—the speech of healthcare providers who wish to help their patients secure lawful abortions outside this State. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Enforcing the other challenged provisions threatens irreparable harm as well. As explained above, those provisions condition criminal prosecution on confusing and conflicting statutory commands, in violation of the Due Process Clause. Infringing constitutional rights generally constitutes irreparable harm. *See Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987). That is particularly true where an unconstitutional statute threatens criminal prosecution. *See Pierce v. Soc'y of Sisters*, 268 U.S. 510, 536 (1925). And here, the consequences of that threat are particularly stark: Absent an injunction, doctors must choose between either (a) declining to provide reproductive healthcare to avoid prosecution or (b) rolling the dice and risking criminal liability. Either option threatens irreparable harm.

\* \* \*

As explained above, Plaintiffs are likely to prevail on the merits of their challenge. *See supra* Part I. Because Plaintiffs are further likely to suffer immediate and irreparable harm absent an injunction, and because the balance of the equities and the public interest favor an injunction, this Court should enter an injunction as follows:

- An injunction barring enforcement of the fetal-homicide statutes against doctors who provide lawful abortions. *See* N.C. Gen. Stat. §§ 14-23.2, -23.7.

- An injunction that bars enforcement of the gestational-age verification requirement. *See* N.C. Gen. Stat. § 90-21.83B(a)(6).

- An injunction barring enforcement of the 72-hour waiting-period provisions in the case of a medical emergency. *See* N.C. Gen. Stat. §§ 90-21.82-21.83A.

- An injunction barring enforcement of N.C. Gen. Stat. § 90-21.81A(a) against anyone who explains how to secure or assists with securing a lawful abortion outside of North Carolina.

Further, the Court should enter an injunction relating to any other provision of S.B. 20 as the Court deems appropriate.

## CONCLUSION

The provisions that Plaintiffs have challenged violate the Due Process Clause because they fail to provide doctors with fair notice as to how to "conform their conduct to the proscriptions of the law." *Manning*, 930 F.3d at 274. The Court should therefore enjoin the challenged provisions in the manner described above. Should new legislation that materially changes S.B. 20 be enacted into law, the Court can revisit the matter, with supplemental briefing and argument from the parties as the Court deems necessary.

Dated: June 27, 2023.                    Respectfully submitted,

JOSHUA H. STEIN
Attorney General

Sarah G. Boyce
Deputy Attorney General and
General Counsel
N.C. State Bar 56896

21

sboyce@ncdoj.gov

Sripriya Narasimhan
Deputy General Counsel
N.C. State Bar 57032
snarasimhan@ncdoj.gov

Amar Majmundar
Senior Deputy Attorney General
N.C. State Bar 24668
amajmundar@ncdoj.gov

Stephanie A. Brennan
Special Deputy Attorney General
N.C. State Bar 35955
sbrennan@ncdoj.gov

*Counsel for Defendant Stein*

North Carolina Dept. of Justice
P.O. Box 629
Raleigh, NC 27602
Phone: 919-716-6900
Fax: 919-716-6758

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with Local Rule 7.3(d) because, excluding the parts of the brief exempted by Rule 7.3(d) (cover page, caption, signature lines, and certificates of counsel), this brief contains fewer than 6,250 words. This brief also complies with Local Rule 7.1(a).

Sarah G. Boyce
Deputy Attorney General
and General Counsel

Case 1:23-cv-00480-CCE-LPA   Document 27   Filed 06/27/23   Page 23 of 23