# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PLANNED PARENTHOOD SOUTH ATLANTIC and BEVERLY GRAY, M.D, on behalf of themselves and their patients seeking abortions,

        Plaintiffs,

v.

JOSHUA STEIN, Attorney General of North Carolina, in his official capacity; TODD M. WILLIAMS, District Attorney ("DA") for Prosecutorial District ("PD") 40, in his official capacity; JIM O'NEILL, DA for PD 31, in his official capacity; SPENCER B. MERRIWEATHER III, DA for PD 26, in his official capacity; AVERY CRUMP, DA for PD 24, in her official capacity; JEFF NIEMAN, DA for PD 18, in his official capacity; SATANA DEBERRY, DA for PD 16, in her official capacity; WILLIAM WEST, DA for PD 14, in his official capacity; LORRIN FREEMAN, DA for PD 10, in her official capacity; BENJAMIN R. DAVID, DA for PD 6, in his official capacity; KODY H. KINSLEY, M.P.P., Secretary of the North Carolina Department of Health and Human Services, in his official capacity; MICHAUX R. KILPATRICK, M.D., PhD., President of the North Carolina Medical Board, in her official capacity, on behalf of herself, the board and its Members; RACQUEL INGRAM, PhD., R.N., Chair of the North Carolina Board of Nursing, in her capacity, on behalf of herself, the Board and its members; and their employees, agents, and successors,

Case No. 1:23-cv-00480-CCE-LPA

**VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Style Definition: Default Paragraph Font

Style Definition: Comment Text: Font: (Default) Arial, , Ligatures: None

Style Definition: Header: Font: (Default) Arial, 11 pt, , Ligatures: None

Style Definition: Footer: Font: (Default) Arial, 11 pt, , Ligatures: None

Style Definition: List Paragraph

Style Definition: Comment Subject

Style Definition: Balloon Text

Style Definition: Normal (Web)

Style Definition: x_contentpasted0

Style Definition: Footnote Text

Style Definition: Revision

Formatted: Small caps

Formatted: Line spacing: single, No widow/orphan control, Tab stops: 1.13", Left

Formatted: Font: Not Bold, Small caps

Formatted: Centered, Line spacing: single, No widow/orphan control, Tab stops: 1.13", Left

Deleted: ¶
PLANNED PARENTHOOD SOUTH ATLANTIC; BEVERLY GRAY, M.D, on behalf of themselves and their patients seeking abortions,→→→→¶
→ ¶
Plaintiffs,→ ¶
v.¶
¶
JOSHUA STEIN, Attorney General of North Carolina, in his official capacity; TODD M. WILLIAMS, District Attorney ("DA") for Prosecutorial District ("PD") 40, in his official capacity; JIM O'NEILL, DA for PD 31, in his official capacity; SPENCER B. MERRIWEATHER III, DA for PD 26, in his official capacity; AVERY CRUMP, DA for PD 24, in her official capacity; JEFF NIEMAN, DA for PD 18, in his official capacity; SATANA DEBERRY, DA for PD 16, in her official capacity; WILLIAM WEST, DA for PD 14, in his official capacity; LORRIN FREEMAN, DA for PD 10, in her official capacity; BENJAMIN R. DAVID, DA for PD 6, in his official capacity; KODY H. KINSLEY, M.P.P., Secretary of the North Carolina Department of Health and Human Services, in his official capacity; MICHAUX R. KILPATRICK, M.D., PhD., President of the North Carolina Medical Board, in her official capacity, on behalf of herself, the board and its Members; RACQUEL INGRAM, PhD., R.N., Chair of the North Carolina Board of Nursing, in her official capacity, on behalf of herself, the Board and its members; and their employees, agents, and successors,→ ¶
Defendants.→ ¶
... [1]

                    Defendants,          )
                                          )
and                                       )
                                          )
PHILIP E. BERGER, *et al.*,               )
                                          )
              Intervenor-Defendants.      )

Plaintiffs Planned Parenthood South Atlantic ("PPSAT") and Beverly Gray, M.D., by and through their undersigned attorneys, bring this First Amended Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following:

## I.  INTRODUCTORY STATEMENT AND CASE HISTORY

1.  On behalf of themselves and their patients, Plaintiffs bring this civil rights action under the U.S. Constitution and 42 U.S.C. § 1983 to challenge the constitutionality of three provisions of North Carolina Session Law 2023-14 ("S.B. 20," *see* DE 1-1) (codified as amended by Session Law 2023-65 ("H.B. 190," *see* DE 26-1) at N.C. Gen. Stat. art. 11, ch. 90 (the "Act")). The Act bans abortion after twelve weeks of pregnancy, with narrow exceptions, and imposes other significant restrictions on abortion access that will harm patients and impede health care professionals from providing quality care.

2.  In particular, Plaintiffs challenge the following: (1) the Act's requirement that a physician "[d]ocument in the woman's medical chart the . . . existence of an intrauterine pregnancy," N.C. Gen. Stat. § 90-21.83B(a)(7) (the "IUP Documentation Requirement"); (2) the Act's requirement that an abortion provided after the twelfth week

1

of pregnancy in cases of rape or incest or "life-limiting anomaly" be provided in a hospital, not an abortion clinic, *id.* §§ 90-21.81B(3), -(4), 90-21.82A, 131E-153.1 (the "Hospitalization Requirement"); and (3) the lack of clarity as to whether a hospital can provide an induction abortion, which involves the use of medication, to a rape or incest survivor after the twelfth week of pregnancy, *id.* §§ 90-21.81B(3), 90-21.82A(c) (the "Induction Abortion Ban").

3.   S.B. 20 was ratified by the General Assembly on May 4, 2023; vetoed by Governor Roy Cooper on May 14, 2023; and, upon legislative override of the veto, enacted on May 16, 2023, with Part I taking effect on July 1, 2023 and Part II taking effect on October 1, 2023.

