# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| PLANNED PARENTHOOD SOUTH ATLANTIC, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| JOSHUA STEIN, *et al.*, | ) | Case No. 1:23-cv-00480-CCE-LPA |
| Defendants, | ) ) ) | |
| and | ) ) | |
| PHILIP E. BERGER, *et al.*, | ) ) | |
| Intervenor-Defendants. | ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

This spring, the North Carolina General Assembly radically rewrote and expanded the state's abortion restrictions, banning abortion after the twelfth week of pregnancy with few exceptions and passing a law riddled with inconsistencies, irrational requirements, and unconstitutional threats to North Carolinians' health and rights. *See* North Carolina Session Law 2023-14 ("S.B. 20," *see* DE 1-1) (codified as amended by Session Law 2023-65 ("H.B. 190," *see* DE 26-1) at N.C. Gen. Stat. art. 1I, ch. 90 (the "Act")).

With this amended motion, Planned Parenthood South Atlantic ("PPSAT") and Beverly Gray, M.D. (together, "Plaintiffs") seek a preliminary injunction against two

1

components of the Act which will significantly restrict abortion access for patients and impede medical professionals from providing quality care: (i) N.C. Gen. Stat. §§ 90-21.81B(3), -(4), 90-21.82A(c), 131E-153.1 (the "Hospitalization Requirement"); and (ii) *id*. § 90-21.83B(a)(7) (the "IUP Documentation Requirement").

Plaintiffs are likely to succeed on the merits of their claims that these provisions violate the Fourteenth Amendment because they impose vague and irrational requirements that subject Plaintiffs to a risk of professional and criminal penalties. In turn, Plaintiffs' patients will face unnecessary delays and additional burdens in accessing abortion—and, in some cases, may be denied abortion entirely—without any benefit to their health or safety. The challenged provisions will therefore cause irreparable harm to Plaintiffs and their patients. The balance of equities and public interest likewise weigh heavily in favor of injunctive relief. This Court should therefore enjoin the Hospitalization Requirement and the IUP Documentation Requirement before the former becomes effective on October 1, 2023.[1]

## STATEMENT OF FACTS

### I. Abortion Is Common, Safe, and Essential Health Care

Abortion is a basic component of health care and is one of the safest medical treatments in the United States. All methods of abortion provided by Plaintiffs in licensed

---

[1] The Court's temporary restraining order enjoined enforcement of the IUP Documentation Requirement, DE 31 (TRO) at 6–9, and that order has been extended until the Court rules on this motion. DE 35 (Consent Order Extending TRO); DE 37 (Scheduling Order). The effective date of the Hospitalization Requirement is October 1, 2023. *See* DE 30 (Joint Stip.) at 2; DE 31 (TRO) at 9.

2

abortion clinics—medication abortion, aspiration abortion, and dilation and evacuation ("D&E")—are simple, straightforward treatments that typically take no more than fifteen minutes to perform, involve no incisions, have an extremely low complication rate, and, nationwide, are almost always provided in outpatient, office-based settings. Decl. of Katherine Farris, M.D., in Supp. of Pls.' Amended Mot. for a Prelim. Inj. ("Farris Decl.") ¶ 14, attached as Exhibit 1; Decl. of Christy M. Boraas Alsleben, M.D., M.P.H. in Supp. of Pls.' Amended Mot. for a Prelim. Inj. ("Boraas Decl.") ¶¶ 21–22, 32, attached as Exhibit 2; DE 42 (Am. Compl.) ¶ 47.

Abortion is far safer than continuing a pregnancy to term and childbirth, and complications related to pregnancy and childbirth are much more common than complications from abortion. Farris Decl. ¶ 33; Boraas Decl. ¶ 25. Indeed, the mortality rate for childbirth is approximately 12 to 14 times greater than that for abortion. Farris Decl. ¶ 34; Boraas Decl. ¶ 25.

There are two main methods of outpatient abortion: procedural abortion and medication abortion. Although procedural abortion is sometimes referred to as "surgical abortion," including in the Act, that is a misnomer, as procedural abortion methods do not involve the typical characteristics of surgery, such as incisions or use of general anesthesia. Farris Decl. ¶ 15; Boraas Decl. ¶ 22. These methods are therefore more appropriately characterized as procedures.[2]

---

[2] *Definition of "Procedures" Related to Obstetrics and Gynecology*, The Am. Coll. of Obstetricians & Gynecologists (reaffirmed Mar. 2023), https://www.acog.org

3

Plaintiffs provide procedural abortion using two common methods: aspiration abortion, which is available up to approximately 14 weeks of pregnancy, and dilation and evacuation abortion, or "D&E," which is available after approximately 14 weeks of pregnancy, depending on the provider's individual practice and the patient's individual medical characteristics. Farris Decl. ¶ 25; DE 42 (Am. Compl.) ¶ 66.

