# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| PLANNED PARENTHOOD SOUTH ATLANTIC, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:23-cv-00480-CCE-LPA |
| v. | ) ) | **DECLARATION OF KATHERINE FARRIS, M.D.,** |
| JOSHUA STEIN, *et al.*, | ) ) | **IN SUPPORT OF PLAINTIFFS' AMENDED MOTION** |
| Defendants, | ) ) | **FOR A PRELIMINARY INJUNCTION** |
| and | ) ) | |
| PHILIP E. BERGER, *et al.*, | ) ) | |
| Intervenor-Defendants. | ) ) | |

I, Katherine Farris, M.D., declare as follows:

1.  I am a physician licensed to practice medicine in North Carolina, South Carolina, West Virginia, and Virginia. I am board-certified by the American Board of Family Physicians in family medicine.

2.  I have been employed by Planned Parenthood South Atlantic ("PPSAT") since 2009 in various capacities as a medical doctor. Since July 2013, I have been PPSAT's Interim Affiliate Medical Director, then Affiliate Medical Director, then Chief Medical Officer. (From 2013 to 2015, the Planned Parenthood affiliate in North Carolina was named "Planned Parenthood Health Systems, Inc.") As Chief Medical Officer, I am responsible for ensuring the high quality of the medical care that we provide to patients. In this position,

1

I provide oversight, supervision, and leadership on all medical services we provide, including abortion. As part of my role, I collaborate with other members of PPSAT senior management to develop policies and procedures to ensure that the medical services we provide follow evidence-based guidelines and comply with all relevant laws.

3.     I also provide direct medical services for PPSAT. Specifically, I provide a range of family planning and reproductive health care to patients, including (among other things) both medication and procedural abortion, as well as miscarriage care, referrals for ectopic pregnancy care, contraception, and advanced gynecological care—such as complicated intrauterine device ("IUD") and Nexplanon removals (Nexplanon is a birth control implant placed under the skin in the upper arm)—at PPSAT's North Carolina health centers in Winston-Salem, Charlotte, and Asheville (and periodically in Fayetteville, Wilmington, and Chapel Hill), as well as in the other states in which I am licensed.

4.     I earned my medical degree from the Northwestern University Medical School in 2000 and completed my residency at Valley Medical Center Family Practice, where I was Chief Resident in my last year. I am often called upon to present at educational institutions as an expert in abortion care and provider advocacy.

5.     The facts I state here and the opinions I offer are based on my education, my years of medical practice, my expertise as a doctor and specifically as an abortion provider, my personal knowledge, my review of PPSAT business records, information obtained through the course of my duties at PPSAT, and my familiarity with relevant medical literature and statistical data recognized as reliable in the medical profession.

6.      A copy of my *curriculum vitae* is attached as **Exhibit A**.

## I.    SUMMARY OF OPINIONS

7.      I submit this Declaration in support of PPSAT's Amended Motion for a Preliminary Injunction against North Carolina Session Law 2023-14 ("S.B. 20"), as amended by 2023 House Bill 190 ("H.B. 190"), which is codified at Article 1I of Chapter 90 of the North Carolina General Statutes ("the Act").

8.      I understand that the Act's Hospitalization Requirement[1] for abortions after the twelfth week of pregnancy could bar PPSAT from providing abortion care beyond twelve weeks to survivors of rape or incest or for pregnancies with a "life-limiting anomaly," despite the Act's exceptions for those circumstances. Requiring all abortions after the twelfth week of pregnancy to be performed in a hospital is contrary to the standard of care, under which abortions are routinely performed in outpatient clinic settings through twenty weeks. Indeed, PPSAT provides abortion after twelve weeks to patients with fetal diagnoses who have been referred to us *by hospital providers*. This Hospitalization Requirement is also illogical as a matter of patient health and safety because, even when the Act takes effect, licensed clinics like PPSAT's will still be allowed to perform identical procedures after twelve weeks to treat miscarriage. If interpreted to require all abortions after twelve weeks to be performed in hospitals, the Hospitalization Requirement will only serve to harm patients who have experienced sexual assault and those who are facing "life-limiting" fetal diagnoses.

---

[1] N.C. Gen. Stat. §§ 90-21.81B(3)–(4), 90-21.82A(c), 131E-153.1.

9.     I further understand that the Act's Intrauterine Pregnancy ("IUP") Documentation Requirement[2] could prevent us from providing early medication abortion to patients who have a very early pregnancy that is not yet visible by ultrasound (also known as a "pregnancy of unknown location"). Not only is it safe and evidence-based to provide medication abortion to patients whose pregnancies are too early to see by ultrasound and who are at low risk of ectopic pregnancy, but preserving patients' access to this very early abortion care is all the more important given North Carolina's twelve-week ban. Denying medication abortion to patients whose pregnancies cannot yet be seen on an ultrasound will force those patients either to delay wanted care, or to obtain a procedural abortion even if they have important reasons for preferring a medication-only method. Either of these alternatives subverts the patient autonomy that both patient-centered practices and medical evidence support.

10.    In particular, the Act is an attack on families with low incomes, North Carolinians of color, and rural North Carolinians, who already face inequities in access to medical care and who will bear the brunt of the Act's cruelties. While forced pregnancy carries health risks for everyone, it imposes greater risks for those already suffering from health inequities. Black women,[3] who in North Carolina are more than three times as likely

---

[2] N.C. Gen. Stat. § 90-21.83B(a)(7).

[3] In this declaration, I use "woman" or "women" as a short-hand for people who are or may become pregnant, but people of many gender identities, including transgender men and gender-diverse individuals, may become pregnant and seek abortion and are also harmed by the Act.

4

as white women to die during pregnancy,[4] will acutely feel the Act's harms. Furthermore, North Carolinians face a critical shortage of reproductive health care providers, including obstetrician-gynecologists, especially in rural areas.[5]

## II.    PPSAT AND ITS SERVICES

11.    PPSAT is a non-profit corporation organized under the laws of North Carolina. PPSAT offers a wide range of affordable and reliable reproductive and sexual health care services in our 15 locations across North Carolina, South Carolina, Virginia, and West Virginia. PPSAT operates ten health centers throughout North Carolina, located in Asheville, Chapel Hill, Charlotte, Durham, Fayetteville, Greensboro, Raleigh,

---

[4] *See* NC State Ctr. for Health Stats., Trends in Maternal Mortality Statistics, NC Dep't Health & Hum. Servs., tbl. 4 (2013), https://schs.dph.ncdhhs.gov/data/maternal/ Table4_MMReport2013.pdf (available at https://schs.dph.ncdhhs.gov/data/maternal/); *2022 Health of Women and Children Report – Report Data (All States)*, Am.'s Health Rankings, (2022), https://www.americashealthrankings.org/learn/reports/2022-health-of-women-and-children-report (reporting a white maternal mortality rate of 17.3 and a Black maternal mortality rate of 52.8 per 100,000 live births); NC Health News, *Childbirth Is Still Killing Black Moms at a Higher Rate. NC Advocates, Policymakers Discuss*, Carolina Public Press, (April 19, 2023), https://carolinapublicpress.org/59894/childbirth- is-still-killing-black-moms-at-a-higher-rate-nc-advocates-policymakers-discuss-solutions/.

