IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PLANNED PARENTHOOD SOUTH          Civil Action
ATLANTIC, et al.,                No. 1:23CV480
     Plaintiff,

vs.                              Greensboro, North Carolina
                                 June 28, 2023
JOSHUA STEIN, et al.,

     Defendants,


PHILIP BERGER and Timothy Moore,

     Intervenors.
_____/

TRANSCRIPT OF MOTION FOR TEMPORARY RESTRAINING ORDER
PROCEEDINGS
BEFORE THE HONORABLE CATHERINE C. EAGLES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff ACLU:

               BRIGITTE AMIRI, ESQ.
               KRISTI GRAUNKE, ESQ.
               LINDSEY KALEY, ESQ.
               JACLYN A. MAFFETORE, ESQ.
               ACLU of North Carolina


For the Plaintiff Planned Parenthood South Atlantic:

               PETER IM, ESQ.
               Planned Parenthood Federation of America

**** APPEARANCES CONTINUED ****




Proceedings reported by stenotype reporter.
Transcript produced by computer-aided transcription.

```
 1   APPEARANCES:

 2

 3   For the Defendant Attorney General Joshua Stein:

 4                         SARAH G. BOYCE, ESQ.
                           SRIPRIYA NARASIMHAN, ESQ
 5                         Greensboro, North Carolina 27401
                           (336) 332-6033
 6

 7   For the Defendant Jim O'Neill:

 8                         KEVIN GUY WILLIAMS, ESQ.
                           Bell, Davis & Pitt, P.A.
 9

10   For the Defendant the Secretary of DHHS:

11                         MICHAEL T. WOOD, ESQ.
                           North Carolina Department of Justice
12
     For the Defendants North Carolina Medical Board and North
13   Carolina Board of Nursing Board:

14                         MICHAEL E. BULLERI, ESQ.
                           North Carolina Department of Justice
15

16   For the Intervenor Defendants:

17                         WILLIAM ELLIS BOYLE, ESQ.
                           Ward and Smith, P.A.
18

19

20   Court Reporter:       J. Allen, RPR
                           United States District Court
21

22

23

24

25
```

1                    **P R O C E E D I N G S**

2              (All parties are present.)

3              (Court in session at 9:38 a.m.)

4         **THE COURT:**  Good morning.  We're here for a hearing

5    on a motion for temporary restraining order in Planned

6    Parenthood South Atlantic against Josh Stein, et al, 23CV480.

7              I have read everything, unless somebody filed

8    something in the last 20 minutes.  Okay, good.  So I have read

9    everything.

10             The first thing I would like to do is have counsel

11   identify themselves and who they are here for.  I did notice

12   that somebody had entered an appearance for District Attorney

13   O'Neill.

14             So, any way, let me get everybody to tell me who they

15   are and who they are here for, starting at the plaintiffs'

16   table.

17        **MS. GRAUNKE:**  Good morning, Your Honor.  I'm Kristi

18   Graunke.  I'm representing plaintiffs, here for the ACLU of

19   North Carolina.

20             I'll pass to co-counsel to introduce themselves.

21        **MS. KALEY:**  Good morning, Your Honor, Lindsey Kaley

22   from the American Civil Liberties Union.  I'm here on behalf of

23   Dr. Beverly Gray, plaintiff.

24        **MR. IM:**  Good morning, Your Honor.  Peter Im, from

25   Planned Parenthood Federation of America.  I represent Planned

1    Parenthood of South Atlantic.

2            MS. AMIRI:  Brigitte Amiri, from the ACLU,

3    representing Dr. Gray.

4            MS. MAFFETORE:  Good morning, Your Honor, Jaclyn --

5            THE COURT:  I'm sorry, speak up.

6            MS. MAFFETORE:  Jaclyn Maffetore from the ACLU of

7    North Carolina, also on behalf of all plaintiffs.

8            THE COURT:  Okay.  And also at the other table where

9    every one did not fit, it looks like, go ahead.

10           MS. BOYCE:  My name is Sarah Boyce and I'm here on

11   behalf of Attorney General Josh Stein.

12           MS. NARASIMHAN:  My name is Sripriya Narasimhan --

13           THE COURT:  Say again.

14           MS. NARASIMHAN:  Sripriya Narasimhan, with North

15   Carolina Department of Justice, here on behalf of Attorney

16   General Stein.

17           THE COURT:  Just so I cannot butcher your name, I'm

18   going to try to say it again.  Please correct me.

19           Narasimhan.

20           MS. NARASIMHAN:  Narasimhan, but that also works, and

21   I know you are talking to me.

22           THE COURT:  I got very confused in an airport in

23   Germany one time, and I'm saying Bond, which is the city, and

24   they think I'm saying train and it is like it sounds exactly

25   the same to me.

1    **MS. NARASIMHAN:**  No worries, Your Honor.

2    **THE COURT:**  I'll try to do better.

3    **MR. WILLIAMS:**  Kevin Williams.  I'm here on behalf of

4    District Attorney Jim O'Neill.

5    **MR. BULLERI:**  Good morning, Your Honor.  Michael

6    Bulleri.  I'm here on behalf of the North Carolina Medical

7    Board and the North Carolina Board of Nursing.

8    **MR. WOOD:**  Good morning, Your Honor, Michael Wood

9    with the Department of Justice, representing Secretary Kinsley.

10   Of DHHS.

11   **MR. BOYLE:**  Good morning, Your Honor, Ellis Boyle

12   from the Wake County Bar.  I am here representing Senator

13   Berger and Speaker Moore.

14   **THE COURT:**  Thank you.  Okay.  So all of the rest of

15   the district attorney defendants are as yet unrepresented, it

16   sounds like.

17   **MS. BOYCE:**  Yes, Your Honor, that's correct.  The

18   Department is currently working out their representation, but

19   given Mr. O'Neill's different position, it is taking a little

20   bit of time to work through those wrinkles, but we do expect an

21   attorney to notice an appearance soon.

22   **THE COURT:**  They have all been served?

23   **MR. IM:**  Yes, Your Honor, they have.

24   **THE COURT:**  Now here is how I propose to go about

25   this.  First, somebody is going to tell me the status of the

1  proposed Bill which would amend the Act.  I'll ask the
2  plaintiff -- well, I don't know, maybe I'll ask Mr. Boyle to
3  tell me, and then if anybody else wants to tell me anything
4  different, you can.

5         Then, we are going to talk about the three -- I have
6  broken things out into three categories.

7         One of them has a lot of subject categories, but my
8  first one is the hospitalization, what I'm calling the
9  hospitalization requirement, because I believe that every one
10 agrees it doesn't go into effect until October 1st, so we'll
11 just speak about that briefly, hopefully briefly.

12        Then there are the claims that it seems likely every
13 one will agree will be mooted if the proposed bill goes into
14 effect, and within that, there is several of the plaintiffs'
15 claims, so we'll go over those and identify them.

16        Then the third one is the claims that aren't mooted
17 if that Act passes, and we'll identify those, which presumably
18 we will have done -- will become clear after the second part
19 and, you know, so we get all that identified, and then we'll go
20 through those and kind of -- well, let's talk about what we
21 should do, what I should do, actually.  I guess that's really
22 all anybody cares about today.

23        We'll talk about them kind of in that order, and then
24 at the end, I do want to talk about the motion to intervene to
25 see if anybody has any objections.  I know not all of the

1   district attorneys are represented yet so, you know, that

2   Supreme Court case says what it says, but I'll hear from you on

3   that.

4           Then, if I am able to give you a decision or even if

5   I'm not, we'll talk about the future and briefing for

6   preliminary injunctions and discovery and possibly combining

7   things, expediting things, amended complaints, blah, blah.

8           Okay.  Those are the things that sort of jumped out

9   at me, but we'll talk about that, because it is my goal to get

10  the case fully and completely resolved as quickly as possible,

11  and even if you don't share that goal, it will soon become your

12  goal, because, you know, I kind of drive a speed boat even in

13  the ordinary case, and I don't have any desire to stretch this

14  out.

15          Of course to the extent there is factual matters and

16  factual disputes, you may have to have some discovery, and I'm

17  sensitive to that, but we'll talk about that down the road.

18          Anybody have any problems with that proposed way of

19  dealing with things or any sort of big topic things I may have

20  left out?

21          From the plaintiffs' perspective?  No.

22          This table?

23          **MR. BOYLE:**  No, Your Honor.

24          **THE COURT:**  Everybody is shaking their head no.

25          So the first thing is the hospitalization

1    requirement, and it looks like every one agrees -- and I think

2    this seemed to me to be a pretty sensible way to read the Act,

3    that it goes into effect on October 1st.  I appreciate the

4    plaintiffs' concerns about that, but I can't quarrel with your

5    concern that it might go into effect July 1st, but certainly

6    seems like a good sensible way to read it, that it goes into

7    effect October 1st.

8            Let me just go down the row over here and see if

9    anybody disagrees.

10           Ms. Boyce.

11           **MS. BOYCE:**  No disagreement.

12           **THE COURT:**  No, no, no.

13           Mr. Boyle.

14           **MR. BOYLE:**  No, Your Honor.  I think we would be the

15   sticky-wicked bear and we made that stipulation in our brief

16   that we filed, and I think the parties have, but for the rest

17   of the DAs, all agreed to a very similar, if a little bit more

18   robust version of that, that hopefully will be forthcoming to

19   the Court and filed in form soon.

20           **THE COURT:**  All right, great.  Of course the DAs are

21   an important part of this, because they are the people who

22   ultimately enforce it, so possibly even if everybody here

23   stipulates and agrees, I may still need to independently agree,

24   or not.

25           **MS. AMIRI:**  For part two of the Act there is no

criminal penalties, so in fact the district attorney -- we, of course, would like every one's stipulation on this, but they are not the enforcers for part two.

**THE COURT:**  Thank you, very much.  That was one of my questions to go through, which items had criminal and which had civil, so if I forget to do that, you all feel free to remind me.

Everybody on this end agree with that?  Everybody is nodding yes.  If anybody thinks no, stand up.  Okay.  Well, that's good.  That lessens that.

So it would seem like as part of whatever order I enter, I can just say -- because I do actually think this -- I was going to give somebody a chance to tell me why it went into effect July 1st, but since nobody thinks that, my view was it was October 1st, and I can enter an order that says that, and you all can file your stipulation and I don't even really need to enter a TRO about that, and we can just brief it.

Everybody is nodding yes on a preliminary injunction schedule as we agree later.  Anybody think differently about that?

Okay.  So next I would like first the plaintiffs, and then we'll go down the row -- wait a minute, I forgot to ask you what the status of the proposed Bill was.

**MR. BOYLE:**  Yes, Your Honor.  So this Bill H-190, which I believe we attached a copy that had been passed by the

1  Senate as Exhibit 1 to our briefing that we filed yesterday

2  morning.  It passed through the Senate, I believe a 45 to two

3  vote.  And then it went to the House yesterday, and because

4  they did not change it, I believe they were able to vote on a

5  concurrence, and I handed out sheets that has the vote.  I'd be

6  happy to hand one up to Your Honor, but basically it was 115 to

7  four in favor.

8         So it passed the House and there is a mechanism to

9  get a Bill that passes both Chambers to the Governor's desk by,

10  I believe special message is what it is called.  I received

11  copies of that by email last night and circulated that amongst

12  the lawyers who have already made appearances.

13         I apologize, I've not had a chance to file it with

14  the Court, and I got it late enough that I don't have a copy

15  for the Court, but I believe all of the parties that are here

16  today, the lawyers, any way, have seen a copy of that special

17  message that was sent to the governor, and I believe the

18  Governor has until July 7th to act on the pending legislation

19  in front of him on his desk now.

20         **THE COURT:**  If you will give me a little civics

21  lesson.  Correct me -- or maybe I should just let you tell me

22  so I don't make a mistake in front of everybody.  He has -- if

23  he doesn't act on it -- I'll just go ahead.  I don't mind

24  making mistakes in front everybody.  If he doesn't act on it,

25  it becomes law?

1          **MR. BOYLE:**  That's my understanding.

2          **THE COURT:**  If he vetoes it, it goes back and the

3  legislature can try to override the veto?

4          **MR. BOYLE:**  That's correct, Your Honor.

5          **THE COURT:**  Those would be the two options at that

6  point?

