## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## DURHAM DIVISION

| | |
|---|---|
| PLANNED PARENTHOOD SOUTH ATLANTIC; BEVERLY GRAY, M.D., on behalf of themselves and their patients seeking abortions, <br><br>                         Plaintiffs, <br><br> v. <br><br> JOSHUA H. STEIN, Attorney General of North Carolina, in his official capacity; et al. <br><br>                         Defendants. | No. 1:23-CV-480 |

## DEFENDANT ATTORNEY GENERAL JOSHUA H. STEIN'S MEMORANDUM OF LAW REGARDING PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

Less than three months ago, the North Carolina General Assembly voted to pass a set of sweeping new restrictions on abortion access, significantly curtailing women's reproductive freedom in this State. Senate Bill 20, 2023-24 Leg., 156th Sess. (May 2, 2023), *as amended* House Bill 190, 2023-24 Leg., 156th Sess. (June 22, 2023) (codified at N.C. Gen. Stat. art. 1I, ch. 90). Plaintiffs now move for a preliminary injunction against two of the Act's provisions. Doc. 48, 49. The first requires all abortions after the twelfth week of pregnancy—abortions in cases of rape, incest, or life-limiting fetal anomalies—to take place at a hospital rather than at an abortion clinic. N.C. Gen. Stat. §§ 90-21.81B(3)-(4), -21.82A(c); *id.* § 131E-153.1. The second requires a physician to

"[d]ocument . . . [the] existence of an intrauterine pregnancy" before providing an abortion.  *Id.* § 90-21.83B(a)(7).  This Court should enjoin both provisions.

*First*, Plaintiffs have carried their burden to show that they are likely to succeed on the merits of their challenges to the hospitalization requirement.  The hospitalization requirement is wholly irrational.  It requires so-called "surgical abortions"—abortions that do not actually involve any surgical procedures, like incisions or cutting—to take place only at hospitals.  The requirement therefore prevents survivors of sexual violence, as well as patients with life-limiting fetal anomalies, from seeking an abortion at licensed abortion clinics—even though the vast majority of abortions are performed safely in that clinical setting; even though the law permits individuals to undergo riskier procedures at nonhospital facilities; and even though the law allows miscarriages to be treated using *the very same procedures* without any hospitalization requirement.  Thus, the hospitalization requirement serves only to increase health risks for these vulnerable patients, decrease the number of providers available to them, and impose additional, unjustified costs.

The Constitution does not permit this kind of irrational governmental action. Although courts now review substantive constitutional challenges to abortion regulations under the deferential rational-basis test, *see Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2284 (2022), the hospitalization requirement cannot clear even this very low bar.

*Second*, Plaintiffs have carried their burden to show that they are likely to succeed on the merits of their challenge to the intrauterine pregnancy-documentation requirement. The Act broadly allows abortions during the first twelve weeks of pregnancy.  N.C. Gen.

2

Stat. § 90-21.81B(2). Yet Plaintiffs' evidence here appears to show that at the very early stages of pregnancy, it is often impossible to see a pregnancy through an ultrasound, preventing physicians from complying with the Act's documentation requirement, even when abortions are otherwise allowed. This Court held that Plaintiffs were entitled to a temporary restraining order against this provision, as it fails to give fair notice of what conduct it actually prohibits. Doc. 31 (TRO) at 6-7. Plaintiffs' evidence appears only to confirm the Court's earlier conclusion.

*Third*, Plaintiffs have also shown the remaining requirements for preliminary relief, including that they will likely suffer irreparable harm absent an injunction and that the equities and public interest weigh in their favor. As for the intrauterine pregnancy-documentation requirement, because the Act on the one hand appears to allow abortions up to twelve weeks and on the other prohibits those abortions when the documentation requirement cannot be met, doctors will be put to an impossible choice: turning away patients from getting much-needed medical care or risking criminal sanction. Not only are doctors put to this impossible choice, the contradiction in the documentation requirement also makes it impossible for executive-branch defendants who are charged with enforcing these criminal provisions to understand what conduct is permitted and what conduct is prohibited.

As for the hospitalization requirement, injunctive relief is necessary to avoid the immediate public harm that will result if the requirement goes into effect. More than half of North Carolina's counties lack a hospital capable of performing abortions. If the hospitalization requirement goes into effect, women living in half of this State could be

3

denied access to critical medical procedures unless they bear the costs of traveling long distances to hospitals. Worst of all, the only women affected by this requirement are rape and incest survivors and those carrying fetuses with life-limiting anomalies. Injunctive relief is necessary to avoid a violation of the due-process rights of women and girls who find themselves in some of the most horrifying circumstances.

