# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### No. 1:23-cv-480

| | |
|---|---|
| PLANNED PARENTHOOD SOUTH ATLANTIC; BEVERLY GRAY, M.D., on behalf of themselves and their patients seeking abortions,<br><br>                              Plaintiffs,<br><br>v.<br><br>JOSHUA H. STEIN, Attorney General of North Carolina, in his official capacity; et al.<br><br>                              Defendants. | **DEFENDANT ATTORNEY GENERAL STEIN'S ANSWER TO FIRST AMENDED COMPLAINT** |

Defendant Joshua H. Stein, in his official capacity as Attorney General of the State of North Carolina, by and through undersigned counsel, answers Plaintiff's Amended Complaint as follows:

## I.    INTRODUCTORY STATEMENT AND CASE HISTORY

1.      On behalf of themselves and their patients, Plaintiffs bring this civil rights action under the U.S. Constitution and 42 U.S.C. § 1983 to challenge the constitutionality of three provisions of North Carolina Session Law 2023-14 ("S.B. 20," see DE 1-1) (codified as amended by Session Law 2023-65 ("H.B. 190," see DE 26-1) at N.C. Gen. Stat. art. 11, ch. 90 (the "Act")). The Act bans abortion after twelve weeks of pregnancy with narrow exceptions, and imposes other significant restrictions on abortion access that will harm patients and impede health care professionals from providing quality care.

**ANSWER**: The statutes cited in Paragraph 1 speak for themselves and serve as the

best evidence of their own content. Otherwise, the allegations in Paragraph 1 state legal conclusions and require no response from Defendant.

2.       In particular, Plaintiffs challenge the following: (1) the Act's requirement that a physician "[d]ocument in the woman's medical chart the . . . existence of an intrauterine pregnancy," N.C. Gen. Stat. § 90-21.83B(a)(7) (the "IUP Documentation Requirement"); (2) the Act's requirement that an abortion provided after the twelfth week of pregnancy in cases of rape or incest or "life-limiting anomaly" be provided in a hospital, not an abortion clinic, *id.* §§ 90-21.81B(3), -(4), 90-21.82A, 131E-153.1 (the "Hospitalization Requirement"); and (3) the lack of clarity as to whether a hospital can provide an induction abortion, which involves the use of medication, to a rape or incest survivor after the twelfth week of pregnancy, *id*. §§ 90-21.81B(3), 90-21.82A(c) (the "Induction Abortion Ban").

**ANSWER**: Defendant admits, on information and belief, that Plaintiffs challenge the "IUP Documentation Requirement," the "Hospitalization Requirement," and the "Induction Abortion Ban." The statutes cited in Paragraph 2 speak for themselves and serve as the best evidence of their own contents. The remaining allegations in Paragraph 2 state legal conclusions and require no response from Defendant.

3.	S.B. 20 was ratified by the General Assembly on May 4, 2023; vetoed by
Governor Roy Cooper on May 14, 2023; and, upon legislative override of the veto, enacted
on May 16, 2023, with Part I taking effect on July 1, 2023 and Part II taking effect on
October 1, 2023.

**ANSWER**: Defendant admits, on information and belief, the allegations in
Paragraph 3.


4.	On June 16, 2023, Plaintiffs filed a complaint alleging that various provisions
of S.B. 20—including the IUP Documentation Requirement and the Hospitalization
Requirement—were impermissibly vague and lacked a rational basis in violation of the
Fourteenth Amendment's Due Process and Equal Protection Clauses, and that one
provision of S.B. 20 violated the First Amendment. *See* DE 1 (Verified Complaint).

**ANSWER**: Defendant admits, on information and belief, that on June 16, 2023,
Plaintiffs filed a complaint challenging various provisions of S.B. 20 as violating the First
and Fourteenth Amendments.


5.	On June 21, 2023, Plaintiffs filed a motion for a temporary restraining order
and preliminary injunction seeking to block the entirety of Part I of S.B. 20, including the
IUP Documentation Requirement, and also Part II's Hospitalization Requirement. *See* DE
11 (First TRO/PI Mot.), 12 (First TRO/PI Br.).

3

**ANSWER**: Defendant admits, on information and belief, the allegations in Paragraph 5.

6.      In response to this lawsuit, on June 27, 2023, the General Assembly passed H.B. 190, which amended S.B. 20. Governor Cooper signed H.B. 190 into law on June 29, 2023.

**ANSWER**: Defendant admits that the General Assembly passed H.B. 190 on June 27, 2023, and Governor Cooper signed H.B. 190 into law on June 29, 2023. The provisions in H.B. 190 speak for themselves and serve as the best evidence of their own contents. Defendant lacks sufficient information and knowledge to form a belief as to whether H.B. 190 was a response to Plaintiffs' lawsuit.

7.      H.B. 190 resolved many of the issues Plaintiffs raised in their Verified Complaint, and on June 29, 2023, the Parties reached a joint stipulation resolving certain of these claims. *See* DE 30 (Joint Stip.).

**ANSWER**: Defendant admits that the Parties reached a joint stipulation resolving certain of Plaintiffs' claims in their first complaint. The provisions in H.B. 190 speak for themselves and serve as the best evidence of their own contents.

8.      In particular, the Parties stipulated that none of the provisions in the Act

4

"impose[s] civil, criminal, or professional liability on an individual who advises, procures, causes, or otherwise assists someone in obtaining a lawful out-of-state abortion," and specified that "[f]or the avoidance of doubt, this stipulation means that advising, procuring, causing, or otherwise assisting someone in obtaining a lawful out-of-state abortion is not a criminal offense under N.C. Gen. Stat. § 14-23.2." *Id.* at 2. Because this construction resolves the First Amendment issue, the Court denied Plaintiffs' TRO motion with respect to this claim in its order on June 30, 2023. *See* DE 31 (TRO) at 5.

