# EXHIBIT 2

| | |
|---|---|
| PLANNED PARENTHOOD SOUTH ATLANTIC, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| JOSHUA STEIN, *et al.*, | ) ) |
| Defendants, | ) ) |
| and | ) ) |
| PHILIP E. BERGER, *et al.*, | ) ) |
| Intervenor-Defendants. | ) ) |

Case No. 1:23-cv-00480-CCE-LPA

**REBUTTAL DECLARATION OF KATHERINE FARRIS, M.D., IN SUPPORT OF PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION**

I, Katherine Farris, M.D., declare as follows:

1. I have reviewed the declarations of Drs. Monique Chireau Wubbenhorst and Susan Bane and in response offer the following additional information about Planned Parenthood South Atlantic ("PPSAT"), my medical practice, the Hospitalization Requirement, and the IUP Documentation Requirement. This rebuttal report responds to certain of the statements and opinions expressed in the reports I reviewed; the fact that I do not address every statement or issue raised in their reports does not suggest that I agree with them.

2. I previously submitted a declaration in this case, which I executed on July 24, 2023. Decl. of Katherine Farris, M.D., in Supp. of Pls.' Am. Mot. for Prelim. Inj. ("First Farris Decl."), DE 49-1. That declaration described my qualifications as a board-certified

1

physician licensed to practice medicine, an expert in abortion care, and PPSAT's Chief Medical Officer.

3. Like the opinions in my original declaration, the opinions in this rebuttal declaration are based on my education, my years of medical practice, my expertise as a doctor and specifically as an abortion provider, my personal knowledge, my review of PPSAT business records, information obtained through the course of my duties at PPSAT, and my familiarity with relevant medical literature and statistical data recognized as reliable in the medical profession.

The Safety of Abortion and PPSAT's Handling of its Rare Complications

4. Intervenors' experts go to great lengths to characterize abortion as unsafe and risky. However, the reality remains that abortion is extremely safe. *See* First Farris Decl. ¶¶ 29-47.

5. Complications from abortions are exceedingly rare, both generally and at PPSAT in particular. Drs. Wubbenhorst and Bane refer to the risk of hemorrhage. *See, e.g.,* Decl. of Monique Chireau Wubbenhorst, M.D., M.P.H. ("Wubbenhorst Decl."), DE 65-1 ¶ 151 , Decl. of Susan Bane, M.D., Ph.D. ("Bane Decl."), DE 65-3 ¶ 35. First, a small amount of bleeding during a procedural abortion is expected and managed; the average procedural abortion patient loses less than 100 cubic centimeters ("ccs") of blood. For comparison, blood loss during a vaginal delivery is closer to 400 ccs in the majority of patients, and blood loss during a Cesarean section is often greater. Hemorrhage, generally understood as losing 500 or more ccs of blood, is rare during a procedural abortion.

Moreover, PPSAT is equipped to treat blood loss in our clinics on the rare occasions when it is necessary to do so. Treatment methods include providing medications (such as misoprostol, methergine, tranexamic acid, or pitocin) or mechanical interventions (such as re-suction, uterine massage, or intrauterine tampenade with a foley catheter) depending on the circumstances of the case. Many of these same treatments would be provided in a hospital in similar circumstances, and they are usually adequate to treat heavy bleeding. Dr. Wubbenhorst's assertion that PPSAT cannot manage potential hemorrhage because of staffing logistics, Wubbenhorst Decl. ¶ 287, is incorrect. For virtually all of the small number of patients affected, hemorrhage happens during or immediately after a procedural abortion, at which point PPSAT is able to treat the patient on-site or, in rare cases, transfer the patient to a hospital for additional care. From January 2020 to June 2023, 0.04% of PPSAT patients in North Carolina were transferred to a hospital for treatment of hemorrhage following an abortion.

6. Another infrequent complication is infection, but this would not develop at the time the patient is in the health center (or the hospital) for an abortion. Rather, it would manifest days after a patient has a procedural abortion or after a medication abortion patient has taken the second medication. If a patient later presents with symptoms of endometritis, which is inflammation of the uterine lining, we confirm endometritis with a physical exam and/or an ultrasound. We then treat the patient with an antibiotic injection, followed up by oral antibiotics. We do a follow-up appointment 48-72 hours after starting antibiotics to make sure that the patient is improving, then have them finish their course

of oral antibiotics and return for another follow-up appointment within seven days. If there is retained pregnancy tissue in the uterus — which is also rare — we offer the patient additional treatment to remove the tissue using medication or a suction procedure. This would be the same treatment as if a patient presented after having an abortion at a hospital.

