# EXHIBIT 3

NO. 22-CI-3225

JEFFERSON CIRCUIT COURT
DIVISION THREE
JUDGE MITCH PERRY

EMW WOMENS
SURGICAL CENTER, et al.

PLAINTIFFS

v.

DANIEL CAMERON, et al.

DEFENDANTS

---

## OPINION & ORDER GRANTING TEMPORARY INJUNCTION

---

### **Introduction**

This matter comes before the Court on Plaintiffs' Motion for a Temporary Injunction. The Court held a Hearing on July 6, 2022 where the parties presented expert witness testimony. Both parties have filed proposed Findings of Fact and Conclusions of Law. After careful consideration of the record and the memoranda of the parties, as well as the applicable law, the Court determines that the Temporary Injunction should be granted.

The Plaintiffs have sustained their burden of demonstrating substantial questions on the merits regarding the constitutionality of the challenged laws. As discussed further below, the Court finds that there is a substantial likelihood that these laws violate the rights to privacy and self-determination as protected by Sections 1 and 2 of the Kentucky Constitution, the right to equal protection in Sections 1, 2, and 3, the right to religious freedom in Section 5, and that additionally KRS 311.772 is both an unconstitutional delegation of legislative authority and unconstitutionally vague. For all of these reasons, the Plaintiffs are entitled to injunctive relief pending full resolution of this matter on the merits.

1

**Findings of Fact**

## I. Procedural Background

On June 24, 2022, the United States Supreme Court issued its opinion in *Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228 (2022). The Supreme Court in *Dobbs* entirely overruled *Roe v. Wade*, 410 U.S. 113 (1973), and returned the issue of abortion to the states. The Attorney General contended that KRS 311.772 ("Trigger Ban") was thereby triggered and became effective on June 24, 2022. On June 27, 2022, the Plaintiffs, two clinics that provide abortions, among other medical services, and the doctor-owner of one of the clinics, filed this lawsuit challenging the constitutionality of the Trigger Ban and KRS 311.7701-7711 ("Six Week Ban"), and seeking a Temporary Restraining Order ("TRO") pending a hearing and ruling on a Temporary Injunction.

The Court held a hearing on June 29, 2022 to consider the TRO. After hearing arguments of all parties, the Court reviewed the filings and subsequently granted the TRO. The Court then held a full evidentiary hearing for the Temporary Injunction on July 6, 2022. Each side presented two expert witnesses. Dr. Ashlee Bergin and Dr. Jason Lindo testified for the Plaintiffs, while Dr. Monique Wubbenhorst and Professor O. Carter Snead testified for the Defendants. After the hearing was concluded, the Court requested the parties file proposed Findings of Fact & Conclusions of Law.

## II. Factual Findings

The Plaintiffs are healthcare providers who also provide abortions in Kentucky. Prior to *Dobbs*, EMW Women's Surgical Center ("EMW") provided medication abortion up to 10 weeks from the last menstrual period ("LMP"), and procedural abortion through 21 weeks and 6 days from the LMP. Since entry of the TRO, EMW provides medication abortion up to 10 weeks from the LMP and procedural abortion up to 15 weeks.

The second Plaintiff, Planned Parenthood Great Northwest, Hawai'i, Alaska, Indiana, and Kentucky ("Planned Parenthood"), provides a variety of medical services to patients, and has also been providing abortion services in Louisville, Kentucky since 2020. Before *Dobbs*, Planned Parenthood provided medication abortion up to 10 weeks from LMP, and procedural abortion up to 13 weeks and 6 days from the LMP. After entry of the TRO, Planned Parenthood resumed abortion services as before *Dobbs*.

2

The final Plaintiff is Dr. Ernest Marshall, a board-certified obstetrician-gynecologist ("OBGYN") who performs abortions at EMW, and is also the owner of EMW.

Defendant Daniel Cameron is the Attorney General of Kentucky. In this role, he has the statutory authority, and duty to ensure proper enforcement and compliance with the laws of the Commonwealth. Defendant Eric Friedlander is the Secretary of the Cabinet for Health and Family Services ("the Cabinet"). In that role, he is responsible for the oversight and licensing of facilities that provide abortions to ensure they comply with applicable state laws. Defendant Michael Rodman is the Executive Director of the Kentucky Board of Medical Licensure ("the Board"). The Board possesses the authority to pursue disciplinary actions against Kentucky physicians for violations of state law. Finally, Defendant Thomas Wine is the Commonwealth's Attorney for the 30th Judicial Circuit. In this capacity, he has authority to pursue criminal prosecutions for crimes committed in Jefferson County.

At the July 6th Hearing, the Plaintiffs first called Dr. Ashlee Bergin. Dr. Bergin is a board-certified OBGYN who provides care at EMW, as well as teaching at the University of Louisville Medical School. Dr. Bergin testified at length regarding the complications that can arise from pregnancy, the relative safety of abortions, and the harms that can result from lack of access to abortions. Video Record ("VR") 10:12:21-10:13:04; 10:13:35-10:13:55; 10:15:50-10:16:15; 10:17:04-10:17:16. The latest records from the Kentucky Department of Public Health Office of Vital Statistics show that of the 4,104 abortions provided in Kentucky in 2020, there were only 30 complications, the majority of which were minor. Pls.' Ex. 3 at 12. Further, there were zero recorded deaths from abortion complications in Kentucky in 2020, whereas there were 16.6 per 100,000 pregnancy-related deaths in 2018, the last year data is available. Pls.' Ex. 3 at 12; Pls.' Ex. 10 at 10. Dr. Bergin testified that at the date of the hearing, EMW had turned away approximately 200 patients, before the TRO was entered. VR 10:20:25-10:20:41. Dr. Bergin also testified that the narrow medical emergency exceptions in the laws at issue are insufficient because it is medically and ethically unacceptable to force a patient deteriorate to the point at which she would become clearly eligible for the exception. VR 10:18:10-10:18:38.

