IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| PLANNED PARENTHOOD SOUTH ATLANTIC, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| JOSHUA STEIN, *et al.*, | ) Case No. 1:23-cv-00480-CCE-LPA ) |
| Defendants, | ) ) |
| and | ) ) |
| PHILIP E. BERGER, *et al.*, | ) ) |
| Intervenor-Defendants. | ) |

**SUPPLEMENTAL BRIEF IN SUPPORT OF
PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY INJUNCTION**

After discovery, the record remains clear: the Hospitalization and IUP Documentation Requirements are not rationally related to patients' health, and the IUP Documentation Requirement fails to give adequate notice of what it demands. The Requirements therefore violate the Fourteenth Amendment.

**I. Intervenors' Witnesses Fail to Undermine the Medical Consensus**

Intervenors' defense of the challenged provisions rests entirely on the testimony of Drs. Wubbenhorst and Bane, but neither's testimony should be credited. Neither has ever performed an abortion. Dep. of Dr. Monique Wubbenhorst ("Wubbenhorst Dep.") 36:5–6 **(Ex. 3)**; Dep. of Dr. Susan Bane ("Bane Dep.") 32:23–24 **(Ex. 4)**. Dr. Wubbenhorst has no

1

clinical or academic background in abortion; she opted out of abortion training in her residency. Wubbenhorst Dep. 36:12–16. And while Dr. Bane relies by analogy on her experience managing miscarriage, she has never performed a D&E to manage miscarriage. Bane Dep. 30:7–9.

Moreover, these witnesses' anti-abortion bias is evident. Dr. Wubbenhorst opposes abortion in all circumstances, including rape or incest. Wubbenhorst Dep. 31:2–5, 31:23–32:19. Dr. Wubbenhorst opposes abortion even for child victims of rape. *Id*. 32:8–33:1. She believes that doctors who provide abortion are committing murder, and that "all" abortions, even those with no complications, cause harm to women. *Id.* 31:20–22, 33:24–35:9. Dr. Bane referred to herself as a "pro-life advocate," repeatedly described abortion as the "direct and intentional killing of a human being," and demonstrated remarkable unfamiliarity with the risks of childbirth, saying that people "rarely" struggle with postpartum anxiety and depression. Bane Dep. 84:18–19, 13:1–2, 40:15–16, 79:22–80:1.

These witnesses' opinions that abortion is unsafe, and that carrying a pregnancy to term and delivering a baby are safer than abortion, are not supported by credible evidence, and are contrary to every mainstream medical organization's conclusion. *See, e.g.*, Rebuttal Decl. of Dr. Christy Boraas Alsleben ("Boraas Rebuttal Decl.") ¶¶ 7–29, DE 69-1.

## II. Discovery Shows that Plaintiffs Are Likely to Succeed on the Merits

### A. *It is irrational to require hospitalization for abortion after the twelfth week.*

Even under rational basis review, any presumption of rationality can be rebutted with evidence or even "common knowledge." *Borden's Farm Prods. Co. v. Baldwin*, 293

U.S. 194, 209–10 (1934); *see also, e.g.*, *St. Joseph Abbey v. Castille*, 712 F.3d 215, 226 (5th Cir. 2013). Here, the overwhelming evidence of abortion's safety—both before and after the twelfth week of pregnancy—more than rebuts any presumption that the General Assembly acted rationally in requiring hospitalization for abortion, a politically stigmatized type of medical care, but not for less-stigmatized procedures. *See* PI Memo, DE 49 at 9–13; PI Reply, DE 69 at 2–7.

