# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION FILE NO. 1:23-CV-480

PLANNED PARENTHOOD SOUTH )
ATLANTIC, et al., )
)
                 Plaintiffs, )
)
    vs. )
)
JOSHUA STEIN, et al., )
)
                 Defendants )
)
and )
)
PHILIP E. BERGER and TIMOTHY K. )
MOORE, )
)
                 Intervenor- )
                 Defendants )
--------------------------------

_____
VIDEO CONFERENCE DEPOSITION
OF
CHRISTY MARIE BORAAS ALSLEBEN, MD
_____


TAKEN VIA VIDEO CONFERENCE AT THE OFFICES OF:
CHAPLIN AND ASSOCIATES, INC.
NETWORKING WITH:
CAPE FEAR COURT REPORTING, INC.


08-29-2023
10:06 O'CLOCK A.M.
_____
Gretchen Wells
Court Reporter

2

REMOTE APPEARANCES

FOR PLANNED PARENTHOOD SOUTH ATLANTIC:
   Hannah Swanson, Esquire
   Kara L. Grandin, Esquire
   Anjali Salvador, Esquire
   Dylan Cowit, Esquire
   PLANNED PARENTHOOD FEDERATION OF AMERICA
   1110 Vermont Avenue NW, Suite 300
   Washington, DC 20005
   hannah.swanson@ppfa.org
   kara.grandin@ppfa.org
   anjali.salvador@ppfa.org
   dylan.cowit@ppfa.org

FOR ALL PLAINTIFFS:

   Jaclyn A. Maffetore, Esquire
   ACLU OF NORTH CAROLINA
   P.O. Box 28004
   Raleigh, NC 27611
   jmaffetore@acluofnc.org

FOR THE PLAINTIFF DR. BEVERLY GRAY:

   Brigitte Amiri, Esquire
   Ryan Mendias, Esquire
   AMERICAN CIVIL LIBERTIES UNION FOUNDATION
   125 Broad Street, 18th Floor
   New York, NY 10004-2400
   bamiri@aclu.org
   rmendias@aclu.org

3

REMOTE APPEARANCES

FOR THE LEGISLATIVE LEADER DEFENDANTS
SENATOR BERGER AND SPEAKER MOORE:

    W. Ellis Boyle, Esquire
    WARD & SMITH, PA
    751 Corporate Center Drive, Suite 300
    Raleigh, NC 27607
    ewboyle@wardandsmith.com
Julia Payne, Esquire
    ALLIANCE DEFENDING FREEDOM
    15100 N. 90th Street
    Scottsdale, AZ 85260
    jpayne@adflegal.org

    Denise M. Harle, Esquire
    ALLIANCE DEFENDING FREEDOM
    1000 Hurricane Shoals Rd NE, Suite D-1100
    Lawrenceville, GA 30043
    dharle@adflegal.org

    Erin M. Hawley, Esquire
    ALLIANCE DEFENDING FREEDOM
    440 First Street NW, Suite 600
    Washington, DC 20001
    ehawley@adflegal.org

FOR THE DISTRICT ATTORNEY JIM O'NEILL
    Kevin G. Williams
    BELL DAVIS & PITT, P.A.
    100 N. Cherry Street, Suite 600
    Winston-Salem, NC 27101

FOR ATTORNEY GENERAL JOSH STEIN:
    South A. Moore
    NORTH CAROLINA DEPARTMENT OF JUSTICE
    14 West Edenton Street
    Raleigh, NC 27603
    smoore@ncdoj.gov

Case 1:23-cv-00480-CCE-LPA   Document 74-1   Filed 09/12/23   Page 4 of 190

4

1                         REMOTE APPEARANCES

2

3    FOR ALL DISTRICT ATTORNEY DEFENDANTS
     EXCEPT JIM O'NEILL:

4

5        Elizabeth C. O'Brien, Esquire
         NORTH CAROLINA DEPARTMENT OF JUSTICE

6        14 West Edenton Street
         Raleigh, NC 27603

7        eobrien@ncdoj.gov

8

     FOR THE NORTH CAROLINA MEDICAL BOARD,

9    NORTH CAROLINA BOARD OF NURSING:

10       Michael E. Bulleri
         NORTH CAROLINA DEPARTMENT OF JUSTICE

11       14 West Edenton Street
         Raleigh, NC 27603

12       mbulleri@ncdoj.gov

13

     FOR THE DEPARTMENT OF HEALTH AND HUMAN SERVICES

14

         Colleen M. Crowley, Esquire

15       NORTH CAROLINA DEPARTMENT OF JUSTICE
         14 West Edenton Street

16       Raleigh, NC 27603
         ccrowley@ncdoj.gov

17

18

     OTHER APPEARANCES

19

     Shealyn Massey

20     Planned Parenthood Federation of America
     Vanisha Kudumuri

21     Planned Parenthood Federation of America
     Joshua Yost

22     General Counsel, Office of the
       Senate President Pro Tempore

23

24

25

Case 1:23-cv-00480-CCE-LPA   Document 74-1   Filed 09/12/23   Page 5 of 190

5

# I N D E X

STIPULATIONS                                        6
EXAMINATION
    By Mr. Boyle                              10, 177
    By Ms. Grandin                                168


ADJOURNMENT                                       186
REPORTER CERTIFICATE                              187
WITNESS CERTIFICATION                             188
WITNESS ADDENDUM                                  189

# E X H I B I T S

| Name | Offered By | Identified |
|------|-----------|-----------|
| Exhibit A | All parties | 7 |
| (Declaration of Deponent) | | |

NOTE: Quoted material has been reproduced as read or
quoted by the speaker.

Case 1:23-cv-00480-CCE-LPA   Document 74-1   Filed 09/12/23   Page 6 of 190

6

1                    STIPULATIONS
2
3          Pursuant to Notice and/or consent of the parties,

the deposition hereon captioned was conducted at the
4
time and location indicated and was conducted before
5
Gretchen Wells, Notary Public in and for the County of Iredell,
6
State of North Carolina at Large.
7
           Notice and/or defect in Notice of time, place,
8
purpose and method of taking the deposition was waived.
9
Formalities with regard to sealing and filing the
10
deposition were waived, and it is stipulated that the
11
original transcript, upon being certified by the
12
undersigned court reporter, shall be made available for
13
use in accordance with the applicable rules as amended.
14
           It is stipulated that objections to questions
15
and motions to strike answers are reserved until the
16
testimony, or any part thereof, is offered for evidence,
17
except that objection to the form of any question shall
18
be noted herein at the time of the taking of the
19
testimony.
20
           Reading and signing of the testimony was requested
21
prior to the filing of same for use as permitted by
22
applicable rule(s).
23
24
25

1                        PROCEEDINGS
2          (10:06 o'clock a.m.)
3                        THE COURT REPORTER:  We are now on the
4   record.  Today's date is Tuesday, August 29th, 2023,
5   and the time is 10:06 a.m.  This is the deposition of
6   Dr. Boraas taken in the matter of Planned Parenthood
7   South Atlantic, et al., versus Joshua Stein, et al.,
8   Defendants, and Philip E. Berger and Timothy K. Moore
9   in the United States Court for the Middle District of
10  North Carolina, Civil Action File Number 1:23-CV-480.
11          The witness has signed a Declaration of
12  Deponent which will be attached to the transcript as
13  Exhibit A.
14                        (DEPOSITION EXHIBIT
15                        LETTER A WAS MARKED
16                        FOR IDENTIFICATION)
17                        THE COURT REPORTER:  I'll ask the
18  attorneys to please introduce yourselves and who you
19  represent, and indicate for the record whether anyone
20  else is present in the room with you.
21                        MR. BOYLE:  Good morning.  My name is
22  Ellis Boyle.  I represent the Legislative Leader
23  Defendants, Senator Berger and Speaker Moore.  No one
24  else is in the room with me.  And I am joined by my
25  co-counsel, Julia Payne and Denise Harle.  I'll let

1   them say whether anyone is in the room with them.  And

2   my clients' lawyer, Joshua Yost, is also joining us.

3                   MS. PAYNE:  This is Julia Payne with

4   the Alliance Defending Freedom.  No one is here with

5   me.  I'm in my office by myself.

6                   MS. HARLE:  Denise Harle here.  No one

7   is joining me.

8                   MR. YOST:  Joshua Yost, general counsel

9   for Senator Berger, and no one else is in the room

10  with me.

11                  MS. GRANDIN:  Good morning everyone.

12  My name is Kara Grandin, counsel for Planned

13  Parenthood South Atlantic.  No one else is in the room

14  with me.  I am joined by co-counsel from Planned

15  Parenthood Federation of America and the ACLU.  I'll

16  let them introduce themselves as well.

17                  MS. SALVADOR:  Hi.  Anjali Salvador,

18  also co-counsel for Planned Parenthood South Atlantic.

19  No one is in the room for -- with me.

20                  MR. BOYLE:  You're on mute.

21                  MS. SWANSON:  Thanks.  This is Hannah

22  Swanson, also for Planned Parenthood South Atlantic,

23  and no one is in the room with me.

24                  MS. AMIRI:  And this is Brigitte Amiri

25  from the ACLU, representing Dr. Gray, and no one else

1   is in the room with me.

2               MR. MENDIAS:  This is Ryan Mendias,

3   also for Dr. Gray, also with the ACLU, and no one is

4   in the room with me.

5               MR. MOORE:  Hi.  My name is South

6   Moore.  I'm at the North Carolina Department of

7   Justice, and I'm representing Attorney General Josh

8   Stein.  No one else is in the room with me.

9               MS. MAFFETORE:  Apologies, one more for

10  Plaintiffs.

11              MR. MOORE:  I'm sorry.

12              MS. MAFFETORE:  My name is Jaclyn

13  Maffetore.  I'm with the ACLU of North Carolina.  I

14  represent all Plaintiffs in this matter, and nobody's

15  in the room with me.

16              MR. BULLERI:  I'm Michael Bulleri.  I

17  represent the North Carolina Medical Board, North

18  Carolina Board of Nursing, and no one is in the room

19  with me.

20              MR. WILLIAMS:  Good morning everyone.

21  My name is Kevin Williams, and I represent District

22  Attorney Jim O'Neill, and no one is in the room with

23  me.

24              MS. CROWLEY:  Colleen Crowley, with the

25  North Carolina Department of Justice, and I represent

1   DHHS, and no one is in the room with me.

2                 MS. O'BRIEN:  Good morning.  I'm

3   Elizabeth Curren O'Brien.  I -- with North Carolina

4   Department of Justice, and I represent the DA

5   Defendants except for District Attorney O'Neill, who

6   Kevin Williams represents.

7                 THE COURT REPORTER:  Okay.  I believe

8   that is everyone on my list.  And since she has signed

9   a Declaration of Deponent, we can begin.

10                MR. BOYLE:  Very good.

11                THE WITNESS:  I'm in the room by myself

12  too.  Just didn't want to get left out.

13          The witness, CHRISTY MARIE BORAAS ALSLEBEN,

14  MD, under the penalty of perjury, testifies as

15  follows:

16                      EXAMINATION

17  BY MR. BOYLE:

18      Q.   Very good.  Good morning, Doctor.  Have you

19  ever been deposed before or given testimony under

20  oath?

21      A.   I have not.

22      Q.   Okay.  So obviously, we're doing this by

23  Zoom so we're not sitting in a room.  It's more formal

24  than a normal conversation would be.  There's a few

25  ground rules I just want to run over with you.

1    A.    Sure.

2    Q.    You may have already heard this.  If you

3 have, I apologize for repeating it.  First, the court

4 reporter is going to be typing up and transcribing

5 everything that we say.  So it's important to make her

6 job easier, two things.

7         One, that we try not to talk over each

8 other.  That can be a little tricky when you're in the

9 Zoom context because there could be a delay.  I think

10 hopefully we'll get our sea legs as we go along and

11 we'll try and see when one person's talking until they

12 finish.  And you're doing a great job so far.

13        And I may be guilty of this as well.  So I

14 apologize if we start stepping over each other with

15 talking, I may politely try and redirect us.  If I do

16 that, please don't be offended.  It's not meant to be

17 offensive.  Just trying to keep my court reporter

18 happy.  I always find that's a good thing.

19    A.    Sure.

20    Q.    Good.  And then the second thing is nods and

21 saying "uh-huh," those are perfectly normal in a

22 normal conversation.  Like I said, this is more

23 formal.  With transcriptions, if you nod your head up

24 and down and you mean yes, that doesn't really

25 translate well to the written transcript.

1    So as we go along, if I ask a question and I
2 can tell what your answer is but you haven't said it
3 out loud, I may prompt you.  Again, if I do that, it's
4 not intended to be rude at all.  It's more for the
5 formality and the court reporter.  Is that okay?
6    A.   That sounds great.
7    Q.   Good.  Doing a good job so far.  Finally,
8 there is an expectation that you will answer the
9 questions asked even if there is an objection, absent
10 some type of instruction from your lawyer, the lawyer
11 representing you, to the contrary, okay?
12    A.   Yes.
13    Q.   Very good.  Your medical specialty is in
14 obstetrics -- I always say that wrong, obstetrics and
15 gynecology.  Is that correct?
16    A.   Yes.  I completed an obstetrics and
17 gynecology residency.
18    Q.   And the obstetrics part of the OB/GYN deals
19 with pregnancy.  Is that right?
20    A.   Yes.
21    Q.   Sometimes, you provide treatment and care to
22 a pregnant woman as an obstetrician that leads to the
23 birth of the pregnant woman's child.  Is that right?
24    A.   Absolutely.
25    Q.   In that case, you would have provided

1  obstetrics care to the mother and child through the
2  birth of the child.  Is that right?
3      A.    We see -- yeah.  I see pregnant people in
4  clinic all the time and provide antenatal care up
5  until the point of birth, yes.
6      Q.    And just -- I think I understood that, but
7  just -- I'm a simple man.  That means for the mother
8  and the child up until the point of birth, right?
9      A.    For the mother and the fetus, yes.
10     Q.    And I -- I understand our terms may be a
11 little bit different but ---
12     A.    Uh-huh (yes).
13     Q.    --- can we agree that, within reason, if we
14 use a little bit different terms but we understand
15 what each other's saying, we can just keep the
16 conversation going with our own particular terms?  Is
17 that fair?
18     A.    Sounds fine to me.
19     Q.    Yeah.  And I'm not asking you to adopt my
20 terminology, and I think it's fine if you don't adopt
21 mine.  I think, typically, unborn child and fetus, I
22 think we might be able to use interchangeably,
23 understanding you may say fetus when I say unborn
24 child.  Is that fair?
25              MS. GRANDIN:  Objection to form.

14

1         MR. BOYLE:  This is one of those ---

2         THE WITNESS:  So I'm going to -- you

3  know, as a medical expert in -- for this deposition,

4  I'm going to stick to the medical terminology that's

5  used in science.  So I'm going to stick to that for my

6  answers.

7       Q.   (Mr. Boyle)  Yes, and I'm not suggesting you

8  shouldn't.  I'm just saying, so we keep the flow, you

9  understand what I'm saying and I understand what

10  you're saying.  Unless there's a question, in which

11  case please stop me and ask me to clarify, okay?

12       A.   Yeah.  Certainly, if there's -- you know, if

13  there's certain terminology that you're using that

14  it's -- that is not clear to me, I'll be sure to ask.

15  Thank you.

16       Q.   Very good.  After the child is born,

17  typically the child's care shifts over to the

18  pediatrician, and you stop seeing the child as your

19  patient as an obstetrician.  Is that fair?

20       A.   That is, yeah, a good characteristic of my

21  practice.  We don't -- I don't see any newborns as a

22  patient.

23       Q.   Okay.  An induced abortion involves some

24  mechanism to terminate a pregnancy before the birth of

25  what would otherwise appear to be a viable pregnancy

1  that would lead to the birth of a baby in the absence

2  of the induced abortion.  Is that correct?

3      A.    So induced abortion is the procedure --

4  using procedure or medicines to end the pregnancy

5  without the intention of continuing the pregnancy and

6  having -- and giving birth.

7      Q.    And in the absence of an induced abortion,

8  the expectation would be that it would be a viable

9  pregnancy and eventually a child would be born?

10     A.    Well, I mean, that's a lot of what, you

11  know, patients and the lay public think, right?  But

12  there -- miscarriage happens in one-fifth of

13  pregnancies, so I don't know that that's a completely

14  accurate statement.

15     Q.    Right.  Miscarriage being an unplanned

16  termination of the pregnancy.  But absent a

17  miscarriage, an induced abortion is meant to terminate

18  a pregnancy that hasn't yet miscarried and,

19  presumably, if it doesn't miscarry, would proceed all

20  the way to the birth of the child?

21     A.    I would say, you know, generally, that's

22  true.  However, there are certainly problems and

23  chromosomal abnormalities.  There are certainly

24  pregnancies that continue and, for reasons that

25  sometimes we know and sometimes we don't, you know,

16

1  end in a intrauterine fetal demise before birth.

2      Q.   Fair enough.  But not one that is

3  intentionally induced by an abortion?

4      A.   Not in that particular case, no.

5      Q.   You perform surgical abortion for some

6  pregnant women who are your patients, don't you?

7      A.   Yes.  I see pregnant people for procedural

8  abortion.

9      Q.   You perform chemical abortion for some

10  pregnant women who are your patients, don't you?

11           THE WITNESS:  I'm not sure what you ---

12           MS. GRANDIN:  Objection to form.  Go

13  ahead.  You can answer.

14           THE WITNESS:  Sorry, Zoom.  I'm not

15  entirely sure what you mean by "chemical."

16      Q.   (Mr. Boyle)  Well, using chemicals or drugs

17  to induce an abortion like -- well, I'm going to

18  butcher these words, misoprotrol (sic) and Mifeprex,

19  right?

20      A.   So if you're -- you -- I think what you're

21  talking about is using medicines, approved by the FDA

22  for use in our country, to end a pregnancy in the

23  first trimester, which would -- or second, depending

24  on what the patient needs, to induce a -- for the

25  mifepristone to block progesterone and the misoprostol

17

1  to cause cramping and bleeding so that the pregnancy

2  will pass.

3      Q.  Okay.  And so I may refer to that as

4  chemical abortion, but you may refer to it as medicine

5  abortion.  Is that sort of talking about the same

6  thing, using those two drugs to induce an abortion?\

7      A.  So the ---

8

9          MS. GRANDIN:  Objection to form.

10          THE WITNESS:  The medical term for that

11  is medication abortion.

12      Q.  (Mr. Boyle)  Okay.  And each of the women

13  that you performed an induced abortion on was

14  pregnant.  Is that right?

15      A.  For pregnant people that come to us, they've

16  had confirmation of the pregnancy and then are

17  requesting to end the pregnancy.  And then we discuss

18  options about how to do that.

19      Q.  And I'm sorry, so is the answer yes, the

20  people you performed an induced abortion on were

21  pregnant when you did that procedure?

22      A.  People who come requesting abortion have had

23  confirmation of their pregnancy, yes, so they are

24  pregnant.

25      Q.  So every time that you performed an induced

18

1    abortion on a woman who was your pregnant -- I'm

2    sorry, who -- a pregnant woman who was your patient,

3    what was supposed to happen to the unborn child?

4         A.   For people who make an appointment to

5    discuss abortion care and then have counseling and go

6    through informed consent and decide to proceed with

7    either medication or procedural abortion, those people

8    then have procedural termination of their pregnancy or

9    termination of the pregnancy with medicines.

10         Q.   And as an obstetrician, when you perform

11    those induced abortions, do you consider the unborn

12    child or the fetus to be your patient at that point?

13         A.   I don't.

14         Q.   How many induced abortions have you

15    performed in your career?

16         A.   I don't have an exact number to relay to the

17    assembled audience here today.  Many.

18         Q.   Many like a hundred or many like a hundred

19    thousand?  Somewhere in between?

20         A.   Somewhere between those two numbers, yes.

21         Q.   Okay.  Do you have an average per year that

22    you -- of induced abortions that you perform?

23         A.   I don't have an average per year, but maybe

24    a week.  I could provide probably numbers for weekly.

25    An average week would be somewhere between five and

1  15.  Sometimes, up to 20.

2      Q.   Okay.  So would you say an average week is

3  ten to 12?

4      A.   Sure.

5      Q.   And is that 50 weeks a year?

6      A.   I do take vacation occasionally, so yeah.

7      Q.   So -- yeah, I mean ---

8      A.   Forty -- 48 weeks a year.

9      Q.   Forty.  Okay, 40 weeks a year.  Fair enough.

10  Yeah.

11      A.   Yeah.

12      Q.   I wasn't trying to make you work all the

13  time.

14      A.   Yeah.  Okay.  Thanks.

15      Q.   So you're talking somewhere like 400 to 450

16  a year would be a fair estimate?

17              MS. GRANDIN:  Objection to form.  You

18  can answer.

19              THE WITNESS:  Again, it's hard to give

20  me -- give an exact number, but that's probably our

21  best guess for today.

22      Q.   (Mr. Boyle)  And how many years have you

23  been in this practice that that would be your typical

24  practice?

25      A.   I have been an attending physician since

1  2014.

2      Q.   So nine, coming on ten years.  Is that

3  right?

4      A.   Yes.  But please don't age me so fast.

5      Q.   You're far younger than me, so hopefully you

6  won't catch up.  The -- that sounded like -- that came

7  out wrong.  I apologize.  You're going to get older.

8  It's too bad.

9           The -- and in residency, were you doing the

10  same rough numbers of induced abortions per year?

11      A.   No.

12      Q.   Would you have been doing more or less

13  during residency?

14      A.   Less during residency because I was

15  learning, you know, many other aspects of obstetrics

16  and gynecology at that time as well.

17      Q.   How about during your two-year fellowship

18  for advanced family planning?

19      A.   Yeah.  So my fellowship, which you are

20  entirely correct was two years, was focused on

21  contraception for complex -- people with complex

22  medical conditions and clinical research, and also

23  focused care for induced abortion and abnormal

24  pregnancy as well as pregnancy of unknown location.

25      Q.   Have you ever performed a chemical or

21

1    medicine abortion on a patient who was pregnant with

2    twins?

3        A.    Yes.  Yeah, I have seen a pregnant person

4    that requested a medication abortion in the first

5    trimester.

6        Q.    And they were pregnant with twins?

7        A.    Correct.

8        Q.    Does that change the mechanism or the

9    process that you go through when you're performing a

10   chemical or medicine abortion with a patient who is

11   pregnant with twins?

12       A.    Our process for when a patient makes an

13   appointment with us to consider medication abortion is

14   pretty similar regardless of the characteristics of

15   the pregnancy.

16            So our process is to, you know, provide

17   thorough informed consent, to use our extensive

18   protocols about coercion and to ensure that people are

19   making their best decisions for themselves, and then

20   describe in detail expectations about what to expect

21   with medication abortion and what signs and symptoms

22   might prompt further follow-up.

23       Q.    Does the fact that a patient is pregnant

24   with twins change the actual amounts of medication or

25   chemicals given to induce the abortion for that

1  patient?

2      A.   No.  The medicines are the same.

3      Q.   Would that be true of a patient with

4  triplets or quadruplets or more also?

5           MS. GRANDIN:  Objection to form.

6           THE WITNESS:  I have never provided a

7  medication abortion for a patient that had triplets or

8  a higher-order multiple gestation.

9      Q.   (Mr. Boyle)  How do you know that?

10          MS. GRANDIN:  Objection to form.

11          THE WITNESS:  I have never done that to

12  the -- to my knowledge.

13     Q.   (Mr. Boyle)  How would you know if a

14  pregnant patient of yours is pregnant with twins or

15  triplets or quadruplets?

16     A.   Typically, we would know that from

17  ultrasound.

18     Q.   Are there any greater risks involved with a

19  patient who is pregnant with twins or triplets or

20  quadruplets getting a chemical or medical abortion?

21          MS. GRANDIN:  Objection to form.

22          THE WITNESS:  I can really only speak

23  to patients that I've seen that have had a twin

24  gestation.  And the answer to that part of the

25  question is no.

1    Q.   (Mr. Boyle)  Have you seen any studies that
2  describe that or talk about that?
3    A.   I don't recall seeing any studies
4  specifically discussing higher-order multiples and
5  medication abortion.
6    Q.   So you have your experience but you don't
7  have any additional scientific literature or studies
8  to support the question of whether there is a higher
9  risk for a pregnant patient who has twins or triplets
10 receiving a medical -- I'm sorry, medicine or chemical
11 abortion.  Is that correct?
12           MS. GRANDIN:  Objection to form.
13           THE WITNESS:  The risk for a person
14 with a singleton gestation would be the -- similar to
15 the risks of a person that has a twin gestation.
16    Q.   (Mr. Boyle)  But you don't have any studies
17 to support that conclusion, do you?
18    A.   At the ready, no.  But I certainly could do
19 an extensive literature search about that and get back
20 to you about that.
21    Q.   Is there any way to tell if a patient is
22 pregnant with twins or triplets or quadruplets other
23 than by taking a transvaginal ultrasound of that
24 patient?
25    A.   Transvaginal ultrasonography is not required

24

1 for diagnosing a multiple gestation.

