# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION FILE NO. 1:23-CV-480

Planned Parenthood South      )
 Atlantic, et al.,            )
                              )
            Plaintiffs,       )
                              )
     vs.                      )
                              )
 JOSHUA STEIN, et al.,        )
                              )
            Defendants,       )
                              )
 and                          )
                              )
PHILIP E. BERGER and TIMOTHY K.  )
MOORE,                        )
                              )
            Intervenor-       )
            Defendants.       )
                              )
--------------------------------

                  _____

                  VIDEOTAPED DEPOSITION
                         OF
                  KATHERINE A. FARRIS, MD
                  _____

TAKEN AT THE LAW OFFICES OF:
WARD AND SMITH, P.A.
82 PATTON AVENUE, SUITE 300
ASHEVILLE, NC 28801

                    09-01-2023
                10:11 O'CLOCK A.M.

                  Laura Baker
                  Court Reporter
for Cape Fear Court Reporting, Inc.
PO Box 10112
Wilmington NC  28404

2

APPEARANCES

FOR PLANNED PARENTHOOD SOUTH ATLANTIC:

    Hannah Swanson, Esquire
     Kara L. Grandin, Esquire (via videoconference)
    Anjali Salvador, Esquire (via videoconference)
     Dylan Cowit, Esquire (via videoconference)
    Helene T. Krasnoff, Esquire (via videoconference)
     PLANNED PARENTHOOD FEDERATION OF AMERICA
    1110 Vermont Avenue NW, Suite 300
     Washington, DC 20005
    hannah.swanson@ppfa.org
     kara.grandin@ppfa.org
    anjali.salvador@ppfa.org
     dylan.cowit@ppfa.org
    helene.krasnoff@ppfa.org

FOR ALL PLAINTIFFS:
    Jaclyn A. Maffetore, Esquire (via videoconference)
    ACLU OF NORTH CAROLINA
    P.O. Box 28004
    Raleigh, NC 27611
    jmaffetore@acluofnc.org

FOR THE PLAINTIFF DR. BEVERLY GRAY:
    Brigitte Amiri, Esquire (via videoconference)
    AMERICAN CIVIL LIBERTIES UNION FOUNDATION
    125 Broad Street, 18th Floor
    New York, NY 10004-2400
    bamiri@aclu.org

3

APPEARANCES

FOR THE LEGISLATIVE LEADER DEFENDANTS
SENATOR BERGER AND SPEAKER MOORE:

    W. Ellis Boyle, Esquire
     WARD & SMITH, PA
    751 Corporate Center Drive, Suite 300
     Raleigh, NC 27607
    weboyle@wardandsmith.com

    Julia Payne, Esquire (via videoconference)
     ALLIANCE DEFENDING FREEDOM
    15100 N. 90th Street
     Scottsdale, AZ 85260
    jpayne@adflegal.org

FOR ATTORNEY GENERAL JOSH STEIN:
    Sripriya Narasimhan, Esquire (via videoconference)
    NORTH CAROLINA DEPARTMENT OF JUSTICE
    114 West Edenton Street
    Raleigh, NC 27603
    snarasimhan@ncdoj.gov

FOR ALL DISTRICT ATTORNEY DEFENDANTS
EXCEPT JIM O'NEILL:
    Elizabeth C. O'Brien, Esquire (via videoconference)
    NORTH CAROLINA DEPARTMENT OF JUSTICE
    114 West Edenton Street
    Raleigh, NC 27603
    eobrien@ncdoj.gov

FOR THE DISTRICT ATTORNEY JIM O'NEILL

    Kevin G. Williams, Esquire (via videoconference)
    BELL DAVIS & PITT, P.A.
    100 N. Cherry Street, Suite 600
    Winston-Salem, NC 27101
    kwilliams@belldavispitt.com

4

1                      APPEARANCES
2
   FOR THE NORTH CAROLINA MEDICAL BOARD,
3    NORTH CAROLINA BOARD OF NURSING:
4        Michael E. Bulleri (via videoconference)
         NORTH CAROLINA DEPARTMENT OF JUSTICE
5        114 West Edenton Street
         Raleigh, NC 27603
6        mbulleri@ncdoj.gov
7
   FOR SECRETARY KODY H. KINSLEY, DEPARTMENT
8    OF HEALTH AND HUMAN SERVICES
9        Michael T. Wood, Esquire (via videoconference)
         NORTH CAROLINA DEPARTMENT OF JUSTICE
10       114 West Edenton Street
         Raleigh, NC 27603
11       mwood@ncdoj.gov
12
13   OTHER APPEARANCES
14   Rachael Corcione, Videographer
15
16   OTHER REMOTE APPEARANCES
17   Shealyn Massey
         Planned Parenthood Federation of America
18   Vanisha Kudumuri
         Planned Parenthood Federation of America
19   Susanna Birdsong
         General Counsel/Vice President of Compliance
20       at Planned Parenthood South Atlantic
     Joshua Yost
21       General Counsel, Office of the
         Senate President Pro Tempore
22   Sam Hayes
         General Counsel, North Carolina
23       House Speaker Tim Moore
24
25

5

I N D E X

STIPULATIONS                                          6
 EXAMINATION
      By Mr. Boyle                              10, 167
       By Ms. Swanson                               160

 ADJOURNMENT                                        170
REPORTER CERTIFICATE                                171
 WITNESS CERTIFICATION                              172
WITNESS ADDENDUM                                    173

E X H I B I T S

| Name | Offered By | Identified |
|------|-----------|-----------|
| (None marked) | | |

NOTE: Quoted material has been reproduced as read or quoted
by the speaker.

6

STIPULATIONS

     Pursuant to Notice and/or consent of the parties, the
deposition hereon captioned was conducted at the
time and location indicated and was conducted before Laura
Baker, Notary Public in and for the County of Iredell,
State of North Carolina at Large.

     Notice and/or defect in Notice of time, place, purpose
and method of taking the deposition was waived. Formalities
with regard to sealing and filing the deposition were
waived, and it is stipulated that the original transcript,
upon being certified by the undersigned court reporter,
shall be made available for use in accordance with the
applicable rules as amended.

     It is stipulated that objections to questions
and motions to strike answers are reserved until the
testimony, or any part thereof, is offered for evidence,
except that objection to the form of any question shall be
noted herein at the time of the taking of the testimony.

     Reading and signing of the testimony was requested
prior to the filing of same for use as permitted by
applicable rule(s).

7

1                           PROCEEDINGS
2           (10:11 o'clock a.m.)
3                   THE VIDEOGRAPHER:  On record.  Today is
4    September 1st, 2023, and the time is 10:11 a.m.  I'm
5    the videographer, Rachel Corcione, and the court
6    reporter is Laura Baker.
7                   This is the video deposition of Katherine
8    Farris, MD, in the matter of Planned Parenthood South
9    Atlantic, et al., versus Joshua Stein, et al., and
10   Philip E. Berger and Timothy K. Moore.
11                  Will counsel now introduce themselves for the
12   video record, after which the court reporter will swear
13   in the witness.
14                  MS. SWANSON:  Good morning.  My name is
15   Hannah Swanson of Planned Parenthood Federation of
16   America.  I represent Planned Parenthood South
17   Atlantic, and I'm joined on the phone by my colleagues
18   at Planned Parenthood Federation of America, Anjali
19   Salvador, Kara Grandin, Dylan Cowit, Vanisha Kudumuri,
20   Shealyn Massey.  Vanisha and Shealyn are paralegals.
21   And I'm also joined on the phone by Susanna Birdsong of
22   Planned Parenthood South Atlantic.
23                  MR. BOYLE:  Good morning.  My name is
24   Ellis Boyle from the Wake County Bar.  I represent the
25   Legislative Leader Defendants, Speaker Moore and

1 Senator Berger. I believe I'm joined on this Zoom

2 remotely by my co-counsel, Julia Payne, with the ADF.

3         MS. PAYNE: Yes, I am here.

4         MR. BOYLE: And I might just tick down

5 the list so we don't overlap. Can we get Attorney

6 General Stein's counsel next?

7         MS. NARASIMHAN: Morning. My name is

8 Sripriya Narasimhan. I'm with the North Carolina

9 Department of Justice, representing Attorney General

10 Josh Stein.

11         MR. BOYLE: Next, the DAs other than Jim

12 O'Neill?

13         MS. O'BRIEN: Good morning. Elizabeth

14 O'Brien from the North Carolina Department of Justice,

15 and I represent the district attorneys, except for

16 District Attorney Jim O'Neill.

17         MR. BOYLE: Next, DA Jim O'Neill?

18         MR. WILLIAMS: My name is Kevin Williams

19 with the Forsyth County Bar, and I represent District

20 Attorney Jim O'Neill.

21         MR. BOYLE: Next. Secretary Kinsley?

22         MR. WOOD: Hi, good morning. This is

23 Michael Wood with NCDOJ, and I'm counsel to Secretary

24 Kody Kinsley of DHHS.

25         MR. BOYLE: Next. The Medical Boards?

9

1              MR. BULLERI:  Good morning.  This is

2    Michael Bulleri with the North Carolina Department of

3    Justice.  I represent the North Carolina Medical Board

4    and the North Carolina Board of Nursing.

5              MR. BOYLE:  I think that's all of the

6    groups of parties.  If there are any other folks that

7    are on, please identify yourself now.  Thanks.

8              MS. AMIRI:  Hi, everyone.  Brigitte

9    Amiri from the ACLU, and I represent the Plaintiff, Dr.

10   Gray.

11             MS. MAFFETORE:  Good morning, everyone.

12   Jaclyn Maffetore of the ACLU North Carolina on behalf

13   of all Plaintiffs.

14             MR. YOST:  Good morning, everyone.

15   Joshua Yost, General Counsel for Senator Phil Berger.

16             MR. HAYES:  And Sam Hayes, General

17   Counsel for North Carolina House Speaker Tim Moore.

18             MR. BOYLE:  Going once?  All right.

19   Ready to begin?

20             THE COURT REPORTER:  I need to swear in

21   our witness.

22             MR. BOYLE:  Yes.

23            The witness, KATHERINE A. FARRIS, MD, being

24   first duly affirmed to state the truth, the whole

25   truth, and nothing but the truth, testifies as follows:

10

1                            EXAMINATION

2     BY MR. BOYLE:

3                    MR. BOYLE:  Good morning.  We are on the

4     record for the deposition of Dr. Farris.  It's about

5     10:15 a.m. on September 1st, 2023.  And we are located

6     in the Ward and Smith Asheville office, with some

7     counsel appearing remotely.

8                    My name is Ellis Boyle, and I represent the

9     Legislative Defendants in this case.

10         Q.    (Mr. Boyle)  Doctor, have you ever been

11    deposed before?

12         A.    No, I have not.

13         Q.    Welcome.  I'm sure you've heard this from

14    your counsel, but I just want to go over a few ground

15    rules.  A deposition is a more formal conversation than

16    we would have on -- you know, outside of a deposition

17    or court setting, and so there's a few rules.

18                    We like to keep our court reporter happy,

19    because she is transcribing, writing down, all the

20    words that we speak out loud during this deposition.

21    So two big rules for that; number one, if I ask you a

22    question, I ask that you please answer verbally out

23    loud instead of nodding your head or saying, "uh-huh,"

24    which would be normal, and I would understand in a non-

25    deposition context, but since we're having the court

11

1   reporter transcribe it, can you agree to do that,
2   please?
3          A.   I can.
4          Q.   Great.  And if we get down the path and you
5   get a little off that, I may politely nudge you back.
6   I'm not trying to be rude.  Please don't be offended if
7   I do that.  Okay?
8          A.   I understand.
9          Q.   The second one is talking over each other.
10  Again, to have a clean record for the court reporter,
11  it's much better if I allow you to finish whatever
12  you're saying and vice versa before the other one
13  starts to talk again.
14          So I ask that you please try and be more
15  cognizant of that than under normal conversation
16  circumstances where you think you know where I'm going
17  with my question, and you just start answering.  Try to
18  let me finish, even if I ramble, please.
19          A.   I understand.
20          Q.   Thank you.  And then, finally, your lawyer
21  may object during the course of this deposition.  And
22  unless there's an instruction not to answer for some
23  privilege or similar-type reason, the expectation is
24  that you'll respond to the question, even if there's an
25  objection.  Okay?

1     A.   Yes.

2     Q.   Very good.  You work for Planned Parenthood

3  South Atlantic, right?

4     A.   That's correct.

5     Q.   You're the medical director there?

6     A.   My title is chief medical officer.

7     Q.   Okay.  Is there someone else who's the

8  medical director?

9     A.   I have an associate affiliate medical

10  director who works under me.

11     Q.   Okay.  Are you the CEO or president or the

12  highest officer in the operational process of the

13  Planned Parenthood South Atlantic?

14          MS. SWANSON:  Objection to form.

15          THE WITNESS:  I am not the CEO.  I'm the

16  chief medical officer, and I am the highest ranking

17  licensed person in the organization.

18     Q.   (Mr. Boyle)  Okay.  Is there someone who has

19  a title that works there day to day who is your boss,

20  or are you sort of the person who runs the day-to-day

21  operations?

22     A.   I have a boss, yes.  The CEO.

23     Q.   Planned Parenthood -- and I'm going to call

24  it "PPSA" -- or do you want to call it "P-P-S-A-T" or

25  "PP-SAT"?

13

1      A.   If we used an acronym, it would be PPSAT.

2      Q.   Okay.  I'll try to remember that.  I wrote

3   PPSA here, so please forgive me if I say it the wrong

4   way.  PPSAT charges money to perform induced abortions.

5   Isn't that true?

6      A.   Yes.

7                MS. SWANSON:  Objection to form.

8                THE WITNESS:  We do charge for the

9   medical services we provide.

10     Q.   (Mr. Boyle)  And one of those medical

11   services that PPSAT provides is induced abortions,

12   right?

13     A.   We do provide abortions.

14     Q.   And you do charge for those induced abortions

15   that you provide, right?

16     A.   I do not charge, so I'm not directly involved

17   with charging money.

18     Q.   Would you say you're, what, second in command

19   at PPSAT, or where do you fall on the org chart?

20                MS. SWANSON:  Objection to form.

21                THE WITNESS:  I am not second in

22   command.  I do report directly to the CEO, as do a

23   number of other individuals.

24     Q.   (Mr. Boyle)  Okay.  And you're aware, then,

25   that PPSAT charges money to perform induced abortions

14

1   for patients who come to PPSAT seeking an induced
2   abortion, right?
3       A.   Yes.  We do charge for our healthcare
4   services.
5       Q.   And I appreciate that.  I just want to make
6   sure I'm clear, because I asked about induced
7   abortions.  You do charge for induced abortions,
8   including other healthcare?
9                MS. SWANSON:  Objection to form.
10               THE WITNESS:  We charge for all of the
11  healthcare we provide, including induced abortions.
12      Q.   (Mr. Boyle)  Okay.  Thank you.  How much does
13  PPSAT charge for each chemical abortion that it
14  performs in North Carolina?
15      A.   I believe that the cost for self-pay for a
16  medication abortion is $625.
17      Q.   Are there other prices that are charged other
18  than for a self-paid patient who's obtaining a chemical
19  abortion from PPSAT?
20               MS. SWANSON:  Objection to form.
21      Q.   (Mr. Boyle)  In North Carolina, I should say.
22      A.   In North Carolina, we also have insurance
23  that we bill for abortion, and I believe that the cost
24  for insurance is based on contracts, but I don't know
25  the exact amount.

Case 1:23-cv-00480-CCE-LPA   Document 74-2   Filed 09/12/23   Page 15 of 174

15

1      Q.   Do you know if -- and as I understand, PPSAT

2  operates in four different states, right?

3      A.   That is correct.

4      Q.   And you're the medical officer for PPSAT in

5  all four states.  Is that correct?

6      A.   That is correct.

7      Q.   When we're talking about PPSAT today, I'm

8  primarily focused on what PPSAT does at the, what is

9  it, six clinics here in North Carolina.  So if there's

10  any confusion, please let me know.  But generally, when

11  I'm talking about PPSAT, can we agree that we're

12  talking about those six clinics in North Carolina?

13              MS. SWANSON:  Objection to form.

14              THE WITNESS:  Just to clarify, we have

15  more than six clinics in North Carolina.  We only

16  perform abortions at six of the clinics in North

17  Carolina.

18      Q.   (Mr. Boyle)  Fair enough.  How many clinics

19  do you have in North Carolina?

20      A.   Nine clinics in North Carolina.

21      Q.   Okay.  Which six clinics in North Carolina do

22  you perform induced abortions at?

23      A.   Planned Parenthood South Atlantic performs

24  abortions at our Asheville, Charlotte, Winston-Salem,

25  Fayetteville, Chapel Hill and Wilmington clinics in

Case 1:23-cv-00480-CCE-LPA   Document 74-2   Filed 09/12/23   Page 16 of 174

16

1    North Carolina.

2        Q.   So you do not perform them in Raleigh or

3    Greensboro.  Is that correct?

4        A.   We do not perform abortions in Raleigh,

5    Durham or Greensboro.

6        Q.   Okay.  So I'm primarily going to be asking

7    about the six PPSAT clinics in North Carolina where you

8    perform induced abortions.  So if that gets confusing,

9    please clarify and ask me to clarify.  But that's my

10   intent.  Okay?

11       A.   I understand.

12       Q.   Very good.  Do you know if PPSAT charges --

13   insurance companies that pay for medical or chemical

14   abortions, do they charge more or less than they charge

15   for the individual who's paying directly?

16       A.   I believe that we have contracts with

17   insurance companies in North Carolina that we charge

18   for medication abortion, and I think that cost is

19   higher if a patient is using insurance to pay for their

20   abortion healthcare.

21       Q.   Okay.  Do you know how much PPSAT charges for

22   each surgical abortion that it performs in North

23   Carolina?

24       A.   Procedural abortions are charged based on the

25   gestational duration of the pregnancy.  So I believe a

17

1  first trimester, so up through the 13th week of
2  pregnancy, is $625.  And then there are increases in
3  cost based on gestational duration.
4      Q.   What do those increases in cost based on
5  gestational duration look like?  What is the amounts?
6      A.   I do not know those numbers off the top of my
7  head.
8      Q.   Do you know why there's an increase in cost-
9  charge as the durational age goes up?
10     A.   I was not part of making those decisions, so
11 I don't know exactly why those costs change.
12     Q.   Is the surgical procedure for an aspiration
13 abortion at 14 weeks the same as a surgical procedure
14 for an aspiration abortion at 16 weeks?
15             MS. SWANSON:  Objection to form.
16             THE WITNESS:  Every procedure is
17 slightly different based on patient factors, but the
18 difference between a 14-week abortion and a 16-week
19 abortion is fairly minimal.
20     Q.   (Mr. Boyle)  Do you know if you charge -- if
21 PPSAT charges more for an aspiration abortion at 14
22 weeks than they do for an aspiration abortion at 16
23 weeks in North Carolina?
24     A.   No.  I believe they do not charge more for 14
25 weeks than for 16 weeks.

Case 1:23-cv-00480-CCE-LPA   Document 74-2   Filed 09/12/23   Page 18 of 174

18

1    Q.   When does that difference, that increased
2    cost, kick in then?  Is it at week 17?  Is it at week
3    18?
4        A.   Can you please clarify your question?
5        Q.   You just said that you don't believe that
6    PPSAT North Carolina charges anything different for a
7    14-week aspiration abortion versus a 16-week aspiration
8    abortion.  Is that correct?
9            THE WITNESS:  No.
10           MS. SWANSON:  Objection to form.
11           THE WITNESS:  That's not what I said.  I
12    said I do not believe that Planned Parenthood South
13    Atlantic charges more for a 14-week abortion than for a
14    16-week abortion, which is what I understood you to be
15    asking.
16       Q.   (Mr. Boyle)  Okay.  That's not what I was
17    asking.  That's what I meant.  So thank you for the
18    clarification.  I apologize for being confusing.
19           So when would that price difference kick in
20    if it's not, say, 14 to 16 weeks?  Is it at 17 weeks?
21    Is it at 18 weeks?
22       A.   I understand there to be a price difference
23    when a patient hits 14 weeks that is higher than an
24    abortion at 13 weeks.  And I understand there to be
25    incremental increases in abortion at some gestational

1  ages, but I don't know the date range.

2      Q.   Okay.  But you don't think it's 14 to 16

3  weeks?  You think those would be charged the same?

4              MS. SWANSON:  Objection to form.

5              THE WITNESS:  I don't know without

6  looking at our fee service -- our fee -- I don't

7  remember the name of the document, but there's a

8  document that lists our fees.

9      Q.   (Mr. Boyle)  How much money does PPSAT make

10  in one year for chemical abortions it performs in North

11  Carolina?

12             MS. SWANSON:  Objection to form.

13             THE WITNESS:  I do not know.

14      Q.   (Mr. Boyle)  How much money does PPSAT make

15  in a year for surgical abortions it performs in North

16  Carolina?

17             MS. SWANSON:  Objection to form.

18             THE WITNESS:  I do not know.

19      Q.   (Mr. Boyle)  How much money does PPSAT make

20  in a year for surgical abortions it performs in North

21  Carolina for pregnant women in their 14th or later

22  weeks gestational age?

23             MS. SWANSON:  Objection to form.

24             THE WITNESS:  I do not know.

25      Q.   (Mr. Boyle)  But you do know that when a

Case 1:23-cv-00480-CCE-LPA   Document 74-2   Filed 09/12/23   Page 20 of 174

1    patient hits 14 weeks gestational age, PPSAT charges

2    more for all of those surgical abortions 14 weeks and

3    later than earlier time?  So 13 weeks or less, correct?

4        A.   I do know that the cost of an abortion at 14

5    weeks and later is higher than the cost prior to 14

6    weeks.

7        Q.   How many chemical abortions does PPSAT

8    perform in a year in North Carolina on patients who

9    have a pregnancy that is not identified in the mother's

10   uterus by using ultrasound?

11              MS. SWANSON:  Objection to form.

12              THE WITNESS:  I do not know the exact

13   number of abortions that Planned Parenthood provides --

14   pardon me, medication abortions that Planned Parenthood

15   provides to patients with pregnancy of unknown

16   location.

17       Q.   (Mr. Boyle)  Okay.  You would agree that

18   leading up until today, Planned Parenthood South

19   Atlantic does perform chemical abortions on patients

20   who have a pregnancy that is not identified in the

21   uterus or located in the uterus by ultrasound.  Is that

22   correct?

23       A.   Planned Parenthood does perform medication

24   abortions on select patients who do not have a visible

25   pregnancy within their uterus.

