# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CIVIL ACTION NO. 1:23-cv-00480-CCE-LPA

PLANNED PARENTHOOD SOUTH )

ATLANTIC, ET AL., )

 )

   Plaintiffs, )

 )

  vs. )

 )

JOSHUA STEIN, ET AL., )

 )

   Defendants, )

 )

  -and- )

 )

PHILIP E. BERGER, ET AL., )

 )

   Intervenor- )

   Defendants. )


VIDEOTAPE DEPOSITION OF


MONIQUE WUBBENHORST, M.D., M.P.H.


_____


1:16 P.M.


WEDNESDAY, AUGUST 30, 2023

_____

WARD AND SMITH

751 CORPORATE CENTER DRIVE, SUITE 300

RALEIGH, NORTH CAROLINA

1

```
 1              A P P E A R A N C E S
 2     Counsel for the Plaintiff Beverly Gray:
 3          American Civil Liberties Union Foundation
            BY:  Ryan Mendias
 4               Brigitte Amiri
            125 Broad Street, 18th Floor
 5          New York, New York 10004
            (212) 549-2633
 6          rmendias@aclu.org
            bamiri@aclu.org
 7
 8     Counsel for all Plaintiffs:
 9          American Civil Liberties Union of North
              Carolina Legal Foundation
10          BY:  Kristi Graunke
            P.O. Box 28004
11          Raleigh, North Carolina 27611
            (919) 354-5066
12          kgraunke@acluofnc.org
13
       Counsel for the Defendant Joshua Stein:
14
            North Carolina Department of Justice
15          BY:  South A. Moore
                   (Appeared remotely)
16          114 West Edenton Street
            Raleigh, North Carolina 27603
17          (919) 716-0914
            smoore@ncdoj.gov
18
       Counsel for the Defendants Senator Berger and
19     Speaker Moore:
20          Ward and Smith
            BY:  W. Ellis Boyle
21          751 Corporate Center Drive, Suite 300
            Raleigh, North Carolina 27607
22          (919) 277-9187
            weboyle@wardandsmith.co
23
24
25
```

2

 1    Counsel for the North Carolina Medical Board and
      North Carolina Board of Nursing:
 2
              North Carolina Department of Justice
 3            BY:  Michael Bulleri
                  (Appeared remotely)
 4            114 West Edenton Street
              Raleigh, North Carolina 27603
 5            (919) 716-6600
              mbulleri@ncdoj.gov
 6
 7    Counsel for the Defendant District Attorney Jim
      O'Neill:
 8
              Bell Davis Pitt
 9            BY:  Kevin G. Williams
                  (Appeared remotely)
10            100 North Cherry Street, Suite 600
              Winston-Salem, North Carolina 27101
11            (336) 722-3700
              kwilliams@belldavispitt.com
12
13    Counsel for the District Attorney Defendants (with
      the exception of Jim O'Neill):
14
              North Carolina Department of Justice
15            BY:  Elizabeth Curran O'Brien
                  (Appeared remotely)
16            114 West Edenton Street
              Raleigh, North Carolina 27602-0629
17            (919) 716-0091
              eobrien@ncdoj.gov
18
19    Counsel for Secretary Kinsley of the Department of
      Health and Human Services:
20
              North Carolina Department of Justice
21            BY:  Michael T. Wood
              114 West Edenton Street
22            Raleigh, North Carolina 27602-0629
              (919) 716-0186
23            mwood@ncdoj.gov
24
25
                                                          3

1    Counsel for the Legislative Intervenors:
2         Alliance Defending Freedom
          BY:  Julia Payne
3              (Appeared remotely)
             Erin Hawley
4              (Appeared remotely)
          15100 North 90th Street
5         Scottsdale, Arizona 85260
          (800) 835-5233
6         jpayne@adflegal.org
          ehawley@adflegal.org
7
8
9    Also Present:  Anjali Salvador, Esq.
                    Kara Grandin, Esq.
10                   Peter Im, Esq.
                    Vanisha Kudumuri
11                   Shealyn Massey
                    Sam Delaria, Videographer
12
13
14
15
16
17
18
19   Stenographically
        Reported By:    Discovery Court Reporters and
20                        Legal Videographers
                       BY:  Lisa A. Wheeler, RPR, CRR
21                      4208 Six Forks Road, Suite 1000
                       Raleigh, North Carolina 27609
22                      (919) 649-9998
23                          --oOo--
24
25

                                                        4

I N D E X

|  |  | PAGE |
|---|---|---|
| EXAMINATION BY MR. MENDIAS |  | 9 |

E X H I B I T S

| WUBBENHORST NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT B | Declaration of Monique Chireau Wubbenhorst, M.D., M.P.H. | 19 |
| EXHIBIT C | Curriculum Vitae | 20 |
| EXHIBIT D | AAPLOG Mission & Vision Statement | 24 |
| EXHIBIT E | AAPLOG Practicing Physician of any Specialty Form | 25 |
| EXHIBIT F | AUL Video Clip | 30 |
| EXHIBIT G | Deposition Transcript of Monique Chireau, M.D., October 14, 2017 | 43 |
| EXHIBIT H | Declaration and Expert Report of Monique Chireau Wubbenhorst, M.D., M.P.H., Minnesota Case | 63 |
| EXHIBIT I | Article, The facts about abortion and mental health, American Psychological Association | 83 |
| EXHIBIT J | Article, Immediate Complications After Medical Compared With Surgical Termination of Pregnancy | 91 |
| EXHIBIT K | Letters to the Editor, Immediate Complications After Medical Compared With Surgical Termination of Pregnancy | 95 |

5

EXHIBIT L   Declaration of Monique Chireau      122
            Wubbenhorst, M.D., M.P.H.,
            Kansas Case

EXHIBIT M   Excerpt of Hearing Testimony by      125
            Dr. Wubbenhorst

EXHIBIT N   Letters to the Editor, 2/17/2017     136

EXHIBIT O   Expert Opinion Report, Dr.           164
            Monique Chireau Wubbenhorst,
            Beatriz

6

```
1                    P R O C E E D I N G S

2                           * * *

3             THE VIDEOGRAPHER:  We're now on the

4     record.  The time is 1:16, August 30th, 2023.

5     This is the video deposition of Dr. Monique

6     Wubbenhorst.  Case name is Planned Parenthood

7     South Atlantic, et al., v. Joshua Stein, et

8     al.

9             Counsel, if you would please introduce

10    yourselves.

11            MR. MENDIAS:  This is Ryan Mendias with

12    ACLU on behalf of Dr. Beverly Gray, one of

13    the plaintiffs in this case.

14            MS. AMIRI:  Brigitte Amiri also with

15    ACLU representing Dr. Gray.

16            MS. GRAUNKE:  Kristi Graunke, ACLU

17    North Carolina, representing all plaintiffs.

18            MR. BENJAMIN WOOD:  Benjamin Wood, law

19    student intern at the ACLU of North Carolina.

20            MR. BOYLE:  Ellis Boyle, Wake County

21    Bar, representing the legislative leader

22    defendants, Senator Berger and Speaker Moore.

23    Kevin, you're up.

24            MR. MOORE:  South --

25            MR. WILLIAMS:  This is Kevin Williams
```

1    and -- on the Zoom and I am representing

2    defendant District Attorney Jim O'Neill.

3              MS. PAYNE:  Julia Payne --

4              MS. O'BRIEN:  Good after- --

5              MS. PAYNE:  -- with Alliance --

6              MS. O'BRIEN:  Good afternoon.  I'm --

7    if I could just go after Kevin.  Good

8    afternoon.  I am Elizabeth O'Brien.  I'm

9    representing the remaining district attorneys

10   in the lawsuit.

11             MS. PAYNE:  Julia Payne with Alliance

12   Defending Freedom representing the

13   legislators.

14             MR. MICHAEL WOOD:  This is Michael

15   Wood.  I am counsel to Secretary Kinsley from

16   DHHS.

17             MR. BULLERI:  This is Michael Bulleri.

18   I am counsel for the North Carolina Medical

19   Board and the North Carolina Board of

20   Nursing.

21             MS. SALVADOR:  This is Anjali Salva- --

22             MR. MOORE:  This is South --

23             MS. SALVADOR:  Oh, go ahead.

24             MR. MOORE:  Sorry.  This is South

25   Moore, North Carolina Department of Justice,

1          representing Attorney General Stein.

2                  MS. SALVADOR:  This is Anjali Salvador

3          with Planned Parenthood Federation of America

4          representing Planned Parenthood South

5          Atlantic.  Also on the Zoom from Planned

6          Parenthood Federation of America are Kara

7          Grandin, Peter Im, and then the 11W-13 is a

8          conference room with our paralegals, Vanisha

9          Kudumuri and Shealyn Massey.

10                 THE REPORTER:  Is that everyone?

11                         *  *  *

12             MONIQUE WUBBENHORST, M.D., M.P.H.,

13    having been first sworn or affirmed by the court

14   reporter and Notary Public to tell the truth, the

15   whole truth, and nothing but the truth, testified

16                     as follows:

17                     EXAMINATION

18   BY MR. MENDIAS:

19   Q.   Good afternoon, Doctor.

20   A.   Good afternoon.

21   Q.   My name is Ryan Mendias and, like I said, I'm

22        an attorney with the ACLU.  I represent

23        Dr. Beverly Gray, one of the plaintiffs in

24        this case.  So just some initial housekeeping

25        questions.

                                                    9

Case 1:23-cv-00480-CCE-LPA   Document 74-3   Filed 09/12/23   Page 10 of 219

1          You understand that you're under oath

2     and that you have a legal obligation to

3     answer everything truthfully and completely?

4     A.   Yes.

5     Q.   I'll ask that you wait until I finish my

6     question before you start answering and that

7     way we can avoid talking over one another.

8     A.   Yes.

9     Q.   And if you don't understand a question,

10    please let me know.  I can rephrase or repeat

11    it and I'll do so.

12         If you do answer a question without

13    asking for clarification, I will assume that

14    you've understood it, okay?

15    A.   Yes.

16    Q.   And so please answer all questions verbally

17    as you've been doing instead of shaking your

18    head or saying uh-uh or uh-huh.

19         And so during this deposition your

20    attorney may object, but his objections are

21    just for the record.  So after he makes them,

22    you should proceed to answer the question.

23    A.   Yes.

24    Q.   And if at any point you realize that an

25    answer that you previously gave wasn't

10

1    complete or wasn't fully correct, you should

2    feel free to stop me and we can go back and

3    discuss the answer again.

4         Does that sound all right?

5    A.   Thank you.  Yes.

6    Q.   Okay.  And if you don't do so, we can assume

7    that you stand by the accuracy and

8    completeness of your questions?

9    A.   Yes.

10   Q.   Great.  And if you need a break, please let

11   me know.  We can definitely do that but -- as

12   long as there's not a question pending.  If

13   there is a question pending, you'll need to

14   answer the question and then we can proceed

15   to the break.

16   A.   Yes.

17   Q.   Okay.  Is there anything today that would

18   prevent you from giving a full and accurate

19   testimony, medications, illness, anything

20   like that?

21   A.   No.

22   Q.   Okay.  Is this the first time you've given a

23   deposition?

24   A.   No.

25   Q.   When have you given depositions before?

11

1    A.    I gave a deposition in 2017 for a Texas case.

2    Q.    Is that the only deposition that you've

3          given?

4    A.    Yes.

5    Q.    Okay.

6    A.    No.  I've given one deposition when I was a

7          resident that -- no, I wasn't a resident.  It

8          was -- I graduated from residency.  It was

9          around 1995 or 1996.

10   Q.    What was the subject of that deposition?

11   A.    It was an infant that had delivered in the

12         hospital when -- while I was a resident.

13   Q.    Was it a malpractice case?  What -- what sort

14         of case was it?

15   A.    Yeah, I think it was a malpractice case.  I

16         wasn't very educated about legal questions at

17         that time.

18   Q.    Were you a defendant in that case?

19   A.    The hospital that I did my residency at,

20         which was Yale New Haven Hospital, was the

21         def- -- defendant.

22   Q.    Have you ever participated -- oh, I'm sorry.

23         Did you have more to add to that?

24   A.    I -- I'm not a lawyer so I'm just making sure

25         I say the right thing.

                                                        12

1   Q.   Sure.  Sure.  Have you ever participated in a
2        lawsuit as a defendant?
3   A.   No.
4   Q.   Have you ever participated in a lawsuit as a
5        plaintiff?
6   A.   No.
7   Q.   Have you participated in a lawsuit in any
8        other capacity?
9   A.   No.
10  Q.   Well, I assume you've participated as an
11       expert witness in --
12  A.   Oh, as an expert witness --
13  Q.   Yes.
14  A.   -- but not where it was me --
15  Q.   Not as --
16  A.   -- personally.
17  Q.   -- a party?
18  A.   Right.
19  Q.   Okay.  And when have you participated as an
20       expert witness in previous lawsuits?
21  A.   You mean -- not speaking to giving a
22       deposition, just being involved?  Okay.
23  Q.   Correct.
24  A.   So let's see.  Kentucky -- for the state of
25       Kentucky, for the state of Minne- --

13

1      Minnesota.  The cases were in the state of

2      Kentucky, state of Minnesota, state of

3      Kansas.  And I feel like I'm forgetting one.

4      Kentucky, Minnesota, Kansas.  Oh, and Texas,

5      as I said, uh-huh.

6   Q.  And in your role as an expert, have you

7      testified in court?

8   A.  Yes.

9   Q.  In which of those cases did you testify in

10      court?

11   A.  Texas.

12   Q.  Any others?

13   A.  No.

14   Q.  And have you testified before any legislative

15      body?

16   A.  Yes.

17   Q.  Could you say more about that testimony that

18      you gave.

19   A.  Yes.  The Senate Judiciary Committee in --

20      2007, 2008, or 2009 was their -- I'm sorry.

21      I --

22   Q.  That's all right.

23   A.  -- don't know.  And then the House of

24      Representatives last fall and the Senate in

25      April.

                                                        14

1   Q.   And what was the nature of the testimony that

2        you gave before those legislative bodies?

3   A.   I was testifying on the -- abortion safety

4        and maternal mortality.

5   Q.   And is it fair to say that the expert

6        opinions that you offered in those cases that

7        we just discussed were in support of laws

8        restricting or regulating abortion?

9   A.   I don't -- no, I don't think so because I

10       think that in the Senate case, as I

11       understood it, it was a -- regarding

12       legislation that was being proposed that

13       would remove abortion restrictions, as I

14       understood it.

15  Q.   Right.  So I think my question is more

16       specifically about the cases in which you've

17       been an expert witness so Kentucky, Texas --

18  A.   Oh.  Oh.  Oh.  Yes.

19  Q.   -- Minnesota.

20  A.   Right.

21  Q.   And in those cases, you were offering an

22       opinion in support of abortion restrictions;

23       is that correct?

24  A.   Yes.

25  Q.   And the piece of legislation in the Senate

15

1          that you mentioned, is that the Women's

2          Health Protection Act?

3     A.   That's correct.

4     Q.   And were you in favor or opposition of

5          that --

6     A.   I was --

7     Q.   -- act?

8     A.   -- in opposition.  I'm sorry.  Didn't mean

9          to --

10    Q.   Oh, no, no.

11    A.   -- speak too early.

12    Q.   Totally fine.  Thank you.  So you're aware

13         that the Speaker of the North Carolina House

14         of Representatives and the President of the

15         North Carolina Senate have intervened in this

16         litigation to defend the constitutionality of

17         several laws relating to abortion; is that --

18    A.   Yes.

19    Q.   Okay.  So if I say the intervenors, can we

20         agree that I'm referring to those

21         individuals, the Speaker and the Senate

22         President?

23              MR. BOYLE:  Object to form.

24    A.   I'm sorry.  I don't understand what you mean.

25    Q.   So I might refer to the intervenors, who your

                                                        16

1        attorney here is counsel for --

2   A.    Uh-huh.

3   Q.    -- as the intervenors.  When I say the

4         intervenors, I mean the President of the

5         North Carolina Senate --

6   A.    Uh-huh.

7   Q.    -- and the Speaker of the House of North

8         Carolina's House of Representatives.

9   A.    Yes.

10              MR. BOYLE:  Object to form.  You can

11        answer.

12  BY MR. MENDIAS:

13  Q.    So when were you first contacted by counsel

14        for intervenors about participating in this

15        case?

16  A.    I would have to look at my scheduler.

17  Q.    Was it months ago, weeks ago?

18  A.    Let's see.  This is now August.  It was no

19        more than two months ago, but, again, I -- I

20        can't -- you can't hold me to that because I

21        would have to look at my scheduler.  I -- I

22        don't want to not respond truthfully.

23  Q.    I understand.  Thank you.  Who have you been

24        communicating with regarding this -- your

25        participation in this case?

                                                      17

1  A.   Julia Payne, who's counsel for ADF, and

2       Attorney Ellis.

3  Q.   And are you being paid for your participation

4       in this case?

5  A.   Yes.

6  Q.   How much are you being paid?

7  A.   $700 an hour.

8  Q.   And roughly how many hours have you spent

9       preparing for this case so far?

10 A.   More than 30.

11 Q.   And did you bring anything with you to this

12      deposition?

13 A.   Yes.

14 Q.   What did you bring?

15 A.   I brought my declaration, which is here.

16      Would you like to see it?

17 Q.   No.  It's all right.

18 A.   Okay.  And then I brought ACOG Practice

19      Bulletin 193, a study by Alisa Goldberg, a

20      study by Ushma Upadhyay, and a study by Karen

21      Borchert.

22 Q.   Okay.  And I have my own copy, but I think

23      the answer will be yes.

24           MR. MENDIAS:  But I will just ask that

25      this be marked as Exhibit B.

18

1              (WUBBENHORST EXHIBIT B, Declaration of

2         Monique Chireau Wubbenhorst, M.D., M.P.H.,

3         was marked for identification.)

4    BY MR. MENDIAS:

5    Q.   But can you confirm that this is an accurate

6         copy of the declaration that you submitted in

7         this case.

8    A.   It looks as though it is, yes.

9              MR. MENDIAS:  Oh, and then I have a

10        copy for you, Ellis, as well.

11             MR. BOYLE:  Thanks.

12   BY MR. MENDIAS:

13   Q.   Can you please describe the process of

14        drafting this declaration.

15   A.   The process.  In other words, how I arrived

16        at my opinion?  Is that what you mean?

17   Q.   I mean more specifically how you went about

18        writing the -- this particular document.

19   A.   So I had at hand the declarations from

20        Dr. Alsle- -- Dr. Boraas, actually, I'm

21        sorry, and Dr. Farris.  I reviewed those, I

22        reviewed the studies that they cited, and

23        then I did a literature search on the topics

24        that they discussed, used the snowball

25        technique to add additional studies and used

19

1           the -- distilled those into my declaration

2           and my opinion.

3     Q.    And what keywords did you use in doing that

4           search?

5     A.    I looked at abortion complications.  I looked

6           at terms abortion plus complications,

7           abortion-related mortality, ectopic

8           pregnancy, pregnancy of unknown location.

9           And there -- I'm sure there were others, but

10          those -- those were the major -- some of the

11          main ones.

12    Q.    Did anyone provide any particular studies

13          they wanted you to cite in this expert

14          declaration?

15    A.    No.

16    Q.    Did anyone ask that you include a particular

17          fact or opinion in this declaration?

18    A.    No.

19    Q.    And I'd like to talk about your CV, which I

20          will ask to be marked, please.

21                (WUBBENHORST EXHIBIT C, Curriculum

22          Vitae, was marked for identification.)

23                MR. MENDIAS:  Thank you.

24    BY MR. MENDIAS:

25    Q.    Is this an -- look like a -- oh, sorry.

                                                        20

1           MR. BOYLE:  Thank you.

2    BY MR. MENDIAS:

3    Q.   Does this look like an accurate copy of the

4         CV that was attached to your expert

5         declaration?

6    A.   Yes.

7    Q.   Okay.  And I note that the date is May 25th,

8         2023.

9    A.   Uh-huh.

10   Q.   Is this the most recent version of your CV?

11   A.   No, there's a more recent version.

12   Q.   What would have changed between that version

13        that you submitted and -- and the most recent

14        version?

15   A.   I think I discovered an error in my previous

16        CV.  There was a hospital that I worked at in

17        North Carolina that I hadn't listed on my CV.

18        It's -- I believe it was Moses Cone Hospital.

19        I'm actually in the process of updating it

20        now.

21   Q.   And when did you work at Moses Cone Hospital?

22   A.   2004, 2005.  I was there once as a locum

23        tenens.

24   Q.   And I note on your CV as well that you're a

25        fellow of the American College of

                                                        21

1        Obstetricians and Gynecologists, which I'll

2        refer to as ACOG; is that accurate?

3   A.   Yes.

4   Q.   And what is ACOG?

5   A.   It is a professional organization that

6        many -- I think most OB/GYNs but not all

7        belong to in the United States.

8   Q.   And you've presented papers at ACOG

9        conferences; is that correct?

10  A.   That's correct.

11  Q.   Do you believe that ACOG is a reliable source

12       of information for OB/GYNs?

13  A.   Not always.

14  Q.   On which topics is it not reliable?

15  A.   I think that in terms of their abortion

16       advocacy, they do not always reflect the --

17       the, I would say, preferences and practices

18       of their constituency.

19  Q.   Are there any other topics besides abortion

20       that you find ACOG to be unreliable on?

21  A.   I haven't reviewed all of their literature so

22       I couldn't answer that.

23  Q.   But of the literature that you've reviewed,

24       you find it all reliable except for abortion;

25       is that correct?

22

1    A.   I think that there are some areas that I

2         couldn't bring to mind at this exact moment

3         where I would say that they have not cited

4         all of the available literature.

5    Q.   Is there -- can you give any inkling as to

6         what those areas might be?

7    A.   I would have to go back because I haven't

8         looked at those areas recently.

9    Q.   I understand.  To be a member of ACOG, does

10        a -- an OB/GYN need to express any particular

11        view of abortion?

12   A.   No.

13   Q.   So ACOG then has members who are opposed to

14        abortion?

15   A.   Actually, the vast majority do not perform

16        abortions.

17   Q.   My question was whether they have members who

18        are opposed to abortion.

19   A.   Yes, they do.

20   Q.   Great.  You also indicate on your CV that

21        you're a member of the American Association

22        of Pro-Life Obstetricians and Gynecologists,

23        which --

24   A.   Yes.

25   Q.   -- I'll refer to as AAPLOG; is that correct?

23

1    A.    Yes.

2    Q.    And you actually served on their board.  Is

3          that right, too?

4    A.    Yes.

5    Q.    How long was your time as a board member?

6    A.    I want to say about three years.

7    Q.    And was it continuous or did you have various

8          stints as a board member?

9    A.    No.  It was continuous.

10   Q.    And what did your duties as a board member of

11         AAPLOG include?

12   A.    They were most -- similar to any board.  We

13         oversaw the activities of the organization,

14         coordinated with the CEO, reviewed scientific

15         papers that AAPLOG put out, among others.

16         AAPLOG is A-A-P-L-O-G.  Yeah.

17   Q.    Thank you for that.  Could a physician become

18         a member of AAPLOG if they did not oppose

19         abortion?

20   A.    I don't know.

21   Q.    What if I -- I'm going to introduce another

22         exhibit.  This, I believe, is Exhibit --

23         so...

24              MR. MENDIAS:  Thank you.

25              (WUBBENHORST EXHIBIT D, AAPLOG Mission

                                                              24

1          & Vision Statement, was marked for

2          identification.)

3     BY MR. MENDIAS:

4     Q.   Does this look like the mission and vision

5          statement of AAPLOG?

6     A.   It does.

7     Q.   Okay.

8     A.   But I can't confirm that because I haven't

9          looked at it in a while.

10    Q.   Okay.  Do you remember what the mission and

11         vision of AAPLOG was when you were on the

12         board?

13    A.   I think similar to what's here.  And, again,

14         not being able to quote it because it's been

15         some time, it was to defend the lives of the

16         pregnant mother and her unborn child.

17    Q.   And that necessarily means prohibiting

18         abortion in most circumstances, correct?

19    A.   Yes.

20    Q.   Okay.  And I actually have another exhibit.

21              (WUBBENHORST EXHIBIT E, AAPLOG

22         Practicing Physician of any Specialty Form,

23         was marked for identification.)

24    BY MR. MENDIAS:

25    Q.   And, Dr. Wubbenhorst, do you recognize this

25

1        document, if not necessarily its particular

2        form, what it is with respect to AAPLOG?

3   A.   Yeah.  I haven't -- I -- it's been a while

4        since I've seen this so I don't know if this

5        is the current one or not.

6   Q.   But when you say one, what -- one of what?

7        What do you mean?

8   A.   Well, this looks like the form that you would

9        use to join --

10  Q.   Okay.

11  A.   -- but it's been -- I've been a member for

12       some time so I can't speak to this.

13  Q.   But you would have filled something similar

14       out when you became a member, correct?

15  A.   Yes.

16  Q.   And physicians joining the organization while

17       you were on the board would have filled out a

18       similar form --

19  A.   Uh-huh.

20  Q.   -- correct?

21  A.   Yes.  Sorry.

22  Q.   And could you read the first sentence under

23       the heading, Practicing Physician of any

24       Specialty?

25  A.   Practicing Physician of any Specialty --

26

1   Physicians of any Specialty are those

2   Physicians (either M.D. or D.O.) who agree

3   with our mission statement and su- -- support

4   AAPLOG with annual dues and donations.

5  Q.  And as we just discussed, AAPLOG's mission

6   statement includes prohibiting abortion; is

7   that right?

8  A.  I don't think it's prohibiting abortion.  I

9   think it's restricting abortion or advocating

10   for the life of the mother and the unborn

11   child.

12  Q.  Okay.  So restricting.

13   You were also on the board of Americans

14   United for Life, which I'll refer to as AUL;

15   is that correct?

16  A.  That's correct.

17  Q.  You're currently on the board?

18  A.  Yes.

19  Q.  And what are your duties on that board?

20  A.  So it is to oversee the -- the board oversees

21   the activities of the organizations -- of the

22   organization and also works with the CEO in

23   accomplishing its mission.

24  Q.  And what is the mission of AUL?

25  A.  It is to serve as the architects of the

27

1           pro-life movement or --

2    Q.    And -- I'm sorry.  Did you have more to say

3          that --

4    A.    No.

5    Q.    Apologies if I cut you off at all.  When you

6          say, architects of the pro-life movement,

7          what does that specifically mean?

8    A.    Well, I think I'm not articulating very

9          clearly, you know, what the mission is.

10         That's kind of what I would call the general

11         way that they -- general -- how they're seen

12         and how they see themselves.  I would have to

13         review the curr- -- the mission statement to

14         give you a precise answer.  I don't want to

15         give you an imprecise answer.

16   Q.    So speaking generally, what is it that the

17         organization hopes to accomplish in this

18         country?

19   A.    It supports legislation supporting the life

20         of the wo- -- woman and her unborn child.

21   Q.    And is it true that AUL advocates for what

22         they call abortion abolition?

23   A.    I don't know.

24   Q.    Does AUL believe that abortion should be a

25         matter of state law as opposed to something

                                                      28

1        regulated at the federal level?

2   A.   I think that they consider both pathways --

3        I'm sorry.  I saw your cup that said,

4        Pathways, and that's what came into my mind.

5        I think they consider both strategies.

6   Q.   And whether it's a pathway or a strategy,

7        what is the ultimate goal of AUL?

8   A.   I think it's to promote life.

9   Q.   Not to ban abortion nationwide?

10  A.   I would say that if you were to ask members

11       of the board and people working in the

12       organization that, similar to AAPLOG, it is

13       to advocate for the life of the unborn child

14       and for the mother.

15  Q.   Okay.  I'm -- I'm going to play a video

16       briefly and I'll ask the court reporter how

17       best to --

18            MR. MENDIAS:  Do you mind if we go off

19       the record to discuss how we do this?  We

20       can...

21            THE VIDEOGRAPHER:  Going off the

22       record.  The time is 1:37.

23            (Discussion off the record.)

24            THE VIDEOGRAPHER:  Back on the record.

25       The time is 1:37.

                                              29

1          MR. MENDIAS:  All right.  And I will

2      mark this as the next exhibit.

3          (WUBBENHORST EXHIBIT F, AUL Video Clip,

4      was marked for identification.)

5          (Video played and stopped.)

6   BY MR. MENDIAS:

7   Q.   Dr. Wubbenhorst, do you believe that that

8      fairly represents the mission of AUL?

9          MR. BOYLE:  Objection.  Are you saying

10      that's an AUL document?

11          MR. MENDIAS:  It -- I am, yes.

12          MR. BOYLE:  Can you establish that

13      first, please.  Sorry.  Not to --

14   BY MR. MENDIAS:

15   Q.   Does this -- or do you recognize this video

16      at all?

17   A.   Yeah.  I have seen it, yes.

18   Q.   And it is from AUL?

19   A.   Uh-huh.

20   Q.   Correct?

21   A.   I'm sorry.  Yes.

22   Q.   Thanks.  So do you believe that this

23      accurately encapsulates the mission of AUL?

24   A.   Yes.

25   Q.   Do you agree with this mission?

                                                30

1   A.   Yes.

2   Q.   And so I take that to mean that you

3        personally oppose abortion in all

4        circumstances?

5   A.   Yes.

6   Q.   In fact, you believe that abortion is a moral

7        and social evil, correct?

8   A.   Yes.

9   Q.   Is it fair to say that you believe abortion

10       is murder?

11  A.   I think it's a nuanced question.  I think

12       that if you are saying -- and, again, I'm not

13       a lawyer, but are you referring to the mother

14       who has the abortion or are you referring to

15       the abortionist who performs the abortion?

16  Q.   Let's deal with them one by one.  Do you

17       think a woman who seeks and obtains an

18       abortion has committed murder?

19  A.   No.

20  Q.   Do you think a physician who performs an

21       abortion has committed murder?

22  A.   Yes.

23  Q.   Do you believe that what you might call

24       elective abortions should be illegal in all

25       circumstances?

31

Case 1:23-cv-00480-CCE-LPA   Document 74-3   Filed 09/12/23   Page 32 of 219

1   A.   Yes.

2   Q.   Does that include cases where the pregnancy

3        is the result of rape or incest?

4   A.   Yes.

5   Q.   And that would include cases no matter the

6        age of the rape victim?

7   A.   I'm sorry.

8   Q.   Would you oppose abortion in a case where

9        pregnancy is the result of rape or incest

10       when the rape victim is a child?

11  A.   Yes, because I have taken care of minors who

12       were the victims of incest who chose to carry

13       their children to term and said that this --

14       they -- in particular, they've told me two

15       things.  They said that, without this baby, I

16       would not have evidence that he did it, and,

17       I also feel that this child is redeeming this

18       circumstance -- this terrible circumstance

19       that has happened to me.

20  Q.   Do you believe that all child victims of rape

21       feel the same way about carrying their

22       rapist's baby to term?

23  A.   I can't speak for how all child victims feel.

24  Q.   Do you think it's possible that some would

25       not feel that way?

                                                        32

1    A.   I think it's possible.

2    Q.   And do you think that delivering a child is

3         the only way to establish the paternity of a

4         rapist?

5    A.   I'm not understanding your question.  Without

6         DNA, how would you establish paternity?

7    Q.   Do you believe that DNA can only be obtained

8         from a child that has been delivered?

9    A.   I think that there are techniques now for

10        confirming paternity, but at the time that I

11        was speaking of with these children, that

12        technology was not available.

13   Q.   Do you think that when an abortion is

14        performed, a -- that there is a way to

15        determine forensically who the rapist was

16        based on the products of conception?

17   A.   That's not what I'm -- what I was saying.  I

18        was telling you what a patient had actually

19        told me.

20   Q.   Okay.  But you would agree that after an

21        abortion, the products of conception can be

22        used to identify the rapist?

23   A.   Yes.

24   Q.   And do you believe that all abortions, even

25        those that have no medical complications,

33

Case 1:23-cv-00480-CCE-LPA   Document 74-3   Filed 09/12/23   Page 34 of 219

1          cause harm to women?

2     A.   Yes.  That's based on my clinical experience

3          of caring for thousands of woman.  I've never

4          met a woman who was happy that she had an

5          abortion.  Relieved?  Yes.  Feeling as though

6          she couldn't do anything else?  Yes.  But all

7          women to one degree or another were damaged

8          by that experience, some very damaged, some

9          not so much.

10    Q.   When you say women were relieved, what about

11         their relief made you think that they were

12         damaged?

13    A.   Because they all expressed sorrow at having

14         undergone the abortion and many of my

15         patients report that every year when that

16         child would have been born, they have a

17         ceremony to mourn their death.

18    Q.   What percentage of patients would you say

19         have disclosed to you that they had an

20         abortion?

21              MR. BOYLE:  Object to form.

22    BY MR. MENDIAS:

23    Q.   You can answer.

24    A.   I'm not understanding the question.  You mean

25         if I asked -- you -- you're talking about

                                                          34

Case 1:23-cv-00480-CCE-LPA   Document 74-3   Filed 09/12/23   Page 35 of 219

1          patients that I ask?

2     Q.   How did you come to know that those patients

3          had had abortions?

4     A.   I routinely ask them.

5     Q.   And in answering that question, do you then

6          ask how they felt about their abortion

7          experience?

8     A.   I do.

9     Q.   All of them?

10    A.   Yes.

11    Q.   Are you currently practicing medicine?

12    A.   Yes.

13    Q.   Where?

14    A.   Indiana.

15    Q.   Where specifically in Indiana are you

16         practicing medicine?

17    A.   Saint Joseph's Regional Medical Center.

18    Q.   And what do you do there?

19    A.   I'm a hospitalist there.

20    Q.   And what does that mean?

21    A.   I cover the labor floor in shifts and any

22         women that come in through the emergency room

23         or come into triage or who are laboring, I

24         provide backup for the other clinicians or we

25         have our own practice where we care for those

                                                            35

1       patients in labor as well.  And I also

2       practice internationally.

3   Q.  You don't perform abortions, do you?

4   A.  No.

5   Q.  And you've never performed an abortion?

6   A.  No.

7   Q.  Have you ever observed a physician performing

8       an abortion?

9   A.  Yes.

10  Q.  How many?

11  A.  One.

12  Q.  In residency were you offered the opportunity

13      to learn how to perform an abortion?

14  A.  Yes.

15  Q.  And you declined that opportunity?

16  A.  Yes.

17  Q.  What -- have you ever induced labor in a

18      pregnant patient before the fetus was viable?

19  A.  Yes.

20  Q.  In what circumstance would you have to do

21      that?

22  A.  Would I or have I?

23  Q.  Have you?

24  A.  Where a woman had infection and needed to be

25      delivered because she had clear signs of

36

1   chorioamnionitis.

2 Q. And do you remember how far along in her

3   pregnancy this patient was?

4 A. She was between 21 and 23 weeks.

5 Q. You don't consider induction in that

6   circumstance to be an abortion?

7 A. No, because of the principle of double

8   effect.

9 Q. Could you say more about what that is.

10 A. It means that when your intention is to save

11   the life of the mother, the outcome of fetal

12   death may be an unavoidable and tragic

13   consequence, but that is not the intent,

14   whereas, in abortion, the intent is clearly

15   the death of the unborn child.

16 Q. Where -- do you think that some physicians

17   would call induction in that circumstance an

18   abortion?

19 A. I can't say.

20 Q. How do you --

21 A. I think they would.  I think there are some

22   people that would say that.

23 Q. Have you ever performed a dilation and

24   curettage procedure on a patient?

25 A. Yes.

1    Q.    In what circumstances have you performed a --

2          a dilation and curettage?

3    A.    Can you be more specific?  Are you referring

4          to a living fetus or a dead fetus?

5    Q.    I'm talking about any time that you've

6          performed that particular procedure.

7    A.    Yes.

8    Q.    So in what circumstances have you performed a

9          D&C, either for a living or dead fetus?

10   A.    Hemorrhage, a woman who was infected with a

11         demised fetus in the second trimester.  And

12         I -- if you can clarify, you're referring

13         strictly to D&C in pregnancy, not D&C in a

14         nonpregnant woman?

15   Q.    Correct.

16   A.    Okay.

17   Q.    Thank you for that clarification.  So have

18         you ever performed a D&C when there is

19         embryonic or fetal cardiac activity?

20   A.    No.

21   Q.    Do you believe that physicians who perform

22         abortions are degraded by the pos- --

23         procedure?

24   A.    I do.  And I have a great deal of sympathy

25         for them.  I feel that many people -- it's --

38

1     it's very interesting.  When you look at

2     statistics, people graduate from residency

3     and a high percentage stopped -- planning to

4     do abortions and a high percentage stopped

5     doing abortions within five years.  And I

6     think others really feel very -- speaking to

7     physicians who were abortionists who then

8     decided to leave -- stop becoming

9     abortionists, they've described to me how

10     they felt terrible going to work every day,

11     they felt morally conflicted, so I have a

12     great deal of sympathy for them.

13  Q.  About how many physicians who previously

14     provided abortions but no longer do have you

15     spoken to?

16  A.  Five.

17  Q.  Five.  When you provide medical care in the

18     hospital, you've -- do you encounter patients

19     who were referred to your care from the

20     emergency room?

21  A.  Are you -- you're talking about obstetrical

22     patients?

23  Q.  Correct.

24  A.  Yes.

25  Q.  And throughout your career, how many do you

39

```
 1            think you have encountered who are

 2            transferred from the ER to your service?

 3   A.   So you're referring to my current practice in

 4            the first -- let me -- when you asked me the

 5            question the first time, you said right now.

 6            Are -- were you referring to my current

 7            practice?

 8   Q.   I'm not sure if I said right now and if I

 9            did, I misspoke.  I meant throughout the

10            entirety of your medical career.

11   A.   Have I -- just to make sure I understand, so

12            have I cared for patients who were referred

13            through the emergency room?

14   Q.   Correct.

15   A.   Yes.

16   Q.   And my question is, about how many over

17            your --

18   A.   Thousands.

19   Q.   Thousands.  Is it more than 10,000?

20   A.   No, less than 10,000.  Somewhere between

21            probably 5- and 10,000.

22   Q.   And about how many of those patients were in

23            North Carolina?

24   A.   I would have to think because I practiced in

25            nine hospitals in North Carolina but a total
```

                                                          40

1        of close to 30 hospitals elsewhere.  So it --

2        I -- I would have to think about that.

3   Q.   If I give you a few seconds or a minute, do

4        you think you could come up with a ballpark?

5   A.   It would be quite a few.  It would be quite a

6        few, yeah.

7   Q.   Would you say closer to a hundred or a

8        thousand?

9   A.   It would be more than a hundred, probably

10       considerably more than a hundred --

11  Q.   So --

12  A.   -- because I was a solo practitioner at many

13       of these hospitals when the covering OB/GYN

14       went out of town.

15  Q.   And so would it be closer to 500 or a

16       thousand?

17  A.   It's somewhere in that range, yeah.

18  Q.   Okay.  And so out of all the patients -- now

19       I'm talking in any hospital in any state that

20       you've described as --

21  A.   Or country.

22  Q.   -- in -- or country.  I -- I would like to

23       limit in -- to the United States so any

24       state.

25  A.   The pathologies are the same, though.

41

1    Q.    Sure.  I'm specifically wondering about

2          patients transferred from emergency rooms to

3          your obstetrical service.

4    A.    Right.

5    Q.    Does that -- does that alter the number of

6          patients --

7    A.    No, because I've practiced --

8    Q.    -- you --

9    A.    -- more here than --

10                 MR. BOYLE:  Object to form.  You can

11         answer.

