# EXHIBIT 4

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PLANNED PARENTHOOD SOUTH          )
ATLANTIC, et al.,                 )
    Plaintiffs                    )
                                     )
       vs.                       )
                                       )
JOSHUA STEIN, et al.,             )
    Defendants                    )
                                       )
       and                       )
                                       )
PHILIP E. BERGER, et al.,         )
    Intervenor-Defendants         )

REMOTE DEPOSITION

OF

SUSAN BANE, M.D., PhD.

August 31, 2023 - 2:05 P.M.

PREPARED BY: Susan A. Hurrey, RPR

Discovery Court Reporters

and Legal Videographers, LLC

4208 Six Forks Road

Suite 1000

Raleigh, North Carolina 27609

919-424-8242

www.discoverydepo.com

1

A P P E A R A N C E S:


     Plaintiffs:


                    PLANNED PARENTHOOD FEDERATION OF AMERICA
                    BY: Anjali Salvador, Esquire
                        Dylan Cowit, Esquire
                        Shealyn Massey, Esquire
                    123 William Street, 9th Floor
                    New York, New York 10038
                    212-541-7800
                    anjali.salvador@ppfa.org,
                    dylan.cowit@ppfa.org, Shealyn.massey@ppfa.org
                    Counsel for Planned Parenthood South Atlantic
                    PLANNED PARENTHOOD FEDERATION OF AMERICA
                    By: Hannah Swanson, Esquire
                        Peter Im, Esquire
                    1110 Vermont Avenue, NW
                    Suite 300
                    Washington, DC 20005
                    202-973-4800
                    Hannah.swanson@ppfa.org, peter.im@ppfa.org
                    Counsel for Planned Parenthood South Atlantic


Counsel for the Plaintiff Beverly Gray:
                    American Civil Liberties Union Foundation
                    By: Ryan Mendias, Esquire
                        Brigitte Amiri, Esquire
                    125 Broad Street, 18th Floor
                    New York, New York 10004
                    212-549-2633
                    Rmendias@aclu.org
                    Bamiri@aclu.org


Counsel for all Plaintiffs:


                    American Civil Liberties Union of North
                    By: Carolina Legal Foundation
                        Kristi Graunke, Esquire
                    P.O. Box 28004
                    Raleigh, North Carolina 27611
                    919-354-5066
                    kgraunke@acluofnc.org
                    Counsel for the Defendant Joshua Stein

                                                           2

North Carolina Department of Justice
By:  Sripiya Narasimhan, Esquire
114 West Edenton Street
Raleigh, North Carolina 27603
919-716-6421
snarasimhan@ncgov.gov
Counsel for Attorney General Joshua Stein
Ward and Smith
By: W. Ellis Boyle, Esquire
751 Corporate Center Drive, Suite 300
Raleigh, North Carolina 27607
919-277-9187
weboyle@ardandsmith.com
Counsel for the North Carolina Medical Board
and North Carolina Board of Nursing

North Carolina Department of Justice
By: Michael Bulleri, Esquire
114 West Edenton Street
Raleigh, North Carolina 27603
919-716-6600
Mbulleri@ncdoj.gov
Counsel for the Defendant District Attorney
Jim O'Neill

Bell Davis Pitt
By: Kevin G. Williams, Esquire
100 North Cherry Street, Suite 600
Winston-Salem, North Carolina 27101
336-722-3700
kwilliams@belldavispitt.com
Counsel for the District Attorney Defendants
(with the exception of Jim O'Neill)
North Carolina Department of Justice
By: Colleen Crowley, Esquire
    Elizabeth Curran O'Brien, Esquire
114 West Edenton Street
Raleigh, North Carolina 27602-0629
919-716-0091
ccrowley@ncjog.gov
eobrien@ncdoj.gov
Counsel for Secretary Kinsley of the
Department of Health and Human Services

3

Alliance Defending Freedom

By: Julia Payne, Esquire

15100 North 90th Street

Scottsdale, Arizona 85260

800-835-5233

jpayne@adflegal.org


ALSO PRESENT:

Vanisha Kudumuri

Kara Grandin, Esquire

Kristi Graunke, Esquire

Elisa Sturkie

Vanisha Kudumuri

Carrie Rapaport - Videographer

4

I N D E X

E X A M I N A T I O N S

EXAMINATION                                                    PAGE

Examination by Ms. Salvador                                       6

Examination by Mr. Boyle                                        142

E X H I B I T S

NUMBER              DESCRIPTION                    PAGE

Ex-P                Declaration and C.V.            19

Ex-Q                Bartlett Study                  61

Ex-R                2021 Maternal Mortality Rates   62

Ex-S                NC Maternal Mortality Review Report  64

Ex-T                CDC Abortion Surveillance       65

Ex-U                Abortion Legislation in Mexico  68

Ex-V                Niinimaki, et al.               71

Ex-W                Fjerstad-Niinimaki Report       73

Ex-X                Mota Study                      75

Ex-Y                Fergusson Study                 81

Ex-Z                Karalis Mortality Study         88

Ex-AA               Shah and Zao Study              97

Ex-BB               ACOG Practice Bulletin         115

Ex-CC               Care Net Affiliation Agreement 126

Ex-DD               Care Net Statement of Faith    128

Ex-EE               Standards of Affiliation       131

5

1              SUSAN BANE, M.D., PhD, after having been

2    first duly sworn, was examined and testified as follows:

3              VIDEOTAPE TECHNICIAN:  Good afternoon, ladies

4    and gentlemen.  We are going on the remote video record on

5    Thursday, August 31, 2023 at 2:05 p.m.  I am Carrie Rapaport in

6    association with Discovery Court Reporters in Raleigh, North

7    Carolina.  This is a matter pending before the United States

8    District Court for the Middle District of North Carolina in the

9    case captioned Planned Parenthood South Atlantic, et al.

10   versus Joshua Stein, et al. and Philip E. Berger, et al.  Case

11   number 1:23-cv-00480-CCE-LPA.

12             This is the start of media one, volume one of

13   the deposition of Susan Bane, M.D., Ph.D.  The deposition is

14   being taken on behalf of the plaintiffs.  Starting with the

15   questioning attorney, I will ask counsel to identify

16   yourselves, state who you represent and whether co-counsel or

17   your client are in attendance.

18             MS. SALVADOR:  This is Anjali Salvador with

19   Planned Parenthood Federation of America on behalf of Planned

20   Parenthood South Atlantic.  I do have co-counsel with me here

21   today.

22             MR. BOYLE:  Good afternoon.  My name is Ellis

23   Boyle, Wake County Bar.  I am representing the legislative

24   defendants Berger and Moore and I am joined by Julie Payne with

25   the ADF who is co-counsel.

6

Case 1:23-cv-00480-CCE-LPA   Document 74-4   Filed 09/12/23   Page 7 of 188

1           MS. GRAUNKE:  Hi, everyone.  I'm Kristi Graunke

2   from the ACLU of North Carolina Legal Foundation, appearing for

3   all plaintiffs.  I'm joined today by Elisa Sturkie who is a UNC

4   law student who is externing with us, and also by my co-counsel

5   Brigitte Amiri and Ryan Mendias from ACLU's national office.

6           MS. SWANSON:  Hi.  This is Hannah --

7           MR. WILLIAMS:  My name is --

8           MS. SWANSON:  Oh, I'm sorry.

9           MR. WILLIAMS:  Go ahead, Hannah.

10          MS. SWANSON:  Thank you.  This is Hannah

11  Swanson also from Planned Parenthood Federation of America for

12  Planned Parenthood South Atlantic.

13          MR. WILLIAMS:  My name is Kevin Williams from

14  the Forsyth County Bar and I represent District Attorney Jim

15  O'Neill.

16          MS. NARASIMHAN:  Good afternoon.  My name is

17  Sripiya Narasimhan with the North Carolina Department of

18  Justice representing Attorney General Joshua Stein.

19          MS. O'BRIEN:  Good afternoon.  I'm Elizabeth

20  O'Brien also from the North Carolina Department of Justice.  I

21  represent the DA defendants other than DA O'Neill and my

22  clients are not present, nor is co-counsel.

23          MR. BULLERI:  I'm Michael Bulleri, also with

24  the North Carolina Department of Justice.  I represent the

25  North Carolina Medical Board, North Carolina Board of Nursing.

                                                              7

Case 1:23-cv-00480-CCE-LPA   Document 74-4   Filed 09/12/23   Page 8 of 188

1          MS. CROWLEY:  Colleen Crowley also with the

2  North Carolina Department of Justice.  I represent North

3  Carolina Department of Health and Human Services.

4          VIDEOTAPE TECHNICIAN:  Thank you.  As the

5  witness has already been sworn in, you may proceed, Counsel.

6  BY MS. SALVADOR:

7      Q.  Dr. Bane, good afternoon and thank you for being here

8  today.  My name is Anjali Salvador and I'm one of the attorneys

9  representing Planned Parenthood South Atlantic in this case.

10  While we're talking here I might refer to it as PPSAT.

11          Could you please state your full name for the record?

12      A.  Yes, I'm Susan Bane.

13      Q.  All right.  Thank you.  We're going to start with some

14  housekeeping and ground rules.  Do you understand that you're

15  under oath today the same way that you would be in a court room

16  and that you're obligated to answer my questions truthfully and

17  completely?

18      A.  Yes.

19      Q.  So as you heard, we have a court reporter with us

20  today who will be taking down what we say for a transcript.  So

21  please make an effort to continue giving all of your answers

22  verbally like you are instead of nodding or shaking your head.

23  Okay?

24      A.  Yes.

25      Q.  Also, because of the transcript, we're going to need

8

1   to do our best not to talk over each other.  So please wait for

2   me to finish each question before answering and I'll wait for

3   you to finish before asking my next question.  Okay?

4       A.  Yes.

5       Q.  Great.  I'll do my very best to ask clear questions.

6   If you don't understand a question, please feel free to let me

7   know and I'll rephrase it or repeat it, whatever you need.  But

8   if you do answer I'm going to assume you have understood my

9   question.  Okay?

10      A.  That sounds good.

11      Q.  Great.  If at any point either in the moment or later

12  in the deposition you realize that you have made a mistake with

13  a prior answer or you want to clarify something, that's totally

14  fine, just let me know.  Okay?

15      A.  Okay.

16      Q.  If at any point you need a break, please let me or

17  your attorney know and we'll take one, with the exception that

18  if I'm in the middle of a question you'll have to answer it

19  before we take that break.

20          Do you understand?

21      A.  I do.

22      Q.  During the deposition your attorney may object to some

23  of my questions.  But unless your attorney directly tells you

24  not to answer the question, you still have to answer it.

25          Do you understand?

9

1    A.  Yes.

2    Q.  And have you turned off your cell phone like the

3  videographer asked?

4    A.  I have.

5    Q.  Great.

6    A.  Excuse me.  Did you say turn off it or -- I muted it.

7    Q.  It would be great if you could either -- definitely

8  silence it, but turning it off would be preferable just so we

9  know you're not looking at it during the deposition.

10   A.  Okay.  So I just have it turned over on its backside,

11  plus it's muted.

12   Q.  That's fine.  So this is a little invasive and I

13  apologize, but it's a standard question at the start of

14  depositions.  Are you dealing with any illness or taking any

15  substance that would affect your memory or prevent you from

16  being able to understand and answer my questions today?

17   A.  No.

18   Q.  Thanks.  Have you ever had your deposition taken

19  before?

20   A.  I have.

21   Q.  How many times?

22   A.  As in expert witness?

23   Q.  Both as an expert witness or as a fact witness, if

24  that's happened.

25   A.  So I was an expert in a medical malpractice case and

10

then I have a son with special needs and I was an expert in a

case related to him.

     Q.  Did either of those --

     A.  Sorry, I wasn't an expert.  I was his mom.

     Q.  Understood.  Did either of those cases relate to

abortion in any way?

     A.  They did not.

     Q.  Other than the report you submitted in this case, have

you submitted a -- I'm sorry, the declaration -- have you

submitted a declaration in a legal case before?

     A.  I have not.

     Q.  Have you testified in any court before?

     A.  Yes, in the case that I was the expert witness, the

malpractice case.

     Q.  Got it.  What -- so you said you were an expert in

that case, correct?

     A.  Correct.

     Q.  So you were not a party in that case?

     A.  No, I was not.

     Q.  Have you testified before any legislative body?

     A.  Yes.

     Q.  Can you describe that testimony, please?

     A.  Sure.  I have testified three times at the North

Carolina State Legislation.  One was on the Bill SB20.  One was

on a conscience right, conscience protection bill, and the

1   other was on the bill related to gender affirmation care in

2   minors.

3       Q.  Got it.

4           MS. SALVADOR:  Counsel, at the break could we

5   get copies of that testimony, please?

6           MR. BOYLE:  Are you asking me?

7           MS. SALVADOR:  Yes.  I think we had asked you

8   to produce Dr. Bane's testimony as one of our requests for

9   production.

10          MR. BOYLE:  I don't think she has it.

11          MS. SALVADOR:  Okay.

12  BY MS. SALVADOR:

13      Q.  Dr. Bane, was that verbal testimony?

14      A.  Yes.

15      Q.  Okay.  Could you describe the nature of your

16  testimony on SB20, please?

17      A.  Yes.  I was one of -- I believe they had 10

18  individuals have -- I think we had one-and-a-half -- one or two

19  minutes and it was -- so it was the public who could testify.

20  I think they had 10 of us who supported the bill and 10 who did

21  not.  And so I spoke as a citizen of North Carolina and a

22  medical doctor, an ob-gyn, why I supported the bill.

23      Q.  Why did you support the bill, according to your

24  testimony?

25      A.  I supported the bill because as a medical doctor I

                                                          12

don't believe the direct and intentional killing of another

human being is part of medical practice and that for 50 years

we have basically had unfettered access to abortion in the

United States and it has not impacted maternal mortality, that

women in North Carolina need solutions, not greater access.

And that we need to look at root causes.  And that this bill

has provisions to support women who are in that position of an

unplanned pregnancy and have socioeconomic, typically, factors

are the main ones that both the literature and I see in my

practice as the reasons and there are provisions in the bill to

support them.

Q.  Thank you for that description.  You mentioned that

you also testified on a bill relating to I believe you said

freedom of conscience, is that correct?

A.  I did.

Q.  Could you please describe your testimony for that

bill?

MR. BOYLE:  Objection.  I want to put on the

record that there's been a lot of comment from the plaintiff's

side about focusing this case on -- at this stage of discovery

on the preliminary injunction hearing and I don't know if she

may be talking about something that's germane to that.

MS. SALVADOR:  That's a speaking objection and

speaking objections aren't allowed under the rules.  So your

objection is noted.

13

BY MS. SALVADOR:

Q.  Dr. Bane, if you could please answer.

A.  Sure.  So I don't have in my head what I said as fresh, but I spoke basically about the fact that conscience rights, so what is ethically and morally allowed -- that we have a right both as healthcare practitioners of all sorts to be able to recognize our conscience and not have to do things that go against our conscience.  I would say that's the gist of what I talked about.

Q.  And you said the third bill was related to gender, is that correct?

A.  Yes.

Q.  Was there anything in your testimony related to abortion for that bill?

A.  No.

Q.  Got it.  Thank you.  Do you have any notes or files related to this case with you right now either in front of you in hard copy or open digitally?

A.  I don't have anything open digitally that I can see.  If you ask me to go to something I have digital copies of things.  I have my clean copy of my declaration here and then I have -- sometimes when I listen I like to take notes, so I have this pad which I put all your names when you introduced yourselves, but it's empty otherwise.

Q.  Understood.  Thank you.

14

1       A.  And then over -- way over -- I'm in a hotel room, a

2  desk, I have all the copies of -- in my declaration of the

3  references I used.  Actually I probably have the majority of

4  them.  Some were digital and too long.

5       Q.  Got it.  Thank you.  So when were you first contacted

6  about participating as an expert witness in this case?

7       A.  I think it was about a month ago.

8       Q.  And who specifically have you communicated with

9  regarding this case?

10       A.  Julia Payne with ADF reached out to me and then -- and

11  I have talked to Ellis about it.  The other person is Dr. John

12  Thorpe who's at Chapel Hill.  He is a colleague and friend of

13  mine and was -- I think and potentially be involved and then

14  they decided I would do it.

15       Q.  What did you speak to Dr. Thorpe about?

16       A.  He is experienced regarding -- he's done a lot of

17  depositions.  So I actually asked him because I had never done

18  one with the law, what to expect with the deposition.

19       Q.  Did he contribute any sources for you to use in your

20  declaration?

21       A.  He did not.

22       Q.  Did he give you advice on what would go into your

23  declaration?

24       A.  No.  We talked about the logistics of the deposition

25  itself.

                                                          15

1    Q.  And you mentioned that you thought he was originally

2    going to be involved in this case.  How do you know that?

3    A.  When Julia reached out to individuals to potentially

4    be in the case, he was one of the people on the email.

5    Q.  Do you know why you rather than he are an expert in

6    this case?

7              MR. BOYLE:  I'm going to object and I'm going

8    to instruct you not to answer that.  That would be work

9    product.  That's protected.

10   BY MS. SALVADOR:

11   Q.  Other than the folks you have already named, have you

12   communicated with anyone else regarding this case?

13   A.  No.

14   Q.  What topics are you providing your opinion on in this

15   case?

16   A.  Can I go back to the last question?  I have family --

17   my family knows I'm in the case.  I'm a very literal thinker so

18   when you said have you talked with anyone, of course some of my

19   family and colleagues know about it, but not the specifics of

20   my declaration.

21   Q.  So they know that you're in a deposition right now,

22   but do they know what you're talking about?

23   A.  They know it's about SB20.

24   Q.  Okay.  But did you discuss the specific contents of

25   your declaration with them?

16

1      A.  No.

2      Q.  So what topics are you providing your opinion on in

3  this case?

4      A.  I'm providing my opinion on the hospitalization

5  requirement and the documentation of an intrauterine pregnancy

6  prior to chemical or medication abortion.

7      Q.  Are you being paid for your participation in this

8  case?

9      A.  Yes.

10      Q.  How much are you being paid for your participation in

11  this case?

12      A.  $500 per hour.

13      Q.  And about how many hours have you spent working on

14  this case so far?

15      A.  A lot.  I can't quantify -- I don't have -- I mean, I

16  have it written down elsewhere, but I haven't tallied it.  But

17  a month ago I was asked and I know towards the end of July I

18  started working on a declaration and the declaration itself

19  took several hours so...

20      Q.  Would you say that since you were contacted you have

21  spent several hours a week on this case?

22      A.  Yes.

23      Q.  Would you say you have spent more than 10 hours a week

24  on this case?

25      A.  Yes.

17

1     Q.  Got it.  Thank you.  How did you prepare for today's

2  deposition?

3             MR. BOYLE:  I'll just instruct you not to

4  discuss anything specifically that you said with your lawyer,

5  but you can answer generally.

6             THE WITNESS:  Sure.  It was -- sorry.  And I'm

7  sorry -- is it -- how do I pronounce your name?

8  BY MS. SALVADOR:

9     Q.  Sure.  It's Anjali.

10     A.  Anjali.  And you asked me specifically for today?

11     Q.  No.  How did you prepare generally for today's

12  deposition, without revealing the contents of any conversation

13  you had with your attorneys?

14     A.  Sure.  So really reviewing my declaration was the

15  biggest thing and then reviewing the responses from the other

16  individuals who are witnesses.  They have declarations too.

17     Q.  Other than your attorneys, did you speak with anyone

18  about the substance of the deposition testimony you'll give

19  today?

20     A.  I did not.

21     Q.  You mentioned reviewing your own declaration and the

22  other declarations in this case.  Did you review any other

23  documents to prepare for this deposition?

24     A.  So I -- the resources that I used and then some of the

25  other literature in this area I reviewed.

18

1      Q.  When you say some of the other literature in this

2    area, what do you mean by that?

3      A.  Literature related to complications related to

4    pregnancy.  I think all the ACOG guidelines I used are part of

5    my references, so they are above and -- I mean, I already said

6    I included those.  I did get information about Planned

7    Parenthood South Atlantic and their policies, as well as some

8    of the other information they provided.  For example, numbers

9    that they -- of abortions they do in their centers and things

10   like that.

11     Q.  Thanks.  Other than speaking with your attorneys and

12   reviewing the documents you mentioned, did you do anything else

13   to prepare for today's deposition?

14     A.  I prayed.

15     Q.  So you have -- you have already mentioned that you

16   prepared an expert declaration in this case, right?

17     A.  I have.

18     Q.  Okay.

19            MS. SALVADOR:  So I am going to drop it into

20   the chat so that every one can access it.  It's already been

21   premarked as an exhibit.  I believe it is Exhibit-P.

22                    -  -  -

23            (Document marked as Exhibit-P for

24   identification.)

25                    -  -  -

19

BY MS. SALVADOR:

Q.  So Dr. Bane, is this an accurate copy of the -- well, first I should say, are you able to open the document that I dropped into the chat?

A.  Let me try because I have my own copy, so I wasn't looking to do that.  It's wanting me to save it first, so just a sec.

Q.  Sure.

(Pause.)

A.  Yes, I have it now.

Q.  And is this an accurate copy of the expert declaration you submitted in this case?

A.  Give me a minute.

Q.  Sure.

(Pause.)

A.  Yes, it's what I submitted.

Q.  Thank you.  And if it's easier, for your purposes, to refer to your paper copy rather than the digital copy, that's fine.  We just needed to make sure that everyone on this deposition is looking at the same document.

A.  Okay.

Q.  Please describe the process of drafting this declaration.

A.  So really understanding what specifically I was being asked to address was the first thing, which was the two things

20

1   I already mentioned regarding the IUP documentation requirement

2   and hospital requirement and reviewing the literature related

3   to that, including the maternal mortality report for North

4   Carolina that I thought was an important document related to

5   this.

6       Q.  And did you write all of this declaration yourself?

7       A.  One hundred percent.

8       Q.  Have you read all of the documents cited in your

9   declaration in their entirety?

10      A.  Yes.

11      Q.  Other than your attorneys, did you work with anyone to

12  prepare your declaration?

13      A.  No.

14      Q.  Have you discussed the contents of your declaration

15  with anyone other than your attorneys?

16      A.  No.

17      Q.  Did you read the declarations that Dr. Farris

18  submitted in this case in their entirety?

19      A.  Yes.

20      Q.  Did you read the sources cited in Dr. Farris's

21  declarations?

22      A.  I looked at them, but I can't say that I read all of

23  them.

24      Q.  Got it.  Thank you.  And did you read the declarations

25  that Dr. Borass submitted in this case in their entirety?

21

1    A.  Yes.  And I'll add that I had those when I was writing

2  my declaration, so I should have included them as part of my

3  answer regarding how I prepared this.

4    Q.  Got it.  Thank you.  And did you read the sources

5  cited in Dr. Borass's declarations?

6    A.  I looked at them and -- so I can't say I read them

7  from front to back.

8    Q.  So I'd like to turn now to your C.V., which is

9  Exhibit-A, attached to your declaration which we have already

10  pulled up and you have in front of you.

11    So is this C.V. current?

12    A.  It's very current.  It's not current as of today.  I

13  have done two talks this week at a conference that aren't on

14  there, things like that.

15    Q.  Got it.  Thank you.  And you graduated from -- with a

16  Bachelor of Science degree from Atlantic Christian College in

17  1987, correct?

18    A.  Correct.

19    Q.  And now it's called Barton College, is that right?

20    A.  Correct.

21    Q.  So we'll get to the specifics of your career in a bit,

22  but am I correct that you also ended up working at Barton

23  College for a number of years?

24    A.  Yes.

25    Q.  After you attended Barton College, you graduated from

                                                          22

1  the University of Illinois with a Master of Science in

2  kinesiology in 1989, is that right?

3      A.  Yes.

4      Q.  And then you received a Ph.D. in kinesiology from the

5  University of Illinois in 1995, is that right?

6      A.  Correct.

7      Q.  And you also got an M.D. from the same place in 1997,

8  is that right?

9      A.  Correct.

10     Q.  Did those two programs overlap?

11     A.  So they are -- it was a 10-year program from the

12 standpoint of I went there in 1987 and I finished in 1997.  So

13 from '87 to '89 I did my master's degree and then I was in a

14 M.D. Ph.D. medical scholars program.  So I had a total of six

15 years of graduate work with my master's and my Ph.D. and four

16 years of medical school.

17     Q.  Got it.  Thank you.  And you completed your residency

18 in obstetrics and gynecology at the East Carolina University

19 School of Medicine, right?

20     A.  Right.

21     Q.  And you completed that in 2001?

22     A.  Yes.

23     Q.  Are there any other educational credentials you have

24 that are not on your C.V.?

25     A.  Not that are graduate level degrees and a master

23

1    level.  I have certifications, but I think they're all on my

2    C.V.

3        Q.  Okay.  Thanks.  So after you completed your residency,

4    did you work as an ob-gyn?

5        A.  I did.  I was in private practice at Greenville

6    Obstetrics and Gynecology in Greenville, North Carolina for

7    nine years.

8        Q.  And what were your duties at Greenville?

9        A.  So in my practice -- it was a private practice,

10   obstetrics and gynecology.  We were part of a bigger group

11   called Physicians East, which was a multispecialty group.  So I

12   did obstetrical care and gynecological care both in the office

13   and in the hospital taking call.  I had medical students and

14   residents from the Brody School of Medicine at East Carolina

15   that were with me.  I also had students from UNC Chapel Hill

16   who rotated with me.

17       Q.  And in your declaration you state that you helped

18   women deliver over 1,000 babies and supervised midwives who

19   helped women deliver several thousand babies, is that right?

20       A.  Correct.

21       Q.  Did all of those deliveries take place in hospitals?

22       A.  Yes.

23       Q.  What is your familiarity, if any, with midwives in

24   North Carolina delivering babies outside of hospitals?

25       A.  I'm not familiar.

                                                              24

1    Q.  And you mentioned your gynecological practice included

2    gynecological surgery, is that right?

3    A.  Yes.

4    Q.  What type of gynecological surgery did you perform?

5    A.  I performed D&Cs for miscarriage.  I performed vaginal

6    and abdominal hysterectomies.  I performed urogynecological

7    surgery.  That was more limited.  And I'm talking about

8    basically in the hospital.  If a woman had an ectopic pregnancy

9    I would do laparoscopy for removing cysts, things like that.

10   Q.  And just to clarify, you used a word -- did you say

11   urogynecological?

12   A.  Sorry, uro.  U-r-o.  So it's bladder issues.

13   Q.  Got it.  Thank you.  And did you ever perform any of

14   those procedures outside of the hospital?

15   A.  Those procedures, no.

16   Q.  Which of the procedures you mentioned, if any, did you

17   perform outside of the hospital?

18   A.  None of those procedures outside of the hospital.

19   Q.  So you never --

20   A.  So -- excuse me.  We did have as part of our hospital

21   a surgical center.  So it would be like a same-day surgery

22   center.  So I don't know if you're calling that -- that was

23   freestanding outpatient surgical center.  So I didn't think of

24   that as a hospital.  But I did not provide any of those

25   surgeries I mentioned in my outpatient clinic.

                                                          25

1      Q.  Got it.  Thank you.  So you mentioned miscarriage D&Cs

2  as one of the procedures you performed, is that right?

3      A.  Correct.

4      Q.  What are the risks of miscarriage D&Cs?

5      A.  So the risks are -- the biggest one acutely is

6  hemorrhage and infection.  You can also have a uterine

7  perforation and that can lead to damage of adjacent organs

8  around the uterus, which are primarily bowel and bladder.  And

9  you can also have death.

10     Q.  Thank you for that.  And we'll go into all of those a

11  little bit more later, but just kind of continuing with the

12  description of your work at Greenville.  In your work at

13  Greenville did you ever prescribe contraception?

14     A.  Yes.

15     Q.  What types of contraception?

16     A.  Hormonal and non-hormonal.  So hormonal included birth

17  control pills or patch, Depo-Provera, which is an injection

18  shot, IUDs, tubal ligations, which are actually surgeries.  I

19  would say those are the main things.

20     Q.  And in your work at Greenville did you ever perform

21  abortions?

22     A.  I did not perform induced abortions, which I'm using

23  that as the CDC's definition of an induced abortion.

24     Q.  What is that definition?

25     A.  So it's an intervention that is designed to -- whether

26

1  it's a suspected or a documented pregnancy, to not result in a

2  live birth.

3     Q.  And so you referred to induced abortions as though

4  they were one type of abortion, is that right?

5     A.  Correct.

6     Q.  What are the other types of abortion?

7     A.  So abortion is a term -- it's an umbrella term in

8  medicine and induced abortion is one type.  We have what's

9  called a spontaneous abortion, commonly known as a miscarriage.

10  A threatened abortion would be when somebody comes into our

11  office, maybe they're cramping or bleeding and we do an

12  ultrasound and everything looks fine but they're possibly going

13  to miscarry.  There's incomplete abortions, which would be a

14  woman who's in the middle of miscarrying.  A complete abortion

15  is typically she's already miscarried.  So those are examples

16  of terminology.

17     Q.  So you described your practice as involving treatment

18  of spontaneous abortions, by your definition, is that correct?

19     A.  Yes.

20     Q.  And colloquially is that referred to as miscarriage

21  management?

22     A.  Yes.

23     Q.  So did miscarriage management ever involve providing

24  patients with medication?

25     A.  We could give that as an option, but it was primarily

27

1   expectant management, meaning if she was bleeding and didn't

2   want to have a D&C, we had confirmed that she did not have a

3   viable pregnancy.  But often times we would do surgery or we

4   would do expectant management.

5       Q.  And that expectant management would sometimes involve

6   providing the patient with medication, is that right?

7       A.  No.  I'm sorry.  Them on their own doing it.  So you

8   can do medication management also.

9       Q.  Okay.

10      A.  We can do that.  We just didn't have many people that

11  wanted that option.

12      Q.  Got it.  But did you ever provide medication

13  management?

14      A.  Yes.

15      Q.  Did that medication include Mifepistone and

16  Misoprostol?

17      A.  Just Misoprostol.

18      Q.  Got it.  Thank you.  Did you ever provide Misoprostol

19  to a patient outside of a hospital setting?

20      A.  So if -- I can't recall a specific patient, but in

21  terms of being able to -- if she had a miscarriage and hadn't

22  passed it and wanted to have medical management, that was an

23  option she was given.

24      Q.  And that was an option that she would be given in an

25  outpatient facility, is that right?

28

1      A.  Yes.

2      Q.  Did you consider providing Misoprostol to a patient in

3  an outpatient facility to be safe?

4      A.  Sorry, I heard a ding from somebody.  Could you say it

5  again?  Did I consider it to be safe like doing that?

6      Q.  Yes.  That's right.

7      A.  Yeah.  So if it was clinically indicated, I'm going to

8  do things that I think are safe and that the patient and I

9  align with in terms of her, you know, shared decisionmaking in

10  the process.

11      Q.  And that would sometimes include providing Misoprostol

12  to a patient in an outpatient clinic as part of miscarriage

13  management, is that right?

14      A.  Yes.

15      Q.  To your knowledge did you ever provide Misoprostol to

16  a patient where there was fetal cardiac activity still present?

17      A.  No.

18      Q.  Did your miscarriage management involve providing

19  aspiration procedures?

20      A.  If you're calling an aspiration procedure a D&C, yes,

21  and that would have been at the hospital.

22      Q.  Could you define a D&C, please?

23      A.  So dilatation and curettage.  But it -- in the past

24  that was equated with sharp curettage where you would scrape

25  the lining.  And we know that that's associated with something

29

1    called Asherman's syndrome, which is adhesions.  And so now I

2    think the term is still used but it's usually with suction

3    aspiration.  But we still use the term D&C often.

4         Q.  Have you ever performed a D&C, to your knowledge,

5    where there was fetal cardiac activity present?

6         A.  No.

7         Q.  Did your miscarriage management involve any dilatation

8    and evacuation procedures or D&Es?

9         A.  No.

10        Q.  Just one second, I'm going back and forth in my

11   document just to make sure I didn't miss any questions.  So you

12   mentioned -- we were talking about your work at Greenville and

13   your resume lists your work at Greenville and East Carolina

14   University separately, but you kind of described them as

15   together.  So could you clarify that relationship, please?

16        A.  Sure.  So I was not an employee of East Carolina

17   University.  We were clinical facility members if we taught

18   residents and had medical students on there.  So I was employed

19   a hundred percent by Greenville Ob-Gyn and part of Physicians

20   East and I volunteered because I love to educate and had

21   students with me.  I also taught some lectures -- not

22   regularly, but I did teach a two-week fourth year elective

23   called Residency 101 and that was volunteer service work also.

24        Q.  Go it.  So in our discussion of your practice so far,

25   is there anything different about your East Carolina practice

30

1    versus your Greenville practice?

2        A.  I don't consider that I ever had an East Carolina

3    practice.  If it comes across as that in my C.V. I should

4    change it.  But no, I was never employed as -- I guess when I

5    was a resident they paid me, but once I graduated from

6    residency I was at Greenville Ob-Gyn.

7        Q.  Got it.  And in your teaching, did you ever teach your

8    students about abortion?

9        A.  No.  I mean, I did do lectures on that, I guess I

10   would say.

11       Q.  Understood.  So we have generally been talking about

12   your ob-gyn practice from 2001 to 2010, is that correct?

13       A.  Yes.

14       Q.  Okay.  And is there any part of that ob-gyn work --

15   or, I'm sorry.  Have we discussed basically everything you did

16   in your ob-gyn work?

17       A.  No.

18       Q.  So what else did you do as part of that ob-gyn work?

19       A.  So I took call.  I delivered babies.  I did vaginally

20   and vacuum-assisted.  I did c-sections and the full gamut of

21   what an obstetrician who is covering a hospital would do.

22   Consults all across the hospital.  In my practice a big part of

23   my gyn practice was yearly physicals with women.  And I did

24   prenatal care.

25       Q.  And in your medical practice, have you ever prescribed

31

1    medication off label?

2         A.  Yes.

3         Q.  In what circumstances?

4         A.  When women are menopausal and having hot flashes, for

5    example, SSRIs, which are antidepressants, have been shown to

6    help with hot flashes, for example.  So I may prescribe one of

7    those.

8         Q.  Did you consider that safe?

9         A.  Yeah.  Yes, I did.

10        Q.  Why did you consider that to be safe?

11        A.  I think that there were several studies that showed

12   that it was effective.  The potential side effects of

13   prescribing it were minimal.  It was well studied in women --

14   it is a drug that has been well studied and so it's been

15   commonly used.  Like, for example, Prozac, let's say, was one

16   of them that we would use.  So I felt comfortable that there

17   was not a harm that I was causing.  And I also knew that if she

18   didn't like it, we could stop it.

19        Q.  Got it.  Thank you.  And we have already discussed

20   Misoprostol.  Have you ever prescribed Mifepistone or Mifeprex

21   to a patient?

22        A.  I have not.

23        Q.  Have you ever provided an abortion?

24        A.  I have never performed an induced abortion, no.

25        Q.  You state in your declaration that while you were in

                                                             32

1  private practice you cared for preborn children with

2  life-limiting conditions, is that correct?

3     A.  Yes.

4     Q.  Could you describe what you mean by that?

5     A.  So they are -- typically -- I mean, so a fetus is

6  after eight weeks.  So usually the diagnoses aren't made when

7  they're embryos.  And so they have a diagnoses that we know

8  that if the normal age limit for men and women is in the 70s

9  and 80s, that they have a condition that has been diagnosed

10 that the likelihood of them surviving to 70 or 80 is not

11 expected.  So that would be a life-limiting condition.

12    Q.  And how did you treat -- how did you treat your

13 patients in that situation?

14    A.  A lot of love.  It was hard because they -- you know,

15 it's a tragedy when you expect to have a healthy child and

16 you're told that.  So we would refer them to maternal-fetal

17 medicine because maternal-fetal medicine works with high-risk

18 pregnancies.  And then depending on the situation they may come

19 back to our practice and we provide their prenatal care or

20 there may be a transfer of care.

21    Q.  And a transfer of care for what?

22    A.  Well, usually for the maternal-fetal medicine

23 specialist to take over the care of them, whether it's -- there

24 was going to be a delivery or if the patient had decided that

25 they wanted to have an induced abortion, they would provide

33

that.

Q.   And would you ever refer those patients directly for an induced abortion?

A.   No.

Q.   Have you ever performed a previability induction on a pregnant patient?

A.   Can you define previability?

Q.   Sure.  How would you define viability?

A.   Well, traditionally it is able to survive outside the mother.  And that's changed over time of course because our understanding of how to care for premature babies is better.  So I assume you're asking babies that -- maybe I shouldn't assume -- but that are too young to survive if they were born at the time of the induction.

Q.   That's right.  Have you ever performed an induction on a pregnant patient at the stage where their fetus was not developed enough to survive outside the womb?

A.   Yes, I have.

Q.   About how many times?

A.   Lots and lots.  Residency in four years because we were a Level 1 hospital where we had a lot of transfers that came in -- excuse me.  I'm sorry.  I have a reminder coming up that was loud.  We had a lot of patients transferred to us that had, for example, preterm premature rupture of membranes.  And -- or other things that caused us to have to do a premature

34

1  separation of the maternal and fetal patient.  So that was four

2  years and then I had nine years in private practice.  So, you

3  know, greater than a hundred.

4      Q.  Got it.  Thank you.  And did you consider those

5  inductions to be abortions?

6      A.  No, not induced abortions.

7      Q.  So you referred to preterm premature rupture of

8  membranes or pprom.  What other conditions would lead you to

9  perform an induction in these circumstances?

10      A.  That would probably be the most common.  Really it

11  would be situations in which typically the mom is so sick that

12  if we do not do an induction and separate our maternal and

13  fetal patient, both patients would die.  So, you know, it would

14  be any indication that the mom was so sick.  And occasionally

15  it's a fetal indication, but it's usually the mother.

16      Q.  Did you ever recommend to one of your patients that

17  they have an induction before the fetus could survive outside

18  the woman?

19      A.  Yeah, I had a lot of hard conversations about that.

20      Q.  Would you have recommended an induction to, for

21  example, a patient with gestational diabetes at risk of going

22  blind?

23      A.  I would need more clinical context than a hypothetical

24  like that.

25      Q.  Would you wait until the patient was dying before you

                                                          35

1    recommended such an induction?

2                MR. BOYLE:  Objection.  You can answer.

3                THE WITNESS:  Did you say you can answer?

4                MR. BOYLE:  Yes, you can answer.

5                THE WITNESS:  Okay.  Would you repeat the

6    question, please.

7    BY MS. SALVADOR:

8        Q.  Sure.  Would you wait until the patient -- would you

9    recommend waiting until the patient -- sorry.  Let me start

10   over.  Would you wait until the patient was dying to recommend

11   such an induction?

12               MR. BOYLE:  Objection.  You can answer.

13               THE WITNESS:  So I just want to kind of pull

14   back for a second and clarify.  So an induced abortion has the

15   intention of not having a live birth.  So when I would

16   recommend an induction in these cases, my intention was

17   hopefully to have a live mom for sure and a live baby.  And so

18   there were times, for example, if she's what's called

19   periviable, she's near where maybe the baby did have a fighting

20   chance and her risks are small at that point that we could do

21   expectant management.  So, for example, with pprom, one of the

22   -- ACOG'S, you know, practice bulletin on pprom says expectant

23   management.  And so I'm trained to be able to watch for signs

24   of infection in the mom and daily, you know, go see her and

25   multiple times a day do vital signs and at the very beginning

                                                      36

1   of the process say to her, you know -- let's say she's 22 weeks

2   is we have a couple different options here and one of them is

3   to go ahead and deliver you.  And -- well, there are 22 weekers

4   that have survived.  So let me say 20 weeks.  And say to her

5   that we can wait.  We can do expectant management and if we do

6   that we're going to have to monitor you very closely and if

7   there's a sign that you have what's called chorioamnionitis I'm

8   going to recommend induction.

9       Q.  And you said -- please repeat that term,

10  chorioamnionitis?

11      A.  Chorioamnionitis.  So it's an infection of the

12  amniotic fluid.

13      Q.  Would you recommend -- would you ever recommend to a

14  patient waiting until sepsis develops to have an induction?

15      A.  Heck, no.

16      Q.  Between when you finished residency in 2010, did you

17  work as an ob-gyn anywhere other than Greenville and then its

18  associated work at East Carolina University?

19      A.  No.

20      Q.  After you stopped working at Greenville, where did you

21  work next?

22      A.  So I worked at Barton College, which was Atlantic

23  Christian when I was there, and I have been there since 2010 --

24  well, I was an adjunct, but full time starting in 2011, until

25  this summer and I'm no longer there.

37

1        Q.   Could you generally describe your role at Barton,

2    please?

3        A.   Sure.  I was initially hired as an associate professor

4    of Allied Health and Sports Studies, although I think our

5    department had a different name back then.  But I was an

6    associate professor.  So my Ph.D. is in kinesiology, which is

7    exercise science.  And so I taught classes ranging from anatomy

8    and physiology to exercise physiology, exercise psychology.

9    After I believe my first year I was asked to run the honors

10   program.  So I taught in the honors program and had an

11   administrative role there and continued to teach, but as time

12   went on I taught less and had more administrative

13   responsibilities, including dean of graduate and professional

14   studies.  And then the last few years I have been the director

15   of a partnership with Area L AHEC, at Barton College.

16       Q.   I'm sorry, what is that term, Area L AHEC?

17       A.   AHEC.  So AHEC is a system within -- actually, it's a

18   national organization, but each state -- I believe most of the

19   states have AHECs.  And they work on workforce development,

20   retention and diversity.  And so we ran a program on campus

21   with college students trying to increase health careers

22   awareness, but also diversity within the healthcare system.

23       Q.   And did your work at Barton also involve practicing as

24   a women's health physician at Lee Student Health Center?

25       A.   Yes, it did.  I was in there a few half days a week

38

1    when I first started.  I think it was the first couple years.

2    But then as my administrative duties increased I wasn't able to

3    do direct patient care in there and I served more on a

4    consultative role.

5        Q.  Did you prescribe contraception to your patients at

6    Lee Student Health Center?

7        A.  Yes.

8        Q.  Did you ever talk to any of them -- I'm sorry.  Were

9    any students you treated at Lee Student Health Center pregnant?

10       A.  Yes.

11       Q.  Would your treatment of students ever involve talking

12   to them about abortion?

13       A.  Yes.

14       Q.  Describe those conversations about abortion, please.

15       A.  Yeah.  So I basically want women to be empowered with

16   information before they make a decision of such massive

17   consequence.  And so it would really be helping them understand

18   their legal choices in the State of North Carolina.  Some of

19   our students are from out of state.  And so helping them

20   understand they had the option to give birth, to give birth and

21   parent, to give birth and place the child for adoption, or to

22   give permission to a healthcare practitioner to do an abortion.

23   We have a lot of student athletes at our campus.  Probably

24   close to 70 percent of our students are athletes, so there was

25   always conversation typically about how it would impact their

39

1    play and scholarships and things like that.  So I really just

2    wanted them to be really well informed before they made a

3    decision.

4        Q.  Did any of the students who you spoke with about their

5    decision ever express to you a desire to have an abortion?

6        A.  Yes.

7        Q.  And would you support them in that decision?

8        A.  You would have to define support them.

9        Q.  Sure.  Would you ever affirm their decision to have an

10   abortion?

11               MR. BOYLE:  Objection.  Object to form.  You

12   can answer.

13               THE WITNESS:  So what I would talk to them

14   about are -- well, risks -- I would not refer them for an

15   abortion because for me the direct and intentional killing of

16   another human being is not part of healthcare and so I didn't

17   want to contribute to harming one of my patients because I have

18   -- when she's in front of me, I have two patients in front of

19   me.  So I wouldn't refer them.  What I would do is help them

20   understand the risks, benefits and alternatives.

21   BY MS. SALVADOR:

22       Q.  And -- I'm sorry, I didn't mean to interrupt you.

23       A.  It's okay.

24       Q.  So you said risks, benefits and alternatives.  What

25   would the benefits be?

                                                              40

1        A.  Of which choice?

2        Q.  Of an abortion.

3        A.  Oh, risk, benefit.  Basically that nobody would have

4    to know they're pregnant typically and that they would likely

5    be able to compete in their sport.

6        Q.  Why did you leave Barton?

7        A.  I left Barton -- probably should have left two years

8    ago because I really felt like God was calling me to work more

9    with women with unplanned pregnancy.  I have been a volunteer

10   for years at Pregnancy Centers and often times when you're a

11   volunteer medical director you are reading all the ultrasounds.

12   But we had -- we needed -- we didn't have a nurse and we had

13   trouble finding one a few years back and I said well, I can do

14   ultrasound.  I will go in there and do it.  And I just love

15   working with these women.  Every woman now has an unplanned

16   pregnancy and I just have a heart for women.  And I want them

17   to be able to -- I want to be able to address the barriers for

18   why women feel like the best choice in front of them is ending

19   the life of their own child.  I think that it's sad that we

20   have the best of our legal and medical minds in our country and

21   that's the best we can offer for women for equality is to end

22   the life of their children and I just think that's wrong.  So I

23   wanted to work full time caring for women in these situations

24   and there wasn't time to do my job at Barton and that.

25       Q.  Understood.  Thank you.  So before we get to your

41

1   Pregnancy Center work I want to talk a little bit about your

2   professional associations.

3        A.  Okay.

4        Q.  Are you currently a member of the American College of

5   Obstetricians and Gynecologists?

6        A.  I am currently not.

7        Q.  Okay.  And we'll call that ACOG, is that okay?

8        A.  Yes.

9        Q.  Were you ever a member of ACOG?

10       A.  Yeah, for a long time.

11       Q.  And do you remember what years?

12       A.  I believe when I first started private practice, 2001.

13  I might have been a member during residency, but I'm not a

14  hundred percent sure of that.  Because if so, I think they

15  would have paid for a membership.  And so I started in 2001 and

16  I stopped my membership a year or two ago.

17       Q.  Got it.  I think your C.V. says 1997 and 2021.  Does

18  that sound right?

19       A.  It does.

20       Q.  So why are you no longer a member of ACOG?

21       A.  So I have got -- I think ACOG does great work, but I

22  really philosophically disagree in the abortion area with

23  induced abortion.  And I feel like it was an organization that

24  did not represent so many of us who really feel like the direct

25  and intentional killing of our fetal patient, there's no

                                                          42

1  purpose in medicine for that.  And I -- ACOG has I think it's

2  eight percent of our dues that go towards advocacy work.  I

3  will say they do some great advocacy work, but I couldn't --

4  they wouldn't allow us to not contribute that part.  And so I

5  just in good faith, I didn't want to know that some of my dues

6  were going to advocate for induced abortion.

7      Q.  Did anyone suggest to you that you end your ACOG

8  membership?

9      A.  No.

10     Q.  ACOG members aren't required to hold any particular

11 view of abortion as a precondition of membership, are they?

12     A.  No.

13     Q.  And ACOG'S membership includes individuals who are

14 opposed to abortion, is that right?

15          MR. BOYLE:  Objection.

16          THE WITNESS:  I know lots of colleagues that

17 are members of ACOG that are pro-life and pro-choice, so I --

18 there are members of both in ACOG.

19 BY MS. SALVADOR:

20     Q.  And you cite ACOG bulletins on early pregnancy loss

21 and tubal ectopic pregnancy in your declaration, is that right?

22     A.  Do.

23     Q.  And you also cite an ACOG committee opinion on methods

24 of estimating pregnancy due date, is that right?

25     A.  Yes.

43

1      Q.  So you believe that ACOG is a reliable source of

2   information?

3      A.  So, as I said when you asked me the question about why

4   I left, ACOG does a lot of great work.  I just disagree that

5   they -- their position on abortion access, their abortion

6   policy.  And so there's a part of ACOG that I don't agree with

7   and for a while I considered leaving and it was just in the

8   last few years I felt like -- particularly when they wouldn't

9   allow me to not contribute to their advocacy work.

10           MR. BOYLE:  I just ask -- we have been going

11   for about an hour.  When you get a chance, can we take a break,

12   please?

13           MS. SALVADOR:  Sure.  We have just got one or

14   two more questions on ACOG and then we can break after that, if

15   that works.

16   BY MS. SALVADOR:

17      Q.  So would you find ACOG bulletins on abortion to be

18   reliable?

19      A.  Well, I disagree with them and so it is -- a lot of it

20   is ACOG'S opinion, without even caring that so many of us, the

21   majority of -- based on studies that have been cited, you know,

22   don't do induced abortions.  So they advocate for laws that I

23   don't agree with.  And so --

24      Q.  But is it your position that the medical information

25   in ACOG'S bulletins on abortion is unreliable?

                                                            44

1      A.  I don't think I can answer that without looking at

2  them.  Like what medical information you're asking me to answer

3  about.

4      Q.  Okay.  Understood.

5              MS. SALVADOR:  We can take a break now.  Would

6  10 minutes work?

7              THE WITNESS:  Sure.

8              MS. SALVADOR:  Okay.  Why don't we go off the

9  record.

10             VIDEOTAPE TECHNICIAN:  Thank you.  We are now

11  going off the video record.  The time is 3:07 p.m.

12             (A break was taken.)

13             VIDEOTAPE TECHNICIAN:  We are now back on the

14  video record.  The time is 3:17 p.m.

15  BY MS. SALVADOR:

16     Q.  Thank you, Dr. Bane.  So before we go back to your

17  professional associations, I wanted to ask you whether John

18  Thorpe reviewed a draft of your declaration?

19     A.  No, he did not.

20     Q.  Okay.  Thank you.  So going back to your professional

21  associations, you're a member of the American Association of

22  Pro-Life Obstetricians and Gynecologists, is that correct?

23     A.  Yes.

24     Q.  And I'll refer to that as AAPLOG, if that's all right?

25     A.  Yes.

45

1        Q.  How long have you been a member of AAPLOG?

2        A.  I think two years maybe.

3        Q.  You currently serve on their board, is that right?

4        A.  I do.

5        Q.  Do you have a title other than board member?

6        A.  I just got a title.  I am the team leader for

7   education advocacy.  The CEO, Donna Harrison, stepped down as

8   the CEO and Dr. Christina Francis became the CEO.  So I took

9   her place.

10       Q.  So you took her place as CEO?

11       A.  No.  No.  No.  Sorry.  As the team leader on the board

12  for education and advocacy.

13       Q.  Understood.  So what does your role as team leader for

14  education and advocacy entail?

15       A.  Well, it's brand new so my understanding -- I haven't

16  really had a board meeting in which I have lead it yet, but

17  it's really going to be related to both patient and

18  practitioner educational material that looks at the medical

19  evidence and advocacy work in terms of really equipping

20  practitioners who have a pro-life perspective to be able to

21  communicate their -- why they have that perspective.

22       Q.  Would it be fair to say that communicating their

23  perspective is advocacy?

24       A.  Yes.

25       Q.  Do you consider yourself a pro-life advocate?

                                                          46

1       A.  I stand up for pro-life values.  I stand up for both

2   my maternal and my fetal patients.  So that would be my

3   definition of being an advocate for them.  I also stand up for

4   medical students and residents and healthcare practitioners of

5   all types who acknowledge and want to have health and wholeness

6   for both their maternal and fetal patients.

7       Q.  So you said you were new to this -- I'm sorry, I

8   forget exactly what it's called, but the education and

9   advocacy --

10      A.  Team leader.

11      Q.  -- team leader role.  But you have been on the board

12  of AAPLOG for sometime, is that correct?

13      A.  For a year.

14      Q.  What do your duties entail as a board member?

15      A.  So -- what do my duties entail?  So in terms of

16  oversight -- things that I have had to do.  So I have attended

17  one face-to-face meeting and two virtual meetings.  So

18  basically going over the strategic plan, which was already made

19  when I was there, but reviewing that.  Updating the strategic

20  plan.  So more a visionary picture for the organization.

21  Fiscal responsibility.  We are a nonprofit and we do not have a

22  lobbying arm to what we do in terms of -- I think it's called a

23  C4 maybe.  I don't know that for sure.  So making sure that we

24  are educating, but not lobbying.  So, so far I would say big

25  decisions that are strategic are what our role is in our

47

1   governance.

2      Q.  What's your understanding of AAPLOG's position on

3   abortion?

4      A.  You said AAPLOG, right?

5      Q.  Yes.

6      A.  That induced abortion as defined earlier, that it --

7   it is not healthcare and it is not -- the direct intentional

8   killing of one of our patients we should never do.

9      Q.  Have you attended any expert witness trainings

10  conducted by AAPLOG?

11     A.  Yes, I did attend one.

12     Q.  Could you generally describe what that training

13  entailed?

14     A.  Yes.  A communications -- it was one day -- I think it

15  was one day.  It might have been -- no, it was one day.  A

16  communications expert spent the morning just kind of talking to

17  us regarding interviews with reporters and kind of what that

18  world is like.  And then the other half of the day was more

19  about being an expert witness as I'm being now.

20     Q.  And what training or do you remember what the training

21  covered on being an expert witness like you're doing right now?

22     A.  So they had some lawyers that came and just kind of

23  talked about depositions and we did a -- each of us did an

24  individual short mock deposition.  We ran out of time, to be

25  honest, so I didn't really do much with that part.

48

1          Q.  Well, now you're getting the real thing.

2          A.  Amen.

3          Q.  And you were a committee member of the Preborn to End

4     of Life Advisory Committee for the Diocese of Raleigh from 2013

5     to 2020, is that correct?

6          A.  I was a member and we had one meeting during that

7     time.

8          Q.  Got it.  So it sounds like not much.  But what did

9     your duties as a committee member entail?

10         A.  Basically if the diocese needed direction on life

11    issues, then they would come to us.

12         Q.  Did you do any work relating to abortion as part of

13    that committee?

14         A.  Well, the one meeting we had, which was my first and

15    only time going to Raleigh for it, I honestly can't remember

16    the content.  I do know the woman who is in charge of their

17    Right to Life program was there, but I don't recall that it was

18    specific to abortion.

19         Q.  Got it.  Thank you.  Have you ever had a complaint

20    made against you by a patient?

21         A.  Yes.

22         Q.  Could you describe that, please?

23         A.  I had a patient that she was in our practice.  She had

24    twins.  I had not met her until I was on call and she came in

25    and -- when I took over call she was in labor and her twins

                                                              49

were vertex.  Vertex.  So you can do a vaginal delivery.  And

the first baby was delivered and he did fine, but as soon as he

was delivered the second baby had a big deceleration, which I

was worried about.  But then that baby recovered.  And I had --

so I had taken off the fetal heart rate monitors because I was

using ultrasound to make sure the second baby didn't change

positions.  And so I manually palpated her abdomen.  I was

looking at the heart rate monitor and everything and that baby

was born and he was very flaccid and had to be resuscitated

and he died four days later.  And looking back at it I did not

recognize that that baby was having a hard time.  I thought it

was what are called early decelerations.  But looking closely

at it they were called late decelerations.  And so I should

have done an emergency c-section.

Q.  And what was the resolution of that complaint?

A.  Am I allowed to share -- I thought that was -- I mean,

I'm happy to say we settled, but I don't know if I'm allowed to

share more than that.  The hospital settled and then my

practice settled.

Q.  Got it.  And have you ever had a complaint made

against you by a student?

A.  By a student?  Well, they do evaluations at the end of

the year and not all of them are, you know -- you know, some

students don't like me, but not from the context of what you're

talking about medically.  So I'll have to say no, other than

50

1    what I have already said.

2         Q.  Understood.  Thank you.

3         A.  Yeah.

4         Q.  Have you ever had a complaint made against you, an

5    official complaint made against you by a colleague?

6         A.  So I would say -- so an official complaint like with

7    human resources?

8         Q.  Sure.

9         A.  No.

10        Q.  Have you ever had a -- what sort of, if any,

11   unofficial complaints have you had made against you by

12   colleagues?

13        A.  I had a time this year at the college where I -- when

14   the Dobbs decision happened last June I wanted to do a talk on

15   campus so that the students could understand the new decision,

16   how it impacted them, because we have -- as I said before, 60

17   to 70 percent of our students are athletes.  I wanted to make

18   sure they understood the NCAA policy as it relates to unplanned

19   pregnancy.  And eight of my colleagues at Barton campus wrote

20   the administration and did not want me to present.

21        Q.  Why did they not want you to present?

22        A.  Sorry.  I can answer.  In their letter that they wrote

23   they said it's because they felt like we -- they needed -- I

24   would bring my pro-life perspective and not -- it needed to be

25   balanced with someone who is pro-choice.

51

1    Q.  Did you end up giving that talk?

2    A.  I did give the talk.  Instead of in October, I gave it

3  in April.

4    Q.  Did you end up -- did you end up giving your pro-life

5  perspective to that talk?

6    A.  No.  As a matter of fact, my daughter was in

7  attendance and she said if I didn't know you I wouldn't have

8  known whether you were pro-life or pro-choice.

9    Q.  Have you ever had a malpractice claim filed against

10  you?

11    A.  The one that I told you about earlier I have.  When I

12  was a chief resident, there was a claim that was filed and I

13  was included on it.  But right before the jury was being

14  selected the case was dropped.  And I believe that's the only

15  one.

16    Q.  And what was that dropped case regarding?

17    A.  A baby that had cerebral palsy.  You know, I don't

18  know if it was cerebral palsy.  But had some chronic medical

19  illnesses and they -- I think they felt like we didn't do the

20  c-section maybe fast enough, but it turned out that they

21  dropped the case.

22    Q.  Have you ever been disciplined by a licensing board?

23    A.  No.

24    Q.  Have you ever been subject to disciplinary proceedings

25  by an employer?

52

1     A.  No.

2     Q.  Got it.  Thank you.  So we're going to switch gears a

3  little bit.

4     A.  Okay.

5     Q.  Do you believe that national data underestimates

6  complications from abortions?

7     A.  Yes.

8     Q.  Are you aware that the CDC has obtained data on

9  abortion mortality from all 50 states?

10    A.  I'm aware that there is voluntary reporting from the

11 states.

12    Q.  Other than voluntary reporting from the states, do you

13 know what sources the CDC relies on to identify

14 abortion-related deaths?

15    A.  I don't know a complete list.  I could go to the CDC

16 and look it up, but not off the top of my head.

17    Q.  Are you aware that they rely on state vital records?

18    A.  I am aware that they rely on state vital records and

19 that those vital records are also voluntary.

20    Q.  Are you aware that the CDC relies on individual case

21 reports by public health agencies?

22    A.  Yes, I'm aware that public health agencies do report

23 information.

24    Q.  Are you aware that the CDC relies on data from state

25 maternal mortality review committees?

53

1        A.  I'm aware that some states have those committees.  I

2    don't believe all states have those committees.

3        Q.  Are you aware though that for where those committees

4    exist, that the CDC relies on their data?

5        A.  Yes.

6        Q.  Are you aware that the CDC relies on reports by

7    private citizens?

8        A.  I'm not aware of the complete list, no.

9        Q.  Are you aware that the CDC relies on media reports to

10   identify abortion-related deaths?

11       A.  Did you say media?

12       Q.  Yes.

13       A.  No, I'm not aware of that.

14       Q.  Are you aware that for each death that is possibly

15   related to abortion the CDC requests clinical records and

16   autopsy reports?

17       A.  I'm not aware of all the sources in which the CDC

18   uses.  What I will say is I'm aware that none of it is

19   mandatory.  And -- sorry.

20       Q.  Sorry.  Go ahead.

21       A.  And that there is -- there are a lot of holes in terms

22   of the fact that we don't have to have -- we don't have

23   mandatory abortion reporting data.

24       Q.  So you were not aware that the CDC requests clinical

25   records and autopsy reports for deaths possibly related to

54

1    abortion, correct?

2              MR. BOYLE:  Objection.  You can answer.

3              THE WITNESS:  Once again, I may have read it,

4    but I don't have that list in my head of everything.  So I

5    can't truthfully say to you all the places I'm aware that they

6    get their data.

7    BY MS. SALVADOR:

8        Q.  And are you aware that where the CDC reviews autopsy

9    reports two epidemiologists review these reports to determine

10   the cause of death and whether it was abortion related?

11       A.  I'll repeat that I'm not aware of all the sources off

12   the top of my head that the CDC uses.

13       Q.  Is it your understanding that carrying a pregnancy to

14   term carries more medical risk for the patient -- for the

15   pregnant patient than having an abortion?

16       A.  Could you say that one more time?  You switched on me

17   and --

18       Q.  Sure.  Is it your understanding that carrying a

19   pregnancy to term carries more medical risk for the pregnant

20   patient than having an abortion?

21       A.  I disagree with that.

22       Q.  So you disagree that carrying a pregnancy to term has

23   more risk for the pregnant patient than having an abortion?

24       A.  Yes.  Because we have inaccurate data and so you --

25   that leads to inaccurate conclusions.  The only -- when we

1  compare those two, it's very difficult when you have a data

2  collection system that basically live birth is the only thing

3  we know for sure because everybody has a birth certificate.

4  And when you look at maternal mortality it is, you know, number

5  of deaths per hundred thousand live births.  And pregnancies

6  don't just end in live births.  You know, as a matter of fact

7  in our country about 65 percent of pregnancies end in live

8  birth.  About 35 percent don't.  And if you look at black

9  women, almost half of their pregnancies don't.  So you have a

10  statistic in which the denominator -- we have 35 to 50 percent

11  that we're not even accounting for the fact that those

12  pregnancies can end in abortion, induced abortion, or natural

13  losses or ectopics or hydatiform moles.  So yeah, there are

14  great limitations in how we collect our data.

15      Q.  Do you accept that abortion is safer than child birth

16  for most abortion patients?

17      A.  I cannot make that conclusion given the data we have.

18      Q.  Are there circumstances in which you would say that

19  abortion is riskier than a pregnancy and child birth?

20      A.  Could you repeat that for me, Anjali?

21      Q.  Sure.

22          MS. SALVADOR:  Could I actually ask the court

23  reporter to read that back so the words are exactly the

24  same.                    -  -  -

25          (The requested portion was read back by the

56

1    reporter.)

2                        -  -  -

3                  THE WITNESS:  So that's a hypothetical

4    question.  So it's difficult to know because circumstances

5    often change.  We know that abortion -- you know, the greatest

6    predictors of complications and death from abortion -- induced

7    abortion is gestational age.  So it's very difficult to make a

8    comparison of a pregnancy to an abortion.

9    BY MS. SALVADOR:

10       Q.  Is it true that some people who get abortions would

11   have experienced pregnancy complications if they had stayed

12   pregnant?

13       A.  Yes.

14       Q.  The likelihood of pregnancy-related death is higher

15   for women with certain preexisting conditions, isn't that

16   right?

17       A.  The likelihood of pregnancy-related deaths is higher

18   for some women with preexisting conditions?

19       Q.  Yes.  Is that right?

20       A.  That is correct.

21       Q.  What sorts of conditions would increase the risk of

22   death during pregnancy?

23       A.  So certain types of cardiac issues.  Women who have

24   kidney failure are, you know, some of the worst mortality

25   risks.  You know, uncontrolled diabetes.  When a woman has it

                                                          57

1    uncontrolled during pregnancy, uncontrolled hypertension.  So

2    various chronic diseases do make the pregnancy more difficult,

3    which is why we have a subspecialty of maternal-fetal medicine

4    and designed to care for those women and if we do our job well,

5    we really can hopefully reduces those risks for her.

6        Q.  And at least some of women with those preexisting

7    conditions you have just named obtain abortions, is that right?

8        A.  Yes.

9        Q.  So in your declaration -- and I'll point you to --

10   it's the bottom of page 12.

11       A.  Okay.

12       Q.  Sorry, I'm going there myself.  You write it is

13   possible that the higher rate of induced abortion and later

14   abortions in black women account for a portion of the racial

15   disparity noted in pregnancy mortality, is that right?

16       A.  You said page -- is it page or paragraph?  I'm doing

17   the hard copy here.

18       Q.  Okay.  Sorry.  It's paragraph 25.  It's the end of

19   paragraph 25.  And if anyone is looking at the page numbers,

20   it's the bottom of page 12 of the PDF.

21       A.  Just give me a second.

22       Q.  Sure.

23               (Pause.)

24       A.  Okay.  I'm there.

25       Q.  Okay.  So the declaration says it is possible that the

58

higher rate of induced abortion and later abortions in black

women account for a portion of the racial disparity noted in

pregnancy mortality and this level actually be protected for

black women.

        Did I read that sentence correctly?

    A.  Yes.

    Q.  But you don't cite any sources for that statement, is

that right?

    A.  No.  It's based on the full paragraph in terms of the

sentences before in that we know that black women have more

abortions, induced abortions than white women.  We also know

their mortality rate is higher.

    Q.  When you say the mortality rate, you mean that we know

that their maternal mortality is higher, is that right?

    A.  Yes.  Well, the data suggests that, yeah, it is higher

and that they have more second trimester abortions, later

abortions, which we know have greater risk for complication and

death.  So the answer for woman -- black women to addressing

maternal mortality is not more abortion.  That's what I'm

saying in this.  It's really that we have to get to the root

causes of why black women die and they're multifactorial,

including chronic diseases, which we have talked about, but

also health disparities that happen in their treatment of care.

They're not often heard the same.  And it also is access to

early prenatal care, transportation issues, education about

                                                    59

1    warning signs.  So my point in this paragraph is that the

2    answer to help women who are black or white and have chronic

3    disease is not to destroy their children.  It's get to the root

4    cause of why they're dying.

5       Q.  But you're not aware of a source that draws a causal

6    link between abortion-related mortality and the relatively high

7    black maternal mortality rate, are you?

8       A.  Not off the top of my head, no.

9       Q.  So in your declaration -- and this is also in

10   paragraph 25.

11      A.  Okay.

12      Q.  You state that the risk of death from induced abortion

13   increases as gestation progresses, is that right?

14      A.  Yes.

15      Q.  And you cite a study by Bartlett, et al. for the idea

16   that women whose abortions were performed in the second

17   trimester were significantly more likely to die of

18   abortion-related causes, is that right?

19      A.  Yes, I do cite that study.

20      Q.  Do you recall that that study found that for the time

21   period it was discussing the overall death rate for women

22   obtaining legally-induced abortion was 0.7 per 100,000 legal

23   induced abortions?

24      A.  I would need to look at the study.  I don't recall

25   those exact numbers.

60

1        Q.   Sure.  One second.

2        A.   Can I -- I have a copy of it.  Is it --

3        Q.   Sure.  You can use your copy.

4             MS. SALVADOR:  And then I am dropping the

5   digital copy into the chat right now.  So could we please have

6   that marked as an exhibit.

7                           -  -  -

8             (Document marked as Exhibit-Q for

9   identification.)

10                          -  -  -

11  BY MS. SALVADOR:

12       Q.   Dr. Bane, I'm going to ask you to pull up the digital

13  copy too and just confirm that it's the same as what you're

14  looking at.

15       A.   Okay.  Sorry, it's making me save it again.

16       Q.   That's fine.

17             (Pause.)

18       A.   Okay.  It's the same.

19       Q.   Okay.  Great.  And so this document is the Bartlett

20  study that we were discussing, is that correct?

21       A.   That's correct.

22       Q.   So I'm going to point you to the first page, left hand

23  column where it says results.

24       A.   Okay.

25       Q.   The first sentence there is during 1988 to 1997 the

Case 1:23-cv-00480-CCE-LPA   Document 74-4   Filed 09/12/23   Page 62 of 188

1    overall death rate for women obtaining legally induced

2    abortions was 0.7 per 100,000 legally-induced abortions.

3        Did I read that correctly?

4    A.  You did.

5    Q.  So do you recall that CDC data states that in 2021 the

6    maternal mortality rate was 32.9 deaths per 100,000 live

7    births?

8    A.  No, I don't recall the exact number.

9    Q.  One second, please.

10        MS. SALVADOR:  So I'm dropping a document into

11   the chat entitled 2021 Maternal Mortality Rates as the file

12   name.  Could we please have that marked as an exhibit and, Dr.

13   Bane, could you please open it?

14        THE WITNESS:  Sure.

15                    -   -   -

16        (Document marked as Exhibit-R for

17   identification.)

18                    -   -   -

19   BY MS. SALVADOR:

20   Q.  Just tell me when you have it open.

21   A.  Just a sec.  Let me try again.

22   Q.  Sure.

23   A.  Okay.

24   Q.  If that doesn't work for you I can try to screen share

25   it.

1    A.  No.  I actually got it and I actually think I have

2    that same document.

3    Q.  Okay.  I just have a couple of questions about it, so

4    if you have to find it, it might be easier to use the digital

5    copy.

6    A.  Okay.  That will be fine.

7    Q.  So is this document we're looking at the CDC data for

8    maternal mortality rates in the United States for 2021?

9    A.  Yes.

10   Q.  So if you go to the second full paragraph on the first

11   page.

12   A.  Okay.

13   Q.  Do you see that it says that the maternal mortality

14   rate for 2021 was 32.9 deaths per 100,000 live births?

15   A.  I do see that.

16   Q.  And then do you see that at the very beginning of the

17   next paragraph it says in 2021 the maternal mortality rate for

18   non-Hispanic, black, in parentheses, subsequently black women

19   was 69.9 deaths per 100,000 live births?

20   A.  Yes.

21   Q.  And in your declaration you also discuss a North

22   Carolina Maternal Mortality Review report from 2021, is that

23   correct?

24   A.  Yes.

25   Q.  Do you recall that the report states that in 2016 the

63

1    maternal mortality rate was 20.7 deaths per 100,000 live

2    births?

3        A.  I don't recall that number, but I have easy access to

4    that document if you would like me to get it out.

5        Q.  Sure.

6            MS. SALVADOR:  I'm going to drop that into the

7    chat as well.  So if we could please have it marked as an

8    exhibit.

9                     -  -  -

10           (Document marked as Exhibit-S for

11   identification.)

12                    -  -  -

13           THE WITNESS:  I have it.

14   BY MS. SALVADOR:

15       Q.  And then, Dr. Bane, could you just please verify that

16   the digital copy is the same as what you're looking at?

17       A.  Okay.  Let me look.  Yes, it's the same.

18       Q.  Okay.  Thank you.  Could you go to page 12 of that

19   report, please.

20       A.  Sure.

21       Q.  So do you see on page 12 there is a paragraph that

22   starts with pregnancy-related death ratios from 2007 to 2016.

23   And the end of it says that the pregnancy-related death ratio

24   is 20.7 deaths in 2016, is that right?

25       A.  Yes.

64

1    Q.  Are you familiar with the CDC's abortion surveillance

2    data from 2020?

3    A.  I looked at it, but I don't have it on the tip of my

4    tongue.  I would need to see it also.

5    Q.  Got it.  Thank you.

6            MS. SALVADOR:  So I am dropping that into the

7    chat as well.  It's the file name entitled CDC Abortion

8    Surveillance.  If we could please have that marked as an

9    exhibit and then, Dr. Bane, just let me know when you have it

10   opened.

11                       -  -  -

12           (Document marked as Exhibit-T for

13   identification.)

14                       -  -  -

15           THE WITNESS:  Okay.  I have it open.

16   BY MS. SALVADOR:

17   Q.  Okay.  And do you recognize this document as CDC

18   Abortion Surveillance Data from 2020?

19   A.  I have not seen this exact document.  I have seen a

20   summary.  So I -- I --

21   Q.  Okay.  If you could go to the title page.  Do you see

22   there that it has the CDC logo at the bottom and then at the

23   top it says Centers for Disease Control and Prevention, MMWR,

24   Morbidity and Mortality Weekly Report, is that right?

25   A.  Yes.

                                                         65

1    Q.  Do you have any reason to believe that this document

2    is -- or sorry.  Do you have any reason to believe that this

3    document is not the CDC abortion surveillance data from 2020?

4    A.  No, I have no reason to believe that.

5    Q.  So if you could please go to page 27 of the document.

6    A.  All right.

7    Q.  Let me know when you're there.

8    A.  Okay.

9    Q.  Do you see that it is -- it's a table labeled table

10   15, number of deaths in case fatality rate for abortion-related

11   deaths reported to CDC by type of abortion, United States, 1973

12   to 2019?

13   A.  Yes, I see that table.

14   Q.  And then do you see that the far right column of that

15   table is CFR, or case fatality rate, per 100,000 legal

16   abortions?

17   A.  Yes.

18   Q.  And then do you see at the bottom right of the table

19   that the fatality rate of abortions, according to the table,

20   was 0.43 per 100,000 live births from 2013 to 2019?

21   A.  I see that.

22   Q.  Okay.  Thank you.  In your study and it's on -- it's

23   in paragraph -- I'm sorry, not in your study.  In your

24   declaration in paragraph 33, you state that a study of 32

25   states in Mexico found that states with less permissive

66

1    abortion legislation exhibited lower maternal mortality rates

2    overall, is that right?

3        A.  Correct.

4        Q.  But that study didn't know that restrictive abortion

5    laws cause lower mortality rates, did it?

6        A.  It was a correlation association.

7        Q.  Right.  So it didn't show causation, did it?

8        A.  No.  You can't do causation with induced abortion

9    studies.  You're not going to ever randomize people to an

10   induced abortion.  So yes, you have to do correlational

11   studies.

12       Q.  And didn't that study explicitly state that the

13   initial estimated effects for all mortality outcomes were

14   explained by differences in other independent factors known to

15   influence maternal health rather than by abortion legislation

16   itself?

17       A.  I need to look -- pull it up.  But I do not recall

18   that -- I think it -- it recognized that it is multifactorial

19   why women die.  So, you know, any time you're doing a

20   correlational study you're going to have to try to control for

21   confounding factors.  So we of course have to recognize that

22   it's multifactorial.

23       Q.  Understood.

24                MS. SALVADOR:  So I am dropping the study

25   itself into the chat.  If we could please have it marked as an

                                                              67

1    exhibit and then, Dr. Bane, please let me know if you have it

2    open.

3                        -  -  -

4                (Document marked as Exhibit-U for

5    identification.)

6                        -  -  -

7                THE WITNESS:  Yeah.  Give me just a second.

8    I'm trying to figure out in my -- did you say paragraph 33,

9    right?

10   BY MS. SALVADOR:

11       Q.  Of your declaration?

12       A.  Uh-huh.

13       Q.  Yes.  Paragraph 33.  But it goes on to the next page.

14   Okay.

15       A.  Okay.  I'm just going to get that article.

16       Q.  Yeah, I know it's hard to juggle these documents.

17       A.  I was going to say, is there going to be a question at

18   the end of all of this?

19       Q.  There absolutely will.

20       A.  I figured as much.  I'm looking through my stack for

21   that one.  I'm a hard copy gal.

22       Q.  Sure.

23       A.  Okay.  And you want me to confirm it's the same one,

24   right?

25       Q.  Yes, please.

68

1     A.  Okay.

2               (Pause.)

3     A.  Sorry, I'm having a hard time getting it to come up.

4  So let's see.  Okay.  Let me just look.  Okay.

5     Q.  So is this the same study regarding abortion

6  legislation in Mexico that we have been talking about?

7     A.  It is.

8     Q.  So could you please go to page 10 of the document and

9  I'm using the numbers that are printed on the bottom right and

10  left.

11     A.  Yes.  I'm there.

12     Q.  Okay.  So in the discussion there is a section that

13  starts with discussion and then in the column on the right

14  there's a long paragraph and it's kind of in the middle

15  paragraph.  So I'm going to read the sentence, nevertheless,

16  after an exhaustive analysis adjusting for multiple cofounders,

17  the initial estimated effects for all mortality outcomes were

18  explained by differences in other independent factors known to

19  influence maternal health rather than by abortion legislation

20  itself.

21          Did I read that correctly?

22               MR. BOYLE:  Object to form.  I think you said

23  cofounders and it's confounders.

24               MS. SALVADOR:  I'm sorry, confounders.

25               THE WITNESS:  Yes.

                                                        69

BY MS. SALVADOR:

Q.   And going a little bit further down in that paragraph, there's a sentence that says consequently, making a direct or independent causal link between a less permissive abortion law and the lower incidence of maternal death, or conversely by considering a more permissive abortion law would be a premature or even erroneous conclusion.   Is that right?

A.   Yes.

Q.   Okay.   Thank you.   And we're done with this particular study.

A.   Okay.

Q.   So going back to your declaration, paragraph 35.   You cite a -- you state that medication abortions have a four times higher rate -- I'm sorry, four times higher risk of complications as compared to procedural abortions, is that right?

A.   You're in paragraph 35 now?

Q.   Yes.

A.   Yes.

Q.   And for that statement you're citing a study by -- there's a bunch of authors, but it's by Niinimaki, et al., is that right?

A.   Yes.   And then Mantula for the next statement, yes.

Q.   Okay.   So starting with Niinimaki, didn't the medication abortion group in that study include abortions

1    performed with Misoprostol alone?

2        A.  Yes.

3        Q.  Do you know whether PPSAT provides medication

4    abortions using Misoprostol alone?

5        A.  I would need to look again at the policies and

6    procedures in order to answer that a hundred percent.

7        Q.  And didn't the study describe both medication and

8    procedural abortion as generally safe?

9        A.  I don't know what you mean by generally safe.

10       Q.  Sure.  One second.

11            MS. SALVADOR:  So I am dropping a document into

12   the chat that starts -- the file name is Niinimaki, et al.  Can

13   we please mark it as an exhibit and then, Dr. Bane, let me know

14   when you have it up, please.

15                        -  -  -

16            (Document marked as Exhibit-V for

17   identification.)

18                        -  -  -

19            THE WITNESS:  Okay.  I have it up.  I'm just

20   going to get it out of my stack over here.  Okay.  I've got it.

21   BY MS. SALVADOR:

22       Q.  And is the digital document the same as your hard copy

23   document?

24       A.  It is.

25       Q.  And is that the same Niinimaki study that we were

                                                              71

1   discussing?

2       A.  Yes.

3       Q.  So could you please go to page 798?

4       A.  Okay.

5       Q.  Do you see that in the discussion -- right under the

6   discussion heading the first sentence is in the present study

7   we found that the two methods of pregnancy termination, medical

8   and surgical, are generally safe, is that correct?

9       A.  Just a second.  I'm trying to -- I'm missing a page.

10  So is that 798 you said?

11      Q.  That's right.  And if it's easier, I can also share my

12  screen.

13      A.  No, I have got it up on my screen.  For some reason I

14  don't have page 798 printed.  So would you repeat that?

15      Q.  Sure.  Under the discussion heading, the first

16  sentence right there is in the present study, we found that the

17  two methods of pregnancy termination, medical and surgical, are

18  generally safe.

19          Did I read that sentence correctly?

20      A.  Yes.

21      Q.  And are you aware that this study characterized all

22  patient reports of heavy bleeding as hemorrhage even if they

23  were within the expected range for medication abortion?

24      A.  I'm aware that that's a limitation of the study.

25      Q.  And are you aware that in response to criticism that

72

1  other literature about medical abortion reported a dramatically

2  lower rate of complications that the authors of this study

3  conceded that many of the complications are not really such,

4  but rather concerns or adverse events that bring women back to

5  the healthcare system?

6          MR. BOYLE:  Object to form.  You can answer.

7          THE WITNESS:  So I'm aware just based on

8  reading this study myself.  I don't know about other

9  conversations that I've had.  But in reading it, I'm aware that

10  there was probably some over reporting, which is a limitation.

11  When you document in studies you always document limitations.

12  And so I'm aware of that.

13  BY MS. SALVADOR:

14     Q.  Are you aware that the study authors conceded that the

15  rate of serious real complications is rare and rather similar

16  between surgical and medical abortions?

17     A.  I have no awareness that they have conceded that and

18  this study has not been retracted.

19     Q.  Understood.

20          MS. SALVADOR:  I am dropping another document

21  into the chat.  The file name is Fjerstad-Niinimaki, letter to

22  editor.  Could we please mark it as an exhibit and then Dr.

23  Bane, let me know when you have it open, please.

24                    -  -  -

25          (Document marked as Exhibit-W for

                                                          73

1   identification.)

2                              -   -   -

3                    THE WITNESS:  I have it open.

4   BY MS. SALVADOR:

5       Q.  And you testified that you had reviewed Dr. Borass's

6   declarations in this case, is that right?

7       A.  Yes.

8       Q.  And you also said that you reviewed some, but not all,

9   of the literature she cited in her declarations, is that right?

10      A.  Correct.

11      Q.  Do you remember reviewing this particular document as

12  one of the sources she cited in her declaration?

13      A.  Not immediately, but I need to read it.  Do you want

14  me to do that?

15      Q.  Sure.  If you could just review.  It says -- the

16  relevant part is going to be that end reply column on the

17  right.

18      A.  Okay.

19      Q.  And then it will go down to the next page.

20                  (Pause.)

21      A.  Okay.  Thank you.

22      Q.  So was the reply written by Niinimaki and the other

23  coauthors of the study we're discussing?

24      A.  Yes.

25      Q.  And do you see at the bottom of page 660 on the right

74

1  that they write the main contributions that the present article

2  makes to the literature are rate of serious and then in

3  quotations, real.  Complications is rare and rather similar

4  between surgical and medical abortions?

5      A.  I do see that.

6      Q.  In your declaration you claim that there is a

7  relationship between abortions and mental health complications,

8  is that right?

9      A.  Yes.

10     Q.  And if you could go to paragraph 39 of your

11  declaration.

12     A.  Sure.  Okay.

13     Q.  So you describe a study by Mota or Mota and some

14  others as discovering that abortion was associated with an

15  increased likelihood of several mental disorders, substance

16  abuse disorders, and suicidal ideation, is that right?

17     A.  Yes.

18     Q.  Is it true that in this study mental disorders were

19  assessed by lay interviewers rather than by clinicians?

20     A.  Let me get the study.

21     Q.  Sure.  And since you're looking at it, I'm going to

22  put it in the chat and we'll mark it as an exhibit.  Just one

23  second.

24                  -  -  -

25              (Document marked as Exhibit-X for

75

1    identification.)

2                          -  -  -

3              THE WITNESS:  Let me go to the chat and get it.

4    BY MS. SALVADOR:

5        Q.  I'm sorry.  I know it's tedious.

6        A.  It's okay.  I could use a potty break soon, just so

7    y'all know.

8        Q.  Okay.  I just have a couple of questions about this

9    study and then maybe we can take another break.

10       A.  Okay.  Let me just confirm it's the same study.  Okay.

11       Q.  So the study that you're looking at the hard copy of

12   in the digital exhibit we just made, that's the same study,

13   right, that we have been talking about?

14       A.  Yes.

15       Q.  And do you see on the first page there's a box there

16   and it's got headings for clinical implications and

17   limitations?

18       A.  On the first page?

19       Q.  Yeah.

20       A.  I see that box, yes.

21       Q.  And do you see that the first bullet point under

22   limitations says mental disorders were assessed by lay

23   interviewers?

24       A.  I do see that.

25       Q.  And then could you please go to page 245 of the study?

                                                        76

1      A.   Okay.

2      Q.   There's a heading that says conclusions.  And then in

3   the middle of that paragraph it says exposure to violence is a

4   confounding factor in several of the associations between

5   mental disorders and abortions.

6           Did I read that correctly?

7      A.   I'm sorry, where -- you're on page 244 under the

8   discussion?

9      Q.   I'm sorry, 245 under the conclusion.

10     A.   Oh, okay.  Let me look on here.  Okay.

11     Q.   Should I repeat that question?

12     A.   That would be nice.  Thank you.

13     Q.   Sure.  So in that conclusion paragraph, in the middle

14  of the paragraph it says exposure to violence is a confounding

15  factor in several of the associations between mental disorders

16  and abortions.

17          Did I read that correctly?

18     A.   I'm sorry, Anjali, I don't see where that is.

19     Q.   Okay.  I'm going to just for this one --

20     A.   I see it now.  I see it now.

21     Q.   Okay.

22     A.   Yes.

23     Q.   So yes, I read that correctly?

24     A.   You did.

25     Q.   And then do you see that the next sentence says our

                                                              77

1  study does not support a unidirectional relation between

2  abortion and mental disorders?

3      A.  Yes.

4      Q.  And so this study didn't conclude that abortion caused

5  the mental disorders it discusses, did it?

6      A.  So, once again, when you do research, there are

7  limitations and -- so when -- you're looking for associations

8  and -- when it's correlational research of this type.  And so

9  you can't make the statement of cause and effect in this

10  literature.  What you can do though is note that there are lots

11  of associations.  It's similar to lung cancer.  We can't say --

12  you can't say okay, you have to smoke for the next 20 years and

13  you don't and we're going to see who gets cancer and the

14  complications.  But when you get an aggregate of data that

15  consistently show those associations, that then allows you to

16  draw inferences from that.  So yes, you're talking about the

17  Mota study, but there are hundreds of studies looking at the

18  association.  And yes, there are confounding variables, but we

19  know how to control those in research and look for the impact

20  -- you know, one of the strongest one is who I reference next,

21  Dr. Fergusson who is openly pro-choice and he's greatly

22  disturbed by the fact that his research shows me that women who

23  have had an abortion when he looks at them longitudinally have

24  similar to what this Mota study showed and, you know, his -- he

25  had trouble publishing it, unfortunately, because sometimes the

78

1    conclusions aren't what journals want.  But it would be

2    scientifically irresponsible if I didn't.  And so, you know,

3    there are just so many articles in this literature to show that

4    some women really do struggle with anxiety, depression,

5    substance use disorder and suicidal ideations.  So something

6    that one in four women experience, I would think as a

7    scientific community we would want know as much as possible for

8    the safety and health and well-being of those women.  So I

9    think categorizing correlational research as not good research

10   is a misnomer.  We would never be able to say lung cancer is

11   caused, you know, by cigarette smoking.

12       Q.  For sure.  And we'll get -- I know you wanted a break,

13   so we'll get to the Fergusson study after the break.  But just

14   on this study, would you say that it's fair that one of the

15   flaws of the particular Mota research used in this study is

16   that it cannot concretely establish causation?

17       A.  So it is a limitation in all correlational research

18   that by itself causation -- it's not a randomized trial in

19   which you have an abortion and you don't.  So you cannot by

20   itself say causation and that's not what I implied in my

21   declaration.

22       Q.  Got it.  Thank you.  And based on your experience as a

23   physician, would you say that anxiety, depression, substance

24   use and suicidal ideation are things that folks might struggle

25   with after giving birth also?

79

1      A.  Rarely.

2      Q.  All right.

3      A.  Yes.  But I don't -- most women have tremendous amount

4   of joy after giving birth.  And so to equate that women who

5   have a pregnancy loss of any kind, whether it's an abortion or

6   a miscarriage, an ectopic, those women struggle in a different

7   capacity than women who give birth.

8      Q.  Okay.  Thank you very much.  We can take a break and

9   go off the record.

10                  VIDEOTAPE TECHNICIAN:  Thank you.

11                  MS. SALVADOR:  10 minutes.

12                  VIDEOTAPE TECHNICIAN:  We are now going off the

13   video record.  The time is 4:18 p.m.

14                  (A break was taken.)

15                  VIDEOTAPE TECHNICIAN:  We are now back on the

16   video record.  The time is 4:29 p.m.

17   BY MS. SALVADOR:

18      Q.  Okay.  So Dr. Bane, we left off discussing paragraph

19   39 of your declaration and the studies you cite there.

20      A.  Okay.

21      Q.  So in your declaration you describe a study by

22   Fergusson, et al. as finding that women who had abortions had

23   30 percent increased rates of mental disorders, is that right?

24      A.  Yeah.  Let me get that one.

25      Q.  Sure.

1              (Pause.)

2      A.  I got the right one.

3      Q.  Could you define confounding in the research context,

4  please.

5      A.  Sure.  So basically we know that many relationships

6  are multifactorial.  So in research you -- if you're trying to

7  look at an association between two variables, you want to

8  control for confounding variables, other things that might be

9  associated.  So in studies what you could do is you can control

10  for those and see if a relationship still exists after

11  controlling for those.

12      Q.  Got it.  Thank you.  So didn't the study state, the

13  Fergusson study state that the small association between

14  abortion and mental health found in the study could be

15  explained by uncontrolled residual confounding?

16      A.  I would need to look at the sentence you're talking

17  about.

18      Q.  Okay.  One second.

19              MS. SALVADOR:  I am dropping the study into the

20  chat.  Can we please mark it as an exhibit.  And then, Dr.

21  Bane, if you can please confirm that we're all looking at the

22  same thing.

23              THE WITNESS:  Okay.

24                  -  -  -

25              (Document marked as Exhibit-Y for

Case 1:23-cv-00480-CCE-LPA   Document 74-4   Filed 09/12/23   Page 82 of 188

1    identification.)

2                        - - -

3             THE WITNESS:  Okay.  They're the same.

4    BY MS. SALVADOR:

5        Q.  Great.  So if you go to page 450 of the study.

6        A.  Sorry, my sheet was out of order.  My page numbers got

7    cut off when I printed it.  Yes, the page with implications on

8    it?

9        Q.  Yes, that's right.  So right before that implications

10   heading, there's a sentence that starts in particular in that

11   paragraph right before.  And it says in particular, it could be

12   suggested that the small association between abortion and

13   mental health found in this study could be explained by

14   uncontrolled residual confounding.

15            Did I read that correctly?

16       A.  You read it correctly.

17       Q.  Going back to your declaration.  And we're still in

18   paragraph 39.  You also describe a study by Coleman as finding

19   that adolescents who aborted an unwanted pregnancy were more

20   likely than adolescents who delivered to seek psychological

21   counseling and that they reported more frequent problems

22   sleeping and more frequent marijuana use, is that correct?

23       A.  Yes.

24       Q.  Are you aware that Coleman's work on abortion and

25   mental health has been heavily criticized by scientific

                                                              82

experts, including the Royal College of Psychiatrists?

A.   I am quite aware that Dr. Coleman has had one study

that was retracted.  She also had another study that was

attempted to be retracted and in her study that was attempted

to be retracted, that study was then in -- I believe it was in

the British Journal of Psychiatry, which is one of the highest

impact factor publications, that they actually -- there was a

group of people that wanted it retracted, they did an

investigation and this is a very reputable journal and they

kept it in there.  I'm aware in the Frontiers of Psychology, I

believe that's the one that retracted it, she did not even have

the opportunity to give a rebuttal, which is extremely -- it's

malpractice in research for that.  And she has had a long

career of a variety of studies that are in the literature and

are well published and well respected.  So I am quite aware

that there is that one study.

Q.   And would you say that retraction of the study is a

fairly significant thing to have happen?

A.   I am aware of retraction being a significant one.

It's kind of like what I experienced at Barton College this

year.  They didn't like -- a group of people didn't like the

fact that I was going to be sharing information that wasn't

from -- it didn't have a conclusion that they particularly

liked and they tried to retract and not allow me to talk.

Fortunately my administration eventually allowed me, supported

me to talk.  So I wish that she had had the opportunity to give

-- to do what the other journal did and found there was nothing

wrong in what she did.  There has to be scientific integrity

and sadly, she's being classified as somebody who doesn't have

that when she has a tremendous amount to offer in her work.

Q.  Generally speaking wouldn't you say that a scientific

journal would not retract a study just because some people

dislike it?

A.  When I was training in my Ph.D. I would have said

that, but I don't think that is necessarily true anymore.  I

think that a lot of the professional societies who print their

own journals, they decide which studies to have in those

journals.  And, you know, we all have bias, all of us.  And I

gave a talk on diversity, equity and inclusion at this

conference I'm at and I spoke about implicit bias and I said

the most important thing is for us to be aware that we have it.

And so in research every one of us on this call have biases and

I'm aware that I have biases.  As you said earlier, I'm a

pro-life advocate.  Okay.  That should make me be an even

better researcher because I know my biases and if I care more

about the truth than I care about being right, then I can look

at my research, my data, just like Dr. Coleman does, Dr.

Fergusson who this study I cited, it took him four journals to

get it accepted because they didn't like his conclusion.  And

he -- he basically is -- said I'm pro-choice.  I didn't like my

84

1  results either, but I want women to be safe, so we need to

2  publish my results.  He said I get my stuff -- he's so

3  internationally known he gets his research published the first

4  try.  It took him four tries to get a journal.  So I get scared

5  about where publication and the ability to publish when it goes

6  against what certain professional organizations want to see.

7      Q.  Just to be clear, just now you were talking about Dr.

8  Fergusson and not Dr. Coleman, is that right?

9      A.  I was talking about both of them.  But Dr. Fergusson,

10  I was talking about his article that I cited in my declaration

11  took him four tries to get published and he -- it was very

12  discouraging because of the fact that he is so well respect

13  had.  You know, there are certain people that when they submit

14  and you're the author in a journal there, they are happy you

15  chose their journal and he's one of those type people, yet his

16  finding weren't consistent with what some wanted to get out

17  there, which is very sad and scares me.

18      Q.  Going back to the study -- the Coleman study that we

19  were talking about, are you -- the one that you cited in your

20  declaration, to be clear.  Didn't the study also explicitly

21  state that design limitations precluded definitive assumptions

22  about causation for some of the same reasons that we talked

23  about today?

24      A.  Yes, it's -- once again, this whole body of literature

25  is -- you can't randomize people to have an abortion or not.

85

1    And so you have to either retrospectively look back at charts

2    or you can prospectively follow them.  Which both Dr.

3    Fergusson and Dr. Coleman's studies were longitudinal studies.

4    They were prospective, which gives them great strength.  But

5    once again, because mental health issues are not going to

6    necessarily -- they're going to be multifactorial, you can set

7    up your study design to control for those and still see

8    associations.

9        Q.  And going back to your declaration.  Again, we're

10   still in paragraph 39.  You also discuss a -- or, I'm sorry,

11   we're now in paragraph 40.  You also discuss a Finnish study

12   showing a higher suicide rate after abortion when compared to

13   giving birth, is that right?

14       A.  I do.

15       Q.  Are you aware of how the maternal mortality rate in

16   Finland compares to the maternal mortality rate in the United

17   States?

18       A.  I would have to -- not off the top of my head, no.  I

19   would have to look at the study.

20       Q.  Is it your opinion that abortion causes increased

21   suicidality?

22       A.  It is my opinion there's an association between

23   abortion and suicidal ideation, as well as suicide.  Once

24   again, being an increased risk.  So we know mental disorders,

25   anxiety, particularly depression, and they can be comorbid,

86

1  meaning about half the people who have depression also have an

2  element of anxiety, is a significant risk factor for suicide.

3  And so it follows that if a woman struggles after an abortion

4  with anxiety or depression, that could lead to suicidal

5  ideation and suicide.  So once again, the type of study is

6  correlational and there's an association.  But there are

7  criteria so that if you continue over and over again to get the

8  same correlational studies showing this, then that strengthens,

9  as I said with the lung cancer example, that there is a very

10  strong association.

11      Q.  And to your knowledge is increased suicidal ideation

12  ever associated with child birth for the period post-child

13  birth?

14      A.  Yes.  So postpartum depression occurs and with the

15  same rationale I just explained, a woman has postpartum

16  depression would have an increased risk of suicidal ideation as

17  well as suicide.

18      Q.  And doesn't the Finnish study that you cite in your

19  declaration also say social circumstances might be a common

20  risk factor in terms of deaths from suicide and homicide?

21      A.  I'll need to pull up the study.

22      Q.  Sure.

23          MS. SALVADOR:  So I'm dropping the study into

24  the chat like we have been doing.  If we could please mark it

25  as an exhibit and then, Dr. Bane, please confirm that we're

                                                        87

1    looking at the same document.

2                        -  -  -

3                 (Document marked as Exhibit-Z for

4    identification.)

5                        -  -  -

6                 THE WITNESS:  Okay.

7                 MR. BOYLE:  I believe this one is already --

8                 THE WITNESS:  Yeah, it's not in my stack.

9                 MR. BOYLE:  You're talking about the Niinimaki

10   study?

11                MS. SALVADOR:  No, this is Karalis.

12                MR. BOYLE:  Oh.

13                THE WITNESS:  Just a second.  Let me look.  So

14   paragraph 40.  So number 28.  Okay.  My reference 28.

15                (Pause.)

16                THE WITNESS:  I'm going to have to rely on

17   yours.  I misplaced it.  We pulled out a lot of documents.  Let

18   me go to the chat.

19   BY MS. SALVADOR:

20      Q.  We're almost to the end of the part that's heavy on

21   studies so...

22      A.  Okay.  My desk looks like a mess over there.  Okay.

23   Oh, yeah.  Okay.  So where did you want me to look?

24      Q.  So first, could you please confirm that this is the

25   same Karalis study that you cite in your declaration?

                                                              88

1     A.  It is.

2     Q.  So could you please go to page 1119.

3     A.  Okay.

4     Q.  And under the sentence right before conclusion it says

5  higher mortality rates after termination of pregnancy among

6  teenagers, and especially deaths from suicide and homicide,

7  indicate that women are very vulnerable at this stage and that

8  social circumstances might be a common risk factor.

9        Did I read that correctly?

10    A.  You read that correctly and it's consistent with all

11 the other examples we have gone through of correlational

12 studies.  A design always in studies is, you know, when you

13 present your research you're going to want to put the

14 limitations and the confounding so that you're -- the reader

15 knows you're not looking just narrowly.  And, you know, they're

16 highlighting the fact that suicides among teenagers, and

17 especially deaths from suicide and homicide, while they

18 increase, it's not going to be the only factor.  So it's

19 consistent with all the studies that are out there showing an

20 association.

21    Q.  Would you agree that it's important that studying and

22 examining mental health and abortion control for the person's

23 reason for getting an abortion?

24    A.  Sure.

25    Q.  Would you agree that someone who had an abortion of a

89

1  wanted pregnancy might have a different emotional reaction than

2  someone who had an abortion of a pregnancy they didn't want?

3      A.  We know that there are actually several factors.  I

4  didn't cite it in my declaration, but I believe -- I think it's

5  up to 14 factors that are more commonly associated with mental

6  health disorders and this doesn't just come from -- gosh, it's

7  a text that looks at abortion and psychological impact.  I

8  can't recall it right now, but I could get the reference for

9  you.  But it is very commonly known that there are certain risk

10 factors that are more associated with a risk for mental health

11 issues afterwards and adjustment, negative emotions like anger

12 and guilt.  So yes, not every woman is exactly alike when it

13 comes to her risk.

14     Q.  Would you agree that a good comparison for studies

15 examining mental health and abortion would be between people

16 who wanted an abortion and got one versus people who wanted an

17 abortion but couldn't get one?

18     A.  So you're talking about the Turnaway Study, it sounds

19 like.  I think a better one is an -- comparing women who had an

20 unwanted pregnancy or an unplanned let's -- let me correct

21 that.  An unplanned pregnancy, which is what I see all the

22 time, and comparing women who had an abortion and women who

23 chose to give birth and following them longitudinally.  That is

24 a much better comparison.

25     Q.  So it sounds like you're familiar with the Turnaway

1   Study?

2       A.  Yes.  I don't have it in front of me, but yes, I am.

3       Q.  And are you familiar with how the Turnaway Study was

4   designed?

5       A.  I'm familiar to the extent that they -- they provided

6   their sampling plan.  If you look in their very long document

7   about it they don't actually give you very specifics and so

8   that's a major limitation.  And it's actually not a great

9   research from the standpoint of one of the strengths of

10  research is that it's reproducible.  So I should be able to

11  take their methods and replicate their methods and see what I

12  find.  That's when studies are stronger.  And unfortunately

13  they don't clarify that very well.

14      Q.  And are you aware that Dr. Wubbenhorst, your fellow

15  expert in this case, has referred to the Turnaway Study as

16  extremely well designed?

17      A.  No, I'm not aware of that.

18      Q.  So you would not agree with that?

19      A.  No, I would not.

20      Q.  Got it.  And are you aware that the American

21  Psychological Association has said that research shows that

22  having an abortion is not linked to mental health problems?

23      A.  I am aware of their statement.  I disagree with it,

24  but I am aware of it.

25      Q.  So you also state in your declaration that hemorrhage

1    is a risk of abortion, right?  And this is in paragraph 35.

2        A.  Did you say hemorrhage?

3        Q.  Yes.

4        A.  Okay.  Sorry.  You switched gears.

5        Q.  I did.  I'm sorry.

6        A.  We're going to paragraph 35?

7        Q.  Yes, we are.

8        A.  Okay.  I am aware that hemorrhage is a risk of

9    abortion.

10       Q.  I'm sorry, I didn't mean to cut you off.

11       A.  Oh, no.  No.  You're fine.

12       Q.  So in your opinion what amount of blood loss

13   constitutes hemorrhage in the abortion context?

14       A.  So we'll typically when a woman is bleeding say to her

15   if you're filling two pads an hour full of blood for more than

16   two hours is typically what I will tell them, I want you to

17   call me.  I'm concerned about that level of bleeding.

18       Q.  And is there a risk of hemorrhage associated with

19   childbirth as well?

20       A.  Yes.

21       Q.  Do you know whether the risk of hemorrhage is greater

22   with carrying a pregnancy to term or abortion?

23       A.  I don't know head-to-head studies that look at that

24   particular thing.  I know the average birth is -- a vaginal

25   delivery is about 500 cc of blood.  A c-section is more.  And

92

1  so if a woman does not have hemorrhage you would expect much

2  less than that.  But if she has hemorrhage, it could be a wide

3  range of amounts.

4      Q.  So you don't know whether the risk of hemorrhage is

5  greater with childbirth versus abortion?

6      A.  I don't know of studies that have like -- I can't

7  reference a study, so that's just a big generalization.

8      Q.  Got it.  And you state in your declaration also that

9  infection is a risk of abortion, correct?

10     A.  Yes.

11     Q.  Is there a risk of infection associated with carrying

12 to term in childbirth also?

13     A.  Yes.

14     Q.  Could you describe how that infection might arise in

15 the childbirth context?

16     A.  Yeah.  So postpartum --- well, if we're talking about

17 -- and if you could clarify, Anjali, that would help me.

18 You're saying after a woman has had a baby or during her

19 pregnancy?

20     Q.  Both.  Let's do both.  So why don't you go one by one.

21     A.  Okay.  So I guess what I'll probably do just to not

22 make this too long is what I'm talking about in my declaration

23 is an infection after a pregnancy -- after an induced abortion.

24 So probably just an infection after delivery.  Because, I mean,

25 a woman can get every type of infection during pregnancy that

94

1   she can get when she's not pregnant, plus she can get, for

2   example, the chorioamnionitis that I mentioned also because she

3   has a gestational sac that she wouldn't have when she's not

4   pregnant.  But after pregnancy women can get something called

5   postpartum endometritis where they get an infection of the

6   lining of the uterus and that infection -- when you think about

7   the fact that the cervix opens to 10 centimeters to deliver a

8   baby vaginally or by c-section that while it's a sterile

9   environment, you still have the risk of infection.  You're

10  using instruments and things like that.  So she can present

11  with a fever.  It's usually after she has gone home and she

12  presents with a fever and sometimes abnormal discharge that's

13  consistent with infection.  And we treat it with antibiotics.

14      Q.  Do you know whether the risk of endometritis is

15  greater after childbirth like you have been describing or after

16  an abortion?

17      A.  No, I do not.  And -- yeah.  No.

18      Q.  So it sounds like you have treated patients with

19  endometritis, is that right?

20      A.  I have.

21      Q.  And you said you treated them with antibiotics, is

22  that right?

23      A.  Yes.

24      Q.  Did that treatment always require hospitalization of

25  the patient?

1      A.  Not always.

2      Q.  How often does that treatment require hospitalization?

3      A.  I can't give you a percentage.  I don't know the

4  answer to that.

5      Q.  Would you say more often than not you had to

6  hospitalize those patients?

7      A.  Yes.

8      Q.  Do you think that endometritis can only be treated

9  safely in a hospital?

10     A.  I think you have to look at the clinical context and

11  how sick the woman is and make a decision also how reliable she

12  is and how -- whether or not she wants to go to the hospital.

13  She's got a newborn now.  You know, so I think that you can

14  give her the option if you feel like she can be safely treated

15  as an outpatient and check in with her.  So I think you can

16  give options.

17     Q.  Okay.  So in certain circumstances you can safely

18  treat endometritis outside of the hospital setting, is that

19  right?

20     A.  Yeah.  But it usually requires I.V. antibiotics

21  typically.  So the majority are in the hospital.  I'm trying to

22  think even now -- I think -- to be honest, I have to change my

23  statement.  I'm pretty sure we did everybody in the hospital.

24  It's been over 10 years.  There may be a protocol now for

25  outpatient.  I also think I was thinking about someone with

95

1    mastitis, which is infection in the breast.  And we have

2    treated a lot of those women as an outpatient.

3        Q.  Got it.  Thank you.  So you also state in your

4    declaration -- and now we're at paragraph 37.

5        A.  All right.

6        Q.  You also state in your declaration that a single

7    induced abortion increases the risk of preterm birth, is that

8    right?

9        A.  Yes.

10       Q.  And you cite a study by Hanes, et al., is that right?

11       A.  Yes.

12       Q.  But didn't that study also say that association

13   between abortion and preterm birth may be due to chance or bias

14   or confounding variables?

15       A.  Once again, good researchers actually talk about

16   limitations and recognize that preterm birth has many factors

17   associated with it.  So what they're trying to do is -- in this

18   case it was a review of the literature and take all the

19   different studies and -- that met the criteria for their

20   metaanalysis and look at it recognizing that an association

21   does exist, yet there are other factors that come into play.

22       Q.  Right.  So they recognize that the association could

23   be due to chance, bias, or confounding variables, is that

24   right?

25       A.  They do recognize that.  But they do also say that

96

1   there is consistent evidence that there's an association and it

2   is a risk factor for preterm birth.

3       Q.  Got it.  Thank you.  And your declaration also states

4   in that same paragraph 37 that more than one abortion has been

5   shown to increase the risk for preterm birth by 93 percent, is

6   that right?

7       A.  Yes.

8       Q.  And that's the study by Shah, et al., is that right,

9   or Shah and Zao?

10      A.  Yes.

11      Q.  But didn't that study also explicitly note that it

12  doesn't establish that multiple abortions cause that increased

13  risk, correct?

14      A.  Let me get that study.  Just a second.

15      Q.  Sure.

16          MS. SALVADOR:  And I'm going to put that in the

17  chat as well and please mark that as an exhibit.  And, Dr.

18  Bane, please confirm that we're looking at the same thing.

19          THE WITNESS:  Okay.

20                     -  -  -

21          (Document marked as Exhibit-AA for

22  identification.)

23                     -  -  -

24          THE WITNESS:  Yes, I have got the study now.

25  BY MS. SALVADOR:

                                                            97

1    Q.  Okay.  And it's the same study by Shah and Zao that

2  we've been discussing?

3    A.  It is.

4    Q.  Okay.  Could we go to page 1438, please.

5    A.  I'm there.

6    Q.  Okay.  So if you go to the right column there is a

7  heading that says implications for practice.  And above that

8  heading there is a long paragraph.  And I'm going to read

9  starting from the middle of it.  So it says we must caution

10  readers that we have restricted ourselves to explore the

11  association of I-TOP -- I-TOP being previously defined as

12  induced termination of pregnancy -- and pregnancy outcomes.

13  Several biomedical, social, environmental, lifestyle-related,

14  genetic and other factors contribute to a preterm and/or LBW --

15  that's low birth weight -- births and this needs to be kept in

16  mind in interpreting our results.  We caution interpretation

17  being causal as confounding effects of socioeconomic factors,

18  which are important, were considered in very few studies only.

19  Discussion regarding downsides of I-TOP are incomplete without

20  discussing downside of unwanted pregnancies as they are also at

21  risk of adverse outcomes.

22    Did I read that correctly?

23    A.  You did.

24    Q.  So we have gone over a lot of studies.  Have any of

25  these studies that we have gone over lead you to want to modify

98

1    the opinions you state in your declarations -- in your

2    declaration, I'm sorry?

3        A.  No, they simply reinforce what I have repeatedly said

4    this afternoon, that really good research recognizes the

5    limitations of the research.  But we also know that -- like for

6    example, what you just read, if I was -- if I was a reviewer

7    for this paper, I would be looking for that paragraph right

8    there.  And the fact that it is there and the fact that they

9    acknowledge that it is there shows me that bias I was talking

10   about earlier.  They're trying to control for that.  They're

11   not in any way trying to say that this is a causal

12   relationship.  But once again, this is review of a lot of

13   studies.  And what I like about this is we know that the

14   preterm birth rate is so high in this country.  We also know

15   that it's higher in black women.  And we also know that black

16   women have more abortions.  And so wouldn't we care enough

17   about black women and their children to want to really

18   understand this relationship.  So if indeed induced abortion is

19   a contributing factor, not the only factor, but a contributing

20   factor to why they're delivering premature children that have

21   chronic diseases, because that's a risk factor of prematurity,

22   not all of them have them, wouldn't we want women to know when

23   they're making that decision about whether or not to give birth

24   or to have an abortion.  And so I -- I applaud these authors

25   for doing that and so many of what you have cited just

99

1    reinforces that these are really important studies that I

2    included and that the authors are doing good research.

3         Q.  I got it.  Thanks for your explanation.  So we're

4    going to switch gears a little bit.  We talked a little bit

5    about hemorrhage earlier.  Did you ever treat patients who were

6    hemorrhaging in your medical practice?

7         A.  Yes.

8         Q.  Under what circumstances?

9         A.  Probably the most common would be postpartum

10   hemorrhage.  So a woman delivers a baby and then her bleeding

11   doesn't slow down.  It could also be that she had a placental

12   abruption, which means the placenta comes off the edge of the

13   uterine wall and she could bleed.  She could have a placenta

14   previa where the placenta is implanted over the internal os,

15   which is the internal opening of the cervix, and she could

16   bleed.  Intraoperatively I dealt with hemorrhages in women.  I

17   particularly remember some traumas of pregnant women who were

18   in car accidents, one in a train accident.  Yeah.

19        Q.  And in the labor and delivery context, I think you

20   might have mentioned the number before, but in terms of the

21   amount of blood, what do you mean by hemorrhage?

22        A.  So, you know, in terms of labor and delivery, you

23   know, it's not normal when you're not giving birth to bleed.

24   And so, you know, the placenta accreta, the placental

25   abruptions, these women are coming in and they're soaking pads

1    or, you know, they can't control the bleeding.

2         In terms of postpartum hemorrhage after a delivery, it

3    would be -- I mentioned 5OO ccs, but -- for a vaginal delivery.

4    When you're in the middle of a postpartum hemorrhage, holy cow,

5    the bleeding is so brisk because the -- a pregnant uterus, the

6    blood vessels are -- particularly at term are very large.

7    They're engorged.  They have a lot of blood flow.  So you have

8    to act fast and you have -- in your head you have to go through

9    your differential diagnosis.  You know, do you have uterine

10   atony, meaning the uterus is not contracting down to top --

11   when the uterus contracts down, it squeezes the blood vessels

12   and helps.  You have to think of that.  You have to think is

13   there a laceration in there.  Is there some retained placenta

14   in there.  So you're differentially diagnosing while you're

15   calling for treatment options.

16       Q.  And have you ever treated patients who are

17   hemorrhaging in the miscarriage management context?

18       A.  So yes, I have.  And the -- typically there we did

19   most of our D&Cs in the operating room where we could use

20   suction aspiration and often times control that well.  But, you

21   know, if they were still bleeding heavily, we would have to

22   give them -- well, you can do uterine massage, you can give

23   medicines that help contract the uterus, things like that.

24       Q.  So you said you handled most of your D&Cs in the

25   operating room.  So where would the other -- where else would

101

1    you handle D&Cs?

2        A.  Oh, so what I meant is some that do expectant

3    management.  I never did D&Cs in the outpatient setting.

4        Q.  And would the definition of hemorrhage for a D&C be a

5    different amount than the labor and delivery amount we just

6    talked about?

7        A.  Yes, it would be less typically.

8        Q.  About how much?

9        A.  I would probably say 200 cc.

10       Q.  Do you think that hemorrhage can only ever be treated

11   safely in hospitals?

12       A.  I think that --

13                   MR. BOYLE:  Objection to form.  You can answer.

14                   THE WITNESS:  Okay.  I think hospitals are much

15   more equipped to handle hemorrhage, particularly with a

16   pregnant uterus.  And the risk of uterine atony that we can

17   have with it and lacerations, I think hospitals have the

18   resources they -- if I need to do an immediate transfusion they

19   have blood banks, they have -- if she bleeds so much that she

20   needs support from an ICU team, if she were to, God forbid,

21   code, they have code teams there.  I have anesthesiologists

22   that can intubate her and nurse anesthetists.  So I think that

23   every pregnant woman's life matters and because of that I want

24   her, should I have hemorrhaging, to be near the resources that

25   can best save her life.

BY MS. SALVADOR:

    Q.  Do you think a hemorrhage of 200 cc can be treated

safely in an outpatient setting?

                    MR. BOYLE:  Object to form.

                    THE WITNESS:  I think that if you -- so when I

said 200 cc, what I'm talking about is maybe she initially

comes in and complains and has 200 cc, but it's not like then

it's turned off.  She's continuing to bleed.  And so, you know,

I have reviewed the protocols that Planned Parenthood -- PPS --

I'm sorry, the acronym you said at the beginning -- southern

states has.  And it's obvious that they do have protocols, but

it's obvious that they recognize that they can have an awful

lot of hemorrhaging because their protocols are very, you know,

multilayered that go way beyond what you would do if there was

200 cc of loss only.

BY MS. SALVADOR:

    Q.  In your medical practice have you ever treated

patients with cervical tears or lacerations?

    A.  I have.

    Q.  Under what circumstances?

    A.  Usually childbirth is where you can have it.  I'm

trying to think if any other times that I recall cervical

lacerations.  When you're dilating the cervix using the

dilators, which are metal instruments that you sequentially

dilate the cervix when you're doing a D&C, you can have a

103

1   laceration from that.

2       Q.  Got it.  And so -- and then you said before also that

3   all of your D&Cs you would perform in a hospital setting, is

4   that right?

5       A.  Correct.

6       Q.  Is it your opinion that cervical tears can only be

7   treated safely in a hospital?

8       A.  It's my opinion that cervical tears bleed really

9   rapidly and that I would not try to be -- in a hospital setting

10  your ability to visualize, you have to picture your -- the

11  cervix is, you know, four, five centimeters inside the vaginal

12  canal.  And so if you're in an office setting, to try to

13  visualize it and control the blood is a lot more difficult than

14  it is in a hospital.  So as much as anything, yes, you have the

15  resources if you can't get the bleeding to stop in a hospital,

16  but you also have the ability in terms of -- with the amount of

17  blood loss I have seen with cervical tears to just have, you

18  know, the surgical packs that are available to help you have

19  the instrumentation that you need.

20      Q.  I'm sorry, that isn't quite what I asked.  So I asked

21  whether you think that cervical tears can only ever be treated

22  safely in hospitals?

23      A.  No.  I think that if you have a cervical tear -- and

24  I'm just trying to recall if I ever had a cervical tear when I

25  was in my office that I had to try to repair that -- I think it

1  would be harder.  But I think that if you had to repair it, you

2  would do the best you could.  But it would be more difficult

3  without having the instrumentation.

4      Q.  And you mentioned doing a D&C with four to five

5  centimeters of dilatation.  Do you always have to dilate to

6  that amount when you're doing a D&C?

7      A.  No.  I'm sorry, that's not what I said.  Maybe it

8  sounded like what I said.  I apologize.  Let me fix that.  The

9  cervix is four to five centimeters like in the vaginal canal.

10 So you have to put a speculum in and it's not like the cervix

11 is right at the opening.  It's deep in the canal.  So no, no,

12 you do not have to dilate four to five centimeters.  I was just

13 saying from a landmark perspective the cervix -- if you have a

14 cervical laceration you have to get deep into the vagina.  And

15 so visualization -- you're not just going to start throwing

16 stitches without seeing where you think your source of the

17 bleeding is and that's difficult because the cervix is so far

18 away.

19     Q.  Understood.  Thank you for clarifying.

20     A.  You're welcome.

21     Q.  Did you ever use sedation in your medical practice?

22     A.  Not that I was overseeing.  The nurse anesthetist or

23 the anesthesiologist was overseeing the sedation because that's

24 out of the scope of my practice.

25     Q.  And what types of sedation were you overseeing?  I'm

105

1    sorry, you said you were not overseeing, is that right?

2         A.  So it depends -- I guess I should clarify.  If

3    somebody was -- let's say she was coming in for something

4    called a LEEP procedure or a colposcopy procedure, which is

5    what we use to manage abnormal Pap smears, and she just said

6    I'm really anxious.  Like I would go to the radiology

7    department and do something called a hysterosalpingogram to

8    look for whether tubes were opened or closed for women who had

9    infertility.  If she said to me I'm really anxious then I would

10   give her potentially something called a benzodiazapine, which

11   is an over-the-counter medicine for anxiety.  That could be

12   categorized as like very mild sedation.  But I would give those

13   to women who potentially had an anxiety disorder.  What I think

14   I want to just make sure I clarify is that I don't think it's

15   the role of an obstetrician and gynecologist to manage deeper

16   levels of sedation that anesthesiologists, nurse anesthetists

17   are specifically trained to do.

18        Q.  And so for those patients who you would prescribe

19   benzos, was that ever in an outpatient facility?

20        A.  Yes, it would potentially be in the office, that they

21   would get -- you know, 30 minutes before their procedure that

22   they would get that medicine.

23        Q.  And were you able to administer that medicine safely

24   in an outpatient facility?

25        A.  So they -- I didn't administer it.  I would write a

                                                          106

1    prescription and they would take it before they came.  So if

2    that's your definition of administer it, then yes, I was for

3    those situations.

4        Q.  And did you ever supervise the use of I.V. sedation?

5        A.  I did not.

6        Q.  And did you ever supervise the use of kind of local

7    anesthesia?

8        A.  So I use local anesthesia.  So, for example, if you're

9    doing a procedure in the office sometimes we would put it in

10   the cervix.  If we're removing like a -- doing a vulvar biopsy.

11   So I would do local anesthesia, yes.  But not any sort of

12   systemic anesthesia.  That's what I'm referencing to.  I think

13   that's out of the scope of the practice of anyone but an

14   anesthesiologist and nurse anesthetist.

15       Q.  Understood.  And that local -- that local anesthesia

16   that you're referring to, you were able to administer that in

17   an outpatient facility?

18       A.  I was.

19       Q.  So we're going to switch gears a little bit.  What is

20   an ectopic pregnancy?

21       A.  An ectopic pregnancy is a pregnancy that is outside of

22   the uterine cavity.  It can be -- well, most commonly it's in

23   the fallopian tube, but it can occur in other places such as

24   the ovary, can even be intraabdominal, cervical.

25       Q.  And how are ectopic pregnancies detected?

107

1          A.   Ectopic pregnancies are detected by ultrasound.

2          Q.   Would you agree that an ectopic screening protocol

3     that uses ultrasound, the patient's medical history, and hCG

4     testing is an appropriate protocol?

5          A.   So you said three things.  You said ultrasound,

6     history and hCG?

7          Q.   That's right.

8          A.   So I follow the protocol from ACOG and I think it's a

9     committee opinion or a Practical Bulletin 191.  It got updated

10    to 193.  I think I used 191 in my declaration.  There's an

11    updated 193 and I follow their protocol which includes, yes,

12    doing those things to document whether an individual has an

13    ectopic pregnancy.

14         Q.   And how early can ultrasounds detect pregnancy?

15         A.   We can usually see a gestational sac about five weeks.

16    It doesn't confirm that it's not an intrauterine pregnancy just

17    to see a sac.  So we have to be cautious with that because you

18    can something called a pseudosac with an ectopic pregnancy.

19    You can also have what's called a heterotopic pregnancy, which

20    is fortunately very rare, but it's an intrauterine pregnancy

21    and an ectopic pregnancy at the same time.

22         Q.   What is a pregnancy of unknown location?

23         A.   So a pregnancy of unknown location is a transient

24    situation.  It not a diagnosis.  It is where you don't know

25    exactly if the person -- if the woman has as intrauterine

108

pregnancy or an ectopic.  So you have to have a high clinical

suspicion when you have -- any time you have a pregnant patient

you have to have a high clinical suspicion that she has an

ectopic until you prove otherwise.  But particularly if you

were expecting to see an intrauterine pregnancy based on a sure

last menstrual period for example, which we know unfortunately

only happens about 50 percent of the time.  A lot of women

don't know their last menstrual period.  But yeah, it's

particularly important that we follow those women who have

pregnancy of unknown location because we really -- for her

safety we haven't confirmed where her pregnancy is located.

Q.  So you wouldn't consider a pregnancy of unknown

location equivalent to a confirmed ectopic then, would you?

A.  No, I would not.  I would basically have a high

clinical suspicion until proven otherwise that she had an

ectopic.  If she has an intrauterine pregnancy I'm not going to

send her home and she potentially die on me.  But if she has an

ectopic pregnancy and I send her home she could rupture that

and unfortunately it's one of the leading causes of maternal

mortality in the first trimester.

Q.  So is it your medical opinion that all pregnancies

should be assumed to be ectopic until proven otherwise?

A.  It is my medical opinion than I want to document every

pregnancy to confirm an IUP and that gives me a great sense of

reassurance.  So yes, I think all pregnancies we have to

109

1    document that we have an IUP.

2        Q.  If a pregnancy has -- sorry.  If a patient has a

3    pregnancy of unknown location --

4        A.  Okay.

5        Q.  -- but doesn't have symptoms of ectopic pregnancy and

6    doesn't have risk factors for ectopic pregnancy in their

7    medical history --

8        A.  Okay.

9        Q.  -- would you consider that a suspected ectopic

10   pregnancy?

11       A.  So we know that 50 percent of our patients who have no

12   risk factors have ectopic pregnancies.  So the standard of care

13   is not screening them.  And so yes, I would still be very

14   concerned and want to make sure she has an intrauterine

15   pregnancy.

16       Q.  So you would consider that a suspected ectopic

17   pregnancy then, just to make sure I understand your answer?

18       A.  Could you give me the clinical situation again?

19       Q.  Sure.  So if a patient has a pregnancy of unknown

20   location, has no symptoms of ectopic pregnancy, no risk factors

21   for ectopic pregnancy indicated in their medical history, would

22   you consider that a suspected ectopic?

23       A.  I would consider -- I would have a certain level of

24   clinical suspicion, but often times when I document I will say

25   I have a low level of clinical suspicion or I have a higher

110

1   level of clinical suspicion, but there is suspicion there

2   because I have not proven that she has an intrauterine

3   pregnancy.

4       Q.  Got it.  Thank you.  I'm sorry, I was just trying to

5   find your declaration again because I accidently closed a tab.

6   So let's go to paragraph 61 of your declaration.

7       A.  Okay.  I'm there.

8       Q.  So in paragraph 61 of your declaration you state that

9   people who receive abortion medication without an ultrasound

10  may result and delay detection and treatment of an ectopic

11  pregnancy, is that right?

12      A.  I state the pregnant woman with an ectopic -- oh, yes.

13  Yes.

14      Q.  Sorry, I should have clarified where I was starting to

15  quote.  So the quote is women who desire an induced abortion

16  and receive abortion medications Mifepistone and Misoprostol

17  without an ultrasound may result in delayed detection and

18  treatment of an ectopic pregnancy.

19          Did I read that correctly?

20      A.  Yes.

21      Q.  Is it your understanding that PPSAT uses a patient's

22  recollection of their last menstrual period alone to date a

23  pregnancy?

24      A.  I would have to look at their documentation.

25      Q.  Okay.  So you're not sure?

111

1    A.  No.  I know that they -- based on what I reviewed,

2    that they use last menstrual period.  And I am aware that they

3    do give Mifepistone and Misoprostol without -- on the same day

4    sometimes without a documented IUP, if that's your question.

5    Q.  So is it your understanding then that PPSAT provides

6    medication abortion to patients with pregnancies of unknown

7    location without those patients having an ultrasound?

8    A.  I am aware of that and it bothers me.  It's -- I don't

9    think it's standard of care and it's inconsistent with ACOG'S

10   recommendations in Practice Bulletin 193.

11   Q.  Is it your understanding that PPSAT uses hCG levels

12   alone to diagnose ectopic pregnancy?

13   A.  They have an algorithm, but I would have to review the

14   algorithm when you say hCG along.

15   Q.  So I'll just point you to paragraph 62 of your

16   declaration.

17   A.  Okay.

18   Q.  So it says they falsely claim that hCG levels alone

19   can be used to diagnose an ectopic, is that right?

20   A.  So I'm talking about what the witnesses say with

21   protocols using Mifepistone and Misoprostol that are

22   inconsistent with practice guideline 193.  So when I say using

23   it alone, they're not using an ultrasound with it.

24   Q.  Okay.  Got it.  So in your declaration discussion of

25   the IUP -- the intrauterine pregnancy requirement, you rely

112

1   heavily on ACOG'S practice bulletin on tubal ectopic pregnancy,

2   is that right?

3       A.  Yes, I do.

4       Q.  And I believe the document you cite in your

5   declaration is Practice Bulletin 191, isn't that right?

6       A.  Yes.  They did an update and I did not include that

7   update, but I have reviewed 193, which is actually -- I think

8   they updated it two months after and I did 191.

9       Q.  From what you remember, how does the update differ

10  from the protocol you cite -- I'm sorry, from the bulletin you

11  cite in your declaration?

12      A.  I have it.  Let me look.  I have both of them.

13      Q.  I'm just going to ask you generally what you remember,

14  because we don't have that as a cited document in your

15  declaration.  So if you remember and if you don't, that's fine.

16      A.  I think there is -- I don't remember exactly.  It was

17  just on one page they clarified something, but I honestly --

18  without looking at it I can't tell you exactly what that

19  paragraph said.

20      Q.  But generally speaking do you stand by, you know, the

21  discussion of intrauterine pregnancy and ectopic pregnancy

22  that's in your declaration?

23      A.  Yes, I do.

24              MR. BOYLE:  We have been going for about an

25  hour.  If you're getting close to the end, we don't need to

113

1  break.  But if you're going to go for more than, say, 15

2  minutes I would request a break, please.

3             MS. SALVADOR:  Yeah, we can break now.  We're

4  going to talk about the bulletin, but we can do that after we

5  come back.

6             VIDEOTAPE TECHNICIAN:  We are now going off the

7  video record.  The time is 5:29 p.m.

8                    (A break was taken.)

9             VIDEOTAPE TECHNICIAN:  We are now back on the

10 video record.  The time is 5:40 p.m.

11 BY MS. SALVADOR:

12    Q.  Okay.  Dr. Bane, we were discussing ACOG's practice

13 bulletin on tubal ectopic pregnancy.  According to the bulletin

14 the minimum diagnostic evaluation of a suspected ectopic

15 pregnancy is a transvaginal ultrasound evaluation to confirm

16 the pregnancy, is that right?

17    A.  Can I just get the document?

18    Q.  Sure.

19             MS. SALVADOR:  For the folks on Zoom, I am

20 dropping the document into the chat.  Attempting to drop the

21 document into the chat.  I'm dropping the document into the

22 chat and then can we please have it marked as an exhibit and

23 then Dr. Bane can just confirm that we're looking at the same

24 thing.

25                         -  -  -

114

1              (Document marked as Exhibit-BB for

2      identification.)

3                          -   -   -

4              THE WITNESS:  Yes, we are.

5      BY MS. SALVADOR:

6          Q.  Okay.  On this document is the ACOG bulletin that we

7      have been discussing, correct?

8                  MR. BOYLE:  Object to form.

9                  THE WITNESS:  Yes.

10     BY MS. SALVADOR:

11         Q.  It's the ACOG Practice Bulletin 191 on tubal ectopic

12     pregnancy, is that right?

13         A.  Yes.

14         Q.  Okay.  So if you go to page E66.  Let me know when

15     you're there.

16         A.  I'm there.

17         Q.  So there's a heading that says Clinical Considerations

18     and Recommendations.  And then there's a subheading that says

19     how is an ectopic pregnancy diagnosed.  And then the first

20     sentence right after that is the minimum diagnostic evaluation

21     of a suspected ectopic pregnancy is a transvaginal ultrasound

22     evaluation and confirmation of pregnancy, is that correct?

23         A.  Yes.

24         Q.  Do you agree that that statement is discussing the

25     evaluation of a suspected ectopic pregnancy?

                                                            115

1      A.  So consistent with what I said before, yes, it has the

2   word suspected and because on page E65 of the same bulletin

3   under risk factors it says one half of all women who receive a

4   diagnosis of an ectopic do not have known risk factors.  As a

5   clinician who really wants my patients to be safe, every single

6   one of them is a suspected IUP until I have confirmed

7   otherwise.  I will honestly tell you that every woman that

8   walks in my door now and in the past I needed to know where her

9   pregnancy was because of the risk of death of an ectopic.

10     Q.  But the bulletin itself doesn't directly say that a

11  transvaginal ultrasound evaluation is required when an ectopic

12  pregnancy is not suspected, correct?

13     A.  So it's speaking about how do we take care of our

14  patients with -- associated with tubal ectopics.  And so, you

15  know, it starts off with the background, risk factors,

16  epidemiology, and then it gives us our clinical

17  recommendations.  And included in that very clearly is that an

18  ultrasound is central to that, as well as following hCG levels.

19  But an ultrasound is central to it.

20     Q.  But the clinical -- actually, strike that.  So in your

21  career, in your medical practice, did you perform ultrasounds?

22     A.  Yes, I did.

23     Q.  How early in pregnancy would you perform ultrasounds?

24     A.  So, you know, a lot of it depended on the clinical

25  scenario.  But if she was coming in for just confirmation of

116

gestational age, we can usually do a crown rump length about

five weeks and five days.  So five to six weeks would be the

earliest.  But, you know, so -- so that's in that clinical

scenario.  I may do -- I may do it at a different time, you

know, in a different scenario.  But the earliest I can usually

confirm a documented IUP with an embryo is going to be five to

six weeks.  We know that if you see a gestational sac that also

has a yolk sac in it, that's also -- and you can see that

before -- like earlier in the five weeks, that's also very

reassuring that you don't have an ectopic pregnancy.  You may

not have a viable pregnancy if you only see the yolk sac,

meaning you haven't confirmed fetal heart rate or seen the

embryo, yeah.

    Q.  Did it ever occur in your medical practice where a

patient had a positive pregnancy test but an ultrasound did not

detect a pregnancy?

    A.  Sure.  Meaning we did an ultrasound and we didn't see

anything?

    Q.  That's right.

    A.  Yes.  So that would be that pregnancy of unknown

location.

    Q.  So what would your next step be in treating such a

patient?

    A.  It would basically be if -- if she were coming in and

she had a positive pregnancy test and she was completely

asymptomatic and she, you know, was just there for prenatal

care, we would typically wait until she was six to seven weeks

and do an ultrasound at that point.  If she was coming in with

a complaint then we would -- depending on the complaint.  But

if it was a complaint that for example, abdominal pain or some

bleeding, you know, depending on how far along she was, we

would do an ultrasound potentially then and then do hCG levels,

so draw blood.

     Q.  And would you refer that patient to the emergency

room?

     A.  No.  I would usually manage her.  I would refer her to

the emergency room if I thought that she had -- if she was

unstable or she potentially needed to be observed in the

hospital.  If she needed to have surgery.  But that's not the

clinical scenario I gave you.  So that's why I would say no.

But, yeah, if she was unstable and/or she was -- you know, I

was worried that she had a ruptured ectopic at that moment,

most definitely I would.

     Q.  So you shifted over to talking about a patient who was

unstable, but before that you were talking about a patient who

was stable.  So for those stable patients, would you recommend

that they return to your clinic for followup?

     A.  Most definitely we would follow their hCG levels and

get what are called serial hCG levels.  We would also do a

repeat ultrasound.

1        Q.  Did it ever happen that those patients didn't show up

2   for followup at the schedule you recommended?

3        A.  I can't -- I can't picture -- think of a patient off

4   the top of my head.  I was also in a large practice where

5   sometimes they didn't follow up with the same person, but if I

6   had somebody that I was following up, I would make sure that,

7   you know, I was coordinating her care with one of my partners.

8   There's not a patient that I -- that jumps out because you

9   don't sleep.  I mean, you're taught early in your ob rotations

10  that a woman that you're concerned with a high level of

11  suspicion for an ectopic you don't go to sleep on because she

12  might go to sleep and die.  So those are the women that I'm

13  following very closely.  But I can't tell you about a patient

14  who didn't come back, off the top of my head.

15       Q.  So what happens if an ectopic pregnancy ruptures?

16       A.  So if an ectopic pregnancy ruptures a woman will --

17  and I'll say from let's say a tubal pregnancy -- she will

18  typically have pain.  We have two tubes, a left and a right.

19  So sometimes that pain is one-sided.  It can become in her

20  entire abdomen though because she will start to bleed and she

21  can actually fill her abdomen with blood and blood is very

22  irritating to the peritoneal lining.  And she can have just

23  generalized abdominal pain.  She can also -- if she's like

24  filling her abdomen with blood she can actually get blood under

25  the diaphragm that irritates the diaphragm and can even have

119

¹ referred shoulder pain.  Those are the women that have a high

² risk of dying because our abdomen has the ability to hold an

³ awful lot of blood.  Some of the women will have some bleeding

⁴ but it's usually not heavy, heavy bleeding like a miscarriage

⁵ type of bleeding.  But they can complain of spotting too.

⁶      Q.  Got it.  So you said a lot just there.  So I'm going

⁷ to ask about some details of what you just said.

⁸      A.  Okay.

⁹      Q.  So you mentioned that the pain typically starts as a

¹⁰ sharp pain on one side of the abdomen, is that right?

¹¹      A.  So, I mean, I have seen it present in lots of

¹² different ways.  But when a woman comes into me, she's got pain

¹³ on one side or the other, you know, my differential diagnosis

¹⁴ -- and I know she's pregnant, you know, it can be appendicitis,

¹⁵ it can be a ruptured ovarian cyst.  If I haven't confirmed an

¹⁶ intrauterine pregnancy it can be an ectopic pregnancy.  And it

¹⁷ usually, I would say, is one-sided, but I have seen it present

¹⁸ with just lower abdominal pain.  I'm absolutely amazed -- and

¹⁹ maybe this is judgemental on my part because I feel like I know

²⁰ my body really well -- how poorly some women and men, my

²¹ husband being one, to try to describe like is this muscle pain,

²² is this a different type of pain.  And so, you know, I am going

²³ to assume it's an ectopic if I have a pregnancy of unknown

²⁴ location until otherwise proven.

²⁵      Q.  I got it.  Thank you.  And would those -- would

120

1    patients suffering -- I'm sorry, let me rephrase that.  So

2    would that pain typically be a sharp pain or more of like a

3    cramping type of pain?

4        A.  So I have heard women describe it as both.  But I do

5    think one-sided sharp pain is a presentation I would get for

6    sure.  But I have also heard women talk about cramping pain.

7    When I hear them say sharp pain, you know, it perks my ears up

8    to an ectopic.  But my concern is that it presents not just in

9    one way, from my clinical experience.  And so I can't

10   differentiate out blood in the abdomen, it fills the abdomen

11   can feel different for different people.

12       Q.  Got it.  And would somebody suffering ectopic rupture

13   ever feel a popping sensation or anything like that?

14       A.  You know, I have actually not had a woman use that

15   terminology with me.  I have heard people with appendicitis

16   after it ruptures actually for a little bit have a sense of

17   relief, but I -- I honestly have never had anyone describe it

18   as popping.

19       Q.  And you mentioned that there is bleeding and I -- I

20   don't want to put words in your mouth.  I think you

21   characterized it as mostly internal bleeding at first, is that

22   right?

23       A.  No, not necessarily at first.  A woman can come into

24   me and have spotting, bleeding and not have a ruptured ectopic

25   at that point.  She may have a small amount of bleeding and we

121

1    can actually look on ultrasound.  That's one of the things you

2    can look for.  It talks about this in Practice Bulletin 191,

3    ultrasound finding of fluid in the cul-de-sac.  So the

4    cul-de-sac is kind of in the lower part of the pelvis behind

5    the uterus and -- so when I see blood in the cul-de-sac, which

6    is in the abdomen, so not coming out the vagina but inside the

7    woman's peritoneal cavity, that I have to pay attention to when

8    I see it.  Sometimes you can have a ruptured ovarian cyst that

9    can cause that and sometimes a little bit can be normal to see.

10   But if I have a woman who is -- I'm concerned about with

11   asymptomatic and I see that on the ultrasound, I don't see an

12   intrauterine pregnancy, even if I don't see a mass in the

13   adnexa, the adnexa would be the left and right side of the

14   lower pelvis, but I see fluid in the cul-de-sac, that would

15   concern me for some blood there.  But in terms of vaginal

16   bleeding, women can have spotting, but they can have a little

17   bit of heavier bleeding.  But it is true that I'd characterize

18   the bleeding of a miscarriage, the soaking pads I don't see as

19   much in ectopic as I see in miscarriages.

20       Q.  Got it.  Thank you.  Would it surprise you to learn

21   that PPSAT does not provide medication abortion if a patient

22   has not had an ultrasound?

23       A.  Say that one more time.

24       Q.  Sure.  Would it surprise you to learn that PPSAT

25   doesn't provide medication abortion if a patient hasn't had an

122

1   ultrasound?

2       A.  You're doing a double negative there and we're on the

3   fourth hour.

4       Q.  Sure.

5       A.  Ask me that one more time at the end.  Doesn't and

6   doesn't it you said.

7       Q.  Sure.  I'll ask it the other way.  Would it surprise

8   you to learn that all of PPSAT's medication abortion patients

9   have had ultrasounds before receiving the medication abortion?

10      A.  Would it surprise me?  I would have expected them to

11  all have had them to confirm an IUD -- IUP because it's

12  contraindicated to use Mifepistone and Misoprostol without

13  excluding an IUP.  That's straight from the prescribing

14  information from the FDA, that you have -- you have to exclude

15  it.  So I was very surprised when I received their protocols

16  and they actually do that.  And I read in Dr. Farris I think is

17  where I read it first.  I was very surprised that they do that.

18      Q.  So we're going to change gears a little bit here and

19  we're going to go to your current work.

20      A.  Oh, okay.

21      Q.  So you're a member of the National Medical Advisory

22  Board of Care Net, is that right?

23      A.  I am.  And I'm at the Care Net conference right now.

24      Q.  So what is Care Net?

25      A.  Care Net is a Christian organization that helps

                                                            123

1    support men and women who face an unplanned pregnancy with

2    resources to help them know that they can choose life.  So

3    life-affirming choices.

4        Q.  So what is Care Net's position on abortion?

5        A.  Induced abortion is never indicated.

6        Q.  What are your duties as a member of Care Net's

7    national medical and advisory board entail?

8        A.  The national medical director of the board is Dr.

9    Sandy Christiansen and she will ask our opinions regarding

10   maybe language that is clear -- this is an organization that

11   helps the thousands of Pregnancy Centers across the country

12   provide exceptional care to our clients and patients.  Many of

13   those organizations -- all the organizations started as really

14   client advocacy -- helping with those socioeconomic barriers

15   for women.  But in I think it was the '90s they began also

16   having medical clinics.  And so those of us on the medical

17   board help to guide centers who have medical clinics.

18       Q.  So you mentioned that you're at the Care Net national

19   conference right now, right?

20       A.  I am, in Mobile, Alabama.

21       Q.  I think you mentioned that you lead a couple of

22   breakout sessions, is that right?

23       A.  Yes.  Yesterday I did one on diversity, equity and

24   inclusion in Pregnancy Centers and today I did it on stress,

25   burnout, compassion, satisfaction, compassion fatigue.

124

1      Q.  And according to your C.V. you gave a keynote

2  presentation at the Care Net national conference last year, is

3  that right?

4      A.  Well, I got COVID and didn't get to come.  So -- but

5  they prerecorded it and -- what did I -- what was it on?  I

6  can't remember the exact title.  But yes, they did show my

7  prerecorded talk.

8      Q.  So your C.V. says the title was the Science of

9  Decisionmaking, Implications for Pregnancy Centers, is that

10  right?

11      A.  Yeah.  That rings a bell now.  Thank you.

12      Q.  Do you remember whether that presentation discussed

13  abortion?

14      A.  Okay.  Let me think through.  So a big part of it was

15  really looking at -- yeah.  I mean, it did.  But I would have

16  to go back to that to look at the details of it.  But yes,

17  there was -- it was -- the big picture of healthcare in general

18  and our role as -- like really healthcare practitioners, our

19  role of -- we're really journeying with these women.  We are

20  partnering with them.  They bring their own life experiences.

21  They bring their expertise and their own bodies and we bring

22  medical expertise to the table.  And it's not our job to make

23  their decision.  It's not our job to -- they're not broken.

24  It's not our job to try to fix them.  It's not our job to judge

25  them should they choose abortion.  It's really our job to

125

empower them with information and to really partner with them.

And so I brought up a lot of concepts.  I trained I think it

was '21/'22 at Duke Divinity School.  I completed a

certification in theology medicine and culture looking at the

intersection of religion and medicine and a lot of what I

shared were some of the concepts I learned there.

Q.  Got it.  Thank you.  And you're currently the medical

director of three different organizations, is that right?

A.  Three different Pregnancy Centers.

Q.  Okay.  Could you name those three Pregnancy Centers,

please.

A.  Sure.  So Choices Women's Center is in Wilson, North

Carolina.  And Albemarle Pregnancy Resource Center and Clinic

in Elizabeth City, North Carolina.  And then Waterlife

Pregnancy Center which is in the Outer Banks in North Carolina.

Q.  Got it.  Thanks.  And all three of those Pregnancy

Centers are affiliated with Care Net, is that right?

A.  They are.

Q.  So that means that they all have to sign a Care Net

affiliation agreement, is that right?

A.  They do.

MS. SALVADOR:  So I am dropping a document into

the chat and then if we could please mark it as an exhibit.

-  -  -

(Document marked as Exhibit-CC for

126

1   identification.)

2                          -  -  -

3   BY MS. SALVADOR:

4       Q.  Dr. Bane, let me know when you have this pulled up.

5       A.  Okay.

6       Q.  Are you familiar with this document?

7       A.  I am familiar.  I'm not sure if it's the exact one

8   that all three of the centers sign.  I'd have to look at it.  I

9   don't know how old this one is.

10      Q.  Sure.  But this document is a Care Net affiliation

11  agreement, is that right?

12      A.  That's its title, yes.

13      Q.  And all three of the Pregnancy Centers you work at

14  would have signed some version of this agreement, is that

15  right?

16      A.  Yes.

17      Q.  And are they required to remain in compliance with the

18  agreement they signed in order to remain affiliated with Care

19  Net?

20      A.  That would be my assumption.  I have never known --

21  been involved in a practice that, like, Care Net kicked out.

22      Q.  Got it.  So number one on the document states the

23  Pregnancy Center concurs with each and every affirmation set

24  forth in the statement of faith attached hereto and

25  incorporated herein by reference.  The Pregnancy Center will

                                                        127

1    not engage the services of any board member, director, or

2    volunteer who does not concur with each and every such

3    affirmation.

4         Did I read that correctly?

5         A.  You did.

6         Q.  And so did all three of the Pregnancy Centers where

7    you work concur with the statement of faith?

8         A.  I know the one in Wilson did.  I honestly don't know

9    about the other two in terms of -- I would assume they did

10   since they're affiliated with Care Net.  But I cannot -- I have

11   not laid my eyes on this document.

12        Q.  I understand.  But all three -- you said all three are

13   Care Net affiliates, right?

14        A.  Yes.

15        Q.  And you have no reason to believe that they did not

16   sign something like this?

17        A.  Correct.

18             MS. SALVADOR:  So I am dropping another

19   document into the chat.  The file name is Care Net Statement of

20   Faith.  Please mark it as an exhibit and then, Dr. Bane, let me

21   know when you have it open.

22                       -  -  -

23             (Document marked as Exhibit-DD for

24   identification.)

25                       -  -  -

128

1                   THE WITNESS:  Thank you.

2     BY MS. SALVADOR:

3         Q.  Okay.  Do you recognize this document?

4         A.  Let me read it.

5         Q.  Sure.

6                   (Pause.)

7         A.  I do recognize it.

8         Q.  So what is this document?

9         A.  Care Net Statement of Faith.

10        Q.  So all three of the Pregnancy Centers where you work

11    have certified that they concur with the Statement of Faith, is

12    that right?

13        A.  I can only speak specifically for Wilson because I

14    have not had a conversation about Care Net -- the executive

15    director's decision to be a Care Net-affiliated center.  I have

16    spoken directly with my center before I signed this.  I am

17    Catholic and number one, we believe the bible to be the

18    inspired and only infallible authoritative word of God in the

19    Catholic Church.  The Catholic Church also believes in oral

20    tradition of their early church fathers.  And so I think this

21    is a very strong document from an Evangelical Christian

22    perspective.  And so I shared that I thought it could be less

23    than inclusive for Catholic Christians.

24        Q.  Okay.  Got it.  So is that why you disagreed with --

25    I'm sorry.  Did you say that you disagreed with the Wilson

                                                              129

1    Center's decision to become a Care Net affiliate?

2         A.  No.  No.  No.  No.  I just said that I have some

3    concerns with how this is written as a Catholic Christian.  I

4    think Care Net is a wonderful organization.  It has -- does

5    many wonderful things.  I think it comes from a more narrow

6    perspective.  I even -- you know, before I agreed to be on the

7    board I thought long and hard about it.  I prayed about it.  I

8    talked to Dr. Christiansen who she actually had me speak to a

9    priest who -- a Catholic priest regarding it.  And so at first

10   glance I did have some reservations, but then I felt

11   comfortable afterwards.

12        Q.  Got it.  Thank you.

13        A.  You're welcome.

14        Q.  And so let's go back to the Care Net affiliation

15   agreement.

16        A.  Okay.

17        Q.  Do you still have that document up?

18        A.  I'm pretty sure it's this one right here.  Statement

19   of Faith.  Yes.

20        Q.  Okay.  And so number two says the Pregnancy Center

21   agrees to fully comply with each and every standard set forth

22   in the Standards of Affiliation for Pregnancy Centers, attached

23   hereto and incorporated herein by reference.

24             Did I read that correctly?

25        A.  You did.

                                                          130

1      Q.  Okay.

2             MS. SALVADOR:  So I am dropping a document into

3      the chat.  Please mark it as an exhibit and then, Dr. Bane, let

4      me know when you have it open.

5                        -  -  -

6             (Document marked as Exhibit-EE for

7      identification.)

8                        -  -  -

9             THE WITNESS:  I have it open.

10     BY MS. SALVADOR:

11     Q.  Do you recognize this document?

12     A.  Give me just a second.

13     Q.  Sure.

14             (Pause.)

15     A.  Okay.

16     Q.  So do you recognize this document?

17     A.  I do.

18     Q.  Are these the Standards of Affiliation that are

19     referenced in the affiliation agreement that we were

20     discussing?

21     A.  Yes, they are.

22     Q.  So do the three Pregnancy Centers where you work

23     comply with these Standards of Affiliation?

24     A.  There was nothing I read that was a red flag to me.

25     The one related to contraception, we don't provide

                                                          131

1    contraception at all from the standpoint of like I used to do

2    in private practice.  When we have a woman come in and she has

3    -- let's say she wants a pregnancy test and she's not pregnant,

4    then we have a handout for her that includes her options, as

5    well as resources in our community for contraception.  But I

6    don't particularly prescribe contraception at the Pregnancy

7    Center.

8         Q.  So are -- looking at number six on the document.

9         A.  Okay.

10        Q.  It says the Pregnancy Center does not recommend,

11   provide or refer single people for contraceptives.  Married

12   women and men seeking contraceptive information should be urged

13   to seek counsel along with their spouses from their pastor

14   and/or physician.  Is that what you're referring to?

15        A.  I was referring to the first sentence is what I was

16   talking about.  I have had discussions related to Care Net's

17   single versus married and -- but I also recognize that as --

18   because we don't even do contraception there, I was comfortable

19   signing this knowing that -- and I'll tell you, when I first

20   started working there as a contracted doctor -- I used to

21   volunteer, now I'm a contracted doctor -- I had to work really

22   hard to advocate for my patients to even get a handout I

23   developed related to contraception and being able to, you know,

24   have the health department information on there and things like

25   that.  And they had to check with Care Net and make sure it was

132

1   in compliance.  So, you know, as I said before, I love this

2   organization, but I do push back on some things.

3       Q.  Do you know why the Care Net standards of affiliation

4   make a distinction between single and married had people?

5       A.  Yeah.  Because of the desire for abstinence in single

6   people.

7       Q.  In your opinion and experience of your medical

8   practice, can an unmarried woman ever have a healthy sexual

9   relationship?

10              MR. BOYLE:  Objection.

11              THE WITNESS:  Boy, that was a loaded question.

12  I do think there are consequences of being sexually active for

13  all of us, whether we're married or not.  But particularly with

14  single I do think there's literature that shows that sexual --

15  sexual risk avoidance, not just reduction is very effective.

16  And so -- what I do is once again what I said earlier about

17  that partnership between the woman and I'm not living in her

18  lived experience, but I don't want to ever do anything that is

19  potentially going to harm one of my patients.  And so if it's a

20  single woman who is sexually active, I'm not just going to

21  blindly give her contraception.  I'm talking to her about, you

22  know, her risk factors for sexually transmitted infections,

23  what is her sexual behavior, is this somebody she's been with

24  for a long time and they have a monogamous relationship where

25  there's a lot of trust built in.  And I also know that men and

133

1    women fall hard and they hurt hard when they break up.  And so,

2    you know, I -- kind of like earlier with the multifactorial

3    nature of studies, I know that there are many different factors

4    related to the choice to become sexually active.

5    BY MS. SALVADOR:

6        Q.  Got it.  Thank you for clarifying that.  Going to

7    number one on the Standards of Affiliation document.  It states

8    that the primary mission of the pregnancy center is to share

9    the compassion, hope, and help of Jesus Chris, both in word and

10   deed, with those facing pregnancy decisions.  The pregnancy

11   center is equally committed to sharing the gospel of salvation

12   through Jesus Christ with those that serve.

13        Did I read that correctly?

14       A.  Yes, you did.

15       Q.  Is that statement true for the three pregnancy centers

16   where you work?

17              MR. BOYLE:  Objection.

18              THE WITNESS:  Yeah.  So I believe that love is

19   a verb and we are clearly Christian pregnancy centers.  And so

20   I believe that when you love others you're willing their good

21   and it's -- it is doing good for people.  I believe that you

22   can meet this statement without ever mentioning the word Jesus.

23   And you -- you can love people the way Christ loved.  I think

24   that when you look at -- in the literature with medicine when

25   -- about 60 percent of people at least in the psychiatry

134

1  literature are in a crisis and this -- in their case it's a

2  mental health crisis, but you can make some inferences, they

3  want a healthcare practitioner who wants to talk about

4  spirituality.  So I will talk about that.  I will sometimes

5  pray with people if they want me to, but I -- I know they're

6  there for a medical appointment when they're seeing me.  And

7  remember, we have two sides of the house.  We have this -- the

8  medical side of the house and so I integrate spirituality in

9  that.  But my goal -- they're in the middle of a challenge and

10 I want to respect that they -- whatever their faith is, whether

11 they're Christian or not, if spirituality is going to help them

12 through that challenge, I want to encourage them in that way.

13 The client advocacy side where they provide -- connect them

14 with community partners and services they may need like

15 subsidized daycare and the parenting classes, those are where I

16 think this statement really lies and the recognition that these

17 women are often scared and alone, sometimes being coerced, and

18 maybe they were -- they grew up in a church and they are

19 disconnected.  And so like how could a church walk alongside

20 them and help them.  So I think, you know, yes, this is an

21 extremely strong Evangelical statement, but it's not like we

22 have something that says everybody must leave with a gospel

23 pamphlet.

24     Q.  Right.  So the statement -- the Standards of

25 Affiliation, I'm sorry, referred to sharing the gospel of

                                                        135

salvation through Jesus Christ.  So what does that mean on the

medical side as you described it as two sides?

     A.  Yeah.  I mean, on the medical side it's really being

the hands, the feet, the eyes of Jesus.  Which is loving people

in a way that -- like when they leave I want them to know

whatever their choice is, my door is always open.  And we will

never judge them.  And so it's in our actions.  It's how we

care for them, how we respect them, how we love them as we're,

you know, providing information for them.  And, you know, if as

part of the conversation, which it doesn't happen every time,

you know, some of them will say like without me even prompting

them -- I mean, I have had women say everything from I'm going

to hell for murdering my child, I have had them say I know God

is going to be so mad at me, things like that, and I try to

really meet them where they are and help them realize no,

you're not murdering your child and you're trying to make the

best decision at this moment that you think for yourself and I

hope it can be a life-affirming decision for you.  But don't

own that.

     Q.  Are the pregnancy centers where you work subject to

any form of regulation by a health agency?

     A.  So we -- we have -- in the State of North Carolina we

have -- we actually don't have to follow HIPAA guidelines like

the way my other practice did.  I think that should change, to

be honest.  We're a medical clinic and we should follow HIPAA

136

1    guidelines and I am very strict about that.  Everybody is HIPAA

2    trained.  We have medical policies and procedures that I'm in

3    the middle of -- because I'm just starting to work with the

4    other centers and I'm updating ours.  I think our standards

5    should be exceptional.

6       Q.  So the pregnancy centers where you work are not

7    inspected by any sort of state agency?

8       A.  Not that I am aware of.  I think they should be.  But

9    I don't think in North Carolina that we have that.

10      Q.  What medical training are Pregnancy Center staff

11   required to have -- the ones who have medical duties that is?

12      A.  Yeah.  I mean, they have to have some sort of medical

13   license.  So I have everything from nurses to medical

14   assistants to ultrasonographers, RDMSs in the three different

15   centers.  So they have to stay licensed according to what their

16   particular license is, their scope of practice.  We do HIPAA

17   training regularly.  We do OSHA training.  We do CPR training.

18   That's all that can come to my mind right now.

19      Q.  Thanks.  That's really helpful.  So going to number

20   four on the Standards of Affiliation document.

21      A.  Yeah.

22      Q.  It says the pregnancy center does not perform or refer

23   for abortion and provides a written disclaimer to this effect

24   to clients requesting services.

25          Did I read that correctly?

137

1    A.  You did.

2    Q.  Is that statement true for the Pregnancy Centers where

3   you work?

4    A.  We don't have a written disclaimer.  I have never had

5   a patient request something like that, so I'm not sure, to be

6   honest, what that's all about.  But we do not perform or refer

7   for induced abortions.

8    Q.  Are the Pregnancy Centers where you work open with

9   clients about their position on abortion?

10   A.  So we are not -- when you say open, could you define?

11  What do you mean by that?  We're open to our clients about our

12  position.  Do we tell them?  Make statements?

13   Q.  Yeah.  Do you tell them about your position on

14  abortion?

15   A.  Yes.  So they know that we do not perform abortions.

16  It's on our Website and the people who answer the phone who are

17  trained to let them know that.  They also know that when I

18  counsel them and give them an informed consent I say to them my

19  hope is you can choose a life-affirming choice for your child

20  and yourself, but I recognize that's your decision and not

21  mine.

22   Q.  Thank you.  And how do you split your time between the

23  three pregnancy centers where you work?

24   A.  Yeah.  So I am in Wilson, North Carolina, about an

25  hour east of Raleigh.  And I am there actually Tuesdays,

138

1    Wednesdays, and Thursdays for about half a day each on average.

2    And then in the Outer Banks in Nags Head I physically go there

3    once a month, but I talk to them most days when they have a

4    patient who's getting an ultrasound.  And I'm available if they

5    -- the ultrasonographer needs to talk to me.  I just last week

6    had -- we had a patient who was coming in and she had a 12-week

7    intrauterine pregnancy, but the baby looked like it had some

8    very significant skeletal abnormalities.  And so as the patient

9    was in one room the ultrasonographer reached out to me and

10   electronically we looked at the pictures together and then I

11   gave the staff recommendation on followup so that she could get

12   an ultrasound and see an ob-gyn at the practice.  So I'm

13   available.  None of the centers are open on weekends.  They're

14   Monday through Friday if they need consults.  And then I also

15   -- I try to read all scans within 24 hours.

16        Q.  Got it.  So for that patient you just mentioned, I

17   just want to make sure I understand what you said.  So you

18   ended up referring that patient to an ob-gyn, is that correct?

19        A.  I did.

20        Q.  Okay.  So you refer them out of the pregnancy center,

21   is that right?

22        A.  Yes.  We don't do prenatal care or deliveries in terms

23   of the -- the biggest thing that we try to do is if a woman

24   decides to carry her pregnancy often times because of shortages

25   in healthcare practitioners, especially in rural eastern North

139

1    Carolina, we may have some gaps so sometimes we really try to

2    facilitate if she needs to see a maternal-fetal medicine

3    specialist.  So we do referrals.  We just don't do referrals

4    for induced abortion.  As I said earlier in my testimony I have

5    a maternal and a fetal patient and I want health and wholeness

6    for both of them.  So referral for ending the life of one of

7    them is not a part of medicine.

8        Q.  So understanding that you don't refer patients to

9    pregnancy centers for induced abortions, do you ever talk to

10   them about induced abortions?

11       A.  Yes, I do.

12       Q.  What types of things do you say in those

13   conversations?

14       A.  So I usually -- I ask their permission and if they

15   want to talk, what information they would like and I say would

16   you like to know about the different types of abortion.  And so

17   I may explain the difference in a medication/chemical abortion

18   and a surgical abortion.  And then I will talk to them about

19   risks related from a medical perspective, things that we have

20   talked about today.

21       Q.  Have you ever received a complaint from a patient at

22   the pregnancy centers where you work?

23       A.  No.

24       Q.  Has any of the centers where you work ever received a

25   complaint related to how they handle abortion counseling?

1        A.  Not that I -- since I have been the medical director

2   of the three.  There could have been something before that I'm

3   unaware of.

4        Q.  Got it.  I think we're basically done here.  So why

5   don't we just take a brief break and then we'll come back.

6   I'll ask a few more questions if I have them, which I might

7   not, and then your counsel will have the opportunity to ask

8   questions.  So why don't we just take a -- how about a

9   five-minute break.  Does that work?

10                  THE WITNESS:  Yes.  Thank you.

11                  MS. SALVADOR:  Sorry.  Let's go off the record.

12                  VIDEOTAPE TECHNICIAN:  We are now going off the

13  video record.  The time is 6:29 p.m.

14                  (A break was taken.)

15                  VIDEOTAPE TECHNICIAN:  We are now back on the

16  video record.  The time is 6:36 p.m.

17  BY MS. SALVADOR:

18       Q.  Dr. Bane, are you the only ob-gyn who is employed by

19  those three pregnancy centers where you work?

20       A.  I am.

21       Q.  Okay.  And that's -- so that's all I have on the

22  Pregnancy Centers.  And then just going back, you mentioned

23  that you completed a witness training through ACOG, is that

24  right?

25       A.  Yes, that one-day course.

                                                        141

1    Q.  Did you review any materials from that training to

2  prepare for this deposition?

3    A.  No.

4    Q.  Okay.

5            MS. SALVADOR:  I don't have any further

6  questions.

7            MR. BOYLE:  Okay.  Thank you.  If it's all

8  right, I'll go ahead.

9  BY MR. BOYLE:

10    Q.  This is Ellis Boyle.  I represent the legislative

11  leaders, Speaker Moore and Senator Berger.  Doctor, thank you

12  for your time today.  I have a few questions.  You said in your

13  testimony in that last hour that Mifeprex and Misoprostol are

14  contraindicated until you exclude an intrauterine pregnancy.

15  And I think you may have mixed up your wording a little bit and

16  I want to give you an opportunity to clarify that if you want

17  to.  Did you mean that Mifeprex and Misoprostol are

18  contraindicated until you would exclude an ectopic pregnancy

19  instead of the IUP?

20    A.  Okay.  So it's Misoprostol, so I think that's what

21  you're talking about, Mifeprex and Misoprostol.  So yeah, the

22  FDA, their prescribing information, if I said it wrong, what I

23  meant to say is that they state that you have to exclude an

24  ectopic pregnancy before giving the medication.

25    Q.  Okay.  Do you agree that it is safer to suspect every

                                                    142

1  patient who tests positive for pregnancy has an ectopic

2  pregnancy until you can rule that out?

3     A.  Yes.

4     Q.  If you have a patient who tests positive for pregnancy

5  and has an ultrasound that does not show either an ectopic

6  pregnancy or an intrauterine pregnancy, so it's a pregnancy of

7  an unknown location on that ultrasound finding, what would you

8  say the safest way is to treat that patient?

9     A.  I have had many patients over the years that are in

10  that situation and I -- we do a combination of serial hCG

11  levels, so lab work, and then a repeat ultrasound.

12    Q.  Why would you do the repeat ultrasound?

13    A.  To document an IUP hopefully, but also to rule out

14  ectopic pregnancy.

15    Q.  If you take an ultrasound of a patient who tested

16  positive for pregnancy and it neither shows the IUP nor an

17  ectopic pregnancy, so again, it's an ultrasound that shows a

18  pregnancy of unknown location, does that lower or increase your

19  suspicion that that patient has an ectopic pregnancy?

20    A.  So it increases my suspicion because I would want, as

21  I have said earlier, to have diagnostic certainty in something

22  that is potentially fatal, which ectopic pregnancies can be.

23    Q.  Doctor, if I can direct you to a couple of the

24  exhibits that you were asked questions about.  First, I believe

25  it's Exhibit-Q.  And, Madam Court Reporter, if you could tell

                                                          143

1    me if I'm correct, this would be the CDC's maternal mortality

2    rates in the United States for 2021.  I believe that's

3    Exhibit-Q.

4        A.  I'm going to have to find that.  Just a second.

5        Q.  Well, that's what I'm talking about, Exhibit-Q,

6    correct?

7                    COURT REPORTER:  I don't know.

8                    MR. BOYLE:  Okay.  Well, that's what I'm

9    talking about and I think it's Q. We'll correct it after the

10   fact, if necessary.

11                   THE WITNESS:  Is it the 2021 mortality rates?

12                   MR. BOYLE:  Yes.  That's correct.

13                   THE WITNESS:  Okay.

14   BY MR. BOYLE:

15       Q.  So as I understand it, when you were asked questions

16   about these maternal mortality rates from the CDC in 2021, am I

17   correct in saying that these are maternal mortality rates not

18   specifically related to abortion but just for all maternal

19   mortality in the United States?

20       A.  Correct.

21       Q.  Okay.  And then if I can direct you to what I believe

22   again is Exhibit-R, which would be the North Carolina 2016

23   maternal mortality review report.  If you let me know when you

24   get there, please.

25       A.  Okay.

1          Q.  Do you have that one up?

2          A.  No.  I'm sorry.

3          Q.  Okay.  Let me know.

4          A.  Okay.  Yes, I have it up.

5          Q.  And I believe you were asked questions on page 11 of

6     that document.  Do you see page 11?

7          A.  I'm getting there.  Yes.

8          Q.  Again, I believe you were asked questions about this

9     page and these numbers at that chart on the bottom.  And I just

10    want to clarify again, are these numbers in that chart that

11    represent maternal mortality in the State of North Carolina for

12    these various years, are they specific to abortion or are they

13    just general maternal mortality?

14         A.  Let me look at the chart here.  Overall.  Pregnancy

15    mortality ratio.  So they are for all deaths, not just deaths

16    related to abortion.

17         Q.  Right.  So all maternal death, not the specific

18    question that you were asked later about the CDC numbers, which

19    were the abortion-related maternal mortality, right?

20         A.  Correct.

21         Q.  Let me direct you to what I believe is Exhibit-S,

22    which is the CDC mortality -- morbidity and mortality weekly

23    report from November 2022.  This is the abortion surveillance

24    for the United States in 2020.  Please let me know when you

25    have got that up and go to page 27.

145

1     A.  Actually it was still on page 27.

2     Q.  There you go.  So you were asked questions about this

3  exhibit and it was represented that this table on page 27 for

4  the 2013 to 2019 abortion-related maternal mortality was .43 or

5  43 deaths per 100,000 I believe, is that correct?

6     A.  Yes.

7     Q.  And this question wasn't asked, but I want you to

8  please look at the asterisk and look at the little small print

9  there at the bottom of this chart and tell me if I'm reading

10  this particular part of that correctly, quote, because a

11  substantial number of legal induced abortions occurred outside

12  reporting areas that provided data to CDC, national CFRs, i.e.

13  number of legal induced abortion-related deaths per 100,000

14  reported legal induced abortions in the United States, were

15  calculated with denominator data from the Guttmacher

16  Institute's national survey of abortion-providing facilities,

17  end quote.  Did I read that sentence properly?

18     A.  Yes.

19     Q.  And what does that sentence tell or inform your

20  opinions in this case, please?

21     A.  They're consistent with my opinions in my declaration

22  that we don't have accurate information on the number of

23  legal-induced abortions.  So our -- it's difficult for us to

24  really know the true and accurate number of complications and

25  deaths.

146

1    Q.  Okay.  And does the fact that they don't have accurate

2    data of actual abortion deaths from places that just didn't

3    give it to the CDC and then they use the Guttmacher Institute's

4    number as the denominator, does that impact what you think

5    those numbers might reflect in this chart?

6    A.  Well, I mean, I think I said earlier that your

7    conclusions that you draw are only as accurate as the

8    information you're drawing them from.  And so I think a

9    consistent message that I have had is that we don't do a good

10   job because we have this voluntary reporting.  And, you know,

11   the fact that the CDC is having to rely on someone else's data

12   is concerning.  It's not surprising because if you look at the

13   number of abortions reported between Guttmacher and the CDC,

14   they differ vastly.  So we have got to do a better job if we're

15   going to truly understand and keep women safe.

16   Q.  And you say the Guttmacher number is different.  Isn't

17   it much larger than the CDC number?

18   A.  Yes, it is much larger.

19   Q.  So if you have underreporting of the actual deaths on

20   the voluntary information provided on that side and then you

21   have an overinflation on the denominator from the Guttmacher,

22   what does that tell you about your opinion about that actual

23   number in this chart?

24   A.  You're going to have to repeat that.  Sorry.

25   Q.  Yes.  So you have underreporting of that number of

1    actual deaths on the top of the division, right, the numerator?

2    Because the CDC is not getting all those deaths, is that

3    correct?

4        A.  Correct.

5        Q.  And then on the bottom part, the denominator, you have

6    got a higher number because Guttmacher has a bigger number than

7    the CDC's reported number?

8        A.  Right.

9        Q.  So if you're dividing fewer on top than more on the

10   bottom doesn't it under inflate the likely actual number --

11   misrepresent to the low end of the spectrum how many maternal

12   deaths are actually attributable to an abortion in that year?

13       A.  Yes.  Your number -- your fraction would be different.

14   It would be lower.

15       Q.  I would like to direct you to what I believe is

16   Exhibit-10, the Koch report from I believe the study of

17   abortion legislation, maternal healthcare, fertility, et

18   cetera, et cetera, in the 32 Mexican states.  Can you let me

19   know when you're at that document, please?

20       A.  I'm there.

21       Q.  Okay.  If you turn to page 10.  I believe you were

22   asked a question about one particular sentence on page 10.  Do

23   you recall that?

24       A.  Let me get to 10.  I don't remember what sentence I

25   was asked a question about.

1    Q.  Okay.  I believe you were asked a question about the,

2    quote, consequently making a direct or independent causal link

3    between a less permissive abortion law and a lower incidence of

4    maternal deaths, or conversely by considering a more permissive

5    abortion law would be a premature or even erroneous conclusion,

6    end quote.  Do you remember that question?

7    A.  I do.

8    Q.  Let me read you the next sentence and ask you your

9    opinion of that and whether it impacts your declaration.

10   Quote, rather, from an epidemiological perspective the Mexican

11   natural experiment provides evidence to support three

12   complimentary assumptions at the population level.  First,

13   abortion legislation per se did not appear to have an

14   independent effect on overall maternal mortality rates.

15   Second, a less permissive abortion law in terms of not

16   considering exemptions from criminal prosecution of abortion in

17   cases of genetic or congenital fetal anomalies was not

18   associated with increased maternal and abortion-related deaths.

19   And third, differences in maternal mortality incidents in the

20   context of different abortion legislation, more or less

21   permissive, appear to be mainly explained by the distribution

22   of other major independent factors most likely facilitating an

23   epidemiological transition for its low maternal mortality rates

24   independently from abortion legislation itself, end quote.

25           Did I read that correctly?

149

1      A.  You did.

2      Q.  Does adding that other sentence there for context help

3  explain why you included this report?  I'm sorry, yes, this

4  report in your declaration.

5      A.  Yeah.  I mean, it's consistent with the message that I

6  have shared earlier about the difference between correlation

7  and causal and the fact that we know that there are multiple

8  factors that cause women to die and that this is -- they're

9  acknowledging the fact that they're -- it is not one factor

10  alone, but actually proposing that we have to look at many of

11  the different factors.  But just because you're looking at

12  things like education and warning signs and transportation and

13  clean sanitation and things like that, it doesn't exclude that

14  your other observation on the trends -- you don't discount

15  those.  You just recognize the multifactorial nature of this

16  issue.

17      Q.  And finally, I'd like to ask you about the Fergusson

18  study, which I believe was Exhibit-X.  Again, I could be off.

19  That's what my internal numbering was.  So if we can fix that

20  later.  But you let me know, please, when you've got the

21  Fergusson study up.

22      A.  Okay.

23      Q.  And go to page 450 once you get there, please.

24      A.  All right.  I can't easily find it, so I'm just going

25  to pull up my hard copy.

1      Q.  That's fine.

2      A.  What page again?

3      Q.  450 with the implications section.

4      A.  Okay.  I'm there.

5      Q.  Okay.  Again, you weren't asked about this, so I want

6   to give you the opportunity to explain more fulsomely why you

7   included this study in your declaration.  There's a sentence

8   under implication that's, quote, specifically, the results do

9   not support strong pro-life positions that claim that abortion

10  has large and devastating effects on the mental health of

11  women.  Neither do the results support strong pro-choice

12  positions that imply that abortion is without any mental health

13  effects, end quote.

14      Do you see that?

15      A.  Yes.

16      Q.  And I think you were talking about that, but does that

17  particular sentence there, and anything else that you would

18  like to point to in this study to explain why you included

19  this, please?

20      A.  So I know a little bit of the back story of this study

21  from Dr. Fergusson's -- some interviews he did because he

22  struggled so much with getting it published and he was really

23  disheartened that the scientific community would not publish

24  something because they didn't like the results.  And he was

25  afraid that pro-life -- the pro-life side would use it to say

151

1    it's causal and the pro-choice side would use it to say that

2    abortion doesn't cause mental health effects.  So the next

3    sentence is actually, I think, one of the most powerful.  In

4    general, the results lead to a middle-of-the-road position that

5    for some women, abortion is likely to be a stressful and

6    traumatic life event which places those exposed to it at

7    modestly increased risk of a range of common mental health

8    problems.

9         So what he's saying is that he saw an association and

10   the scientific community has to take that association and

11   explore it more.  You know, when Tobacco was first blamed for

12   -- and cigarettes for lung cancer, there was a whole pushback

13   from people who wanted tobacco out there.  And it took a long

14   time for people to take that relationship seriously and he

15   doesn't want that to happen.  And he says -- I think in his

16   study I think he says one in 10 women in New Zealand have

17   abortions.  It's one in four in our country.  And why wouldn't

18   we want to dig our feet in deeper and find out are we really

19   helping or harming women.  And that's why I think this is a

20   critical paper.

21        Q.  Okay.

22             MR. BOYLE:  Doctor, I don't think I have any

23   other questions.  Thank you very much for your time.  There may

24   be some redirect or another lawyer may have a question.  But

25   thank you.

152

 1                    THE WITNESS:  You're welcome.

 2                    VIDEOTAPE TECHNICIAN:  Anyone else?  All right.

 3    Before we do go off the video record I did need to see if

 4    anyone needed transcript copies, rough drafts, or video copies.

 5                    MR. BOYLE:  Can I say for my side, can I just

 6    put in the chat what we want?  Would that work for you?

 7                    VIDEOTAPE TECHNICIAN:  It won't be on the

 8    record.

 9                    MR. BOYLE:  Oh, you need it on the record?

10    Yeah, we want a -- please, if we can for the legislative

11    defendants, can we have an expedited by next Tuesday, if

12    possible, and a video whenever.  I imagine that's easier to do,

13    but it does need to be synced.

14                    VIDEOTAPE TECHNICIAN:  But you don't need an

15    expedite for the video?

16                    MR. BOYLE:  I mean, I would hope that it would

17    come around -- if I'm paying for an expedited transcript, I'm

18    hoping the video is coming too.

19                    VIDEOTAPE TECHNICIAN:  Okay.  We'll make sure

20    -- we'll take care of it for you.

21                    MR. BOYLE:  Okay.  Thank you.

22                    VIDEOTAPE TECHNICIAN:  Certainly.

23                    MS. SALVADOR:  We would also like an expedited

24    transcript, please.  And if you have the rough ready sooner we

25    will take that too.

                                                                    153

1              VIDEOTAPE TECHNICIAN:  All right.  Anything

2     else?

3              MS. NARASIMHAN:  We would appreciate a rough,

4     but don't need an expedited transcript.  Thank you.

5              MR. BOYLE:  Do you have contact information for

6     where to send that, Ms. Rapaport?

7              VIDEOTAPE TECHNICIAN:  For you, Mr. Boyle?  If

8     you could give me that in chat, that would be great.

9              MR. BOYLE:  Sure.  I'll do it right now.

10              VIDEOTAPE TECHNICIAN:  Thank you so very much.

11     All right.  That said, today's deposition is now concluded.  We

12     are going off the video record at 6:57 p.m.

13                        -   -   -

14                   (Witness excused.)

15                        -   -   -

16             (Deposition concluded 6:57 p.m.)

17                        -   -   -

18

19

20

21

22

23

24

25

154

1                    CERTIFICATE OF REPORTER

2    STATE OF NORTH CAROLINA      )

3    COUNTY OF ALAMANCE            )

4               I, Susan A. Hurrey, RPR, the officer before

5    whom the foregoing remote deposition was taken, do hereby

6    certify that the witness whose testimony appears in the

7    foregoing deposition was duly sworn; that the testimony of said

8    witness was taken by me to the best of my ability and

9    thereafter reduced to typewriting under my direction; that the

10   witness reserves the right to read and sign the transcript of

11   the deposition prior to filing; that I am neither counsel for,

12   related to, nor employed by any of the parties to the action in

13   which this deposition was taken; and further, that I am not a

14   relative or employee of any attorney or counsel employed by the

15   parties thereto, nor financially or otherwise interested in the

16   outcome of the action.

17               This the 5th day of September, 2023.

18

19                         _____

                           SUSAN A. HURREY, RPR

20                         Notary Public #201826800211

21

22

23

24

25

                                                            155

1          I, SUSAN BANE, M.D., PhD, do hereby state under

2          oath that I have read the above and foregoing

3          deposition in its entirety and that the same is

4          a full, true and correct transcript of my

5          testimony, subject to the attached list of

6          corrections, if any.

7

8

9                                    _____

10                                   SUSAN BANE, M.D., PhD.

11

12   STATE OF_____

13   COUNTY OF_____

14

15          Sworn to and subscribed before me this_____day

16   of_____, 20_____.

17

18                          _____

19                          Notary Public

20

21          My commission expires:_____

22

23

24

25

                                                      156

E R R A T A   S H E E T

PAGE          LINE                                    CORRECTION

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

        I, _____, after having read the

foregoing transcript of my deposition, wish to make the above

corrections.

        SIGNATURE_____

        DATE_____

157

**A**

**AAPLOG** 45:24
46:1 47:12
48:4,10
**AAPLOG's** 48:2
**abdomen** 50:7
119:20,21,24
120:2,10
121:10,10
122:6
**abdominal** 25:6
118:5 119:23
120:18
**ability** 85:5
104:10,16
120:2 155:8
**able** 10:16 14:7
20:3 28:21
34:9 36:23
39:2 41:5,17
41:17 46:20
79:10 91:10
106:23 107:16
132:23
**abnormal** 94:12
106:5
**abnormalities**
139:8
**aborted** 82:19
**abortion** 5:14,15
11:6 13:3
14:14 17:6
26:23 27:4,6,7
27:8,9,10,14
31:8 32:23,24
33:25 34:3
36:14 39:12,14
39:22 40:5,10
40:15 41:2
42:22,23 43:6
43:11,14 44:5
44:5,17,25
48:3,6 49:12
49:18 53:9
54:15,23 55:1
55:10,15,20,23
56:12,12,15,16
56:19 57:5,6,7
57:8 58:13
59:1,19 60:12

60:22 65:1,7
65:18 66:3,11
67:1,4,8,10,15
69:5,19 70:4,6
70:25 71:8
72:23 73:1
75:14 78:2,4
78:23 79:19
80:5 81:14
82:12,24 85:25
86:12,20,23
87:3 89:22,23
89:25 90:2,7
90:15,16,17,22
91:22 92:1,9
92:13,22 93:5
93:9,23 94:16
96:7,13 97:4
99:18,24 111:9
111:15,16
112:6 122:21
122:25 123:8,9
124:4,5 125:13
125:25 137:23
138:9,14 140:4
140:16,17,18
140:25 144:18
145:12,16,23
147:2 148:12
148:17 149:3,5
149:13,15,16
149:20,24
151:9,12 152:2
152:5
**abortion-prov...**
146:16
**abortion-relat...**
53:14 54:10
60:6,18 66:10
145:19 146:4
146:13 149:18
**abortions** 19:9
26:21,22 27:3
27:13,18 35:5
35:6 44:22
53:6 57:10
58:7,14 59:1
59:11,11,16,17
60:16,23 62:2
62:2 66:16,19

70:13,15,25
71:4 73:16
75:4,7 77:5,16
80:22 97:12
99:16 138:7,15
140:9,10
146:11,14,23
147:13 152:17
**abruption**
100:12
**abruptions**
100:25
**absolutely** 68:19
120:18
**abstinence**
133:5
**abuse** 75:16
**accept** 56:15
**accepted** 84:24
**access** 13:3,5
19:20 44:5
59:24 64:3
**accident** 100:18
**accidently** 111:5
**accidents** 100:18
**account** 58:14
59:2
**accounting**
56:11
**accreta** 100:24
**accurate** 20:2,11
146:22,24
147:1,7
**acknowledge**
47:5 99:9
**acknowledging**
150:9
**ACLU** 7:2
**ACLU's** 7:5
**ACOG** 5:22
19:4 42:7,9,20
42:21 43:1,7
43:10,17,18,20
43:23 44:1,4,6
44:14,17 108:8
115:6,11
141:23
**ACOG's** 36:22
43:13 44:20,25
112:9 113:1

114:12
**acronym** 103:10
**act** 101:8
**action** 155:12,16
**actions** 136:7
**active** 133:12,20
134:4
**activity** 29:16
30:5
**actual** 147:2,19
147:22 148:1
148:10
**acutely** 26:5
**add** 22:1
**adding** 150:2
**address** 20:25
41:17
**addressing**
59:18
**ADF** 6:25 15:10
**adhesions** 30:1
**adjacent** 26:7
**adjunct** 37:24
**adjusting** 69:16
**adjustment**
90:11
**administer**
106:23,25
107:2,16
**administration**
51:20 83:25
**administrative**
38:11,12 39:2
**adnexa** 122:13
122:13
**adolescents**
82:19,20
**adoption** 39:21
**adverse** 73:4
98:21
**advice** 15:22
**advisory** 49:4
123:21 124:7
**advocacy** 43:2,3
44:9 46:7,12
46:14,19,23
47:9 124:14
135:13
**advocate** 43:6
44:22 46:25

47:3 84:19
132:22
**affect** 10:15
**affiliate** 130:1
**affiliated** 126:17
127:18 128:10
**affiliates** 128:13
**affiliation** 5:23
5:25 126:20
127:10 130:14
130:22 131:18
131:19,23
133:3 134:7
135:25 137:20
**affirm** 40:9
**affirmation** 12:1
127:23 128:3
**afraid** 151:25
**afternoon** 6:3,22
7:16,19 8:7
99:4
**age** 33:8 57:7
117:1
**agencies** 53:21
53:22
**agency** 136:21
137:7
**aggregate** 78:14
**ago** 15:7 17:17
41:8 42:16
**agree** 44:6,23
89:21,25 90:14
91:18 108:2
115:24 142:25
**agreed** 130:6
**agreement** 5:23
126:20 127:11
127:14,18
130:15 131:19
**agrees** 130:21
**ahead** 7:9 37:3
54:20 142:8
**AHEC** 38:15,16
38:17,17
**AHECs** 38:19
**al** 1:3,6,8 5:16
6:9,10,10
60:15 70:21
71:12 80:22
96:10 97:8

Alabama 124:20
ALAMANCE 155:3
Albemarle 126:13
algorithm 112:13,14
align 29:9
alike 90:12
Alliance 4:7
Allied 38:4
allow 43:4 44:9 83:24
allowed 13:24 14:5 50:16,17 83:25
allows 78:15
alongside 135:19
alternatives 40:20,24
amazed 120:18
Amen 49:2
America 2:3,9 6:19 7:11
American 2:16 2:21 42:4 45:21 91:20
Amiri 2:17 7:5
amniotic 37:12
amount 80:3 84:5 92:12 100:21 102:5,5 104:16 105:6 121:25
amounts 93:3
analysis 69:16
anatomy 38:7
and/or 98:14 118:16 132:14
anesthesia 107:7 107:8,11,12,15
anesthesiologist 105:23 107:14
anesthesiologi... 102:21 106:16
anesthetist 105:22 107:14
anesthetists 102:22 106:16

anger 90:11
Anjali 2:4 6:18 8:8 18:9,10 56:20 77:18 93:17
anjali.salvado... 2:7
anomalies 149:17
answer 8:16 9:8 9:13,18,24,24 10:16 14:2 16:8 18:5 22:3 36:2,3,4,12 40:12 45:1,2 51:22 55:2 59:18 60:2 71:6 73:6 95:4 102:13 110:17 138:16
answering 9:2
answers 8:21
antibiotics 94:13 94:21 95:20
antidepressants 32:5
anxiety 79:4,23 86:25 87:2,4 106:11,13
anxious 106:6,9
anymore 84:10
apologize 10:13 105:8
appear 149:13 149:21
appearing 7:2
appears 155:6
appendicitis 120:14 121:15
applaud 99:24
appointment 135:6
appreciate 154:3
appropriate 108:4
April 52:3
area 18:25 19:2 38:15,16 42:22
areas 146:12
Arizona 4:10

arm 47:22
article 68:15 75:1 85:10
articles 79:3
Asherman's 30:1
asked 10:3 12:7 15:17 17:17 18:10 20:25 38:9 44:3 104:20,20 143:24 144:15 145:5,8,18 146:2,7 148:22 148:25 149:1 151:5
asking 9:3 12:6 34:12 45:2
aspiration 29:19 29:20 30:3 101:20
assessed 75:19 76:22
assistants 137:14
associate 38:3,6
associated 29:25 37:18 75:14 81:9 87:12 90:5,10 92:18 93:11 96:17 116:14 149:18
association 6:6 45:21 67:6 78:18 81:7,13 82:12 86:22 87:6,10 89:20 91:21 96:12,20 96:22 97:1 98:11 152:9,10
associations 42:2 45:17,21 77:4,15 78:7 78:11,15 86:8
assume 9:8 34:12,13 120:23 128:9
assumed 109:22
assumption 127:20

assumptions 85:21 149:12
asterisk 146:8
asymptomatic 118:1 122:11
athletes 39:23 39:24 51:17
Atlantic 1:3 2:8 2:13 6:9,20 7:12 8:9 19:7 22:16 37:22
atony 101:10 102:16
attached 22:9 127:24 130:22 156:5
attempted 83:4 83:4
Attempting 114:20
attend 48:11
attendance 6:17 52:7
attended 22:25 47:16 48:9
attention 122:7
attorney 3:4,12 3:17 6:15 7:14 7:18 9:17,22 9:23 155:14
attorneys 8:8 18:13,17 19:11 21:11,15
attributable 148:12
August 1:13 6:5
author 85:14
authoritative 129:18
authors 70:21 73:2,14 99:24 100:2
autopsy 54:16 54:25 55:8
available 104:18 139:4,13
Avenue 2:10
average 92:24 139:1
avoidance

133:15
aware 53:8,10 53:17,18,20,22 53:24 54:1,3,6 54:8,9,13,14 54:17,18,24 55:5,8,11 60:5 72:21,24,25 73:7,9,12,14 82:24 83:2,10 83:15,19 84:16 84:18 86:15 91:14,17,20,23 91:24 92:8 112:2,8 137:8
awareness 38:22 73:17
awful 103:12 120:3

**B**

B 5:7
babies 24:18,19 24:24 31:19 34:11,12
baby 36:17,19 50:2,3,4,6,8,11 52:17 93:18 94:8 100:10 139:7
Bachelor 22:16
back 16:16 22:7 30:10 33:19 36:14 38:5 41:13 45:13,16 45:20 50:10 56:23,25 70:12 73:4 80:15 82:17 85:18 86:1,9 114:5,9 119:14 125:16 130:14 133:2 141:5,15,22 151:20
background 116:15
backside 10:10
balanced 51:25
Bamiri@aclu.... 2:19

**Bane** 1:12 6:1,13
   8:7,12 12:13
   14:2 20:2
   45:16 61:12
   62:13 64:15
   65:9 68:1
   71:13 73:23
   80:18 81:21
   87:25 97:18
   114:12,23
   127:4 128:20
   131:3 141:18
   156:1,10
**Bane's** 12:8
**banks** 102:19
   126:15 139:2
**Bar** 6:23 7:14
**barriers** 41:17
   124:14
**Bartlett** 5:11
   60:15 61:19
**Barton** 22:19,22
   22:25 37:22
   38:1,15,23
   41:6,7,24
   51:19 83:20
**based** 44:21 59:9
   73:7 79:22
   109:5 112:1
**basically** 13:3
   14:4 25:8
   31:15 39:15
   41:3 47:18
   49:10 56:2
   81:5 84:25
   109:14 117:24
   141:4
**began** 124:15
**beginning** 36:25
   63:16 103:10
**behalf** 6:14,19
**behavior** 133:23
**believe** 12:17
   13:1,13 19:21
   38:9,18 42:12
   44:1 52:14
   53:5 54:2 66:1
   66:2,4 83:5,11
   88:7 90:4
   113:4 128:15

129:17 134:18
   134:20,21
143:24 144:2
   144:21 145:5,8
   145:21 146:5
   148:15,16,21
   149:1 150:18
**believes** 129:19
**bell** 3:14 125:11
**benefit** 41:3
**benefits** 40:20
   40:24,25
**benzodiazapine**
   106:10
**benzos** 106:19
**Berger** 1:8 6:10
   6:24 142:11
**best** 9:1,5 41:18
   41:20,21
   102:25 105:2
   136:17 155:8
**better** 34:11
   84:20 90:19,24
   147:14
**Beverly** 2:15
**beyond** 103:14
**bias** 84:13,15
   96:13,23 99:9
**biases** 84:17,18
   84:20
**bible** 129:17
**big** 31:22 47:24
   50:3 93:7
   125:14,17
**bigger** 24:10
   148:6
**biggest** 18:15
   26:5 139:23
**bill** 11:24,25
   12:1,20,22,23
   12:25 13:6,10
   13:13,17 14:10
   14:14
**biomedical**
   98:13
**biopsy** 107:10
**birth** 26:16 27:2
   36:15 39:20,20
   39:21 56:2,3,8
   56:15,19 79:25

80:4,7 86:13
   87:12,13 90:23
   92:24 96:7,13
   96:16 97:2,5
   98:15 99:14,23
   100:23
**births** 56:5,6
   62:7 63:14,19
   64:2 66:20
   98:15
**bit** 22:21 26:11
   42:1 53:3 70:2
   100:4,4 107:19
   121:16 122:9
   122:17 123:18
   142:15 151:20
**black** 56:8 58:14
   59:1,4,10,18
   59:21 60:2,7
   63:18,18 99:15
   99:15,17
**bladder** 25:12
   26:8
**blamed** 152:11
**bleed** 100:13,16
   100:23 103:8
   104:8 119:20
**bleeding** 27:11
   28:1 72:22
   92:14,17
   100:10 101:1,5
   101:21 104:15
   105:17 118:6
   120:3,4,5
   121:19,21,24
   121:25 122:16
   122:17,18
**bleeds** 102:19
**blind** 35:22
**blindly** 133:21
**blood** 92:12,15
   92:25 100:21
   101:6,7,11
   102:19 104:13
   104:17 118:8
   119:21,21,24
   119:24 120:3
   121:10 122:5
   122:15
**board** 3:8,8 7:25

7:25 46:3,5,11
   46:16 47:11,14
   52:22 123:22
   124:7,8,17
   128:1 130:7
**bodies** 125:21
**body** 11:20
   85:24 120:20
**Borass** 21:25
**Borass's** 22:5
   74:5
**born** 34:13 50:9
**bothers** 112:8
**bottom** 58:10,20
   65:22 66:18
   69:9 74:25
   145:9 146:9
   148:5,10
**bowel** 26:8
**box** 2:23 76:15
   76:20
**Boy** 133:11
**Boyle** 3:5 5:5
   6:22,23 12:6
   12:10 13:18
   16:7 18:3 36:2
   36:4,12 40:11
   43:15 44:10
   55:2 69:22
   73:6 88:7,9,12
   102:13 103:4
   113:24 115:8
   133:10 134:17
   142:7,9,10
   144:8,12,14
   152:22 153:5,9
   153:16,21
   154:5,7,9
**brand** 46:15
**break** 9:16,19
   12:4 44:11,14
   45:5,12 76:6,9
   79:12,13 80:8
   80:14 114:1,2
   114:3,8 134:1
   141:5,9,14
**breakout** 124:22
**breast** 96:1
**brief** 141:5
**Brigitte** 2:17 7:5

**bring** 51:24 73:4
   125:20,21,21
**brisk** 101:5
**British** 83:6
**Broad** 2:17
**Brody** 24:14
**broken** 125:23
**brought** 126:2
**built** 133:25
**Bulleri** 3:10 7:23
   7:23
**bullet** 76:21
**bulletin** 5:22
   36:22 108:9
   112:10 113:1,5
   113:10 114:4
   114:13,13
   115:6,11 116:2
   116:10 122:2
**bulletins** 43:20
   44:17,25
**bunch** 70:21
**burnout** 124:25

─────────
**C**

**C** 2:1
**c-section** 50:14
   52:20 92:25
   94:8
**c-sections** 31:20
**C.V** 5:10 22:8,11
   23:24 24:2
   31:3 42:17
   125:1,8
**C4** 47:23
**calculated**
   146:15
**call** 24:13 31:19
   42:7 49:24,25
   84:17 92:17
**called** 22:19
   24:11 27:9
   30:1,23 36:18
   37:7 47:8,22
   50:12,13 94:4
   106:4,7,10
   108:18,19
   118:24
**calling** 25:22
   29:20 41:8

101:15
**campus** 38:20
   39:23 51:15,19
**canal** 104:12
   105:9,11
**cancer** 78:11,13
   79:10 87:9
   152:12
**capacity** 80:7
**captioned** 6:9
**car** 100:18
**cardiac** 29:16
   30:5 57:23
**care** 5:23,24
   12:1 24:12,12
   31:24 33:19,20
   33:21,23 34:11
   39:3 58:4
   59:23,25 84:20
   84:21 99:16
   110:12 112:9
   116:13 118:2
   119:7 123:22
   123:23,24,25
   124:4,6,12,18
   125:2 126:17
   126:19 127:10
   127:18,21
   128:10,13,19
   129:9,14,15
   130:1,4,14
   132:16,25
   133:3 136:8
   139:22 153:20
**cared** 33:1
**career** 22:21
   83:14 116:21
**careers** 38:21
**caring** 41:23
   44:20
**Carolina** 1:1,23
   2:22,23 3:1,2,6
   3:8,8,9,11,16
   3:19,21 6:7,8
   7:2,17,20,24
   7:25,25 8:2,3
   11:24 12:21
   13:5 21:4
   23:18 24:6,14
   24:24 30:13,16

30:25 31:2
   37:18 39:18
   63:22 126:13
   126:14,15
   136:22 137:9
   138:24 140:1
   144:22 145:11
   155:2
**Carrie** 4:21 6:5
**carries** 55:14,19
**carry** 139:24
**carrying** 55:13
   55:18,22 92:22
   93:11
**case** 6:9,10 8:9
   10:25 11:2,8
   11:10,13,14,16
   11:18 13:20
   14:17 15:6,9
   16:2,4,6,12,15
   16:17 17:3,8
   17:11,14,21,24
   18:22 19:16
   20:12 21:18,25
   52:14,16,21
   53:20 66:10,15
   74:6 91:15
   96:18 135:1
   146:20
**cases** 11:5 36:16
   149:17
**categorized**
   106:12
**categorizing**
   79:9
**Catholic** 129:17
   129:19,19,23
   130:3,9
**causal** 60:5 70:4
   98:17 99:11
   149:2 150:7
   152:1
**causation** 67:7,8
   79:16,18,20
   85:22
**cause** 55:10 60:4
   67:5 78:9
   97:12 122:9
   150:8 152:2
**caused** 34:25

78:4 79:11
**causes** 13:6
   59:21 60:18
   86:20 109:19
**causing** 32:17
**caution** 98:9,16
**cautious** 108:17
**cavity** 107:22
   122:7
**cc** 92:25 102:9
   103:2,6,7,15
**ccrowley@ncj...**
   3:22
**ccs** 101:3
**CDC** 5:14 53:8
   53:13,15,20,24
   54:4,6,9,15,17
   54:24 55:8,12
   62:5 63:7 65:7
   65:17,22 66:3
   66:11 144:16
   145:18,22
   146:12 147:3
   147:11,13,17
   148:2
**CDC's** 26:23
   65:1 144:1
   148:7
**cell** 10:2
**center** 3:6 25:21
   25:22,23 38:24
   39:6,9 42:1
   126:12,13,15
   127:23,25
   129:15,16
   130:20 132:7
   132:10 134:8
   134:11 137:10
   137:22 139:20
**Center's** 130:1
**centers** 19:9
   41:10 65:23
   124:11,17,24
   125:9 126:9,10
   126:17 127:8
   127:13 128:6
   129:10 130:22
   131:22 134:15
   134:19 136:20
   137:4,6,15

138:2,8,23
   139:13 140:9
   140:22,24
   141:19,22
**centimeters** 94:7
   104:11 105:5,9
   105:12
**central** 116:18
   116:19
**CEO** 46:7,8,8,10
**cerebral** 52:17
   52:18
**certain** 57:15,23
   85:6,13 90:9
   95:17 110:23
**Certainly**
   153:22
**certainty** 143:21
**certificate** 56:3
   155:1
**certification**
   126:4
**certifications**
   24:1
**certified** 129:11
**certify** 155:6
**cervical** 103:18
   103:22 104:6,8
   104:17,21,23
   104:24 105:14
   107:24
**cervix** 94:7
   100:15 103:23
   103:25 104:11
   105:9,10,13,17
   107:10
**cetera** 148:18,18
**CFR** 66:15
**CFRs** 146:12
**challenge** 135:9
   135:12
**chance** 36:20
   44:11 96:13,23
**change** 31:4
   50:6 57:5
   95:22 123:18
   136:24
**changed** 34:10
**Chapel** 15:12
   24:15

**characterize**
   122:17
**characterized**
   72:21 121:21
**charge** 49:16
**chart** 145:9,10
   145:14 146:9
   147:5,23
**charts** 86:1
**chat** 19:20 20:4
   61:5 62:11
   64:7 65:7
   67:25 71:12
   73:21 75:22
   76:3 81:20
   87:24 88:18
   97:17 114:20
   114:21,22
   126:23 128:19
   131:3 153:6
   154:8
**check** 95:15
   132:25
**chemical** 17:6
**Cherry** 3:15
**chief** 52:12
**child** 33:15
   39:21 41:19
   56:15,19 87:12
   136:13,16
   138:19
**childbirth** 92:19
   93:5,12,15
   94:15 103:21
**children** 33:1
   41:22 60:3
   99:17,20
**choice** 41:1,18
   134:4 136:6
   138:19
**choices** 39:18
   124:3 126:12
**choose** 124:2
   125:25 138:19
**chorioamnion...**
   37:7,10,11
   94:2
**chose** 85:15
   90:23
**Chris** 134:9

**Christ** 134:12,23
136:1
**Christian** 22:16
37:23 123:25
129:21 130:3
134:19 135:11
**Christians**
129:23
**Christiansen**
124:9 130:8
**Christina** 46:8
**chronic** 52:18
58:2 59:22
60:2 99:21
**church** 129:19
129:19,20
135:18,19
**cigarette** 79:11
**cigarettes**
152:12
**circumstances**
32:3 35:9
56:18 57:4
87:19 89:8
95:17 100:8
103:20
**cite** 43:20,23
59:7 60:15,19
70:13 80:19
87:18 88:25
90:4 96:10
113:4,10,11
**cited** 21:8,20
22:5 44:21
74:9,12 84:23
85:10,19 99:25
113:14
**citing** 70:20
**citizen** 12:21
**citizens** 54:7
**City** 126:14
**Civil** 2:16,21
**claim** 52:9,12
75:6 112:18
151:9
**clarified** 111:14
113:17
**clarify** 9:13
25:10 30:15
36:14 91:13

93:17 106:2,14
142:16 145:10
**clarifying**
105:19 134:6
**classes** 38:7
135:15
**classified** 84:4
**clean** 14:21
150:13
**clear** 9:5 85:7,20
124:10
**clearly** 116:17
134:19
**client** 6:17
124:14 135:13
**clients** 7:22
124:12 137:24
138:9,11
**clinic** 25:25
29:12 118:22
126:13 136:25
**clinical** 30:17
35:23 54:15,24
76:16 95:10
109:1,3,15
110:18,24,25
111:1 115:17
116:16,20,24
117:3 118:15
121:9
**clinically** 29:7
**clinician** 116:5
**clinicians** 75:19
**clinics** 124:16,17
**close** 39:24
113:25
**closed** 106:8
111:5
**closely** 37:6
50:12 119:13
**co-counsel** 6:16
6:20,25 7:4,22
**coauthors** 74:23
**code** 102:21,21
**coerced** 135:17
**cofounders**
69:16,23
**Coleman** 82:18
83:2 84:22
85:8,18

**Coleman's** 82:24
86:3
**colleague** 15:12
51:5
**colleagues** 16:19
43:16 51:12,19
**collect** 56:14
**collection** 56:2
**Colleen** 3:19 8:1
**college** 22:16,19
22:23,25 37:22
38:15,21 42:4
51:13 83:1,20
**colloquially**
27:20
**colposcopy**
106:4
**column** 61:23
66:14 69:13
74:16 98:6
**combination**
143:10
**come** 33:18
49:11 69:3
90:6 96:21
114:5 119:14
121:23 125:4
132:2 137:18
141:5 153:17
**comes** 27:10
31:3 90:13
100:12 103:7
120:12 130:5
**comfortable**
32:16 130:11
132:18
**coming** 34:22
100:25 106:3
116:25 117:24
118:3 122:6
139:6 153:18
**comment** 13:19
**commission**
156:21
**committed**
134:11
**committee** 43:23
49:3,4,9,13
108:9
**committees**

53:25 54:1,2,3
**common** 35:10
87:19 89:8
100:9 152:7
**commonly** 27:9
32:15 90:5,9
107:22
**communicate**
46:21
**communicated**
15:8 16:12
**communicating**
46:22
**communicatio...**
48:14,16
**community** 79:7
132:5 135:14
151:23 152:10
**comorbid** 86:25
**compare** 56:1
**compared** 70:15
86:12
**compares** 86:16
**comparing**
90:19,22
**comparison** 57:8
90:14,24
**compassion**
124:25,25
134:9
**compete** 41:5
**complain** 120:5
**complains** 103:7
**complaint** 49:19
50:15,20 51:4
51:5,6 118:4,4
118:5 140:21
140:25
**complaints**
51:11
**complete** 27:14
53:15 54:8
**completed** 23:17
23:21 24:3
126:3 141:23
**completely** 8:17
117:25
**compliance**
127:17 133:1
**complication**

59:17
**complications**
19:3 53:6 57:6
57:11 70:15
73:2,3,15 75:3
75:7 78:14
146:24
**complimentary**
149:12
**comply** 130:21
131:23
**conceded** 73:3
73:14,17
**concepts** 126:2,6
**concern** 121:8
122:15
**concerned** 92:17
110:14 119:10
122:10
**concerning**
147:12
**concerns** 73:4
130:3
**conclude** 78:4
**concluded**
154:11,16
**conclusion**
56:17 70:7
77:9,13 83:23
84:24 89:4
149:5
**conclusions**
55:25 77:2
79:1 147:7
**concretely** 79:16
**concur** 128:2,7
129:11
**concurs** 127:23
**condition** 33:9
33:11
**conditions** 33:2
35:8 57:15,18
57:21 58:7
**conducted** 48:10
**conference**
22:13 84:15
123:23 124:19
125:2
**confirm** 61:13
68:23 76:10

81:21 87:25
88:24 97:18
108:16 109:24
114:15,23
117:6 123:11
**confirmation**
115:22 116:25
**confirmed** 28:2
109:11,13
116:6 117:12
120:15
**confounders**
69:23,24
**confounding**
67:21 77:4,14
78:18 81:3,8
81:15 82:14
89:14 96:14,23
98:17
**congenital**
149:17
**connect** 135:13
**conscience** 11:25
11:25 13:14
14:4,7,8
**consent** 138:18
**consequence**
39:17
**consequences**
133:12
**consequently**
70:3 149:2
**consider** 29:2,5
31:2 32:8,10
35:4 46:25
109:12 110:9
110:16,22,23
**Considerations**
115:17
**considered** 44:7
98:18
**considering** 70:6
149:4,16
**consistent** 85:16
89:10,19 94:13
97:1 116:1
146:21 147:9
150:5
**consistently**
78:15

**constitutes**
92:13
**consultative**
39:4
**consults** 31:22
139:14
**contact** 154:5
**contacted** 15:5
17:20
**content** 49:16
**contents** 16:24
18:12 21:14
**context** 35:23
50:24 81:3
92:13 93:15
95:10 100:19
101:17 149:20
150:2
**continue** 8:21
87:7
**continued** 38:11
**continuing**
26:11 103:8
**contraception**
26:13,15 39:5
131:25 132:1,5
132:6,18,23
133:21
**contraceptive**
132:12
**contraceptives**
132:11
**contract** 101:23
**contracted**
132:20,21
**contracting**
101:10
**contracts** 101:11
**contraindicated**
123:12 142:14
142:18
**contribute** 15:19
40:17 43:4
44:9 98:14
**contributing**
99:19,19
**contributions**
75:1
**control** 26:17
65:23 67:20

78:19 81:8,9
86:7 89:22
99:10 101:1,20
104:13
**controlling**
81:11
**conversation**
18:12 39:25
129:14 136:10
**conversations**
35:19 39:14
73:9 140:13
**conversely** 70:5
149:4
**coordinating**
119:7
**copies** 12:5
14:20 15:2
153:4,4
**copy** 14:18,21
20:2,5,11,18
20:18 58:17
61:2,3,5,13
63:5 64:16
68:21 71:22
76:11 150:25
**Corporate** 3:6
**correct** 11:16,17
13:14 14:11
22:17,18,20,22
23:6,9 24:20
26:3 27:5,18
31:12 33:2
45:22 47:12
49:5 55:1
57:20 61:20,21
63:23 67:3
72:8 74:10
82:22 90:20
93:9 97:13
104:5 115:7,22
116:12 128:17
139:18 144:1,6
144:9,12,17,20
145:20 146:5
148:3,4 156:4
**CORRECTION**
157:3
**corrections**
156:6 157:21

**correctly** 59:5
62:3 69:21
72:19 77:6,17
77:23 82:15,16
89:9,10 98:22
111:19 128:4
130:24 134:13
137:25 146:10
149:25
**correlation** 67:6
150:6
**correlational**
67:10,20 78:8
79:9,17 87:6,8
89:11
**counsel** 2:8,13
2:15,20,25 3:4
3:8,12,17,24
6:15 8:5 12:4
132:13 138:18
141:7 155:11
155:14
**counseling**
82:21 140:25
**country** 41:20
56:7 99:14
124:11 152:17
**County** 6:23
7:14 155:3
156:13
**couple** 37:2 39:1
63:3 76:8
124:21 143:23
**course** 16:18
34:10 67:21
141:25
**court** 1:1,19 6:6
6:8 8:15,19
11:12 56:22
143:25 144:7
**covered** 48:21
**covering** 31:21
**COVID** 125:4
**cow** 101:4
**Cowit** 2:4
**CPR** 137:17
**cramping** 27:11
121:3,6
**credentials**
23:23

**criminal** 149:16
**crisis** 135:1,2
**criteria** 87:7
96:19
**critical** 152:20
**criticism** 72:25
**criticized** 82:25
**Crowley** 3:19
8:1,1
**crown** 117:1
**cul-de-sac** 122:3
122:4,5,14
**culture** 126:4
**curettage** 29:23
29:24
**Curran** 3:20
**current** 22:11,12
22:12 123:19
**currently** 42:4,6
46:3 126:7
**cut** 82:7 92:10
**cyst** 120:15
122:8
**cysts** 25:9

---

**D**

**D** 5:1
**D&C** 28:2 29:20
29:22 30:3,4
102:4 103:25
105:4,6
**D&Cs** 25:5 26:1
26:4 101:19,24
102:1,3 104:3
**D&Es** 30:8
**DA** 7:21,21
**daily** 36:24
**damage** 26:7
**data** 53:5,8,24
54:4,23 55:6
55:24 56:1,14
56:17 59:15
62:5 63:7 65:2
65:18 66:3
78:14 84:22
146:12,15
147:2,11
**date** 43:24
111:22 157:23
**daughter** 52:6

Davis 3:14
day 36:25 48:14
   48:15,15,18
   112:3 139:1
   155:17 156:15
daycare 135:15
days 38:25 50:10
   117:2 139:3
DC 2:11
dealing 10:14
dealt 100:16
dean 38:13
death 26:9 54:14
   55:10 57:6,14
   57:22 59:18
   60:12,21 62:1
   64:22,23 70:5
   116:9 145:17
deaths 53:14
   54:10,25 56:5
   57:17 62:6
   63:14,19 64:1
   64:24 66:10,11
   87:20 89:6,17
   145:15,15
   146:5,13,25
   147:2,19 148:1
   148:2,12 149:4
   149:18
deceleration
   50:3
decelerations
   50:12,13
decide 84:12
decided 15:14
   33:24
decides 139:24
decision 39:16
   40:3,5,7,9
   51:14,15 95:11
   99:23 125:23
   129:15 130:1
   136:17,18
   138:20
decisionmaking
   29:9 125:9
decisions 47:25
   134:10
declaration 5:10
   11:9,10 14:21

15:2,20,23
   16:20,25 17:18
   17:18 18:14,21
   19:16 20:11,23
   21:6,9,12,14
   22:2,9 24:17
   32:25 43:21
   45:18 58:9,25
   60:9 63:21
   66:24 68:11
   70:12 74:12
   75:6,11 79:21
   80:19,21 82:17
   85:10,20 86:9
   87:19 88:25
   90:4 91:25
   93:8,22 96:4,6
   97:3 99:2
   108:10 111:5,6
   111:8 112:16
   112:24 113:5
   113:11,15,22
   146:21 149:9
   150:4 151:7
declarations
   18:16,22 21:17
   21:21,24 22:5
   74:6,9 99:1
deed 134:10
deep 105:11,14
deeper 106:15
   152:18
Defendant 2:25
   3:12
defendants 1:6
   3:17 6:24 7:21
   153:11
Defending 4:7
define 29:22
   34:7,8 40:8
   81:3 138:10
defined 48:6
   98:11
definitely 10:7
   118:18,23
definition 26:23
   26:24 27:18
   47:3 102:4
   107:2
definitive 85:21

degree 22:16
   23:13
degrees 23:25
delay 111:10
delayed 111:17
deliver 24:18,19
   37:3 94:7
delivered 31:19
   50:2,3 82:20
deliveries 24:21
   139:22
delivering 24:24
   99:20
delivers 100:10
delivery 33:24
   50:1 92:25
   93:24 100:19
   100:22 101:2,3
   102:5
denominator
   56:10 146:15
   147:4,21 148:5
department 3:1
   3:9,19,25 7:17
   7:20,24 8:2,3
   38:5 106:7
   132:24
depended
   116:24
depending 33:18
   118:4,6
depends 106:2
Depo-Provera
   26:17
deposition 1:10
   6:13,13 9:12
   9:22 10:9,18
   15:18,24 16:21
   18:2,12,18,23
   19:13 20:20
   48:24 142:2
   154:11,16
   155:5,7,11,13
   156:3 157:20
depositions
   10:14 15:17
   48:23
depression 79:4
   79:23 86:25
   87:1,4,14,16

describe 11:22
   12:15 13:16
   20:22 33:4
   38:1 39:14
   48:12 49:22
   71:7 75:13
   80:21 82:18
   93:14 120:21
   121:4,17
described 27:17
   30:14 136:2
describing 94:15
description 5:9
   13:12 26:12
design 85:21
   86:7 89:12
designed 26:25
   58:4 91:4,16
desire 40:5
   111:15 133:5
desk 15:2 88:22
destroy 60:3
details 120:7
   125:16
detect 108:14
   117:16
detected 107:25
   108:1
detection 111:10
   111:17
determine 55:9
devastating
   151:10
developed 34:17
   132:23
development
   38:19
develops 37:14
diabetes 35:21
   57:25
diagnose 112:12
   112:19
diagnosed 33:9
   115:19
diagnoses 33:6,7
diagnosing
   101:14
diagnosis 101:9
   108:24 116:4
   120:13

diagnostic
   114:14 115:20
   143:21
diaphragm
   119:25,25
die 35:13 59:21
   60:17 67:19
   109:17 119:12
   150:8
died 50:10
differ 113:9
   147:14
difference
   140:17 150:6
differences
   67:14 69:18
   149:19
different 30:25
   37:2 38:5 80:6
   90:1 96:19
   102:5 117:4,5
   120:12,22
   121:11,11
   126:8,9 134:3
   137:14 140:16
   147:16 148:13
   149:20 150:11
differential
   101:9 120:13
differentially
   101:14
differentiate
   121:10
difficult 56:1
   57:4,7 58:2
   104:13 105:2
   105:17 146:23
dig 152:18
digital 14:20
   15:4 20:18
   61:5,12 63:4
   64:16 71:22
   76:12
digitally 14:18
   14:19
dilatation 29:23
   30:7 105:5
dilate 103:25
   105:5,12
dilating 103:23

dilators 103:24
ding 29:4
diocese 49:4,10
direct 13:1 39:3
 40:15 42:24
 48:7 70:3
 143:23 144:21
 145:21 148:15
 149:2
direction 49:10
 155:9
directly 9:23
 34:2 116:10
 129:15
director 38:14
 41:11 124:8
 126:8 128:1
 141:1
director's
 129:15
disagree 42:22
 44:4,19 55:21
 55:22 91:23
disagreed
 129:24,25
discharge 94:12
disciplinary
 52:24
disciplined
 52:22
disclaimer
 137:23 138:4
disconnected
 135:19
discount 150:14
discouraging
 85:12
discovering
 75:14
discovery 1:19
 6:6 13:20
discuss 16:24
 18:4 63:21
 86:10,11
discussed 21:14
 31:15 32:19
 125:12
discusses 78:5
discussing 60:21
 61:20 72:1

74:23 80:18
98:2,20 114:12
115:7,24
131:20
discussion 30:24
69:12,13 72:5
72:6,15 77:8
98:19 112:24
113:21
discussions
132:16
disease 60:3
65:23
diseases 58:2
59:22 99:21
disheartened
151:23
dislike 84:8
disorder 79:5
106:13
disorders 75:15
75:16,18 76:22
77:5,15 78:2,5
80:23 86:24
90:6
disparities 59:23
disparity 58:15
59:2
distinction
133:4
distribution
149:21
District 1:1,1
3:12,17 6:8,8
7:14
disturbed 78:22
diversity 38:20
38:22 84:14
124:23
dividing 148:9
Divinity 126:3
division 148:1
Dobbs 51:14
doctor 12:22,25
132:20,21
142:11 143:23
152:22
document 19:23
20:3,20 21:4
30:11 61:8,19

62:10,16 63:2
63:7 64:4,10
65:12,17,19
66:1,3,5 68:4
69:8 71:11,16
71:22,23 73:11
73:11,20,25
74:11 75:25
81:25 88:1,3
91:6 97:21
108:12 109:23
110:1,24 113:4
113:14 114:17
114:20,21,21
115:1,6 126:22
126:25 127:6
127:10,22
128:11,19,23
129:3,8,21
130:17 131:2,6
131:11,16
132:8 134:7
137:20 143:13
145:6 148:19
documentation
17:5 21:1
111:24
documented
27:1 112:4
117:6
documents
18:23 19:12
21:8 68:16
88:17
doing 28:7 29:5
48:21 58:16
67:19 87:24
99:25 100:2
103:25 105:4,6
107:9,10
108:12 123:2
134:21
Donna 46:7
door 116:8
136:6
double 123:2
downside 98:20
downsides 98:19
Dr 8:7 12:8,13
14:2 15:11,15

20:2 21:17,20
21:25 22:5
45:16 46:8
61:12 62:12
64:15 65:9
68:1 71:13
73:22 74:5
78:21 80:18
81:20 83:2
84:22,22 85:7
85:8,9 86:2,3
87:25 91:14
97:17 114:12
114:23 123:16
124:8 127:4
128:20 130:8
131:3 141:18
151:21
draft 45:18
drafting 20:22
drafts 153:4
dramatically
73:1
draw 78:16
118:8 147:7
drawing 147:8
draws 60:5
Drive 3:6
drop 19:19 64:6
114:20
dropped 20:4
52:14,16,21
dropping 61:4
62:10 65:6
67:24 71:11
73:20 81:19
87:23 114:20
114:21 126:22
128:18 131:2
drug 32:14
due 43:24 96:13
96:23
dues 43:2,5
Duke 126:3
duly 6:2 155:7
duties 24:8 39:2
47:14,15 49:9
124:6 137:11
dying 35:25
36:10 60:4

120:2
Dylan 2:4
dylan.cowit@...
2:7

**E**
E 1:8 2:1,1 5:1,2
5:7 6:10 157:1
157:1,1
E65 116:2
E66 115:14
earlier 48:6
52:11 84:18
99:10 100:5
117:9 133:16
134:2 140:4
143:21 147:6
150:6
earliest 117:3,5
early 43:20
50:12 59:25
108:14 116:23
119:9 129:20
ears 121:7
easier 20:17
63:4 72:11
153:12
easily 150:24
east 23:18 24:11
24:14 30:13,16
30:20,25 31:2
37:18 138:25
eastern 139:25
easy 64:3
ectopic 25:8
43:21 80:6
107:20,21,25
108:1,2,13,18
108:21 109:1,4
109:13,16,18
109:22 110:5,6
110:9,12,16,20
110:21,22
111:10,12,18
112:12,19
113:1,21
114:13,14
115:11,19,21
115:25 116:4,9
116:11 117:10

118:17 119:11
119:15,16
120:16,23
121:8,12,24
122:19 142:18
142:24 143:1,5
143:14,17,19
143:22
ectopics 56:13
116:14
**Edenton** 3:2,10
3:20
**edge** 100:12
**editor** 73:22
**educate** 30:20
**educating** 47:24
**education** 46:7
46:12,14 47:8
59:25 150:12
**educational**
23:23 46:18
**effect** 78:9
137:23 149:14
**effective** 32:12
133:15
**effects** 32:12
67:13 69:17
98:17 151:10
151:13 152:2
**effort** 8:21
**eight** 33:6 43:2
51:19
**either** 9:11 10:7
11:3,5 14:17
85:1 86:1
143:5
**elective** 30:22
**electronically**
139:10
**element** 87:2
**Elisa** 4:19 7:3
**Elizabeth** 3:20
7:19 126:14
**Ellis** 3:5 6:22
15:11 142:10
**else's** 147:11
**email** 16:4
**embryo** 117:6
117:13
**embryos** 33:7

**emergency**
50:14 118:9,12
**emotional** 90:1
**emotions** 90:11
**employed** 30:18
31:4 141:18
155:12,14
**employee** 30:16
155:14
**employer** 52:25
**empower** 126:1
**empowered**
39:15
**empty** 14:24
**encourage**
135:12
**ended** 22:22
139:18
**endometritis**
94:5,14,19
95:8,18
**engage** 128:1
**engorged** 101:7
**entail** 46:14
47:14,15 49:9
124:7
**entailed** 48:13
**entire** 119:20
**entirety** 21:9,18
21:25 156:3
**entitled** 62:11
65:7
**environment**
94:9
**environmental**
98:13
**eobrien@ncd...**
3:23
**epidemiological**
149:10,23
**epidemiologists**
55:9
**epidemiology**
116:16
**equality** 41:21
**equally** 134:11
**equate** 80:4
**equated** 29:24
**equipped** 102:15
**equipping** 46:19

**equity** 84:14
124:23
**equivalent**
109:13
**erroneous** 70:7
149:5
**especially** 89:6
89:17 139:25
**Esquire** 2:4,4,5
2:9,10,16,17
2:22 3:1,5,10
3:15,19,20 4:8
4:17,18
**establish** 79:16
97:12
**estimated** 67:13
69:17
**estimating** 43:24
**et** 1:3,6,8 5:16
6:9,10,10
60:15 70:21
71:12 80:22
96:10 97:8
148:17,18
**ethically** 14:5
**evacuation** 30:8
**evaluation**
114:14,15
115:20,22,25
116:11
**evaluations**
50:22
**Evangelical**
129:21 135:21
**event** 152:6
**events** 73:4
**eventually** 83:25
**everybody** 56:3
95:23 135:22
137:1
**evidence** 46:19
97:1 149:11
**Ex-AA** 5:21
**Ex-BB** 5:22
**Ex-CC** 5:23
**Ex-DD** 5:24
**Ex-EE** 5:25
**Ex-P** 5:10
**Ex-Q** 5:11
**Ex-R** 5:12

**Ex-S** 5:13
**Ex-T** 5:14
**Ex-U** 5:15
**Ex-V** 5:16
**Ex-W** 5:17
**Ex-X** 5:18
**Ex-Y** 5:19
**Ex-Z** 5:20
**exact** 60:25 62:8
65:19 125:6
127:7
**exactly** 47:8
56:23 90:12
108:25 113:16
113:18
**Examination**
5:3,4,5
**examined** 6:2
**examining** 89:22
90:15
**example** 19:8
32:5,6,15
34:24 35:21
36:18,21 87:9
94:2 99:6
107:8 109:6
118:5
**examples** 27:15
89:11
**exception** 3:18
9:17
**exceptional**
124:12 137:5
**exclude** 123:14
142:14,18,23
150:13
**excluding**
123:13
**excuse** 10:6
25:20 34:22
**excused** 154:14
**executive** 129:14
**exemptions**
149:16
**exercise** 38:7,8,8
37:5 102:2
**exhaustive**
69:16
**exhibit** 19:21
61:6 62:12
64:8 65:9 68:1

71:13 73:22
75:22 76:12
81:20 87:25
97:17 114:22
126:23 128:20
131:3 146:3
**Exhibit-10**
148:16
**Exhibit-A** 22:9
**Exhibit-AA**
97:21
**Exhibit-BB**
115:1
**Exhibit-CC**
126:25
**Exhibit-DD**
128:23
**Exhibit-EE**
131:6
**Exhibit-P** 19:21
19:23
**Exhibit-Q** 61:8
143:25 144:3,5
**Exhibit-R** 62:16
144:22
**Exhibit-S** 64:10
145:21
**Exhibit-T** 65:12
**Exhibit-U** 68:4
**Exhibit-V** 71:16
**Exhibit-W**
73:25
**Exhibit-X** 75:25
150:18
**Exhibit-Y** 81:25
**Exhibit-Z** 88:3
exhibited 67:1
**exhibits** 143:24
exist 54:4 96:21
exists 81:10
expect 15:18
33:15 93:1
expectant 28:1,4
28:5 36:21,22
37:5 102:2
expected 33:11
72:23 123:10
expecting 109:5
expedite 153:15
expedited

153:11,17,23
154:4
**experience** 79:6
79:22 121:9
133:7,18
**experienced**
15:16 57:11
83:20
**experiences**
125:20
**experiment**
149:11
**expert** 10:22,23
10:25 11:1,4
11:13,15 15:6
16:5 19:16
20:11 48:9,16
48:19,21 91:15
**expertise** 125:21
125:22
**experts** 83:1
**expires** 156:21
**explain** 140:17
150:3 151:6,18
**explained** 67:14
69:18 81:15
82:13 87:15
149:21
**explanation**
100:3
**explicitly** 67:12
85:20 97:11
**explore** 98:10
152:11
**exposed** 152:6
**exposure** 77:3
77:14
**express** 40:5
**extent** 91:5
**externing** 7:4
**extremely** 83:12
91:16 135:21
**eyes** 128:11
136:4

**F**

**face** 124:1
**face-to-face**
47:17
**facilitate** 140:2

**facilitating**
149:22
**facilities** 146:16
**facility** 28:25
29:3 30:17
106:19,24
107:17
**facing** 134:10
**fact** 10:23 14:4
52:6 54:22
56:6,11 78:22
83:22 85:12
89:16 94:7
99:8,8 144:10
147:1,11 150:7
150:9
**factor** 77:4,15
83:7 87:2,20
89:8,18 97:2
99:19,19,20,21
150:9
**factors** 13:8
67:14,21 69:18
90:3,5,10
96:16,21 98:14
98:17 110:6,12
110:20 116:3,4
116:15 133:22
134:3 149:22
150:8,11
**failure** 57:24
**fair** 46:22 79:14
**fairly** 83:18
**faith** 5:24 43:5
127:24 128:7
128:20 129:9
129:11 130:19
135:10
**fall** 134:1
**fallopian** 107:23
**falsely** 112:18
**familiar** 24:25
65:1 90:25
91:3,5 127:6,7
**familiarity**
24:23
**family** 16:16,17
16:19
**far** 17:14 30:24
47:24 66:14

105:17 118:6
**Farris** 21:17
123:16
**Farris's** 21:20
**fast** 52:20 101:8
**fatal** 143:22
**fatality** 66:10,15
66:19
**fathers** 129:20
**fatigue** 124:25
**FDA** 123:14
142:22
**Federation** 2:3,9
6:19 7:11
**feel** 9:6 41:18
42:23,24 95:14
120:19 121:11
121:13
**feet** 136:4
152:18
**fellow** 91:14
**felt** 32:16 41:8
44:8 51:23
52:19 130:10
**Fergusson** 5:19
78:21 79:13
80:22 81:13
84:23 85:8,9
86:3 150:17,21
**Fergusson's**
151:21
**fertility** 148:17
**fetal** 29:16 30:5
35:1,13,15
42:25 47:2,6
50:5 117:12
140:5 149:17
**fetus** 33:5 34:16
35:17
**fever** 94:11,12
**fewer** 148:9
**fighting** 36:19
**figure** 68:8
**figured** 68:20
**file** 62:11 65:7
71:12 73:21
128:19
**filed** 52:9,12
**files** 14:16
**filing** 155:11

**fill** 119:21
**filling** 92:15
119:24
**fills** 121:10
**finally** 150:17
**financially**
155:15
**find** 44:17 63:4
91:12 111:5
144:4 150:24
152:18
**finding** 41:13
80:22 82:18
85:16 122:3
143:7
**fine** 9:14 10:12
20:19 27:12
50:2 61:16
63:6 92:11
113:15 151:1
**finish** 9:2,3
**finished** 23:12
37:16
**Finland** 86:16
**Finnish** 86:11
87:18
**first** 6:2 15:5
20:3,6,25 38:9
39:1,1 42:12
49:14 50:2
61:22,25 63:10
72:6,15 76:15
76:18,21 85:3
88:24 109:20
115:19 121:21
121:23 123:17
130:9 132:15
132:19 143:24
149:12 152:11
**Fiscal** 47:21
**five** 104:11
105:4,9,12
108:15 117:2,2
117:2,6,9
**five-minute**
141:9
**fix** 105:8 125:24
150:19
**Fjerstad-Niini...**
5:17 73:21

**flaccid** 50:9
**flag** 131:24
**flashes** 32:4,6
**flaws** 79:15
**Floor** 2:5,17
**flow** 101:7
**fluid** 37:12
122:3,14
**focusing** 13:20
**folks** 16:11
79:24 114:19
**follow** 86:2
108:8,11 109:9
118:23 119:5
136:23,25
**following** 90:23
116:18 119:6
119:13
**follows** 6:2 87:3
**followup** 118:22
119:2 139:11
**forbid** 102:20
**foregoing** 155:5
155:7 156:2
157:20
**forget** 47:8
**Forks** 1:21
**form** 40:11
69:22 73:6
102:13 103:4
115:8 136:21
**Forsyth** 7:14
**forth** 30:10
127:24 130:21
**fortunately**
83:25 108:20
**found** 60:20
66:25 72:7,16
81:14 82:13
84:2
**Foundation** 2:16
2:22 7:2
**four** 23:15 34:20
35:1 50:10
70:13,14 79:6
84:23 85:4,11
104:11 105:4,9
105:12 137:20
152:17
**fourth** 30:22

**fraction** 148:13
**Francis** 46:8
**free** 9:6
**freedom** 4:7
   13:14
**freestanding**
   25:23
**frequent** 82:21
   82:22
**fresh** 14:4
**Friday** 139:14
**friend** 15:12
**front** 14:17 22:7
   22:10 40:18,18
   41:18 91:2
**Frontiers** 83:10
**full** 8:11 31:20
   37:24 41:23
   59:9 63:10
   92:15 156:4
**fully** 130:21
**fulsomely** 151:6
**further** 70:2
   142:5 155:13

**G**

**G** 3:15
**gal** 68:21
**gamut** 31:20
**gaps** 140:1
**gears** 53:2 92:4
   100:4 107:19
   123:18
**gender** 12:1
   14:10
**general** 3:4 7:18
   125:17 145:13
   152:4
**generalization**
   93:7
**generalized**
   119:23
**generally** 18:5
   18:11 31:11
   38:1 48:12
   71:8,9 72:8,18
   84:6 113:13,20
**genetic** 98:14
   149:17
**gentlemen** 6:4

**germane** 13:22
**gestation** 60:13
**gestational**
   35:21 57:7
   94:3 108:15
   117:1,7
**getting** 49:1 69:3
   89:23 113:25
   139:4 145:7
   148:2 151:22
**gist** 14:8
**give** 15:22 18:18
   20:13 27:25
   39:20,20,21,22
   52:2 58:21
   68:7 80:7
   83:12 84:1
   90:23 91:7
   95:3,14,16
   99:23 101:22
   101:22 106:10
   106:12 110:18
   112:3 131:12
   133:21 138:18
   142:16 147:3
   151:6 154:8
**given** 28:23,24
   56:17
**gives** 86:4
   109:24 116:16
**giving** 8:21 52:1
   52:4 79:25
   80:4 86:13
   100:23 142:24
**glance** 130:10
**go** 7:9 14:8,20
   15:22 16:16
   26:10 30:24
   36:24 37:3
   41:14 43:2
   45:8,16 53:15
   54:20 63:10
   64:18 65:21
   66:5 69:8 72:3
   74:19 75:10
   76:3,25 80:9
   82:5 88:18
   89:2 93:20
   95:12 98:4,6
   101:8 103:14

106:6 111:6
   114:1 115:14
   119:11,12
   123:19 125:16
   130:14 139:2
   141:11 142:8
   145:25 146:2
   150:23 153:3
**goal** 135:9
**God** 41:8 102:20
   129:18 136:13
**goes** 68:13 85:5
**going** 6:4 8:13
   8:25 9:8 16:2,7
   16:7 19:19
   27:12 29:7
   30:10 33:24
   35:21 37:6,8
   43:6 44:10
   45:11,20 46:17
   47:18 49:15
   53:2 58:12
   61:12,22 64:6
   67:9,20 68:15
   68:17,17 69:15
   70:2,12 71:20
   74:16 75:21
   77:19 78:13
   80:12 82:17
   83:22 85:18
   86:5,6,9 88:16
   89:13,18 92:6
   97:16 98:8
   100:4 105:15
   107:19 109:16
   113:13,24
   114:1,4,6
   117:6 120:6,22
   123:18,19
   133:19,20
   134:6 135:11
   136:12,14
   137:19 141:12
   141:22 144:4
   147:15,24
   150:24 154:12
**good** 6:3,22 7:16
   7:19 8:7 9:10
   43:5 79:9
   90:14 96:15

99:4 100:2
   134:20,21
   147:9
**gosh** 90:6
**gospel** 134:11
   135:22,25
**governance** 48:1
**graduate** 23:15
   23:25 38:13
**graduated** 22:15
   22:25 31:5
**Grandin** 4:17
**Graunke** 2:22
   4:18 7:1,1
**Gray** 2:15
**great** 9:5,11 10:5
   10:7 42:21
   43:3 44:4
   56:14 61:19
   82:5 86:4 91:8
   109:24 154:8
**greater** 13:5
   35:3 59:17
   92:21 93:5
   94:15
**greatest** 57:5
**greatly** 78:21
**Greenville** 24:5
   24:6,8 26:12
   26:13,20 30:12
   30:13,19 31:1
   31:6 37:17,20
**grew** 135:18
**ground** 8:14
**group** 24:10,11
   70:25 83:8,21
**guess** 31:4,9
   93:21 106:2
**guide** 124:17
**guideline** 112:22
**guidelines** 19:4
   136:23 137:1
**guilt** 90:12
**Guttmacher**
   146:15 147:3
   147:13,16,21
   148:6
**gyn** 31:23
**gynecological**
   24:12 25:1,2,4

**gynecologist**
   106:15
**Gynecologists**
   42:5 45:22
**gynecology**
   23:18 24:6,10

**H**

**H** 5:7 157:1
**half** 38:25 48:18
   56:9 87:1
   116:3 139:1
**hand** 61:22
**handle** 102:1,15
   140:25
**handled** 101:24
**handout** 132:4
   132:22
**hands** 136:4
**Hanes** 96:10
**Hannah** 2:9 7:6
   7:9,10
**Hannah.swan...**
   2:12
**happen** 59:23
   83:18 119:1
   136:10 152:15
**happened** 10:24
   51:14
**happens** 109:7
   119:15
**happy** 50:17
   85:14
**hard** 14:18
   33:14 35:19
   50:11 58:17
   68:16,21 69:3
   71:22 76:11
   130:7 132:22
   134:1,1 150:25
**harder** 105:1
**harm** 32:17
   133:19
**harming** 40:17
   152:19
**Harrison** 46:7
**hCG** 108:3,6
   112:11,14,18
   116:18 118:7
   118:23,24

143:10
**head** 8:22 14:3
  53:16 55:4,12
  60:8 86:18
  101:8 119:4,14
  139:2
**head-to-head**
  92:23
**heading** 72:6,15
  77:2 82:10
  98:7,8 115:17
**headings** 76:16
**health** 3:25 8:3
  38:4,21,24,24
  39:6,9 47:5
  53:21,22 59:23
  67:15 69:19
  75:7 79:8
  81:14 82:13,25
  86:5 89:22
  90:6,10,15
  91:22 132:24
  135:2 136:21
  140:5 151:10
  151:12 152:2,7
**healthcare** 14:6
  38:22 39:22
  40:16 47:4
  48:7 73:5
  125:17,18
  135:3 139:25
  148:17
**healthy** 33:15
  133:8
**hear** 121:7
**heard** 8:19 29:4
  59:24 121:4,6
  121:15
**hearing** 13:21
**heart** 41:16 50:5
  50:8 117:12
**heavier** 122:17
**heavily** 82:25
  101:21 113:1
**heavy** 72:22
  88:20 120:4,4
**Heck** 37:15
**hell** 136:13
**help** 32:6 40:19
  60:2 93:17

101:23 104:18
  124:2,17 134:9
  135:11,20
  136:15 150:2
**helped** 24:17,19
**helpful** 137:19
**helping** 39:17,19
  124:14 152:19
**helps** 101:12
  123:25 124:11
**hemorrhage**
  26:6 72:22
  91:25 92:2,8
  92:13,18,21
  93:1,2,4 100:5
  100:10,21
  101:2,4 102:4
  102:10,15
  103:2
**hemorrhages**
  100:16
**hemorrhaging**
  100:6 101:17
  102:24 103:13
**hereto** 127:24
  130:23
**heterotopic**
  108:19
**Hi** 7:1,6
**high** 60:6 99:14
  109:1,3,14
  119:10 120:1
**high-risk** 33:17
**higher** 57:14,17
  58:13 59:1,12
  59:14,15 70:14
  70:14 86:12
  89:5 99:15
  110:25 148:6
**highest** 83:6
**highlighting**
  89:16
**Hill** 15:12 24:15
**HIPAA** 136:23
  136:25 137:1
  137:16
**hired** 38:3
**history** 108:3,6
  110:7,21
**hold** 43:10 120:2

**holes** 54:21
**holy** 101:4
**home** 94:11
  109:17,18
**homicide** 87:20
  89:6,17
**honest** 48:25
  95:22 136:25
  138:6
**honestly** 49:15
  113:17 116:7
  121:17 128:8
**honors** 38:9,10
**hope** 134:9
  136:18 138:19
  153:16
**hopefully** 36:17
  58:5 143:13
**hoping** 153:18
**hormonal** 26:16
  26:16
**hospital** 21:2
  24:13 25:8,14
  25:17,18,20,24
  28:19 29:21
  31:21,22 34:21
  50:18 95:9,12
  95:18,21,23
  104:3,7,9,14
  104:15 118:14
**hospitalization**
  17:4 94:24
  95:2
**hospitalize** 95:6
**hospitals** 24:21
  24:24 102:11
  102:14,17
  104:22
**hot** 32:4,6
**hotel** 15:1
**hour** 17:12
  44:11 92:15
  113:25 123:3
  138:25 142:13
**hours** 17:13,19
  17:21,23 92:16
  139:15
**house** 135:7,8
**housekeeping**
  8:14

**human** 3:25 8:3
  13:2 40:16
  51:7
**hundred** 21:7
  30:19 35:3
  42:14 56:5
  71:6
**hundreds** 78:17
**Hurrey** 1:18
  155:4,19
**hurt** 134:1
**husband** 120:21
**hydatiform**
  56:13
**hypertension**
  58:1
**hypothetical**
  35:23 57:3
**hysterectomies**
  25:6
**hysterosalpin...**
  106:7

————————
**I**
————————
**I-TOP** 98:11,11
  98:19
**i.e** 146:12
**I.V** 95:20 107:4
**ICU** 102:20
**idea** 60:15
**ideation** 75:16
  79:24 86:23
  87:5,11,16
**ideations** 79:5
**identification**
  19:24 61:9
  62:17 64:11
  65:13 68:5
  71:17 74:1
  76:1 82:1 88:4
  97:22 115:2
  127:1 128:24
  131:7
**identify** 6:15
  53:13 54:10
**Illinois** 23:1,5
**illness** 10:14
**illnesses** 52:19
**Im** 2:10
**imagine** 153:12

**immediate**
  102:18
**immediately**
  74:13
**impact** 39:25
  78:19 83:7
  90:7 147:4
**impacted** 13:4
  51:16
**impacts** 149:9
**implanted**
  100:14
**implication**
  151:8
**implications**
  76:16 82:7,9
  98:7 125:9
  151:3
**implicit** 84:15
**implied** 79:20
**imply** 151:12
**important** 21:4
  84:16 89:21
  98:18 100:1
  109:9
**inaccurate** 55:24
  55:25
**incidence** 70:5
  149:3
**incidents** 149:19
**include** 28:15
  29:11 70:25
  113:6
**included** 19:6
  22:2 25:1
  26:16 52:13
  100:2 116:17
  150:3 151:7,18
**includes** 43:13
  108:11 132:4
**including** 21:3
  38:13 59:22
  83:1
**inclusion** 84:14
  124:24
**inclusive** 129:23
**incomplete**
  27:13 98:19
**inconsistent**
  112:9,22

incorporated 127:25 130:23
increase 38:21 57:21 89:18 97:5 143:18
increased 39:2 75:15 80:23 86:20,24 87:11 87:16 97:12 149:18 152:7
increases 60:13 96:7 143:20
independent 67:14 69:18 70:4 149:2,14 149:22
independently 149:24
indicate 89:7
indicated 29:7 110:21 124:5
indication 35:14 35:15
individual 48:24 53:20 108:12
individuals 12:18 16:3 18:16 43:13
induced 26:22 26:23 27:3,8 32:24 33:25 34:3 35:6 36:14 42:23 43:6 44:22 48:6 56:12 57:6 58:13 59:1,11 60:12 60:23 62:1 67:8,10 93:23 96:7 98:12 99:18 111:15 124:5 138:7 140:4,9,10 146:11,13,14
induction 34:5 34:14,15 35:9 35:12,17,20 36:1,11,16 37:8,14
inductions 35:5

infallible 129:18
infection 26:6 36:24 37:11 93:9,11,14,23 93:24,25 94:5 94:6,9,13 96:1
infections 133:22
inferences 78:16 135:2
infertility 106:9
inflate 148:10
influence 67:15 69:19
inform 146:19
information 19:6,8 39:16 44:2,24 45:2 53:23 83:22 123:14 126:1 132:12,24 136:9 140:15 142:22 146:22 147:8,20 154:5
informed 40:2 138:18
initial 67:13 69:17
initially 38:3 103:6
injection 26:17
injunction 13:21
inside 104:11 122:6
inspected 137:7
inspired 129:18
Institute's 146:16 147:3
instruct 16:8 18:3
instrumentation 104:19 105:3
instruments 94:10 103:24
integrate 135:8
integrity 84:3
intention 36:15 36:16
intentional 13:1 40:15 42:25

48:7
interested 155:15
internal 100:14 100:15 121:21 150:19
internationally 98:16
interpretation 98:16
interpreting 98:16
interrupt 40:22
intersection 126:5
Intervenor-De... 1:9
intervention 26:25
interviewers 75:19 76:23
interviews 48:17 151:21
intraabdominal 107:24
Intraoperativ... 100:16
intrauterine 17:5 108:16,20 108:25 109:5 109:16 110:14 111:2 112:25 113:21 120:16 122:12 139:7 142:14 143:6
introduced 14:23
intubate 102:22
invasive 10:12
investigation 83:9
involve 27:23 28:5 29:18 30:7 38:23 39:11
involved 15:13 16:2 127:21
involving 27:17
irresponsible 79:2

irritates 119:25
irritating 119:22
issue 150:16
issues 25:12 49:11 57:23 59:25 86:5 90:11
IUD 123:11
IUDs 26:18
IUP 21:1 109:24 110:1 112:4,25 116:6 117:6 123:11,13 142:19 143:13 143:16

**J**

Jesus 134:9,12 134:22 136:1,4
Jim 3:13,18 7:14
job 41:24 58:4 125:22,23,24 125:24,25 147:10,14
John 15:11 45:17
joined 6:24 7:3
Joshua 1:6 2:25 3:4 6:10 7:18
journal 83:6,9 84:2,7 85:4,14 85:15
journals 79:1 84:12,13,23
journeying 125:19
joy 80:4
jpayne@adfle... 4:12
judge 125:24 136:7
judgemental 120:19
juggle 68:16
Julia 4:8 15:10 16:3
Julie 6:24
July 17:17
jumps 119:8
June 51:14

jury 52:13
Justice 3:1,9,19 7:18,20,24 8:2

**K**

Kara 4:17
Karalis 5:20 88:11,25
keep 147:15
kept 83:10 98:15
Kevin 3:15 7:13
keynote 125:1
kgraunke@ac... 2:24
kicked 127:21
kidney 57:24
killing 13:1 40:15 42:25 48:8
kind 26:11 30:14 36:13 48:16,17 48:22 69:14 80:5 83:20 107:6 122:4 134:2
kinesiology 23:2 23:4 38:6
Kinsley 3:24
knew 32:17
know 9:7,14,17 10:9 13:21 16:2,5,19,21 16:22,23 17:17 25:22 29:9,25 33:7,14 35:3 35:13 36:22,24 37:1 41:4 43:5 43:16 44:21 47:23 49:16 50:17,23,23 52:7,17,18 53:13,15 56:3 56:4,6 57:4,5,5 57:24,25 59:10 59:11,13,17 65:9 66:7 67:4 67:19 68:1,16 71:3,9,13 73:8 73:23 76:5,7 78:19,20,24

79:2,7,11,12
81:5 84:13,20
85:13 86:24
89:12,15 90:3
92:21,23,24
93:4,6 94:14
95:3,13 99:5
99:13,14,15,22
100:22,23,24
101:1,9,21
103:8,13
104:11,18
106:21 108:24
109:6,8 110:11
112:1 113:20
115:14 116:8
116:15,24
117:3,5,7
118:1,6,16
119:7 120:13
120:14,14,19
120:22 121:7
121:14 124:2
127:4,9 128:8
128:8,21 130:6
131:4 132:23
133:1,3,22,25
134:2,3 135:5
135:20 136:5,9
136:9,11,13
138:15,17,17
140:16 144:7
144:23 145:3
145:24 146:24
147:10 148:19
150:7,20
151:20 152:11
knowing 132:19
knowledge
  29:15 30:4
  87:11
known 27:9 52:8
  67:14 69:18
  85:3 90:9
  116:4 127:20
knows 16:17
  89:15
Koch 148:16
Kristi 2:22 4:18
  7:1

Kudumuri 4:16
  4:20
kwilliams@be...
  3:17

**L**

L 38:15,16
lab 143:11
label 32:1
labeled 66:9
labor 49:25
  100:19,22
  102:5
laceration
  101:13 104:1
  105:14
lacerations
  102:17 103:18
  103:23
ladies 6:3
laid 128:11
landmark
  105:13
language 124:10
laparoscopy
  25:9
large 101:6
  119:4 151:10
larger 147:17,18
late 50:13
law 7:4 15:18
  70:4,6 149:3,5
  149:15
laws 44:22 67:5
lawyer 18:4
  152:24
lawyers 48:22
lay 75:19 76:22
LBW 98:14
lead 26:7 35:8
  46:16 87:4
  98:25 124:21
  152:4
leader 46:6,11
  46:13 47:10,11
leaders 142:11
leading 109:19
leads 55:25
learn 122:20,24
  123:8

learned 126:6
leave 41:6
  135:22 136:5
leaving 44:7
lectures 30:21
  31:9
Lee 38:24 39:6,9
LEEP 106:4
left 41:7,7 44:4
  61:22 69:10
  80:18 119:18
  122:13
legal 1:20 2:22
  7:2 11:10
  39:18 41:20
  60:22 66:15
  146:11,13,14
legal-induced
  146:23
legally 62:1
legally-induced
  60:22 62:2
legislation 5:15
  11:24 67:1,15
  69:6,19 148:17
  149:13,20,24
legislative 6:23
  11:20 142:10
  153:10
length 117:1
let's 32:15 37:1
  69:4 90:20
  93:20 106:3
  111:6 119:17
  130:14 132:3
  141:11
letter 51:22
  73:21
level 23:25 24:1
  34:21 59:3
  92:17 110:23
  110:25 111:1
  119:10 149:12
levels 106:16
  112:11,18
  116:18 118:7
  118:23,24
  143:11
Liberties 2:16
  2:21

license 137:13
  137:16
licensed 137:15
licensing 52:22
lies 135:16
life 41:19,22
  49:4,10,17
  102:23,25
  124:2 125:20
  140:6 152:6
life-affirming
  124:3 136:18
  138:19
life-limiting
  33:2,11
lifestyle-related
  98:13
ligations 26:18
liked 83:24
likelihood 33:10
  57:14,17 75:15
limit 33:8
limitation 72:24
  73:10 79:17
  91:8
limitations
  56:14 73:11
  76:17,22 78:7
  85:21 89:14
  96:16 99:5
limited 25:7
LINE 157:3
lining 29:25 94:6
  119:22
link 60:6 70:4
  149:2
linked 91:22
list 53:15 54:8
  55:4 156:5
listen 14:22
lists 30:13
literal 16:17
literature 13:9
  18:25 19:1,3
  21:2 73:1 74:9
  75:2 78:10
  79:3 83:14
  85:24 96:18
  133:14 134:24
  135:1

little 10:12 26:11
  42:1 53:3 70:2
  100:4,4 107:19
  121:16 122:9
  122:16 123:18
  142:15 146:8
  151:20
live 27:2 36:15
  36:17,17 56:2
  56:5,6,7 62:6
  63:14,19 64:1
  66:20
lived 133:18
living 133:17
LLC 1:20
loaded 133:11
lobbying 47:22
  47:24
local 107:6,8,11
  107:15,15
located 109:11
location 108:22
  108:23 109:10
  109:13 110:3
  110:20 112:7
  117:21 120:24
  143:7,18
logistics 15:24
logo 65:22
long 15:4 42:10
  46:1 69:14
  83:13 91:6
  93:22 98:8
  130:7 133:24
  152:13
longer 37:25
  42:20
longitudinal
  86:3
longitudinally
  78:23 90:23
look 13:6 53:16
  56:4,8 60:24
  64:17 67:17
  69:4 71:5
  77:10 78:19
  81:7,16 84:21
  86:1,19 88:13
  88:23 91:6
  92:23 95:10

**low** 98:15
110:25 148:11
149:23
**lower** 67:1,5
70:5 73:2
120:18 122:4
122:14 143:18
148:14 149:3
**lung** 78:11 79:10
87:9 152:12

---

**M**

**M** 5:2
**M.D** 1:12 6:1,13
23:7,14 156:1
156:10
**mad** 136:14
**Madam** 143:25
**main** 13:9 26:19
75:1
**major** 91:8
149:22
**majority** 15:3
44:21 95:21
**making** 47:23
61:15 70:3
99:23 149:2
**malpractice**
10:25 11:14
52:9 83:13
**manage** 106:5
106:15 118:11
**management**
27:21,23 28:1
28:4,5,8,13,22
29:13,18 30:7
36:21,23 37:5
101:17 102:3
**mandatory**
54:19,23
**Mantula** 70:23
**manually** 50:7
**marijuana** 82:22
**mark** 71:13
73:22 75:22
81:20 87:24
97:17 126:23
128:20 131:3
**marked** 19:23
61:6,8 62:12

96:20 106:8
111:24 113:12
122:1,2 125:16
127:8 134:24
145:14 146:8,8
147:12 150:10
**looked** 21:22
22:6 65:3
139:7,10
**looking** 10:9
20:6,20 45:1
50:8,10,12
58:19 61:14
63:7 64:16
68:20 75:21
76:11 78:7,17
81:21 88:1
89:15 97:18
99:7 113:18
114:23 125:15
126:4 132:8
150:11
**looks** 27:12
46:18 78:23
88:22 90:7
**loss** 43:20 80:5
92:12 103:15
104:17
**losses** 56:13
**lot** 13:19 15:16
17:15 33:14
34:21,23 35:19
39:23 44:4,19
54:21 84:11
88:17 96:2
98:24 99:12
101:7 103:13
104:13 109:7
116:24 120:3,6
126:2,5 133:25
**lots** 34:20,20
43:16 78:10
120:11
**loud** 34:23
**love** 30:20 33:14
41:14 133:1
134:18,20,23
136:8
**loved** 134:23
**loving** 136:4

62:16 64:7,10
65:8,12 67:25
68:4 71:16
73:25 75:25
81:25 88:3
97:21 114:22
115:1 126:25
128:23 131:6
**married** 132:11
132:17 133:4
133:13
**mass** 122:12
**massage** 101:22
**Massey** 2:5
**massive** 39:16
**master** 23:1,25
**master's** 23:13
23:15
**mastitis** 96:1
**material** 46:18
**materials** 142:1
**maternal** 5:12
5:13 13:4 21:3
35:1,12 47:2,6
53:25 56:4
59:14,19 60:7
62:6,11 63:8
63:13,17,22
64:1 67:1,15
69:19 70:5
86:15,16
109:19 140:5
144:1,16,17,18
144:23 145:11
145:13,17,19
146:4 148:11
148:17 149:4
149:14,18,19
149:23
**maternal-fetal**
33:16,17,22
58:3 140:2
**matter** 6:7 52:6
56:6
**matters** 102:23
**Mbulleri@nc...**
3:12
**mean** 17:15 19:2
19:5 31:9 33:4
33:5 40:22

50:16 59:13
71:9 92:10
93:24 100:21
119:9 120:11
125:15 136:1,3
136:12 137:12
138:11 142:17
147:6 150:5
153:16
**meaning** 28:1
87:1 101:10
117:12,17
**means** 100:12
126:19
**meant** 102:2
142:23
**media** 6:12 54:9
54:11
**medical** 3:8 7:25
10:25 12:22,25
13:2 23:14,16
24:13 28:22
30:18 31:25
41:11,20 44:24
45:2 46:18
47:4 52:18
55:14,19 72:7
72:17 73:1,16
75:4 100:6
103:17 105:21
108:3 109:21
109:23 110:7
110:21 116:21
117:14 123:21
124:7,8,16,16
124:17 125:22
126:7 133:7
135:6,8 136:2
136:3,25 137:2
137:10,11,12
137:13 140:19
141:1
**medically** 50:25
**medication** 17:6
27:24 28:6,8
28:12,15 32:1
70:13,25 71:3
71:7 72:23
111:9 112:6
122:21,25

123:8,9 142:24
**medication/ch...**
140:17
**medications**
111:16
**medicine** 23:19
24:14 27:8
33:17,17,22
43:1 58:3
106:11,22,23
126:4,5 134:24
140:2,7
**medicines**
101:23
**meet** 134:22
**meeting** 46:16
47:17 49:6,14
**meetings** 47:17
**member** 42:4,9
42:13,20 45:21
46:1,5 47:14
49:3,6,9
123:21 124:6
128:1
**members** 30:17
43:10,17,18
**membership**
42:15,16 43:8
43:11,13
**membranes**
34:24 35:8
**memory** 10:15
**men** 33:8 120:20
124:1 132:12
133:25
**Mendias** 2:16
7:5
**menopausal**
32:4
**menstrual** 109:6
109:8 111:22
112:2
**mental** 75:7,15
75:18 76:22
77:5,15 78:2,5
80:23 81:14
82:13,25 86:5
86:24 89:22
90:5,10,15

91:22 135:2
151:10,12
152:2,7
mentioned 13:12
  16:1 18:21
  19:12,15 21:1
  25:1,16,25
  26:1 30:12
  94:2 100:20
  101:3 105:4
  120:9 121:19
  124:18,21
  139:16 141:22
mentioning
  134:22
mess 88:22
message 147:9
  150:5
met 49:24 96:19
metaanalysis
  96:20
metal 103:24
methods 43:23
  72:7,17 91:11
  91:11
Mexican 148:18
  149:10
Mexico 5:15
  66:25 69:6
Michael 3:10
  7:23
middle 1:1 6:8
  9:18 27:14
  69:14 77:3,13
  98:9 101:4
  135:9 137:3
middle-of-the-...
  152:4
midwives 24:18
  24:23
Mifepistone
  28:15 32:20
  111:16 112:3
  112:21 123:12
Mifeprex 32:20
  142:13,17,21
mild 106:12
mind 98:16
  137:18
minds 41:20

mine 15:13
  138:21
minimal 32:13
minimum
  114:14 115:20
minors 12:2
minute 20:13
minutes 12:19
  45:6 80:11
  106:21 114:2
miscarriage
  25:5 26:1,4
  27:9,20,23
  28:21 29:12,18
  30:7 80:6
  101:17 120:4
  122:18
miscarriages
  122:19
miscarried
  27:15
miscarry 27:13
miscarrying
  27:14
misnomer 79:10
Misoprostol
  28:16,17,18
  29:2,11,15
  32:20 71:1,4
  111:16 112:3
  112:21 123:12
  142:13,17,20
  142:21
misplaced 88:17
misrepresent
  148:11
missing 72:9
mission 134:8
mistake 9:12
mixed 142:15
MMWR 65:23
Mobile 124:20
mock 48:24
modestly 152:7
modify 98:25
moles 56:13
mom 11:4 35:11
  35:14 36:17,24
moment 9:11
  118:17 136:17

Monday 139:14
monitor 37:6
  50:8
monitors 50:5
monogamous
  133:24
month 15:7
  17:17 139:3
months 113:8
Moore 6:24
  142:11
morally 14:5
morbidity 65:24
  145:22
morning 48:16
mortality 5:12
  5:13,20 13:4
  21:3 53:9,25
  56:4 57:24
  58:15 59:3,12
  59:13,14,19
  60:6,7 62:6,11
  63:8,13,17,22
  64:1 65:24
  67:1,5,13
  69:17 86:15,16
  89:5 109:20
  144:1,11,16,17
  144:19,23
  145:11,13,15
  145:19,22,22
  146:4 149:14
  149:19,23
Mota 5:18 75:13
  75:13 78:17,24
  79:15
mother 34:10
  35:15
mouth 121:20
multifactorial
  59:21 67:18,22
  81:6 86:6
  134:2 150:15
multilayered
  103:14
multiple 36:25
  69:16 97:12
  150:7
multispecialty
  24:11

murdering
  136:13,16
muscle 120:21
muted 10:6,11

_____

N

N 2:1 5:1,2,2
Nags 139:2
name 6:22 7:7
  7:13,16 8:8,11
  18:7 38:5
  62:12 65:7
  71:12 73:21
  126:10 128:19
named 16:11
  58:7
names 14:23
Narasimhan 3:1
  7:16,17 154:3
narrow 130:5
narrowly 89:15
national 7:5
  38:18 53:5
  123:21 124:7,8
  124:18 125:2
  146:12,16
natural 56:12
  149:11
nature 12:15
  134:3 150:15
NC 5:13
NCAA 51:18
near 36:19
  102:24
necessarily
  84:10 86:6
  121:23
necessary
  144:10
need 8:25 9:7,16
  13:5,6 35:23
  60:24 65:4
  67:17 71:5
  74:13 81:16
  85:1 87:21
  102:18 104:19
  113:25 135:14
  139:14 153:3,9
  153:13,14
  154:4

needed 20:19
  41:12 49:10
  51:23,24 116:8
  118:13,14
  153:4
needs 11:1 98:15
  102:20 139:5
  140:2
negative 90:11
  123:2
neither 143:16
  151:11 155:11
Net 5:23,24
  123:22,23,24
  123:25 124:18
  125:2 126:17
  126:19 127:10
  127:19,21
  128:10,13,19
  129:9,14 130:1
  130:4,14
  132:25 133:3
Net's 124:4,6
  132:16
Net-affiliated
  129:15
never 15:17
  25:19 31:4
  32:24 48:8
  79:10 102:3
  121:17 124:5
  127:20 136:7
  138:4
nevertheless
  69:15
new 2:6,6,18,18
  46:15 47:7
  51:15 152:16
newborn 95:13
nice 77:12
Niinimaki 5:16
  70:21,24 71:12
  71:25 74:22
  88:9
nine 24:7 35:2
nodding 8:22
non-Hispanic
  63:18
non-hormonal
  26:16

nonprofit 47:21
normal 33:8
　100:23 122:9
North 1:1,23
　2:21,23 3:1,2,6
　3:8,8,9,11,15
　3:16,19,21 4:9
　6:6,8 7:2,17,20
　7:24,25,25 8:2
　8:2 11:23
　12:21 13:5
　21:3 24:6,24
　39:18 63:21
　126:12,14,15
　136:22 137:9
　138:24 139:25
　144:22 145:11
　155:2
Notary 155:20
　156:19
note 78:10 97:11
noted 13:25
　58:15 59:2
notes 14:16,22
November
　145:23
number 5:9 6:11
　22:23 56:4
　62:8 64:3
　66:10 88:14
　100:20 127:22
　129:17 130:20
　132:8 134:7
　137:19 146:11
　146:13,22,24
　147:4,13,16,17
　147:23,25
　148:6,6,7,10
　148:13
numbering
　150:19
numbers 19:8
　58:19 60:25
　69:9 82:6
　145:9,10,18
　147:5
numerator
　148:1
nurse 41:12
　102:22 105:22

106:16 107:14
nurses 137:13
Nursing 3:8 7:25
NW 2:10

──────────
O
──────────

O 5:2
O'Brien 3:20
　7:19,20
O'Neill 3:13,18
　7:15,21
oath 8:15 156:2
ob 119:9
ob-gyn 12:22
　24:4 30:19
　31:6,12,14,16
　31:18 37:17
　139:12,18
　141:18
object 9:22 16:7
　40:11 69:22
　73:6 103:4
　115:8
objection 13:18
　13:23,25 36:2
　36:12 40:11
　43:15 55:2
　102:13 133:10
　134:17
objections 13:24
obligated 8:16
observation
　150:14
observed 118:13
obstetrical 24:12
obstetrician
　31:21 106:15
Obstetricians
　42:5 45:22
obstetrics 23:18
　24:6,10
obtain 58:7
obtained 53:8
obtaining 60:22
　62:1
obvious 103:11
　103:12
occasionally
　35:14
occur 107:23

117:14
occurred 146:11
occurs 87:14
October 52:2
offer 41:21 84:5
office 7:5 24:12
　27:11 104:12
　104:25 106:20
　107:9
officer 155:4
official 51:5,6
oh 7:8 41:3
　77:10 88:12,23
　92:11 102:2
　111:12 123:20
　153:9
okay 8:23 9:3,9
　9:14,15 10:10
　12:11,15 16:24
　19:18 20:21
　24:3 28:9
　31:14 36:5
　40:23 42:3,7,7
　45:4,8,20 53:4
　58:11,18,24,25
　60:11 61:15,18
　61:19,24 62:23
　63:3,6,12
　64:17,18 65:15
　65:17,21 66:8
　66:22 68:14,15
　68:23 69:1,4,4
　69:12 70:9,11
　70:24 71:19,20
　72:4 74:18,21
　75:12 76:6,8
　76:10,10 77:1
　77:10,10,19,21
　78:12 80:8,18
　80:20 81:18,23
　82:3 84:19
　88:6,14,22,22
　88:23 89:3
　92:4,8 93:21
　95:17 97:19
　98:1,4,6
　102:14 110:4,8
　111:7,25
　112:17,24
　114:12 115:6

115:14 120:8
　123:20 125:14
　126:10 127:5
　129:3,24
　130:16,20
　131:1,15 132:9
　139:20 141:21
　142:4,7,20,25
　144:8,13,21,25
　145:3,4 147:1
　148:21 149:1
　150:22 151:4,5
　152:21 153:19
　153:21
old 127:9
once 31:5 55:3
　78:6 85:24
　86:5,23 87:5
　96:15 99:12
　133:16 139:3
　150:23
one-and-a-half
　12:18
one-day 141:25
one-sided
　119:19 120:17
　121:5
ones 13:9 137:11
open 14:18,19
　20:3 62:13,20
　65:15 68:2
　73:23 74:3
　128:21 131:4,9
　136:6 138:8,10
　138:11 139:13
opened 65:10
　106:8
opening 100:15
　105:11
openly 78:21
opens 94:7
operating
　101:19,25
opinion 16:14
　17:2,4 43:23
　44:20 86:20,22
　92:12 104:6,8
　108:9 109:21
　109:23 133:7
　147:22 149:9

opinions 99:1
　124:9 146:20
　146:21
opportunity
　83:12 84:1
　141:7 142:16
　151:6
opposed 43:14
option 27:25
　28:11,23,24
　39:20 95:14
options 37:2
　95:16 101:15
　132:4
oral 129:19
order 71:6 82:6
　127:18
organization
　38:18 42:23
　47:20 123:25
　124:10 130:4
　133:2
organizations
　85:6 124:13,13
　126:8
organs 26:7
originally 16:1
os 100:14
OSHA 137:17
outcome 155:16
outcomes 67:13
　69:17 98:12,21
Outer 126:15
　139:2
outpatient 25:23
　25:25 28:25
　29:3,12 95:15
　95:25 96:2
　102:3 103:3
　106:19,24
　107:17
outside 24:24
　25:14,17,18
　28:19 34:9,17
　35:17 95:18
　107:21 146:11
ovarian 120:15
　122:8
ovary 107:24
over-the-coun...

106:11
**overall** 60:21
62:1 67:2
145:14 149:14
**overinflation**
147:21
**overlap** 23:10
**overseeing**
105:22,23,25
106:1
**oversight** 47:16

**P**

**P** 2:1,1
**p.m** 1:13 6:5
45:11,14 80:13
80:16 114:7,10
141:13,16
154:12,16
**P.O** 2:23
**packs** 104:18
**pad** 14:23
**pads** 92:15
100:25 122:18
**page** 5:3,9 58:10
58:16,16,19,20
61:22 63:11
64:18,21 65:21
66:5 68:13
69:8 72:3,9,14
74:19,25 76:15
76:18,25 77:7
82:5,6,7 89:2
98:4 113:17
115:14 116:2
145:5,6,9,25
146:1,3 148:21
148:22 150:23
151:2 157:3
**paid** 17:7,10
31:5 42:15
**pain** 118:5
119:18,19,23
120:1,9,10,12
120:18,21,22
121:2,2,3,5,6,7
**palpated** 50:7
**palsy** 52:17,18
**pamphlet**
135:23

**Pap** 106:5
**paper** 20:18
99:7 152:20
**paragraph**
58:16,18,19
59:9 60:1,10
63:10,17 64:21
66:23,24 68:13
68:13 69:14,15
70:2,12,17
75:10 77:3,13
77:14 80:18
82:11,18 86:10
86:11 88:14
92:1,6 96:4
97:4 98:8 99:7
111:6,8 112:15
113:19
**parent** 39:21
**parentheses**
63:18
**Parenthood** 1:3
2:3,8,9,13 6:9
6:19,20 7:11
7:12 8:9 19:7
103:9
**parenting**
135:15
**part** 13:2 19:4
22:2 24:10
25:20 29:12
30:19 31:14,18
31:22 40:16
43:4 44:6
48:25 49:12
74:16 88:20
120:19 122:4
125:14 136:10
140:7 146:10
148:5
**participating**
15:6
**participation**
17:7,10
**particular** 43:10
70:9 74:11
79:15 82:10,11
92:24 137:16
146:10 148:22
151:17

**particularly**
44:8 83:23
86:25 100:17
101:6 102:15
109:4,9 132:6
133:13
**parties** 155:12
155:15
**partner** 126:1
**partnering**
125:20
**partners** 119:7
135:14
**partnership**
38:15 133:17
**party** 11:18
**passed** 28:22
**pastor** 132:13
**patch** 26:17
**patient** 28:6,19
28:20 29:2,8
29:12,16 32:21
33:24 34:6,16
35:1,13,21,25
36:8,9,10
37:14 39:3
42:25 46:17
49:20,23 55:14
55:15,20,23
72:22 94:25
109:2 110:2,19
117:15,23
118:9,19,20
119:3,8,13
122:21,25
138:5 139:4,6
139:8,16,18
140:5,21 143:1
143:4,8,15,19
**patient's** 108:3
111:21
**patients** 27:24
33:13 34:2,23
35:13,16 39:5
40:17,18 47:2
47:6 48:8
56:16 94:18
95:6 100:5
101:16 103:18
106:18 110:11

112:6,7 116:5
116:14 118:21
119:1 121:1
123:8 124:12
132:22 133:19
140:8 143:9
**Pause** 20:9,15
58:23 61:17
69:2 74:20
81:1 88:15
129:6 131:14
**pay** 122:7
**paying** 153:17
**Payne** 4:8 6:24
15:10
**PDF** 58:20
**pelvis** 122:4,14
**pending** 6:7
**people** 16:4
28:10 57:10
67:9 83:8,21
84:7 85:13,15
85:25 87:1
90:15,16 111:9
121:11,15
132:11 133:4,6
134:21,23,25
135:5 136:4
138:16 152:13
152:14
**percent** 21:7
30:19 39:24
42:14 43:2
51:17 56:7,8
56:10 71:6
80:23 97:5
109:7 110:11
134:25
**percentage** 95:3
**perforation** 26:7
**perform** 25:4,13
25:17 26:20,22
35:9 104:3
116:21,23
137:22 138:6
138:15
**performed** 25:5
25:5,6 26:2
30:4 32:24
34:5,15 60:16

71:1
**period** 60:21
87:12 109:6,8
111:22 112:2
**peritoneal**
119:22 122:7
**periviable** 36:19
**perks** 121:7
**permission**
39:22 140:14
**permissive**
66:25 70:4,6
149:3,4,15,21
**person** 15:11
108:25 119:5
**person's** 89:22
**perspective**
46:20,21,23
51:24 52:5
105:13 129:22
130:6 140:19
149:10
**Peter** 2:10
**peter.im@ppf...**
2:12
**Ph.D** 6:13 23:4
23:14,15 38:6
84:9
**PhD** 1:12 6:1
156:1,10
**Philip** 1:8 6:10
**philosophically**
42:22
**phone** 10:2
138:16
**physically** 139:2
**physicals** 31:23
**physician** 38:24
79:23 132:14
**Physicians**
24:11 30:19
**physiology** 38:8
38:8
**picture** 47:20
104:10 119:3
125:17
**pictures** 139:10
**pills** 26:17
**Pitt** 3:14
**place** 23:7 24:21

175

39:21 46:9,10
**placenta** 100:12
100:13,14,24
101:13
**placental** 100:11
100:24
**places** 55:5
107:23 147:2
152:6
**Plaintiff** 2:15
**plaintiff's** 13:19
**plaintiffs** 1:4 2:2
2:20 6:14 7:3
**plan** 47:18,20
91:6
**Planned** 1:3 2:3
2:8,9,13 6:9,19
6:19 7:11,12
8:9 19:6 103:9
**play** 40:1 96:21
**please** 8:11,21
9:1,6,16 11:22
12:5,16 13:16
14:2 20:22
29:22 30:15
36:6 37:9 38:2
39:14 44:12
49:22 61:5
62:9,12,13
64:7,15,19
65:8 66:5
67:25 68:1,25
69:8 71:13,14
72:3 73:22,23
76:25 81:4,20
81:21 87:24,25
88:24 89:2
97:17,18 98:4
114:2,22
126:11,23
128:20 131:3
144:24 145:24
146:8,20
148:19 150:20
150:23 151:19
153:10,24
**plus** 10:11 94:1
**point** 9:11,16
36:20 58:9
60:1 61:22

76:21 112:15
118:3 121:25
151:18
**policies** 19:7
71:5 137:2
**policy** 44:6
51:18
**poorly** 120:20
**popping** 121:13
121:18
**population**
149:12
**portion** 56:25
58:14 59:2
**position** 13:7
44:5,24 48:2
124:4 138:9,12
138:13 152:4
**positions** 50:7
151:9,12
**positive** 117:15
117:25 143:1,4
143:16
**possible** 58:13
58:25 79:7
153:12
**possibly** 27:12
54:14,25
**post-child** 87:12
**postpartum**
87:14,15 93:16
94:5 100:9
101:2,4
**potential** 32:12
**potentially**
15:13 16:3
106:10,13,20
109:17 118:7
118:13 133:19
143:22
**potty** 76:6
**powerful** 152:3
**pprom** 35:8
36:21,22
**PPS** 103:9
**PPSAT** 8:10
71:3 111:21
112:5,11
122:21,24
**PPSAT's** 123:8

**Practical** 108:9
**practice** 5:22
13:2,10 24:5,9
24:9 25:1
27:17 30:24,25
31:1,3,12,22
31:23,25 33:1
33:19 35:2
36:22 42:12
49:23 50:19
98:7 100:6
103:17 105:21
105:24 107:13
112:10,22
113:1,5 114:12
115:11 116:21
117:14 119:4
122:2 127:21
132:2 133:8
136:24 137:16
139:12
**practicing** 38:23
**practitioner**
39:22 46:18
135:3
**practitioners**
14:6 46:20
47:4 125:18
139:25
**pray** 135:5
**prayed** 19:14
130:7
**preborn** 33:1
49:3
**precluded** 85:21
**precondition**
43:11
**predictors** 57:6
**preexisting**
57:15,18 58:6
**preferable** 10:8
**pregnancies**
33:18 56:5,7,9
56:12 98:20
107:25 108:1
109:21,25
110:12 112:6
143:22
**pregnancy** 13:8
17:5 19:4 25:8

27:1 28:3 41:9
41:10,16 42:1
43:20,21,24
51:19 55:13,19
55:22 56:19
57:8,11,22
58:1,2,15 59:3
72:7,17 80:5
82:19 89:5
90:1,2,20,21
92:22 93:19,23
93:25 94:4
98:12,12
107:20,21,21
108:13,14,16
108:18,19,20
108:21,22,23
109:1,5,10,11
109:12,16,18
109:24 110:2,3
110:5,6,10,15
110:17,19,20
110:21 111:3
111:11,18,23
112:12,25
113:1,21,21
114:13,15,16
115:12,19,21
115:22,25
116:9,12,23
117:10,11,15
117:16,20,25
119:15,16,17
120:16,16,23
122:12 124:1
124:11,24
125:9 126:9,10
126:13,15,16
127:13,23,25
128:6 129:10
130:20,22
131:22 132:3,6
132:10 134:8
134:10,10,15
134:19 136:20
137:6,10,22
138:2,8,23
139:7,20,24
140:9,22
141:19,22

142:14,18,24
143:1,2,4,6,6,6
143:14,16,17
143:18,19
145:14
**pregnancy-rel...**
57:14,17 64:22
64:23
**pregnant** 34:6
34:16 39:9
41:4 55:15,19
55:23 57:12
94:1,4 100:17
101:5 102:16
102:23 109:2
111:12 120:14
132:3
**preliminary**
13:21
**premarked**
19:21
**premature**
34:11,24,25
35:7 70:6
99:20 149:5
**prematurity**
99:21
**prenatal** 31:24
33:19 59:25
118:1 139:22
**prepare** 18:1,11
18:23 19:13
21:12 142:2
**prepared** 1:18
19:16 22:3
**prerecorded**
125:5,7
**prescribe** 26:13
32:6 39:5
106:18 132:6
**prescribed**
31:25 32:20
**prescribing**
32:13 123:13
142:22
**prescription**
107:1
**present** 4:15
7:22 29:16
30:5 51:20,21

72:6,16 75:1
89:13 94:10
120:11,17
**presentation**
121:5 125:2,12
**presents** 94:12
121:8
**preterm** 34:24
35:7 96:7,13
96:16 97:2,5
98:14 99:14
**pretty** 95:23
130:18
**prevent** 10:15
**Prevention**
65:23
**previa** 100:14
**previability** 34:5
34:7
**previously** 98:11
**priest** 130:9,9
**primarily** 26:8
27:25
**primary** 134:8
**print** 84:11
146:8
**printed** 69:9
72:14 82:7
**prior** 9:13 17:6
155:11
**private** 24:5,9
33:1 35:2
42:12 54:7
132:2
**pro-choice** 43:17
51:25 52:8
78:21 84:25
151:11 152:1
**pro-life** 43:17
45:22 46:20,25
47:1 51:24
52:4,8 84:19
151:9,25,25
**probably** 15:3
35:10 39:23
41:7 73:10
93:21,24 100:9
102:9
**problems** 82:21
91:22 152:8

**procedural**
70:15 71:8
**procedure** 29:20
106:4,4,21
107:9
**procedures**
25:14,15,16,18
26:2 29:19
30:8 71:6
137:2
**proceed** 8:5
**proceedings**
52:24
**process** 20:22
29:10 37:1
**produce** 12:8
**product** 16:9
**production** 12:9
**professional**
38:13 42:2
45:17,20 84:11
85:6
**professor** 38:3,6
**program** 23:11
23:14 38:10,10
38:20 49:17
**programs** 23:10
**progresses** 60:13
**prompting**
136:11
**pronounce** 18:7
**properly** 146:17
**proposing**
150:10
**prosecution**
149:16
**prospective** 86:4
**prospectively**
86:2
**protected** 16:9
59:3
**protection** 11:25
**protocol** 95:24
108:2,4,8,11
113:10
**protocols** 103:9
103:11,13
112:21 123:15
**prove** 109:4
**proven** 109:15

109:22 111:2
120:24
**provide** 25:24
28:12,18 29:15
33:19,25
122:21,25
124:12 131:25
132:11 135:13
**provided** 19:8
32:23 91:5
146:12 147:20
**provides** 71:3
112:5 137:23
149:11
**providing** 16:14
17:2,4 27:23
28:6 29:2,11
29:18 136:9
**provisions** 13:7
13:10
**Prozac** 32:15
**pseudosac**
108:18
**Psychiatrists**
83:1
**psychiatry** 83:6
134:25
**psychological**
82:20 90:7
91:21
**psychology** 38:8
83:10
**public** 12:19
53:21,22
155:20 156:19
**publication** 85:5
**publications**
83:7
**publish** 85:2,5
151:23
**published** 83:15
85:3,11 151:22
**publishing**
78:25
**pull** 36:13 61:12
67:17 87:21
150:25
**pulled** 22:10
88:17 127:4
**purpose** 43:1

**purposes** 20:17
**push** 133:2
**pushback**
152:12
**put** 13:18 14:23
75:22 89:13
97:16 105:10
107:9 121:20
153:6

_____

**Q**
**quantify** 17:15
**question** 9:2,3,6
9:9,18,24
10:13 16:16
36:6 44:3 57:4
68:17 77:11
112:4 133:11
145:18 146:7
148:22,25
149:1,6 152:24
**questioning** 6:15
**questions** 8:16
9:5,23 10:16
30:11 44:14
63:3 76:8
141:6,8 142:6
142:12 143:24
144:15 145:5,8
146:2 152:23
**quite** 83:2,15
104:20
**quotations** 75:3
**quote** 111:15,15
146:10,17
149:2,6,10,24
151:8,13

_____

**R**
**R** 2:1 157:1,1
**racial** 58:14 59:2
**radiology** 106:6
**Raleigh** 1:23
2:23 3:2,6,11
3:21 6:6 49:4
49:15 138:25
**ran** 38:20 48:24
**randomize** 67:9
85:25
**randomized**

79:18
**range** 72:23 93:3
152:7
**ranging** 38:7
**Rapaport** 4:21
6:5 154:6
**rapidly** 104:9
**rare** 73:15 75:3
108:20
**Rarely** 80:1
**rate** 50:5,8 58:13
59:1,12,13
60:7,21 62:1,6
63:14,17 64:1
66:10,15,19
70:14 73:2,15
75:2 86:12,15
86:16 99:14
117:12
**rates** 5:12 62:11
63:8 67:1,5
80:23 89:5
144:2,11,16,17
149:14,23
**ratio** 64:23
145:15
**rationale** 87:15
**ratios** 64:22
**RDMSs** 137:14
**reached** 15:10
16:3 139:9
**reaction** 90:1
**read** 21:8,17,20
21:22,24 22:4
22:6 55:3
56:23,25 59:5
62:3 69:15,21
72:19 74:13
77:6,17,23
82:15,16 89:9
89:10 98:8,22
99:6 111:19
123:16,17
128:4 129:4
130:24 131:24
134:13 137:25
139:15 146:17
149:8,25
155:10 156:2
157:19

**DISCOVERY COURT REPORTERS**      www.discoverydepo.com      1-919-424-8242

Case 1:23-cv-00480-CCE-LPA   Document 74-4   Filed 09/12/23   Page 178 of 188

reader 89:14
readers 98:10
reading 41:11
  73:8,9 146:9
ready 153:24
real 49:1 73:15
  75:3
realize 9:12
  136:15
really 18:14
  20:24 35:10
  39:17 40:1,2
  41:8 42:22,24
  46:16,17,19
  48:25 58:5
  59:20 73:3
  79:4 99:4,17
  100:1 104:8
  106:6,9 109:10
  116:5 120:20
  124:13 125:15
  125:18,19,25
  126:1 132:21
  135:16 136:3
  136:15 137:19
  140:1 146:24
  151:22 152:18
reason 66:1,2,4
  72:13 89:23
  128:15
reasons 13:10
  85:22
reassurance
  109:25
reassuring
  117:10
rebuttal 83:12
recall 28:20
  49:17 60:20,24
  62:5,8 63:25
  64:3 67:17
  90:8 103:22
  104:24 148:23
receive 111:9,16
  116:3
received 23:4
  123:15 140:21
  140:24
receiving 123:9
recognition

135:16
recognize 14:7
  50:11 65:17
  67:21 96:16,22
  96:25 103:12
  129:3,7 131:11
  131:16 132:17
  138:20 150:15
recognized
  67:18
recognizes 99:4
recognizing
  96:20
recollection
  111:22
recommend
  35:16 36:9,10
  36:16 37:8,13
  37:13 118:21
  132:10
recommendati...
  139:11
recommendati...
  112:10 115:18
  116:17
recommended
  35:20 36:1
  119:2
record 6:4 8:11
  13:19 45:9,11
  45:14 80:9,13
  80:16 114:7,10
  141:11,13,16
  153:3,8,9
  154:12
records 53:17,18
  53:19 54:15,25
recovered 50:4
red 131:24
redirect 152:24
reduced 155:9
reduces 58:5
reduction
  133:15
refer 8:10 20:18
  33:16 34:2
  40:14,19 45:24
  118:9,11
  132:11 137:22
  138:6 139:20

140:8
reference 78:20
  88:14 90:8
  93:7 127:25
  130:23
referenced
  131:19
references 15:3
  19:5
referencing
  107:12
referral 140:6
referrals 140:3,3
referred 27:3,20
  35:7 91:15
  120:1 135:25
referring 107:16
  132:14,15
  139:18
reflect 147:5
regarding 15:9
  15:16 16:12
  21:1 22:3
  48:17 52:16
  69:5 98:19
  124:9 130:9
regularly 30:22
  137:17
regulation
  136:21
reinforce 99:3
reinforces 100:1
relate 11:5
related 11:2
  12:1 14:10,13
  14:17 19:3,3
  21:2,4 46:17
  54:15,25 55:10
  131:25 132:16
  132:23 134:4
  140:19,25
  144:18 145:16
  155:12
relates 51:18
relating 13:13
  49:12
relation 78:1
relationship
  30:15 75:7
  81:10 99:12,18

133:9,24
  152:14
relationships
  81:5
relative 155:14
relatively 60:6
relevant 74:16
reliable 44:1,18
  95:11
relief 121:17
relies 53:13,20
  53:24 54:4,6,9
religion 126:5
rely 53:17,18
  88:16 112:25
  147:11
remain 127:17
  127:18
remember 42:11
  48:20 49:15
  74:11 100:17
  113:9,13,15,16
  125:6,12 135:7
  148:24 149:6
reminder 34:22
remote 1:10 6:4
  155:5
removing 25:9
  107:10
repair 104:25
  105:1
repeat 9:7 36:5
  37:9 55:11
  56:20 72:14
  77:11 118:25
  143:11,12
  147:24
repeatedly 99:3
rephrase 9:7
  121:1
replicate 91:11
reply 74:16,22
report 5:13,17
  11:8 21:3
  53:22 63:22,25
  64:19 65:24
  144:23 145:23
  148:16 150:3,4
reported 66:11
  73:1 82:21

146:14 147:13
  148:7
reporter 8:19
  56:23 57:1
  143:25 144:7
  155:1
reporters 1:19
  6:6 48:17
reporting 53:10
  53:12 54:23
  73:10 146:12
  147:10
reports 53:21
  54:6,9,16,25
  55:9,9 72:22
represent 6:16
  7:14,21,24 8:2
  42:24 142:10
  145:11
represented
  146:3
representing
  6:23 7:18 8:9
reproducible
  91:10
reputable 83:9
request 114:2
  138:5
requested 56:25
requesting
  137:24
requests 12:8
  54:15,24
require 94:24
  95:2
required 43:10
  116:11 127:17
  137:11
requirement
  17:5 21:1,2
  112:25
requires 95:20
research 78:6,8
  78:19,22 79:9
  79:9,15,17
  81:3,6 83:13
  84:17,22 85:3
  89:13 91:9,10
  91:21 99:4,5
  100:2

researcher
  84:20
researchers
  96:15
reservations
  130:10
reserves 155:10
residency 23:17
  24:3 30:23
  31:6 34:20
  37:16 42:13
resident 31:5
  52:12
residents 24:14
  30:18 47:4
residual 81:15
  82:14
resolution 50:15
Resource 126:13
resources 18:24
  51:7 102:18,24
  104:15 124:2
  132:5
respect 85:12
  135:10 136:8
respected 83:15
response 72:25
responses 18:15
responsibilities
  38:13
responsibility
  47:21
restricted 98:10
restrictive 67:4
result 27:1
  111:10,17
results 61:23
  85:1,2 98:16
  151:8,11,24
  152:4
resume 30:13
resuscitated
  50:9
retained 101:13
retention 38:20
retract 83:24
  84:7
retracted 73:18
  83:3,4,5,8,11
retraction 83:17

83:19
retrospectively
  86:1
return 118:22
revealing 18:12
review 5:13
  18:22 53:25
  55:9 63:22
  74:15 96:18
  99:12 112:13
  142:1 144:23
reviewed 18:25
  45:18 74:5,8
  103:9 112:1
  113:7
reviewer 99:6
reviewing 18:14
  18:15,21 19:12
  21:2 47:19
  74:11
reviews 55:8
right 8:13 11:25
  14:6,17 16:21
  19:16 22:19
  23:2,5,8,19,20
  24:19 25:2
  26:2 27:4 28:6
  28:25 29:6,13
  34:15 42:18
  43:14,21,24
  45:24 46:3
  48:4,21 49:17
  52:13 57:16,19
  58:7,15 59:8
  59:14 60:13,18
  61:5 64:24
  65:24 66:6,14
  66:18 67:2,7
  68:9,24 69:9
  69:13 70:7,16
  70:22 72:5,11
  72:16 74:6,9
  74:17,25 75:8
  75:16 76:13
  80:2,23 81:2
  82:9,9,11
  84:21 85:8
  86:13 89:4
  90:8 92:1
  94:19,22 95:19

96:5,8,10,22
  96:24 97:6,8
  98:6 99:7
  104:4 105:11
  106:1 108:7
  111:11 112:19
  113:2,5 114:16
  115:12,20
  117:19 119:18
  120:10 121:22
  122:13 123:22
  123:23 124:19
  124:19,22
  125:3,10 126:8
  126:17,20
  127:11,15
  128:13 129:12
  130:18 135:24
  137:18 139:21
  141:24 142:8
  145:17,19
  148:1,8 150:24
  153:2 154:1,9
  154:11 155:10
rights 14:5
rings 125:11
risk 35:21 41:3
  55:14,19,23
  57:21 59:17
  60:12 70:14
  86:24 87:2,16
  87:20 89:8
  90:9,10,13
  92:1,8,18,21
  93:4,9,11 94:9
  94:14 96:7
  97:2,5,13
  98:21 99:21
  102:16 110:6
  110:12,20
  116:3,4,9,15
  120:2 133:15
  133:22 152:7
riskier 56:19
risks 26:4,5
  36:20 40:14,20
  40:24 57:25
  58:5 140:19
Rmendias@ac...
  2:19

Road 1:21
role 38:1,11 39:4
  46:13 47:11,25
  106:15 125:18
  125:19
room 8:15 15:1
  101:19,25
  118:10,12
  139:9
root 13:6 59:20
  60:3
rotated 24:16
rotations 119:9
rough 153:4,24
  154:3
Royal 83:1
RPR 1:18 155:4
  155:19
rule 143:2,13
rules 8:14 13:24
rump 117:1
run 38:9
rupture 34:24
  35:7 109:18
  121:12
ruptured 118:17
  120:15 121:24
  122:8
ruptures 119:15
  119:16 121:16
rural 139:25
Ryan 2:16 7:5

_____

S
S 2:1 5:2,7 157:1
sac 94:3 108:15
  108:17 117:7,8
  117:11
sad 41:19 85:17
sadly 84:4
safe 29:3,5,8
  32:8,10 71:8,9
  72:8,18 85:1
  116:5 147:15
safely 95:9,14,17
  102:11 103:3
  104:7,22
  106:23
safer 56:15
  142:25

safest 143:8
safety 79:8
  109:11
Salvador 2:4 5:4
  6:18,18 8:6,8
  12:4,7,11,12
  13:23 14:1
  16:10 18:8
  19:19 20:1
  36:7 40:21
  43:19 44:13,16
  45:5,8,15 55:7
  56:22 57:9
  61:4,11 62:10
  62:19 64:6,14
  65:6,16 67:24
  68:10 69:24
  70:1 71:11,21
  73:13,20 74:4
  76:4 80:11,17
  81:19 82:4
  87:23 88:11,19
  97:16,25 103:1
  103:16 114:3
  114:11,19
  115:5,10
  126:22 127:3
  128:18 129:2
  131:2,10 134:5
  141:11,17
  142:5 153:23
salvation 134:11
  136:1
same-day 25:21
sampling 91:6
Sandy 124:9
sanitation
  150:13
satisfaction
  124:25
save 20:6 61:15
  102:25
saw 152:9
saying 59:20
  93:18 105:13
  144:17 152:9
says 36:22 42:17
  58:25 61:23
  63:13,17 64:23
  65:23 70:3

74:15 76:22
77:2,3,14,25
82:11 89:4
98:7,9 112:18
115:17,18
116:3 125:8
130:20 132:10
135:22 137:22
152:15,16
**SB20** 11:24
12:16 16:23
**scans** 139:15
**scared** 85:4
135:17
**scares** 85:17
**scenario** 116:25
117:4,5 118:15
**schedule** 119:2
**scholars** 23:14
**scholarships**
40:1
**school** 23:16,19
24:14 126:3
**science** 22:16
23:1 38:7
125:8
**scientific** 79:7
82:25 84:3,6
151:23 152:10
**scientifically**
79:2
**scope** 105:24
107:13 137:16
**Scottsdale** 4:10
**scrape** 29:24
**screen** 62:24
72:12,13
**screening** 108:2
110:13
**se** 149:13
**sec** 20:7 62:21
**second** 30:10
36:14 50:3,6
58:21 59:16
60:16 61:1
62:9 63:10
68:7 71:10
72:9 75:23
81:18 88:13
97:14 131:12

144:4 149:15
**Secretary** 3:24
**section** 69:12
151:3
**sedation** 105:21
105:23,25
106:12,16
107:4
**see** 13:9 14:19
36:24 63:13,15
63:16 64:21
65:4,21 66:9
66:13,14,18,21
69:4 72:5
74:25 75:5
76:15,20,21,24
77:18,20,20,25
78:13 81:10
85:6 86:7
90:21 91:11
108:15,17
109:5 117:7,8
117:11,17
122:5,8,9,11
122:11,12,14
122:18,19
139:12 140:2
145:6 151:14
153:3
**seeing** 105:16
135:6
**seek** 82:20
132:13
**seeking** 132:12
**seen** 65:19,19
104:17 117:12
120:11,17
**selected** 52:14
**Senator** 142:11
**send** 109:17,18
154:6
**sensation** 121:13
**sense** 109:24
121:16
**sentence** 59:5
61:25 69:15
70:3 72:6,16
72:19 77:25
81:16 82:10
89:4 115:20

132:15 146:17
146:19 148:22
148:24 149:8
150:2 151:7,17
152:3
**sentences** 59:10
**separate** 35:12
**separately** 30:14
**separation** 35:1
**sepsis** 37:14
**September**
155:17
**sequentially**
103:24
**serial** 118:24
143:10
**serious** 73:15
75:2
**seriously** 152:14
**serve** 46:3
134:12
**served** 39:3
**service** 30:23
**services** 3:25 8:3
128:1 135:14
137:24
**sessions** 124:22
**set** 86:6 127:23
130:21
**setting** 28:19
95:18 102:3
103:3 104:3,9
104:12
**settled** 50:17,18
50:19
**seven** 118:2
**sexual** 133:8,14
133:15,23
**sexually** 133:12
133:20,22
134:4
**Shah** 5:21 97:8,9
98:1
**shaking** 8:22
**share** 50:16,18
62:24 72:11
134:8
**shared** 29:9
126:6 129:22
150:6

**sharing** 83:22
134:11 135:25
**sharp** 29:24
120:10 121:2,5
121:7
**Shealyn** 2:5
**Shealyn.masse...**
2:7
**sheet** 82:6
**shifted** 118:19
**short** 48:24
**shortages**
139:24
**shot** 26:18
**shoulder** 120:1
**show** 67:7 78:15
79:3 119:1
125:6 143:5
**showed** 32:11
78:24
**showing** 86:12
87:8 89:19
**shown** 32:5 97:5
**shows** 78:22
91:21 99:9
133:14 143:16
143:17
**sick** 35:11,14
95:11
**side** 13:20 32:12
120:10,13
122:13 135:8
135:13 136:2,3
147:20 151:25
152:1 153:5
**sides** 135:7
136:2
**sign** 37:7 126:19
127:8 128:16
155:10
**SIGNATURE**
157:22
**signed** 127:14,18
129:16
**significant** 83:18
83:19 87:2
139:8
**significantly**
60:17
**signing** 132:19

**signs** 36:23,25
60:1 150:12
**silence** 10:8
**similar** 73:15
75:3 78:11,24
**simply** 99:3
**single** 96:6 116:5
132:11,17
133:4,5,14,20
**situation** 33:13
33:18 108:24
110:18 143:10
**situations** 35:11
41:23 107:3
**six** 1:21 23:14
117:2,7 118:2
132:8
**skeletal** 139:8
**sleep** 119:9,11
119:12
**sleeping** 82:22
**slow** 100:11
**small** 36:20
81:13 82:12
121:25 146:8
**smears** 106:5
**Smith** 3:5
**smoke** 78:12
**smoking** 79:11
**snarasimhan...**
3:3
**soaking** 100:25
122:18
**social** 87:19 89:8
98:13
**societies** 84:11
**socioeconomic**
13:8 98:17
124:14
**solutions** 13:5
**somebody** 27:10
29:4 84:4
106:3 119:6
121:12 133:23
**son** 11:1
**soon** 50:2 76:6
**sooner** 153:24
**sorry** 7:8 11:4,9
18:6,7 25:12
28:7 29:4

180

31:15 34:22
36:9 38:16
39:8 40:22
46:11 47:7
51:22 54:19,20
58:12,18 61:15
66:2,23 69:3
69:24 70:14
76:5 77:7,9,18
82:6 86:10
92:4,5,10 99:2
103:10 104:20
105:7 106:1
110:2 111:4,14
113:10 121:1
129:25 135:25
141:11 145:2
147:24 150:3
sort 51:10
107:11 137:7
137:12
sorts 14:6 57:21
sound 42:18
sounded 105:8
sounds 9:10 49:8
90:18,25 94:18
source 44:1 60:5
105:16
sources 15:19
21:20 22:4
53:13 54:17
55:11 59:7
74:12
South 1:3 2:8,13
6:9,20 7:12 8:9
19:7
southern 103:10
speak 15:15
18:17 129:13
130:8
Speaker 142:11
speaking 13:23
13:24 19:11
84:6 113:20
116:13
special 11:1
specialist 33:23
140:3
specific 16:24
28:20 49:18

145:12,17
specifically 15:8
18:4,10 20:24
106:17 129:13
144:18 151:8
specifics 16:19
22:21 91:7
spectrum 148:11
speculum
105:10
spent 17:13,21
17:23 48:16
spirituality
135:4,8,11
split 138:22
spoke 12:21 14:4
40:4 84:15
spoken 129:16
spontaneous
27:9,18
sport 41:5
Sports 38:4
spotting 120:5
121:24 122:16
spouses 132:13
squeezes 101:11
Sripiya 3:1 7:17
SSRIs 32:5
stable 118:21,21
stack 68:20
71:20 88:8
staff 137:10
139:11
stage 13:20
34:16 89:7
stand 47:1,1,3
113:20
standard 10:13
110:12 112:9
130:21
standards 5:25
130:22 131:18
131:23 133:3
134:7 135:24
137:4,20
standpoint
23:12 91:9
132:1
start 6:12 8:13
10:13 36:9

105:15 119:20
started 17:18
39:1 42:12,15
124:13 132:20
starting 6:14
37:24 70:24
98:9 111:14
137:3
starts 64:22
69:13 71:12
82:10 116:15
120:9
state 6:16 8:11
11:24 24:17
32:25 38:18
39:18,19 53:17
53:18,24 60:12
66:24 67:12
70:13 81:12,13
85:21 91:25
93:8 96:3,6
99:1 111:8,12
136:22 137:7
142:23 145:11
155:2 156:1,12
statement 5:24
59:7 70:20,23
78:9 91:23
95:23 115:24
127:24 128:7
128:19 129:9
129:11 130:18
134:15,22
135:16,21,24
138:2
statements
138:12
states 1:1 6:7
13:4 38:19
53:9,11,12
54:1,2 62:5
63:8,25 66:11
66:25,25 86:17
97:3 103:11
127:22 134:7
144:2,19
145:24 146:14
148:18
statistic 56:10
stay 137:15

stayed 57:11
Stein 1:6 2:25
3:4 6:10 7:18
step 117:22
stepped 46:7
sterile 94:8
stitches 105:16
stop 32:18
104:15
stopped 37:20
42:16
story 151:20
straight 123:13
strategic 47:18
47:19,25
Street 2:5,17 3:2
3:10,15,20 4:9
strength 86:4
strengthens 87:8
strengths 91:9
stress 124:24
stressful 152:5
strict 137:1
strike 116:20
strong 87:10
129:21 135:21
151:9,11
stronger 91:12
strongest 78:20
struggle 79:4,24
80:6
struggled
151:22
struggles 87:3
student 7:4
38:24 39:6,9
39:23 50:21,22
students 24:13
24:15 30:18,21
31:8 38:21
39:9,11,19,24
40:4 47:4
50:24 51:15,17
studied 32:13,14
studies 32:11
38:4,14 44:21
67:9,11 73:11
78:17 80:19
81:9 83:14
84:12 86:3,3

87:8 88:21
89:12,12,19
90:14 91:12
92:23 93:6
96:19 98:18,24
98:25 99:13
100:1 134:3
study 5:11,18,19
5:20,21 60:15
60:19,20,24
61:20 66:22,23
66:24 67:4,12
67:20,24 69:5
70:10,20,25
71:7,25 72:6
72:16,21,24
73:2,8,14,18
74:23 75:13,18
75:20 76:9,10
76:11,12,25
78:1,4,17,24
79:13,14,15
80:21 81:12,13
81:14,19 82:5
82:13,18 83:2
83:3,4,5,16,17
84:7,23 85:18
85:18,20 86:7
86:11,19 87:5
87:18,21,23
88:10,25 90:18
91:1,3,15 93:7
96:10,12 97:8
97:11,14,24
98:1 148:16
150:18,21
151:7,18,20
152:16
studying 89:21
stuff 85:2
Sturkie 4:19 7:3
subheading
115:18
subject 52:24
136:20 156:5
submit 85:13
submitted 11:8
11:9,10 20:12
20:16 21:18,25
subscribed

181
DISCOVERY COURT REPORTERS      www.discoverydepo.com      1-919-424-8242
Case 1:23-cv-00480-CCE-LPA   Document 74-4   Filed 09/12/23   Page 182 of 188

156:15
**subsequently**
63:18
**subsidized**
135:15
**subspecialty**
58:3
**substance** 10:15
18:18 75:15
79:5,23
**substantial**
146:11
**suction** 30:2
101:20
**suffering** 121:1
121:12
**suggest** 43:7
**suggested** 82:12
**suggests** 59:15
**suicidal** 75:16
79:5,24 86:23
87:4,11,16
**suicidality** 86:21
**suicide** 86:12,23
87:2,5,17,20
89:6,17
**suicides** 89:16
**Suite** 1:22 2:11
3:6,15
**summary** 65:20
**summer** 37:25
**supervise** 107:4
107:6
**supervised**
24:18
**support** 12:23
13:7,11 40:7,8
78:1 102:20
124:1 149:11
151:9,11
**supported** 12:20
12:22,25 83:25
**sure** 11:23 14:3
18:6,9,14 20:8
20:14,19 30:11
30:16 34:8
36:8,17 38:3
40:9 42:14
44:13 45:7
47:23,23 50:6

51:8,18 55:18
56:3,21 58:22
61:1,3 62:14
62:22 64:5,20
68:22 71:10
72:15 74:15
75:12,21 77:13
79:12 80:25
81:5 87:22
89:24 95:23
97:15 106:14
109:5 110:14
110:17,19
111:25 114:18
117:17 119:6
121:6 122:24
123:4,7 126:12
127:7,10 129:5
130:18 131:13
132:25 138:5
139:17 153:19
154:9
**surgeries** 25:25
26:18
**surgery** 25:2,4,7
25:21 28:3
118:14
**surgical** 25:21
25:23 72:8,17
73:16 75:4
104:18 140:18
**surprise** 122:20
122:24 123:7
123:10
**surprised**
123:15,17
**surprising**
147:12
**surveillance**
5:14 65:1,8,18
66:3 145:23
**survey** 146:16
**survive** 34:9,13
34:17 35:17
**survived** 37:4
**surviving** 33:10
**Susan** 1:12,18
6:1,13 8:12
155:4,19 156:1
156:10

**suspect** 142:25
**suspected** 27:1
110:9,16,22
114:14 115:21
115:25 116:2,6
116:12
**suspicion** 109:2
109:3,15
110:24,25
111:1,1 119:11
143:19,20
**Swanson** 2:9 7:6
7:8,10,11
**switch** 53:2
100:4 107:19
**switched** 55:16
92:4
**sworn** 6:2 8:5
155:7 156:15
**symptoms** 110:5
110:20
**synced** 153:13
**syndrome** 30:1
**system** 38:17,22
56:2 73:5
**systemic** 107:12

---

**T**

**T** 5:2,7 157:1,1
**tab** 111:5
**table** 66:9,9,13
66:15,18,19
125:22 146:3
**take** 9:17,19
14:22 24:21
33:23 44:11
45:5 76:9 80:8
91:11 96:18
107:1 116:13
141:5,8 143:15
152:10,14
153:20,25
**taken** 6:14 10:18
45:12 50:5
80:14 114:8
141:14 155:5,8
155:13
**talk** 9:1 39:8
40:13 42:1
51:14 52:1,2,5

83:24 84:1,14
96:15 114:4
121:6 125:7
135:3,4 139:3
139:5 140:9,15
140:18
**talked** 14:9
15:11,24 16:18
48:23 59:22
85:22 100:4
102:6 130:8
140:20
**talking** 8:10
13:22 16:22
25:7 30:12
31:11 39:11
48:16 50:25
69:6 76:13
78:16 81:16
85:7,9,10,19
88:9 90:18
93:16,22 99:9
103:6 112:20
118:19,20
132:16 133:21
142:21 144:5,9
151:16
**talks** 22:13
122:2
**tallied** 17:16
**taught** 30:17,21
38:7,10,12
119:9
**teach** 30:22 31:7
38:11
**teaching** 31:7
**team** 46:6,11,13
47:10,11
102:20
**teams** 102:21
**tear** 104:23,24
**tears** 103:18
104:6,8,17,21
**TECHNICIAN**
6:3 8:4 45:10
45:13 80:10,12
80:15 114:6,9
141:12,15
153:2,7,14,19
153:22 154:1,7

154:10
**tedious** 76:5
**teenagers** 89:6
89:16
**tell** 62:20 92:16
113:18 116:7
119:13 132:19
138:12,13
143:25 146:9
146:19 147:22
**tells** 9:23
**term** 27:7,7 30:2
30:3 37:9
38:16 55:14,19
55:22 92:22
93:12 101:6
**termination**
72:7,17 89:5
98:12
**terminology**
27:16 121:15
**terms** 28:21 29:9
46:19 47:15,22
54:21 59:9
87:20 100:20
100:22 101:2
104:16 122:15
128:9 139:22
149:15
**test** 117:15,25
132:3
**tested** 143:15
**testified** 6:2
11:12,20,23
13:13 74:5
**testify** 12:19
**testimony** 11:22
12:5,8,13,16
12:24 13:16
14:13 18:18
140:4 142:13
155:6,7 156:5
**testing** 108:4
**tests** 143:1,4
**text** 90:7
**thank** 7:10 8:4,7
8:13 13:12
14:16,25 15:5
18:1 20:17
21:24 22:4,15

26:1,10 28:18
32:19 35:4
41:25 45:10,16
45:20 49:19
51:2 53:2
64:18 65:5
66:22 70:9
74:21 77:12
79:22 80:8,10
81:12 96:3
97:3 105:19
111:4 120:25
122:20 125:11
126:7 129:1
130:12 134:6
138:22 141:10
142:7,11
152:23,25
153:21 154:4
154:10
**Thanks** 10:18
19:11 24:3
100:3 126:16
137:19
**theology** 126:4
**thereto** 155:15
**thing** 18:15
20:25 49:1
56:2 81:22
83:18 84:16
92:24 97:18
114:24 139:23
**things** 14:7,21
19:9 20:25
22:14 25:9
26:19 29:8
34:25 40:1
47:16 79:24
81:8 94:10
101:23 108:5
108:12 122:1
130:5 132:24
133:2 136:14
140:12,19
150:12,13
**think** 12:7,10,18
12:20 15:7,13
19:4 24:1
25:23 29:8
30:2 32:11

38:4 39:1
41:19,22 42:14
42:17,21 43:1
45:1 46:2
47:22 48:14
52:19 63:1
67:18 69:22
79:6,9 84:10
84:11 90:4,19
94:6 95:8,10
95:13,15,22,22
95:25 100:19
101:12,12
102:10,12,14
102:17,22
103:2,5,22
104:21,23,25
105:1,16
106:13,14
107:12 108:8
108:10 109:25
112:9 113:7,16
119:3 121:5,20
123:16 124:15
124:21 125:14
126:2 129:20
130:4,5 133:12
133:14 134:23
135:16,20
136:17,24
137:4,8,9
141:4 142:15
142:20 144:9
147:4,6,8
151:16 152:3
152:15,16,19
152:22
**thinker** 16:17
**thinking** 95:25
**third** 14:10
149:19
**Thorpe** 15:12,15
45:18
**thought** 16:1
21:4 50:11,16
118:12 129:22
130:7
**thousand** 24:19
56:5
**thousands**

124:11
**threatened**
27:10
**three** 11:23
108:5 126:8,9
126:10,16
127:8,13 128:6
128:12,12
129:10 131:22
134:15 137:14
138:23 141:2
141:19 149:11
**throwing** 105:15
**Thursday** 6:5
**Thursdays**
139:1
**time** 34:10,14
37:24 38:11
41:23,24 42:10
45:11,14 48:24
49:7,15 50:11
51:13 55:16
60:20 67:19
69:3 80:13,16
90:22 108:21
109:2,7 114:7
114:10 117:4
122:23 123:5
133:24 136:10
138:22 141:13
141:16 142:12
152:14,23
**times** 10:21
11:23 28:3
34:19 36:18,25
41:10 70:13,14
101:20 103:22
110:24 139:24
**tip** 65:3
**title** 46:5,6 65:21
125:6,8 127:12
**tobacco** 152:11
152:13
**today** 6:21 7:3
8:8,15,20
10:16 18:10,19
22:12 85:23
124:24 140:20
142:12
**today's** 18:1,11

19:13 154:11
**told** 33:16 52:11
**tongue** 65:4
**top** 53:16 55:12
60:8 65:23
86:18 101:10
119:4,14 148:1
148:9
**topics** 16:14
17:2
**total** 23:14
**totally** 9:13
**tradition** 129:20
**traditionally**
34:9
**tragedy** 33:15
**train** 100:18
**trained** 36:23
106:17 126:2
137:2 138:17
**training** 48:12
48:20,20 84:9
137:10,17,17
137:17 141:23
142:1
**trainings** 48:9
**transcript** 8:20
8:25 153:4,17
153:24 154:4
155:10 156:4
157:20
**transfer** 33:20
33:21
**transferred**
34:23
**transfers** 34:21
**transfusion**
102:18
**transient** 108:23
**transition**
149:23
**transmitted**
133:22
**transportation**
59:25 150:12
**transvaginal**
114:15 115:21
116:11
**traumas** 100:17
**traumatic** 152:6

**treat** 33:12,12
94:13 95:18
100:5 143:8
**treated** 39:9
94:18,21 95:8
95:14 96:2
101:16 102:10
103:2,17 104:7
104:21
**treating** 117:22
**treatment** 27:17
39:11 59:23
94:24 95:2
101:15 111:10
111:18
**tremendous**
80:3 84:5
**trends** 150:14
**trial** 79:18
**tried** 83:24
**tries** 85:4,11
**trimester** 59:16
60:17 109:20
**trouble** 41:13
78:25
**true** 57:10 75:18
84:10 122:17
134:15 138:2
146:24 156:4
**truly** 147:15
**trust** 133:25
**truth** 84:21
**truthfully** 8:16
55:5
**try** 20:5 62:21
62:24 67:20
85:4 104:9,12
104:25 120:21
125:24 136:14
139:15,23
140:1
**trying** 38:21
68:8 72:9 81:6
95:21 96:17
99:10,11
103:22 104:24
111:4 136:16
**tubal** 26:18
43:21 113:1
114:13 115:11

183

116:14 119:17
**tube** 107:23
**tubes** 106:8
119:18
**Tuesday** 153:11
**Tuesdays**
138:25
**turn** 10:6 22:8
148:21
**Turnaway** 90:18
90:25 91:3,15
**turned** 10:2,10
52:20 103:8
**turning** 10:8
**twins** 49:24,25
**two** 12:18 20:25
22:13 23:10
40:18 41:7
42:16 44:14
46:2 47:17
55:9 56:1 72:7
72:17 81:7
92:15,16 113:8
119:18 128:9
130:20 135:7
136:2
**two-week** 30:22
**type** 25:4 27:4,8
66:11 78:8
85:15 87:5
93:25 120:5,22
121:3
**types** 26:15 27:6
47:5 57:23
105:25 140:12
140:16
**typewriting**
155:9
**typically** 13:8
27:15 33:5
35:11 39:25
41:4 92:14,16
95:21 101:18
102:7 118:2
119:18 120:9
121:2

————————
**U**
————————
**U-r-o** 25:12
**Uh-huh** 68:12

ultrasonograp...
139:5,9
ultrasonograp...
137:14
**ultrasound**
27:12 41:14
50:6 108:1,3,5
111:9,17 112:7
112:23 114:15
115:21 116:11
116:18,19
117:15,17
118:3,7,25
122:1,3,11,22
123:1 139:4,12
143:15,17
**ultrasounds**
41:11 108:14
116:21,23
123:9
**umbrella** 27:7
**unaware** 141:3
**UNC** 7:3 24:15
**uncontrolled**
57:25 58:1,1
81:15 82:14
**underestimates**
53:5
**underreporting**
147:19,25
**understand** 8:14
9:6,20,25
10:16 39:17,20
40:20 51:15
99:18 110:17
128:12 139:17
144:15 147:15
**understanding**
20:24 34:11
46:15 48:2
55:13,18
111:21 112:5
112:11 140:8
**understood** 9:8
11:5 14:25
31:11 41:25
45:4 46:13
51:2,18 67:23
73:19 105:19

107:15
**unfettered** 13:3
**unfortunately**
78:25 91:12
109:6,19
**unidirectional**
78:1
**Union** 2:16,21
**United** 1:1 6:7
13:4 63:8
66:11 86:16
144:2,19
145:24 146:14
**University** 23:1
23:5,18 30:14
30:17 37:18
**unknown**
108:22,23
109:10,12
110:3,19 112:6
117:20 120:23
143:7,18
**unmarried**
133:8
**unofficial** 51:11
**unplanned** 13:8
41:9,15 51:18
90:20,21 124:1
**unreliable** 44:25
**unstable** 118:13
118:16,20
**unwanted** 82:19
90:20 98:20
**update** 113:6,7,9
**updated** 108:9
108:11 113:8
**updating** 47:19
137:4
**urged** 132:12
**uro** 25:12
**urogynecologi...**
25:6,11
**use** 15:19 30:3
32:16 61:3
63:4 76:6 79:5
79:24 82:22
101:19 105:21
106:5 107:4,6
107:8 112:2
121:14 123:12

147:3 151:25
152:1
**uses** 54:18 55:12
108:3 111:21
112:11
**usually** 30:2
33:6,22 35:15
94:11 95:20
103:21 108:15
117:1,5 118:11
120:4,17
140:14
**uterine** 26:6
100:13 101:9
101:22 102:16
107:22
**uterus** 26:8 94:6
101:5,10,11,23
102:16 122:5

————————
**V**
————————
**vacuum-assist...**
31:20
**vagina** 105:14
122:6
**vaginal** 25:5
50:1 92:24
101:3 104:11
105:9 122:15
**vaginally** 31:19
94:8
**values** 47:1
**Vanisha** 4:16,20
**variables** 78:18
81:7,8 96:14
96:23
**variety** 83:14
**various** 58:2
145:12
**vastly** 147:14
**verb** 134:19
**verbal** 12:13
**verbally** 8:22
**verify** 64:15
**Vermont** 2:10
**version** 127:14
**versus** 6:10 31:1
90:16 93:5
132:17
**vertex** 50:1,1

**vessels** 101:6,11
**viability** 34:8
**viable** 28:3
117:11
**video** 6:4 45:11
45:14 80:13,16
114:7,10
141:13,16
153:3,4,12,15
153:18 154:12
**videographer**
4:21 10:3
**Videographers**
1:20
**VIDEOTAPE**
6:3 8:4 45:10
45:13 80:10,12
80:15 114:6,9
141:12,15
153:2,7,14,19
153:22 154:1,7
154:10
**view** 43:11
**violence** 77:3,14
**virtual** 47:17
**visionary** 47:20
**visualization**
105:15
**visualize** 104:10
104:13
**vital** 36:25 53:17
53:18,19
**volume** 6:12
**voluntary** 53:10
53:12,19
147:10,20
**volunteer** 30:23
41:9,11 128:2
132:21
**volunteered**
30:20
**vs** 1:5
**vulnerable** 89:7
**vulvar** 107:10

————————
**W**
————————
**W** 3:5
**wait** 9:1,2 35:25
36:8,10 37:5
118:2

**waiting** 36:9
   37:14
**Wake** 6:23
**walk** 135:19
**walks** 116:8
**wall** 100:13
**want** 9:13 13:18
   28:2 36:13
   39:15 40:17
   41:16,17 42:1
   43:5 47:5
   51:20,21 68:23
   74:13 79:1,7
   81:7 85:1,6
   88:23 89:13
   90:2 92:16
   98:25 99:17,22
   102:23 106:14
   109:23 110:14
   121:20 133:18
   135:3,5,10,12
   136:5 139:17
   140:5,15
   142:16,16
   143:20 145:10
   146:7 151:5
   152:15,18
   153:6,10
**wanted** 28:11,22
   33:25 40:2
   41:23 45:17
   51:14,17 79:12
   83:8 85:16
   90:1,16,16
   152:13
**wanting** 20:6
**wants** 95:12
   116:5 132:3
   135:3
**Ward** 3:5
**warning** 60:1
   150:12
**Washington**
   2:11
**wasn't** 11:4 20:5
   39:2 41:24
   83:22 146:7
**watch** 36:23
**Waterlife**
   126:14

**way** 8:15 11:6
   15:1 99:11
   103:14 121:9
   123:7 134:23
   135:12 136:5
   136:24 143:8
**ways** 120:12
**we'll** 9:17 22:21
   26:10 42:7
   75:22 79:12,13
   92:14 141:5
   144:9 153:19
   153:20
**we're** 8:10,13,25
   37:6 53:2
   56:11 63:7
   70:9 74:23
   78:13 81:21
   82:17 86:9,11
   87:25 88:20
   92:6 93:16
   96:4 97:18
   100:3 107:10
   107:19 114:3
   114:23 123:2
   123:18,19
   125:19 133:13
   136:8,25
   138:11 141:4
   147:14
**we've** 98:2
**weboyle@ard...**
   3:7
**Website** 138:16
**Wednesdays**
   139:1
**week** 17:21,23
   22:13 38:25
   139:5
**weekends**
   139:13
**weekers** 37:3
**weekly** 65:24
   145:22
**weeks** 33:6 37:1
   37:4 108:15
   117:2,2,7,9
   118:2
**weight** 98:15
**welcome** 105:20

   130:13 153:1
**well-being** 79:8
**went** 23:12
   38:12
**weren't** 85:16
   151:5
**West** 3:2,10,20
**white** 59:11 60:2
**wholeness** 47:5
   140:5
**wide** 93:2
**William** 2:5
**Williams** 3:15
   7:7,9,13,13
**willing** 134:20
**Wilson** 126:12
   128:8 129:13
   129:25 138:24
**Winston-Salem**
   3:16
**wish** 84:1 157:20
**witness** 8:5
   10:22,23,23
   11:13 15:6
   18:6 36:3,5,13
   40:13 43:16
   45:7 48:9,19
   48:21 55:3
   57:3 62:14
   64:13 65:15
   68:7 69:25
   71:19 73:7
   74:3 76:3
   81:23 82:3
   88:6,8,13,16
   97:19,24
   102:14 103:5
   115:4,9 129:1
   131:9 133:11
   134:18 141:10
   141:23 144:11
   144:13 153:1
   154:14 155:6,8
   155:10
**witnesses** 18:16
   112:20
**woman** 25:8
   27:14 35:18
   41:15 49:16
   57:25 59:18

   87:3,15 90:12
   92:14 93:1,18
   93:25 95:11
   100:10 108:25
   111:12 116:7
   119:10,16
   120:12 121:14
   121:23 122:10
   132:2 133:8,17
   133:20 139:23
**woman's** 102:23
   122:7
**womb** 34:17
**women** 13:5,7
   24:18,19 31:23
   32:4,13 33:8
   39:15 41:9,15
   41:16,18,21,23
   56:9 57:15,18
   57:23 58:4,6
   58:14 59:2,4
   59:10,11,18,21
   60:2,16,21
   62:1 63:18
   67:19 73:4
   78:22 79:4,6,8
   80:3,4,6,7,22
   85:1 89:7
   90:19,22,22
   94:4 96:2
   99:15,16,17,22
   100:16,17,25
   106:8,13 109:7
   109:9 111:15
   116:3 119:12
   120:1,3,20
   121:4,6 122:16
   124:1,15
   125:19 132:12
   134:1 135:17
   136:12 147:15
   150:8 151:11
   152:5,16,19
**women's** 38:24
   126:12
**wonderful** 130:4
   130:5
**word** 25:10
   116:2 129:18
   134:9,22

**wording** 142:15
**words** 56:23
   121:20
**work** 16:8 21:11
   23:15 24:4
   26:12,12,20
   30:12,13,23
   31:14,16,18
   37:17,18,21
   38:19,23 41:8
   41:23 42:1,21
   43:2,3 44:4,9
   45:6 46:19
   49:12 62:24
   82:24 84:5
   123:19 127:13
   128:7 129:10
   131:22 132:21
   134:16 136:20
   137:3,6 138:3
   138:8,23
   140:22,24
   141:9,19
   143:11 153:6
**worked** 37:22
**workforce** 38:19
**working** 17:13
   17:18 22:22
   37:20 41:15
   132:20
**works** 33:17
   44:15
**world** 48:18
**worried** 50:4
   118:17
**worst** 57:24
**wouldn't** 40:19
   43:4 44:8 52:7
   84:6 94:3
   99:16,22
   109:12 152:17
**write** 21:6 58:12
   75:1 106:25
**writing** 22:1
**written** 17:16
   74:22 130:3
   137:23 138:4
**wrong** 41:22
   84:3 142:22
**wrote** 51:19,22

**Wubbenhorst**
91:14
**www.discover...**
1:25

**X**
**X** 5:1,2,7

**Y**
**y'all** 76:7
**yeah** 29:7 32:9
35:19 39:15
42:10 51:3
56:13 59:15
68:7,16 76:19
80:24 88:8,23
93:16 94:17
95:20 100:18
109:8 114:3
117:13 118:16
125:11,15
133:5 134:18
136:3 137:12
137:21 138:13
138:24 142:21
150:5 153:10
**year** 30:22 38:9
42:16 47:13
50:23 51:13
83:21 125:2
148:12
**yearly** 31:23
**years** 13:2 22:23
23:15,16 24:7
34:20 35:2,2
38:14 39:1
41:7,10,13
42:11 44:8
46:2 78:12
95:24 143:9
145:12
**Yesterday**
124:23
**yolk** 117:8,11
**York** 2:6,6,18,18
**young** 34:13

**Z**
**Zao** 5:21 97:9
98:1

**Zealand** 152:16
**Zoom** 114:19

**0**
**0.43** 66:20
**0.7** 60:22 62:2

**1**
**1** 34:21
**1,000** 24:18
**1:23-cv-00480...**
6:11
**10** 12:17,20,20
17:23 45:6
69:8 80:11
94:7 95:24
148:21,22,24
152:16
**10-year** 23:11
**100** 3:15
**100,000** 60:22
62:2,6 63:14
63:19 64:1
66:15,20 146:5
146:13
**1000** 1:22
**10004** 2:18
**10038** 2:6
**101** 30:23
**11** 145:5,6
**1110** 2:10
**1119** 89:2
**114** 3:2,10,20
**115** 5:22
**12** 58:10,20
64:18,21
**12-week** 139:6
**123** 2:5
**125** 2:17
**126** 5:23
**128** 5:24
**131** 5:25
**14** 90:5
**142** 5:5
**1438** 98:4
**15** 66:10 114:1
**15100** 4:9
**18th** 2:17
**19** 5:10
**191** 108:9,10

**113:5,8 115:11**
122:2
**193** 108:10,11
112:10,22
113:7
**1973** 66:11
**1987** 22:17
23:12
**1988** 61:25
**1989** 23:2
**1995** 23:5
**1997** 23:7,12
42:17 61:25

**2**
**2:05** 1:13 6:5
**20** 37:4 78:12
156:16
**20.7** 64:1,24
**200** 102:9 103:2
103:6,7,15
**20005** 2:11
**2001** 23:21
31:12 42:12,15
**2007** 64:22
**2010** 31:12
37:16,23
**2011** 37:24
**2013** 49:4 66:20
146:4
**2016** 63:25
64:22,24
144:22
**201826800211**
155:20
**2019** 66:12,20
146:4
**202-973-4800**
2:12
**2020** 49:5 65:2
65:18 66:3
145:24
**2021** 5:12 42:17
62:5,11 63:8
63:14,17,22
144:2,11,16
**2022** 145:23
**2023** 1:13 6:5
155:17
**21/'22** 126:3

**212-541-7800**
2:6
**212-549-2633**
2:18
**22** 37:1,3
**24** 139:15
**244** 77:7
**245** 76:25 77:9
**25** 58:18,19
60:10
**27** 66:5 145:25
146:1,3
**27101** 3:16
**27602-0629** 3:21
**27603** 3:2,11
**27607** 3:6
**27609** 1:23
**27611** 2:23
**28** 88:14,14
**28004** 2:23

**3**
**3:07** 45:11
**3:17** 45:14
**30** 80:23 106:21
**300** 2:11 3:6
**31** 1:13 6:5
**32** 66:24 148:18
**32.9** 62:6 63:14
**33** 66:24 68:8,13
**336-722-3700**
3:16
**35** 56:8,10 70:12
70:17 92:1,6
**37** 96:4 97:4
**39** 75:10 80:19
82:18 86:10

**4**
**4:18** 80:13
**4:29** 80:16
**40** 86:11 88:14
**4208** 1:21
**43** 146:4,5
**450** 82:5 150:23
151:3

**5**
**5:29** 114:7
**5:40** 114:10

**50** 13:2 53:9
56:10 109:7
110:11
**500** 17:12
**5OO** 92:25
101:3
**5th** 155:17

**6**
**6** 5:4
**6:29** 141:13
**6:36** 141:16
**6:57** 154:12,16
**60** 51:16 134:25
**600** 3:15
**61** 5:11 111:6,8
**62** 5:12 112:15
**64** 5:13
**65** 5:14 56:7
**660** 74:25
**68** 5:15
**69.9** 63:19

**7**
**70** 33:10 39:24
51:17
**70s** 33:8
**71** 5:16
**73** 5:17
**75** 5:18
**751** 3:6
**798** 72:3,10,14

**8**
**80** 33:10
**800-835-5233**
4:11
**80s** 33:9
**81** 5:19
**85260** 4:10
**87** 23:13
**88** 5:20
**89** 23:13

**9**
**90s** 124:15
**90th** 4:9
**919-277-9187**
3:7
**919-354-5066**
2:24

**919-424-8242**
  1:24
**919-716-0091**
  3:21
**919-716-6421**
  3:3
**919-716-6600**
  3:11
**93** 97:5
**97** 5:21
**9th** 2:5