# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION FILE NO. 1:23-CV-480

Planned Parenthood South      )
 Atlantic, et al.,           )
                             )
             Plaintiffs,      )
                             )
     vs.                     )
                             )
 JOSHUA STEIN, et al.,         )
                             )
             Defendants,      )
                             )
 and                           )
                             )
PHILIP E. BERGER and TIMOTHY K.   )
MOORE,                            )
                             )
             Intervenor-      )
             Defendants.      )
                             )
--------------------------------

_____

VIDEOTAPED DEPOSITION
OF
KATHERINE A. FARRIS, MD
_____

TAKEN AT THE LAW OFFICES OF:
WARD AND SMITH, P.A.
82 PATTON AVENUE, SUITE 300
ASHEVILLE, NC 28801

09-01-2023
10:11 O'CLOCK A.M.

Laura Baker
Court Reporter
for Cape Fear Court Reporting, Inc.
PO Box 10112
Wilmington NC  28404

22

1    2023, you would agree that PPSAT North Carolina was

2    performing surgical abortions on patients in their 13th

3    week and later gestational age and charging money to

4    perform those abortions, right?

5        A.    Prior to July 1st, Planned Parenthood South

6    Atlantic was performing procedural abortions beyond the

7    12th week of pregnancy and charging for those

8    abortions, yes.

9        Q.    And this law, this change in the law, has

10   caused PPSAT to lose the income that it made from

11   charging those patients for those abortions, right?

12                  MS. SWANSON:  Objection to form.

13                  THE WITNESS:  I am not aware of what our

14   income balance is since the change in the law.

15       Q.    (Mr. Boyle)  Well, you're aware that if you

16   were performing those abortions before and charging

17   money and getting paid for them, and now you're not,

18   you've lost that money, right?

19                  MS. SWANSON:  Objection to form.

20                  THE WITNESS:  I am not aware of what

21   money or what our income has been since the change in

22   the law.

23       Q.    (Mr. Boyle)  Yes, I'm not asking about your

24   general income or your general balance sheet.  I'm

25   saying, the simple fact is, if you were doing those

23

1  abortions and charging money for them before, and now
2  you no longer are, you've lost that money that you made
3  before, correct?
4          MS. SWANSON:  Objection to form.
5          THE WITNESS:  I think that would require
6  me to speculate, because we've changed the services we
7  provide since the law went into effect, and I can't
8  speculate as to the exact impact that has had on our
9  income.
10     Q.  (Mr. Boyle)  I'm not asking you to compare
11  income.  I'm just asking if you simply lose revenue
12  from that potential source if you're no longer doing
13  it.
14          MS. SWANSON:  Objection to form.
15          THE WITNESS:  I can state that we are
16  not charging for abortions that we are not performing,
17  and we are not performing abortions, routinely, beyond
18  the 12th week of pregnancy since the law went into
19  effect.
20     Q.  (Mr. Boyle)  You just said, "routinely."  Are
21  you performing them at all?
22     A.  Legally, we can perform them.  And I'm not
23  personally aware of an abortion that has done -- that
24  has been done past the 12th week that meets one of the
25  exceptions.

24

1     Q.  So as I understand your testimony, you're

2 saying that it's possible that an abortion after the

3 12th week that meets one of the exceptions under the

4 new law has been performed at a PPSAT clinic since July

5 1st leading up to today, September 1st, but you're just

6 not aware of that.

7     A.  Correct.

8     Q.  Okay.  I just want to clarify.  If you were

9 making money doing that type of abortion before July

10 1st when the law in effect, and now you're no longer

11 doing it, you would agree that you've lost at least

12 that money that you were able to make and charge for

13 those abortions that you're not able to make and charge

14 now, correct?

15           MS. SWANSON:  Objection to form.

16           THE WITNESS:  I would not characterize

17 that I -- that PPSAT has lost money.  I would

18 characterize that PPSAT is not charging for procedures

19 that we are not performing.

20     Q.  (Mr. Boyle)  PPSAT is a nonprofit.  Is that

21 correct?

22     A.  Yes, that's correct.

23     Q.  Does it provide any charity care to patients?

24           MS. SWANSON:  Objection to form.

25           THE WITNESS:  I am not deeply involved

62

1   is just anterior to the uterus in most patients,

2   although there can be a space, and often is a space,

3   between the uterus and the bladder; and the intestines

4   can be in the space generally surrounding the uterus.

5       Q.   (Mr. Boyle)  Any other organs that would be

6   immediately adjacent to the uterus, if there was a

7   uterine perforation?

8       A.   Those are the organs that are closest to the

9   uterus.

10      Q.   You would agree that uterine perforation is a

11  known complication of a surgical abortion, wouldn't

12  you?

13      A.   Uterine perforation is an extremely rare but

14  known complication of procedural abortion.