4.   On June 16, 2023, Plaintiffs filed a complaint alleging that various provisions of S.B. 20—including the IUP Documentation Requirement and the Hospitalization Requirement—were impermissibly vague and lacked a rational basis in violation of the Fourteenth Amendment's Due Process and Equal Protection Clauses, and that one provision of S.B. 20 violated the First Amendment. *See* DE 1 (Verified Complaint).

5.   On June 21, 2023, Plaintiffs filed a motion for a temporary restraining order and preliminary injunction seeking to block the entirety of Part I of S.B. 20, including the IUP Documentation Requirement, and also Part II's Hospitalization Requirement. *See* DE 11 (First TRO/PI Mot.), 12 (First TRO/PI Br.).

2

**Deleted:** <#>and whether they can provide early medication abortion when a patient has a positive pregnancy test but it is too soon to visualize an intrauterine pregnancy. ¶
And although the Act provides an exception to the 12-week ban in

**Deleted:** <#>, it limits the provision of those procedures to hospitals

**Formatted:** Font color: Auto

**Moved down [2]:** <#>. *Id.*

**Deleted:** <#>. This irrational limitation on one of the safest medical procedures will further harm to survivors of sexual assault without increasing abortion safety.

**Formatted:** Font color: Auto

**Formatted:** Font: Not Italic, Font color: Auto

**Formatted:** Font color: Auto

**Formatted:** Font color: Auto

**Deleted:** <#>Furthermore, under the Act, patients must make an in-person visit to receive certain state mandated information at least 72 hours before an abortion, but the Act is internally inconsistent about whether a provider must restart the 72-hour waiting period if certain information is not available at the time of the initial state-mandated visit. *Compare id.* §§ 90-21.82(b)(1a) & (a); 90-21.83A(b)(2) & (a) *with* § 90-21.83C. The Act's new section 90-21.83C also requires the provider to give information that in many circumstances will be impossible to know 72 hours in advance of the abortion (and sometimes even on the day of the abortion itself) such as whether the abortion is covered by insurance. Moreover, that new section does not explicitly incorporate the medical emergency exception, suggesting that providers must wait 72 hours after providing the information required by section 90-21.83C—even when there is a medical emergency.¶
The Act also changes providers' responsibilities with respect to sending reports related to abortion to the State in ways that make compliance impossible. For example, the Act states that a "report *completed* under this section for a minor shall be sent to the Department and the Division of Social Services *within three days* of the surgical or medical abortion."

**Moved down [3]:** *Id.*

**Moved down [4]:** *Id.*

**Deleted:** § 90-21.93(a) (emphasis added). But the Act requires information to be included in the report that will not be known within three days, including whether a minor who had a medication abortion returned for the follow-up appointment that is required to be schedule seven to fourteen days later (*id.* § 90-21.83B(b)) and information about t… [7]

**Formatted:** Font color: Auto

**Formatted:** Font: Not Italic, Font color: Auto

**Formatted:** Font color: Auto

6. In response to this lawsuit, on June 27, 2023, the General Assembly passed H.B. 190, which amended S.B. 20. Governor Cooper signed H.B. 190 into law on June 29, 2023.

7. H.B. 190 resolved many of the issues Plaintiffs raised in their Verified Complaint, and on June 29, 2023, the Parties reached a joint stipulation resolving certain of these claims. *See* DE 30 (Joint Stip.).

8. In particular, the Parties stipulated that none of the provisions in the Act "impose[s] civil, criminal, or professional liability on an individual who advises, procures, causes, or otherwise assists someone in obtaining a lawful out-of-state abortion," and specified that "[f]or the avoidance of doubt, this stipulation means that advising, procuring, causing, or otherwise assisting someone in obtaining a lawful out-of-state abortion is not a criminal offense under N.C. Gen. Stat. § 14-23.2." *Id.* at 2. Because this construction resolves the First Amendment issue, the Court denied Plaintiffs' TRO motion with respect to this claim in its order on June 30, 2023. *See* DE 31 (TRO) at 5.

9. With respect to the Hospitalization Requirement, the Parties stipulated that the requirement takes effect on October 1, 2023. *See* DE 30 (Joint Stip.) at 2. Therefore, the Court denied as unnecessary the TRO request as to that claim. *See* DE 31 (TRO) at 9.

10. H.B. 190 amended S.B. 20's IUP Documentation Requirement, but the Court concluded that this amendment did not resolve the vagueness issue. *Id.* at 6–7. As a result, the Court granted Plaintiffs' TRO motion with respect to this requirement, blocking its enforcement before its effective date on July 1, 2023. *Id.* at 8–9.

3

11.  As issued on June 30, the TRO was to remain in effect until noon on July 14, 2023. *Id.* at 10. On July 5, 2023, by consent of the Parties, the Court entered an order extending the TRO until the Court rules on either Plaintiffs' motion for a preliminary injunction or their renewed motion for a preliminary injunction, which Plaintiffs will submit by July 24, 2023. *See* DE 35 (Consent Order Extending TRO); 37 (Scheduling Order).

12.  The Court further directed Plaintiffs to file an amended complaint by July 17, 2023. DE 37 (Scheduling Order) at 1.

13.  As a result of the changes to the Act, many of Plaintiffs' original claims have been resolved. However, (1) Plaintiffs maintain their due process challenges to the IUP Requirement; (2) PPSAT maintains its due process and equal protection challenges to the Hospitalization Requirement[2]; and (3) Dr. Gray adds to the Amended Complaint allegations about the vagueness of the Induction Abortion Ban.

14.  Plaintiffs who fail to comply with the Act will face disciplinary action, and violations of some sections of the Act carry felony criminal penalties. *See* N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B; *see also* N.C. Gen. Stat. § 14-23.7(1).

15.  The Act will harm North Carolinians by delaying—and even, at times, denying—their access to necessary health care. The IUP Documentation Requirement will harm patients by preventing them from accessing medication abortion before an

---

[2] PPSAT also adds allegations challenging the Hospitalization Requirement as to abortions performed under the "life-limiting anomaly" exception established by N.C. Gen. Stat. § 90-21.81B(4).