For aspiration abortion, the provider passes a small tube, called a cannula, through the patient's vagina and cervical opening. The cannula is attached to a syringe or electrical pump that creates gentle suction to empty the uterus. The entire procedure takes around three to five minutes. Aspiration abortion involves no incisions, cutting, or suturing. Farris Decl. ¶ 23; Boraas Decl. ¶ 22. The same procedure is used to manage incomplete miscarriages.[3] Farris Decl. ¶ 24; Boraas Decl. ¶ 24.

For D&E, the provider uses a combination of gentle suction and additional instruments to evacuate the uterus. Before starting the evacuation procedure, the provider dilates the patient's cervix using medications, osmotic dilators, and/or mechanical dilators. Farris Decl. ¶ 26; Boraas Decl. ¶ 35. Mild to moderate sedation may be used. The entire evacuation procedure typically takes up to fifteen minutes. Like aspiration abortion, D&E does not involve any incisions, cutting, or suturing. Farris Decl. ¶ 28; Boraas Decl. ¶ 22.

---

/clinicalinformation/policy-and-position-statements/position-statements/2018/definition-ofprocedures-related-to-obstetrics-and-gynecology.

[3] "Miscarriage" is when a pregnancy stops growing, as evident from the absence of embryonic or fetal cardiac activity. While sometimes a person's body naturally expels the pregnancy tissue, other times medical treatment, known as "miscarriage management," is needed to empty the uterus. The only thing distinguishing miscarriage management from abortion is the presence or absence of cardiac activity. Boraas Decl. ¶ 21 n.7.

D&E is also used to manage incomplete miscarriages. Farris Decl. ¶ 28; Boraas Decl. ¶ 24.

Procedural abortion is analogous to other procedures that take place in outpatient settings in terms of risks, invasiveness, and duration. Farris Decl. ¶¶ 36–44. In addition to being identical to the procedures used to manage miscarriage, procedural abortions are also substantially similar in technique and risk to certain outpatient procedures for removing tissue from the uterus or cervix for testing. Farris Decl. ¶¶ 24, 28, 40. Procedural abortion is safer than numerous other outpatient procedures and surgeries—for example, vasectomies or colonoscopies—and has been safely provided in clinics in North Carolina for years.[4] *See* Farris Decl. ¶¶ 15, 32.

The medication abortion regimen in the first trimester typically involves two medications: mifepristone and misoprostol.[5] Farris Decl. ¶ 17; Boraas Decl. ¶ 21. Plaintiffs provide this regimen through eleven weeks of pregnancy. Farris Decl. ¶ 12; Am. Compl. ¶ 48. The patient first takes the mifepristone and then, usually 24 to 48 hours later, takes the misoprostol. Farris Decl. ¶ 17. Together, these medications stop the development of the pregnancy and cause uterine contractions that expel the contents of the uterus, as in a miscarriage. Farris Decl. ¶ 17; Boraas Decl. ¶ 21. Indeed, these same medications are used

---

[4] *See* Elizabeth G. Raymond et al., *Mortality of Induced Abortion, Other Outpatient Surgical Procedures and Common Activities in the United States*, 90 Contraception 476 (2014); Farris Decl. ¶¶ 11–14.

[5] Adverse events (including death, hospitalization, serious infection, and bleeding requiring transfusion) among mifepristone patients are "exceedingly rare, generally far below 0.1% for any individual adverse event." FDA, *Ctr. for Drug Evaluation & Rsch., Med. Rev., Application No. 020687Orig1s020*, at 47 (2016), https://www.accessdata.fda.gov/drugsatfda_docs/nda/ 2016/020687Orig1s020MedR.pdf; *see also* Farris Decl. ¶ 18.

to manage incomplete miscarriage. Farris Decl. ¶ 17; Boraas Decl. ¶ 21.

First-trimester medication abortion and procedural abortion through the second trimester can both be safely provided in a clinic, and there is no medical reason to require these abortions to occur in hospitals. Farris Decl. ¶¶ 14–15, 36, 44; Boraas Decl. ¶ 32. Only 3% of abortions nationwide are performed in hospitals, and abortions at outpatient clinics are often more affordable, easier to navigate, and less time-consuming for patients. Farris Decl. ¶ 36; Boraas Decl. ¶¶ 32, 38. In the rare event that a complication arises during a procedural abortion, the complication can nearly always be managed in the outpatient setting, and PPSAT has protocols in place to ensure safe transfer to a hospital-based provider in the exceedingly unlikely event that hospitalization is needed. Farris Decl. ¶ 43.

## II.   The Act Imposes Irrational and Unconstitutional Restrictions on Abortion Care

Prior to the Act, abortion was broadly lawful in North Carolina before 20 weeks of pregnancy and was provided safely and routinely at licensed outpatient abortion clinics like PPSAT's. *E.g.* Farris Decl. ¶¶ 12, 36–37. But in June 2023, after limited debate and over the Governor's veto, the Act radically overhauled North Carolina's abortion restrictions.