[5] Clarissa Donnelly-DeRoven, *Filling Rural NC's Maternal Health Care*, NC Health News, (May 11, 2022), https://www.northcarolinahealthnews.org/2022/05/11/ filling-rural-ncs-maternal-health-care-desert/ (describing this shortage and mapping 13 rural North Carolina hospitals that closed their maternity units between 2014 and 2019); Isabella Higgins, *Legislative Gaps in Addressing Rural Women's Access to Obstetric Care in the United States: A Case Study of the North Carolina Home Birth Freedom Act*, 26 J. Trachtenburg Sch. Pub. Pol'y & Pub. Admin. at George Washington Univ. 1, 30 (2019), (reporting that about one-third of rural counties in North Carolina did not have an OB/GYN in 2017 (citing Cecil G. Sheps Ctr. for Health Servs. Rsch., *North Carolina Health Professional Supply Data*, Univ. N.C. Chapel Hill, (last modified February 10, 2019), https://nchealthworkforce.unc.edu/supply/)); *see generally* NC Maternal Mortality Rev. Comm., *North Carolina Maternal Mortality Review Report*, NC Dep't of Health & Hum. Servs., (2021), https://wicws.dph.ncdhhs.gov/docs/2014-16-MMRCReport_ web.pdf.

5

Wilmington, and Winston-Salem. Altogether, these health centers provide a full range of reproductive and sexual health services, including: cervical cancer screenings; breast and annual gynecological exams; family planning counseling; pregnancy testing and counseling; reproductive health education; testing and treatment for sexually transmitted infections; contraception; procedural and medication abortion services and related care; prenatal consultation; primary care; gender affirming hormone therapy; vasectomies; and health care related to miscarriage. PPSAT provides care to approximately 38,000 patients at its health centers in North Carolina each year.

12.     PPSAT provides abortions at six health centers licensed under North Carolina law as abortion clinics located in Asheville, Chapel Hill, Charlotte, Fayetteville, Wilmington, and Winston-Salem. At these health centers, we provide both medication abortion through 77 days (or 11 weeks) gestation as measured from the first day of the patient's last menstrual period ("LMP") and, under S.B. 20, procedural abortion through the twelfth week. When one of S.B. 20's exceptions to the twelve-week ban applies, we may provide procedural abortion up to either 13.6 or 19.6 weeks LMP depending on location and staffing. PPSAT has been providing procedural abortions past the twelfth week of pregnancy for more than fifteen years in North Carolina.

13.     But for the Hospitalization Requirement and the IUP Documentation Requirement taking effect later this fall, PPSAT would continue to provide abortion after twelve weeks to survivors of rape or incest and to patients with diagnoses of "life-limiting

6

anomalies" and would continue to provide medication abortion to patients at low risk for ectopic pregnancy whose pregnancies are not yet visible by ultrasound.

III.    **ABORTION IS COMMON, SAFE, AND CRITICAL HEALTH CARE**

    A.    **Abortion Methods Performed in Outpatient Settings**

    14.    All methods of abortion provided at PPSAT—medication abortion, procedural abortion using aspiration, and procedural abortion by dilation and evacuation ("D&E")—are simple, straightforward medical treatments that typically take no more than 10 to 15 minutes, have an extremely low complication rate, and, unlike some other office-based procedures such as vasectomies or contraceptive implant removals, involve no incisions. In North Carolina and nationwide, these methods are almost always provided in outpatient, office-based settings by clinicians adhering to widely-accepted medical standards of care.

    15.    Although aspiration abortion and D&E are both sometimes referred to as "surgical" abortion, they are not what is commonly understood to be surgery. Both aspiration abortion and D&E are done through the natural opening of the vagina and cervix and therefore involve no incisions. Both can be, and almost always are, performed in outpatient clinics like PPSAT's.

        i.    **First-Trimester Medication Abortion**

    16.    In a medication abortion, a patient takes medications to cause uterine contractions that empty the uterus. Medication abortion requires no anesthesia or sedation.

7

From the time a patient receives a positive pregnancy test through 11 weeks, or 77 days, LMP, PPSAT provides the most common form of medication abortion.

17.     In a typical medication abortion, the patient takes a combination of two prescription drugs—mifepristone (also known as RU-486 or by its trade name, Mifeprex) and misoprostol (also known as a prostaglandin analogue or by its trade name, Cytotec)—a day or two apart. Mifepristone works by blocking the hormone progesterone, which is necessary to maintain pregnancy. Misoprostol causes the cervix to open and the uterus to contract and empty. These same medications are offered as a treatment option to patients who have a miscarriage with retained tissue. Indeed, the process of medication abortion very closely approximates the process of miscarriage.

18.     Mifepristone and misoprostol are safe—substantially safer than Tylenol and Viagra, for example.[6] The FDA approved mifepristone, by its brand name Mifeprex, in 2000. Decades of experience with medication abortion since then have resoundingly confirmed its safety and efficacy. According to the FDA, serious adverse events (including death, hospitalization, serious infection, and bleeding requiring transfusion) among mifepristone patients are "exceedingly rare, generally far below 0.1% for any individual adverse event."[7] Indeed, earlier this year, the FDA modified its dispensing requirements

---

[6] *See Analysis of Medication Abortion Risk and the FDA report, "Mifepristone U.S. Post-Marketing Adverse Events Summary through 12/31/2018"*, Advancing New Standards in Reprod. Health (2019), https://www.ansirh.org/sites/default/files/publications/files/mifepristone_safety_4-23-2019.pdf.

[7] FDA, *Ctr. for Drug Evaluation & Rsch., Med. Rev., Application No. 020687Orig1s020*, 47 (2016), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020MedR.pdf.

8

for mifepristone to reflect the ever-growing body of evidence demonstrating the safety and effectiveness of medication abortion.[8] While the FDA-approved labeling for mifepristone reflects its usage through 70 days LMP, there is significant evidence that supports its use through 77 days LMP, as is provided at PPSAT.[9]

19. For some patients, medication abortion offers important advantages over procedural abortion. Procedural abortion is contraindicated for patients with certain medical conditions, such as intolerance of available sedation or analgesic medications, or a history of seizure disorder. And medication abortion may be preferable for patients with some clinical conditions such as fibroids, or other uterine abnormalities such as bicornuate uterus, which can make it difficult to visualize the cervix and contents of the uterus during a procedural abortion. Some patients prefer medication abortion because it feels more natural to them to have their body expel the pregnancy rather than to have a provider use aspiration or instruments to empty the uterus. And some patients choose medication abortion because of fear or discomfort around a procedure involving aspiration or instruments. For example, survivors of rape and people who have experienced sexual abuse, molestation, or other trauma may choose medication abortion to feel more in control

---

[8] *See Information About Mifepristone for Medical Termination of Pregnancy Through Ten Weeks Gestation*, FDA, https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/information-about-mifepristone-medical-termination-pregnancy-through-ten-weeks-gestation (last reviewed July 23, 2023).