7          **MR. BOYLE:**  He could sign it also.

8          **THE COURT:**  Oh, yes, right, thank you.  He could sign

9  it.

10         **MR. BOYLE:**  Hopefully, he'll sign it.

11         **THE COURT:**  Either of those would result in it going

12  into effect.  If he vetoes it, it goes back, you presumably try

13  to override and if those votes are accurate, it seems very

14  likely that that would happen.

15         **MR. BOYLE:**  I don't think that the override votes

16  would be the same, but I believe if recent history is any

17  indication, there is a fair, if not a good chance it will be

18  overridden, Your Honor.

19         **THE COURT:**  If that were to happen, that process

20  would add another, roughly couple of weeks, three weeks, a

21  month, one day?

22         **MR. BOYLE:**  Well, it reminds me about a joke about

23  hurting cats and how many people you need to be in the room to

24  make the vote for the override in July.  Probably a bad joke,

25  but it would take, I would say, two to four weeks, hopefully

1  sooner, but when you hit July and try and get votes in the
2  General Assembly, it is my understanding that it might take a
3  little bit longer than if it was, say, March.

4          **THE COURT:**  All right.  Thank you.

5          Does anybody -- does the plaintiff have a different
6  perspective?

7          **MS. AMIRI:**  No, Your Honor.

8          **THE COURT:**  Or different information?

9          Anybody else at the defense table have a different
10 perspective or different information or additional information?

11         Okay.  Nobody.

12         Okay.  So if it is signed by Friday at midnight, then
13 my perspective is that that will moot some of the claims.  If
14 it is not signed, the claims are not yet moot, not mooted, and
15 I have to figure out -- well, okay, then what do I do about the
16 merits, the merits at the TRO stage?

17         I know it is the plaintiffs' position I still need to
18 go ahead and enter the injunction, and I have read the
19 intervenors' briefs.  Their position is I don't need to do
20 that.

21         So we'll talk about what happens if the Governor has
22 not signed it, and I'll just tell you, I'm not entering an
23 order at 11:00 p.m. on Friday night.  I'm going to do something
24 by noon, because otherwise, you know, it is kind of ridiculous.
25 So I say noon.  I might do it at nine o'clock in the morning.

1   You know, I do have other stuff to do.

2           So we'll -- some time on Friday, you know, unless the

3   Governor signs it today or tomorrow, you know, I'm going to

4   have to figure that out.  So I'm thinking about what I'm going

5   to do either way.  But if he signs it, then I want to know,

6   well, what is mooted and what is not, and if he doesn't sign

7   it, then we need to talk about what to do, what I should do.

8   And then we might need to have some sort of discussion about

9   the merits of the ones that everybody agrees are mooted.

10          This is a little complicated.  And then, you know, as

11  part of that I want to know, well, what does the plaintiff say

12  is not mooted.  What do the defendants say is not mooted.  And

13  then hearing from you on the merits of all of that.

14          So can we just go through them claim by claim -- and

15  I appreciated the intervenors' brief on that.  You did that in

16  a clear way as to your perspective.  In fact, let me just get

17  that open.  That might be the easiest way for me to go through

18  it.

19          **MR. BOYLE:**  Your Honor, I have a loose copy if you

20  would like to have that just for ease of reference.

21          **THE COURT:**  I have it myself.

22          **MR. BOYLE:**  Very good.

23          **THE COURT:**  Docket 26.  Let me get to the right page

24  of what I'm thinking about.  Hopefully it is what I remember.

25  There we go.  Okay.

1          We've already talked about the hospitalization

2    provision.  So I'm looking at page eight.  Is it all right if

3    we just use this list?  It is pretty manageable, and that way

4    we probably won't forget anything.

5          The first one would be the fetal homicide

6    unconstitutionally vague problem.  What is the plaintiffs'

7    position on that?

8          **MS. AMIRI:**  Your Honor, if the amendment passes, it

9    would clarify that the fetal homicide statute has an exception

10   for lawful abortions.

11         **THE COURT:**  So basically, moot?

12         **MS. AMIRI:**  That would moot the claim, yes, Your

13   Honor.

14         **THE COURT:**  Any defendant -- I know that is the

15   intervenors' position from their brief.  Correct, Mr. Boyle?

16         **MR. BOYLE:**  Yes, Your Honor.

17         **THE COURT:**  Any defendant think differently?

18         **MS. BOYCE:**  No, Your Honor.

19         **THE COURT:**  Okay.  The ten week verification, you

20   know, the 70 day versus twelve weeks problem, and the

21   invertenors' have put that together with the pregnancy location

22   requirement.

23         What is the plaintiffs' -- if you have a different

24   view on those two, just tell me.

25         **MS. AMIRI:**  Yes, Your Honor, they are different

1  indeed.  So for the ten week versus twelve week limitation for

2  medication abortion, we agree that the amendments would make

3  clear that medication abortion can be provided through the

4  twelfth week of pregnancy, so it would moot that claim.

5          However, with the pregnancy location requirement, the

6  amendments do not clarify that and they are still vague and

7  irrational and Mr. Im can speak to that, either now or later.

8          **THE COURT:**  Later.  I would like to get my list

9  clear.  And I think it is the intervenors' position that both

10  of those would be mooted, correct?

11          **MR. BOYLE:**  Your Honor, I think definitely the ten

12  versus twelve week and 70 days is mooted as it relates to

13  this -- so I tried to lift from the TRO brief and address it.

14          There were two parts, I believe, that dealt with the

15  intrauterine location in the Bill, and this part, the first

16  part, number two here was talking about it is vague.  I think

17  the new Bill, if it passes, it is not vague.  I think that they

18  do have, and they set forward an argument about it being

19  irrational, I believe, in number seven on page 13.  So --

20          **THE COURT:**  Let me get the plaintiff to clarify.  Are

21  you saying it would still be vague and making -- we're just

22  going to use like really summary words here, vague and

23  irrational, that's still both of those arguments if the Bill

24  passes, or just one of them?

25          **MR. IM:**  Your Honor, it would be plaintiffs' position

1 that it would still be vague and irrational.

2        **THE COURT:** And it's the intervenors' position it is

3 no longer vague, but they may -- it doesn't necessarily moot

4 their argument about whether it has a rational basis?

5        **MR. BOYLE:** Correct, Your Honor. I believe the

6 amendment would make it not vague. We object to the argument

7 and oppose the argument about the rationality.

8        **THE COURT:** Right. Of course.

9        **MR. BOYLE:** Yes, Your Honor.

10        **THE COURT:** And which of those views, or some third

11 view, we'll just go down the line.

12        Ms. Boyce.

13        **MS. BOYCE:** The Attorney General agrees that the

14 amendments would moot the question of ten versus twelve weeks

15 with respect to medication abortion. The Attorney General

16 similarly agrees that the amendments would not moot the issue

17 regarding the location or existence of an intrauterine

18 pregnancy, but the Attorney General takes no position with

19 respect to the vagueness of that provision, given his legal as

20 opposed to medical expertise.

21        **THE COURT:** All right. What do the other defendants

22 say?

23        **MR. WILLIAMS:** We concur with Mr. Boyle's

24 representations to the Court.

25        **MR. BULLERI:** On behalf of the Medical Board and the

1   Nursing Board, we take no position.

2           **THE COURT:**  We might need to spread those mics out a

3   little bit.  This room is beautiful, but it is a little hard to

4   hear.  Okay.

5           And for the secretary?

6           **MR. WOOD:**  We take no position on this point.

7           **THE COURT:**  Excuse me just one second.

8           Okay.  The 72 hour mandate argument.

9           **MS. AMIRI:**  Your Honor, I believe that the amendments

10  would moot our claims in this regard as well.  The shorthand on

11  page eight is a little difficult to follow, but to the extent

12  that these are addressing claims raised by the original

13  provision, which will now be repealed, Section 90-21.83C.

14          **THE COURT:**  That C, yes, that 83C.

15          **MS. AMIRI:**  Yes, exactly, which cause a whole host of

16  problems, which now will be repealed, and we agree that our

17  claims with respect to that section would be moot.

18          **THE COURT:**  I believe that's the intervenors'

19  position as well.

20          **MR. BOYLE:**  Yes, Your Honor.

21          **THE COURT:**  Does any defendant have a different

22  position?

23          **MS. BOYCE:**  No, Your Honor.

24          **THE COURT:**  I'll just say, you agree or either you

25  have no position, which for purposes of today, I'm going to

1  treat the same way, if you don't want to be heard in

2  opposition.

3          Okay.  Then there is the reporting requirement.  I

4  think that's the three day requirement, and then this, let's

5  see, the additional 72 hour mandate.  I think we've really

6  already maybe covered that.  So this three day reporting.

7          **MS. AMIRI:**  I think if I follow this, it is both with

8  respect to the mandatory reporting requirement for minors,

9  which was a three day limit, even though activities had not

10  occurred at that time frame, so that requirement, reporting

11  requirement for minors, our claim on that would be moot with

12  the amendments, and I believe this number four on page eight of

13  the intervenors' brief also refers to the insurance

14  requirement.

15          **THE COURT:**  Right, insurance.

16          **MS. AMIRI:**  On checking, that would be moot as well,

17  with Section 83C being repealed and the insurance provision

18  changed and moved into a different part of the bill.  So both

19  of these things in number four on page eight of the

20  intervenors' brief would be moot.

21          **THE COURT:**  That's the intervenors' position, I

22  believe.

23          **MR. BOYLE:**  Yes, Your Honor.

24          **THE COURT:**  Does any defendant want to be heard to

25  the contrary?

1          **MS. BOYCE:**  No, Your Honor.

2          **THE COURT:**  So I already know the answer to the next

3     one.  The advise, procure, consent provision, and the

4     intervenors' belief that the amendments take care of that and

5     the plaintiffs' disagree and the Attorney General disagrees.  I

6     don't know what the other defendants think about that.  I

7     recall that you all told me perhaps they take no position, I

8     just don't remember.

9          **MS. AMIRI:**  Your Honor, I think that we're still

10    figuring out our position.  I think in light of the Attorney

11    General's brief raising issues about whether cause could be

12    interpreted to breach speech that is protected, I think we are

13    assessing our position, and I think, however, it might be

14    easily cured by some sort of agreement or stipulation by the

15    parties if we all agree that helping people obtain abortions in

16    states where it is lawful is not breached by this.  I think we

17    can probably find a resolution to this.

18         **THE COURT:**  All right.  Okay.  So still an open

19    question.  I'll just put it that way.

20         What do you want to say, Ms. Boyce?

21         **MS. BOYCE:**  The Attorney General's position as

22    conveyed in the brief is that injunctive relief from this Court

23    clarifying -- either clarifying the scope of that particular

24    provision or enjoining enforcement of that provision more

25    broadly to sweep-in conduct that would assist women in

1  obtaining abortions out of state would be necessary to avoid

2  any concerns about due process.

3          **THE COURT:**  And the other defendants?

4          Mr. Williams.

5          **MR. WILLIAMS:**  Don't need to be heard on this issue,

6  Your Honor.

7          **MR. BULLERI:**  Same, Your Honor.

8          **THE COURT:**  I'm taking that to mean that you have no

9  position.

10          **MR. BULLERI:**  Correct, Your Honor.

11          **MR. WOOD:**  No position, Your Honor.

12          **THE COURT:**  And the hospitalization argument, we can

13  just put that off and talk about that later, if nobody thinks

14  that the amendments are -- I mean, they don't even address

15  that, the substance of that argument, so we don't actually need

16  to talk about that one today any further, right?  Okay.

17          Is there any other claim by the plaintiff that we

18  have not touched on here?

19          **MS. AMIRI:**  No, Your Honor.

20          **THE COURT:**  Thank you for helping me understand that

21  better.

22          So I think what I might like to do is for the ones

23  that everybody is in agreement on, that they are going to be

24  mooted if this Bill passes.  If I can just hear from you on

25  what does that mean for today.

1          I still need to decide if in case the Bill doesn't go

2    into effect by whenever I get ready to issue an order on

3    Friday, which is June 30th, yes, or I can -- I don't need to

4    decide.  You know, so kind of that question, and then of course

5    to the extent you need to address the merits on it, go ahead.

6          We will maybe work through the merits of it in a

7    little more detail, but still, being as efficient as we can

8    with our time.