For the reasons discussed below, this Court should preliminarily enjoin the hospitalization and intrauterine pregnancy-documentation requirements before the former takes effect on October 1, 2023.

## STATEMENT OF FACTS

As discussed, Plaintiffs seek a preliminary injunction. Doc. 48, 49; *see* Fed. R. Civ. P. 65. "When a party moves for a preliminary injunction, . . . it invites the district court to act as the finder of fact on a limited record." *Speech First, Inc. v. Sands*, 69 F.4th 184, 190 (4th Cir. 2023); Fed. R. Civ. P. 52(a)(2). "Because preliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 725-26 (4th Cir. 2016), *vacated and remanded on other grounds*, 137 S. Ct. 1239 (2017). When parties submit affidavits in support of a preliminary-injunction motion, "the question of how much weight an affidavit will be given is left to the trial court's discretion." 11A C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 2949 (3d ed.).

4

Here, Plaintiffs have submitted two declarations in support of their preliminary-injunction motion. One declarant is a physician employed by Planned Parenthood South Atlantic who provides reproductive healthcare to patients, including abortions and miscarriage care. *See* Doc. 49-1. The other is an obstetrician-gynecologist who provides abortions for patients in both hospitals and outpatient clinics. *See* Doc. 49-2. The Attorney General does not claim to have the specialized knowledge to evaluate this evidence. But the evidence appears consistent with well-established and publicly available information.

Abortion is one of the safest and most common medical procedures in the United States.[1] Approximately one in four American women are estimated to have had an abortion before the age of 45.[2] The rate of complications related to an abortion and requiring hospitalization is generally estimated to be a fraction of 1 percent.[3] And any

---

[1]    Nat'l Acad. Sci., Eng'g, & Med., *The Safety and Quality of Abortion Care in the United States* 10 (2018); Rachel K. Rachel K. Jones & Megan L. Kavanaugh, *Changes in Abortion Rates Between 2000 and 2008 and Lifetime Incidence of Abortion*, 117 Obstetrics & Gynecology 1358, 1365 (2011); *see also* Katherine Kortsmit, *et al.*, *Abortion Surveillance – United States, 2020*, 71 Morbidity & Mortality Wkly. Rep. 10, 8 (Nov. 25, 2022), *available at* https://www.cdc.gov/mmwr/volumes/71/ss/pdfs/ss7110a1-H.pdf ).

[2]    Rachel K. Jones & Jenna Jerman, *Population Group Abortion Rates and Lifetime Incidene of Abortion: United States, 2008-2014*, 107 Am. J. Pub. Health 1904, 1904 (2017); *see also* Katherine Kortsmit, *et al.*, *Abortion Surveillance – United States, 2019*, 70 Morbidity & Mortality Wkly. Rep. 9, 7 (Nov. 26, 2021), *available at* https://www.cdc.gov/mmwr/volumes/70/ss/pdfs/ss7009a1-H.pdf.

[3]    *The Safety and Quality of Abortion Care in the United States*, *supra* n.4 at 55, 60, 63, and 67 (discussing rates of hospitalization for medication, aspiration, dilation and evacuation, and induction abortion).

5

complications arising from abortion tend to be overwhelmingly minor, including easily treatable infections and incomplete medication abortions that later require further non-surgical treatment.[4]  Indeed, even so-called "surgical" abortions do not involve actual surgical procedures, like incisions or cutting, but instead require a short "non-incisional therapeutic intervention through a natural body cavity or orifice."[5]

In addition, abortions have lower complication rates relative to other medical events and procedures that take place outside of hospital settings.  For example, unlike an abortion, a vasectomy is considered a "surgical operation" and traditionally requires an incision and local anesthesia.[6]  Complications associated with vasectomies include severe infection, occurring in 3-4 percent of vasectomies performed.[7]  Yet vasectomies are nonetheless permitted as outpatient procedures that do not need to be performed at hospitals.  N.C. Gen. Stat. § 90-271.  Childbirth is another example.  The risk of death associated with childbirth is fourteen times higher than the risk of death associated with

---

[4]    Ushma D. Upadhyay, *Incidence of Emergency Department Visits and Complications After Abortion*, 125(1) Obstetrics & Gynecology 175, 176, 181 (2015).