**ANSWER**: Defendant admits that the Parties stipulated as described in Paragraph 8 and that the Court denied Plaintiffs' TRO motion with respect to Plaintiffs' First Amendment claim on June 30, 2023. The remaining allegations of Paragraph 8 state legal conclusions and require no response from Defendant.

9.      With respect to the Hospitalization Requirement, the Parties stipulated that the requirement takes effect on October 1, 2023. *See* DE 30 (Joint Stip.) at 2. Therefore, the Court denied as unnecessary the TRO request as to that claim. *See* DE 31 (TRO) at 9.

**ANSWER:** Defendant admits that the Parties stipulated as described in Paragraph 9 and that the Court denied Plaintiffs' TRO motion with respect to this claim. The remaining allegations of Paragraph 9 state legal conclusions and require no response from Defendant.

5

10.     H.B. 190 amended S.B. 20's IUP Documentation Requirement, but the Court concluded that this amendment did not resolve the vagueness issue. *Id.* at 6–7. As a result, the Court granted Plaintiffs' TRO motion with respect to this requirement, blocking its enforcement before its effective date on July 1, 2023. *Id.* at 8–9.

**ANSWER:** Defendant admits that the Court granted Plaintiffs' TRO motion with respect to the IUP Documentation Requirement. The remaining allegations of Paragraph 10 state legal conclusions and require no response from Defendant.

11.     As issued on June 30, the TRO was to remain in effect until noon on July 14, 2023. *Id.* at 10. On July 5, 2023, by consent of the Parties, the Court entered an order extending the TRO until the Court rules on either Plaintiffs' motion for a preliminary injunction or their renewed motion for a preliminary injunction, which Plaintiffs will submit by July 24, 2023. *See* DE 35 (Consent Order Extending TRO); 37 (Scheduling Order).

**ANSWER:** Defendant admits the allegations in Paragraph 11.

12.     The Court further directed Plaintiffs to file an amended complaint by July 17, 2023. DE 37 (Scheduling Order) at 1.

**ANSWER:** Defendant admits the allegations in Paragraph 12.

6

13.     As a result of the changes to the Act, many of Plaintiffs' original claims have been resolved. However, (1) Plaintiffs maintain their due process challenges to the IUP Requirement; (2) PPSAT maintains its due process and equal protection challenges to the Hospitalization Requirement; and (3) Dr. Gray adds to the Amended Complaint allegations about the vagueness of the Induction Abortion Ban.

**ANSWER:** Defendant admits that Plaintiffs maintain their challenges to the IUP Requirement and the Hospitalization Requirement and that Plaintiff Dr. Gray adds a vagueness challenge to the Induction Abortion Ban. The remaining allegations of Paragraph 13 state legal conclusions and require no response from Defendant.

14.     Plaintiffs who fail to comply with the Act will face disciplinary action, and violations of some sections of the Act carry felony criminal penalties. *See* N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B; *see also* N.C. Gen. Stat. § 14-23.7(1).

**ANSWER:** The provisions of the Act speak for themselves and serve as the best evidence of their own contents.

15.     The Act will harm North Carolinians by delaying—and even, at times, denying—their access to necessary health care. The IUP Documentation Requirement will harm patients by preventing them from accessing medication abortion before an intrauterine pregnancy can be seen on ultrasound. This may delay patients' access to

7

abortion care, unnecessarily exposing them to increased medical risk, or compel them to consider a procedural abortion, even though for some patients, medication abortion offers important advantages over procedural abortion. For example, survivors of sexual assault may decide to have a medication abortion because they do not want instruments placed in their vagina. This is relevant to the IUP Requirement as well as the Induction Abortion Ban, which seemingly prohibits the use of medication to induce abortion in the second-trimester in the hospital setting for sexual assault survivors. Moreover, an induction abortion may be safer and faster for some patients.

    **ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 15.


16.    And the Hospitalization Requirement will have devastating consequences for survivors of sexual violence and patients with diagnoses of "life-limiting anomalies" by limiting the number of providers available to these patients, increasing the expense of abortion and delaying or denying access to desperately needed care. These heightened barriers will force patients who are already facing personal hardship and even trauma due to the circumstances of their pregnancies to remain pregnant against their will even longer.

    **ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 16.

17.     In particular, the Act is an attack on families with low incomes, North Carolinians of color, and rural North Carolinians, who already face inequities in access to medical care and who will bear the brunt of the Act's cruelties. While forced pregnancy carries health risks for everyone, it imposes greater risks for those already suffering from health inequities. Black women, who in North Carolina are more than three times as likely as white women to die during pregnancy, will acutely feel the Act's harms. Furthermore, North Carolinians face a critical shortage of reproductive health care providers, including obstetrician-gynecologists, especially in rural areas.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 17.

18.     While the U.S. Supreme Court last year held that the right to abortion is no longer a fundamental substantive due process right under the Fourteenth Amendment, that amendment nonetheless protects other rights guaranteed to Plaintiffs and their patients. The Supreme Court's decision did not insulate abortion restrictions from court review if, as here, those restrictions are vague, irrational, and inflict a high risk of suffering for no legitimate governmental purpose.

**ANSWER:** The allegations of Paragraph 18 state legal conclusions and require no response from Defendant.

9

19.     Plaintiffs seek declaratory and injunctive relief from those constitutional deprivations.

**ANSWER:** Defendant admits that Plaintiffs seek declaratory and injunctive relief as described.


## II.     JURISDICTION AND VENUE

20.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343(a)(3).

**ANSWER:** The allegation of Paragraph 20 states a legal conclusion and requires no response from Defendant.


21.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

**ANSWER:** The allegations of Paragraph 21 state legal conclusions and require no response from Defendant.


22.     Venue is appropriate under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district and because Defendants Jim O'Neill, Jeff Nieman, Satana Deberry, and Avery Crump reside

10

in this district.