7. Cervical lacerations from procedural abortion are also incredibly rare. When they do occur, PPSAT is able to treat them with stitches. From January 2020 through June 2023, none of PPSAT's North Carolina abortion patients required hospital transfers as a result of cervical lacerations. Uterine perforation is similarly rare and would be treated with either transfer to a hospital or, if the patient is completely stable, close observation and follow-up. From January 2020 through June 2023, 0.005% of abortion patients at PPSAT in North Carolina were transferred to a hospital for treatment of uterine perforation. Similarly, perforation of the colon (which is much more dangerous, because it exposes the membrane lining the walls of the abdominal cavity to bowel bacteria) can occur during a colonoscopy, and colonoscopies are not required to be performed in hospitals.

8. Overall, PPSAT transferred 31 of its 38,795 North Carolina abortion patients to hospitals in three and a half years. Only 7 of those patients required admission, and all 31 were released in stable condition. These infrequent emergency transfers are not logistically difficult, since PPSAT has relationships with hospitals close to our clinics and we have clear protocols for emergency management while we are awaiting transport and for a smooth hand-off to the receiving institution.

9. The Intervenors and their experts suggest that the Hospitalization Requirement is not burdensome because I and the other PPSAT physicians can just obtain hospital admitting privileges and perform abortions at hospitals. That is not the case. Requiring our physicians to obtain admitting privileges at hospitals would be prohibitively difficult. Admitting privileges are a business agreement based on the amount of business that a health care provider does with a hospital. Because abortion is so safe and hospital transfers are so rare, it would be incredibly difficult and time-consuming for me and other PPSAT providers to obtain them.

10. Furthermore, expense to our patients is also a factor. As I mentioned in my prior declaration, some of the abortions that PPSAT provides are for patients who have been referred to us by hospital providers. First Farris Decl. ¶ 8. Many of those patients prefer to receive an abortion at PPSAT because receiving one in a hospital would be prohibitively expensive. Requiring hospitalization would hurt many people's ability to receive care. Indeed, many abortion providers specifically choose to work in outpatient clinics because we know we will be providing care in settings where all of the patient-facing staff are supportive and non-judgemental of that care and where the care will be much more affordable to patients.

PPSAT's Treatment of Patients with Pregnancies of Unknown Location

11. Contrary to the assertions made by Drs. Wubbenhorst and Bane, the ability to provide immediate abortion care for patients with pregnancies of unknown location offers important benefits to those patients without compromising their safety. *See* Decl.

5

of Christy M. Boraas Alseben, M.D., M.P.H. in Supp. of Pls.' Am. Mot. for a Prelim. Inj. (DE 49-2) ("First Boraas Decl.") ¶¶ 41-51. Dr. Wubbenhorst in particular states repeatedly that ectopic pregnancy is a contraindication to medication abortion. *See* Wubbenhorst Decl. ¶¶ 247, 251. However, this is not because there is any safety issue with the provision of medication abortion to a patient with an ectopic pregnancy, as she implies, but rather because medication abortion does not treat ectopic pregnancy—i.e., it is not effective, but it is also not harmful as she suggests. PPSAT's protocol for treating patients whose pregnancies are too early to see by ultrasound and who are at low risk of ectopic pregnancy both ensures the timely provision of abortion care *and* that the patient receives further testing to identify or rule out ectopic pregnancy. *See* First Farris Decl. ¶¶ 51-59.

12. We screen patients with pregnancy of unknown location in a variety of ways, including by obtaining a detailed menstrual history, pregnancy history (including history of prior ectopic pregnancy), contraceptive history, and symptom evaluation. Medication abortion is only offered to patients with low risk of ectopic pregnancy, and all of these patients are educated on signs and symptoms to watch for so that they can contact the clinic for further guidance or even report to the emergency department if needed. As my prior declaration describes, when medication abortion is provided to this group of patients, we also draw a blood sample to test the level of the pregnancy hormone human chorionic gonadotropin ("hCG"). *Id*. ¶ 54. Each patient in this situation leaves the clinic with a plan for when to do their next blood test. *See id.* ¶ 56. We warn patients, both verbally and in writing, that an untreated ectopic pregnancy could result in their death, and we conduct

6

multiple follow-up phone calls. If the provider evaluating the patient has a clinical suspicion of ectopic pregnancy, medication abortion is not offered; rather, the patient is immediately referred for further ectopic evaluation and management.