The Plaintiffs next called Dr. Jason Lindo, an economist and causal effects expert. Dr. Lindo testified about the impacts abortion bans have on people, and the likely impact if these abortion bans take effect. Dr. Lindo testified that prenatal care and childbirth are very costly, even to those with medical insurance. VR 12:05:34-12:06:23. Further, these costs are not limited

3

to purely monetary ones. Pregnancy can lead to significant disruptions to a woman's education and career[1]. VR 12:07:31-12:08:04. Not all Kentuckians are legally protected from pregnancy discrimination in the workplace, or entitled to the reasonable accommodations needed to perform their jobs while pregnant. KRS 344.030(2) (exempting employers with fewer than 15 employees from pregnancy discrimination laws). Additionally, many Kentuckians are not entitled to paid time off for pregnancy, delivery, or recovery. U.S. Dep't of Labor, National Compensation Survey: Employee Benefits in the United States, March 2021, Table 33.

Dr. Lindo further testified that while some Kentuckians will be able to travel to other states to access abortions, not all will be able to afford to, and others will be prevented by the similarly restrictive policies of surrounding states. VR 12:16:19-12:16:41; 12:23:16-12:27:40.

The Defendants first called Dr. Monique Wubbenhorst, an OBGYN and research fellow at the University of Notre Dame de Nicola Center for Ethics and Culture. Dr. Wubbenhorst testified that she questioned the accuracy of abortion statistics in general, but was unable to provide any evidence to support her criticism. VR 2:18:46-2:20:14; 3:01:17-3:01:46. She further challenged the accuracy of maternal mortality statistics, but again was unable to provide any evidence to support her criticisms. VR 2:16:12-2:18-45.

The Defendants also called O. Carter Snead, a professor at the University of Notre Dame Law School and the Director of the de Nicola Center for Ethics and Culture at Notre Dame. Professor Snead has contributed significantly to the field of public bioethics. Professor Snead testified about the ethical concerns of the data indicating that many women who receive abortions are poorer, minorities, or experiencing some sort of life disruption. VR 3:59:15-4:01:29. He expressed concern that these women lacked a real choice, and were likely coerced into obtaining abortions by outside factors. *Id.*

Both Defense witnesses generally expressed views that mirrored the positions of their institutional employer, namely that abortion should have no place in the practice of medicine and should not be provided even in the cases of fatal fetal anomalies, rape, or incest. VR 2:44:37-2:46:09. In a recent statement, the de Nicola Center reaffirmed that position: "The University of Notre Dame is institutionally committed to 'to the defense of human life in all its stages,' recognizing and upholding the sanctity of human life from conception to natural death (cf.,

---

[1] The Court recognizes that these laws will also impact members of the LGBTQ community. Accordingly, "woman" is used in this Order to refer to all people affected by these laws.

4

https://news.nd.edu/news/notre-dame-adopts-new-statement-and-principles-in-support-of-life/).
For our part, the de Nicola Center is proud to advance that commitment through our own efforts
and programming." de Nicola Center Director's Statement on Dobbs v. Jackson Women's Health
Organization, June 24, 2022, https://ethicscenter.nd.edu/news/dcec-directors-statement-on-
dobbs-v-jackson-womens-health-organization/.

## Conclusions of Law

### I.   Statutory Review

KRS 311.772 ("Trigger Ban") and KRS 311.7701-7711 ("Six Week Ban") were both
passed by the General Assembly in 2019. The Trigger Ban prohibits all abortions except in
extremely limited medical situations "to prevent the death or substantial risk of death due to a
physical condition, or to prevent the serious, permanent impairment of a life-sustaining organ of
a pregnant woman." KRS 311.772(4)(a). The Trigger Ban makes it a Class D felony for anyone
to knowingly provide an abortion. KRS 311.772(3)(b). KRS 311.772 is referred to as a trigger
law because it would only become effective by the issuance of a U.S. Supreme Court decision
"which reverses, in whole or in part, *Roe v. Wade*, 410 U.S. 113 (1973)." KRS 311.772(2)(a).

The Six Week Ban criminalizes abortion once embryonic or fetal cardiac activity is
detectable. KRS 311.7704(1); KRS 311.7706(1). This is activity usually detectable around the
six week mark of pregnancy, as measured from the first day of the patient's last menstrual
period. Like the Trigger Ban, the Six Week Ban provides only very limited medical exceptions,
preventing the woman's death or substantial and irreversible impairment of major bodily
function. KRS 311.7706(2)(a). A violation of the Six Week Ban is also a Class D felony. KRS
311.990(21)-(22); KRS 532.060(2)(d). Neither the Trigger Ban nor the Six Week Ban contain
exceptions for cases of rape or incest.

### II.  Standing

Kentucky courts have "the constitutional duty to ascertain the issue of constitutional
standing … to ensure that only justiciable causes proceed in court." *Commonwealth, Cabinet for
Health & Fam. Servs., Dep't for Medicaid Servs. v. Sexton by & through Appalachian Reg'l
Healthcare, Inc.*, 566 S.W.3d 185, 192 (Ky. 2018) (emphasis omitted). In *Sexton*, the Kentucky
Supreme Court adopted the federal standard for standing as set forth in *Lujan v. Defenders of
Wildlife*, 504 U.S. 555 (1992), holding that "for a party to sue in Kentucky, the initiating party

5

must have the requisite constitutional standing to do so, defined by three requirements: (1) injury, (2) causation, (3) redressability. In order words, [a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Sexton*, 566 S.W.3d at 196.