First, complications from abortion are incredibly rare. PPSAT performed 38,795 abortions in North Carolina between January 1, 2020 and June 30, 2023; 522 complications resulted, most of which were minor. Rebuttal Decl. of Dr. Katherine Farris ("Farris Rebuttal Decl.") ¶ 8, DE 69-2; Bates 0106 **(Ex. 13)**. PPSAT screens all abortion patients for conditions that increase the risk of complications and refers high-risk patients to hospitals for their abortions. Dep. of Dr. Katherine A. Farris ("Farris Dep.") 166:9–22 **(Ex. 2)**. Second, when abortion complications do arise, the vast majority can be treated safely in the clinic. Dep. of Dr. Christy Boraas Alsleben ("Boraas Dep.") 170:17–171:15, 171:21–173:7, 152:14–153:1 **(Ex. 1)**; Farris Dep. 65:2–8, 62:20–63:10; *see also* Bane Dep. 94:4–13, 95:17–20; *id*. 104:20–21. Of the 38,795 abortions between January 1, 2020 and June 30, 2023, only 31 patients (or 0.08%) were transferred to a hospital. Farris Rebuttal Decl. ¶ 8, DE 69-2; Bates 0051–0052 **(Ex. 12)**; Bates 0106; Bates 0107 **(Ex. 14)**. All 31 were treated and released in stable condition, and only 7 (or 0.02%) required admission. Farris Rebuttal Decl. ¶ 8, DE 69-2; Bates 0051–0052; Bates 0107. There is no medical reason to require that abortions be provided in hospitals when the need for hospital treatment is so

3

extraordinarily rare, and rarer than for other outpatient procedures. *See* PI Memo, DE 49 at 9–11; PI Reply, DE 69 at 5, 7.

Nor does a hospital setting improve patient safety. *See, e.g.*, Boraas Dep. 175:6–9; Farris Dep. 75:4–6. Research shows that second-trimester D&E procedures can be both safer and more affordable in outpatient clinics than in hospitals. Decl. of Dr. Katherine Farris ("First Farris Decl.") ¶ 38 & n.30, DE 49-1; *accord* Wubbenhorst Dep. 131:22–132:10. And by delaying survivors of rape or incest and patients with life-limiting anomalies, the Hospitalization Requirement forces these patients to obtain abortions later than they otherwise would, when the risk (although still very low) has increased. Farris Dep. 164:25–165:10, 145:17–18; *see* Boraas Dep. 149:11–22; Wubbenhorst Dep. 64:16–18; Bane Dep. 57:5–7. The Hospitalization Requirement therefore undermines patient safety.

Crucially, Intervenors have failed to identify any safety justification for a hospitalization requirement that applies to abortion after the twelfth week of pregnancy, but not to procedures of equal or greater risk, including *clinically identical* procedures to treat miscarriage. *See* Intervenors' Interrog. Resp. Nos. 5, 6 **(Ex. 5)**. The various abortion complications highlighted by Intervenors also arise during miscarriage management and childbirth—indeed, they are *more likely* to occur as a result of childbirth. *E.g.* Boraas Dep. 92:3–10, 173:8–175:5; *accord* Bane Dep. 26:5–9; *see also id*. at 94:4–13, 100:5–16, 101:16–23, 103:17–21.

Finally, to the extent Intervenors defend the Hospitalization Requirement based on

4

what instruments are used in procedural abortion starting after the twelfth week of pregnancy, the record shows that abortion providers do not routinely start using additional instruments immediately after the twelfth or even fourteenth week of pregnancy. *E.g.* Farris Dep. 17:16–19, 72:10–20, 165:15–19; Boraas Dep. 151:17–23.

      B.     *The IUP Documentation Requirement is unconstitutionally vague.*

The IUP Documentation Requirement fails to provide notice of what it requires or permits for patients seeking early medication abortion. N.C. Gen. Stat. § 90-21.83B(a)(7); *see* TRO, DE 31 at 6–7; *accord* Def. Att'y General Joshua H. Stein's PI Response, DE 63 at 14–17.