2     Q.   You can do it without an ultrasound?

3     A.   You don't need a transvaginal one.

4     Q.   Okay.  You can -- oh, that's fair.

5 Ultrasound is the way that you tell if your pregnant

6 patient has twins or triplets or quadruplets, right?

7     A.   That would be -- that would be -- yes, that

8 -- it would be -- ultrasound is the typical way we

9 diagnose a multiple gestation, yes.

10     Q.   Do you think it's important to know if a

11 pregnant patient that you're providing an induced

12 abortion to has twins or triplets or quadruplets

13 before you provide that induced abortion?

14     A.   I think, given the rarity of spontaneous

15 triplets and certainly higher-order multiple

16 gestations for pregnant people in our country, that

17 that would be an irrational thing to require for each

18 person coming to access medication abortion.

19     Q.   I'm sorry, you said "an irrational thing."

20 What thing are you talking about?

21     A.   Like, an irrational thing to require an

22 ultrasound to ensure that you know whether or not a

23 person has a singleton gestation, which is the vast

24 majority of pregnant people, or a twin gestation,

25 which is a very low amount of people, versus a

1  higher-order multiple gestation like triplets or

2  quadruplets or quints or something crazy, which is

3  even -- which is just even more rare.  It's irrational

4  to require transvaginal ultrasonography when safety

5  isn't known to be improved for that.

6       Q.   Well, you said safety isn't known to be

7  improved but you also, I believe, said that you're not

8  aware of any studies of the risks in -- associated

9  with induced abortions for twins or triplets or

10  quadruplets.  Did I misstate that?

11            MS. GRANDIN:  Objection to form.

12            THE WITNESS:  What I -- what I want to

13  communicate to this group is that the risks of

14  medication abortion for somebody with a singleton

15  gestation or a twin gestation are the same.

16            I don't know of any other studies for --

17  again, at the top of my head, because -- because the

18  incidence of triplets, quadruplets, quints is so

19  exceedingly rare that there wouldn't -- I would not be

20  surprised if there aren't studies about that because

21  it is so rare.

22       Q.   (Mr. Boyle)  Is there any increased risk for

23  performing a surgical abortion on a patient who is

24  pregnant with twins or triplets or quadruplets?

25            MS. GRANDIN:  Objection to form.

1          THE WITNESS:  In the first trimester,

2   no.

3      Q.    (Mr. Boyle)  Have you seen any studies that

4   support your opinion on that?

5      A.    Not that I recall at this moment.

6      Q.    So you're unaware of any independent

7   corroborating scientific literature to support that

8   opinion, but that's your opinion.  Is that what you're

9   saying?

10     A.    Again, it's really hard -- with the vast

11  amount of literature on this topic, it's really hard

12  to keep all of that in my brain at one time.  But I

13  certainly am well versed at extensive literature

14  searches and could produce that if you -- if need be.

15     Q.    Well ---

16     A.    If it exists.

17     Q.    Sorry.

18     A.    Sorry.

19     Q.    No, please finish if you had something else.

20     A.    Yeah, so, I mean, it's not uncommon that as

21  a physician, right, if I have a clinical question,

22  that I would go to the literature and look things up

23  and to really examine that.

24          I can tell you that, in my practice, the

25  risk for a procedural abortion in the first trimester,

27

1    whether a patient has a singleton IUP or a twin
2    gestation, those two people would have similar risks.
3        Q.   And is that also true for second-trimester
4    procedural abortions?
5        A.   Second-trimester procedural abortions have
6    similar risks to the first.  However, when -- it
7    really just kind of depends on what the gestation is.
8    We would certainly, in the second trimester, you know,
9    be prepared for all the risks associated with the
10   procedure.
11       Q.   Have you looked at any documents or
12   guidelines from the Plaintiff, Planned Parenthood
13   South Atlantic, in this case?
14       A.   I have reviewed the declarations from
15   Dr. Farris.
16       Q.   Have you looked at any independent documents
17   beyond what Dr. Farris said in her declarations from
18   Planned Parenthood South Atlantic?
19       A.   No.
20       Q.   So you're not basing any of your opinions on
21   the actual guidelines or protocols from Planned
22   Parenthood South Atlantic, are you?
23       A.   I'm not employed by Planned Parenthood South
24   Atlantic, so I don't know their specific protocols.
25   What I do know is that Planned Parenthood Federation

28

1    of America convenes expert medical -- medically

2    trained people, advanced practice clinicians,

3    physicians, certified nurse midwives to review

4    evidence related to all aspects of care that we

5    provide at all affiliates, and there are standards

6    related to those.

7         Q.   So this is information that is shared

8    nationwide among Planned Parenthood subsidiaries.  Is

9    that what you're saying?

10        A.   Yeah.  There's what -- there's a national

11   group of medical experts that convenes and reviews

12   evidence and ensures that we have the most up-to-date,

13   evidence-based protocols to use in our health centers.

14        Q.   But none of your opinions in this case are

15   based on Planned Parenthood South Atlantic's internal

16   guides or protocols, because you haven't seen any of

17   those, correct?

18        A.   I have not seen them with my eyeballs, but I

19   suspect they are very similar to the ones we use here

20   at Planned Parenthood North Central States.

21        Q.   Did you read the laws at issue in this case

22   in the process of developing your opinions?

23        A.   I review -- I've read portions of them.

24        Q.   Which portions did you read?

25        A.   I mean, I can't -- I don't recall the

1  specifics, but I read the -- I read details related to

2  both the hospitalization requirement and the portion

3  that requires existence of -- documentation of the

4  existence of an intrauterine pregnancy.

5      Q.   And how did you know to just read those two

6  excerpts from the laws?

7      A.   In conversations with counsel, we reviewed

8  those two specific themes and the portions of the law

9  that pertain to them.

10     Q.   So as part of your conversations with the

11 Plaintiff's lawyers, you were given just specific

12 excerpts of the laws, not the whole law themselves?

13            MS. GRANDIN:  Objection.  Calls for

14 privileged information.  You can answer to the extent

15 you don't disclose any privileged communications.

16            THE WITNESS:  We -- I'm sorry, can you

17 repeat the question?

18     Q.   (Mr. Boyle)  Yeah.  So you were talking

19 about your conversations with counsel.  And I was just

20 asking specifically the conversations you had with the

21 Plaintiff's counsel involved just them feeding you the

22 specific excerpts, not the whole law, so you haven't

23 read the whole law to base your opinion.  Is that

24 correct?

25            MS. GRANDIN:  Same objection.

1           THE WITNESS:  I am perfectly capable of

2    scrolling and reading a PDF myself.  And I'm also a

3    very busy practicing clinician, and so I focused on

4    the portions of the law that I was planning to provide

5    expert testimony for.

6        Q.   (Mr. Boyle)  When were you first contacted

7    by Plaintiffs to be their expert witness in this case?

8        A.   In late July.

9        Q.   Did you have -- well, I guess you didn't

10   have anything to do with the temporary restraining

11   order portion of the case leading up to July 1st.  Is

12   that correct?

13       A.   That is correct.

14       Q.   Okay.  Do you agree that patient safety is

15   always the most important consideration when you're

16   treating a patient?

17           MS. GRANDIN:  Objection to form.

18           THE WITNESS:  Patient safety is

19   absolutely near the top, yes.

20       Q.   (Mr. Boyle)  Do you always choose to treat

21   your patients in the safest way?

22       A.   I aim to.

23       Q.   So as I understand it, you work for another

24   affiliate of the Planned Parenthood Federation of

25   America.  Is that correct?

1      A.    Yeah.   So I'm employed by the University of

2  Minnesota Medical School.  I'm an associate professor

3  in obstetrics and gynecology there.  I'm also a board

4  -- board certified in obstetrics and gynecology.

5           I'm also sub -- board certified in the

6  subspecialty of complex family planning and I provide

7  care at Planned Parenthood North Central States, as

8  you just described.

9      Q.    And so Planned Parenthood North Central

10  States is like a branch -- subsidiary branch of

11  Planned Parenthood Federation of America just like

12  Planned Parenthood South Atlantic is a branch here in

13  North Carolina.  Is that fair?

14      A.    Planned Parenthood North Central States is

15  an affiliate, yeah.  We -- that's how they are

16  described.  Uh-huh (yes).  So there's over -- you

17  know, sort of guiding principles and, like I said,

18  medical standards, but each affiliate is responsible

19  for, you know, the conduct of their -- of the

20  healthcare provided within their health centers.

21      Q.    And Dr. Farris is the director who runs the

22  South -- Planned Parenthood South Atlantic.  And

23  you're the director and you run the Planned Parenthood

24  Central North States, right?

25      A.    I'm the director of research at Planned

1  Parenthood North Central States and I also serve as
2  one of the associate medical directors.  I am not the
3  chief medical officer of Planned Parenthood North
4  Central States.
5       Q.   Do you know Dr. Farris personally?
6       A.   I don't.
7       Q.   Never met her at any Planned Parenthood
8  convention or seminar or anything like that?
9       A.   I have never met her directly.
10      Q.   Excluding the lawyers who represent the
11 Plaintiffs in this case, have you spoken to anyone
12 else, to include other doctors perhaps, about your
13 opinions in this case?
14      A.   No.  I mean, my husband knows I'm here, but
15 he -- he's not medical and he wouldn't know anything I
16 was speaking about if I tried to tell him.
17      Q.   So you said you looked at Senate Bill 20 in
18 the process of developing your opinions.  Did you see
19 where it defines possible complications that can arise
20 from an induced abortion at North Carolina General
21 Statue Section 90-21.81(2)a?
22      A.   I mean, I'd have to see the text again to
23 say whether or not I reviewed that portion.
24      Q.   Okay.  What is a uterine perforation?
25      A.   A uterine perforation is a known risk of

1  procedural abortion when an instrument goes into the

2  wall or through the wall of the uterus during the

3  procedure.

4      Q.   When you say "instrument," what do you mean

5  by instrument?

6      A.   A surgical instrument, either a suction

7  cannula or a forceps, typically.

8      Q.   And how does that happen during a procedural

9  -- I'm sorry, surgical abortion?

10     A.   How that happens, you know, really just

11 depends on the -- on the case.  It is a very low risk.

12 It's a very -- it's a -- it's a known complication and

13 one that I counsel patients about, but it is not very

14 common.

15     Q.   Do you agree that this is a possible

16 complication that can arise from an induced abortion,

17 surgical abortion, that should be disclosed to a

18 pregnant woman who is a patient considering that type

19 of abortion so that the patient can make an informed

20 decision with more complete knowledge of the risks of

21 the procedure?

22          MS. GRANDIN:  Objection to form.

23          THE WITNESS:  I believe all people

24 should -- that are pregnant and considering abortion

25 should be counseled on the risks and benefits of the

1 desired mode of abortion that they are considering.

2     Q.   (Mr. Boyle)  And who should inform the

3 patient of that potential risk?

4     A.   I mean, our whole healthcare team takes onus

5 of that.  But ultimately, it's my responsibility as

6 the treating physician to ensure that the patient has

7 good informed consent about the procedure that they

8 have selected.

9     Q.   And how -- I'm sorry, when should that

10 patient be informed of this particular risk?

11     A.   Prior to their procedural abortion.

12     Q.   Are you aware that in -- under the North

13 Carolina law, there's a 72-hour informed consent

14 period where, after the initial counseling, the

15 patient has to wait 72 hours before the induced

16 abortion can occur?

17     A.   I was not -- I'm -- I was not aware of that

18 mandatory counseling wait, but that is a common thing

19 that -- law that some patient -- some states have

20 enacted accepting and exceptionalizing the healthcare

21 that we provide during abortion care.

22     Q.   What is a cervical laceration?

23     A.   A cervical laceration is a tear that -- in

24 the cervix.

25     Q.   And how -- well, do you agree that a

1    cervical laceration is a possible complication that

2    can arise from an induced abortion?

3        A.   Yes.  Mostly for -- mostly, we consider that

4    risk for procedural abortion, and mostly in the second

5    trimester.

6        Q.   And how can that happen during a surgical

7    abortion?

8        A.   Again, the specifics of how those occur are

9    unique to each case.  And the overall risk of cervical

10   lacerations at the time of procedural abortion is also

11   very low.

12       Q.   Well, how is it even possible that a

13   cervical laceration could occur during a surgical

14   abortion?

15       A.   How it might occur would be related to

16   during the evacuation part of the procedure, as the --

17   there are -- as the -- as we're guiding the fetus out

18   through the cervix.

19       Q.   So explain to me what you mean by that.  How

20   do you guide the fetus out through the cervix?

21       A.   With instruments.

22       Q.   What type of instruments?

23       A.   It's -- it varies for each case.  Typically,

24   a combination, again, of suction and forceps.

25       Q.   So forceps are, not to be indelicate, but

36

1  sort of like tongs like you would see in a kitchen?
2  Is that what forceps ---
3      A.  They do not look like ---
4      Q.  A medical version?
5      A.  They don't look like grilling tongs, no.
6      Q.  What do they look like then?
7      A.  I don't know.  It's hard to -- really to
8  describe that in words for a person who's -- I would
9  guess never has seen one.  I'd certainly be able to
10  find an image for you if that would be helpful.
11      Q.  Are they sharp?
12      A.  No.
13      Q.  Are they -- do they have rounded edges?
14      A.  They do.
15      Q.  How does something that's not sharp cause a
16  laceration?
17      A.  Mostly, that occurs because the cervix
18  probably suboptimally responded to the preparation of
19  the cervix that's typically employed, especially in
20  the second trimester.
21      Q.  So when we're talking second trimester, what
22  weeks are we actually talking about?
23      A.  The medical community, medical consensus
24  about when the second trimester starts is at 14 weeks
25  and zero days and continues until 27 weeks and six

1 days.

2      Q.   And am I correct in understanding that that

3 14 weeks actually includes an extra two weeks for

4 implantation?

5      A.   Again, the medical community uses and dates

6 a pregnancy starting with the first day of the last

7 menstrual period.

8      Q.   Okay.  And how big is the baby or the fetus

9 at 14 weeks when the second trimester starts?

10      A.   It varies depending on the patient.

11      Q.   What's the typical size?

12      A.   I don't -- I don't know that there is a

13 typical size.

14      Q.   What's the expected range that you as a

15 practicing OB/GYN, who has done this for at least nine

16 years, expect to see?

17      A.   Yeah.  There are certain -- you know, there

18 are certain calibrated measurements that we use with

19 ultrasound that can give an estimated size, but that's

20 a conglomeration of different measurements that --

21 that gives an estimated gestational age if someone

22 doesn't have one already.

23      Q.   And would that be head-to-rump measurements?

24 Is that what it's called?

25      A.   Not typically at 14 weeks.  Typically at 14

1    weeks, we would use the biparietal diameter.
2         Q.   What's that?
3         A.   That's a measurement that can be performed
4    with ultrasound that measures the biparietal diameter,
5    the distance.
6         Q.   Okay.  When you say that, "biparietal
7    diameter," what ---
8         A.   Yeah.
9         Q.   --- exactly is that?
10        A.   It's the distance between the parietal
11   bones.
12        Q.   Where is that?
13        A.   In the cranium.
14        Q.   So it's the skull?
15        A.   Colloquially, yes, skull.
16        Q.   Which bones in the cranium or the skull is
17   it that you're measuring there?
18        A.   I'm sorry, what?
19        Q.   Which part of the cranium or the skull are
20   you measuring with the biperimetal (sic) diameter?
21        A.   It's biparietal diameter.  And again, it's
22   the distance between both parietal bones.  Yeah.
23        Q.   What are the parietal bones in the skull?
24        A.   They're bones of the skull.
25        Q.   Well, I got a head and I can point to it.

39

1  Can you -- can you point to your head where the
2  parietal bones are in the skull?
3      A.   Well, I -- you know, again, for the sake of
4  the transcript, I don't think that would be reflected
5  very well.  But I think, you know, the parietal bones
6  on the side of -- both sides of the skull.
7      Q.   Okay.  So sort of right above the ears on an
8  adult would be where the parietal bones are.  Is that
9  correct?
10     A.   I don't know that I've ever measured a
11 biparietal diameter on an adult.  But, yes, on the
12 fetus, that's where we measure them.
13     Q.   Okay.  So not the top, not the bottom.  On
14 the sides.  Not the face, not the back of the head.
15 Sort of above where the ears will eventually be if
16 they're not already there, that's what you're
17 measuring.  Is that correct?
18     A.   We measure, again, the distance between both
19 visualized parietal bones on ultrasound.  Kind of at
20 the level of the thalamus, if you want to be more
21 specific, so that's typically well above of the ears.
22     Q.   So explain to me again what that measurement
23 tells you and why it's important to guide your
24 decision-making as the doctor who is performing the
25 D&E abortion.

40

1           MS. GRANDIN:  Objection to form.

2           THE WITNESS:  The biparietal diameter

3    in the early -- you know, in the second trimester, if

4    one were using one single measurement for dating a

5    pregnancy, is the best one for dating, providing a

6    gestational age for the pregnancy if, again, a person

7    doesn't have -- has not had an ultrasound previously.

8        Q.   (Mr. Boyle)  And why is that measurement

9    important to inform you as the doctor about what types

10   of tools you -- as I understand, you said that's the

11   driving factor for what type of tools you use.

12          MS. GRANDIN:  Objection to form.

13          THE WITNESS:  Gestational age is a

14   consideration sort of preoperatively about what my

15   initial plan would be for how to accomplish a

16   procedural abortion safely.

17       Q.   (Mr. Boyle)  Why?  What exactly does it tell

18   you?  How does it inform your decision-making?

19       A.   Because it -- because the size of the fetus

20   is related to how we're able to accomplish the

21   procedure.

22       Q.   In what way does the size of the fetus or

23   the baby impact your decision-making on how you

24   accomplish the procedure?

25       A.   Yeah.  It dictates a lot of what instruments

41

1    we use, what kind of preparation of the cervix might
2    be the safest and recommended for increased safety to
3    decrease the risks of both perforation and cervical
4    laceration like we've already discussed.
5        Q.   So again, I'm still having trouble
6    understanding how the forceps, which are rounded and
7    not sharp cause a laceration in the cervix.  Can you
8    explain that to me, please?
9        A.   Again, it -- it really just depends on the
10   case.  As the fetus comes through the cervix, there
11   can be mismatch in size.  There can be, as you know --
12   ossification of certain parts of the fetus can cause
13   tears in the cervix also.
14       Q.   When you say "ossification of certain parts
15   of the fetus," are you saying that the fetus, the baby
16   has developed bones that are hard which could be sharp
17   and cause a cut?
18       A.   The fetus ---
19            MS. GRANDIN:  Objection to form.
20            THE WITNESS:  The fetus certainly
21   develops bones as it grows, yes.
22       Q.   (Mr. Boyle)  At what stage does the baby,
23   the fetus, start to develop ossification or bones that
24   could be hard enough that they could cause a cervical
25   laceration?

42

1          A.   I mean, we're -- to be honest, the --

2     laceration is something we always worry about, much

3     more so in the second trimester.  And again, the

4     overall risk of that complication is extremely low.

5     When it occurs, you know, we identify and treat it.

6               And when -- there's not a specific point in

7     pregnancy where -- that I can, you know, define a week

8     for you where that risk becomes exceedingly more high.

9     Because it just -- it's always very low.

10         Q.   Well, at week ten, you're doing an

11    aspiration abortion, not a D&E abortion, right?

12         A.   So -- I'm sorry, can -- will you repeat the

13    question?  I don't think I got it, the whole thing.

14         Q.   At week ten -- and when I say "week," are we

15    talking about gestational age, or is that a different

16    thing?  Are you saying gestational age when you say

17    week?

18         A.   Yeah.  So if I -- if I say a pregnancy is

19    ten weeks, that's -- I consider that the gestational

20    age.

21         Q.   Okay.  So at ---

22         A.   Calculated from the last menstrual period.

23    Sorry to speak over.

24         Q.   It's fine.  I understand.  So at week ten,

25    gestational age, typically the baby or the fetus has

43

1   not developed any bones in its growth process.  Is
2   that correct?
3        A.   Not necessarily.  Organogenesis is --
4   begins, you know, sometime between the eighth and 12th
5   week of pregnancy.
6        Q.   Okay.  So at week eight, you would say
7   there's not likely going to be any bones or
8   ossification in that baby/fetus.  Is that correct?
9        A.   I mean, it kind of depends.  Certainly --
10  you know, certainly, it -- I don't -- I don't consider
11  bones, you know, in the -- when I'm counseling a
12  person about procedural abortion or continuing a
13  pregnancy, for that matter, at eight weeks.
14       Q.   Because you don't think that the baby or the
15  fetus has developed bones in eight weeks.  Is that
16  correct?
17       A.   No.  Not necessarily.  It's just when we --
18  you know, we're good at magnifying things with
19  ultrasound quite a bit.  At the end of an eight-week
20  procedural abortion, there certainly wouldn't be
21  identifiable bones for me to see with my -- with my
22  eyes.
23       Q.   But that would be different at the end of a
24  14-week ---
25       A.   Potentially, yes.

44

1    Q.   --- procedural abortion?  Okay.

2    A.   Uh-huh (yes).

3    Q.   So walk me through what happens when you do

4    an aspiration abortion versus a D&E abortion.  What's

5    the difference between those two?  And please explain

6    the difference by explaining what each one of them is.

7    A.   Sure.  A procedural abortion that involves

8    aspiration alone would include dilation of the cervix

9    and then evacuation of the pregnancy typically with

10   suction alone.

11   Q.   So I'm looking for a little bit more in

12   depth.  What does that actually mean when you say

13   "suction alone"?  What device do you use?  How is it

14   placed?  What is it doing when it's placed?  What

15   happens afterwards?

16           MS. GRANDIN:  Objection to form.

17           THE WITNESS:  Yeah, that's kind of a

18   lot of questions in a row, so I'm going to try to get

19   them all.  If I don't, please let me know.

20           So after dilation of the cervix, we pass a

21   cannula, typically plastic.  I've only ever used

22   plastic ones in my professional career.  And then the

23   plastic cannula's attached to either handheld, so

24   manual vacuum aspiration, or electric vacuum

25   aspiration, you know, generated with a motor.

1     Q.   (Mr. Boyle)  So the plastic aspiration tube,

2  what does that look like?

3     A.   It looks like a plastic tube.  It's

4  typically clear.

5     Q.   How big is the diameter?

6     A.   So we -- cannulas are sized in diameter and

7  measured in millimeters.

8     Q.   So what is the size and measurement?

9     A.   There are many different sizes of cannulas.

10     Q.   So you have an array of options to choose

11  from when you decide to do an aspiration abortion.  Is

12  that correct?

13     A.   That is correct.

14     Q.   How do you determine what size to use in a

15  particular patient?

16     A.   Yes.  Typically, we have a prior plan, so a

17  plan at -- you know, just prior to the start of the

18  procedure of what cannula we're going to use to

19  accomplish the abortion safely.

20     Q.   And what is it that drives your planning on

21  that?  How do you make that plan?

22     A.   Typically, the gestational age of the

23  pregnancy.

24     Q.   What does that impact?  How does that impact

25  your decision-making on what size of the cannula?

1    A.    Because, in my experience, when we use an
2   eight-millimeter cannula, for example, an eight-week
3   pregnancy will pass through the cannula successfully.
4    Q.    Okay.  So when you say eight millimeters,
5   that's the top-to-bottom diameter of the inside of the
6   tube.  Is that correct?
7    A.    It's the -- it's diameter of the -- of the
8   suction cannula, yes.
9    Q.    And is it just a tube with a flush end
10  opening that is placed and does the suction?
11   A.    Yeah, so the suction cannula is attached
12  either to a manual vacuum aspirator, which I don't
13  have here in my office but I certainly could get one
14  to show you, or electric suction via tubing.
15   Q.    Okay.  And if it's the manual version of
16  suction, who is it that's actually manipulating that
17  machine to create the suction?
18   A.    The operating -- the operating healthcare
19  provider.
20   Q.    So the doctor, or a technician?
21   A.    In our setting, a doctor.
22   Q.    Okay.  So if you're doing a manual
23  aspiration abortion, you're the one actually turning
24  the crank to create the suction on it?
25   A.    It's not a -- it's not a crank.  It's --

Case 1:23-cv-00480-CCE-LPA   Document 74-1   Filed 09/12/23   Page 47 of 190

1  looks similar to maybe a large syringe. So there's a
2  plunger, right, that once you create the seal at the
3  top of the device, you pull back the plunger to
4  create, you know, vacuum in the -- in the -- in the
5  canister, in the -- you know, again, if you're a
6  -- you know, thinking of it as akin to a syringe,
7  right, you would pull back and then -- it's similar to
8  that.
9      Q.   Okay. And then the fetus is pulled through
10  the cannula tube into that reservoir there that you're
11  pulling the plunger back from. Is that correct?
12      A.   Yeah. The pregnancy -- we evacuate the
13  pregnancy into the -- into the canister.
14      Q.   And does that also include the placenta and
15  the other parts of the embryonic sac, et cetera, that
16  is removed with the syringe or the plunger?
17      A.   Yeah. So what comes into the canister --
18  and this would be for an induced abortion or for a
19  missed abortion or what people would talk about -- you
20  know, what people would call a miscarriage. We -- we
21  evacuate all the tissue that's inside the uterus.
22          Typically, in the eighth week of pregnancy,
23  for example, we don't talk about the tissue being
24  placenta. It's really the -- the gestational sac and
25  the villi. And again, in early pregnancy, there's

48

1    usually not an identifiable fetus.  So it really just
2    depends.
3         Q.   At what point do you ---
4         A.   Oh, sorry, may ---
5         Q.   Go ahead.
6         A.   --- can I go back ---
7         Q.   Yeah.
8         A.   --- for just a second?  We also evacuate the
9    decidual tissue, which is tissue that forms in the
10   uterus, supporting tissue around the pregnancy.
11        Q.   And do you do all of that, if it's manual,
12   with just one pull, one time pulling back the plunger
13   from the syringe device?
14        A.   Many times, yes.  Again, it really -- it
15   really just depends.  Our goal with any aspiration
16   procedure is to ensure the uterus is empty at the end.
17        Q.   So what do you do with the contents of that
18   plunger when you're doing the manual aspiration
19   abortion after you're completed with the procedure?
20        A.   We examine the tissue to ensure we have the
21   amount of tissue that we're expecting based on the
22   gestational age of the pregnancy.  And then there are
23   laws governing the handling of pregnancy tissue in all
24   states including Minnesota.
25        Q.   Is that tissue used for any scientific

49

1  research or anything like that?