1    Q.   And they charge money -- let me rephrase
2  that.
3         Planned Parenthood South Atlantic charges
4  money for those chemical abortions that it provides to
5  patients who have an ultrasound, but you are not able
6  to locate the pregnancy in their uterus, correct?
7    A.   Planned Parenthood does charge for abortions
8  on a patient with a pregnancy of unknown location.
9  Yes.
10   Q.   How much money do you think Planned
11 Parenthood South Atlantic will lose in a year if it
12 cannot perform surgical abortions in North Carolina for
13 pregnant women in their 13th -- I'm sorry, 14th or
14 later weeks gestational age?
15             MS. SWANSON:  Objection to form.
16             THE WITNESS:  I do not know.
17   Q.   (Mr. Boyle)  But you do know that currently,
18 PPSAT is performing surgical abortions on women in
19 their 14th week gestational age or later, and they are
20 charging money for those abortions, right?
21             MS. SWANSON:  Objection to form.
22             THE WITNESS:  I am not aware of -- I'm
23 not sure if we have performed an abortion beyond the
24 12th week since the new law went into effect.
25   Q.   (Mr. Boyle)  Okay.  Leading up to July 1st,

Case 1:23-cv-00480-CCE-LPA  Document 74-2  Filed 09/12/23  Page 22 of 174

22

1 2023, you would agree that PPSAT North Carolina was
2 performing surgical abortions on patients in their 13th
3 week and later gestational age and charging money to
4 perform those abortions, right?
5     A.   Prior to July 1st, Planned Parenthood South
6 Atlantic was performing procedural abortions beyond the
7 12th week of pregnancy and charging for those
8 abortions, yes.
9     Q.   And this law, this change in the law, has
10 caused PPSAT to lose the income that it made from
11 charging those patients for those abortions, right?
12            MS. SWANSON:  Objection to form.
13            THE WITNESS:  I am not aware of what our
14 income balance is since the change in the law.
15     Q.   (Mr. Boyle)  Well, you're aware that if you
16 were performing those abortions before and charging
17 money and getting paid for them, and now you're not,
18 you've lost that money, right?
19            MS. SWANSON:  Objection to form.
20            THE WITNESS:  I am not aware of what
21 money or what our income has been since the change in
22 the law.
23     Q.   (Mr. Boyle)  Yes, I'm not asking about your
24 general income or your general balance sheet.  I'm
25 saying, the simple fact is, if you were doing those

Case 1:23-cv-00480-CCE-LPA   Document 74-2   Filed 09/12/23   Page 23 of 174

1    abortions and charging money for them before, and now
2    you no longer are, you've lost that money that you made
3    before, correct?
4                    MS. SWANSON:  Objection to form.
5                    THE WITNESS:  I think that would require
6    me to speculate, because we've changed the services we
7    provide since the law went into effect, and I can't
8    speculate as to the exact impact that has had on our
9    income.
10        Q.   (Mr. Boyle)  I'm not asking you to compare
11   income.  I'm just asking if you simply lose revenue
12   from that potential source if you're no longer doing
13   it.
14                   MS. SWANSON:  Objection to form.
15                   THE WITNESS:  I can state that we are
16   not charging for abortions that we are not performing,
17   and we are not performing abortions, routinely, beyond
18   the 12th week of pregnancy since the law went into
19   effect.
20        Q.   (Mr. Boyle)  You just said, "routinely."  Are
21   you performing them at all?
22        A.   Legally, we can perform them.  And I'm not
23   personally aware of an abortion that has done -- that
24   has been done past the 12th week that meets one of the
25   exceptions.

Case 1:23-cv-00480-CCE-LPA   Document 74-2   Filed 09/12/23   Page 24 of 174

1    Q.   So as I understand your testimony, you're

2  saying that it's possible that an abortion after the

3  12th week that meets one of the exceptions under the

4  new law has been performed at a PPSAT clinic since July

5  1st leading up to today, September 1st, but you're just

6  not aware of that.

7    A.   Correct.

8    Q.   Okay.  I just want to clarify.  If you were

9  making money doing that type of abortion before July

10  1st when the law in effect, and now you're no longer

11  doing it, you would agree that you've lost at least

12  that money that you were able to make and charge for

13  those abortions that you're not able to make and charge

14  now, correct?

15            MS. SWANSON:  Objection to form.

16            THE WITNESS:  I would not characterize

17  that I -- that PPSAT has lost money.  I would

18  characterize that PPSAT is not charging for procedures

19  that we are not performing.

20    Q.   (Mr. Boyle)  PPSAT is a nonprofit.  Is that

21  correct?

22    A.   Yes, that's correct.

23    Q.   Does it provide any charity care to patients?

24            MS. SWANSON:  Objection to form.

25            THE WITNESS:  I am not deeply involved

25

1   in exactly how patients pay for abortions, so have some

2   limited knowledge of how that works.

3       Q.   (Mr. Boyle)  Does it provide charity abortion

4   care to patients?

5               MS. SWANSON:  Objection to form.

6               THE WITNESS:  I know that there are

7   abortion funds that support patients who cannot afford

8   to pay.  So if they don't have insurance that covers

9   the abortion or choose not to use insurance and they

10  are paying the self-pay fee, some patients, it is my

11  understanding, cannot afford to pay it, and I am aware

12  that there are donation funds that support patients.

13              I'm not exactly sure when or how that money

14  comes directly from Planned Parenthood versus other

15  non-Planned Parenthood abortion funds.

16      Q.   (Mr. Boyle)  Fair enough.  And when you say

17  Planned Parenthood in that context of your last answer,

18  are you talking about PPSAT, or are you talking about

19  the parent organization, Planned Parenthood, sort of

20  nationwide?

21      A.   Thank you for clarifying.  I was referring

22  specifically to Planned Parenthood South Atlantic.  I'm

23  also not fully aware of Planned Parenthood Federation

24  of America funds that may be supporting care.

25      Q.   Okay.  So it might happen, you're just not

Case 1:23-cv-00480-CCE-LPA   Document 74-2   Filed 09/12/23   Page 26 of 174

1  aware of how and when.

2      A.    Correct.

3      Q.    Okay.  And I don't need specifics, but you're

4  paid to be the medical director on an annual basis for

5  your work at PPSAT, right?

6      A.    Yes, I am.

7      Q.    Do you have any other jobs -- again, not

8  looking for specifics.  Do you have any other jobs

9  where you work for money, you earn income outside of

10  PPSAT, in the past five years, or do you dedicate your

11  full workload and income earning to your job at PPSAT?

12     A.    The only job I have is at PPSAT.

13     Q.    Is that true for the past, say, five years?

14     A.    Yes, that is true.

15     Q.    Are you being paid for your testimony here

16  today?

17     A.    I'm not being paid differently for my

18  testimony.  I'm just working as the chief medical

19  officer of Planned Parenthood South Atlantic.

20     Q.    Take a water break.

21           Right.  That -- and that's my question

22  specifically, is, you know, sometimes expert witnesses

23  are paid independently from their day job.  Are you

24  being paid as an expert witness beyond your normal

25  salary that you derive working as the medical director

Case 1:23-cv-00480-CCE-LPA   Document 74-2   Filed 09/12/23   Page 27 of 174

1    at PPSAT for your time testifying here today?

2          A.    No, I'm not.

3          Q.    So your role here today is as the chief

4    medical director for one of the Plaintiffs in -- the

5    parties in this case.  Is that right?

6          A.    My title is chief medical officer, and I am

7    here speaking based on my knowledge as the chief

8    medical officer of Planned Parenthood South Atlantic,

9    who I understand to be a Plaintiff in this case.

10         Q.    Sorry, when I do that weird thing, I'm

11   thinking.  I apologize.

12               Is part of your payment for your job at PPSAT

13   derived from how PPSAT performs overall in any given

14   year?

15               MS. SWANSON:  Objection to form.

16               THE WITNESS:  I do not have any change

17   in compensation related to performance metrics.

18         Q.    (Mr. Boyle)  So you don't have incentive

19   payments or bonuses or anything like that related to

20   your job?  Again, not asking for specific amounts, but

21   any type of incentive payment.

22         A.    I have received bonuses in the past, but

23   never as an incentive related to -- when I think about

24   bonuses in healthcare, often bonuses are applied for

25   volume.  I've never received a bonus from Planned

28

1  Parenthood South Atlantic based on the volume of care
2  that I provided.
3      Q.   Without going into details about numbers, why
4  would you have gotten, or why did you get bonuses in
5  the past from PPSAT?
6      A.   I've received a bonus in the past when I took
7  on additional job responsibilities.  For example,
8  serving as the interim -- I don't recall the exact
9  title, but it's in my CV.  The interim VP of patient
10 services, I think.  So it was a substantive change in
11 my job description that they paid me a bonus for.
12     Q.   Very small print on your CV.
13          MS. SWANSON:  And, Ellis, if you're
14 going to be referring to that, could we also have a
15 copy to look at, please?
16          MR. BOYLE:  Yeah, I was just looking to
17 see if I remembered the name she was talking about.  I
18 don't know that I have a copy of her CV.
19          But I accept your explanation.
20     Q.   (Mr. Boyle)  So if PPSAT performs a certain
21 metric of induced abortions in a year, are you paid
22 more in that year for achieving that goal or metric?
23          MS. SWANSON:  Objection to form.
24          THE WITNESS:  No.
25     Q.   (Mr. Boyle)  But if the North Carolina law

1 that goes into effect that you're here testifying about

2 in this case, if it goes into effect, your company,

3 PPSAT, could lose money, because it will lose the

4 ability to perform as many induced abortions.  Is that

5 correct?

6             MS. SWANSON:  Objection to form.

7             THE WITNESS:  It's outside the scope of

8 my job to speculate on the exact finances of the

9 organization.

10     Q.   (Mr. Boyle)  Sure, but you're a very smart

11 doctor, and common sense would dictate, I believe, that

12 if PPSAT was performing induced abortions that it can

13 no longer perform, and it loses the ability to derive

14 that income from those induced abortions, PPSAT could

15 and probably would lose money from this new law.  Is

16 that correct?

17             MS. SWANSON:  Objection to form.

18             THE WITNESS:  PPSAT could lose money, or

19 we could provide different services which would make up

20 for any change in income.

21     Q.   (Mr. Boyle)  Fair enough.  Do you engage in

22 fundraising for any Planned Parenthood or abortion

23 group?

24             MS. SWANSON:  Objection to form.

25             THE WITNESS:  I'm not sure what you mean

Case 1:23-cv-00480-CCE-LPA   Document 74-2   Filed 09/12/23   Page 30 of 174

1    by, "engage in fundraising."

2        Q.    (Mr. Boyle)  Do you raise money for Planned

3    Parenthood?

4        A.    I do not personally raise money for Planned

5    Parenthood, but I have been present at events,

6    fundraising events.

7        Q.    Okay.  Your medical specialty is in family

8    medicine.  Is that right?

9        A.    Yes, it is.

10       Q.    You're not an OB/GYN, are you?

11       A.    I am a family physician, not an

12   obstetrician/gynecologist.

13       Q.    You said it better than me.  I'm going to do

14   terrible with it, but I'm going to call it an OB/GYN,

15   if that's all right.  I can say that without confusing

16   myself.  You have no residency or fellowship training

17   in OB/GYN, do you?

18       A.    That is not correct.

19       Q.    Okay.  What residency or fellowship training

20   do you have in OB/GYN?

21       A.    Family medicine encompasses obstetrics and

22   gynecology in their routine residency training.

23       Q.    Okay.  So beyond the -- and as I understand

24   it, family medicine is sort of a combination of

25   pediatrics and internal medicine, so typically, it

31

1   would be outpatient care for children and adults in a
2   family medicine practice.  Is that a fair assessment of
3   that?
4               MS. SWANSON:  Objection to form.
5               THE WITNESS:  That is not how I would
6   characterize family medicine, no.
7       Q.   (Mr. Boyle)  How would you characterize it?
8       A.   Family physicians are trained to care for
9   pregnant people, trained to perform deliveries, to care
10  for pediatrics, to care for adult medicine, to take
11  care of geriatric medicine, which is later adult, to do
12  end-of-life care and to care for patients both in the
13  hospital and in the outpatient setting.
14      Q.   Okay.  As part of your family medicine
15  residency -- well, and let me just clarify.  You didn't
16  get any fellowship training in OB/GYN, correct?
17      A.   That is correct.  I did not do an additional
18  fellowship.
19      Q.   Did you do a fellowship in family medicine?
20      A.   No, I did not.
21      Q.   Are you board certified?
22      A.   I am board certified in family medicine.
23      Q.   Are you board certified as an OB/GYN?
24      A.   No, I am not.
25      Q.   Are you board certified in advanced family

Case 1:23-cv-00480-CCE-LPA  Document 74-2  Filed 09/12/23  Page 32 of 174

1  planning?

2       A.   I'm not aware of a board certification in

3  advanced family planning.

4       Q.   You haven't had a fellowship in advanced

5  family training -- I'm sorry, advanced family planning,

6  have you?

7       A.   I'm not aware of a fellowship in advanced

8  family planning.

9       Q.   Which, I guess, means you are not fellowship

10 trained in that.

11      A.   I do ---

12      Q.   Yeah.

13      A.   --- not have a fellowship training in that.

14      Q.   In your residency for family practice,

15 describe for me what your rotations were, related to

16 OB/GYN practice.

17      A.   In my residency, we performed rotations that

18 were more highly focused on obstetrics and gynecology,

19 where we performed obstetrics and gynecologic

20 surgeries, deliveries, both vaginal deliveries and C-

21 sections.  And we also, throughout the entire course of

22 our residency, had our own obstetrical patients that we

23 would follow regardless of what rotation we were on.

24      Q.   And where did you do that residency, again?

25      A.   Just outside of Seattle, Washington, in

1   Renton.

2          Q.   Now did, in your residency, you have any

3   training or experience performing induced abortions?

4          A.   Yes, I did receive training in abortion

5   during my residency.

6          Q.   Describe that training for me, please.

7          A.   Can you clarify what you mean by describing

8   the training?

9          Q.   What did you learn about abortion during your

10  residency in that hospital near Seattle?

11              MS. SWANSON:  Objection to form.

12              THE WITNESS:  My training in abortion

13  was primarily outpatient.  I don't recall whether I did

14  any abortions in the hospital, but I was trained to

15  perform induced abortion in an outpatient clinic.

16         Q.   (Mr. Boyle)  When you did your training, that

17  was after the chemical abortion protocols had been

18  approved, and they were available as an induced

19  abortion option, weren't they?

20         A.   I don't recall exactly when that was

21  approved.

22         Q.   Did you do any residency training about

23  chemical abortion drugs -- and I'm going to say them

24  wrong, but I'm going to try, mifeprexin (sic),

25  misoprostol, when you were in your residency?

34

1      A.    I don't recall the exact details of training
2  or the exact timing of when that was approved, but I do
3  recall receiving some training on mifepristone and
4  misoprostol as they are used for abortion.
5      Q.    Did you receive that training you're thinking
6  of during your residency?
7      A.    I received it, I believe, during the time of
8  my residency, yes.
9      Q.    How long was your residency?
10     A.    My residency was three years, if you include
11 internship.
12     Q.    What years were that -- was that again?
13     A.    I started residency in 2000 and completed it
14 in 2003.
15     Q.    And from your residency, you went to work at
16 Planned Parenthood in Massachusetts.  Is that correct?
17     A.    That was one of the jobs I took after
18 residency, yes.
19     Q.    What was the other job?
20     A.    It was a comprehensive family practice job.
21     Q.    Where was that?
22     A.    It was in Fitchburg, Massachusetts.
23 Actually, the office was in -- I believe that my office
24 was located in Westminster, Massachusetts, and the
25 hospital that I admitted at was in Gardner,

1    Massachusetts.

2         Q.    And that was Heywood -- practice in Heywood

3    Hospital?

4         A.    Heywood Hospital was the name of the

5    hospital, yes.

6         Q.    What did you learn in your residency about

7    induced abortions using aspiration or D&E procedures?

8         A.    I learned a great deal about abortion.  I'm

9    not sure if you want me to outline everything I learned

10   about abortion in that time.

11        Q.    Probably not everything, but just give me

12   some basics, and if I feel the need to explore further,

13   I will.  But just basically, what did you learn about

14   those two procedures?

15        A.    That they are incredibly safe and an

16   important aspect of comprehensive sexual and

17   reproductive healthcare.

18        Q.    Did you learn how to perform any other

19   gynecological surgery procedures?

20             MS. SWANSON:  Objection to form.

21        Q.   (Mr. Boyle)  During your residency?  Sorry.

22             MS. SWANSON:  Same objection.

23             THE WITNESS:  I learned to perform other

24   gynecologic procedures during my residency, yes.

25        Q.   (Mr. Boyle)  Surgical -- gynecological

36

1    surgical procedures?

2                    MS. SWANSON:  Objection to form.

3                    THE WITNESS:  I did learn to perform

4    some gynecologic surgery, primarily first assisting on

5    C-sections.

6         Q.   (Mr. Boyle)  Okay.  Have you done any C-

7    sections as the lead doctor performing the surgery?

8         A.   I have not been the primary surgeon on a C-

9    section, no.

10        Q.   Have you assisted with any C-section

11   surgeries since you left residency?

12        A.   Yes.

13        Q.   When was the last time you assisted in a C-

14   section surgery after residency?

15        A.   I don't know the exact date or time, but it

16   was when I was practicing in Massachusetts.

17        Q.   So when you were practicing in Massachusetts,

18   which I believe was from 2004 to 2007 -- is that

19   roughly correct?  Maybe 2003 to 2007?

20        A.   I believe it was 2003 to 2007, yes.

21        Q.   So during that period of your career, how

22   many C-section surgeries did you assist with?

23        A.   I don't recall the number.

24        Q.   Was it, like, two or 2,000?  I mean, can you

25   give me a range maybe?

37

1      A.   It was a routine part of the care I provided.
2  If I had any patient who needed a C-section, I would
3  first assist on that C-section routinely.
4      Q.   I still don't have a sense, though.  I mean,
5  was that something that happened once a week, once a
6  year?
7      A.   I don't know the exact range, but it was on
8  average, I believe, once a month.
9      Q.   Okay.  So maybe 40 to 60 times you assisted
10 in a C-section surgery during that three-to-four-year
11 stint?
12              MS. SWANSON:  Objection to form.
13              THE WITNESS:  I can't recall the exact
14 numbers.
15     Q.   (Mr. Boyle)  More than 25 times?
16     A.   I believe it would have been more than 25,
17 yes.
18     Q.   And you haven't done any since 2007.  Is that
19 correct?
20     A.   I have not assisted in a C-section since
21 2007.
22     Q.   What other gynecological surgical procedures
23 did you train on and learn how to do in your residency?
24     A.   I did not learn to be the primary surgeon on
25 any other gynecologic surgeries.

38

1    Q.   Okay.  Did you learn how to be the primary
2    provider who would perform an aspiration abortion
3    during your residency?
4    A.   Yes, I did.
5    Q.   Did you learn how to be the primary provider
6    who would lead on a D&E abortion during your residency?
7    A.   No, I did not.
8    Q.   Do you perform D&E abortions?
9    A.   Yes, I do.
10   Q.   When did you learn how to do that?
11   A.   I learned to do that as a provider at Planned
12   Parenthood South Atlantic.
13   Q.   Okay.  And you arrived at PPSAT in 2007 when
14   you left Massachusetts.  Is that correct?
15   A.   I didn't start at Planned Parenthood South
16   Atlantic until 2009.
17   Q.   What did you do in between?
18   A.   I had a second baby.
19   Q.   Okay.  So when you went back to work after
20   that, you went to work at PPSAT in 2009, and you've
21   worked there ever since.  Is that correct?
22   A.   That is correct.
23   Q.   Okay.  So you never had any formal training
24   in a pedantic or academic setting about how to perform
25   a D&E abortion.  Is that correct?

Case 1:23-cv-00480-CCE-LPA   Document 74-2   Filed 09/12/23   Page 39 of 174

1        MS. SWANSON:  Objection to form.

2        THE WITNESS:  I don't know what you mean

3   by, "pedantic academic setting."

4        Q.   (Mr. Boyle)  In school or residency.

5        A.   I was not trained to perform D&E during a

6   formal residency program.

7        Q.   Who taught you how to do it at PPSAT?

8        MS. SWANSON:  Objection, to the extent

9   this calls for the name of a physician.  This is

10  something that ---

11       Q.   (Mr. Boyle)  Just give me something general.

12  I don't need to know the name.  That's fine.

13       A.   More experienced providers at PPSAT who had

14  extensive experience in D&E.

15       Q.   As a family practice physician, you have

16  experience providing prenatal care, don't you?

17       A.   Yes, I do.

18       Q.   And I think we've established, you've

19  delivered babies in your practice, right?

20       A.   Yes, I have.

21       Q.   Do you still deliver babies currently in your

22  practice?

23       A.   I do not still perform deliveries, no.

24       Q.   When was the last time that you delivered a

25  baby, to rough recollection?

40

1    A.   It would have been in probably 2007, before I
2  left my practice there.
3    Q.   Okay.  So -- and I don't want to
4  mischaracterize, but it sounds to me like -- since you
5  left Massachusetts and stopped having whatever your
6  privileges were at Heywood Hospital, have you not
7  engaged in helping a mother deliver a baby since that
8  time?
9    A.   I have not performed deliveries since I left
10  Massachusetts in 2007.
11    Q.   Does any of your practice at PPSAT, since
12  you've been there, involve prenatal care and providing
13  care to mothers who intend to give birth to their
14  children?
15    A.   We do not provide comprehensive prenatal
16  care.  We do provide some general guidance for people
17  who are attempting to become pregnant.  And for people
18  who have found they are pregnant and are wishing to
19  continue their pregnancy, we provide primarily
20  referrals to obstetricians for them to receive that
21  prenatal care.
22    Q.   And I'm -- and that makes sense to me.  I'm
23  just trying to see if I understand it completely.
24         So at PPSAT, if a patient comes in who tests
25  positive as pregnant, and they want to continue the

Case 1:23-cv-00480-CCE-LPA   Document 74-2   Filed 09/12/23   Page 41 of 174

1  pregnancy, you evaluate them sort of as an initial

2  evaluation/confirmation and then you would refer them

3  out to see an obstetrician for care through the

4  pregnancy.  And you all don't actually give that

5  obstetrician care there and assist with the childbirth.

6          Do I understand that correctly?

7              MS. SWANSON:  Objection to form.

8              THE WITNESS:  I would clarify that when

9  we have a patient who comes in and has a positive

10  pregnancy test and chooses to continue their pregnancy,

11  we provide them with resources to go see either a

12  family physician who provides prenatal care or an

13  obstetrician who provides prenatal care.

14      Q.   (Mr. Boyle)  Okay.

15      A.   Or a certified nurse midwife who provides

16  prenatal care.

17      Q.   Does PPSAT provide -- and you may have said

18  this; I apologize.  I'm just trying to close it out.

19          Does PPSAT provide prenatal care for any

20  patients up until the time of birth if they choose to

21  continue a pregnancy?

22      A.   No.  PPSAT does not provide comprehensive

23  prenatal care.

24      Q.   When you worked at -- and is that true for

25  the whole time you've worked at PPSAT, from 2009 up

42

1  until today?

2       A.   Yes, it is.

3       Q.   When you worked at Planned Parenthood in

4  Massachusetts, did you -- were you involved with

5  delivering any babies there?

6       A.   I did not deliver any babies in my role at

7  Planned Parenthood League of Massachusetts.

8       Q.   Yeah.  And I think you've said you did

9  deliver babies in your role working at the hospital in

10 the family practice, right?

11      A.   That is correct.

12      Q.   Okay.  How many -- when you were working in

13 Planned Parenthood Massachusetts, did you ever deliver

14 a baby outside of a hospital up there?

15      A.   In my role at Planned Parenthood League of

16 Massachusetts?

17      Q.   I'm sorry, I said that wrong.

18           During the time that you were working at both

19 Planned Parenthood Massachusetts and at the Heywood

20 Hospital, that 2003 to 2007 time frame, did you ever

21 deliver a baby outside of a hospital when you were

22 delivering babies up there?

23      A.   No, I did not provide home births when I was

24 -- or deliver any babies outside of a hospital when I

25 was working in Massachusetts.