12   BY MR. MENDIAS:

13   Q.    Sure.  So I believe you said it was thousands

14         of patients throughout your career.

15   A.    Yeah.  I've been in practice more than 30

16         years.

17   Q.    Okay.  And of -- out of those thousands of

18         patients, how many have you encountered who

19         were experiencing complications from an

20         induced abortion?

21   A.    None from an induced abortion.  From

22         procedural abortion, yes.

23   Q.    Okay.  From an abortion of any kind?

24   A.    Yes.

25   Q.    How many?

                                                          42

1  A.   Two.

2  Q.   Two.

3  A.   No.  More than two.  Yeah, more than two.

4       Let me just think for a minute.

5  Q.   Sure.

6  A.   I'd say ten or less.

7  Q.   Ten.  Dr. Wubbenhorst, do you recall earlier

8       you said that you were -- you participated in

9       a deposition in Texas?

10 A.   Yes.

11 Q.   Is that correct?  Okay.

12          MR. MENDIAS:  So I'm going to mark the

13       transcript of that deposition as an exhibit.

14          (WUBBENHORST EXHIBIT G, Deposition

15       Transcript of Monique Chireau, M.D., October

16       14, 2017, was marked for identification.)

17 BY MR. MENDIAS:

18 Q.   So, Dr. Wubbenhorst, you'll see that the

19       numbers are on the top right of each page and

20       that there are four pages per printed page.

21       So direct you to Page 138.  So it would be in

22       the top right.  Are you there?

23 A.   Yes.

24 Q.   Okay.  So beginning with Line Number 9,

25       there's a question.  Have you ever managed a

                                                      43

1       patient who is experiencing a complication

2       from an induced abortion?

3   A.  Yes.

4   Q.  Your answer was, Yes?

5   A.  Uh-huh.

6   Q.  And then the question was, How many times?

7   A.  Right.

8   Q.  And then you answered, Probably four times.

9   A.  Yes.

10  Q.  So are you suggesting now that it was

11      actually ten times or have --

12  A.  No.  I've seen --

13  Q.  -- there been --

14  A.  -- more patients --

15          MR. BOYLE:  Objection.

16  A.  -- with --

17          MR. BOYLE:  You can answer.

18  A.  Yeah.  I'm not suggesting that this was

19      incorrect.  I'm saying that I've seen more

20      patients since then.

21  Q.  Okay.  Where have you seen those patients?

22  A.  Internationally.

23  Q.  Internationally.  In the United States, have

24      you seen any patients --

25  A.  No.

                                                      44

1   Q.   -- suffering from -- okay.  And have you seen

2        any patients experiencing complications from

3        an abortion of any type in North Carolina?

4   A.   No.

5   Q.   So just because I know that your CV might be

6        a little out of date, I wanted to ask, are

7        you currently a senior research associate at

8        the Center for Ethics and Culture at the

9        University of Notre Dame?

10  A.   Yes.  Well, my job title has changed.  I

11       think I'm a senior fellow.

12  Q.   Okay.  What does that position entail?

13  A.   I use -- I'm still do- -- I'm doing research

14       and so I have an office at Notre Dame and I

15       have access to -- I work with people in the

16       center on different projects and I use Notre

17       Dame's considerable resources to carry out my

18       research.

19  Q.   What sort of research do you do?

20  A.   Women's health epidemiology, demography,

21       maternal mortality.

22  Q.   Do you -- would you say that abortion is a

23       focus of your research?

24  A.   No.  It's one focus.

25  Q.   So I -- I asked if you would say abortion is

45

1          a focus of your research and I just want to

2          be clear.  What is your answer?

3     A.   I'm just clarifying that it's one focus.

4     Q.   Okay.  So you consider it to be a focus of

5          your research?

6     A.   Yes.

7     Q.   Have you ever served as a peer reviewer for a

8          publication?

9     A.   Multiple publications, yes.  I think that's

10         in my CV as well.  You've seen that.

11    Q.   Yeah.  What do you understand the purpose of

12         peer review to be?

13    A.   In peer review what we attempt to do is to

14         evaluate papers for their research methods,

15         their applicability to the general literature

16         and so on, and decide whether they should be

17         published.

18    Q.   Have you ever published a peer-reviewed

19         article or paper on the topic of abortion?

20    A.   No.

21    Q.   Are you familiar with the complication rate

22         for abortion in North Carolina?

23    A.   Yes.

24    Q.   And what is it?

25    A.   I would have to look at my deposition, but I

46

1    believe that the -- the overall complication

2    rate is listed by CDC.  I would have to look

3    at the -- the exact data to be sure.

4  Q.  So are you familiar with the abortion

5    reporting requirements in North Carolina?

6  A.  Yes.

7  Q.  What are they?

8  A.  They state that abortionists need to report

9    the com- -- their complications and -- to the

10    North Carolina Department of Public Health as

11    I understand it.

12  Q.  And are you familiar with the

13    pregnancy-associated death rate in North

14    Carolina?

15  A.  Yes.

16  Q.  And can you say what that is?

17  A.  I would have to just confirm it.  I don't

18    want to give you a wrong number.

19  Q.  When you say confirm it, do you mean in your

20    declaration or --

21  A.  I believe I brought that up in my

22    declaration, but, again, the maternal

23    mortality rate is -- it depends on -- when

24    you say, pregnancy-associated death rate, I

25    think those are two different numbers.  The

47

1    pregnancy-associated death rate would include

2    deaths in the first trimester, for example,

3    from ectopic pregnancy.  It would also

4    include deaths from abortion and it would

5    include maternal deaths toward the end of

6    gestation as well and those are three very

7    different numbers.

8         By far, the number that we have the best

9    data for, in my opinion, is maternal

10   mortality.  We have -- our data on -- on

11   deaths due to ectopic pregnancy and abortion

12   is very limited.

13   Q.   So during your testimony before the court in

14        Kentucky last year -- do you remember

15        testifying in --

16   A.   Yes.

17   Q.   -- Kentucky?  -- you described treating

18        preeclamptic women.

19   A.   Yes.

20   Q.   And you testified that if a woman was getting

21        sicker, you would deliver her.  Sometimes

22        depending on the capacity of the place you

23        were when you were delivering her, you might

24        have to call helicopters or planes or

25        ambulances to transport the woman and her

48

1          infant to a better-equipped hospital.

2               Does that sound correct?

3     A.   Yes.

4     Q.   And I think your specific testimony was that

5          you had done so plenty of times.  Does that

6          sound right?

7     A.   Yes.

8     Q.   About how many times, if you had to estimate,

9          have you had to transfer -- we can just pick

10         one of those forms of transportation --

11         transfer a woman via ambulance to a place

12         where she could get care that could not be

13         provided where you had delivered her?

14              MR. BOYLE:  Object to form.  You can

15         answer.

16    A.   I would say for ambulance transfers, most of

17         the places where -- most of the facilities

18         where I worked where I had to transfer

19         patients, time was of the essence so

20         relatively few ambulance transfers and more

21         helicopter or plane transfers.

22    Q.   If you had to give a ballpark, could you?

23    A.   For both?

24    Q.   Yes, please.

25    A.   I would say somewhere between 20 -- somewhere

                                                    49

Case 1:23-cv-00480-CCE-LPA   Document 74-3   Filed 09/12/23   Page 50 of 219

1          around 20 --

2     Q.   For ambulance?

3     A.   -- patients.

4     Q.   Oh, that includes both?

5     A.   Yes.

6     Q.   And could you be more specific within that 20

7          how many were in ambulances, how many were in

8          helicopters?

9     A.   Helicopters or planes, probably ten to a

10         dozen and then maybe ten to -- probably not

11         as many as -- I would have to think about it

12         a little bit more.

13    Q.   Okay.  So --

14    A.   Again, mostly, those were in places like

15         South Dakota or remote parts of Arizona.

16    Q.   And you'd say -- so eight to ten is maybe a

17         fair ballpark for how many --

18    A.   For?

19    Q.   For ambulance transfers.

20    A.   I would have to really think about it, yeah.

21    Q.   All right.  So in your declaration you cite

22         five examples of patients transferred from

23         Planned Parenthood South Atlantic, which I'll

24         call PPSAT, that -- their Chapel Hill clinic

25         to UNC Hospital between February 2022 and May

                                                        50

1       of 2023; is that --

2   A.  Yes.

3   Q.  Yes?  Okay.  Do you have firsthand knowledge

4       of these patients?

5   A.  The patients who were transferred?

6   Q.  Yes.

7   A.  No.

8   Q.  How did you learn of these hospital -- or

9       these ambulance transfers?

10  A.  I don't remember exactly how I came across

11      them.  I think that when I was looking at the

12      question of hospital transfers, transfers

13      from facilities to hospitals, this

14      information popped up and then I started to

15      dig a little bit deeper into it and found the

16      9-1-1 transcripts.

17  Q.  I notice in your declaration you cite for one

18      of these ambulance transfers a website called

19      operationrescue.org.

20  A.  Yes.

21  Q.  Did they all come from Operation Rescue?

22  A.  No.

23  Q.  And Operation Rescue is an antiabortion

24      organization, correct?

25  A.  Yes.  I don't know very much about them.

51

1    Q.    Okay.  Are you aware that the man who

2          murdered Dr. George Tiller, an abortion

3          provider in Kansas, in 2009 asserted that he

4          was affiliated with Operation Rescue?

5    A.    I can't speak to that.

6    Q.    Are you aware of any other ambulance

7          transfers from any of PPSAT's clinics during

8          the period of February 2022 to May 2023?

9    A.    I'm not.

10   Q.    Do you know how many abortions PPSAT provided

11         between February 2022 to May 2023?

12   A.    No.

13   Q.    If you were to go about calculating the rate

14         of hospital transfers per abortion patient,

15         how would you do that?

16   A.    Hospital transfers from PPSAT Chapel Hill?

17   Q.    Correct.

18   A.    I think that what I would look at is how many

19         abortions were performed and how many

20         ambulance transfers actually occurred.

21   Q.    So in your declaration you also say that it's

22         an axiom in medicine that physicians should

23         not perform procedures if they are not able

24         to manage their complications.

25               Do you agree with that statement?

                                                        52

1    A.    That's correct for most procedures.

2    Q.    Which procedures does it not apply to?

3    A.    I think that a good example is screening

4          colonoscopy because with screening

5          colonoscopy, if a patient undergoes a

6          perforation, that's usually a -- a

7          complication that would be managed

8          surgically.

9    Q.    So you don't believe that colonoscopies

10         should always be performed in hospitals?

11   A.    No, I don't.

12   Q.    Why not?

13   A.    Because I think that the available literature

14         shows that the complication rate for

15         colonoscopies is much lower than for, say,

16         induced abortions, especially abortion in the

17         second trimester, and most abortion --

18         second-trimester abortion procedures -- I'm

19         sorry, second abortion tri- --

20         second-trimester abortion procedures can

21         become very complicated very quickly.

22   Q.    And you don't believe that a rupture of -- or

23         a perforation of a patient's colon can become

24         very serious very quickly?

25   A.    I think that it can be, but I think that when

53

Case 1:23-cv-00480-CCE-LPA   Document 74-3   Filed 09/12/23   Page 54 of 219

1      you look at complication rates and types of

2      complications, it -- including especially

3      where uterine perforation has occurred with

4      damage to vascular structures, perforation

5      has occurred with damage to bowel and

6      bladder, which I've personally had to care

7      for patients with those complications, the

8      rationale for doing those procedures in -- as

9      well as potential anesthesia complications,

10      the rationale for doing those procedures in a

11      hospital is re- -- is much clearer.

12  Q.  As an obstetrician/gynecologist, if someone

13      had a perforation of their colon during a

14      colonoscopy, they would not ever be

15      transferred to your service for care,

16      correct?

17  A.  No.

18  Q.  Do you know the complication rate for

19      perforations in the course of a colonoscopy?

20  A.  I would have to look at my declaration

21      because I believe that that was a question

22      that I discussed in my declaration.  Would

23      you like me to do that?

24  Q.  Sure.

25  A.  Okay.  Oh.  Yeah.  I did not put the

54

1           complication rates in here.

2     Q.    Okay.

3     A.    I think that what I had -- the point I was

4           trying to make in my declaration about

5           colonoscopy safety was that Dr. Farris cited

6           a paper to try to compare colonoscopy

7           complications to abortion complications, but

8           the particular paper that she cited did not

9           focus on colonoscopy complications.  It was

10          looking at risk stratification to arrive at

11          an outcome measure so that outpatient

12          facilities could be profiled in terms of what

13          their rates of unplanned hospital visits

14          were.  It did not have as its purpose the

15          estimation of overall incidence of

16          complication.  So that was why -- that was

17          why I felt that that particular paper was not

18          speaking to the question of being able to

19          compare abortion complications with

20          colonoscopy.

21    Q.    Understood.  But you didn't then look for the

22          complication rate?

23    A.    It was in the -- it was in the -- I'm sorry.

24          What -- what's your question?

25    Q.    The -- that after -- in the course of

                                                        55

1    drafting your declaration, you did not look

2    up the --

3  A.   Oh, no, I did.

4  Q.   -- complication rate --

5  A.   I did.  I didn't put --

6        MR. BOYLE:  Let -- let him finish the

7    question.

8  A.   Oh, I'm sorry.  Sorry.  Sorry.  Sorry.

9    Sorry.

10  Q.   That's all right.  So my question is, in the

11    course of your declaration, did you look up

12    the complication rate associated with

13    perforations during a colonoscopy?

14  A.   Yes, I did.

15  Q.   But you did not include that in your

16    declaration?

17  A.   No.  There was a lot of other ground to

18    cover.

19  Q.   Do you know what the mortality rate of an

20    outpatient colonoscopy is?

21  A.   No.

22  Q.   Do you know what kind of sedation is

23    typically used in an outpatient colonoscopy?

24  A.   Mild to moderate.

25  Q.   And do you know if tissue is ever biopsied

56

1           during a colonoscopy?

2      A.   Yes.

3      Q.   And how would the person performing the

4           colonoscopy go about biopsying that tissue?

5      A.   They use a hot snare.

6      Q.   And what does that mean?

7      A.   It's a either loop or -- or they -- they may

8           use a punch.  They either use a loop or a

9           punch device to obtain a biopsy of what they

10          consider might be malignant tissue or even

11          nonmalignant if it's an adenoma -- I mean, a

12          polyp.

13     Q.   And what is the process like of removing that

14          tissue or potential malignancy from the

15          colon?

16     A.   As I said, they use a snare or they use a

17          biopsy forcep.  They snip the biopsy and then

18          they -- if there's bleeding, they may or may

19          not cauterize it or they may use something

20          else to achieve hemostasis.

21     Q.   So other than abortion clinics, do you know

22          whether North Carolina inspects outpatient

23          health centers that perform procedures or

24          surgeries?

25     A.   I don't know for sure because I haven't

                                                      57

1        researched the information, but I do know

2        that ambulatory surgical centers have an

3        accreditation and inspection process.

4   Q.   Are you aware of how frequently ambulatory

5        surgical centers receive notices of

6        deficiencies following those inspections?

7   A.   No.

8   Q.   Do you know what kind of sedation is provided

9        in outpatient surgical facilities in North

10       Carolina?

11  A.   Ambulatory surgical centers?

12  Q.   Yeah.

13  A.   So at ambulatory surgical centers they have

14       anesthesiologists and anesthetists so they

15       provide the full gamut of anesthesia from

16       general anesthesia to sedation.

17  Q.   So what is general anesthesia?

18  A.   So general endotracheal anesthesia is where a

19       patient is paralyzed and intubated and the

20       ventilator breathes for them.

21  Q.   And I believe you said deeper sedation.

22  A.   Deep sedation.

23  Q.   Deep sedation.  What do you understand that

24       term to mean as you've used it in your

25       declaration?

                                                    58

1    A.    It typically means that a patient will

2          receive a combination of barbiturate and --

3          b-a-r-b-i- -- okay.  -- barbiturate and

4          narcotic and will put them into a state of

5          profound relaxation.  They won't feel pain

6          and their breathing will slow.  In general,

7          deep sedation is a procedure that should be

8          performed with an anesthetist or an

9          anesthesiology -- anesthesiologist present

10         because those patients can rapidly

11         decompensate and require intubation.

12   Q.    And what do you understand moderate sedation

13         to be as you used that term in your

14         declaration?

15   A.    The line -- the line between mild and

16         moderate simply means that the patient is

17         still able to breathe on their own and they

18         can often respond to you when you speak to

19         them, whereas, with deep sedation, they

20         usually can't.  They have -- can maintain --

21         they can manage their secretions and breathe

22         on their own.

23   Q.    And what medications are used to achieve this

24         level of sedation?

25   A.    There's a wide variety.

                                                        59

1    Q.   And I meant to ask earlier.  What medications

2         are used to achieve general anesthesia?

3    A.   There is a wide variety.  I'm not an

4         anesthe- -- anesthesiologist.

5    Q.   Okay.  Do you know what kind of sedation is

6         provided to abortion patients at PPSAT's

7         clinics?

8    A.   My understanding is that they provide mild,

9         moderate, and deep sedation according to

10        their own information.

11   Q.   What information specifically are you

12        referring to?

13   A.   Their protocols.

14   Q.   When you say, protocols, can you be more

15        specific?  How did you come to read these

16        protocols?

17   A.   My understanding is that -- I believe that

18        she said in -- somewhere in -- one of --

19        Dr. Farris said in one of her declarations

20        that that's what they provide.

21   Q.   So you have not seen anything produced by

22        PPSAT itself on this topic?

23   A.   Yes, I have.

24   Q.   Distinct from Dr. Farris's declaration?

25   A.   Yes.

                                                    60

Case 1:23-cv-00480-CCE-LPA   Document 74-3   Filed 09/12/23   Page 61 of 219

1    Q.    How did you obtain those documents?

2    A.    I was given to them -- I saw them through the

3          discovery process.

4    Q.    In this case?

5    A.    Yes.  But I have seen them also in other

6          cases as well, in particular the Texas case,

7          and there was one other case where I'd seen

8          them as well.

9    Q.    And you believe that the protocols in Texas

10         are comparable to the protocols in North

11         Carolina?

12   A.    In general, my experience with Planned

13         Parenthood is that they seek to standardize

14         their procedures as much as possible across

15         different affiliates.  So if I'm recalling

16         correctly, I had seen these in Texas and I

17         may have seen them in another case as well.

18         I just can't remember which one.

19   Q.    Okay.  Thank you.  And do you know what kind

20         of medications PPSAT uses to achieve the

21         levels of sedation that they provide to their

22         abortion --

23   A.    No.

24   Q.    -- patients?  Sorry.  As -- I'm not sure that

25         the court reporter got your answer.

                                                        61

1    A.    No.

2    Q.    Thank you.

3    A.    Yeah.

4    Q.    So in Paragraph 180 of your declaration you

5          say that during the first six weeks of

6          pregnancy is when maternal morbidity and

7          mortality are highest.

8                Can you explain what you meant by that.

9    A.    I think that what that is -- the -- I'm

10         referring to -- not referring to the entirety

11         of pregnancy; I'm referring to the first

12         trimester.

13   Q.    Sorry.  Can you just read that sentence that

14         begins, Deaths during.

15   A.    It says, Deaths during the first six weeks of

16         pregnancy when maternal mortal- -- morbidity

17         and mortality are highest are kept classified

18         as maternal deaths and placed together with

19         deaths due to births and delivery.

20   Q.    So you're not asserting that the first six

21         weeks of pregnancy are the most dangerous

22         part of the entire period of pregnancy, are

23         you?

24   A.    No.  What I'm saying is that the first six

25         weeks of the first trimester are the most

                                                        62

1    dangerous because that is typically when

2    ectopic pregnancies occur.

3  Q.  And in Paragraph 238 of your declaration,

4    which I believe is on Page 41 in the upper

5    right-hand corner --

6  A.  Yes.

7  Q.  -- you say that, Carrying a pregnancy to term

8    is safer than an abortion.

9        Do you believe that that's true?

10 A.  Yes.

11 Q.  Do you -- as you mentioned earlier, you

12   submitted a declaration in a Minnesota case

13   in September of last year; is that right?

14 A.  Yes.

15 Q.  Okay.

16        MR. MENDIAS:  And I'd like to mark that

17   as the next exhibit.

18        (WUBBENHORST EXHIBIT H, Declaration and

19   Expert Report of Monique Chireau Wubbenhorst,

20   M.D., M.P.H., Minnesota Case, was marked for

21   identification.)

22        MR. BOYLE:  Thank you.

23        MR. MENDIAS:  Thanks.

24 BY MR. MENDIAS:

25 Q.  So on Page 10, Paragraph Number 47, can you

1           read that paragraph.

2    A.     Yes.  It is my opinion that without an

3           accurate estimate of the number of abortions

4           performed in the United States or the number

5           of maternal deaths from abortion, it is

6           impossible to estimate abortion-related

7           mortality with any precision.

8    Q.     Do you agree that that's true?

9    A.     Yes.

10   Q.     If it is impossible to estimate the true

11          abortion-related mortality with any

12          precision, how are you now able to say that

13          abortion is more dangerous than childbirth?

14   A.     Because if we look at the available data, and

15          the study I'm thinking of in particular is

16          the Bartlett study which shows that the risk

17          of death from abortion increases 38 percent

18          by every additional gestational -- week of

19          gestational age, that is not -- and that by

20          the end of midtrimester, the risk of death is

21          76 times greater than that -- than risk of

22          death in the first trimester.  There is no

23          corresponding increase -- there is no

24          increase in risk in pregnancy that

25          corresponds to that risk.

64

1           And another study, I believe it was by

2      Lidiro, but don't quote me, found similarly

3      that there is a 30 percent increase in death

4      from abortion by -- with each additional

5      gestational week.

6           So what that says is that as you proceed

7      in gestation, the risks of abortion increase

8      exponentially, not just linearly but they

9      increase exponentially, and that is not the

10     case for mortality in pregnancy.

11  Q.  Do you believe that people regularly obtain

12     abortions in pregnancy at the point in which

13     childbirth is most dangerous or in which

14     pregnancy is most dangerous?

15  A.  Can you --

16           MR. BOYLE:  Object to form.

17  A.  I'm not sure I understand your question.

18  Q.  That was a very confusingly worded

19     question --

20  A.  Yeah.

21  Q.  -- on my part.  When do people typically

22     obtain abortions?

23  A.  Well, this is an important question.  Most

24     people -- so 93 percent of abortions in the

25     United States are performed -- 91 to 93

                                                        65

1    percent are performed before the first

2    trimester.  And this is a significant problem

3    in ascertaining maternal complications and

4    death because the lar- -- much larger number

5    of abortions that are performed in the first

6    trimester when risk for mortality and

7    morbidity is lower basically drowns out all

8    of the additional morbidity and mortality

9    that's occurring in the second and third

10   trimester.  We know that those abortions

11   occur because Warren Hern advertises on his

12   website that he does abortions up to 36 weeks

13   so we know that that happens.  We know that

14   those occur.

15        We also know that simply based on

16   uterine and maternal physiology, the risk of

17   abortion at higher gestational ages is higher

18   and is not amenable to intervention because

19   the difference between a fetus at six

20   weeks -- an unborn child at six weeks and an

21   unborn child at 36 weeks is there's an

22   astronomical difference.  You know, you're

23   talking about several grams -- 15 grams

24   versus eight -- you know, somewhere between

25   six and eight pounds.  So I think that that's

1          the basis of that statement.

2                  MR. BOYLE:  Not immediately

3          necessarily, but can we take a break at some

4          point?  It's been about an hour.

5                  MR. MENDIAS:  Sure.  I'm -- if you

6          would like to take a break now --

7                  THE WITNESS:  Yeah, because you haven't

8          asked another question --

9                  MR. MENDIAS:  Sure.

10                 THE WITNESS:  -- so this might --

11                 MR. MENDIAS:  Okay.

12                 THE WITNESS:  -- be a good place.

13                 MR. MENDIAS:  Great.

14                 THE WITNESS:  Thank you.

15                 THE VIDEOGRAPHER:  Going off the

16         record.  The time is 2:16.

17                 (Whereupon, there was a recess in the

18         proceedings from 2:16 p.m. to 2:30 p.m.)

19                 THE VIDEOGRAPHER:  Back on the record.

20         The time is 2:30.

21     BY MR. MENDIAS:

22     Q.   Doctor, during the break did you speak with

23         anyone about the deposition so far?

24                 MR. BOYLE:  Objection.  To the extent

25         she spoke with me, that's work product and I

                                                          67

1     would instruct her not to divulge anything

2     that we spoke about.

3  BY MR. MENDIAS:

4  Q.   Did you speak to anyone other than an

5     attorney --

6  A.   No.

7  Q.   -- during the break?  Okay.

8  A.   Well, I said hello to the front desk person.

9  Q.   Did you consult -- did you consult any

10    studies or materials during the break?

11  A.   No.

12  Q.   So before we broke, you had mentioned

13    Dr. Hern.  And your testimony was that he

14    performs abortions through 36 weeks; is that

15    right?

16  A.   The last I saw on his website, yes.

17  Q.   Does Dr. Hern practice in North Carolina?

18  A.   No.

19  Q.   Is abortion permitted through 36 weeks in

20    North Carolina?

21  A.   No.

22  Q.   If a woman is pregnant and is considering

23    whether to have an abortion or to carry to

24    term, isn't the relevant comparison for the

25    mortality associated with abortion at eight

68

1       weeks versus -- I'm sorry.  I might have

2       omitted that from -- so I'll withdraw that

3       question.

4           If a woman is pregnant at eight weeks

5       and is considering an abortion, if she is

6       deciding between carrying to term and

7       delivering and having an abortion, isn't it

8       relevant for her to compare the mortality

9       associated with an abortion performed at

10      eight weeks with mortality associated with

11      childbirth?

12  A.  No, it's not relevant at all.

13  Q.  Why?

14  A.  Because the mortality from abortion at eight

15      weeks -- the more relevant comparison would

16      be abortion at term or near term and maternal

17      mortality at the same gestational age.

18  Q.  For that patient making the decision, you

19      believe that is the relevant comparison?

20  A.  I guess I'm not understanding your question.

21      Are you saying that if -- if a woman is

22      looking -- wanting to understand what is

23      abortion-related mortality?  Can you please

24      clarify?

25  Q.  If a woman is eight weeks pregnant and is

                                                            69

1          deciding between continuing a pregnancy or

2          having an abortion at eight weeks --

3     A.   Right.

4     Q.   -- isn't it relevant for her to compare the

5          mortality associated with an abortion at

6          eight weeks with the mortality associated

7          with childbirth?

8               MR. BOYLE:  Object to form.

9     A.   So the mortality at eight weeks when the

10         fetus weighs 50 -- 15 grams is not applicable

11         or similar in any way to an abortion close to

12         term, as I said earlier, where the fetus

13         weighs five or six pounds, maybe seven

14         pounds.  And abortion, as we've said, has a

15         38 percent -- the risks of mortality increase

16         exponentially, by 38 percent, for each week

17         of gestational age so I don't think that's an

18         accurate comparison.

19              I think the second problem with that

20         reasoning is that you cannot predict for any

21         given patient what their -- you know, risk is

22         a population-based assessment.  It's not an

23         expression of whether an individual patient

24         will have an outcome or not.  So you can't

25         say that, well, this patient had an abortion

                                                        70

Case 1:23-cv-00480-CCE-LPA  Document 74-3  Filed 09/12/23  Page 71 of 219

1    and it kept her from having gestational

2    diabetes because you simply can't predict for

3    any individual patient with any certainty

4    that they will have a specific outcome.

5  Q.  It's true that a person who has an abortion

6    will not suffer any complication from

7    pregnancy after that -- after the point in

8    which they had an abortion, correct?

9  A.  Because you've performed the abortion and

10    they're no longer pregnant, but that's not

11    the point.  The point of this discussion is

12    often that you can perform an abortion to

13    prevent maternal morbidity and mortality and

14    that's just not true.  Number one, because we

15    know that where abortion is legal -- and the

16    specific examples that I'm aware of are Chile

17    during the Pinochet regime, Ireland, and

18    Malta.  They had -- especially in Malta where

19    abortion is banned for any reason, they've

20    had zero maternal mortality for five years.

21    Same thing in Ireland.  Ireland had one of

22    the lowest rates of maternal mortality in the

23    world prior to them legalizing abortion and

24    the same thing in Chile.

25        So it doesn't follow from that argument

71

1      that if you do an abortion, it's going to

2      lower maternal mortality or reduce maternal

3      morbidity.

4   Q.  It's true that some women have preexisting

5      conditions that put them at very high risks

6      of negative outcomes during pregnancy,

7      correct?

8   A.  Yes, that's correct.  But you cannot say to

9      someone with diabetes, you're going to

10     develop diabetes and have a diabetic coma or

11     if you have high blood pressure, you're going

12     to develop preeclampsia and die.  You simply

13     cannot do that.  All of our assessments of

14     risk are population based; they are not

15     predictive for an individual.

16  Q.  What is the risk that a woman with pulmonary

17     hypertension dies during pregnancy?

18  A.  50 percent.

19  Q.  Do you believe a woman deciding whether or

20     not to have an abortion when she has

21     pulmonary hypertension might consider the

22     risk associated with abortion versus the risk

23     of a pregnancy in which there's a 50 percent

24     chance of dying?

25          MR. BOYLE:  Objection and object to

                                                      72

1        form.

2   A.   I guess --

3            MR. BOYLE:  You can answer.

4   A.   Okay.  So your question -- let me just

5        rephrase your question back to you.  So

6        you're saying that that woman should -- are

7        you saying that she should have the option to

8        have an abortion because she -- of her -- the

9        50 percent risk of mortality?

10  Q.   That's a good question.  Do you think that

11       she should?

12  A.   I don't believe that abortion is -- elective

13       abortion is -- as -- as you've said before, I

14       don't agree with elective abortion.  I think

15       that in the patient with pulmonary

16       hypertension, if she develops worsening

17       symptoms saying she could be delivered,

18       that's certainly an option.

19  Q.   If a woman with pulmonary hypertension

20       becomes pregnant and not yet experienced any

21       negative outcome from her hypertension, you

22       don't think that she should be permitted to

23       have an abortion?

24            MR. BOYLE:  Objection and object to

25       form.  You can answer.

73

1  A.    Yeah.  I -- I -- I could not speak to that

2        situation.  I think that, as I said, if she

3        became pregnant and she continued to carry

4        the pregnancy, she became symptomatic to the

5        extent that she needed to be delivered, then

6        that's an appropriate management plan.

7  Q.    In Paragraph 196 of your declaration --

8            MR. BOYLE:  Is this Exhibit B?

9            MR. MENDIAS:  Yes.

10 A.    Okay.  Let me just read --

11 Q.    Sure.

12 A.    -- back so I can get context here.  Okay.

13       Yes.

14 Q.    Can you read the last sentence of that

15       paragraph.

16 A.    In other words, the authors made estimates

17       for a substantial number of caseloads using

18       sources such as media stories which weakens

19       the validity of their study.

20 Q.    Why do you believe re- -- relying on media

21       stories is inappropriate --

22            MR. BOYLE:  Object to form.

23 BY MR. MENDIAS:

24 Q.    -- in this context?

25 A.    Because what we're talking about here is

74

1    epidemiology and epidemiology -- rather than

2    being based on what a media story says,

3    epidemiology ideally looks at patient-level

4    data.

5  Q.  So in your report you provide the names of

6    women you say died following an abortion.

7    Did you have firsthand knowledge of any of

8    these women?

9  A.  No.

10  Q.  How did you first learn about these deaths?

11  A.  I was, again, as I said earlier, looking at

12    data on abortion-related mortality and came

13    across the names of these women and I felt

14    that it was truly tragic that young, healthy

15    women underwent abortions that related --

16    resulted in their deaths.

17  Q.  Did you find information about these women's

18    deaths in newspaper articles?

19  A.  No.  I found their -- can you just remind me

20    where that is?

21  Q.  Sure.  That is in Paragraph 188.

22  A.  Yes.  No.  These were not -- I think in one

23    situation, it was -- the -- the first one, it

24    was a -- it was an article from the New York

25    Daily News.

75

1    Q.   And in Subparagraph 7 you also cite the New

2         York Times, correct?

3    A.   Yes.

4    Q.   You also cite a website called

5         abortiondocs.org.  Do you know what that is?

6    A.   This was a website that had information, and

7         I believe this one had a autopsy report as

8         well.

9    Q.   Do you know anything else about that website?

10   A.   No.

11   Q.   Did you review the medical charts of any of

12        these women?

13   A.   No.  I reviewed the autopsy reports as they

14        were presented on the internet.

15   Q.   How many of them had autopsy reports?

16   A.   I would have to count, but it looks like one,

17        two, three, four, five, six -- six or seven.

18        And then --

19   Q.   Which --

20   A.   -- the others had depos- -- were from a

21        deposition, another one was from an EMS

22        report, and two were from -- oh, I just saw

23        the numbers are out of order.  Okay.

24   Q.   Did any of the autopsy reports or articles

25        that you consulted detail the women's medical

                                                         76

1          histories?

2     A.    Yes.

3     Q.    Which ones?

4     A.    All of the autopsy reports.  That's routine

5          with autopsy reports.

6     Q.    Do you know how much time elapsed between the

7          abortion procedure and the complications --

8     A.    I would have to look at --

9     Q.    -- each women suffered?

10    A.    -- each -- I would have to look at each one.

11         I'm sorry.  Sorry.  Did not mean to cut you

12         off.

13    Q.    Are you aware of any women who died following

14         second-trimester abortions in hospitals?

15    A.    Yes.  I think I mentioned a couple of those.

16    Q.    Can you specify which ones occurred in

17         hospitals?

18    A.    I believe Keisha Atkins did and I believe --

19         in fact, I'm pretty sure -- I would have to

20         look at the autopsy reports but -- I believe

21         that most of these women died in hospital,

22         but I would have to confirm that.

23    Q.    Oh, I'm sorry.  My question was, do you know

24         if any of the abortions were performed in

25         hospitals?

77

1   A.   I think that information was in the autopsy

2        reports, but I would have to reread them.

3   Q.   But you didn't include any of that

4        information in the declaration, did you?

5   A.   No.

6   Q.   Do you know how many abortions were performed

7        at the clinics where these patients received

8        their abortions?

9   A.   No.

10  Q.   Throughout your report you cite studies that

11       suggest that a woman is at a high risk of

12       suicide following abortion; is that right?

13  A.   I think that the more precise way of

14       expressing it is that there is evidence that

15       in- -- there are increased risks for suicide

16       among women who've undergone abortion.

17  Q.   So to be clear, you're not arguing that

18       abortion causes suicidality?

19  A.   I would say that more accurately that there

20       is an association between abortion and

21       suicidality, yes.

22  Q.   And so what is an association?

23  A.   Association can be positive or negative, but

24       it does not necessarily -- to -- it doesn't

25       address the issue of causality.  It's a -- it

78

1           indicates that there is an association.

2    Q.    Is an association synonymous with a

3          correlation?

4    A.    Not exactly, no.

5    Q.    How do they differ?

6    A.    Correlation means that you compare one set of

7          outcomes or one set of values with another to

8          see if the relationship is linear or colinear

9          or nonlinear so it's a -- it's a slightly

10         different -- slightly different way of

11         approaching it.

12              An association is simply that you can

13         have a positive or a negative association

14         between an exposure and an outcome.

15   Q.    Doctor, what is the American Psychological

16         Association, if you know?

17   A.    The APA?  Yeah.

18   Q.    Correct.

19   A.    It's an association of -- I don't know -- I

20         know of the organization's existence.  I

21         don't know whether they are the same as ACOG

22         or as a professional society.  I can't speak

23         to that.

24   Q.    Do you believe that they're a reliable

25         source?

                                                        79

1   A.   I can't speak to that either.  I do know that

2        they've engaged in considerable abortion

3        advocacy starting in 1979.

4   Q.   What makes you describe their -- what makes

5        you describe what they do as advocacy?

6   A.   One of their statements that they made in

7        1979 was that they felt that abortion was --

8        and I'm paraphrasing.  I would have to look

9        at the exact quote.  But they made statements

10       strongly supporting abortion.

11  Q.   Do you believe that a statement either in

12       favor of or in opposition to abortion is

13       necessarily advocacy?

14  A.   I think it depends on how you define

15       advocacy.

16  Q.   How would --

17  A.   I think on some level, what it means is

18       that -- when an organization engages in

19       pro-abortion statements, it means that it's

20       worth looking very carefully at their

21       statements and the particular conclusions

22       they draw regarding abortion.

23  Q.   Do you believe the same applies to

24       organizations that oppose abortion?

25  A.   Yes.  I think that you have to look at the

80

1    quality of the science that they're proposing

2    and I think that in some studies, for

3    example, because this is a contentious topic,

4    some researchers will -- will look -- will

5    provide -- will look at both -- will look at

6    what's called the null hypothesis, which is

7    in their research to say, you know, we're --

8    we're not going to assume a benefit or a

9    risk; we're just going to approach this

10   agnostically to try to account for that.

11   Q.  Do you consider yourself an advocate?

12   A.  No.  I would say my advocacy more falls in

13       terms of scientific advocacy.

14   Q.  But you would describe yourself as a

15       scientific advocate then?

16   A.  No, I would not.  I would say that I am

17       interested in looking at the science,

18       critiquing the science, and applying the

19       science appropriately.

20   Q.  But you engage in advocacy?

21   A.  I don't engage in formal advocacy efforts as

22       in -- I think I would -- if you can define

23       what you mean by advocacy, that would help me

24       to answer the question.

25   Q.  All right.  Well, earlier, in response to one

1       of my questions you referred to, my advocacy,

2       and so I'm just wondering what you mean by

3       that.

4    A.  I'm -- I'm sorry.  I don't remember -- if she

5       can read the question, that would be helpful.

6    Q.  Sure.

7           MR. MENDIAS:  Would you mind doing

8       that, Lisa?

9           (The following question and answer were

10      read back:

11          Q:  Do you consider yourself an

12      advocate?

13          A:  No.  I would say my advocacy more

14      falls in terms of scientific advocacy.)

15   A.  Right.  So what I would say is that my

16      advocacy is for women and children.  That's

17      what I'm about.  To the extent that that

18      impinges on the question of abortion, yes,

19      but I've devoted my career and my life to

20      serving women, especially vulnerable women,

21      vulnerable children, women in socioeconomic

22      deprivation and otherwise.  So that's the

23      source of my advocacy and the reason for it.

24   Q.  Have you ever testified before Congress on a

25      topic unrelated to abortion?

1    A.    No.

2              MR. MENDIAS:  All right.  So I'm going

3        to mark this as an exhibit.

4              (WUBBENHORST EXHIBIT I, Article, The

5        facts about abortion and mental health,

6        American Psychological Association, was

7        marked for identification.)

8              MR. BOYLE:  Thank you.

9              MR. MENDIAS:  Thanks.

10   BY MR. MENDIAS:

11   Q.    And so this is the APA, and it has said that,

12       More than 50 years of international

13       psychological research shows that having an

14       abortion is not linked to mental health

15       problems, but restricting access to safe,

16       legal abortions does cause harm.

17             You consider that statement to be

18       advocacy, correct?

19   A.    I'm sorry.  I -- I started reading it.

20   Q.    Oh, apologies.

21   A.    Distract- -- got distracted.

22   Q.    I'm sorry.

23   A.    Yeah.  Go ahead.

24   Q.    You would consider the statement -- I -- I --

25       I'm sorry.  I'll -- I'll read the statement

83

1      again.  More than 50 years of international

2      psychological research shows that having an

3      abortion is not linked to mental health

4      problems, but restricting access to safe,

5      legal abortions does cause harm.