15      Q.   Have you ever had a patient who you performed

16  a surgical abortion on who suffered from a uterine

17  perforation?

18      A.   I have had a patient that I performed a

19  procedural abortion on who had a uterine perforation.

20      Q.   Did you have to transfer the patients, who

21  you performed a surgical abortion on who suffered a

22  uterine perforation from the Planned Parenthood clinic,

23  to the hospital?

24      A.   No, I did not.

25      Q.   You -- are you aware that sometimes, if a

Case 1:23-cv-00480-CCE-LPA   Document 75-2   Filed 09/12/23   Page 6 of 35

63

1    patient has a uterine perforation during a surgical

2    abortion, it's required that they be transferred to a

3    hospital for higher level of care?

4                MS. SWANSON:  Objection to form.

5                THE WITNESS:  I am aware that there are

6    some cases of uterine perforation where the patient

7    does need to be transferred to a hospital for

8    additional care.

9         Q.   (Mr. Boyle)  Has that ever happened at PPSAT?

10        A.   Yes, it has.

11        Q.   Did you know before the surgical abortion was

12   performed that those patients who suffered a uterine

13   perforation would require transfer to the hospital

14   based on that known complication?

15               MS. SWANSON:  Objection to form.

16               THE WITNESS:  I just want to clarify.

17   Are you asking if I knew in advance that a patient

18   would experience a uterine perforation and require

19   transfer?

20        Q.   (Mr. Boyle)  That is what I'm asking.

21        A.   No, it is not possible to know that in

22   advance.

23        Q.   Because you can't always know what

24   complications will arise during a surgical procedure,

25   can you?

64

1      A.   It is true that with any procedure, you

2   cannot always predict accurately what complications may

3   arise.

4      Q.   What is a cervical laceration?

5      A.   A cervical laceration is a tear of the

6   cervix.

7      Q.   You agree that a cervical laceration is a

8   known complication of surgical abortion, don't you?

9      A.   I would agree that a cervical laceration is

10   an extremely rare but known complication of procedural

11   abortion.

12      Q.   Have you ever had a patient, who you

13   performed a surgical abortion on, who suffered from a

14   cervical laceration?

15      A.   I would say that I have had a patient who

16   suffered from some bleeding associated with the

17   instruments we use on the cervix, but I've never had a

18   cervical laceration that required interventions such as

19   suturing.

20      Q.   Do some patients who suffer the known

21   complication of surgical laceration during a surgical

22   abortion require transfer to a hospital for a higher

23   level of care?

24            MS. SWANSON:  Objection to form.

25            THE WITNESS:  I'm not aware of patients

65

1  needing to be transferred for cervical laceration.

2      Q.  (Mr. Boyle)  Are you aware of any patient

3  from PPSAT who suffered a cervical laceration during a

4  surgical abortion having to be transferred to a

5  hospital to care for that known complication?

6      A.  I do not recall any patient with a cervical

7  laceration having to be transferred for that

8  complication.

9      Q.  Have you ever had a situation where you

10  performed a surgical abortion on a patient and the

11  patient suffered hemorrhaging such that you needed to

12  transfer that patient to a hospital for higher level of

13  care?

14      A.  I have had a patient who hemorrhaged during a

15  procedural abortion who I transferred to the hospital

16  for care, yes.

17      Q.  Is hemorrhage a known complication of

18  surgical abortion?

19      A.  Hemorrhage is an extremely rare and known

20  complication of procedural abortion.

21      Q.  Are you aware of other patients from PPSAT

22  who have suffered hemorrhage during a surgical abortion

23  that were transferred to a hospital for a higher level

24  of care?

25      A.  I am aware of patients who have suffered

1   hemorrhage during a procedural abortion who have been
2   transferred to a hospital.
3       Q.   Did you know, before the surgical abortion
4   was performed, that those patients who suffered
5   hemorrhage that required transfer to the hospital would
6   have that complication during that surgical abortion?
7       A.   No.  You cannot know in advance what
8   complication a patient may experience from any given
9   procedure.
10      Q.   Do you disclose all possible complications
11  that can arise from an induced abortion to a woman who
12  has tested pregnant, who has tested positive for
13  pregnancy, who is your patient considering obtaining an
14  induced abortion?
15      A.   We disclose the most common and most
16  concerning potential complications to patients as part
17  of their informed consent.
18      Q.   And tell me, what -- how many days is the
19  waiting period now, under the new law, SB20 and HB190,
20  for informed consent for a patient seeking an induced
21  abortion before the induced abortion can actually
22  occur?
23              MS. SWANSON:  Objection to form.
24              THE WITNESS:  My understanding of the
25  current law is that it requires a 72-hour waiting

67

1  period from the time the State consent form is reviewed

2  by the patient and signed and when the abortion takes

3  place.