4

intrauterine pregnancy can be seen on ultrasound. This may delay patients' access to abortion care, unnecessarily exposing them to increased medical risk, or compel them to consider a procedural abortion, even though for some patients, medication abortion offers important advantages over procedural abortion. For example, survivors of sexual assault may decide to have a medication abortion because they do not want instruments placed in their vagina. This is relevant to the IUP Requirement as well as the Induction Abortion Ban, which seemingly prohibits the use of medication to induce abortion in the second-trimester in the hospital setting for sexual assault survivors. Moreover, an induction abortion may be safer and faster for some patients.

16.   And the Hospitalization Requirement will have devastating consequences for survivors of sexual violence and patients with diagnoses of "life-limiting anomalies" by limiting the number of providers available to these patients, increasing the expense of abortion and delaying or denying access to desperately needed care. These heightened barriers will force patients who are already facing personal hardship and even trauma due to the circumstances of their pregnancies to remain pregnant against their will even longer.

17.   In particular, the Act is an attack on families with low incomes, North Carolinians of color, and rural North Carolinians, who already face inequities in access to medical care and who will bear the brunt of the Act's cruelties. While forced pregnancy carries health risks for everyone, it imposes greater risks for those already suffering from

5

health inequities. Black women,[3] who in North Carolina are more than three times as likely as white women to die during pregnancy, will acutely feel the Act's harms. Furthermore, North Carolinians face a critical shortage of reproductive health care providers, including obstetrician-gynecologists, especially in rural areas.

18.  While the U.S. Supreme Court last year held that the right to abortion is no longer a fundamental substantive due process right under the Fourteenth Amendment, that amendment nonetheless protects other rights guaranteed to Plaintiffs and their patients. The Supreme Court's decision did not insulate abortion restrictions from court review if, as here, those restrictions are vague, irrational, and inflict a high risk of suffering for no legitimate governmental purpose.

19.  Plaintiffs seek declaratory and injunctive relief from those constitutional deprivations.

## II.  JURISDICTION AND VENUE

20.  Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343(a)(3).

21.  Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

---

[3] Plaintiffs use "woman" or "women" as a short-hand for people who are or may become pregnant, but people of many gender identities, including transgender men and gender-diverse individuals, may become pregnant and seek abortion and are also harmed by the Act. *See Reprod. Health Servs. v. Strange*, 3 F.4th 1240, 1246 n.2 (11th Cir. 2021) ("[N]ot all persons who may become pregnant identify as female."), *reh'g en banc granted, opinion vacated on other grounds*, 22 F.4th 1346 (11th Cir. 2022), *and abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).

6

22. Venue is appropriate under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district and because Defendants Jim O'Neill, Jeff Nieman, Satana Deberry, and Avery Crump reside in this district.

### III.    PLAINTIFFS

23. Plaintiff PPSAT is a not-for-profit corporation organized under the laws of North Carolina, operating nine health centers throughout the state, located in Asheville, Chapel Hill, Charlotte, Durham, Fayetteville, Greensboro, Raleigh, Wilmington, and Winston-Salem, as well as in South Carolina, Virginia, and West Virginia. Depending on the location, PPSAT health centers provide a broad range of reproductive and sexual health services, including cervical cancer screenings; breast and annual gynecological exams; family planning counseling; pregnancy testing and counseling; reproductive health education; testing and treatment for sexually transmitted infections; contraception; procedural and medication abortion services and related care; prenatal consultation; primary care; gender affirming hormone therapy; and health care related to miscarriage. PPSAT sues on behalf of itself, its staff, and its patients.

24. Plaintiff Dr. Gray is a physician licensed to practice medicine in the State of North Carolina and is board-certified in obstetrics and gynecology. She currently provides a range of obstetric and gynecological services, including abortion care, in Durham and provides contraceptive and gynecological care, including abortion care, in Chapel Hill and Fayetteville. Dr. Gray provides abortion both in a hospital setting and in

7

<u>licensed outpatient abortion clinics. Dr.</u> Gray sues on behalf of herself and her patients.

**IV.    DEFENDANTS**

25.  Defendant Joshua Stein is the Attorney General of North Carolina. Defendant Stein is authorized to seek injunctive relief against willful violations of the Act. N.C. Gen. Stat. § 90-21.88. Defendant Stein also bears the duty of consulting with and advising prosecutors, upon request, and represents the State of North Carolina in certain criminal proceedings. *Id.* § 114-2(1), (4). Defendant Stein is sued in his official capacity.

26.  Defendant Todd M. Williams is the District Attorney for Prosecutorial District 40, which includes the city of Asheville. Defendant Williams has the authority to prosecute violations of <u>certain sections of</u> the <u>Act.</u> N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B. Defendant Williams is sued in his official capacity.

27.  Defendant Jim O'Neill is the District Attorney for Prosecutorial District 31, which includes the city of Winston-Salem. Defendant O'Neill has the authority to prosecute violations of <u>certain sections of</u> the <u>Act.</u> N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B. Defendant O'Neill is sued in his official capacity.

28.  Defendant Spencer B. Merriweather III is the District Attorney for Prosecutorial District 26, which includes the city of Charlotte. Defendant Merriweather has the authority to prosecute violations of <u>certain sections of</u> the <u>Act.</u> N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B. Defendant Merriweather is sued in his official capacity.

29.  Defendant Avery Crump is the District Attorney for Prosecutorial District 24, which includes the city of Greensboro. Defendant Crump has the authority to prosecute

Deleted:
Deleted:
Deleted: twelve-week ban
Deleted: twelve-week ban
Deleted: twelve-week ban.

8

violations of certain sections of the Act. N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B.

Deleted: twelve-week ban

Defendant Crump is sued in her official capacity.