The Act provides: "It shall be unlawful after the twelfth week of a woman's pregnancy to procure or cause a miscarriage or abortion in the State of North Carolina." N.C. Gen. Stat. § 90-21.81A (the "Twelve-Week Ban"). After the twelfth week, there are limited exceptions, which include: a) when a qualified physician determines there is a medical emergency, *id.* § 90-21.81B(1); b) through the twentieth week of pregnancy, when

Case 1:23-cv-00480-CCE-LPA   Document 49   Filed 07/24/23   Page 6 of 27

the pregnancy is a result of rape or incest, *id.* § 90-21.81B(3); and c) during the first twenty-four weeks of pregnancy if a qualified physician determines there exists a life-limiting anomaly, *id.* § 90-21.81B(4).

Although the Act creates exceptions to the Twelve-Week Ban in cases of rape, incest, or life-limiting anomalies, it also requires abortions provided after the twelfth week to occur in a hospital. *Id.* §§ 90-21.81B(3), 90-21.81B(4), 90-21.82A(c). This irrational limitation will further harm survivors of sexual assault and patients with grave fetal diagnoses, without increasing abortion safety.

The Act also requires that prior to medication (but not procedural) abortions, physicians must "[d]ocument in the woman's medical chart the . . . existence of an intrauterine pregnancy," *id.* § 90-21.83B(a)(7). Even as amended by H.B. 190, it is unclear whether physicians can provide early medication abortion when a patient has a positive pregnancy test but it is too soon to view the location of the pregnancy, even though research demonstrates the safety and efficacy of this practice.

A physician who violates the Act is subject to discipline by the North Carolina Medical Board, and any other licensed health care provider who violates the Act is subject to discipline by their respective licensing agency or board. *Id.* § 90-21.88A. Moreover, certain provisions of the Act carry criminal penalties. Relevant here, providing an abortion

7

that does not fit within the Act's exceptions to the Twelve-Week Ban is a felony. *Id.* §§ 90-21.81A, 90-21.81B; *see also id.* §§ 14-44, -45, -23.7(1).[6]

## QUESTIONS PRESENTED

1. Are Plaintiffs likely to prevail on their claims that the Hospitalization and IUP Documentation Requirements violate due process and equal protection under the Fourteenth Amendment?

2. Will Plaintiffs and their patients suffer irreparable injury without preliminary injunctive relief?

3. Does the injury to Plaintiffs and their patients outweigh any injury to Defendants?

4. Is preliminary injunctive relief in the public interest?

## ARGUMENT

A preliminary injunction is warranted upon a showing that: "(1) the party is likely to succeed on the merits of the claim; (2) the party is likely to suffer irreparable harm in the absence of an injunction; (3) the balance of hardships weighs in the party's favor; and (4) the injunction serves the public interest." *HIAS, Inc. v. Trump*, 985 F.3d 309, 318 (4th Cir. 2021). To satisfy the first prong, Plaintiffs "need not establish a certainty of success," but only "a clear showing that they are likely to succeed at trial." *Roe v. U.S. Dep't of Defense*, 947 F.3d 207, 219 (4th Cir. 2020) (cleaned up). Plaintiffs readily meet this test.

## I. Plaintiffs Are Likely to Succeed on the Merits of Their Claims That the Act Violates Plaintiffs' and Their Patients' Constitutional Rights

The Hospitalization Requirement violates the Fourteenth Amendment's Equal Protection and Due Process Clauses because there is no rational basis for restricting access

---

[6] *See also* DE 31 (TRO) at 6 ("Failing to comply with the intrauterine documentation requirement may carry the possibility of criminal penalties.").

8

to safe, compassionate, evidence-based abortion care in cases of rape, incest, or life-limiting anomaly by confining that care to the hospital setting. And the IUP Documentation Requirement is unconstitutionally vague in violation of the Due Process Clause because it is unclear whether physicians can provide medication abortion when an intrauterine pregnancy cannot yet be seen by ultrasound. To the extent the IUP Documentation Requirement prevents physicians from providing medication abortion in those circumstances, it too is irrational in violation of the Due Process Clause.

A. **The Hospitalization Requirement Is Irrational in Violation of the Fourteenth Amendment**

1. *The Hospitalization Requirement irrationally distinguishes between abortion and other health care of equal or greater risk*

The Act's requirement that abortions after the twelfth week of pregnancy in cases of rape, incest, or life-limiting anomaly be performed in a hospital violates the Equal Protection Clause of the Fourteenth Amendment. *See* N.C. Gen. Stat. §§ 90-21.81B(3), -(4). It irrationally singles out physicians who provide and patients who seek abortion, a politically stigmatized type of medical care, as compared to those providing and seeking medical procedures of equal or greater risk—including miscarriage management using identical methods. *See Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 790 (7th Cir. 2013) ("An issue of equal protection of the laws is lurking in this case. For the state seems indifferent to complications from non-hospital procedures other than surgical abortion (especially other gynecological procedures), even when they are more likely to produce complications."); *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. Dep't*