[9] *See, e.g.*, Ilana G. Dzuba et al., *A Repeat Dose of Misoprostol 800 mcg Following Mifepristone for Outpatient Medical Abortion at 64–70 and 71–77 Days of Gestation: A Retrospective Chart Review*, 102 Contraception 104 (2020); Ilana G. Dzuba et al., *A Non-Inferiority Study of Outpatient Mifepristone-Misoprostol Medical Abortion at 64–70 days and 71–77 Days of Gestation*, 101 Contraception 302 (2020).

of the experience and to avoid further trauma from having instruments placed in their vaginas. In the rare event that a medication abortion is unsuccessful, the patient may require follow-up care with procedural abortion, but in the vast majority of cases a patient who prefers medication abortion will be able to use that method, saving them from an unwanted procedure or a hospital referral.

20.    Additionally, the logistics of a procedural abortion may be prohibitive for some patients, especially those with lower incomes, those who have difficulty getting time off work and securing childcare, or those who live in rural areas far from facilities where procedural abortion care is provided. Some health care providers charge more for procedural abortions, meaning some patients must wait longer to get an abortion while they gather funds—if they can afford it at all. Survivors of intimate partner violence in particular may struggle to find such support, as telling their partner they are having an abortion could be dangerous. And unlike procedural abortion, medication abortion gives the patient a greater degree of control over when and where they will pass the pregnancy, including who is with them to offer support. For example, patients can time their medications so that they begin the process of passing the pregnancy—involving cramping and bleeding—when their partner is home with them or when a family member is available to care for their other children. This degree of control and predictability is a big factor for some patients.

### ii.    Aspiration Abortion

21.    Aspiration abortion (also known as suction curettage or dilation & curettage) entails using suction to empty the uterus. It is a straightforward procedure performed in the

first and early second trimester. PPSAT provides aspiration abortion up to approximately 14 weeks LMP. For this method, a small plastic tube, called a cannula, is passed through the cervical canal. The cannula is attached to a syringe or electrical pump that creates gentle suction to empty the uterus.

22.     Prior to starting the suction procedure, the provider dilates the cervix as needed to allow the cannula to enter the uterus. An analgesic such as ibuprofen, an anti-anxiety medication such as Ativan or Valium, a local anesthetic such as Lidocaine, and/or moderate sedation may be used during or prior to the procedure.

23.     The entire procedure, including administration of local anesthesia, dilating the cervix, and aspirating the uterine contents usually takes 3 to 5 minutes. It involves no incision, cutting, or suturing.

24.     This same aspiration method is used to treat a miscarriage after embryonic or fetal demise has occurred naturally, and for pregnancies of the same gestational age there is no difference in the risk of complications between a procedure to manage early miscarriage and aspiration abortion. PPSAT currently uses this aspiration procedure for miscarriage management up to approximately 14 weeks.

### iii.     D&E Abortion

25.     Dilation and evacuation, or D&E, uses a combination of gentle suction and additional instruments, including specialized forceps, to evacuate the pregnancy contents from the uterus. While we generally refer to procedures starting at 14 weeks LMP as "D&Es," instruments are routinely used in addition to suction starting around 15 weeks

Case 1:23-cv-00480-CCE-LPA   Document 49-1   Filed 07/24/23   Page 12 of 39

LMP, depending on the provider's individual practice and the patient's individual medical characteristics.

26.     Prior to the D&E procedure, the provider dilates the patient's cervix. This may be done through medications such as misoprostol, which softens the cervix, and/or through the placement of osmotic dilators in the cervix. Osmotic dilators are slender sticks made of a material that gradually swells as it absorbs moisture; as the dilators swell in the cervical opening, they cause the cervix to dilate. The provider may also use mechanical dilators or a combination of these techniques. The provider then empties the uterus using instruments or a combination of suction and instruments. When providing D&Es, PPSAT offers patients the option of local anesthesia or minimal or moderate sedation.

27.     In the early part of the second trimester, physicians may perform the cervical preparation and evacuation procedure on the same day. Later in the second trimester, the physician may start the dilation process one day before the evacuation. In most cases, PPSAT begins the dilation process for patients from 16 to 20 weeks LMP through the placement of osmotic dilators the day before evacuation. If this first appointment for dilation also includes tests, examination, education and consent, it may take a few hours, though the actual procedure to place the dilators takes approximately five minutes. After this appointment, the patient then leaves the clinic and returns the next day for the evacuation procedure.

28.     Once the patient's cervix is sufficiently dilated, the entire evacuation procedure typically takes 10 to 15 minutes. Like aspiration abortion, D&E does not involve

any incision, cutting, or suturing. And like aspiration, the D&E procedure is used both to provide abortion and to manage miscarriage.

**B.      Abortion Is One of the Safest Procedures in Medicine**

29.      To the extent the Act requires abortion after twelve weeks to be provided in a hospital, or prohibits medication abortion for low-ectopic-risk patients whose pregnancies are not yet visible by ultrasound, the Act does not improve patient health and safety.

30.      Abortion is one of the safest forms of medical care in contemporary medical practice and is safely and routinely provided in outpatient settings in countries around the world. Leading medical authorities agree that abortion is one of the safest procedures in medical practice,[10] "stand[ing] in contrast to the extensive regulatory requirements that state laws impose on the provision of abortion services."[11]

31.      In fact, major complications, defined as those requiring hospital admission, surgery, or blood transfusion, occur in just 0.23 percent of abortions performed in outpatient, office-based settings.[12]

---

[10]    Nat'l Acads. Scis., Eng'g, & Med., *The Safety and Quality of Abortion Care in the United States* 1, 77 (2018), available at http://nap.edu/24950 ("The clinical evidence makes clear that legal abortions in the United States—whether by medication, aspiration, D&E, or induction—are safe and effective.").

[11]    *Id.*

[12]    Ushma D. Upadhyay et al., *Incidence of Emergency Department Visits and Complications After Abortion*, 125 Obstetrics & Gynecology 175, 181 (2015); *see also* Ushma D. Upadhyay et al., *Abortion-Related Emergency Room Visits in the United States: An Analysis of a National Emergency Room Sample*, 16 BMC Med. 1, 1 (2018).

Case 1:23-cv-00480-CCE-LPA   Document 49-1   Filed 07/24/23   Page 14 of 39

32.     Abortion compares favorably, with a markedly lower complication rate, to other procedures routinely performed outside of a hospital setting, including:

- vasectomies, a form of male birth control that involves transecting and cauterizing the vas deferens, the tubes that carry sperm, resulting in hematoma formation two percent of the time while major complications requiring hospitalization occur in 0.2–0.8 percent of cases;[13]

- colonoscopies, an exam used to look for changes in the large intestine (colon) and rectum, such as swollen, irritated tissues, polyps or cancer, with a complication rate of 1.6 percent;[14]

- wisdom teeth extraction, a surgical procedure to remove one or more of the four permanent teeth located at the back corners of the mouth, with a complication rate of 6.9 percent;[15] and

- tonsillectomies, surgical removal of the tonsils, with a complication rate of 7.9 percent.[16]

---

[13] Christopher E. Adams & Moshe Wald, *Risks and Complications of Vasectomy*, 36 Urologic Clinics N. Am. 331, 331 (2009).