9          What is the plaintiffs' view on that?

10         **MS. AMIRI:**  Yes, Your Honor.  I can speak more

11   globally to the plaintiffs' request and then Mr. Im can speak

12   to the pregnancy location requirement.

13         Our position is that this Court should enter a TRO as

14   to all of part one to prevent its enforcement on July 1st, and

15   we could seek a TRO for 14-days, and ask the Court to get the

16   parties to meet and confer no later than ten days, for example,

17   and report to the Court about what is addressed in terms of

18   what we've just gone through today.

19         I think the biggest issue for us, Your Honor, is

20   compliance, that this does not give enough time for the parties

21   to -- the plaintiffs to comply.

22         Even if the Governor signs the amendments on Friday,

23   let's say or Saturday, there still is chaos that is being

24   reaked and havoc that the providers face in having to try to

25   comply with ever-shifting requirements as well as confusion on

1   patients' part as well.  So we need time to comply.

2            Also the Department of Health and Human Services

3   needs time to adjust the forms.  The amendments change

4   requirements that DHHS will have to adjust in the forms that

5   plaintiffs must use.

6            So our position is, that we still need a time to

7   comply, even if the amendments will moot many of our claims.  I

8   would point to Planned Parenthood of Wisconsin versus

9   VanHolland, as we cited in our brief.  In that case,

10  Wisconsin's statute restricting abortion was passed on a

11  Friday, took effect on Monday, and the Court said, "What is the

12  urgency here in terms of compliance?  We are preserving the

13  status quo here that has existed for years.  The difference

14  between a July 1 effective date and a July 14th effective date

15  is not going to harm the defendants or the invertenors'.  They

16  have not alleged as much.  Instead, plaintiffs will suffer

17  irreparable harm if the law takes effect without time to

18  comply."

19           The concessions by the legislature with all of these

20  changes also indicate that plaintiffs' would succeed on the

21  merits of their claims.

22           So I would say that, you know, to the extent that the

23  July 1st effective date is relatively arbitrary, the

24  legislature did have a different effective date, October 1 for

25  a different part of the law, and they would not be harmed by

1  this short period of time to allow us to assess all of these

2  changes, come into compliance.  The parties can meet and

3  confer, figure out what is left, maybe the TRO could dissolve

4  on its own, but it would give the parties time to assess the

5  changes in this rapidly shifting landscape.

6       **THE COURT:**  Just to confirm, the Bill amending the

7  Act does not change the effective date, correct?

8       **MS. AMIRI:**  That's correct, Your Honor.  That's

9  correct.

10       **THE COURT:**  All right.  Thank you.

11       **MS. AMIRI:**  Would you like to hear from Mr. Im about

12  the pregnancy location requirement at this point?

13       **THE COURT:**  I think we'll wait for a second to get to

14  the merits of it.  I just want to think first about -- I don't

15  know, I need a flowchart.

16       **MS. AMIRI:**  Which is, we think, the easiest course is

17  to block all of part one because it is very confusing and

18  complex.

19       **THE COURT:**  All right.

20       Ms. Boyce.

21       **MS. BOYCE:**  Yes, Your Honor.  The Attorney General

22  set forth his position regarding the injunctive relief that

23  must be entered by July 1st at the latest on page 21 of our

24  brief.  We have focused on the particular provisions that we

25  believe would remain vague or that are currently vague and that

1   need to be enjoined before the law takes effect.

2            So the Attorney General, I don't think, has any issue

3   with you waiting a little bit longer to see whether the

4   Governor immediately vetoes these bills, but certainly before

5   July 1st or by Friday, as Your Honor indicated.

6            It is the Attorney General's position that there

7   needs to be injunctive relief on these provisions, lest clinics

8   be uncertain as to what healthcare they can provide, and women

9   be unable to access the reproductive healthcare that they need.

10           **THE COURT:**  So are you saying that you agree with the

11  plaintiff, that I should enjoin all of part one, or more

12  narrow?

13           **MS. BOYCE:**  No, Your Honor.  We are urging you to

14  enjoin the provisions that are listed on page 21 of our brief.

15  And to be clear, there are several other provisions that we

16  simply take no position on, given the Attorney General's

17  expertise or lack thereof in the medical field.

18           **THE COURT:**  Mr. Williams.

19           **MR. WILLIAMS:**  Your Honor, on these issues I'm going

20  to refer to Mr. Boyle.  I was just retained in this case

21  yesterday afternoon, so I'm playing a little bit of catch-up,

22  as you might imagine.

23           **MR. BULLERI:**  On these issues we take no position.

24           **THE COURT:**  I'm sorry, speak up.

25           **MR. BULLERI:**  On these issues, we take no position.

1          **THE COURT:**  You are here for the licensing boards?

2          **MR. BULLERI:**  Yes.

3          **THE COURT:**  Okay.

4          And for the secretary?

5          **MR. WOOD:**  Likewise, the secretary takes no position

6    on these issues, Your Honor.

7          **THE COURT:**  Mr. Boyle, I'll hear from you.

8          **MR. BOYLE:**  Thank you, Your Honor.  First, we would

9    suggest that there doesn't need to be a TRO, given the passage

10   of the Bill and likelihood that it will be enacted and become

11   law in the near future.

12          If the Court is going to enter a TRO, we would

13   certainly not think that it would be for the entirety of

14   Section 1 of the Bill, and we would ask that it -- the Court

15   only address the few items on page 21 from Attorney General

16   Stein's brief.

17          And just some points about TROs in general that I

18   think apply here, Your Honor.  A TRO is an extraordinary

19   measure.  It is a remedy that should not be given lightly.

20   Laws have the imprimatur and premise of being valid.  This is a

21   validly passed law in North Carolina, so it is a high burden to

22   undo and enjoin, have a court enjoin a law passed by the

23   General Assembly.

24          As for the timing, I certainly appreciate the

25   argument that these are forms that have been there for years,

but this law passed on May 17th.  It became effective after the

veto was overridden, so really we're talking about six weeks,

and the complaint wasn't filed for another month after that,

which is fine.  I'm not saying that as an attack or any type of

fault but, you know, it sat there for a month and then a week

or so after the complaint was filed, the TRO motion was filed.

So the timing issues that we're facing right now,

have been -- and I should say before the veto was overridden,

the law was actually passed originally on May 4th, I believe.

So really, it is two months or so that these particular issues

have been there.

The argument that there are forms that need to be

changed, you know, I'm not at the DHHS.  I don't know the

particulars of that, but I don't know that they're very onerous

at all to change to the extent they need to be changed.  Again,

I guess you would probably just revert back to the way they

were somewhat before May 4th or May 17th, so it's not like this

isn't something that had been in the process of changing.

If DHHS hasn't seen this law, which is actually

attached if you look at Exhibit 1, Your Honor, it is 28 pages.

The first 25 pages are technical changes and specific changes

for DHHS.  It is the DHHS Bill, as I understand it.

So I suspect they're aware of all of this and that it

would not be terribly difficult for them to make these changes.

I could be wrong and I don't mean to testify for them.  I'm

1   just making the argument.

2           **THE COURT:**  If it becomes effective, once it becomes

3   effective?

4           **MR. BOYLE:**  Once it becomes effective, yes, Your

5   Honor.

6           **THE COURT:**  If and when.

7           **MR. BOYLE:**  Just again, I want to address that the

8   comment was made that the easiest course would just be to enter

9   a TRO and enjoin the passage, but that's not really the legal

10  standard here, and we think that there isn't really a potential

11  harm that could occur here.

12          The only thing standing between all of these mooted

13  arguments becoming the new law that addresses those issues and

14  not is, the Governor signing it, and that could happen ten

15  minutes ago, a day from now, by July 7th, or he could veto it,

16  but these are certainly problems with a very simple solution,

17  one signature.

18          **THE COURT:**  All right.

19          **MR. BOYLE:**  So we would ask, Your Honor, that we

20  don't think there needs to be a TRO at all.  To the extent the

21  Court is intending to do so, we would ask that it is very

22  narrowly tailored to only the issues that are not mooted or

23  that will be mooted when the technical and conforming bill

24  becomes enacted into law.

25          One more point that I am blanking on, Your Honor, so

1  I'll sit down.

2          **THE COURT:**  Thank you.

3          If I can have the plaintiff address the question that

4  you raised, but perhaps in light of these arguments -- because

5  I did have some question.  I mean, all of your claims, each

6  claim addresses a very specific part.  I spent some time

7  thinking, well, if I were to enjoin this, what would it look

8  like, and I didn't really have a lot of trouble drafting an --

9  I'm not saying I'm going to do this, I just like to practice

10 and be ready for all eventualities.

11         You will know, I didn't really have any trouble

12 drafting a TRO enjoining just the specific provisions, should I

13 decide that that's appropriate as to some or all.  So I

14 wasn't -- I'm not yet persuaded that if I ruled in your favor

15 on the merits as to likelihood of success on the merits, that's

16 what I'm just going to talk about for a second here, that I

17 need to enjoin the entirety of part one, so if you can address

18 that.

19         **MS. AMIRI:**  Yes, Your Honor.  I think the overarching

20 concern in part one, for example, is the lack of an exception

21 for lawful abortion in the fetal homicide statute, and that is

22 a flaw that runs, you know, far and wide in terms of the

23 implication.  And so I think that is one of the fundamental

24 flaws in part one in general.  And, you know, the conflicting

25 and confusing nature of the entire Bill, the vagueness that

1  runs throughout, I think is also the -- is also a big concern

2  of the overall Bill.

3      I will say, Your Honor, if you are inclined to enjoin

4  parts of the Bill, we would like an opportunity to also address

5  how the amendments now affect that process, because it is

6  actually even made a little more complicated now by the

7  amendments, because with .83C removed, there is now

8  information, for example, that the insurance information be

9  provided in another part and those forms from DHHS are not

10 ready yet.  So it wouldn't even now just be a question of going

11 through our complaint and enjoining certain provisions.  It

12 would also now be looking at amendments and now the

13 impossibility of compliance that is now raised by some of the

14 amendments.

15      **THE COURT:**  Does the statute require use of a DHHS

16 form prepared by the secretary?

17      **MS. AMIRI:**  It is my understanding that certain

18 sections do, and perhaps DHHS can provide further information.

19      I think the practical implication, too, for folks on

20 the ground, there is a 72 hour waiting period.  People are

21 being consented this week for procedures that will be happening

22 after July 1, and so that chaos and confusion and getting

23 resolution for them is incredibly important.

24      So I'll say that if there is an inclination by Your

25 Honor to focus on certain provisions, we, at your request,

could propose an order to encompass some of the amendments as well, to give us time to get those forms or to comply with those statutory sections should they become law.

**THE COURT:** Well, just a general observation about, you know, the proposed injunction that the plaintiffs did attach to the motion or the complaint. You know, Rule 52, possibly, Rule 52 somewhere in there requires findings of fact and conclusions of law, requires it when I grant TROs and when I deny TROs, and it didn't really have any of those, which is fine, you know, I'm used to doing them.

I don't know that they need to be extensive. Typically they aren't, especially for TROs, but that is kind of a -- I can say that the one the plaintiffs asked me to sign is not good enough, because I don't think it satisfies Rule 52, you know, so I'm going to -- even if I were to give you everything you wanted, I can't sign that, and I'm not saying I'm going to.

Let me just repeat, I have not made up my mind about anything. All right.

Well, let's go through some of these things in a little bit more detail.

**MR. BOYLE:** Your Honor, very quickly. One point that is the relief that they seek is an injunction of the entirety of Section 1. What they really are going to achieve is declaring -- well, having the twelve week abortion standard

1 undone, and I'm not suggesting that is the main goal here, but

2 it would be far, far beyond, and implicate far more issues than

3 the fetal homicide statute, which understandably should have

4 been caught in the cross-reference, should have been changed,

5 and now it is going to be.

6       These are very far-reaching implications that were

7 not argued or briefed, and if it is going to be considered

8 further by the Court, we would certainly rest on the *Dobbs* case

9 and suggest that that would be far beyond the simple vagueness

10 and suggest that that would be far beyond the simple vagueness

11 and rationality arguments that they actually brought in their

12 lawsuit.