[5]    Position Statement, *Definition of "Procedures" Related to Obstetrics and Gynecology*, Am. C. of Obstetricians & Gynecologists, *available at* https://www.acog.org/clinical-information/policy-and-position-statements/position-statements/2018/definition-of-procedures-related-to-obstetrics-and-gynecology.

[6]    Fang Yang, et al., *Review of Vasectomy Complications and Safety Concerns*, 39(3) World J. Men's Health 406, 407 (2020).

[7]    *Id.*

abortion.[8]  Yet physicians and certified nurse-midwives may deliver babies outside of hospitals.  *Id.* § 90-178.4.  Moreover, Plaintiffs assert that the procedures used in surgical abortions are the very same as those used for miscarriages, and miscarriage management routinely takes place outside of hospitals.  Doc. 49 at 4-5, 10-11; *cf. Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 618 (2016) (noting record evidence showing that "[m]edical treatment after an incomplete miscarriage often involves a procedure identical to that involved in a nonmedical abortion, but it often takes place outside a hospital or surgical center").

## STATEMENT OF THE CASE

Notwithstanding the profound importance of reproductive freedom and the incontrovertible evidence of abortion's safety, the North Carolina General Assembly— over Governor Cooper's veto—rushed to prohibit abortion after twelve weeks of pregnancy, with a few narrow exceptions.  Senate Bill 20, 2023-24 Leg., 156th Sess. (May 2, 2023).  The law, also known as S.B. 20, contained numerous inconsistencies, contradictions, and ambiguities.  Those contradictions, among many other problems, gave rise to this lawsuit.  Plaintiffs filed their Complaint on June 16, 2023, alleging that numerous provisions of S.B. 20 run afoul of the Constitution.  Doc. 1 (Compl.) ¶¶ 77-87.

In response to that Complaint, six days later, the General Assembly introduced a bill "to make technical and conforming changes to Session Law 2023-14" (*i.e.*, S.B. 20).

---

[8]      Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215, 216 (2012).

House Bill 190, 2023-24 Leg., 156th Sess. (June 22, 2023).  House Bill 190 directly addressed most of Plaintiffs' challenges to S.B. 20.  *Compare* Doc. 1 ¶¶ 3-8 *with* Doc. 25-1 (H.B. 190).  H.B. 190 was enacted on June 29, 2023.

While H.B. 190 resolved most of the issues raised in Plaintiffs' original Complaint, three issues remained that were (1) resolved by stipulation, (2) deferred until further briefing, or (3) subject to a temporary restraining order, respectively.  First, the parties stipulated that none of the provisions in S.B. 20 "impose civil, criminal, or professional liability on an individual who advises, procures, causes, or otherwise assists someone in obtaining a lawful out-of-state abortion."  Doc. 30 (Joint Stipulation).  This stipulation mooted Plaintiffs' First Amendment challenge to the prohibition against advising, procuring, or causing an abortion after twelve weeks.

Second, the parties stipulated that S.B. 20's requirement that an abortion after the twelfth week of pregnancy be performed only in a hospital does not take effect until October 1, 2023.  N.C. Gen. Stat. §§ 90-21.81B(3)-(4), -21.82A(c); *id.* § 131E-153.1; Doc. 30.  As a result, the Court and the parties deferred resolution of Plaintiffs' challenge to this provision.

Third, the Court held as unconstitutionally vague S.B. 20's requirement that a physician "[d]ocument . . . [the] existence of an intrauterine pregnancy," because the provision contradicted other parts of S.B. 20 that allowed abortions up to 12 weeks without limitation.  Doc. 31 at 6-7.  As a result, the Court granted Plaintiffs' request to temporarily block enforcement of that provision.  *Id.*  That order remains in effect until the Court rules on this motion.  Doc. 35 (Consent Order).

8

On July 17, 2023, Plaintiffs filed their Amended Complaint. Doc. 42 (First Amended Complaint). In the Amended Complaint, they challenge the intrauterine pregnancy-confirmation requirement as vague, violating due process; the hospitalization requirement as irrational, violating substantive due process and equal protection; and the lack of clarity as to whether a hospital can provide an induction abortion as vague, violating due process. Doc. 42 (FAC), ¶ 13.

On July 23, Plaintiffs filed their amended motion for a preliminary injunction. In that motion, they seek a preliminary injunction against enforcement of the hospitalization and intrauterine pregnancy-documentation requirements. Doc. 49 (MOL ISO Amended PI motion).