**ANSWER:** Defendant admits, on information and belief, that Defendants Jim O'Neill, Jeff Nieman, Satana Deberry, and Avery Crump reside in this district. The remaining allegations of Paragraph 22 state legal conclusions and require no response from Defendant.

## III.    PLAINTIFFS

23.    Plaintiff PPSAT is a not-for-profit corporation organized under the laws of North Carolina, operating nine health centers throughout the state, located in Asheville, Chapel Hill, Charlotte, Durham, Fayetteville, Greensboro, Raleigh, Wilmington, and Winston-Salem, as well as in South Carolina, Virginia, and West Virginia. Depending on the location, PPSAT health centers provide a broad range of reproductive and sexual health services, including cervical cancer screenings; breast and annual gynecological exams; family planning counseling; pregnancy testing and counseling; reproductive health education; testing and treatment for sexually transmitted infections; contraception; procedural and medication abortion services and related care; prenatal consultation; primary care; gender affirming hormone therapy; and health care related to miscarriage. PPSAT sues on behalf of itself, its staff, and its patients.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 23.

11

24.     Plaintiff Dr. Gray is a physician licensed to practice medicine in the State of North Carolina and is board-certified in obstetrics and gynecology. She currently provides a range of obstetric and gynecological services, including abortion care, in Durham and provides contraceptive and gynecological care, including abortion care, in Chapel Hill and Fayetteville. Dr. Gray provides abortion both in a hospital setting and in licensed outpatient abortion clinics. Dr. Gray sues on behalf of herself and her patients.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 24.

## IV.    DEFENDANTS

25.     Defendant Joshua Stein is the Attorney General of North Carolina. Defendant Stein is authorized to seek injunctive relief against willful violations of the Act. N.C. Gen. Stat. § 90-21.88. Defendant Stein also bears the duty of consulting with and advising prosecutors, upon request, and represents the State of North Carolina in certain criminal proceedings. *Id.* § 114-2(1), (4). Defendant Stein is sued in his official capacity.

**ANSWER:** Defendant admits that he is the Attorney General for the State of North Carolina and is sued in his official capacity. The provisions in N.C. Gen. Stat. §§ 90-21.88, 114-2(1), and (4) speak for themselves and serve as the best evidence of their own content.

26.     Defendant Todd M. Williams is the District Attorney for Prosecutorial District 40, which includes the city of Asheville. Defendant Williams has the authority to prosecute violations of certain sections of the Act. N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B. Defendant Williams is sued in his official capacity.

**ANSWER:** Defendant admits that Defendant Williams is the District Attorney for Prosecutorial District 40, which includes the city of Asheville, and that Defendant Williams is sued in his official capacity. The provisions in N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B speak for themselves and serve as the best evidence of their own content.

27.     Defendant Jim O'Neill is the District Attorney for Prosecutorial District 31, which includes the city of Winston-Salem. Defendant O'Neill has the authority to prosecute violations of certain sections of the Act. N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B. Defendant O'Neill is sued in his official capacity.

**ANSWER:** Defendant admits that Defendant O'Neill is the District Attorney for Prosecutorial District 31, which includes the city of Winston-Salem, and that Defendant O'Neill is sued in his official capacity. The provisions in N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B speak for themselves and serve as the best evidence of their own content.

28.     Defendant Spencer B. Merriweather III is the District Attorney for Prosecutorial District 26, which includes the city of Charlotte. Defendant Merriweather has

the authority to prosecute violations of certain sections of the Act. N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B. Defendant Merriweather is sued in his official capacity.

**ANSWER:** Defendant admits that Defendant Merriweather is the District Attorney for Prosecutorial District 26, which includes the city of Charlotte, and that Defendant Merriweather is sued in his official capacity. The provisions in N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B speak for themselves and serve as the best evidence of their own content.

29.    Defendant Avery Crump is the District Attorney for Prosecutorial District 24, which includes the city of Greensboro. Defendant Crump has the authority to prosecute violations of certain sections of the Act. N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B. Defendant Crump is sued in her official capacity.

**ANSWER:** Defendant admits that Defendant Crump is the District Attorney for Prosecutorial District 24, which includes the city of Greensboro, and that Defendant Crump is sued in her official capacity. The provisions in N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B speak for themselves and serve as the best evidence of their own content.

30.    Defendant Jeff Nieman is the District Attorney for Prosecutorial District 18, which includes the city of Chapel Hill. Defendant Nieman has the authority to prosecute violations of certain sections of the Act. N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B.

14

Defendant Nieman is sued in his official capacity.

**ANSWER:** Defendant admits that Defendant Nieman is the District Attorney for Prosecutorial District 18, which includes the city of Chapel Hill, and that Defendant Nieman is sued in his official capacity. The provisions in N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B speak for themselves and serve as the best evidence of their own content.

31. Defendant Satana Deberry is the District Attorney for Prosecutorial District 16, which includes the city of Durham. Defendant Deberry has the authority to prosecute violations of certain sections of the Act. N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B. Defendant Deberry is sued in her official capacity.

**ANSWER:** Defendant admits that Defendant Deberry is the District Attorney for Prosecutorial District 16, which includes the city of Durham, and that Defendant Deberry is sued in her official capacity. The provisions in N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B speak for themselves and serve as the best evidence of their own content.

32. Defendant William West is the District Attorney for Prosecutorial District 14, which includes the city of Fayetteville. Defendant West has the authority to prosecute violations of certain sections of the Act. N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B. Defendant West is sued in his official capacity.

**ANSWER:** Defendant admits that Defendant West is the District Attorney for

15

Prosecutorial District 14, which includes the city of Fayetteville, and that Defendant West is sued in his official capacity. The provisions in N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B speak for themselves and serve as the best evidence of their own content.