The General Quality of PPSAT's Care

13. Dr. Wubbenhorst incorrectly implies that hospitals are subject to robust health, safety, and record-keeping standards, whereas abortion clinics are not. *See* Wubbenhorst Decl. ¶¶ 232-36. This characterization is wholly inaccurate. As Dr. Wubbenhorst herself acknowledges, *id.* ¶ 232, the North Carolina Department of Health and Human Services inspects all abortion-providing facilities annually.[1] Abortion providers are also required to submit reports of each abortion "within 15 days after either the (i) date of the follow-up appointment following a medical abortion, (ii) date of the last patient encounter for treatment directly related to a surgical abortion, or (iii) end of the month in which the last scheduled appointment occurred, whichever is later."[2]

14. Additionally, Dr. Wubbenhorst's statements regarding the impact of influence, pressure, and coercion surrounding a person's decision to seek abortion are deeply flawed, and her characterization of PPSAT's practices regarding reproductive coercion are inaccurate and offensive. *See* Wubbenhorst Decl. ¶¶ 290-305. PPSAT screens for abortion coercion and assesses decisional certainty as part of our informed consent and counseling process. We ask every patient a series of questions to assess their confidence

---

[1] N.C. Gen Stat. § 90-21.81C(g).
[2] *Id.* § 90-21.93.

and whether they have been pressured either to obtain an abortion or to remain pregnant. We ask them these questions without anyone else present in the room, even if a partner or other support person is present for all other parts of the visit. The purpose of these discussions is, among other things, to ensure the patient has considered their options; is confident in their decision to have an abortion; and is making an informed and voluntary decision. During this process, staff are trained to pay close attention to the patient's body language cues in addition to the patient's verbal responses. On the rare occasion a patient exhibits signs of ambivalence or suggests they are not firm in their decision, regardless of whether coercion is a factor, the staff member takes time to explore those feelings with the patient and discuss all their options, including continuing the pregnancy.

15. In my experience, patients sometimes experience negative emotions, not because they are uncertain about their decision to have an abortion, but because of the stigma that people seeking abortions face in North Carolina. While the majority of North Carolinians did not support the law challenged in this case,[3] abortion remains politically stigmatized, and abortion patients often have to pass by anti-abortion extremists outside clinics before they are able to obtain care.

16. Dr. Wubbenhorst also states that she does not know whether abortion clinics can "provide resources to assist women in crisis while engaging law enforcement."

---

[3] Steve Doyle, *Poll Says Most North Carolinians Don't Support Abortion Restrictions Recently Passed by General Assembly*, Fox 8 (May 11, 2023) https://myfox8.com/news/north-carolina/poll-says-most-north-carolinians-dont-support-abortion-restrictions-recently-passed-by-general-assembly/.

8

Wubbenhorst Decl. ¶ 304. In fact, that is exactly PPSAT's approach. If a patient indicates that they fear violence if they do not obtain an abortion, staff will offer to engage law enforcement. If the patient feels that involving law enforcement would increase rather than lessen the danger they are in, we will provide the patient with a safe area in the health center from which they may reach out to resources we suggest in order to develop a safety plan. If a patient indicated that they were being threatened and would not otherwise want an abortion, we would not perform one.

<u>Abortion Restrictions Disproportionately Harm Marginalized Communities</u>

17. In an apparent attempt to shock readers, Dr. Wubbenhorst claims that "abortion is a eugenic tool of injustice." Wubbenhorst Decl. ¶ 25. But Dr. Wubbenhorst's assertion that abortion care is driven by eugenics is radically flawed, stigmatizing, and a pretext for treating Black people and people of color as though they are incapable of making their own medical decisions. Ironically, the hallmark of eugenics, ignored by Dr. Wubbenhorst, was the adoption of policies allowing the state to make reproductive decisions for patients, in service of state aims, thus restricting or limiting personal autonomy over reproduction—which is exactly what the law challenged here does.

18. Dr. Wubbenhorst fails to provide any evidence that Black people are being targeted by abortion providers with racist intentions. Instead, she states only that in 2020, 52% of the North Carolinians who received abortions were Black women, and that "[t]he percentage of black women undergoing abortion in North Carolina is higher than the national average." Wubbenhorst Decl. ¶¶ 23-24. This argument wrongly suggests that

Black people are passive recipients of abortion care. To the contrary, the Black patients I care for are completely capable of making thoughtful decisions about their reproductive health, just as my white patients are.

19. Advocacy by Black feminists and scholars for a range of reproductive health options, including birth control and safe abortion access, persists today. The claim that "abortion among black women is part of a genocidal plot against black people . . . [has] been rejected—time and again over the years."[4] My Black patients and other patients of color who seek abortion care do so in order to exert their autonomy over their reproductive lives to do what is in their best interest, as well as that of their families. Dr. Wubbenhorst's overreliance on racial disparities in abortion rates is misplaced and fails to recognize the socioeconomic factors that drive higher abortion rates among Black people,[5] as well as the agency Black people are entitled to exercise in determining their reproductive lives.

---

[4] Br. of Amici Curiae Reprod. Just. Scholars Supporting Pet'rs-Cross-Resp'ts at 19, *June Med. Servs., LLC v. Russo*, 140 S.Ct. 2103 (2020) (Nos. 18-1323, -1460).
[5] Katy Backes Kozhimannil et al., Abortion Access as a Racial Justice Issue, 387 New Eng. J. Med. 1537 (2022).

10

I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 18, 2023

Katherine A. Farris, M.D.

11