Here, the Attorney General claims the Plaintiffs lack the standing to bring this suit because the facilities do not have third party standing to represent the rights of their patients. However, the Court finds that the Plaintiffs do have standing to proceed with this suit. While not binding, since Kentucky adopted the federal standing guidelines, federal cases provide persuasive authority. Federal courts have long allowed for third party standing in situations where "enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights." *Warth v. Seldin*, 422 U.S. 490, 510 (1975). Third party standing should be allowed when: "(1) the interests of the litigant and the third party are aligned, and (2) there is an obstacle to the third party asserting her own rights." *Singleton v. Wulff*, 428 U.S. 106, 114-18 (1976).

Recently, the Supreme Court reaffirmed the practicality of third party standing for abortion providers in *June Medical Services LLC v. Russo*, 140 S.Ct. 2103, 2118 (2020). The Supreme Court concluded that abortion providers had third party standing to assert claims on behalf of their patients because the challenged laws regulated their conduct, including by threat of sanctions, the providers had every incentive to resist efforts at restricting their operations, and the providers were far better positioned than their patients to challenge the restrictions. *Id.* at 2119[2].

Turning then to the standing analysis. The challenged statutes directly prohibit the Plaintiffs from lawfully engaging in both medication and procedural abortions. The Attorney General is attempting to enforce these statutes against the Plaintiffs. An order of this Court preventing enforcement of these statutes would provide the Plaintiffs with adequate relief. Therefore, the Plaintiffs have satisfactorily established all the required elements of standing and can proceed with this suit.

---

[2] The Defendants contend that the United States Supreme Court undermined third party standing in *Dobbs* to the point it can no longer be relied upon. While the United States Supreme Court expressed displeasure with how abortion related litigation had proceeded with the doctrine of third party standing, this comment came in dicta, and is therefore not binding upon this Court. *Dobbs*, 142 S.Ct. at 2276.

6

Relatedly, the other Defendants, the Kentucky Board of Medical Licensure, The Cabinet for Health and Family Services, and the Commonwealth's Attorney, have taken the position that relief should not be granted against them because the Plaintiffs' claims are purely speculative as they have not yet taken any enforcement actions against the Plaintiffs. For the same reasons, this argument is unpersuasive. The Plaintiffs have been forced to modify their medical services and practices in order to avoid the harm and sanctions envisioned by these statutes. The Commonwealth's Attorney could bring criminal prosecutions against the facilities and their practitioners. The Board of Medical Licensure and the Cabinet would then be empowered to bring administrative actions against the facilities and practitioners to prevent them from operating or even practicing medicine again in the state. The relief Plaintiffs seek would merely maintain the long-standing status quo while this litigation proceeds. With that context in mind, the Court concludes that all Defendants are properly before the Court and subject to the relief sought by the Plaintiffs.

## III. Injunction Analysis

The standard for a temporary injunction is well established in Kentucky. The party moving for injunctive relief must show: (1) irreparable injury is probable if injunctive relief is not granted; (2) the equities – including the public interest, harm to the defendant, and preservation of the status quo – weigh in favor of the injunction; and (3) there is a "serious question warranting a trial on the merits." *Maupin v. Stansbury*, 575 S.W.2d 695, 699 (Ky. Ct. App. 1978). The Court will examine each of these factors.

### A. Irreparable Harm

A party must first show that it will suffer irreparable harm if injunctive relief is not granted. An injury is irreparable if "there exists no certain pecuniary standard for the measurement of the damages." *Cyprus Mountain Coal Corp. v. Brewer*, 828 S.W.2d 642, 645 (Ky. 1992) (quoting *United Carbon Co. v. Ramsey*, 350 S.W.2d 454 (Ky. 1961). The Plaintiffs have demonstrated that they will indeed suffer irreparable harm without injunctive relief.

At the July 6th hearing, Dr. Bergin testified about the harms the Plaintiffs will suffer if injunctive relief is not provided. From the time when the Supreme Court's decision in *Dobbs* was handed down on June 24th to June 30th when the TRO was granted, EMW turned away almost 200 patients. These patients were denied previously scheduled medical care because of the legal uncertainty that resulted from the Trigger Ban and the Six Week Ban. Some of these women may

7

be able to reschedule their procedures, but others may not. Dr. Bergin testified that EMW has stopped providing abortions after 15 weeks.

Dr. Bergin also testified extensively to the harms and risks that can result from, and be exacerbated by, pregnancy. She testified that the risks presented by abortions are much lower, but do increase the later in the pregnancy the procedure is performed. Thus any delays in scheduling and performing an abortion comes with more serious risks.

Finally, waiting until final judgment on the issues presented here, without injunctive relief, would be effectively meaningless to many people because they would either be past gestational age restrictions or would have been forced to carry their pregnancy to term. Therefore, the Plaintiffs have demonstrated that they would suffer irreparable harm if injunctive relief is not provided.

**B. Balance of Equities**

Next the Court must consider whether the balance of equities weighs in favor of injunctive relief. This factor includes several components for courts to analyze. Courts balancing the equities of injunctive relief should consider "possible detriment to the public interest, harm to the defendant, and whether the injunction will merely preserve the status quo." *Maupin*, 575 S.W.2d at 699. The Court will examine each of the factors in order.

Public health concerns carry great weight in the public interest analysis. *Beshear v. Acree*, 615 S.W.3d 780, 830 (Ky. 2020). Plaintiffs assert, and this Court agrees, that abortion is a form of healthcare. It is provided by licensed medical professionals in licensed medical facilities, just like many other medical procedures. As such, the denial of this healthcare procedure is detrimental to the public interest.

Additionally, Dr. Lindo testified at length about the economic harms that Kentuckians would suffer under the laws at issue. Dr. Lindo noted that the burden of abortion bans falls hardest on poorer and disadvantaged members of society. By contrast the Defendants presented a baseless claim that the Plaintiffs are essentially advocating for eugenics and fewer minorities in Kentucky. This is a tired and repeatedly discredited claim[3]. It has no legal basis, and the Court disregards it as such.