Intervenors read the IUP Documentation Requirement to demand that an abortion provider *visually identify* an intrauterine pregnancy by transvaginal ultrasound before providing a medication abortion. Int. Br., DE 65 at 20, 22. But this interpretation would effectively ban medication abortion in the earliest weeks of pregnancy. *See* Farris Dep. 20:23–25; Boraas Dep. 145:7–13. Intervenors' discovery responses confirm that the General Assembly did not intend to ban medication abortion until after the twelfth week of pregnancy—as the General Assembly later clarified directly through H.B. 190. *See* E-mail from Nathan Babcock to Rob Lamme (May 16, 2023, 08:15 AM ET) **(Ex. 6)** (email from Intervenor Senator Philip Berger's senior policy advisor stating that "SB20 states that medication abortion shall be lawful through 12 weeks"); E-mail from Nathan Babcock to Rob Lamme (June 12, 2023, 03:24 PM ET) **(Ex. 7)** (email from same individual stating that "[t]he intent is to prohibit elective medical abortions after 12 weeks—and that is what

5

the bill states in the key section listing when abortion is legal and when it is not."); Session Law 2023-65, DE 26-1 § 14.1(f) (striking language suggesting that medication abortion was lawful only through 70 days' gestation).

Of course, to the extent the IUP Documentation Requirement requires only that medication abortion patients be screened for ectopic pregnancy, Plaintiffs comply with this requirement, while also giving patients the option of receiving their desired medical care more promptly. *See* Farris Dep. 137:9–15, 86:6–8; 111:4–11, 162:15–163:13 (patients with pregnancies of unknown location are screened for ectopic pregnancy); 107:3–8, 109:14–21, 110:5–9, 163:8–17 (high-ectopic risk patients are not provided medication abortion, but instead referred for prompt evaluation and treatment); 163:18–164:8 (low-ectopic risk patients are given option of medication abortion along with continued screening for ectopic pregnancy); 164:9–24 (low-ectopic-risk patients who choose medication abortion are counseled on ectopic pregnancy risks and symptoms and concurrently receive serial hCG testing and close follow-up to definitively exclude ectopic pregnancy).

Given the threat of possible criminal and/or professional penalties for violating the Act, however, *see* Int. Br., DE 65 at 18, Plaintiffs will be chilled from adopting this reading of the IUP Documentation Requirement absent further clarity from the Court.

C. *If the IUP Documentation Requirement bans early medication abortion, it is irrational.*

To the extent Intervenors' interpretation of the IUP Documentation Requirement controls, it bans medication abortion in the earliest weeks of pregnancy without any basis

6

in patient safety and is therefore irrational.

Intervenors suggest that visual confirmation of intrauterine pregnancy by ultrasound is necessary to exclude the possibility of ectopic pregnancy. *See* Intervenors' Interrog. Resp. Nos. 10, 11, 12. Both Drs. Wubbenhorst and Bane testified that they believed PPSAT does not perform ultrasounds before abortions. Bane Dep. 112:5–8; Wubbenhorst Dep. 145:2–7. But North Carolina law *requires* that all patients receive an ultrasound prior to obtaining a medication abortion, *see* 10A N.C. Admin. Code 14E.0305(d), *replaced by* 10A N.C. Admin. Code 14E.0321(d) (effective July 1, 2023), and Plaintiffs are not challenging that requirement here, Farris Dep. 84:18-20, 129:12-18.

Instead, Plaintiffs argue that it is irrational to deny medication abortion to patients whose pregnancies are not yet visible by ultrasound and who are low risk for ectopic pregnancy. Because these patients have been screened *and deemed low risk*, they are considered patients with a pregnancy of unknown location, not patients with a "confirmed" or "suspected" ectopic pregnancy—distinct diagnostic categories. *Compare* Wubbenhorst Dep. 142:6–20, *with* Farris Dep. 102:22–103:6, 108:2–7, 110:10–19, 162:3–14, 168:17–23; Boraas Dep. 127:6–16, 145:20–146:1, 164:22–165:22. These patients need not wait until an intrauterine pregnancy is visible on a *subsequent* ultrasound before initiating medication abortion in accordance with Plaintiffs' evidence-based protocol that concurrently excludes the possibility of ectopic pregnancy. Farris Dep. 98:24–99:11, 137:9–15, 139:22–25; Boraas Dep. 160:2–168:3.