2              MS. GRANDIN:  Objection to form.

3              THE WITNESS:  In our setting, whether

4  I'm providing abortion care at the University of

5  Minnesota or at Planned Parenthood North Central

6  States, we currently don't have that option for

7  patients at this time.

8       Q.   (Mr. Boyle)  How is the material then

9  treated?  What is done with it then?

10      A.   Yeah, we follow the laws in Minnesota

11 regarding the disposal of pregnancy tissue.

12      Q.   And what ---

13      A.   And all tissue actually, whether or not I

14 take -- you know, do a biopsy of the vulva or, you

15 know, culture, exudate from a wound or something like

16 that.

17      Q.   What exactly does the law in Minnesota

18 require you to do with that?

19              MS. GRANDIN:  Objection.  Calls for a

20 legal conclusion.

21              THE WITNESS:  The laws in Minnesota

22 require that in -- well, I have -- most detailed

23 knowledge about what -- you know, to be honest, at the

24 University of Minnesota, pathology is the department

25 that handles that.  But here at Planned Parenthood

50

1 North Central States, we contract with a mortuary
2 provider.
3 And we also offer the patients the option to
4 make their own arrangements for handling of the fetal
5 tissue after the procedure if that's their desire.
6 MR. BOYLE: Okay. I've got us at 58
7 minutes and I'd just as soon take a break if that's
8 all right with everyone else. Is everyone okay with
9 that?
10 MS. GRANDIN: Uh-huh (yes). Does ten
11 minutes sound good?
12 MR. BOYLE: Ten minutes is fine.
13 THE COURT REPORTER: Off the record at
14 11:09 a.m.
15 (Brief recess: 11:09 a.m. to 11:20 a.m.)
16 THE COURT REPORTER: Back on the record
17 at 11:20 a.m.
18 Q. (Mr. Boyle) Okay. Doctor, we were talking
19 about the differences between aspiration abortion and
20 D&E abortion. At what point does the fetus or the
21 baby get to the size where you need to switch from
22 doing an aspiration abortion to a D&E abortion?
23 A. In my practice, typically, that's around the
24 17th week.
25 Q. Okay. And so you said you use an

51

1 eight-millimeter cannula to do the suction with an

2 aspiration abortion at an eight-week gestational age.

3 What size cannula are you using at week 16 before you

4 decide to switch to a D&E in week 17?

5     A.   Yeah, typically, at 16 weeks, I would --

6 again, it kind of depends on the patient-specific

7 characteristics, but generally I would try to start

8 with a 16-millimeter cannula.

9     Q.   Is it just a roughly number of weeks to

10 number of millimeters decision?

11     A.   That's a -- yeah, that's a general

12 guideline.

13     Q.   And again, going back to doing an aspiration

14 abortion for twins or -- or triplets, do you need to

15 know whether there are twins or triplets before you

16 start that procedure?

17     A.   To increase safety, no.

18     Q.   Do you need to know for any reason?

19     A.   Well, I think it's important -- you know,

20 it's our standard practice to ask people, if they're

21 having an ultrasound and the person who is pregnant,

22 if they want to know whether or not they have a

23 multiple gestation or not.

24     Q.   Okay.

25     A.   It's -- I mean, it's their body, so I think

52

1    that's important, you know, for -- piece of
2    information to know whether or not the person who's
3    pregnant wants to know that information.
4         Q.   Is it important to the doctor performing the
5    induced abortion?
6         A.   Again, to increase safety, not really.  It's
7    my standard practice to use ultrasound during the
8    procedure in the -- in the case of a multiple
9    gestation.
10        Q.   So when you've performed aspiration
11   abortions, and I think you said you've only done it
12   with twins, on a patient who's pregnant with twins,
13   you use ultrasound during that procedure.  Is that
14   correct?
15        A.   That -- yeah.  I mean, generally speaking,
16   yes, that is my -- the general way I do those
17   procedures.
18        Q.   Why?
19        A.   Well, one of the ways, right, we know that
20   the procedure is complete is how the uterus feels at
21   the end, right?  It feels empty.  The other way we
22   know the procedure is complete is by examining the
23   products of conception after the procedure.
24             So, for example, if the patient has a
25   six-week twin-gestation pregnancy, identifying the

1   pregnancy tissue at the end of the procedure and
2   knowing for sure that a -- that we have both
3   gestational sac -- gestational sacs present is a
4   little bit harder, technically, to do.
5          And so in order to both ensure -- to ensure
6   the uterus is empty at the completion of the
7   procedure, I use ultrasound guidance.
8       Q.   And so for that pregnant woman who is
9   pregnant with twins that you do an aspiration abortion
10  for at six weeks, you use an ultrasound during the
11  actual procedure, during the aspiration abortion.  Is
12  that correct?
13      A.   Correct.
14      Q.   And how is it that you've come to know that
15  that particular patient was pregnant with twins before
16  you started that procedure?
17      A.    Prior to procedural abortion, it's our
18  practice to -- to review ultrasound records that the
19  patient brings with them, for example, or to provide
20  an ultrasound in our -- in our health center prior to
21  procedural abortion.
22      Q.   So when you are performing -- and when you
23  say that, at your center, are you talking about at the
24  hospital, or are you talking about at the Planned
25  Parenthood clinic where you work?

54

1       A.    In both settings, that would be true.

2       Q.    So at both the hospital and at the Planned

3    Parenthood clinic, before you do a procedural

4    abortion, an aspiration abortion or a D&E abortion,

5    you perform an ultrasound on those patients a hundred

6    percent of the time.  Is that correct?

7       A.    I mean, as a experienced healthcare

8    provider, I try not to say ever a hundred percent,

9    because that's just not always possible.  But, yes, it

10   is -- it is our general practice to review records of

11   an ultrasound previously or to provide one on the day

12   -- or to provide one for a patient prior to a

13   procedural abortion.

14      Q.    And in your memory, have you actually

15   performed an aspiration abortion on a woman who was

16   pregnant with twins at six weeks gestational age?

17      A.    I mean, the specifics at six weeks, I

18   couldn't say for sure at six versus seven.  But I

19   certainly have provided a procedural abortion for a

20   patient who had a twin gestation in the first

21   trimester.  That statement would certainly be

22   accurate.

23      Q.    Okay.  We've talked about aspiration

24   abortion.  And if you would now, please explain what

25   the details are of the D&E abortion, please.

1      A.    "The details" meaning what?

2      Q.    How do you do it?

3      A.    Yeah.  How we do it, again, depending on

4  where somebody is in their -- in their pregnancy, they

5  -- we may recommend some type of preparation of the

6  cervix.

7           We know from data and guidelines from the

8  Society of Family Planning, for example, that cervical

9  preparation helps reduce the risk of the -- of a D&E

10 procedure, especially in the -- later in the second

11 trimester when we're providing that care.

12     Q.    Why does -- first of all, what does

13 preparation of the cervix entail?  What does that

14 mean?

15     A.    Yeah.  It might entail different things for

16 -- for each individual, but may include a combination

17 of the medication misoprostol, which we've talked

18 about previously, and potentially the use of the

19 medication mifepristone as well in preparation of the

20 cervix.  And then also placement of osmotic dilators.

21     Q.    What is it you're trying to achieve with

22 this preparation?  What exactly is the point of it?

23     A.    Yeah, we -- preparation of the cervix, if we

24 can help the cervix soften some and provide a little

25 bit of a dilation before the dilation and evacuation

56

1  starts, the risks of, in particular, cervical

2  laceration decrease.

3      Q.   When you say "dilation," does that mean

4  increase the diameter of it?

5      A.   Yeah.  In -- you know, in obstetrics,

6  commonly refer to a cervix as -- as dilated in

7  centimeters.  So, you know -- if we -- if I do an exam

8  of the cervix and the cervix is open one centimeter,

9  then I say the cervix is dilated one, one centimeter.

10  And that would be true for before a dilation and

11  evacuation or, you know, if I'm examining a patient's

12  cervix at the end of a pregnancy in preparation for

13  birth.

14      Q.   What is the typical intent or level of

15  dilation that you're trying to achieve when you

16  perform a D&E abortion?

17      A.   There's no -- there's no standardized number

18  that is required before a person, you know, could have

19  the start of their D&E, necessarily.

20      Q.   Why does the size or the diameter of the

21  cervix dilation matter then if -- what are you trying

22  to do by dilating it if the particular size doesn't

23  matter?

24      A.   The greater the -- I mean, the -- you know,

25  as the pregnancy advances, the pregnancy gets larger.

57

1   And therefore, we have to have, you know, a larger
2   space with which to be able to complete that
3   evacuation safely.
4        Q.   Meaning the fetus or the baby is getting
5   bigger as the pregnancy progresses and it's just a
6   tighter fit to pull the bigger baby out if the cervix
7   isn't dilated.  Is that what you mean?
8                 MS. GRANDIN:  Objection to form.
9                 THE WITNESS:  Generally, when -- as
10  we're, you know, providing a D&E for a patient, we
11  need, you know, dilation of -- to some extent at -- at
12  any gestation we're providing a D&E in order to be
13  able to guide the products of conception through the
14  cervix safely.
15       Q.   (Mr. Boyle)  And when you say guide them
16  through, this isn't simply sticking -- this isn't
17  simply applying a cannula, the tube, into the uterus
18  and sucking out the contents because there's
19  ossification and bone present and those bones won't go
20  through the tube.  Is that correct?
21       A.   Well, the largest cannula that I've ever
22  encountered in my practice is a 16-millimeter cannula.
23  So that's the largest one we have at our -- at our
24  ready to be able to use.
25       Q.   Okay.  I don't -- I don't see -- I don't

58

1    think that answered my question though.

2          A.   Okay.

3          Q.   And I'm not trying to be rude.  I ---

4          A.   Oh, no.

5          Q.   I was asking if the reason you can't use

6    just a cannula and do the aspiration at a certain

7    point is because the fetus, the baby has gotten so big

8    and the bones are developed and rigid, more rigid such

9    that they won't just go through the tube.  Is that

10   correct, that's why you convert it to a D&E?

11         A.   Yeah.

12              MS. GRANDIN:  Objection to form.

13              THE WITNESS:  It's a -- it's a little

14   bit difficult to answer specifically because, for

15   example, if there were a 17-millimeter cannula and I

16   was providing a D&E abortion for a patient at 17 weeks

17   of pregnancy, it's conceivable that we would be able

18   to provide an aspiration abortion at that time as

19   well.

20         Q.   (Mr. Boyle)  Okay.  But since you have a

21   16-millimeter cannula as the largest option available,

22   at 17 weeks gestation age -- gestational age, it's

23   your medical opinion that you would not be able to

24   suck the contents out through the 16-millimeter

25   cannula.  Is that correct?

1      A.   It -- again, it depends a little bit on the
2  nuances of each patient, but generally I don't expect
3  to be able to complete the D&E at 17 weeks with
4  aspiration alone.
5      Q.   With the D&E procedure, do you -- well,
6  first of all, what are the options or the array of
7  options that you have for surgical instruments related
8  to the D&E procedure?
9      A.   Oh.  I mean, we have many different -- well,
10 I mean, again, like I said previously, we -- even at
11 the -- even for a D&E, we use a combination of
12 instruments, typically forceps and aspiration.
13     Q.   Okay.  So forceps is one type of surgical
14 tool that you use during D&E.
15     A.   Yes.
16     Q.   Are there any others that you've ever used?
17     A.   Well, let me think about that for a second.
18 I don't think so, no.
19     Q.   Okay.  So when you say ---
20     A.   I can't -- I can't recall a time.
21     Q.   So when you say "surgical instruments,"
22 you're really talking about forceps.  Is that correct?
23     A.   Yes.
24     Q.   And how big -- I mean, the forceps sort of
25 have an X axis like scissors, if you will, and a clamp

Case 1:23-cv-00480-CCE-LPA  Document 74-1  Filed 09/12/23  Page 60 of 190

1  on one end and a handle on the other end that you hold

2  the handle in your hand.  Is that correct?

3      A.    How -- there certainly is a handle and then

4  there's a -- on the end of the -- on the other -- on

5  the opposite end of the forceps, there are, you know,

6  fenestrations at the end that, you know, oppose each

7  other directly, not necessarily in a, you know,

8  crossing fashion like in a -- with a scissor.

9      Q.    Right.  They -- when you say fenestrations,

10 are they like clamps or grabbers, like my hands here

11 (demonstrates)?

12     A.    Yeah, I mean, we call ---

13             MS. GRANDIN:  Objection to form.

14             THE WITNESS:  We call them

15 fenestrations.

16     Q.    (Mr. Boyle)  Okay.  Is there sort of a

17 layperson word for fenestrations that you could help

18 us understand?

19     A.    There -- all the forceps I have used are

20 metal.  On the end of -- on the non-handle end of the

21 forceps, there's typically a rounded opening --

22 rounded opening on either side that then, you know,

23 can come together and touch each other.

24     Q.    Two loops that come together and ---

25     A.    Loop.  Yeah, loop is a -- probably a

61

1    good ---

2         Q.    Okay.

3         A.    --- description.  Yeah.

4         Q.    And they're metal on the fenestration or

5    looped end?  That's a metal instrument?

6         A.    All the forceps that I've ever used are

7    entirely metal.

8         Q.    And how big are those loops?  Are they, say,

9    one inch in diameter?  Are they ten millimeters in

10   diameter?  What's -- what would you say the size -- or

11   are there different sizes?

12        A.    It really depends on the forceps.  Forceps

13   aren't sized necessarily like a -- like a suction

14   cannula would be.  So really it just depends on the --

15   on the forceps.

16        Q.    Do you have multiple different forceps

17   options, or is it all the same set of forceps you use

18   every single time?

19        A.    I have the same, you know, array of forceps

20   available to me regardless of when I do or where I do

21   a D&E, so both here at Planned Parenthood as well as

22   at the university.  You know, which one is required

23   just depends on the, you know, individual patient

24   characteristics, really.

25        Q.    And when you say "on the individual patient

62

1   characteristics," are some of the forceps sort of
2   wider at the fenestration or the loop side, the
3   business end, if you will, the grabbers?
4       A.   Sorry?
5       Q.   Are they wider and bigger such that if the
6   cervix isn't dilated to a certain point you wouldn't
7   want to use the bigger one, you might use a smaller
8   one?
9           MS. GRANDIN:  Objection to form.
10          THE WITNESS:  The -- there are
11  certainly different -- you know, the diameter of the
12  fenestration of the -- or loop of the forceps can vary
13  depending on the -- on the forceps, yes.
14      Q.   (Mr. Boyle)  And you make a medical judgment
15  based on the field presented, the operative field, as
16  to what size forceps you choose.  Is that correct?
17      A.   Yeah.  Generally, that's correct.  You know,
18  like with any -- certainly for D&E, that's similar to
19  -- I mean, I don't use forceps for a diagnostic
20  laparoscopy, for example.  But I certainly would, you
21  know, call for the instruments that made the most
22  sense at the time based on my experience and training.
23      Q.   So when you're performing a D&E, do you
24  insert more than one forcep at a time inside the
25  uterus or is it just one forcep at a time?

63

1      A.   I have never inserted more than one -- or
2  placed more than one forceps at a time.
3      Q.   Okay.  When you're doing a D&E and you place
4  one forceps in -- tool in through the cervix into the
5  patient's uterus, do you also have the cannula
6  positioned through the cervix in the uterus at the
7  same time?
8      A.   No.  I cannot recall a time where that was
9  true.
10      Q.   So when you're doing a D&E abortion, you
11  don't have both the cannula and the forceps passing
12  through the cervix at the same time.  You only have
13  one at a time.  Is that correct?
14      A.   Yeah.  Generally, I think that's, yeah, been
15  my experience.
16      Q.   What do you do with the forceps?  What is
17  the actual technique that you are using those for in
18  the D&E procedure?
19      A.   Yeah.  So after the -- I pass the forceps
20  through the cervix, I open them gently and guide the
21  products of conception out through the cervix.
22      Q.   So you open the forceps gently, meaning you
23  get the loops or the fenestrations apart.  And then
24  what do you do with them after you open it to guide
25  the fetus or the baby out of the uterus?

64

1      A.   Yeah, so after the forceps are open, then I
2   would close them, and whatever -- and then remove
3   whatever tissue is between the fenestrations of the
4   forceps.  That could be, you know, any part of the
5   pregnancy, including the placenta.
6      Q.   Okay.  So you essentially put the forceps in
7   closed, open them.  Do you manipulate it at all at
8   that point, or do you just open them and then close
9   it?
10      A.   Typically, manipulation is -- like you're
11   describing is not -- is not part of my practice.
12      Q.   Okay.  So you open the forceps loops, you
13   close them back and you then pull back the forceps
14   through the cervix.  Is that correct?
15      A.   As I -- as I try to instruct our trainees,
16   our resident physicians, it's very much more a guiding
17   of the tissue versus pulling.  And that -- you know,
18   the nuances of that are sometimes lost on them.  But
19   we discuss that at length because we want the -- I
20   want, as the physician, as the surgeon, for that
21   tissue to come through the cervix safely.
22      Q.   So the difference between guiding and
23   pulling is sort of gently retracting it so it's not
24   causing a cervical laceration.  Is that the intent?
25      A.   Yeah.  To prevent forcing the tissue to --

1    to go somewhere where it doesn't actually fit.

2         Q.   And when you -- how many times does it

3    typically take for you to position the forceps inside

4    the uterus, open the loops, close them back, guide

5    tissue out?  How many times of that does it typically

6    take for you to complete a D&E abortion?

7         A.   Oh, that's -- that's a good question.

8    Sometimes very few if a cervix is dilated, you know,

9    quite -- you know, significantly.  Sometimes, you

10   know, depending on, again, patient characteristics

11   and, you know, position of the products of conception,

12   sometimes more.  But I've never -- I don't think I've

13   ever actually counted how many times.

14        Q.   Have you ever had a situation where you

15   opened the forceps in the uterus, closed them, guided

16   the tissue out, and the whole fetus came out at one

17   time?

18        A.   No.  No.

19        Q.   Instead, do you typically close the -- put

20   -- place the forceps in the uterus, open them, close

21   them, guide the tissue out, and it's a portion of the

22   fetus's body, so not the whole entire fetus intact,

23   but a portion of it?

24             MS. GRANDIN:  Objection to form.

25             THE WITNESS:  Yeah.  Generally, in the

1  -- in the way that we provide dilation and abortion --

2  dilation and evacuation abortion -- sorry, excuse my

3  flub there.

4           Dilation and evacuation abortion, yes, the

5  patient is counseled that it is unlikely that the

6  products of conception would come out intact.

7      Q.    (Mr. Boyle)  Do you ever have a situation

8  where you're performing a D&E abortion where the skull

9  or the cranium is too big to fit through the cervix so

10  you have to do something to reduce the size of the

11  skull?

12     A.    I'm sorry, can you rephrase your question

13  again?  I just want to make sure I'm understanding it

14  correctly.

15     Q.    So you've got the cervix opening, let's say

16  it's three centimeters dilated.  And you've got the,

17  I'm going to say it wrong but, parietal bone

18  measurements of the cranium.

19     A.    Uh-huh (yes).

20     Q.    That is, say, five centimeters.  So just it

21  won't fit.  What do you do in that situation when the

22  skull is bigger than whatever dilation level you have

23  the cervix?

24              MS. GRANDIN:  Objection to form.

25              THE WITNESS:  In that instance where

Case 1:23-cv-00480-CCE-LPA   Document 74-1   Filed 09/12/23   Page 67 of 190

67

1  any part of the, you know, fetus is too large to pass

2  through the cervix safely, then compressing the tissue

3  is what we do.

4       Q.   (Mr. Boyle)  When you say you compress the

5  tissue, speaking specifically about the skull itself,

6  what do you mean by that?

7       A.   That means the forceps is around the -- you

8  know, we don't know specifically.  On ultrasound, it's

9  -- you know, for all my -- all my D&E procedures, I

10  use ultrasound guidance.  It's not always possible to

11  know precisely what portion of the cranium that your

12  forceps are, you know, directly on, but I -- we

13  compress the tissue so that it will fit.

14       Q.   So you compress the skull to collapse it.

15  And then once it's collapsed, you extract it, you

16  guide it back through the cervix.  Is that what I

17  understand?

18       A.   Yeah.  We compress ---

19            MS. GRANDIN:  Objection to form.  You

20  can answer.

21            THE WITNESS:  Thank you.  We compress

22  all the tissue so that it fits safely through the

23  cervix.

24       Q.   (Mr. Boyle)  And the skull is the most --

25  typically the biggest part that provides the most

68

1  difficulty in that D&E procedure.  Is that correct?

2      A.   Certainly -- you know, certainly, that's the

3  -- again, if you were going to use ultrasound

4  measurements, typically, that's the -- in all -- at

5  all of the gestations where we provide induced

6  abortion care, that's the -- typically the widest part

7  of the fetus, yes.

8      Q.   Do you ever take the cannula and insert it

9  into the uterus, pass it through the cervix into the

10 uterus and try to reduce the size of the skull with

11 the cannula before you try and remove it with the

12 forceps?

13     A.   So not as part of my Planned Parenthood

14 practice.  There have -- at the university, I can

15 think of less than a handful of a number of times

16 where, because of the anomaly affecting the pregnancy,

17 the cranium was significantly larger than normal.

18          And in order to -- and in one case,

19 actually, you know, had become entrapped.  The patient

20 wanted an induction of labor at 22 weeks, but the

21 cranium became trapped in the cervix.  So to help her

22 complete, you know, her desired induction, we -- I,

23 you know, decompressed the cranium that way with using

24 aspiration instead.

25     Q.   With the guiding of the different parts of

1   the baby or the fetus out of the uterus through the

2   cervix, once you get a portion out with the forceps,

3   you guide it through the cervix, what do you do next

4   with that portion that's being clasped by the forceps?

5       A.   After it's passed through the cervix?

6       Q.   Yes.

7       A.   Typically, I have a tray. You know,

8   typically I'm seated for dilation and evacuation

9   procedures and I have a tray that's resting on my lap.

10   And after the tissue is removed safely through the

11   cervix, then I place the tissue on the tray.

12       Q.   Okay. So you don't use suction from the

13   cannula once it's past the cervix. You just use the

14   forceps to remove it from the body -- from the

15   patient's body and put it in a tray not using suction.

16   Is that correct?

17            MS. GRANDIN: Objection to form.

18            THE WITNESS: Yeah, I guess I just --

19   if I'm -- I guess I just want to make sure I

20   understand the question correctly. So I've used the

21   forceps to remove a portion of the products of

22   conception through the cervix, out past the introitus

23   of the pregnant person and then I place it on the

24   tray.

25       Q.   (Mr. Boyle) Okay. Yeah, I just didn't know

70

1    if once it -- I was asking if once you guided it
2    through the cervix then you used the cannula ---
3         A.   Oh, no.
4         Q.   --- on that remnant and -- but, no, you
5    extract it all the way sort of manually with the
6    forceps ---
7         A.   Yeah.  That's my typical practice, yes, for
8    sure.
9         Q.   Do you use curettage for any of these
10   surgical abortion procedures that you do?
11        A.   Are you -- well, I mean, to be honest, the
12   procedure in the first trimester is called a dilation
13   and curettage, right, or D&C.  But mostly -- so I
14   guess it just depends on what you mean by curettage.
15        Q.   What do you consider to be curettage?
16        A.   I consider curettage to be use of a -- an
17   actual curette, which is metal and has -- I'm not
18   going to say sharp edges, but firm, thin edges, to --
19   again, I don't prefer the word scrape ---
20        Q.   Sort of like a -- sort of like a tongue
21   scrapper but for a different part of your body?
22                  MS. GRANDIN:  Objection to form.
23                  THE WITNESS:  I'm not sure what a
24   tongue scrapper is but -- but, yeah, I mean, people
25   colloquially kind of refer to curettage as scraping.