43

1     Q.   Do you have admitting privileges to any
2     hospital here in North Carolina?
3     A.   Yes, I do.
4     Q.   Which ones?
5     A.   Novant Forsyth.
6     Q.   Okay.  Are you -- do you have privileges to
7     perform surgical abortions at Novant Hospital in
8     Forsyth?
9     A.   No, I do not.
10    Q.   Have you ever attempted to get hospital
11    privileges to perform a surgical abortion in a hospital
12    in North Carolina?
13    A.   No, I have not.
14    Q.   Are you eligible to obtain privileges to
15    perform a surgical abortion in a hospital in North
16    Carolina if you are not OB/GYN board certified?
17    A.   I do not know how hospitals make their
18    decision on eligibility for different privileges.
19    Q.   You've just never tried to obtain that
20    particular privilege at any hospital in North Carolina.
21    Is that correct?
22              MS. SWANSON:  Objection to form.
23              THE WITNESS:  I have not attempted to
24    obtain privileges to perform inpatient procedural
25    abortions.

1      Q.   (Mr. Boyle)  Right.  What do you have

2   privileges for?  I think you said, "admitting

3   privileges."  What does that mean?  What are your

4   admitting privileges at Novant Forsyth?

5      A.   My admitting privileges at Novant Forsyth

6   allow me to order certain types of tests, review

7   medical records, go in and see patients who are in the

8   hospital.

9      Q.   Okay.  Do you have privileges at any

10  ambulatory -- outpatient ambulatory surgery center in

11  North Carolina?

12     A.   I don't actually know if ambulatory surgical

13  centers have a privileging process.  I do not work at

14  any ambulatory surgical center in North Carolina.

15     Q.   The only place that you perform surgical

16  abortions in North Carolina since you started in 2009

17  is in a Planned Parenthood PPSAT clinic, right?

18               MS. SWANSON:  Objection to form.

19               THE WITNESS:  The only place that I have

20  performed procedural abortions in North Carolina is at

21  one of the Planned Parenthood South Atlantic clinics.

22     Q.   (Mr. Boyle)  Okay.  Which one?

23     A.   I have performed procedural abortions in all

24  of the Planned Parenthood South Atlantic North Carolina

25  locations that provide procedural abortion.

Case 1:23-cv-00480-CCE-LPA   Document 74-2   Filed 09/12/23   Page 45 of 174

45

1    Q.   Have you ever provided a surgical abortion in

2  a hospital setting?

3              MS. SWANSON:  Objection to form.

4              THE WITNESS:  Yes, I believe that I have

5  performed a procedural abortion in a hospital setting.

6    Q.   (Mr. Boyle)  Please describe what you recall

7  about that.

8    A.   I participated in abortion care during

9  medical school, possibly during residency, but I don't

10  actually recall.

11    Q.   And anything that you would have been doing

12  during medical school would have been more in an

13  observational role, right?  Not a hands-on performing a

14  surgical procedure, but observing a doctor or a

15  resident doing that, correct?

16    A.   No, that is not correct.

17    Q.   Were you actually holding the instruments and

18  doing some of the procedures yourself in medical

19  school?

20    A.   Part of medical school includes hands-on

21  training to perform procedures, yes.

22    Q.   Did you hands-on perform any surgical

23  abortions in a hospital setting when you were a medical

24  student?  If you don't remember, I don't blame you.

25  I'm just ---

46

1    A.    I ---

2    Q.    --- clarifying.

3    A.    --- believe I did, yes.

4    Q.    Okay.  So you perform D&E abortions now, but

5    as I understand it, you've never received any

6    specialized training or school or resident training on

7    how to perform that procedure.  Is that correct?

8              MS. SWANSON:  Objection to form.

9              THE WITNESS:  I performed D&Es, and I

10   did receive formal training in performing D&Es.  It was

11   not in my capacity as a resident.

12   Q.    (Mr. Boyle)  When you say you received formal

13   training, is there anything on your CV that would

14   identify what formal training you received?

15   A.    No, there is nothing on my CV.

16   Q.    Is there any other specialized training that

17   you may have received, since your residency completed,

18   about how to perform surgical abortions?

19   A.    I do not understand your question.  Can you

20   please rephrase that?

21   Q.    Is there anything else on your CV that would

22   suggest or show us that you had additional training or

23   certification about how to perform a surgical abortion

24   since your residency?

25   A.    None of that training is reflected on my

Case 1:23-cv-00480-CCE-LPA   Document 74-2   Filed 09/12/23   Page 47 of 174

47

1  resume.

2       Q.   How many induced abortions have you performed

3  in your career?

4       A.   I do not know.

5       Q.   Do you have any way to estimate?

6       A.   Not without doing a great deal of math, no.

7       Q.   How many would you say -- how many induced

8  abortions, chemical and surgical, have you performed

9  for patients within the past month?

10      A.   I believe, in the past month, I've probably

11 performed approximately 50 induced abortions.

12      Q.   Okay.  Is that typical -- is that a typical

13 month for you in your practice?

14      A.   Yes, I would say that it is.

15      Q.   So if you typically do 50 a month, would you

16 say that you typically do 600 a year, roughly?

17           MS. SWANSON:  Objection to form.

18           THE WITNESS:  The number of days that I

19 have worked clinic has varied greatly throughout my

20 career.  So I would say that I have performed, on

21 average, 50 a month for the past year, and that would

22 probably be accurate.

23      Q.   (Mr. Boyle)  Okay.  Were you doing more in

24 the past or less than that 50 per month?

25      A.   It ---

1              MS. SWANSON:  Objection to form.

2              THE WITNESS:  It has varied.  There have

3    been years where I worked more clinics per month on

4    average, and there have been years where I worked fewer

5    clinics per month on average.

6         Q.   (Mr. Boyle)  Would you say that, again,

7    giving it a range, 500 to 700 a year, is a fair

8    estimate based on the variability you've experienced

9    over your career?

10             MS. SWANSON:  Objection to form.

11             THE WITNESS:  I am not good at doing

12   math in my head, and so without actually calculating

13   that, I'm not comfortable saying that.

14        Q.   (Mr. Boyle)  Okay.  You've been performing

15   induced abortions from 2000 to 2007, so seven years;

16   and then 2009 to 2023, so another 13 and a half years.

17   So for approximately 20 years, is that safe to say,

18   that you've been performing induced abortions in your

19   career?

20        A.   I have been performing induced abortions for

21   approximately 20 years, yes.

22        Q.   Okay.  Do you ever use a curette?

23             MS. SWANSON:  Objection to form.

24             THE WITNESS:  For what purpose?

25        Q.   (Mr. Boyle)  Do you know what a curette is?

49

1     A.   Yes, I do.

2     Q.   What is it?

3     A.   A curette is a scraping tool that can be used

4   for many different purposes.

5     Q.   Okay.  Have you ever used a curette?

6     A.   Yes, I have used a curette.

7     Q.   For what?

8     A.   Primarily, for skin lesion removal.

9     Q.   Have you ever used a curette -- well, are you

10  performing skin lesion removal in your current

11  practice, or would that have been back when you were

12  working at the hospital in Massachusetts?

13    A.   I do not currently perform.

14    Q.   Do or have you used a curette in the past,

15  say, 14 years, since you've been working at PPSAT, for

16  any reason?

17    A.   No, I have not used a curette since I have

18  been working at PPSAT.

19    Q.   Have you ever used a curette for any OB/GYN

20  purpose?

21    A.   I do not routinely use curettes for any

22  OB/GYN purpose.

23    Q.   Okay.  So that's not something in your

24  typical or scope of practice?

25              MS. SWANSON:  Objection to form.

50

1          THE WITNESS:  I would disagree that it's

2     outside of my scope of practice and state that it's not

3     a tool that I prefer to use.

4          Q.   (Mr. Boyle)  Fair enough.  Not in your

5     typical practice.  Even if you could use it, you choose

6     not to for whatever purpose you're treating a patient?

7          A.   Yes.  It's not a tool that I choose to use.

8          Q.   Okay.  When were you first contacted by

9     Plaintiffs to be their expert witness, who offered

10    opinions in this case?

11         A.   I don't consider myself here as an expert

12    witness.  I -- based on the statements you made earlier

13    about paid expert witnesses, I don't consider myself an

14    expert witness as a paid person contacted.

15         Q.   Okay.  Would you consider yourself more of an

16    employee of PPSAT who's here talking about PPSAT?

17         A.   I consider myself an expert on the practices

18    of PPSAT, and I consider myself an expert in the field

19    of abortion care in my role at PPSAT.

20         Q.   Okay.  When were you first contacted by the

21    Plaintiffs to give testimony of any kind in this case?

22         A.   I don't remember.

23         Q.   The lawsuit was filed, I believe, June 20th,

24    roughly.  Do you recall whether you were involved with

25    the lawsuit before it was filed?

51

1      A.   I would have participated in conversations

2   prior to the filing of the lawsuit.  Yes.

3      Q.   You say you "would have."  Did you, in fact?

4      A.   I believe I did, yes.

5      Q.   Okay.  So -- and specific dates.  You

6   remember participating in conversations with lawyers on

7   behalf of Planned Parenthood South Atlantic before the

8   lawsuit was filed?

9           MS. SWANSON:  Objection.  I'm just going

10  to direct you not to reveal the content of any

11  communications with your lawyers.

12     Q.   (Mr. Boyle)  Absolutely not asking about the

13  actual words.  Just, did you actually speak to them?

14     A.   I ---

15     Q.   Before the lawsuit was filed.  Sorry.

16     A.   I did have conversations during the month of

17  June ---

18     Q.   Okay.

19     A.   --- which would have been before the lawsuit

20  was filed.

21     Q.   And you filed a declaration with the original

22  temporary restraining order that was filed sometime in

23  later June.  Do you recall that?

24     A.   I recall filing a declaration.  I don't

25  recall the exact date of that declaration.

52

1      Q.   You've seen what Dr. Boraas said -- and I
2  apologize because I'm not very good with saying
3  people's names -- Dr. Boraas said in her deposition on
4  Tuesday, haven't you?
5      A.   No, I have not.
6      Q.   Have you seen what Dr. Wubbenhorst said in
7  her deposition Wednesday?
8      A.   No, I have not.
9      Q.   So you're not aware of what the other three
10 expert witnesses in this case have said in their
11 depositions, are you?
12     A.   No, I am not.
13     Q.   You would agree that patient safety is always
14 the most important consideration when you are treating
15 a patient, wouldn't you?
16              MS. SWANSON:  Objection to form.
17              THE WITNESS:  I would agree that patient
18 safety is one of the critical factors that should be
19 considered for any procedure.
20     Q.   (Mr. Boyle)  Do you always choose to treat
21 your patient in the safest way available?
22              MS. SWANSON:  Objection to form.
23              THE WITNESS:  I always consider patient
24 safety when I am doing any procedure.
25     Q.   (Mr. Boyle)  And if you have two options

53

1  before you, one is safer than the other, do you always

2  select the safer option when you're treating that

3  patient?

4              MS. SWANSON:  Objection to form.

5              THE WITNESS:  I don't believe that there

6  always is a clear differentiation between one option

7  being safer absolutely than another.

8      Q.   (Mr. Boyle)  You said that's not always the

9  case, but sometimes it's the case, isn't it?

10     A.   There are times that there is a safer option

11  that is clearly safer for the patient, and when that is

12  the case, I do provide that option to the patient.

13     Q.   What did you do to prepare yourself for this

14  deposition today?  Again, don't tell me about

15  conversations you may have had with your lawyers.

16     A.   I had conversations with my lawyers, and I

17  reviewed a number of documents.

18     Q.   Which documents?

19     A.   I'm not sure if I can accurately list every

20  single one.  I reviewed both of my declarations.  I

21  reviewed -- and I apologize, I don't know legal terms,

22  so I don't know the names of all of the documents.

23          But I believe that there were two intervener

24  declarations, I think they were called.  I reviewed

25  both of those.  I reviewed our -- again, I don't know

54

1    the term, our filing that we made.  I reviewed SB20,

2    the law in question, and I reviewed the amendments to

3    the law ---

4        Q.   HB190.

5        A.   I believe ---

6        Q.   Yeah.

7        A.   --- it was HB190.  And I reviewed some of the

8    articles cited, both in my declaration and in the other

9    physicians' declarations.  And I reviewed documents

10   that were presented to you.

11       Q.   The ---

12       A.   I'm not sure what they're called.

13       Q.   --- PPSAT documents that were presented in

14   discovery?

15       A.   Yes, I believe so.

16       Q.   Okay.  A little bit of follow-up on that.

17   Did you read Dr. Boraas's declaration and rebuttal?

18       A.   Yes, I did.

19       Q.   Okay.  And it sounded like you said you read

20   Dr. Wubbenhorst's declaration and Dr. Bane's

21   declaration also.

22       A.   Yes, I did.

23       Q.   Okay.  You mentioned some articles.  Which

24   articles did you review?

25       A.   I don't remember them by name.

1    Q.   You don't remember anything about them?

2              MS. SWANSON:  Objection to form.

3              THE WITNESS:  I didn't ---

4    Q.   (Mr. Boyle)  Can you describe ---

5    A.   --- say that I don't remember anything ---

6    Q.   Fair enough.  That ---

7    A.   --- about them, but I don't remember their

8    names.

9    Q.   Without necessarily remembering the formal

10   name, do you recall what they were about?

11   A.   They were about the safety of abortion and

12   data on abortion.

13   Q.   Can you give me a little more specifics so we

14   can maybe ferret out which ones they were?

15   A.   I don't think I can outline every single

16   cited document I read, but I certainly reviewed the

17   National Association of Science ---

18   Q.   "The Academy" ---

19   A.   National ---

20   Q.   It's from 2018?

21   A.   Thank you.  The -- I'd have to look at the

22   document to make sure I had the name correct.

23   Q.   Yeah.

24   A.   I reviewed an article, or a study, from

25   Finland that was referenced by one of the other

56

 1  physicians.

 2      Q.   That's the Niinimaki study; do you recall?

 3      A.   I do not recall without looking at the

 4  document.

 5      Q.   Okay.

 6      A.   I apologize.  I've reviewed a number,

 7  probably four or five different -- and I don't recall

 8  the exact names ---

 9      Q.   Okay.

10      A.   --- or their exact content.

11      Q.   No, that's fine.  Do you recall reading the

12  Goldberg study from 2022 that was a retrospective

13  review of, I believe, 2007 to 2012 or so, Planned

14  Parenthood Massachusetts cases that had patients who

15  were presenting with recent positive pregnancy tests,

16  and they had ultrasound findings of pregnancy of

17  unknown location.  Do you recall reading that one?

18      A.   I recall reviewing two articles on pregnancy

19  of unknown location.  I don't recall the level of

20  detail that you just described, but if I were to look

21  at the article, I could confirm whether I read it.

22      Q.   Okay.  Anything else?

23      A.   Anything else?

24      Q.   That you reviewed in preparation for this

25  deposition other than what you've just told me?

1    A.   I don't recall anything other than what I've
2    just told you.
3    Q.   Have you ever performed a surgical abortion
4    on a patient who was pregnant with twins?
5    A.   I have performed procedural abortions on
6    patients who were pregnant with twins.
7    Q.   How many times have you done that over the
8    course of your career?
9    A.   I do not know.
10   Q.   Was it more than once?  More than 100 times?
11   A.   I would say it's definitely more than dozens.
12   Q.   So 24?  More than 25 times?
13   A.   More than 25, I believe.
14   Q.   Okay.  That's fine.
15        And I asked you earlier about how many
16   induced abortions you performed over the past month.  I
17   forgot to ask the sort of breakdown, chemical abortion
18   versus surgical abortion.  Can you give me a split?  It
19   doesn't have to be precise, but, you know, is it 50/50?
20   Are you doing 75 percent chemical?  What do you think
21   that number looks like?
22             MS. SWANSON:  Objection to form.
23             THE WITNESS:  I have access that -- to
24   that information if I were to look at our procedure
25   logs, but I estimate that 60 percent of the abortions

58

1    that I performed in the last month were medication

2    abortions and 40 percent were procedural abortions.

3          Q.    (Mr. Boyle)  Okay.  If you look back over the

4    course of your career, would you say that there's a

5    higher percentage of those induced abortions that

6    you've performed over the course of your career, a

7    higher percentage of them skews to be medical abortion

8    as opposed to surgical abortion?

9                 MS. SWANSON:  Objection to form.

10                THE WITNESS:  No.  Over the course of my

11   career, I would not say that the majority of the

12   abortions I performed were medical over procedural.

13         Q.    (Mr. Boyle)  Okay.  Can you give me an idea

14   what you think the percentages would look like

15   comparatively over the course of your career?

16                MS. SWANSON:  Objection to form.

17                THE WITNESS:  I can tell you that until

18   I came to Planned Parenthood South Atlantic, I rarely

19   performed medication abortions.

20         Q.    (Mr. Boyle)  Okay.

21         A.    And since I came to Planned Parenthood South

22   Atlantic, I would say that medication abortions

23   accounted for anywhere from 40 to 60 percent of the

24   abortions that I performed.

25         Q.    Okay.

Case 1:23-cv-00480-CCE-LPA   Document 74-2   Filed 09/12/23   Page 59 of 174

1           MS. SWANSON:  Ellis, I'm just going to
2   do a time check.  I think we've been on the record for
3   about an hour.  So when you come to a good stopping
4   point ---
5           MR. BOYLE:  Let's take a break.
6           MS. SWANSON:  --- if we could take a
7   break?
8           MR. BOYLE:  Off the record.
9           THE VIDEOGRAPHER:  Off the record at
10  11:18.
11  (Brief recess: 11:18 a.m. to 11:29 a.m.)
12          THE VIDEOGRAPHER:  On record, 11:29.
13      Q.   (Mr. Boyle)  Doctor, how do you know -- well,
14  is it important to know if your patient is pregnant
15  with twins before you perform a surgical abortion?
16          MS. SWANSON:  Objection to form.
17          THE WITNESS:  If I know that a patient
18  is pregnant with twins when I am performing a
19  procedural abortion, I take extra steps to ensure that
20  I have removed the tissue from the entire pregnancy.
21      Q.   (Mr. Boyle)  So you would agree it's
22  important to know that beforehand, going into the
23  procedure?
24          MS. SWANSON:  Objection to form.
25          THE WITNESS:  I would actually disagree.

60

1   I don't think it's necessarily important to know that
2   beforehand.
3       Q.   (Mr. Boyle)  Is it important to know if a
4   patient is pregnant with twins before you give that
5   patient a medical -- yes, a chemical abortion?
6               MS. SWANSON:  Objection to form.
7               THE WITNESS:  I do not find that being
8   pregnant with twins changes the way we perform a
9   medication abortion in the way that it can sometimes
10  change a procedural abortion.
11      Q.   (Mr. Boyle)  What about with triplets?  Would
12  that change -- if a patient was pregnant with triplets,
13  would that change the way you perform a chemical
14  abortion?
15      A.   No, it would not.
16      Q.   Have you seen any studies about any increased
17  risks or potential problems for patients who are
18  pregnant with triplets or twins or quadruplets when you
19  give them a chemical abortion?
20      A.   I have not seen any studies on that.
21      Q.   Excluding the lawyers who represent
22  Plaintiffs in this case, have you spoken to anyone else
23  about your involvement in this case?
24      A.   I have spoken to other people from the
25  context that they are aware that I was scheduling a

61

1    deposition, but only from the context of them being
2    aware of how my time was being used.
3         Q.    Just to clarify.  So you haven't spoken about
4    the substance of your opinions with anyone other than
5    your lawyers.  Is that correct?
6         A.    That is correct.
7         Q.    Okay.  What is a uterine preforation?
8              MS. SWANSON:  Objection to form.
9              THE WITNESS:  I believe you are asking
10   about a uterine perforation.
11        Q.    (Mr. Boyle)  What is it?
12        A.    A uterine perforation is where usually an
13   instrument, but sometimes a device, goes through the
14   wall of the uterus, called the myometrium.
15        Q.    What's on the other side of that wall?
16             MS. SWANSON:  Objection to form.
17             THE WITNESS:  The tissue within the
18   retroperitoneum and abdomen.
19        Q.    (Mr. Boyle)  Are there any specific
20   structures or tissues that typically surround the
21   uterus and would be impacted if a surgical instrument
22   or device punctured the uterine wall?
23             MS. SWANSON:  Objection to form.
24             THE WITNESS:  There are many different
25   forms of tissue and organs.  In particular, the bladder

Case 1:23-cv-00480-CCE-LPA  Document 74-2  Filed 09/12/23  Page 62 of 174

62

1    is just anterior to the uterus in most patients,

2    although there can be a space, and often is a space,

3    between the uterus and the bladder; and the intestines

4    can be in the space generally surrounding the uterus.

5        Q.    (Mr. Boyle)  Any other organs that would be

6    immediately adjacent to the uterus, if there was a

7    uterine perforation?

8        A.    Those are the organs that are closest to the

9    uterus.

10       Q.    You would agree that uterine perforation is a

11   known complication of a surgical abortion, wouldn't

12   you?

13       A.    Uterine perforation is an extremely rare but

14   known complication of procedural abortion.

15       Q.    Have you ever had a patient who you performed

16   a surgical abortion on who suffered from a uterine

17   perforation?

18       A.    I have had a patient that I performed a

19   procedural abortion on who had a uterine perforation.

20       Q.    Did you have to transfer the patients, who

21   you performed a surgical abortion on who suffered a

22   uterine perforation from the Planned Parenthood clinic,

23   to the hospital?

24       A.    No, I did not.

25       Q.    You -- are you aware that sometimes, if a

63

1  patient has a uterine perforation during a surgical
2  abortion, it's required that they be transferred to a
3  hospital for higher level of care?
4           MS. SWANSON:  Objection to form.
5           THE WITNESS:  I am aware that there are
6  some cases of uterine perforation where the patient
7  does need to be transferred to a hospital for
8  additional care.
9      Q.   (Mr. Boyle)  Has that ever happened at PPSAT?
10     A.   Yes, it has.
11     Q.   Did you know before the surgical abortion was
12  performed that those patients who suffered a uterine
13  perforation would require transfer to the hospital
14  based on that known complication?
15          MS. SWANSON:  Objection to form.
16          THE WITNESS:  I just want to clarify.
17  Are you asking if I knew in advance that a patient
18  would experience a uterine perforation and require
19  transfer?
20     Q.   (Mr. Boyle)  That is what I'm asking.
21     A.   No, it is not possible to know that in
22  advance.
23     Q.   Because you can't always know what
24  complications will arise during a surgical procedure,
25  can you?

64

1      A.   It is true that with any procedure, you
2 cannot always predict accurately what complications may
3 arise.
4      Q.   What is a cervical laceration?
5      A.   A cervical laceration is a tear of the
6 cervix.
7      Q.   You agree that a cervical laceration is a
8 known complication of surgical abortion, don't you?
9      A.   I would agree that a cervical laceration is
10 an extremely rare but known complication of procedural
11 abortion.
12      Q.   Have you ever had a patient, who you
13 performed a surgical abortion on, who suffered from a
14 cervical laceration?
15      A.   I would say that I have had a patient who
16 suffered from some bleeding associated with the
17 instruments we use on the cervix, but I've never had a
18 cervical laceration that required interventions such as
19 suturing.
20      Q.   Do some patients who suffer the known
21 complication of surgical laceration during a surgical
22 abortion require transfer to a hospital for a higher
23 level of care?
24                MS. SWANSON:  Objection to form.
25                THE WITNESS:  I'm not aware of patients

65

1    needing to be transferred for cervical laceration.

2         Q.    (Mr. Boyle)  Are you aware of any patient

3    from PPSAT who suffered a cervical laceration during a

4    surgical abortion having to be transferred to a

5    hospital to care for that known complication?

6         A.    I do not recall any patient with a cervical

7    laceration having to be transferred for that

8    complication.