6           Do you believe that that conclusion is

7      advocacy?

8   A.  I can't speak to that because I don't know

9      the intent of the person saying it.  I can

10     say that I disagree with that statement.

11  Q.  Are you aware that the APA has cited large

12     longitudinal and international studies which

13     have found that obtaining a wanted abortion

14     does not increase risk for depression,

15     anxiety, or suicidal thoughts?

16          MR. BOYLE:  Objection.

17  A.  I am not -- I haven't -- I haven't seen this

18     particular -- this particular document so I

19     can't really comment on it.  When I look at

20     this -- documents like this, I need to look

21     at the studies they're citing, critique their

22     statistical methods, and so on and so forth

23     so I can't really speak to that.

24  Q.  That's fair.  Are you familiar with the

25     Turnaway Study?

84

1    A.    Yes.

2    Q.    And what is it?

3    A.    So the Turnaway Study was a study -- was a

4          survey of women who had undergone abortion at

5          differing intervals over -- out to five years

6          and looked at various outcomes associated

7          with the women who -- women who remained in

8          the study until the -- the end of the study.

9    Q.    And would you agree that it was extremely

10         well-designed?

11   A.    Yes.  I think I've stated that, actually.

12   Q.    And --

13   A.    But the best design can't overcome the

14         vagaries of surveys.  Survey data is the

15         weakest form of data as opposed to

16         observational studies, clinical trials, and

17         others.

18               Second of all, the Turnaway Study, as

19         I've said, while it was well-designed, had

20         very significant dropoff to the extent that

21         only 19 percent of patients finished.

22               And more to the point, by the end of the

23         study, if you look very carefully at the

24         data, 95 percent of women who kept their

25         children said they were happy with their

                                                        85

Case 1:23-cv-00480-CCE-LPA   Document 74-3   Filed 09/12/23   Page 86 of 219

1        decision.

2    Q.  Are you aware of the comparable percentage of

3        women who reported life satisfaction after

4        they had obtained abortions?

5    A.  The comparable percent?

6    Q.  (Nods head).

7    A.  I would have to look at it again.  I think I

8        cited it in my -- but I think -- again, I

9        would like to come back to the point that the

10       methodological problems associated with

11       Turnaway Study are very significant.

12           Another important issue, and forgive me

13       if this is not the most current data, is that

14       people have repeatedly requested Turnaway

15       Study -- the authors to put their data in a

16       data repository and to date, as far as I

17       know, they've refused to do that.

18   Q.  Do you know whether there were any

19       significant differences between the women who

20       continued in the study and those who were

21       lost to follow-up?

22   A.  Yes.  I think that if you look at the

23       study -- and I would have -- it would be

24       great if I could refer to my -- oh, actually,

25       I don't know if I went into a detailed

                                                    86

1    critique here.  There were differences in

2    gestational age at the time of abortion

3    versus no abortion.  And, again, the -- the

4    question really is that if only one in five

5    patients at the end of a study stayed in the

6    study, no matter how well-designed it was --

7    and I think it was -- it was a very

8    well-designed study, asked a lot of

9    questions, but that cast doubt on the

10   validity of the study simply based on the

11   lack of follow-up.

12   Q.  Do you believe that that's true even if there

13       were no meaningful differences between the

14       women who were lost to follow-up and the

15       women who stayed in the study?

16   A.  You can't make any conclusions.  If one --

17       only one in five patients stayed till the

18       end, you simply cannot draw conclusions.

19   Q.  Are you familiar with a 2018 report published

20       by the National Academies of Science,

21       Engineering, and Medicine concerning the

22       safety of abortion in the United States?

23   A.  Yes.

24   Q.  So in your declaration you criticize it for

25       being funded by abortion advocates; is that

87

1      correct?

2   A.   Yes.

3   Q.   Do you believe that a study should be

4        discounted on the basis that the people who

5        funded it have a strong political view of

6        abortion?

7   A.   No.  I think that that means that you should

8        scrutinize the methods and the results more

9        carefully.

10  Q.   Are you familiar with the criteria that the

11       National Academies used in deciding whether

12       to include a study in its review?

13  A.   Yes.  And I think that they eliminated a vast

14       number of studies that were -- would have

15       spoken to the issue and ended up with a very

16       small amount -- very small number of studies

17       that did not accurately reflect the

18       literature.

19            They also continued to discuss this

20       statistic of, you know, women are more -- 12

21       to 14 times more likely to die in childbirth

22       when preg- -- than from abortion when that

23       statistic is based on a paper by Raymond and

24       Grimes which has severe methodological

25       problems.  It combines different data sets.

                                              88

1    It uses different denominators.  It does not
2    use -- does not account for the majority --
3    I'm sorry.  -- does not account for
4    differences in -- in those databases.
5         So, again, I -- I would have to say that
6    on the merits, the National Academy study
7    suffers from one of the typical problems of
8    systematic evidence reviews and metaanalyses,
9    which is that they're very dependent on what
10   criteria you use for your metaanalysis and
11   how biased those studies are or are not.
12 Q.  You -- I believe the answer was, yes, you are
13   familiar with the criteria that the National
14   Academies used so can you say what criteria
15   those are.
16 A.  I would have to look to be precise.
17 Q.  But when you say you're familiar, you have a
18   general sense of what they used to exclude or
19   include studies?
20 A.  Yes.  I think that what they -- they used in
21   their metaanalysis, they used metaanalytic
22   rules that -- again, I would have to look at
23   the study to be precise because I don't want
24   to misquote them.  But they -- through their
25   process, the point is that their rules

89

1          excluded a very large number of studies that

2          were responsive to the question.

3     Q.   Do you believe that they excluded only

4          studies that showed a -- a -- an association

5          with negative outcomes and abortion?

6     A.   I'm not following your question.

7     Q.   Do you believe they --

8     A.   Will you rephrase, please.

9     Q.   Sure.  They -- do you believe that they

10         excluded studies that showed no negative

11         outcomes associated with abortion?

12    A.   Studies that showed no negative -- I -- I

13         would have to go back and look at the studies

14         they excluded.  I can't say off the top of my

15         head.

16    Q.   Can you give an example of one criterion that

17         they used to exclude studies?

18    A.   Again, I don't want to misquote.  I have read

19         the study in great detail and critiqued its

20         methods, but if you want me to pull up the

21         study and look at it, if you have a copy of

22         it, I'm happy to do that.

23    Q.   I don't so we can continue.

24    A.   Yeah.

25    Q.   In your report you cite a 2009 Finnish study

                                                     90

1        by Niinimäki, which is N-i-i-n-i-m-a-k-i,

2        called, Immediate Complications After Medical

3        Compared With Surgical Termination of

4        Pregnancy.

5   A.   What -- what paragraph is that?

6   Q.   So that would be Paragraph 32.  And did you

7        bring a copy of that study?  I forget if that

8        was one of the ones that you said you had.

9   A.   No, I didn't bring one.

10  Q.   So just give me a moment.

11            MR. MENDIAS:  I'm going to mark this as

12       well.

13            (WUBBENHORST EXHIBIT J, Article,

14       Immediate Complications After Medical

15       Compared With Surgical Termination of

16       Pregnancy, was marked for identification.)

17            MR. BOYLE:  Thank you.

18            MR. MENDIAS:  Uh-huh.

19  BY MR. MENDIAS:

20  Q.   And in Paragraph 32 you cite this study in

21       support of your claim that first-trimester

22       medication abortion carries substantial risks

23       to the mother; is that right?

24  A.   Yes.

25  Q.   And are you aware what sorts of medication

91

1    abortion regimens patients had received in

2    this study?

3  A.   Yes.  I think that they used vaginal

4    misoprostol, which is somewhat different from

5    the regimen that's used in the United States;

6    however, there have never been any

7    head-to-head trials to show that that regimen

8    is less safe or more safe or -- there have

9    been -- never been any effectiveness or

10   efficacy trials to compare those two.

11  Q.   So I'm going to direct you to a particular

12   paragraph.  So on Page 796, the first

13   paragraph of the column on the right side, do

14   you see the sentence after Footnote 14 that

15   begins, The time of follow-up?

16  A.   Yes.

17  Q.   Would you please read that sentence.

18  A.   The time of follow-up after abortion was 42

19   days.

20  Q.   Then could you read the next sentence as

21   well.

22  A.   Medical abortion was defined as the use of

23   mif- -- mifepristone alone or in combination

24   with misoprostol or other prostaglandins.

25  Q.   So do you know whether PPSAT uses a

1       medication abortion regimen different from

2       those methods?

3    A.    I think PPSAT does use a -- an abort- -- a

4       regimen that's different.  But, again, as I

5       said earlier, there's never been a

6       head-to-head comparison to show that the

7       efficacy, safety, or effectiveness of this

8       regimen differs from the one used by PPSAT.

9    Q.    Okay.  And so returning to the first page,

10       can you read the paragraph after the all caps

11       word conclusion.

12   A.    Both meso- -- methods of abortion are

13       generally safe, but medical termination is

14       associated with a higher incidence of adverse

15       effects.  These observations are relevant

16       when counseling women seeking early abortion.

17   Q.    So are you aware that the authors later

18       explained that the study was based on a

19       Finnish health registry that coded all

20       follow-up visits as complications even if

21       those visits were just for additional

22       consultation?

23   A.    Yes, I'm aware of that, but I don't think

24       that's relevant to the point that I was

25       trying to make.  The point that I was trying

93

1     to make was that the risk of hemorrhage was

2     very significant.  It was almost 16 percent.

3     So the risk of incomplete abortion was 6.7

4     percent and 1.6 percent with surgical

5     abortion.  And the risk of emergency surgery

6     was also close to 6.7 -- 6 percent.

7          So the point I was trying to make was

8     not the study design.  It was the fact that

9     these hard outcomes that they looked at

10    including hemorrhage, including need for

11    surgical evacuation, in- -- including risk of

12    incomplete abortion, were higher than

13    surgical abortion and higher than what's

14    reported in the United States.

15         Moreover, I want to emphasize that these

16    Finnish studies have the advantage of

17    complete ascertainment, which we do not have

18    in the United States ever.  They track every

19    woman from birth -- every human being from

20    birth until death, all of their interactions

21    with the medical system, so this is a

22    comprehensive way of looking at all tort --

23    tor- -- sorts of medical outcomes.  I've

24    spoken with Mika Gissler.  The research that

25    they do is really excellent and that's the

94

1       point I was trying to make.

2               MR. MENDIAS:  So I'm going to mark

3       this.

4               (WUBBENHORST EXHIBIT K, Letters to the

5       Editor, Immediate Complications After Medical

6       Compared With Surgical Termination of

7       Pregnancy, was marked for identification.)

8               MR. BOYLE:  Thank you.

9    BY MR. MENDIAS:

10   Q.  Doctor, you mentioned hemorrhage.  In the

11       second paragraph on -- in the leftmost

12       column, do you see a sentence in the middle

13       of that paragraph that begins, Based on?

14               MR. BOYLE:  Objection.  What -- what

15       are we looking at here?

16   BY MR. MENDIAS:

17   Q.  This is -- do you rec- -- do you recognize

18       this publication that --

19   A.  Yes.  Uh-huh.

20   Q.  Okay.  Do you see the paragraph -- the second

21       paragraph in the leftmost column?

22   A.  Yes.

23   Q.  And do you see the sentence about halfway

24       through that begins, Based on?

25   A.  Uh-huh.

                                                    95

1    Q.   Could you --

2              MR. BOYLE:  Objection.  Can we -- can

3         we just clarify what it is on the record,

4         please.

5    BY MR. MENDIAS:

6    Q.   All right.  Can you say what this document

7         is.

8    A.   Oh, this is a letter to the editor from --

9         I'm familiar with this.  -- I think her name

10        is Mary Fjerstad to the editors of The Green

11        Journal OB/GYN asking -- presenting some

12        questions for the authors.

13   Q.   Okay.  And can you read that sentence we were

14        just talking about.

15   A.   Based on correspondence with the Dr. --

16        H-e-i-k-i-n-h-e-i-m-o, one of the authors of

17        the Niinimäki -- I'll spell that,

18        N-i-i-n-i-m-ä-k-i, and there's an umlaut over

19        the A -- in Finnish health registries, any

20        return visit, even for additional

21        consultation, is categorized as a

22        complication.  Thus, a woman who is bleeding

23        may have been within the normal range but who

24        sought reassurance could have been coded as

25        having had a hem- -- hemorrhage.

                                                    96

1  Q.   So isn't it true that the rates of hemorrhage

2       might have been inflated in the original

3       Niinimäki study?

4  A.   I don't think that's true.  This author is

5       making a presumption not based on any data.

6       She said a woman may -- her bleeding may have

7       been in the normal range and could have been

8       coded, but she doesn't present any data or

9       any critique of the data to support that

10      statement.

11 Q.   And the doctor she refers to, Heikinheimo, he

12      was a -- an coauthor of the 2009 --

13 A.   Right.

14 Q.   -- Niinimäki story -- or article?

15 A.   But they don't present the correspondence so

16      I can't comment on that.

17 Q.   How do you define hemorrhage?

18 A.   It depends on the procedure.  So typically,

19      you can have as much as -- I mean, again, it

20      depends on the procedure.

21 Q.   Is any amount of bleeding in a patient

22      hemorrhage?

23 A.   No.

24 Q.   So how much bleeding is a minimum to be

25      considered hemorrhage?

97

1   A.   It's usually prespecified in patients and in

2       clinical data so that's why I'm asking you

3       which procedure you're referring to.  For

4       example, if it's a labor-and-delivery

5       patient, we would consider bleeding up to

6       about 400 milliliters to be normal and then

7       once past that, maybe 3- to 400, and then

8       once it's beyond that, we count that as

9       postpartum hemorrhage.  So it's procedure

10      specific and in papers, as I said, they

11      usually provide a predefined cutoff as to

12      what they consider to be hemorrhage.

13   Q.   How much bleeding is considered hemorrhage in

14      a medication abortion patient?

15   A.   I think that it's -- they can bleed as much

16      as 80 to 100, but, again -- 100 is --

17      milliliters.  But, again, the amount is

18      subjective.  And unless you weigh pads, which

19      is what we do -- weigh pads and surgical

20      sponges and so on and so forth, which is what

21      we do with hemorrhage at term, it is

22      difficult to quantify.

23   Q.   And in the right column of this letter to the

24      editor page, this was written by the authors

25      of the study, Niinimäki 2009, et al.,

1       correct?

2   A.   Yes.

3   Q.   And can you read the bullet point at the

4       bottom of that rightmost column on the first

5       page.

6   A.   Rate of serious real complications is rare

7       and rather similar between surgical and

8       medical abortion.

9   Q.   And was the 2009 Niinimäki study a

10      retrospective administrative database study?

11  A.   Yes.

12  Q.   And you say a strength of that study is to

13      completely ascertain all abortions and all

14      complications, correct?

15  A.   Yes.

16  Q.   But in your declaration at Paragraph 36, you

17      criticize a study by Upadhyay, et al., from

18      2015.

19  A.   Yes.

20  Q.   And you specifically say that it has many

21      limitations similar to other retrospective

22      administrative database research studies,

23      correct?

24  A.   Yes.  That's because studies that are done in

25      the United States cannot have complete

1       ascertainment.  We don't have the types of

2       databases, we don't have the types of

3       registration, we don't have the types of

4       statistical methodology and power that they

5       do in Scandinavia so they're not com- --

6       comparable at all.

7  Q.   But didn't Upadhyay in the 2015 study look at

8       Medicaid data which included all Medicaid

9       beneficiaries who had received an abortion

10      and any follow-up care that they obtained?

11           MR. BOYLE:  Objection.  You can answer.

12 A.   They're -- the Medicaid databases are

13      notorious.  I've worked extensively -- you

14      can look at my CV and see that I have two,

15      maybe three papers looking -- doing heavy

16      power lifts using Medicaid data.  Medicaid

17      data is notorious for being limited.  There

18      is miscoding.  There are patients that, for

19      example, will code for having two deliveries

20      in one year.  The ability to -- for them to

21      follow up on patients is -- is not -- it is

22      not comparable in any way to what the Finnish

23      people can do with their databases.

24           And in addition to that, the Finnish

25      database is designed to capture both medical

1    and administrative and financial data.

2    Medicaid is designed just to capture

3    financial data.  That's it.  It's -- it is

4    not -- and it doesn't have information on

5    gestational age, doesn't have information on

6    complications at the patient level.  These

7    databases do.

8  Q.  So looking back at the reply that Niinimäki

9    wrote in response to Mary Fjerstad's letter

10   to the editor, isn't it true that she writes

11   that complications -- many of the

12   complications are not really such but,

13   rather, concerns or adverse events that bring

14   women back to the healthcare system?

15 A.  Yes.  That's what she says.

16 Q.  Does that imply that there was some

17   miscoding?

18         MR. BOYLE:  Objection.

19 BY MR. MENDIAS:

20 Q.  You can answer.

21 A.  No, I don't think that there's miscoding

22   because, as I've said, they organize their

23   database very differently from ours and

24   miscoding is very rare if -- and unusual.

25         What I would say is that the specific

101

1    outcomes that I mentioned, which were

2    hemorrhage, incomplete abortion, and

3    emergency surgery, are hard outcomes and they

4    were demonstrated to be more common and they

5    were demonscra- -- -strated to occur at a

6    specific incidence or prevalence within a

7    population that we were looking at.

8  Q.  And you also criticized the 2015 Upadhyay

9    study saying that, There is a likelihood that

10   patients with complications didn't engage

11   with the medical system; is that right?

12 A.  Yes.  And what I meant by that was that they

13   did not engage with the medical system in a

14   way that was visible through a Medicaid

15   administrative database.  That's the point

16   that I was trying to make.  If a patient had

17   complications, of course, they would

18   reasonably engage with the medical system,

19   but the fact of the matter is that what we

20   find very frequently is that when patients

21   suffer abortion complications, they do not

22   return to the abortion clinic.  They are seen

23   by physicians like myself who go to hospital

24   emergency rooms and that was the point that I

25   was trying to make, that they did not engage

                                              102

1          with the medical system in a way that was

2          visible through a Medicaid database.

3     Q.   In Paragraph -- my -- my apologies.  So in

4          general, you criticize record linkage study

5          involving the Medicaid program.

6               Is that a fair representation of your

7          position in the declaration?

8     A.   I think it's open to critique, but sometimes

9          it's the data that we have.  But I do think

10         that it is not adequate to answer certain

11         questions and that's what I'm -- the point

12         I'm trying to make.

13    Q.   So in Paragraph 57 of your declaration you

14         cite a study by Reardon, et al., from 2002.

15    A.   Uh-huh.

16    Q.   That was also a California Medicaid record

17         linkage study, correct?

18    A.   Right.  Yes.

19    Q.   Would you agree that the 2015 Upadhyay study

20         was well-designed?

21    A.   I would have to go back and look at the study

22         design because I cannot say off the top of my

23         head whether it was well-designed or not.  I

24         don't believe I commented on the study

25         design.  I said there were methodologic

                                                            103

1              issues, but I didn't say whether it was

2              well-designed or not well-designed.

3      Q.    So do you have your Minnesota expert report?

4              And I'm -- apologies.  I do not remember what

5              exhibit it was marked as.

6                    MR. BOYLE:  H.

7      BY MR. MENDIAS:

8      Q.    H.  So --

9      A.    Oh.  Oh.  Oh.  You already --

10     Q.    Yeah.

11     A.    -- gave it.  Okay.

12     Q.    Yeah.

13     A.    Wait a minute.  Wait a minute.

14     Q.    So on Page 16 -- or -- I'm sorry.  Yes.

15             Actually, Page 16, Paragraph 71.  And that

16             would be the fifth line of that paragraph.

17     A.    Yes.

18     Q.    You did say it was well-designed, correct?

19     A.    Yes.

20     Q.    Okay.

21     A.    Uh-huh.  And in Paragraph 143 you also

22             criticize another Upadhyay study.

23                    MR. BOYLE:  Object to form.  What --

24             what exhibit are you on now?

25                    MR. MENDIAS:  It's -- I haven't marked

                                                          104

1          that exhibit yet.  I'm talking about her

2          declaration.

3     A.   But you didn't tell me which --

4               MR. BOYLE:  So you're back to --

5     A.   -- document --

6               MR. BOYLE:  -- Exhibit B?

7     A.   -- we're referring to.

8     Q.   No.  No.  No.  I -- this is another Upadhyay

9          study and I will mark that, but I haven't

10         marked it yet.  So --

11              MR. BOYLE:  But you're back in

12         Exhibit B --

13              MR. MENDIAS:  Oh, in Exhibit B --

14              MR. BOYLE:  -- 4- --

15              MR. MENDIAS:  -- yes.  Correct.

16              THE WITNESS:  Okay.

17              MR. BOYLE:  -- Paragraph 143?

18              MR. MENDIAS:  Apologies.  Yeah.

19              MR. BOYLE:  Yeah.  Thank you.

20    BY MR. MENDIAS:

21    Q.   So Paragraph 143 of your declaration.  So in

22         the --

23    A.   Yes.  Uh-huh.

24    Q.   So that was a 2018 Upadhyay study?

25    A.   Uh-huh.  And I just want to say, I have

                                                        105

1       nothing against Dr. Upadhyay.

2    Q.   Sure.  You point out that it only included

3         data from 15.7 percent of the country.

4              MR. BOYLE:  Objection.

5    BY MR. MENDIAS:

6    Q.   You can answer.

7    A.   I think that what I said was that it's 15.7

8         percent of hospitals.

9    Q.   Sure.

10   A.   And then I went on to say, quote -- quote, It

11        undersampled some regions west and south and

12        oversampled others.

13   Q.   Do you have a reason to believe that abortion

14        complications are more likely in some regions

15        of the country than others?

16   A.   Yes.

17   Q.   What would those reasons be?

18   A.   I think that the -- actually, not the

19        complications themselves.  I can't really

20        comment on whether the complications

21        themselves would be more likely in different

22        parts of the country, but the management of

23        those complications might depend on the

24        availability of health services.

25   Q.   And so with respect to your criticism that it

                                                          106

1          only included 15.7 percent of hospitals in

2          the country, are you aware of any data set

3          that includes emergency room data from every

4          hospital in the United States?

5   A.    I think there are data sets like that that

6          exist, but I would have to confirm that.

7   Q.    You've never -- you couldn't provide a name

8          of such a data set?

9   A.    It would be very easy to get that.

10  Q.    Okay.  Who do you think maintains this data

11         set?

12  A.    I think the Hospital Association of America

13         has similar data sets.  Again, I can't really

14         comment on which ones they are or who

15         maintains them, but I know that they exist.

16  Q.    So the authors of that study say they used

17         data from the nationwide emergency department

18         sample.

19              Are you familiar with what that is?

20  A.    Yes.

21  Q.    What is it?

22  A.    It is a sampling -- but it's not a random

23         sampling.  It's a sampling of emergency

24         department encounters with -- from patients

25         with the medical system through the emergency

107

1       department.

2   Q.  And they also, the authors, that is, say that

3       that sample is maintained by the Agency for

4       Healthcare Research and Quality.

5               Are you familiar with that --

6   A.  Yes.

7   Q.  -- agency?  What is that agency?

8   A.  HRQ is an agency of the Federal Government

9       that looks at -- its mandate is health

10      services research in the United States.

11  Q.  Do you believe that it's a reliable source of

12      data?

13  A.  It's reliable to the extent that -- of the

14      data's quality.  No source is reliable in and

15      of itself; it depends on data quality and

16      integrity.

17  Q.  Do you believe that the data from the

18      national emergency department sample is of

19      low quality?

20  A.  I haven't reviewed it and I can't really say.

21  Q.  You note as well in your declaration that 15

22      deaths were noted in the Upadhyay 2018 study;

23      is that right?

24  A.  Can you direct me to where -- where you

25      are --

1    Q.   Sure.  That's --

2    A.   -- referring to?

3    Q.   -- Paragraph 146.

4    A.   It says -- yes.  It says, 15 patients in the

5         sample had ED visits that ended in the

6         patient's death.

7    Q.   Are you aware what the total sample size was?

8    A.   I would have to look at the paper, but I was

9         not using that statistic as the numerator for

10        an assessment of deaths from abortion.  That

11        was not the purpose.  The point I was trying

12        to make is that patients present to the

13        emergency room and died in the emergency

14        room.  That was the point I was making.  I

15        was not making an epidemiologic assessment

16        that this is the numerator over some

17        denominator of encounters in the ER.  That's

18        not what I was trying to do.

19   Q.   What was the relevance of the point you were

20        trying to make?

21   A.   That patients presented to the emergency room

22        and died in the emergency room.

23   Q.   Isn't it possible that if a woman did not

24        disclose that she had had an abortion, she

25        would have been excluded from the study

1           sample?

2    A.    It's possible, but that's speculation.

3    Q.    But you believe that abortion providers tell

4          their patients not to inform emergency

5          departments staff that they've had an

6          abortion?

7    A.    I don't believe it, but I believe that I've

8          documented in my declaration where that has

9          occurred.

10   Q.    Has it occurred in North Carolina?

11   A.    I don't know.

12   Q.    Have you ever seen anything from PPSAT to

13         suggest that it tells its patients such a

14         thing?

15   A.    I would not say that.  I have not seen that.

16   Q.    In Paragraph 67 of your declaration --

17   A.    Okay.  Give me just a minute here.

18   Q.    Sure.

19   A.    Yes.

20   Q.    -- you assert that aspiration abortion is

21         surgery.

22   A.    Yes.

23   Q.    And in the next paragraph you say, It

24         requires surgical training distinct from

25         other types of training.

110

1   A.   Yes.

2   Q.   Is that training that you've received?

3   A.   No.  But as an academic physician, I was

4        aware of and continue to be aware of the fact

5        that physicians who are being trained to do

6        abortions are trained in surgical technique

7        of doing abor- -- performing abortion.

8   Q.   Do you consider a D&C to be a form of

9        surgery?

10  A.   Yes.

11  Q.   In Paragraph 69 you say, It requires surgical

12       operative sterile technique.  What do you

13       mean by that phrase?

14  A.   What are we referring to?

15  Q.   In Paragraph 69 you say, It requires --

16  A.   When you say -- are you referring to surgical

17       abortion?

18  Q.   Well, I -- I'm asking about the paragraph

19       that you wrote so I'm wondering what the it

20       is there and --

21  A.   Right.

22  Q.   -- what you mean --

23  A.   So it's surgical --

24  Q.   -- by that phrase.

25  A.   -- abor- -- oh, sorry.  Sorry.  I'm sorry.

111

1    Q.   No.  Go ahead.  I -- I'm asking you to

2         explain that paragraph in -- both in terms of

3         what it's referring to and what you mean by

4         surgical operative sterile technique.

5    A.   So when surgery is performed, typically, we

6         perform surgery using instruments that have

7         undergone high-level sterilization to prevent

8         the introduction of spores and resistant

9         organisms into body cavities.  That is part

10        of operative technique.  We also use sterile

11        gloves, sterile gowns, sterile instruments,

12        and sterile conditions, sterile surfaces, and

13        that defines what sterile operative technique

14        is.

15   Q.   And what is curettage?

16   A.   It's French because many of our medical terms

17        are from French or Greek and it means

18        scraping.

19   Q.   Can you explain how that scraping constitutes

20        a, quote, linear incision through the lining

21        of the uterus, end quote, as you assert in

22        Paragraph 71 of your report.

23   A.   Because when you perform an abortion or when

24        you are doing dilation and curettage for

25        retained products of conception, you apply

                                                     112

1    the curette until you hear something called a

2    cri, c-r-i, and what that is is the sound of

3    you scraping through the layer of the uterus

4    to make linear incisions in the endometrium,

5    the lining of the uterus, down to the

6    beginning of the -- down to the interface

7    between the muscle -- the -- what's -- down

8    to the base of the endometrium.  And that is

9    characteristically a gritty sensation that

10   you encounter and that tells you that you've

11   removed the tissue either through an

12   incomplete abortion or whatever procedure

13   you're doing.

14 Q.  And do you consider that scraping to be an

15   incision?

16 A.  It is because you're incising through the

17   lining of the uterus.

18 Q.  Are you aware that ACOG does not describe

19   curettage as involving an incision?

20 A.  I'm aware that ACOG makes that distinction.

21   I don't agree with that.

22 Q.  In Paragraph 74 of your declaration you

23   suggest that, 15 to 20 percent of patients

24   receiving curettage due to an induced or

25   spontaneous abortion develop intrauterine

113

1           adhesions, correct?

2      A.   I didn't say that.  I quoted these authors as

3           saying that.

4      Q.   And you agree with that statement?

5      A.   Yes.

6      Q.   What is a spontaneous abortion?

7      A.   It's a miscarriage where you have in utero

8           fetal demise.

9      Q.   So the figure that you cite doesn't

10          differentiate between those patients who

11          miscarried and those who obtain an abortion

12          and then subsequently developed intrauterine

13          adhesions, correct?

14     A.   In the paper and in subsequent papers they do

15          make that distinction.  The point I was

16          trying to make there is that curettage is

17          surgery and it leads to surgical

18          complications.  It leads to scar tissue.

19     Q.   And like you said, you've performed D&Cs for

20          patients experiencing miscarriage, correct?

21     A.   Yes.

22     Q.   Do you know how frequently your patients

23          develop intrauterine adhesions after you

24          perform a D&C?

25     A.   No.

                                                    114

1    Q.   When an embryo or a fetus has died in utero,

2         what are physician -- physician's options for

3         removing it?

4    A.   So I'm going to rephrase it a little bit

5         differently.  So if a patient comes to me --

6         and miscarriage is a very sad situation.

7         Many times women are devastated by the loss

8         of a child that they had already planned and

9         thought about and contemplated their birth.

10        When patients come to me with a miscarriage,

11        I typically offer them the opportunity of

12        expected management versus immediate

13        management with a D&C.  Does that answer your

14        question?

15   Q.   Yeah.  I think I have a follow-up question,

16        though.  What happens if there is fetal death

17        in the second trimester?

18   A.   So with fetal death in the second trimester,

19        we are much more concerned with abort- --

20        with infection and hemorrhage.  And so

21        typically, those patients in my experience in

22        every hospital in every program that I've

23        worked at are managed in the hospital.

24   Q.   And --

25   A.   They're not managed as outpatients.

1    Q.    Have you managed those patients yourself?

2    A.    Yes.

3    Q.    What have you done to manage them?

4    A.    Either -- before misoprostol we would have to

5          dilate the patient's cervix with laminaria

6          and then do essentially a D&E, dilation and

7          evacuation, but not a D&E in the sense that

8          it was not on a living -- it was on a demised

9          fetus.  With misoprostol, management has

10         become much more straightforward.

11   Q.    What is management like now that

12         misoprostol --

13   A.    We give them --

14   Q.    -- exists?

15   A.    -- high doses of -- of -- I'm sorry.  We give

16         them misoprostol orally.  I -- some

17         clinicians may give it vaginally and that

18         usually effects expulsion.  E -- that should

19         be e-f-f-e-c- -- thank you.

20   Q.    So in Paragraph 94 of your declaration you

21         discuss a report produced by an organization

22         called Advancing New Standards in

23         Reproductive Health, correct?

24   A.    Uh-huh.  I'm sorry.  Yes.

25   Q.    And that report was an analysis of a report

116

1           produced by the FDA entitled, Mifepristone

2           U.S. Post-Marketing Adverse Events Summary

3           through 12/31/2018, right?

4      A.   Yes.

5      Q.   And you describe as demonstrably false the

6           report's assertion that it is mandatory to

7           report any death among someone who used

8           mifepristone, correct?

9      A.   Yes.

10     Q.   What is your view to arrive at your

11          conclusion that that statement was

12          demonstrably false?

13     A.   I reviewed FDA's REMS for mifepristone and I

14          also reviewed their postmarketing protocols.

15          Their postmarketing protocols are very

16          specific in stating for the REMS that

17          prescribers must report complications to

18          Danco or -- actually, it's not just Danco

19          because there's a generic manufacturer.  But

20          let's say for this -- just the manufacturer

21          of mifepristone, prescribers must report

22          those to the -- complications to the

23          manufacturer who then reports them to FDA.

24          But if prescribers are not notified of

25          complications and those complications occur

117

1    and are managed in an emergency room or

2    elsewhere, they are never reported.  And so,

3    therefore, it is not true.  There is no

4    mandate on practitioners, physicians,

5    emergency room docs, gynecologists to report

6    those complications to FDA.  That does not

7    exist.

8  Q.  Do you consider yourself an expert on the

9    Federal Food, Drug, and Cosmetic Act?

10  A.  Only an expert insofar as it affects my

11    practice and needing to understand the ways

12    that FDA's mandates and rules affect my

13    practice.

14  Q.  Do the REMS for mifepristone affect your

15    practice?

16  A.  No -- no, because I do not perform abortion.

17    However, it is incumbent to understand, as in

18    this situation, that, as I said earlier,

19    there is no mandatory reporting on the part

20    of everyday pres- -- of -- there's mandatory

21    reporting on the part of prescribers but not

22    on the part of other physicians who may

23    manage those complications.  Without having

24    that information, it is impossible to

25    accurately ascertain what the true

118

1   complication rate is from mifepristone

2   abortions -- mifepristone/misoprostol

3   abortions.

4   Q.   So between Paragraphs 113 and 114 of your

5        declaration you include a table, correct?

6   A.   Yes.

7   Q.   And that table includes deaths that the FDA

8        was aware of after a patient took

9        mifepristone, correct?

10  A.   Yes.

11  Q.   Does that suggest that those deaths were

12       caused by mifepristone?

13  A.   They were associated with mifepristone.

14  Q.   And what is your basis for saying that they

15       were associated?

16  A.   The statement there under the paragraph --

17       the second double dagger where it says, The

18       fatal cases are included regardless of causal

19       attribution.  So if there is no cause, then

20       you're really talking about association, that

21       the woman took it -- mifepristone and then

22       had -- experienced these outcomes.

23  Q.   But doesn't the paragraph go on to say that

24       some of these deaths involved causes that

25       could not possibly have been associated with

119

1        mifepristone?

2   A.   I disagree with that statement because I

3        believe and I think that there's evidence,

4        which I have supplied in my declaration, that

5        women do engage in risk-taking behavior, do

6        engage in unhealthy behaviors which can lead

7        to them dying from drug intoxication,

8        suicide, and so on and so forth.

9   Q.   Do you believe that there's an association

10       between medication abortion and being the

11       victim of a homicide?

12  A.   I think that if a woman undergoes a

13       medication abortion and then engages in

14       risk-taking activities, in particular drug

15       use, and I documented associations between

16       abortion and drug use, that she could put

17       herself in a situation where she could be the

18       victim of homicide.

19            MR. BOYLE:  We've been going for about

20       another hour so whenever it's convenient, I'd

21       like to take a break.

22            MR. MENDIAS:  Sure.  I've got a few

23       more questions in this -- on this topic but

24       then after that, maybe ten minutes from now.

25  A.   Yes, because I could use the ladies' room.

                                                    120

1    Q.   So did this report -- or -- I'm sorry.  This
2         table here includes all the deaths the FDA
3         was aware of between September 28th, 2000,
4         and June 30th, 2021; is that correct?
5    A.   As far as I know, yes.
6              MR. BOYLE:  Object to form.
7    BY MR. MENDIAS:
8    Q.   And that was a yes?
9    A.   No.  It was -- I said, as far as I know.  I
10        can't say yes or no because I wasn't the FDA
11        and I didn't collect the data.
12   Q.   Did the report indicate how many women had
13        taken mifepristone in that period of time?
14   A.   There are two parts to this report and I
15        didn't include everything, but they -- there
16        is a -- somewhere in here there is a
17        denominator.  Again, I think that it would be
18        very difficult to identify which -- whether
19        women took mifepristone or not because,
20        again, we are relying on data that were
21        reported to the manufacturer.  And as I said
22        earlier, those data are necessarily com- --
23        incomplete because there is no mandated --
24        mandated reporting for nonprescribers.
25   Q.   Do you believe that the denominator is

                                                    121

1          inaccurate that the FDA reported?

2     A.    Can you define what you mean by the

3          denominator.

4     Q.    The number of women who took mifepristone in

5          that time period.

6     A.    I don't know.  I haven't reviewed their raw

7          data so I can't say.

8     Q.    Did you encounter a figure that the FDA

9          provided as the number of women who had taken

10         mifepristone in that time period?

11    A.    I want to say it was in the millions and the

12         number 2.6 million comes to mind, but that is

13         recollection so I can't really say that

14         that's completely accurate.

15    Q.    And last month you submitted a declaration in

16         a case in Kansas, correct?

17    A.    Yes.

18              MR. MENDIAS:  Could I mark this as the

19         next exhibit.  Thank you.

20              (WUBBENHORST EXHIBIT L, Declaration of

21         Monique Chireau Wubbenhorst, M.D., M.P.H.,

22         Kansas Case, was marked for identification.)

23              MR. BOYLE:  Thank you.

24    BY MR. MENDIAS:

25    Q.    And so on Page 39 of that declaration --

                                                        122

1    A.    Yes.

2    Q.    -- you include a very similar chart, correct?

3    A.    Yes.

4    Q.    And it reports the same number of deaths and

5          ectopic pregnancies; is that right?

6    A.    Yes.

7    Q.    Just give me one second.  And above the chart

8          there is text from the FDA report, right?

9    A.    Yes.

10   Q.    And do you see the number of women indicated

11         there who took mifepristone through the time

12         period covered in the chart?

13   A.    Yes.  I think I said earlier it was in the

14         millions.

15   Q.    Great.  And what -- how many specifically

16         millions is it?

17   A.    They say approximately 5.6 million.

18   Q.    Why didn't you include that figure in your

19         report for this case?

20   A.    I was at the point where I needed to keep my

21         text as short as possible.  It was certainly

22         not because I was trying to run away from

23         that figure.  I'm well aware of that figure.

24         It's commonly cited in the literature so it

25         was simply a question of trying to shorten --

123

1       keep my testimony as brief and to the point

2       as possible.

3   Q.  And how long is your declaration report --

4       or, I'm sorry, your declaration submitted in

5       this case?  That would be Exhibit B.

6   A.  64 pages.

7   Q.  Okay.

8           MR. MENDIAS:  I'm willing to take a

9       break at this point.

10          THE VIDEOGRAPHER:  Going off the

11      record.  The time is 3:33.

12          (Whereupon, there was a recess in the

13      proceedings from 3:33 p.m. to 3:49 p.m.)

14          THE VIDEOGRAPHER:  Back on the record.

15      The time is 3:49.

16  BY MR. MENDIAS:

17  Q.  Dr. Wubbenhorst, do you believe that maternal

18      mortality surveillance relies exclusively on

19      death certificates?

20  A.  No.

21  Q.  And do you agree that the gold standard for

22      ascertaining maternal mortality is to collect

23      data and then have a state-level group of

24      obstetricians and epidemiologists review

25      every case?  Correct?

                                                    124

1    A.    I don't think that's the gold standard for

2          ascertaining mortality.  I think that that is

3          more related to ascertaining causes of

4          mortality.

5    Q.    Okay.  And you -- we were discussing earlier

6          the testimony that you gave in Kentucky.  You

7          remember that testimony, correct?

8    A.    I do.  I'm thinking you have a copy of it.

9    Q.    I might have given it already, but let me

10         see.

11   A.    I don't believe you've given it yet.

12   Q.    Correct.

13              MR. MENDIAS:  So I'll mark this.  Thank

14         you.