4           MR. BOYLE:  I'm going to hand you a

5  document that has Bates numbers that was produced in

6  discovery.

7           MS. SWANSON:  Thank you.

8       Q.   (Mr. Boyle)  It's Bates Numbers 31 through

9  50.  If you don't mind, down at the bottom right-hand

10 corner, do you see Bates and then numbers there?

11      A.   I do see those numbers, yes.

12      Q.   And the first page says Bates 31.  Do you see

13 that?

14      A.   I do see that, yes.

15      Q.   And then if you turn to the last page,

16 please, you see Bates 50?

17      A.   Yes, I do see that.

18      Q.   Okay.  So do you recognize this document?

19      A.   Yes, I do.

20      Q.   What is it?

21      A.   This is our education and consent packet for

22 procedural abortion.

23      Q.   Can a patient die from complication of

24 bleeding if there is a cervical laceration or a uterine

25 perforation or hemorrhage?

1  correct?

2       A.   This is a signature page.  We don't actually

3  use paper forms for signature.  We use an electronic

4  health record, so we use an electronic version of this

5  form, unless our electronic health system is down, and

6  then we use the paper form.  But the patient does sign

7  an electronic version of this form, yes.

8       Q.   Is the electronic version of this form

9  exactly the same format as this paper copy here, this

10 34, 35 and 36?

11            MS. SWANSON:  Objection to form.

12            THE WITNESS:  I would -- I can't speak

13 to the exact format, but it contains the same

14 information.  We use this form to create the electronic

15 form.

16      Q.   (Mr. Boyle)  So you don't actually hand a

17 patient this piece of paper, this three-page document.

18 Is that what you're saying?

19      A.   No, that is not what I'm saying.  I do hand

20 the patient this three-page document.  We at Planned

21 Parenthood hand the patient this document.

22      Q.   Okay.  So someone at -- at PPSAT hands the

23 patient a three-page document that looks like Bates

24 Number 34, 35 and 36, and that patient then has that

25 hard copy paper document to take with them?  Is that

1  correct?

2      A.   It is correct that the patient receives a

3  paper copy of this document before they leave the

4  clinic -- or actually, when they are arriving and going

5  through consent.

6      Q.   Okay.  Do the -- does the patient receive a

7  signed copy of this document?

8      A.   The patient does not routinely receive a copy

9  of this form that they have signed, but they may

10 receive a copy, if they would like, that can be printed

11 from the EHR for them if they request it.

12     Q.   So when the patient signs an electronic copy

13 of this document, is the patient looking at a computer

14 screen and having the opportunity to read all three

15 pages before they sign, or do they have a paper copy?

16 What's the method for that?

17     A.   They have both.  They have a paper copy in

18 front of them, and they can see the electronic form as

19 it is being filled out and they are signing it.

20     Q.   And who goes over this document with the

21 patient?

22     A.   A trained staff member.

23     Q.   What level of training does that staff member

24 have?

25             MS. SWANSON:  Objection to form.

79

1          THE WITNESS:  They are -- they can have

2     a variety of backgrounds of training, but they are

3     specifically trained in the process of Planned

4     Parenthood South Atlantic's informed consent.

5          Q.   (Mr. Boyle)  Is that person who undertakes

6     informed consent with the patient, is that a nurse?  Is

7     that a PA?  Is that an MD doctor?  What level of

8     training do they have?

9          A.   It varies based on which aspect of informed

10    consent you're referring to.

11         Q.   Okay.  How about this aspect with this three-

12    page document?  What level of PPSAT employee -- in

13    terms of training for that employee, what level of

14    employee is engaging with the patient to ensure

15    informed consent is obtained?

16         A.   It can be multiple levels.  I've had nurses

17    or physicians who participate in that.  Routinely, it

18    is not a licensed person who is going over the form.

19    It is someone who is trained specifically in the

20    process of consent who had -- goes over the form with

21    the patient.

22         Q.   Does the law speak to who has to interact

23    with a patient, what level of training that person has,

24    in order to ensure informed consent is indeed proper

25    and legal?

1          MS. SWANSON:  Objection to form.

2          THE WITNESS:  So the second category I

3    referred to, we call a probably intrauterine pregnancy.

4    And I don't know how to answer the question, "Is there

5    a different differential diagnosis?"  I'm not really

6    clear what you're asking.

7      Q.   (Mr. Boyle)  Is your differential diagnosis

8    the same or different compared -- Category 1 to

9    Category 2?

10          MS. SWANSON:  Objection to form.

11          THE WITNESS:  I would say it was

12   different.  One of the common ways we would see a

13   probably intrauterine pregnancy would be in someone who

14   had a large, empty uterine sac.  And depending on the

15   size of that sac, would make us either suspicious for,

16   or clinically certain, that the patient was

17   experiencing a miscarriage.