30. Defendant Jeff Nieman is the District Attorney for Prosecutorial District 18, which includes the city of Chapel Hill. Defendant Nieman has the authority to prosecute violations of certain sections of the Act. N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B.

Deleted: twelve-week ban

Defendant Nieman is sued in his official capacity.

31. Defendant Satana Deberry is the District Attorney for Prosecutorial District 16, which includes the city of Durham. Defendant Deberry has the authority to prosecute violations of certain sections of the Act. N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B.

Deleted: twelve-week ban

Defendant Deberry is sued in her official capacity.

32. Defendant William West is the District Attorney for Prosecutorial District 14, which includes the city of Fayetteville. Defendant West has the authority to prosecute violations of certain sections of the Act. N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B.

Deleted: twelve-week ban

Defendant West is sued in his official capacity.

33. Defendant Lorrin Freeman is the District Attorney for Prosecutorial District 10, which includes the city of Raleigh. Defendant Freeman has the authority to prosecute violations of certain sections of the Act. N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B.

Deleted: twelve-week ban

Defendant Freeman is sued in her official capacity.

34. Defendant Benjamin R. David is the District Attorney for Prosecutorial District 6, which includes the city of Wilmington. Defendant David has the authority to prosecute

9

violations of certain sections of the Act. N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B.

Deleted: twelve-week ban

Defendant David is sued in his official capacity.

35. Defendant Kody H. Kinsley is the Secretary of the Department of Health and Human Services. The Department regulates abortion clinics in North Carolina and is authorized to investigate complaints "relative to the care, treatment or complications of any patient." 10A N.C. Admin. Code 14E.0111. Defendant Kinsley is sued in his official capacity.

36. Defendant Michaux R. Kilpatrick is the President of the North Carolina Medical Board. The Medical Board licenses physicians and other health care professionals. Doctors who violate the Act are subject to discipline by the Medical Board. N.C. Gen. Stat. § 90-21.88A. Furthermore, the Medical Board has the power to place health care professionals on probation, impose other sanctions, or suspend or revoke their licenses for a variety of acts or conduct, including "[p]roducing or attempting to produce an abortion contrary to law." N.C. Gen. Stat. §§ 90-14(a)(2), 90-14(h), 90-14.5(c); 21 N.C. Admin. Code 32N.0111(b). Defendant Kilpatrick is sued in her official capacity.

37. Defendant Racquel Ingram is the Chair of the North Carolina Board of Nursing. The Board of Nursing regulates the practice of nursing in the state and oversees licensing for the various nursing professions. Nurses who violate the Act are subject to discipline by the Board of Nursing. N.C. Gen. Stat. § 90-21.88A. Defendant Ingram is sued in her official capacity.

Deleted:

10

## V. STATUTORY FRAMEWORK

38. Prior to the Act, abortion was broadly lawful in North Carolina before 20 weeks of pregnancy, and was provided safely and routinely at licensed outpatient abortion clinics like PPSAT's. Patients seeking abortion were required to obtain certain state-mandated information from a "qualified professional" 72 hours in advance of the procedure. The information could be given either in person or by telephone, and providers were subject to certain reporting requirements. *See* N.C. Gen. Stat. § 90-21.82.

39. Enacted with limited debate and over the Governor's veto, the Act radically overhauled North Carolina's abortion restrictions in numerous ways: banning abortion after the twelfth week of pregnancy with a few narrow exceptions, making the mandated counseling requirement more onerous and requiring that it be done in person, and imposing much more burdensome reporting requirements. As explained above, Part I of the Act took effect on July 1, 2023 (except the provision blocked by this Court) and Part II of the Act is set to take effect on October 1, 2023.

40. For the purposes of this First Amended Complaint, the relevant changes to the abortion laws are as follows.

41. The Act repeals section 14-45.1 of the General Statutes of North Carolina, which included a long list of circumstances under which abortion was lawful, and newly provides: "It shall be unlawful after the twelfth week of a woman's pregnancy to procure or cause a miscarriage or abortion in the State of North Carolina." N.C. Gen. Stat. § 90-21.81A(a).

11

42. After twelve weeks, there are limited exceptions, which include:

    a. When a physician determines there is a medical emergency, *id.* § 90-21.81B(1);

    b. Through the twentieth week of pregnancy, when the procedure is performed by a qualified physician in a suitable facility and when the pregnancy is a result of rape or incest, *id.* § 90-21.81B(3); and

    c. During the first twenty-four weeks of pregnancy, if a qualified physician determines there exists a life-limiting anomaly, *id.* § 90-21.81B(4).

43. Despite the subsections providing that abortions in the case of rape or incest may be provided in a "suitable facility," *id.* § 90-21.81B(3), and that abortions in the case of "life-limiting anomaly" may be provided upon referral by a "qualifying physician," *id.* § 90-21.81B(4), the Act elsewhere states that "[a]fter the twelfth week of pregnancy, a physician licensed to practice medicine under this Chapter may not perform a surgical abortion as permitted under North Carolina law in any facility other than a hospital," *id.* § 90-21.82A(c), and defines "abortion clinic" as a facility that provides abortions "during the first 12 weeks of pregnancy," *id.* § 131E-153.1.

44. The Act also imposes a host of restrictions on physicians providing an "abortion-inducing drug."[5] Most relevant here, physicians must "[d]ocument in the

_____

[5] The Act defines "Abortion-inducing drug" as "A medicine, drug, or any other substance prescribed or dispensed with the intent of terminating the clinically diagnosable pregnancy

Formatted: Normal, Justified, Outline numbered + Level: 3 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 1.25" + Indent at: 1.5", Tab stops: 0.85", Left

Deleted: section

Formatted: Normal, Justified, Indent: Left: 0", First line: 0.5", Outline numbered + Level: 2 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.75" + Indent at: 1", Tab stops: 0.85", Left

Deleted: § 90-21.81B(3

Deleted: ." *Id.* § 90-21.82A(c).