9

*of Health*, 64 F. Supp. 3d 1235, 1257 (S.D. Ind. 2014) ("[Supreme Court precedent] does not . . . authorize the unequal treatment of those providing the exact same procedure, without a rational basis, and equal protection demands otherwise.").[7]

Procedural abortion is as safe as, and frequently safer than, a wide range of other medical procedures—including vasectomies, colonoscopies, wisdom tooth extraction, and tonsillectomies—that are routinely performed in North Carolina outside of hospital settings. Farris Decl. ¶ 32; Am. Compl. ¶ 74. North Carolina law permits outpatient clinics to provide gynecological procedures that are substantially similar to procedural abortion in technique and risk, such as endometrial biopsy and hysteroscopy. Farris Decl. ¶ 40. And although a woman is approximately 12 to 14 times more likely to die from childbirth than from having an abortion, Boraas Decl. ¶ 25, North Carolina law—including *the Act itself*—permits physicians and certified nurse-midwives to deliver babies outside of hospitals, at birthing centers and even in private homes. Farris Decl. ¶ 35; N.C. Gen. Stat. § 90-178.4 (as amended by S.B. 20, § 4.3(d), effective Oct. 1, 2023) (providing for "planned birth outside of a hospital setting").

Moreover, the *same* procedures that the Act requires to be performed in hospitals for abortions after twelve weeks—aspiration abortion and D&E—are also used to manage

_____

[7] The Hospitalization Requirement also violates substantive due process under the Fourteenth Amendment's Due Process Clause. Even where a fundamental substantive due process right is not implicated, laws restricting access to abortion remain subject to rational basis review. *See Doe v. Settle*, 24 F.4th 932, 943–44, 953 (4th Cir. 2022) ("A substantive due process challenge is considered under rational-basis review unless some fundamental right is implicated."). The Hospitalization Requirement fails rational basis review under the Due Process Clause and Equal Protection Clause alike.

miscarriage, and the Act permits these procedures to be performed at clinics for *that* purpose. Farris Decl. ¶¶ 24, 28, 40. That is, after fetal cardiac activity has ceased, procedures to empty a patient's uterus may be performed in an outpatient setting; if fetal cardiac activity is present, however, under the Act the patient must go to a hospital for the very same procedures. *See* Boraas Decl. ¶ 21 n.7. There is no rational basis to require different clinical settings for the same medical procedure based purely on the purpose for which the procedure is performed.

> 2. *The Hospitalization Requirement is not rationally related to a legitimate government interest*

Because the Hospitalization Requirement is not rationally related to a legitimate government interest, it fails rational basis review. The requirement plainly does not further any state interest in protecting potential life because the General Assembly has already deemed permissible (albeit in a different clinical setting) the abortions to which the requirement applies—abortions after the twelfth week of pregnancy in cases of rape or incest or upon diagnosis of a life-limiting anomaly. *See* N.C. Gen. Stat. §§ 90-21.81B(3), -(4) (providing that it "shall not be unlawful" to provide abortion in these circumstances). And the Hospitalization Requirement is not rationally related to any government interest in patient safety.

Indeed, in cases following *Roe v. Wade* and its progeny, the Supreme Court repeatedly recognized that hospitalization requirements for abortion serve no legitimate health and safety interest. *See e.g.*, *Whole Woman's Health v. Hellerstedt*, 136 S.Ct. 2292, 2315 (2016) (striking ambulatory surgical center requirement for abortion and recognizing

"well supported" district court finding that "requiring all abortion facilities to meet all surgical-center standards does not benefit patients and is not necessary"); *City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 435–37 & n.25 (1983) (in striking down second-trimester hospital requirement, finding these abortions were "rarely performed" in hospitals and relying on "present medical knowledge," including ACOG guidelines, to determine second-trimester abortions "may be performed safely on an outpatient basis"); *Planned Parenthood Ass'n of Kan. City, Mo., Inc. v. Ashcroft*, 462 U.S. 476, 481–82 (1983) (same); *Doe v. Bolton*, 410 U.S. 179, 195 (1973) (striking down second-trimester hospitalization requirement and finding no evidence "that only the full resources of a licensed hospital, rather than those of some other appropriately licensed institution, satisfy [the State's asserted] health interests").

Although these cases' legal holdings—that second-trimester hospitalization requirements violate patients' Fourteenth Amendment fundamental due process right to abortion—have been overruled by *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), the factual findings that hospital requirements do not serve any interest in patient health and safety were not. These cases therefore demonstrate that the Hospitalization Requirement is not based on "reasonable speculation," a "plausible reason," or a "conceivable basis." *Settle*, 24 F.4th at 943–44; *see also Abuelhawa v. United States*, 556 U.S. 816, 821 (2009) ("[W]e presume legislatures act with case law in mind.").