[14] Isuru Ranasinghe et al., *Differences in Colonoscopy Quality Among Facilities: Development of a Post-Colonoscopy Risk-Standardized Rate of Unplanned Hospital Visits*, 150 Gastroenterology 103, 109 (2016).

[15] Francois Blondeau & Nach G. Daniel, *Extraction of Impacted Mandibular Third Molars: Postoperative Complications and their Risk Factors*, 73 J. Canadian Dental Ass'n 325, 325b (2007).

[16] Jack L. Paradise et al., *Tonsillectomy and Adenotonsillectomy for Recurrent Throat Infection in Moderately Affected Children*, 110 Pediatrics 7, 12 (2002).

14

33.     Abortion is significantly safer than the alternative of carrying a pregnancy to term and giving birth, and complications related to pregnancy and childbirth are much more common than abortion-related complications.[17] The United States has the highest maternal mortality rate among high-income countries (more than four times the rate of others in that group). Most concerningly, it is getting worse.[18] In 2021 alone, 1,205 pregnant women died of pregnancy-related causes in the United States.[19] The Centers for Disease Control and Prevention (CDC) measure maternal mortality rates as the number of maternal deaths per 100,000 live births.[20] In 2021, the maternal mortality rate was 32.9 deaths per 100,000 live births.[21] And the maternal mortality rate in North Carolina is even higher than the national average.[22]

34.     In contrast, the CDC reported 0.43 deaths per 100,000 legal abortions from 2013 to 2019.[23] While the U.S. maternal mortality rate has significantly increased, there is

---

[17]  *See* Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215 (2012); Nat'l Acads. Scis., Eng'g, & Med., *supra* note 10, at 11 tbl. S-1.

[18]  Donna L. Hoyert, , *Maternal Mortality Rates in the United States, 2021*, CDC, Nat'l Ctr. for Health Stats. 1, 1 (2023), https://www.cdc.gov/nchs/data/hestat/maternal-mortality/2021/maternal-mortality-rates- 2021.pdf.

[19]  *Id.*

[20]  *Id.*

[21]  *Id.*

[22]  Teddy Rosenbluth & Tyler Dukes, *Pregnancy Can Be Risky in the US. In North Carolina, the Threat of Death Is Even Higher*., News & Observer, (July 19, 2023, 10:45 A.M.), https://www.newsobserver.com/news/state/north-carolina/article277397263 .html.

[23]  Katherine Kortsmit et al., *Abortion Surveillance — United States, 2020*, 71 Morbidity & Mortality Weekly Rep. Surveillance Summaries 1, 6 (2022).

Case 1:23-cv-00480-CCE-LPA   Document 49-1   Filed 07/24/23   Page 16 of 39

no evidence that has occurred for abortion care, making legal abortion approximately 12 to 14 times safer than live birth.[24]

35.     In North Carolina, physicians and certified nurse-midwives can deliver babies in locations other than a hospital, including at birthing centers and even in private homes.

**C.     Abortions Are Safely Performed in Outpatient, Office-Based Settings**

36.     There is no medical reason to require that all abortions after twelve weeks take place in hospitals and not abortion clinics. In North Carolina, as is done throughout the country, legal abortions are safely and routinely performed in doctors' offices and outpatient health center settings. Procedural abortions are almost always provided in an outpatient setting; nationwide, only 3% of abortions annually are performed in hospitals.[25] In addition, abortions at outpatient clinics are often more affordable, easier to navigate, and generally require considerably less time for patients than abortions in a hospital setting.

37.     According to the National Academies of Sciences, Engineering, and Medicine, "most abortions can be provided safely in office-based settings," and a hospital setting is not clinically necessary.[26] Similarly, major medical associations, including the American College of Obstetricians and Gynecologists ("ACOG") and the American Public

---

[24]  Nat'l Acads. Scis., Eng'g, & Med., *supra* note 10, at 75; Raymond & Grimes, *supra* note 17, at 215.
[25]  Rachel K. Jones et al., *Abortion Incidence and Service Availability in the United States, 2020*, 54 Persps. on Sexual & Reprod. Health 128, 134 (2022).
[26]  Nat'l Acads. Scis. Eng'g, & Med., supra note 10, at 10.

16

Health Association, reject the notion that abortions should be required to be performed in hospitals.[27]

38. The technique for a procedural abortion is clinically identical whether performed in a hospital or outpatient setting, and there is no scientific evidence indicating that abortions performed in a hospital are safer than those performed in an appropriate outpatient clinic or office-based setting.[28] To the contrary, as is true for nearly every medical procedure, fewer complications are seen in settings that perform higher volumes of the same procedure, making licensed abortion clinics like PPSAT's safer for most patients than most hospitals, many of which do not routinely provide abortion care.[29] In fact, at least one study demonstrated that second-trimester terminations of pregnancy by

---

[27] *See* Comm. on Health Care for Underserved Women, *ACOG Committee Opinion No. 815: Increasing Access to Abortion*, 136 Obstetrics & Gynecology e107, e109 (2020); Am. Pub. Health Ass'n, *Policy Statement No. 20083—Need for State Legislation Protecting and Enhancing Women's Ability to Obtain Safe, Legal Abortion Services Without Delay or Government Interference* (Oct. 2008), http://www.apha.org/ policies-and-advocacy/public-healthpolicy-statements/policy-database/2014/07/23/09/30/needfor-state-legislation-protecting-and-enhancing-womensability-to-obtain-safe-legal-abortion; *see also* Barbara S. Levy et al., *Consensus Guidelines for Facilities Performing Outpatient Procedures: Evidence Over Ideology*, 133 Obstetrics & Gynecology 255 (2019) (concluding, based on an analysis of available evidence, that requiring facilities performing abortion to meet standards beyond those currently in effect for all general medical offices and clinics is unjustified).

[28] Sarah C. M. Roberts et al., *Association of Facility Type with Procedural-Related Morbidities and Adverse Events Among Patients Undergoing Induced Abortions*, 319 JAMA 2497, 2502 (2018).

[29] Steve Sternberg & Geoff Dougherty, *Risks are High at Low-Volume Hospitals*, U.S. News & World Rep. (May 18, 2015, 12:01 A.M.), https://www.usnews.com/news/articles/2015/05/18/risks-are-high-at-low-volume-hospitals#:~:text=These%20large%20numbers%20of%20low,similar%20patients%20rather%20than%20by.

D&E in appropriate patients in a dedicated outpatient facility can be safer and less expensive than hospital-based D&E or induction of labor.[30]

39.     The features that differentiate hospitals from abortion clinics include system operations requirements, staffing requirements, and building construction requirements.[31] Not only are these features irrelevant and unnecessary in the context of abortion care, they also provide no medical benefit.

40.     Unlike invasive surgical procedures, aspiration abortion and D&E do not involve incisions of any kind. In North Carolina, procedures with risks similar to the risks associated with abortion—including inserting or removing an IUD; endometrial biopsy; colposcopy; hysteroscopy (scoping of the cervix and uterus); Loop Electrosurgical Excision Procedure (removing pre-cancerous cells from the cervix); and miscarriage management (which, from a clinical perspective, involves the exact same procedures as aspiration abortion and D&E, and is distinguished from those treatments only by the absence of embryonic or fetal cardiac activity)—are routinely performed in outpatient clinics and physicians' offices rather than in hospitals. And the procedures noted above with higher complication rates than abortion (like vasectomies and wisdom-tooth extractions) are routinely, and without controversy, performed outside of the hospital setting throughout North Carolina.