13       Thank you.

14       **THE COURT:** All right. Well, let's walk-through

15 these kind of one-by-one, and I don't know, some of them

16 probably don't take very much time, but I'll just tell you my

17 general understanding of the law on most of these are vagueness

18 challenges, I think is fair to say, and as the intervenors

19 already pointed out, we have the well-known established

20 restraining orders and preliminary injunctions, which I don't

21 know that I need to repeat the four point test.

22       Apparently, I'm going to repeat it. Likelihood of

23 success on the merits, irreparable harm, public interest, and

24 what is the other one? Balance of equities. So, you know, got

25 that. I have to make findings of fact, so put that aside.

1          The law on vagueness is that a statute has to give

2    fair notice to persons of ordinary intelligence of what conduct

3    is prohibited and provide sufficient standards to prevent

4    arbitrary and discriminatory enforcements.  That's from the

5    *Manning* case, more or less out of the Fourth Circuit, and the

6    *Carolina Youth Action* case this year says similar things.

7          I appreciated the Attorney General's brief on the,

8    you know, kind of when a statute has conflicting requirements

9    and the *Cardiff* case and the *Raley* case, directing my attention

10   there, because it does sound like the Supreme Court has

11   recognized, at least in some circumstances, when you have two

12   provisions that say conflicting things, you know, something has

13   got to give, basically.  And there is a strict standard

14   applying to laws that carry criminal penalties.  Certainly even

15   with civil remedies and professional discipline, which also

16   exists here in this statute.  You know, you can't have a vague

17   statute where those are at issue, either.  It is just a

18   stricter standard for criminal law.

19          So that's my general understanding of the topics

20   we're about to address.  As we talk about each one, you know,

21   it is pretty clear about the fetal homicide we're talking about

22   criminal, but for the rest of them, you know, it would be

23   helpful if everybody, you know, addresses are there criminal

24   sanctions for the particular one we're talking about, or not.

25          So fetal homicide, who is going to talk?

 1          **MS. AMIRI:**  Your Honor, I will, and as you mentioned,

 2   I think this one --

 3          **THE COURT:**  Slow down.

 4          **MS. AMIRI:**  I will address this one.  As Your Honor

 5   has indicated, this one is fairly straightforward.  This is

 6   criminal penalties, severe criminal penalties for violating the

 7   fetal homicide law, and the elimination of an exception for

 8   lawful abortion is of deep concern and is in contrast to S.B.

 9   20, Section 90-21.81B, that specifically says when abortion is

10   lawful.

11          So in one part of the code you'll have a section that

12   says when abortion is lawful, and then the elimination of a

13   lawful abortion exception in the fetal homicide statute,

14   leaving plaintiffs to guess as to whether they may face

15   criminal penalties if they provide lawful abortion under S.B.

16   20.

17          So I think that, Your Honor, the standard you

18   provided in terms of failing to give fair notice to the

19   plaintiffs and fighting arbitrary enforcement, those are our

20   concerns and plaintiffs are likely to succeed on the merits of

21   their vagueness claim for the fetal homicide provision and lack

22   of an exception for lawful abortion.

23          **THE COURT:**  All right.  Thank you.

24          For the Attorney General, or I guess Mr. Stein in his

25   official capacity.

 1          **MS. BOYCE:**  We agree with that assessment of the law.

 2          **THE COURT:**  The licensing defendants?

 3          **MR. BULLERI:**  Yes, Your Honor, the same.  We

 4 understand that to be a criminal provision.

 5          **THE COURT:**  Okay.  And the secretary?

 6          **MR. WOOD:**  The secretary is taking no position on

 7 this point, Your Honor.

 8          **THE COURT:**  Mr. Williams, have you had time to think

 9 about it?

10          **MR. WILLIAMS:**  I don't need to be heard on this

11 point, Your Honor.

12          **THE COURT:**  Okay.  And for the invertenors'?

13          **MR. BOYLE:**  Thank you, Your Honor.  We're changing

14 that.

15          **THE COURT:**  And so --

16          **MR. BOYLE:**  We agree it needs to be changed.

17          **THE COURT:**  All right.  Then that takes us-- let's

18 split this up a little bit.

19          The ten week -- the 70 day, twelve week problem, who

20 is going to talk about that?

21          **MS. AMIRI:**  I'm happy to speak to that, Your Honor,

22 in terms of the two completely inconsistent sections of S.B.

23 20.  In one place, in 90-21.81B, it says that abortion is

24 lawful through the first twelve weeks of the pregnancy, either

25 by medication abortion or surgical abortion, and then yet in

1  the other section involving the informed consent for medication

2  abortion, it requires providers to verify that the pregnancy is

3  no more than 70 days.

4         So where there are two inconsistent provisions that

5  are completely contrary to each other, there has to be one, as

6  you say, something has got to give.  We think the better

7  reading of the statute is that abortion be provided through the

8  twelve week pregnancy.

9         **THE COURT:**  Which seems to have been stated a kind of

10  number of different places.

11         **MS. AMIRI:**  Exactly.  It is the primary provision in

12  the law.  Legislatures during the passage, including supporters

13  of the Act, made clear in their public statements that it was

14  intended to be through the twelve weeks of pregnancy for

15  medication and not the ten week limit, but that fix was not

16  proposed until after our lawsuit was filed.  So we are likely

17  to succeed on this inconsistency and vagueness in this

18  provision.

19         **THE COURT:**  For Mr. Stein.

20         **MS. BOYCE:**  The Attorney General agrees with that

21  assessment, Your Honor, and the only thing I would add, I do

22  think it is notable that neither in the intervenors' brief nor

23  today do they seem to be disputing the idea that these statutes

24  do currently pose a due process problem.

25         I think my colleague, Mr. Boyle, said these do need

1  to be changed, implying there is a constitutional problem here,

2  so I think that speaks to the earlier question we were

3  discussing about the need for injunctive relief in the event

4  that July 1st arrives and we do not yet have any action from

5  the Governor one way or the other.

6          I do think it is important to emphasize that there

7  does seems to be unanimous agreement here that there is a

8  constitutional problem necessitating relief from this Court.

9          **THE COURT:**  All right.

10         For the licensing defendants?

11         **MR. BULLERI:**  We do not wish to be heard on this

12  point, Your Honor.

13         **THE COURT:**  And the secretary?

14         **MR. WOOD:**  We are not taking a position on this

15  either, Your Honor.

16         **THE COURT:**  Mr. Williams?

17         **MR. WILLIAMS:**  No need to be heard, Your Honor.

18         **THE COURT:**  Mr. Boyle.

19         **MR. BOYLE:**  Thank you, Your Honor.  We do not think

20  that this was an improperly included provision because I'm no

21  doctor, but I've been told, and I think I can represent to the

22  Court that my understanding is that the FDA says that Mifeprex

23  and Mifepristone, the abortion drugs, are approved up to ten

24  weeks, which would be 70 days.  So there is a rational basis

25  for including that in the Bill as it was included.

1          However, I think what you have unanimity on here
2    today is that if the Bill, the T&C Bill is enacted into law, it
3    moots that argument, so I don't know that we need to be heard
4    on it further because, again, our position is that the Bill
5    will obviate the need for further discussion, but if there is
6    an actual substantive decision made on that, then we would be
7    able to provide facts that support the rational basis for our
8    inclusion of the original language in the Act, Your Honor.

9          **THE COURT:**  All right.  Turning to -- let's see,
10   let's just talk about the 72 hour and pregnancy location
11   reporting things.

12         Can we talk about those together?

13         **MS. AMIRI:**  Yes, Your Honor.  All of the problems
14   caused by 83C.

15         **THE COURT:**  83C problems.

16         **MS. AMIRI:**  Yes.  So they are legion with that
17   section, including creating a new 72 hour waiting period
18   requirement that does not cross-reference any medical emergency
19   exception.  So it is vague as to whether a provider could
20   forego the 72 hour waiting period in the context of an
21   emergency, which obviously then would lead into our other
22   claims involving concern for bodily integrity.  But certainly
23   on our TRO we've moved on a vagueness claim here because of the
24   lack of a health exception, emergency exception in this section
25   where it is present in other provisions in the law that has

1  existed for years, but no cross-reference here.

2       There is also the other problem with 83C that has the

3  impossibility of compliance that we have raised in terms of

4  providing insurance information about whether the procedure to

5  be performed is covered.  That is not possible to do in all

6  circumstances, given that the insurance companies often make

7  determinations about coverage after the fact and --

8       **THE COURT:**  I mean, probably everybody in the room

9  has some experience with insurance coverage, maybe, or almost

10 everybody, but you did have some allegations in your complaint

11 about this and your complaint was verified because I did not

12 see it in the affidavit that you filed, but it was in the

13 verified complaint, right?

14      **MS. AMIRI:**  Yes, Your Honor.

15      **THE COURT:**  Go ahead.

16      **MS. AMIRI:**  Verified by both Planned Parenthood and

17 as well as Dr. Gray.  So in their experience, and as you say

18 for those of us on the patient side of things, we often know

19 that sometimes the insurance companies deny a claim after the

20 procedure happens and so it is not possible to say with a

21 hundred percent certainty that the insurance will cover the

22 procedure 72 hours in advance.

23      The amendments obviously address this as well, but as

24 the law was written originally, there was an impossibility of

25 compliance there.

1  There was also another issue which now has escaped my
2  brain -- the restarting of the clock.
3  **THE COURT:**  Oh, yes.
4  **MS. AMIRI:**  The other issue with this is in other
5  sections of the informed consent law is, that if certain
6  information is not available, then the -- like the physician's
7  name, then the 72 hour waiting period doesn't restart and that
8  is not clear from .83C, and so what that would mean for
9  patients is, that if a doctor changes, and again, this is in
10  the verified complaint, as you can imagine with busy schedules,
11  both on the patients' side and on the providers' side, the
12  provider who intends to provide the abortion, that person's
13  schedule may change or the patient may have to reschedule,
14  which is why the informed consent provisions that have existed
15  for years, allow for that change and not restarting the 72 hour
16  clock, but .83C does not allow, on its face, for the restarting
17  of the clock.
18  **THE COURT:**  Well, I would be less concerned -- I
19  mean, they can change it if they want to, arguably.  *Dobbs*
20  gives legislature a lot of authority.  My concern was more that
21  it is inconsistent or at least appears to be inconsistent with
22  what is in the other two provisions that seemed like a stronger
23  argument.
24  **MS. AMIRI:**  Yes, Your Honor.  That's exactly what I
25  am saying.  Inconsistency and vagueness as to what has to be

followed, because as you are noticing, there is a lot of
duplication in .83C as well as in the other informed consent
provisions in .83C, you have to provide the physician's name 72
hours in advance.  There is no mention of restarting the clock
if the physician's name changes, but in the informed consent
provision there is, so you have the inconsistency and the
vagueness as to what needs to be followed by the providers.

As to *Dobbs*, Your Honor, we're not making any
arguments about the fundamental right to access abortion under
the constitution, but *Dobbs* does not change other
constitutional restraints on the Government to not pass vague
laws, to not pass laws that are impossible to comply with, and
those are what our claims are about.  They are not about both
the right to privacy and the other claims, the other
constitutional claims that we have brought are not changed by
*Dobbs*.

**THE COURT:**  All right.  Thank you.

For Mr. Stein.

**MS. BOYCE:**  Yes, Your Honor, we agree with the
assessment that the law imposes contradictory rules, or at
least has a vagueness problem with respect to the medical
emergency exception.

The Attorney General has not taken a position with
respect to things like insurance, given the lack of any
evidence that has been put forward on that thus far, and

despite his experiential familiarity with insurance, just like
Your Honor's, he didn't take a position with respect to how
quickly insurance can be obtained or verified, so no position
on that particular aspect of this issue.

     **THE COURT:** Okay. Let me just go to Mr. Boyle first
and get you to address that.

     **MR. BOYLE:** Yes, Your Honor. We don't necessarily
agree that it was vague or that the clock is restarted as
originally written, but again, this all collapses when the Bill
becomes a law, the T&C Bill becomes a law and removes this
section completely.

     I think, you know, the fact that DHHS is presumably
making all of these forms it has been since maybe May 4th or at
least May 17th, also goes to the underlying need for the
immediate action here.

     Again, I think that just highlights that aspect of
why it does not need to be a TRO, but this mootness argument,
this will be moot once the Bill becomes law.

     **THE COURT:** All right. Do any of the other
defendants who are present here want to be heard? Stand up if
you do and say so. Okay.