## ARGUMENT

I. **PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS OF THEIR HOSPITALIZATION CHALLENGE.**

Because the hospitalization requirement bears no rational relationship to any State interest, including maternal health or fetal viability, Plaintiffs are likely to succeed on the merits of their due-process challenge.

A. **The Due Process Clause Demands a Rational Relationship Between the Hospitalization Requirement and a State Interest.**

The parties agree that the hospitalization requirement is governed by the same standard of review as other "health and safety measures"—rational basis review. *Dobbs*, 142 S. Ct. at 2246. Therefore, States can regulate abortion for "legitimate reasons." *Id.* at 2283. And while the Supreme Court has required only a "relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is

9

peculiarly a legislative task," *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 314 (1976), the rational-basis test is "not a toothless one," *Mathews v. Lucas*, 427 U.S. 495, 510 (1976). The regulation must "rationally advance[] a reasonable and identifiable governmental objective." *Schweiker v. Wilson*, 450 U.S. 221, 235 (1981).

On the other hand, regulations that do not advance an identifiable governmental objective or have only a tangential relationship with legitimate state interests must be invalidated. *See Moore v. East Cleveland*, 431 U.S. 494, 500 (1977) (striking down, under rational-basis review, an ordinance limiting the types of families that could live in a neighborhood, because the ordinance served the stated government interests "marginally, at best"); *see also Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 622 (1985) (striking down a statute that granted a tax exemption to those Vietnam veterans who resided in the State before a certain date because that retrospective preference did not have a rational relationship to encouraging Vietnam veterans to move to the State in the future).

Although the Supreme Court has since overruled the case's underlying legal holding, the Court's reasoning in *Whole Woman's Health v. Hellerstedt* illustrates how courts might decide whether an abortion regulation has any relationship to a legitimate state interest. In *Hellerstedt*, the Court affirmed as "well supported" a district court's finding that a law "requiring all abortion facilities to meet all surgical-center standards does not benefit patients and is not necessary." 579 U.S. at 617. Indeed, the Court affirmed a finding that some of the standards had such a "tangential relationship to patient safety in the context of abortion as to be nearly arbitrary." *Id.* at 619. In

10

analyzing the law, moreover, the Court observed that although other procedures and medical events (including childbirth) were more dangerous than abortions, the law nonetheless allowed those procedures to take place outside of hospitals. *Id.* at 618. The law also allowed physicians to provide miscarriage treatment—using procedures identical to those involved in some abortions—in nonsurgical settings. *Id.* All told, because the restriction failed to "provide better care or more frequent positive outcomes," the Court concluded that the surgical-center requirement was "not necessary." *Id.* at 619 (internal quotations and citations omitted).

To be sure, the Supreme Court in *Dobbs* overruled the "undue burden" standard applied in *Hellerstedt*. But *Dobbs* did not disturb any of that case's factual findings or its reasoning about why hospital requirements fail to serve any interest in patient health. And *Dobbs* also made clear that while courts must review abortion regulations deferentially, laws of that kind must still have a rational relationship to a legitimate state interest. 142 S. Ct. at 2284. Specifically, the Court identified six legitimate interests that a State might have in regulating abortion, including (1) "respect for and preservation of prenatal life at all stages of development," (2) the "protection of maternal health and safety," (3) "the elimination of particularly gruesome or barbaric medical procedures," (4) "the preservation of the integrity of the medical profession," (5) "the mitigation of fetal pain," and (6) "the prevention of discrimination on the basis of race, sex, or disability." *Id.* As discussed below, however, the hospitalization requirement serves none of these interests.

11

**B.     The Hospitalization Requirement Bears No Rational Relationship to Any State Interest and Violates Due Process.**

The Act's requirement that an abortion provided after the twelfth week of pregnancy in cases of rape, incest, or "life-limiting anomaly" be performed only at a hospital fails rational-basis review. The hospitalization requirement does not bear a rational relationship to any legitimate state interest that the Supreme Court identified in *Dobbs*.

*First*, the hospitalization requirement does not preserve prenatal life. The requirement regulates only *where* an abortion may take place, not *whether* an abortion may take place. *Id.* at 2284. Indeed, the entire premise of the requirement is that, under certain narrow circumstances, women may seek abortions after the twelfth week of pregnancy.