33.     Defendant Lorrin Freeman is the District Attorney for Prosecutorial District 10, which includes the city of Raleigh. Defendant Freeman has the authority to prosecute violations of certain sections of the Act. N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B. Defendant Freeman is sued in her official capacity.

**ANSWER:** Defendant admits that Defendant Freeman is the District Attorney for Prosecutorial District 10, which includes the city of Raleigh, and that Defendant Freeman is sued in her official capacity. The provisions in N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B speak for themselves and serve as the best evidence of their own content.

34.     Defendant Benjamin R. David is the District Attorney for Prosecutorial District 6, which includes the city of Wilmington. Defendant David has the authority to prosecute violations of certain sections of the Act. N.C. Gen. Stat. §§ 90-21.81A, 90-21.81B. Defendant David is sued in his official capacity.

**ANSWER:** Defendant admits that Defendant David is the District Attorney for Prosecutorial District 6, which includes the city of Wilmington, and that Defendant David is sued in his official capacity. The provisions in N.C. Gen. Stat. §§ 90-21.81A, 90-

21.81B speak for themselves and serve as the best evidence of their own content.

35.     Defendant Kody H. Kinsley is the Secretary of the Department of Health and Human Services. The Department regulates abortion clinics in North Carolina and is authorized to investigate complaints "relative to the care, treatment or complications of any patient." 10A N.C. Admin. Code 14E.0111. Defendant Kinsley is sued in his official capacity.

**ANSWER:** Defendant admits that Defendant Kinsley is the Secretary of the Department of Health and Human Services and is sued in his official capacity. The provisions in 10A N.C. Admin. Code 14E.0111 speak for themselves and serve as the best evidence of their own content.

36.     Defendant Michaux R. Kilpatrick is the President of the North Carolina Medical Board. The Medical Board licenses physicians and other health care professionals. Doctors who violate the Act are subject to discipline by the Medical Board. N.C. Gen. Stat. § 90-21.88A. Furthermore, the Medical Board has the power to place health care professionals on probation, impose other sanctions, or suspend or revoke their licenses for a variety of acts or conduct, including "[p]roducing or attempting to produce an abortion contrary to law." N.C. Gen. Stat. §§ 90-14(a)(2), 90-14(h), 90-14.5(c); 21 N.C. Admin.

17

Code 32N.0111(b). Defendant Kilpatrick is sued in her official capacity.

**ANSWER:** Defendant admits that Defendant Kilpatrick is the President of the North Carolina Medical Board and is sued in her official capacity. The provisions in N.C. Gen. Stat. §§ 90-21.88A, 90-90-14(a)(2), 90-14(h), 90-14.5(c), and 21 N.C. Admin. Code 32N.011(b) speak for themselves and serve as the best evidence of their own content.

37.     Defendant Racquel Ingram is the Chair of the North Carolina Board of Nursing. The Board of Nursing regulates the practice of nursing in the state and oversees licensing for the various nursing professions. Nurses who violate the Act are subject to discipline by the Board of Nursing. N.C. Gen. Stat. § 90-21.88A. Defendant Ingram is sued in her official capacity.

**ANSWER:** Defendant admits that Defendant Ingram is the Chair of the North Carolina Board of Nursing and is sued in her official capacity. The provisions in N.C. Gen. Stat. § 90-21.88A speak for themselves and serve as the best evidence of their own content.

## V.     STATUTORY FRAMEWORK

38.     Prior to the Act, abortion was broadly lawful in North Carolina before 20 weeks of pregnancy and was provided safely and routinely at licensed outpatient abortion clinics like PPSAT's. Patients seeking abortion were required to obtain certain state-

18

mandated information from a "qualified professional" 72 hours in advance of the procedure. The information could be given either in person or by telephone, and providers were subject to certain reporting requirements. *See* N.C. Gen. Stat. § 90-21.82.

**ANSWER:** Defendant admits, on information and belief, that abortion has been provided safely and routinely at licensed outpatient abortion clinics in North Carolina for many decades. Otherwise, the allegations of Paragraph 38 state legal conclusions and require no response from Defendant. Furthermore, the statute cited in Paragraph 38 speaks for itself and serves as the best evidence of its own contents.

39.     Enacted with limited debate and over the Governor's veto, the Act radically overhauled North Carolina's abortion restrictions in numerous ways: banning abortion after the twelfth week of pregnancy with a few narrow exceptions, making the mandated counseling requirement more onerous and requiring that it be done in person, and imposing much more burdensome reporting requirements. As explained above, Part I of the Act took effect on July 1, 2023 (except the provision blocked by this Court) and Part II of the Act is set to take effect on October 1, 2023.

**ANSWER:** The allegations of Paragraph 39 state legal conclusions and require no response from Defendant. Furthermore, the statutes cited in Paragraph 39 speak for themselves and serve as the best evidence of their own contents.

19

40.     For the purposes of this First Amended Complaint, the relevant changes to the abortion laws are as follows.

**ANSWER:** Defendant admits that Plaintiffs list the changes that Plaintiffs believe are relevant in the paragraphs that follow.

41.     The Act repeals section 14-45.1 of the General Statutes of North Carolina, which included a long list of circumstances under which abortion was lawful, and newly provides: "It shall be unlawful after the twelfth week of a woman's pregnancy to procure or cause a miscarriage or abortion in the State of North Carolina." N.C. Gen. Stat. § 90-21.81A(a).

**ANSWER:** The statutes cited in Paragraph 41 speak for themselves and serve as the best evidence of their own contents.