---

[3] See further Melissa Murphy, *Race-ing Roe: Reproductive Justice, Racial Justice, and the Battle for Roe v. Wade*, 134 HARV. L. REV. 2025 (April 12, 2021).

Dr. Lindo also testified that these abortion bans will impose not just serious financial costs, but also educational and professional harms on Kentuckians. Pregnancy, childbirth, and the resulting raising of a child are incredibly expensive. Adding another child can put exponential strain on an already struggling family and lead to detrimental outcomes for all involved. An unplanned pregnancy can also derail a woman's career or educational trajectory. Across the United States, approximately 72% of women obtaining abortions are under the age of 30. Rachel K. Jones & Jenna Jerman, *Population Group Abortion Rates and Lifetime Incidence of Abortion: United States, 2008-2014*, 101 AM.J.PUB.HEALTH 1904, 1907 (2017). This is the stage of life where people are completing their education and establishing a career. All of this is not to say, as the Defendants' witness Professor Snead contends, that all young women who get abortions are financially coerced to do so. Indeed, quite the contrary. This is a decision that has perhaps the greatest impact on a person's life and as such is best left to the individual to make, free from unnecessary governmental interference. In the Court's view, denial of this healthcare option will have a detrimental impact on the public interest, satisfying the first prong of the injunctive relief analysis.

The Court must next consider if the Defendants will suffer any harm by the requested injunctive relief. The Court finds any harm the Defendants may suffer is outweighed by the interests of the Plaintiffs. At the outset, the Court notes the Supreme Court's opinion in *Dobbs* does not become final until 25 days after it was issued on June 24, 2022. Sup. Ct. R 45. Judge Glenn Acree noted in the related appellate court proceedings, 2022-CA-0780, the Defendants will at most suffer the harm of delayed enforcement, as the earliest this law became enforceable was July 19, 2022. This harm, when balanced against the harms of the Plaintiffs, is not sufficient to preclude injunctive relief.

Further, as long recognized, the state has no interest in enforcing an unconstitutional law. *See Harrod v. Whaley*, 239 S.W.2d 480, 482 (Ky. 1951). As the Court will explain further below, the Plaintiffs have established significant doubt as to the constitutionality of the laws at issue. Accordingly, the state's interest in enforcing these laws is uncertain at this stage.

Finally, the requested injunctive relief will merely restore the status quo that has existed in Kentucky for nearly fifty years. This factor weighs strongly in favor of granting the injunctive relief. Based on all of these considerations, the Court finds the balance of equities weighs in favor of granting injunctive relief.

9

## C. Serious Questions Raised

The final factor courts must examine when considering injunctive relief is whether there are serious questions presented that warrant trial on the merits. For the reasons stated below in Section IV, the Court concludes that the Plaintiffs have identified, and sufficiently supported, serious questions such that injunctive relief is warranted.

## IV. Constitutional Analysis

At the outset, the Court notes that, despite what some suggest, the inquiry does not end simply because the word "abortion" is not found in the Kentucky Constitution. The Constitution must protect more than just the words explicitly enumerated on the page in order for the purpose behind the words to have effect. To hold otherwise ignores the realities of how constitutions, and laws more generally, are written. It is impossible for any legislative or constitutional body to enumerate every possible future scenario and application. Instead, bodies craft broad sentiments, ideas, and rights they value and choose to protect. It is then the role of the judiciary to interpret the enumerated words and give effect to the meaning behind them. Indeed, "to declare the meaning of constitutional provisions is a primary function of the judicial branch in the scheme of checks and balances that has protected freedom and liberty in this country and in this Commonwealth for more than two centuries. The power of judicial review is an integral and indispensable piece of the separation of powers doctrine. To desist from declaring the meaning of constitutional language would be an abdication of our constitutional duty." *Bevin v. Commonwealth ex rel. Beshear*, 563 S.W.3d 74, 83 (Ky. 2018).

The Court further recognizes that while the parties did not raise every argument analyzed below, it is the duty of courts to consider all legal aspects when evaluating cases. *Community Financial Services Bank v. Stamper*, S.W.3d 737, 740-41 (Ky. 2019). This is so because "applicable legal authority is not evidence and can be resorted to at any stage of the proceedings whether cited by the litigants or simply applied, *sua sponte*, by the adjudicator(s). Nor is legal research a matter of judicial notice, for the issue is one of law, not evidence." *Burton v. Foster Wheeler Corp.*, 72 S.W.3d 925, 930 (Ky. 2002); *see also Mitchell v. Hadl*, 816 S.W.2d 183, 185 (Ky. 1991) ("When the facts reveal a fundamental basis for decision not presented by the parties, it is our duty to address the issue to avoid a misleading application of the law."). That is what this Court will endeavor to do below.

10

## A. Trigger Ban

The Trigger Ban is an arguably unconstitutional delegation of legislative authority, not just to a different branch of government, but to a different jurisdictional body entirely. Since the law was drafted to take effect at a later time if the United States Supreme Court made a certain decision, it violates Sections 27, 28, and 29 of the Kentucky Constitution.

Kentucky is a strict adherent to the separation of powers. "The General Assembly cannot delegate any portion of the legislative function to another authority." *Diemer v. Commonwealth*, 786 S.W.2d 861, 864 (Ky. 1990). The Trigger Ban would create criminal penalties for abortions. Criminal laws fall directly under the umbrella of legislative and nondelegable functions. "What conduct shall in the future constitute a crime in Kentucky or be subject to severe penalties is a matter for the Kentucky legislature to determine in view of the *then existing conditions when the need for such a statute arises*. It is not a matter that may be delegated." *Dawson v. Hamilton*, 314 S.W.2d 532, 536 (Ky. 1958) (emphasis added). The Kentucky Supreme Court held that adopting prospective federal legislation or rules into state statute constituted an impermissible delegation of legislative authority. *Id.* at 535. This is precisely the action the General Assembly took with the Trigger Ban. It impermissibly delegated its legislative authority to a federal body (the United States Supreme Court) in violation of the Kentucky Constitution.