Intervenors suggest that a ban on very early medication abortion is justified because

7

the FDA label for mifepristone states that it is "contraindicated" for ectopic pregnancy. Int. Br., DE 65 at 3, 21. But Intervenors ignore that mifepristone is contraindicated for patients with "*confirmed/suspected* ectopic pregnancy or undiagnosed adnexal mass," DE 65-2 at 1 (emphasis added), not for patients who have been clinically deemed low-risk for ectopic pregnancy—and low-ectopic-risk patients are the ones Plaintiffs would treat but for the IUP Documentation Requirement.

Even taken at face value, this argument misunderstands what it means for a medication to be contraindicated. As Intervenors' experts agree, mifepristone does not exacerbate or increase the risk of complications from ectopic pregnancy; it simply does not treat that condition. *See* Boraas Dep. 99:17–100:8; Farris Dep. 123:9–12, 155:8–14; *accord* Wubbenhorst Dep. 143:19–21 (medication abortion cannot cause an ectopic pregnancy to rupture). And Plaintiffs' evidence-based protocol does not interfere in any way with the detection and treatment of ectopic pregnancy. *See* Farris Dep. 155:8–14, 161:10–15; Boraas Dep. 163:7–19, 167:19–168:3; *accord* Wubbenhorst Dep. 143:22–25; Bane Dep. 108:2–13. Dr. Wubbenhorst testified that she is unaware of any early medication abortion patients who have experienced negative outcomes from an ectopic pregnancy as a result of PPSAT's protocol. Wubbenhorst Dep. 153:18–22.

Intervenors' suggestion that patients will confuse the symptoms of an ectopic rupture with those of a medication abortion, Int. Br., DE 65 at 23, is unlikely given the significant differences between the severe, sharp pain associated with ectopic rupture and the midline cramping associated with medication abortion. Boraas Dep. 140:12–16,

140:22–141:19; Farris Dep. 129:8–11, 130:17–25. In fact, Dr. Wubbenhorst says that symptoms of a ruptured ectopic pregnancy are straightforward: "Women will often say they felt a pop, they experienced terrible pain in their right side, and they feel faint." Wubbenhorst Dep. 182:16–25; *see also* Bane Dep. 119:16–122:19 (explaining that ectopic rupture may involve "spotting" or "a little bit of heavier bleeding," but not the volume of vaginal bleeding associated with miscarriage). And PPSAT's patients are counseled to remain alert specifically for symptoms of ectopic pregnancy. *See* Bates 0119–0120 **(Ex. 15)** (PPSAT patient education materials); Farris Dep. 125:2–9, 164:9–24.

One study indicates that ectopic pregnancies are detected *sooner* when patients are allowed to access early medication abortion as compared to when they wait for treatment until their pregnancy can be seen by ultrasound. Boraas Rebuttal Decl. ¶ 49 & n.61, DE 69-1 (citing and discussing Alisa B. Goldberg et al., *Mifepristone and Misoprostol for Undesired Pregnancy of Unknown Location*, 139 Obstetrics & Gynecology 771 (2022)); *see also* Boraas Dep. 167:4–168:3. This lack of means-ends fit between the Requirement and the goal of promptly detecting ectopic pregnancies indicates that detecting ectopic pregnancy was not the General Assembly's true purpose, but rather a justification invented once this litigation was underway. *See* E-mail from John Thorp to Paul Stam (June 30, 2023, 08:23 PM ET) **(Ex. 8)** (John Thorp, a frequent witness in support of abortion restrictions,[1] suggests that IUP Documentation Requirement was intended "to prevent harm

---

[1] *See Planned Parenthood of Wis., Inc. v. Van Hollen*, 94 F. Supp. 3d 949, 967 n.16 (W.D. Wis. 2015) (expressing "several concerns with Dr. Thorp's credibility").