1   I think that's an intense word for what we're doing.

2         But I -- to, you know, get back to your

3   question, if that's what we're defining as curettage,

4   then I -- the last time I needed to use that in the

5   setting of a procedural abortion was -- I don't know.

6   It happens extremely rarely.

7         Q.   (Mr. Boyle)  Okay.  With the D&E abortion,

8   after you have used the forceps to grasp and guide the

9   bigger portions of the fetus or baby out of the

10  uterus, what do you do after you -- you're done with

11  the forceps portion of the procedure?

12        A.   Yeah, so once I'm confident that we have,

13  you know, nearly all the products of conception

14  evacuated safely from the uterus, then I would advance

15  a suction cannula to the fundus of the uterus, or the

16  top, and aspirate any remaining decidual tissue,

17  typically, that still remains within the uterus.

18        Q.   When you say, "the fundus," or the top,

19  that's the part farthest away from the cervix, so sort

20  of up towards the rib cage and the lungs, that

21  direction of the body?

22        A.   Yeah.  I guess.  It's the portion of the

23  uterus typically the furthest away both from me as the

24  operator, as the surgeon and, as you described, from

25  the cervix, yes.

1    Q.   Is there anything else about the D&E

2  abortion procedure that you do that we didn't cover or

3  that we've missed?

4            MS. GRANDIN:  Objection to form.

5            THE WITNESS:  As far as the procedural

6  steps?

7    Q.   (Mr. Boyle)  Yes.  The start to finish, how

8  it -- how it actually unfolds and your process.

9    A.   Yeah, I mean, for every procedure, we would

10  start with a surgical timeout and make sure that the

11  healthcare team, you know, was all on the same page

12  and prepped and ready for the procedure that we

13  planned.  We discuss, you know, the patient's wishes,

14  any allergies, planned anesthesia, type of specimen we

15  will have at the end.  You know, we do many things.

16            But if you're talking about the procedure,

17  you know, the actual operating steps for me as

18  surgeon, then we've described those pretty much in

19  detail.  The main last one is, you know, assessment of

20  hemostasis and ensuring that bleeding is appropriate.

21    Q.   You mentioned anesthesia.  What type of

22  anesthesia options are available for your patients who

23  you are performing a D&E abortion on?

24            MS. GRANDIN:  Objection to form.

25            THE WITNESS:  The patients that I see

73

1   have a -- a very wide range of anesthesia options.
2        Q.   (Mr. Boyle)  Such as?
3        A.   Such as it is standard practice to ---
4        Q.   Go ahead and drink water.  I didn't mean to
5   interrupt you.  I'm sorry.
6        A.   Oh, that's okay.
7        Q.   Take your time.
8        A.   I got this one.
9        Q.   Okay.
10       A.   The standard practice, to use local
11  anesthesia by the cervix for all patients unless, for
12  example, a patient has a severe allergy.  From there,
13  patients can opt for mild sedation with medicine or
14  moderate sedation with medicine, deep sedation with
15  medicine or a general anesthesia.
16       Q.   So local anesthesia, what's the actual
17  anesthesia used there?  Is it lidocaine or something
18  like that?
19       A.   Yeah.  Typically, in our current practice,
20  we use lidocaine plus or minus epinephrine.
21       Q.   And that's standard for both aspiration and
22  D&E unless the patient has a known allergy.  Is that
23  what I heard you say?
24       A.   Yeah, generally, I think that's correct.
25       Q.   Let's move on to the -- well, start at the

74

1    end.  General anesthesia, that involves intubating a
2    patient and putting them completely unconscious.  Is
3    that correct?
4         A.   General -- again, I'm not an
5    anesthesiologist, so this is my understanding of that
6    realm of care.  But general anesthesia involves
7    medications for relaxation and then sometimes muscle
8    paralysis, and then intubation with a endotracheal
9    tube that then's connected to an anesthesia machine
10   that provides oxygenation for the patient during that
11   general anesthesia.
12        Q.   You're not an anesthesiologist and ---
13        A.   No.
14        Q.   --- and so I'm ---
15        A.   Thankfully, no.
16        Q.   I'm not asking you for in-depth ---
17        A.   Yeah.
18        Q.   --- general anesthesia opinions.  But ---
19        A.   Good.
20        Q.   --- is it safe to say that if your patient
21   is going through one of these two surgical procedures,
22   and they ask for general anesthesia, you are not
23   providing the general anesthesia?  Is that correct?
24        A.   No, I am not providing general anesthesia.
25        Q.   Okay.  So if the -- if your patient is

1  having general anesthesia, is it correct that there is
2  an anesthesiologist also involved in that procedure?
3      A.   Yes.
4      Q.   Do you perform any procedures outside of a
5  hospital -- let me just -- let me rephrase that.
6          Do you perform any D&E or aspiration
7  abortion procedures outside of a hospital that use
8  general anesthesia?
9      A.   No.
10     Q.   Okay.  So when it comes to general
11 anesthesia, you do all of those patients in the
12 hospital setting for those procedures.  Is that
13 correct?
14     A.   Currently, yes.
15     Q.   Mild sedation, what's the process with that?
16 Are you the doctor who is actually administering the
17 mild sedation?
18     A.   Yes.  So I would prescribe an oral
19 medication, typically a benzodiazepine, for the
20 patient to take prior to their procedure.
21     Q.   Okay.  And do you have specialized training,
22 or do you require specialized anesthesia training to
23 provide mild sedation to a patient?
24     A.   The medications used for mild sedation for a
25 procedural abortion would be similar to those that are

1    -- and the very same that are sometimes used for other

2    conditions in medicine, for example, extreme anxiety.

3    So any physician can prescribe those medicines.

4         Q.   Okay.  So it's within your practice, then,

5    to conduct mild sedation using benzodiazepine oral

6    medication.  Is that correct?

7         A.   Absolutely.

8         Q.   Okay.  So you are the responsible doctor

9    prescribing the mild sedation oral medication for your

10   patients who opt for that type of sedation for the D&E

11   and aspiration abortions.  Is that correct?

12        A.   Yes.

13        Q.   Okay.  Moderate sedation, what does that

14   involve?

15        A.   Moderate sedation, in our setting -- again,

16   the official anesthesia definition is based on the

17   kind of level of responsiveness of the patient.  But

18   in our -- both of our settings, typically moderate

19   sedation includes the combination of two intravenous

20   medications.

21        Q.   Which two?

22        A.   Typically, we use fentanyl and midazolam.

23        Q.   Is midazolam a benzodiazepine?

24        A.   Yes.

25        Q.   Are there any other ways that you are aware

77

1   of to provide moderate sedation in your practice?

2       A.   Those are the two medications that we --

3   that we use for moderate sedation.

4       Q.   And those are IV administered to your

5   patients?

6       A.   Yes.

7       Q.   Are you the responsible doctor who is

8   providing moderate sedation with those -- prescribing

9   those two IV medications?

10      A.   Yes.

11      Q.   Can you perform mild and moderate sedation

12  at the outpatient clinic, at the Planned Parenthood

13  clinic that you perform surgical abortions at?

14      A.   At Planned Parenthood North Central States,

15  we offer patients who are having a procedural abortion

16  to a -- you know, again, we talk to them about local

17  anesthesia is a recommendation for any -- for

18  everyone, and then give them the option to consider

19  mild or moderate sedation if that's their preference.

20      Q.   Okay.  So you are acting within the scope of

21  your practice in prescribing and monitoring patients

22  who you're performing a surgical procedure on at the

23  outpatient clinic when they opt for mild or moderate

24  sedation.  Is that correct?

25      A.   Yes.

Case 1:23-cv-00480-CCE-LPA   Document 74-1   Filed 09/12/23   Page 78 of 190

1    Q.   Do you have any type of heart rate or

2  oxygenation or any other type of monitoring on the

3  patients who are undergoing moderate sedation?

4    A.   We have extensive safety protocols regarding

5  sedation of any kind in our -- in our setting -- in

6  both settings, yes.

7    Q.   And I'm speaking specifically about in the

8  setting of your outpatient clinic, the Planned

9  Parenthood clinic that you both provide clinical care

10  at and are in the management of that clinic.

11    A.   Uh-huh (yes).

12    Q.   Do you have heart rate monitoring or

13  oxygenation monitoring or respiratory monitoring for

14  your patients who are undergoing moderate sedation

15  there?

16    A.   Yes.  We are continually assessing vital

17  signs throughout the procedure and measure heart rate

18  and oxygenation during the procedure.

19    Q.   So you actually have devices attached to the

20  patient that have a constant monitoring of their heart

21  rate and oxygenation.  Is that correct?

22    A.   That is correct.

23    Q.   Okay.  Do you have any anesthesiologists or

24  CRNAs on-site at the Planned Parenthood clinic?

25    A.   No, we don't.  Because we can administer

1  moderate sedation or mild sedation, for that matter,

2  safely in our setting ---

3      Q.   Okay.  So ---

4      A.   --- without that.

5      Q.   Sorry.  So it's not required under Minnesota

6  licensure and practice to have an actual specialist in

7  anesthesia, either an anesthesiologist or a CRNA,

8  present for you to prescribe mild or moderate sedation

9  to your patient.  Is that correct?

10     A.   That is correct.

11     Q.   Okay.  Talk to me about -- well, and just to

12 jump back to general anesthesia.

13     A.   Sure.

14     Q.   It is a requirement that you have a

15 specialist, either an anesthesiologist or a CRNA or

16 some combination of the two, if you're going to under

17 -- if your patient is going to undergo general

18 anesthesia.  Is that correct?

19     A.   I'm not trained in general anesthesia.  So

20 if my patient is planning that type of anesthesia,

21 then, yes, I would -- I would request an anesthesia

22 colleague to be present for that.

23     Q.   And that does not occur at the outpatient

24 Planned Parenthood clinic, the general anesthesia

25 component.  Is that correct?

80

1     A.    Not currently.

2     Q.    Has it ever?

3     A.    No.

4     Q.    Let's talk about deep sedation.  What does

5   that involve?

6     A.    Deep sedation typically involves an IV

7   medication called propofol.

8     Q.    Is that it?

9     A.    Yeah.  Yes.

10    Q.    Okay.  So you're -- you've got a patient who

11  chooses deep sedation, you're going to put that

12  patient on IV propofol.  Is that correct?

13    A.    I don't administer intravenous propofol.

14    Q.    Okay.  So when a patient of yours selects

15  deep sedation for an induced abortion surgical

16  procedure, either D&E or an aspiration, you can't do

17  that at the Planned Parenthood clinic, you have to do

18  that at the hospital.  Is that correct?

19    A.    Current -- yes, currently all patients that

20  desire deep sedation would be -- I would take care of

21  them in the hospital setting.

22    Q.    This IV propofol, when it's administered, do

23  you have to have an anesthesiologist or a CRNA present

24  to monitor the patient once the propofol is

25  administered throughout the procedure?

1      A.   Well, again, in my setting, that's typically

2  the case.  I don't know the specific -- because it's

3  not a medication I administer, I don't know the

4  specific -- you know, both -- you know, if there's any

5  law about that, because I don't -- I don't do that.

6  I'm not -- I don't ---

7      Q.   And that's fair.  It's outside your

8  specialty.

9      A.   Yeah.

10     Q.   In your observation, you typically see some

11 specialist, anesthesiology specialist monitoring that

12 patient, but you don't know if that's required or not.

13 Is that a fair way to say that?

14     A.   So every patient that I've taken care of

15 that has had propofol administered, yes, there is

16 someone trained with specific -- I'm sorry, you know,

17 has either a CRNA, typically, or an anesthesia

18 resident or an anesthesia attending physician.

19     Q.   And you would not convert a patient of yours

20 in the Planned Parenthood setting -- if you were doing

21 a aspiration or a D&E abortion in the Planned

22 Parenthood clinic on your patient using mild or

23 moderate sedation, you would not convert that patient

24 to deep sedation during the procedure, would you?

25     A.   During the procedure, no, we don't have --

1   we don't have the medications on-site for conversion
2   to deep sedation.
3        Q.   Have you reviewed the sedation policy that
4   Planned Parenthood South Atlantic produced in
5   discovery in this case?
6        A.   I have not.
7        Q.   Would you agree that, in your practice, you
8   would not give your patients at the Planned Parenthood
9   clinic an option of deep sedation at your clinic
10  setting to perform an aspiration or D&E abortion?
11       A.   Currently, with the capacity that we have in
12  our health centers that provide procedural abortion,
13  we do not offer deep sedation.
14       Q.   Because you don't have any specialist there
15  who can actually monitor the patient under deep
16  sedation and it's outside your scope of practice.  Is
17  that correct?
18       A.   Yes.  Because I don't -- I don't administer
19  medications like propofol.
20       Q.   And you are aware of what your Planned
21  Parenthood informed consent and sedation and --
22  minimal or moderate, paperwork looks like when you
23  give your patients counseling about what type of
24  sedation or anesthesia they have available to them?
25  You're aware of that paperwork, right?

1    A.    Yes.

2    Q.    And you would not expect in your paperwork

3 for the Minnesota Planned Parenthood clinic, where you

4 are, that a patient could receive deep sedation at

5 that Planned Parenthood clinic under any circumstance,

6 right?

7    A.    Well, for example, there may be an instance

8 where we're planning to start offering that service

9 where we would update the consent to reflect the

10 option for deep sedation, you know, just prior to

11 being able to offer that service.

12    Q.    Are you aware of any anesthesiologists or

13 CRNAs practicing at Planned Parenthood South Atlantic

14 facilities in North Carolina?

15            MS. GRANDIN:  Objection to form.

16            THE WITNESS:  I don't know -- other

17 than Dr. Farris, I don't know any other physician

18 that's employed by Planned Parenthood South Atlantic.

19    Q.    (Mr. Boyle)  So you don't know of any

20 general -- I'm sorry, you don't know of any

21 anesthesiologist or CRNA who practices at or with any

22 of the Planned Parenthood South Atlantic facilities in

23 North Carolina.  Is that correct?

24    A.    Again, the -- really, the only physician I

25 know in North Carolina is Dr. Farris and my residency

1 | colleague ---
2 |     Q.  Well, I ---
3 |     A.  --- who is an obstetric and gynecology
4 | physician.
5 |     Q.  But you agree it wouldn't be safe in your
6 | practice in Minnesota to provide deep sedation at a
7 | Planned Parenthood clinic where you work there?
8 |             MS. GRANDIN:  Objection to form.
9 |             THE WITNESS:  We -- we currently can't
10 | offer deep sedation based on the capacity and
11 | personnel that we have on staff.
12 |     Q.  (Mr. Boyle)  And you're not aware of any
13 | reason or any practice with the Planned Parenthood
14 | South Atlantic in North Carolina facilities that they
15 | can provide deep sedation, are you?
16 |     A.  I'm not aware whether they can or they
17 | cannot.  I don't -- I'm not sure what, you know,
18 | personnel are on the -- on the payroll for that
19 | organization.
20 |     Q.  If they do not have any anesthesiologists or
21 | CRNAs who are present and able to provide care to
22 | patients at the Planned Parenthood clinics in North
23 | Carolina, would you agree that it's not appropriate
24 | for them to offer deep sedation?
25 |     A.  The facilities that I'm aware of, none of

85

1  which are in -- you know, I don't really know the

2  details about any facilities in North Carolina, the

3  specifics.  The facilities that I am aware of that

4  primarily offer abortion care that have the

5  opportunity to provide deep sedation do have typically

6  either a CRNA or an anesthesiologist overseeing that

7  type of sedation.

8        Q.   So you don't know anything about Planned

9  Parenthood South Atlantic North Carolina facilities,

10 operations or guidelines, or who they have present to

11 assist with the performance of surgical abortions.  Is

12 that correct?

13            MS. GRANDIN:  Objection to form.

14            THE WITNESS:  I know that they are very

15 diligent about following the law in North Carolina.

16 And I know, because they are a Planned Parenthood

17 affiliate, that they have very -- very rigorous

18 medically-evident -- you know, evidence-based

19 guidelines for providing all the care they provide,

20 including abortion care and including any type of

21 sedation.

22       Q.   (Mr. Boyle)  You said you know that they're

23 diligent about following the law.  How do you know

24 that?  What facts do you have that inform your opinion

25 about that?

1      A.   I've read Dr. Farris's declarations in this
2   case.  And as an employee of a Planned Parenthood
3   affiliate, I know the rigorous attention to the
4   medical evidence that all affiliates must be up to
5   date on and providing for their patients.
6      Q.   But you don't have any specific facts about
7   the North Carolina facilities.  Is that correct?
8      A.   I don't practice in North Carolina, so no.
9      Q.   Do you know how far away from the North
10  Carolina Planned Parenthood facilities the hospitals
11  are located?
12     A.   I do not.
13     Q.   So you don't have any idea about how long it
14  would take to transfer a patient from a Planned
15  Parenthood facility in North Carolina to any hospital
16  in North Carolina, do you?
17     A.   I do not.
18     Q.   So you don't have any opinions about whether
19  it would be easy or not for Planned Parenthood North
20  Carolina to transfer patients to hospitals in North
21  Carolina, do you?
22     A.   I'm afraid that I'm not very up to date on
23  my North Carolina geography, no.
24     Q.   I would've been shocked if your answer was
25  different, but I just want to clarify.  You don't know

Case 1:23-cv-00480-CCE-LPA   Document 74-1   Filed 09/12/23   Page 87 of 190

1  anything about that ---

2      A.   I lived in North Carolina once upon a time,

3  but I have not.

4      Q.   And I understand and I'm not trying to ---

5      A.   No, that's okay.

6      Q.   --- overkill it, but just so I'm clear on

7  your answer.  You don't have any opinions about

8  whether there is a great distance between any Planned

9  Parenthood facility in North Carolina and any hospital

10 in North Carolina.  Is that correct?

11              MS. GRANDIN:  Objection to form.

12 Apologies.

13              THE WITNESS:  I don't have any

14 information in my brain at this time about the

15 distance, whether short or long or middle or however

16 you would define those terms, between a health center

17 -- Planned Parenthood health center in North Carolina

18 and any type of hospital.

19     Q.   (Mr. Boyle)  And you don't have any idea

20 about what Planned Parenthood in -- facilities in

21 North Carolina's procedures are to transfer patients

22 to North Carolina hospitals because you haven't seen

23 any of that information.  Is that correct?

24     A.   I have not seen them.  However, again,

25 because I'm an employee of a Planned Parenthood

88

1    affiliate and I know the rigorous protocols that we

2    have for -- regarding any patient that needs transfer

3    out of our facility, I am quite certain that Planned

4    Parenthood South Atlantic has a similar rigorous

5    protocol for any type of occurrence where a person

6    might need to be transferred out of the health center.

7         Q.   Well, I appreciate that you think that is

8    probably the case, and you may even be right.  But as

9    we sit here today, you don't have any factual basis to

10   make that other than your speculation of how your

11   experience is with the Planned Parenthood parent

12   organization.  Is that correct?

13        A.   All facilities as part of a Planned

14   Parenthood affiliate go through what's called

15   accreditation.  And safety protocols, including for

16   patients that need transfer outside of the health

17   center, are required to continue to be a Planned

18   Parenthood affiliate.

19             So at that level, I do know that there is a

20   safety protocol that exists.

21        Q.   Well, I appreciate ---

22        A.   But I have -- but you're correct, I have not

23   seen it with my eyeballs.

24        Q.   Okay.  And I appreciate that I think what

25   you're saying is is they all should be.  But you don't

1  know even if these North Carolina Planned Parenthood
2  facilities are accredited, do you?
3              MS. GRANDIN:  Objection to form.
4              THE WITNESS:  In order for the doors to
5  be open, they must be up to date on accreditation.
6       Q.   (Mr. Boyle)  And again, not to get too deep,
7  but I think what you're saying is in order for the
8  doors to be open, they should be, but you don't know
9  specifically whether they are or not in North
10  Carolina, do you?
11              MS. GRANDIN:  Objection to form.
12              THE WITNESS:  I mean, it's hard for me
13  -- I mean, I don't -- I don't have really any detailed
14  knowledge about the safety protocols other than the
15  ones that I use, so...
16       Q.   (Mr. Boyle)  And just to close the loop on
17  that.  So you don't have detailed knowledge about
18  what's going on in the North Carolina facilities.  Is
19  that correct?
20              MS. GRANDIN:  Objection to form.
21              THE WITNESS:  Again, I know that in
22  order to continue to be an accredited affiliate within
23  our -- within in the Planned Parenthood Federation,
24  that leadership in health centers must demonstrate
25  that they are up to date and practicing in accordance

90

1   with the standards and guidelines of the federation.

2       Q.   (Mr. Boyle)  And you don't know if the North

3   Carolina facilities have done that, do you?

4       A.   I mean, I don't know what -- on a intimate

5   level what other -- what any other physician is doing

6   in their -- in their practice.

7       Q.   And I appreciate that.  But that means you

8   don't know what's going on at the North Carolina

9   Planned Parenthood facilities in that regard.  Is that

10  correct?

11      A.   I have ---

12              MS. GRANDIN:  Objection to form.

13              THE WITNESS:  I have never been there

14  or visited.

15      Q.   (Mr. Boyle)  And you don't know what's going

16  on with their accreditation or their safety policies,

17  do you?

18              MS. GRANDIN:  Objection.

19              THE WITNESS:  I can't -- it's hard for

20  me to comment on care that's being provided in a place

21  where -- you know, the specific details of that care

22  when I've never been there to observe that care.  I

23  can speak most authoritatively to my own practice.

24      Q.   (Mr. Boyle)  Is infection a possible

25  complication that can arise from induced abortion?

1      A.    Infection is a known risk associated with
2  pregnancy and also induced abortion, yes.
3      Q.    Is bleeding or vaginal bleeding that
4  qualifies as a Grade 2 or higher an adverse event --
5  I'm sorry.
6           Is bleeding or vaginal bleeding that
7  qualifies as a Grade 2 or higher adverse event,
8  according to the common terminology criteria for
9  adverse events, a risk of a surgical abortion?
10           MS. GRANDIN:  Objection to form.
11           THE WITNESS:  Are you reading from a
12  document that I could see, or -- I'm not sure what you
13  mean by Grade 2.  That's not standard terminology in
14  my practice.
15      Q.    (Mr. Boyle)  Okay.  Is bleeding or vaginal
16  bleeding, heavy vaginal bleeding a risk that can
17  accompany an induced abortion?
18      A.    Heavy vaginal bleeding, which typically,
19  honestly, arises from the uterus -- so, you know,
20  heavy bleeding in pregnancy can occur with spontaneous
21  abortion.  It can happen with induced abortion.  It
22  can also happen at the time of giving birth.
23      Q.    Is heavy bleeding a risk of both an induced
24  abortion and a risk of an ectopic pregnancy?
25      A.    Bleeding can see -- be seen with both a

1   patient having an induced abortion and an ectopic
2   pregnancy.
3       Q.   Do you agree that pulmonary embolism is a
4   possible complication that can arise from induced
5   abortion?
6       A.   Pulmonary embolism, again, is a extremely
7   rare complication that can happen as a -- as a result
8   of being pregnant.  It is extremely rare after a
9   person has an induced abortion.  It is much more
10  common and likely after giving birth.
11      Q.   Is it a risk of an induced abortion that you
12  describe to your patients when you are counseling them
13  about their decision of whether to have an induced
14  abortion?
15      A.   We talk to patients having any sort of
16  procedure in pregnancy, whether that's a procedural
17  abortion or a cesarean section, about the risk of
18  blood clot.
19      Q.   And do you include deep vein thrombosis in
20  that category of risks that you discuss with your
21  patients in those circumstances?
22      A.   Yes.  I mean, we usually -- the language
23  that we use with patients is typically blood clot,
24  because that's a little bit more -- it's easier to
25  wrap your head around.  Most people don't know the

1    term deep vein thrombosis.  Really, the -- you know,
2    correct term is venous thromboembolism or VTE, which
3    would encompass a deep vein thrombosis and a pulmonary
4    embolism.
5         Q.   Okay.
6              MR. BOYLE:  Folks, we've been going for
7    another hour.  I'm at two hours.  I suggest we take a
8    break unless folks are wanting to keep pushing ahead.
9    What do you all think?
10             MS. GRANDIN:  Yeah, let's take a break.
11             MR. BOYLE:  Okay.
12             MS. GRANDIN:  Work for you, Dr. Boraas?
13             THE WITNESS:  Yeah, that's fine.
14             MR. BOYLE:  Very good.
15             THE COURT REPORTER:  Off record at
16   12:26 p.m.
17   (Brief recess: 12:26 p.m. to 12:39 p.m.)
18             THE COURT REPORTER:  Back on the record
19   at 12:39 p.m.
20        Q.   (Mr. Boyle)  Very good.  Doctor, have you
21   ever had to transfer a patient of yours who you were
22   treating for an induced abortion, either surgical or
23   chemical, from your Planned Parenthood clinic to a
24   hospital because of a complication?
25        A.   I have never had to transfer a patient with

94

1    a medication abortion.  I have had a -- a patient that
2    I had to transfer after a procedural abortion.
3        Q.   How many patients have you had to transfer
4    after a surgical abortion?
5        A.   I actually don't have an exact number, but I
6    can recall -- I can recall, you know -- I'm -- I --
7    it's certainly not even one per year.  Yeah.
8        Q.   So somewhere around ten would be the number?
9        A.   No.  I mean, the ones that I can recall, I
10   can only recall transferring two people.
11       Q.   Would you agree that pelvic inflammatory
12   disease is a possible complication from -- that can
13   arise from an induced abortion?
14       A.   As a trained gynecologist, a pelvic
15   inflammatory disease is something that arises from
16   upper genital tract disease typically associated with
17   an infectious process.
18       Q.   Right.  And infection, I think we've already
19   gone over, is a complication that can arise from an
20   induced abortion.  So sort of derivative from that,
21   would you agree that pelvic inflammatory disease is
22   also a complication that can arise from an induced
23   abortion?
24       A.   So infection after an induced abortion --
25   you know, infection is a risk associated with

95

1    pregnancy and certainly with induced abortion as well.
2    It's typically -- it's typically referred to as
3    endometritis after a procedural abortion when we're
4    talking about a infection that's affecting the uterus.
5        Q.   Okay.  Would you agree that endometritis, an
6    infection of the uterus, is a possible complication
7    that can arise from an induced abortion?
8        A.   Yes.  A very rare one.
9        Q.   Okay.  Would you agree that a missed ectopic
10   pregnancy is a complication that can arise when you're
11   providing an induced abortion for a patient?
12       A.   I mean, if -- ectopic pregnancy is a -- is a
13   reality of pregnancy in general.  It's not more likely
14   to be associated with induced abortion versus a
15   population of people who aren't seeking an induced
16   abortion.
17       Q.   Okay.  The general consensus, I believe, is
18   that 2 percent of pregnant -- positive pregnancies are
19   ectopic pregnancies.  Is that correct?
20       A.   I think, depending on the population, the
21   exact point estimate differs, but somewhere between a
22   -- probably a half point -- a half a percent up to
23   three, depending on the population.
24       Q.   And would you agree that a missed ectopic
25   pregnancy, without regard to what the general sort of

96

1   prevalence of it is in any given population, that a

2   missed ectopic pregnancy is a potential complication

3   that can arise with providing an induced abortion to a

4   patient?