9         Q.    Have you ever had a situation where you

10   performed a surgical abortion on a patient and the

11   patient suffered hemorrhaging such that you needed to

12   transfer that patient to a hospital for higher level of

13   care?

14        A.    I have had a patient who hemorrhaged during a

15   procedural abortion who I transferred to the hospital

16   for care, yes.

17        Q.    Is hemorrhage a known complication of

18   surgical abortion?

19        A.    Hemorrhage is an extremely rare and known

20   complication of procedural abortion.

21        Q.    Are you aware of other patients from PPSAT

22   who have suffered hemorrhage during a surgical abortion

23   that were transferred to a hospital for a higher level

24   of care?

25        A.    I am aware of patients who have suffered

66

1  hemorrhage during a procedural abortion who have been
2  transferred to a hospital.
3       Q.   Did you know, before the surgical abortion
4  was performed, that those patients who suffered
5  hemorrhage that required transfer to the hospital would
6  have that complication during that surgical abortion?
7       A.   No.  You cannot know in advance what
8  complication a patient may experience from any given
9  procedure.
10      Q.   Do you disclose all possible complications
11 that can arise from an induced abortion to a woman who
12 has tested pregnant, who has tested positive for
13 pregnancy, who is your patient considering obtaining an
14 induced abortion?
15      A.   We disclose the most common and most
16 concerning potential complications to patients as part
17 of their informed consent.
18      Q.   And tell me, what -- how many days is the
19 waiting period now, under the new law, SB20 and HB190,
20 for informed consent for a patient seeking an induced
21 abortion before the induced abortion can actually
22 occur?
23            MS. SWANSON:  Objection to form.
24            THE WITNESS:  My understanding of the
25 current law is that it requires a 72-hour waiting

67

1  period from the time the State consent form is reviewed

2  by the patient and signed and when the abortion takes

3  place.

4           MR. BOYLE:  I'm going to hand you a

5  document that has Bates numbers that was produced in

6  discovery.

7           MS. SWANSON:  Thank you.

8       Q.  (Mr. Boyle)  It's Bates Numbers 31 through

9  50.  If you don't mind, down at the bottom right-hand

10  corner, do you see Bates and then numbers there?

11      A.  I do see those numbers, yes.

12      Q.  And the first page says Bates 31.  Do you see

13  that?

14      A.  I do see that, yes.

15      Q.  And then if you turn to the last page,

16  please, you see Bates 50?

17      A.  Yes, I do see that.

18      Q.  Okay.  So do you recognize this document?

19      A.  Yes, I do.

20      Q.  What is it?

21      A.  This is our education and consent packet for

22  procedural abortion.

23      Q.  Can a patient die from complication of

24  bleeding if there is a cervical laceration or a uterine

25  perforation or hemorrhage?

68

1          MS. SWANSON:  Objection to form.

2          THE WITNESS:  I do not think a patient

3    could die from a cervical laceration.  Could a patient

4    die from hemorrhage?  They theoretically could die.

5          Q.   (Mr. Boyle)  Okay.  How about uterine

6    perforation, could a patient die from a uterine

7    perforation if it's not treated?

8          A.   If a complication was untreated, it's

9    possible that a patient could experience severe

10   complications that could lead to death.

11         Q.   What surgical tools do you use in an

12   aspiration abortion?

13         A.   I use a number of tools, including a ring

14   forceps, sterile gauze, dilators.  I use a suction

15   cannula that is attached to tubing and electronic

16   vacuum aspirator or that is attached to a manual or

17   handheld vacuum aspirator.

18         I use a tenaculum, which is an instrument

19   used to hold the cervix, and I use a speculum.  I

20   sometimes use an ultrasound -- just thinking through my

21   tray to see if there's anything I've left off.  Those

22   are the instruments I would routinely use for a suction

23   abortion.

24         Q.   Okay.  What surgical tools do you use for a

25   D&E abortion?

1    A.   I would use the same tools for a D&E abortion

2  and often use an additional type of forceps in addition

3  to the ring forceps.  There are different shapes and

4  types of forceps, so I would often use a Bierer's

5  forceps.

6    Q.   Sorry, a what type?

7    A.   Bierer's.  I'm not sure how to pronounce it.

8  I apologize.

9    Q.   How do you spell it?

10    A.   I'm not sure how to spell it.  B-i-e-r-s

11  (sic).

12    Q.   Okay.

13    A.   Maybe B-r-i-e-r-s (sic).  I apologize.  I

14  don't recall the exact spelling.

15    Q.   And what do -- what do the Bierer's forceps

16  look like, if you can describe them?

17    A.   So they are oval shaped.  The best way to

18  describe them is they look like a pair of scissors

19  where they open and shut, but they don't cut at the end

20  like a pair of scissors would.  Instead, they have two

21  flat plates at the end that are oval shaped and that

22  close down around tissue.

23    Q.   Like, they clamp on something and grab it?

24    A.   A ---

25         MS. SWANSON:  Objection to form.

Case 1:23-cv-00480-CCE-LPA   Document 74-2   Filed 09/12/23   Page 70 of 174

70

1          THE WITNESS:  A forceps will often close

2    to be able to clamp, for example, on a gauze or on

3    tissue.

4          Q.   (Mr. Boyle)  And what type of forceps do you

5    use in the aspiration abortion, or the suction,

6    abortion?

7          A.   I routinely use a ring forceps in a suction

8    abortion.

9          Q.   And what's the difference between the ring

10   forceps and the Bierer's forceps?

11         A.   Well, I use the ring forceps for any abortion

12   that I perform routinely.  And the Bierer's, I use in a

13   D&E.  And the difference is the size.

14         Q.   What's the difference in the size between

15   them?

16         A.   I don't know the exact measurements, but the

17   Bierer's are slightly larger than the ring forceps.

18         Q.   So the ring forceps also have the one end you

19   have where you put your fingers to open and close the

20   forceps, then you have a fulcrum, I guess, in the

21   middle and then on the far end it's got two rings?  Or

22   are they ovals?

23          Are they -- are they loops that are sort of

24   solid throughout, or do they have, like, just the outer

25   rim is a loop?  What's that like?

71

1      A.   So a ring forceps has two open loops at the
2  end that close down, and the other end has the handles
3  where you would hold it.
4      Q.   Okay.
5      A.   And the Bierer's also has two open loops at
6  the end, just the loops are oval in shape and slightly
7  larger.
8      Q.   Okay.
9      A.   And the ring forceps, I would consider more
10  circular.
11      Q.   Okay.  And the sort of clasping and the
12  loops, if you will, they're not solid all the way
13  through, they're just on the outer edge of the circle
14  or the outer edge of the oval?
15      A.   Correct.  They are both hollow in the middle
16  of the shape.
17      Q.   What do you use the forceps, the ring forceps
18  for, in the suction abortion?
19      A.   Primarily, I use them for grasping gauze and
20  wiping down the tissue within the vagina.  That is the
21  most common use.  I also use them sometimes to grasp
22  tissue that's coming out of the vagina.  And very
23  rarely, I introduce them inside of the cervix itself to
24  grasp tissue.
25      Q.   Typically, as I understand it, the major

72

1  difference between the suction abortion and the D&E is

2  the use of the tongs beyond the cervix to grab tissue

3  inside the uterus and pull it out.  Is that -- am I

4  understanding that correct?

5       That's the D&E versus the aspiration, you

6  simply put the cannula in there, and it uses suction to

7  suction out -- suck it out?

8            MS. SWANSON:  Objection to form.

9       Q.  (Mr. Boyle)  Is that correct?

10      A.  So when I am performing a suction abortion, I

11  use suction throughout all -- as we are calling suction

12  abortions or D&Cs, we use suction, and the suction

13  removes most of the tissue of the pregnancy or all of

14  the tissue of the pregnancy, most of the time.

15      When I am performing a D&E, I still use

16  suction.  That is a continuum where we use suction

17  throughout a D&E as well.  And with a D&E, I am more

18  likely to use instruments.  And later in pregnancy, I

19  would say that I always use instruments to remove the

20  pregnancy tissue later in -- with later D&Es.

21      Q.  (Mr. Boyle)  The pregnancy tissue that you

22  remove in the later D&Es, what time frame, gestational

23  age time frame, are you talking about?

24            MS. SWANSON:  Objection to form.

25      Q.  (Mr. Boyle)  What weeks?

73

1        A.   I consider a D&E any abortion 14 weeks or

2    later.

3        Q.   Do -- does PPSAT do D&E abortion at all six

4    of the clinics in North Carolina where they perform

5    induced abortions?

6        A.   Since I consider a D&E abortion any abortion

7    over 14 weeks, I believe we have performed abortions at

8    approximately 14 weeks at all of our six North Carolina

9    clinics.

10        Q.   Because it looked like, from the chart that

11    we received in discovery, that it's only Chapel Hill

12    where the surgical abortions are occurring after, say,

13    week 16, 17, 18.  Is that correct, or are you doing

14    those surgical abortions at all six clinics in North

15    Carolina?

16              MS. SWANSON:  Objection to form.

17              THE WITNESS:  We do not routinely

18    perform -- let me rephrase.

19          We, prior to this ban, were routinely

20    performing abortions over 16 weeks at only two of our

21    locations, both Chapel Hill and Asheville.

22        Q.   (Mr. Boyle)  Okay.  On Page Bates 34 -- just

23    let me know when you get there, please.  Do you see

24    that?

25        A.   I see Page 34, yes.

74

1    Q.   Top of the page says, "Information for
2  Informed Consent In-Clinic Abortion," right?
3    A.   Yes, that is what it says.
4    Q.   Down, under "The risks of the in-clinic
5  abortion are," I'm looking at "heavy bleeding."  Do you
6  see that?
7    A.   I do see "heavy bleeding," yes.
8    Q.   And it says, at the end of that, "Very
9  rarely, you may have to go to the hospital for
10 treatment."  Do you see that?
11   A.   Yes, I see that.
12   Q.   The next one down, "Infection of the Uterus."
13 It says, "Very rarely you may have to go to the
14 hospital for treatment."  Do you see that?
15   A.   I do see that.
16   Q.   You agree that post-twelve-week abortions can
17 be performed in a hospital section -- setting, don't
18 you?  Let me say that again.
19        Post-twelve-week surgical abortions can be
20 performed in a hospital setting.  Is that correct?
21   A.   I believe that they can be performed in some
22 hospitals, but I am not sure that they are performed in
23 most or all hospitals.
24   Q.   And I understand you think they can be
25 performed at the PPSAT clinics post twelve weeks for

Case 1:23-cv-00480-CCE-LPA   Document 74-2   Filed 09/12/23   Page 75 of 174

75

1    the surgical abortion, right?  That is a bad question.

2         You think that post-twelve-week surgical

3    abortions can be performed in the PPSAT clinics, right?

4      A.   I know that procedural abortions beyond

5    twelve weeks can safely be performed in the PPSAT

6    clinics.

7      Q.   Do you also know that they can safely be

8    performed in a hospital setting?

9      A.   No, I don't know that they can safely be

10   performed in any hospital setting.

11     Q.   Okay.  Are you worried that hospitals don't

12   have the same resources and equipment and tools

13   available to them that you have at your PPSAT clinic?

14           MS. SWANSON:  Objection to form.

15           THE WITNESS:  I don't work at a

16   hospital, so can't speak exactly, but I do know that

17   they have equipments and tools.  I know they have some

18   resources, but those resources might be different than

19   PPSAT resources.

20     Q.   (Mr. Boyle)  But if you have a complication

21   at PPSAT that PPSAT can't handle, you transfer that

22   patient to a hospital, right?

23           MS. SWANSON:  Objection to form.

24           THE WITNESS:  In very rare instances, we

25   have a complication where a patient does need to be

76

1    transferred to a hospital.

2         Q.    (Mr. Boyle)  So if you turn, please -- well,

3    let me just ask you, on Page 34 there, and Page 35 and

4    Page 36, that's all -- as I understand it, and you tell

5    me if I'm wrong, that's all one three-page document

6    about information for informed consent for in-clinic

7    abortions.  Is that correct?

8         A.    You're asking about Bates 34, 35 and 36?

9         Q.    Correct.

10        A.    Correct.  That is one PPSAT document.

11        Q.    And it is one PPSAT document that PPSAT gives

12   to patients who are seeking an in-clinic surgical

13   abortion at a PPSAT facility.  Is that correct?

14        A.    This is a document that is given to and

15   signed by patients who receive a procedural abortion at

16   Planned Parenthood South Atlantic.

17        Q.    Does the patient get a copy of this one

18   three-page document?

19        A.    It is our protocol to give the patient a copy

20   of this document.

21        Q.    When you look at Page 36, this looks like the

22   signature page for the patient.  Is that correct?

23        A.    It is a signature page, yes.

24        Q.    For the patient to sign when they're going to

25   get a surgical abortion at a PPSAT facility.  Is that

77

1   correct?

2       A.   This is a signature page.  We don't actually

3   use paper forms for signature.  We use an electronic

4   health record, so we use an electronic version of this

5   form, unless our electronic health system is down, and

6   then we use the paper form.  But the patient does sign

7   an electronic version of this form, yes.

8       Q.   Is the electronic version of this form

9   exactly the same format as this paper copy here, this

10  34, 35 and 36?

11              MS. SWANSON:  Objection to form.

12              THE WITNESS:  I would -- I can't speak

13  to the exact format, but it contains the same

14  information.  We use this form to create the electronic

15  form.

16      Q.   (Mr. Boyle)  So you don't actually hand a

17  patient this piece of paper, this three-page document.

18  Is that what you're saying?

19      A.   No, that is not what I'm saying.  I do hand

20  the patient this three-page document.  We at Planned

21  Parenthood hand the patient this document.

22      Q.   Okay.  So someone at -- at PPSAT hands the

23  patient a three-page document that looks like Bates

24  Number 34, 35 and 36, and that patient then has that

25  hard copy paper document to take with them?  Is that

78

1    correct?

2        A.   It is correct that the patient receives a

3    paper copy of this document before they leave the

4    clinic -- or actually, when they are arriving and going

5    through consent.

6        Q.   Okay.  Do the -- does the patient receive a

7    signed copy of this document?

8        A.   The patient does not routinely receive a copy

9    of this form that they have signed, but they may

10   receive a copy, if they would like, that can be printed

11   from the EHR for them if they request it.

12       Q.   So when the patient signs an electronic copy

13   of this document, is the patient looking at a computer

14   screen and having the opportunity to read all three

15   pages before they sign, or do they have a paper copy?

16   What's the method for that?

17       A.   They have both.  They have a paper copy in

18   front of them, and they can see the electronic form as

19   it is being filled out and they are signing it.

20       Q.   And who goes over this document with the

21   patient?

22       A.   A trained staff member.

23       Q.   What level of training does that staff member

24   have?

25              MS. SWANSON:  Objection to form.

79

1          THE WITNESS:  They are -- they can have

2    a variety of backgrounds of training, but they are

3    specifically trained in the process of Planned

4    Parenthood South Atlantic's informed consent.

5          Q.   (Mr. Boyle)  Is that person who undertakes

6    informed consent with the patient, is that a nurse?  Is

7    that a PA?  Is that an MD doctor?  What level of

8    training do they have?

9          A.   It varies based on which aspect of informed

10   consent you're referring to.

11         Q.   Okay.  How about this aspect with this three-

12   page document?  What level of PPSAT employee -- in

13   terms of training for that employee, what level of

14   employee is engaging with the patient to ensure

15   informed consent is obtained?

16         A.   It can be multiple levels.  I've had nurses

17   or physicians who participate in that.  Routinely, it

18   is not a licensed person who is going over the form.

19   It is someone who is trained specifically in the

20   process of consent who had -- goes over the form with

21   the patient.

22         Q.   Does the law speak to who has to interact

23   with a patient, what level of training that person has,

24   in order to ensure informed consent is indeed proper

25   and legal?

80

1          MS. SWANSON:  Objection to form.

2          THE WITNESS:  My understanding of the

3    law is that -- and I don't know the exact language, but

4    that I believe it can be a nurse, physician assistant,

5    advanced practice clinician or advanced practice nurse,

6    such as nurse midwife, or an NP, or a physician who can

7    perform -- or pardon me, who must perform the advanced

8    consent mandated by the State using the State's 72-hour

9    advanced consent forms for both procedural and

10   medication abortion.

11       Q.   (Mr. Boyle)  Does this document we're talking

12   about here, this three pages Bates Numbered 34, 35, 36,

13   does that qualify as satisfying the State's required

14   informed consent you just described?

15          MS. SWANSON:  Objection to form.

16          THE WITNESS:  No, this is done in

17   addition to the State's mandated consent.

18       Q.   (Mr. Boyle)  Is -- and it may be in here, and

19   I may just ask you to direct me.  Does that mandated

20   consent from the State exist in here in these

21   documents?

22          MS. SWANSON:  Objection to form.

23       Q.   (Mr. Boyle)  And you can take your time

24   looking through the package if you'd like.

25   (Witness examines document)

81

1    A.   This packet does not contain the State's

2  consent form.

3    Q.   So this packet that was given to us as

4  PPSAT's informed consent documentation that they give

5  to patients is missing the actual State-law-required

6  informed consent.  Is that correct?

7              MS. SWANSON:  Objection to form.

8              THE WITNESS:  This packet does not

9  contain the State consent.  The State consent is

10  performed by necessity and law 72 hours prior to the

11  abortion.  This consent is signed at the time of the

12  abortion.

13            So we review and go over the state forms at

14  the 72-hour consent and provide the patient with a copy

15  of the form both at that time, and we provide them with

16  another copy of that form at the time of their

17  abortion.  But because they are separate forms used at

18  different times in the process, they're not part of the

19  exact same packet.

20    Q.   (Mr. Boyle)  So you're saying there exists a

21  separate informed consent document from the State

22  that's not included here, but you know it exists and

23  you've seen it and participated in those State-law-

24  required informed consent conversations yourself with

25  some patients.  Is that correct?

82

1      MS. SWANSON:  Objection to form.

2      THE WITNESS:  The State requires that we

3  use State-created forms, so we access those State-

4  created forms from the State and use them for the

5  advanced consent.

6      Q.   (Mr. Boyle)  And you agree that form is not

7  in this packet starting at Page 31, running to Page 50.

8  Is that correct?

9      A.   That form is not a part of this packet,

10  correct.

11      Q.   And as I understood you to just say, this

12  packet that we're looking at, specifically Bates 34,

13  35, 36, that three-page document, is something that is

14  discussed with the patient and signed at the time of

15  the abortion, the surgical abortion.  So the day of the

16  surgical abortion.  Is that correct?

17      MS. SWANSON:  Objection to form.

18      THE WITNESS:  A copy of this paper

19  packet is routinely provided to the patient at the time

20  of their 72-hour consent for their review.  We do

21  not ---

22      Q.   (Mr. Boyle)  Okay.

23      A.   Let me correct.

24      We review it and sign the actual forms that

25  require signature in this packet at -- on the day of

83

1   the abortion, not at the 72-hour consent.

2       Q.   Okay.  And I think I understand it now.  Let

3   me just -- very slow.  I apologize.  I'm working

4   through it.

5           Day one, patient comes in, decides, "I want

6   to have a surgical abortion."

7           PPSAT says, "We will do that, but there is a

8   72-hour required waiting period for informed consent

9   under State law.  Here is that form," that we don't

10  have a copy of.  "Here's that form," which you go over

11  with the patient, they sign, starting the clock.

12          And you also give them a copy of this three-

13  page document, Bates Number 34, 35, and 36, but you

14  don't have the patient sign it on day one.  You have

15  the patient sign this three-page document when they

16  come back 72 or more hours later for the actual

17  surgical abortion.  Do I understand that correctly?

18                  THE WITNESS:  Yes.

19                  MS. SWANSON:  Objection to form.

20                  THE WITNESS:  That is correct that we

21  have them sign this form at the time of the procedural

22  abortion.

23      Q.   (Mr. Boyle)  When do they pay for the

24  surgical abortion?

25      A.   I don't participate in the payment process,

84

1  but I believe -- it's my understanding the patient pays

2  for the abortion on the day of the abortion.

3      Q.   So not the first day that triggers the 72-

4  hour clock.  It's when they come back for the day of

5  the actual surgical abortion after at least 72 hours

6  have passed.  Is that correct?

7              MS. SWANSON:  Objection to form.

8              THE WITNESS:  It is my understanding

9  that the patient only pays for the services they

10 receive.  So on day one, they might pay for the

11 ultrasound or labs if they received them.  But they do

12 not pay for the abortion on the day of the consent

13 process, because they cannot receive the abortion on

14 that day.

15     Q.   (Mr. Boyle)  You charge your patients an

16 independent fee for performing an ultrasound.  Is that

17 right?

18             MS. SWANSON:  Objection to form.

19             THE WITNESS:  I did not create the forms

20 or create the fee schedule.  But my understanding is

21 that a patient who's self paying for an abortion would

22 be charged $625 for the entire abortion procedure,

23 including the pretesting that we do.

24             And if that pretesting occurs 72 hours in

25 advance, including the ultrasound, they pay that

85

1   portion and then they would pay the remainder to reach
2   the total on the day of their abortion.
3       Q.   (Mr. Boyle)  Do you know how much it costs to
4   have the ultrasound?
5       A.   I do not recall that number.
6       Q.   I think you also said that there's an
7   independent separate charge for performing blood work
8   also.
9       A.   If the patient has blood work as part of
10  their 72-hour consent, then that charge is paid on day
11  one and reduced from the total that is owed on the
12  second day.
13      Q.   But if they don't come back, then they've
14  paid whatever for that blood work and that ultrasound.
15  They don't have to pay the balance of the 625, but they
16  also don't get a refund for what they paid for the
17  ultrasound and the blood work.  Is that correct?
18      A.   The patient only pays for the services they
19  receive on day one, and those are not reimbursed if
20  they choose not to return for their abortion.
21      Q.   Do you give an ultrasound to every patient
22  who tests positive for pregnancy at PPSAT?
23              MS. SWANSON:  Objection to form.
24              THE WITNESS:  No, we don't perform an
25  ultrasound on every patient who tests positive for

86

1   pregnancy at PPSAT.

2        Q.    (Mr. Boyle)  Do you give an ultrasound to

3   every patient who tests positive for pregnancy at PPSAT

4   who elects to have a chemical abortion?

5              MS. SWANSON:  Objection to form.

6              THE WITNESS:  We do require that every

7   patient who has a medication abortion at PPSAT has had

8   an ultrasound prior to that abortion.

9        Q.    (Mr. Boyle)  When you say, "an ultrasound

10  prior to that abortion," can you be a little more

11  specific?  Is there a time frame?

12       A.    The ultrasound would have had to have taken

13  place during this pregnancy.  Yes.

14       Q.    That's what I'm asking about.

15       A.    Yes.

16       Q.    I figured, but lawyers like to clarify.

17             Okay.  So as I understand what you just said,

18  if there is a patient at PPSAT who tests positive for

19  pregnancy and elects to have a chemical abortion, 100

20  percent of the time, PPSAT either takes their own

21  ultrasound if there isn't one already on file, or PPSAT

22  reviews a recent ultrasound from this particular

23  pregnancy for that patient.  Is that correct?