15              (WUBBENHORST EXHIBIT M, Excerpt of

16         Hearing Testimony by Dr. Wubbenhorst, was

17         marked for identification.)

18   BY MR. MENDIAS:

19   Q.    And this is a transcript of the direct and

20         cross-examination you underwent, I believe,

21         last summer in Kentucky.

22              Does that look like -- correct to you?

23   A.    Yes.

24   Q.    Okay.  And on Page 197 -- so -- and the

25         pages, again, are in the upper right-hand

125

1    corner of each small page in the --

2         MR. BOYLE:  So objection.  Is there

3    anything to identify this with?

4         MR. MENDIAS:  Yeah.  Let me -- well,

5    the witness has said that it looks familiar

6    so I can look for the full copy in a moment

7    but --

8  A.  Yeah.  I haven't -- I haven't seen this so...

9  Q.  So on Page 197 --

10  A.  Yes.

11  Q.  Okay.  Pardon me one second.  All right.

12     Actually, we'll set that aside for the -- a

13     moment.  I apologize for that.

14          Are you aware that the CDC has obtained

15     data on abortion mortality from all 50

16     states?

17  A.  I -- on abortion mortality.  I haven't looked

18     lately but, yes.

19  Q.  Do you know the sources that the CDC relies

20     on to identify abortion-related deaths?

21  A.  They pull from a variety of sources and I

22     would need to look precisely at their actual

23     method section of their MMWR.

24  Q.  Do you know off the top of your head some of

25     those sources even if we'll acknowledge that

126

1        it's not all of them?

2   A.   They rely on reports from the states.  They

3        rely on death certificate data.  There --

4        there are a few sour- -- data sources that

5        they use.

6   Q.   Do they rely on reports by private citizens?

7   A.   I don't know.

8   Q.   Do you know what happens after the CDC

9        obtains a -- a report of an abortion-related

10       death?

11  A.   My understanding is that they will try to get

12       as much information as they can regarding

13       that death.

14  Q.   And then what happens, if you know?

15  A.   Then they compile their data and report them.

16  Q.   Are you aware of any review of the reports

17       that the CDC undertakes?

18  A.   Well, that's what I meant, trying to get as

19       much information as possible.

20  Q.   Okay.  So could you say a little bit more

21       about what you mean when you say they try to

22       get as much information as possible.

23  A.   They will try to get information about things

24       like gestational age and so on and so forth.

25       Again, I don't have their protocol in front

127

1           of me so I don't want to try to recite it

2           from memory.

3    Q.    And are you aware of who at the CDC

4           undertakes the review of these reports?

5    A.    I do not know.  I would have to look at their

6           report to see that, which should be very

7           straightforward and easy to do.

8    Q.    Okay.  So back to Ex- -- Exhibition -- or

9           Exhibit B, your declaration in this case.

10   A.    Just give me a moment.  Yes.

11   Q.    So in Paragraph 39 of your declaration you

12          cite a study by Cates and Grimes, correct?

13   A.    Yes.

14   Q.    And that study is to support your assertions

15          about the mortality rate of the D&E abortion

16          procedure; is that right?

17   A.    No.

18   Q.    What is it for?

19   A.    It's to show trends.  I was not citing

20          because that study's obviously very old, but

21          I was trying to make the point about methods

22          of D&E -- methods of abortion in the second

23          trimester and trends in how abortion data

24          were collected and so on and so forth.  I was

25          not making a comment about mortality per se

128

1        in that era compared to this era.

2    Q.   What trend do you think the study

3        exemplifies?

4    A.   I think that it shows that the -- again,

5        using contemporaneous -- their techniques

6        were similar to what we use now, but it

7        showed that their rate -- the increase in

8        mortality in their study was fairly

9        substantial between 13 to 15 weeks and

10        greater than 16 weeks.  That was the point

11        that I was trying to make.

12    Q.   So you acknowledge that the study is fairly

13        old and, as you say in your report, it looked

14        at D&E procedures performed from 1972 to

15        1978, correct?

16    A.   That's correct.

17    Q.   And that was before -- at least some of the

18        abortions in the study were performed before

19        the Supreme Court's decision in 1973 in Roe

20        v. Wade, correct?

21    A.   That's correct.

22    Q.   Do you know the circumstances under which an

23        abortion prior to Roe could be performed in

24        most states?

25    A.   It depended on the state and it was -- it was

1          not as much of a patchwork as it was that the

2          legalization of abortion proceeded starting

3          with -- I believe was California and New

4          York.  I don't know which one was first.

5               But, again, that's not the point I was

6          trying to make.  The point I was trying to

7          make was the change in mortality rates that

8          occurred from 5.6 per hundred thousand at 13

9          to 15 weeks to 14 at greater than 16 weeks.

10         That's the point I was trying to make.

11    Q.   Do you think that the rates -- the trend that

12         you're discussing might have been affected by

13         the medical procedures used 40 years ago?

14    A.   I think that the D&E procedure they were

15         using then was similar to what we're using

16         now.  And in the second part where I talked

17         about installation procedures and

18         prostaglandin and hysterotomy, the point I

19         was making there is that those procedures are

20         actually still used in some states and that

21         they're associated with significantly

22         increased rates of mortality.

23    Q.   Do you believe that PPSAT uses any procedure

24         other than D&E for abortions in the second

25         trimester?

1    A.    Not to the best of my knowledge, but, again,

2          that's not the point I was making.  I was

3          looking at overall abortion-related

4          mortality.

5    Q.    Do you believe that advances in medicine

6          could have undermined the conclusions of the

7          study with respect to the trend across

8          gestational ages?

9    A.    I can't speak to that.  I can't say what

10         could or could not have happened.

11   Q.    Do you believe that medicine does advance

12         over time?

13   A.    Yes.

14   Q.    And are you aware that the study's authors

15         found that out of 234,000 D&E abortions,

16         there were only 18 deaths?

17   A.    Yes, I'm aware of that.  But, again, the

18         point I'm trying to make was not related to

19         mortality rate per se; it was related to

20         mortality rate as it increases with

21         gestational age.

22   Q.    Are you aware that the authors of the study

23         concluded that D&Es performed in nonhospital

24         settings had lower death-to-case rates than

25         those performed in hospitals?

131

1    A.    I'm aware of that, but, again, that's not the
2          point I was trying to make by citing this
3          study.  And, again, the study is not
4          contemporaneous.
5    Q.    And are you aware that the study's authors
6          concluded that comparative mortality data
7          indicate that performing D&E outside of
8          hospitals carries no greater risk of death?
9    A.    Oh, yeah, I'm aware of that, but, again, as
10         you said, this study is how old now?
11   Q.    Doctor, you've expressed doubts with the
12         completeness of the CDC's surveillance of
13         abortion-related mortality; is that correct?
14   A.    Yes.
15   Q.    Are you aware that this study relies on
16         annual abortion surveillance conducted by the
17         CDC at the time?
18   A.    Am I aware of what?
19   Q.    That the study relied on CDC's annual sur- --
20         abortion surveillance activities when
21         calculating mortality rate.
22   A.    You're talking about the 1991 study?
23   Q.    Yes.
24   A.    Correct.  I'm familiar with Willard Cates'
25         and David Grimes's work.

1   Q.   Is it your view that abortion mortality

2        surveillance is more accurate in countries

3        like the United Kingdom with nationalized

4        health systems?

5   A.   No, because I think they have the same

6        problem of ascertainment that we have here

7        and they also have significant problems with

8        issues around miscoding just as we have here.

9        And what I mean by that is that some abortion

10       deaths are coded as being due to pregnancy or

11       natural causes.  And an excellent example of

12       that is the unfortunate young lady who I

13       mentioned earlier, Keisha Atkins, who died

14       as -- due to complications from a late -- I

15       believe it was between 38 -- 28- and 32-week

16       abortion who was listed as -- the cause of

17       death was pregnancy.  So they suffer from the

18       same issues that we have in terms of

19       miscoding, in terms of inaccurate --

20       insufficient ascertainment.

21   Q.   To be clear, Keisha Atkins died in the United

22        States, not the United Kingdom, right?

23   A.   But I'm using that as an example of something

24        that I think is a phenomenon common to all

25        abortion statistics and not just abortion,

133

1      other causes of death as well.

2   Q.  So why is the ascertainment better in Finland

3       than in the United Kingdom?

4   A.  Because once you enter the health system when

5       you're born, you don't exit it till you die.

6       Every encounter with the medical system is

7       documented and every encounter with the

8       medical system, when researchers go to look

9       at it, they can look at what the coding was

10      and correlate it to a hospital chart if they

11      want to.  We do not have those capa- --

12      capabilities.

13  Q.  Sure.  I asked you about the United Kingdom.

14      So do you have any basis to believe in the

15      United Kingdom the surveillance is different

16      than in Finland?

17  A.  It is because the national health service is

18      a national health service, but it does not

19      enroll patients from birth to death and

20      collect comprehensive data on every encounter

21      with the medical system.  They can collect

22      data administratively and then try to go back

23      and look at patient-level data, but to have

24      granular patient-level data requires

25      something like what they have in Scandinavia.

                                                134

Q.   Have you examined patient-level data or any
     health service data from the United Kingdom?

A.   Yes, I have looked at some -- some of their
     data.

Q.   In what context?

A.   I was interested in some of their maternal
     mortality data because what their data was
     showing was that there were disparities in
     maternal mortality between women of color and
     white women even though they have a
     nationalized health system.  I have not
     looked at patient charts because I haven't
     gotten permission to do that.

Q.   Do you believe that the data that you
     reviewed was inaccurate?

A.   It was aggregate data and I can't vouch for
     its integrity or its quality.

Q.   Do you -- are you aware that the authors of
     the 1981 Cates and Grimes study found that
     the death case rates for D&E in the United
     States are consistent with British data?

A.   I was not aware of that.  And, again, the
     point of my citing that study was simply to
     show the difference -- the issues around
     increasing mortality with increasing

135

1                gestational age.  That was the point of my

2                citing it.

3        Q.    And in Paragraph 179 of your declaration you

4                cite a source by Lanska.  Can you say what

5                that source is.

6                      MR. BOYLE:  What paragraph is that,

7                please?

8                      MR. MENDIAS:  That was 179.

9                      MR. BOYLE:  Thank you.

10       A.    Yes.

11       Q.    What is that source?

12       A.    It's a journal article.

13       Q.    Okay.

14                      MR. MENDIAS:  I'm going to mark this,

15                please.  Thank you so much.

16                      (WUBBENHORST EXHIBIT N, Letters to the

17                Editor, 2/17/2017, was marked for

18                identification.)

19                      MR. BOYLE:  Thank you.

20       BY MR. MENDIAS:

21       Q.    And, Doctor, this is not a journal article,

22                is it?

23       A.    It's a letter to the editor.  That's correct.

24                Yeah.

25       Q.    So it was not peer reviewed?

                                                          136

1    A.    Uh-huh.  That's correct.

2    Q.    And the letter was written in 1983, correct?

3    A.    That's correct.

4    Q.    And isn't it true that the only source cited

5          in this article -- or the only sources cited

6          in this article are from 1981 or earlier?

7    A.    That's correct.

8    Q.    And the --

9    A.    The point -- I'm sorry.

10   Q.    No.  Go ahead.

11   A.    If I can continue, the point I was making in

12         including these -- including this particular

13         letter is that it's stated in a very clear

14         and understand way that the -- I think it's

15         the first, second -- third paragraph on Page

16         362 where it says, The mortality rate for

17         vaginal deliver- -- excuse me.  Excuse me.

18         The mortality rate for vaginal deliveries may

19         be artificially low because high-risk mothers

20         are more likely to have a cesarean delivery.

21         This effect could be eliminated by adjusting

22         for preexisting medical conditions between

23         the vaginal and cesarean delivery subgroups

24         as the authors did in calculating rates for

25         women who had an abortion.

137

1          So the only reason I was including this

2     was not as a way of comparing maternal

3     mortality, which was higher at that time.

4     And certainly, this is, you know, 40 year --

5     some-odd years ago, but it was easily -- an

6     easy-to-understand way of talking about how

7     high-risk moms are more likely to have a

8     cesarean delivery, which is associated with

9     increased risk for mortality than low-risk

10     moms.

11     Q.   In defining a high-risk delivery, the

12     letter's authors assume that maternal

13     mortality following a cesarean is

14     approximately a hundred per 100,000; isn't

15     that correct?

16     A.   Yes.  But, again, I'm not looking at their --

17     or not citing their specific data.  What I'm

18     trying to help to present and perhaps didn't

19     need -- and appreciate the opportunity to

20     make it clearer is that cesarean delivery is

21     associated with a higher mortality rate than

22     vaginal delivery --

23     Q.   Do you believe --

24     A.   -- and that when you combine maternal

25     mortality statistics, very often that

138

1    distinction is not made.  That's the only

2    point I was trying to make.

3  Q.  Do you believe that the mortality rate today

4    following C-section is a hundred per 100,000?

5  A.  I just said a moment ago that I am not

6    relying on the maternal mortality statistics.

7    I am simply making the point that cesarean

8    delivery is associated with higher mortality

9    and morbidity than vaginal delivery.

10  Q.  I understand.  But I'm asking you if you

11    believe that the mortality rate today

12    following a cesarean section --

13  A.  No, it's not.

14  Q.  What do you think it is?

15  A.  I think that the most recent statistics I saw

16    were that the -- I would have to look, but I

17    think the mortality rate for a cesarean

18    delivery is about ten times greater, but,

19    again, I would have to look to be sure of

20    that.

21  Q.  And the authors of the letter conclude that,

22    Cesarean sections account for only 10 percent

23    of deliveries and 90 percent of maternal

24    mortality associated with childbirth; is that

25    right?

139

1    A.    That was true then, but it's not true right

2          now --

3    Q.    So you're not --

4    A.    -- because we have a much higher -- sir?

5    Q.    No.  Go ahead.

6    A.    No.  Please complete your question.

7    Q.    I just wanted to confirm.  So you don't

8          believe that 90 percent of maternal deaths

9          associated with childbirth are attributable

10         to C-sections today?

11   A.    No, I don't think that that's the case.  I

12         think that the other point is that our

13         cesarean rate is much -- what I was going to

14         say is that the -- our cesarean rate is much

15         higher than it was at that point.

16   Q.    Understood.  Doctor, what is an ectopic

17         pregnancy?

18   A.    It's an -- ectopic pregnancy, excuse me, is a

19         pregnancy that implants outside of the

20         uterus.  It can implant in a variety of other

21         sites, but the majority of them implant in

22         the fallopian tube.

23   Q.    And how common is ectopic pregnancy?

24   A.    1 to 2 percent of pregnancies in the United

25         States.

                                                    140

1   Q.   What are the risks of an ectopic pregnancy?

2   A.   Rupture with hemorrhage requiring urgent

3        surgical intervention; death; complications

4        of hypovolemia, for example, if she bleeds

5        and then suffers heart attack or other

6        complications as well.

7   Q.   Do you know what the rate of each of those

8        risks is, how frequently they occur in an

9        ectopic pregnancy?

10  A.   I couldn't tell you what -- the risks

11       associated with hypovolemia.  I do -- I can

12       affirm that ectopic pregnancy is the leading

13       cause of first-trimester maternal death.

14  Q.   Sure.  Do you know the specific rate, how

15       many women per ectopic pregnancy die in this

16       country?

17  A.   No.  I think that the point is -- as I was

18       saying earlier, that it's fairly common,

19       happening in 1 to 2 percent, and it is not an

20       easy diagnosis to make always.

21  Q.   Do you know at what point in pregnancy an

22       embryo can be visualized with a transvaginal

23       ultrasound?

24  A.   Depends on the woman.  So most pregnancies

25       and the radiology literature state that you

141

1    should be able to visualize an embryo

2    sometime between four and six weeks, but it

3    can be longer.  Relates to tissue

4    characteristics, to the skill of the

5    operator.

6    Q.  Would you consider a pregnancy of unknown

7        location to be equivalent to a confirmed

8        ectopic pregnancy?

9    A.  No.

10   Q.  And if a patient has a pregnancy of unknown

11       location but no symptoms of ectopic

12       pregnancy, do you consider that a suspected

13       ectopic pregnancy?

14   A.  It's suspected until proven otherwise.

15       That's axiomatic in OB/GYN.

16   Q.  So your opinion is that all pregnancies of

17       unknown location should be assumed to be

18       ectopic until ruled out?

19   A.  Yes, because if you miss it and a woman dies,

20       then that's very bad.

21   Q.  And so you said in your declaration that

22       ectopic pregnancy is a contraindication to

23       medication abortion.

24   A.  That's correct.

25   Q.  Why is it contraindicated?

1    A.    I'm just quoting FDA's -- the prescribing

2          information there.

3    Q.    Do you have your own basis for believing that

4          it's contraindicated?

5    A.    I was just quoting the prescribing

6          information.  I'm sorry.  I'm just putting

7          this in order.  Just my little thing here

8          of --

9    Q.    Uh-huh.

10   A.    -- keeping papers straight.  Yeah.

11   Q.    Okay.  So you don't have any other knowledge

12         about why it might be contraindicated?

13   A.    No, sir.  I'm relying on what the prescribing

14         information states.

15   Q.    Do you believe that mifepristone causes tubal

16         rupture?

17              MR. BOYLE:  Object to form.

18   A.    No.

19   Q.    Do you believe that misoprostol can cause a

20         tubal rupture of an ectopic pregnancy?

21   A.    Not to my knowledge.

22   Q.    Would you agree that an ectopic screening

23         protocol that uses ultrasound and hCG testing

24         is appropriate?

25   A.    Yes.

143

1   Q.   Do you know PPSAT's protocol for providing

2        medication abortion when there is a pregnancy

3        of unknown location?

4   A.   My understanding is that it relies on ruling

5        out ectopic pregnancy through -- or

6        attempting to rule out ectopic pregnancy

7        based on symptoms and history and not

8        ultrasound.

9   Q.   Do you believe that PPSAT provides medication

10       abortion to patients without having first

11       performed an ultrasound?

12  A.   Yes.

13  Q.   Do you believe that PPSAT provides medication

14       abortion to patients without doing hCG

15       testing?

16  A.   Can I just --

17  Q.   Sure.

18  A.   -- clarify that?  So your question was do I

19       believe that PPSAT provides medication

20       abortion to patients without an ultrasound.

21       Yes.  In -- in all cases, I don't know.

22  Q.   So do you believe that PPSAT provides

23       medication abortion to patients without doing

24       hCG testing?

25  A.   My understanding and the specific issue that

1          I was responsive to here was the pregnancy of

2     unknown location.  Reading the -- what

3     Dr. Farris said, it appears that PPSAT does

4     not perform -- routinely perform transvaginal

5     ultrasound in a patient with pregnancy of

6     unknown location to rule out ectopic

7     pregnancy.

8     Q.   If a patient seeking medication abortion

9     can't obtain one because she has a pregnancy

10     of unknown location, do you believe that the

11     law's requirement to document an intrauterine

12     pregnancy requires that patient to seek

13     further screening --

14     A.   Can you --

15     Q.   -- for ectopic pregnancy?

16     A.   Can you --

17          MR. BOYLE:  Object to form.

18     A.   Yeah.  Can you break that question down?  I'm

19     sorry.  It's --

20     Q.   Sure.

21     A.   -- long.

22     Q.   So you understand that the law that you are

23     here testifying in support of requires the

24     documentation of an intrauterine pregnancy

25     before a medication abortion can be provided,

145

1          correct?

2     A.    Yes.

3               MR. BOYLE:  Object to form.  You can

4          answer.

5     BY MR. MENDIAS:

6     Q.    And if a patient because of that requirement

7          cannot obtain a medication abortion, is it

8          your understanding that anything in the law

9          requires her to seek further screening for

10         ectopic pregnancy?

11              MR. BOYLE:  Object to form.  You can

12         answer.

13    A.    I'm really having trouble following you.

14         What -- what do you mean by cannot obtain an

15         abortion?

16    Q.    Well, as you understand, the law does not

17         permit a medication abortion in cases of

18         pregnancy of unknown location, correct?

19              MR. BOYLE:  Object to form.  You can

20         answer.

21    A.    That's correct.  But if the patient has a

22         pregnancy of unknown location, it's -- you

23         must triage that patient to either a

24         diagnosis of ectopic pregnancy, intrauterine

25         pregnancy, or a failing pregnancy,

                                                      146

1        miscarriage.  It doesn't mean that she can't

2        have an abortion.  I don't understand what

3        you mean by that.

4    Q.  If a patient prefers a medication abortion

5        but she doesn't have a documented

6        intrauterine pregnancy, do you believe that

7        she can get an abortion under the law?

8    A.  If she has an ultrasound that diagnoses her

9        to have a living intrauterine pregnancy.

10       If -- if she has -- if -- she could either

11       have an ectopic pregnancy, in which

12       medication abortion would be entirely

13       inappropriate; she could have a miscarriage,

14       in which case medication abortion would be

15       inappropriate because she would have passed

16       that demised fetus on her own or potentially

17       needed follow-up down the road but certainly

18       wouldn't have necessarily needed to -- to be

19       treated for and charged for an abortion; or

20       she has a viable intrauterine pregnancy that

21       she could have an abortion.

22            So I'm -- I'm just not understanding

23       your question, maybe.  Maybe I just don't --

24       I don't get what you're saying.

25   Q.  You understand that some patients prefer

                                                    147

1          medication abortion over surgical abortion,

2          correct?

3   A.     Yes.  And those patients have the option to

4          get it when an -- a vi- -- an intrauterine

5          pregnancy is seen.

6   Q.     And if they don't have a documented

7          intrauterine pregnancy --

8   A.     Then they must be triaged to a diagnosis of

9          either intrauterine pregnancy, failing

10         pregnancy or miscarriage, or ectopic

11         pregnancy.

12  Q.     And what does triaging mean?

13  A.     You apply the appropriate diagnostic

14         procedures to make -- to identify the

15         location of the pregnancy.

16  Q.     And if a patient refuses to comply with those

17         diagnostic procedures, what happens then?

18  A.     Then you have an obligation to not administer

19         a medication that could -- that she either

20         doesn't need or would not be effective.

21  Q.     Does anything in the law require that woman

22         to then seek ectopic screening elsewhere?

23              MR. BOYLE:  Objection.

24  BY MR. MENDIAS:

25  Q.     You can answer.

148

1    A.    I don't understand the -- the legal issue.  I

2          mean, I'm here as a witness on medical

3          issues; I can't speak to the legal issue.

4    Q.    Okay.  You've read the laws in question?

5    A.    Yes, I have.  But, again, I'm -- I'm here to

6          speak to the -- to the -- to the -- the

7          medical issues as an expert.

8    Q.    Okay.  So in Paragraph 268 of your

9          declaration...

10   A.    Just give me one moment, sir.

11   Q.    Sure.

12   A.    Yes.

13   Q.    So you say that if a patient's h- -- well,

14         you quote Dr. Farris who says that if a

15         patient's hCG levels are sufficiently high,

16         this may be evidence of ectopic pregnancy,

17         correct?

18   A.    Yes.

19   Q.    And you suggest that implicit in that

20         statement is that the patient must now

21         undergo surgical abortion in addition to

22         medical abortion; is that correct?

23   A.    Okay.  What I say is, Implicit in this

24         statement is the fact that because

25         appropriate diagnostic steps to rule out

149

1    ectopic pregnancy were not taken at the time

2    of the patient's initial visit, she must now

3    undergo surgical abortion in addition to

4    medical abortion.

5  Q.  So --

6  A.  So that's what I said and what I mean by that

7    is the fact that if the patient had had an

8    ultrasound that could confirm a diagnosis of

9    intrauterine pregnancy, ectopic pregnancy, or

10    miscarriage, she would have not received a

11    medication that she did not need and then she

12    would not have had to have both a medical

13    abortion and a surgical abortion.

14  Q.  Is it your understanding that PPSAT only

15    offers the patient the option of a surgical

16    abortion in this circumstance?

17  A.  That's not what I said here.  What I said is

18    that the patient has already undergone a

19    medical abortion and now, because she did not

20    have an ultrasound to triage her to the

21    appropriate diagnostic category, she has to

22    have a surgical abortion in addition to her

23    medical abortion.

24  Q.  Well, what is your basis for saying that she

25    has to have just now or in the report she

150

1    must now undergo a surgical abortion?

2  A.   Because that's what their protocol says.  It

3       says that if the hCG is elevated, they would

4       now do a surgical abortion.  If there were --

5       was no -- if there were no chorionic villi or

6       gestational sac on that surgical abortion,

7       then she would have to go and be seen for an

8       ectopic preg- -- to diagnose an ectopic

9       pregnancy, whereas, if they had done the

10      transvaginal ultrasound initially and said,

11      okay, this is either -- we -- we don't --

12      this is either a -- we can't really tell what

13      this is, this could be a miscarriage, this

14      could be an ectopic pregnancy, it could be an

15      intrauterine pregnancy, and had tri- --

16      triaged her to the appropriate diagnostic

17      category, she would not have had to undergo

18      those procedures and pay for both of those.

19 Q.   So my question is, if a patient returns after

20      a medication abortion with high hCG levels,

21      you believe the only option PPSAT says to her

22      is a surgical abortion?

23 A.   No.

24 Q.   What else do they offer her?

25 A.   First of all, again, I'm not talking about --

151

1      I am talking about in the pre- -- patient

2      with a pregnancy of unknown origin where

3      you -- they did not do a screening ultrasound

4      to ascertain the location of the pregnancy.

5      If they then -- they did not do that

6      ultrasound, she comes back with high hCG

7      levels, they have no basis -- no diagnostic

8      basis for -- to have triaged her into one of

9      those three categories, then their own

10      protocol says that they perform a surgical

11      abortion.

12  Q.  You believe that the protocol only includes a

13      surgical abortion at that point?

14  A.  No.  That's not what I'm saying.  I'm saying

15      that is what their protocol says is part of

16      their algorithm.

17  Q.  Do you believe a physician provides

18      substandard care if they do not provide every

19      medical service a patient might need?

20  A.  I don't -- I think that that's a -- it's a

21      question that I really can't answer because

22      it's -- a patient's perception of need has

23      nothing to do necessarily -- or may not have

24      anything to do with actually what's medically

25      appropriate.

152

1    Q.   When you treat patients, do you occasionally

2         refer them for services that you do not

3         provide?

4    A.   Yes.

5    Q.   Do you think that that's a shortcoming of

6         your medical practice?

7    A.   Well, not so much in my current medical

8         practice, actually --

9    Q.   It's something --

10   A.   -- because I'm a hospitalist and my primary

11        responsibility is patients in labor.

12   Q.   Do you believe that a physician who practices

13        in an outpatient setting and refers a patient

14        for medical services that physician does not

15        provide is deficient in some way?

16   A.   Not necessarily.  Depends on the clinical

17        situation.

18   Q.   Are you aware of any early medication

19        abortion patients who have experienced

20        negative outcomes from an ectopic pregnancy

21        as a result of PPSAT's protocol?

22   A.   No.

23   Q.   In Paragraph 351 of your report --

24   A.   Yes.

25   Q.   -- you discuss a study by Barnhart, et al.,

153

1       correct?

2    A.   Yes.

3    Q.   And you say -- one moment.  And -- okay.

4        Actually, Paragraph 354 you say in reference

5        to this study that, Performing a medical

6        abortion without identifying the location of

7        pregnancy goes against the recommendations in

8        this paper.

9            Where in Barnhart, et al., do they

10       discuss medication abortion?

11   A.   They talk -- it's -- it's -- the point that

12       I'm trying to make there is not Barn- --

13       whether Barnhart discusses medication

14       abortion.  The point -- the overarching and

15       much bigger point and the reason why there is

16       an enormous literature on pregnancy of

17       unknown location is that you must triage a

18       patient -- as it says in Paragraph 353,

19       Pat- -- patients must have an ultimate

20       diagnosis of an IUP, an ectopic pregnancy, or

21       spontaneous resolution of a pregnancy.

22            That is the point that I'm trying to

23       make.  It's not whether they mention

24       medication abortion or not.  It is simply one

25       of the best studies that synthesizes the

154

1    available consensus on pregnancy of unknown

2    location.

3  Q.  So does the paper discuss medication abortion

4    at all?

5  A.  It doesn't discuss it, but that's not why I

6    included it.  The reason I included it here

7    is because it clearly states unequivocally

8    and as consensus that pregnacies of unknown

9    location must be appropriately diagnosed --

10    triaged into appropriate diagnostic

11    categories.  That is the important point that

12    I'm trying to make here.

13  Q.  I know you say that you are a hospitalist

14    now, but did you provide treatment to

15    patients in an outpatient setting?

16  A.  Yes.

17  Q.  Did you provide prenatal care to patients in

18    an outpatient setting?

19  A.  Did I?

20  Q.  Yes.

21  A.  Yes.

22  Q.  When you did provide prenatal care to

23    outpatients, at what point in pregnancy do

24    you typically begin seeing them for prenatal

25    care?

1    A.    I started seeing them sometimes from very

2          soon after they had a positive home pregnancy

3          test.

4    Q.    Can you estimate about how many weeks since

5          the patient's last menstrual period that

6          would have been?

7    A.    So typically, for most women, they present

8          for care if they've done a home pregnancy

9          test early because they -- they -- when they

10         come in to see -- see us, it's typically

11         sometime between six and ten weeks I would

12         say.

13   Q.    And when you provided prenatal care in an

14         outpatient setting, when would your patients

15         typically receive their first ultrasound?

16   A.    As soon as they came in or maybe within a

17         week after they came in if they couldn't stay

18         for an ultrasound.

19   Q.    And what sort of ultrasound was that?

20   A.    Usually transvaginal -- abdominal and if, you

21         know, we couldn't see anything, then

22         transvaginal.

23   Q.    And in Paragraph 358 of your declaration you

24         discuss -- well, apologies.  You -- you first

25         cite the study in Paragraph 356 but are

                                                        156

1      discussing it there, a study by Borchert, et

2      al., correct?

3  A.   Yes.

4  Q.   And that is coauthored by Dr. Boraas, an

5      expert witness for plaintiffs in this case,

6      correct?

7  A.   Yes.

8  Q.   And you assert that, With a high

9      loss-to-follow-up rate, no conclusions can be

10      drawn related to risks for complications,

11      right?

12  A.   Yes.

13  Q.   Is there anything in the paper that you read

14      that suggests the patients who were lost to

15      follow-up were different in any meaningful

16      way from the ones who remained in the study?

17  A.   You can't say.  They -- they were lost to

18      follow-up so you can't say.

19  Q.   Do you think that there was any information

20      taken about those patients initially?

21  A.   I think that some information was taken, but

22      there's absolutely no way to determine from

23      the paper how the patients -- how the

24      distribution of risk factors or

25      sociodemographic factors or anything else

157

1           differed between the patients lost to

2           follow-up versus the ones that stayed.

3   Q.    Dr. Wubbenhorst, you submitted a report to

4           the Inter-American Court of Human Rights,

5           correct?

6   A.    Yes.

7   Q.    And that was specifically an expert opinion

8           in support of the Republic of El Salvador in

9           a legal challenge to the application of its

10          abortion ban for a woman known as Beatriz,

11          correct?

12  A.    Yes.

13  Q.    Is it fair to say that you support

14          El Salvador's abortion laws?

15  A.    Yes.

16  Q.    Are you aware that abortion in El Salvador is

17          illegal in every circumstance?

18  A.    Yes.

19  Q.    Are you aware that it is punishable by up to

20          40 years in prison?

21  A.    Yes.

22  Q.    Are you aware that there are dozens of women

23          currently imprisoned in El Salvador?

24  A.    I was not aware of that.

25  Q.    Do you believe that pregnant women in North

158

1        Carolina who seek and obtain abortions should

2        be criminally prosecuted?

3  A.   I think I said earlier in this deposition

4        that I do not believe that women should be

5        prosecuted.  If I didn't say it then, then

6        I'm going to say it now.  I think that we

7        need compassion for women.  We need to help

8        them to see that there are alternatives to

9        abortion and help provide the -- that --

10       those alternatives, whether it's financial,

11       whether it's walking with them through

12       pregnancy.  In talking with many, many women

13       who were looking at having abortions, the

14       number one thing they have said to me is, I

15       have no one to go with me through this

16       pregnancy.  So I think that if we can provide

17       that, that's what we do.  I do not agree in

18       prosecu- -- -cuting women or putting them in

19       jail just to be very clear.

20  Q.   If you don't agree with that, then what

21       motivated your expert opinion -- or what

22       motivated you to submit an expert opinion in

23       support of a country that does such a thing?

24  A.   I'm not a lawyer and I don't necessarily

25       agree with that, but the goal -- the stated

1    goal of the challenge to El Salvador's law

2    was to create abortion on demand at any

3    gestational age.  The people challenging the

4    statute were very clear that that was what

5    they were trying to do.  I do not agree with

6    that.  How El Salvador deals with the

7    question of pregnant women who have abortions

8    is -- I don't nec- -- I do not agree with

9    that.  I'll be very clear with that.  But I

10   do not agree that their laws should be

11   overturned -- and not just El Salvador but

12   the rest of Latin America -- their laws

13   should be overturned to allow abortion on

14   demand at any gestational age.

15   Q.   Do you believe that Beatriz was seeking

16        abortion on demand at any age?

17   A.   I'm very familiar with the case.  She was

18        not.  She was seeking the -- looking for an

19        abortion because her child had anencephaly.

20        However, as I've just said, the people who

21        are seeking to overturn -- -turn the laws

22        have made it very clear in multiple arenas

23        that that was their goal.

24   Q.   But Beatriz's family was a participant in

25        this litigation, correct?

160

1   A.   The -- I don't know.  I don't know.

2   Q.   It's also true that Beatriz suffered from

3        lupus, correct?

4   A.   That's correct.

5   Q.   And isn't it true that women with lupus

6        occasionally suffers negative pregnancy

7        outcomes as a result of the lupus?

8   A.   But I'm going to return to something I said

9        earlier.  You cannot predict whether a given

10       woman -- all of our strategies around risk

11       are population-based risk stratification

12       strategies.  They do -- cannot predict

13       whether a single patient will undergo a

14       complication.  And in her case, she did not.

15  Q.   And my question is whether a woman with

16       lupus -- at a population level, women with

17       lupus, if they face higher risks of

18       complications during their pregnancy as a

19       result of lupus.

20  A.   They do.  And if those complications occur,

21       then we intervene appropriately.

22  Q.   And do those women also experience a higher

23       rate of death during pregnancy as a result of

24       lupus?

25  A.   With good medical care, it is very unusual.

161

1    And as I've said, if a woman develops

2    complications like nephritis, encephalitis,

3    any other complication from lupus, we

4    intervene urgently and do what is best for

5    the mom.

6  Q.   Do you believe that El Salvador is a place

7    that provides good medical care to women with

8    lupus who are pregnant?

9  A.   From reviewing the -- her chart, which I did,

10    I reviewed her chart in its entirety, yes,

11    they provided excellent medical care.

12  Q.   She had a C-section at 26 weeks, correct?

13  A.   That's correct.

14  Q.   Do you believe that is the standard of care

15    for a woman who seeks an abortion at 13 weeks

16    because of health concerns?

17  A.   It has nothing to do --

18         MR. BOYLE:  Objection to form.  You can

19    answer.

20  A.   It has nothing to do with abortion.  It has

21    to do with the clinician's assessment of what

22    was the appropriate management for her at

23    that stage.

24  Q.   If Beatriz decided that she didn't want to

25    bear the risk, whatever it might be, for any

162

1        individual woman with lupus --

2   A.   Bear the risk of what?

3   Q.   A negative complication or death from lupus

4        during pregnancy, the standard of care is to

5        deny her an abortion you feel?

6             MR. BOYLE:  Objection to form.  You can

7        answer.

8   A.   I don't think we're talking about a standard

9        of care; we are talking about the law.  The

10       law states that abortion is illegal.  If she

11       had a complication and she needed to have

12       urgent delivery, that is not an abortion.

13       I've made that clear previously and I think

14       you understand that.  That is not an

15       abortion.  That is simply acting to preserve

16       the life of the mother, but the intent is not

17       to kill the -- the infant.

18  Q.   But you did refer to good medical care that

19       met the standard of care that Beatriz

20       allegedly received, correct?

21  A.   Because I reviewed the chart and I felt that

22       she did receive good medical care.

23  Q.   And you say that that care helped her achieve

24       a goal of good medical care during pregnancy,

25       correct?

163

1            MR. BOYLE:  Object to form.

2   A.   I don't understand your question.

3            MR. MENDIAS:  So I can -- I'll mark

4        this as an exhibit.  Thank you.

5            (WUBBENHORST EXHIBIT O, Expert Opinion

6        Report, Dr. Monique Chireau Wubbenhorst,

7        Beatriz, was marked for identification.)

8            MR. BOYLE:  Thank you.

9            MR. MENDIAS:  Uh-huh.

10  A.   Great.  Thank you for providing this.

11  Q.   Uh-huh.  So on Page 38 of that report, the

12       first nonindented paragraph, the one that

13       begins, Like other women --

14  A.   Yes.

15  Q.   -- can you read the first two sentences --

16  A.   Uh-huh.

17  Q.   -- of that paragraph.

18  A.   Like other women, Beatriz had the right to

19       enjoy a good state of health to the extent

20       possible given her lupus.  Good medical care

21       that met the standard of care helped her

22       achieve that goal during her pregnancy.

23  Q.   So you believe her goal was to have an

24       emergency C-section at 26 weeks?

25  A.   I'm not understanding your question.  If

                                                    164

1          she -- she -- that was not her goal, but that

2          was an outcome of her pregnancy based on the

3          clinicians that were caring for her.  And in

4          my review of the chart, that was an

5          appropriate decision.

6     Q.   Her goal was to have an abortion at 13 weeks,

7          wasn't it?

8     A.   I can't -- I'm not speaking to that question

9          of what her goal was or what her goal was

10         not.  The question here is good medical care

11         met the standard of care that helped her

12         achieve the goal of having a -- a good state

13         of health during pregnancy.  That is the

14         question that I am opining -- I opined on in

15         here.

16    Q.   Do you believe that the risks of a C-section

17         at 26 weeks of pregnancy are greater than the

18         risks of an abortion at 13 weeks of

19         pregnancy?

20    A.   Again, I don't think that that is a relevant

21         concept here.  She continued her pregnancy.

22         She needed an emergency cesarean section at

23         26 weeks for indications that were well

24         understood, that were -- reflected good

25         medical care.  It was -- would have been

165

1        impossible to foresee that she was going to

2        need a cesarean section at 26 weeks and so,

3        therefore, you can't compare the outcome of

4        her having an emergency C-section with the

5        outcome of her having an abortion.  She had

6        good care.  She got, from my viewpoint --

7        again, reviewing the chart in detail, she had

8        good care and when it was necessary to

9        deliver the baby, this was the mode of

10       delivery that was chosen.

11   Q.  Okay.  But my question was whether the -- you

12       believe that the risk of complications is

13       higher from a 13-week abortion than a

14       C-section at 26 weeks.

15   A.  No.  I think the risk of complications is

16       higher for -- I think the com- -- risk of

17       complications is higher for an -- for a

18       cesarean section 26 weeks, but I don't think

19       that's relevant to the question here.

20   Q.  But she sought an abortion at 13 weeks,

21       correct?

22   A.  That's correct.

23   Q.  And if she had been permitted to obtain an

24       abortion at 13 weeks, the risk for

25       complications for a 13-week abortion would

166

1          have been relevant to her, correct?

2     A.   I don't think so because, again, she could

3          have had an abortion at 13 weeks and had

4          perforation, had infection, had hemorrhage.