18      Q.   (Mr. Boyle)  Okay.  How about for Category 3,

19   which I believe you said was an ultrasound that

20   definitely showed an ectopic pregnancy?  What's your

21   differential diagnosis for that patient?

22          MS. SWANSON:  Objection to form.

23          THE WITNESS:  I would consider that

24   patient to have an ectopic pregnancy or a pregnancy

25   outside the uterus.

107

1      Q.   (Mr. Boyle)  And what would you do as a
2  result of that?
3      A.   If I see a patient with an ectopic pregnancy,
4  I refer them for treatment of that pregnancy.
5      Q.   Refer them where?
6      A.   Either to their primary gynecologist, if
7  that's their preference, and they're able to see them
8  quickly, or to a hospital for care.
9      Q.   Because an ectopic pregnancy is a life-
10  threatening risk for a patient, isn't it?
11              MS. SWANSON:  Objection to form.
12              THE WITNESS:  An ectopic pregnancy can
13  be life threatening if not treated, yes.
14      Q.   (Mr. Boyle)  Because it's a pregnancy growing
15  outside of the uterus, where it's supposed to be, and
16  it can cause -- if it's in the fallopian tubes, it
17  cause those to rupture and bleed, right?
18      A.   That is one form of ectopic pregnancy.  There
19  are many locations that an ectopic pregnancy can exist,
20  including technically within the uterus.
21      Q.   Okay.  And if you have -- well, the fourth
22  category would be an ultrasound that showed a suspected
23  ectopic pregnancy.  How would your differential
24  diagnosis for that fourth category differ, if any way,
25  from the third category, where you actually identified

1  ectopic pregnancy?

2       A.   So a probable ectopic pregnancy would mean

3  that I am seeing something outside of the uterus that I

4  am suspicious is ectopic, but I don't see

5  characteristics that absolutely confirm that that is a

6  pregnancy that I'm seeing versus some other structure

7  such as an ovarian cyst that's complex.

8       Q.   And what would your differential diagnosis

9  -- what would you do with that patient, that Category

10 4?

11 (Knock at door)

12      Q.   You can continue.  You can continue.  I'm

13 listening.

14            MR. BOYLE:  Thanks.

15            THE WITNESS:  Differential diagnosis and

16 treatment are two very different things.  Would you

17 like me to answer what the differential diagnosis was

18 or what I would do for it?

19      Q.   (Mr. Boyle)  Start with the differential,

20 yes.

21      A.   So the differential diagnosis of a probable

22 ectopic pregnancy is would be that there is an ectopic

23 pregnancy that I can't definitely diagnosis or that

24 there is some other structure outside of the uterus

25 that I -- that could be a complex ovarian cyst, it

1   their gynecologist or an emergency room so that she can

2   get worked up further, and they can rule it out or rule

3   it in.  Is that fair?

4                    MS. SWANSON:  Objection to form.

5                    THE WITNESS:  If a patient has a

6   definite or probable ectopic pregnancy, that means that

7   I am concerned about a potentially life-threatening

8   condition, and I would refer them for further immediate

9   evaluation.

10      Q.   (Mr. Boyle)  A patient with the fifth

11  category, pregnancy of unknown location, could that be

12  an ectopic pregnancy?

13      A.   It could be.

14      Q.   Are you suspicious that it might be an

15  ectopic pregnancy?

16                   MS. SWANSON:  Objection to form.

17                   THE WITNESS:  No.  If I'm suspicious

18  that it might be an ectopic pregnancy, then I would

19  consider it a probable or definite ectopic pregnancy.

20      Q.   (Mr. Boyle)  So if you have a pregnancy of

21  unknown location on an ultrasound, you're not seeing an

22  actual pregnancy or possible pregnancy either in the

23  uterus or outside the uterus, correct?

24      A.   Correct.

25      Q.   Doesn't that raise your suspicion that that

1  patient could have an ectopic pregnancy, because you

2  haven't ruled it out?

3              MS. SWANSON:  Objection to form.

4              THE WITNESS:  When I have a patient who

5  has a probable -- or, pardon me, who has a pregnancy of

6  unknown location, I consider three -- the most common

7  three possibilities in my differential diagnosis: that

8  they have an early intrauterine pregnancy that is not

9  yet visible; that they have an early intrauterine

10 pregnancy that is undergoing miscarriage; or that they

11 have an ectopic pregnancy that is not yet visible.

12      Q.   (Mr. Boyle)  So when you have a Category 5,

13 pregnancy of unknown location, on an ultrasound, part

14 of your differential diagnosis is Number 3, that they

15 may have an ectopic pregnancy that you just can't see

16 yet?

17      A.   That is correct.  That is part of the

18 differential diagnosis.