Deleted: A physician providing an abortion-inducing drug[4] must follow

Deleted: , including some that are contradictory. One provision of the Act states that medication abortion is lawful "during the first 12 weeks of a woman's pregnancy," *id.* § 90-21.81B(2). Yet a separate provision compels

Deleted: medication abortions to "[v]erify that the probable gestational age of the unborn child is no more than 70 days." *Id.* § 90-21.83B(a)(6). These

Deleted: are also required to

Formatted: Font color: Auto

Formatted: Line spacing: single

Formatted: Line spacing: single

woman's medical chart the . . . existence of an intrauterine pregnancy." *Id.* § 90-21.83B(a)(7).

45. A physician who violates any provision of the Act is subject to discipline by the North Carolina Medical Board, and any other licensed health care provider who violates any provision of the Act shall be subject to discipline under their respective licensing agency or board. *Id.* § 90-21.88A.

46. Moreover, certain provisions of the Act carry criminal penalties. Relevant here, providing an abortion that does not fit within the Act's exceptions to the twelve-week ban is a felony. *Id.* §§ 90-21.81A, 90-21.81B; *see also id.* §§ 14-44, -45, -23.7(1).[6]

## VI. FACTUAL ALLEGATIONS

47. Abortion is a basic component of comprehensive health care and is one of the safest medical procedures in the United States. All methods of abortion provided by Plaintiffs in licensed abortion clinics—medication abortion, aspiration abortion, and dilation and evacuation ("D&E")—are simple, straightforward medical treatments that typically take no more than fifteen minutes to perform, involve no incisions, have an extremely low complication rate, and, nationwide, are almost always provided in outpatient, office-based settings.

---

of a woman . . . This includes the off-label use of drugs such as mifepristone (Mifeprex), misoprostol (Cytotec), and methotrexate." N.C. Gen. Stat. § 90-21.81(1a).

[6] *See also* DE 31 (TRO) at 6 ("Failing to comply with the intrauterine documentation requirement may carry the possibility of criminal penalties.").

13

## Whether the Act Allows Early Medication Abortion

48.     The medication abortion regimen in the first trimester typically involves two medications: mifepristone and misoprostol. The first drug, mifepristone, is a progesterone antagonist, which means that it blocks the body's receptors for progesterone, a hormone required for the continuation of the pregnancy. The patient first takes the mifepristone and then, several hours or days later (usually 24 to 48 hours), takes the misoprostol. Misoprostol causes the uterus to contract and expel its contents, generally within hours.

49.     PPSAT and Dr. Gray (including when she is providing abortions in the hospital) currently provide this first-trimester medication abortion regimen through the first 77 days (11 weeks) of pregnancy, including—as discussed in detail below—to patients who have a positive pregnancy test but who are too early in their pregnancies for an intrauterine pregnancy to appear on ultrasound.

50.     For some patients, medication abortion offers important advantages over procedural abortion. Some patients prefer medication abortion because it feels more "natural" to them to have their body expel the pregnancy rather than to have a provider use aspiration or instruments to empty the uterus. Some patients choose medication abortion because of fear or discomfort around a procedure involving aspiration or instruments. For example, survivors of rape and people who have experienced sexual abuse, molestation, or other trauma may choose medication abortion to feel more in control of the experience and to avoid further trauma from having instruments placed in their vaginas.

14

51.    Additionally, the logistics of a procedural abortion may be prohibitive for some patients, especially those with lower incomes, those who have difficulty getting time off work and securing childcare, or those who live in rural areas far from facilities where abortion care is provided. Some health care providers charge more for procedural abortions, meaning some patients must wait longer to get an abortion while they gather funds—if they can afford it at all.

52.    Survivors of intimate partner violence in particular may struggle to find such support, as telling their partner they are having an abortion could be dangerous.

53.    The risk of serious complications related to abortion is extremely low, including for abortions provided using the first-trimester medication abortion regimen. According to the FDA, serious adverse events (including death, hospitalization, serious infection, and bleeding requiring transfusion) among mifepristone patients are "exceedingly rare, generally far below 0.1% for any individual adverse event."[8]

54.    At early gestational stages, though the patient has a positive pregnancy test, it may be too soon to see an intrauterine gestational sac via ultrasound. In such circumstances, Plaintiffs screen patients for risk of ectopic pregnancy (i.e., a pregnancy that has implanted outside of the uterus). If a provider determines that a patient is at high risk of ectopic pregnancy, they refer the patient to another provider, typically an emergency department.

---

[8] U.S. Food & Drug Admin., *Ctr. for Drug Evaluation & Rsch.*, *Med. Rev.*, *Application No. 020687Orig1s020*, 47 (2016), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020MedR.pdf.

55.     If the patient is not at high risk of ectopic pregnancy, the provider follows evidence-based best practices and offers the patient three options for treatment: aspiration abortion, medication abortion, or a follow-up appointment at a later date to see if an intrauterine pregnancy can be seen on an ultrasound at that time. The provider and the patient decide which option is the most appropriate given the patient's particular circumstances.

56.     If a patient with a pregnancy of unknown location chooses medication abortion, the provider *simultaneously* provides the medication abortion *and* conducts further testing to rule out ectopic pregnancy—specifically, by drawing a blood sample to test the level of the pregnancy hormone human chorionic gonadotropin ("hCG"). These test results usually come back no more than 24 hours later.

57.     If the blood test results indicate that the patient's hCG levels are sufficiently high (indicating a more developed pregnancy), this may be evidence of ectopic pregnancy. At that point, even if the patient has already taken the medications for medication abortion, the provider will offer the patient the option of returning for an aspiration procedure as a means of *both* testing for ectopic pregnancy and completing the abortion. If the patient with high hCG levels opts for aspiration, then following that procedure, the provider will examine the aspirated uterine contents to see if gestational tissue is identifiable—confirming that the pregnancy was intrauterine and that the abortion is complete. If the patient with high hCG levels does not opt for aspiration, or if a gestational sac is not identifiable following aspiration, the provider may refer the patient for further ectopic

16

evaluation (or, if the patient is already receiving this protocol in the hospital, the hospital may evaluate for ectopic pregnancy).