Medical evidence and professional consensus confirm this. Researchers have found that D&Es in a dedicated outpatient abortion facility can be both safer and less expensive

12

than hospital-based D&Es. Farris Decl. ¶ 38. As is true for nearly every medical procedure, fewer complications from abortion are seen in settings that perform higher volumes of those procedures, making abortion clinics like PPSAT safer for patients than most hospitals, many of which do not routinely provide abortions. *Id*. ¶¶ 38, 74.

On the rare occasions when complications do arise after a procedural abortion, they can nearly always be managed in an outpatient setting, with no need for hospital-based care. *Id.* ¶ 41. Serious complications—those that require hospital admission—are vanishingly rare, occurring in just 0.23% of all abortions performed in outpatient settings. *Id.* ¶ 31. The risk of death is even lower: the mortality rate for legal abortions—a vast majority of which are provided in outpatient facilities—is 0.43 per 100,000 procedures, making it at least twelve times safer than childbirth. *Id.* ¶ 34. When serious complications do arise, PPSAT follows established procedures to safely transfer the patient to a hospital. *Id.* ¶ 43.

Nationwide, 97% of abortions are provided in the outpatient setting, yielding an enormous volume of data establishing beyond any doubt the safety of outpatient abortions. *Id.* ¶ 36; Boraas Decl. ¶ 32. Reflecting this data, the National Academies of Sciences, Engineering, and Medicine, as well as major medical associations including the American College of Obstetricians and Gynecologists and the American Public Health Association, have made clear that hospitalization requirements for abortion lack any scientific or medical basis. Farris Decl. ¶ 37.

13

3. *The Hospitalization Requirement is irrational specifically as to cases of rape, incest, or "life-limiting" anomaly*

The irrationality of the Hospitalization Requirement is further underscored by its application *only* to survivors of rape or incest and patients with grave fetal diagnoses. By creating exceptions to the Twelve-Week Ban for patients in these circumstances, the Act appears to recognize the importance of maintaining their access to abortion. But requiring that these patients go to hospitals, where abortions are generally much more expensive than at clinics, reduces the number of providers available to them, especially if they have lower incomes or live in rural areas. *Id.* ¶ 20. The requirement therefore makes accessing abortion even more challenging for people already facing personal hardship due to the circumstances of their pregnancies. *Id*. The physical aspects of pregnancy can be especially traumatizing for survivors of sexual violence, and ongoing intimate partner violence may make it extremely difficult for people to obtain abortions without compromising their confidentiality. *Id.* ¶¶ 65–67. And patients who are diagnosed with a fetal anomaly usually receive this diagnosis after the twelfth week of pregnancy, since the screening and diagnostic procedures for anomalies are generally conducted in the second trimester. Farris Decl. ¶ 68; Boraas Decl. ¶ 20. Indeed, hospital providers in North Carolina refer patients with fetal diagnoses *to PPSAT* for abortion after twelve weeks. Farris Decl. ¶¶ 8, 46.

Specifically for survivors of rape or incest, abortion care in a licensed abortion clinic offers particular benefits related to the specialized setting. At PPSAT, for example, all staff are trained to recognize and counteract abortion stigma, and clinicians are trained annually on providing trauma-informed care for patients who have experienced intimate partner

14

violence—such as special considerations when performing a physical exam for those patients, and what words to use in their clinical interactions. *Id.* ¶ 75. One such trauma-informed practice is offering the patient the opportunity to remain conscious during the procedure rather than receiving general anesthesia (which some hospitals administer as a matter of course for abortion patients, *see* Boraas Decl. ¶ 36): while some survivors may prefer general anesthesia, others wish to avoid the experience of being told after waking up from sedation what has happened to their body, with no firsthand memory of the procedure itself. Farris Decl. ¶ 75; Boraas Decl. ¶ 36.

When receiving care at a licensed abortion clinic, patients can trust that their care team—from the front desk staff to the physician performing their procedure—will not judge their reproductive decisionmaking, whether they decide to continue or end the pregnancy. Farris Decl. ¶ 76; Boraas Decl. ¶ 37. While there are of course excellent physicians and staff providing compassionate, patient-centered care in hospital settings too, patients are *more likely* to encounter stigma and judgment at a hospital than at a licensed abortion clinic in North Carolina. Farris Decl. ¶ 76; Boraas Decl. ¶ 37. Requiring people to go to a hospital for their abortion deprives them of the option to receive care in the specialized, supportive environment that a licensed abortion clinic offers.