---

[30]   David K. Turok et al, *Second Trimester Termination of Pregnancy: A Review by Site and Procedure Type*, 77 Contraception 155, 155 (2008).
[31]   *Compare* 10A N.C. Admin. Code 13B.3201 (hospital requirements) *with* 10A N.C. Admin. Code 14E .0100 *et. seq.* (abortion facility requirements).

41.     Even in the rare event that complications arise during a procedural abortion, management can nearly always be safely and appropriately administered in the clinic where the abortion is being provided.[32] For example, most cases of hemorrhage (the technical term for heavy bleeding) are managed in the clinic setting with uterotonic medications, like misoprostol, that cause uterine contractions and reduce bleeding, and with uterine massage.[33] Most cases of cervical laceration are managed in the clinic setting with suture.[34] Cases of incomplete abortion are generally managed through repeat aspiration or medication, and, at any rate, arise *after* completion of the procedure, such that even if the abortion took place in a hospital, this complication would occur only after the patient leaves the hospital setting. In fact, because the Hospitalization Requirement applies only to abortion and not to identical procedures for miscarriage management or removal of retained pregnancy tissue, patients who have retained tissue as a complication of a procedural abortion *performed in a hospital* could obtain treatment for that complication at an outpatient clinic using aspiration or D&E.

42.     In the rare event that a patient experiences infection as a result of a procedural abortion, the infection would typically not develop until days after the procedure. At that time, the patient diagnosed with infection would receive treatment with oral antibiotics on an outpatient basis; i.e., they would take the antibiotics at home or a place of their choosing.

---

[32] Roberts et al., *supra* note 28; Nat'l Acads. of Scis., Eng'g, & Med., *supra* note 10.

[33] Jennifer Kerns & Jody Steinauer, *Management of Postabortion Hemorrhage*, 87 Contraception 331, 333 (2013).

[34] *Id.*

Oral or intramuscular antibiotics almost always resolve infection without any long-term or permanent injury to the patient. The use of intravenous antibiotics to treat infection arising from procedural abortion is rare, and can often be provided in an outpatient setting.

43.     As discussed above, major abortion complications occur in fewer than one-quarter of one percent (0.23 percent) of abortions.[35] In the exceedingly rare event that hospitalization is needed to manage complications, patients are safely stabilized and transferred to a hospital.

44.     It is unreasonable, and a waste of hospital resources, to require an entire category of procedure to be performed in a hospital when there is no medical benefit for the vast majority of patients. As with any other medical procedure, whether an abortion should be provided in a hospital should be a patient-specific consideration, based on the patient's individual medical circumstances.

45.     PPSAT physicians have low abortion complication rates and superb safety records. Because PPSAT specializes in providing patient-centered, holistic sexual and reproductive health care, PPSAT patients benefit from receiving care from highly experienced and specialized providers and staff. This is particularly important for the patient population we are talking about here—survivors of sexual assault or patients with a "life-limiting" fetal anomaly, who may be more comfortable with a specialized provider

---

[35] Upadhyay et al., *Incidence of Emergency Department Visits*, *supra* note 12, at 175.

like Planned Parenthood than having to navigate a hospital, especially one for which they need to travel outside of their community.

46.     Indeed, PPSAT receives referrals from North Carolina hospital-based physicians for patients seeking abortion after twelve weeks following a fetal anomaly diagnosis. Abortions in these circumstances are almost always clinically identical to abortions where no anomaly is present. For those patients, receiving an abortion at one of PPSAT's licensed abortion clinics is just as safe as getting that care in a hospital, and moreover, for most of them, it is more accessible from a logistical and financial standpoint, particularly where insurance would not cover the patient's abortion in a hospital setting.

47.     There is no medical reason to require all abortions for "life-limiting" anomalies to be provided in a hospital, and PPSAT would continue to provide abortions to these patients after the twelfth week of pregnancy under the Act's "life-limiting anomaly" exception but for the Hospitalization Requirement.

**D.     Medication Abortion Is Safe to Provide to Patients at Low Risk of Ectopic Pregnancy Before an Intrauterine Pregnancy Can Be Documented**

48.  If the IUP Documentation Requirement requires express confirmation of an intrauterine pregnancy *before* administration of medication abortion, it will be impossible for PPSAT to comply in the early weeks of pregnancy, and accordingly impossible for us to provide medication abortion to patients at that gestational stage.

49.  Specifically, some patients present for abortions very early in pregnancy. At these early gestational stages, though the patient has a positive pregnancy test, it may be

Case 1:23-cv-00480-CCE-LPA   Document 49-1   Filed 07/24/23   Page 22 of 39

too soon to see an intrauterine gestational sac via ultrasound because the pregnancy is not yet sufficiently developed. Accordingly, if the IUP Documentation Requirement requires PPSAT to document that an intrauterine pregnancy is *visible by ultrasound* before providing a medication abortion, it would prohibit PPSAT from providing medication abortion to patients who are very early in their pregnancies.

50. The Act would therefore force patients with pregnancies of unknown location either to delay their abortion until an intrauterine pregnancy can be seen by ultrasound or to undergo a procedural abortion, even if they have been determined to be at low risk for ectopic pregnancy and have decided in consultation with their provider that a medication abortion is the best option for them.

51. Medical evidence supports the safety and efficacy of providing medication abortion to low-ectopic-risk patients before the pregnancy can be seen on an ultrasound, using a protocol that *simultaneously* (1) provides medication abortion to a patient who wants it and (2) conducts further testing to rule out ectopic pregnancy. Moreover, this protocol is more patient-centered than requiring the patient to wait for medication abortion at a later date or to obtain a procedural abortion despite their preference for medication abortion. PPSAT follows this evidence-based protocol at its clinics in North Carolina.

52. Under this protocol, when a patient is seeking abortion and their pregnancy is not visible by ultrasound, PPSAT first screens the patient for risk of ectopic pregnancy (i.e., a pregnancy that has implanted outside of the uterus) by asking questions about the

22

patient's medical history and symptoms.[36] If we determine that the patient is at high risk of ectopic pregnancy, we refer the patient to another provider, typically an emergency department, for diagnosis and treatment.

53. If the patient is not at high risk of ectopic pregnancy, the provider offers the patient three options for treatment: medication abortion, aspiration abortion, or a follow-up appointment at a later date to see if an intrauterine pregnancy can be seen on an ultrasound at that time. We explain the potential risks and benefits of each option, and the patient and the physician decide which option is best for the patient.

54. If a low-ectopic-risk patient with a pregnancy of unknown location chooses medication abortion, the provider *simultaneously* provides the medication abortion *and* conducts further testing to rule out ectopic pregnancy—specifically, by drawing a blood sample to test the level of the pregnancy hormone human chorionic gonadotropin ("hCG"). These test results usually come back no more than 24 hours later.