     All right. That takes us to the reporting
requirement, the three day requirement. You actually already
said some things about this one, but go ahead.

     **MS. AMIRI:** Yes, Your Honor. Thank you. This is

1    another section where it is compelling the impossible, which

2    is, "Filing a completed report to the Department of Health and

3    Human Services, and also the Division of Social Services, three

4    days after a minor's abortion, that includes information about

5    whether they returned for a follow-up visit that must be

6    scheduled seven to 14-days after the medication abortion."

7          So there is no way for providers to file a completed

8    report three days after a medication abortion for a minor,

9    where she must be scheduled for a follow-up visit seven to 14

10   days after the abortion.

11         **THE COURT:** To state the obvious, seven days hasn't

12   happened.

13         **MS. AMIRI:** Exactly, Your Honor. There is no way to

14   file a completed report. Also, there is information about how

15   much money was --

16         **THE COURT:** Say again, how much money --

17         **MS. AMIRI:** Was billed to cover treatment for

18   complications. And not all complications might arise in three

19   days. So, Your Honor, we think that for both of those reasons

20   the reporting requirement for minors and that three day time

21   period to submit a completed report is an attempt to compel the

22   impossible, which is prohibited under the due process clause.

23         **THE COURT:** Hold on just one second.

24         Was there anything else?

25         **MS. BOYCE:** The Attorney General hasn't taken a

position on this particular provision except to say that it does seem that the plaintiffs have pointed out a conflict particularly with respect to the three days versus seven to 14 day follow-up visit timeline.

THE COURT: Mr. Boyle.

MR. BOYLE: Sort of the same argument, Your Honor. We intend to fix -- make it 30 days. I think that obviates the need for further discussion once that becomes law.

THE COURT: Any of the other defendants want to be heard?

MR. WOOD: No, Your Honor.

THE COURT: All right. I think that takes us, if I have not missed anything -- I have missed something. We may -- I forgot to cover the intrauterine location provision.

MR. IM: That's correct, Your Honor, just to be clear for the intrauterine location of the pregnancy provision, that is a provision that would not be mooted by the amendments released. That's our position.

THE COURT: Can you talk to me about that?

MR. IM: It might be helpful to take a step back and look a little bit at the medicine just to be precise about what we're talking about. Some patients at the clinic present very early in their pregnancy and so at that point they have a positive pregnancy test but there is not yet a gestational sack that is visible in the ultrasound, so when that happens --

1      **THE COURT:**  This is all in Dr. Gray's affidavit or

2 declaration, I think.

3      **MR. IM:**  It is in Dr. Farris's declaration.  So in

4 these kinds of cases, Planned Parenthood South Atlantic

5 provides care that is in line with best practices, that is in

6 line with evidence-based medicine, and so essentially what they

7 do is, they screen, so they do screenings to insure that the

8 patient is still pregnant, that there is not an ectopic

9 pregnancy, and that the patient hasn't had a miscarriage.  And

10 then once they do that, they essentially sit down with the

11 patient and offer three options; so there is medication

12 abortion, aspiration abortion, or essentially waiting and

13 seeing, and then together, the provider and the patient decide

14 which option is best.

15      So what the Act would do, and what we're talking

16 about here is this third option of medication abortion, and

17 whether that will continue to be available.

18      So I'll start with our vagueness challenge.  The Act

19 in general of course says that it is not unlawful to provide

20 abortions through twelve weeks of gestation age, but has

21 enacted -- right now the Act requires that the physician,

22 "document in the woman's medical chart the intrauterine

23 location of the pregnancy."  So it doesn't say that when the

24 provider can't verify the intrauterine location of the

25 pregnancy, essentially when it is one of these pregnancies of

1  unknown location, is the term of art, so for a pregnancy of

2  unknown location, it doesn't explicitly ban medication

3  abortion, but it kind of suggests that the doctor might have to

4  document the intrauterine location of the pregnancy.

5          **THE COURT:** Well, it requires you to document it.

6          **MR. IM:** Right.

7          **THE COURT:** It doesn't suggest that you do it, it

8  requires that you do it. I say you, I don't mean you, but one.

9          **MR. IM:** It requires that you document the

10  intrauterine location of the pregnancy.

11          **THE COURT:** Your argument is if you can't document

12  it, that implies that you can't do it?

13          **MR. IM:** Right. As amended, the Act will read that

14  the physician is required to document the existence of an

15  intrauterine location pregnancy, which again, I think has that

16  same issue. It is not completely clear whether it is banned,

17  because I think --

18          **THE COURT:** Doesn't that just mean it is not ectopic?

19  I mean, isn't that what it means?

20          **MR. IM:** That is what it means.

21          **THE COURT:** You didn't tell me that you check for

22  that, not you personally.

23          **MR. IM:** Right. I think the problem is when you

24  can't actually see the gestational sack on ultrasound. I don't

25  know if the doctor can check off they can screen for ectopic,

1  but they can't check off on a form that it is for sure
2  intrauterine.

3         I believe there is a bit of a factual issue there
4  but, ultimately this is evidence-based care that Planned
5  Parenthood South Atlantic provides, and to the extent that the
6  Act is unclear about whether medication abortion is permitted
7  for pregnancies of unknown location, our argument is that it is
8  vague, and to the extent it actually prohibits providing
9  medication abortion for patients who have a pregnancy of
10 unknown location, our argument is that it doesn't satisfy
11 rational basis scrutiny, and as it stands right now, and I know
12 this is an early stage in the litigation, the State and the
13 intervenors haven't presented any evidence on that part, so the
14 unrebutted evidence in the record is that medication abortion
15 can safely and effectively be provided to patients with
16 pregnancy of unknown location, and for that reason, I -- and
17 there is, you know, no legitimate State interest that is served
18 by prohibiting medication abortion under the circumstances.

19         **THE COURT:**  So on this one you have two arguments and
20 you are making both of them at this stage.  One, it is vague.
21 Two, if it prohibits them, then it is -- there is no rational
22 basis.

23         **MR. IM:**  That's right, Your Honor.  We're making
24 those regardless of whether the amendment passes, so our
25 argument is the amendments don't take care of either of those

1 issues.

2      **THE COURT:**  For the Attorney General.

3      **MS. BOYCE:**  Yes, Your Honor.  My understanding of

4 this argument is essentially that it is analogous to the 70 day

5 versus twelve week issue, where the law in one place seems to

6 clearly say medication abortion is lawful up to twelve weeks,

7 but then has a provision that would seem to suggest after ten

8 weeks it is not okay.

9      Here, too, it sounds like the law says medication

10 abortion is okay up to twelve weeks, but then in another

11 provision it seems to suggest that if the pregnancy is too

12 early for these things to be seen on an ultrasound, perhaps it

13 isn't actually lawful after all, and the Attorney General has

14 not taken a firm view as to the conflict, given his lack of

15 experience with this technology and his medical expertise, but

16 certainly as presented, that would seem to present a conflict

17 that makes it quite difficult for law enforcement officers to

18 know whether they could -- whether an abortion was lawful or

19 not.

20      **THE COURT:**  And no position on the rational basis

21 argument?

22      **MS. BOYCE:**  No, Your Honor.

23      **THE COURT:**  Mr. Boyle.

24      **MR. BOYLE:**  Thank you, Your Honor.  I'm looking at

25 Dr. Farris's declaration, which is docket entry 26-1, and I

believe I heard plaintiffs' counsel say that Dr. Farris said in
her declaration that they test to screen for ectopic
pregnancies before they perform a medical abortion --
medication abortion.  I'm not trying to be obtuse, but I can't
find it in here, and I'm happy to yield my time back to
plaintiffs' counsel if it's in here, but I wasn't able to find
it.

I think it is an important admission, though, Your
Honor, even if it is not from the doctor, and I could be wrong,
so I'm not suggesting it is not in there, I just couldn't find
it.

It is an important admission, because this is not a
confusion.  There wasn't some accidental, we included 70 days
when we said twelve weeks.  You know, that wasn't an accident,
either, but this is an important medical health and safety
thing, component, rather, of this law, Your Honor, because we
believe that we will be able to present medical evidence.

I'm no doctor, I'm not giving evidence, but we
believe that we'll be able to present medical evidence that
supports the law as written, and suggests very strongly, that
it is not safe or it could be more risky to give a patient
Mifepristone, I'm saying that wrong, but Mifeprex and the other
abortion drugs if there is an ectopic pregnancy.  The patient
needs to know, and I think I heard plaintiffs' lawyer say that
they actually do screen for this and make sure that it is not

an ectopic pregnancy, and I think Your Honor hit the nail on
the head when you asked, isn't this just saying you are making
sure it's not an ectopic pregnancy.  That's not a mistake in
the law, Your Honor.  We clarified what it was specifically.

We meant -- we don't need to know the exact location,
you just need to know that it is intrauterine, not ectopic, and
I believe that the medicine will support that.

To the extent plaintiffs say, no, you don't need to
know that, the defendants, the legislature and the intervenors
say you do need to know that.  That's a rational basis,
argument, Your Honor.  It is not vague to determine whether it
is intrauterine or not.  That's not vague.  It is not
irrational.  Again, it is quite rational, based on the evidence
that we intend to present and provide to the Court.

**THE COURT:**  So under the current law, and I guess
even as amended -- well, let me just ask it separately, two
different questions.

Under the current law, is it the intervenors'
position that if the provider cannot locate -- you know, cannot
provide an intrauterine location, then the abortion would be
unlawful, the medical abortion would be unlawful?  Is that your
position?  So it is not vague because it is clear that it would
be unlawful?

**MR. BOYLE:**  It would be not allowed under the laws of
North Carolina.  That doesn't mean it is criminal.  To my

1   understanding, there isn't a criminal provision attached to

2   that, but it would be unlawful, like, pick another medical

3   risky --

4           **THE COURT:** So a doctor could have his license

5   suspended if he prescribed the medicine without being able to

6   determine that there was an intrauterine location?

7           **MR. BOYLE:** I think that's correct, Your Honor. I

8   believe that's correct.

9           **THE COURT:** Okay. And the second part of that is --

10  so, first of all, it is not vague. It is clear that you can't

11  do it, whether it is unlawful or just not allowed, and there is

12  a rational basis for that, and I know we're very early and we

13  don't have a lot, hardly any evidence from anybody really on

14  this point, but that's going to be your position, that there is

15  a rational basis?

16          **MR. BOYLE:** Don't take my word for it. It is either

17  in 26-1, the declaration, or the plaintiffs have made that

18  representation to the Court, and I don't disagree with them,

19  you do need to know if it is an ectopic pregnancy before you

20  get those drugs or not. That's very rational and it is quite

21  related to health and safety for the mother, the patient.

22          **THE COURT:** Okay. Thank you.

23          Any other defendants want to be heard, and by that I

24  mean, state a position? Everybody is saying no.

25          Plaintiff have anything to say in response?

1         **MR. IM:** Your Honor, just briefly. So first of all,

2 as to Dr. Farris's declaration, I'm looking at the declaration,

3 and I do apologize if I went into a little more detail than is

4 included, but paragraph 41 does state the PP --

5         **THE COURT:** Slow down.

6         **MR. IM:** Absolutely. The declaration does state,

7 "The PPSAT follows an established protocol for safely

8 administering medication abortion in early pregnancies before

9 the location of the pregnancy can be visualized and

10 determined."

11         Your Honor --

12         **THE COURT:** But it doesn't say anything about

13 screening for ectopic pregnancies, right?

14         **MR. IM:** It doesn't say anything specific about that.

15 I have two brief points about the arguments.

16         First, on the vagueness argument, I think the fact

17 that counsel for the legislature has said that it is clear that

18 it is unlawful, I've also looked at the statute many times. I

19 don't think it is clear that it says that providing medication

20 abortion for a patient who has pregnancy of unknown location is

21 unlawful, so I think that kind of hits the nail on the head for

22 the vagueness argument, and to the extent that it says that it

23 is unlawful, that's in direct contradiction as counsel for AG

24 Stein pointed out with the provision that medication abortion

25 before twelve weeks is not unlawful.