*Second*, the hospitalization requirement does not rationally advance any legitimate state interest in protecting maternal health and safety. The Supreme Court has already reasoned that a surgical-facility requirement similar to the hospitalization requirement that Plaintiffs challenge here "does not benefit patients and is not necessary," and that women "will not obtain better care or experience more frequent positive outcomes" at a surgical facility rather than at a clinic. *See Hellerstedt*, 579 U.S. at 617.

The record in this case also supports that conclusion. Abortions are overwhelmingly safe. *See supra* p. 5. And the rate of complications requiring hospitalization is generally estimated to be a fraction of 1 percent. *Id.* It is also clear that the hospitalization requirement has—at best—only a tangential relationship with positive

12

health outcomes. *See Moore*, 431 U.S. at 500. The health risk associated with many other medical procedures and events that are not required to take place in hospitals is much greater than the risks associated with surgical abortions. For example, the risk of death associated with childbirth is up to fourteen times higher than the risk of death associated with abortion—yet state law does not require all childbirths to occur at hospitals. *See supra* p. 6. And vasectomies, which traditionally require both a scalpel to make incisions and local anesthesia, have a greater chance of complications, even though state law allows vasectomies to be performed outside of hospitals as well. N.C. Gen. Stat. § 90-271; *see supra* pp. 6-7. As a result, the hospitalization requirement does not seem to correspond with any purported state interest in preventing or more effectively treating health complications. In short, the lack of correlation between the restriction and the State's purported interest in maternal health only demonstrates that the restriction is not necessary. *Cf. Hellerstedt*, 579 U.S. at 618.

Critically, any purported state interest in maternal health here is further belied by Plaintiffs' evidence that physicians perform the *same* surgical-abortion procedures in nonhospital settings for miscarriages. Doc. 49 (Pls.' MOL ISO PI motion) at 4-5. It is hard to imagine a legitimate interest that would justify allowing the *identical* procedure to be performed outside of a hospital for miscarriages but not for abortions.

*Third*, the hospitalization requirement also does not eliminate a "particularly gruesome or barbaric medical procedure[]." *Dobbs*, 142 S. Ct. at 2284. Rather, it regulates only *where* a surgical abortion may take place, not *how* it is performed. Indeed, as noted above, the State permits the same medical procedures to be performed on

13

patients experiencing miscarriages.

*Fourth*, the hospitalization requirement does not preserve the "integrity of the medical profession" either. Again, the hospitalization requirement limits only *where* a doctor may perform the abortion—it is not a restriction on the manner in which a physician may perform the procedure.

*Fifth*, the hospitalization requirement does not seek to mitigate "fetal pain." There is no evidence in the record here that would support a conclusion that requiring surgical abortions to be performed in hospitals rather than at abortion clinics mitigates or prevents "fetal pain."

*Sixth*, the hospitalization requirement also does not prevent "discrimination on the basis of race, sex, or disability." The restriction has nothing to do with preventing abortions performed for any particular reason. Indeed, state law has an entirely separate prohibition that seeks to prohibit abortions performed for discriminatory reasons. *See* N.C. Gen. Stat. § 90-21.121.

Because the hospitalization requirement does not appear to be even tangentially related to a legitimate state interest, it fails even the extremely permissive rational-basis test. *See Moore*, 431 U.S. at 500.

## II. PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS OF THEIR DUE-PROCESS CHALLENGE TO THE INTRAUTERINE PREGNANCY-DOCUMENTATION REQUIREMENT.

As this Court already held, the intrauterine pregnancy-documentation requirement, which requires that a physician "[d]ocument . . . [the] existence of an intrauterine pregnancy" before providing an abortion, could be understood to be in inherent conflict

14

with other provisions of the Act that allow abortions up to twelve weeks. *Compare* N.C. Gen. Stat. § 90-21.83B(a)(7), *with* §§ 90-21.81A(a), -21.81B(2). This ambiguity, which requires a doctor to choose between denying medical services to a patient or risking criminal sanction, is prohibited by the Due Process Clause.

The Due Process Clause demands fair notice and clarity. A State violates due process when it deprives someone of life, liberty, or property under an overly vague statute. *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 781 (4th Cir. 2023). Vagueness is least tolerated in statutes that threaten the most serious deprivations, like those imposing criminal penalties or inhibiting constitutional rights. *Manning v. Caldwell ex rel. City of Roanoke*, 930 F.3d 264, 272-73 (4th Cir. 2019) (en banc). In those cases, a vague statute "can be invalidated on its face even where it could conceivably have some valid application." *See Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012).