42.     After twelve weeks, there are limited exceptions, which include:

a.      When a physician determines there is a medical emergency, *id.* § 90-21.81B(1);

b.      Through the twentieth week of pregnancy, when the procedure is performed by a qualified physician in a suitable facility and when the pregnancy is a result of rape or incest, *id.* § 90-21.81B(3); and

c.      During the first twenty-four weeks of pregnancy, if a qualified physician

20

determines there exists a life-limiting anomaly, *id.* § 90- 21.81B(4).

**ANSWER:** The statutes cited in Paragraph 42 speak for themselves and serve as the best evidence of their own contents.

43.     Despite the subsections providing that abortions in the case of rape or incest may be provided in a "suitable facility," *id.* § 90-21.81B(3), and that abortions in the case of "life-limiting anomaly" may be provided upon referral by a "qualifying physician," *id.* § 90-21.81B(4), the Act elsewhere states that "[a]fter the twelfth week of pregnancy, a physician licensed to practice medicine under this Chapter may not perform a surgical abortion as permitted under North Carolina law in any facility other than a hospital," *id.* § 90-21.82A(c), and defines "abortion clinic" as a facility that provides abortions "during the first 12 weeks of pregnancy," *id.* § 131E-153.1.

**ANSWER:** The statutes cited in Paragraph 43 speak for themselves and serve as the best evidence of their own contents.

44.     The Act also imposes a host of restrictions on physicians providing an "abortion-inducing drug." Most relevant here, physicians must "[d]ocument in the woman's medical chart the . . . existence of an intrauterine pregnancy." *Id.* § 90-21.83B(a)(7).

**ANSWER:** The statutes cited in Paragraph 44 speak for themselves and serve as

21

the best evidence of their own contents.

45.     A physician who violates any provision of the Act is subject to discipline by the North Carolina Medical Board, and any other licensed health care provider who violates any provision of the Act shall be subject to discipline under their respective licensing agency or board. *Id.* § 90-21.88A.

**ANSWER:** The statute cited in Paragraph 45 speaks for itself and serves as the best evidence of its own contents.

46.     Moreover, certain provisions of the Act carry criminal penalties. Relevant here, providing an abortion that does not fit within the Act's exceptions to the twelve-week ban is a felony. *Id.* §§ 90-21.81A, 90-21.81B; *see also id.* §§ 14-44, -45, -23.7(1).

**ANSWER:** The allegations of Paragraph 46 state legal conclusions and require no response from Defendant. Furthermore, the statutes cited in Paragraph 46 speak for themselves and serve as the best evidence of their own contents.

## VI.     FACTUAL ALLEGATIONS

47.     Abortion is a basic component of comprehensive health care and is one of the safest medical procedures in the United States. All methods of abortion provided by Plaintiffs in licensed abortion clinics—medication abortion, aspiration abortion, and

dilation and evacuation ("D&E")—are simple, straightforward medical treatments that typically take no more than fifteen minutes to perform, involve no incisions, have an extremely low complication rate, and, nationwide, are almost always provided in outpatient, office-based settings.

**ANSWER:** Defendant admits that abortion is a basic component of comprehensive health care and that complications arising from abortion are rare and that abortions are commonly safely performed outside of a hospital in the United States. Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 47.

### Whether the Act Allows Early Medication Abortion

48.     The medication abortion regimen in the first trimester typically involves two medications: mifepristone and misoprostol. The first drug, mifepristone, is a progesterone antagonist, which means that it blocks the body's receptors for progesterone, a hormone required for the continuation of the pregnancy. The patient first takes the mifepristone and then, several hours or days later (usually 24 to 48 hours), takes the misoprostol. Misoprostol causes the uterus to contract and expel its contents, generally within hours.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 48.

49.     PPSAT and Dr. Gray (including when she is providing abortions in the hospital) currently provide this first-trimester medication abortion regimen through the first 77 days (11 weeks) of pregnancy, including—as discussed in detail below—to patients who have a positive pregnancy test but who are too early in their pregnancies for an intrauterine pregnancy to appear on ultrasound.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 49.

50.     For some patients, medication abortion offers important advantages over procedural abortion. Some patients prefer medication abortion because it feels more "natural" to them to have their body expel the pregnancy rather than to have a provider use aspiration or instruments to empty the uterus. Some patients choose medication abortion because of fear or discomfort around a procedure involving aspiration or instruments. For example, survivors of rape and people who have experienced sexual abuse, molestation, or other trauma may choose medication abortion to feel more in control of the experience and to avoid further trauma from having instruments placed in their vaginas.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 50.

51.     Additionally, the logistics of a procedural abortion may be prohibitive for

24

some patients, especially those with lower incomes, those who have difficulty getting time off work and securing childcare, or those who live in rural areas far from facilities where abortion care is provided. Some health care providers charge more for procedural abortions, meaning some patients must wait longer to get an abortion while they gather funds—if they can afford it at all.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 51.

52. Survivors of intimate partner violence in particular may struggle to find such support, as telling their partner they are having an abortion could be dangerous.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 52.

53. The risk of serious complications related to abortion is extremely low, including for abortions provided using the first-trimester medication abortion regimen. According to the FDA, serious adverse events (including death, hospitalization, serious infection, and bleeding requiring transfusion) among mifepristone patients are "exceedingly rare, generally far below 0.1% for any individual adverse event."

**ANSWER:** Defendant admits, on information and belief, that the risk of serious complications related to abortion—including for abortions provided using the first-

25

trimester medication abortion regimen—is extremely low. Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 53.

54.     At early gestational stages, though the patient has a positive pregnancy test, it may be too soon to see an intrauterine gestational sac via ultrasound. In such circumstances, Plaintiffs screen patients for risk of ectopic pregnancy (i.e., a pregnancy that has implanted outside of the uterus). If a provider determines that a patient is at high risk of ectopic pregnancy, they refer the patient to another provider, typically an emergency department.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 54.