The Plaintiffs also contend the Trigger Ban is unconstitutionally vague. Kentucky laws must be sufficiently clear that a person ordinarily disposed to obey the law is able to "determine whether the contemplated conduct would amount to a violation." *State Bd. for Elementary & Secondary Educ. v. Howard*, 834 S.W.2d 657, 662 (Ky. 1992). The test to determine whether a statute is unconstitutionally vague contains two separate elements: first, does the statute place someone to whom it applies on actual notice as to what conduct is prohibited; and second, is it written in a manner that encourages arbitrary and discriminatory enforcement. *Id.* (citing *Musselman v. Commonwealth*, 705 S.W.2d 476, 478 (Ky. 1986)).

The Trigger Ban does not adequately give actual notice because the date upon which it becomes effective is at best unclear. The General Assembly stated that the Trigger Ban was to take effect "immediately upon … the occurrence of … [a]ny decision of the United States Supreme Court which reverses, in whole or in part *Roe v. Wade*, 410 U.S. 113 (1973)." KRS 311.772(2)(a). On its face this might seem clear enough, but upon closer examination problems arise. Unless specifically stated otherwise in the opinion, United States Supreme Court opinions

11

do not become final until twenty-five days after the opinion is announced. Sup. Ct. R. 45. Since the opinion in *Dobbs* was announced on June 24, 2022, the opinion did not become final until July 19, 2022. Defendant Cameron however, contends the Trigger Ban became effective immediately on June 24th. Attorneys general in other states with trigger laws have failed to reach a consensus on this matter as well[4]. This uncertainty is sufficient to satisfy the first prong of the analysis.

Secondly, the lack of clarity regarding the date of enforceability creates the risk of arbitrary and discriminatory enforcement because prosecutors across the Commonwealth could reach different conclusions as to when they may begin enforcing the Trigger Ban. Indeed, Defendant Cameron insisted that he has the authority to begin enforcing the law immediately. Defendant Wine has not given any indication when, or if, his office intends to enforce the law. A situation where the Attorney General and Commonwealth's Attorney could be at odds over the enforceability of a criminal law is undesirable for all involved. Accordingly, this second factor of the analysis is met as well. The Plaintiffs have presented serious questions as to the constitutionality of the Trigger Ban.

### B. Six Week Ban

Unlike the Trigger Ban, the Six Week Ban does not rely on a decision of the U.S. Supreme Court to become effective. As such, the Six Week Ban and its constitutionality must be examined separately. For the reasons stated below, the Court concludes that the Six Week Ban implicates Sections 1, 2 and 5 of the Kentucky Constitution. The Court will separately examine the Plaintiffs' likelihood of success in Section C.

#### 1. Right to Privacy

Sections 1 and 2 of the Kentucky Constitution broadly protect an individual's rights to liberty and self-determination. The liberty right protected in Sections 1 and 2 have been interpreted to include a similar right to privacy as recognized in the federal Constitution.

---

[4] See Advisory from Tex. Att'y Gen. Ken Paxton on Texas Law upon Reversal of *Roe v. Wade* (June 24, 2022), https://www.texasattorneygeneral.gov/sites/default/files/images/executive-management/Post-Roe%20Advisory.pdf, *and* Kelcie Moseley-Morris, *Idaho Attorney General Says Abortion Ban Likely to Take Effect in Late August After SCOTUS Decision*, Idaho Capitol Sun (June 24, 2022) https://idahocapitalsun.com/2022/06/24/idahos-trigger-law-will-abolish-abortions-30-days-after-scotus-ruling-overturning-roe-v-wade/

*Commonwealth v. Wasson*, 842 S.W.2d 487 (Ky. 1992)[5]. Indeed, the Kentucky Constitution has been held to "offer greater protection for the right of privacy than provided by the Federal Constitution as interpreted by the United States Supreme Court." *Id.* at 491. The right of privacy has been consistently recognized as an integral part of the guarantee of liberty in the 1891 Kentucky Constitution since its inception. *Id.* at 495. The Kentucky Supreme Court has held that the 1891 Constitution prohibits state action "thus intruding upon the inalienable rights possessed by the citizens" of Kentucky. *Commonwealth v. Campbell*, 117 S.W. 383, 385 (Ky. 1909).

The constitutional privacy right protects individuals "against the intrusive police power of the state." *Wasson*, 842 S.W.2d at 492[6]. The Kentucky Supreme Court has recognized that "Kentucky has a rich and compelling tradition of recognizing and protecting individual rights from state intrusion." *Id.* The Defendants here placed great emphasis on the importance of the history and precedent of laws outlawing abortion in the mid to late nineteenth century. However, conduct is "not beyond the protections of the guarantees of individual liberty in our Kentucky Constitution simply because 'proscriptions against that conduct have ancient roots.' Kentucky constitutional guarantees against government intrusion address substantive rights." *Id.* at 493 (quoting *Bowers v. Hardwick*, 478 U.S. 186, 192 (1986)).

Additionally, the history the Defendants rely on is less clear than they contend, and actually tends to potentially weaken their case. At common law, abortion with the consent of the woman was not a crime before quickening[7]. *Mitchell v. Commonwealth*, 78 Ky. 204, 210 (1879). Ten years after the ratification of the current Kentucky Constitution, the Kentucky Supreme Court again held that "[t]here is no statute in this state changing the common-law rule" that "it was not ... a punishable offense to produce with the consent of the mother an abortion prior to

---

[5] The Court recognizes that *Wasson* was revisited by the Kentucky Supreme Court in *Calloway Cnty. Sheriff's Dept. v. Woodall*, 607 S.W.3d 557 (Ky. 2020). However, *Calloway County* merely modified the analysis courts use for evaluating special legislation. The privacy analysis of *Wasson* was untouched and remains the law of Kentucky.