from ectopic pregnancy" and that the Court "did not understand" this); E-mail from Tami Fitzgerald to Neal Inman & Demi Dowdy (Mar. 23, 2023, 08:02 AM ET) **(Ex. 9)** (email from NC Values Coalition to Speaker Moore's office attaching "list of things we would like to see in the pro-life bill"); Requirements for the Pro-Life Bill **(Ex. 10)** (number one includes "restrictions on chemical abortion"); *Chemical Abortion: Protocols for a Risky Business*, Chemical Abortion National Coalition (Jan. 2023) **(Ex. 11)** (model legislation including the IUP Documentation Requirement under Section 5(a)(7)).

Of course, banning medication abortion in the earliest weeks of pregnancy is logically incompatible with the Act's intent—that people obtain abortion as early in pregnancy as possible, and that abortion remain generally lawful through the twelfth week of pregnancy. *See* N.C. Gen. Stat. § 90-21.81A. As both the published research and Plaintiffs' experts explain, there is no reason for the government to *mandate* that people wait to obtain a medication abortion until their pregnancy is visible by ultrasound, rather than allowing them to opt for a safe and effective medication abortion protocol with concurrent ectopic pregnancy screening. Farris Dep 159:3–20, 161:10–15. As Dr. Boraas testified, "when we have . . . a perfectly safe and effective way to provide abortion care in the setting of a pregnancy of unknown location, . . . I think it's rather cruel to make a person wait." Boraas Dep. 167:19–168:3, 98:4–9; *accord* Farris Dep. 148:14–149:11, 152:24–153:11.

## CONCLUSION

For the foregoing reasons and those Plaintiffs have presented in previous submissions, this Court should grant Plaintiffs' amended motion for a preliminary injunction.

Dated: September 12, 2023

Respectfully submitted,

/s/ Kristi Graunke
Kristi Graunke
NC Bar # 51216
Jaclyn Maffetore
NC Bar # 50849
American Civil Liberties Union
of North Carolina Legal Foundation
P.O. Box 28004
Raleigh, NC 27611
Tel.: (919) 354-5066
kgraunke@acluofnc.org
jmaffetore@acluofnc.org

COUNSEL FOR ALL PLAINTIFFS

Brigitte Amiri*
Lindsey Kaley*
Ryan Mendias*
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2633
bamiri@aclu.org
lkaley@aclu.org
rmendias@aclu.org

COUNSEL FOR BEVERLY GRAY, M.D.

/s/ Hannah Swanson
Hannah Swanson*
Helene T. Krasnoff*
Planned Parenthood Fed. of America
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
Tel.: (202) 803-4030
hannah.swanson@ppfa.org
helene.krasnoff@ppfa.org

Anjali Salvador*
Planned Parenthood Fed. of America
123 William Street, 9th Floor
New York, NY 10038
Tel.: (212) 541-7800
anjali.salvador@ppfa.org

COUNSEL FOR PLANNED
PARENTHOOD SOUTH ATLANTIC

*Special appearance filed

## CERTIFICATE OF WORD COUNT

Relying on the word count function of Microsoft Word, I hereby certify that this brief is 2,498 words in length and, therefore, complies with the 2,500 word limitation prescribed by the Court's scheduling order of July 6, 2023.

*/s/ Hannah Swanson*
Hannah Swanson*
Planned Parenthood Fed. of America
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
Tel.: (202) 803-4030
hannah.swanson@ppfa.org

*\*Special appearance filed*

## CERTIFICATE OF SERVICE

I hereby certify that, on September 12, 2023, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which served notice of this electronic filing to all counsel of record.

*/s/ Hannah Swanson*
Hannah Swanson\*
Planned Parenthood Fed. of America
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
Tel.: (202) 803-4030
hannah.swanson@ppfa.org

\**Special appearance filed*