5        A.   I guess I'm not sure "missed" is the

6   appropriate terminology here.  People who come for

7   induced abortion care are assessed for their risk of

8   ectopic pregnancy regardless of what setting I'm

9   working in in order to, you know, try to ensure the

10  person is safe.

11       Q.   If you have a patient who receives -- who

12  you provide a chemical abortion to, and it's actually

13  -- the patient actually has an ectopic pregnancy, do

14  those two drugs that you provide the patient for the

15  chemical abortion have any effect on the ectopic

16  pregnancy?

17       A.   The medicines that we use for medication

18  abortion do not -- are not treatment for an ectopic

19  pregnancy.

20       Q.   So if the patient has an ectopic pregnancy

21  and you are unaware of that and you provide a chemical

22  abortion, that chemical abortion, those drugs, those

23  two drugs that you provide that patient will not stop

24  or end the ectopic pregnancy, will they?

25       A.   So for a person that comes and requests a

97

1  medication abortion, we do extensive counseling about
2  the expectations around what they might experience if
3  they take the medicines, but also assess their risk
4  for ectopic pregnancy.
5          So we certainly wouldn't provide medications
6  for abortion like mifepristone and misoprostol if we
7  thought a person had an ectopic pregnancy.
8      Q.   Right.  But sometimes you miss an ectopic
9  pregnancy even if you do screening, right?
10     A.   Sometimes, we're not able to diagnose it
11 because we can't see it.
12     Q.   On an ultrasound, right?
13     A.   If a person has an ultrasound.
14     Q.   So sometimes a patient who comes to you and
15 asks for -- tests positive for pregnancy and asks for
16 a chemical abortion has an ectopic pregnancy that you
17 don't diagnose, and you give that patient the chemical
18 abortion drugs, right?
19     A.   So if someone screens low risk or -- and
20 doesn't have an ultrasound or if a person has an
21 ultrasound and we don't see an ectopic pregnancy, then
22 those people can safely access medication abortion
23 with mifepristone and misoprostol with close follow-up
24 to ensure that the abortion was successful.
25     Q.   But sometimes those people actually have an

1    ectopic pregnancy even if you think they were low risk

2    or you took an ultrasound and did not locate the

3    pregnancy.  Is that correct?

4        A.    Again, for a low-risk population, it's

5    certainly something we discuss with people.  But

6    again, because the risk of ectopic pregnancy is so

7    low, it's irrational to not provide the care that the

8    person needs based on that very, very low risk unless

9    that's a risk that's not acceptable to the patient.

10       Q.    And I understand the question you're

11   answering, but it's not really the question I'm

12   asking.

13       A.    Okay.  Let me try again.

14       Q.    Yeah.  The -- and I appreciate your answer.

15   It's fine.  The question I am asking is, sometimes

16   when those patients come to you, even if they are low

17   risk after you screen them and even if you take an

18   ultrasound and you cannot locate the pregnancy

19   anywhere on the ultrasound: intrauterine, adnexa,

20   wherever, sometimes those patients will have an

21   ectopic pregnancy.  Sometimes, it's too early to be

22   seen on ultrasound and you just might not see it yet,

23   but sometimes they will have an ectopic pregnancy,

24   right?

25       A.    Some -- a very small percentage of those may

1  go on to eventually be diagnosed with an ectopic

2  pregnancy, yes.

3      Q.  Okay.  And in that situation, if you had a

4  patient who you felt it was safe to give the chemical

5  abortion drugs to even though they slipped through the

6  screening process somehow and actually have an ectopic

7  pregnancy, that particular patient who has ectopic

8  pregnancy and chemical abortion drugs, those chemical

9  abortion drugs don't do anything to stop the ectopic

10 pregnancy, do they?

11     A.  Not that is generally known within the

12 medical community.

13     Q.  Okay.  Beyond unstudied and unsubstantiated

14 possibilities, you use methotrexate to actually

15 medically treat an ectopic pregnancy.  Is that

16 correct?

17     A.  If a patient comes to me and has a known

18 ectopic pregnancy, then I would -- based on, you know,

19 various patient-level characteristics, I would discuss

20 with that person their options for treatment, which

21 would include expectant management with very close

22 follow-up.

23          That meaning, you know, watch -- what

24 colloquially people call "watch and wait" with good

25 symptom assessment and, you know, kind of close

1  follow-up, or medication management with methotrexate
2  typically, or a surgical procedure to treat the
3  ectopic pregnancy.
4       Q.   But in any event, the two chemical abortion
5  drugs don't stop an ectopic pregnancy if they're given
6  to a patient who actually has an ectopic pregnancy.
7  Is that correct?
8       A.   Not that we know.
9       Q.   Okay.  You agree that misoprostol has an FDA
10 approval through ten weeks or 70 days.  Is that
11 correct?
12      A.   Excuse me, can ---
13           MS. GRANDIN:  Objection to form.
14           THE WITNESS:  Can you say that again?
15      Q.   (Mr. Boyle)  Do you agree that the FDA has
16 approved misoprostol through ten weeks or 70 days?
17           MS. GRANDIN:  Objection.
18           THE WITNESS:  Are you saying
19 misoprostol, like m-i-s-o-p-r-o ---
20      Q.   (Mr. Boyle)  Mispronouncing that ---
21      A.   Okay.
22      Q.   --- because I have a terrible
23 pronunciation ---
24      A.   Oh, that's okay.  I just wanted to make sure
25 that I know what you're saying.

1    Q.   Yes.  I apologize.

2    A.   Nope.  Yep, that's okay.  And your -- so now

3  that I know what medicine you're discussing, can you

4  say the rest of it again?  I'm sorry.

5    Q.   Yes.  You agree that misoprostol has an FDA

6  approval through ten weeks or 70 days, don't you?

7              MS. GRANDIN:  Objection.

8              THE WITNESS:  My understanding of the

9  FDA label is that medication abortion with a

10  combination of mifepristone and misoprostol, the FDA

11  label discusses using those medicines through 70 days

12  of pregnancy.

13    Q.   (Mr. Boyle)  Let me ask a question about

14  your CV.  And I'm sure I'm just not quite following.

15  It says that you got your fellowship in family

16  planning from the Magee-Womens Hospital.  But when I

17  look that up, it looks like that's not a fellowship

18  program.  Is it just under the umbrella of the

19  University of Pittsburgh?

20    A.   Yeah.  Let me clarify.  So -- well, I guess

21  I can't think of a good -- but, so, yes, the

22  fellowship educational, you know, umbrella is the

23  University of Pittsburgh and the specific site is

24  Magee-Womens Hospital ---

25    Q.   Okay.

1      A.   --- and associated clinics.

2      Q.   And you also got a degree in clinical

3  research.  Is that a Ph.D. or...

4      A.   I have a master's degree in epidemiology.

5  And then during my fellowship, I completed a

6  certificate in clinical research because I already,

7  you know, had a preceding master's degree.

8      Q.   What is the Consortium of Abortion Providers

9  that you list in your CV?

10     A.   The Consortium of Abortion Providers is a

11  group of healthcare professionals that provide

12  abortion care committed to, you know, examining the

13  evidence and producing evidence to help ensure we take

14  the best care of people.

15     Q.   And I apologize, I may have said it all

16  wrong.

17     A.   Oh, no.

18     Q.   Is it Mifeprex that has the 70-day FDA

19  approval?  I might've gotten those two confused.  One

20  of them has a 70-day approval.  Is that correct?

21  Or...

22     A.   The combination of mifepristone and

23  misoprostol for induced abortion care to 70 days ---

24     Q.   Okay.

25     A.   --- is my understanding of the FDA label.

1  Mifeprex is actually a brand name, so we try to stick

2  to saying the generic name mifepristone.

3      Q.  Okay.  It's easier for -- I can actually say

4  Mifeprex so ---

5      A.  Yeah.  Yeah.

6      Q.  You list in your CV that you received a

7  fellowship in reproductive health advocacy from a

8  group called Physicians for Reproductive Health in

9  2014.  Is that correct?

10     A.  I did.

11     Q.  And that's not a fellowship based on

12  medicine or clinical research or clinical practice of

13  medicine.  Instead, it's a group of

14  abortion-performing doctors who train how to speak to

15  government officials and lobby them, and to speak to

16  media and advocate for abortion.  Is that correct?

17     A.  The Physicians for Reproductive Health

18  Leadership Training Academy was an opportunity that I

19  was able to take advantage of because I was a fellow,

20  but other physicians are able to apply for and be

21  accepted into that program as well.

22          The fellowship included, yeah,

23  evidence-based ways to communicate patient stories to

24  multiple people, to coworkers, to family, to elected

25  officials, to anybody really.

1      Q.   Have you ever lobbied on behalf of abortion

2  advocacy to any government officials?

3      A.   I -- I'd have to look up the years to be

4  specific, but I certainly have participated in ACOG,

5  the American College of Obstetrics and Gynecology's,

6  annual event called the Congressional Leadership

7  Conference, which typically takes place in the spring.

8  Although -- like spring, usually March, early April,

9  approximately.

10         Which, again, lobbies for -- where we have

11  the opportunity to talk with, ideally, our elected

12  officials as constituents, but may -- this last time I

13  participated was only staffers, about bills that are

14  important for reproductive health generally.

15         So both for obstetric care as well as

16  induced abortion and other aspects of ensuring people

17  get the best healthcare when they're a young person

18  seeking reproductive health.

19      Q.   Do you agree that abortion -- induced

20  abortion should not be banned after a certain point in

21  a pregnancy?

22      A.   I think bans severely -- I think any

23  abortion ban severely limits our collective

24  responsibility to people to ensure that they're able

25  to access the healthcare that they need.

1    Q.   So do you think, then, that abortion should
2    be allowed up to a normal full-term pregnancy or 40
3    weeks gestational age?
4                  MS. GRANDIN:  Objection to form.
5                  THE WITNESS:  I have never met a
6    patient who had a term pregnancy that desired an
7    induced abortion.
8        Q.   (Mr. Boyle)  But do you support that type of
9    induced abortion all the way up to the full term of
10   pregnancy before the mother gives birth?
11       A.   I think ---
12                 MS. GRANDIN:  Objection.
13                 THE WITNESS:  I think defining a
14   gestational age week is hard, because there are many,
15   many patient factors that go into that
16   decision-making.  And again, as an obstetrician,
17   people who get to term pregnancy don't -- they don't
18   want an abortion.  They want -- they want to continue
19   their pregnancy and give birth.
20       Q.   (Mr. Boyle)  Have you ever performed an
21   induced abortion on a patient who was beyond 30 weeks
22   gestational age in pregnancy?
23                 MS. GRANDIN:  Objection to form.
24                 THE WITNESS:  No.
25       Q.   (Mr. Boyle)  Do you think that there's any

1  limit that should be put on induced abortions at

2  gestational age for any reason?

3          MS. GRANDIN:  Objection.

4          THE WITNESS:  I think limits -- I think

5  blanket limits are harmful to patient autonomy.

6      Q.   (Mr. Boyle)  How many induced abortions have

7  you performed of any type for an unborn child or fetus

8  with a gestational age of 24 weeks or more?

9          MS. GRANDIN:  Objection to form.

10         THE WITNESS:  Again, I don't have a

11 specific number.  But because of the unique settings

12 where I work, we are -- all of those patients that I

13 would've taken care of in that gestational age range

14 would've been diagnosed with a pregnancy with a

15 life-limiting or a fatal lethal anomaly.

16     Q.   (Mr. Boyle)  So does Minnesota have laws

17 that provide a limit to performing an induced abortion

18 for a gestational age of the child or the fetus?

19     A.   Minnesota does not have laws defining a

20 specific gestational age week.

21     Q.   You would agree that an unborn child or

22 fetus, absent some anomaly like you mentioned, is

23 typically viable or can live outside the womb after 24

24 weeks gestational age, wouldn't you?

25         MS. GRANDIN:  Objection to form.

1          THE WITNESS:  The general medical
2    consensus about the periviable period, yes, includes
3    the -- you know, the general consensus in my community
4    is the 24 weeks and zero days would be a gestational
5    age that if the patient, you know, had a complication
6    of pregnancy that, with much support for many days,
7    sometimes even more than a year, that fetus could be
8    supported and -- outside the uterus.
9          Q.   (Mr. Boyle)  Could live outside the uterus,
10   is that what you mean?
11         A.   Yeah.  Again, with support, typically
12   extensive support.
13         Q.   In your opinion, does the former North
14   Carolina law that allowed abortion pretty openly up
15   through 20 weeks, was that too restrictive in your
16   opinion?
17         MS. GRANDIN:  Objection to form.  Calls
18   for a legal conclusion.
19         THE WITNESS:  Again, I think it's hard
20   to define -- after sitting with many patients in this
21   decision-making space, I think it's hard to define a
22   specific week that honors the lived experience of
23   patients.
24         Q.   (Mr. Boyle)  So you think a 20-week -- ban
25   after 20 weeks is too restrictive?

1          MS. GRANDIN:  Objection to form.

2          THE WITNESS:  To be honest, I'm not in

3  favor of any ban.  But I think there are plenty of

4  circumstances -- albeit if you look up, you know, the

5  overall percentage of how many abortions occur after

6  20 weeks, the percentage is very low.

7          But again, for those patients, a ban after

8  20 weeks doesn't honor their lived experience and the

9  need for that healthcare.

10     Q.    (Mr. Boyle)  You understand that at least

11  some people have the opinion that an abortion should

12  be restricted after the unborn child or fetus has a

13  heartbeat or to the first trimester, and some of those

14  people believe that the unborn child or fetus is a

15  separate human being who has their own life and,

16  absent an induced abortion, would be able to progress

17  and live their own life?  Do you understand that ---

18          MS. GRANDIN:  Object ---

19     Q.    (Mr. Boyle)  --- some people ---

20          MS. GRANDIN:  Objection to form.

21     Q.    (Mr. Boyle)  Do you understand that ---

22          MS. GRANDIN:  Apologies.  Objection,

23  form.

24          MR. BOYLE:  Okay.

25     Q.    (Mr. Boyle)  Do you understand that some

1   people have that opinion?  Right?

2                   MS. GRANDIN:  Objection.

3                   THE WITNESS:  Can you restate again in

4   the -- what opinion people have so I can answer?

5       Q.   (Mr. Boyle)  Sure.  And I understand we're

6   going to get an objection.  So I'll try and say it all

7   and then objection, and then you answer if we can,

8   okay?

9                   MS. GRANDIN:  Apologies.

10                  MR. BOYLE:  No.  No problem.

11                  THE WITNESS:  Sorry.

12                  MR. BOYLE:  I kept rambling.  It's not

13  your fault.  I'll try it better this time.

14      Q.   (Mr. Boyle)  Do you understand that at least

15  some people have the opinion that abortion should be

16  restricted because the unborn child has a heartbeat in

17  the first trimester at some point and that the unborn

18  child is its own separate person that can have a life

19  if allowed to progress and be born?

20                  MS. GRANDIN:  Objection to form.

21                  THE WITNESS:  I certainly, as a person

22  who's awake many of the days in our country,

23  understand that there are many legislatures trying to

24  ban induced abortion care once fetal cardiac activity

25  is detected on ultrasonography.

1     Q.   (Mr. Boyle)  So you're aware that some folks
2   have that opinion.  And I'm not suggesting you agree
3   with it, but some people do have that opinion, right?
4                 MS. GRANDIN:  Objection.
5                 THE WITNESS:  I mean, I can't -- I
6   can't know other people's opinions unless they tell
7   them to me.
8     Q.   (Mr. Boyle)  Would you think that someone
9   who has that opinion is just always unreasonable or
10  irrational?
11                MS. GRANDIN:  Objection to form.
12                THE WITNESS:  I think -- I think that
13  people are entitled to have beliefs about a lot of
14  topics.  Whether or not that relates to rationality, I
15  think just depends on the topic.
16    Q.   (Mr. Boyle)  Well, and I appreciate that.
17  On that particular topic, do you think it's just
18  impossible for someone to have a reasonable opinion
19  that says that?
20                MS. GRANDIN:  Objection to form.
21                THE WITNESS:  Yeah, I'm not -- I'm not
22  entirely sure.  I think the -- well, of exactly what
23  you're asking.  You know, like, if people -- if a
24  person I met had the opinion that elephants were
25  endemic to the United States, I would say that's

1    irrational.  That's not based in fact.

2         Q.   (Mr. Boyle)  Do you perform induction

3    abortions?

4         A.   I see patients that are in the second

5    trimester that prefer induction, decide to proceed

6    with induction abortion versus dilation and

7    evacuation, yes.

8         Q.   And you have performed those induction

9    abortions, right?

10        A.   I take care of patients who need an

11   induction termination of pregnancy, yes.

12        Q.   Can you tell me what does an induction

13   abortion entail?  What are the -- sort of like we went

14   through aspiration and then D&E ---

15                 MS. GRANDIN:  Objection.  Apologies.

16                 THE WITNESS:  Yeah, I will -- I will do

17   my best.  So typically, for the patients that I see

18   needing an induction of -- induction for -- to end the

19   pregnancy, typically are, you know, seen through our

20   clinic.  They are counseled about their options.  They

21   -- and the rest of induction versus dilation and

22   evacuation versus continuing the pregnancy.

23                 When they've made their own best healthcare

24   decisions and decided to proceed with induction, then

25   they would be -- receive, ideally, would -- because

112

1   it's the evidence-based protocol, a combination of

2   medications very similar to those people ending their

3   pregnancy in the first trimester, which would include

4   mifepristone and misoprostol.

5       Q.   (Mr. Boyle)  Is there anything beyond giving

6   those patients who choose to have an induction

7   abortion those two drugs that you do to perform the

8   induction abortion?

9       A.   The most effective regimen to ensure the

10  successful completion of their termination of

11  pregnancy via induction would be to administer

12  mifepristone and misoprostol.

13          Typically -- well, at times, people are also

14  interested and we counsel patients about the options

15  for pain control during that process because it's a

16  much longer process than dilation and evacuation would

17  be.

18      Q.   So as I understand it, an induction abortion

19  performed later in the second trimester is really just

20  like a chemical abortion that you'd perform in the

21  first trimester, it just takes longer?

22      A.   The combination ---

23          MS. GRANDIN:  Objection to form.  Go

24  ahead.

25          THE WITNESS:  The combination of

1    medicines is the exact same.  The dosing of

2    misoprostol is typically different.

3        Q.   (Mr. Boyle)  Is there any surgical or

4    procedural component of an induction abortion in

5    addition to the chemical or medicine?

6        A.   So induction of labor in the second

7    trimester, you know, one of the risks that we discuss

8    with people is the need for a, you know, procedure

9    during the process.  Typically, that would be for

10   concern for a significant amount of bleeding.

11        So that's one of the things that we discuss

12   with patients when they're -- when they're deciding

13   between mode -- the mode of ending the pregnancy in

14   the second trimester.

15       Q.   And what type of procedure is it that you

16   would possibly need to perform during that induction

17   abortion?

18       A.   It kind of depends on the patient-level

19   characteristics again.  You know, the most common

20   reason that people need a procedure would be for a

21   retained placenta.

22       Q.   And what type of procedure would you perform

23   on a patient that had a retained placenta under those

24   circumstances?

25       A.   Well, you know, to, like, be the most

114

1    succinct, we go in and get the placenta.  So -- and

2    that depends on the provider, honestly, whether or not

3    they would feel comfortable using an instrument like a

4    forceps for that.  Certainly, I do with ultrasound

5    guidance.  Other people, depending on their training,

6    may use aspiration or suction alone.

7        Q.   So you said the most common is retrieval of

8    retained placenta.  What other circumstances have you

9    confronted in addition to that most common one?

10       A.   Well, for -- I've never -- I've never needed

11   to provide a procedure for a patient who was having an

12   induction abortion in the second trimester other than

13   to help the placenta -- you know, to evacuate the

14   placenta.

15       Q.   So the chemical abortion drugs are given in

16   different doses to essentially stop the growth and

17   development of the baby or the fetus at that point.

18   And then the second drug promotes the uterus to expel

19   the fetus or the baby, and basically the mother

20   delivers the -- the now terminated baby or fetus.  Is

21   that correct?

22       A.   That was a lot of steps for that question,

23   so I'll just kind of describe what happens.  So

24   mifepristone -- the science behind mifepristone in use

25   for induction termination of pregnancy in the second

1   trimester is really to provide cervical softening and

2   also to provide the decidual necrosis so the

3   supporting tissue around the pregnancy starts to be

4   less supportive.

5           And then when we add misoprostol, when we

6   administer misoprostol, the action of misoprostol is

7   to provide uterine contraction so that the pregnancy

8   will pass.  Typically, patients need more than one

9   dose of misoprostol to accomplish that fully.

10     Q.  And so that would be a more fully formed

11   baby/fetus that looked like a baby because it's later

12   in the second trimester.  Is that correct?

13           MS. GRANDIN:  Objection to form.

14           THE WITNESS:  It really depends on what

15   gestational age we're talking about when the patient

16   starts the induction of labor to -- for abortion.  In

17   my experience, people who select induction of labor

18   versus a dilation and -- a dilation and evacuation are

19   hoping that they will be able to see -- are hoping

20   that the pregnancy will pass intact.

21     Q.  (Mr. Boyle)  Do you use a differential

22   diagnosis in your clinical practice?

23     A.  I would, yeah, venture to guess pretty much

24   every day.

25     Q.  Do you agree that a differential diagnosis

116

1  should include all of the possible risks or dangerous

2  situations for a patient that you are treating?

3      A.   I mean, a differential diagnosis is simply a

4  list of possible diagnoses for a certain constellation

5  of signs or symptoms that a patient is reporting.

6      Q.   And typically when you develop that list of

7  possible risks or situations a patient might be

8  facing, your job as a doctor is to treat the worst

9  first, right?  You have to focus on the things that

10 could be life threatening, don't you?

11             MS. GRANDIN:  Objection to form.

12             THE WITNESS:  My job is to -- to know

13 the list and communicate the list of possible

14 diagnoses to the patient.  Only the patient can decide

15 what risks and -- to accept for a given diagnosis.

16 It's not my job to say what risks a person should

17 accept or shouldn't.

18     Q.   (Mr. Boyle)  You said you're a member of

19 ACOG, right?

20     A.   I am a member of ACOG, yes.

21     Q.   Do you follow and agree with the practice

22 bulletins that ACOG publishes?

23     A.   I mean, generally, I think that's true.

24 Some of -- you know, there are committees that review

25 those regularly.

1    Q.   Do you agree that ACOG practice bulletins

2    provide clinical management guidelines for OB/GYNs?

3        A.   Generally speaking, yes.  I think the hard

4    part about practice bulletins, again, is it's a

5    collated document of evidence about a specific topic,

6    and patients, individual patients, you know, in my

7    experience, don't always fit guidelines or, you know

8    -- you know, fit specific algorithms.

9            So that's when the clinical judgment based

10   on experience and training of each individual treating

11   physician comes into play.