24             MS. SWANSON:  Objection to form.

25             THE WITNESS:  It is correct that we

Case 1:23-cv-00480-CCE-LPA   Document 74-2   Filed 09/12/23   Page 87 of 174

87

1   require that there is an ultrasound performed prior to
2   any medication abortion.  The vast majority of the
3   time, we are performing that ultrasound, but there are
4   cases where we would accept an ultrasound from an
5   outside source.
6        Q.   (Mr. Boyle)  Related to that particular
7   patient's current pregnancy?
8        A.   From this current patient that we are
9   performing an abortion on during this pregnancy.
10  Correct.
11       Q.   So it's fair to say -- and I will tell you,
12  it did not appear that way to me reading the protocols.
13  But I want to clarify that PPSAT does not perform any
14  chemical abortion on a patient who has tested positive
15  for pregnancy without reviewing at least one
16  ultrasound, whether they took it or whether it was
17  taken outside the facility and provided to PPSAT.  Is
18  that correct?
19       A.   That is correct, in the state of North
20  Carolina.
21       Q.   Clarification understood.  State of North
22  Carolina.  Has that been PPSAT's practice in North
23  Carolina about always having at least one ultrasound
24  before giving a medication abortion to a patient before
25  -- you know, prior to July 1st, 2023?

88

1      A.    That has been the practice throughout my
2  entire time ---
3      Q.    Okay.
4      A.    --- at Planned Parent South Atlantic.
5      Q.    So since 2009 when you arrived, it's been the
6  same up to today.
7      A.    It has been the practice to perform an
8  ultrasound prior to medication abortion.
9      Q.    Do you -- does PPSAT provide deep sedation at
10  any of its North Carolina clinics?
11     A.    No, we do not.
12     Q.    If you look at Page Bates Number 39, please.
13  And as you're getting there, I'll ask, do you require,
14  or is it your understanding that there has to be an
15  anesthesiologist or CRNA or some specialist who has
16  anesthesia specialization in medicine in order to have
17  a patient receive deep sedation for a procedure?
18              MS. SWANSON:  Objection to form.
19              THE WITNESS:  It is my understanding of
20  the PPFA protocols that a CRNA or an anesthesiologist
21  is required for deep sedation.
22     Q.    (Mr. Boyle)  Do -- does PPSAT have any
23  anesthesiologists who perform anesthesia services at
24  any of its six clinics in North Carolina?
25     A.    No, we do not.

1    Q.   Same question for CRNAs.

2    A.   No, we do not.

3    Q.   So PPSAT does not have any anesthesia

4    specialists who perform anesthesia services at any of

5    the clinics in North Carolina.  Is that correct?

6              MS. SWANSON:  Objection to form.

7              THE WITNESS:  It is correct that PPSAT

8    does not hire anesthesiologists or CRNAs, because we do

9    not perform deep sedation.

10   Q.   (Mr. Boyle)  Okay.  So when you look at Bates

11   Number 39, in the middle there, do you see there's a

12   box that says, "I would like to receive, Select one:

13   moderate, deep sedation and have read and understood --

14   and understand the risks and benefits outlined above"?

15        Do you see that?

16   A.   I see that.

17   Q.   So you're saying that, despite what this

18   says, that the patient has an option of choosing deep

19   sedation, that that's just wrong on this form, and

20   PPSAT North Carolina does not provide deep sedation?

21   A.   The patient is only permitted to select

22   moderate sedation or minimal sedation or no sedation at

23   PPSAT.

24   Q.   But the form here says, "deep sedation,"

25   doesn't it?

1    A.   The form says, "deep sedation."  It is not an
2  option that the patient can select.
3    Q.   So the form is inaccurate.
4         MS. SWANSON:  Objection to form.
5         THE WITNESS:  The form is -- I can't
6  speak to the accuracy of the form.  I can tell you that
7  patients are not offered the option of deep sedation at
8  PPSAT.
9    Q.   (Mr. Boyle)  Well, you're reading the same
10  form I am that says it gives the patient the option of
11  choosing deep sedation, right?
12         MS. SWANSON:  Objection to form.
13         THE WITNESS:  The patient is not allowed
14  to choose deep sedation.
15    Q.   (Mr. Boyle)  Then what happens when the
16  patient just reads this form, sees deep sedation as an
17  option, and selects it?
18         MS. SWANSON:  Objection to form.
19         THE WITNESS:  The patient is informed
20  that deep sedation is not an option at a Planned
21  Parenthood clinic.
22    Q.   (Mr. Boyle)  Okay.  And I'm not saying I
23  don't believe you.  I just -- this gave me pause,
24  because I didn't know if you all were doing deep
25  sedation.  It sounds like the answer is categorically,

91

1   "No."

2        A.   We are not providing deep sedation.

3        Q.   Who witnesses these forms, this Bates 39 and

4   Bates 36?

5        A.   The forms are witnessed by the staff member

6   who reviews the forms and has the patient sign them, so

7   the person who sees the patient sign the form witnesses

8   their signature.

9        Q.   And that's different than what we were

10  talking about with the State law 72-hour requirement

11  witness.  That has to be someone who is one of those

12  categories: the nurse, nurse practitioner, midwife,

13  doctor or PA.  Correct?

14            MS. SWANSON:  Objection to form.

15            THE WITNESS:  It is correct that the 72-

16  hour advance form provided by the State must be done by

17  one of those select licenses.  That person reviews the

18  form and witnesses the patient's signature.

19       Q.   (Mr. Boyle)  Now, I haven't seen that form.

20  Does it include a description of risks of the

21  procedure?

22       A.   I ---

23            MS. SWANSON:  Objection to form.

24            THE WITNESS:  --- have not looked at

25  that form in detail in recent days, but it does involve

Case 1:23-cv-00480-CCE-LPA   Document 74-2   Filed 09/12/23   Page 92 of 174

92

1    some information about risks of abortion.  To speak in

2    any detail, I would need to look at the form.

3         Q.   (Mr. Boyle)  When a patient is there, day of,

4    looking at these documents that we have in this package

5    in front of us and is signing Bates Number 36 or

6    signing Bates Number 39, and it's witnessed by someone

7    who is a staff member at PPSAT, that staff member is

8    not -- typically not a licensed practitioner who will

9    be able to answer that patient's questions about risks

10   of a procedure or risks of anesthesia.  Is that

11   correct?

12             MS. SWANSON:  Objection to form.

13             THE WITNESS:  No, that is not correct.

14        Q.   (Mr. Boyle)  What's incorrect about it?

15        A.   All of our staff are trained to answer

16   routine questions that patient asks -- patients ask

17   about the risks, and all of our staff are trained to

18   have a licensed provider come in and answer questions

19   that they do not know how to answer or any additional

20   questions that the patient may have.

21        Q.   What steps do you take to ensure that a

22   patient who is getting mild or moderate sedation for a

23   surgical abortion at a PPSAT clinic doesn't drive away

24   from that clinic after the procedure?

25        A.   We review, with any patient who is receiving

1  minimal or moderate sedation, that they are not allowed
2  to drive, with the exception of nitrous used for
3  minimal sedation, which does not preclude the patient
4  from driving.  We review with them, ideally at the time
5  of scheduling, that they cannot receive sedation and
6  drive after the procedure.
7        Q.   Do you take any steps when that patient shows
8  up on the day of the procedure for that surgical
9  abortion to ensure that they didn't just drive
10 themselves, and they have someone to drive them after
11 they've received that mild or moderate sedation?
12       A.   May I look at the form?
13       Q.   Absolutely.  Just orient us to a Bates ---
14       A.   Yeah ---
15       Q.   --- Number, if you don't mind.
16       A.   --- I'm looking at Bates Page 39.  And in the
17 second box at the top of the document, we review with
18 the patient that in order to receive and consent to
19 receiving minimal or moderate sedation, they have to
20 agree that they will not drive, operate heavy machinery
21 or make important decisions for at least 12 hours after
22 sedation or analgesic.
23       Q.   You said that this box says you make sure
24 that in order to receive mild or moderate sedation,
25 they will not drive and they will not operate heavy

94

1  machinery, and they will not make important life

2  decisions for the next 12 hours, right?

3              MS. SWANSON:  Objection to form.

4       Q.   (Mr. Boyle)  That's what you said.

5       A.   What I did was read this statement that the

6  patient is required to review prior to consenting to

7  sedation.

8       Q.   Right.  But it doesn't say that they agree to

9  it.  It just says, "do not drive," "do not operate

10 heavy machinery," "do not make important decisions."

11              My question is, what do you do to ensure that

12 they didn't drive there themselves and that they have

13 someone else or some other mechanism of transportation

14 to get them from the clinic to wherever they're going,

15 their home or somewhere else?  Do you take any steps to

16 verify that?

17              MS. SWANSON:  Objection to form.

18              THE WITNESS:  We do confirm with the

19 patient that they have a plan for leaving the clinic

20 that does not involve them driving.

21      Q.   (Mr. Boyle)  That's not something you record

22 in these documents, though, is it?

23      A.   The driver is not recorded in this document.

24 Our electronic health record, if the patient has a

25 driver that we'll be contacting when it's time to pick

1  the patient up, does record the name and phone number
2  of their driver.
3      Q.   Do you agree that an unborn child is
4  typically viable outside of the mother's womb after 24
5  weeks of gestational age?
6            MS. SWANSON:  Objection to form.
7            THE WITNESS:  That is not my specialty,
8  and I do not have significant training or knowledge
9  about pregnancy viability dates.
10     Q.   (Mr. Boyle)  So you've performed abortions
11 for the past 13 and a half years at least, and you're
12 not able to say when you think a child is typically
13 viable, at what gestational age?
14           MS. SWANSON:  Objection to form.
15           THE WITNESS:  I'm saying that is not my
16 area of expertise.  And I have not performed or
17 participated in abortion in the last 20 years -- no, in
18 the last 15 years, that occurred past 20 weeks.  So my
19 area of expertise is more in abortions under 20 weeks.
20     Q.   (Mr. Boyle)  And that's fair enough.  And I'm
21 not saying you should know.  I'm just trying to
22 clarify.  You don't know at what gestational age,
23 you're not able to say -- as a family practice doctor,
24 who performs abortions, you are not able to say when
25 you think an unborn child is viable and whether that's

96

1 after 24 weeks or some other time.  Is that correct?

2                MS. SWANSON:  Objection to form.

3                THE WITNESS:  I understand fetal

4 viability to be approximately 24 weeks but have a great

5 deal to do with the circumstances of the fetus, and

6 that there are experts who know much more about that

7 than I do.

8      Q.   (Mr. Boyle)  Do you agree that abortion

9 should not be banned at any point during a pregnancy?

10                MS. SWANSON:  Objection to form.

11                THE WITNESS:  I do not believe that

12 abortion should be banned.  I think that the decision

13 to have an abortion should be made by a healthcare

14 provider and a patient based on their individual

15 circumstances.

16      Q.   (Mr. Boyle)  And that's probably a better way

17 to say it.  So if I understand that, you think that

18 abortion should be allowed up to the full term of prior

19 to giving birth, but -- up until basically an unborn

20 child is ready to be born.  Is that correct?

21                MS. SWANSON:  Objection to form.

22                THE WITNESS:  No, I don't believe that

23 abortion occurs at term.  If a fetus needs to leave the

24 uterus at term, it is a delivery, not an abortion.

25      Q.   (Mr. Boyle)  Okay.  Do you think that

97

1  abortion should occur -- induced abortion should occur
2  at, say, 35 weeks of gestational age?
3            MS. SWANSON:  Objection to form.
4            THE WITNESS:  I think that if a patient
5  had tragic circumstances that necessitated no longer
6  carrying a fetus at 35 weeks, that the decision about
7  how to handle that should be based entirely on the
8  patient's circumstances and be a decision between the
9  patient and their healthcare provider as to whether
10 delivery or termination is the most appropriate next
11 step.
12      Q.   (Mr. Boyle)  Based on that, do you think that
13 the former North Carolina law that restricted abortion
14 generally after 20 weeks was too restrictive?
15            MS. SWANSON:  Objection to form.
16            THE WITNESS:  I think there are medical
17 circumstances beyond 20 weeks that patients should
18 absolutely have access to abortion care.
19      Q.   (Mr. Boyle)  Do you agree that if there is a
20 safety reason to take some medical action, it can be
21 considered a rational decision to take that action?
22            MS. SWANSON:  Objection to form.
23            THE WITNESS:  I believe that safety is
24 one of the very important factors that should be
25 considered any time we are making a decision about an

Case 1:23-cv-00480-CCE-LPA   Document 74-2   Filed 09/12/23   Page 98 of 174

98

1    action.

2         Q.    (Mr. Boyle)  Do you use a differential

3    diagnosis in your clinical practice?

4         A.    Yes, I do consider a differential diagnosis

5    in my clinical practice.

6         Q.    Do you agree that a differential diagnosis

7    should include all of the possible risk or dangerous

8    situations for a patient that you are providing medical

9    care to?

10                   MS. SWANSON:  Objection to form.

11                   THE WITNESS:  I believe that a

12   differential diagnosis should include the most likely

13   or most common.  I think stating all possible outcomes

14   is something that can never truly be known.

15        Q.    (Mr. Boyle)  Do you agree that if you're

16   treating a patient and there's something on that

17   patient's differential diagnosis that could be life

18   threatening, that you should treat that and rule it in

19   or rule it out before you stop considering it as

20   something of importance on your differential diagnosis?

21                   MS. SWANSON:  Objection to form.

22                   THE WITNESS:  I don't understand what

23   you're asking.

24        Q.    (Mr. Boyle)  If you're treating a patient and

25   you develop a differential diagnosis, and it includes

99

1    on that differential diagnosis something that could be
2    life threatening, you're not sure if it's there or not,
3    don't you agree that you need to rule it in or rule it
4    out before you cross it off your list on your
5    differential diagnosis?
6        A.    I believe you need to rule it in or out
7    before you remove it from your differential diagnosis,
8    but not that you need to rule it in or rule it out
9    before you provide some treatment to the patient.  They
10   can be done concurrently.  And I'd like to clarify,
11   that can be done concurrently in some cases.
12       Q.    You agree, though, that the concept of the
13   differential diagnosis is you treat the worst first,
14   right?
15                MS. SWANSON:  Objection to form.
16                THE WITNESS:  I think that's too vague a
17   statement for me to be able to answer.
18       Q.    (Mr. Boyle)  So if you've got a patient who
19   comes in and they're having pain in their chest, it
20   could be heartburn.  But it could be a heart attack,
21   right?
22       A.    Those are two things in a differential
23   diagnosis for chest pain.
24       Q.    And a heart attack could kill that patient,
25   right?

1              MS. SWANSON:  Objection to form.

2              THE WITNESS:  Heart attacks can be life

3      threatening, yes.

4      Q.   (Mr. Boyle)  Heartburn is probably not going

5      to kill that patient, is it?

6      A.   Heartburn is usually not life threatening.

7      Q.   If you have a patient who comes in, and they

8      have an unknown diagnosis with symptoms of things that

9      are not life threatening but also could be life

10     threatening, you've got to look at that life-

11     threatening diagnosis and treat that and rule it out,

12     don't you?

13     A.   Actually, it depends a great deal on the

14     patient.  In my experience of managing patients with

15     chest pain, the decision to rule out heart attack would

16     be based on the patient's risk factors, age and the

17     likelihood that the pain they were feeling was a heart

18     attack.

19     Q.   What is the American College of Obstetricians

20     and Gynecologists?

21     A.   I understand it to be an organization

22     supporting OB/GYN and ancillary providers of

23     obstetrical and gynecologic care.

24     Q.   And we'll call it ACOG.  Is that your

25     understanding of the ---

1  A.   That's ---

2  Q.   --- acronym?

3  A.   --- my understanding of the acronym.

4  Q.   Okay.  Are you a member of ACOG?

5  A.   Yes, I am.

6  Q.   Do you agree that the ACOG practice bulletins

7  provide clinical management guidelines for -- excuse

8  me, OB/GYNs and people who are providing similar

9  services to OB/GYNs?

10  A.   I have not reviewed every ACOG bulletin.  I

11  understand that they are intended to provide guidance.

12  Q.   Do you review ACOG bulletins on occasion?

13           MS. SWANSON:  Objection to form.

14           THE WITNESS:  I do review some ACOG

15  bulletins.

16  Q.   (Mr. Boyle)  When you have a woman who you

17  are seeing as a patient who has a positive pregnancy

18  test result, what is on her differential diagnosis as

19  potential medical issues and risks, in your mind?

20           MS. SWANSON:  Objection to form.

21           THE WITNESS:  The depth of what I would

22  consider as risks would depend on the context in which

23  I was seeing a patient with a positive pregnancy test.

24  Q.   (Mr. Boyle)  Okay.  You have a patient who

25  has a positive pregnancy test that comes into PPSAT and

102

1  is discussing with you the possibility of having a

2  chemical abortion.  What would you have on that

3  patient's differential diagnosis?

4       A.    I do not routinely make a differential

5  diagnosis based on a positive pregnancy test.  When I'm

6  seeing a patient for a medication abortion, I have

7  ultrasound information.  And so I'm basing my decisions

8  not on the pregnancy test, but on the ultrasound

9  results, in most cases.

10      Q.    Okay.  If you get an ultrasound result from a

11  patient who's tested pregnancy -- sorry, tested

12  pregnant -- tested positive for pregnancy.  Start over.

13            If you have a patient who has tested positive

14  for pregnancy and you get an ultrasound result for that

15  patient, what is on your differential diagnosis for

16  that patient?

17                 MS. SWANSON:  Objection to form.

18                 THE WITNESS:  My differential diagnosis

19  would be based on the results of the ultrasound.

20  Q.   (Mr. Boyle)  And what are the options there?

21                 MS. SWANSON:  Objection to form.

22                 THE WITNESS:  The most common options in

23  a pregnant patient when I am looking at their

24  ultrasound would be one of five categories.  Would you

25  like me to outline those categories?

1      Q.    (Mr. Boyle)  Please.

2      A.    Definite intrauterine pregnancy, probable

3  intrauterine pregnancy, definite ectopic pregnancy,

4  probable ectopic pregnancy and pregnancy of unknown

5  location.  There are some other things that could be

6  considered, but those are the main five categories.

7      Q.    Okay.  What is your differential diagnosis

8  for the patient who has definite intrauterine

9  pregnancy?

10     A.    If I have diagnosed a definite intrauterine

11  pregnancy?  I have diagnosed a definite intrauterine

12  pregnancy, so the differential -- I'm not sure what you

13  mean by, "What differential diagnosis do you have?"

14     Q.    Fair enough.  If you have, category one, a

15  patient who has an ultrasound with a definite

16  intrauterine pregnancy, do you include ectopic

17  pregnancy on that patient's differential diagnosis?

18               MS. SWANSON:  Objection to form.

19               THE WITNESS:  When we are doing an

20  ultrasound, we routinely evaluate the adnexal with

21  every ultrasound we do.  We do not always -- we

22  routinely do a full sweep of the uterus and adnexal on

23  all ultrasounds.

24               If someone has a definite intrauterine

25  pregnancy, then the likelihood that there is another

1 diagnosis is small, although other diagnoses that I

2 have seen have been molar pregnancy or partial molar

3 pregnancy, early pregnancy failure or miscarriage, twin

4 pregnancy. There can be other things in addition to an

5 intrauterine pregnancy.

6     Q. (Mr. Boyle) What is twin pregnancy? What is

7 that?

8     A. Twin pregnancy is generally understood as a

9 pregnancy that contains either two gestational sacs

10 and/or two fetal poles.

11     Q. (Mr. Boyle) So twins?

12     A. Correct.

13     Q. Okay.

14         MS. SWANSON: I'd just like to note that

15 we've been on the record for about another hour, so if

16 we could wrap up for lunch when you come to a good

17 stopping point, that'd be great.

18         MR. BOYLE: That's fine with me.

19         THE VIDEOGRAPHER: Off record, 12:31.

20 (Lunch Break: 12:31 p.m. to 1:07 p.m.)

21         THE VIDEOGRAPHER: On record, 1:07.

22         MS. SWANSON: Before we get started, I'd

23 like to note for the record that my colleague, Helene

24 Krasnoff, from Planned Parenthood Federation of America

25 for Planned Parenthood South Atlantic, has joined us.

1      Q.   (Mr. Boyle)  All right.  We ready, Doctor?

2      A.   I am.

3      Q.   Very good.  Thank you.  Do -- does PPSAT ever

4  offer informed consent, like we were talking about, the

5  second -- the returned trip informed consent, like

6  Bates Number 36 and Bates Number 39 we were looking at,

7  in a group setting to patients, or is it always a one-

8  on-one, employee talking to an individual patient?

9           MS. SWANSON:  Objection to form.

10           THE WITNESS:  Our protocol is to offer

11  informed consent one on one.

12      Q.   (Mr. Boyle)  Okay.  So it doesn't happen

13  with, like, five or ten patients sitting in a room with

14  one employee giving them all the paperwork and having

15  them all sign it at the same time?

16      A.   No, it does not.

17      Q.   Okay.  I think we stopped on differential

18  diagnosis for Category Number 1, when you have an

19  ultrasound with a patient who has a definite

20  intrauterine pregnancy.

21           Is there a difference between what you said

22  the differential diagnosis is for that patient, with an

23  ultrasound showing an intrauterine pregnancy, versus

24  Category 2, an ultrasound showing possible intrauterine

25  pregnancy?

1          MS. SWANSON:  Objection to form.

2          THE WITNESS:  So the second category I

3    referred to, we call a probably intrauterine pregnancy.

4    And I don't know how to answer the question, "Is there

5    a different differential diagnosis?"  I'm not really

6    clear what you're asking.

7          Q.   (Mr. Boyle)  Is your differential diagnosis

8    the same or different compared -- Category 1 to

9    Category 2?

10         MS. SWANSON:  Objection to form.

11         THE WITNESS:  I would say it was

12   different.  One of the common ways we would see a

13   probably intrauterine pregnancy would be in someone who

14   had a large, empty uterine sac.  And depending on the

15   size of that sac, would make us either suspicious for,

16   or clinically certain, that the patient was

17   experiencing a miscarriage.

18         Q.   (Mr. Boyle)  Okay.  How about for Category 3,

19   which I believe you said was an ultrasound that

20   definitely showed an ectopic pregnancy?  What's your

21   differential diagnosis for that patient?

22         MS. SWANSON:  Objection to form.

23         THE WITNESS:  I would consider that

24   patient to have an ectopic pregnancy or a pregnancy

25   outside the uterus.

1    Q.   (Mr. Boyle)  And what would you do as a
2  result of that?
3    A.   If I see a patient with an ectopic pregnancy,
4  I refer them for treatment of that pregnancy.
5    Q.   Refer them where?
6    A.   Either to their primary gynecologist, if
7  that's their preference, and they're able to see them
8  quickly, or to a hospital for care.
9    Q.   Because an ectopic pregnancy is a life-
10  threatening risk for a patient, isn't it?
11        MS. SWANSON:  Objection to form.
12        THE WITNESS:  An ectopic pregnancy can
13  be life threatening if not treated, yes.
14    Q.   (Mr. Boyle)  Because it's a pregnancy growing
15  outside of the uterus, where it's supposed to be, and
16  it can cause -- if it's in the fallopian tubes, it
17  cause those to rupture and bleed, right?
18    A.   That is one form of ectopic pregnancy.  There
19  are many locations that an ectopic pregnancy can exist,
20  including technically within the uterus.
21    Q.   Okay.  And if you have -- well, the fourth
22  category would be an ultrasound that showed a suspected
23  ectopic pregnancy.  How would your differential
24  diagnosis for that fourth category differ, if any way,
25  from the third category, where you actually identified

Case 1:23-cv-00480-CCE-LPA   Document 74-2   Filed 09/12/23   Page 108 of 174

1 ectopic pregnancy?