5          She could have had any one of a number of

6          outcomes.  As I've said, risk is population

7          stratified.  You cannot say what could or

8          could not have happened.  That's speculative.

9          I can't respond to that.

10    Q.   The population of women having C-sections at

11         26 weeks undergo much higher risks of

12         complications than the population of women --

13    A.   But we're not --

14    Q.   -- obtaining abortions --

15    A.   -- talking about --

16              MR. BOYLE:  Object.  Object to form.

17    BY MR. MENDIAS:

18    Q.   -- at 13 weeks.

19    A.   We're not talking about --

20              MR. BOYLE:  Object to form.

21              THE WITNESS:  Okay.

22              MR. BOYLE:  You can answer.

23              THE WITNESS:  Thank you.

24    A.   We're not talking about population; we're

25         talking about her.  You can't say that she

                                                    167

1    would have had no risk to an abortion at 13

2    weeks.  You can't say that.  And she didn't

3    have any complications from her cesarean

4    section at 26 weeks.  She died in a car

5    accident a few years later.

6    Q.   Do you believe that her death was

7         attributable to the fact that she wanted an

8         abortion?

9    A.   No.  She died in a car accident.

10   Q.   In Paragraph 47 of your report you say that,

11        Black women have two to three times higher

12        mortality from abortion compared to white

13        women.

14   A.   Give me -- give me a chance to get there.

15        Give me a chance to get there.  Yes.

16   Q.   Do you know if black women also have a higher

17        mortality from childbirth than white women?

18   A.   Yes, they do.

19   Q.   Why would the mortality rate be higher for

20        black women from both abortion and

21        childbirth?

22   A.   Because I think there are underlying

23        comorbidities that are more common in

24        African-American women, in particular

25        diabetes and hypertension.  I think the other

168

1    reason that it's difficult to make that

2    comparison is that if you look at maternal

3    mortality statistics, the morbidity and

4    mortality for African-American women tends to

5    cluster in older ages and typically, women

6    undergoing abortion -- late abortion may be

7    older as well, but that discrepancy is most

8    likely due to -- although it's -- you know,

9    there's -- this is a very active area of

10   research.  -- that those differences are

11   probably due to the distribution of

12   underlying health factors and possibly to

13   access to care as well.

14   Q.  And in Paragraph 19 of your declaration you

15       reference, the deliberate targeting and

16       destruction of 17 million African-American

17       lives through abortions since Roe; is that

18       right?

19   A.  Yes.

20   Q.  Who deliberately targeted African-American

21       women for abortion?

22   A.  I think that if you look at the history of --

23       of abortion and specifically population

24       control, it is very clear that black women

25       and African-Americans in general were seen as

                                                    169

1    the other -- especially in eugenic terms.

2    That's going all the way back to Galton and

3    Darwin and those other folks.  But as you

4    continue that thread through the 20th

5    century, Fredrick Osborn said that abortion

6    is turning out to -- and contraception

7    turning out to be great eugenic advances of

8    our time.  Others have said that abortion

9    is -- I think it was Lawrence Lader said that

10   abortion is -- is -- is especially useful

11   given in minorities who are likely to rise up

12   in armed rebellion.  So you have a consistent

13   thread of a worldview that says that

14   African-Americans are subhuman and,

15   therefore, that the -- that abortion can --

16   has the potential for being a eugenic tool of

17   injustice.

18        Now, I want to be very clear in saying

19   that I am not saying that individual abortion

20   providers have eugenic intent in performing

21   abortions.  I want to be very clear in saying

22   that.  What I am saying is that the outcomes

23   of policy, especially as -- and practice

24   especially as they are related to abortion

25   have led to eugenic outcomes, namely, that

170

1    most abortions occur in African-Americans

2    even though we constitute only 13 to 14

3    percent of the population, that the

4    African-American population principally

5    because of abortion is in decline and has

6    been since the 1990s in terms of the number

7    of births every year.

8         So that's the point that I'm trying to

9    make, not attributing intent to anyone

10   because I can't know someone's intent, but

11   the outcome remains the same.

12   Q.   Is it possible to have deliberate targeting

13        without intent?

14   A.   I think you can -- again, I'm looking at the

15        outcome.

16   Q.   Do --

17   A.   I understand -- I understand what you're

18        saying, but, again, if the result is that you

19        have this enormous racial disparity in

20        abortion, I can't ascertain intent, but the

21        eugenic outcome is -- remains the same.

22   Q.   And you can't ascertain whether it's

23        deliberate, correct?

24   A.   What's that?

25   Q.   And you couldn't ascertain whether the

171

1           discrepancy is deliberate?

2      A.   Then how else would you arrive at the -- at

3           the discrepancy if it's not deliberate on

4           some level and --

5      Q.   So the --

6      A.   -- and especially if policy, especially

7           population control policy, has been directed

8           in -- in -- along those lines --

9      Q.   Since --

10     A.   -- since --

11     Q.   -- 1972 -- '73?

12     A.   No.  Since -- since before that.  Since the

13          Nixon era and since the 1960s.  This -- this

14          antedates 1973.  This has been going on for a

15          while.

16     Q.   Okay.  So, Doctor, I'm curious specifically

17          who you say is deliberately targeting and

18          destroying 17 million African-American lives.

19               Can you identify who's doing that

20          deliberate targeting?

21     A.   I think that -- again, I am looking at the

22          outcome and I am looking at the fact that,

23          whether we like it or not, that disparity

24          exists.  Whether we like it or not, the ugly

25          fact is that we have had 17 million

172

1    African-American lives destroyed, that we are

2    looking at the decline in the number of

3    births to African-American woman -- women,

4    that for every three births to

5    African-American women that occur, there are

6    two abortions.

7         So whether an individual practitioner

8    makes a deliberate -- is deliberately

9    targeting African-Americans, I don't know.

10   That may be true; that may not be true.  But

11   as a policy statement, the net out- -- the

12   net outcome is the same.

13   Q.   Do you believe that African-Americans who

14        obtain abortions are complicit in eugenics?

15             MR. BOYLE:  Objection.

16   BY MR. MENDIAS:

17   Q.   You can answer.

18   A.   I'm not -- I don't know what that statement

19        means.  How can you be complicit in eugenics

20        because eugenics is a worldview?  Eugenics

21        says that one group of people is human and

22        one group of people is not human and because

23        this group of people is not human, you can

24        subject them to anything, any kind of

25        mistreatment, any kind of suppression.

173

1    That's -- that's the essence of eugenics as

2    defined by Galton in his speech in 1901.  He

3    was very clear, according to Darwinian

4    theories, that some people were the fit and

5    others were not the fit.  And the slogan of

6    the -- one of the slogans of the American

7    Eugenics Board was less from the fit -- less

8    from the unfit, more from the fit.  That's

9    one of the goals of eugenics.

10   Q.   Changing topics a little bit, Doctor, what

11        is, in medicine, an off-label use?

12   A.   It's when a medication has been approved for

13        one specific indication but physicians use it

14        for another indication.

15   Q.   Have you ever prescribed medications for uses

16        that differ than what's on their FDA-approved

17        label?

18   A.   Yes.  This is something, actually, that --

19        for a number of different medications, using

20        nifedipine to control blood pressure in

21        pregnancy.  There's -- there's a list of --

22        of those -- of those medications.

23   Q.   Is off-label use common in obstetrics and

24        gynecology?

25   A.   I can't speak to how it's common -- whether

174

1    it's common or uncommon.  I know that it's

2    something that I do and that many of the

3    clicians -- clinicians that I know do as

4    well.

5    Q.   In going back to something we talked about

6         much earlier today, you mentioned that you

7         had seen -- that you had treated patients who

8         were suffering from postabortion

9         complications outside the United States; is

10        that right?

11   A.   Yes.

12   Q.   Where did you treat those patients?

13   A.   Kenya.

14   Q.   Is abortion legal in Kenya?

15   A.   No.  Well, it's -- the current status is that

16        it's -- I believe it's legal with

17        restrictions.  I would have to check on the

18        exact -- the laws changed recently.

19   Q.   Was abortion legal in Kenya when you treated

20        these patients?

21   A.   Yes --

22   Q.   How --

23   A.   -- for specific indications.  And the

24        patients that I treated were actually not --

25        had not been aborted by, like, back alley

175

1    abortions or, you know, self-abortions.  The

2    abortions were carried out by NGOs,

3    nongovernment organizations, who had set up

4    abortion clinics in those areas and then when

5    their patients -- when those patients had

6    complications, they would -- they would come

7    in and be seen.

8  Q.    Did you ever report NGOs performing illegal

9        abortions in Kenya to anyone?

10          MR. BOYLE:  Object to form.  You can

11       answer.

12          THE WITNESS:  What's that?

13          MR. BOYLE:  Object to form.  You can

14       answer.

15 A.    Yeah, I don't know what the indication was

16       for the abortions.

17 Q.    So another topic.  We discussed earlier

18       forensic use of the products of conception

19       after an abortion to identify a rapist.

20 A.    Yes.

21 Q.    Do you remember that?  Do you know what

22       protocol PPSAT follows for maintaining a

23       chain of custody when it provides an abortion

24       to someone who's been a victim of rape?

25 A.    No.

                                                    176

1    Q.   You believe that a major flaw in studies

2         demonstrating the safety of abortion is that

3         they don't include review of patient medical

4         charts, correct?

5    A.   I wouldn't say it's a --

6              MR. BOYLE:  Object to form.

7              THE WITNESS:  Okay.

8              MR. BOYLE:  You can answer.

9              THE WITNESS:  Okay.  Thank you.

10   A.   No, sir.  I wouldn't say that it's a major

11        flaw because sometimes I think you have to

12        work with the data that you have and

13        sometimes the data that you have is not

14        perfect.

15             MR. MENDIAS:  Can I ask how long we've

16        been --

17             THE REPORTER:  I have three hours.

18             MR. MENDIAS:  Three hours.  Do you want

19        to take a brief break?

20             THE WITNESS:  Thank you, sir.  That

21        would be great.  Another bathroom break would

22        be great.  Oops.  Wait.

23             THE VIDEOGRAPHER:  Going off the

24        record.  The time is 4:46.

25             (Whereupon, there was a recess in the

                                                    177

1          proceedings from 4:46 p.m. to 5:04 p.m.)

2                    THE VIDEOGRAPHER:  Back on the record.

3          The time is 5:04.

4                    MR. MENDIAS:  So, Counsel, I'd just

5          like to request given that Dr. Wubbenhorst

6          stated that she has an updated CV if, Ellis,

7          you could provide that by the end of the

8          week.

9                    THE WITNESS:  No problem at all.  Yeah.

10                   MR. MENDIAS:  Wonderful.

11                   THE WITNESS:  Uh-huh.

12         BY MR. MENDIAS:

13         Q.   Okay.  So, Doctor, you testified that

14              abortion patients with complications do not

15              frequently return to the clinic that provided

16              the abortion; is that correct?

17         A.   That's correct.

18         Q.   What's your basis for that statement?

19         A.   I believe it's in my declaration that ACOG

20              noted that 50 percent or fewer of patients

21              returned to clinic following their abortion.

22         Q.   Do you know what year that ACOG statement is

23              from?

24         A.   I'd have to look in here.

25         Q.   Do you know if that's examined data from

                                                        178

1           North Carolina?

2      A.   I don't know if that was including Nor- --

3           data from North Carolina.

4      Q.   And going back to our conversation about

5           intrauterine adhesions after a D&C, you

6           remember that, correct?

7      A.   Yes.

8      Q.   So I think I asked how frequently your

9           patients had developed intrauterine

10          adhesions, but I just wanted to clarify.

11               Have any of your parent -- patients that

12          you've provided a D&C to developed such

13          adhesions?

14     A.   So I have cared for women who have developed

15          intrauterine adhesions following prior D&C.

16          I have not seen my -- any of my own patients

17          who I performed D&C on return with

18          intrauterine adhesions.

19     Q.   Is it possible that they sought care for

20          intrauterine adhesions from other providers?

21     A.   I think that's possibly it.  I think it's

22          also that I've practiced in a lot of

23          geographic locales over, you know, the last

24          30 years so it's entirely possible that if

25          they developed them, they could have seen

                                                        179

1          another provider.

2     Q.   And what does it mean if a patient has

3          developed an intrauterine adhesion in terms

4          of consequences for her health?

5     A.   So with Asherman's syndrome, intrauterine --

6          intrauterine adhesions, they're associated

7          with infertility and dysfunctional uterine

8          bleeding.

9     Q.   Do you characterize that as a serious

10         condition?

11    A.   With -- in the case of dysfunctional uterine

12         bleeding and -- I -- and I -- there's another

13         entity with which they're associated and

14         that's abnormal placental adherence and

15         that's actually quite serious.

16    Q.   How frequently do patients develop abnormal

17         placentation as a result of Asherman's

18         syndrome?

19    A.   I think that I describe that in my statement

20         and I can take a look and see, but the real

21         question was not so much the frequency

22         because, again, it's hard to get at the

23         frequency.  It's that when patients develop

24         intrauterine adhesions, they are at higher

25         risk for going on to have abnormal

                                                  180

1    placentation and -- leading to adhering

2    placenta, which is a real obstetrical

3    problem.

4  Q.  When you provided prenatal care to patients,

5    did you tell them about ectopic pregnancy?

6  A.  I am not following your argument.

7  Q.  Well, it was a question.  When you --

8  A.  I mean, your question.  I'm not following

9    your question.  Sorry.

10 Q.  When you provided prenatal care to your

11   patients -- you remember testifying that you

12   did that, correct?

13 A.  Yes.  Yes.

14 Q.  Did you counsel them on symptoms of ectopic

15   pregnancy?

16 A.  If they came in and they did not have a -- a

17   pregnancy that could be seen in the uterus on

18   ultrasound, definitely.

19 Q.  And what did you say to them as part of that

20   counseling?

21 A.  So if we did not see a pregnancy on -- then

22   we would warn them that they might have a --

23   a -- an ectopic pregnancy, describe what an

24   ectopic pregnancy was, what the risks were.

25   And then they would return within 48 hours so

181

1        that we could rescan them and recheck their

2        hCG.

3    Q.   Did any patients not return?

4    A.   I've never had a patient not return.

5    Q.   What symptoms would you counsel them to look

6        for concerning a ruptured eptoc- -- ectopic

7        pregnancy?

8    A.   Well, I think that it's important to make a

9        distinction here between symptoms of ectopic

10       pregnancy which are transient and fleeting --

11       and, in fact, I wrote a paper -- cowrote a

12       paper in the Journal of American Medical

13       Association some years back that looked at

14       the unreliability -- how reliable were

15       different symptoms.

16            So the diagnosis of a ruptured ectopic

17       pregnancy is fairly straightforward.  Women

18       will often say they felt a pop, they

19       experienced terrible pain in their right

20       side, and they may feel faint.  But one of

21       the problems that arises with that is that

22       they don't always associate that with -- they

23       think, oh, I have, you know, a ruptured cyst

24       or something like that.  And so the real

25       danger is that they are not symptomatic

182

1        enough that they seek medical care and they

2        bleed and bleed.  And healthy young women

3        have an amazing ability to adapt to loss of

4        blood, but once they run out of those

5        adaptive capabilities, they just die.  So

6        this is why diagnosing ectopic pregnancy is

7        so treacherous.  Yes, if they rupture, it's a

8        little bit more straightforward, but even

9        sometimes when they're rupturing, it's not

10       until they become faint or pass out or have

11       some other complication.  And before that,

12       it's -- it's -- it's very protean.  It can be

13       very difficult.  They can -- they can have

14       bleeding that looks like a miscarriage and

15       they'll think that they've miscarried, for

16       example.

17   Q.  At what point in pregnancy does ectopic

18       pregnancy typically present on an ultrasound?

19   A.  So are you talking about at what point in

20       pregnancy is it typically diagnosed, sir?  Is

21       that what you're saying?

22   Q.  Sure.

23   A.  Right.  So usually, about the same time

24       plus -- you know, plus a few weeks as you see

25       an intrauterine preg- -- that you might

                                                        183

1          expect that you would see an intra- --

2          inter- -- intrauterine pregnancy you could

3          potentially see an ectopic pregnancy.  Again,

4          the problem is that even with skilled hands,

5          it depends on -- very much on the hCG level

6          and there's some -- it depends on the hCG

7          level and there are sort of formulae or

8          algorithms that you use.

9     Q.   So throughout your medical career as an

10         attending, did you train medical residents?

11    A.   Yes.

12    Q.   Has a medical resident ever lodged a

13         complaint about you?

14    A.   No.

15    Q.   Throughout your medical career have you ever

16         faced any disciplinary action --

17    A.   No.

18    Q.   -- from a hospital?

19    A.   No.

20    Q.   Have you ever received any disciplinary or

21         remedial action from a hospital?

22    A.   No.

23    Q.   Have you ever received any disciplinary

24         action from a state medical board?

25    A.   No.

184

1   Q.   You were with the faculty of Duke University
2        School of Medicine from 2003 to 2018?
3   A.   Yes.
4   Q.   It's correct that this is where you practiced
5        medicine for the significant majority of your
6        medical career, correct?
7   A.   Yes.
8   Q.   Under what circumstances did you leave Duke?
9   A.   I was recruited starting in fall of 2017 to
10       the U.S. Agency for International
11       Development.
12  Q.   How would you characterize your relationship
13       with Duke when you left?
14  A.   I would say that it wasn't great.  I think
15       that the -- it was hard to totally assess
16       this, but I had a sense that they were not --
17       you know, they were -- people were not in
18       favor of the pro-life work I was doing.
19  Q.   What led you to that conclusion?
20  A.   I think that people would say things to me.
21  Q.   Such as?
22  A.   You know, what -- what's the -- you know, why
23       are you doing this, you know, that type of
24       thing.
25  Q.   So you weren't asked to resign from your

                                                    185

1        position at Duke?

2   A.   No.  No, I was not asked to resign.

3            MR. MENDIAS:  Okay.  I think that's all

4        the questions that I have.

5            MR. BOYLE:  Give me just a moment, if

6        you would --

7            MR. MENDIAS:  Sure.

8            MR. BOYLE:  -- please.  If -- if anyone

9        on the Zoom has any questions, I'll -- I'll

10       defer to y'all.

11           This is Ellis Boyle on behalf of the

12       legislative leader defendants.  I don't have

13       any questions and I don't hear any from the

14       Zoom so unless -- I -- I guess that concludes

15       the deposition.

16           THE REPORTER:  Sam?

17           MR. MENDIAS:  Thank you very much,

18       Doctor.

19           THE WITNESS:  Okay.  Thank you.

20           THE VIDEOGRAPHER:  Anybody on the Zoom?

21           MR. BOYLE:  No.  I think -- I think

22       we're -- we're clear.  You can go off the

23       record.  Thank you.

24           THE VIDEOGRAPHER:  This concludes the

25       deposition.  We're going off the record.  The

                                                        186

1          time is 5:15.

2                      [SIGNATURE RESERVED]

3              [DEPOSITION CONCLUDED AT 5:15 P.M.]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

187

A C K N O W L E D G E M E N T   OF   D E P O N E N T

        I, MONIQUE WUBBENHORST, M.D., M.P.H.,
declare under the penalties of perjury under the
State of North Carolina that I have read the
foregoing 187 pages, which contain a correct
transcription of answers made by me to the question
therein recorded, with the exception(s) and/or
addition(s) reflected on the correction sheet
attached hereto, if any.

                Signed this, the _____ day of
_____, 2023.




                 _____

                   MONIQUE WUBBENHORST, M.D., M.P.H.

State of:_____
County of:_____
        Subscribed and sworn to before me this
_____ day of _____, 2023.


                 _____

                      Notary Public
My commission expires:_____

                                                      188

E R R A T A   S H E E T

Case Name:  Planned Parenthood South Atlantic, Et

Al. vs. Joshua Stein, Et Al.

Witness Name:  Monique Wubbenhorst, M.D., M.P.H.

Deposition Date:  Wednesday, August 30, 2023

Page/Line          Reads                Should Read

_____/_____|_____|_____

_____/_____|_____|_____

_____/_____|_____|_____

_____/_____|_____|_____

_____/_____|_____|_____

_____/_____|_____|_____

_____/_____|_____|_____

_____/_____|_____|_____

_____/_____|_____|_____

_____/_____|_____|_____

_____/_____|_____|_____

_____/_____|_____|_____

_____/_____|_____|_____

_____/_____|_____|_____

_____/_____|_____|_____

_____/_____|_____|_____

_____/_____|_____|_____

_____        _____

  Signature                          Date

189

STATE OF NORTH CAROLINA      )

                             ) C E R T I F I C A T E

COUNTY OF WAKE               )


            I, LISA A. WHEELER, RPR, CRR,

Stenographic Court Reporter and Notary Public, the

officer before whom the foregoing proceeding was

conducted, do hereby certify that the witness whose

testimony appears in the foregoing proceeding was

duly sworn by me; that the testimony of said

witness was taken by me to the best of my ability

and thereafter transcribed by me; and that the

foregoing pages, inclusive, constitute a true and

accurate transcription of the testimony of the

witness.

            I do further certify that I am neither

counsel for, related to, nor employed by any of the

parties to this action and, further, that I am not

a relative or employee of any attorney or counsel

employed by the parties thereof, nor financially or

otherwise interested in the outcome of said action.

            This the 4th day of September, 2023.



                    _____

                    Lisa A. Wheeler, RPR, CRR

                    Notary Public #19981350007


                                                    190

**A**

**A-A-P-L-O-G**
24:16
**AAPLOG** 5:10
5:11 23:25
24:11,15,16,18
24:25 25:5,11
25:21 26:2
27:4 29:12
**AAPLOG's** 27:5
**abdominal**
156:20
**ability** 100:20
183:3 190:10
**able** 25:14 52:23
55:18 59:17
64:12 142:1
**abnormal**
180:14,16,25
**abolition** 28:22
**abor-** 111:7,25
**abort-** 93:3
115:19
**aborted** 175:25
**abortion** 5:18
15:3,8,13,22
16:17 20:5,6
22:15,19,24
23:11,14,18
24:19 25:18
27:6,8,9 28:22
28:24 29:9
31:3,6,9,14,15
31:18,21 32:8
33:13,21 34:5
34:14,20 35:6
36:5,8,13 37:6
37:14,18 42:20
42:21,22,23
44:2 45:3,22
45:25 46:19,22
47:4 48:4,11
52:2,14 53:16
53:17,18,19,20
55:7,19 57:21
60:6 61:22
63:8 64:5,13
64:17 65:4,7
66:17 68:19,23
68:25 69:5,7,9

69:14,16 70:2
70:5,11,14,25
71:5,8,9,12,15
71:19,23 72:1
72:20,22 73:8
73:12,13,14,23
75:6 77:7
78:12,16,18,20
80:2,7,10,12
80:22,24 82:18
82:25 83:5,14
84:3,13 85:4
87:2,3,22,25
88:6,22 90:5
90:11 91:22
92:1,18,22
93:1,12,16
94:3,5,12,13
98:14 99:8
100:9 102:2,21
102:22 106:13
109:10,24
110:3,6,20
111:7,17
112:23 113:12
113:25 114:6
114:11 118:16
120:10,13,16
126:15,17
128:15,22,23
129:23 130:2
132:16,20
133:1,9,16,25
133:25 137:25
142:23 144:2
144:10,14,20
144:23 145:8
145:25 146:7
146:15,17
147:2,4,7,12
147:14,19,21
148:1,1 149:21
149:22 150:3,4
150:13,13,16
150:19,22,23
151:1,4,6,20
151:22 152:11
152:13 153:19
154:6,10,14,24
155:3 158:10

158:14,16
159:9 160:2,13
160:16,19
162:15,20
163:5,10,12,15
165:6,18 166:5
166:13,20,24
166:25 167:3
168:1,8,12,20
169:6,6,21,23
170:5,8,10,15
170:19,24
171:5,20
175:14,19
176:4,19,23
177:2 178:14
178:16,21
**abortion-relat...**
20:7 64:6,11
69:23 75:12
126:20 127:9
131:3 132:13
**abortiondocs....**
76:5
**abortionist**
31:15
**abortionists**
39:7,9 47:8
**abortions** 23:16
31:24 33:24
35:3 36:3
38:22 39:4,5
39:14 52:10,19
53:16 64:3
65:12,22,24
66:5,10,12
68:14 75:15
77:14,24 78:6
78:8 83:16
84:5 86:4
99:13 111:6
119:2,3 129:18
130:24 131:15
159:1,13 160:7
167:14 169:17
170:21 171:1
173:6,14 176:1
176:2,9,16
**absolutely**
157:22

**academic** 111:3
**Academies**
87:20 88:11
89:14
**Academy** 89:6
**access** 45:15
83:15 84:4
169:13
**accident** 168:5,9
**accomplish**
28:17
**accomplishing**
27:23
**account** 81:10
89:2,3 139:22
**accreditation**
58:3
**accuracy** 11:7
**accurate** 11:18
19:5 21:3 22:2
64:3 70:18
122:14 133:2
190:13
**accurately** 30:23
78:19 88:17
118:25
**achieve** 57:20
59:23 60:2
61:20 163:23
164:22 165:12
**acknowledge**
126:25 129:12
**ACLU** 7:12,15
7:16,19 9:22
**ACOG** 18:18
22:2,4,8,11,20
23:9,13 79:21
113:18,20
178:19,22
**act** 16:2,7 118:9
**acting** 163:15
**action** 1:3
184:16,21,24
190:17,20
**active** 169:9
**activities** 24:13
27:21 120:14
132:20
**activity** 38:19
**actual** 126:22

**adapt** 183:3
**adaptive** 183:5
**add** 12:23 19:25
**addition** 100:24
149:21 150:3
150:22
**addition(s)**
188:9
**additional** 19:25
64:18 65:4
66:8 93:21
96:20
**address** 78:25
**adenoma** 57:11
**adequate** 103:10
**ADF** 18:1
**adherence**
180:14
**adhering** 181:1
**adhesion** 180:3
**adhesions** 114:1
114:13,23
179:5,10,13,15
179:18,20
180:6,24
**adjusting**
137:21
**administer**
148:18
**administrative**
99:10,22 101:1
102:15
**administrativ...**
134:22
**advance** 131:11
**advances** 131:5
170:7
**Advancing**
116:22
**advantage** 94:16
**adverse** 93:14
101:13 117:2
**advertises** 66:11
**advocacy** 22:16
80:3,5,13,15
81:12,13,20,21
81:23 82:1,13
82:14,16,23
83:18 84:7
**advocate** 29:13

191

81:11,15 82:12
**advocates** 28:21
  87:25
**advocating** 27:9
**affect** 118:12,14
**affiliated** 52:4
**affiliates** 61:15
**affirm** 141:12
**affirmed** 9:13
**African-Amer...**
  168:24 169:4
  169:16,20
  171:4 172:18
  173:1,3,5
**African-Amer...**
  169:25 170:14
  171:1 173:9,13
**after-** 8:4
**afternoon** 8:6,8
  9:19,20
**age** 32:6 64:19
  69:17 70:17
  87:2 101:5
  127:24 131:21
  136:1 160:3,14
  160:16
**agency** 108:3,7,7
  108:8 185:10
**ages** 66:17 131:8
  169:5
**aggregate**
  135:16
**agnostically**
  81:10
**ago** 17:17,17,19
  130:13 138:5
  139:5
**agree** 16:20 27:2
  30:25 33:20
  52:25 64:8
  73:14 85:9
  103:19 113:21
  114:4 124:21
  143:22 159:17
  159:20,25
  160:5,8,10
**ahead** 8:23
  83:23 112:1
  137:10 140:5
**al** 1:5,8,11 7:7,8

98:25 99:17
  103:14 153:25
  154:9 157:2
  189:3,3
**algorithm**
  152:16
**algorithms**
  184:8
**Alisa** 18:19
**allegedly** 163:20
**alley** 175:25
**Alliance** 4:2 8:5
  8:11
**allow** 160:13
**Alsle-** 19:20
**alter** 42:5
**alternatives**
  159:8,10
**amazing** 183:3
**ambulance**
  49:11,16,20
  50:2,19 51:9
  51:18 52:6,20
**ambulances**
  48:25 50:7
**ambulatory** 58:2
  58:4,11,13
**amenable** 66:18
**America** 9:3,6
  107:12 160:12
**American** 2:3,9
  5:18 21:25
  23:21 79:15
  83:6 174:6
  182:12
**Americans**
  27:13
**Amiri** 2:4 7:14
  7:14
**amount** 88:16
  97:21 98:17
**analysis** 116:25
**and-** 1:10
**and/or** 188:8
**anencephaly**
  160:19
**anesthe-** 60:4
**anesthesia** 54:9
  58:15,16,17,18
  60:2

**anesthesiologist**
  59:9 60:4
**anesthesiologi...**
  58:14
**anesthesiology**
  59:9
**anesthetist** 59:8
**anesthetists**
  58:14
**Anjali** 4:9 8:21
  9:2
**annual** 27:4
  132:16,19
**answer** 10:3,12
  10:16,22,25
  11:3,14 17:11
  18:23 22:22
  28:14,15 34:23
  42:11 44:4,17
  46:2 49:15
  61:25 73:3,25
  81:24 82:9
  89:12 100:11
  101:20 103:10
  106:6 115:13
  146:4,12,20
  148:25 152:21
  162:19 163:7
  167:22 173:17
  176:11,14
  177:8
**answered** 44:8
**answering** 10:6
  35:5
**answers** 188:7
**antedates**
  172:14
**antiabortion**
  51:23
**anxiety** 84:15
**Anybody** 186:20
**APA** 79:17
  83:11 84:11
**apologies** 28:5
  83:20 103:3
  104:4 105:18
  156:24
**apologize**
  126:13
**Appeared** 2:15

3:3,9,15 4:3,4
**appears** 145:3
  190:8
**applicability**
  46:15
**applicable** 70:10
**application**
  158:9
**applies** 80:23
**apply** 53:2
  112:25 148:13
**applying** 81:18
**appreciate**
  138:19
**approach** 81:9
**approaching**
  79:11
**appropriate**
  74:6 143:24
  148:13 149:25
  150:21 151:16
  152:25 155:10
  162:22 165:5
**appropriately**
  81:19 155:9
  161:21
**approved**
  174:12
**approximately**
  123:17 138:14
**April** 14:25
**architects** 27:25
  28:6
**area** 169:9
**areas** 23:1,6,8
  176:4
**arenas** 160:22
**arguing** 78:17
**argument** 71:25
  181:6
**arises** 182:21
**Arizona** 4:5
  50:15
**armed** 170:12
**arrive** 55:10
  117:10 172:2
**arrived** 19:15
**article** 5:17,20
  46:19 75:24
  83:4 91:13

97:14 136:12
  136:21 137:5,6
**articles** 75:18
  76:24
**articulating**
  28:8
**artificially**
  137:19
**ascertain** 99:13
  118:25 152:4
  171:20,22,25
**ascertaining**
  66:3 124:22
  125:2,3
**ascertainment**
  94:17 100:1
  133:6,20 134:2
**Asherman's**
  180:5,17
**aside** 126:12
**asked** 34:25 40:4
  45:25 67:8
  87:8 134:13
  179:8 185:25
  186:2
**asking** 10:13
  96:11 98:2
  111:18 112:1
  139:10
**aspiration**
  110:20
**assert** 110:20
  112:21 157:8
**asserted** 52:3
**asserting** 62:20
**assertion** 117:6
**assertions**
  128:14
**assess** 185:15
**assessment**
  70:22 109:10
  109:15 162:21
**assessments**
  72:13
**associate** 45:7
  182:22
**associated** 56:12
  68:25 69:9,10
  70:5,6 72:22
  85:6 86:10

90:11 93:14
119:13,15,25
130:21 138:8
138:21 139:8
139:24 140:9
141:11 180:6
180:13
**association** 5:19
23:21 78:20,22
78:23 79:1,2
79:12,13,16,19
83:6 90:4
107:12 119:20
120:9 182:13
**associations**
120:15
**assume** 10:13
11:6 13:10
81:8 138:12
**assumed** 142:17
**astronomical**
66:22
**Atkins** 77:18
133:13,21
**Atlantic** 1:5 7:7
9:5 50:23
189:2
**attached** 21:4
188:10
**attack** 141:5
**attempt** 46:13
**attempting**
144:6
**attending**
184:10
**attorney** 3:7,13
8:2 9:1,22
10:20 17:1
18:2 68:5
190:18
**attorneys** 8:9
**attributable**
140:9 168:7
**attributing**
171:9
**attribution**
119:19
**August** 1:19 7:4
17:18 189:5
**AUL** 5:13 27:14

27:24 28:21,24
29:7 30:3,8,10
30:18,23
**author** 97:4
**authors** 74:16
86:15 93:17
96:12,16 98:24
107:16 108:2
114:2 131:14
131:22 132:5
135:18 137:24
138:12 139:21
**autopsy** 76:7,13
76:15,24 77:4
77:5,20 78:1
**availability**
106:24
**available** 23:4
33:12 53:13
64:14 155:1
**avoid** 10:7
**aware** 16:12
52:1,6 58:4
71:16 77:13
84:11 86:2
91:25 93:17,23
107:2 109:7
111:4,4 113:18
113:20 119:8
121:3 123:23
126:14 127:16
128:3 131:14
131:17,22
132:1,5,9,15
132:18 135:18
135:22 153:18
158:16,19,22
158:24
**axiom** 52:22
**axiomatic**
142:15

———————————
**B**
———————————
**B** 5:5,7 18:25
19:1 74:8
105:6,12,13
124:5 128:9
**b-a-r-b-i-** 59:3
**baby** 32:15,22
166:9

**back** 11:2 23:7
29:24 67:19
73:5 74:12
82:10 86:9
90:13 101:8,14
103:21 105:4
105:11 124:14
128:8 134:22
152:6 170:2
175:5,25 178:2
179:4 182:13
**backup** 35:24
**bad** 142:20
**ballpark** 41:4
49:22 50:17
**bamiri@aclu....**
2:6
**ban** 29:9 158:10
**banned** 71:19
**Bar** 7:21
**barbiturate** 59:2
59:3
**Barn-** 154:12
**Barnhart**
153:25 154:9
154:13
**Bartlett** 64:16
**base** 113:8
**based** 33:16 34:2
66:15 72:14
75:2 87:10
88:23 93:18
95:13,24 96:15
97:5 144:7
165:2
**basically** 66:7
**basis** 67:1 88:4
119:14 134:14
143:3 150:24
152:7,8 178:18
**bathroom**
177:21
**bear** 162:25
163:2
**Beatriz** 6:6
158:10 160:15
161:2 162:24
163:19 164:7
164:18
**Beatriz's** 160:24

**becoming** 39:8
**beginning** 43:24
113:6
**begins** 62:14
92:15 95:13,24
164:13
**behalf** 7:12
186:11
**behavior** 120:5
**behaviors** 120:6
**believe** 21:18
22:11 24:22
28:24 30:7,22
31:6,9,23
32:20 33:7,24
38:21 42:13
47:1,21 53:9
53:22 54:21
58:21 60:17
61:9 63:4,9
65:1,11 69:19
72:19 73:12
74:20 76:7
77:18,18,20
79:24 80:11,23
84:6 87:12
88:3 89:12
90:3,7,9
103:24 106:13
108:11,17
110:3,7,7
120:3,9 121:25
124:17 125:11
125:20 130:3
130:23 131:5
131:11 133:15
134:14 135:14
138:23 139:3
139:11 140:8
143:15,19
144:9,13,19,22
145:10 147:6
151:21 152:12
152:17 153:12
158:25 159:4
160:15 162:6
162:14 164:23
165:16 166:12
168:6 173:13
175:16 177:1

178:19
**believing** 143:3
**Bell** 3:8
**belong** 22:7
**beneficiaries**
100:9
**benefit** 81:8
**Benjamin** 7:18
7:18
**Berger** 1:11 2:18
7:22
**best** 29:17 48:8
85:13 131:1
154:25 162:4
190:10
**better** 134:2
**better-equipped**
49:1
**Beverly** 2:2 7:12
9:23
**beyond** 98:8
**biased** 89:11
**bigger** 154:15
**biopsied** 56:25
**biopsy** 57:9,17
57:17
**biopsying** 57:4
**birth** 94:19,20
115:9 134:19
**births** 62:19
171:7 173:3,4
**bit** 50:12 51:15
115:4 127:20
174:10 183:8
**black** 168:11,16
168:20 169:24
**bladder** 54:6
**bleed** 98:15
183:2,2
**bleeding** 57:18
96:22 97:6,21
97:24 98:5,13
180:8,12
183:14
**bleeds** 141:4
**blood** 72:11
174:20 183:4
**board** 3:1,1 8:19
8:19 24:2,5,8
24:10,12 25:12

193

26:17 27:13,17
27:19,20 29:11
174:7 184:24
**bodies** 15:2
**body** 14:15
112:9
**Boraas** 19:20
157:4
**Borchert** 18:21
157:1
**born** 34:16
134:5
**bottom** 99:4
**bowel** 54:5
**Box** 2:10
**Boyle** 2:20 7:20
7:20 16:23
17:10 19:11
21:1 30:9,12
34:21 42:10
44:15,17 49:14
56:6 63:22
65:16 67:2,24
70:8 72:25
73:3,24 74:8
84:16 91:17
95:8,14 96:2
100:11 101:18
104:6,23 105:4
105:6,11,14,17
105:19 106:4
120:19 121:6
122:23 126:2
136:6,9,19
143:17 145:17
146:3,11,19
148:23 162:18
163:6 164:1,8
167:16,20,22
173:15 176:10
176:13 177:6,8
186:5,8,11,21
**break** 11:10,15
67:3,6,22 68:7
68:10 120:21
124:9 145:18
177:19,21
**breathe** 59:17
59:21

**breathes** 58:20
**breathing** 59:6
**brief** 124:1
177:19
**briefly** 29:16
**Brigitte** 2:4 7:14
**bring** 18:11,14
23:2 91:7,9
101:13
**British** 135:21
**Broad** 2:4
**broke** 68:12
**brought** 18:15
18:18 47:21
**Bulleri** 3:3 8:17
8:17
**bullet** 99:3
**Bulletin** 18:19

——————
**C**
——————
**C** 2:1 5:9 7:1
20:21 188:1
190:1,1
**c-r-i** 113:2
**C-section** 139:4
162:12 164:24
165:16 166:4
166:14
**C-sections**
140:10 167:10
**calculating**
52:13 132:21
137:24
**California**
103:16 130:3
**call** 28:10,22
31:23 37:17
48:24 50:24
**called** 51:18
76:4 81:6 91:2
113:1 116:22
**capa-** 134:11
**capabilities**
134:12 183:5
**capacity** 13:8
48:22
**caps** 93:10
**capture** 100:25
101:2
**car** 168:4,9

**cardiac** 38:19
**care** 32:11 35:25
39:17,19 49:12
54:6,15 100:10
152:18 155:17
155:22,25
156:8,13
161:25 162:7
162:11,14
163:4,9,18,19
163:22,23,24
164:20,21
165:10,11,25
166:6,8 169:13
179:19 181:4
181:10 183:1
**cared** 40:12
179:14
**career** 39:25
40:10 42:14
82:19 184:9,15
185:6
**carefully** 80:20
85:23 88:9
**caring** 34:3
165:3
**Carolina** 1:2,23
2:9,11,14,16
2:21 3:1,1,2,4
3:10,14,16,20
3:22 4:21 7:17
7:19 8:18,19
8:25 16:13,15
17:5 21:17
40:23,25 45:3
46:22 47:5,10
47:14 57:22
58:10 61:11
68:17,20
110:10 159:1
179:1,3 188:5
190:1
**Carolina's** 17:8
**carried** 176:2
**carries** 91:22
132:8
**carry** 32:12
45:17 68:23
74:3
**carrying** 32:21