19      Q.   Unless they are discovered and treated early,

20 you would agree that almost 40 percent of ectopic

21 pregnancies rupture suddenly, causing pain and bleeding

22 in the abdominal cavity, wouldn't you?

23      A.   I do not have that data.

24      Q.   You don't know that data?

25      A.   I do not know that statistic off the top of

1   my head.

2        Q.   You would agree, at least, that ruptured

3   ectopic pregnancies can be fatal, wouldn't you?

4        A.   I would agree.

5        Q.   At least 2 percent of pregnancies are ectopic

6   pregnancies.  Isn't that right?

7        A.   The categorization I have heard is that up to

8   2 percent of pregnancies are ectopic pregnancies.

9        Q.   We were talking about ACOG before.  Are you

10  familiar with ACOG Practice Bulletin 193?

11       A.   I would have to look at it to know.

12       Q.   You don't know it just off the top of your

13  head?

14       A.   Not from a number.

15       Q.   Okay.

16            MR. BOYLE:  I'm going to hand you a

17  document.

18            MS. SWANSON:  Thank you.

19            MR. BOYLE:  You're welcome.

20       Q.   (Mr. Boyle)  Take your time, review that

21  please, and let me know when you're ready to identify

22  it.

23       A.   I have not read it in detail, but I am -- I

24  do have it in front of me.

25       Q.   Okay.  Are you able to identify what this is,

114

1     Q.   Okay.  If you look over that Risk Factor
2  section on the first page, I'm going to read you a
3  sentence and ask you about that.  First sentence says,
4  quote, "One-half of all women who receive a diagnosis
5  of an ectopic pregnancy do not have any known risk
6  factors," end quote.  Do you see that?
7     A.   I do see that.
8     Q.   So you would agree that it's possible that a
9  woman who comes into a PPSAT clinic has an ectopic
10  pregnancy but doesn't have any known risk factors for
11  that ectopic pregnancy?
12     A.   Yes, that is possible.
13     Q.   And the gold standard to test and look for an
14  ectopic pregnancy is to conduct a transvaginal
15  ultrasound and see if there is an embryo or fetus seen
16  in the uterus.  Isn't that right?
17     A.   I don't know ---
18              MS. SWANSON:  Object to form.
19              THE WITNESS:  --- what you mean by,
20  "gold standard."
21     Q.   (Mr. Boyle)  You don't use the word -- the
22  term "gold standard" in your medical practice?
23     A.   I would not use the term "gold standard" in
24  this context.
25     Q.   Do you use it in any context in your medical

Case 1:23-cv-00480-CCE-LPA   Document 75-2   Filed 09/12/23   Page 21 of 35

1   practice?

2               MS. SWANSON:  Objection to form.

3               THE WITNESS:  I don't know that I --

4   it's not a -- it's not a term that I routinely use, no.

5   I would say that ultrasound is a critical factor in

6   diagnosis of ectopic pregnancy.

7       Q.   (Mr. Boyle)  I will accept that.  If you turn

8   to the second page of this Bulletin 193, under Clinical

9   Considerations and Recommendations, How is an Ectopic

10  Pregnancy Diagnosed; you see that section?

11      A.   I do see that section.

12      Q.   Okay.  You see the sentence that says, quote,

13  "The minimum diagnostic evaluation of a suspected

14  ectopic pregnancy is transvaginal ultrasound evaluation

15  and confirmation of pregnancy," end quote.  Do you see

16  that?

17      A.   I do.

18      Q.   So ACOG requires, according to this Bulletin,

19  that in order to rule in or rule out an ectopic

20  pregnancy, you have to have an ultrasound that shows

21  the pregnancy.  Is that correct?

22      A.   That ---

23               MS. SWANSON:  Objection to form.

24               THE WITNESS:  That's not actually what

25  it's saying.  What it's saying is that the minimum

116

1  diagnostic evaluation, so the minimum you must do if

2  you suspect ectopic pregnancy, is a transvaginal

3  ultrasound evaluation.

4          And when they say, "and confirmation of

5  pregnancy," they mean that if you do a transvaginal

6  ultrasound but you haven't done another test to confirm

7  that the patient is pregnant, such as a urine or blood

8  pregnancy test, then it's not as useful.

9          For example, if a patient had a negative

10  pregnancy test, then the -- the transvaginal ultrasound

11  wouldn't be helpful.  So if you do a transvaginal

12  ultrasound and don't see a pregnancy, you would next do

13  a pregnancy test to see if the patient was even

14  pregnant.

15      Q.   (Mr. Boyle)  So you think that sentence

16  there, that's talking clearly about ultrasound, means

17  that a doctor doesn't have to actually confirm the

18  pregnancy with the ultrasound?  That's how you

19  interpret that sentence?

20          MS. SWANSON:  Objection to form.

21          THE WITNESS:  No.  What I am saying is

22  that this sentence says that you must do an ultrasound,

23  and you must also confirm that the patient is pregnant.