58.   If, however, the patient's hCG levels are low (indicating a pregnancy at a very early gestational age) at the appointment when the medication abortion is provided, the patient's hCG levels are tested again after the abortion. Whether or not the patient's hCG levels have decreased more than 50% after the abortion is evidence whether the pregnancy has been terminated by the medication abortion, or whether there is still a possibility of ectopic pregnancy. Patients whose hCG levels have not decreased sufficiently are further evaluated for ectopic pregnancy, including, where medically indicated, through referral to a hospital provider (or, if the patient is already being seen in the hospital setting, the hospital would offer treatment for ectopic pregnancy).

59.   Administration of medication abortion according to this protocol has been shown to be safe and effective in terminating the pregnancy.[9] And at least one study found that this protocol leads to earlier exclusion of ectopic pregnancy than waiting to see if an intrauterine pregnancy can be detected later.[10]

[9] *See, e.g.*, Alisa B. Goldberg et al., *Mifepristone and Misoprostol for Undesired Pregnancy of Unknown Location*, 139 Obstetrics & Gynecology 771 (2022); Karen Borchert et al., *Medication Abortion and Uterine Aspiration for Undesired Pregnancy of Unknown Location: A Retrospective Cohort Study*, 122 Contraception 109980 (2023); I. Bizjak I et al., *Efficacy and Safety of Very Early Medical Termination of Pregnancy: A Cohort Study*, 124 BJOG: An Int'l J. of Obstetrics & Gynaecology 1993 (2017); Philip Goldstone et al., *Effectiveness of Early Medical Abortion Using Low-Dose Mifepristone and Buccal Misoprostol in Women With No Defined Intrauterine Gestational Sac*, 87 Contraception 855 (2012).
[10] Goldberg, *supra* note 6.

17

60.     If a patient with a pregnancy of unknown location were referred to a hospital for ectopic evaluation instead of receiving a medication abortion according to this protocol, the hospital would perform the very same hCG testing that, under the protocol, Plaintiffs perform simultaneously with the medication abortion. Referring a patient for ectopic evaluation instead of providing a medication abortion to a patient with a pregnancy of unknown location therefore does not lead to earlier or more accurate diagnosis of ectopic pregnancy. Instead, it only delays the patient's abortion.

61.     The Act permits abortion through the twelfth week of pregnancy, but also requires physicians to "[d]ocument in the woman's medical chart the . . . existence of an intrauterine pregnancy" before administering medication abortion. N.C. Gen. Stat. § 90-21.83B(a)(7). The Act therefore does not give Plaintiffs notice as to whether or not they can provide early medication abortion to patients with pregnancies of unknown location. If the IUP Documentation Requirement requires express confirmation of an intrauterine pregnancy *before* administration of medication abortion, it will be impossible for Plaintiffs to comply in the early weeks of pregnancy, and accordingly impossible for Plaintiffs to provide medication abortion to patients at that gestational stage.

62.     If the Act denies patients in this situation access to medication (but not procedural) abortion, it is irrational. And it will harm Plaintiffs' patients by forcing them to have a procedural abortion when they have important reasons for choosing a safe, non-invasive method of abortion, or to wait and potentially make additional visits to the health center and seek abortion later in pregnancy (but before 12 weeks) for no medical reason.

18

<u>Hospitalization Requirement for Procedural Abortions Under Exceptions</u>
<u>After the Twelfth Week of Pregnancy</u>

63.     The Act requires "surgical," or procedural, abortions after the twelfth week of pregnancy to be provided in a hospital. PPSAT would provide abortions after the twelfth week of pregnancy under the rape and incest and life-limiting anomaly exceptions but for this prohibition.

64.     It is irrational to require one of the safest outpatient medical procedures in the United States to be performed in a hospital, particularly for patients who have already suffered trauma or patients who a referring physician has already determined may safely receive care at one of PPSAT's licensed abortion clinics.

65.     Although certain outpatient abortion methods are sometimes referred to as "surgical abortion," that is a misnomer, as they do not entail the typical characteristics of surgery, such as an incision into bodily structures or general anesthesia. According to the American College of Obstetricians and Gynecologists, the leading professional organization for obstetrician-gynecologists, these methods are more appropriately characterized as a procedure, which is defined as a "short interventional technique that includes the following general categories . . . non-incisional diagnostic or therapeutic intervention through a natural body cavity or orifice" and is "generally associated with lower risk of complications."[15]

---

[15] Am. Coll. of Obstetricians & Gynecologists, *Definition of "Procedures" Related to Obstetrics and Gynecology* (Reaffirmed Mar. 2023), https://www.acog.org/clinical-information/policy-and-position-statements/position-statements/2018/definition-of-procedures-related-to-obstetrics-and-gynecology.

19

66.   In licensed abortion clinics, Plaintiffs provide procedural abortion using two common methods: aspiration abortion, which is available up to approximately 14 weeks of pregnancy, and dilation and evacuation abortion, or "D&E," which is available after approximately 14 weeks of pregnancy, depending on the provider's individual practice and the patient's individual medical characteristics.

67.   For aspiration abortion, the provider passes a small plastic tube, called a cannula, through the patient's vagina and cervical opening. The cannula is attached to a syringe or electrical pump that creates gentle suction to empty the uterus. The entire procedure takes three to five minutes. Aspiration abortion involves no incision, cutting, or suturing. The same procedure is used to manage incomplete miscarriages.