* * *

Absent a health-related justification or an interest in protecting potential life, the only remaining justification for the Hospitalization Requirement is a "bare desire to harm" certain medical providers or patients, which is not a legitimate state interest. *City of*

15

*Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 447, 450 (1985) (alteration omitted) (reasoning, after ruling out other purported justifications advanced by the government, that only impermissible animus towards persons with intellectual disabilities could have motivated the challenged regulation); *see also U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) ("[A] bare [legislative] desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."). As the Fourth Circuit has recognized, "[a]bortion may well be a special case" in some regards, "but it cannot be so special a case that all other professional rights and medical norms go out the window." *Stuart v. Camnitz*, 774 F.3d 238, 255–56 (4th Cir. 2014). Where, as here, the gulf between a legislature's action and "the realities of the subject addressed by the legislation" is vast, *Heller v. Doe*, 509 U.S. 312, 321 (1993), the challenged provision fails rational basis review.

## B. The Act's IUP Documentation Requirement Is Unconstitutionally Vague and/or Irrational

### 1. *The IUP Documentation Requirement is unconstitutionally vague*

The Act is unconstitutionally vague because it fails to provide notice as to when medication abortion is lawful for pregnancies of unknown location.

"To survive a vagueness challenge, a statute must give a person of ordinary intelligence adequate notice of what conduct is prohibited and must include sufficient standards to prevent arbitrary and discriminatory enforcement." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019) (en banc); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018). The Act may be unconstitutionally vague under either theory: lack of notice or lack of

standards. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Here, where the IUP Documentation Requirement "fails to provide any standard of conduct by which persons can determine whether they are violating the statute," the Act is "unconstitutionally vague." *Manning*, 930 F.3d at 274.

"The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). Although "[l]ess clarity is required in purely civil statutes . . . laws that nominally impose only civil consequences warrant a 'relatively strict test' for vagueness if the law is 'quasi-criminal' and has a stigmatizing effect." *Manning*, 930 F.3d at 272–73. Because the IUP Documentation Requirement carries livelihood-threatening licensing penalties and possibly criminal penalties, *see* DE 31 (TRO) at 6, a stricter standard of review applies here.

The Act provides that medication abortion is lawful up to twelve weeks of pregnancy, but the IUP Documentation Requirement requires physicians to "[d]ocument in the woman's medical chart the . . . existence of an intrauterine pregnancy," N.C. Gen. Stat. § 90-21.83B(a)(7)—an impossibility for some in the early weeks of pregnancy, where an intrauterine embryo cannot yet be detected by ultrasound. *See* Farris Decl. ¶ 49; Boraas Decl. ¶ 41.

Plaintiffs are likely to succeed on their vagueness claim because the Act "is ambiguous as to whether a provider who cannot comply with the documentation

17

requirement because it is impossible is prohibited from proceeding." DE 31 (TRO) at 7. This is not a situation of "uncertainty about the normal meaning of the term at issue, but [is] rather about what specific conduct is covered by the statute and what is not," which is the core of a vagueness challenge. *Manning*, 930 F.3d at 274–75 (quoting *Lytle v. Doyle*, 326 F.3d 463, 469 (4th Cir. 2003)). The Act "specifies no standard of conduct," giving Plaintiffs no notice as to whether they can provide early medication abortion after screening for ectopic pregnancy (which appears to be the goal of the IUP Documentation Requirement) but before an intrauterine pregnancy can be visualized by ultrasound. *See id.* at 278. Further, the Act is vague because these inconsistencies "invite[] the very type of arbitrary enforcement that the Constitution's prohibition against vague statutes is designed to prevent." *Id.* Accordingly, Plaintiffs are likely to succeed on their claim that the IUP Documentation Requirement is vague in violation of their due process rights.

2. *The IUP Documentation Requirement is irrational*

If interpreted to ban early medication abortion, the IUP Documentation Requirement is also irrational. Providing early medication abortion when a patient has a positive pregnancy test but the pregnancy cannot be visualized on ultrasound is a safe, evidence-based practice that the State has no legitimate reason to bar. Boraas Decl. ¶ 50. This is especially so because the Act authorizes abortion only through twelve weeks, indicating a policy preference that if abortion is performed, it occurs very early in pregnancy.

Consistent with the General Assembly's policy preference, some patients present

18

for abortions at very early gestational ages. Indeed, access to early abortions is even more important in light of the time constraints imposed by the Twelve-Week Ban. Farris Decl. ¶ 60. At early stages of a pregnancy, when it is too soon to see an intrauterine gestational sac via ultrasound, abortion providers follow established protocols for safely administering medication abortion while *simultaneously* using additional testing to rule out ectopic pregnancy. *Id.* ¶ 51; Boraas Decl. ¶ 47. For these patients with "pregnancies of unknown location," Plaintiffs first screen for risk of ectopic pregnancy by asking questions about the patient's medical history and current symptoms. Farris Decl. ¶ 52; DE 42 (Am. Compl.) ¶ 54. If the patient is at high risk of ectopic pregnancy, Plaintiffs refer the patient to another provider, typically an emergency department. Farris Decl. ¶ 52; DE 42 (Am. Compl.) ¶ 54. If the patient is not at high risk of ectopic pregnancy, however, and the patient would like to proceed with a medication abortion, the provider *simultaneously* provides the medication abortion *and* conducts further testing using serial blood draws to rule out ectopic pregnancy. Farris Decl. ¶ 54; DE 42 (Am. Compl.) ¶ 56.