55. If the blood test results indicate that the patient's hCG levels are sufficiently high (indicating a more developed pregnancy), this may be evidence of ectopic pregnancy. At that point, even if the patient has already taken the medications for medication abortion,

---

[36] An ectopic pregnancy occurs when a fertilized egg implants and grows outside of the uterus. Ectopic pregnancies require treatment to terminate the non-viable pregnancy. Research has shown that it is safe and effective to screen for ectopic pregnancy by considering known risk factors—including symptoms such as pain and bleeding, history of ectopic pregnancies, past surgery on the fallopian tube, and presence of pelvic inflammatory disease. *See* Ushma D. Upadhyay et al., *Outcomes and Safety of History-Based Screening for Medication Abortion: A Retrospective Multicenter Cohort Study*, 182 JAMA Internal Med. 482 (2022).

the provider will offer the patient the option of returning for an aspiration procedure as a means of *both* testing for ectopic pregnancy and completing the abortion. If the patient with high hCG levels opts for aspiration, then following that procedure, the provider will examine the aspirated uterine contents to see if gestational tissue is identifiable— confirming that the pregnancy was intrauterine and that the abortion is complete. If the patient with high hCG levels does not opt for aspiration, or if a gestational sac is not identifiable following aspiration, the provider may refer the patient for further ectopic evaluation, usually in an emergency department.

56.   If, however, the patient's hCG levels are low (indicating a pregnancy at a very early gestational age), the patient's hCG levels are tested again 48–72 hours after taking the misoprostol.

57.   Whether or not the patient's hCG levels have decreased more than 50% after the abortion is evidence of whether the pregnancy has been terminated by the medication abortion, the pregnancy is in the uterus and continuing to grow, or there is still a possibility of ectopic pregnancy. Patients whose hCG levels have not decreased sufficiently are further evaluated for ectopic pregnancy, including, where medically indicated, through referral to a hospital provider.

58.   Administration of medication abortion according to this protocol has been shown to be safe and effective in terminating the pregnancy.[37] And at least one study found

---

[37] *See, e.g.*, Alisa B. Goldberg et al., *Mifepristone and Misoprostol for Undesired Pregnancy of Unknown Location*, 139 Obstetrics & Gynecology 771 (2022); Karen Borchert et al., *Medication Abortion and Uterine Aspiration for Undesired Pregnancy of*

that this protocol leads to earlier exclusion of ectopic pregnancy than waiting to see if an intrauterine pregnancy can be detected later.[38]

59.   If a low-ectopic-risk patient with a pregnancy of unknown location were referred to a hospital for ectopic evaluation instead of receiving a medication abortion according to this protocol, in most cases the hospital would perform the very same serial hCG testing that, under the protocol, PPSAT performs simultaneously with the medication abortion. Referring a low-ectopic-risk patient with a pregnancy of unknown location for ectopic evaluation instead of providing a medication abortion per this protocol therefore does not lead to earlier or more accurate diagnosis of ectopic pregnancy. Instead, it only delays the patient's abortion.

60.   Access to early abortion care is all the more important given the Act's twelve-week ban, which is already in effect in North Carolina. Delaying their abortion may not be possible for some patients, since scheduling constraints due to clinic capacity and personal matters such as work and childcare might force them past the twelve-week mark and prevent them from accessing abortion altogether. Further restrictions on access to abortion in North Carolina and surrounding states will put even more pressure on us to provide timely care to our patients.

---

*Unknown Location: A Retrospective Cohort Study*, 122 Contraception 109980 (2023); I. Bizjak et al., *Efficacy and Safety of Very Early Medical Termination of Pregnancy: A Cohort Study*, 124 BJOG: Int'l J. Obstetrics & Gynaecology 1993 (2017); Philip Goldstone et al., *Effectiveness of Early Medical Abortion Using Low-Dose Mifepristone and Buccal Misoprostol in Women With No Defined Intrauterine Gestational Sac*, 87 Contraception 855 (2013).

[38] Goldberg et al., *supra* note 37, at 771.

Case 1:23-cv-00480-CCE-LPA   Document 49-1   Filed 07/24/23   Page 26 of 39

61.     Furthermore, banning medication abortion, but not procedural abortion, for low-ectopic-risk patients with pregnancies of unknown location is arbitrary and unnecessary. It puts patients in a position of opting for a procedural abortion even though they feel that a medication abortion is best for them. Aspiration abortion is not the best option for every patient, and it is vital to make available to patients the full range of medically appropriate options.

62.     Further, PPSAT sometimes has clinic days on which, for staffing reasons, it is able to offer medication abortion but not procedural abortion. Eliminating the option of medication abortion for some patients would reduce the availability of appointments at PPSAT health centers for them, thus hampering their access to abortion.

## IV.     IMPACT ON PPSAT PATIENTS

### A.     Impact of the Hospitalization Requirement on Survivors of Rape or Incest and Patients with "Life-Limiting" Fetal Anomalies

63.     If the Hospitalization Requirement means that PPSAT cannot provide abortion after the twelfth week of pregnancy even under the Act's exceptions for survivors of rape or incest and for people diagnosed with "life-limiting" fetal anomalies, it will limit the number of providers available to these patients, increasing the expense of abortion and delaying or denying their access to desperately needed care. These heightened barriers will force patients who are already facing personal hardship and even trauma due to the circumstances of their pregnancies to remain pregnant against their will even longer—all without any medical benefit.

Case 1:23-cv-00480-CCE-LPA   Document 49-1   Filed 07/24/23   Page 27 of 39

64.     It should go without saying that it is vitally important to preserve access to abortion after the twelfth week of pregnancy for survivors of rape or incest, and for patients who have received a diagnosis of a "life-limiting" fetal anomaly.

65.     Thousands of North Carolinians suffer sexual abuse each year.[39] Because of the non-consensual nature of rape and incest, these survivors are at heightened risk of unwanted pregnancy. And the traumatic circumstances of the pregnancy may increase the urgency of access to abortion. The physical aspects of pregnancy, including the sense of losing control of one's body, can be particularly traumatic for patients who have experienced a forcible loss of control of their bodies or their lives. For these survivors, pregnancy can trigger flashbacks, dissociative episodes, and other symptoms of re-traumatization.[40] Survivors experiencing mental health challenges may decide they are not healthy enough to parent a child (or an additional child, if they are within the roughly 62% of North Carolina abortion patients who already have children).[41]

---

[39] *Sexual Violence in North Carolina, 2018-2019*, NC Dep't of Health & Hum. Servs., (May 2021), https://injuryfreenc.dph.ncdhhs.gov/preventionResources/docs/ BRFSS-SV-Factsheet-Final.pdf (reporting that over 940,000 North Carolina adults have ever experienced sexual violence); Council for Women & Youth Involvement, *Sexual Assault in North Carolina July 2021–June 2022*, NC Dep't of Admin., (2022), https://ncadmin.nc.gov/cfwyi/2021-2022-dvsa-statistical-briefpdf-0/download?attachment (reporting that the North Carolina Department of Administration's Council for Women and Youth Involvement provided sexual-assault support services to 11,933 clients between July 2021 and June 2022).

[40] L. G. Ward, *Trauma-Informed Perinatal Healthcare for Survivors of Sexual Violence*, 34(3) J. Perinatal & Neonatal Nursing 199.