1          Then as to the rational basis issue, I certainly

2    appreciate that counsel for the intervenors will present

3    evidence in the future, certainly at the PI stage about this,

4    but as it stands right now, the only evidence in the record is

5    from Dr. Farris, and Dr. Farris also cites medical studies

6    about -- or a medical study, excuse me, about the safety and

7    efficacy of providing medication abortion in cases of

8    pregnancies of unknown location, and so right now as the

9    evidence is in the record, our position would be that

10   plaintiffs have carried their burden that this can be safely

11   and effectively provided and, therefore, that there is no

12   rational basis for the provision.

13          **THE COURT:**  Thank you.

14          **MR. BOYLE:**  Very briefly, Your Honor.  I haven't read

15   footnote 29 --

16          **THE COURT:**  Speak up.

17          **MR. BOYLE:**  I have not read footnote 29, the article

18   that is cited by Dr. Farris, Professor Cronin, for undesired

19   pregnancy of unknown location, and I don't know if it says that

20   you have to screen for ectopic pregnancies.  I do know that it

21   sounds like they do screen for ectopic pregnancies, so if it's

22   codified into law that you screen for that, I don't see how it

23   is any problem for them whatsoever.

24          And to the extent that they were screening for

25   ectopic pregnancies but not at the same time verifying they

were located intrauterine, this is probably a bonus, not a bug
to this new law, Your Honor.

        **THE COURT:**  All right.  Well, we will have to work
through the details of that later.  I appreciate you all going
through that with me.

        I think that the advised, procure, cause provision,
it is five minutes to 11, so because that might take more than
five minutes, and I'm pretty religious about taking regular
breaks, I propose that we take a 15 minute break.  Let
everybody stretch their legs.  People can call and see if the
Governor signed something.  You know, tell me something I don't
know.

        Then we'll come back and what I show left is the one
I just mentioned, advise, procure, cause, and then what is next
and how do we deal with all of, you know, between now and
Saturday, that situation, and then how do we deal with the
timing after that, and we'll just talk about that.  Mostly
about scheduling, you know, and the logistics and that kind of
thing.

        So if counsel have not really talked about that, you
all might take at least a few minutes during the break to talk
among yourselves, and then we'll -- you know, I'm not asking
you to -- well, I'm certainly not demanding that you agree on
scheduling issues, but it would be helpful if you all at least
kind of think about it together before we come back and talk

1  about it.

2          So that's where we are.  We'll take a 15 minute

3  recess.

4          (Recess taken from 10:55 to 11:15 a.m.)

5          **THE COURT:**  I'm sorry I took a little longer than 15

6  minutes.

7          Let's turn to the advise, procure, consent section --

8  hold on.  Let me get my notes about that in front of me.  All

9  right.  Go ahead for the plaintiff.

10         **MS. AMIRI:**  Thank you, Your Honor.  So as written

11 originally, our argument is that the provision that makes it

12 unlawful after the twelfth week of a woman's pregnancy to

13 advise, procure, or cause a miscarriage or abortion is vague as

14 to whether it breaches First Amendment protected activity,

15 specifically about providing assistance to others to obtain

16 abortions out of state where abortion is lawful.

17         Given vagueness, it is susceptible to two readings,

18 and the Court could adopt a binding instruction, avoiding the

19 constitutional issue, which if read that it would prohibit that

20 First Amendment protected activity, would violate the First

21 Amendment, and I don't think that there is any dispute on the

22 fact that the First Amendment protects providing information,

23 for example, about how to obtain an abortion out of state, that

24 that is protected lawful activity under the First Amendment,

25 but certainly we can go into that if there is such a dispute.

1       **THE COURT:**  I guess this could fall by the wayside,

2  because it is an abortion case, what is it, 1975, that was an

3  advertising case.

4       **MS. AMIRI:**  Yes, Your Honor, it was *Bigalow versus*

5  *Virginia*, yes, Your Honor, and it was about advertising

6  abortion in Virginia where abortion at the time was unlawful in

7  Virginia but legal in New York, but it was an advertisement

8  saying you could obtain abortion in New York, and the Supreme

9  Court said advertisements were protected speech.

10       **THE COURT:**  That was strictly a First Amendment case.

11       **MS. AMIRI:**  Correct.  Yes, your Honor.  I don't know

12  that there is anyone on the other side disputing that the First

13  Amendment protects providing such information or assistance to

14  people to obtain abortions in a state where abortion is lawful.

15  If there is, we're happy to dig into the case law a little bit

16  more.

17       I think the primary consideration for the Court, Your

18  Honor, is on the initial read as written in the original Bill,

19  the provision is vague, and it could breach protected First

20  Amendment activity, and so we would offer that there could be a

21  temporary restraining order on limits, basically adopting a

22  binding instruction that it does not reach --

23       **THE COURT:**  Slow down.

24       **MS. AMIRI:**  That it does not reach protected First

25  Amendment activity such as providing assistance to people who

1 are seeking abortions out of the state where abortion is

2 lawful, after the twelfth week of pregnancy.

3          **THE COURT:**  And if the amendment passes -- or let

4 me -- it already has passed, it just hasn't gone into effect,

5 it takes out advise, leaves in procure or cause and it adds the

6 North Carolina language.  So let me hear from you about that.

7          **MS. AMIRI:**  Yes, Your Honor.  As to the amendments, I

8 think that there remains concern that the Attorney General has

9 raised in terms of whether that word "cause" could be

10 interpreted as reaching First Amendment conduct to access

11 abortions out of state where abortion is lawful.  So I think to

12 the extent a concern is lingering, I think that there is an

13 opportunity for construction as well to prevent what I think

14 all of the parties agree would be protected under the First

15 Amendment, which is providing assistance to people to obtain

16 lawful abortions out of state.

17          **THE COURT:**  Okay.  Thank you.

18          **MS. AMIRI:**  Your Honor, I think the heightened

19 concern there is, this is a provision that has criminal

20 penalties, so there aren't many in the law that do, but this

21 provision of the law does have criminal penalties.

22          **THE COURT:**  Thank you for pointing that out, since I

23 think I specifically asked about that and we haven't always

24 covered it.  But thank you.

25          Okay.  For the Attorney General, Mr. Stein.

1          **MS. BOYCE:**  Yes, Your Honor.  So we agree with the

2    plaintiffs' assessment of the law as originally drafted.  I'll

3    focus just briefly on the cause for concern with respect to the

4    amendments, should those become law.

5          So I don't want to make a mountain out of a molehill

6    on this, and to the extent the parties do all agree as to the

7    appropriate interpretation of the law, then perhaps a

8    stipulation might be the best way to approach this as well, but

9    given the criminal penalties that the plaintiffs have

10   referenced, the Attorney General does strongly believe that it

11   needs to be clear exactly what is and is not criminalized under

12   this provision, and we do have the concern that even if the

13   amendments become law and the law is revised, there remains

14   ambiguity as to what exactly is lawful and what is not, and

15   that is both with respect to the cause language which would

16   seem to sweep in certainly First Amendment speech, but perhaps

17   also other indirect means of bringing about an abortion, and

18   also a concern about the geographic limitation.

19          We agree that perhaps the most straightforward way to

20   read that language is that it only applies to the location of

21   the abortion, but we don't think that is the only way to read

22   it.  It could also be read to reference the entire conduct

23   described in the provision, and to avoid any ambiguity there

24   and make sure every one is on clear notice as to what is and

25   what is not criminal in North Carolina, we would urge the Court

1  to either enter declaratory relief clarifying the scope of the

2  law or enter an injunction barring enforcement of the law in

3  circumstances that would relate to abortion out of state.

4          **THE COURT:**  Thank you.

5          For the intervenors.

6          **MR. BOYLE:**  Thank you, Your Honor.  First, it is my

7  understanding that this particular part of the law was

8  originally passed in 1973.  This clause that included unlawful

9  to advise, procure, or cause miscarriage or abortion in the

10  following circumstances, and the new part that is added in the

11  Act are the specific exceptions one through four and some of

12  those may be somewhat carried over from the old versions with

13  some modifications like twelve weeks, as you can see.

14          Your Honor, I've got a copy of the Act.  I don't know

15  if you've got one.

16          **THE COURT:**  I've got it right here, but it is like 48

17  pages long, so if you can tell me --

18          **MR. BOYLE:**  Let me direct you, if I can.  It is on

19  page four of mine, but I don't know if that's how it is in

20  your's, Your Honor.  Section 90-21.81B, so 90-21.81B, when

21  abortion is lawful.

22          **THE COURT:**  Hold on.

23          **MR. BOYLE:**  I'd be happy to give you a copy of it.

24          **THE COURT:**  It is just these numbers make it almost

25  impossible to speak in plain English.  Everybody is nodding

1  yes, I want the record to reflect.

2         So at the bottom, I'm looking at the copy attached to

3  the complaint, all right.  So 90-21.81B, when abortion is

4  lawful and then where is it in the --

5         **MR. BOYLE:**  So you got that first paragraph right

6  underneath there and that has the unlawful to advise, procure,

7  cause and doesn't have the North Carolina phrase of this law,

8  the Act that's been passed, the Act that was veto override

9  May 17th, Your Honor.  And then will you cross-reference that

10  to the T&C Bill --

11         **THE COURT:**  Wait a second.

12         **MR. BOYLE:**  I'm sorry, I forgot to make that point.

13  That passage right there, I believe has been in North Carolina

14  law since 1973.

15         **THE COURT:**  Where it says, "it shall not be

16  unlawful," the language you just directed me to,

17  notwithstanding the provisions of, it shall not be unlawful?

18  Is that what you are directing me to?

19         **MR. BOYLE:**  Yes, Your Honor.  Which when you

20  cross-reference that to the T&C Bill Section 14.1(c), that that

21  is what we're talking about, where they take out the word

22  "advise," and have the words State of North Carolina.

23         **THE COURT:**  Wait a second.  I think I've made myself

24  confused, hold on.

25         **MR. BOYLE:**  Again, Your Honor, I don't mean to --

 1          THE COURT:  That's okay, just stop talking for a
 2   second.  I thought we were talking about -- I thought we were
 3   talking about 90-21.81A(a) right above that, where it says, "It
 4   shall be unlawful after the twelfth week to advise, procure, or
 5   cause."  Now I appreciate which I had not noticed, that the
 6   advised, procure, or cause language is in 81B, but I thought
 7   the part that was at issue was 81A(a).  Right?  I'm looking at
 8   the plaintiff.

 9          MS. AMIRI:  Yes, Your Honor.  I believe that is
10   correct, although the amendment addresses both sections.

11          THE COURT:  All right.  Okay.  So I've -- I think I
12   have caught up.  Now start over again, please, Mr. Boyle.

13          MR. BOYLE:  Thank you, Your Honor.  I think my
14   understanding is that that part that includes "the advise," and
15   did not include the "in North Carolina," has been in the law
16   since 1973.

17          So to the extent that we've recently discovered a new
18   way to interpret that, I don't know that that's accurate and
19   again, if the T&C --

20          THE COURT:  I'm not following you.  I'm looking at
21   the -- again, the attachment to the complaint, and I thought
22   the underlined language was new.  Now, I don't know where
23   this --

24          MR. BOYLE:  I had it wrong, I'm sorry, Your Honor,
25   you are correct.  It is in both, actually.  It is B and C.  I

1  was only talking about C, but it is B and C, and it includes

2  81A and 81B, Your Honor, I apologize.

3          **THE COURT:**  That's okay.  It is a miracle we haven't

4  had more confusion today.  Okay.  So what I think we're talking

5  about here is primarily today, at least, A.  "It shall be

6  unlawful to advise, procure, or cause a miscarriage or

7  abortion."  And are you saying that has been in the statute for

8  years, except for the twelfth week part?

9          **MR. BOYLE:**  That's my understanding, yes, Your Honor.

10  I believe that's just a recodification of the prior law,

11  updating it to the twelve weeks as opposed to --

12          **THE COURT:**  The 20 weeks?

13          **MR. BOYLE:**  Yes, Your Honor.  I have not done the

14  research on that myself.  That's what I've been told, and I

15  think that's accurate, and so I only bring that up, Your Honor,

16  to suggest that this isn't really a problem with the First

17  Amendment violations and people being prosecuted.  It is not

18  like there is some emergency that occurred on May 17th when the

19  Act passed.

20          **THE COURT:**  It is a different world than it was a

21  year ago.  Right?  Isn't that your position on this issue on

22  abortion, it is a different world?