To determine whether a statute is unconstitutionally vague, courts will ask whether the law "provide[s] a person of ordinary intelligence fair notice of what is prohibited." *Doe v. Cooper*, 842 F.3d 833, 842 (4th Cir. 2016). The fair-notice requirement is intended to "enable citizens to conform their conduct to the proscriptions of the law" and invalidate statutes that are little more than a "trap for those who act in good faith." *United States v. Ragen*, 314 U.S. 513, 524 (1942); *Manning*, 930 F.3d at 274. Thus, statutes that are confusing, ambiguous, or contradictory are impermissibly vague and must be enjoined. *Raley v. Ohio*, 360 U.S. 423, 438 (1959) (quoting *United States v. Cardiff*, 344 U.S. 174, 176 (1952)); *Manning*, 930 F.3d at 274.

15

Plaintiffs allege that, in the early weeks of pregnancy, it is sometimes impossible to detect an intrauterine embryo by ultrasound. Doc. 49 at 17. In those circumstances, it appears as though the intrauterine pregnancy-documentation requirement cannot be satisfied because a physician will not be able to confirm, once-and-for-all, the existence of an intrauterine pregnancy. As a result, doctors may feel prohibited from performing abortions at this early stage. This uncertainty, Plaintiffs argue, will result in doctors delaying abortions, potentially causing them to expose their patients to increased and unnecessary medical risks. Doc. 49-2, ¶ 41.

However, the same law explicitly permits abortions to take place "[d]uring the first 12 weeks of a woman's pregnancy, when the procedure is performed by a qualified physician licensed to practice medicine in this State in a hospital, ambulatory surgical center, or clinic certified by the Department of Health and Human Services to be a suitable facility for the performance of abortions . . . or during the first 12 weeks of a woman's pregnancy when a medical abortion is procured." N.C. Gen. Stat. § 90-21.81B(2); *see also id.* § 90-21.81A(a) ("It shall be unlawful after the twelfth week of a woman's pregnancy to advise, procure, or cause a miscarriage or abortion.").

The Attorney General does not claim to have the specialized knowledge to evaluate Plaintiffs' factual allegations regarding this restriction. But, to the extent that Plaintiffs are correct that the intrauterine pregnancy-confirmation requirement may prohibit certain abortions within the first twelve weeks of pregnancy, causing patients to delay abortions and subject themselves to increased and unnecessary medical risks, that provision contradicts other provisions of the Act in a way that will confuse doctors and

16

enforcement authorities about what conduct is permitted and what is prohibited. *Ragen*, 314 U.S. at 524; *Manning*, 930 F.3d at 274. The possibility of that kind of confusion, under penalty of criminal prosecution, would seem to require clarification from this Court.

What is more, Plaintiffs have already successfully proven that they are likely to succeed on the merits of their challenge to the intrauterine pregnancy-documentation requirement. Doc. 31. This Court entered a temporary restraining order enjoining the provision, based on the record at that early stage. Since then, there have been no changes to the relevant facts or legal circumstances. If anything, the evidence Plaintiffs have submitted in support of their motion for a preliminary injunction appears only to further confirm that the Court was correct to enjoin the provision. *See* Doc. 49 at 17-20.

## III. THE REMAINING PRELIMINARY-INJUNCTION REQUIREMENTS FAVOR ENTERING AN INJUNCTION THAT REMEDIES THE DUE-PROCESS VIOLATIONS.

Not only are Plaintiffs likely to prevail on the merits of their claims, each of the remaining preliminary-injunction requirements supports their desired relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The balance of the equities and the public interest underscore the need for an injunction. And Plaintiffs are likely to suffer irreparable harm unless this Court acts.

To begin, the balance of the equities and public interest support enjoining or construing these arbitrary and contradictory provisions to bring them into constitutional compliance. Until last year, millions of women in North Carolina relied on having access to abortion care through the twenty-fourth week of pregnancy. Over the course of 48

17

hours, and without the opportunity for public awareness or debate, the General Assembly stripped these millions of women of this right, forcing them to access necessary healthcare in *half* the time previously afforded. In addition, the legislature added onerous and unnecessary restrictions that make it harder for doctors to offer reproductive services and for patients—particularly those who are economically vulnerable—to access them.