55.     If the patient is not at high risk of ectopic pregnancy, the provider follows evidence-based best practices and offers the patient three options for treatment: aspiration abortion, medication abortion, or a follow-up appointment at a later date to see if an intrauterine pregnancy can be seen on an ultrasound at that time. The provider and the patient decide which option is the most appropriate given the patient's particular circumstances.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief

26

as to the truth or falsity of the allegations in Paragraph 55.

56.     If a patient with a pregnancy of unknown location chooses medication abortion, the provider *simultaneously* provides the medication abortion *and* conducts further testing to rule out ectopic pregnancy—specifically, by drawing a blood sample to test the level of the pregnancy hormone human chorionic gonadotropin ("hCG"). These test results usually come back no more than 24 hours later.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 56.

57.     If the blood test results indicate that the patient's hCG levels are sufficiently high (indicating a more developed pregnancy), this may be evidence of ectopic pregnancy. At that point, even if the patient has already taken the medications for medication abortion, the provider will offer the patient the option of returning for an aspiration procedure as a means of *both* testing for ectopic pregnancy and completing the abortion. If the patient with high hCG levels opts for aspiration, then following that procedure, the provider will examine the aspirated uterine contents to see if gestational tissue is identifiable— confirming that the pregnancy was intrauterine and that the abortion is complete. If the patient with high hCG levels does not opt for aspiration, or if a gestational sac is not identifiable following aspiration, the provider may refer the patient for further ectopic

27

evaluation (or, if the patient is already receiving this protocol in the hospital, the hospital may evaluate for ectopic pregnancy).

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 57.

58.     If, however, the patient's hCG levels are low (indicating a pregnancy at a very early gestational age) at the appointment when the medication abortion is provided, the patient's hCG levels are tested again after the abortion. Whether or not the patient's hCG levels have decreased more than 50% after the abortion is evidence whether the pregnancy has been terminated by the medication abortion, or whether there is still a possibility of ectopic pregnancy. Patients whose hCG levels have not decreased sufficiently are further evaluated for ectopic pregnancy, including, where medically indicated, through referral to a hospital provider (or, if the patient is already being seen in the hospital setting, the hospital would offer treatment for ectopic pregnancy).

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 58.

59.     Administration of medication abortion according to this protocol has been shown to be safe and effective in terminating the pregnancy. And at least one study found that this protocol leads to earlier exclusion of ectopic pregnancy than waiting to see if an

28

intrauterine pregnancy can be detected later.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 59.

60.     If a patient with a pregnancy of unknown location were referred to a hospital for ectopic evaluation instead of receiving a medication abortion according to this protocol, the hospital would perform the very same hCG testing that, under the protocol, Plaintiffs perform simultaneously with the medication abortion. Referring a patient for ectopic evaluation instead of providing a medication abortion to a patient with a pregnancy of unknown location therefore does not lead to earlier or more accurate diagnosis of ectopic pregnancy. Instead, it only delays the patient's abortion.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 60.

61.     The Act permits abortion through the twelfth week of pregnancy, but also requires physicians to "[d]ocument in the woman's medical chart the . . . existence of an intrauterine pregnancy" before administering medication abortion. N.C. Gen. Stat. § 90-21.83B(a)(7). The Act therefore does not give Plaintiffs notice as to whether or not they can provide early medication abortion to patients with pregnancies of unknown location. If the IUP Documentation Requirement requires express confirmation of an intrauterine

29

pregnancy *before* administration of medication abortion, it will be impossible for Plaintiffs to comply in the early weeks of pregnancy, and accordingly impossible for Plaintiffs to provide medication abortion to patients at that gestational stage.

**ANSWER:** The allegations of Paragraph 61 state legal conclusions and require no response from Defendant. Furthermore, the statute cited in Paragraph 61 speaks for itself and serves as the best evidence of its own contents.

62.     If the Act denies patients in this situation access to medication (but not procedural) abortion, it is irrational. And it will harm Plaintiffs' patients by forcing them to have a procedural abortion when they have important reasons for choosing a safe, non-invasive method of abortion, or to wait and potentially make additional visits to the health center and seek abortion later in pregnancy (but before 12 weeks) for no medical reason.

**ANSWER:** The allegations of Paragraph 62 state legal conclusions and require no response from Defendant.

Hospitalization Requirement for Procedural Abortions Under Exceptions After the Twelfth Week of Pregnancy

63.     The Act requires "surgical," or procedural, abortions after the twelfth week of pregnancy to be provided in a hospital. PPSAT would provide abortions after the twelfth week of pregnancy under the rape and incest and life-limiting anomaly exceptions but for

30

this prohibition.

**ANSWER:** The Act cited in Paragraph 63 speaks for itself and serves as the best evidence of its contents. Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of PPSAT's intention to provide abortions after the twelfth week of pregnancy under the rape and incest and life-limiting anomaly exceptions.

64.     It is irrational to require one of the safest outpatient medical procedures in the United States to be performed in a hospital, particularly for patients who have already suffered trauma or patients who a referring physician has already determined may safely receive care at one of PPSAT's licensed abortion clinics.

**ANSWER:** The allegations of Paragraph 64 state legal conclusions and require no response from Defendant.

65.     Although certain outpatient abortion methods are sometimes referred to as "surgical abortion," that is a misnomer, as they do not entail the typical characteristics of surgery, such as an incision into bodily structures or general anesthesia. According to the American College of Obstetricians and Gynecologists, the leading professional organization for obstetrician-gynecologists, these methods are more appropriately characterized as a procedure, which is defined as a "short interventional technique that includes the following general categories . . . non-incisional diagnostic or therapeutic

31

intervention through a natural body cavity or orifice" and is "generally associated with lower risk of complications."