[6] The Court acknowledges the Defendants' contention that *Wasson* is limited to the context of private sexual activity between consenting adults. The Court is unpersuaded however that *Wasson* is, or should be, limited to that narrow context. The privacy analysis in *Wasson* discusses a much broader and more fundamental right than Defendants acknowledge. As such, the reasoning of the Kentucky Supreme Court in *Wasson* is directly applicable to this context as well.

[7] Quickening is recognized as the moment when a woman first feels fetal movement. This is generally understood not to occur until late in the fourth month or early in the fifth month of gestation. Reva Siegel, *Reasoning from the Body: A Historical Perspective on Abortion Regulation and Questions of Equal Protection*, 44 STANFORD L. REV. 261, 281-82 (1992).

13

the time when she became quick with child." *Wilson v. Commonwealth*, 60 S.W. 400, 401 (Ky. 1901). The Six Week Ban intercedes well before the point of quickening. Contrary to the Defendants' contention, history demonstrates that pre-quickening abortions were permissible. Defendants' reliance on the history and traditions of Kentucky law are therefore misplaced.

Furthermore, the laws that the Defendants seek to enforce would at the very least potentially obligate the state to investigate the circumstances and conditions of every miscarriage that occurs in Kentucky. This would lead to an unprecedented level of intrusion and invasiveness, rarely seen before in this state. Kentucky has a long and proud history of limiting governmental intrusion and overreach. The Six Week Ban flies directly in the face of that tradition.

The Six Week Ban will have wide ranging effects on family planning decisions that are traditionally protected from governmental imposition. It not only compromises a woman's right to self-determination protected in Section 2 of the Kentucky Constitution by taking away the choice to have an abortion in many instances, but also undercut a woman's choice to have children at all. Many people are justifiably concerned about having children now due to a very real fear around many of the complications that may arise during the pregnancy, as outlined by Dr. Bergin in her testimony. Women have legitimate concerns about their ability to receive adequate care, and the possibility their health and safety will be deemed subordinate to the life of a fetus. Already, laws similar to the ones at issue here, are creating confusion and concern in healthcare settings as doctors, in order to avoid incurring civil and criminal liability, are forced to wait until women are in dire medical conditions before interceding[8]. There is further uncertainty regarding the future legality and logistics of In Vitro Fertilization. The implications of constitutional protections beginning from the very moment of fertilization raises a whole host of concerns for the continued legal feasibility of IVF.

These laws intrude into the traditionally protected familial sphere, and as such require exceedingly compelling justifications in order to pass constitutional muster.

---

[8] Arey, et al., *A Preview of the Dangerous Future of Abortion Bans – Texas Senate Bill 8*, NEW ENGLAND JOURNAL OF MEDICINE, June 22, 2022, (last visited July 12, 2022), https://www.nejm.org/doi/full/10.1056/NEJMp2207423

14

### 2. Equal Protection

Furthermore, Sections 1, 2, and 3 of the Kentucky Constitution function much the same way as the Equal Protection Clause of the 14th Amendment of the Federal Constitution. *D.F. v. Codell*, 127 S.W.3d 571, 575 (Ky. 2003). The goal of Equal Protection is to ensure that similarly situated persons are treated alike. *Vision Mining, Inc. v. Gardner*, 364 S.W.3d 455, 465 (Ky. 2011). The challenged statutes may run afoul of this protection by imposing obligations, restrictions, and penalties on the woman, and possibly physicians, but not on the man. As defined by statute, the man is at least 50% responsible for the creation of the fetus, yet contrary to the woman, he bears no legal consequences for his contribution. As similarly situated parties to the creation of life, the woman and the man must be treated equal under the law.

Additionally, there is no other context in which the law dictates that a person's body must be used against her will, even to aid or save the life of another. Section 2 of the Kentucky Constitution grants a right to self-determination that protects people from "absolute and arbitrary power over [their] lives, liberty, and property." Ky. Const. § 2. People cannot be legally coerced into giving blood or donating organs. Bone marrow transplants are not compulsory. When a person dies, their organs can be utilized only if they consent to being an organ donor. These laws grant less bodily autonomy to pregnant women than in any of these other instances, or at any other time in the woman's life. Only in the context of pregnancy is a woman's bodily autonomy taken away from her. This is a burden that falls directly, and only, on females. It is inescapable, therefore, that these laws discriminate on the basis of sex.

### 3. Religious Freedom

Section 5 of the Kentucky Constitution protects both the free exercise of religion and prohibits the establishment of a state religion. The Six Week Ban infringes upon those rights as well, but primarily upon the prohibition on the establishment of religion. Defendants' witnesses at the July 6th hearing advocated for, and agreed with what the General Assembly essentially established in these laws, independent fetal personhood[9]. They argue that life begins at the very moment of fertilization and as such is entitled to full constitutional protection at that point. However, this is a distinctly Christian and Catholic belief. Other faiths hold a wide variety of views on when life begins and at what point a fetus should be recognized as an independent

---

[9] The General Assembly uses the term "unborn human beings" to refer to fetal personhood.

human being[10]. While numerous faith traditions embrace the concept of "ensoulment," or the acquisition of personhood, there are myriad views on when and how this transformation occurs[11]. The laws at issue here, adopt the view embraced by some, but not all, religious traditions, that life begins at the moment of conception.

The General Assembly is not permitted to single out and endorse the doctrine of a favored faith for preferred treatment. By taking this approach, the bans fail to account for the diverse religious views of many Kentuckians whose faith leads them to take very different views of when life begins. There is nothing in our laws or history that allows for such theocratic based policymaking. Both the Trigger Ban and the Six Week Ban implicate the Establishment and Free Exercise Clauses by impermissibly establishing a distinctly Christian doctrine of the beginning of life, and by unduly interfering with the free exercise of other religions that do not share that same belief.