12       Q.   You said in your report, your declaration,

13   that you were asked whether there is any medical

14   justification for the two challenged provisions in

15   relation to the Court deciding the Preliminary

16   Injunction Motion.  Who asked you to do that?

17       A.   Who asked me to serve as an expert witness

18   in this case?

19       Q.   Who asked you whether there was any medical

20   justification for the two challenged provisions?

21       A.   I would have to understand which challenged

22   positions you're referring to, I guess, first.

23       Q.   Right.  I -- I think we talked earlier about

24   the IUP documentation is one and then the 12 -- after

25   12-week hospitalization for induced abortion was the

118

1  other, right?

2      A.   So I reviewed with counsel the -- my

3  opinions based on experience and training for both the

4  requirement for induced abortion care for rape and

5  incest and life-limiting fetal anomaly to be provided

6  in a hospital after the 12th week.

7          And I also discussed the specific portion

8  about requiring the -- or documenting the existence of

9  an intrauterine pregnancy before a medication

10 abortion.

11     Q.   Do you know what the legal standard is for

12 those issues before the Court at the preliminary

13 injunction?

14         MS. GRANDIN:  Objection to form.  Calls

15 for a legal conclusion.

16         THE WITNESS:  Yeah, I'm not an

17 attorney, so I'm not sure I understand what you mean

18 by "legal standard."  I'm not -- I can't remember what

19 you said.

20     Q.   (Mr. Boyle)  When you have a woman you're

21 treating as your patient who has a positive pregnancy

22 test, what do you consider to be on her differential

23 diagnosis as potential medical risks and issues for

24 her?

25     A.   If I have a pregnant person sitting in front

1  of me, there are an exhaustive number of risks that I

2  would think about for -- that might occur in a

3  pregnancy.

4       Q.  Such as?

5       A.  Such as nausea and vomiting of pregnancy,

6  such as high blood pressure diseases of pregnancy like

7  gestational hypertension or preeclampsia.  Like the

8  need for a cesarean section, like the risk of pre-term

9  birth, like the risk of a premature rupture of

10  membranes, like bleeding in early pregnancy, the --

11  like -- I mean, the -- the list goes on.

12       Q.  Do you consider the possibility of an

13  ectopic pregnancy to be one of those risks that's

14  immediately on every differential diagnosis ---

15       A.  Of ---

16       Q.  --- for your patients who have tested

17  positive for pregnancy?

18       A.  Yeah.  If somebody calls and reports a

19  positive pregnancy test at home, again, we would do a

20  thorough screen of the patient's history and try to

21  determine their risk for an ectopic pregnancy.

22       Q.  Do you agree that unless they are discovered

23  and treated early almost 40 percent of ectopic

24  pregnancies rupture suddenly causing pain and bleeding

25  in the abdominal cavity?

1          MS. GRANDIN:  Objection to form.

2          THE WITNESS:  I'd have to see the

3   specific text where that exact number is quoted.  I

4   can, you know, say as a practicing gynecologist, you

5   know, when we identify an ectopic pregnancy, we

6   usually talk about -- we counsel patients about the

7   risks and benefits of expectant management versus

8   medical management versus surgical management.

9      Q.   (Mr. Boyle)  Do you agree that ruptured

10  ectopic pregnancies can be fatal?

11     A.   Can be what?

12     Q.   Fatal.

13     A.   Fatal.  Yes.  Although, thankfully, in the

14  U.S., you know, in 2023, I don't know of a time where

15  that's happened in my hospital.

16     Q.   Has it ever happened, that you're aware of,

17  from one of the Planned Parenthood patients that you

18  see in Minnesota?

19     A.   Nope.  Not that I'm aware of.

20     Q.   And we mentioned this earlier, and I got

21  this number from the ACOG bulletin 193, which is the

22  clinical management guidelines for OB/GYNs for tubal

23  ectopic pregnancy from March of 2018.  Are you

24  familiar with this document, this bulletin?

25     A.   I have seen ---

1          MS. GRANDIN:  Objection.  Go ahead.
2          THE WITNESS:  I have seen this practice
3  bulletin, yes.
4      Q.  (Mr. Boyle)  Okay.  And that's -- this
5  practice bulletin says, "According to the CDC, ectopic
6  pregnancy accounts for approximately 2 percent of all
7  reported pregnancies."  Does that sound accurate to
8  you?
9          MS. GRANDIN:  Objection.
10          THE WITNESS:  I mean, again, it would
11  be best to view the document and -- in order for me to
12  authoritatively answer that question.
13      Q.  (Mr. Boyle)  Do you have a copy of it in
14  front of you?
15      A.  Not currently.
16      Q.  We had discussed having available these
17  documents.  Do you have the ability to pull that up
18  and look at it?
19      A.  Yes.  I should have that ability.
20      Q.  Yeah, just take your time and let me know
21  when you get it.
22      A.  Okay.
23          MS. GRANDIN:  Are you introducing this
24  as an exhibit, Mr. Boyle?
25          MR. BOYLE:  Maybe.

1          MS. GRANDIN:  Okay.

2          MR. BOYLE:  I don't know yet.

3          THE WITNESS:  Okay.

4     Q.  (Mr. Boyle)  Let me know when you get it

5  pulled up.

6     A.  I will.  My computer is exceedingly slow.

7     Q.  Yeah, that's why I always print these

8  things.

9          MR. BOYLE:  I'll tell you what.  We're

10  at about two hours and 50 minutes, and I'm not going

11  to be done in ten or 15 minutes.

12          THE WITNESS:  Okay.

13          MR. BOYLE:  Do you want to take a

14  little bit of a longer break now and -- maybe take 30

15  minutes and come back and finish up?  And hopefully,

16  you can get that pulled up in the interim.

17          THE WITNESS:  Sure.  That sounds fine

18  to me.

19          MR. BOYLE:  Does that work for you,

20  Ms. Grandin?

21          MS. GRANDIN:  Yes.  Can we go off the

22  record to talk about timing?

23          THE COURT REPORTER:  Off the record at

24  1:23 p.m.

25  (Luncheon recess:  1:23 p.m. to 1:52 p.m.)

1          THE COURT REPORTER:  Back on the record

2    at 1:52 p.m.

3        Q.   (Mr. Boyle)  Okay.  So, Doctor, do you have

4    that ACOG Practice Bulletin 193 from March 2018

5    available?

6        A.   I do.  I have it pulled up here in PDF on my

7    computer.

8        Q.   Okay.  Do you agree with the -- that ACOG

9    bulletin 193 that, quote, "Despite improvements in

10   diagnosis and management, ruptured ectopic pregnancy

11   continues to be a significant cause of

12   pregnancy-related mortality and morbidity.

13          "In 2011 to 2013, ruptured ectopic pregnancy

14   accounted for 2.7 percent of all pregnancy-related

15   deaths and was the leading cause of hemorrhage-related

16   mortality," end quote?

17       A.   Gosh, that's a long sentence.  If you could

18   point me kind of specifically in the document where

19   you're discussing, then I can ---

20       Q.   Yeah.  In the first page, "Background

21   Epidemiology," about halfway through that paragraph.

22       A.   Okay.

23       Q.   "Despite improvements..."  Do you agree that

24   that's what the ACOG says on this topic?

25       A.   Yep.  That -- what you read there is written

124

1    here in that -- in this practice bulletin, yes.
2        Q.   Is that -- and you agree with the ACOG
3    bulletin, right?
4                   MS. GRANDIN:  Objection to form.
5                   THE WITNESS:  You know, I haven't seen
6    any specific mortality data related to ectopic
7    pregnancy in those specific years, but I know ACOG
8    takes, you know, the production of their practice
9    bulletins very seriously.
10       Q.   (Mr. Boyle)  And you rely on these practice
11   bulletins in your practice to provide you with
12   clinical management guidelines, right?
13       A.   As a -- as a starting point, sure.  Yeah.
14   Yes.
15       Q.   If you look under -- sorry.  If you look
16   under the "Risk Factors" section, do you agree with
17   ACOG that, quote, "Half of all women who receive a
18   diagnosis of ectopic pregnancy do not have any known
19   risk factors," end quote?
20       A.   Yes.
21       Q.   And so a lot of women who actually end up
22   having an ectopic pregnancy don't have flags for known
23   risks for an ectopic pregnancy.  Is that correct?
24       A.   Based in their history, not necessarily
25   what's happening in their body currently, yes.

125

1    Q.   At what stage in pregnancy do you normally
2  screen a woman for an ectopic pregnancy?
3    A.   Well, certainly if I'm taking care of a
4  patient doing their prenatal care visit at 30 weeks, I
5  usually don't discuss ectopic pregnancy at that time.
6  I don't know if you're asking for a specific
7  gestational age week.
8         I try to assess -- you know, once a pregnant
9  person has had a positive test, a positive pregnancy
10 test, we -- one of the first things we do is talk
11 about how they're feeling in their body and ask about
12 last menstrual period to try to assess an estimated
13 gestational age of the pregnancy.
14   Q.   And so as I understand it, whenever you
15 become aware that your patients has -- patient has
16 tested positive for pregnancy, you consider an ectopic
17 pregnancy as a risk on that patient's differential
18 diagnosis, right?
19   A.   Generally speaking, sure.  Yes.
20   Q.   And you screen that patient as soon as you
21 become aware that they're pregnant for ectopic
22 pregnancy immediately, right?
23   A.   I mean, we have -- in all the locations
24 where I work, we have -- we have, you know, kind of
25 general protocols about how to assess somebody's risk

1  for an ectopic pregnancy.  One of which is, you know,

2  just talking about past history, as we've described.

3  The other is to talk about any current signs or

4  symptoms that might be concerning for an ectopic

5  pregnancy.

6      Q.   And the gold standard to test and look for

7  an ectopic pregnancy is to conduct a transvaginal

8  ultrasound and see if there is an embryo or fetus

9  inside the uterus.  Isn't that right?

10          MS. GRANDIN:  Objection to form.

11          THE WITNESS:  There are, you know, kind

12  of five main categories of early pregnancy.  Much of

13  which can rely on ultrasonography.

14     Q.   (Mr. Boyle)  Yeah.  My question was, the

15  gold standard to test and look for an ectopic

16  pregnancy is to conduct a transvaginal ultrasound and

17  see if there is an embryo or fetus seen in the uterus.

18  Isn't that right?

19     A.   The only ---

20          MS. GRANDIN:  Objection to form.

21          THE WITNESS:  The only way to

22  definitively diagnose an ectopic pregnancy is to see

23  an embryo outside of the uterus with ultrasound.  It

24  doesn't necessarily have to be a transvaginal one.

25     Q.   (Mr. Boyle)  Okay.  So you can do a

1   ultrasound outside the woman's body ---

2       A.    Again, it really -- it really just depends

3   on the patient characteristics.  But yes, we, at

4   times, certainly can use transabdominal

5   ultrasonography also.

6       Q.    You said the only time you can definitively

7   diagnose it is when you do the ultrasound and see the

8   ectopic pregnancy.  Did I hear you correctly?

9       A.    So what -- if we're using ultrasound in

10  early pregnancy, there are kind of five main diagnoses

11  we could come up with, right?  The first is a definite

12  intrauterine pregnancy.  The second is a probable

13  intrauterine pregnancy.  The third is a pregnancy of

14  unknown location.  The fourth is a probable ectopic

15  pregnancy.  And the fourth is -- or the fifth, excuse

16  me, the fifth is a definite ectopic pregnancy.

17      Q.    But under those categories, number one, if

18  you do the ultrasound and you see the pregnancy inside

19  the uterus, you've ruled out ectopic pregnancy there,

20  right?

21      A.    In the -- in the vast majority of cases,

22  yes.

23      Q.    You agree that you should always perform an

24  ultrasound on a patient you provide care to when they

25  test positive for pregnancy so that you can confirm if

1  the pregnancy is intrauterine by seeing it on an

2  ultrasound, don't you?

3                  MS. GRANDIN:  Objection to form.

4                  THE WITNESS:  Not all patients in early

5  pregnancy need an ultrasound.

6      Q.   (Mr. Boyle)  Why not?

7      A.   Lots -- various reasons.

8      Q.   Is there any contraindication to giving a

9  patient an ultrasound?

10     A.   The first and foremost would be the patient

11 doesn't want one.

12     Q.   But you can't see inside the patient's

13 abdomen to see if the pregnancy is intrauterine or

14 ectopic unless you do an ultrasound, can you?

15     A.   The way I could see inside the abdomen would

16 be to provide a laparoscopy or to provide an

17 exploratory laparotomy or any imaging modality that we

18 have available, such as ultrasound, such as CT, such

19 as MRI.

20     Q.   Right.  But you're not going to do a

21 exploratory surgery or an MRI.  You just do an

22 ultrasound to see where the pregnancy is, right?

23                 MS. GRANDIN:  Objection to form.

24                 THE WITNESS:  I would recommend an

25 ultrasound if it was indicated.

1    Q.    (Mr. Boyle)  And a pregnant patient who you

2  don't know if it's ectopic or not, you have ectopic

3  pregnancy on that pregnant patient's differential

4  diagnosis until you can confirm that it's in the

5  uterus or not, correct?

6    A.    There are many ways to assess a person's

7  risk for an ectopic pregnancy.  One of which is using

8  ultrasound.  There are many others.

9    Q.    Do you agree with ACOG bulletin 193 which

10  says, "The minimum diagnostic evaluation of a

11  suspected ectopic pregnancy is transvaginal ultrasound

12  evaluation and confirmation of pregnancy"?

13    A.    Can you point me to exactly where in the

14  document you're referring to?

15    Q.    Yeah.  It's on the second page under

16  "Clinical Considerations and Recommendations.  How is

17  an ectopic pregnancy diagnosed?"  I believe it's the

18  first sentence there.

19    A.    So for a patient with a suspected ectopic

20  pregnancy, ultrasound can be very valuable.  Most

21  oftentimes, we would use a transvaginal

22  ultrasonography.  However, like I said previously, in

23  select patients, transabdominal ultrasound --

24  ultrasonography would also suffice.

25    Q.    Okay.  So you agree with ACOG on that

1    particular sentence?

2                    MS. GRANDIN:  Objection to form.

3                    THE WITNESS:  I agree with the

4    statement that diagnostic evaluation of a suspected

5    ectopic pregnancy would -- you know, that ultrasound

6    would be valuable in that case.

7        Q.   (Mr. Boyle)  But ectopic pregnancy is on the

8    differential diagnosis for every pregnant woman until

9    you actually rule it in or rule it out, isn't it?

10       A.   That -- it's on the differential, but I

11   don't suspect it in every case, partly because ectopic

12   pregnancy is very rare compared to intrauterine

13   pregnancy.  And I also take many more factors about

14   each individual patient into consideration when I'm

15   deciding whether or not I suspect an ectopic pregnancy

16   or not.

17       Q.   All you'd have to do is do an ultrasound and

18   you'd be able to tell one way or the other if it's

19   intrauterine pregnancy or ectopic pregnancy.  It

20   doesn't seem that difficult.  Why can't you do that

21   for all your patients?  Are you -- I don't understand.

22       A.   Because ultrasound ---

23                   MS. GRANDIN:  Objection to form.  Go

24   ahead.

25                   THE WITNESS:  Because ultrasound isn't

1  indicated for every pregnant person that I see.  Many

2  people have pregnancies that don't -- that don't ever

3  have an ultrasound.

4      Q.   (Mr. Boyle)  Do you agree with ACOG bulletin

5  193 where it says that, quote, "Serum hCG values alone

6  should not be used to diagnose an ectopic pregnancy

7  and should be correlated with the patient's history,

8  symptoms and ultrasound findings," end quote?

9      A.   Yeah, where in the document are -- is that

10  section?

11      Q.   If you look at the "Serum Human CHG -- hCG

12  Measurement" section, second sentence.

13      A.   Under the heading "Trends of Serial Serum

14  Human Chorionic Gonadotropin," under that section?

15      Q.   Yeah, under "Serum hCG Measurement."

16      A.   Oh, okay, I see where you're saying now.

17  And where?

18      Q.   Second sentence.

19      A.   Second sentence.

20      Q.   Do you see that?

21      A.   I see that the practice bulletin has that

22  quote in it, yes.

23      Q.   So you would agree that, at least according

24  to the ACOG practice bulletin, it recommends that

25  patients get ultrasound to determine the location of

1  the pregnancy?

2      A.    In my practice, we use serum hCG levels in

3  conjunction with patient history, symptoms and, at

4  times, ultrasound.

5      Q.    Right.  And I understand that's what you say

6  in your practice.  But the ACOG here says that you use

7  serum hCG with an ultrasound, right?

8              MS. GRANDIN:  Objection to form.

9              THE WITNESS:  It also states in the

10  practice bulletin, the sentence immediately preceding

11  that, that "Measurement of the serum hCG level aids in

12  the diagnosis of women at risk of ectopic pregnancy."

13      Q.    (Mr. Boyle)  Right.  It says it aids in

14  it ---

15      A.    It says ---

16      Q.    --- however ---

17      A.    The sentence to follow describes assessment

18  of a patient at risk for ectopic pregnancy.

19      Q.    And you just disagree that every patient is

20  at risk for ectopic pregnancy because you think that

21  the way you screen them means you don't have to

22  consider certain patients at risk.  Is that fair?

23              MS. GRANDIN:  Objection to form.

24              THE WITNESS:  Again, the only way to

25  diagnose a definitive ectopic pregnancy is to see that

133

1   pregnancy outside the uterus.  For patients that come

2   in early pregnancy and request any care, including

3   abortion care, we do a thorough history assessment and

4   recommend the best care for that patient and

5   consistent with medical evidence.

6       Q.   (Mr. Boyle)  And you've run studies on

7   whether a patient who is pregnant needs an ultrasound

8   to confirm an ectopic pregnancy early in their

9   pregnancy or if you can just use screening to

10  determine whether they are at risk for an ectopic

11  pregnancy.  Is that correct?

12      A.   I have published articles assessing

13  history-based screening in early pregnancy for

14  abortion care, yes.

15      Q.   And that is not the consensus position.  It

16  is what you are advocating for through your research

17  should become the consensus position, but it is not

18  established as the consensus position, is it?

19      A.   By "consensus," are you referring to the

20  practice bulletin?

21      Q.   Yes.

22      A.   The practice bulletin states, right, for

23  people at risk of ectopic pregnancy, that serum hCG

24  should correlate with patient history, symptoms and

25  ultrasound findings.  So we do our due diligence to

1    provide best healthcare to people to ensure that we
2    are assessing people for either high risk for ectopic
3    pregnancy or low risk for ectopic pregnancy.
4             You will also recall that this publication,
5    the practice bulletin about tubal ectopic pregnancy,
6    was published in March of 2018.  So it is not uncommon
7    when research is produced showing safety, for example,
8    in this case, providing abortion for people with
9    pregnancy of unknown location, that it takes a few
10   years for those document -- consensus documents, as
11   you referred to them, to be updated and published.
12       Q.  (Mr. Boyle)  And there isn't a consensus
13   document from the ACOG that says your version of
14   screening without ultrasound is accepted in the
15   practice yet.  Is that correct?
16             MS. GRANDIN:  Objection to form.
17             THE WITNESS:  The study that I
18   published was just published in 2013, so I doubt -- I
19   doubt they've had time to update the practice
20   bulletin.
21       Q.  (Mr. Boyle)  And I think you just said it
22   was published in 2013, but it was published in ---
23       A.  I'm sorry, I meant 2023.  I am so sorry.
24       Q.  Yeah, yeah.  That's okay.  I was just ---
25       A.  Thank you.  Thank you ---

135

1      Q.    No, I understood what you meant.

2      A.    Yeah.

3      Q.    Right.  So -- and I appreciate that it's

4  fairly new research.  But even if it eventually gets

5  adopted, the current standard of care for patients who

6  appear with a pregnancy and you don't know if it's an

7  ectopic pregnancy -- first of all, I think we've

8  established -- let me clarify.  You agree that every

9  pregnant woman is at risk on some level for an ectopic

10 pregnancy, right?

11             MS. GRANDIN:  Objection to form.

12             THE WITNESS:  No.

13     Q.    (Mr. Boyle)  You don't think that every

14 woman who is pregnant, early in their pregnancy before

15 you're able to establish through other means that it's

16 intrauterine, you don't think you have to treat every

17 single patient as potentially having an ectopic

18 pregnancy when they test pregnant -- positive for

19 pregnancy?

20     A.    If someone hasn't -- doesn't have a

21 intrauterine pregnancy or a probable intrauterine

22 pregnancy, then, yes, we counsel those patients about

23 the potential, albeit low, risk, right?  We've

24 discussed the risks of ectopic pregnancy generally in

25 this deposition already.  That low risk that a -- the

136

1  pregnancy may be growing outside the uterus.

2      Q.   And it's fairly simple to conduct an

3  ultrasound and find out if it's intrauterine, which

4  would relieve that risk.  Or if you see it

5  ectopically, it would confirm the risk and you'd treat

6  it that way.  Or if you don't see it at all, then you

7  still don't know, correct?

8      A.   I would ---

9           MS. GRANDIN:  Objection to form.

10          THE WITNESS:  I would never perform an

11  ultrasound for a patient that declined that care.

12     Q.   (Mr. Boyle)  So you agree, though, that the

13  current status of the ACOG, based on bulletin 193, is

14  that patients should be considered at risk for ectopic

15  pregnancy and should be screened using ultrasound and

16  possibly also serum hCG and history and other

17  screenings, but at least ultrasound to determine

18  whether they have an ectopic pregnancy?

19          MS. GRANDIN:  Objection to form.

20          THE WITNESS:  Again, according to ACOG

21  in this bulletin that was published in 2018, I -- I'm

22  not aware that the -- I don't know what the schedule

23  of review of this practice bulletin is, but I agree

24  that this practice bulletin from 2018 says that hCG

25  values may be helpful when used in conjunction with

137

1  patient history, symptoms and potentially ultrasound

2  findings for people at risk of ectopic pregnancy.

3      Q.   (Mr. Boyle)  Well, it doesn't say -- so you

4  added, "and potentially."  It doesn't say, "and

5  potentially."  It actually says, "and ultrasound

6  findings," right?

7      A.   It does.

8      Q.   Okay.  So it's including ultrasound in that

9  process of screening a patient to determine whether

10 you can rule in or rule out the ectopic pregnancy

11 risk, correct?

12     A.   As of 2018, that's what -- you know, the

13 sentence says, "patient's history, symptoms, and

14 ultrasound findings."

15     Q.   And again, I'm not trying to exclude or

16 diminish even your research.  I've read it.  I

17 understand it exists.  However, there is some

18 scientific support for conducting an ultrasound with a

19 patient based on this ACOG 193 bulletin.  Wouldn't you

20 agree?

21     A.   There is for people at risk of ectopic

22 pregnancy, again, in this -- this paragraph that we're

23 discussing as part of -- as part of this practice

24 bulletin, for people at risk of ectopic pregnancy,

25 then hCG findings "should be correlated with patient's

138

1  history, symptoms, and ultrasound findings."  That's
2  what the practice bulletin says.
3      Q.    Which you would agree provides some support
4  for having an ultrasound to rule out or rule in that
5  particular risk on every woman's differential
6  diagnosis when she tests positive for pregnancy?
7      A.    The practice ---
8              MS. GRANDIN:  Objection to form.
9              THE WITNESS:  The practice bulletin,
10  again, is a starting point.  And for the -- you know,
11  when it's published, the best guidance that we have at
12  that time for how to guide care for people within the
13  obstetrics and gynecology practice.
14          Now, again, for each individual patient, I'm
15  going to take that guidance and apply it to their
16  specific characteristics and patient experience and
17  then tailor that guidance based on the individual in
18  front of me.
19      Q.    (Mr. Boyle)  I understand that and
20  appreciate it and agree that's almost certainly
21  appropriate ---
22      A.    That, I would argue, is the standard of care
23  that we've been -- been discussing.
24      Q.    Okay.  Very good.
25          I asked you earlier -- you've read the

1    Planned Parenthood South Atlantic documents that they

2    provide to their patients related to informed consent

3    for chemical abortion and for surgical abortion,

4    haven't you?

5         A.   I have not -- I have not read those

6    documents, no.

7         Q.   Okay.  So if those documents inform a

8    patient that is there to obtain a chemical abortion

9    that they may have severe cramping and severe bleeding

10   for several weeks, would you agree that those are

11   similar symptoms that a patient who has a ruptured

12   ectopic pregnancy might face?

13        A.   If you're asking me to comment on specific

14   documents, I'd have to review those.

15        Q.   Well, I'm asking you a question.  If a

16   patient is told, "After you have the chemical

17   abortion, the two-drug regime, you may experience

18   heavy bleeding for even several weeks and blood clots

19   the size of a lemon, and" -- you would agree that that

20   patient could experience those symptoms but actually

21   have a ruptured ectopic pregnancy and not be able to

22   distinguish between having a ruptured ectopic

23   pregnancy versus what the symptoms described as heavy

24   bleeding were?