2     A.  So a probable ectopic pregnancy would mean

3 that I am seeing something outside of the uterus that I

4 am suspicious is ectopic, but I don't see

5 characteristics that absolutely confirm that that is a

6 pregnancy that I'm seeing versus some other structure

7 such as an ovarian cyst that's complex.

8     Q.  And what would your differential diagnosis

9 -- what would you do with that patient, that Category

10 4?

11 (Knock at door)

12     Q.  You can continue.  You can continue.  I'm

13 listening.

14                 MR. BOYLE:  Thanks.

15                 THE WITNESS:  Differential diagnosis and

16 treatment are two very different things.  Would you

17 like me to answer what the differential diagnosis was

18 or what I would do for it?

19     Q.  (Mr. Boyle)  Start with the differential,

20 yes.

21     A.  So the differential diagnosis of a probable

22 ectopic pregnancy is would be that there is an ectopic

23 pregnancy that I can't definitely diagnosis or that

24 there is some other structure outside of the uterus

25 that I -- that could be a complex ovarian cyst, it

1 could be some other structure outside of the uterus

2 such as bowel that has a strange appearance.

3      Q.   If it was a cyst instead of an ectopic

4 pregnancy, would you consider that patient to be at

5 risk of danger from that cyst?

6              MS. SWANSON:  Objection to form.

7              THE WITNESS:  Some cysts can create

8 danger, but rarely the more immediate, potentially

9 life-threatening danger of an ectopic.

10      Q.   (Mr. Boyle)  Okay.  So what would you do with

11 that patient if you -- you couldn't tell if it was an

12 ectopic pregnancy, but you saw something and you

13 suspected it might be a cyst?  What would you do?

14      A.   If I saw something outside of the uterus that

15 I would categorize as a possible ectopic pregnancy,

16 even if I thought there was a reasonable possibility

17 that it was a cyst, if it falls under the category of

18 probable ectopic pregnancy, I would treat it as an

19 ectopic pregnancy, where I would refer the patient ---

20      Q.   Okay.

21      A.   --- for immediate evaluation.

22      Q.   And that makes sense, because an ectopic

23 pregnancy is a potentially life-threatening condition.

24 So if you have a strong suspicion for it, you have to

25 rule it out, so you go ahead and refer that patient to

1  their gynecologist or an emergency room so that she can

2  get worked up further, and they can rule it out or rule

3  it in.  Is that fair?

4                    MS. SWANSON:  Objection to form.

5                    THE WITNESS:  If a patient has a

6  definite or probable ectopic pregnancy, that means that

7  I am concerned about a potentially life-threatening

8  condition, and I would refer them for further immediate

9  evaluation.

10      Q.   (Mr. Boyle)  A patient with the fifth

11  category, pregnancy of unknown location, could that be

12  an ectopic pregnancy?

13      A.   It could be.

14      Q.   Are you suspicious that it might be an

15  ectopic pregnancy?

16                    MS. SWANSON:  Objection to form.

17                    THE WITNESS:  No.  If I'm suspicious

18  that it might be an ectopic pregnancy, then I would

19  consider it a probable or definite ectopic pregnancy.

20      Q.   (Mr. Boyle)  So if you have a pregnancy of

21  unknown location on an ultrasound, you're not seeing an

22  actual pregnancy or possible pregnancy either in the

23  uterus or outside the uterus, correct?

24      A.   Correct.

25      Q.   Doesn't that raise your suspicion that that

1    patient could have an ectopic pregnancy, because you

2    haven't ruled it out?

3                    MS. SWANSON:  Objection to form.

4                    THE WITNESS:  When I have a patient who

5    has a probable -- or, pardon me, who has a pregnancy of

6    unknown location, I consider three -- the most common

7    three possibilities in my differential diagnosis: that

8    they have an early intrauterine pregnancy that is not

9    yet visible; that they have an early intrauterine

10   pregnancy that is undergoing miscarriage; or that they

11   have an ectopic pregnancy that is not yet visible.

12        Q.   (Mr. Boyle)  So when you have a Category 5,

13   pregnancy of unknown location, on an ultrasound, part

14   of your differential diagnosis is Number 3, that they

15   may have an ectopic pregnancy that you just can't see

16   yet?

17        A.   That is correct.  That is part of the

18   differential diagnosis.

19        Q.   Unless they are discovered and treated early,

20   you would agree that almost 40 percent of ectopic

21   pregnancies rupture suddenly, causing pain and bleeding

22   in the abdominal cavity, wouldn't you?

23        A.   I do not have that data.

24        Q.   You don't know that data?

25        A.   I do not know that statistic off the top of

1  my head.

2       Q.   You would agree, at least, that ruptured

3  ectopic pregnancies can be fatal, wouldn't you?

4       A.   I would agree.

5       Q.   At least 2 percent of pregnancies are ectopic

6  pregnancies.  Isn't that right?

7       A.   The categorization I have heard is that up to

8  2 percent of pregnancies are ectopic pregnancies.

9       Q.   We were talking about ACOG before.  Are you

10 familiar with ACOG Practice Bulletin 193?

11      A.   I would have to look at it to know.

12      Q.   You don't know it just off the top of your

13 head?

14      A.   Not from a number.

15      Q.   Okay.

16           MR. BOYLE:  I'm going to hand you a

17 document.

18           MS. SWANSON:  Thank you.

19           MR. BOYLE:  You're welcome.

20      Q.   (Mr. Boyle)  Take your time, review that

21 please, and let me know when you're ready to identify

22 it.

23      A.   I have not read it in detail, but I am -- I

24 do have it in front of me.

25      Q.   Okay.  Are you able to identify what this is,

1  please?

2       A.   It is the ACOG Practice Bulletin, Number 193.

3       Q.   And from what -- what time frame?

4       A.   From March 2018.

5       Q.   What's the topic of this Practice Bulletin?

6       A.   Clinical Management Guidelines for

7  Obstetrician/Gynecologist Tubal Ectopic Pregnancy.

8       Q.   Do you see on the first page, under

9  Background/Epidemiology, where it says, quote,

10 "According to the CDC, ectopic pregnancy accounts for

11 approximately two percent of all reported pregnancies,"

12 end quote?

13      A.   Yes, I see that quote.

14      Q.   You see a few lines down where it says,

15 quote, "Despite improvements in diagnosis and

16 management, ruptured ectopic pregnancy continues to be

17 a significant cause of pregnancy-related mortality and

18 morbidity.  In 2011 to 2013, ruptured ectopic pregnancy

19 accounted for 2.7 of all pregnancy-related deaths and

20 was the leading cause of hemorrhage-related mortality,"

21 end quote?

22           You see that?

23      A.   Yes, I see that.

24      Q.   Do you agree with that?

25      A.   I do trust this data.

1    Q.   Okay.  If you look over that Risk Factor

2  section on the first page, I'm going to read you a

3  sentence and ask you about that.  First sentence says,

4  quote, "One-half of all women who receive a diagnosis

5  of an ectopic pregnancy do not have any known risk

6  factors," end quote.  Do you see that?

7    A.   I do see that.

8    Q.   So you would agree that it's possible that a

9  woman who comes into a PPSAT clinic has an ectopic

10 pregnancy but doesn't have any known risk factors for

11 that ectopic pregnancy?

12   A.   Yes, that is possible.

13   Q.   And the gold standard to test and look for an

14 ectopic pregnancy is to conduct a transvaginal

15 ultrasound and see if there is an embryo or fetus seen

16 in the uterus.  Isn't that right?

17   A.   I don't know ---

18             MS. SWANSON:  Object to form.

19             THE WITNESS:  --- what you mean by,

20 "gold standard."

21   Q.   (Mr. Boyle)  You don't use the word -- the

22 term "gold standard" in your medical practice?

23   A.   I would not use the term "gold standard" in

24 this context.

25   Q.   Do you use it in any context in your medical

115

1  practice?

2              MS. SWANSON:  Objection to form.

3              THE WITNESS:  I don't know that I --

4  it's not a -- it's not a term that I routinely use, no.

5  I would say that ultrasound is a critical factor in

6  diagnosis of ectopic pregnancy.

7       Q.   (Mr. Boyle)  I will accept that.  If you turn

8  to the second page of this Bulletin 193, under Clinical

9  Considerations and Recommendations, How is an Ectopic

10 Pregnancy Diagnosed; you see that section?

11      A.   I do see that section.

12      Q.   Okay.  You see the sentence that says, quote,

13 "The minimum diagnostic evaluation of a suspected

14 ectopic pregnancy is transvaginal ultrasound evaluation

15 and confirmation of pregnancy," end quote.  Do you see

16 that?

17      A.   I do.

18      Q.   So ACOG requires, according to this Bulletin,

19 that in order to rule in or rule out an ectopic

20 pregnancy, you have to have an ultrasound that shows

21 the pregnancy.  Is that correct?

22      A.   That ---

23              MS. SWANSON:  Objection to form.

24              THE WITNESS:  That's not actually what

25 it's saying.  What it's saying is that the minimum

116

1  diagnostic evaluation, so the minimum you must do if

2  you suspect ectopic pregnancy, is a transvaginal

3  ultrasound evaluation.

4         And when they say, "and confirmation of

5  pregnancy," they mean that if you do a transvaginal

6  ultrasound but you haven't done another test to confirm

7  that the patient is pregnant, such as a urine or blood

8  pregnancy test, then it's not as useful.

9         For example, if a patient had a negative

10 pregnancy test, then the -- the transvaginal ultrasound

11 wouldn't be helpful.  So if you do a transvaginal

12 ultrasound and don't see a pregnancy, you would next do

13 a pregnancy test to see if the patient was even

14 pregnant.

15    Q.  (Mr. Boyle)  So you think that sentence

16 there, that's talking clearly about ultrasound, means

17 that a doctor doesn't have to actually confirm the

18 pregnancy with the ultrasound?  That's how you

19 interpret that sentence?

20         MS. SWANSON:  Objection to form.

21         THE WITNESS:  No.  What I am saying is

22 that this sentence says that you must do an ultrasound,

23 and you must also confirm that the patient is pregnant.

24 Because often, for example, in pregnancy of unknown

25 location, you will do an ultrasound and not see a

1  pregnancy.

2      So if you perform an ultrasound, which is

3  often done before a pregnancy test is done, and you see

4  no pregnancy, the very next step is to perform a

5  pregnancy test to confirm that the patient is pregnant.

6  Because if the patient is not pregnant, then the

7  concern for ectopic pregnancy no longer exists.

8      Q.   (Mr. Boyle)  I just want to make sure that I

9  understand what you're saying.  The next sentence says,

10  quote, "Serial evaluation with transvaginal

11  ultrasonography, or serum HCG level measurements, or

12  both, often is required to confirm the diagnosis," end

13  quote.

14      Do you see that?

15      A.   Yes, I see that.

16      Q.   And you think that, again, when the prior

17  sentence says, "confirmation of pregnancy," it's not

18  talking about with an ultrasound, it's talking about

19  with a pregnancy test?

20          MS. SWANSON:  Objection to form.

21          THE WITNESS:  I believe that the first

22  sentence is saying that a transvaginal ultrasound in

23  the absence of confirming that the patient is actually

24  pregnancy is not helpful.  So you confirm that the

25  patient is pregnant.

1          And then, I believe, that you must perform
2    not just one ultrasound, unless the ultrasound
3    definitely diagnoses an ectopic pregnancy.  If it does
4    not give you a definitive diagnosis, then the next step
5    is to perform serial ultrasounds, usually over the
6    course of several days, and often, serial blood tests,
7    usually over the course of several days.
8          Q.   And I guess I'm -- I'm confused, and maybe
9    I'm just ignorant to this.  It's entirely possible.
10   When a woman comes to PPSAT and says, "I think I might
11   be pregnant," isn't the first step, you just give her a
12   pregnancy test as opposed to giving her an ultrasound?
13         A.   It depends on the type of visit.  If a
14   patient comes in and says, "I'm not sure if I'm
15   pregnant.  I'd like to find out," we perform a
16   pregnancy test.
17         Most of the patients who are coming to us for
18   abortion come and say, "I did a pregnancy test at home.
19   I'm here for an abortion."  In those patients, we start
20   with ultrasound, because they've already performed an
21   equivalent pregnancy test at home.
22         Q.   So -- and that second type of patient, when
23   they show up and say, "I did a pregnancy test at home.
24   I think I'm pregnant.  I want an abortion," you perform
25   an ultrasound first.

119

1      And then, if you don't see a pregnancy on the
2  ultrasound, that fifth category, pregnancy of unknown
3  location, then you give them the pregnancy test?
4      A.   That's correct.
5      Q.   How much does it cost to give them a
6  pregnancy test?
7      A.   I don't know the cost of pregnancy tests, and
8  I don't know that we actually charge for the pregnancy
9  test in that setting.  I'm not sure.
10     Q.   But you charge for the ultrasound?
11     A.   We do charge for the ultrasound.
12     Q.   Why wouldn't you just give them a pregnancy
13 test first, especially if it doesn't cost the patient
14 any money?
15          MS. SWANSON:  Objection to form.
16          THE WITNESS:  We almost never have to do
17 a pregnancy test.  If we were performing a pregnancy
18 test on every single patient, I think we probably would
19 have to charge for it.
20     So a vast majority of patients come to us and
21 say they've had a positive pregnancy test.  If a
22 patient came to us and said, "I'm not sure if I'm
23 pregnant," we would start with a pregnancy test before
24 an ultrasound.
25     Q.   (Mr. Boyle)  If you look at the next column

1  over, Serum Human CH -- CG -- HCG, sorry.  Serum HCG
2  Measurements, do you see that?
3      A.  I see that.
4      Q.  It says, quote, "Measurement of the Serum HCG
5  levels aids in the diagnosis of women at risk of
6  ectopic pregnancy.  However, Serum HCG values alone
7  should not be used to diagnosis an ectopic pregnancy
8  and should be correlated with the patient's history,
9  symptoms, and the ultrasound findings," end quote.
10          Do you see that?
11      A.  I see that.
12      Q.  So doesn't that say that you have to see an
13  ectopic pregnancy by an ultrasound, either saying it's
14  intrauterine or it's not?
15              MS. SWANSON:  Objection to form.
16              THE WITNESS:  No, that's not at all what
17  it says.
18      Q.  (Mr. Boyle)  Okay.  If you have a woman who
19  has tested pregnant -- tested positive for pregnancy,
20  and you take an ultrasound of her and you don't see a
21  fetus or an embryo anywhere on that ultrasound, doesn't
22  that actually raise your suspicion for her having an
23  ectopic pregnancy on that differential diagnosis you
24  were discussing earlier?
25      A.  Yes, it does increase my suspicion for

121

1    ectopic pregnancy if I do not see a pregnancy either

2    inside or outside of the uterus, including a

3    gestational sac, not just a fetus or embryo.

4        Q.   Okay.  When you're treating a -- a woman

5    who's tested positive for pregnancy, but she has a

6    confirmed ectopic pregnancy, you don't provide her with

7    the two chemical abortion drugs, do you?

8        A.   That is correct.  We do not treat anyone with

9    a confirmed ectopic pregnancy with medication abortion

10   medications.

11       Q.   Because mifeprex (sic) and misoprostol are

12   drugs that do not assist a woman in treating her for

13   her ectopic pregnancy, are they?

14              MS. SWANSON:  Object to form.

15              THE WITNESS:  Mifepristone and

16   misoprostol, as used in medication abortion, are not

17   effective in treating ectopic pregnancy.

18       Q.   (Mr. Boyle)  And the FDA label says that they

19   are contraindicated in patients with confirmed or

20   suspected ectopic pregnancies, doesn't it?

21       A.   I don't know what the FDA label says without

22   looking at it.

23       Q.   You've prescribed these medications several

24   times every week for the past 14 years, correct?

25       A.   That is correct.

1    Q.   And you are unaware that the FDA label says

2   that they are contraindicated for a woman who has an

3   actual diagnosed or suspected ectopic pregnancy?

4              MS. SWANSON:  Object to form.

5              THE WITNESS:  I cannot directly quote

6   the FDA label without looking at it.  I am aware that

7   we do not use mifepristone and misoprostol, as designed

8   for medication abortion, in patients with known or

9   suspected ectopic pregnancy.

10    Q.   (Mr. Boyle)  A patient who has a suspected

11   ectopic pregnancy needs to be worked up to see if she

12   needs surgical treatment for her ectopic pregnancy or

13   if she qualifies for a different drug treatment,

14   methotrexate, right?

15    A.   There are different treatments for ectopic

16   pregnancy, and those treatments should be offered based

17   on the patient's exact circumstances, yes.

18    Q.   Typically, the drug you give for ectopic

19   pregnancy is methotrexate, not the two chemical

20   abortion drugs, right?

21    A.   I do not treat ectopic pregnancy, but it

22   is -- you do not use mifepristone and misoprostol to

23   treat ectopic pregnancy.  Methotrexate is one of the

24   medications that can be used to treat ectopic

25   pregnancy.

1    Q.   If you give a woman who tests positive for

2    pregnancy, who is actually suffering from an ectopic

3    pregnancy, the chemical abortion drugs, and it does not

4    stop her ectopic pregnancy from growing, that ectopic

5    pregnancy can rupture, possibly in her fallopian tubes

6    or some other internal structure, causing damage and

7    bleeding inside her abdomen.  Isn't that right?

8            MS. SWANSON:  Object to form.

9            THE WITNESS:  Any woman who has an

10   ectopic pregnancy, that ectopic pregnancy can rupture

11   if it is not treated, regardless of whether the patient

12   receives mifepristone and misoprostol or not.

13   Q.   (Mr. Boyle)  That's fair.  But the

14   prescription of those two drugs wouldn't have any

15   impact on whether that ectopic pregnancy will continue

16   to grow and possibly rupture, right?

17   A.   I don't believe it's been extensively

18   studied, but we do not treat ectopic pregnancy with

19   mifepristone and misoprostol.  There's a possibility

20   that they could stop the growth theoretically, but we

21   do not use it for that purpose.

22   Q.   Okay.  I appreciate that there may be further

23   research to be done, but there's none that you're aware

24   of that has been done to suggest that's an appropriate

25   treatment regimen for ectopic pregnancy.  Is that

124

1 correct?

2           MS. SWANSON:  Object to form.

3           THE WITNESS:  I am unaware that anyone

4 would use mifepristone and misoprostol to treat a known

5 or suspected ectopic pregnancy.

6     Q.   (Mr. Boyle)  You agree that many of the

7 symptoms of a ruptured ectopic pregnancy mimic, or are

8 exactly the same as, the expected side effects of a

9 chemical abortion that you or one of your colleagues at

10 PPSAT have counseled your patient could occur if you

11 give that patient a chemical abortion, right?

12           MS. SWANSON:  Object to form.

13           THE WITNESS:  There are some overlapping

14 symptoms between the normal symptoms we expect with

15 medication abortion and the symptoms of an ectopic

16 pregnancy.

17     Q.   (Mr. Boyle)  It's possible that a patient who

18 took chemical abortion drugs and then suffered a

19 ruptured ectopic pregnancy, leading to internal

20 bleeding and vaginal bleeding, pain, dizziness,

21 headache, could misconstrue or confuse those symptoms

22 of the ectopic pregnancy with the normal expected side

23 effects of the chemical abortion, as it was described

24 to her by her doctor or other provider at PPSAT.  Isn't

25 that true?

1           MS. SWANSON:  Object to form.

2           THE WITNESS:  It would be important to

3    educate any patient on whom we have not diagnosed an

4    intrauterine pregnancy, who takes mifepristone and

5    misoprostol, on the normal symptoms that they would

6    experience with a medication abortion and on the

7    abnormal symptoms that they might experience, including

8    detailed education on the symptoms of ectopic

9    pregnancy.

10       Q.   (Mr. Boyle)  But they might confuse a

11   ruptured ectopic pregnancy for the normal side effects

12   from the chemical abortion process, correct?

13           MS. SWANSON:  Object to form.

14           THE WITNESS:  I can't speculate on who

15   might get confused by what.  It is important to give

16   clear education and closely follow up with patients.

17       Q.   (Mr. Boyle)  If you look at the document,

18   please, at, let's see, Bates 31, on the first page

19   there.

20           MS. SWANSON:  And for the record, we're

21   now switching back to the patient education packet from

22   the ACOG bulletin.

23       Q.   (Mr. Boyle)  Right.  Bates 31.  Do you see

24   that?

25       A.   I see that form, yes.

1    Q.   Okay.  You see on the left-hand column, it's

2  talking about abortion pill and it's -- and it's going

3  over what the patient may expect and how it might turn

4  out.  Is that fair?

5    A.   I do see that form.

6    Q.   Okay.  And there's two columns.  There's --

7  the one on the left is abortion pill, and the other one

8  on the right is in-clinic abortion, right?

9    A.   Correct.

10   Q.   Okay.  So when you go down to How Will I

11  Feel, there's a list of symptoms there, right?

12   A.   There is.

13   Q.   It says, "nausea or vomiting, headache,

14  dizziness."  You see those?

15   A.   I do.

16   Q.   And then you go down two more rows and it

17  talks about bleeding.  It says, "Heavy bleeding with

18  clots is common after taking misoprostol," right?

19   A.   It says, "Heavy bleeding with clots is common

20  after taking misoprostol," yes.

21   Q.   Okay.

22        MR. BOYLE:  I'm going to give you what's

23  been marked as Bates Number 119 and 120.

24        MS. SWANSON:  Thank you.

25        MR. BOYLE:  You're welcome.

1    Q.   (Mr. Boyle)  Ask you if you recognize that
2  document?
3    A.   Yes, I do.
4    Q.   And actually it's two documents there, but
5  they're actually separate documents, I believe.  Are
6  these given out to your patients at PPSAT?
7    A.   They are given out to some patients at PPSAT,
8  yes.
9    Q.   Not to every patient?
10   A.   No, not to every patient.
11   Q.   Okay.  And when we're looking at Bates Number
12  119, what's the name of this document up at the top,
13  please?
14   A.   Positive Pregnancy Test No Pregnancy Seen on
15  Ultrasound.
16   Q.   Okay.  So this is a document, a one-page
17  document, about what we were talking about, that
18  Category 5, pregnancy of unknown location from an
19  ultrasound, right?
20   A.   Correct.
21   Q.   Okay.  Look at the second document, Bates
22  Number 120.  What's the topic of this particular
23  document?
24   A.   The title of this document is Ectopic
25  Pregnancy.

128

1      Q.   Okay.  And let's stay with 120 there, Bates

2  Number 120, the ectopic pregnancy.  Do you see the box

3  that says, "What are the symptoms of ectopic

4  pregnancy"?

5      A.   Yes, I do.

6      Q.   And it says, "Bleeding from the vagina may be

7  heavy or light," right?

8      A.   I see that.

9      Q.   Okay.  It says, "Dizziness or fainting,"

10  right?

11      A.   I see that.

12      Q.   Okay.  Those are similar symptoms that are

13  found on Bates Number 31, talking about what might

14  happen to a patient after they take the chemical

15  abortion drugs, right?

16              MS. SWANSON:  Object to form.

17              THE WITNESS:  There are similarities

18  between the two forms.

19      Q.   (Mr. Boyle)  There are similarities between

20  the symptoms that you tell a patient might -- a patient

21  might experience with ectopic pregnancy as the side

22  effects and symptoms you expect the patient to

23  experience after they take the chemical abortion drugs,

24  right?

25      A.   There are similarities, but they are not

129

1  identical, yes.

2       Q.   Dizziness is identical, isn't it?

3            MS. SWANSON:  Object to form.

4            THE WITNESS:  There are similarities

5  between the symptoms you asked me, so not ---

6       Q.   (Mr. Boyle)  I'm asking, dizziness is in both

7  of them, isn't it?