63:7 69:6
**case** 5:16 6:2 7:6
7:13 9:24 12:1
12:13,14,15,18
15:10 17:15,25
18:4,9 19:7
32:8 61:4,6,7
61:17 63:12,20
65:10 122:16
122:22 123:19
124:5,25 128:9
135:20 140:11
147:14 157:5
160:17 161:14
180:11 189:2
**caseloads** 74:17
**cases** 14:1,9 15:6
15:16,21 32:2
32:5 61:6
119:18 144:21
146:17
**cast** 87:9
**categories** 152:9
155:11
**categorized**
96:21
**category** 150:21
151:17
**Cates** 128:12
135:19
**Cates'** 132:24
**causal** 119:18
**causality** 78:25
**cause** 34:1 83:16
84:5 119:19
133:16 141:13
143:19
**caused** 119:12
**causes** 78:18
119:24 125:3
133:11 134:1
143:15
**cauterize** 57:19
**cavities** 112:9
**CDC** 47:2
126:14,19
127:8,17 128:3
132:17
**CDC's** 132:12
132:19

**center** 1:22 2:21
35:17 45:8,16
**centers** 57:23
58:2,5,11,13
**century** 170:5
**CEO** 24:14
27:22
**ceremony** 34:17
**certain** 103:10
**certainly** 73:18
123:21 138:4
147:17
**certainty** 71:3
**certificate** 127:3
**certificates**
124:19
**certify** 190:7,15
**cervix** 116:5
**cesarean** 137:20
137:23 138:8
138:13,20
139:7,12,17,22
140:13,14
165:22 166:2
166:18 168:3
**chain** 176:23
**challenge** 158:9
160:1
**challenging**
160:3
**chance** 72:24
168:14,15
**change** 130:7
**changed** 21:12
45:10 175:18
**Changing**
174:10
**Chapel** 50:24
52:16
**characteristic...**
113:9
**characteristics**
142:4
**characterize**
180:9 185:12
**charged** 147:19
**chart** 123:2,7,12
134:10 162:9
162:10 163:21
165:4 166:7

**charts** 76:11
135:12 177:4
**check** 175:17
**Cherry** 3:10
**child** 25:16
27:11 28:20
29:13 32:10,17
32:20,23 33:2
33:8 34:16
37:15 66:20,21
115:8 160:19
**childbirth** 64:13
65:13 69:11
70:7 88:21
139:24 140:9
168:17,21
**children** 32:13
33:11 82:16,21
85:25
**Chile** 71:16,24
**Chireau** 5:7,14
5:16 6:1,6 19:2
43:15 63:19
122:21 164:6
**chorioamnion...**
37:1
**chorionic** 151:5
**chose** 32:12
**chosen** 166:10
**circumstance**
32:18,18 36:20
37:6,17 150:16
158:17
**circumstances**
25:18 31:4,25
38:1,8 129:22
185:8
**cite** 20:13 50:21
51:17 76:1,4
78:10 90:25
91:20 103:14
114:9 128:12
136:4 156:25
**cited** 19:22 23:3
55:5,8 84:11
86:8 123:24
137:4,5
**citing** 84:21
128:19 132:2
135:23 136:2

138:17
**citizens** 127:6
**Civil** 1:3 2:3,9
**claim** 91:21
**clarification**
10:13 38:17
**clarify** 38:12
69:24 96:3
144:18 179:10
**clarifying** 46:3
**classified** 62:17
**clear** 36:25 46:2
78:17 133:21
137:13 159:19
160:4,9,22
163:13 169:24
170:18,21
174:3 186:22
**clearer** 54:11
138:20
**clearly** 28:9
37:14 155:7
**clicians** 175:3
**clinic** 50:24
102:22 178:15
178:21
**clinical** 34:2
85:16 98:2
153:16
**clinician's**
162:21
**clinicians** 35:24
116:17 165:3
175:3
**clinics** 52:7
57:21 60:7
78:7 176:4
**Clip** 5:13 30:3
**close** 41:1 70:11
94:6
**closer** 41:7,15
**cluster** 169:5
**coauthor** 97:12
**coauthored**
157:4
**code** 100:19
**coded** 93:19
96:24 97:8
133:10
**coding** 134:9

**colinear** 79:8
**collect** 121:11
124:22 134:20
134:21
**collected** 128:24
**College** 21:25
**colon** 53:23
54:13 57:15
**colonoscopies**
53:9,15
**colonoscopy**
53:4,5 54:14
54:19 55:5,6,9
55:20 56:13,20
56:23 57:1,4
**color** 135:9
**column** 92:13
95:12,21 98:23
99:4
**com–** 47:9 100:5
121:22 166:16
**coma** 72:10
**combination**
59:2 92:23
**combine** 138:24
**combines** 88:25
**come** 35:2,22,23
41:4 51:21
60:15 86:9
115:10 156:10
176:6
**comes** 115:5
122:12 152:6
**comment** 84:19
97:16 106:20
107:14 128:25
**commented**
103:24
**commission**
188:25
**committed**
31:18,21
**Committee**
14:19
**common** 102:4
133:24 140:23
141:18 168:23
174:23,25
175:1
**commonly**

123:24
**communicating**
17:24
**comorbidities**
168:23
**comparable**
61:10 86:2,5
100:6,22
**comparative**
132:6
**compare** 55:6,19
69:8 70:4 79:6
92:10 166:3
**compared** 5:20
5:23 91:3,15
95:6 129:1
168:12
**comparing**
138:2
**comparison**
68:24 69:15,15
70:18 93:6
169:2
**compassion**
159:7
**compile** 127:15
**complaint**
184:13
**complete** 11:1
94:17 99:25
140:6
**completely** 10:3
99:13 122:14
**completeness**
11:8 132:12
**complicated**
53:21
**complication**
44:1 46:21
47:1 53:7,14
54:1,18 55:1
55:16,22 56:4
56:12 71:6
96:22 119:1
161:14 162:3
163:3,11
183:11
**complications**
5:20,23 20:5,6
33:25 42:19

45:2 47:9
52:24 54:2,7,9
55:7,7,9,19
66:3 77:7 91:2
91:14 93:20
95:5 99:6,14
101:6,11,12
102:10,17,21
106:14,19,20
106:23 114:18
117:17,22,25
117:25 118:6
118:23 133:14
141:3,6 157:10
161:18,20
162:2 166:12
166:15,17,25
167:12 168:3
175:9 176:6
178:14
**complicit** 173:14
173:19
**comply** 148:16
**comprehensive**
94:22 134:20
**concept** 165:21
**conception**
33:16,21
112:25 176:18
**concerned**
115:19
**concerning**
87:21 182:6
**concerns** 101:13
162:16
**conclude** 139:21
**concluded**
131:23 132:6
187:3
**concludes**
186:14,24
**conclusion** 84:6
93:11 117:11
185:19
**conclusions**
80:21 87:16,18
131:6 157:9
**condition**
180:10
**conditions** 72:5

195

112:12 137:22
**conducted**
132:16 190:7
**Cone** 21:18,21
**conference** 9:8
**conferences** 22:9
**confirm** 19:5
25:8 47:17,19
77:22 107:6
140:7 150:8
**confirmed** 142:7
**confirming**
33:10
**conflicted** 39:11
**confusingly**
65:18
**Congress** 82:24
**consensus** 155:1
155:8
**consequence**
37:13
**consequences**
180:4
**consider** 29:2,5
37:5 46:4
57:10 72:21
81:11 82:11
83:17,24 98:5
98:12 111:8
113:14 118:8
142:6,12
**considerable**
45:17 80:2
**considerably**
41:10
**considered**
97:25 98:13
**considering**
68:22 69:5
**consistent**
135:21 170:12
**constituency**
22:18
**constitute** 171:2
190:12
**constitutes**
112:19
**constitutionality**
16:16
**consult** 68:9,9

**consultation**
93:22 96:21
**consulted** 76:25
**contacted** 17:13
**contain** 188:6
**contemplated**
115:9
**contemporane...**
129:5 132:4
**contentious** 81:3
**context** 74:12,24
135:5
**continue** 90:23
111:4 137:11
170:4
**continued** 74:3
86:20 88:19
165:21
**continuing** 70:1
**continuous** 24:7
24:9
**contraception**
170:6
**contraindicated**
142:25 143:4
143:12
**contraindicati...**
142:22
**control** 169:24
172:7 174:20
**convenient**
120:20
**conversation**
179:4
**coordinated**
24:14
**copy** 18:22 19:6
19:10 21:3
90:21 91:7
125:8 126:6
**corner** 63:5
126:1
**Corporate** 1:22
2:21
**correct** 11:1
13:23 15:23
16:3 22:9,10
22:25 23:25
25:18 26:14,20
27:15,16 30:20

31:7 38:15
39:23 40:14
43:11 49:2
51:24 52:17
53:1 54:16
71:8 72:7,8
76:2 79:18
83:18 88:1
99:1,14,23
103:17 104:18
105:15 114:1
114:13,20
116:23 117:8
119:5,9 121:4
122:16 123:2
124:25 125:7
125:12,22
128:12 129:15
129:16,20,21
132:13,24
136:23 137:1,2
137:3,7 138:15
142:24 146:1
146:18,21
148:2 149:17
149:22 154:1
157:2,6 158:5
158:11 160:25
161:3,4 162:12
162:13 163:20
163:25 166:21
166:22 167:1
171:23 177:4
178:16,17
179:6 181:12
185:4,6 188:6
**correction** 188:9
**correctly** 61:16
**correlate** 134:10
**correlation** 79:3
79:6
**correspondence**
96:15 97:15
**corresponding**
64:23
**corresponds**
64:25
**Cosmetic** 118:9
**counsel** 2:2,8,13
2:18 3:1,7,13

3:19 4:1 7:9
8:15,18 17:1
17:13 18:1
178:4 181:14
182:5 190:16
190:18
**counseling**
93:16 181:20
**count** 76:16 98:8
**countries** 133:2
**country** 28:18
41:21,22 106:3
106:15,22
107:2 141:16
159:23
**County** 7:20
188:19 190:2
**couple** 77:15
**course** 54:19
55:25 56:11
102:17
**court** 1:1 4:19
9:13 14:7,10
29:16 48:13
61:25 158:4
190:5
**Court's** 129:19
**cover** 35:21
56:18
**covered** 123:12
**covering** 41:13
**cowrote** 182:11
**create** 160:2
**cri** 113:2
**criminally** 159:2
**criteria** 88:10
89:10,13,14
**criterion** 90:16
**criticism** 106:25
**criticize** 87:24
99:17 103:4
104:22
**criticized** 102:8
**critique** 84:21
87:1 97:9
103:8
**critiqued** 90:19
**critiquing** 81:18
**cross-examina...**
125:20

**CRR** 4:20 190:4
190:24
**Culture** 45:8
**cup** 29:3
**curettage** 37:24
38:2 112:15,24
113:19,24
114:16
**curette** 113:1
**curious** 172:16
**curr-** 28:13
**Curran** 3:15
**current** 26:5
40:3,6 86:13
153:7 175:15
**currently** 27:17
35:11 45:7
158:23
**Curriculum** 5:9
20:21
**custody** 176:23
**cut** 28:5 77:11
**cuting** 159:18
**cutoff** 98:11
**CV** 20:19 21:4
21:10,16,17,24
23:20 45:5
46:10 100:14
178:6
**cyst** 182:23

**D**

**D** 5:1,10 7:1
24:25 188:1,1
**D&C** 38:9,13,13
38:18 111:8
114:24 115:13
179:5,12,15,17
**D&Cs** 114:19
**D&E** 116:6,7
128:15,22
129:14 130:14
130:24 131:15
132:7 135:20
**D&Es** 131:23
**D.O** 27:2
**dagger** 119:17
**Daily** 75:25
**Dakota** 50:15
**damage** 54:4,5

damaged 34:7,8
   34:12
Dame 45:9,14
Dame's 45:17
Danco 117:18,18
danger 182:25
dangerous 62:21
   63:1 64:13
   65:13,14
Darwin 170:3
Darwinian
   174:3
data 47:3 48:9
   48:10 64:14
   75:4,12 85:14
   85:15,24 86:13
   86:15,16 88:25
   97:5,8,9 98:2
   100:8,16,17
   101:1,3 103:9
   106:3 107:2,3
   107:5,8,10,13
   107:17 108:12
   108:15,17
   121:11,20,22
   122:7 124:23
   126:15 127:3,4
   127:15 128:23
   132:6 134:20
   134:22,23,24
   135:1,2,4,7,7
   135:14,16,21
   138:17 177:12
   177:13 178:25
   179:3
data's 108:14
database 99:10
   99:22 100:25
   101:23 102:15
   103:2
databases 89:4
   100:2,12,23
   101:7
date 21:7 45:6
   86:16 189:5,25
David 132:25
Davis 3:8
day 39:10
   188:11,21
   190:21

days 92:19
dead 38:4,9
deal 31:16 38:24
   39:12
deals 160:6
death 34:17
   37:12,15 47:13
   47:24 48:1
   64:17,20,22
   65:3 66:4
   94:20 109:6
   115:16,18
   117:7 124:19
   127:3,10,13
   132:8 133:17
   134:1,19
   135:20 141:3
   141:13 161:23
   163:3 168:6
death-to-case
   131:24
deaths 48:2,4,5
   48:11 62:14,15
   62:18,19 64:5
   75:10,16,18
   108:22 109:10
   119:7,11,24
   121:2 123:4
   126:20 131:16
   133:10 140:8
decide 46:16
decided 39:8
   162:24
deciding 69:6
   70:1 72:19
   88:11
decision 69:18
   86:1 129:19
   165:5
declaration 5:7
   5:15 6:1 18:15
   19:1,6,14 20:1
   20:14,17 21:5
   47:20,22 50:21
   51:17 52:21
   54:20,22 55:4
   56:1,11,16
   58:25 59:14
   60:24 62:4
   63:3,12,18

74:7 78:4
   87:24 99:16
   103:7,13 105:2
   105:21 108:21
   110:8,16
   113:22 116:20
   119:5 120:4
   122:15,20,25
   124:3,4 128:9
   128:11 136:3
   142:21 149:9
   156:23 169:14
   178:19
declarations
   19:19 60:19
declare 188:4
decline 171:5
   173:2
declined 36:15
decompensate
   59:11
deep 58:22,23
   59:7,19 60:9
deeper 51:15
   58:21
def- 12:21
defend 16:16
   25:15
defendant 2:13
   3:7 8:2 12:18
   12:21 13:2
defendants 1:9
   1:13 2:18 3:13
   7:22 186:12
Defending 4:2
   8:12
defer 186:10
deficiencies 58:6
deficient 153:15
define 80:14
   81:22 97:17
   122:2
defined 92:22
   174:2
defines 112:13
defining 138:11
definitely 11:11
   181:18
degraded 38:22
degree 34:7

Delaria 4:11
deliberate
   169:15 171:12
   171:23 172:1,3
   172:20 173:8
deliberately
   169:20 172:17
   173:8
deliver 48:21
   166:9
deliver- 137:17
delivered 12:11
   33:8 36:25
   49:13 73:17
   74:5
deliveries
   100:19 137:18
   139:23
delivering 33:2
   48:23 69:7
delivery 62:19
   137:20,23
   138:8,11,20,22
   139:8,9,18
   163:12 166:10
demand 160:2
   160:14,16
demise 114:8
demised 38:11
   116:8 147:16
demography
   45:20
demonscra-
   102:5
demonstrably
   117:5,12
demonstrated
   102:4
demonstrating
   177:2
denominator
   109:17 121:17
   121:25 122:3
denominators
   89:1
deny 163:5
department 2:14
   3:2,14,19,20
   8:25 47:10
   107:17,24

108:1,18
departments
   110:5
depend 106:23
depended
   129:25
dependent 89:9
depending 48:22
depends 47:23
   80:14 97:18,20
   108:15 141:24
   153:16 184:5,6
depos- 76:20
deposition 1:15
   5:14 7:5 10:19
   11:23 12:1,2,6
   12:10 13:22
   18:12 43:9,13
   43:14 46:25
   67:23 76:21
   159:3 186:15
   186:25 187:3
   189:5
depositions
   11:25
depression
   84:14
deprivation
   82:22
describe 19:13
   80:4,5 81:14
   113:18 117:5
   180:19 181:23
described 39:9
   41:20 48:17
DESCRIPTION
   5:6
design 85:13
   94:8 103:22,25
designed 100:25
   101:2
desk 68:8
destroyed 173:1
destroying
   172:18
destruction
   169:16
detail 76:25
   90:19 166:7
detailed 86:25

                                                                      197
DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242
Case 1:23-cv-00480-CCE-LPA   Document 74-3   Filed 09/12/23   Page 198 of 219

determine 33:15
157:22
devastated
115:7
develop 72:10
72:12 113:25
114:23 180:16
180:23
developed
114:12 179:9
179:12,14,25
180:3
Development
185:11
develops 73:16
162:1
device 57:9
devoted 82:19
DHHS 8:16
diabetes 71:2
72:9,10 168:25
diabetic 72:10
diagnose 151:8
diagnosed 155:9
183:20
diagnoses 147:8
diagnosing
183:6
diagnosis 141:20
146:24 148:8
150:8 154:20
182:16
diagnostic
148:13,17
149:25 150:21
151:16 152:7
155:10
die 72:12 88:21
134:5 141:15
183:5
died 75:6 77:13
77:21 109:13
109:22 115:1
133:13,21
168:4,9
dies 72:17
142:19
differ 79:5
174:16
differed 158:1

difference 66:19
66:22 135:24
differences
86:19 87:1,13
89:4 169:10
different 45:16
47:25 48:7
61:15 79:10,10
88:25 89:1
92:4 93:1,4
106:21 134:15
157:15 174:19
182:15
differentiate
114:10
differently
101:23 115:5
differing 85:5
differs 93:8
difficult 98:22
121:18 169:1
183:13
dig 51:15
dilate 116:5
dilation 37:23
38:2 112:24
116:6
direct 43:21
92:11 108:24
125:19
directed 172:7
disagree 84:10
120:2
disciplinary
184:16,20,23
disclose 109:24
disclosed 34:19
discounted 88:4
discovered
21:15
discovery 4:19
61:3
discrepancy
169:7 172:1,3
discuss 11:3
29:19 88:19
116:21 153:25
154:10 155:3,5
156:24
discussed 15:7

19:24 27:5
54:22 176:17
discusses 154:13
discussing 125:5
130:12 157:1
discussion 29:23
71:11
disparities 135:8
disparity 171:19
172:23
distilled 20:1
distinct 60:24
110:24
distinction
113:20 114:15
139:1 182:9
Distract- 83:21
distracted 83:21
distribution
157:24 169:11
district 1:1,2 3:7
3:13 8:2,9
divulge 68:1
DNA 33:6,7
do- 45:13
docs 118:5
doctor 9:19
67:22 79:15
95:10 97:11
132:11 136:21
140:16 172:16
174:10 178:13
186:18
document 19:18
26:1 30:10
84:18 96:6
105:5 145:11
documentation
145:24
documented
110:8 120:15
134:7 147:5
148:6
documents 61:1
84:20
doing 10:17 20:3
39:5 45:13
54:8,10 82:7
100:15 111:7
112:24 113:13

144:14,23
172:19 185:18
185:23
donations 27:4
doses 116:15
double 37:7
119:17
doubt 87:9
doubts 132:11
dozen 50:10
dozens 158:22
Dr 6:3,5 7:5,12
7:15 9:23
19:20,20,21
25:25 30:7
43:7,18 52:2
55:5 60:19,24
68:13,17 96:15
106:1 124:17
125:16 145:3
149:14 157:4
158:3 164:6
178:5
drafting 19:14
56:1
draw 80:22
87:18
drawn 157:10
Drive 1:22 2:21
dropoff 85:20
drowns 66:7
drug 118:9
120:7,14,16
due 48:11 62:19
113:24 133:10
133:14 169:8
169:11
dues 27:4
Duke 185:1,8,13
186:1
duly 190:9
duties 24:10
27:19
dying 72:24
120:7
dysfunctional
180:7,11

E

E 1:11 2:1,1 5:1

5:5,11 7:1,1
25:21 116:18
188:1,1,1,1,1
189:1,1,1
190:1,1
e-f-f-e-c- 116:19
earlier 43:7 60:1
63:11 70:12
75:11 81:25
93:5 118:18
121:22 123:13
125:5 133:13
137:6 141:18
159:3 161:9
175:6 176:17
early 16:11
93:16 153:18
156:9
easily 138:5
easy 107:9 128:7
141:20
easy-to-under...
138:6
ectopic 20:7
48:3,11 63:2
123:5 140:16
140:18,23
141:1,9,12,15
142:8,11,13,18
142:22 143:20
143:22 144:5,6
145:6,15
146:10,24
147:11 148:10
148:22 149:16
150:1,9 151:8
151:8,14
153:20 154:20
181:5,14,23,24
182:6,9,16
183:6,17 184:3
ED 109:5
Edenton 2:16
3:4,16,21
editor 5:22 6:4
95:5 96:8
98:24 101:10
136:17,23
editors 96:10
educated 12:16

**effect** 37:8
  137:21
**effective** 148:20
**effectiveness**
  92:9 93:7
**effects** 93:15
  116:18
**efficacy** 92:10
  93:7
**efforts** 81:21
**ehawley@adfl...**
  4:6
**eight** 50:16
  66:24,25 68:25
  69:4,10,14,25
  70:2,6,9
**either** 27:2 38:9
  57:7,8 80:1,11
  113:11 116:4
  146:23 147:10
  148:9,19
  151:11,12
**El** 158:8,14,16
  158:23 160:1,6
  160:11 162:6
**elapsed** 77:6
**elective** 31:24
  73:12,14
**elevated** 151:3
**eliminated** 88:13
  137:21
**Elizabeth** 3:15
  8:8
**Ellis** 2:20 7:20
  18:2 19:10
  178:6 186:11
**embryo** 115:1
  141:22 142:1
**embryonic**
  38:19
**emergency**
  35:22 39:20
  40:13 42:2
  94:5 102:3,24
  107:3,17,23,25
  108:18 109:13
  109:13,21,22
  110:4 118:1,5
  164:24 165:22
  166:4

**emphasize** 94:15
**employed**
  190:16,19
**employee** 190:18
**EMS** 76:21
**encapsulates**
  30:23
**encephalitis**
  162:2
**encounter** 39:18
  113:10 122:8
  134:6,7,20
**encountered**
  40:1 42:18
**encounters**
  107:24 109:17
**ended** 88:15
  109:5
**endometrium**
  113:4,8
**endotracheal**
  58:18
**engage** 81:20,21
  102:10,13,18
  102:25 120:5,6
**engaged** 80:2
**engages** 80:18
  120:13
**Engineering**
  87:21
**enjoy** 164:19
**enormous**
  154:16 171:19
**enroll** 134:19
**entail** 45:12
**enter** 134:4
**entire** 62:22
**entirely** 147:12
  179:24
**entirety** 40:10
  62:10 162:10
**entitled** 117:1
**entity** 180:13
**eobrien@ncd...**
  3:17
**epidemiologic**
  109:15
**epidemiologists**
  124:24
**epidemiology**

45:20 75:1,1,3
**eptoc-** 182:6
**equivalent** 142:7
**ER** 40:2 109:17
**era** 129:1,1
  172:13
**Erin** 4:3
**error** 21:15
**especially** 53:16
  54:2 71:18
  82:20 170:1,10
  170:23,24
  172:6,6
**Esq** 4:9,9,10
**essence** 49:19
  174:1
**essentially** 116:6
**establish** 30:12
  33:3,6
**estimate** 49:8
  64:3,6,10
  156:4
**estimates** 74:16
**estimation** 55:15
**et** 1:5,8,11 7:7,7
  98:25 99:17
  103:14 153:25
  154:9 157:1
  189:2,3
**Ethics** 45:8
**eugenic** 170:1,7
  170:16,20,25
  171:21
**eugenics** 173:14
  173:19,20,20
  174:1,7,9
**evacuation**
  94:11 116:7
**evaluate** 46:14
**events** 101:13
  117:2
**everyday** 118:20
**evidence** 32:16
  78:14 89:8
  120:3 149:16
**evil** 31:7
**Ex-** 128:8
**exact** 23:2 47:3
  80:9 175:18
**exactly** 51:10

79:4
**EXAMINATI...**
  5:3 9:17
**examined** 135:1
  178:25
**example** 48:2
  53:3 81:3
  90:16 98:4
  100:19 133:11
  133:23 141:4
  183:16
**examples** 50:22
  71:16
**excellent** 94:25
  133:11 162:11
**exception** 3:13
**exception(s)**
  188:8
**Excerpt** 6:3
  125:15
**exclude** 89:18
  90:17
**excluded** 90:1,3
  90:10,14
  109:25
**exclusively**
  124:18
**excuse** 137:17
  137:17 140:18
**exemplifies**
  129:3
**exhibit** 5:7,9,10
  5:11,13,14,15
  5:17,20,22 6:1
  6:3,4,5 18:25
  19:1 20:21
  24:22,22,25
  25:20,21 30:2
  30:3 43:13,14
  63:17,18 74:8
  83:3,4 91:13
  95:4 104:5,24
  105:1,6,12,13
  122:19,20
  124:5 125:15
  128:9 136:16
  164:4,5
**Exhibition**
  128:8
**exist** 107:6,15

118:7
**existence** 79:20
**exists** 116:14
  172:24
**exit** 134:5
**expect** 184:1
**expected** 115:12
**experience** 34:2
  34:8 35:7
  61:12 115:21
  161:22
**experienced**
  73:20 119:22
  153:19 182:19
**experiencing**
  42:19 44:1
  45:2 114:20
**expert** 5:15 6:5
  13:11,12,20
  14:6 15:5,17
  20:13 21:4
  63:19 104:3
  118:8,10 149:7
  157:5 158:7
  159:21,22
  164:5
**expires** 188:25
**explain** 62:8
  112:2,19
**explained** 93:18
**exponentially**
  65:8,9 70:16
**exposure** 79:14
**express** 23:10
**expressed** 34:13
  132:11
**expressing**
  78:14
**expression**
  70:23
**expulsion**
  116:18
**extensively**
  100:13
**extent** 67:24
  74:5 82:17
  85:20 108:13
  164:19
**extremely** 85:9

## F

F 5:13 30:3
190:1
face 161:17
faced 184:16
facilities 49:17
51:13 55:12
58:9
fact 20:17 31:6
77:19 94:8
102:19 111:4
149:24 150:7
168:7 172:22
172:25 182:11
factors 157:24
157:25 169:12
facts 5:17 83:5
faculty 185:1
failing 146:25
148:9
faint 182:20
183:10
fair 15:5 31:9
50:17 84:24
103:6 158:13
fairly 30:8 129:8
129:12 141:18
182:17
fall 14:24 185:9
fallopian 140:22
falls 81:12 82:14
false 117:5,12
familiar 46:21
47:4,12 84:24
87:19 88:10
89:13,17 96:9
107:19 108:5
126:5 132:24
160:17
family 160:24
far 18:9 37:2
48:8 67:23
86:16 121:5,9
Farris 19:21
55:5 60:19
145:3 149:14
Farris's 60:24
fatal 119:18
favor 16:4 80:12
185:18

FDA 117:1,23
118:6 119:7
121:2,10 122:1
122:8 123:8
FDA's 117:13
118:12 143:1
FDA-approved
174:16
February 50:25
52:8,11
federal 29:1
108:8 118:9
Federation 9:3,6
feel 11:2 14:3
32:17,21,23,25
38:25 39:6
59:5 163:5
182:20
Feeling 34:5
fellow 21:25
45:11
felt 35:6 39:10
39:11 55:17
75:13 80:7
163:21 182:18
fetal 37:11 38:19
114:8 115:16
115:18
fetus 36:18 38:4
38:4,9,11
66:19 70:10,12
115:1 116:9
147:16
fewer 178:20
fifth 104:16
figure 114:9
122:8 123:18
123:23,23
filled 26:13,17
financial 101:1,3
159:10
financially
190:19
find 22:20,24
75:17 102:20
fine 16:12
finish 10:5 56:6
finished 85:21
Finland 134:2
134:16

Finnish 90:25
93:19 94:16
96:19 100:22
100:24
first 9:13 11:22
17:13 26:22
30:13 40:4,5
48:2 62:5,11
62:15,20,24,25
64:22 66:1,5
75:10,23 92:12
93:9 99:4
130:4 137:15
144:10 151:25
156:15,24
164:12,15
first-trimester
91:21 141:13
firsthand 51:3
75:7
fit 174:4,5,7,8
five 39:5,16,17
50:22 70:13
71:20 76:17
85:5 87:4,17
Fjerstad 96:10
Fjerstad's 101:9
flaw 177:1,11
fleeting 182:10
floor 2:4 35:21
focus 45:23,24
46:1,3,4 55:9
folks 170:3
follow 71:25
100:21
follow-up 86:21
87:11,14 92:15
92:18 93:20
100:10 115:15
147:17 157:15
157:18 158:2
following 58:6
75:6 77:13
78:12 82:9
90:6 138:13
139:4,12
146:13 178:21
179:15 181:6,8
follows 9:16
176:22

Food 118:9
Footnote 92:14
forcep 57:17
foregoing 188:6
190:6,8,12
forensic 176:18
forensically
33:15
foresee 166:1
forget 91:7
forgetting 14:3
forgive 86:12
Forks 4:21
form 5:12 16:23
17:10 25:22
26:2,8,18
34:21 42:10
49:14 65:16
70:8 73:1,25
74:22 85:15
104:23 111:8
121:6 143:17
145:17 146:3
146:11,19
162:18 163:6
164:1 167:16
167:20 176:10
176:13 177:6
formal 81:21
forms 49:10
formulae 184:7
forth 84:22
98:20 120:8
127:24 128:24
found 51:15
65:2 75:19
84:13 131:15
135:19
Foundation 2:3
2:9
four 43:20 44:8
76:17 142:2
Fredrick 170:5
free 11:2
Freedom 4:2
8:12
French 112:16
112:17
frequency
180:21,23

frequently 58:4
102:20 114:22
141:8 178:15
179:8 180:16
front 68:8
127:25
full 11:18 58:15
126:6
fully 11:1
funded 87:25
88:5
further 145:13
146:9 190:15
190:17

## G

G 3:9 5:14 7:1
43:14 188:1
Galton 170:2
174:2
gamut 58:15
general 9:1
28:10,11 46:15
58:16,17,18
59:6 60:2
61:12 89:18
103:4 169:25
generally 28:16
93:13
generic 117:19
geographic
179:23
George 52:2
gestation 48:6
65:7
gestational
64:18,19 65:5
66:17 69:17
70:17 71:1
87:2 101:5
127:24 131:8
131:21 136:1
151:6 160:3,14
getting 48:20
Gissler 94:24
give 23:5 28:14
28:15 41:3
47:18 49:22
90:16 91:10
110:17 116:13

116:15,17
123:7 128:10
149:10 168:14
168:14,15
186:5
**given** 11:22,25
12:3,6 61:2
70:21 125:9,11
161:9 164:20
170:11 178:5
**giving** 11:18
13:21
**gloves** 112:11
**go** 8:7,23 11:2
23:7 29:18
52:13 57:4
83:23 90:13
102:23 103:21
112:1 119:23
134:8,22
137:10 140:5
151:7 159:15
186:22
**goal** 29:7 159:25
160:1,23
163:24 164:22
164:23 165:1,6
165:9,9,12
**goals** 174:9
**goes** 154:7
**going** 24:21
29:15,21 39:10
43:12 67:15
72:1,9,11 81:8
81:9 83:2
91:11 92:11
95:2 115:4
120:19 124:10
136:14 140:13
159:6 161:8
166:1 170:2
172:14 175:5
177:23 179:4
180:25 186:25
**gold** 124:21
125:1
**Goldberg** 18:19
**good** 8:4,6,7
9:19,20 53:3
67:12 73:10

161:25 162:7
163:18,22,24
164:19,20
165:10,12,24
166:6,8
**gotten** 135:13
**Government**
108:8
**gowns** 112:11
**graduate** 39:2
**graduated** 12:8
**grams** 66:23,23
70:10
**Grandin** 4:9 9:7
**granular** 134:24
**Graunke** 2:10
7:16,16
**Gray** 2:2 7:12,15
9:23
**great** 11:10
23:20 38:24
39:12 67:13
86:24 90:19
123:15 164:10
170:7 177:21
177:22 185:14
**greater** 64:21
129:10 130:9
132:8 139:18
165:17
**Greek** 112:17
**Green** 96:10
**Grimes** 88:24
128:12 135:19
**Grimes's** 132:25
**gritty** 113:9
**ground** 56:17
**group** 124:23
173:21,22,23
**guess** 69:20 73:2
186:14
**gynecologists**
22:1 23:22
118:5
**gynecology**
174:24

─────── **H** ───────

**H** 5:5,15 63:18
104:6,8 189:1

**h-** 149:13
**H-e-i-k-i-n-h-...**
96:16
**halfway** 95:23
**hand** 19:19
**hands** 184:4
**happened** 32:19
131:10 167:8
**happening**
141:19
**happens** 66:13
115:16 127:8
127:14 148:17
**happy** 34:4
85:25 90:22
**hard** 94:9 102:3
180:22 185:15
**harm** 34:1 83:16
84:5
**Haven** 12:20
**Hawley** 4:3
**hCG** 143:23
144:14,24
149:15 151:3
151:20 152:6
182:2 184:5,6
**head** 10:18 86:6
90:15 103:23
126:24
**head-to-head**
92:7 93:6
**heading** 26:23
**health** 3:19 5:18
16:2 45:20
47:10 57:23
83:5,14 84:3
93:19 96:19
106:24 108:9
116:23 133:4
134:4,17,18
135:2,11
162:16 164:19
165:13 169:12
180:4
**healthcare**
101:14 108:4
**healthy** 75:14
183:2
**hear** 113:1
186:13

**Hearing** 6:3
125:16
**heart** 141:5
**heavy** 100:15
**Heikinheimo**
97:11
**helicopter** 49:21
**helicopters**
48:24 50:8,9
**hello** 68:8
**help** 81:23
138:18 159:7,9
**helped** 163:23
164:21 165:11
**helpful** 82:5
**hem-** 96:25
**hemorrhage**
38:10 94:1,10
95:10 96:25
97:1,17,22,25
98:9,12,13,21
102:2 115:20
141:2 167:4
**hemostasis**
57:20
**hereto** 188:10
**Hern** 66:11
68:13,17
**high** 39:3,4 72:5
72:11 78:11
116:15 149:15
151:20 152:6
157:8
**high-level** 112:7
**high-risk** 137:19
138:7,11
**higher** 66:17,17
93:14 94:12,13
138:3,21 139:8
140:4,15
161:17,22
166:13,16,17
167:11 168:11
168:16,19
180:24
**highest** 62:7,17
**Hill** 50:24 52:16
**histories** 77:1
**history** 144:7
169:22

**hold** 17:20
**home** 156:2,8
**homicide** 120:11
120:18
**hopes** 28:17
**hospital** 12:12
12:19,20 21:16
21:18,21 39:18
41:19 49:1
50:25 51:8,12
52:14,16 54:11
55:13 77:21
102:23 107:4
107:12 115:22
115:23 134:10
184:18,21
**hospitalist** 35:19
153:10 155:13
**hospitals** 40:25
41:1,13 51:13
53:10 77:14,17
77:25 106:8
107:1 131:25
132:8
**hot** 57:5
**hour** 18:7 67:4
120:20
**hours** 18:8
177:17,18
181:25
**House** 14:23
16:13 17:7,8
**housekeeping**
9:24
**HRQ** 108:8
**human** 3:19
94:19 158:4
173:21,22,23
**hundred** 41:7,9
41:10 130:8
138:14 139:4
**hypertension**
72:17,21 73:16
73:19,21
168:25
**hypothesis** 81:6
**hypovolemia**
141:4,11
**hysterotomy**
130:18

**I**

ideally 75:3
identification
19:3 20:22
25:2,23 30:4
43:16 63:21
83:7 91:16
95:7 122:22
125:17 136:18
164:7
identify 33:22
121:18 126:3
126:20 148:14
172:19 176:19
identifying
154:6
illegal 31:24
158:17 163:10
176:8
illness 11:19
Im 4:10 9:7
immediate 5:20
5:22 91:2,14
95:5 115:12
immediately
67:2
impinges 82:18
implant 140:20
140:21
implants 140:19
implicit 149:19
149:23
imply 101:16
important 65:23
86:12 155:11
182:8
impossible 64:6
64:10 118:24
166:1
imprecise 28:15
imprisoned
158:23
in- 78:15 94:11
inaccurate 122:1
133:19 135:15
inappropriate
74:21 147:13
147:15
incest 32:3,9,12
incidence 55:15

93:14 102:6
incising 113:16
incision 112:20
113:15,19
incisions 113:4
include 20:16
24:11 32:2,5
48:1,4,5 56:15
78:3 88:12
89:19 119:5
121:15 123:2
123:18 177:3
included 100:8
106:2 107:1
119:18 155:6,6
includes 27:6
50:4 107:3
119:7 121:2
152:12
including 54:2
94:10,10,11
137:12,12
138:1 179:2
inclusive 190:12
incomplete 94:3
94:12 102:2
113:12 121:23
incorrect 44:19
increase 64:23
64:24 65:3,7,9
70:15 84:14
129:7
increased 78:15
130:22 138:9
increases 64:17
131:20
increasing
135:25,25
incumbent
118:17
Indiana 35:14
35:15
indicate 23:20
121:12 132:7
indicated 123:10
indicates 79:1
indication
174:13,14
176:15
indications

165:23 175:23
individual 70:23
71:3 72:15
163:1 170:19
173:7
individuals
16:21
induced 36:17
42:20,21 44:2
53:16 113:24
induction 37:5
37:17
infant 12:11
49:1 163:17
infected 38:10
infection 36:24
115:20 167:4
infertility 180:7
inflated 97:2
inform 110:4
information
22:12 51:14
58:1 60:10,11
75:17 76:6
78:1,4 101:4,5
118:24 127:12
127:19,22,23
143:2,6,14
157:19,21
initial 9:24
150:2
initially 151:10
157:20
injustice 170:17
inkling 23:5
insofar 118:10
inspection 58:3
inspections 58:6
inspects 57:22
installation
130:17
instruct 68:1
instruments
112:6,11
insufficient
133:20
integrity 108:16
135:17
intent 37:13,14
84:9 163:16

170:20 171:9
171:10,13,20
intention 37:10
inter- 184:2
Inter-American
158:4
interactions
94:20
interested 81:17
135:6 190:20
interesting 39:1
interface 113:6
intern 7:19
international
83:12 84:1,12
185:10
internationally
36:2 44:22,23
internet 76:14
intervals 85:5
intervene 161:21
162:4
intervened
16:15
Intervenor- 1:12
intervenors 4:1
16:19,25 17:3
17:4,14
intervention
66:18 141:3
intoxication
120:7
intra- 184:1
intrauterine
113:25 114:12
114:23 145:11
145:24 146:24
147:6,9,20
148:4,7,9
150:9 151:15
179:5,9,15,18
179:20 180:3,5
180:6,24
183:25 184:2
introduce 7:9
24:21
introduction
112:8
intubated 58:19
intubation 59:11

involved 13:22
119:24
involving 103:5
113:19
Ireland 71:17,21
71:21
issue 78:25
86:12 88:15
144:25 149:1,3
issues 104:1
133:8,18
135:24 149:3,7
IUP 154:20