24  Because often, for example, in pregnancy of unknown

25  location, you will do an ultrasound and not see a

1  over, Serum Human CH -- CG -- HCG, sorry.  Serum HCG

2  Measurements, do you see that?

3       A.   I see that.

4       Q.   It says, quote, "Measurement of the Serum HCG

5  levels aids in the diagnosis of women at risk of

6  ectopic pregnancy.  However, Serum HCG values alone

7  should not be used to diagnosis an ectopic pregnancy

8  and should be correlated with the patient's history,

9  symptoms, and the ultrasound findings," end quote.

10       Do you see that?

11       A.   I see that.

12       Q.   So doesn't that say that you have to see an

13  ectopic pregnancy by an ultrasound, either saying it's

14  intrauterine or it's not?

15            MS. SWANSON:  Objection to form.

16            THE WITNESS:  No, that's not at all what

17  it says.

18       Q.   (Mr. Boyle)  Okay.  If you have a woman who

19  has tested pregnant -- tested positive for pregnancy,

20  and you take an ultrasound of her and you don't see a

21  fetus or an embryo anywhere on that ultrasound, doesn't

22  that actually raise your suspicion for her having an

23  ectopic pregnancy on that differential diagnosis you

24  were discussing earlier?

25       A.   Yes, it does increase my suspicion for

121

1  ectopic pregnancy if I do not see a pregnancy either

2  inside or outside of the uterus, including a

3  gestational sac, not just a fetus or embryo.

4       Q.   Okay.  When you're treating a -- a woman

5  who's tested positive for pregnancy, but she has a

6  confirmed ectopic pregnancy, you don't provide her with

7  the two chemical abortion drugs, do you?

8       A.   That is correct.  We do not treat anyone with

9  a confirmed ectopic pregnancy with medication abortion

10  medications.

11      Q.   Because mifeprex (sic) and misoprostol are

12  drugs that do not assist a woman in treating her for

13  her ectopic pregnancy, are they?

14           MS. SWANSON:  Object to form.

15           THE WITNESS:  Mifepristone and

16  misoprostol, as used in medication abortion, are not

17  effective in treating ectopic pregnancy.

18      Q.   (Mr. Boyle)  And the FDA label says that they

19  are contraindicated in patients with confirmed or

20  suspected ectopic pregnancies, doesn't it?

21      A.   I don't know what the FDA label says without

22  looking at it.

23      Q.   You've prescribed these medications several

24  times every week for the past 14 years, correct?

25      A.   That is correct.

122

1    Q.   And you are unaware that the FDA label says

2    that they are contraindicated for a woman who has an

3    actual diagnosed or suspected ectopic pregnancy?

4              MS. SWANSON:  Object to form.

5              THE WITNESS:  I cannot directly quote

6    the FDA label without looking at it.  I am aware that

7    we do not use mifepristone and misoprostol, as designed

8    for medication abortion, in patients with known or

9    suspected ectopic pregnancy.

10   Q.   (Mr. Boyle)  A patient who has a suspected

11   ectopic pregnancy needs to be worked up to see if she

12   needs surgical treatment for her ectopic pregnancy or

13   if she qualifies for a different drug treatment,

14   methotrexate, right?

15   A.   There are different treatments for ectopic

16   pregnancy, and those treatments should be offered based

17   on the patient's exact circumstances, yes.

18   Q.   Typically, the drug you give for ectopic

19   pregnancy is methotrexate, not the two chemical

20   abortion drugs, right?

21   A.   I do not treat ectopic pregnancy, but it

22   is -- you do not use mifepristone and misoprostol to

23   treat ectopic pregnancy.  Methotrexate is one of the

24   medications that can be used to treat ectopic

25   pregnancy.

1    Q.   If you give a woman who tests positive for
2  pregnancy, who is actually suffering from an ectopic
3  pregnancy, the chemical abortion drugs, and it does not
4  stop her ectopic pregnancy from growing, that ectopic
5  pregnancy can rupture, possibly in her fallopian tubes
6  or some other internal structure, causing damage and
7  bleeding inside her abdomen.  Isn't that right?
8              MS. SWANSON:  Object to form.
9              THE WITNESS:  Any woman who has an
10  ectopic pregnancy, that ectopic pregnancy can rupture
11  if it is not treated, regardless of whether the patient
12  receives mifepristone and misoprostol or not.
13    Q.   (Mr. Boyle)  That's fair.  But the
14  prescription of those two drugs wouldn't have any
15  impact on whether that ectopic pregnancy will continue
16  to grow and possibly rupture, right?
17    A.   I don't believe it's been extensively
18  studied, but we do not treat ectopic pregnancy with
19  mifepristone and misoprostol.  There's a possibility
20  that they could stop the growth theoretically, but we
21  do not use it for that purpose.
22    Q.   Okay.  I appreciate that there may be further
23  research to be done, but there's none that you're aware
24  of that has been done to suggest that's an appropriate
25  treatment regimen for ectopic pregnancy.  Is that

124

1  correct?