68.   For D&E, the provider uses a combination of gentle suction and additional instruments, including specialized forceps, to evacuate the uterus. Before starting the evacuation procedure, the provider dilates the patient's cervix using medications, osmotic dilators, and/or mechanical dilators. Once the cervix is sufficiently dilated, the provider empties the uterus using instruments or a combination of suction and instruments. Mild to moderate sedation may be used. The entire evacuation procedure typically takes up to fifteen minutes. Like aspiration abortion, D&E does not involve any incision, cutting, or suturing. D&E is also used to manage incomplete miscarriages.

**Deleted:** The Act singles out procedural abortion, which is analogous to other gynecological procedures that also take place in outpatient settings in terms of risks, invasiveness, instrumentation, and duration. In addition to being identical to the procedure used to manage miscarriage, procedural abortions are also identical to certain outpatient diagnostic procedures that are used to remove tissue from the uterus for testing (though different levels of sedation may be used).

20

69.     Serious complications—that is, complications requiring hospitalization, surgery, or blood transfusion—from abortion care are exceedingly rare, occurring in fewer than 1% of abortions.[17]

70.     Abortion is far safer than continuing a pregnancy to term and childbirth. Indeed, the mortality rate for childbirth is approximately 12–14 times greater than that associated with abortion.[19] Complications related to carrying a pregnancy to term and childbirth also are much more common than abortion-related complications.[20]

71.     In the exceedingly rare event of a complication requiring hospital-based care, established policies and protocols ensure the patient's care is safely transferred to a hospital-based provider. These are the same policies and protocols that are followed for comparable outpatient gynecological or other procedures, as well as for those that carry greater risks.

72.     Because of the extraordinary safety profile of procedural abortions in the outpatient setting, courts have repeatedly found that there is no medical basis for requiring procedural abortions be performed in hospitals. *See, e.g.*, *Doe v. Bolton*, 410 U.S. 179, 193–95 (1973); *City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 433–

---

[17] Ushma D. Upadhyay et al., *Incidence of Emergency Department Visits and Complications After Abortion*, 125 Obstetrics & Gynecology 175, 181 (2015).

[19] Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215, 215 (2012).

[20] *Id.*

21

34 (1983); *Planned Parenthood Ass'n of Kan. City v. Ashcroft*, 462 U.S. 476, 481–82 (1983).

73.     The Act singles out procedural abortion even though it is analogous in terms of risks, invasiveness, instrumentation, and duration to other gynecological procedures that also take place in outpatient settings. In addition to being identical to the procedures used to manage miscarriage, procedural abortions are also substantially similar in technique and risk to certain outpatient diagnostic procedures that are used to remove tissue from the uterus for testing (though different levels of sedation may be used).

74.     Moreover, the mortality risk for abortion is lower than that of many other common procedures that are not required to be performed in a hospital. For example, one recent and robust analysis found that in the United States, the mortality rate for colonoscopy is 2.9 per 100,000 procedures; the mortality rate for tonsillectomy ranges from 2.9 to 6.3 per 100,000 procedures; and the mortality rate for plastic surgery is 0.8 to 1.7 per 100,000 procedures.[22] By contrast, the mortality rate for legal induced abortion is only 0.7 per 100,000 procedures.[23] These procedures of greater risk are routinely provided on an outpatient basis outside the hospital setting.

75.     There is no rational basis for mandating that procedural abortions be provided in hospitals while continuing to allow identical or nearly identical procedures to take place in outpatient settings.

---

[22] Nat'l Acads. of Scis., Eng'g, & Med., *The Safety and Quality of Abortion Care in the United States*, Nat'l Acads. Press 1, 74–75 (2018).

[23] *Id*.

**Deleted:** The Unconstitutional Changes to Informed Consent and Waiting Period Provisions[21]¶

¶
The Act is also internally inconsistent as to whether a provider must restart the 72-hour waiting period if certain information is not available at the time of the initial state-mandated visit. In some places the Act explicitly says, for example, that if the doctor's name is not known at the time of first counseling session that starts the 72-hour clock, the clock does not reset once that information is provided to the patient. *See* S.B. 20 §§ 90-21.82(b)(1a) & (b)(1a)(a); 90-21.83A(b)(2) & (b)(2)(a). But another section of the Act requires the physician's name to be provided to the patient 72 hours before the abortion and is silent on whether the 72-hour period must be restarted if the name of the physician changes or whether the waiting period cannot start at all if the physician's name is not known 72 hours in advance. *Id.* § 90-21.83C.¶

Given Plaintiffs' busy medical practices as well as the complexity of their patients' lives, the doctor who is scheduled to perform the abortion sometimes changes between the first visit, when patients receive the state-mandated information, and the abortion, including when a doctor has an urgent matter with another patient at another facility, when a doctor or patient is ill, or when a patient is unable to get off of work or find childcare to attend their appointment as initially scheduled. ¶

Forcing patients to wait another 72 hours in these circumstances will unnecessarily delay the abortion, pushing the patient further into their pregnancy and possibly beyond the gestational limits for a lawful abortion. It will also impose unnecessary burdens on the patient, who would be forced to reschedule their appointment and rearrange time off from work, childcare, and/or transportation. ¶

Furthermore, section 90-21.83C, which requires certain information to be provided to the patient 72 hours prior to the abortion, does not explicitly incorporate the medical emergency exception in the other 72-hour informed consent in sections 90-21.82(b) and 90-21.83A(b). It is therefore unclear whether a physician can forgo giving a patient the information outlined in section 90-21.83C in a medical emergency. ¶

If there is no medical emergency exception to the 72-hour waiting period in section 90-21.83C, this provision would be irrational, and could put patients at risk of gratuitous suffering, severe injury, and death. There is no justification for risking a patient's health and life simply because the patient was not provided information such as the physician's name or the location of the hospital where they have admitting privileges 72 hours earlier.¶

Additionally, section 90-21.83C requires a physician to inform a patient 72 hours prior to an abortion "wheth… [11]

**Moved (insertion) [8]**

**Formatted:** Normal, Justified, Indent: Left: 0", First line: 0.5", Outline numbered + Level: 2 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.75" + Indent at: 1", Tab stops: 1", Left

**Formatted:** Line spacing: single

76.     Forcing patients to seek abortions at hospitals does not improve patient health and safety, and instead only serves to harm survivors of sexual assault and patients with diagnoses of life-limiting anomalies by limiting their options for access to care without medical justification. These harms will be borne most heavily by patients who are lower income, have trouble getting off work and/or securing childcare to seek a hospital-based procedure, or who live in rural areas far from hospitals that offer abortion care.