Administration of medication abortion according to this protocol has been shown to be safe and effective in terminating the pregnancy.[8] And at least one study found that this

---

[8] *See, e.g.*, Alisa B. Goldberg et al., *Mifepristone and Misoprostol for Undesired Pregnancy of Unknown Location*, 139 Obstetrics & Gynecology 771 (2022); Karen Borchert et al., *Medication Abortion and Uterine Aspiration for Undesired Pregnancy of Unknown Location: A Retrospective Cohort Study*, 122 Contraception 109980 (2023); I. Bizjak et al., *Efficacy and Safety of Very Early Medical Termination of Pregnancy: A Cohort Study*, 124 BJOG: An Int'l J. of Obstetrics & Gynaecology 1993 (2017); Philip Goldstone et al., *Effectiveness of Early Medical Abortion Using Low-Dose Mifepristone and Buccal Misoprostol in Women With No Defined Intrauterine Gestational Sac*, 87 Contraception 855 (2012).

protocol leads to earlier exclusion of ectopic pregnancy than waiting to see if an intrauterine pregnancy can be detected later.[9] Farris Decl. ¶ 58; Boraas Decl. ¶ 46; Am. Compl. ¶ 59.

Importantly, if a patient with a pregnancy of unknown location were referred to a hospital for ectopic evaluation instead of receiving a medication abortion, the hospital would generally perform the very same serial blood testing that, under the protocol, Plaintiffs perform *simultaneously* with the medication abortion. Farris Decl. ¶ 59; Boraas Decl. ¶ 48; *see* DE 42 (Am. Compl.) ¶¶ 54–59. Referring a patient for ectopic evaluation instead of providing a medication abortion to a patient with a pregnancy of unknown location therefore does not lead to earlier or more accurate diagnosis of ectopic pregnancy. Farris Decl. ¶ 59; Boraas Decl. ¶ 50. Instead, it only delays the patient's abortion.

Because there is no medical reason to deny medication abortion to patients with pregnancies that are too early to see via ultrasound, doing so does not serve any governmental interest in health or safety. In fact, it does the opposite, since forcing patients to wait until a later gestational age before getting a medication abortion unnecessarily exposes them to increased medical risk. Farris Decl. ¶ 73. And the IUP Documentation Requirement does not further any state interest in protecting potential life because any patient who is denied a medication abortion under it could still, under the Act, obtain a procedural abortion or (if they have the means) return later to get a medication abortion once the pregnancy is visible via ultrasound.

---

[9] Goldberg, *supra* note 8.

## II. Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief

Absent injunctive relief, Plaintiffs and their patients will suffer irreparable harm. The Act will deprive them of their constitutional rights to due process and equal protection, DE 42 (Am. Compl.) ¶¶ 82–86, which "unquestionably constitutes irreparable injury." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc) (internal quotation marks omitted). This alone is sufficient to establish irreparable harm. The challenged provisions also impose additional harms that "impair[] a court's ability to grant an effective remedy, such as a harm that cannot be compensated by money damages at a later trial." *Int'l Refugee Assistance Project v. Trump*, 265 F. Supp. 3d 570, 629 (D. Md. 2017), *aff'd*, 883 F.3d 233 (4th Cir. 2018).

Moreover, the Act will harm Plaintiffs and their patients by delaying—and even, at times, denying—necessary health care, interfering with Plaintiffs' ability to practice evidence-based, patient-centered medicine. *See* Farris Decl. ¶ 81; DE 42 (Am. Compl.) ¶¶ 15–16.

The Hospitalization Requirement will have serious consequences for survivors of sexual violence and patients with life-limiting fetal diagnoses. It will limit the number of providers available to these patients and increase the cost of abortion, delaying access to urgently needed care that a licensed outpatient clinic could have provided but for the Act. Farris Decl. ¶¶ 67, 69–71. Thousands of North Carolinians suffer sexual abuse each year. *Id*. ¶ 65. For many survivors of rape or incest, pregnancy can trigger flashbacks, dissociative episodes, and other symptoms of trauma. *Id*. Those experiencing ongoing

intimate partner violence may find it difficult if not impossible to escape their partner's physical, emotional, and financial control long enough to access an abortion, *id.* ¶ 66, and delays resulting from the Act will worsen those challenges.