[41] Katherine Kortsmit et al., *Abortion Surveillance — United States, 2019*, Morbidity & Mortality Weekly Rep. Surveillance Summaries 1, 22 tbl. 8 (2021) (reporting that in 2019, 37.4% of North Carolina abortion patients had zero previous live births;

66.     It is already hard for those who have experienced intimate partner violence to access abortion care in many instances. In particular, it can be difficult if not impossible for people experiencing intimate partner violence to escape their partner's physical, emotional, and financial control long enough to access an abortion without compromising their confidentiality. In cases where they have been physically isolated from the community, they may not be able to leave their homes to seek routine medical care in the hours or days directly following the assault, let alone have access to transportation or the financial means to access abortion providers or follow-up services. At the same time, research has indicated that women who are denied a wanted abortion, when compared to those who are able to obtain abortions, face a greater likelihood of continued physical violence from the man involved in the pregnancy.[42]

67.     Even when survivors are able to access abortion, the process of finding a way to do so can delay them substantially, making them more likely to need abortion after twelve weeks of pregnancy. Survivors of repeated abuse may also be unsure of the gestational age of their pregnancies, so they may present to outpatient clinics for the state-mandated informed consent visit but find they are already beyond their twelfth week of pregnancy. If the Hospitalization Requirement applies to patients seeking abortion due to rape or incest, those patients would have to be referred to a hospital provider, despite the

23.9% had one previous live birth; 19.8% had two; 10.5% had three; and 8.5% had four or more).
    [42] Sarah C.M. Roberts et al., *Risk of Violence From the Man Involved in the Pregnancy After Receiving or Being Denied an Abortion*, 12 BMC Med. 1, 5  (2014).

clinic being able to safely provide the care, forcing the patient who has already experienced trauma to present to and share their story with an additional provider.

68.  Meanwhile, patients who are diagnosed with a fetal anomaly usually receive this diagnosis after the twelfth week of pregnancy, since the screening and diagnostic procedures for anomalies are generally conducted in the second trimester, and structural anomalies may not be identified by ultrasound until the eighteenth or twentieth week of pregnancy.

69.  Requiring abortion after twelve weeks to be provided in hospitals will reduce these patients' access to care. Most obviously, patients required to seek abortions in a hospital will have fewer options for care due to the fact that many hospitals do not provide abortion.[43]

70.  In addition, abortions at hospitals are generally much more expensive than they would be at PPSAT. Though hugely variable, abortions in hospitals can cost thousands of dollars. Given that only one in three Americans can comfortably cover a $400 emergency expense, the financial burden of an abortion at a hospital will be insurmountable

---

[43] *See* Comm. on Health Care for Underserved Women, *supra* note 27, at e108 (recognizing that "many hospitals and health care systems limit the scope of reproductive health care for a range of reasons"); *see also* David L. Eisenberg & V. C. Leslie, *Threats to Reproductive Health Care: Time for Obstetrician-Gynecologists to Get Involved*, 216 Am. J. Obstetrics & Gynecology 256, 256 (observing that "health care institutions limit the scope of reproductive health care because of hospital policies, financial pressures, and a desire to limit negative press").

Case 1:23-cv-00480-CCE-LPA   Document 49-1   Filed 07/24/23   Page 30 of 39

for many would-be patients.[44] At PPSAT, the cost of an abortion varies based on gestational age from $625 to $1795—a fraction of the cost charged by some hospitals.

71.    Due to cost alone, if a patient could find a hospital willing to provide their abortion, hospital treatment would not be feasible for many of PPSAT's patients. Arranging for transportation, childcare, and taking time off work to come to PPSAT is challenging enough. A majority of patients seeking abortion are already parents. Many have multiple jobs or jobs with inflexible or unpredictable schedules with no paid sick leave. Some are compromised by physical and/or mental health conditions or struggle with a substance use disorder.

72.    Patients who are able to get an appointment at a hospital may also face lengthy wait times, added stress, complicated paperwork and other logistical requirements, loss of confidentiality, and possibly increased medical risk from clinicians who provide abortion care infrequently. Particularly when deep sedation or general anesthesia is used— as is done at some hospitals, but not at PPSAT's clinics—the total appointment time, post-procedure recovery time, staffing and facility requirements, costs, and procedure risks increase, without any medical benefit to the patient.

73.    Studies demonstrate that increased barriers to abortion access increase the likelihood a patient will not receive an abortion at all.[45] In addition, delay of any kind is

---

[44] Bd. Governors Fed. Reserve Sys., *Economic Well-Being of U.S. Households in 2021*, 1, 36 (2022), https://www.federalreserve.gov/publications/files/2021-report-economic-well-being-us-households-202205.pdf.

[45] *See e.g.*, Benjamin P. Brown et al., *Association of Highly Restrictive State Abortion Policies With Abortion Rates, 2000-2014*, 3 JAMA Network Open 1, 1 (2020)

particularly concerning because, while abortion is safe, its risks increase with gestational age, as do the invasiveness of the procedure and the need for deeper levels of sedation.

74.     Moreover, some hospitals may provide abortion using practices that are not patient-centered. Because only 3% of abortions nationwide are provided in hospitals, physicians who primarily practice in a hospital setting are likely less experienced in procedural abortion, particularly D&Es (given that most abortions occur before the point in pregnancy when D&Es are generally provided). Patients seeking abortion at a hospital may therefore be limited, either expressly or functionally, to the induction abortion method, even though induction can be far more expensive, time-consuming, and physically arduous for the patient as compared to D&E.

75.     Specifically for survivors of rape or incest, abortion care in a licensed abortion clinic offers particular benefits related to the specialized setting. At PPSAT, for example, all staff are trained to recognize and counteract abortion stigma, and clinicians are trained annually on providing trauma-informed care for patients who have experienced intimate partner violence—such as special considerations when performing a physical exam for those patients, and what words to use in their clinical interactions. One such trauma-informed practice is offering the patient the opportunity to remain conscious during the procedure rather than receiving general anesthesia (which some hospitals administer as a matter of course for abortion patients): while some survivors may prefer general

("A highly restrictive legislative climate, when compared with a less restrictive one, was associated with . . . a 17% decrease [in] the median abortion rate….").

31

anesthesia, others wish to avoid the experience of being told after waking up from sedation what has happened to their body, with no firsthand memory of the procedure itself.

76.     And when receiving care at a licensed abortion clinic, survivors and patients diagnosed with fetal anomalies can trust that their care team—from the administrative staff at the front desk to the physician performing their procedure—will not judge their reproductive decisionmaking, whether they decide to continue or end the pregnancy. While there are of course excellent physicians and staff providing compassionate, patient-centered care in hospital settings, too, patients are *more likely* to encounter stigma and judgment at a hospital than at a licensed abortion clinic in North Carolina. Requiring people to go to a hospital for their abortion deprives them of the option to receive care in the specialized, supportive environment that a licensed abortion clinic offers.