23          **MR. BOYLE:**  *Dobbs* certainly changed the aspect of it,

24  but admittedly following *Dobbs* for 11 months, the prior law was

25  on the books, Your Honor, and nobody was going out and

1  prosecuting people for giving women in North Carolina advice
2  about how to get abortions outside North Carolina beyond the 20
3  weeks.  I'm not saying that that inchoate issue wasn't there,
4  and again, when you look at the T&C Bill.

5        **THE COURT:**  Plus, the Fourth Circuit told me fairly
6  recently in the *Grimmett* case, that the fact that something,
7  you know, has never been enforced in an unconstitutional way,
8  doesn't mean that the statute is constitutional.  I heard them.
9  That's what they told, me and everybody else, just a few months
10 ago.

11       **MR. BOYLE:**  I almost cited that case and then I read
12 it and decided not to.

13       **THE COURT:**  I don't mind being told I'm wrong on the
14 rare occasions that it happens.

15       **MR. BOYLE:**  But the T&C Bill takes out any confusion
16 about the advise, and it adds the geographic location in North
17 Carolina, and my esteemed colleague is very smart and has read
18 this, I believe in a way that you might in a law school setting
19 or in a lawyer's office setting.  I don't think Your Honor's
20 recitation of what vagueness to the average person interpreting
21 the statute, I don't think that's a problem with the way it
22 will be rewritten if the Bill becomes enacted.  And, I mean, it
23 is fairly straightforward from my reading of it, Your Honor,
24 for whatever that's worth, that you can't help someone get an
25 actual abortion in North Carolina under the new changed wording

1  of the T&C Bill, but it would not preclude anyone from -- I

2  would say, driving a car, driving a person across state lines

3  to another state where it might be legal after twelve weeks.  I

4  don't think that's a fair reading of it.

5          **THE COURT:**  It wouldn't even, under the procure, if

6  you were in North Carolina and you called somebody in some

7  other state where it is legal and made the appointment, that

8  wouldn't be procuring it in a way that violated this, the

9  amended statute?

10         **MR. BOYLE:**  I think the abortion in North Carolina

11 would be the problem, and if it's an abortion somewhere else,

12 it would not.

13         **THE COURT:**  Lawful abortion somewhere else.

14         **MR. BOYLE:**  If there is a lawful abortion somewhere

15 else, Your Honor, I don't think there is a fair reading of this

16 after the changes that would implicate that person.

17         **THE COURT:**  All right.  Thank you.

18         **MR. BOYLE:**  Thank you, Your Honor.

19         **THE COURT:**  Any of the other defendants want to be

20 heard?  No.

21         What else does the plaintiff have to say about this?

22         **MS. AMIRI:**  Your Honor, I think we don't necessarily

23 need to get into the history, but for point of reference, the

24 statute that I believe opposing counsel is referring to is

25 14-44, which is actually referenced in the S.B. 20, and it does

talk about advise and procure.  It does not use the word cause.

But I think you're right, Your Honor, that we are in a different world now where there is heightened concern about the use of statutes to go after abortion providers and we are currently litigating --

**THE COURT:**  Not just abortion providers, moms of teenagers.

**MS. AMIRI:**  Correct.  People helping other people access abortions.

**THE COURT:**  I mean, you read about that in other states.

**MS. AMIRI:**  And to that point, Your Honor, we have a case pending in Idaho, after the Idaho Attorney General said that medical providers could lose their license and possibly face criminal penalties for referring people to abortions out of State in Idaho, to places -- states where abortion is legal.

So there is a heightened concern for every one who helps people access abortion out of state, so we've, given the criminal penalties, there is in increased concern about the arbitrary enforcement, a fair notice, everything that is in the vagueness doctrine that Your Honor is familiar with, and where there is two readings and one of them is a constitutional reading, it seems that I think I heard notice agreement that there could be a construction here that would avoid the constitutional problems.

1        **THE COURT:**  Okay.  Anything else for the Attorney

2  General?

3        **MS. BOYCE:**  No, nothing further, Your Honor.

4        **THE COURT:**  I think I might have overlooked a

5  possibility, which is, the Governor signs the Bill Sunday or

6  Monday and then we have -- you know, I mean, I've done whatever

7  I've done.  Okay.  I don't know.

8        So what I want to talk about now -- well, let me

9  think.  I've got two other things I want to talk about.  Let me

10  think about the order that I want to do them.

11        **MR. BOYLE:**  Your Honor, if I may.  Just trying to

12  think creatively about solutions to the problem.  Obviously the

13  Court has broad discretionary authority, and it would seem to

14  me that perhaps conditional injunction that might expire upon

15  passage of amendments for the particular provisions where the

16  parties have agreed that their claims would be moot, might be a

17  potential solution to this timing issue where we all agree that

18  there is certainly a very real possibility that Governor Cooper

19  has failed to act or at least failed to sign the Bill or veto

20  it before July 1st when there is urgent need for clarification.

21  That might be one possible approach to this uncertainty with

22  respect to timing.

23        **THE COURT:**  Well, yes, as to parts.  As to parts of

24  what we've been talking about here today.  If it does pass,

25  then you have new provisions that effect this advice, procure,

1  consent provision, and the intrauterine argument to use very

2  summary fashioned words, you know, which that is a good idea,

3  but it doesn't solve the problem as to those provisions.

4        **MS. BOYCE:**  ***** If I may, Your Honor.  I think what

5  I was proposing is perhaps an injunction for certain provisions

6  would not expire but for other provisions you would make clear

7  that upon signage or veto of the Bill, then injunctive relief

8  would terminate.

9        I don't believe aside from the provision that's been

10 repealed, that the citation of the laws are actually changing

11 such that it would be a problem for Your Honor to enjoin

12 specific provisions.

13       **THE COURT:**  And leave that even if they are amended,

14 leave that in effect?

15       **MS. BOYCE:**  Yes, Your Honor, for the ones that there

16 is disagreement.  Certainly that would be our position for the

17 ones there is disagreement about whether the amendments moot

18 the issue, the injunctive relief would be ongoing.

19       **THE COURT:**  I'm not saying I am going to do that.

20 You are suggesting a way to do that, if that's what I decide to

21 do?

22       **MS. BOYCE:**  Absolutely.

23       **THE COURT:**  Plaintiffs' view on that.

24       **MS. AMIRI:**  I think it is, unfortunately, more

25 complicated than that, because the amendments will include

changes to provisions of the law that we didn't initially

challenge because they were not at issue at the time we filed

our complaint.

So, for example, with .83C being repealed and some of

that information like the insurance information now being

incorporated into 90-21.82 and 90-21.83A, that is a place where

DHHS must promulgate the forms, and I got a citation for you on

the break that the providers are required to use DHHS's forms,

and that's 90-26.83(c).  So there will also need to be time to

finish that.

So I think that that's also just another complication

as to if we are required to use forms and the forms are not yet

available, and there are provisions that change because of the

amendments that we had not previously challenged, I think

that's -- that he raises some other impossibility of compliance

issues that were obviously unforeseen until just yesterday, I

think.

          **THE COURT:**  All right.

          **MR. BOYLE:**  As to that last point, I don't -- I'm

sympathetic to that position, but until and unless that is

presented to the Court, I don't think it is before the Court

today.

          **THE COURT:**  That is a problem.  And so what -- you

know, like what could happen is, the Governor signs it or he

doesn't sign it, but he doesn't veto it and then I guess the

1  plaintiffs need to amend the complaint and immediately file for

2  TRO, or I don't know what.  I mean, that's what you are saying.

3  Right?

4            **MR. BOYLE:**  I hope not, but I'm sure --

5            **THE COURT:**  Or not.  But if they continue to have

6  concerns, that would be what they need to do.  Is that what you

7  say?

8            **MR. BOYLE:**  That would be appropriate recourse to get

9  it before the Court properly and let us have a chance to

10  address it.

11           Actually, I had another point, Your Honor, if I may,

12  if you're ready.

13           **THE COURT:**  I'm ready.

14           **MR. BOYLE:**  On the advise and in North Carolina, I

15  meant to offer this, that we would certainly be willing to look

16  at a stipulation and see if the parties could come to some

17  agreement.

18           Again, I appreciate the very intellectual reading of

19  the revision, if it becomes law, presented by the Mr. Stein,

20  Attorney General Stein, but I think we can collapse that

21  problem into a stipulation because we don't -- I don't think we

22  see it that way.

23           I don't mean to get ahead of myself, but I suspect

24  this is another one of those problems we can take off the

25  Court's plate, maybe within the next day or two.

1          **THE COURT:**  That would be very nice.  Thank you for

2    that.

3          Ms. Amiri is standing back up.

4          **MS. AMIRI:**  Yes, Your Honor.  Just in terms of would

5    we need to amend our complaint, for example, or our TRO.  First

6    of all, we challenge the whole Bill as unconstitutional because

7    of these inconsistencies and the vagueness and the fetal

8    homicide piece, which we think would need rewriting of the law

9    to come into compliance with the constitution, and so we ask

10   for all relief as just is proper in our complaint and our

11   preliminary injunction and temporary restraining order motion

12   asks for the entire Bill to be enjoined.  So, you know, if the

13   request from the Court is to go back and --

14         **THE COURT:**  I'm not questioning.  I'm asking.

15         **MS. AMIRI:**  I think the relief that we have requested

16   in our complaint and in our current temporary restraining order

17   would cover any changes.

18         Also, one of the housekeeping matters, you know, that

19   we could offer the Court is if you would want two different

20   proposed orders from the plaintiffs, one, a more compliant

21   order on all of part one, with findings of facts and

22   conclusions of law and another that goes to part one with

23   findings of fact and conclusions of law, and another that goes

24   piecemeal and tries to address all of the issues, including the

25   amendments that are coming down the pike, like the confusion

1   that I mentioned about the forms needing to encompass these

2   things, so I offer that as also a possible solution as well.

3          **THE COURT:**  Thank you.

4          Well, I'm less concerned about the findings of fact

5   and conclusions of law as I am about the -- if I were to decide

6   to issue an injunction, the language of the injunction.  That,

7   to me, is the harder part.

8          So let me just say, at the moment, I don't see any

9   way that I'm going to enjoin part one in its entirety.  That

10  seems to me to be overbroad relief for the constitutional

11  problems identified, even if I agree with the plaintiffs and

12  some of the defendants about those problems.  I think that if I

13  do agree, a narrower injunction is appropriate, so I'm just

14  going to take that off the table.

15         Now I do think there is some things here that

16  probably I do have to do something, at least if the Governor

17  doesn't act, how that should be worded to take care of the

18  entirety of the situation, you know, I don't exactly know, and

19  of course the extent of it, there is still a lot of things that

20  are undecided, you know, particularly the parts that you all

21  are continuing to disagree about.

22         So what I'm going to give you all is something that I

23  roughed out before the hearing as to -- and I just went ahead

24  and put everything in there, not because I'm sure I'm going to

25  do it, but because I'm trying to plan for every eventuality.

1          It does not have the hospitalization in there because

2     that just didn't seem like I was going to have to do anything

3     about that.

4          So I think what I would like you all to do, you can

5     take -- it says "draft," okay, for any media people here, I

6     have not decided to do it, and if you say I have, you will not

7     be accurate, to the extent you care about being accurate.  I

8     assume you do.  But, you know, we got to figure out what to

9     say.  And then if anybody wants to submit some alternative

10    language for the possibility that I decide to grant an

11    injunction, then I am open to that.  Given the timing, you need

12    to do it by -- today is -- gosh, 4 o'clock tomorrow.

13         **MR. BOYLE:**  Any chance we can get a word version of

14    that?  Not necessary, but helpful if possible.

15         **THE COURT:**  I don't know.  Possibly.  I'll worry

16    about that later on.  Yes, I suspect.

17         I mean, I've signed a lot of injunctions in my life

18    in the last 30 and a half years.  But, you know, this is kind

19    of complicated and it has a lot of numbers in it going back to

20    our joking around probably inappropriately a little bit earlier

21    so, you know, I just want to be sure I don't make clerical

22    errors, too, and it doesn't have any language, like Ms. Boyce

23    just suggested, to deal with expiring, you know, what if, what

24    if, what if.  I think it has the typical 14-days.

25         Also don't see, if I should grant the injunction, the

TRO, I don't see any reason for a bond.  That typically is not
done in these kinds of cases.  So you will see that in there.