The hospitalization requirement is one such onerous and unnecessary restriction. It targets the most vulnerable pregnant women and girls—rape and incest survivors and those carrying fetuses with life-limiting anomalies—and makes it harder for them to access physicians who can provide them the services they need at convenient locations.

There are significant negative consequences to "requiring that care take place in costlier and more sophisticated settings than are clinically necessary."[9] The hospitalization requirement would delay care and increase the costs of care because medical care at hospitals is almost always more expensive than at clinics. [10] The hospitalization requirement would also reduce the availability of providers, which in turn reduces options for many women by reducing the availability of care by imposing unneeded regulations.[11]

The hospitalization requirement will have a particularly acute impact on North Carolinians' access to care. Already, 21 North Carolina counties are maternal healthcare

---

[9]     *Safety and Quality of Abortion*, *supra* note 1, at 77.

[10]    *Id.*

[11]    *Id.*

deserts "without a hospital or birth center offering obstetric care."[12]  There are 33

additional counties that do not have hospitals but do have obstetric practitioners, family

practitioners, or other providers who offer maternal care.[13]  If the hospitalization

requirement goes into effect, there will be 54 counties—home to more than 460,000

women of reproductive age—that would not have a hospital that could provide abortion

care for rape and incest survivors between the twelfth and twentieth week of their

pregnancies.[14]  This is most distressing for those patients who live in the 33 counties that

*would* have easier access to care but for the hospitalization requirement.  And even in

those counties that do have hospitals, many do not provide abortion services.[15]

    The bottom line is that the hospitalization requirement will impose increasing

burdens on counties that do have hospitals that will provide abortion services and will

force women to travel long distances to receive care that they would otherwise be able to

access in more convenient locations.  For example, patients in Pamlico County already

---

[12]    March of Dimes, Maternity Care Desert (Oct. 2022), *available at*
https://www.marchofdimes.org/peristats/data?top=23&lev=1&stop=641&reg=37&sreg=37&obj=18&slev=4.

[13]    *Id.*

[14]    United States Census Bureau, *2020 DEC Demographic and Housing Characteristics* (Apr. 1, 2020), *available at* https://data.census.gov/table?q=population+in+north+carolina+in+2020&g=040XX00US37$0500000&tid=DECENNIALDHC2020.P1.

[15]    *See, e.g.*, Washington Regional Medical Center, https://www.washingtonregionalmedical.org/ (last visited July 21, 2023); CarolinaEast Health System, https://www.carolinaeasthealth.com/ (last visited July 21, 2023).

19

have to drive an average of 138 minutes to reach their nearest non-hospital abortion care facility.[16]  The hospitalization requirement will only make that drive longer.  And women in Washington County, a majority-minority county where the median household income is $54,200 (one of the lowest in North Carolina)—already have to drive an average of 101 minutes to access the closest non-hospital abortion care facility.[17]  That facility is actually in Virginia.[18]  Residents of Washington County, too, will experience increasingly longer travel times to visit hospitals in North Carolina, should the hospitalization requirement go into effect.  The hospitalization requirement, therefore, will impose particularly heavy burdens on the women with the fewest resources in North Carolina.

In the end, the hospitalization requirement does not improve maternal or fetal health outcomes.  Rather, it causes inequitable access to abortion care based on where a woman lives and reduces the efficiency of abortion services.[19]  Plaintiffs have also

---

[16]    Caitlin Myers, *Abortion Access Dashboard* (May 31, 2023), *available at* https://experience.arcgis.com/experience/6e360741bfd84db79d5db774a1147815/page/Page/?views=Dashboard---October-10.

[17]    *Id.*; United States Census Bureau, *Median Income in the Past 12 Months (In 2021 Inflation-Adjusted Dollars): 2021 ACS 1-Year Estimates Subject Table*, *available at* https://data.census.gov/table?q=income+in+north+carolina+in+2021&tid=ACSST1Y2021.S1903.

[18]    Caitlin Myers, *Abortion Access Dashboard* (May 31, 2023), *available at* https://experience.arcgis.com/experience/6e360741bfd84db79d5db774a1147815/page/Page/?views=Dashboard---October-10.

[19]    *Safety and Quality of Abortion*, *supra* note 1, at 77.

submitted particularly compelling evidence that the hospitalization requirement will make it harder for especially vulnerable groups—survivors of rape and incest—to access the healthcare they need by limiting the number of providers available to these patients, imposing increased costs, delaying access to urgently needed care, and possibly forcing retraumatization.  Doc. 49 at 21-22.