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 65. Furthermore, the writings from the American College of Obstetricians and Gynecologists in Paragraph 65 speak for themselves and serve as the best evidence of their own contents.

66.     In licensed abortion clinics, Plaintiffs provide procedural abortion using two common methods: aspiration abortion, which is available up to approximately 14 weeks of pregnancy, and dilation and evacuation abortion, or "D&E," which is available after approximately 14 weeks of pregnancy, depending on the provider's individual practice and the patient's individual medical characteristics.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 66.

67.     For aspiration abortion, the provider passes a small plastic tube, called a cannula, through the patient's vagina and cervical opening. The cannula is attached to a syringe or electrical pump that creates gentle suction to empty the uterus. The entire procedure takes three to five minutes. Aspiration abortion involves no incision, cutting, or suturing. The same procedure is used to manage incomplete miscarriages.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 67.

68.     For D&E, the provider uses a combination of gentle suction and additional instruments, including specialized forceps, to evacuate the uterus. Before starting the evacuation procedure, the provider dilates the patient's cervix using medications, osmotic dilators, and/or mechanical dilators. Once the cervix is sufficiently dilated, the provider empties the uterus using instruments or a combination of suction and instruments. Mild to moderate sedation may be used. The entire evacuation procedure typically takes up to fifteen minutes. Like aspiration abortion, D&E does not involve any incision, cutting, or suturing. D&E is also used to manage incomplete miscarriages.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 68.

69.     Serious complications—that is, complications requiring hospitalization, surgery, or blood transfusion—from abortion care are exceedingly rare, occurring in fewer than 1% of abortions.

**ANSWER:** Defendant admits that serious complications arising from abortion care are exceedingly rare. Defendant lacks knowledge or information sufficient to for a

33

belief as to the truth or falsity of the remaining allegations in Paragraph 69.

70.     Abortion is far safer than continuing a pregnancy to term and childbirth. Indeed, the mortality rate for childbirth is approximately 12–14 times greater than that associated with abortion. Complications related to carrying a pregnancy to term and childbirth also are much more common than abortion-related complications.

**ANSWER:** Defendant admits, on information and belief, that the mortality rate for childbirth in the United States is as much as 14 times greater than the mortality rate associated with abortion in the United States. Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 70.

71.     In the exceedingly rare event of a complication requiring hospital-based care, established policies and protocols ensure the patient's care is safely transferred to a hospital-based provider. These are the same policies and protocols that are followed for comparable outpatient gynecological or other procedures, as well as for those that carry greater risks.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 71.

34

72.     Because of the extraordinary safety profile of procedural abortions in the outpatient setting, courts have repeatedly found that there is no medical basis for requiring procedural abortions be performed in hospitals. *See, e.g.*, *Doe v. Bolton*, 410 U.S. 179, 193–95 (1973); *City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 433-34 (1983); *Planned Parenthood Ass'n of Kan. City v. Ashcroft*, 462 U.S. 476, 481–82 (1983).

**ANSWER:** The cases cited in Paragraph 72 speak for themselves and serve as the best evidence of their contents.


73.     The Act singles out procedural abortion even though it is analogous in terms of risks, invasiveness, instrumentation, and duration to other gynecological procedures that also take place in outpatient settings. In addition to being identical to the procedures used to manage miscarriage, procedural abortions are also substantially similar in technique and risk to certain outpatient diagnostic procedures that are used to remove tissue from the uterus for testing (though different levels of sedation may be used).

**ANSWER:** The Act cited in Paragraph 73 speaks for itself and serves as the best evidence of its contents. Defendant admits, on information and belief, that procedural abortion is identical to the procedures used to manage miscarriage and that miscarriage care is provided in the outpatient setting. Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in

35

Paragraph 73.

74.     Moreover, the mortality risk for abortion is lower than that of many other common procedures that are not required to be performed in a hospital. For example, one recent and robust analysis found that in the United States, the mortality rate for colonoscopy is 2.9 per 100,000 procedures; the mortality rate for tonsillectomy ranges from 2.9 to 6.3 per 100,000 procedures; and the mortality rate for plastic surgery is 0.8 to 1.7 per 100,000 procedures. By contrast, the mortality rate for legal induced abortion is only 0.7 per 100,000 procedures. These procedures of greater risk are routinely provided on an outpatient basis outside the hospital setting.

**ANSWER:** Defendant admits, on information and belief, that the mortality risk for abortion in the United States is lower than that of other common procedures that are not required to be performed in a hospital. Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 74.

75.     There is no rational basis for mandating that procedural abortions be provided in hospitals while continuing to allow identical or nearly identical procedures to take place in outpatient settings.

**ANSWER:** The allegation in Paragraph 75 states a legal conclusion and requires

36

no response from Defendant.

76.     Forcing patients to seek abortions at hospitals does not improve patient health and safety, and instead only serves to harm survivors of sexual assault and patients with diagnoses of life-limiting anomalies by limiting their options for access to care without medical justification. These harms will be borne most heavily by patients who are lower income, have trouble getting off work and/or securing childcare to seek a hospital-based procedure, or who live in rural areas far from hospitals that offer abortion care.

**ANSWER:** Defendant admits, on information and belief, that abortion has been provided safely and routinely outside of hospitals in North Carolina for many decades. Defendant further admits, on information and belief, that requiring all abortions after the twelfth week of pregnancy to take place in a hospital will impose a range of burdens on patients, including reductions in the range of options for access to care.  Otherwise, the allegations in Paragraph 76 state legal conclusions and require no response from Defendant.

Whether Induction Abortion Is Permitted for Rape and Incest Survivors After the Twelfth Week of Pregnancy

77.     Many North Carolina hospitals, including the one where Dr. Gray provides abortion, offer labor induction abortion to patients in the second trimester. This type of

37

abortion involves the use of medications to induce labor pre-viability in the second trimester in a hospital setting.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 77.