All of these considerations together stand for the proposition that governmental intrusion into the fundamentally private sphere of self-determination as contemplated by these laws is to be prohibited. Having recognized that the Six Week Ban necessarily involves several fundamental rights, the Court will next analyze whether the law withstands constitutional scrutiny.

---

[10] David Masci, *Where Major Religious Groups Stand on Abortion*, PEW RESEARCH CENTER, June 21, 2016, (last visited Jul 11, 2022), https://www.pewresearch.org/fact-tank/2016/06/21/where-major-religious-groups-stand-on-abortion/

[11] See Vatican Sacred Congregation for the Doctrine of the Faith, Declaration on Procured Abortion, at n.19 (Nov. 18, 1974), available at https://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_doc_19741118_declarationabortion_en.html; Presbyterian Church (U.S.A.), Abortion/ Reproductive Choice Issues ("We may not know exactly when human life begins[.]"), available at https://www.presbyterianmission.org/what-we-believe/socialissues/abortion-issues/; United Church of Christ, Statement on Reproductive Health and Justice (noting the "many religious and theological perspectives on when life and personhood begin"), available at https://d3n8a8pro7vhmx.cloudfront.net/unitedchurchofchrist/le gacy_url/455/reproductive-health-and-justice.pdf?1418423872; Evangelical Lutheran Church in America, Social Statement on Abortion at 1, 3 n.2 (1991) (explaining that embryology provides insight into the "complex mystery of God's creative activity" but that individual interpretation of the scientific information leads to various understandings of when life begins), available at http://download.elca.org/ELCA%20Resource%20Repository/Abo rtionSS.pdf; National Council of Jewish Women, Abortion and Jewish Values Toolkit at 16 (2020), available at https://www.ncjw.org/wpcontent/uploads/2020/05/NCJW_ReproductiveGuide_Final.pdf.

Case 1:23-cv-00480-CCE-LPA   Document 69-3   Filed 08/18/23   Page 17 of 21

## C. Constitutional Scrutiny Analysis

As established in Section B above, the Six Week Ban implicates numerous fundamental rights protected by the Kentucky Constitution. Strict scrutiny is the highest level of scrutiny courts apply. It applies to analysis of statutes that "impact a fundamental right or liberty explicitly or implicitly protected by the Constitution." *Beshear v. Acree*, 615 S.W.3d 780, 816 (Ky. 2020). To survive strict scrutiny, "the government must prove that the challenged action furthers a compelling governmental interest and is narrowly tailored to that interest." *Id.* The seldom used intermediate scrutiny is generally used when evaluating discrimination based on gender. *D.F. v. Codell*, 127 S.W.3d 571, 575 (Ky. 2003). Intermediate scrutiny requires the government to "prove its action is substantially related to a legitimate state interest." *Id.* (citing *Steven Lee Enters v. Varney*, 36 S.W.3d 391, 394). Under either standard, the Plaintiffs have demonstrated serious questions regarding the validity of the Six Week Ban.

It is well established in statutory interpretation that courts must always presume the legislature did not intend for a statute to produce absurd results. *Beshear v. Acree*, 615 S.W.3d 780, 804 (Ky. 2021), citing *Layne v. Newberg*, 841 S.W.2d 181, 183 (Ky. 1992). However, followed to its logical conclusions, the theory of "independent fetal personhood" that is created by both the Trigger Ban and the Six Week Ban would have far-ranging implications and could lead to unintended consequences and absurd results. For instance, do child support obligations now begin from the moment of fertilization? Does a fetus gain a legal claim as an heir to the father's estate at the moment of fertilization? Would a pregnant woman be able to claim her fetus as a dependent on her tax returns? Would a company that schedules a pregnant woman to work be in violation of child labor laws? Or, if a pregnant woman commits a crime and is sentenced to serve time in prison, would the rights of the fetus be violated by sharing the same confinement as the woman? The answer to all of these is surely "no."[12] With these considerations in mind, the Court will now evaluate the previously identified constitutional provisions.

---

[12] A further example of the unintended chaos these laws will bring comes from a pregnant woman in Texas who recently received a ticket for driving in a High-Occupancy Vehicle (HOV) lane. She is currently challenging the ticket in court arguing that since Texas has recognized independent fetal personhood, the two-person minimum occupancy to use the HOV Lane was satisfied. https://www.cnn.com/2022/07/11/us/pregnant-woman-hov-lane/index.html

Case 1:23-cv-00480-CCE-LPA   Document 69-3   Filed 08/18/23   Page 18 of 21

### 1. **Right to Privacy**

The Defendants argue that the state has a compelling interest in protecting what it calls "unborn human beings." As established at the July 6th Hearing, a fetus cannot survive on its own outside of the womb until it has reached a gestational age between twenty and twenty-five weeks. The Six Week Ban intercedes well before the point of viability, indeed at a point before many women even know they are pregnant. The state's interest in protecting potential fetal life before the point of viability has traditionally been viewed as insufficient to justify total or near total bans on abortion in courts across the country[13]. While the decisions of other states are not binding upon this Court, the reasoning behind those decisions is both informative and persuasive. This Court agrees with many other courts that the state's purported interest in protecting potential fetal life pre-viability is not a compelling enough state interest to justify such an unparalleled level of intrusion and invasiveness into the fundamental area of choosing whether or not to bear a child. The fundamental right for a woman to control her own body free from governmental interference outweighs a state interest in potential fetal life before viability. As the Court has previously recounted, Kentucky has a prodigious history of protecting privacy at a greater level than the federal Constitution. See *Wasson*, 842 S.W.2d at 491. Surely, if this heightened privacy right stands for anything, it stands for the proposition that Kentuckians should have control over basic family planning choices, free from governmental interference.