25        A.   In my practice, we would counsel a person

1  about the main signs and symptoms of both ectopic

2  pregnancy and induced abortion with medications so

3  that they could really be in -- you know, the best in

4  tune to their body and know when to access our 24-hour

5  assistance line for assistance and help and -- and

6  guidance if they were not sure if they needed it or if

7  they thought they needed it.

8      Q.   But you agree that the symptoms of a

9  ruptured ectopic pregnancy can include things like bad

10 pain in your abdomen, cramping and heavy bleeding,

11 right?

12     A.   The symptom -- what a person might

13 experience with a ruptured ectopic pregnancy is

14 typically different than the experience in the -- in

15 the vast majority of cases for patients who access

16 medication abortion.

17     Q.   You say, "typically different," but they can

18 be at least similar, right?

19     A.   So the -- the symptoms that someone might

20 have with an ectopic pregnancy are typically

21 different.

22     Q.   I -- I understand, typically they are

23 different.  But sometimes they're similar and could

24 very well overlap.  Is that correct?

25     A.   The -- the symptoms a person might

141

1  experience with a ruptured ectopic pregnancy is going

2  to be severe pain, typically unilaterally.  They may

3  experience pain with deep inspiration.  They may

4  experience lightheaded and dizziness.

5         They -- you know, it's not a typical

6  experience of a person with ectopic pregnancy to have

7  significant heavy bleeding noticeable on a pad, for

8  example.

9       Q.   I missed that last part.  Can you -- can you

10  say that -- I got confused.

11       A.   Yeah.

12       Q.   I thought you were talking about the

13  chemical abortion.  Were you talking about the

14  ectopic?

15       A.   A person with ectopic pregnancy may have

16  some bleeding, but it's typically not very heavy when

17  -- you know, when they're assessing the amount of

18  bleeding they're having, like if they had a pad in

19  their underwear.

20       Q.   And -- well, you haven't looked at the

21  Planned Parenthood for South Atlantic's documents that

22  they produced in this case related to their informed

23  consent.  Is that correct?

24       A.   I have not reviewed any Planned Parenthood

25  South Atlantic documents, no.

1      Q.   Okay.  You don't know what the Planned

2  Parenthood South Atlantic's protocol is for screening

3  patients for ectopic pregnancy before performing a

4  chemical abortion on them, do you?

5      A.   Again, because -- in order to be an

6  affiliate of the federation, I know that extensive

7  protocols must be in place to continue to be an

8  affiliate.  So I know they have one.  I just don't

9  know the specific details of that.

10     Q.   And I accept that you believe they exist,

11 and I -- I think they do too.  I haven't seen them.

12 But more to the point, you have not seen them,

13 correct?

14          MS. GRANDIN:  Objection to form.

15          THE WITNESS:  I have not seen any

16 documents that Planned Parenthood South Atlantic uses.

17     Q.   (Mr. Boyle)  So you are unable to form any

18 opinions about what Planned Parenthood South

19 Atlantic's protocols are based on your review of those

20 because you haven't reviewed them.  Is that fair?

21     A.   I haven't reviewed the documents.  But

22 again, because I'm an employee of Planned Parenthood

23 North Central States, I understand the requirements

24 that are necessary to continue to participate in the

25 federation and continue to be a Planned Parenthood

1  site.  So I know they exist.  I just haven't seen the

2  details of the specific documents.

3      Q.   When is the typical gestational age of a

4  pregnancy that you find yourself providing care to

5  patients in your role in Minnesota?

6      A.   Can you -- can you repeat the question,

7  please?

8      Q.   So you see patients who are testing positive

9  for pregnancy.  What's the typical earliest time that

10  you will see that patient?  Is it two weeks

11  gestational age?  Is it eight weeks gestational age,

12  somewhere in between?

13      A.   When they first make an appointment with me?

14      Q.   When you see them, yes.

15      A.   Oh, it can vary very widely.

16      Q.   Do you typically -- do you agree that

17  typically a woman wouldn't know that she is pregnant

18  until four or five weeks gestational age just based on

19  last menstrual cycle, et cetera?

20      A.   The reason that the medical community uses

21  and dates a pregnancy from the last menstrual period

22  dates back from when we didn't have sophisticated

23  ultrasound -- ultrasonography capacity.  And,

24  therefore, a person's first missed period would be a

25  first sign for a person that they may be pregnant.

Case 1:23-cv-00480-CCE-LPA   Document 74-1   Filed 09/12/23   Page 144 of 190

1    Q.   Okay.  So when you typically see patients

2  that are early on, do you ever see patients that have

3  a gestational age pregnancy of two or three weeks, or

4  is it typically after five weeks gestational age?

5    A.   I think, you know, people who -- once they

6  realize they're pregnant and know they need to proceed

7  with abortion care, they often call as soon as they

8  can.

9    Q.   I appreciate that and I don't dispute it.

10  But what's your practical experience as, like, what's

11  the gestational age when that happens?

12    A.   Again, it's varied.  Anywhere from -- I

13  mean, a -- a person can make an appointment related to

14  a pregnancy at any -- at any gestation that -- that

15  they would prefer.

16         Some people, once they have that positive

17  test, know they need to become -- that they need

18  abortion care.  So I've seen people in the -- in the

19  third week of pregnancy, for example.

20    Q.   Okay.  And that's what I was asking.  And so

21  would you say third week of pregnancy is the earliest

22  you've ever encountered a patient under those

23  circumstances?

24    A.   Probably.

25    Q.   And ---

1    A.    I don't write those -- I don't write them

2    down, so I don't -- I don't -- probably.

3    Q.    Have you ever provided an induced abortion

4    to a patient who had a gestational age of less than

5    five or six weeks?

6    A.    Yes.

7    Q.    When do you expect to be able to see a fetus

8    or an embryo of one of your pregnant patients on an

9    ultrasound?

10    A.    General consensus about that is we -- if a

11    person accepts a transvaginal ultrasonography, then we

12    would expect to see a gestational sac starting as

13    early as five weeks.

14    Q.    Would you agree that it would be safer to

15    confirm the intrauterine location of a pregnancy than

16    to not know if it's an ectopic pregnancy using

17    ultrasound when you're treating your patient?

18    A.    I'm not sure I missed -- I think I missed

19    the last part of that.  Can you ask that again?

20    Q.    When you're treating a pregnant patient,

21    wouldn't you agree that it's safer for that patient to

22    use ultrasound to rule in or rule out ectopic

23    pregnancy before you provide that patient with a

24    chemical abortion?

25    A.    For a patient who we have assessed as low

1  risk for an ectopic pregnancy, no.

2       Q.   Have you ever had a patient that you
3  assessed as low risk for an ectopic pregnancy, you
4  performed an induced abortion on that patient, and
5  then later that patient turned out to have an ectopic
6  pregnancy?

7       A.   Okay.  Say that one more time.

8       Q.   Have you ever had a situation where you
9  screened a patient, your screening process determined
10 that the patient was low risk for ectopic pregnancy so
11 you did not perform an ultrasound on that patient, you
12 gave that patient a chemical abortion, and then later
13 you found out that that patient had an ectopic
14 pregnancy?

15      A.   I'd have to -- I'd have to go back and look
16 specifically at the -- the only time where that would
17 have occurred -- I'm not sure.  I'd have to go back
18 and look.

19      Q.   You can't say definitively that that's never
20 happened?

21      A.   Correct.

22      Q.   And so you agree that there's a risk that,
23 even if you determine a patient is low risk, they
24 might have an ectopic pregnancy, right?

25      A.   So I think, you know, the important thing

147

1  when we're counseling a person who's sitting in front

2  of us requesting pregnancy care, including induced

3  abortion care, is to review all of the risks, yeah.

4          So we go through those with the person, and

5  then the patient accepts or does not accept those

6  risks and decides for themselves how to proceed during

7  that encounter.

8      Q.   Would you be able to look back through your

9  records and determine whether you had a patient that

10  you screened, found that patient to be low risk for

11  ectopic pregnancy, you did not provide them with a --

12  you did not take an ultrasound of that patient, you

13  did provide them with a chemical abortion, and then

14  afterwards they showed up as having an ectopic

15  pregnancy?

16          MS. GRANDIN:  Objection to form.

17          THE WITNESS:  I could certainly look

18  for that information.  I think it ultimately is

19  irrational to require that for every patient for these

20  very, very rare instances even if that occurred in my

21  practice.

22      Q.   (Mr. Boyle)  You used the word "irrational."

23  Are you using that word because of the lawsuit?  Is

24  that why?

25      A.   I'm using that word -- I don't know.  It's

1  just the word I chose.

2      Q.   Okay.  You're not trying to couch it in

3  terms of the law or the lawsuit when you say

4  irrational?

5      A.   I'm not an attorney, so I don't -- I don't

6  know.

7      Q.   Okay.  Were you able to confirm that that

8  patient who you saw at gestational age three weeks was

9  pregnant?

10     A.   (No audible answer)

11     Q.   You mentioned earlier the earliest that you

12  had treated a patient -- a pregnant patient was three

13  weeks gestational age, right?

14     A.   Yes.

15     Q.   How were you able to confirm that patient

16  was three weeks gestational age pregnancy?

17     A.   The patient reported a sure last menstrual

18  period, a history of regular, predictable menstrual

19  cycles that lasted -- that were consistent with, you

20  know, the -- her history of menstrual cycles, so we

21  were able to date the pregnancy that way.

22          And this particular patient that I'm

23  thinking about also had a urine pregnancy test in our

24  health center.

25     Q.   Did you perform an ultrasound on that

1  patient?

2      A.    I mean, again, I -- it's my -- it's our

3  standard practice to go through a protocol of

4  history-based screening to determine whether or not we

5  need to recommend an ultrasound for a person.

6      Q.    You agree that induced abortion of any type

7  is more complicated after the unborn child reaches the

8  second trimester, don't you?

9      A.    I'm -- I guess I'm not clear what you're

10  asking.

11      Q.    Complications for induced abortions

12  increase, the risks increase the older the gestational

13  age, so when you get to the second trimester it is

14  more risky to perform an induced abortion in the

15  second trimester than the first trimester.  Is that

16  correct?

17      A.    Comparing a procedural abortion in the

18  second trimester to a procedural abortion in the first

19  trimester, yes, the risks are -- the risk, generally,

20  for a procedural abortion increases as the gestation

21  of the pregnancy increases.  That would also be true

22  for a person who decided to continue their pregnancy.

23      Q.    Do you agree with the Academy of Medicine's

24  article you cited from extensively when it says that,

25  "The risk of serious complication increases with weeks

150

1  gestation.  As the number of weeks increase, the
2  invasiveness of the required procedures and the need
3  for deeper levels of sedation also increase"?
4      A.   Again, I'd have to review the specific
5  portion of that document that you're, you know,
6  alluding to to determine whether or not I agree with
7  that.  I think, generally speaking, you know, the
8  academy didn't -- yeah, I'll just stop there.
9      Q.   Do you agree with this statement: "The risk
10 of serious complication increases with weeks
11 gestation.  As the number of weeks increase, the
12 invasiveness of the required surgical procedure for an
13 abortion and the need for deeper levels of sedation
14 also increase"?
15     A.   That was kind of a lot of things there.  So
16 generally, you know, as a person who doesn't -- you
17 know, who recognizes the invasive nature of just
18 having a pelvic exam, I don't -- I don't know exactly
19 what the invasive portion means in that, that you're
20 referring to.  But generally, the -- again, for a
21 procedural abortion, as the pregnancy advances, the
22 risk -- the risk can increase.
23     Q.   After 11 weeks gestational age, you don't
24 perform a chemical abortion, right?
25     A.   Not after 77 days.

151

1    Q.   So every induced abortion ---

2    A.   Or, I -- I'm sorry, let me -- can I ---

3    Q.   Okay.

4    A.   Sorry to interrupt.

5    Q.   Sure.

6    A.   Not -- in the first trimester, no, not after

7    the -- after 77 days.  If a person wanted induction

8    termination abortion in my practice, then we would

9    provide that.

10   Q.   And the induction chemical abortion that you

11   described earlier where you use more of the chemical

12   drugs -- a higher dose, I should say, that's beyond

13   the FDA-approved usage of those drugs also, isn't it?

14   A.   When we're taking care of a patient for an

15   induction termination in the second trimester, we use

16   the medications off-label.

17   Q.   And I think you said that you start using

18   D&E abortion after 17 weeks.  Is that correct?

19   A.   Generally starting in the 17th week.

20   Q.   Okay.  So leading up to week 16, you would

21   -- if you were doing a surgical abortion, it would be

22   an aspiration abortion.  Is that correct?

23   A.   The vast majority of times, yes.

24   Q.   And you would agree that the simple act of

25   placing forceps and surgical tools repeatedly beyond

152

1  the cervix into the uterus increases the risk of both
2  a cervical laceration and uterine perforation,
3  wouldn't you?
4                   MS. GRANDIN:  Objection to form.
5                   THE WITNESS:  I don't -- I don't think
6  I'm aware of any specific data showing a specific
7  number of times that a person may need to pass a
8  forceps to complete the dilation and evacuation as a
9  known increased risk.
10      Q.   (Mr. Boyle)  So you don't think anybody's
11  studied that?
12      A.   I'm not aware of a study.  That doesn't mean
13  that it doesn't exist.
14      Q.   You agree that sometimes patients who
15  undergo surgical abortions need to have a blood
16  transfusion as a complication of that procedure, don't
17  you?
18      A.   Yes.  I'm aware that pregnant people need
19  transfusions, including those, occasionally, that
20  access induced abortion.
21      Q.   Have you ever had one of your patients who
22  you were performing a surgical abortion, either an
23  aspiration or a D&E abortion, at the Planned
24  Parenthood clinic that needed a blood transfusion
25  during or soon after the procedure?

1      A.   No.

2      Q.   Okay.

3      A.   Not to my knowledge.

4      Q.   You agree that some, at least some,

5   second-trimester induced abortions must occur in a

6   hospital setting, don't you?

7      A.   There are certain characteristics either

8   associated with the pregnancy or associated with the

9   patient that may make hospital-based care a

10  recommendation.

11     Q.   And about -- from my reading of your CV,

12  about half of the second-trimester abortions that you

13  perform, you perform in the hospital setting.  Is that

14  correct?

15     A.   That information wouldn't be listed on my

16  CV.

17     Q.   Is it correct?

18     A.   It's not correct.

19     Q.   How many of the second-trimester abortions

20  that you -- procedural, surgical abortions that you

21  perform, what's the percentage breakdown of the ones

22  that you do in the hospital setting versus in the

23  Planned Parenthood clinic setting?

24     A.   Again, speaking generally, I don't --

25  generally, sorry.  I'm going to keep -- stop mumbling

154

1   for the transcript.  Sorry.

2          So I provide dilation and evacuation

3   abortion at both the hospital and Planned Parenthood

4   North Central States.  The exact numbers of -- numbers

5   of patients I take care of at Planned Parenthood

6   versus number of patients I take care of at the

7   university, I don't have at the ready or in my brain.

8          The amount of time I spend, you know,

9   providing procedural abortion at both of those

10  locations, right, the university would be about a half

11  day per week and Planned Parenthood would be about one

12  full day per week.

13       Q.   Okay.  So would you say one-third of the --

14  well, let me ask before I go to that.  When you say a

15  half day at the hospital and a full day at the clinic,

16  is that full day at the clinic focused solely on

17  second-trimester surgical abortions?

18       A.   No.

19       Q.   What else do you do in that time when you're

20  at the clinic?

21       A.   When I'm providing care at the health center

22  here in St. Paul, I -- we assess people for their need

23  for whatever they make a -- an appointment for,

24  honestly.  So I provide medication abortion.  I

25  provide procedural abortion in the first and second

155

1    trimester.  I assess people for management of

2    miscarriage.  I assess people for other pregnancy

3    symptoms they may have in the first trimester.

4         Q.   Okay.  And as it relates to the hospital

5    setting, that half day, is it not true that primarily

6    what you're doing there are second-trimester surgical

7    abortions?

8         A.   I mean, the bulk of my procedural abortion

9    care at the university is in the second trimester,

10   yes.

11        Q.   Okay.  And ---

12        A.   But it's not all -- it's not all that I do

13   in the operating room.

14        Q.   Okay.  So taking just the second-trimester

15   surgical abortions that you perform in the hospital

16   and in the clinic, are they not roughly equal amounts

17   at each place?

18        A.   Again, I can only really tell you what the

19   -- the amount of time that I spend at both of those

20   places.  I'd have to look at specific numbers to say

21   anything about specific numbers.

22        Q.   You're not able to just give a rough

23   percentage based on you doing all of them yourself and

24   knowing what that would be?

25             MS. GRANDIN:  Objection to form.

1          THE WITNESS:  I do many procedures, and
2    there's no way I can keep them all in my head ---
3          MR. BOYLE:  Okay.
4          THE WITNESS:  --- regardless of whether
5    it's for abortion or another obstetric and gynecologic
6    problem.
7    Q.   (Mr. Boyle)  In any event, you do many
8    second-trimester surgical abortions in a hospital
9    setting every week.  Is that fair?
10   A.   It depends on what you define as many.
11   Q.   More than five?
12   A.   No.
13   Q.   How many would you say you do on a weekly
14   basis in the hospital setting?
15   A.   Somewhere probably between one and four.
16   Q.   Okay.  Sorry, I'm closing out things, I've
17   jumped around a little bit.
18   A.   That's okay.
19   Q.   Does the hospital where you work in
20   Minnesota and you see patient -- pregnant patients to
21   give them surgical abortions, does that hospital
22   provide staff training for dealing with those types of
23   patients and for patients who have survived sexual
24   assaults?
25         MS. GRANDIN:  Objection to form.

1    THE WITNESS:  We -- I -- you know, I
2 can't know what detailed training is required for all
3 levels of staff that work in the hospital, so I'm not
4 sure I can comment authoritatively on that question.
5    Q.   (Mr. Boyle)  Do you feel like the staff you
6 work with at the hospital when you bring your patients
7 to the hospital and perform abortions on them, do you
8 feel like the hospital staff is adequately trained to
9 react and deal with those patients?
10    A.   I'm very privileged to work in a hospital
11 that is very supportive of people's access of -- to
12 comprehensive reproductive healthcare.  My -- I have
13 the feeling that many nurses, especially in the
14 preoperative area, actually choose to work there and
15 continue to work there because we're able to provide
16 abortion care in the hospital.
17    Q.   So you think that about your hospital in
18 Minnesota, but you ---
19    A.   I do.
20    Q.   --- made or you gave opinions about the
21 hospital staff in North Carolina.  Do you recall that?
22    A.   I do not.
23    Q.   You don't recall saying that you think that
24 the hospital staff in North Carolina aren't trained to
25 properly deal with patients who are having abortion --

1  surgical abortion procedures?

2          MS. GRANDIN:  Objection to form.

3          THE WITNESS:  If you're referring to

4  statements I made in my declaration, I'm happy to

5  review that document in that specific area that

6  you're, you know, discussing.

7      Q.   (Mr. Boyle)  Well, you don't remember saying

8  that in your declaration that you provided in this

9  case?

10     A.   What I know to be true is that staff at

11  Planned Parenthood are required to do extensive

12  training at least annually, in my Planned Parenthood,

13  at least annually to review how -- you know, sensitive

14  exams and how to be present with a person that has

15  experienced sexual assault.  What I don't know is

16  whether or not that's required for all staff at the

17  hospital.

18     Q.   And you're talking about at your hospital in

19  Minnesota, right?

20     A.   I am.  Uh-huh (yes).

21     Q.   And you don't know ---

22     A.   And I certainly -- if I don't work at a

23  place, I certainly wouldn't know the exact specifics

24  that are required for all staff at any hospital in

25  North Carolina.  I'm sure the -- that differs greatly.

1      Q.   Well, you cut me off, because that's where I

2  was going.

3      A.   Sorry.

4      Q.   It's okay.  I'm kidding.

5           Yeah, I just -- I just wanted to point out

6  that you don't even know what the training is at your

7  Minnesota hospital, so you don't have any opinions

8  about what the training is for staff at any North

9  Carolina hospital.  Is that fair to say?

10     A.   Oh, no, I have -- well, again, I can tell

11  you from my experience in sitting with patients that,

12  generally, people are much more prepared to sit with a

13  person who's experienced sexual assault in my setting

14  at Planned Parenthood than they are in the hospital.

15          Now, I'm not saying that the nurses who

16  staff preoperative area are going to try to be

17  disrespectful to a person that experienced or

18  discloses that they've been a survivor of sexual

19  assault, because, generally, I think the people who

20  work there are pretty good people.  But I'm not aware

21  of any specific training that's required for them to

22  be able to continue their job.

23     Q.   Okay.

24     A.   That also doesn't mean -- well, yeah.  Never

25  mind.

1     MR. BOYLE:  Give me just a moment here.

2     Q.   (Mr. Boyle)  Let me ask you about the

3 Goldberg study.  Do you remember citing that?

4     A.   I do.

5     Q.   That's from 2022.  He did a -- they -- he's

6 the lead author, but they did a retrospective cohort

7 study of medical records from Massachusetts Planned

8 Parenthood entities related to giving chemical

9 abortion drugs to a patient with a pregnancy of

10 unknown location.  Is that right?

11    A.   Yes.  My recollection of the Goldberg study

12 was that they looked backwards, so retrospectively, at

13 care that had already happened that they had provided

14 for patients who presented for induced abortion care,

15 were diagnosed with a pregnancy of unknown location

16 and then requested medication abortion.

17    Q.   And do you recall that 26 of -- well, so

18 there were -- some part of the population decided to

19 delay care and another smaller portion decided to go

20 ahead and take the chemical abortion before there was

21 a specific location of the pregnancy using ultrasound.

22 Is that your recollection?

23    A.   My recollection of that study is that there

24 were two groups of people that they, again, sorted

25 retrospectively that presented for care -- for

161

1    abortion care, were diagnosed with a pregnancy of
2    unknown location, and then based on specific patient
3    factors or counseling or the patient's own assessment
4    of the best -- best way to proceed for them, either
5    chose expectant management with close follow-up or
6    proceeding on that day with induced abortion with
7    medication and close follow-up.
8        Q.   Okay.  So do you recall that of the group
9    that delayed care, that decided not to have a surgical
10   or chemical abortion when they were initially told
11   that they had a pregnancy of unknown location, do you
12   recall that 26 percent of those patients who delayed
13   care never needed to take the chemical abortion drugs
14   at all because they either had an ectopic pregnancy or
15   an early loss of pregnancy without any medication?
16       A.   I'd have to ---
17              MS. GRANDIN:  Objection to form.
18              THE WITNESS:  Sorry, Kara.
19          I'd have to see the specific article to
20   comment on specific percentages.
21       Q.   (Mr. Boyle)  Okay.  If in fact that's what
22   it said and it was 26 percent that did not need --
23   that delayed care, that did not need the chemical
24   abortion drugs for those two reasons, because they
25   either lost the pregnancy or they had an ectopic

162

1    pregnancy, if you extrapolate that to the patient
2    population at large, that would mean that basically
3    one out of four patients who have a pregnancy of
4    unknown location would end up not needing to have the
5    chemical abortion drugs.  Do you agree with that?
6         A.   I do not.
7              MS. GRANDIN:  Objection to form.
8         Q.   (Mr. Boyle)  Why not?
9         A.   I do not.  Because that patient population,
10   again, considering patient factors, patient history,
11   patient's prior access, patient's own assessment of
12   what is happening in their body, a good number of
13   those people chose to remain in the
14   delay-for-diagnosis group.
15             So again, blanket statements like that
16   aren't honoring the fact that we do a very detailed
17   assessment of patients' history and counsel them about
18   their options.  And in this study, you know, there
19   were people who chose to -- you know, to proceed with
20   expectant management.
21             Part of the reason that a patient might
22   choose that management strategy is that they already
23   think they're having a miscarriage.  So I think that's
24   probably more representative of -- of a portion of
25   that group which they described "delay-for-diagnosis"

1  in their study.

2      Q.   Did you include a delay-for-diagnosis cohort

3  in your study from 2022?

4      A.   Are you referring to my study from 2023?

5      Q.   I'm sorry.  Yeah, it was published in 2023,

6  yes.

7      A.   So our -- again, in our setting, our

8  standard protocol for how to proceed when patients are

9  diagnosed with a pregnancy of unknown location is to

10 consider all the options for the patient.  So that

11 includes a detailed history, an assessment of a

12 person's risk for ectopic pregnancy, and then also

13 their own, you know, kind of collation of all that

14 information about how they want to proceed.

15          So there are certainly patients in our

16 setting and, you know -- I presume you've read or at

17 least skimmed the article -- you know, we showed that

18 that -- patients -- that our protocol for how we do

19 that provides that care safely.

20     Q.   Did you study a cohort that delayed after

21 there was a pregnancy of unknown location -- or I'm

22 sorry, after the -- well, yeah.  After there was no

23 ultrasound and you didn't know the location of the

24 pregnancy, did you study a delayed cohort to see what

25 happened to them?