8       A.   Some of the words in both, some of the

9  symptoms use the identical words.  But the entirety of

10 symptoms you might expect are not identical between the

11 two conditions.

12      Q.   You said, "the entirety of the symptoms you

13 might expect," but neither one of these, Bates Number

14 31 or Bates Number 120 says, "You will experience all

15 of these symptoms if you are taking the medical

16 chemical abortion drugs," or, "You will experience all

17 of these symptoms if you have an ectopic pregnancy," do

18 they?

19      A.   That is correct.

20      Q.   They just say these are some things that may

21 exist under the -- that circumstance or this

22 circumstance, right?

23      A.   That is correct.

24      Q.   You agree that it's possible that a patient

25 who received a chemical abortion drug -- drugs from

1    PPSAT, and also was suffering from a ruptured ectopic

2    pregnancy, could look at these forms and be

3    experiencing symptoms from both of them and be mistaken

4    that they think it's from the chemical abortion drug,

5    right?

6                    MS. SWANSON:  Object to form.

7                    THE WITNESS:  Can you repeat that

8    question, please?

9         Q.    (Mr. Boyle)  You agree that a patient from

10   PPSAT could receive chemical abortion drugs, and also

11   have a ruptured ectopic pregnancy at the same time or

12   shortly thereafter, and experience overlapping symptoms

13   that are found in both documents and confuse the

14   ectopic pregnancy rupture for a normal side effect from

15   the chemical abortion drug, right?

16                   MS. SWANSON:  Object to form.

17                   THE WITNESS:  I would actually clarify

18   that the symptoms listed are for the presence of

19   ectopic pregnancy, and not for the presence of a

20   ruptured ectopic pregnancy.

21        And the presence of a ruptured ectopic

22   pregnancy tend to be much more severe, so it is

23   unlikely to me, clinically, that a patient would

24   experience a ruptured ectopic pregnancy and only

25   experience, in the example you gave, dizziness.

131

1    Q.    (Mr. Boyle)  Right.  But it says, on Bates

2    Number 120, "Call us right away if you have dizziness,

3    bleeding from the vagina," down at the bottom.  Do you

4    see that?

5              MS. SWANSON:  Object to form.

6              THE WITNESS:  Yes, I see that statement

7    on the document.

8    Q.    (Mr. Boyle)  And it's not like the patient is

9    going to know that they have an ectopic pregnancy.  You

10   only see that with ultrasound.  They can't look inside

11   their own bodies, right?

12             MS. SWANSON:  Object to form.

13             THE WITNESS:  Patients, unless they have

14   access to an ultrasound machine, cannot look inside

15   their own bodies.

16   Q.    (Mr. Boyle)  Fair enough.  I will grant you

17   that.  And you at least perform, or require someone

18   else to perform and give you a copy of an ultrasound,

19   every single time before you give a patient chemical

20   abortion drugs, right?

21   A.    We require that an ultrasound is performed

22   every time before we give a patient medication

23   abortion.  And in the setting of pregnancy of unknown

24   location, if I were to receive an ultrasound from an

25   outside individual, I would repeat the ultrasound

1  myself before giving a patient medication abortion.

2      Q.   So if you have a pregnancy of unknown

3  location from an outside source for this patient who

4  has just arrived and is seeking a chemical abortion,

5  you would take another ultrasound there, at PPSAT,

6  before you gave that patient chemical abortion drugs.

7  Is that correct?

8      A.   It is our protocol to repeat that ultrasound

9  the same day, yes.

10     Q.   You said that's in your protocols?

11         MS. SWANSON:  Object to form.

12         THE WITNESS:  It is our practice.  I

13  don't know exactly how it's written in our protocols

14  without reviewing the protocols.

15         MR. BOYLE:  And I'm handing you what has

16  been produced in discovery as Bates Numbers 53 through

17  105.

18     Q.   (Mr. Boyle)  Can you just -- first, before we

19  start, can you look at the first page and see if I'm

20  right on the numbers there?

21         MS. SWANSON:  And before we get started,

22  I'm just going to state for the record that this has

23  been produced, designated confidential under our

24  confidentiality agreement, and not everyone who's

25  viewing this deposition has signed that protective

133

1   agreement yet.  So if you are going to be asking

2   questions specifically that reflect the content of this

3   document ---

4                MR. BOYLE:  I think the way I ask this

5   question, it won't.

6                MS. SWANSON:  Okay.

7                MR. BOYLE:  If it does, then ---

8                MS. SWANSON:  I'll object.

9                MR. BOYLE:  --- you will object, and we

10  can address that.  I suspect the answer is going to be,

11  "No."

12               MS. SWANSON:  Okay.

13               MR. BOYLE:  But if it's anything other

14  than, "No," I understand where you're coming from, and

15  I will respect your objection as stated and we'll deal

16  with it.  I don't have a problem with that.

17               MS. SWANSON:  I thank you.

18               MR. BOYLE:  And I'm not making it an

19  exhibit.

20               MS. SWANSON:  Okay.  I appreciate that.

21               MR. BOYLE:  Yes.

22      Q.   (Mr. Boyle)  So I think we established,

23  without going into detail, Bates Number 53 through 105

24  is what's been produced as Chapter 1 of the abortion

25  chapter from PPSAT's internal protocols and guidelines.

1    Is that correct?

2         A.   That is correct.

3         Q.   Okay.  I think I heard you say that you have

4    a protocol -- and you might have said just a practice,

5    so that's why I'm asking about the written protocols.

6              You have a protocol at PPSAT where, if there

7    is a patient who has an ultrasound that gives a result

8    of pregnancy of unknown location, and the patient has

9    tested positive for pregnancy, so under that

10   circumstance, and you get that ultrasound from an

11   outside source, not internal, not done by PPSAT, that

12   you have a protocol that requires PPSAT to do a new

13   ultrasound.

14             Can you show me in this document where it

15   says that, please?

16        A.   Can you turn to Bates Page 64?

17             THE WITNESS:  Am I allowed to go over

18   what's on this?

19             MS. SWANSON:  Let's...

20             MR. BOYLE:  How about this?  Do me a

21   favor, and -- and I know this is bad for keeping a

22   record.  Can you just point to it on your piece of

23   paper and let me see?  And I may not have a follow-up

24   if you show it to me just by pointing.

25   (Witness complies)

1    Q.   (Mr. Boyle)  Okay.  You're saying that you

2    have a policy at PPSAT that says, if a patient arrives

3    with an ultrasound from outside a PPSAT clinic, and

4    that ultrasound shows pregnancy of unknown location,

5    that then, you have a protocol that says you must do a

6    new ultrasound at PPSAT.  Is that what you're saying?

7    A.   What I'm saying is that I have a protocol

8    that states that if I have a patient with a positive

9    pregnancy test, in order to follow any of the next

10   steps, I need to see that there is no gestational sac

11   on transvaginal ultrasound.

12        So a transvaginal ultrasound must be done to

13   show no -- we can't accept an outside ultrasound that

14   has no pregnancy visible.  If there's no pregnancy

15   visible, we must do an ultrasound to see if there's a

16   pregnancy visible.

17   Q.   But, I guess, if that's true, why don't you

18   just agree to the law as written, because all the law

19   says is you have to have an ultrasound that shows an

20   intrauterine pregnancy?

21             MS. SWANSON:  Object to form.

22             THE WITNESS:  Am I allowed to talk more

23   about the protocol?

24             MS. SWANSON:  You can talk about the

25   protocols without referring specifically to this

136

1    document, if that's possible.  If it's not possible, we
2    can go off the record and talk about it a bit more.
3                THE WITNESS:  If I were to receive an
4    ultrasound from an outside organization that showed
5    a intrauterine pregnancy, definite intrauterine
6    pregnancy at eight weeks, four days, and I can see that
7    that ultrasound was done four days ago, and, for
8    example, the patient came in with their ultrasound and
9    their consent for the procedure, our protocol would not
10   absolutely require me to repeat that ultrasound,
11   although the clinician always, always has the clinical
12   prerogative to repeat the ultrasound if they have any
13   reason they want to.
14          Our protocol for management of pregnancy of
15   unknown location requires that we have an ultrasound
16   that shows a pregnancy of unknown location.  So if, for
17   example, a patient had an ultrasound elsewhere and then
18   came to see me at my clinic and said, "They did and
19   ultrasound and they didn't see a pregnancy," I would
20   not use that ultrasound clinically.
21          I would need to perform an ultrasound to see
22   if the patient has a pregnancy of unknown location
23   before proceeding with treatment.
24       Q.   (Mr. Boyle)  Okay.  And if you then do that
25   ultrasound at PPSAT and it still shows a pregnancy of

137

1  unknown location, that fifth category, you think that
2  you should be able to simultaneously provide the
3  chemical abortion drugs before you get the positive
4  confirmation that that patient has an intrauterine
5  pregnancy. Is ---
6              MS. SWANSON:  Object ---
7      Q.   (Mr. Boyle)  --- that correct?
8              MS. SWANSON:  Object to form.
9              THE WITNESS:  So we follow excellent
10 evidence-based protocols that show that it is
11 appropriate to simultaneously determine the location of
12 the pregnancy, which the ACOG Bulletin expresses is
13 usually done through serial ultrasounds and/or serial
14 blood tests, and, at the same time, provide the
15 medication abortion to patients.
16     Q.   (Mr. Boyle)  Do you think it would be safer
17 to give that patient another ultrasound a few days
18 later or a week later to determine if it was an ectopic
19 pregnancy or not, before you gave the contraindicated
20 chemical abortion drugs?
21             MS. SWANSON:  Object to form.
22             THE WITNESS:  I think that it is not
23 necessarily safer to delay starting the medication
24 abortion for patients, and safety is one of several
25 factors that we consider in the options that the

138

1   patient has to choose from.

2   　　Q.　(Mr. Boyle)　What other option -- what other

3   factors are you considering other than the safe -- the

4   patient's safety?

5   　　A.　We are considering patient history and risks,

6   which is part of safety.　We are considering patient

7   preference very strongly.　That many patients, even if

8   they know that if they have an ectopic pregnancy, the

9   medications won't work.

10  　　　　Given that ectopic pregnancy occurs in less

11  than 2 percent of patients, if they have no risk

12  factors and no other concerning signs, there's a very

13  good chance they just have an early pregnancy.　My

14  patients strongly prefer to begin definitive treatment

15  at the same time that we are performing the serial

16  ultrasounds and/or serial blood tests.

17  　　Q.　You said you follow the evidence-based

18  medicine.　How long as PPSAT been providing medical

19  chemical abortion drugs to patients who have pregnancy

20  of unknown location on their ultrasound findings before

21  confirming either ectopic or intrauterine pregnancy?

22  How long has that been going on?

23  　　　　　MS. SWANSON:　Object to form.

24  　　　　　THE WITNESS:　I do not know exactly when

25  that protocol was first made available to us.

1    Q.   (Mr. Boyle)  It's something that would have

2   come, literally, across your desk as the chief medical

3   officer, right?

4    A.   Our protocols are updated every one to three

5   years and different aspects of the protocols are

6   updated at different times, so I cannot recall exactly

7   when that update started without looking back at our

8   historical protocols.

9    Q.   And you just don't have any memory if you've

10  been doing it for one year or for three years or more?

11            MS. SWANSON:  Object to form.

12            THE WITNESS:  That wasn't your original

13  question.

14   Q.   (Mr. Boyle)  Well, I'm -- I know.  I'm asking

15  another question.

16   A.   We have been doing it for at least a year,

17  but I don't recall how long over a year we've been

18  doing it.

19   Q.   Okay.  Because you say it's based on

20  evidence-based medicine, what evidence-based medicine

21  are you basing it on?

22   A.   All of the medical standards that we use,

23  which include the option of medication abortion while

24  simultaneously determining the location of a pregnancy,

25  are based on a large amount of research and data.  And

140

1   we can look to the last pages to show the references,
2   but I don't recall the exact references without
3   actually looking at them.
4         Q.   Can you -- can you tell me -- you can go
5   ahead and take that.  That's the Chapter 1 Abortion.
6   Again, I'm not asking for anything really specific
7   about it other than what you think supports your
8   contention that providing simultaneous chemical
9   abortion drugs to a patient with a pregnancy of unknown
10  location is supported by any evidence-based medicine
11  practice.  And this is Bates Number 53 through 105,
12  that document.
13        A.   It is not possible for me, reading the titles
14  of all of the articles that are referenced in this
15  book, to know the full content of every article.  So
16  there are some of these articles that are very broad,
17  which means that it is possible that the information
18  exists in those.
19        Q.   What page are you looking at, if I might ask?
20        A.   I am looking at -- starting at Bates 102, and
21  the references go through Bates 104, and I have not
22  finished reading through every title yet.
23        Q.   If you find any titles here that you think
24  support your contention that there is evidence-based
25  medicine that underlies the PPSAT's decision to, at the

1  same time, provide chemical abortion with a pregnancy

2  of unknown location, please identify that for me.

3           MS. SWANSON:  Object to form.

4           THE WITNESS:  I would want to read

5  through the Management of Unintended and Abnormal

6  Pregnancy Comprehensive Abortion Care.

7      Q.  (Mr. Boyle)  Which one is that, please?

8      A.   It's labeled throughout, and at approximately

9  halfway down Bates 103.

10     Q.   What's the date on that document?

11     A.   2009.  So based on that date, it may or may

12 not have reference to that.

13     Q.   But you would agree that this is fairly new

14 and evolving theory that you can provide

15 contemporaneous chemical abortion drugs to a patient

16 with a pregnancy of unknown location on an ultrasound,

17 right?  That research is from, like, the past two or

18 three years, right?

19          MS. SWANSON:  Object to form.

20          THE WITNESS:  Without looking at the

21 actual studies, I cannot state the exact time frame.

22 But it is relatively new, and the newness of data does

23 not mean that the data is not valid.

24     Q.   (Mr. Boyle)  It's come out since ACOG 193 in

25 March of 2018, that new theory about giving chemical

142

1   abortion drugs at the same time as a patient has a

2   pregnancy of unknown location on ultrasound, right?

3                    MS. SWANSON:  Object to form.

4                    THE WITNESS:  I don't know that.  And I

5   have not read through the entirety of ACOG Practice

6   Bulletin 193 to see whether it references simultaneous

7   provision of abortion while determining the location of

8   pregnancy.

9        Q.   (Mr. Boyle)  How about you turn to the third

10  page of the ACOG Bulletin, please?  It's down at the

11  bottom.  It says, "E-93".

12       A.   I'm on that page.

13       Q.   Okay.  If you go down to the bottom of the

14  left-hand column, "Pregnancy of Unknown Location," you

15  see that?

16       A.   The -- I'm sorry, the bottom of -- yes, I do

17  see that.

18       Q.   Okay.  So let me read this to you and then

19  I'll ask you a question.  Just making sure I've read it

20  properly for the record.

21            Quote, "A pregnant woman without a definitive

22  finding of an intrauterine or ectopic pregnancy on an

23  ultrasound examination has a pregnancy of unknown

24  location.  A pregnancy of unknown location should not

25  be considered a diagnosis.  Rather, it should be

143

1   treated as a transient state.  An effort should be made
2   to establish a definitive diagnosis when possible," end
3   quote.
4           Do you see that?
5       A.   I see that statement.
6       Q.   So does that inform your opinions about what
7   was going on back in 2018, as it relates to how to
8   diagnosis and treat a patient with -- or ultrasound of
9   pregnancy of unknown location?
10              MS. SWANSON:  Object to form.
11              THE WITNESS:  I would state that it is
12  true now that we should make efforts to establish a
13  definitive diagnosis when possible.  We are just not
14  required to make those efforts in isolation.
15      Q.   (Mr. Boyle)  And I did not mean to interrupt
16  you in your review of -- I apologize, I did interrupt
17  you.  I'm sorry.
18          You were looking at Bates Number 102, Bates
19  Number 103 and Bates Number 104 to tell us if there was
20  any recent research identified by PPSAT that would
21  support its position that it is acceptable medical
22  practice to provide chemical abortion drugs
23  simultaneous with a patient who has a diagnosis or a
24  transient state of pregnancy of unknown location on an
25  ultrasound.

144

1          MS. SWANSON:  Object to form.  I'm not
2     sure there's a question in there.
3          Q.   (Mr. Boyle)  The question is: show it to me,
4     please.
5          MS. SWANSON:  Object to form.
6          THE WITNESS:  So I do not see some of
7     the articles that I know are used to create those
8     protocols.  I also don't think that the list of table
9     references are the sole source of the protocols.
10         Q.   (Mr. Boyle)  And that's fine.  I was just
11    basing that off of what I understood you to say, that
12    they were.  If you're saying they're not, then there
13    may be other things out there that go into the
14    protocols.  Is that what you're saying?
15         Maybe other research out there -- I
16    apologize, maybe other research out there that goes
17    into making these protocols that's not included at the
18    end in that table?
19         A.   There is much research and expert analysis
20    that goes into making these.  I do not personally
21    create these protocols, so cannot speak to all of the
22    details.
23         Q.   You would agree that induced abortions,
24    surgical abortions, become more complicated after the
25    gestational age is beyond 14 weeks, wouldn't you?

1          MS. SWANSON:  Object to form.

2          THE WITNESS:  The complexity of a

3  procedural abortion varies throughout gestational

4  duration.  And over seven or eight weeks, I would say

5  that there is an incremental increase in complexity of

6  the procedure with increasing gestational duration.

7      Q.   (Mr. Boyle)  You cited the "Academies of

8  Medicine" article, and it says that "The risk of

9  serious complication increases with weeks gestation; as

10  the number of weeks increase, the invasiveness of

11  required procedure and the need for deeper levels of

12  sedation also increase."

13          Do you agree with that?

14          MS. SWANSON:  Object to form.

15          THE WITNESS:  I can't agree that that's

16  the exact quote without looking at the actual document.

17  I do agree that there is an incremental increase in

18  risk as gestational duration increases.

19      Q.   (Mr. Boyle)  I'm sorry, I'm working through

20  here.

21          You agree that some second trimester induced

22  abortions must take place in a hospital setting, don't

23  you?

24          MS. SWANSON:  Object to form.

25          THE WITNESS:  I would agree that some

1  abortions, regardless of gestational duration, must
2  take place in a hospital.
3      Q.   (Mr. Boyle)  You would agree that anything
4  beyond moderate sedation -- I think we've discussed it.
5  But anything beyond moderate sedation anesthesia level
6  for a surgical abortion must happen in a hospital, not
7  at a PPSAT clinic, right?
8              MS. SWANSON:  Object to form.
9              THE WITNESS:  No, I would not agree to
10 that.  Deep sedation can be offered in an outpatient
11 setting if you have the right equipment and staff.
12 PPSAT does not have the staff to perform deep sedation
13 in our outpatient clinics, but that doesn't preclude
14 the safety of performing it in a clinic that has that
15 staff.
16     Q.   (Mr. Boyle)  If a patient comes to PPSAT and
17 has an ultrasound, and it's an ultrasound of unknown --
18 pregnancy of unknown location, do you charge for an
19 additional -- does PPSAT charge for an additional
20 ultrasound if that patient gets an additional
21 ultrasound?
22             MS. SWANSON:  Object to form.
23             THE WITNESS:  Do you mean that if the
24 patient had an ultrasound at an outside location that
25 showed a pregnancy of an unknown location, and then we

147

1    performed an ultrasound, would we charge the patient

2    for the ultrasound we performed?

3         Q.   (Mr. Boyle)  I didn't mean that, but do you?

4         A.   If we perform an ultrasound, yes, we charge

5    them for ---

6         Q.   And if ---

7         A.   --- the ultrasound performed.

8         Q.   I'm sorry.  If you come up with an ultrasound

9    of pregnancy of unknown location and you take another

10   one at PPSAT, do you charge for the second one also?

11        A.   We do not routinely charge for repeat

12   ultrasounds that we feel are clinically necessary, no.

13        Q.   So if you charge for an ultrasound and the

14   patient gets a second or even a third, you don't charge

15   for the second or the third.  Is that correct?

16        A.   It is my understanding that we do not

17   routinely charge for repeat ultrasounds that we deem

18   clinically necessary.

19        Q.   Have you ever had a situation where you had a

20   patient with ultrasound finding of pregnancy of unknown

21   location, you gave that patient chemical abortion drugs

22   and then later, you determined that that patient had an

23   ectopic pregnancy?

24        A.   Yes, that has occurred.

25        Q.   Did you give that patient a refund for the

1    unnecessary procedure that you performed?

2                    MS. SWANSON:  Object to form.

3                    THE WITNESS:  The patient is charged for

4    the services they receive on the day they receive them,

5    so the patient paid for the services they received,

6    which included medications that they took.

7         Q.   (Mr. Boyle)  And you would agree that in that

8    circumstance, the medications that the patient paid for

9    were unnecessary, right?

10                   MS. SWANSON:  Object to form.

11                   THE WITNESS:  At the time that the

12   medications were given, we did not know that they were

13   unnecessary, so they were given in good faith.

14        Q.   (Mr. Boyle)  Absolutely.  But had you waited,

15   eventually you were able to determine that that

16   particular patient had an ectopic pregnancy, right?

17        A.   If it had been the patient's preference to

18   wait, we certainly could have waited and not done the

19   medication abortion yet.

20        Q.   Well, you also could have just waited because

21   you don't know where the pregnancy is, regardless of

22   the patient's preference, right?

23                   MS. SWANSON:  Object to ---

24        Q.   (Mr. Boyle)  That's at least an option?

25                   MS. SWANSON:  Object to form.

149

1          THE WITNESS:  We provide the patient
2    with their options and let them choose.  So a patient
3    who is taking medication abortion in the setting of
4    pregnancy of unknown location is aware and informed
5    that they may not have an intrauterine pregnancy, and
6    that if they have an ectopic pregnancy, this medication
7    will not be sufficient to treat that condition.
8          And then the patient chooses that option, or
9    they choose the other option, such as a diagnostic
10   suction, or to wait while determining the location of
11   the pregnancy.
12       Q.   (Mr. Boyle)  You're talking about the
13   evidence-based studies that support your proposition
14   that Planned Parenthood should be able to give chemical
15   abortion drugs simultaneously with a patient with an
16   ultrasound findings of pregnancy of unknown location.
17   Did you consider the Goldberg study?
18       A.   I believe I did look at the Goldberg study,
19   but I'd want to see it to be sure.
20       Q.   Okay.  Copy for you.
21          MS. SWANSON:  Thank you.
22          THE WITNESS:  Thank you.
23       Q.   (Mr. Boyle)  And take your time, take a look
24   at it, and when you're ready, I'll ask you some
25   questions, please.

1    A.   I see the study.

2    Q.   Okay.  Now that you've reviewed that

3    document, is that what you were talking about, with the

4    Goldberg study from 2022, that supports your position

5    that PPSAT should be able to give chemical abortion

6    drugs simultaneously with a ultrasound finding of

7    pregnancy of unknown location?

8    A.   This is one of the studies.  I believe I

9    cited two studies on providing medication abortion

10   concurrent with pregnancy of unknown location.

11   Q.   Did you also cite the Boraas study from

12   Minnesota?  Do you recall if -- if that were her study?

13   I believe Upadhyay, and I'm terrible with names, I

14   apologize, Upadyay, Upadie (sic), I'm saying that

15   wrong, I know by the look on your face, but that lady

16   who is in San Francisco that does a lot of research.

17   Did you consider that report also?

18               MS. SWANSON:  Object to form.

19               THE WITNESS:  Without seeing the actual

20   document ---

21               MR. BOYLE:  Conceded.

22               THE WITNESS:  --- I'm not comfortable

23   confirming that this is the study.