**J**

J 5:20 91:13
jail 159:19
Jim 3:7,13 8:2
job 45:10
join 26:9
joining 26:16
Joseph's 35:17
Joshua 1:8 2:13
5:7 189:3
journal 96:11
136:12,21
182:12
jpayne@adfle...
4:6
Judiciary 14:19
Julia 4:2 8:3,11
18:1
June 121:4
Justice 2:14 3:2
3:14,20 8:25

**K**

K 5:22 95:4
188:1
Kansas 6:2 14:3
14:4 52:3
122:16,22
Kara 4:9 9:6
Karen 18:20
keep 123:20
124:1
keeping 143:10
Keisha 77:18
133:13,21
Kentucky 13:24

202

13:25 14:2,4
15:17 48:14,17
125:6,21
**Kenya** 175:13
175:14,19
176:9
**kept** 62:17 71:1
85:24
**Kevin** 3:9 7:23
7:25 8:7
**keywords** 20:3
**kgraunke@ac...**
2:12
**kill** 163:17
**kind** 28:10 42:23
56:22 58:8
60:5 61:19
173:24,25
**Kingdom** 133:3
133:22 134:3
134:13,15
135:2
**Kinsley** 3:19
8:15
**know** 10:10
11:11 14:23
24:20 26:4
28:9,23 35:2
45:5 51:25
52:10 54:18
56:19,22,25
57:21,25 58:1
58:8 60:5
61:19 66:10,13
66:13,15,22,24
70:21 71:15
76:5,9 77:6,23
78:6 79:16,19
79:20,21 80:1
81:7 84:8
86:17,18,25
88:20 92:25
107:15 110:11
114:22 121:5,9
122:6 126:19
126:24 127:7,8
127:14 128:5
129:22 130:4
138:4 141:7,14
141:21 144:1

144:21 155:13
156:21 161:1,1
168:16 169:8
171:10 173:9
173:18 175:1,3
176:1,15,21
178:22,25
179:2,23
182:23 183:24
185:17,22,22
185:23
**knowledge** 51:3
75:7 131:1
143:11,21
**known** 158:10
**Kristi** 2:10 7:16
**Kudumuri** 4:10
9:9
**kwilliams@be...**
3:11

---

**L**

**L** 6:1 122:20
188:1
**label** 174:17
**labor** 35:21 36:1
36:17 153:11
**labor-and-deli...**
98:4
**laboring** 35:23
**lack** 87:11
**Lader** 170:9
**ladies'** 120:25
**lady** 133:12
**laminaria** 116:5
**Lanska** 136:4
**lar-** 66:4
**large** 84:11 90:1
**larger** 66:4
**late** 133:14
169:6
**lately** 126:18
**Latin** 160:12
**law** 7:18 28:25
145:22 146:8
146:16 147:7
148:21 160:1
163:9,10
**law's** 145:11
**Lawrence** 170:9

**laws** 15:7 16:17
149:4 158:14
160:10,12,21
175:18
**lawsuit** 8:10
13:2,4,7
**lawsuits** 13:20
**lawyer** 12:24
31:13 159:24
**layer** 113:3
**lead** 120:6
**leader** 7:21
186:12
**leading** 141:12
181:1
**leads** 114:17,18
**learn** 36:13 51:8
75:10
**leave** 39:8 185:8
**led** 170:25
185:19
**left** 185:13
**leftmost** 95:11
95:21
**legal** 2:9 4:20
10:2 12:16
71:15 83:16
84:5 149:1,3
158:9 175:14
175:16,19
**legalization**
130:2
**legalizing** 71:23
**legislation** 15:12
15:25 28:19
**legislative** 4:1
7:21 14:14
15:2 186:12
**legislators** 8:13
**let's** 13:24 17:18
31:16 117:20
**letter** 96:8 98:23
101:9 136:23
137:2,13
139:21
**letter's** 138:12
**Letters** 5:22 6:4
95:4 136:16
**level** 29:1 59:24
80:17 101:6

161:16 172:4
184:5,7
**levels** 61:21
149:15 151:20
152:7
**Liberties** 2:3,9
**Lidiro** 65:2
**life** 27:10,14
28:19 29:8,13
37:11 82:19
86:3 163:16
**lifts** 100:16
**likelihood** 102:9
**limit** 41:23
**limitations**
99:21
**limited** 48:12
100:17
**line** 43:24 59:15
59:15 104:16
**linear** 79:8
112:20 113:4
**linearly** 65:8
**lines** 172:8
**lining** 112:20
113:5,17
**linkage** 103:4,17
**linked** 83:14
84:3
**Lisa** 4:20 82:8
190:4,24
**list** 174:21
**listed** 21:17 47:2
133:16
**literature** 19:23
22:21,23 23:4
46:15 53:13
88:18 123:24
141:25 154:16
**litigation** 16:16
160:25
**little** 45:6 50:12
51:15 115:4
127:20 143:7
174:10 183:8
**lives** 25:15
169:17 172:18
173:1
**living** 38:4,9
116:8 147:9

**locales** 179:23
**location** 20:8
142:7,11,17
144:3 145:2,6
145:10 146:18
146:22 148:15
152:4 154:6,17
155:2,9
**locum** 21:22
**lodged** 184:12
**long** 11:12 24:5
124:3 145:21
177:15
**longer** 39:14
71:10 142:3
**longitudinal**
84:12
**look** 17:16,21
20:25 21:3
25:4 39:1
46:25 47:2
52:18 54:1,20
55:21 56:1,11
64:14 77:8,10
77:20 80:8,25
81:4,5,5 84:19
84:20 85:23
86:7,22 89:16
89:22 90:13,21
100:7,14
103:21 109:8
125:22 126:6
126:22 128:5
134:8,9,23
139:16,19
169:2,22
178:24 180:20
182:5
**looked** 20:5,5
23:8 25:9 85:6
94:9 126:17
129:13 135:3
135:12 182:13
**looking** 51:11
55:10 69:22
75:11 80:20
81:17 94:22
95:15 100:15
101:8 102:7
131:3 138:16

159:13 160:18
171:14 172:21
172:22 173:2
**looks** 19:8 26:8
75:3 76:16
108:9 126:5
183:14
**loop** 57:7,8
**loss** 115:7 183:3
**loss-to-follow-...**
157:9
**lost** 86:21 87:14
157:14,17
158:1
**lot** 56:17 87:8
179:22
**low** 108:19
137:19
**low-risk** 138:9
**lower** 53:15 66:7
72:2 131:24
**lowest** 71:22
**lupus** 161:3,5,7
161:16,17,19
161:24 162:3,8
163:1,3 164:20

**M**

**M** 6:3 125:15
188:1
**M.D** 1:16 5:8,14
5:16 6:1 9:12
19:2 27:2
43:15 63:20
122:21 188:3
188:16 189:4
**M.P.H** 1:16 5:8
5:16 6:1 9:12
19:2 63:20
122:21 188:3
188:16 189:4
**main** 20:11
**maintain** 59:20
**maintained**
108:3
**maintaining**
176:22
**maintains**
107:10,15
**major** 20:10

177:1,10
**majority** 23:15
89:2 140:21
185:5
**making** 12:24
69:18 97:5
109:14,15
128:25 130:19
131:2 137:11
139:7
**malignancy**
57:14
**malignant** 57:10
**malpractice**
12:13,15
**Malta** 71:18,18
**man** 52:1
**manage** 52:24
59:21 116:3
118:23
**managed** 43:25
53:7 115:23,25
116:1 118:1
**management**
74:6 106:22
115:12,13
116:9,11
162:22
**mandate** 108:9
118:4
**mandated**
121:23,24
**mandates**
118:12
**mandatory**
117:6 118:19
118:20
**manufacturer**
117:19,20,23
121:21
**mark** 30:2 43:12
63:16 83:3
91:11 95:2
105:9 122:18
125:13 136:14
164:3
**marked** 18:25
19:3 20:20,22
25:1,23 30:4
43:16 63:20

83:7 91:16
95:7 104:5,25
105:10 122:22
125:17 136:17
164:7
**Mary** 96:10
101:9
**Massey** 4:11 9:9
**materials** 68:10
**maternal** 15:4
45:21 47:22
48:5,9 62:6,16
62:18 64:5
66:3,16 69:16
71:13,20,22
72:2,2 124:17
124:22 135:6,9
138:2,12,24
139:6,23 140:8
141:13 169:2
**matter** 28:25
32:5 87:6
102:19
**mbulleri@ncd...**
3:5
**mean** 13:21 16:8
16:24 17:4
19:16,17 26:7
28:7 31:2
34:24 35:20
47:19 57:6,11
58:24 77:11
81:23 82:2
97:19 111:13
111:22 112:3
122:2 127:21
133:9 146:14
147:1,3 148:12
149:2 150:6
180:2 181:8
**meaningful**
87:13 157:15
**means** 25:17
37:10 59:1,16
79:6 80:17,19
88:7 112:17
173:19
**meant** 40:9 60:1
62:8 102:12
127:18

**measure** 55:11
**media** 74:18,20
75:2
**Medicaid** 100:8
100:8,12,16,16
101:2 102:14
103:2,5,16
**medical** 3:1 5:20
5:23 8:18
33:25 35:17
39:17 40:10
76:11,25 91:2
91:14 92:22
93:13 94:21,23
95:5 99:8
100:25 102:11
102:13,18
103:1 107:25
112:16 130:13
134:6,8,21
137:22 149:2,7
149:22 150:4
150:12,19,23
152:19 153:6,7
153:14 154:5
161:25 162:7
162:11 163:18
163:22,24
164:20 165:10
165:25 177:3
182:12 183:1
184:9,10,12,15
184:24 185:6
**medically**
152:24
**medication**
91:22,25 93:1
98:14 120:10
120:13 142:23
144:2,9,13,19
144:23 145:8
145:25 146:7
146:17 147:4
147:12,14
148:1,19
150:11 151:20
153:18 154:10
154:13,24
155:3 174:12
**medications**

11:19 59:23
60:1 61:20
174:15,19,22
**medicine** 35:11
35:16 52:22
87:21 131:5,11
174:11 185:2,5
**member** 23:9,21
24:5,8,10,18
26:11,14
**members** 23:13
23:17 29:10
**memory** 128:2
**Mendias** 2:3 5:3
7:11,11 9:18
9:21 17:12
18:24 19:4,9
19:12 20:23,24
21:2 24:24
25:3,24 29:18
30:1,6,11,14
34:22 42:12
43:12,17 63:16
63:23,24 67:5
67:9,11,13,21
68:3 74:9,23
82:7 83:2,9,10
91:11,18,19
95:2,9,16 96:5
101:19 104:7
104:25 105:13
105:15,18,20
106:5 120:22
121:7 122:18
122:24 124:8
124:16 125:13
125:18 126:4
136:8,14,20
146:5 148:24
164:3,9 167:17
173:16 177:15
177:18 178:4
178:10,12
186:3,7,17
**menstrual** 156:5
**mental** 5:18 83:5
83:14 84:3
**mention** 154:23
**mentioned** 16:1
63:11 68:12

77:15 95:10
102:1 133:13
175:6
merits 89:6
meso- 93:12
met 34:4 163:19
164:21 165:11
metaanalyses
89:8
metaanalysis
89:10,21
metaanalytic
89:21
method 126:23
methodologic
103:25
methodological
86:10 88:24
methodology
100:4
methods 46:14
84:22 88:8
90:20 93:2,12
128:21,22
Michael 3:3,21
8:14,14,17
middle 1:2 95:12
midtrimester
64:20
mif- 92:23
mifepristone
92:23 117:1,8
117:13,21
118:14 119:1,9
119:12,13,21
120:1 121:13
121:19 122:4
122:10 123:11
143:15
mifepristone/...
119:2
Mika 94:24
mild 56:24 59:15
60:8
milliliters 98:6
98:17
million 122:12
123:17 169:16
172:18,25
millions 122:11

123:14,16
mind 23:2 29:4
29:18 82:7
122:12
minimum 97:24
Minne- 13:25
Minnesota 5:16
14:1,2,4 15:19
63:12,20 104:3
minorities
170:11
minors 32:11
minute 41:3
43:4 104:13,13
110:17
minutes 120:24
miscarriage
114:7,20 115:6
115:10 147:1
147:13 148:10
150:10 151:13
183:14
miscarried
114:11 183:15
miscoding
100:18 101:17
101:21,24
133:8,19
misoprostol 92:4
92:24 116:4,9
116:12,16
143:19
misquote 89:24
90:18
mission 5:10
24:25 25:4,10
27:3,5,23,24
28:9,13 30:8
30:23,25
misspoke 40:9
mistreatment
173:25
MMWR 126:23
mode 166:9
moderate 56:24
59:12,16 60:9
mom 162:5
moment 23:2
91:10 126:6,13
128:10 139:5

149:10 154:3
186:5
moms 138:7,10
Monique 1:16
5:7,14,16 6:1,6
7:5 9:12 19:2
43:15 63:19
122:21 164:6
188:3,16 189:4
month 122:15
months 17:17,19
Moore 2:15,19
7:22,24 8:22
8:24,25
moral 31:6
morally 39:11
morbidity 62:6
62:16 66:7,8
71:13 72:3
139:9 169:3
mortal- 62:16
mortality 15:4
20:7 45:21
47:23 48:10
56:19 62:7,17
64:7,11 65:10
66:6,8 68:25
69:8,10,14,17
69:23 70:5,6,9
70:15 71:13,20
71:22 72:2
73:9 75:12
124:18,22
125:2,4 126:15
126:17 128:15
128:25 129:8
130:7,22 131:4
131:19,20
132:6,13,21
133:1 135:7,9
135:25 137:16
137:18 138:3,9
138:13,21,25
139:3,6,8,11
139:17,24
168:12,17,19
169:3,4
Moses 21:18,21
mother 25:16
27:10 29:14

31:13 37:11
91:23 163:16
mothers 137:19
motivated
159:21,22
mourn 34:17
movement 28:1
28:6
multiple 46:9
160:22
murder 31:10
31:18,21
murdered 52:2
muscle 113:7
mwood@ncdo...
3:23

N

N 2:1 5:1 6:4 7:1
136:16 188:1,1
188:1,1
N-i-i-n-i-m-a-k-i
91:1
N-i-i-n-i-m-ä-k-i
96:18
name 7:6 9:21
96:9 107:7
189:2,4
names 75:5,13
narcotic 59:4
national 87:20
88:11 89:6,13
108:18 134:17
134:18
nationalized
133:3 135:11
nationwide 29:9
107:17
natural 133:11
nature 15:1
near 69:16
nec- 160:8
necessarily
25:17 26:1
67:3 78:24
80:13 121:22
147:18 152:23
153:16 159:24
necessary 166:8
need 11:10,13

23:10 47:8
84:20 94:10
126:22 138:19
148:20 150:11
152:19,22
159:7,7 166:2
needed 36:24
74:5 123:20
147:17,18
163:11 165:22
needing 118:11
negative 72:6
73:21 78:23
79:13 90:5,10
90:12 153:20
161:6 163:3
neither 190:15
nephritis 162:2
net 173:11,12
never 34:3 36:5
92:6,9 93:5
107:7 118:2
182:4
New 2:5,5 12:20
75:24 76:1
116:22 130:3
News 75:25
newspaper
75:18
NGOs 176:2,8
nifedipine
174:20
Niinimäki 91:1
96:17 97:3,14
98:25 99:9
101:8
nine 40:25
Nixon 172:13
Nods 86:6
nongovernment
176:3
nonhospital
131:23
nonindented
164:12
nonlinear 79:9
nonmalignant
57:11
nonpregnant
38:14

205

**nonprescribers**
121:24
**Nor-** 179:2
**normal** 96:23
97:7 98:6
**North** 1:2,23 2:9
2:11,14,16,21
3:1,1,2,4,10,10
3:14,16,20,22
4:4,21 7:17,19
8:18,19,25
16:13,15 17:5
17:7 21:17
40:23,25 45:3
46:22 47:5,10
47:13 57:22
58:9 61:10
68:17,20
110:10 158:25
179:1,3 188:5
190:1
**Notary** 9:14
188:24 190:5
190:25
**note** 21:7,24
108:21
**noted** 108:22
178:20
**notice** 51:17
**notices** 58:5
**notified** 117:24
**notorious**
100:13,17
**Notre** 45:9,14,16
**nuanced** 31:11
**null** 81:6
**number** 5:6 42:5
43:24 47:18
48:8 63:25
64:3,4 66:4
71:14 74:17
88:14,16 90:1
122:4,9,12
123:4,10
159:14 167:5
171:6 173:2
174:19
**numbers** 43:19
47:25 48:7
76:23

**numerator**
109:9,16
**Nursing** 3:1 8:20

**O**

**O** 6:5 7:1 164:5
188:1,1
**O'Brien** 3:15 8:4
8:6,8
**O'Neill** 3:7,13
8:2
**oath** 10:1
**OB/GYN** 23:10
41:13 96:11
142:15
**OB/GYNs** 22:6
22:12
**object** 10:20
16:23 17:10
34:21 42:10
49:14 65:16
70:8 72:25
73:24 74:22
104:23 121:6
143:17 145:17
146:3,11,19
164:1 167:16
167:16,20
176:10,13
177:6
**objection** 30:9
44:15 67:24
72:25 73:24
84:16 95:14
96:2 100:11
101:18 106:4
126:2 148:23
162:18 163:6
173:15
**objections** 10:20
**obligation** 10:2
148:18
**observational**
85:16
**observations**
93:15
**observed** 36:7
**obstetrical** 39:21
42:3 181:2
**obstetrician/g...**

54:12
**obstetricians**
22:1 23:22
124:24
**obstetrics**
174:23
**obtain** 57:9 61:1
65:11,22
114:11 145:9
146:7,14 159:1
166:23 173:14
**obtained** 33:7
86:4 100:10
126:14
**obtaining** 84:13
167:14
**obtains** 31:17
127:9
**obviously**
128:20
**occasionally**
153:1 161:6
**occur** 63:2 66:11
66:14 102:5
117:25 141:8
161:20 171:1
173:5
**occurred** 52:20
54:3,5 77:16
110:9,10 130:8
**occurring** 66:9
**October** 5:14
43:15
**off-label** 174:11
174:23
**offer** 115:11
151:24
**offered** 15:6
36:12
**offering** 15:21
**offers** 150:15
**office** 45:14
**officer** 190:6
**oh** 8:23 12:22
13:12 14:4
15:18,18,18
16:10 19:9
20:25 50:4
54:25 56:3,8
76:22 77:23

83:20 86:24
96:8 104:9,9,9
105:13 111:25
132:9 182:23
**okay** 10:14 11:6
11:17,22 12:5
13:19,22 16:19
18:18,22 21:7
25:7,10,20
26:10 27:12
29:15 33:20
38:16 41:18
42:17,23 43:11
43:24 44:21
45:1,12 46:4
50:13 51:3
52:1 54:25
55:2 59:3 60:5
61:19 63:15
67:11 68:7
73:4 74:10,12
76:23 93:9
95:20 96:13
104:11,20
105:16 107:10
110:17 124:7
125:5,24
126:11 127:20
128:8 136:13
143:11 149:4,8
149:23 151:11
154:3 166:11
167:21 172:16
177:7,9 178:13
186:3,19
**old** 128:20
129:13 132:10
**older** 169:5,7
**omitted** 69:2
**once** 21:22 98:7
98:8 134:4
183:4
**ones** 20:11 77:3
77:16 91:8
107:14 157:16
158:2
**oOo--** 4:23
**Oops** 177:22
**open** 103:8
**Operation** 51:21

51:23 52:4
**operationresc...**
51:19
**operative** 111:12
112:4,10,13
**operator** 142:5
**opined** 165:14
**opining** 165:14
**opinion** 6:5
15:22 19:16
20:2,17 48:9
64:2 142:16
158:7 159:21
159:22 164:5
**opinions** 15:6
**opportunity**
36:12,15
115:11 138:19
**oppose** 24:18
31:3 32:8
80:24
**opposed** 23:13
23:18 28:25
85:15
**opposition** 16:4
16:8 80:12
**option** 73:7,18
148:3 150:15
151:21
**options** 115:2
**orally** 116:16
**order** 76:23
143:7
**organisms** 112:9
**organization**
22:5 24:13
26:16 27:22
28:17 29:12
51:24 80:18
116:21
**organization's**
79:20
**organizations**
27:21 80:24
176:3
**organize** 101:22
**origin** 152:2
**original** 97:2
**Osborn** 170:5
**out-** 173:11

206

**outcome** 37:11
  55:11 70:24
  71:4 73:21
  79:14 165:2
  166:3,5 171:11
  171:15,21
  172:22 173:12
  190:20
**outcomes** 72:6
  79:7 85:6 90:5
  90:11 94:9,23
  102:1,3 119:22
  153:20 161:7
  167:6 170:22
  170:25
**outpatient** 55:11
  56:20,23 57:22
  58:9 153:13
  155:15,18
  156:14
**outpatients**
  115:25 155:23
**outside** 132:7
  140:19 175:9
**overall** 47:1
  55:15 131:3
**overarching**
  154:14
**overcome** 85:13
**oversampled**
  106:12
**oversaw** 24:13
**oversee** 27:20
**oversees** 27:20
**overturn** 160:21
**overturned**
  160:11,13

---

**P**

**P** 2:1,1 7:1 188:1
**p.m** 1:18 67:18
  67:18 124:13
  124:13 178:1,1
  187:3
**P.O** 2:10
**pads** 98:18,19
**page** 5:2,6 43:19
  43:20,21 63:4
  63:25 92:12
  93:9 98:24

99:5 104:14,15
  122:25 125:24
  126:1,9 137:15
  164:11
**Page/Line** 189:6
**pages** 43:20
  124:6 125:25
  188:6 190:12
**paid** 18:3,6
**pain** 59:5 182:19
**paper** 46:19
  55:6,8,17
  88:23 109:8
  114:14 154:8
  155:3 157:13
  157:23 182:11
  182:12
**papers** 22:8
  24:15 46:14
  98:10 100:15
  114:14 143:10
**paragraph** 62:4
  63:3,25 64:1
  74:7,15 75:21
  91:5,6,20
  92:12,13 93:10
  95:11,13,20,21
  99:16 103:3,13
  104:15,16,21
  105:17,21
  109:3 110:16
  110:23 111:11
  111:15,18
  112:2,22
  113:22 116:20
  119:16,23
  128:11 136:3,6
  137:15 149:8
  153:23 154:4
  154:18 156:23
  156:25 164:12
  164:17 168:10
  169:14
**Paragraphs**
  119:4
**paralegals** 9:8
**paralyzed** 58:19
**paraphrasing**
  80:8
**Pardon** 126:11

**parent** 179:11
**Parenthood** 1:5
  7:6 9:3,4,6
  50:23 61:13
  189:2
**part** 62:22 65:21
  112:9 118:19
  118:21,22
  130:16 152:15
  181:19
**participant**
  160:24
**participated**
  12:22 13:1,4,7
  13:10,19 43:8
**participating**
  17:14
**participation**
  17:25 18:3
**particular** 19:18
  20:12,16 23:10
  26:1 32:14
  38:6 55:8,17
  61:6 64:15
  80:21 84:18,18
  92:11 120:14
  137:12 168:24
**parties** 190:17
  190:19
**parts** 50:15
  106:22 121:14
**party** 13:17
**pass** 183:10
**passed** 147:15
**Pat-** 154:19
**patchwork**
  130:1
**paternity** 33:3,6
  33:10
**pathologies**
  41:25
**pathway** 29:6
**pathways** 29:2,4
**patient** 33:18
  36:18 37:3,24
  44:1 52:14
  53:5 58:19
  59:1,16 69:18
  70:21,23,25
  71:3 73:15

97:21 98:5,14
  101:6 102:16
  115:5 119:8
  135:12 142:10
  145:5,8,12
  146:6,21,23
  147:4 148:16
  149:20 150:7
  150:15,18
  151:19 152:1
  152:19 153:13
  154:18 161:13
  177:3 180:2
  182:4
**patient's** 53:23
  109:6 116:5
  149:13,15
  150:2 152:22
  156:5
**patient-level**
  75:3 134:23,24
  135:1
**patients** 34:15
  34:18 35:1,2
  36:1 39:18,22
  40:12,22 41:18
  42:2,6,14,18
  44:14,20,21,24
  45:2 49:19
  50:3,22 51:4,5
  54:7 59:10
  60:6 61:24
  78:7 85:21
  87:5,17 92:1
  98:1 100:18,21
  102:10,20
  107:24 109:4
  109:12,21
  110:4,13
  113:23 114:10
  114:20,22
  115:10,21
  116:1 134:19
  144:10,14,20
  144:23 147:25
  148:3 153:1,11
  153:19 154:19
  155:15,17
  156:14 157:14
  157:20,23

158:1 175:7,12
  175:20,24
  176:5,5 178:14
  178:20 179:9
  179:11,16
  180:16,23
  181:4,11 182:3
**pay** 151:18
**Payne** 4:2 8:3,3
  8:5,11,11 18:1
**peer** 46:7,12,13
  136:25
**peer-reviewed**
  46:18
**penalties** 188:4
**pending** 11:12
  11:13
**people** 29:11
  37:22 38:25
  39:2 45:15
  65:11,21,24
  86:14 88:4
  100:23 160:3
  160:20 173:21
  173:22,23
  174:4 185:17
  185:20
**percent** 64:17
  65:3,24 66:1
  70:15,16 72:18
  72:23 73:9
  85:21,24 86:5
  94:2,4,4,6
  106:3,8 107:1
  113:23 139:22
  139:23 140:8
  140:24 141:19
  171:3 178:20
**percentage**
  34:18 39:3,4
  86:2
**perception**
  152:22
**perfect** 177:14
**perforation** 53:6
  53:23 54:3,4
  54:13 167:4
**perforations**
  54:19 56:13
**perform** 23:15

36:3,13 38:21
52:23 57:23
71:12 112:6,23
114:24 118:16
145:4,4 152:10
**performed**
33:14 36:5
37:23 38:1,6,8
38:18 52:19
53:10 59:8
64:4 65:25
66:1,5 69:9
71:9 77:24
78:6 112:5
114:19 129:14
129:18,23
131:23,25
144:11 179:17
**performing** 36:7
57:3 111:7
132:7 154:5
170:20 176:8
**performs** 31:15
31:20 68:14
**period** 52:8
62:22 121:13
122:5,10
123:12 156:5
**perjury** 188:4
**permission**
135:13
**permit** 146:17
**permitted** 68:19
73:22 166:23
**person** 57:3 68:8
71:5 84:9
**personally** 13:16
31:3 54:6
**Peter** 4:10 9:7
**phenomenon**
133:24
**PHILIP** 1:11
**phrase** 111:13
111:24
**physician** 5:11
24:17 25:22
26:23,25 31:20
36:7 111:3
115:2 152:17
153:12,14

**physician's**
115:2
**physicians** 26:16
27:1,2 37:16
38:21 39:7,13
52:22 102:23
111:5 118:4,22
174:13
**physiology**
66:16
**pick** 49:9
**piece** 15:25
**Pinochet** 71:17
**Pitt** 3:8
**place** 48:22
49:11 67:12
162:6
**placed** 62:18
**placenta** 181:2
**placental** 180:14
**placentation**
180:17 181:1
**places** 49:17
50:14
**plaintiff** 2:2
13:5
**plaintiffs** 1:6 2:8
7:13,17 9:23
157:5
**plan** 74:6
**plane** 49:21
**planes** 48:24
50:9
**planned** 1:5 7:6
9:3,4,5 50:23
61:12 115:8
189:2
**planning** 39:3
**play** 29:15
**played** 30:5
**please** 7:9 10:10
10:16 11:10
19:13 20:20
30:13 49:24
69:23 90:8
92:17 96:4
136:7,15 140:6
186:8
**plenty** 49:5
**plus** 20:6 183:24

183:24
**point** 10:24 55:3
65:12 67:4
71:7,11,11
85:22 86:9
89:25 93:24,25
94:7 95:1 99:3
102:15,24
103:11 106:2
109:11,14,19
114:15 123:20
124:1,9 128:21
129:10 130:5,6
130:10,18
131:2,18 132:2
135:23 136:1
137:9,11 139:2
139:7 140:12
140:15 141:17
141:21 152:13
154:11,14,15
154:22 155:11
155:23 171:8
183:17,19
**policy** 170:23
172:6,7 173:11
**political** 88:5
**polyp** 57:12
**pop** 182:18
**popped** 51:14
**population**
72:14 102:7
161:16 167:6
167:10,12,24
169:23 171:3,4
172:7
**population-ba...**
70:22 161:11
**pos-** 38:22
**position** 45:12
103:7 186:1
**positive** 78:23
79:13 156:2
**possible** 32:24
33:1 61:14
109:23 110:2
123:21 124:2
127:19,22
164:20 171:12
179:19,24

**possibly** 119:25
169:12 179:21
**Post-Marketing**
117:2
**postabortion**
175:8
**postmarketing**
117:14,15
**postpartum** 98:9
**potential** 54:9
57:14 170:16
**potentially**
147:16 184:3
**pounds** 66:25
70:13,14
**power** 100:4,16
**PPSAT** 50:24
52:10,16 60:22
61:20 92:25
93:3,8 110:12
130:23 144:9
144:13,19,22
145:3 150:14
151:21 176:22
**PPSAT's** 52:7
60:6 144:1
153:21
**practice** 18:18
35:25 36:2
40:3,7 42:15
68:17 118:11
118:13,15
153:6,8 170:23
**practiced** 40:24
42:7 179:22
185:4
**practices** 22:17
153:12
**practicing** 5:11
25:22 26:23,25
35:11,16
**practitioner**
41:12 173:7
**practitioners**
118:4
**pre-** 152:1
**precise** 28:14
78:13 89:16,23
**precisely** 126:22
**precision** 64:7

64:12
**predefined**
98:11
**predict** 70:20
71:2 161:9,12
**predictive** 72:15
**preeclampsia**
72:12
**preeclamptic**
48:18
**preexisting** 72:4
137:22
**prefer** 147:25
**preferences**
22:17
**prefers** 147:4
**preg-** 88:22
151:8 183:25
**pregnancies**
63:2 123:5
140:24 141:24
142:16 155:8
**pregnancy** 5:21
5:24 20:8,8
32:2,9 37:3
38:13 48:3,11
62:6,11,16,21
62:22 63:7
64:24 65:10,12
65:14 70:1
71:7 72:6,17
72:23 74:4
91:4,16 95:7
133:10,17
140:17,18,19
140:23 141:1,9
141:12,15,21
142:6,8,10,13
142:13,22
143:20 144:2,5
144:6 145:1,5
145:7,9,12,15
145:24 146:10
146:18,22,24
146:25,25
147:6,9,11,20
148:5,7,9,10
148:11,15
149:16 150:1,9
150:9 151:9,14

208

151:15 152:2,4
153:20 154:7
154:16,20,21
155:1,23 156:2
156:8 159:12
159:16 161:6
161:18,23
163:4,24
164:22 165:2
165:13,17,19
165:21 174:21
181:5,15,17,21
181:23,24
182:7,10,17
183:6,17,18,20
184:2,3
**pregnancy-ass...**
47:13,24 48:1
**pregnant** 25:16
36:18 68:22
69:4,25 71:10
73:20 74:3
158:25 160:7
162:8
**prenatal** 155:17
155:22,24
156:13 181:4
181:10
**preparing** 18:9
**pres-** 118:20
**prescribed**
174:15
**prescribers**
117:17,21,24
118:21
**prescribing**
143:1,5,13
**present** 4:9 59:9
97:8,15 109:12
138:18 156:7
183:18
**presented** 22:8
76:14 109:21
**presenting**
96:11
**preserve** 163:15
**President** 16:14
16:22 17:4
**prespecified**
98:1

**pressure** 72:11
174:20
**presumption**
97:5
**pretty** 77:19
**prevalence**
102:6
**prevent** 11:18
71:13 112:7
**previous** 13:20
21:15
**previously** 10:25
39:13 163:13
**primary** 153:10
**principally**
171:4
**principle** 37:7
**printed** 43:20
**prior** 71:23
129:23 179:15
**prison** 158:20
**private** 127:6
**pro-abortion**
80:19
**pro-life** 23:22
28:1,6 185:18
**probably** 40:21
41:9 44:8 50:9
50:10 169:11
**problem** 66:2
70:19 133:6
178:9 181:3
184:4
**problems** 83:15
84:4 86:10
88:25 89:7
133:7 182:21
**procedural**
42:22
**procedure** 37:24
38:6,23 59:7
77:7 97:18,20
98:3,9 113:12
128:16 130:14
130:23
**procedures**
52:23 53:1,2
53:18,20 54:8
54:10 57:23
61:14 129:14

130:13,17,19
148:14,17
151:18
**proceed** 10:22
11:14 65:6
**proceeded** 130:2
**proceeding**
190:6,8
**proceedings**
67:18 124:13
178:1
**process** 19:13,15
21:19 57:13
58:3 61:3
89:25
**produced** 60:21
116:21 117:1
**product** 67:25
**products** 33:16
33:21 112:25
176:18
**professional**
22:5 79:22
**profiled** 55:12
**profound** 59:5
**program** 103:5
115:22
**prohibiting**
25:17 27:6,8
**projects** 45:16
**promote** 29:8
**proposed** 15:12
**proposing** 81:1
**prosecu-** 159:18
**prosecuted**
159:2,5
**prostaglandin**
130:18
**prostaglandins**
92:24
**protean** 183:12
**Protection** 16:2
**protocol** 127:25
143:23 144:1
151:2 152:10
152:12,15
153:21 176:22
**protocols** 60:13
60:14,16 61:9
61:10 117:14

117:15
**proven** 142:14
**provide** 20:12
35:24 39:17
58:15 60:8,20
61:21 75:5
81:5 98:11
107:7 152:18
153:3,15
155:14,17,22
159:9,16 178:7
**provided** 39:14
49:13 52:10
58:8 60:6
122:9 145:25
156:13 162:11
178:15 179:12
181:4,10
**provider** 52:3
180:1
**providers** 110:3
170:20 179:20
**provides** 144:9
144:13,19,22
152:17 162:7
176:23
**providing** 144:1
164:10
**psychological**
5:18 79:15
83:6,13 84:2
**Public** 9:14
47:10 188:24
190:5,25
**publication** 46:8
95:18
**publications**
46:9
**published** 46:17
46:18 87:19
**pull** 90:20
126:21
**pulmonary**
72:16,21 73:15
73:19
**punch** 57:8,9
**punishable**
158:19
**purpose** 46:11
55:14 109:11

**put** 24:15 54:25
56:5 59:4 72:5
86:15 120:16
**putting** 143:6
159:18

_____

## Q

**quality** 81:1
108:4,14,15,19
135:17
**quantify** 98:22
**question** 10:6,9
10:12,22 11:12
11:13,14 15:15
23:17 31:11
33:5 34:24
35:5 40:5,16
43:25 44:6
51:12 54:21
55:18,24 56:7
56:10 65:17,19
65:23 67:8
69:3,20 73:4,5
73:10 77:23
81:24 82:5,9
82:18 87:4
90:2,6 115:14
115:15 123:25
140:6 144:18
145:18 147:23
149:4 151:19
152:21 160:7
161:15 164:2
164:25 165:8
165:10,14
166:11,19
180:21 181:7,8
181:9 188:7
**questions** 9:25
10:16 11:8
12:16 82:1
87:9 96:12
103:11 120:23
186:4,9,13
**quickly** 53:21,24
**quite** 41:5,5
180:15
**quote** 25:14 65:2
80:9 106:10,10
112:20,21

149:14
**quoted** 114:2
**quoting** 143:1,5

**R**
**R** 2:1 7:1 189:1
189:1 190:1
**racial** 171:19
**radiology**
141:25
**Raleigh** 1:23
2:11,16,21 3:4
3:16,22 4:21
**random** 107:22
**range** 41:17
96:23 97:7
**rape** 32:3,6,9,10
32:20 176:24
**rapidly** 59:10
**rapist** 33:4,15
33:22 176:19
**rapist's** 32:22
**rare** 99:6 101:24
**rate** 46:21 47:2
47:13,23,24
48:1 52:13
53:14 54:18
55:22 56:4,12
56:19 99:6
119:1 128:15
129:7 131:19
131:20 132:21
137:16,18
138:21 139:3
139:11,17
140:13,14
141:7,14 157:9
161:23 168:19
**rates** 54:1 55:1
55:13 71:22
97:1 130:7,11
130:22 131:24
135:20 137:24
**rationale** 54:8
54:10
**raw** 122:6
**Raymond** 88:23
**re-** 54:11 74:20
**read** 26:22 60:15
62:13 64:1

74:10,14 82:5
82:10 83:25
90:18 92:17,20
93:10 96:13
99:3 149:4
157:13 164:15
188:5 189:6
**reading** 83:19
145:2
**Reads** 189:6
**real** 99:6 180:20
181:2 182:24
**realize** 10:24
**really** 39:6 50:20
84:19,23 87:4
94:25 101:12
106:19 107:13
108:20 119:20
122:13 146:13
151:12 152:21
**Reardon** 103:14
**reason** 71:19
82:23 106:13
138:1 154:15
155:6 169:1
**reasonably**
102:18
**reasoning** 70:20
**reasons** 106:17
**reassurance**
96:24
**rebellion** 170:12
**rec-** 95:17
**recall** 43:7
**recalling** 61:15
**receive** 58:5
59:2 156:15
163:22
**received** 78:7
92:1 100:9
111:2 150:10
163:20 184:20
184:23
**receiving** 113:24
**recess** 67:17
124:12 177:25
**recheck** 182:1
**recite** 128:1
**recognize** 25:25
30:15 95:17

**recollection**
122:13
**recommendati...**
154:7
**record** 7:4 10:21
29:19,22,23,24
67:16,19 96:3
103:4,16
124:11,14
177:24 178:2
186:23,25
**recorded** 188:8
**recruited** 185:9
**redeeming** 32:17
**reduce** 72:2
**refer** 16:25 22:2
23:25 27:14
86:24 153:2
163:18
**reference** 154:4
169:15
**referred** 39:19
40:12 82:1
**referring** 16:20
31:13,14 38:3
38:12 40:3,6
60:12 62:10,10
62:11 98:3
105:7 109:2
111:14,16
112:3
**refers** 97:11
153:13
**reflect** 22:16
88:17
**reflected** 165:24
188:9
**refused** 86:17
**refuses** 148:16
**regarding** 15:11
17:24 80:22
127:12
**regardless**
119:18
**regime** 71:17
**regimen** 92:5,7
93:1,4,8
**regimens** 92:1
**Regional** 35:17
**regions** 106:11

106:14
**registration**
100:3
**registries** 96:19
**registry** 93:19
**regularly** 65:11
**regulated** 29:1
**regulating** 15:8
**related** 75:15
125:3 131:18
131:19 157:10
170:24 190:16
**Relates** 142:3
**relating** 16:17
**relationship**
79:8 185:12
**relative** 190:18
**relatively** 49:20
**relaxation** 59:5
**relevance**
109:19
**relevant** 68:24
69:8,12,15,19
70:4 93:15,24
165:20 166:19
167:1
**reliable** 22:11,14
22:24 79:24
108:11,13,14
182:14
**relied** 132:19
**relief** 34:11
**relies** 124:18
126:19 132:15
144:4
**relieved** 34:5,10
**rely** 127:2,3,6
**relying** 74:20
121:20 139:6
143:13
**remained** 85:7
157:16
**remaining** 8:9
**remains** 171:11
171:21
**remedial** 184:21
**remember** 25:10
37:2 48:14
51:10 61:18
82:4 104:4