2              MS. SWANSON:  Object to form.

3              THE WITNESS:  I am unaware that anyone

4  would use mifepristone and misoprostol to treat a known

5  or suspected ectopic pregnancy.

6      Q.  (Mr. Boyle)  You agree that many of the

7  symptoms of a ruptured ectopic pregnancy mimic, or are

8  exactly the same as, the expected side effects of a

9  chemical abortion that you or one of your colleagues at

10  PPSAT have counseled your patient could occur if you

11  give that patient a chemical abortion, right?

12              MS. SWANSON:  Object to form.

13              THE WITNESS:  There are some overlapping

14  symptoms between the normal symptoms we expect with

15  medication abortion and the symptoms of an ectopic

16  pregnancy.

17      Q.  (Mr. Boyle)  It's possible that a patient who

18  took chemical abortion drugs and then suffered a

19  ruptured ectopic pregnancy, leading to internal

20  bleeding and vaginal bleeding, pain, dizziness,

21  headache, could misconstrue or confuse those symptoms

22  of the ectopic pregnancy with the normal expected side

23  effects of the chemical abortion, as it was described

24  to her by her doctor or other provider at PPSAT.  Isn't

25  that true?

Case 1:23-cv-00480-CCE-LPA  Document 75-2  Filed 09/12/23  Page 28 of 35

1          MS. SWANSON:  Object to form.

2          THE WITNESS:  It would be important to

3    educate any patient on whom we have not diagnosed an

4    intrauterine pregnancy, who takes mifepristone and

5    misoprostol, on the normal symptoms that they would

6    experience with a medication abortion and on the

7    abnormal symptoms that they might experience, including

8    detailed education on the symptoms of ectopic

9    pregnancy.

10      Q.    (Mr. Boyle)  But they might confuse a

11   ruptured ectopic pregnancy for the normal side effects

12   from the chemical abortion process, correct?

13          MS. SWANSON:  Object to form.

14          THE WITNESS:  I can't speculate on who

15   might get confused by what.  It is important to give

16   clear education and closely follow up with patients.

17      Q.    (Mr. Boyle)  If you look at the document,

18   please, at, let's see, Bates 31, on the first page

19   there.

20          MS. SWANSON:  And for the record, we're

21   now switching back to the patient education packet from

22   the ACOG bulletin.

23      Q.    (Mr. Boyle)  Right.  Bates 31.  Do you see

24   that?

25      A.    I see that form, yes.

1    treated as a transient state.  An effort should be made
2    to establish a definitive diagnosis when possible," end
3    quote.
4            Do you see that?
5        A.   I see that statement.
6        Q.   So does that inform your opinions about what
7    was going on back in 2018, as it relates to how to
8    diagnosis and treat a patient with -- or ultrasound of
9    pregnancy of unknown location?
10                MS. SWANSON:  Object to form.
11                THE WITNESS:  I would state that it is
12   true now that we should make efforts to establish a
13   definitive diagnosis when possible.  We are just not
14   required to make those efforts in isolation.
15       Q.   (Mr. Boyle)  And I did not mean to interrupt
16   you in your review of -- I apologize, I did interrupt
17   you.  I'm sorry.
18           You were looking at Bates Number 102, Bates
19   Number 103 and Bates Number 104 to tell us if there was
20   any recent research identified by PPSAT that would
21   support its position that it is acceptable medical
22   practice to provide chemical abortion drugs
23   simultaneous with a patient who has a diagnosis or a
24   transient state of pregnancy of unknown location on an
25   ultrasound.

144

1                 MS. SWANSON:  Object to form.  I'm not
2      sure there's a question in there.
3          Q.   (Mr. Boyle)  The question is: show it to me,
4      please.
5                 MS. SWANSON:  Object to form.
6                 THE WITNESS:  So I do not see some of
7      the articles that I know are used to create those
8      protocols.  I also don't think that the list of table
9      references are the sole source of the protocols.
10         Q.   (Mr. Boyle)  And that's fine.  I was just
11     basing that off of what I understood you to say, that
12     they were.  If you're saying they're not, then there
13     may be other things out there that go into the
14     protocols.  Is that what you're saying?
15              Maybe other research out there -- I
16     apologize, maybe other research out there that goes
17     into making these protocols that's not included at the
18     end in that table?
19         A.   There is much research and expert analysis
20     that goes into making these.  I do not personally
21     create these protocols, so cannot speak to all of the
22     details.
23         Q.   You would agree that induced abortions,
24     surgical abortions, become more complicated after the
25     gestational age is beyond 14 weeks, wouldn't you?