Whether Induction Abortion Is Permitted for Rape and Incest Survivors
After the Twelfth Week of Pregnancy

77.     Many North Carolina hospitals, including the one where Dr. Gray provides abortion, offer labor induction abortion to patients in the second trimester. This type of abortion involves the use of medications to induce labor pre-viability in the second trimester in a hospital setting.

78.     The Act's definition of "medical abortion" seems to include the use of medication for second-trimester induction abortion because it is defined broadly as "[t]he use of any medicine, drug, or other substance intentionally to terminate the pregnancy of a woman known to be pregnant." N.C. Gen. Stat. § 90-21.81(4e).

79.     It is unclear whether Dr. Gray can provide induction abortion at the hospital after the twelfth week of pregnancy to rape and incest survivors. The exception to the Act for rape or incest says that abortion can be provided "[a]fter the twelfth week and through the twentieth week of a woman's pregnancy, when the procedure is performed by a qualified physician in a suitable facility in accordance with G.S. 90-21.82A." *Id.* § 90-

23

21.81B(3). For purposes of this provision, "abortion" refers to both medication and procedural methods. *See id.* § 90-21.81(1).

80.     N.C. Gen. Stat. § 90-21.82A, however, only explicitly discusses "suitable facilities" for "surgical abortion." Accordingly, it is unclear whether Dr. Gray can provide induction abortion to rape and incest survivors after the twelfth week of pregnancy in the hospital.

81.     As discussed above, some rape and incest survivors decide to have first-trimester medication abortion to avoid the insertion of instruments in their vagina. The same rationale applies in the context of rape and incest survivors seeking second-trimester abortion who decide to have a labor induction abortion.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### DUE PROCESS—VAGUENESS

82.     The allegations of paragraphs 1 through 81 are incorporated as though fully set forth herein.

83.     The IUP Documentation Requirement in N.C. Gen. Stat. § 90- 21.83B(a)(7), the Hospitalization Requirement in N.C. Gen. Stat. § 90-21.81B(3) and (4), and the Induction Abortion Ban in N.C. Gen. Stat. § 90-21.81B(3) violate Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution because they fail to give Plaintiffs fair notice of the requirements of the Act and encourage arbitrary and discriminatory enforcement.

24

**SECOND CLAIM FOR RELIEF**
**DUE PROCESS AND EQUAL PROTECTION**

84.    The allegations of paragraphs 1 through 83 are incorporated as though fully set forth herein.

85.    The IUP Documentation Requirement in N.C. Gen. Stat. § 90-21.83B(a)(7) and the Hospitalization Requirement in N.C. Gen. Stat. §§ 90-21.81B(3), -(4), 90-21.82A, and 131E-153.1 violate Plaintiffs' and their patients' due process rights because they require changes to the provision of medical care that are not rationally related to any legitimate state interest and cause unnecessary delay, suffering, and trauma for patients.

86.    Moreover, requiring hospitalization for abortion in the case of rape or incest or life-limiting anomaly after the twelfth week of pregnancy violates the Equal Protection Clause because it singles out one politically stigmatized treatment, abortion, while allowing other similarly situated procedures, including the treatment of miscarriage at the same gestational age, to be provided in an outpatient setting. This classification does not further any legitimate state interest and instead serves only to harm those seeking abortions under the Act's rape or incest exception.

25



**REQUESTED RELIEF**

Plaintiffs respectfully request that this Court:

1.  Issue a declaratory judgment that the challenged provisions of the Act are unconstitutional and unenforceable;

2.  Issue preliminary and permanent injunctive relief, without security, restraining Defendants, their employees, agents, and successors in office from enforcing the challenged provisions of the Act;

3.  Grant Plaintiffs' attorneys' fees, costs and expenses pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1920; and/or

4.  Grant such other and further relief as this Court may deem just, proper, and equitable.

Dated: July 17, 2023

26

Respectfully submitted,

/s/ Kristi Graunke
Kristi Graunke
NC Bar # 51216
Jaclyn Maffetore
NC Bar # 50849
American Civil Liberties Union
of North Carolina Legal Foundation
P.O. Box 28004
Raleigh, NC 27611
Tel.: (919) 834-3466
kgraunke@acluofnc.org
jmaffetore@acluofnc.org

COUNSEL FOR ALL PLAINTIFFS

Hannah Swanson*
Peter Im*
Helene Krasnoff*
Planned Parenthood Fed. of America
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
Tel.: (202) 494-8764
hannah.swanson@ppfa.org
peter.im@ppfa.org
helene.krasnoff@ppfa.org

COUNSEL FOR PLANNED
PARENTHOOD SOUTH ATLANTIC

Brigitte Amiri*
Lindsey Kaley*
Ryan Mendias*
American Civil Liberties Union
Foundation
125 Broad Street, 18th Fl.
New York, NY 10004
Tel.: (212) 549-2633
bamiri@aclu.org
lkaley@aclu.org
rmendias@aclu.org

COUNSEL FOR BEVERLY GRAY, M.D.

* Special appearance filed

27

**DECLARATION**

I declare under penalty of perjury that the statements contained in the Amended Complaint pertaining to Planned Parenthood South Atlantic are true and accurate to the best of my knowledge and belief.


_____
Paige Johnson, Chief Program Officer

**DECLARATION**

  I declare under penalty of perjury that the statements contained in the Amended Complaint pertaining to myself are true and accurate to the best of my knowledge and belief.


            _____
            Beverly A. Gray, M.D.

29