And because the vast majority of abortions are provided in clinics, not hospitals, physicians who primarily practice in hospital settings are likely less experienced in procedural abortion, particularly D&Es (given that most abortions occur before the point in pregnancy when D&Es are generally provided). *Id.* ¶ 74. Patients seeking abortion at hospitals may therefore be limited, either expressly or functionally, to the induction abortion method, which can be far more expensive, time-consuming, and physically arduous for the patient as compared to D&E. *Id.*

The IUP Documentation Requirement will harm patients by delaying their access to abortion, unnecessarily exposing them to increased medical risk, or compelling them to consider a procedural abortion even if medication abortion may offer important advantages over procedural abortion for them. Farris Decl. ¶ 19; Am. Compl. ¶¶ 50–52. For example, survivors of rape or other sexual abuse may choose medication abortion to feel more in control and to avoid further trauma from having instruments placed in their vaginas. Farris Decl. ¶ 19; Am. Compl. ¶ 50.

In particular, the Act is an attack on families with low incomes, North Carolinians of color, and rural North Carolinians, who already face inequities in access to medical care and who will bear the brunt of the Act's cruelties. Farris Decl. ¶ 10. While forced pregnancy carries health risks for everyone, it imposes greater risks on those already suffering from

22

health inequities. Black women, who in North Carolina are more than three times as likely as white women to die during pregnancy, *id.*, will acutely feel the Act's harms. Furthermore, North Carolinians face a critical shortage of reproductive health care providers, including obstetrician-gynecologists, especially in rural areas. *Id.* Some patients unable to access abortion due to the Act will therefore be forced to remain pregnant and give birth without adequate prenatal, obstetric, or postpartum medical support.

## III. The Balance of Equities and Public Interest Weigh Strongly in Favor of an Injunction

Finally, the balance of equities and public interest weigh heavily in favor of injunctive relief. While Plaintiffs and their patients will suffer grave harm in the absence of an injunction, Defendants are "in no way harmed by issuance of a preliminary injunction which prevents [them] from enforcing" the provisions of the Act that are "likely to be found unconstitutional." *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003); *see also Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011) (recognizing that "upholding constitutional rights is in the public interest"). Not only would an injunction preserve constitutional rights, it would preserve North Carolinians' health and safety by allowing pregnant people to access abortion without these restrictions which impede Plaintiffs' ability to continue to provide abortions consistent with evidence-based, patient-centered best practices. *See Fruth, Inc. v. Pullin*, No. 3:15-16266, 2015 WL 9451066, at *8 (S.D. W. Va. Dec. 23, 2015) (observing that "an injunction here will safeguard the public health and thereby serve the public interest").

**IV.** **The Bond Should Be Waived.**

Because Defendants will suffer no harm under a preliminary injunction against the challenged provisions, and because this case implicates fundamental constitutional rights, the Court should exercise its "discretion to . . . waive the security requirement" under Federal Rule of Civil Procedure 65(c). *Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013).

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' amended motion for a preliminary injunction restraining Defendants, their employees, agents, delegates, and successors in office, and all those acting in concert with them, from enforcing or facilitating the Hospitalization Requirement and the IUP Documentation Requirement. Plaintiffs further request that the Court waive the requirement for bond or security.

Dated: July 24, 2023

Respectfully submitted,

/s/ Hannah Swanson
Hannah Swanson*
Helene T. Krasnoff*
Planned Parenthood Fed. of America
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
Tel.: (202) 973-4800
hannah.swanson@ppfa.org
helene.krasnoff@ppfa.org

Anjali Salvador*
Planned Parenthood Fed. of America
123 William Street, 9th Floor
New York, NY 10038
Tel.: (212) 541-7800
anjali.salvador@ppfa.org

COUNSEL FOR PLANNED
PARENTHOOD SOUTH ATLANTIC

Brigitte Amiri*
Lindsey Kaley*
Ryan Mendias*
American Civil Liberties Union
Foundation
125 Broad Street, 18th Fl.
New York, NY 10004
Tel: 212-549-2633
bamiri@aclu.org
lkaley@aclu.org
rmendias@aclu.org

COUNSEL FOR BEVERLY GRAY, M.D.

/s/ Kristi Graunke
Kristi Graunke
NC Bar # 51216
Jaclyn Maffetore
NC Bar # 50849
American Civil Liberties Union
of North Carolina Legal Foundation
P.O. Box 28004
Raleigh, NC 27611
Tel.: (919) 354-5066
kgraunke@acluofnc.org
jmaffetore@acluofnc.org

COUNSEL FOR ALL PLAINTIFFS

*Special appearance filed

**CERTIFICATE OF WORD COUNT**

Relying on the word count function of Microsoft Word, I hereby certify that this brief is 6,165 words in length and, therefore, complies with the word limitation of 6,250 words for briefs prescribed by Local Rule 7.3(d)(1).

/s/ Hannah Swanson
Hannah Swanson
Planned Parenthood Federation of America
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
Tel.: (202) 494-8764
hannah.swanson@ppfa.org

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 24, 2023, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which served notice of this electronic filing to all counsel of record.

/s/ Hannah Swanson
Hannah Swanson
Planned Parenthood Federation of America
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
Tel.: (202) 494-8764
hannah.swanson@ppfa.org