77.     For all of these reasons, limiting access to abortion for survivors of rape or incest and for patients with "life-limiting" fetal anomalies would cause great harm even to those patients who are able to access abortion in a North Carolina hospital. For many others, the Hospitalization Requirement would put that care out of reach within North Carolina, such that the only remaining options will be to travel out of state to get an abortion or to attempt to manage their abortion outside of the medical system. Still others will be forced to remain pregnant and ultimately give birth against their will.

**B.     Impact of the IUP Documentation Requirement on Access to Early Abortion**

78.     If PPSAT is unable to offer medication abortion to patients with a pregnancy of unknown location, this too will be devastating for patients. This is especially so because

32

the Act already imposes a requirement that patients make two trips to a health center to access care (in addition to the follow-up appointment that must now be scheduled for medication abortion patients). If we cannot provide medication abortion to low-ectopic-risk patients while simultaneously doing further testing to exclude ectopic pregnancy, as supported by the best medical evidence and principles of patient-centered care, these patients may need to make another, wholly medically unnecessary trip, which will further delay their access to care. Early access to care is always preferable, but even more so because the Act bans almost all abortions after twelve weeks.

79.    In my own practice, I see a patient with a pregnancy of unknown location at least once a week. Based on my experience providing abortion in states that have enacted early gestational age bans—for example, South Carolina, where a six-week ban was in effect for roughly 50 days in the summer of 2022—I expect that the number of patients who come to PPSAT in North Carolina for a medication abortion before their pregnancy is visible by ultrasound will increase now that the twelve-week ban is in effect. If the IUP Documentation Requirement prevents us from providing evidence-based abortion care to these patients, it will only delay their access to abortion without any effect on the speed or accuracy of ectopic pregnancy diagnosis.

80.    It is important to note, however, that while patients who are able to recognize their pregnancies early on and *also* have resources and flexibility (in work schedules, caregiving obligations, and access to transportation) may be able to come to PPSAT earlier in pregnancy than they might have before the twelve-week ban took effect, patients who

do not recognize their pregnancies immediately and those lacking those resources and flexibility will not be able to come in any sooner, and in fact will be delayed in accessing abortion by the Act's many other medically unnecessary restrictions.

81. In these ways (and many others), the Act is not only harmful to our patients, but also impairs PPSAT's and its physicians' ability to practice our profession and to satisfy our personal and professional missions and obligations to provide high-quality, evidence-based comprehensive sexual and reproductive health care to people in North Carolina.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July  24  , 2023

Katherine A. Farris, M.D.

# EXHIBIT A

# Katherine A. Farris, M.D.

3000 Maplewood Avenue                                          phone: ███████████
Winston-Salem, NC  27603                              ██████████████████████

## Employment

**Planned Parenthood South Atlantic**                    Winston-Salem/Raleigh, NC
 Chief Medical Officer: April 2020 – present
  Duties of Affiliate Medical Director with increased focus on strategic planning, oversight of new service lines including Primary Care, and increased advocacy work in support of PPSAT mission.
 Affiliate Medical Director: December 2014 – April 2020
  Clinical, policy, and administrative oversight for 14 health centers located throughout NC, SC, VA, and WV.
 Laboratory Director: December 2014 – present
  Oversight of non-waived laboratories WS, NC; AVL, NC; WILM, NC; CLT, NC; waived laboratory VIE, WV
 Infection Control Professional: 2014-present
  Serves as consultant and expert on any infection prevention concerns as per medical training.
 Interim Abortion Facility Administrator: December 2019 – March 2020
 Acting Vice President of Patient Services: March – June 2016; May – August 2017
 Interim Affiliate Medical Director: July 2013 – December 2014
 Reproductive Health Care: September 2009-present
  Provision of comprehensive family planning services to women of all ages as well as STI counseling, testing and treatment to men and women.
 PPFA Succession Planning Task Force, Member: April 2017 – March 2021
  Task force was charged with addressing some of the systemic challenges of abortion provider training and recruitment at Planned Parenthood affiliates.
 Medical Directors Council (MeDC), Mentor: 2015 – present
  Serve as mentor to new Medical Directors/Chief Medical Officers at other PPFA Affiliates.
 BetterHealth IT Board of Directors,
  Member: September 2020 – present
  Chair, Compliance Committee: January 2023 – present
  Board member for the organization responsible for providing revenue cycle services and supporting and rolling out Epic electronic medical records system across PPFA affiliates.
  *(Prior to merger and name change January 2015, organization was named Planned Parenthood Health Systems, Inc.)*

**Heywood Medical Group/Henry Heywood Hospital**          Westminster/Gardner, MA
 Family Practice/Obstetrics: August 2003 – May 2007
  Meetinghouse Family Practice; 16 Wyman Rd.; Westminster, MA  01473
   Provision of full-spectrum family medicine including comprehensive family planning and reproductive health care.

**Planned Parenthood League of Massachusetts**               Boston/Worcester, MA
 Reproductive Health Care: August 2003 – May 2007
  Provision of comprehensive family planning services to women of all ages.

## Education

**Valley Medical Center Family Practice Residency**                    Renton, WA
 Chief Resident: 2002-2003
 Residency: 2001-2003
 Internship: 2000-2001
**Northwestern University Medical School**                            Chicago, IL
 Degree: MD, 1995-2000
**Northwestern University College of Arts and Sciences**              Evanston, IL

Degree: BA, 1991-1995
Major: Molecular and Cellular Biology        Minor: Religion Studies

## Certifications/Special Training

**Physician for Reproductive Health**, Leadership Training Academy Fellow 2018-2019
**Basic Life Support/AED**, Provider: renewed 10/2021
**Title X Family Planning Program Training,** Provider: 2015
**CLIA Laboratory Director Training**, Training for non-waived laboratory director: 2013
**Single-rod Hormonal Implant Insertion Training**, Provider: 2011, Certificate #30001820273

## Professional Organizations / Positions

**American Academy of Family Physicians** (AAFP): 1995-present
**North Carolina Academy of Family Physicians**: 2007-present
**National Abortion Federation** (NAF): 2003-2005, 2018-present
**Physicians for Reproductive Health**: 2018-present
**American College of Obstetricians and Gynecologists**: 2020-present
**Massachusetts Academy of Family Physicians**: 2003-2007
**Washington Academy of Family Physicians** (WAFP): 2000-2003
**American Medical Women's Association** (AMWA): 1995-2000
> Northwestern University Chapter President: 1997-1998
> Vice-President: 1996-1997

## Licenses

**NC Physician License**, active: 143375-2009
**WV Physician License**, active: 26126
**VA Physician License,** active: 0101265486
**SC Physician License,** active: MMD.84073 MD
**American Board of Family Physicians**, Board Diplomate

## Honors/Awards

**Sylvia Clark Award for Creativity in Clinical Services** – Recipient 2023
> Honors a clinical services provider team from a Planned Parenthood affiliate who, through their creativity in clinical services, have demonstrated special commitment and ingenuity in applying the PPFA mission to ensure access to reproductive and sexual health care for all.

**Press Ganey Patient Experience Top Performing Provider** 2020
> Ranked in the top 10% of providers across the country for providing the highest level of patient experience.

**2002 Roy Virak Memorial Family Practice Resident Scholarship** Recipient
> Awarded by the Washington Academy of Family Practice on the basis of academic achievement, excellence in patient care, and strong service to the community.