          So here is what I think we'll do.  I'll give that to
you.  It is just about two and a half pages long.  It kind of
starts in the middle, because I'm not giving you the rest of
it, just the ordering part, and I'm not asking you to tell me
I'm wrong, because I've not decided.  I'm talking about the
language.  As we say in state court, the form, objections to
the form.  I do want it to be clear, you know, that if it is
not clear, that obviously is very important, because Rule 65(d)
requires that.

          I know I complained earlier about Rule 52 and
findings of fact and conclusions of law, but don't worry about
that part, because I'll take care of that part, whatever I
decide to do; yes or no, I'll take care of that part, and I
don't think I actually need any help, if I decide to deny the
injunction, because that's pretty easy, you just say denied.

          **MR. BOYLE:**  I can give you a draft of that.

          **THE COURT:**  You are welcome to.  Pretty much I say,
ordered it is denied, so I don't think I need any real help.
The problem is, what if I decide to do it, either in whole or
in part.  So that's why I want -- when you see my draft, it is
broken out because that makes it easier for me, should I decide
to only enjoin some of them, finding likelihood of success, and
we haven't really talked about irreparable injury, balance of

the equities and public interest, but the Fourth Circuit has
been extremely clear, including very recently in an en banc
decision which -- Leaders Of A Beautiful Struggle versus
Baltimore Police, 2021, recognizing that if there is a likely
constitutional violation, the other factors generally are
satisfied.  So we haven't really talked about those because of
that.  So I'll give you that in a second.

Then I guess as to what happens next, I don't know.
Any TRO expires within 14-days, right?  So we got to have
briefing on a preliminary injunction within 14 -- you know, in
a period that would get the TRO in front of me, you know, and
to the extent the amendments go into effect, you know, we
still -- we would have to address all of that.

**MR. BOYLE:**  Your Honor, I was going to suggest before
you get to the scheduling, what happens next.  You also had
mentioned you wanted to give every one else an opportunity to
say why they didn't want me to be here on behalf of my clients.

**THE COURT:**  Right.  Thank you.  I do definitely want
to talk about that, because I hesitated to just grant the
motion in -- without giving anybody a chance to be heard on it,
but in view of that Supreme Court case, I thought -- and what I
understood the Attorney General's position was likely to be, I
thought, okay, let me go ahead and let you be heard.  It didn't
really hurt anything and I appreciate your contribution.

Going forward, are you going to oppose that.

1          **MS. AMIRI:**  We do not oppose intervention.  We would

2    like to reserve any sort of future objections if there are

3    duplications of efforts, lengthy briefs, so sometimes courts

4    have put limits on intervenors so there isn't duplication of

5    parties, so we would like to reserve that for a later date if

6    that were to arise.

7          **THE COURT:**  That is absolutely true, and I agree with

8    that concept, because I don't like, particularly when people

9    start asking me for extensions of the word limit and then I get

10   a bunch of repetitive stuff in five different briefs from the

11   defendants and am attempted to not read any of it.  I always

12   read it but, you know, it is very much a problem when I end up

13   having to deal with repetitive, because it is confusing, so we

14   would have to deal with some of that.

15         Does Attorney General Stein have a position?

16         **MS. BOYCE:**  With respect to intervention, we do not

17   oppose the motion for intervention, and we certainly agree that

18   we would strive, to the extent there was duplication, to

19   minimize.

20         **THE COURT:**  In fact on some issues you may be aligned

21   with the plaintiff.

22         **MS. BOYCE:**  It is possible.

23         **THE COURT:**  Do the other defendants who are here want

24   to be heard?

25         **MR. WILLIAMS:**  No, Your Honor.  We consent.

1          **MR. WOOD:** No objection by the secretary of DHHS.

2          **MR. BULLERI:** No, Your Honor.

3          **THE COURT:** All right. Here is what I propose to do

4   then about that: Grant the motion to intervene subject to

5   reconsideration, should any of the parties who have not yet

6   appeared through counsel ask me to do so, and that way the

7   burden is on them if they want me to do something different.

8          Does that sound okay?

9          **MR. BOYLE:** It does, Your Honor. You probably --

10  just housekeeping, might need to give them notice when they do

11  make an appearance, of that.

12         **THE COURT:** You know what, they are supposed to read

13  everything on the docket.

14         **MR. BOYLE:** I'm fine if you don't give them notice.

15         **THE COURT:** That's my view, they are supposed to read

16  everything on the docket. Maybe I'll just say that and,

17  Ms. Boyce might, since you're involved in getting

18  representation for all of them, you might --

19         **MS. BOYCE:** I can certainly make sure they are aware.

20         **THE COURT:** I'll do a written order about that. It

21  might be next week. The written order might be next week. I

22  grant the motion to intervene. She's going to put that in the

23  minute entry, right, Ms. Winchester?

24         **THE CLERK:** Yes, Ma'am.

25         **THE COURT:** Okay. Subject to reconsideration upon

motion by any defendant who has not yet made an appearance
through counsel filed -- I'm not going to impose a deadline.
And then we'll workout the logistics that everybody -- that
Ms. Amiri pointed out, later.  Okay.

          Now I've gotten lost about where I was.  I don't want
to hand that out until we leave, because they'll all want to
read it and not talk to me about scheduling.  So whether I
grant the TRO or not, the motion for preliminary injunction is
still pending and I -- that does not deny the motion for
preliminary injunction.

          So what I would propose would be from the date --
well, I don't know.  Did you all talk about this, before I
start proposing things?

          **MR. BOYLE:**  Briefly, Your Honor, with the potential
suggestion that we discuss sort of offline and we can all get
our schedules together and make a proposal, if the Court is
willing to entertain that.

          **THE COURT:**  I mean, I'm certainly open to that.  I
always like it better when you all agree.

          **MR. BOYLE:**  In broad stroke, Your Honor, looking at
maybe early September, backwards planning for that with
briefing and any discovery we might propose.

          **THE COURT:**  That's fine.  I'll be out of town through
the first week of September, and I'm not canceling my vacation.
Subject to that, you know, that is fine.

1          So what you are talking about is extending the TRO,

2   if I grant it, or possibly not, depending on what it says, but

3   combining and maybe doing everything for final resolution in

4   September.  Is that what you are talking about?

5          **MR. BOYLE:**  I would think so, Your Honor, especially

6   if we use the very good idea by Mrs. Boyce about having some

7   expiring, if we can agree they are moot.

8          **MS. AMIRI:**  Yes, Your Honor.  It is possible at that

9   point what is left is the hospitalization requirement that

10  doesn't take effect until October 1, and the pregnancy location

11  requirement that if there is an agreement to extend the TRO on

12  that, then we can combine those two issues and we can propose a

13  schedule working backwards from October 1 to resolve both of

14  the issues.

15         **THE COURT:**  And then the advise, procure, cause,

16  unless you all agree on some language about that.

17         **MS. AMIRI:**  I'm cautiously optimistic.

18         **THE COURT:**  If you all agree on something, please

19  tell me absolutely as soon as you can, because then I can stop

20  working on it, assuming I'm comfortable with what you -- if I'm

21  going to enter an order, I got to be comfortable with what you

22  are saying, but it doesn't really sound like anybody is talking

23  about agreeing to something I would have a problem with.  Were

24  there enough negatives in that?

25         Okay.  I'm going to let you all talk about the

schedule and propose something to me -- let's see, Monday is
July 3rd. As soon as you can. But if you -- but I would say,
maybe on the 5th. Can you get me something -- I mean the TROs
expire and if I deny it, and plaintiff is okay with waiting
until September, fine. If the plaintiff wants a quicker
hearing, you know, I think they are probably entitled to that.

If I grant it, you know, by then you will know
because I will have done something and maybe we'll have some
clarity. I mean, I want to do something by Friday, I guess no
matter what. And four weeks from Friday -- two weeks from
Friday is July 14th. So you kind of -- I don't know. I'm
going to leave it up to you all.

If I don't hear back from you, I don't want to make
you work on the 4th. Would you rather me give you the 3rd as a
deadline -- or I just would like to hear from you, but if I
don't hear from you, you know, I'm going to do something
myself.

So chances are, I will not get to any sort of
schedule until Wednesday, and if you all can help me out, that
would be very good. If you say we're very close, can you wait
until Thursday, just tell me. Okay.

You all are going to give me a draft. Anybody who
cares to be heard about the form of any TRO that I might decide
to enter is going to submit a proposed one, and what I
would -- just to make your lives simpler, and mine, what I'm

going to ask you to do is say whoever you are, plaintiffs'
proposed TRO and attach it and don't argue about it.  Okay.
I've heard from you.  I'm pretty sure I'll be able to figure
out why you have said what you have said and, you know, if you
want to share beforehand, great.  I appreciate you don't have a
huge amount of time, but that might be nice if you can
communicate, especially since there really appear to just be
three of you at this point that are taking an active role, so
you are can kind of narrow and focus, but I know you don't have
very much time, but I don't want to hear any more argument, I
just want a proposed order.

       **MR. BOYLE:**  Are we able to email to chambers and if
so do we do it to that email address or do we include --

       **THE COURT:**  I'm fine with you all emailing it to
Ms. Winchester and not putting it on the docket.  If anybody
wants it on the docket, that's fine.

       If anybody thinks I adopt wholesale proposed orders,
they have not been following my career.  Is it all right -- you
can speak to Ms. Winchester about where exactly to send it.
Send it to me in Word.

       **MR. BOYLE:**  Yes, Your Honor.

       **THE COURT:**  I'll try to get what I give you out to
you in Word from Ms. Winchester later, okay.  I'll be watching.

       If anything happens with the Governor, if somebody
will file something telling me so that I know, that would be

1  very helpful.  What have I forgotten from the plaintiffs'
2  perspective?
3          MR. IM:  I have just one brief housekeeping matter,
4  and certainly I don't want to add anymore confusion to
5  everything.
6          THE COURT:  Feel free.
7          MR. IM:  There is another case pending before Your
8  Honor, a related case --
9          THE COURT:  Right, Stewart.
10         MR. IM:  That's right.
11         THE COURT:  There is no TRO, no injunction in that
12 one.  I did go back and read the Fourth Circuit opinion and
13 that one is strictly a First Amendment case, as I recall.
14         MR. IM:  That's correct, Your Honor, and there is a
15 Rule 60(b) motion pending in that case because of issues that
16 were created by S.B. 20.
17         I just wanted to flag for Your Honor that it is our
18 position that were the amendments to pass, that would resolve
19 the issues raised in the 60(b) motion, however, there is still
20 this issue that if the amendments don't pass by July 1, we
21 might have some issues, so I just wanted to let Your Honor know
22 that we're planning to reach out with a stipulation and see if
23 we can submit something to the Court by consent.
24         THE COURT:  Thank you for telling me about that.  All
25 right.  Anything else for Attorney General Stein?

 1          **MS. BOYCE:**  No, Your Honor.  Thank you.

 2          **THE COURT:**  For the intervenors?

 3          **MR. BOYLE:**  No, Your Honor, thank you.

 4          **THE COURT:**  For any of the other defendants?

 5          **MR. BULLERI:**  No, Your Honor.  Thank you.

 6          **THE COURT:**  When you all are talking about how to

 7 manage all of this, you know, some discussion about not --

 8 managing nonrepetitive briefs, and this is just not concerning

 9 the intervenors, which I think my original order made pretty

10 clear when I made Ms. Boyce speak for everybody, you know, I'm

11 not wedded to that particular approach, and if the licensing

12 defendants and the secretary are generally here as observers,

13 you know, you can just say that, that if you ever want to be

14 heard, you'll ask for permission, which that is a fine way to

15 deal with it if that is going to be you all's view, but I'm not

16 asking that that be your view.

17          I don't know about the DAs.  We have to wait on the

18 rest of them to get in the case.

19          Anything else?  Court is adjourned.

20          (Court was adjourned at 12:02 p.m.)

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3          I, J. ALLEN, RPR, United States District Court Reporter

4     for the Middle District of North Carolina, DO HEREBY CERTIFY:

5

6          That the foregoing is a true and correct transcript of

7     the proceedings had in the above-entitled matter.

8

9

10    July 20, 2023

11

12                    _____

13                         J. Allen, RPR
                           United States Court Reporter
14                         324 W. Market Street
                           Greensboro, NC  27401
15

16

17

18

19

20

21

22

23

24

25