In light of the serious public harms that would arise if the hospitalization requirement were to take effect, the equities weigh decisively in favor of enjoining this provision.

The Act's contradictory requirements in the intrauterine pregnancy-documentation provision also impose unacceptable costs on women and doctors in this State. Particularly in these circumstances, where the legal landscape has shifted seismically in a short timespan, the public interest is served by preserving the status quo, at least until women and doctors have the clarity they need to continue accessing and providing reproductive healthcare.  *See, e.g.*, *Mayor of Baltimore v. Azar*, 392 F. Supp. 3d 602, 619 (D. Md. 2019); *FemHealth USA, Inc. v. City of Mount Juliet*, 458 F. Supp. 3d 777 (M.D. Tenn. 2020).  Moreover, resolving the Act's ambiguities will provide clarity to the executive-branch defendants who are charged with enforcing these criminal provisions.

Meanwhile, enjoining these provisions does not prejudice the Legislative Intervenors in any way.  "[A] state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional.  If anything, the system is improved by such an injunction."  *Centro*

*Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013) (en banc) (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)).

Plaintiffs, by contrast, will suffer irreparable harm absent an injunction. *See Winter*, 555 U.S. at 22. Infringing constitutional rights generally constitutes irreparable harm. *See Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987). That is particularly true where an unconstitutional statute threatens criminal prosecution. *See Pierce v. Soc'y of Sisters*, 268 U.S. 510, 536 (1925).

\* \* \*

As explained above, Plaintiffs are likely to prevail on the merits of their challenges. Because Plaintiffs are also likely to suffer immediate and irreparable harm absent an injunction, and because the balance of the equities and the public interest favor an injunction, this Court should convert the TRO on the intrauterine pregnancy-documentation requirement into a preliminary injunction.

In addition, this Court should sever and enjoin the hospitalization requirement. *See* N.C. Gen. Stat. §§ 90-21.81B(3)-(4), -21.82A(c). When a statute fails rational-basis review, the appropriate remedy is an injunction barring the statute's enforcement. *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 230 (1982) (affirming district court's order enjoining a Texas statute that failed rational-basis review); *U.S. Dep't of Ag. v. Moreno*, 413 U.S. 528, 538 (1973) (affirming district court's order enjoining a federal statute that failed rational basis review); *Moore*, 431 U.S. at 500. Here, because the General Assembly has expressed its intent to sever any provision within S.B. 20 that a court holds unconstitutional, *see* N.C. Gen. Stat. § 90-21.92, and because the hospitalization

22

requirement is not inextricably intertwined with the rest of the Act, that provision can and should be severed and enjoined.

## CONCLUSION

The hospitalization and intrauterine pregnancy-documentation requirements that Plaintiffs have challenged violate the Due Process Clause. The latter is contradictory and confusing, and the former bears no rational relationship to any state interest, including maternal health or fetal viability. In particular, the hospitalization requirement makes it harder, more expensive, and more dangerous for survivors of rape and incest and those carrying fetuses with life-limiting anomalies to obtain an abortion. The Court should therefore enjoin the challenged provision in the manner described above.

Dated: July 31, 2023.

Respectfully submitted,

JOSHUA H. STEIN
Attorney General

Sarah G. Boyce
Deputy Attorney General and
General Counsel
N.C. State Bar 56896
sboyce@ncdoj.gov

Sripriya Narasimhan
Deputy General Counsel
N.C. State Bar 57032
snarasimhan@ncdoj.gov

Amar Majmundar
Senior Deputy Attorney General
N.C. State Bar 24668
amajmundar@ncdoj.gov

Stephanie A. Brennan

23

Special Deputy Attorney General
N.C. State Bar 35955
sbrennan@ncdoj.gov

South A. Moore
Assistant General Counsel
N.C. State Bar 55175
smoore@ncdoj.gov

*Counsel for Defendant Attorney General Stein*

North Carolina Dept. of Justice
P.O. Box 629
Raleigh, NC 27602
Phone: 919-716-6900
Fax: 919-716-6758

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with Local Rule 7.3(d) because, excluding the parts of the brief exempted by Rule 7.3(d) (cover page, caption, signature lines, and certificates of counsel), this brief contains fewer than 6,250 words. This brief also complies with Local Rule 7.1(a).

Sarah G. Boyce
Deputy Attorney General
and General Counsel