78. The Act's definition of "medical abortion" seems to include the use of medication for second-trimester induction abortion because it is defined broadly as "[t]he use of any medicine, drug, or other substance intentionally to terminate the pregnancy of a woman known to be pregnant." N.C. Gen. Stat. § 90-21.81(4e).

**ANSWER:** The allegations of Paragraph 78 state legal conclusions and require no response from Defendant. Furthermore, the statutes cited in Paragraph 78 speak for themselves and serve as the best evidence of their own contents.

79. It is unclear whether Dr. Gray can provide induction abortion at the hospital after the twelfth week of pregnancy to rape and incest survivors. The exception to the Act for rape or incest says that abortion can be provided "[a]fter the twelfth week and through the twentieth week of a woman's pregnancy, when the procedure is performed by a qualified physician in a suitable facility in accordance with G.S. 90-21.82A." *Id.* § 90-21.81B(3). For purposes of this provision, "abortion" refers to both medication and procedural methods. *See id.* § 90-21.81(1).

38

**ANSWER:** The allegations of Paragraph 79 state legal conclusions and require no response from Defendant. Furthermore, the statutes cited in Paragraph 79 speak for themselves and serve as the best evidence of their own contents.

80.     N.C. Gen. Stat. § 90-21.82A, however, only explicitly discusses "suitable facilities" for "surgical abortion." Accordingly, it is unclear whether Dr. Gray can provide induction abortion to rape and incest survivors after the twelfth week of pregnancy in the hospital.

**ANSWER:** The allegations of Paragraph 80 state legal conclusions and require no response from Defendant. Furthermore, the statute cited in Paragraph 80 speaks for itself and serves as the best evidence of its own contents.

81.     As discussed above, some rape and incest survivors decide to have first-trimester medication abortion to avoid the insertion of instruments in their vagina. The same rationale applies in the context of rape and incest survivors seeking second-trimester abortion who decide to have a labor induction abortion.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 81.

## CLAIMS FOR RELIEF
## FIRST CLAIM FOR RELIEF DUE PROCESS—VAGUENESS

82. The allegations of paragraphs 1 through 81 are incorporated as though fully set forth herein.

**ANSWER:** Defendant incorporates by reference and reasserts his responses to Plaintiffs' allegations in all of the Paragraphs of this Answer, as though fully set forth herein.

83. The IUP Documentation Requirement in N.C. Gen. Stat. § 90- 21.83B(a)(7), the Hospitalization Requirement in N.C. Gen. Stat. § 90-21.81B(3) and (4), and the Induction Abortion Ban in N.C. Gen. Stat. § 90-21.81B(3) violate Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution because they fail to give Plaintiffs fair notice of the requirements of the Act and encourage arbitrary and discriminatory enforcement.

**ANSWER:** The allegations of Paragraph 83 state legal conclusions and require no response from Defendant.

## SECOND CLAIM FOR RELIEF
## DUE PROCESS AND EQUAL PROTECTION

84. The allegations of paragraphs 1 through 83 are incorporated as though fully set forth herein.

**ANSWER:** Defendant incorporates by reference and reasserts his responses to Plaintiffs' allegations in all of the Paragraphs of this Answer, as though fully set forth herein.

85.     The IUP Documentation Requirement in N.C. Gen. Stat. § 90-21.83B(a)(7) and the Hospitalization Requirement in N.C. Gen. Stat. §§ 90-21.81B(3), -(4), 90-21.82A, and 131E-153.1 violate Plaintiffs' and their patients' due process rights because they require changes to the provision of medical care that are not rationally related to any legitimate state interest and cause unnecessary delay, suffering, and trauma for patients.

**ANSWER:** The allegations of Paragraph 85 state legal conclusions and require no response from Defendant.

86.     Moreover, requiring hospitalization for abortion in the case of rape or incest or life-limiting anomaly after the twelfth week of pregnancy violates the Equal Protection Clause because it singles out one politically stigmatized treatment, abortion, while allowing other similarly situated procedures, including the treatment of miscarriage at the same gestational age, to be provided in an outpatient setting. This classification does not further any legitimate state interest and instead serves only to harm those seeking abortions under the Act's rape or incest exception.

**ANSWER:** The allegations of Paragraph 86 state legal conclusions and require no

41

response from Defendant.

## **PRAYER FOR RELIEF**

Defendant Attorney General Stein admits that Plaintiffs seek the relief described in the prayer for relief.

## **FURTHER DEFENSES**

Defendant Stein pleads and reserves the right to assert any further defenses that may become apparent during the course of litigation and discovery.

Respectfully submitted this 31st day of July, 2023.

JOSHUA H. STEIN
Attorney General

Sarah G. Boyce
Deputy Attorney General and
General Counsel
N.C. State Bar 56896
sboyce@ncdoj.gov

Sripriya Narasimhan
Deputy General Counsel
N.C. State Bar 57032
snarasimhan@ncdoj.gov

Amar Majmundar
Senior Deputy Attorney General
N.C. State Bar 24668
amajmundar@ncdoj.gov

Stephanie A. Brennan
Special Deputy Attorney General
N.C. State Bar 35955

42

sbrennan@ncdoj.gov

/s/ South A. Moore
South A. Moore
Assistant General Counsel
N.C. State Bar 55175
smoore@ncdoj.gov

*Counsel for Defendant Attorney General Stein*

North Carolina Dept. of Justice
P.O. Box 629
Raleigh, NC 27602
Phone: 919-716-6900
Fax: 919-716-6758

43

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I electronically filed the foregoing document with the clerk of Court using the CM/ECF system which will send notification of such to all counsel of record in this matter.

This 31st day of July, 2023.

<u>/s/ South A. Moore</u>
South A. Moore
Assistant General Counsel