### 2. **Equal Protection**

Next, the Court turns to the Equal Protection analysis. There are two equally necessary parties to the creation of human life, a male and a female. As established above in Section IV(B), these laws impose unilateral obligations and responsibilities on only the female, and none on the male. Laws that discriminate on the basis of sex are not unconstitutional per se, but must pass intermediate scrutiny in order to be constitutional. *Codell*, 127 S.W.3d at 575. This requires the government to show that its action is substantially related to a legitimate state interest. *Id*. The Defendants again argue that the state has a legitimate interest in protecting fetal life, and that by

---

[13] *Valley Hosp. Ass'n v. Mat-Su Coal. for Choice*, 948 P.2d 963, 971 (Alaska 1997); *Comm. to Def. Reprod. Rts. v. Myers*, 625 P.2d 779, 793-797 (Cal. 1981); *In re T.W.*, 551 So.2d 1186, 1192-94 (Fla. 1989); *Women of Minn. v. Gomez*, 542 N.W.2d 17, 31-32 (Minn. 1995); *Armstrong v. State*, 989 P.2d 364, 380-384 (Mont. 1999); *Planned Parenthood of Middle Tenn. v. Sundquist*, 38 S.W.3d 1, 18 (Tenn. 2000); *Right to Choose v. Byrne*, 450 A.2d 925, 934-37 (N.J. 1982); *Hodes & Nauser, MDs, P.A. v. Schmidt*, 440 P.3d 461, 496 (Kan. 2019).

nearly banning all abortions these laws will achieve that goal. However, the Defendants have again failed to meet their burden. The Defendants have proffered no legitimate reason why the woman must bear all the burdens of these laws while the man carries none. As similarly situated parties, they must be treated equally under the law. These laws fail to do that, and therefore the Plaintiffs have established a substantial question as to the merits.

### 3. Religious Freedom

Turning finally to the analysis of Section 5 of the Kentucky Constitution, Kentucky courts have consistently held that the purpose of Section 5 is to guarantee religious freedom. *Lawson v. Commonwealth*, 164 S.W.2d 972, 975-76 (Ky. 1942). The Kentucky Constitution states that "no preference shall ever be given by law to any religious sect, society or denomination." Ky. Const. § 5. This provision mandates "a much stricter interpretation than the Federal counterpart found in the First Amendment's 'Establishment of Religion clause.'" *Neal v. Fiscal Court, Jefferson County.*, 986 S.W.2d 907, 909-10 (Ky. 1999), citing *Fiscal Court of Jefferson County. v. Brady*, 885 S.W.2d 681 (Ky. 1994).

This is not a particularly close call. As discussed above, by ordaining that life begins at the very moment of fertilization, the General Assembly has adopted the religious tenets of specific sects or denominations. The General Assembly ignored the contending positions of other faiths regarding the origins and beginnings of life. It is true that the General Assembly has sweeping authority to legislate for the public good, but expressly encasing the doctrines of a preferred faith, while eschewing the competing views of other faiths, is an arguable violation of Section 5's prohibition on the establishment of religion[14]. Section 5 protects Kentuckians in their choice to worship, how they worship, and to be free from the imposition of a particular faith by the government. As Kentucky courts have long held, "under our institutions there is no room for that inquisitorial and protective spirit which seeks to regulate the conduct of men." *Campbell*, 117 S.W. at 387. For all of these reasons, the Plaintiffs have again at the very least established a substantial question as to the merits of this law.

---

[14] It is further notable that the two witnesses the Defendants called to testify at the July 6th Hearing were both affiliated with a religious institution that expressly promotes and advocates the view adopted by the General Assembly, further deepening the implicit connection between the state and a favored faith.

Case 1:23-cv-00480-CCE-LPA    Document 69-3    Filed 08/18/23    Page 20 of 21

## Conclusion

The Court here is tasked not with finding whether the Kentucky Constitution explicitly contains the right to an abortion, but rather with discerning whether the laws at issue constituting near total bans on abortion violate the rights of privacy, self-determination, equal protection, and religious freedom guaranteed by the Kentucky Constitution. The Plaintiffs have demonstrated at the very least a substantial question as to the merits regarding the constitutionality of both the Trigger Ban and the Six Week Ban. As such, they are entitled to injunctive relief until the matter can be fully resolved on the merits. Therefore, with the Court being sufficiently advised;

**IT IS ORDERED THAT** Plaintiffs' Motion for a Temporary Injunction is **GRANTED**. The Defendants are enjoined from enforcing KRS 311.772 and KRS 311.7701-7711, pending full resolution of this matter on the merits, until further order of this Court. The previously filed bond is continued. Accordingly, the Temporary Restraining Order issued on June 30, 2022 is hereby dissolved pursuant to CR 65.03(5).

ENTERED IN COURT
DAVID L. NICHOLSON, CLERK

JUL 2 2 2022

BY_____
DEPUTY CLERK

_____
HON. MITCH PERRY, JUDGE

Date: _July 22, 2022_

Time: _10:00 am_

CC:  Hon. Michele Henry
*Counsel for Plaintiffs*

Hon. Carrie Flaxman
*Counsel for Plaintiffs*

Hon. Brigitte Amiri
Hon. Chelsea Tejada
Hon. Faren Tang
*Counsel for Plaintiffs*

Hon. Victor Maddox
Hon. Christopher Thacker
Hon. Lindsey Keiser
*Counsel for Daniel Cameron*

Hon. Wesley Duke
*Counsel for Office of the Secretary of Kentucky's Cabinet for Health and Family Services*

Hon. Heather Gatnarek
*Counsel for Plaintiffs*

Hon. Hana Bajramovic
*Counsel for Plaintiffs*

Hon. Leah Goesky
Hon. Kendall Turner
*Counsel for Plaintiffs*

Hon. Leanne Diakov
*Counsel for Kentucky Board of Medical Licensure*

Hon. Jason Moore
*Counsel for the Office of the Commonwealth's Attorney, 30th Judicial Circuit*

20