1      A.    In our 2023 study, all the patients had been
2  diagnosed with a pregnancy of unknown location.
3      Q.    Right.  And ---
4      A.    And some of those patients -- again,
5  retrospectively, right?  Some of those patients, you
6  know, collating all the information that we go through
7  with and the counseling we provide on the day of the
8  encounter, chose to proceed with expectant management
9  with close follow-up.
10      Q.    Chose to have a chemical abortion, is that
11  what you mean by that when ---
12      A.    The other option ---
13              MS. GRANDIN:  Objection to form.  Go
14  ahead.
15              THE WITNESS:  The other option for a
16  person diagnosed with a pregnancy of unknown location
17  that's deemed low risk for ectopic pregnancy in our
18  setting would include proceeding with medication
19  abortion or a procedural abortion.
20      Q.    (Mr. Boyle)  And what was the first one you
21  were describing?  I missed that, I'm sorry.
22      A.    Yeah.  So if a patient comes into our health
23  center requesting an abortion or made an abortion
24  appointment and we diagnose a pregnancy of unknown
25  location, then from there we do, you know, a detailed

165

1    assessment in correlation or in combination to assess
2    a person's risk for ectopic pregnancy.
3           There are certain, you know, factors and
4    patient-level characteristics that may make a person
5    high risk for ectopic pregnancy.  And then we have
6    extensive protocols about how to ensure that patient
7    gets referred out for sometimes, you know, same-day
8    care or close follow-up with their -- with -- to, you
9    know, kind of on -- continue to assess that risk.
10         Q.   Okay.  So did you study pregnancy of unknown
11   location with three groups, one group that got
12   chemical abortion, one group that got surgical
13   abortion and then one group that delayed care and
14   waited until they could confirm the location of the
15   pregnancy?
16         A.   Yes.  Our study in 2023 included three
17   groups.  Patients chose -- after being diagnosed with
18   pregnancy of unknown location and then assessed to be
19   low risk for ectopic pregnancy, those patients chose
20   either expectant management with close follow-up,
21   medication abortion with close follow-up or procedural
22   abortion for -- with close follow-up.
23         Q.   And did some of those who chose expectant
24   management with close follow-up turn out to have a
25   loss of pregnancy or an ectopic pregnancy?

1    A.   I'd have to look at the specific numbers in
2  the article.  But again, one of the reasons -- after
3  counseling a person that's diagnosed with a pregnancy
4  of unknown location, some of that is because the
5  patient has had bleeding and suspects that they have
6  had a miscarriage already.  And we just can't know
7  that with a single time point at a single encounter.
8    Q.   So did some of those people who delayed
9  their care end up having an ectopic pregnancy or
10  having an early loss of pregnancy without any induced
11  abortion?
12    A.   I'd have to look at the specifics, but I
13  think, again, because ectopic pregnancy, you know, is
14  a part of early pregnancy, I -- I'm pretty sure there
15  were ectopic pregnancies eventually diagnosed in all
16  of the groups.
17         MS. GRANDIN:  Pardon my interruption.
18  I was just wondering if we could get a time check from
19  you, Gretchen.  Per my calculation, we're pretty close
20  to four hours.
21         MR. BOYLE:  I agree we are and I've got
22  about two or three questions left.  So if that's all
23  right, I'll just proceed, but I'm not going much
24  longer.
25         MS. GRANDIN:  Okay.  That sounds good.

1        MR. BOYLE:  Okay.

2        MS. GRANDIN:  Thank you.

3        MR. BOYLE:  Thanks.

4    Q.   (Mr. Boyle)  Do you recall that the Goldberg

5  study concluded that waiting to provide chemical

6  abortion drugs until a patient has a confirmed

7  intrauterine pregnancy is reasonably safe and

8  effective?

9    A.   That's not -- I mean, that's not the primary

10  -- that's not my recollection of the primary

11  conclusion that they drew from their study.

12    Q.   Do you recall that it was at least a

13  conclusion that he -- that they drew from their study?

14    A.   I'd have to look specifically.  You know,

15  the conclusion that I recollected from that study was

16  that providing abortion care for patients diagnosed

17  with pregnancy of unknown location is safe and

18  effective.

19    Q.   Do you agree, though, that waiting to

20  provide chemical abortion drugs until a patient has a

21  confirmed intrauterine pregnancy is reasonably safe

22  and effective?

23    A.   I think, again, that doesn't honor patient

24  experience very well.  I think when we have a -- a

25  perfectly safe and effective way to provide abortion

1  care in the setting of a pregnancy of unknown
2  location, I think it's -- I think it's rather cruel to
3  make a person wait.
4              MR. BOYLE:  I don't think I have any
5  further questions.  Some of these other folks may have
6  some.  Doctor, I very much appreciate your time today.
7  Thank you.
8              THE WITNESS:  Indeed.  I appreciate
9  yours as well.
10              MS. GRANDIN:  Do you mind if we take
11  about ten minutes, and I might come up -- come back
12  with a couple re-direct questions?
13              THE COURT REPORTER:  Off the record at
14  2:58 p.m.
15  (Brief recess: 2:58 p.m. to 3:11 p.m.)
16              THE COURT REPORTER:  Back on the record
17  at 3:11 p.m.
18                      EXAMINATION
19  BY MS. GRANDIN:
20      Q.   Dr. Boraas, in your experience when a
21  patient is seeking an abortion involving some level of
22  sedation, who makes the decision about what level of
23  sedation to give a patient?
24      A.   You know, ultimately, it's the patient's
25  decision.

1      Q.   Does the anesthesiologist ever make that

2  decision?

3      A.   I would say the anesthesiologist strongly

4  recommends a specific type of anesthesia, if there's

5  an ---

6      Q.   In your ---

7      A.   --- if there's an anesthesiologist involved.

8      Q.   In your experience, what factors often go

9  into making the decision of what level of sedation a

10 patient prefers?

11     A.   Well, the first and foremost is what the

12 patient desires.  The second is, you know,

13 occasionally we will see a patient that just requires

14 a high -- a high level of sedation in order to

15 complete the procedure safely.

16     Q.   In your experience providing abortions, how

17 often do patients choose deep sedation as their

18 sedation option?

19     A.   Well, again, the only place where people

20 would have that -- would be able to access deep

21 sedation would be in the hospital.  And for various

22 reasons, namely, the first and foremost being

23 insurance coverage, that's a prohibitive option for

24 many people in my setting.

25     Q.   Do you have a general estimation, or is that

1  just -- is that not something you'd be able to provide

2  an estimate of?

3       A.   Deep sedation compared to general

4  anesthesia?

5       Q.   Deep sedation compared to other options I --

6  available.

7       A.   Yeah, I think it really just depends on the

8  patient.  Many patients are nervous about any type of

9  sedation and how it might affect their body.

10      Q.   When a uterine perforation or a cervical

11 laceration occurs during a procedural abortion, how do

12 you generally treat that?

13      A.   So treatment for both of those things is

14 potentially different, so I'm going to talk about one

15 at a time.

16      Q.   Yes.  Thank you.

17      A.   No problem.  If a perforation is suspected

18 during a procedure, the next sort of -- not question,

19 but the next thing that we assess is with what

20 instrument because that -- that determines whether or

21 not the patient -- whether or not we can ensure the

22 integrity of the bowel.

23           If we can't ensure the integrity of the

24 bowel, then the person has to have assessment of that

25 surgically at the hospital.

171

1          If the perforation happens with a blunt
2    instrument, especially in the first trimester, we're
3    usually able to watch those patients closely in our
4    outpatient health center, like at Planned Parenthood
5    North Central States, and closely monitor vitals and
6    pain level and just sort of overall patient
7    assessment.
8          Sometimes potentially using ultrasound to --
9    and sometimes we're also able to, you know, monitor
10   the patient safety in our health center.
11        Q.   And I -- I think you answered this question
12   in your general answer, but just to clarify.  Does --
13   in general, when a uterine perforation occurs, does it
14   always require treatment in a hospital?
15        A.   No.
16        Q.   And when a cervical laceration -- sorry, go
17   ahead.
18        A.   Yeah, sorry.  I just remembered that you
19   asked about cervical laceration, too, and I haven't
20   answered that.  So ---
21        Q.   That's okay.  Let me -- let me ask the
22   question again specifically to cervical laceration.
23   So when a cervical laceration occurs during a
24   procedural abortion, how do you treat that?
25        A.   It depends whether or not the -- the

172

1  laceration is low or in the distal portion of the
2  cervix or whether it's higher and not as easily
3  visible.
4           So for a distal or cervical laceration that
5  occurs at the end of the cervix, those, if they're
6  very small, can just be observed and make sure that
7  they're not bleeding heavily.  And if they're not,
8  those can -- then those heal on their own.
9           If it's more -- if it's a slightly larger
10 laceration or the laceration is bleeding a fair
11 amount, then oftentimes we will reapproximate that
12 laceration with suture, bring it together with suture
13 and ensure that there isn't any ongoing bleeding.
14       Q.   And ---
15       A.   If ---
16       Q.   Sorry, go ahead.
17       A.   If the -- if the laceration is potentially
18 higher, that may be treated with tamponade, like with
19 a intrauterine balloon.  And a fair number of times,
20 that is sufficient for treatment of that.  Higher
21 lacerations sometimes need other procedures depending
22 on where the -- where it is.
23       Q.   So can a cervical laceration be treated
24 safely in the clinic, an outpatient clinic where an
25 abortion is performed?

173

1      A.    Certain types of them, yes, absolutely.

2      Q.    Does it -- is it always a requirement for

3   surgical lacerations that the patient be treated in a

4   hospital setting?

5      A.    It is not always a requirement that cervical

6   lacerations are better addressed in a hospital

7   setting, no.

8      Q.    Are forceps used in miscarriage management

9   in your experience?

10     A.    If I'm providing a dilation and evacuation

11  to help complete a miscarriage for a patient, yes.

12  Again, typically starting around the 17th week of

13  pregnancy, that would be the same for a person

14  experiencing a miscarriage also.

15     Q.    Are forceps used in labor and delivery in

16  your experience?

17     A.    Yes.

18     Q.    Is cervical ---

19     A.    When a patient ---

20     Q.    Sorry, go ahead.

21     A.    Yeah.  Yes, when a patient requires an

22  operative vaginal delivery.  Sometimes even at the

23  time of C-section if the extraction is difficult.

24     Q.    Is cervical laceration a possible

25  complication of miscarriage management?

174

1          A.   Yes.

2          Q.   Is it a possible complication of labor and

3     delivery?

4          A.   Yes.

5          Q.   Is uterine perforation a possible

6     complication of miscarriage management?

7          A.   Yes.

8          Q.   Is it a possible complication of labor and

9     delivery?

10         A.   Yes.

11         Q.   Is infection a possible complication of

12    miscarriage management?

13         A.   Yes.

14         Q.   Is it a possible complication of labor and

15    delivery?

16         A.   Yes.

17         Q.   Is hemorrhage a possible ---

18    (Off-record comments)

19         Q.   (Ms. Grandin)  Is hemorrhage a possible

20    complication of miscarriage management?

21         A.   Yes.

22         Q.   Is it a possible complication of labor and

23    delivery?

24         A.   Yes.

25         Q.   Does that include a hemorrhage requiring a

1  blood transfusion?

2       A.   Hemorrhage requiring a blood transfusion is

3  much more likely at the time of giving birth either

4  vaginally or by a cesarean section than it would be

5  for a person accessing induced abortion.

6       Q.   In your opinion, do dilation and evacuation

7  abortions need to be performed in a hospital in order

8  to be performed safely?

9       A.   No.

10      Q.   So I think you testified earlier that you

11 hadn't seen PPSAT's specific abortion protocols.

12 However, you reviewed Dr. Farris's declaration

13 submitted in support of the Amended Preliminary

14 Injunction Motion in this case.  Is that correct?  Her

15 two declarations?

16      A.   I reviewed the declarations that Dr. Farris

17 submitted, yes.

18      Q.   What from Dr. Farris -- from your review of

19 Dr. Farris's declaration, what is your understanding

20 of PPSAT's protocol for a medication abortion in the

21 circumstance where a patient has a pregnancy of

22 unknown location?

23      A.   From my review of Dr. Farris's declarations,

24 the protocol at PPSAT would include assessment of

25 patient's risk for ectopic pregnancy if they have been

1  diagnosed with a pregnancy of unknown location, and

2  then a thorough review of the risks and benefits of

3  expectant management in the setting of a PUL,

4  pregnancy of unknown location, or proceeding with

5  medication abortion or a procedural abortion.

6        And then my ---

7      Q.   Do you -- sorry.  Go ahead.

8      A.   My -- again, from her declaration, my

9  understanding of PPSAT's protocol regarding patients

10  with a PUL also includes review of, you know,

11  potential warning signs and symptoms associated with

12  an ectopic pregnancy, as well as recommendation for

13  very close follow-up.

14      Q.   From your review of the -- Dr. Farris's

15  declaration, do you understand that PPSAT in North

16  Carolina uses hCG serial testing to evaluate patients

17  who seek medication abortion but have a pregnancy of

18  unknown location?

19      A.   I do recall that from Dr. Farris's

20  declaration.

21      Q.   Do you recall whether PPSAT in North

22  Carolina administers ultrasounds to patients who have

23  a pregnancy of unknown location and seek medication

24  abortion?

25      A.   The only -- the only way to establish a

177

1   definitive diagnosis of pregnancy of unknown location
2   is with ultrasonography.  So, yes, if they're treating
3   people with a pregnancy of unknown location, then they
4   -- that person has had an ultrasound.
5       Q.   Is it your understanding from Dr. Farris's
6   declaration that PPSAT uses a similar protocol as the
7   protocol whose safety and efficacy you discussed in
8   your published research on the topic in your article
9   from 2023 that we discussed previously in this
10  deposition?
11      A.   Our article does, in a box in the article,
12  describe the protocol that we use here at Planned
13  Parenthood North Central States.  And it's -- from her
14  declaration, the protocol that Dr. Farris described in
15  the declarations seems very -- very similar.
16              MS. GRANDIN:  Thank you, Dr. Boraas.  I
17  don't have any further questions.
18              MR. BOYLE:  I have brief re-direct
19  based on your questions if I might.
20              MS. GRANDIN:  Okay.
21              THE WITNESS:  Absolutely.
22                  FURTHER EXAMINATION
23  BY MR. BOYLE:
24      Q.   You were talking about bleeding from a
25  cervical laceration.  How do you see that?  What

1 methodology do you use or mechanism do you use to

2 visualize that?  Do you just see it with your eyes, or

3 are you using radiograph or some other testing?

4     A.   Bleeding is visible with my eyes ---

5     Q.   Okay.  So you don't have like a fiber optic

6 or something like that?

7     A.   No.  No fiber optics.

8     Q.   Then how are you able to see it if it's --

9 not distal, but if it's the other one, farther away?

10     A.   We would suspect a high cervical laceration

11 if there was ongoing bleeding that wasn't coming from

12 the top portion or fundus of the uterus.

13     Q.   Well, you said some cervical lacerations

14 should be treated in a hospital setting, right?

15     A.   I didn't say that.  I said many cervical

16 lacerations can be safely treated in an outpatient

17 setting.

18     Q.   Which means the rest must be treated in a

19 hospital setting, right?

20     A.   There are certain -- you know, there are

21 certain high cervical lacerations that don't respond

22 enough to the measures that we use to treat them in

23 the outpatient center.  And then for those people,

24 they may require transfer to a hospital.

25     Q.   And you said that some uterine perforations

179

1    require hospital exploratory -- exploratory surgery of
2    the abdomen in a hospital setting, right?
3         A.   Some -- depending on what instrument and
4    where the perforation in the uterus occurs and the
5    potential risk for injury to the bowel in particular,
6    some of those patients, yeah, need to be transferred
7    for -- if the D&E happens in the outpatient setting,
8    need to be transferred for that surgery in a hospital.
9         Q.   You don't do any exploratory abdominal
10   surgery to determine the scope of damage to different
11   organs from a uterine perforation in your Planned
12   Parenthood clinic in Minnesota, do you?
13        A.   We don't provide any intraabdominal surgery
14   at Planned Parenthood North Central States, no.
15        Q.   And I know you haven't ---
16        A.   However, if I'm taking care of that patient
17   and that perforation occurs in the hospital, I would
18   be present as the physician responsible and likely
19   probably even start the case while we requested, you
20   know, intraoperative consultation from the general
21   surgeon.
22        Q.   Right.  But you wouldn't do that at the
23   clinic.  You would transfer that patient from the
24   clinic to the hospital before you started that
25   surgery, right?

1    A.    That type of surgery requires general

2    anesthesia, and we don't have that capacity at North

3    -- Planned Parenthood North Central States.

4    Q.    How do you get the serum hCG test from a

5    patient?  What do you do to collect that?

6    A.    We draw their blood.

7    Q.    How do you draw their blood?

8    A.    With a needle.

9    Q.    So do you take hCG testing of every patient

10   before you give them a chemical abortion drug?

11   A.    Not all patients accessing medication

12   abortion need serum beta hCG testing.

13   Q.    So is it your testimony that you have

14   patients that you give chemical abortion drugs to that

15   have neither had an ultrasound to confirm the location

16   of the pregnancy nor had a serum hCG blood draw to

17   test their pregnancy amounts, if you will?

18             MS. GRANDIN:  Objection to form.

19             THE WITNESS:  Testing serum hCG

20   pregnancy amounts isn't really a thing in medical

21   practice.  The absolute value is rarely of helpful

22   significance.  It's really the trend over time that

23   helps us take good, safe care of patients.

24             Now, there are certainly patients who

25   screened, you know, after a thorough assessment to be

1  low risk for ectopic pregnancy and would need neither

2  an ultrasound nor serum hCG testing.

3      Q.   (Mr. Boyle)  Okay.  So in your practice in

4  Minnesota at your Planned Parenthood clinic, you give

5  patients -- on certain occasions, you give them

6  chemical abortion drugs without performing an

7  ultrasound on them or drawing blood to conduct the

8  first in a series of serum hCG blood tests.  Is that

9  correct?

10     A.   The provision of medication abortion without

11  -- after a history-based screening without ultrasound

12  or tests like serum hCG is well established in the

13  medical literature to be safe and effective.

14     Q.   And you do that at your clinic in the

15  Planned Parenthood clinic in Minnesota.  Is that

16  correct?

17     A.   For patients who screen out of the need for

18  ultrasound, yes.

19     Q.   And even if they don't have an ultrasound,

20  you also sometimes don't have either an ultrasound or

21  the blood draw, correct?

22     A.   Those two things are not indicated for every

23  medication abortion patient.

24     Q.   Which is sort of the inverse of what I'm

25  asking.  So sometimes, you give those patients who

1 don't have an ultrasound and don't have the serum

2 blood draw, you give them chemical abortion drugs.  Is

3 that correct?

4     A.   If they are deemed to be a low-risk patient

5 and have -- and that's what they choose as far as

6 prevent -- proceeding with abortion care and are able

7 to, you know, say that they'll, you know, complete the

8 recommended follow-up.

9     Q.   I feel like you left a yes off at the end

10 there.  Was there a yes that -- if all those things,

11 then, yes, you do that?

12     A.   If all those -- if all of those things are

13 true about a individual in front of me, then yes.

14     Q.   Okay.  Lawyers are fun, aren't we?

15     A.   You -- yeah, you all are fun.

16     Q.   So -- and just so I understood your

17 testimony before with Ms. Grandin, you said that it's

18 your understanding that Planned Parenthood South

19 Atlantic performs an ultrasound on every single

20 pregnant patient before they provide that pregnant

21 patient with a chemical abortion, just sometimes when

22 they do the ultrasound it's indeterminate so you have

23 a pregnancy of unknown location.  Is that your

24 understanding?

25     A.   My understanding is that the law in North

1  Carolina -- again, not an expert on laws, specifically

2  not in states where I don't practice.  But my

3  understanding of the law in North Carolina is that an

4  ultrasound is required for each patient to access

5  abortion care.

6          Now, certainly, as people are nervous about

7  limits and bans on when they're able to access

8  abortion care, there are certainly patients -- we've

9  seen this for sure after the Dobbs decision, people

10 making appointments earlier and earlier in pregnancy

11 because they're worried they won't be able to access

12 that care.

13     Q.   Yeah.  I'm trying ---

14     A.   Then naturally, as far as, you know, how

15 pregnancies progress, many of those people will be

16 diagnosed with a pregnancy of unknown location because

17 we don't reasonably expect to see an -- see a

18 pregnancy on ultrasound, regardless of where it's

19 growing.

20     Q.   Fair enough.  My question to you is, I

21 thought I understood you to say that when you read

22 Dr. Farris's declarations in this case that it's your

23 understanding that she said every single patient who

24 gets a chemical abortion in the Planned Parenthood

25 South Atlantic clinic has an ultrasound taken of them

184

1    before they are given that medication.  Is that
2    correct?
3          A.    My understanding of the protocol I'm
4    specifically referring to in her declaration is about
5    people who have been diagnosed with a pregnancy of
6    unknown location.
7                That diagnosis can only happen -- a patient
8    is -- has a pregnancy.  We can diagnose a pregnancy
9    with a urine pregnancy test, but we can't -- we can't
10   diagnosis -- diagnose a pregnancy of unknown location
11   unless we've -- unless we've -- unless the patient has
12   had ultrasound.
13         Q.    Or you can simply not take an ultrasound,
14   and every patient without an ultrasound has a
15   pregnancy of unknown location, right?
16         A.    No.
17         Q.    No?
18         A.    No.  A patient who hasn't had an ultrasound
19   but has had confirmation of a pregnancy, for example,
20   most commonly with a urine pregnancy test, that
21   patient just has a pregnancy.
22         Q.    I think you said this, and I promise this is
23   my last one here.  I just want to confirm.
24         A.    Okay.
25         Q.    Don't believe me because I'm a lawyer, but

1    I'm pretty sure this is my last question.

2              You're saying that every patient at Planned

3    Parenthood South Atlantic who gets chemical abortion

4    drugs has had an ultrasound.  Is that your

5    understanding?

6          A.   My understanding is that the law requires

7    ultrasound prior to abortion care in North Carolina.

8          Q.   So that law, I believe, that you're talking

9    about is currently enjoined, which, fancy legal word,

10   means it's basically on the shelf until this hearing

11   coming up at the end of September.

12             So are you saying that you think every

13   single patient -- see, I told you I was going to ask

14   another question -- every single patient at Planned

15   Parenthood South Atlantic in North Carolina has an

16   ultrasound because of that law or because of what you

17   saw in Dr. Farris's declaration, which is it?

18         A.   Dr. ---

19             MS. GRANDIN:  Objection to form and

20   calls for a legal conclusion.

21             THE WITNESS:  Dr. Farris's declaration

22   describes the protocol they use to help treat patients

23   that are diagnosed with a -- a pregnancy of unknown

24   location.  And again, in order to diagnose a pregnancy

25   of unknown location, a person would have to have an

1  ultrasound.

2              MR. BOYLE:  Okay.  I don't think I have

3  any further questions.

4              THE COURT REPORTER:  Anybody else?

5

6        All right.  This concludes the deposition.

7  The time is 3:34 p.m.

8

9        WHEREUPON, at 3:34 o'clock p.m., the

10  deposition was adjourned.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

187

CERTIFICATION

1

2

3      I, Gretchen Wells, Notary Public in and for the

4  County of Iredell, State of North Carolina at Large, do

5  hereby certify:

6      That said witness appeared before me, via video

7  conference, at the time and place herein aforementioned

8  and the foregoing consecutively numbered pages are a

9  complete and accurate record of all the testimony given

10  by said witness;

11      That the witness has executed a Declaration, which

12  is attached as an exhibit hereto, and who made an

13  attestation through this declaration that their testimony

14  is truthful under the penalty of perjury;

15      That the undersigned is not of kin, nor in anywise

16  associated with any of the parties to said cause of

17  action, nor their counsel, and not interested in the

18  event(s) thereof.

19      Reading and signing of the testimony was requested.

20      IN WITNESS WHEREOF, I have hereunto set my

21  hand this 4th day of September, 2023.

22

_Gretchen Wells_

23                              Notary No. 202110400230

24

25

1
                    WITNESS CERTIFICATION
2
3        I, CHRISTY MARIE BORAAS ALSLEBEN, MD, do hereby
4    certify,
5        That I have read and examined the contents of the
6    foregoing pages of record of testimony as given by me
7    at the times and place herein aforementioned;
8        And that to the best of my knowledge and belief,
9    the foregoing pages are a complete and accurate record
10   of all the testimony given by me at said time, except
11   as noted on the attached here (Addendum A).
12   I have ____ / have not ____ made changes/corrections
13   to be attached.

                          _____
14                               (WITNESS SIGNATURE)
15
         I, _____, Notary Public
16
     for the County of _____, State of
17
     _____, do hereby certify:
18
         That the herein-above named personally appeared
19
     before me this the _____ day of _____, 20____;
20
         And that I personally witnessed the execution
21
     of this document for the intents and purposes herein
22
     above described.
23
                          _____
24                                 NOTARY PUBLIC
     My Commission Expires:              (SEAL)
25

189

ADDENDUM A

     Upon the reading and examination of my
testimony as herein transcribed, I note the following
changes and/or corrections with accompanying reason(s)
for said change/correction:

Page        Line                        Is Amended to Read

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Cape Fear Court Reporting, Inc.**