24   Q.   (Mr. Boyle)  Okay.

25   A.   There was a second study that I did cite.

1    Q.   Okay.  Well, if it's that one, then that one
2   was published in 2023, and this Goldberg study was
3   published in 2022, right?
4              MS. SWANSON:  Object to form.
5              THE WITNESS:  I can see that this study
6   was published in 2022.
7    Q.   (Mr. Boyle)  Are you aware of any other
8   studies from prior to 2022 that would support PPSAT's
9   position on this?
10    A.   I do not have knowledge of all of the full
11   literature on this topic.
12    Q.   When you look at this study, it's a
13   retrospective cohort study of medical records from
14   Massachusetts Planned Parenthood related to giving
15   chemical abortion drugs to a patient with a pregnancy
16   of unknown location.  And I was wrong on the dates.  It
17   was from 2014 to 2019.  Is that correct?
18    A.   That is what I understand this study to be.
19    Q.   Okay.  And if you turn to Page Number 779,
20   the second to last page, please.  It's -- yeah.  And
21   you look on the left-hand column, there's a paragraph
22   that starts with, "Additionally".  Do you see that?
23    A.   On the left-hand column, a ---
24    Q.   I'm sorry.
25    A.   --- paragraph ---

152

1    Q.   Right.  Right.

2    A.   --- that starts ---

3    Q.   Right.

4    A.   --- with, "Additionally"?

5    Q.   Right.

6    A.   Yes, on the right-hand column, I do.

7    Q.   Okay.  And I'm going to read that and then

8    ask you a question.  Quote, "Additionally, some

9    patients who present with undesired pregnancies of

10   unknown location may never require an abortion.

11        "We found that 18 percent of patients in the

12   delay for diagnosis group were eventually diagnosed

13   with early pregnancy loss, and eight percent with

14   ectopic pregnancy.  Thus, collectively, 26 percent did

15   not require abortion," end quote.

16        Did I read that correctly?

17   A.   You did correctly read that.

18   Q.   And if you extrapolate that, that would

19   suggest that possibly a quarter of the patients that

20   you are treating with pregnancies of unknown location

21   with chemical abortion drugs, one out of four of them

22   don't actually need those drugs, do they?

23             MS. SWANSON:  Object to form.

24             THE WITNESS:  In my clinical experience,

25   and in my education of patients, I discuss with them

Case 1:23-cv-00480-CCE-LPA   Document 74-2   Filed 09/12/23   Page 153 of 174

153

1  that they may be having a miscarriage, as I mentioned,

2  or they may have an ectopic pregnancy, neither of which

3  would be treated by the medications we use.

4          And in my clinical experience, my patients

5  are exceedingly anxious to complete their abortion, and

6  those who choose the option of medication abortion in

7  the setting of pregnancy of unknown location, are doing

8  so aware of that and wanting to take the chance that

9  this might actually end their pregnancy, rather than

10  delay their treatment and thus delay their ability to

11  end their pregnancy, especially in the setting of bans.

12      Q.    (Mr. Boyle)  And I appreciate all of that and

13  understand your position.  I believe my question is a

14  little bit more specific than that.

15          Doesn't this research support a conclusion

16  that up to a quarter, one out of four of those patients

17  who you are giving chemical abortion drugs to when you

18  have a pregnancy of unknown location, if you just

19  waited until you either ruled it in or ruled it out,

20  they wouldn't have needed those medications, right?

21              MS. SWANSON:  Object to form.

22              THE WITNESS:  I believe that this data

23  show that in this study, a quarter of the patients may

24  not have needed the medication and that every patient

25  should have the right to make the decision that is

1   right for them once they have the medical information.

2       Q.   (Mr. Boyle)  Well, I only bring up this

3   study, because you said you relied on it to support

4   your position of giving the chemical abortion drugs to

5   a patient with a pregnancy of unknown location on

6   ultrasound, right?

7       A.   Correct.

8       Q.   And part of this also says that maybe up to

9   25 percent of them don't need that, right?

10      A.   Which is why patients are informed of the

11  differential diagnosis before they make the decision

12  that is right for them.

13      Q.   There's a risk associated with giving a

14  patient chemical abortion drugs every time they get it,

15  even if they are indicated and needed, right?

16          MS. SWANSON:  Object to form.

17          THE WITNESS:  Every treatment and every

18  decision to not treat carries a risk, because the

19  decision to not treat is also a decision.

20      Q.   (Mr. Boyle)  Eight percent of the people he

21  studied, Goldberg and his group studied, who had

22  ectopic pregnancies and waited, they didn't get the

23  chemical abortion drugs.  And if they had gotten them,

24  it actually would have been contraindicated for them

25  under that circumstance, right?

1              MS. SWANSON:  Object to form.

2              THE WITNESS:  First of all, I believe

3   Dr. Goldberg uses she pronouns.  Second, the 8 percent

4   of ---

5              MR. BOYLE:  I'm sorry.  I apologize.  I

6   had never looked at the first name, and that was very

7   sexist of me.  I apologize.

8              THE WITNESS:  So the medication abortion

9   in 8 percent of patients who had an ectopic pregnancy,

10  the medication abortion would not treat that ectopic

11  pregnancy.  Medication abortion is contraindicated when

12  you know you have an ectopic pregnancy, but it does not

13  cause harm itself to an ectopic pregnancy, nor does it

14  treat an ectopic pregnancy.

15       Q.  (Mr. Boyle)  But there are some associated

16  risks with the mere fact of taking mifoprex (sic) and

17  misoprostol, right?

18              MS. SWANSON:  Object to form.

19              THE WITNESS:  Any medication that is

20  taken does carry potential risks, including

21  mifepristone and misoprostol.

22       Q.   (Mr. Boyle)  You would agree that there's at

23  least some consensus today that a patient with a

24  pregnancy of unknown location should not be given

25  chemical abortion drugs until serial ultrasounds are

156

1  taken to either rule in ectopic pregnancy or rule it
2  out, wouldn't you?
3              MS. SWANSON:  Object to form.
4              THE WITNESS:  No.
5      Q.   (Mr. Boyle)  You agree there's no ACOG
6  Bulletin that says that it's okay to give a patient
7  with a pregnancy of unknown location chemical
8  medication -- or chemical abortion drugs, right?
9              MS. SWANSON:  Object to form.
10             THE WITNESS:  I am not familiar with the
11 contents of every ACOG Bulletin.
12     Q.   (Mr. Boyle)  I'm just going to be willing to
13 bet that if there was an ACOG that supported that
14 position, you would have included it in your
15 Declaration, right?
16             MS. SWANSON:  Object to form.
17             THE WITNESS:  I did not read all of the
18 ACOG Bulletins in my preparation for this Declaration.
19     Q.   (Mr. Boyle)  Fair enough.  And if there had
20 been one that said that was okay, or the common
21 practice, don't you think you would have included it?
22             MS. SWANSON:  Object to form.
23             THE WITNESS:  That's speculation.  I'm
24 not familiar with all of the ACOG Bulletins.
25     Q.   (Mr. Boyle)  Okay.  So if you turn to Page

157

1  780, the last page of the Goldberg study.

2  A.  780?

3  Q.  7-8-0.  This one.

4  A.  Yes.

5  Q.  Okay.  If you look at the last sentence, it

6  says, quote, "Given that both management strategies are

7  reasonably safe and effective, and that each carries

8  benefits and risks, our data informed shared decision

9  making and enabled choices heavily weighted toward

10 patient priorities and preferences," end quote.

11      Do you see that?

12 A.  I see that statement.

13 Q.  And that means that Goldberg, she may have

14 found that it's okay to give chemical abortion

15 medications to a patient with pregnancy of an unknown

16 location, but she also found that it's also -- it's

17 also reasonable and safe to wait, didn't she?

18 A.  What I read -- understand that statement to

19 say is that patients should be informed of their

20 options and make a choice that works best for their

21 preferences and their personal medical condition.

22 Q.  And the choice is between getting chemical

23 abortion drugs with a pregnancy of unknown location

24 ultrasound finding before you confirm intrauterine or

25 waiting and confirming intrauterine or ruling in

1  ectopic, right?  Those are the two choices there, one

2  or the other?

3              MS. SWANSON:  Object to form.

4              THE WITNESS:  There is -- there are

5  other choices.  She references in this sentence those

6  two choices.

7      Q.   (Mr. Boyle)  Yes.  I'm -- that's what I'm

8  talking about.  I'm sorry.  This sentence, she

9  references go ahead and taking the chemical abortion

10 drug or waiting and ruling in or out ectopic pregnancy,

11 right?

12             MS. SWANSON:  Object ---

13             THE WITNESS:  I'd like to reread the

14 paragraph before I answer that question.

15     Q.   (Mr. Boyle)  Help yourself.  Please do.

16 (Witness examines document)

17     A.   Actually, I'm going to go back further.

18          All right.  Can you repeat your question?

19     Q.   (Mr. Boyle)  Yes.  On Page 780, the end of

20 the study, she determines that the option that PPSAT is

21 promoting the giving of chemical abortion drugs while a

22 patient has an ultrasound finding of pregnancy of

23 unknown location, option one, versus option two,

24 waiting and having repeat tests to actually rule in or

25 rule out ectopic pregnancy with ultrasound.  She found

1    that both of them carry risks and benefits, and they're

2    reasonable safe, didn't she?

3         A.   To be clear, Planned Parenthood South

4    Atlantic offers both options to patients with pregnancy

5    of an unknown location.  We don't only offer medication

6    abortion in the setting of pregnancy of unknown

7    location.

8              We offer the patient both options so that

9    they can, as she says, use shared decision making and

10   choose the choice that makes the most sense for them.

11        Q.   She says both options are reasonably safe and

12   effective, right?

13        A.   Correct.

14        Q.   Which would mean that the option in the law

15   is reasonably safe and effective, right?

16             MS. SWANSON:  Object to form.

17             THE WITNESS:  It is an option that is

18   reasonably safe and effective, but significantly limits

19   the patient and does not provide them with an equally

20   safe and effective option.

21        Q.   (Mr. Boyle)  Okay.

22             MR. BOYLE:  I don't think I have any

23   further questions.  And I thank you very much for your

24   time.  Other folks may, so you're not off the hook yet,

25   but close.

160

1        THE WITNESS:  I'd actually love a break
2   if I can ---
3        MR. BOYLE:  Suits me.
4        MS. SWANSON:  Yeah.  If we could --
5   could we take maybe a ---
6        THE WITNESS:  Twenty?
7        MS. SWANSON:  --- 20-minute break?
8   Yeah.
9        THE COURT REPORTER:  It's 2:20 now.
10       MS. SWANSON:  Oh.  It's 2:20 now?
11       THE COURT REPORTER:  Uh-huh.
12       MS. SWANSON:  Okay.  Then let's take 15
13  minutes, come back at 2:35, if that's okay?
14       MR. BOYLE:  Don't trip -- the unplug ---
15       THE WITNESS:  I know.  I was actually,
16  this time, for the first time ---
17       THE VIDEOGRAPHER:  Off record.
18  (Brief recess: 2:20 p.m. to 2:41 p.m.)
19       THE VIDEOGRAPHER:  On record, 2:41.
20       MS. SWANSON:  All right.  I have just a
21  few follow-up questions for Dr. Farris.
22                 EXAMINATION
23  BY MS. SWANSON:
24       Q.   So Dr. Farris, we've been talking about the
25  Goldberg study that you cited in your Declaration.  Do

1   you have that in front of you?

2       A.   Yes, I do.

3       Q.   I'd like you to look at Page 780 of the

4   Goldberg study.

5       A.   I see that.

6       Q.   And this is the final paragraph that we were

7   just discussing before the break.  Do you see that

8   paragraph?

9       A.   I do.

10      Q.   I'm going to read a section of that

11  paragraph.  "There is no reason to mandate that these

12  patients with pregnancies of unknown location delay

13  initiating abortion to first obtain a definitive

14  diagnosis."  Do you agree with that statement?

15      A.   I do.

16      Q.   I'd now like to look at the ACOG Bulletin

17  that we were discussing earlier.  This is ACOG Bulletin

18  Number 193.

19      A.   I have that.

20      Q.   I'm on Page E-92.

21      A.   Yes.

22      Q.   Under Clinical Considerations and

23  Recommendations, subpart How is an Ectopic Pregnancy

24  Diagnosed, I'm going to read the first sentence of that

25  paragraph.  "The minimum diagnostic evaluation of a

162

1   suspected ectopic pregnancy is a transvaginal
2   ultrasound evaluation and confirmation of pregnancy."
3           Dr. Farris, is a patient with a pregnancy of
4   unknown location, who has been determined low risk of
5   ectopic, a suspected -- a patient with a suspected
6   ectopic pregnancy?
7       A.   No, I would not consider them as having a
8   suspected ectopic pregnancy.
9       Q.   So for patients who have obtained an
10  ultrasound and been determined to have a pregnancy of
11  unknown location, are those patients with a suspected
12  ectopic pregnancy?
13      A.   No, I would not consider that they are
14  suspected to have an ectopic pregnancy.
15      Q.   Earlier, you testified that at that point,
16  after an ultrasound has been done and they have been
17  determined to have a pregnancy of unknown location,
18  ectopic pregnancy might be on their differential
19  diagnosis, right?
20      A.   That is correct.
21      Q.   What do you do to continue to exclude ectopic
22  pregnancy in your differential diagnosis from that
23  point?
24      A.   We would do serial ultrasounds and/or serial
25  blood tests for beta HCG.

163

1    Q.   Do you do any additional screening through
2  questions about the patient's medical history?
3    A.   We very carefully screen the patient, both in
4  their medical history, their pregnancy history, the
5  history of their last menstrual period and other risk
6  factors that might put them at higher risk for ectopic
7  pregnancy.
8    Q.   And based on that screening, that ectopic
9  pregnancy screening, might somebody from the pregnancy
10 of unknown location category, move to a patient with a
11 suspected ectopic pregnancy?
12   A.   Yes, those screening questions could make me
13 suspect ectopic pregnancy.
14   Q.   And for those patients, would you provide
15 medication abortion using the pregnancy of unknown
16 location protocol?
17   A.   No, I would not.
18   Q.   So for patients who have been screened for
19 ectopic pregnancy, patients with pregnancies of unknown
20 location who have been screened for ectopic pregnancy
21 and determined to be low risk for ectopic pregnancy,
22 what happens next in your counseling of those patients?
23   A.   We counsel the patients that they essentially
24 have three options.  They can undergo what we call a
25 diagnostic suction, which is performing a procedural

Case 1:23-cv-00480-CCE-LPA   Document 74-2   Filed 09/12/23   Page 164 of 174

1    abortion and looking to see if we see pregnancy tissue

2    removed from the uterus.

3            They can undergo a medication abortion while

4    we concurrently evaluate for the presence of ectopic

5    pregnancy through serial ultrasounds and serial blood

6    tests.  Or they can choose to wait to initiate abortion

7    care and only go through the concurrent screening

8    process of serial ultrasounds and/or blood tests.

9        Q.   What additional counseling do you provide to

10    those patients who do choose to have a medication

11    abortion with a pregnancy of unknown location?

12        A.   We speak to them at length and very carefully

13    about not only the normal symptoms they should expect

14    with mifepristone and misoprostol, but also any

15    abnormal symptoms that might occur with ectopic

16    pregnancy.

17            We make sure they understand how critical it

18    is that they seek out care, either by calling us or

19    going to a local emergency department should they

20    experience those symptoms.

21            And we also inform them that we will be

22    closely following up with them about their lab results,

23    and that it's very important that they answer the phone

24    when we call so we can check in on how they're doing.

25        Q.   Shifting gears a bit.  Even if it's true that

165

1 abortion becomes riskier as pregnancy advances, why
2 does a hospitalization requirement starting at 12 weeks
3 of pregnancy undermine patient safety?
4     A.   For two reasons.  First of all, we know that
5 outpatient abortion is safe well beyond 12 weeks.  We
6 have plenty of data for that.  But the other thing we
7 know is that when we require abortions to be -- take
8 place in a hospital, that usually delays their care.
9 So by delaying their care, we are actually increasing
10 their incremental risk of those complications.
11     Q.   You testified that you consider abortions
12 after 14 weeks zero days of pregnancy to be D&Es,
13 correct?
14     A.   That's correct.
15     Q.   Do you ever provide an abortion, a procedural
16 abortion, after 14 weeks without the need for
17 additional instrumentation on top of the aspiration
18 using a suction cannula?
19     A.   Yes.  Very frequently.
20     Q.   Shifting back to medication abortion for a
21 moment.  What does it mean for mifepristone to be
22 contraindicated for ectopic pregnancy?
23     A.   That means that if you know a patient has an
24 ectopic pregnancy, or if you strongly suspect a patient
25 has an ectopic pregnancy, it is not appropriate to give

166

1    mifepristone and misoprostol, because they will not
2    treat that condition.
3        Q.   In what capacity do you understand yourself
4    to be testifying here today?
5        A.   I am here testifying as an expert on abortion
6    care, and specifically also as an expert on the
7    clinical care provided by Planned Parenthood South
8    Atlantic.
9        Q.   You testified that it's not possible to know
10   in advance whether a patient will experience a
11   complication from any given procedure.  But is it
12   possible to know in advance whether some patients have
13   specific medical characteristics that would make them
14   candidates for obtaining an abortion at a hospital
15   rather than in the outpatient setting?
16       A.   Yes, it is possible to screen patients for
17   likelihood of complications.  And at PPSAT, we screen
18   all of our patients for different conditions that make
19   it more likely.  If we identify a patient that we feel
20   is highly likely to experience a complication, we will
21   refer them rather than performing the abortion in the
22   outpatient setting.
23       Q.   Why haven't you pursued hospital admitting
24   privileges to provide abortion in North Carolina?
25       A.   Hospital admitting privileges are a business

167

1    agreement, traditionally between an outside or a

2    community provider who then does a lot of business with

3    the hospital or has a lot of patients who need to be in

4    the hospital.

5              It's my experience that very, very, very few

6    of the patients that I treat need to be seen in a

7    hospital, so it doesn't make sense for me to enter into

8    that business agreement.

9              MS. SWANSON:  Thank you, Dr. Farris.

10   I'm going to pause just for a few moments to confirm I

11   have no further questions.

12             A couple more.

13        Q.   (Ms. Swanson)  Approximately what percentage

14   of patients in North Carolina use insurance to pay for

15   their abortions?

16        A.   I don't know exactly, but I believe it is

17   less than 5 percent.

18             MS. SWANSON:  I have no further

19   questions for you, Dr. Farris.

20             THE WITNESS:  I'm sorry, my phone's

21   buzzing.

22             MR. BOYLE:  Just one brief follow-up

23   there.

24                  FURTHER EXAMINATION

25   BY MR. BOYLE:

168

1        Q.   Dr. Farris, you said that the chemical med

2   -- chemical abortion drugs are contraindicated if you

3   strongly suspect there is an ectopic pregnancy or if

4   you confirm that there is ectopic pregnancy.  But are

5   you aware that the FDA regulation label itself actually

6   says, "if you confirm or suspect there is an ectopic

7   pregnancy"?

8                    MS. SWANSON:  Object ---

9                    THE WITNESS:  I wouldn't ---

10                   MS. SWANSON:  Object to form.

11                   THE WITNESS:  I'd need you to show me

12  the label to be able to say what the label says.

13       Q.   (Mr. Boyle)  If it says what I'm suggesting,

14  then you agree that's different than "strongly

15  suspect," right?

16                   MS. SWANSON:  Object to form.

17                   THE WITNESS:  I think that there are

18  varying degrees of suspicion.  So you can have very low

19  suspicion, where something is in your differential

20  diagnosis, or you can have a very high suspicion, and

21  there is a spectrum.  I think clinicians should be

22  using their judgment to determine where on that

23  spectrum a patient's risk falls.

24       Q.   (Mr. Boyle)  And I'm just asking though,

25  specifically, it's different -- you would agree there's

1   a difference if the FDA labels says, "Suspect ectopic

2   pregnancy," as opposed to what you just said, which was

3   "strong suspicion," right?  There's a difference?

4                   MS. SWANSON:  Object to form.

5                   THE WITNESS:  I agree that there is a

6   difference between the phrase "suspect" and the phrase

7   "strongly suspect."

8                   MR. BOYLE:  Okay.  No further questions.

9   Thank you.

10                  THE COURT REPORTER:  Follow-up?

11                  MS. SWANSON:  No more for me.

12                  THE COURT REPORTER:  Okay.

13                  THE VIDEOGRAPHER:  Off record, 2:51.

14  That concludes the deposition.

15  (Brief recess: 2:51 p.m. to 2:52 p.m.)

16                  THE VIDEOGRAPHER:  On record, 2:52.

17                  THE COURT REPORTER:  Is there any other

18  counsel appearing via Zoom that would like to question

19  the witness?

20                  MR. WILLIAMS:  No, thank you.

21                  MR. WOOD:  This is Michael Wood.  No

22  questions by me.

23                  THE COURT REPORTER:  Thank you.

24                  MS. NARASIMHAN:  No questions for

25  Sripriya Narasimhan.

170

1          THE COURT REPORTER:  Okay.  All right.

2    Thank you, Counselors.  This concludes our deposition.

3          THE VIDEOGRAPHER:  This concludes the

4    deposition.  The time is 2:52.

5

6          WHEREUPON, at 2:52 o'clock p.m., the

7    deposition was adjourned.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

171

CERTIFICATION

1

2

3          I, Laura Baker, Notary Public in and for the County of
4     Iredell, State of North Carolina at Large, do hereby
5     certify:
6          That said witness was sworn by me to state the truth,
7     the whole truth, and nothing but the truth, in said cause
8     and appeared before me at the time and place herein
9     aforementioned and the foregoing consecutively numbered
10    pages are a complete and accurate record of all the
11    testimony given by said witness;
12         That the undersigned is not of kin, nor in anywise
13    associated with any of the parties to said cause of
14    action, nor their counsel, and not interested in the
15    event(s) thereof.
16         Reading and signing of the testimony was requested.
17         IN WITNESS WHEREOF, I have hereunto set my
18    hand this 6th day of September, 2023.

19
20                                    *Laura Baker*
                                     _____

                                     CHAPLIN & ASSOCIATES
21                                   Notary No. 202029500095

22

23

24

25

172

WITNESS CERTIFICATION

1

2

3     I, KATHERINE A. FARRIS, MD, do hereby certify,

4     That I have read and examined the contents of the

5 foregoing pages of record of testimony as given by me

6 at the times and place herein aforementioned;

7     And that to the best of my knowledge and belief,

8 the foregoing pages are a complete and accurate record

9 of all the testimony given by me at said time, except

10 as noted on the attached here (Addendum A).

11 I have _____ / have not _____ made changes/corrections

12 to be attached.

13                           _____

                              (WITNESS SIGNATURE)

14

15     I, _____, Notary Public

16 for the County of _____, State of

17 _____, do hereby certify:

18     That the herein-above named personally appeared

19 before me this the _____ day of _____, 20____;

20     And that I personally witnessed the execution

21 of this document for the intents and purposes herein

22 above described.

23                           _____

                              NOTARY PUBLIC

24

25 My Commission Expires:          (SEAL)

173

1

ADDENDUM A

2

3      Upon the reading and examination of my

4   testimony as herein transcribed, I note the following

5   changes and/or corrections with accompanying reason(s)

6   for said change/correction:

7

8   Page        Line                    Is Amended to Read

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

**Cape Fear Court Reporting, Inc.**