125:7 176:21
179:6 181:11
**remind** 75:19
**remote** 50:15
**remotely** 2:15
3:3,9,15 4:3,4
**remove** 15:13
**removed** 113:11
**removing** 57:13
115:3
**REMS** 117:13
117:16 118:14
**repeat** 10:10
**repeatedly** 86:14
**rephrase** 10:10
73:5 90:8
115:4
**reply** 101:8
**report** 5:15 6:5
34:15 47:8
63:19 75:5
76:7,22 78:10
87:19 90:25
104:3 112:22
116:21,25,25
117:7,17,21
118:5 121:1,12
121:14 123:8
123:19 124:3
127:9,15 128:6
129:13 150:25
153:23 158:3
164:6,11
168:10 176:8
**report's** 117:6
**reported** 4:19
86:3 94:14
118:2 121:21
122:1
**reporter** 9:10,14
29:16 61:25
177:17 186:16
190:5
**Reporters** 4:19
**reporting** 47:5
118:19,21
121:24
**reports** 76:13,15
76:24 77:4,5
77:20 78:2

117:23 123:4
127:2,6,16
128:4
**repository** 86:16
**represent** 9:22
**representation**
103:6
**Representatives**
14:24 16:14
17:8
**representing**
7:15,17,21 8:1
8:9,12 9:1,4
**represents** 30:8
**Reproductive**
116:23
**Republic** 158:8
**request** 178:5
**requested** 86:14
**require** 59:11
148:21
**requirement**
145:11 146:6
**requirements**
47:5
**requires** 110:24
111:11,15
134:24 145:12
145:23 146:9
**requiring** 141:2
**reread** 78:2
**rescan** 182:1
**Rescue** 51:21,23
52:4
**research** 45:7,13
45:18,19,23
46:1,5,14 81:7
83:13 84:2
94:24 99:22
108:4,10
169:10
**researched** 58:1
**researchers** 81:4
134:8
**RESERVED**
187:2
**residency** 12:8
12:19 36:12
39:2
**resident** 12:7,7

12:12 184:12
**residents** 184:10
**resign** 185:25
186:2
**resistant** 112:8
**resolution**
154:21
**resources** 45:17
**respect** 26:2
106:25 131:7
**respond** 17:22
59:18 167:9
**response** 81:25
101:9
**responsibility**
153:11
**responsive** 90:2
145:1
**rest** 160:12
**restricting** 15:8
27:9,12 83:15
84:4
**restrictions**
15:13,22
175:17
**result** 32:3,9
153:21 161:7
161:19,23
171:18 180:17
**resulted** 75:16
**results** 88:8
**retained** 112:25
**retrospective**
99:10,21
**return** 96:20
102:22 161:8
178:15 179:17
181:25 182:3,4
**returned** 178:21
**returning** 93:9
**returns** 151:19
**review** 28:13
46:12,13 76:11
88:12 124:24
127:16 128:4
165:4 177:3
**reviewed** 19:21
19:22 22:21,23
24:14 76:13
108:20 117:13

117:14 122:6
135:15 136:25
162:10 163:21
**reviewer** 46:7
**reviewing** 162:9
166:7
**reviews** 89:8
**right** 11:4 12:25
13:18 14:22
15:15,20 18:17
24:3 27:7 30:1
40:5,8 42:4
43:19,22 44:7
49:6 50:21
56:10 63:13
68:15 70:3
78:12 81:25
82:15 83:2
91:23 92:13
96:6 97:13
98:23 102:11
103:18 108:23
111:21 117:3
123:5,8 126:11
128:16 133:22
139:25 140:1
157:11 164:18
169:18 175:10
182:19 183:23
**right-hand** 63:5
125:25
**rightmost** 99:4
**Rights** 158:4
**rise** 170:11
**risk** 55:10 64:16
64:20,21,24,25
66:6,16 70:21
72:14,16,22,22
73:9 78:11
81:9 84:14
94:1,3,5,11
132:8 138:9
157:24 161:10
161:11 162:25
163:2 166:12
166:15,16,24
167:6 168:1
180:25
**risk-taking**
120:5,14

**risks** 65:7 70:15
72:5 78:15
91:22 141:1,8
141:10 157:10
161:17 165:16
165:18 167:11
181:24
**rmendias@acl...**
2:6
**road** 4:21
147:17
**Roe** 129:19,23
169:17
**role** 14:6
**room** 9:8 35:22
39:20 40:13
107:3 109:13
109:14,21,22
118:1,5 120:25
**rooms** 42:2
102:24
**roughly** 18:8
**routine** 77:4
**routinely** 35:4
145:4
**RPR** 4:20 190:4
190:24
**rule** 144:6 145:6
149:25
**ruled** 142:18
**rules** 89:22,25
118:12
**ruling** 144:4
**run** 123:22
183:4
**rupture** 53:22
141:2 143:16
143:20 183:7
**ruptured** 182:6
182:16,23
**rupturing** 183:9
**Ryan** 2:3 7:11
9:21

_____
**S**
_____
**S** 2:1 5:5 7:1
189:1
**sac** 151:6
**sad** 115:6
**safe** 83:15 84:4

92:8,8 93:13
**safer** 63:8
**safety** 15:3 55:5
87:22 93:7
177:2
**Saint** 35:17
**Salva-** 8:21
**Salvador** 4:9
8:21,23 9:2,2
158:8,16,23
160:6,11 162:6
**Salvador's**
158:14 160:1
**Sam** 4:11 186:16
**sample** 107:18
108:3,18 109:5
109:7 110:1
**sampling** 107:22
107:23,23
**satisfaction** 86:3
**save** 37:10
**saw** 29:3 61:2
68:16 76:22
139:15
**saying** 10:18
30:9 31:12
33:17 44:19
62:24 69:21
73:6,7,17 84:9
102:9 114:3
119:14 141:18
147:24 150:24
152:14,14
170:18,19,21
170:22 171:18
183:21
**says** 62:15 65:6
75:2 101:15
109:4,4 119:17
137:16 149:14
151:2,3,21
152:10,15
154:18 170:13
173:21
**Scandinavia**
100:5 134:25
**scar** 114:18
**scheduler** 17:16
17:21
**School** 185:2

**science** 81:1,17
  81:18,19 87:20
**scientific** 24:14
  81:13,15 82:14
**Scottsdale** 4:5
**scraping** 112:18
  112:19 113:3
  113:14
**screening** 53:3,4
  143:22 145:13
  146:9 148:22
  152:3
**scrutinize** 88:8
**se** 128:25 131:19
**search** 19:23
  20:4
**second** 38:11
  53:17,19 66:9
  70:19 85:18
  95:11,20
  115:17,18
  119:17 123:7
  126:11 128:22
  130:16,24
  137:15
**second-trimes...**
  53:18,20 77:14
**seconds** 41:3
**Secretary** 3:19
  8:15
**secretions** 59:21
**section** 126:23
  139:12 165:22
  166:2,18 168:4
**sections** 139:22
**sedation** 56:22
  58:8,16,21,22
  58:23 59:7,12
  59:19,24 60:5
  60:9 61:21
**see** 13:24 17:18
  18:16 28:12
  43:18 79:8
  92:14 95:12,20
  95:23 100:14
  123:10 125:10
  128:6 156:10
  156:10,21
  159:8 180:20
  181:21 183:24

**seeing** 155:24
  156:1
**seek** 61:13
  145:12 146:9
  148:22 159:1
  183:1
**seeking** 93:16
  145:8 160:15
  160:18,21
**seeks** 31:17
  162:15
**seen** 26:4 28:11
  30:17 44:12,19
  44:21,24 45:1
  46:10 60:21
  61:5,7,16,17
  84:17 102:22
  110:12,15
  126:8 148:5
  151:7 169:25
  175:7 176:7
  179:16,25
  181:17
**self-abortions**
  176:1
**Senate** 14:19,24
  15:10,25 16:15
  16:21 17:5
**Senator** 2:18
  7:22
**senior** 45:7,11
**sensation** 113:9
**sense** 89:18
  116:7 185:16
**sentence** 26:22
  62:13 74:14
  92:14,17,20
  95:12,23 96:13
**sentences** 164:15
**September**
  63:13 121:3
  190:21
**serious** 53:24
  99:6 180:9,15
**serve** 27:25
**served** 24:2 46:7
**service** 40:2 42:3
  54:15 134:17
  134:18 135:2

152:19
**services** 3:19
  106:24 108:10
  153:2,14
**serving** 82:20
**set** 79:6,7 107:2
  107:8,11
  126:12 176:3
**sets** 88:25 107:5
  107:13
**setting** 153:13
  155:15,18
  156:14
**settings** 131:24
**seven** 70:13
  76:17
**severe** 88:24
**shaking** 10:17
**Shealyn** 4:11 9:9
**sheet** 188:9
**shifts** 35:21
**short** 123:21
**shortcoming**
  153:5
**shorten** 123:25
**show** 92:7 93:6
  128:19 135:24
**showed** 90:4,10
  90:12 129:7
**showing** 135:8
**shows** 53:14
  64:16 83:13
  84:2 129:4
**sicker** 48:21
**side** 92:13
  182:20
**Signature** 187:2
  189:25
**Signed** 188:11
**significant** 66:2
  85:20 86:11,19
  94:2 133:7
  185:5
**significantly**
  130:21
**signs** 36:25
**similar** 24:12
  25:13 26:13,18
  29:12 70:11
  99:7,21 107:13

123:2 129:6
  130:15
**similarly** 65:2
**simply** 59:16
  66:15 71:2
  72:12 79:12
  87:10,18
  123:25 135:23
  139:7 154:24
  163:15
**single** 161:13
**sir** 140:4 143:13
  149:10 177:10
  177:20 183:20
**sites** 140:21
**situation** 74:2
  75:23 115:6
  118:18 120:17
  153:17
**six** 4:21 62:5,15
  62:20,24 66:19
  66:20,25 70:13
  76:17,17 142:2
  156:11
**size** 109:7
**skill** 142:4
**skilled** 184:4
**slightly** 79:9,10
**slogan** 174:5
**slogans** 174:6
**slow** 59:6
**small** 88:16,16
  126:1
**Smith** 1:21 2:20
**smoore@ncdo...**
  2:17
**snare** 57:5,16
**snip** 57:17
**snowball** 19:24
**social** 31:7
**society** 79:22
**sociodemogra...**
  157:25
**socioeconomic**
  82:21
**solo** 41:12
**some-odd** 138:5
**someone's**
  171:10
**somewhat** 92:4

**soon** 156:2,16
**sorrow** 34:13
**sorry** 8:24 12:22
  14:20 16:8,24
  19:21 20:25
  26:21 28:2
  29:3 30:13,21
  32:7 53:19
  55:23 56:8,8,8
  56:8,9 61:24
  62:13 69:1
  77:11,11,23
  82:4 83:19,22
  83:25 89:3
  104:14 111:25
  111:25,25
  116:15,24
  121:1 124:4
  137:9 143:6
  145:19 181:9
**sort** 12:13 45:19
  156:19 184:7
**sorts** 91:25
  94:23
**sought** 96:24
  166:20 179:19
**sound** 11:4 49:2
  49:6 113:2
**sour-** 127:4
**source** 22:11
  79:25 82:23
  108:11,14
  136:4,5,11
  137:4
**sources** 74:18
  126:19,21,25
  127:4 137:5
**south** 1:5 2:15
  7:7,24 8:22,24
  9:4 50:15,23
  106:11 189:2
**speak** 16:11
  26:12 32:23
  52:5 59:18
  67:22 68:4
  74:1 79:22
  80:1 84:8,23
  131:9 149:3,6
  174:25
**Speaker** 2:19

7:22 16:13,21
17:7
**speaking** 13:21
28:16 33:11
39:6 55:18
165:8
**Specialty** 5:12
25:22 26:24,25
27:1
**specific** 38:3
49:4 50:6
60:15 71:4,16
98:10 101:25
102:6 117:16
138:17 141:14
144:25 174:13
175:23
**specifically**
15:16 19:17
28:7 35:15
42:1 60:11
99:20 123:15
158:7 169:23
172:16
**specify** 77:16
**speculation**
110:2
**speculative**
167:8
**speech** 174:2
**spell** 96:17
**spent** 18:8
**spoke** 67:25 68:2
**spoken** 39:15
88:15 94:24
**sponges** 98:20
**spontaneous**
113:25 114:6
154:21
**spores** 112:8
**staff** 110:5
**stage** 162:23
**stand** 11:7
**standard** 124:21
125:1 162:14
163:4,8,19
164:21 165:11
**standardize**
61:13
**Standards**

116:22
**start** 10:6
**started** 51:14
83:19 156:1
**starting** 80:3
130:2 185:9
**state** 13:24,25
14:1,2,2 28:25
41:19,24 47:8
59:4 129:25
141:25 164:19
165:12 184:24
188:5,18 190:1
**state-level**
124:23
**stated** 85:11
137:13 159:25
178:6
**statement** 5:10
25:1,5 27:3,6
28:13 52:25
67:1 80:11
83:17,24,25
84:10 97:10
114:4 117:11
119:16 120:2
149:20,24
173:11,18
178:18,22
180:19
**statements** 80:6
80:9,19,21
**states** 1:1 22:7
41:23 44:23
64:4 65:25
87:22 92:5
94:14,18 99:25
107:4 108:10
126:16 127:2
129:24 130:20
133:22 135:21
140:25 143:14
155:7 163:10
175:9
**stating** 117:16
**statistic** 88:20
88:23 109:9
**statistical** 84:22
100:4
**statistics** 39:2

133:25 138:25
139:6,15 169:3
**status** 175:15
**statute** 160:4
**stay** 156:17
**stayed** 87:5,15
87:17 158:2
**Stein** 1:8 2:13
7:7 9:1 189:3
**Stenographic**
190:5
**Stenographica...**
4:19
**steps** 149:25
**sterile** 111:12
112:4,10,11,11
112:12,12,13
**sterilization**
112:7
**stints** 24:8
**stop** 11:2 39:8
**stopped** 30:5
39:3,4
**stories** 74:18,21
**story** 75:2 97:14
**straight** 143:10
**straightforward**
116:10 128:7
182:17 183:8
**strated** 102:5
**strategies** 29:5
161:10,12
**strategy** 29:6
**stratification**
55:10 161:11
**stratified** 167:7
**Street** 2:4,16 3:4
3:10,16,21 4:4
**strength** 99:12
**strictly** 38:13
**strong** 88:5
**strongly** 80:10
**structures** 54:4
**student** 7:19
**studies** 19:22,25
20:12 68:10
78:10 81:2
84:12,21 85:16
88:14,16 89:11
89:19 90:1,4

90:10,12,13,17
94:16 99:22,24
154:25 177:1
**study** 18:19,20
18:20 64:15,16
65:1 74:19
84:25 85:3,3,8
85:8,18,23
86:11,15,20,23
87:5,6,8,10,15
88:3,12 89:6
89:23 90:19,21
90:25 91:7,20
92:2 93:18
94:8 97:3
98:25 99:9,10
99:12,17 100:7
102:9 103:4,14
103:17,19,21
103:24 104:22
105:9,24
107:16 108:22
109:25 128:12
128:14 129:2,8
129:12,18
131:7,22 132:3
132:3,10,15,19
132:22 135:19
135:23 153:25
154:5 156:25
157:1,16
**study's** 128:20
131:14 132:5
**su–** 27:3
**subgroups**
137:23
**subhuman**
170:14
**subject** 12:10
173:24
**subjective** 98:18
**submit** 159:22
**submitted** 19:6
21:13 63:12
122:15 124:4
158:3
**Subparagraph**
76:1
**Subscribed**
188:20

**subsequent**
114:14
**subsequently**
114:12
**substandard**
152:18
**substantial**
74:17 91:22
129:9
**suffer** 71:6
102:21 133:17
**suffered** 77:9
161:2
**suffering** 45:1
175:8
**suffers** 89:7
141:5 161:6
**sufficiently**
149:15
**suggest** 78:11
110:13 113:23
119:11 149:19
**suggesting** 44:10
44:18
**suggests** 157:14
**suicidal** 84:15
**suicidality** 78:18
78:21
**suicide** 78:12,15
120:8
**Suite** 1:22 2:21
3:10 4:21
**Summary** 117:2
**summer** 125:21
**supplied** 120:4
**support** 15:7,22
27:3 91:21
97:9 128:14
145:23 158:8
158:13 159:23
**supporting**
28:19 80:10
**supports** 28:19
**suppression**
173:25
**Supreme** 129:19
**sur–** 132:19
**sure** 12:24 13:1
13:1 20:9 40:8
40:11 42:1,13

43:5 47:3
54:24 57:25
61:24 65:17
67:5,9 74:11
75:21 77:19
82:6 90:9
106:2,9 109:1
110:18 120:22
134:13 139:19
141:14 144:17
145:20 149:11
183:22 186:7
**surfaces** 112:12
**surgeries** 57:24
**surgery** 94:5
102:3 110:21
111:9 112:5,6
114:17
**surgical** 5:21,23
58:2,5,9,11,13
91:3,15 94:4
94:11,13 95:6
98:19 99:7
110:24 111:6
111:11,16,23
112:4 114:17
141:3 148:1
149:21 150:3
150:13,15,22
151:1,4,6,22
152:10,13
**surgically** 53:8
**surveillance**
124:18 132:12
132:16,20
133:2 134:15
**survey** 85:4,14
**surveys** 85:14
**suspected**
142:12,14
**sworn** 9:13
188:20 190:9
**sympathy** 38:24
39:12
**symptomatic**
74:4 182:25
**symptoms** 73:17
142:11 144:7
181:14 182:5,9
182:15

**syndrome** 180:5
180:18
**synonymous**
79:2
**synthesizes**
154:25
**system** 94:21
101:14 102:11
102:13,18
103:1 107:25
134:4,6,8,21
135:11
**systematic** 89:8
**systems** 133:4

_____
**T**
**T** 3:21 5:5 188:1
188:1 189:1,1
190:1,1
**table** 119:5,7
121:2
**take** 31:2 67:3,6
120:21 124:8
177:19 180:20
**taken** 32:11
121:13 122:9
150:1 157:20
157:21 190:10
**talk** 20:19
154:11
**talked** 130:16
175:5
**talking** 10:7
34:25 38:5
39:21 41:19
66:23 74:25
96:14 105:1
119:20 132:22
138:6 151:25
152:1 159:12
163:8,9 167:15
167:19,24,25
183:19
**targeted** 169:20
**targeting** 169:15
171:12 172:17
172:20 173:9
**technique** 19:25
111:6,12 112:4
112:10,13

**techniques** 33:9
129:5
**technology**
33:12
**tell** 9:14 105:3
110:3 141:10
151:12 181:5
**telling** 33:18
**tells** 110:13
113:10
**ten** 43:6,7 44:11
50:9,10,16
120:24 139:18
156:11
**tends** 169:4
**tenens** 21:23
**term** 32:13,22
58:24 59:13
63:7 68:24
69:6,16,16
70:12 98:21
**termination**
5:21,24 91:3
91:15 93:13
95:6
**terms** 20:6 22:15
55:12 81:13
82:14 112:2,16
133:18,19
170:1 171:6
180:3
**terrible** 32:18
39:10 182:19
**test** 156:3,9
**testified** 9:15
14:7,14 48:20
82:24 178:13
**testify** 14:9
**testifying** 15:3
48:15 145:23
181:11
**testimony** 6:3
11:19 14:17
15:1 48:13
49:4 68:13
124:1 125:6,7
125:16 190:8,9
190:13
**testing** 143:23
144:15,24

**Texas** 12:1 14:4
14:11 15:17
43:9 61:6,9,16
**text** 123:8,21
**thank** 11:5
16:12 17:23
20:23 21:1
24:17,24 38:17
61:19 62:2
63:22 67:14
83:8 91:17
95:8 105:19
116:19 122:19
122:23 125:13
136:9,15,19
164:4,8,10
167:23 177:9
177:20 186:17
186:19,23
**Thanks** 19:11
30:22 63:23
83:9
**theories** 174:4
**thereof** 190:19
**thing** 12:25
71:21,24
110:14 143:7
159:14,23
185:24
**things** 32:15
127:23 185:20
**think** 12:15 15:9
15:10,15 18:22
21:15 22:6,15
23:1 25:13
27:8,9 28:8
29:2,5,8 31:11
31:11,17,20
32:24 33:1,2,9
33:13 34:11
37:16,21,21
39:6 40:1,24
41:2,4 43:4
45:11 46:9
47:25 49:4
50:11,20 51:11
52:18 53:3,13
53:25,25 55:3
62:9 66:25
70:17,19 73:10

73:14,22 74:2
75:22 77:15
78:1,13 80:14
80:17,25 81:2
81:22 85:11
86:7,8,22 87:7
88:7,13 89:20
92:3 93:3,23
96:9 97:4
98:15 101:21
103:8,9 106:7
106:18 107:5
107:10,12
115:15 120:3
120:12 121:17
123:13 125:1,2
129:2,4 130:11
130:14 133:5
133:24 137:14
139:14,15,17
140:11,12
141:17 152:20
153:5 157:19
157:21 159:3,6
159:16 163:8
163:13 165:20
166:15,16,18
167:2 168:22
168:25 169:22
170:9 171:14
172:21 177:11
179:8,21,21
180:19 182:8
182:23 183:15
185:14,20
186:3,21,21
**thinking** 64:15
125:8
**third** 66:9
137:15
**thought** 115:9
**thoughts** 84:15
**thousand** 41:8
41:16 130:8
**thousands** 34:3
40:18,19 42:13
42:17
**thread** 170:4,13
**three** 24:6 48:6
76:17 100:15

214

152:9 168:11
173:4 177:17
177:18
**till** 87:17 134:5
**Tiller** 52:2
**time** 7:4 11:22
12:17 24:5
25:15 26:12
29:22,25 33:10
38:5 40:5
49:19 67:16,20
77:6 87:2
92:15,18
121:13 122:5
122:10 123:11
124:11,15
131:12 132:17
138:3 150:1
170:8 177:24
178:3 183:23
187:1
**times** 44:6,8,11
49:5,8 64:21
76:2 88:21
115:7 139:18
168:11
**tissue** 56:25 57:4
57:10,14
113:11 114:18
142:3
**title** 45:10
**today** 11:17
139:3,11
140:10 175:6
**told** 32:14 33:19
**tool** 170:16
**top** 43:19,22
90:14 103:22
126:24
**topic** 46:19
60:22 81:3
82:25 120:23
176:17
**topics** 19:23
22:14,19
174:10
**tor-** 94:23
**tort** 94:22
**total** 40:25 109:7
**totally** 16:12

185:15
**town** 41:14
**track** 94:18
**tragic** 37:12
75:14
**train** 184:10
**trained** 111:5,6
**training** 110:24
110:25 111:2
**transcribed**
190:11
**transcript** 5:14
43:13,15
125:19
**transcription**
188:7 190:13
**transcripts**
51:16
**transfer** 49:9,11
49:18
**transferred** 40:2
42:2 50:22
51:5 54:15
**transfers** 49:16
49:20,21 50:19
51:9,12,12,18
52:7,14,16,20
**transient** 182:10
**transport** 48:25
**transportation**
49:10
**transvaginal**
141:22 145:4
151:10 156:20
156:22
**treacherous**
183:7
**treat** 153:1
175:12
**treated** 147:19
175:7,19,24
**treating** 48:17
**treatment**
155:14
**trend** 129:2
130:11 131:7
**trends** 128:19,23
**tri-** 53:19 151:15
**triage** 35:23
146:23 150:20

154:17
**triaged** 148:8
151:16 152:8
155:10
**triaging** 148:12
**trials** 85:16 92:7
92:10
**trimester** 38:11
48:2 53:17
62:12,25 64:22
66:2,6,10
115:17,18
128:23 130:25
**trouble** 146:13
**true** 28:21 63:9
64:8,10 71:5
71:14 72:4
87:12 97:1,4
101:10 118:3
118:25 137:4
140:1,1 161:2
161:5 173:10
173:10 190:12
**truly** 75:14
**truth** 9:14,15,15
**truthfully** 10:3
17:22
**try** 55:6 81:10
127:11,21,23
128:1 134:22
**trying** 55:4
93:25,25 94:7
95:1 102:16,25
103:12 109:11
109:18,20
114:16 123:22
123:25 127:18
128:21 129:11
130:6,6,10
131:18 132:2
138:18 139:2
154:12,22
155:12 160:5
171:8
**tubal** 143:15,20
**tube** 140:22
**turn** 160:21
**Turnaway** 84:25
85:3,18 86:11
86:14

**turning** 170:6,7
**two** 17:19 32:14
43:1,2,3,3
47:25 76:17,22
92:10 100:14
100:19 121:14
164:15 168:11
173:6
**type** 45:3 185:23
**types** 54:1 100:1
100:2,3 110:25
**typical** 89:7
**typically** 56:23
59:1 63:1
65:21 97:18
112:5 115:11
115:21 155:24
156:7,10,15
169:5 183:18
183:20

**U**

**U.S** 117:2
185:10
**ugly** 172:24
**uh-huh** 10:18
14:5 17:2,6
21:9 26:19
30:19 44:5
91:18 95:19,25
103:15 104:21
105:23,25
116:24 137:1
143:9 164:9,11
164:16 178:11
**uh-uh** 10:18
**ultimate** 29:7
154:19
**ultrasound**
141:23 143:23
144:8,11,20
145:5 147:8
150:8,20
151:10 152:3,6
156:15,18,19
181:18 183:18
**umlaut** 96:18
**unavoidable**
37:12
**unborn** 25:16

27:10 28:20
29:13 37:15
66:20,21
**UNC** 50:25
**uncommon**
175:1
**undergo** 149:21
150:3 151:1,17
161:13 167:11
**undergoes** 53:5
120:12
**undergoing**
169:6
**undergone**
34:14 78:16
85:4 112:7
150:18
**underlying**
168:22 169:12
**undermined**
131:6
**undersampled**
106:11
**understand** 10:1
10:9 16:24
17:23 23:9
40:11 46:11
47:11 58:23
59:12 65:17
69:22 118:11
118:17 137:14
139:10 145:22
146:16 147:2
147:25 149:1
163:14 164:2
171:17,17
**understanding**
33:5 34:24
60:8,17 69:20
127:11 144:4
144:25 146:8
147:22 150:14
164:25
**understood**
10:14 15:11,14
55:21 140:16
165:24
**undertakes**
127:17 128:4
**underwent**

75:15 125:20
**unequivocally**
155:7
**unfit** 174:8
**unfortunate**
133:12
**unhealthy** 120:6
**Union** 2:3,9
**United** 1:1 22:7
27:14 41:23
44:23 64:4
65:25 87:22
92:5 94:14,18
99:25 107:4
108:10 133:3
133:21,22
134:3,13,15
135:2,20
140:24 175:9
**University** 45:9
185:1
**unknown** 20:8
142:6,10,17
144:3 145:2,6
145:10 146:18
146:22 152:2
154:17 155:1,8
**unplanned**
55:13
**unrelated** 82:25
**unreliability**
182:14
**unreliable** 22:20
**unusual** 101:24
161:25
**Upadhyay** 18:20
99:17 100:7
102:8 103:19
104:22 105:8
105:24 106:1
108:22
**updated** 178:6
**updating** 21:19
**upper** 63:4
125:25
**urgent** 141:2
163:12
**urgently** 162:4
**use** 20:3 26:9
45:13,16 57:5

57:8,8,16,16
57:19 89:2,10
92:22 93:3
112:10 120:15
120:16,25
127:5 129:6
174:11,13,23
176:18 184:8
**useful** 170:10
**uses** 61:20 89:1
92:25 130:23
143:23 174:15
**Ushma** 18:20
**usually** 53:6
59:20 98:1,11
116:18 156:20
183:23
**uterine** 54:3
66:16 180:7,11
**utero** 114:7
115:1
**uterus** 112:21
113:3,5,17
140:20 181:17

_____

**V**

**v** 7:7 129:20
**vagaries** 85:14
**vaginal** 92:3
137:17,18,23
138:22 139:9
**vaginally** 116:17
**validity** 74:19
87:10
**values** 79:7
**Vanisha** 4:10
9:8
**variety** 59:25
60:3 126:21
140:20
**various** 24:7
85:6
**vascular** 54:4
**vast** 23:15 88:13
**ventilator** 58:20
**verbally** 10:16
**version** 21:10,11
21:12,14
**versus** 66:24
69:1 72:22

87:3 115:12
158:2
**vi-** 148:4
**viable** 36:18
147:20
**victim** 32:6,10
120:11,18
176:24
**victims** 32:12,20
32:23
**video** 5:13 7:5
29:15 30:3,5
30:15
**Videographer**
4:11 7:3 29:21
29:24 67:15,19
124:10,14
177:23 178:2
186:20,24
**Videographers**
4:20
**VIDEOTAPE**
1:15
**view** 23:11 88:5
117:10 133:1
**viewpoint** 166:6
**villi** 151:5
**visible** 102:14
103:2
**vision** 5:10 25:1
25:4,11
**visit** 96:20 150:2
**visits** 55:13
93:20,21 109:5
**visualize** 142:1
**visualized**
141:22
**Vitae** 5:9 20:22
**vouch** 135:16
**vs** 1:7 189:3
**vulnerable**
82:20,21

_____

**W**

**W** 2:20 188:1
**Wade** 129:20
**wait** 10:5 104:13
104:13 177:22
**Wake** 7:20
190:2

**walking** 159:11
**want** 17:22 24:6
28:14 46:1
47:18 89:23
90:18,20 94:15
105:25 122:11
128:1 134:11
162:24 170:18
170:21 177:18
**wanted** 20:13
45:6 84:13
140:7 168:7
179:10
**wanting** 69:22
**Ward** 1:21 2:20
**warn** 181:22
**Warren** 66:11
**wasn't** 10:25
11:1 12:7,16
121:10 165:7
185:14
**way** 10:7 28:11
32:21,25 33:3
33:14 70:11
78:13 79:10
94:22 100:22
102:14 103:1
137:14 138:2,6
153:15 157:16
157:22 170:2
**ways** 118:11
**we'll** 126:12,25
**we're** 7:3 74:25
81:7,8,9 105:7
130:15 163:8
167:13,19,24
167:24 186:22
186:22,25
**we've** 70:14
120:19 177:15
**weakens** 74:18
**weakest** 85:15
**weboyle@war...**
2:22
**website** 51:18
66:12 68:16
76:4,6,9
**Wednesday** 1:19
189:5
**week** 64:18 65:5

70:16 156:17
178:8
**weeks** 17:17
37:4 62:5,15
62:21,25 66:12
66:20,20,21
68:14,19 69:1
69:4,10,15,25
70:2,6,9 129:9
129:10 130:9,9
142:2 156:4,11
162:12,15
164:24 165:6
165:17,18,23
166:2,14,18,20
166:24 167:3
167:11,18
168:2,4 183:24
**weigh** 98:18,19
**weighs** 70:10,13
**well-designed**
85:10,19 87:6
87:8 103:20,23
104:2,2,18
**went** 19:17
41:14 86:25
106:10
**weren't** 185:25
**west** 2:16 3:4,16
3:21 106:11
**Wheeler** 4:20
190:4,24
**white** 135:10
168:12,17
**who've** 78:16
**wide** 59:25 60:3
**Willard** 132:24
**Williams** 3:9
7:25,25
**willing** 124:8
**Winston-Salem**
3:10
**withdraw** 69:2
**witness** 13:11,12
13:20 15:17
67:7,10,12,14
105:16 126:5
149:2 157:5
167:21,23
176:12 177:7,9

178:11 186:19
189:4 190:7,10
190:14
**wo-** 28:20
**woman** 28:20
31:17 34:3,4
36:24 38:10,14
48:20,25 49:11
68:22 69:4,21
69:25 72:16,19
73:6,19 78:11
94:19 96:22
97:6 109:23
119:21 120:12
141:24 142:19
148:21 158:10
161:10,15
162:1,15 163:1
173:3
**women** 34:1,7
34:10 35:22
48:18 72:4
75:6,8,13,15
76:12 77:9,13
77:21 78:16
82:16,20,20,21
85:4,7,7,24
86:3,19 87:14
87:15 88:20
93:16 101:14
115:7 120:5
121:12,19
122:4,9 123:10
135:9,10
137:25 141:15
156:7 158:22
158:25 159:4,7
159:12,18
160:7 161:5,16
161:22 162:7
164:13,18
167:10,12
168:11,13,16
168:17,20,24
169:4,5,21,24
173:3,5 179:14
182:17 183:2
**women's** 16:1
45:20 75:17
76:25

**Wonderful**
178:10
**wondering** 42:1
82:2 111:19
**Wood** 3:21 7:18
7:18 8:14,15
**word** 93:11
**worded** 65:18
**words** 19:15
74:16
**work** 21:21
39:10 45:15
67:25 132:25
177:12 185:18
**worked** 21:16
49:18 100:13
115:23
**working** 29:11
**works** 27:22
**world** 71:23
**worldview**
170:13 173:20
**worsening** 73:16
**worth** 80:20
**wouldn't** 147:18
177:5,10
**writes** 101:10
**writing** 19:18
**written** 98:24
137:2
**wrong** 47:18
**wrote** 101:9
111:19 182:11
**Wubbenhorst**
1:16 5:6,8,16
6:1,3,6 7:6
9:12 19:1,2
20:21 24:25
25:21,25 30:3
30:7 43:7,14
43:18 63:18,19
83:4 91:13
95:4 122:20,21
124:17 125:15
125:16 136:16
158:3 164:5,6
178:5 188:3,16
189:4

   **X**

**X** 5:1,5
_____

   **Y**

**y'all** 186:10
**Yale** 12:20
**yeah** 12:15
24:16 26:3
30:17 41:6,17
42:15 43:3
44:18 46:11
50:20 54:25
58:12 62:3
65:20 67:7
74:1 79:17
83:23 90:24
104:10,12
105:18,19
115:15 126:4,8
132:9 136:24
143:10 145:18
176:15 178:9
**year** 34:15 48:14
63:13 100:20
138:4 171:7
178:22
**years** 24:6 39:5
42:16 71:20
83:12 84:1
85:5 130:13
138:5 158:20
168:5 179:24
182:13
**York** 2:5,5
75:24 76:2
130:4
**young** 75:14
133:12 183:2

   **Z**

**zero** 71:20
**Zoom** 8:1 9:5
186:9,14,20
_____

   **0**
_____

   **1**

**1** 140:24 141:19
**1.6** 94:4
**1:16** 1:18 7:4
**1:23-cv-00480...**
1:3

**1:37** 29:22,25
**10** 63:25 139:22
**10,000** 40:19,20
40:21
**100** 3:10 98:16
98:16
**100,000** 138:14
139:4
**1000** 4:21
**10004** 2:5
**113** 119:4
**114** 2:16 3:4,16
3:21 119:4
**11W-13** 9:7
**12** 88:20
**12/31/2018**
117:3
**122** 6:1
**125** 2:4 6:3
**13** 129:9 130:8
162:15 165:6
165:18 166:20
166:24 167:3
167:18 168:1
171:2
**13-week** 166:13
166:25
**136** 6:4
**138** 43:21
**14** 5:14 43:16
88:21 92:14
130:9 171:2
**143** 104:21
105:17,21
**146** 109:3
**15** 66:23 70:10
108:21 109:4
113:23 129:9
130:9
**15.7** 106:3,7
107:1
**15100** 4:4
**16** 94:2 104:14
104:15 129:10
130:9
**164** 6:5
**17** 169:16
172:18,25
**179** 136:3,8
**18** 131:16

**180** 62:4
**187** 188:6
**188** 75:21
**18th** 2:4
**19** 5:7 85:21
169:14
**1901** 174:2
**193** 18:19
**196** 74:7
**1960s** 172:13
**197** 125:24
126:9
**1972** 129:14
172:11
**1973** 129:19
172:14
**1978** 129:15
**1979** 80:3,7
**1981** 135:19
137:6
**1983** 137:2
**1990s** 171:6
**1991** 132:22
**1995** 12:9
**1996** 12:9
**19981350007**
190:25
_____

   **2**

**2** 140:24 141:19
**2.6** 122:12
**2/17/2017** 6:4
136:17
**2:16** 67:16,18
**2:30** 67:18,20
**20** 5:9 49:25
50:1,6 113:23
**2000** 121:3
**2002** 103:14
**2003** 185:2
**2004** 21:22
**2005** 21:22
**2007** 14:20
**2008** 14:20
**2009** 14:20 52:3
90:25 97:12
98:25 99:9
**2015** 99:18
100:7 102:8
103:19

**2017** 5:14 12:1
  43:16 185:9
**2018** 87:19
  105:24 108:22
  185:2
**2021** 121:4
**2022** 50:25 52:8
  52:11
**2023** 1:19 7:4
  21:8 51:1 52:8
  52:11 188:12
  188:21 189:5
  190:21
**20th** 170:4
**21** 37:4
**212** 2:5
**23** 37:4
**234,000** 131:15
**238** 63:3
**24** 5:10
**25** 5:11
**25th** 21:7
**26** 162:12
  164:24 165:17
  165:23 166:2
  166:14,18
  167:11 168:4
**268** 149:8
**27101** 3:10
**27602-0629** 3:16
  3:22
**27603** 2:16 3:4
**27607** 2:21
**27609** 4:21
**27611** 2:11
**277-9187** 2:22
**28-** 133:15
**28004** 2:10
**28th** 121:3

---
**3**

**3-** 98:7
**3:33** 124:11,13
**3:49** 124:13,15
**30** 1:19 5:13
  18:10 41:1
  42:15 65:3
  179:24 189:5
**300** 1:22 2:21
**30th** 7:4 121:4

**32** 91:6,20
**32-week** 133:15
**336** 3:11
**351** 153:23
**353** 154:18
**354** 154:4
**354-5066** 2:11
**356** 156:25
**358** 156:23
**36** 66:12,21
  68:14,19 99:16
**362** 137:16
**38** 64:17 70:15
  70:16 133:15
  164:11
**39** 122:25
  128:11

---
**4**

**4-** 105:14
**4:46** 177:24
  178:1
**40** 130:13 138:4
  158:20
**400** 98:6,7
**41** 63:4
**42** 92:18
**4208** 4:21
**43** 5:14
**47** 63:25 168:10
**48** 181:25
**4th** 190:21

---
**5**

**5-** 40:21
**5.6** 123:17 130:8
**5:04** 178:1,3
**5:15** 187:1,3
**50** 70:10 72:18
  72:23 73:9
  83:12 84:1
  126:15 178:20
**500** 41:15
**549-2633** 2:5
**57** 103:13

---
**6**

**6** 94:6
**6.7** 94:3,6
**600** 3:10

**63** 5:15
**64** 124:6
**649-9998** 4:22
**67** 110:16
**69** 111:11,15

---
**7**

**7** 76:1
**700** 18:7
**71** 104:15
  112:22
**716-0091** 3:17
**716-0186** 3:22
**716-0914** 2:17
**716-6600** 3:5
**722-3700** 3:11
**73** 172:11
**74** 113:22
**751** 1:22 2:21
**76** 64:21
**796** 92:12

---
**8**

**80** 98:16
**800** 4:5
**83** 5:17
**835-5233** 4:5
**85260** 4:5

---
**9**

**9** 5:3 43:24
**9-1-1** 51:16
**90** 139:23 140:8
**90th** 4:4
**91** 5:20 65:25
**919** 2:11,17,22
  3:5,17,22 4:22
**93** 65:24,25
**94** 116:20
**95** 5:22 85:24