1                MS. SWANSON:  Object to form.

2                THE WITNESS:  The complexity of a

3  procedural abortion varies throughout gestational

4  duration.  And over seven or eight weeks, I would say

5  that there is an incremental increase in complexity of

6  the procedure with increasing gestational duration.

7      Q.  (Mr. Boyle)  You cited the "Academies of

8  Medicine" article, and it says that "The risk of

9  serious complication increases with weeks gestation; as

10  the number of weeks increase, the invasiveness of

11  required procedure and the need for deeper levels of

12  sedation also increase."

13        Do you agree with that?

14                MS. SWANSON:  Object to form.

15                THE WITNESS:  I can't agree that that's

16  the exact quote without looking at the actual document.

17  I do agree that there is an incremental increase in

18  risk as gestational duration increases.

19      Q.  (Mr. Boyle)  I'm sorry, I'm working through

20  here.

21        You agree that some second trimester induced

22  abortions must take place in a hospital setting, don't

23  you?

24                MS. SWANSON:  Object to form.

25                THE WITNESS:  I would agree that some

Case 1:23-cv-00480-CCE-LPA  Document 75-2  Filed 09/12/23  Page 32 of 35

146

1  abortions, regardless of gestational duration, must

2  take place in a hospital.

3      Q.  (Mr. Boyle)  You would agree that anything

4  beyond moderate sedation -- I think we've discussed it.

5  But anything beyond moderate sedation anesthesia level

6  for a surgical abortion must happen in a hospital, not

7  at a PPSAT clinic, right?

8           MS. SWANSON:  Object to form.

9           THE WITNESS:  No, I would not agree to

10  that.  Deep sedation can be offered in an outpatient

11  setting if you have the right equipment and staff.

12  PPSAT does not have the staff to perform deep sedation

13  in our outpatient clinics, but that doesn't preclude

14  the safety of performing it in a clinic that has that

15  staff.

16      Q.  (Mr. Boyle)  If a patient comes to PPSAT and

17  has an ultrasound, and it's an ultrasound of unknown --

18  pregnancy of unknown location, do you charge for an

19  additional -- does PPSAT charge for an additional

20  ultrasound if that patient gets an additional

21  ultrasound?

22           MS. SWANSON:  Object to form.

23           THE WITNESS:  Do you mean that if the

24  patient had an ultrasound at an outside location that

25  showed a pregnancy of an unknown location, and then we

1  performed an ultrasound, would we charge the patient

2  for the ultrasound we performed?

3      Q.   (Mr. Boyle)  I didn't mean that, but do you?

4      A.   If we perform an ultrasound, yes, we charge

5  them for ---

6      Q.   And if ---

7      A.   --- the ultrasound performed.

8      Q.   I'm sorry.  If you come up with an ultrasound

9  of pregnancy of unknown location and you take another

10 one at PPSAT, do you charge for the second one also?

11     A.   We do not routinely charge for repeat

12 ultrasounds that we feel are clinically necessary, no.

13     Q.   So if you charge for an ultrasound and the

14 patient gets a second or even a third, you don't charge

15 for the second or the third.  Is that correct?

16     A.   It is my understanding that we do not

17 routinely charge for repeat ultrasounds that we deem

18 clinically necessary.

19     Q.   Have you ever had a situation where you had a

20 patient with ultrasound finding of pregnancy of unknown

21 location, you gave that patient chemical abortion drugs

22 and then later, you determined that that patient had an

23 ectopic pregnancy?

24     A.   Yes, that has occurred.

25     Q.   Did you give that patient a refund for the

1    unnecessary procedure that you performed?

2              MS. SWANSON:  Object to form.

3              THE WITNESS:  The patient is charged for

4    the services they receive on the day they receive them,

5    so the patient paid for the services they received,

6    which included medications that they took.

7         Q.   (Mr. Boyle)  And you would agree that in that

8    circumstance, the medications that the patient paid for

9    were unnecessary, right?

10             MS. SWANSON:  Object to form.

11             THE WITNESS:  At the time that the

12   medications were given, we did not know that they were

13   unnecessary, so they were given in good faith.

14        Q.   (Mr. Boyle)  Absolutely.  But had you waited,

15   eventually you were able to determine that that

16   particular patient had an ectopic pregnancy, right?

17        A.   If it had been the patient's preference to

18   wait, we certainly could have waited and not done the

19   medication abortion yet.

20        Q.   Well, you also could have just waited because

21   you don't know where the pregnancy is, regardless of

22   the patient's preference, right?

23             MS. SWANSON:  Object to ---

24        Q.   (Mr. Boyle)  That's at least an option?

25             MS. SWANSON:  Object to form.

Case 1:23-cv-00480-CCE-LPA   Document 75-2   Filed 09/12/23   Page 35 of 35