# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION FILE NO. 1:23-CV-480

PLANNED PARENTHOOD SOUTH        )
ATLANTIC, et al.,               )
                                )
                Plaintiffs,     )
                                )
    vs.                         )
                                )
JOSHUA STEIN, et al.,           )
                                )
                Defendants      )
                                )
and                             )
                                )
PHILIP E. BERGER and TIMOTHY K. )
MOORE,                          )
                                )
                Intervenor-     )
                Defendants      )
--------------------------------

_____
VIDEO CONFERENCE DEPOSITION
OF
CHRISTY MARIE BORAAS ALSLEBEN, MD
_____


TAKEN VIA VIDEO CONFERENCE AT THE OFFICES OF:
CHAPLIN AND ASSOCIATES, INC.
NETWORKING WITH:
CAPE FEAR COURT REPORTING, INC.


08-29-2023
10:06 O'CLOCK A.M.

_____
Gretchen Wells
Court Reporter

1   Parenthood North Central States and I also serve as

2   one of the associate medical directors.  I am not the

3   chief medical officer of Planned Parenthood North

4   Central States.

5        Q.   Do you know Dr. Farris personally?

6        A.   I don't.

7        Q.   Never met her at any Planned Parenthood

8   convention or seminar or anything like that?

9        A.   I have never met her directly.

10        Q.   Excluding the lawyers who represent the

11   Plaintiffs in this case, have you spoken to anyone

12   else, to include other doctors perhaps, about your

13   opinions in this case?

14        A.   No.  I mean, my husband knows I'm here, but

15   he -- he's not medical and he wouldn't know anything I

16   was speaking about if I tried to tell him.

17        Q.   So you said you looked at Senate Bill 20 in

18   the process of developing your opinions.  Did you see

19   where it defines possible complications that can arise

20   from an induced abortion at North Carolina General

21   Statue Section 90-21.81(2)a?

22        A.   I mean, I'd have to see the text again to

23   say whether or not I reviewed that portion.

24        Q.   Okay.  What is a uterine perforation?

25        A.   A uterine perforation is a known risk of

1  procedural abortion when an instrument goes into the
2  wall or through the wall of the uterus during the
3  procedure.
4      Q.   When you say "instrument," what do you mean
5  by instrument?
6      A.   A surgical instrument, either a suction
7  cannula or a forceps, typically.
8      Q.   And how does that happen during a procedural
9  -- I'm sorry, surgical abortion?
10     A.   How that happens, you know, really just
11 depends on the -- on the case.  It is a very low risk.
12 It's a very -- it's a -- it's a known complication and
13 one that I counsel patients about, but it is not very
14 common.
15     Q.   Do you agree that this is a possible
16 complication that can arise from an induced abortion,
17 surgical abortion, that should be disclosed to a
18 pregnant woman who is a patient considering that type
19 of abortion so that the patient can make an informed
20 decision with more complete knowledge of the risks of
21 the procedure?
22              MS. GRANDIN:  Objection to form.
23              THE WITNESS:  I believe all people
24 should -- that are pregnant and considering abortion
25 should be counseled on the risks and benefits of the

1   desired mode of abortion that they are considering.

2       Q.   (Mr. Boyle)  And who should inform the

3   patient of that potential risk?

4       A.   I mean, our whole healthcare team takes onus

5   of that.  But ultimately, it's my responsibility as

6   the treating physician to ensure that the patient has

7   good informed consent about the procedure that they

8   have selected.

9       Q.   And how -- I'm sorry, when should that

10  patient be informed of this particular risk?

11      A.   Prior to their procedural abortion.

12      Q.   Are you aware that in -- under the North

13  Carolina law, there's a 72-hour informed consent

14  period where, after the initial counseling, the

15  patient has to wait 72 hours before the induced

16  abortion can occur?

17      A.   I was not -- I'm -- I was not aware of that

18  mandatory counseling wait, but that is a common thing

19  that -- law that some patient -- some states have

20  enacted accepting and exceptionalizing the healthcare

21  that we provide during abortion care.

22      Q.   What is a cervical laceration?

23      A.   A cervical laceration is a tear that -- in

24  the cervix.

25      Q.   And how -- well, do you agree that a

1 I think that's an intense word for what we're doing.

2    But I -- to, you know, get back to your

3 question, if that's what we're defining as curettage,

4 then I -- the last time I needed to use that in the

5 setting of a procedural abortion was -- I don't know.

6 It happens extremely rarely.

7   Q. (Mr. Boyle) Okay. With the D&E abortion,

8 after you have used the forceps to grasp and guide the

9 bigger portions of the fetus or baby out of the

10 uterus, what do you do after you -- you're done with

11 the forceps portion of the procedure?

12   A. Yeah, so once I'm confident that we have,

13 you know, nearly all the products of conception

14 evacuated safely from the uterus, then I would advance

15 a suction cannula to the fundus of the uterus, or the

16 top, and aspirate any remaining decidual tissue,

17 typically, that still remains within the uterus.

18   Q. When you say, "the fundus," or the top,

19 that's the part farthest away from the cervix, so sort

20 of up towards the rib cage and the lungs, that

21 direction of the body?

22   A. Yeah. I guess. It's the portion of the

23 uterus typically the furthest away both from me as the

24 operator, as the surgeon and, as you described, from

25 the cervix, yes.

1    Q.   Is there anything else about the D&E

2  abortion procedure that you do that we didn't cover or

3  that we've missed?

4              MS. GRANDIN:  Objection to form.

5              THE WITNESS:  As far as the procedural

6  steps?

7    Q.   (Mr. Boyle)  Yes.  The start to finish, how

8  it -- how it actually unfolds and your process.

9    A.   Yeah, I mean, for every procedure, we would

10  start with a surgical timeout and make sure that the

11  healthcare team, you know, was all on the same page

12  and prepped and ready for the procedure that we

13  planned.  We discuss, you know, the patient's wishes,

14  any allergies, planned anesthesia, type of specimen we

15  will have at the end.  You know, we do many things.

16              But if you're talking about the procedure,

17  you know, the actual operating steps for me as

18  surgeon, then we've described those pretty much in

19  detail.  The main last one is, you know, assessment of

20  hemostasis and ensuring that bleeding is appropriate.

21    Q.   You mentioned anesthesia.  What type of

22  anesthesia options are available for your patients who

23  you are performing a D&E abortion on?

24              MS. GRANDIN:  Objection to form.

25              THE WITNESS:  The patients that I see

Case 1:23-cv-00480-CCE-LPA  Document 75-3  Filed 09/12/23  Page 7 of 22

73

1  have a -- a very wide range of anesthesia options.
2        Q.    (Mr. Boyle)  Such as?
3        A.    Such as it is standard practice to ---
4        Q.    Go ahead and drink water.  I didn't mean to
5  interrupt you.  I'm sorry.
6        A.    Oh, that's okay.
7        Q.    Take your time.
8        A.    I got this one.
9        Q.    Okay.
10        A.    The standard practice, to use local
11  anesthesia by the cervix for all patients unless, for
12  example, a patient has a severe allergy.  From there,
13  patients can opt for mild sedation with medicine or
14  moderate sedation with medicine, deep sedation with
15  medicine or a general anesthesia.
16        Q.    So local anesthesia, what's the actual
17  anesthesia used there?  Is it lidocaine or something
18  like that?
19        A.    Yeah.  Typically, in our current practice,
20  we use lidocaine plus or minus epinephrine.
21        Q.    And that's standard for both aspiration and
22  D&E unless the patient has a known allergy.  Is that
23  what I heard you say?
24        A.    Yeah, generally, I think that's correct.
25        Q.    Let's move on to the -- well, start at the

1    pregnancy and certainly with induced abortion as well.

2    It's typically -- it's typically referred to as

3    endometritis after a procedural abortion when we're

4    talking about a infection that's affecting the uterus.

5        Q.  Okay.  Would you agree that endometritis, an

6    infection of the uterus, is a possible complication

7    that can arise from an induced abortion?

8        A.  Yes.  A very rare one.

9        Q.  Okay.  Would you agree that a missed ectopic

10   pregnancy is a complication that can arise when you're

11   providing an induced abortion for a patient?

12       A.  I mean, if -- ectopic pregnancy is a -- is a

13   reality of pregnancy in general.  It's not more likely

14   to be associated with induced abortion versus a

15   population of people who aren't seeking an induced

16   abortion.

17       Q.  Okay.  The general consensus, I believe, is

18   that 2 percent of pregnant -- positive pregnancies are

19   ectopic pregnancies.  Is that correct?

20       A.  I think, depending on the population, the

21   exact point estimate differs, but somewhere between a

22   -- probably a half point -- a half a percent up to

23   three, depending on the population.

24       Q.  And would you agree that a missed ectopic

25   pregnancy, without regard to what the general sort of

1  prevalence of it is in any given population, that a

2  missed ectopic pregnancy is a potential complication

3  that can arise with providing an induced abortion to a

4  patient?

5       A.   I guess I'm not sure "missed" is the

6  appropriate terminology here.  People who come for

7  induced abortion care are assessed for their risk of

8  ectopic pregnancy regardless of what setting I'm

9  working in in order to, you know, try to ensure the

10 person is safe.

11      Q.   If you have a patient who receives -- who

12 you provide a chemical abortion to, and it's actually

13 -- the patient actually has an ectopic pregnancy, do

14 those two drugs that you provide the patient for the

15 chemical abortion have any effect on the ectopic

16 pregnancy?

17      A.   The medicines that we use for medication

18 abortion do not -- are not treatment for an ectopic

19 pregnancy.

20      Q.   So if the patient has an ectopic pregnancy

21 and you are unaware of that and you provide a chemical

22 abortion, that chemical abortion, those drugs, those

23 two drugs that you provide that patient will not stop

24 or end the ectopic pregnancy, will they?

25      A.   So for a person that comes and requests a

97

1   medication abortion, we do extensive counseling about
2   the expectations around what they might experience if
3   they take the medicines, but also assess their risk
4   for ectopic pregnancy.
5            So we certainly wouldn't provide medications
6   for abortion like mifepristone and misoprostol if we
7   thought a person had an ectopic pregnancy.
8        Q.   Right.  But sometimes you miss an ectopic
9   pregnancy even if you do screening, right?
10       A.   Sometimes, we're not able to diagnose it
11  because we can't see it.
12       Q.   On an ultrasound, right?
13       A.   If a person has an ultrasound.
14       Q.   So sometimes a patient who comes to you and
15  asks for -- tests positive for pregnancy and asks for
16  a chemical abortion has an ectopic pregnancy that you
17  don't diagnose, and you give that patient the chemical
18  abortion drugs, right?
19       A.   So if someone screens low risk or -- and
20  doesn't have an ultrasound or if a person has an
21  ultrasound and we don't see an ectopic pregnancy, then
22  those people can safely access medication abortion
23  with mifepristone and misoprostol with close follow-up
24  to ensure that the abortion was successful.
25       Q.   But sometimes those people actually have an

98

1  ectopic pregnancy even if you think they were low risk

2  or you took an ultrasound and did not locate the

3  pregnancy.  Is that correct?

4      A.   Again, for a low-risk population, it's

5  certainly something we discuss with people.  But

6  again, because the risk of ectopic pregnancy is so

7  low, it's irrational to not provide the care that the

8  person needs based on that very, very low risk unless

9  that's a risk that's not acceptable to the patient.

10     Q.   And I understand the question you're

11 answering, but it's not really the question I'm

12 asking.

13     A.   Okay.  Let me try again.

14     Q.   Yeah.  The -- and I appreciate your answer.

15 It's fine.  The question I am asking is, sometimes

16 when those patients come to you, even if they are low

17 risk after you screen them and even if you take an

18 ultrasound and you cannot locate the pregnancy

19 anywhere on the ultrasound: intrauterine, adnexa,

20 wherever, sometimes those patients will have an

21 ectopic pregnancy.  Sometimes, it's too early to be

22 seen on ultrasound and you just might not see it yet,

23 but sometimes they will have an ectopic pregnancy,

24 right?

25     A.   Some -- a very small percentage of those may

1  go on to eventually be diagnosed with an ectopic

2  pregnancy, yes.

3       Q.  Okay.  And in that situation, if you had a

4  patient who you felt it was safe to give the chemical

5  abortion drugs to even though they slipped through the

6  screening process somehow and actually have an ectopic

7  pregnancy, that particular patient who has ectopic

8  pregnancy and chemical abortion drugs, those chemical

9  abortion drugs don't do anything to stop the ectopic

10  pregnancy, do they?

11       A.  Not that is generally known within the

12  medical community.

13       Q.  Okay.  Beyond unstudied and unsubstantiated

14  possibilities, you use methotrexate to actually

15  medically treat an ectopic pregnancy.  Is that

16  correct?

17       A.  If a patient comes to me and has a known

18  ectopic pregnancy, then I would -- based on, you know,

19  various patient-level characteristics, I would discuss

20  with that person their options for treatment, which

21  would include expectant management with very close

22  follow-up.

23            That meaning, you know, watch -- what

24  colloquially people call "watch and wait" with good

25  symptom assessment and, you know, kind of close

1  follow-up, or medication management with methotrexate

2  typically, or a surgical procedure to treat the

3  ectopic pregnancy.

4      Q.   But in any event, the two chemical abortion

5  drugs don't stop an ectopic pregnancy if they're given

6  to a patient who actually has an ectopic pregnancy.

7  Is that correct?

8      A.   Not that we know.

9      Q.   Okay.  You agree that misoprostol has an FDA

10 approval through ten weeks or 70 days.  Is that

11 correct?

12     A.   Excuse me, can ---

13          MS. GRANDIN:  Objection to form.

14          THE WITNESS:  Can you say that again?

15     Q.   (Mr. Boyle)  Do you agree that the FDA has

16 approved misoprostol through ten weeks or 70 days?

17          MS. GRANDIN:  Objection.

18          THE WITNESS:  Are you saying

19 misoprostol, like m-i-s-o-p-r-o ---

20     Q.   (Mr. Boyle)  Mispronouncing that ---

21     A.   Okay.

22     Q.   --- because I have a terrible

23 pronunciation ---

24     A.   Oh, that's okay.  I just wanted to make sure

25 that I know what you're saying.

1     THE COURT REPORTER:  Back on the record
2  at 1:52 p.m.
3     Q.   (Mr. Boyle)  Okay.  So, Doctor, do you have
4  that ACOG Practice Bulletin 193 from March 2018
5  available?
6     A.   I do.  I have it pulled up here in PDF on my
7  computer.
8     Q.   Okay.  Do you agree with the -- that ACOG
9  bulletin 193 that, quote, "Despite improvements in
10  diagnosis and management, ruptured ectopic pregnancy
11  continues to be a significant cause of
12  pregnancy-related mortality and morbidity.
13         "In 2011 to 2013, ruptured ectopic pregnancy
14  accounted for 2.7 percent of all pregnancy-related
15  deaths and was the leading cause of hemorrhage-related
16  mortality," end quote?
17     A.   Gosh, that's a long sentence.  If you could
18  point me kind of specifically in the document where
19  you're discussing, then I can ---
20     Q.   Yeah.  In the first page, "Background
21  Epidemiology," about halfway through that paragraph.
22     A.   Okay.
23     Q.   "Despite improvements..."  Do you agree that
24  that's what the ACOG says on this topic?
25     A.   Yep.  That -- what you read there is written

1  here in that -- in this practice bulletin, yes.

2      Q.   Is that -- and you agree with the ACOG

3  bulletin, right?

4            MS. GRANDIN:  Objection to form.

5            THE WITNESS:  You know, I haven't seen

6  any specific mortality data related to ectopic

7  pregnancy in those specific years, but I know ACOG

8  takes, you know, the production of their practice

9  bulletins very seriously.

10     Q.   (Mr. Boyle)  And you rely on these practice

11 bulletins in your practice to provide you with

12 clinical management guidelines, right?

13     A.   As a -- as a starting point, sure.  Yeah.

14 Yes.

15     Q.   If you look under -- sorry.  If you look

16 under the "Risk Factors" section, do you agree with

17 ACOG that, quote, "Half of all women who receive a

18 diagnosis of ectopic pregnancy do not have any known

19 risk factors," end quote?

20     A.   Yes.

21     Q.   And so a lot of women who actually end up

22 having an ectopic pregnancy don't have flags for known

23 risks for an ectopic pregnancy.  Is that correct?

24     A.   Based in their history, not necessarily

25 what's happening in their body currently, yes.

1    Q.   At what stage in pregnancy do you normally

2    screen a woman for an ectopic pregnancy?

3    A.   Well, certainly if I'm taking care of a

4    patient doing their prenatal care visit at 30 weeks, I

5    usually don't discuss ectopic pregnancy at that time.

6    I don't know if you're asking for a specific

7    gestational age week.

8         I try to assess -- you know, once a pregnant

9    person has had a positive test, a positive pregnancy

10   test, we -- one of the first things we do is talk

11   about how they're feeling in their body and ask about

12   last menstrual period to try to assess an estimated

13   gestational age of the pregnancy.

14   Q.   And so as I understand it, whenever you

15   become aware that your patients has -- patient has

16   tested positive for pregnancy, you consider an ectopic

17   pregnancy as a risk on that patient's differential

18   diagnosis, right?

19   A.   Generally speaking, sure.  Yes.

20   Q.   And you screen that patient as soon as you

21   become aware that they're pregnant for ectopic

22   pregnancy immediately, right?

23   A.   I mean, we have -- in all the locations

24   where I work, we have -- we have, you know, kind of

25   general protocols about how to assess somebody's risk

1   for an ectopic pregnancy. One of which is, you know,

2   just talking about past history, as we've described.

3   The other is to talk about any current signs or

4   symptoms that might be concerning for an ectopic

5   pregnancy.

6       Q.  And the gold standard to test and look for

7   an ectopic pregnancy is to conduct a transvaginal

8   ultrasound and see if there is an embryo or fetus

9   inside the uterus. Isn't that right?

10            MS. GRANDIN: Objection to form.

11            THE WITNESS: There are, you know, kind

12   of five main categories of early pregnancy. Much of

13   which can rely on ultrasonography.

14       Q.  (Mr. Boyle) Yeah. My question was, the

15   gold standard to test and look for an ectopic

16   pregnancy is to conduct a transvaginal ultrasound and

17   see if there is an embryo or fetus seen in the uterus.

18   Isn't that right?

19       A.  The only ---

20            MS. GRANDIN: Objection to form.

21            THE WITNESS: The only way to

22   definitively diagnose an ectopic pregnancy is to see

23   an embryo outside of the uterus with ultrasound. It

24   doesn't necessarily have to be a transvaginal one.

25       Q.  (Mr. Boyle) Okay. So you can do a

Case 1:23-cv-00480-CCE-LPA  Document 75-3  Filed 09/12/23  Page 18 of 22

1   ultrasound outside the woman's body ---

2       A.   Again, it really -- it really just depends

3   on the patient characteristics.  But yes, we, at

4   times, certainly can use transabdominal

5   ultrasonography also.

6       Q.   You said the only time you can definitively

7   diagnose it is when you do the ultrasound and see the

8   ectopic pregnancy.  Did I hear you correctly?

9       A.   So what -- if we're using ultrasound in

10  early pregnancy, there are kind of five main diagnoses

11  we could come up with, right?  The first is a definite

12  intrauterine pregnancy.  The second is a probable

13  intrauterine pregnancy.  The third is a pregnancy of

14  unknown location.  The fourth is a probable ectopic

15  pregnancy.  And the fourth is -- or the fifth, excuse

16  me, the fifth is a definite ectopic pregnancy.

17      Q.   But under those categories, number one, if

18  you do the ultrasound and you see the pregnancy inside

19  the uterus, you've ruled out ectopic pregnancy there,

20  right?

21      A.   In the -- in the vast majority of cases,

22  yes.

23      Q.   You agree that you should always perform an

24  ultrasound on a patient you provide care to when they

25  test positive for pregnancy so that you can confirm if

1  just the word I chose.

2      Q.   Okay.  You're not trying to couch it in

3  terms of the law or the lawsuit when you say

4  irrational?

5      A.   I'm not an attorney, so I don't -- I don't

6  know.

7      Q.   Okay.  Were you able to confirm that that

8  patient who you saw at gestational age three weeks was

9  pregnant?

10     A.   (No audible answer)

11     Q.   You mentioned earlier the earliest that you

12 had treated a patient -- a pregnant patient was three

13 weeks gestational age, right?

14     A.   Yes.

15     Q.   How were you able to confirm that patient

16 was three weeks gestational age pregnancy?

17     A.   The patient reported a sure last menstrual

18 period, a history of regular, predictable menstrual

19 cycles that lasted -- that were consistent with, you

20 know, the -- her history of menstrual cycles, so we

21 were able to date the pregnancy that way.

22          And this particular patient that I'm

23 thinking about also had a urine pregnancy test in our

24 health center.

25     Q.   Did you perform an ultrasound on that

1  patient?

2      A.   I mean, again, I -- it's my -- it's our

3  standard practice to go through a protocol of

4  history-based screening to determine whether or not we

5  need to recommend an ultrasound for a person.

6      Q.   You agree that induced abortion of any type

7  is more complicated after the unborn child reaches the

8  second trimester, don't you?

9      A.   I'm -- I guess I'm not clear what you're

10 asking.

11     Q.   Complications for induced abortions

12 increase, the risks increase the older the gestational

13 age, so when you get to the second trimester it is

14 more risky to perform an induced abortion in the

15 second trimester than the first trimester.  Is that

16 correct?

17     A.   Comparing a procedural abortion in the

18 second trimester to a procedural abortion in the first

19 trimester, yes, the risks are -- the risk, generally,

20 for a procedural abortion increases as the gestation

21 of the pregnancy increases.  That would also be true

22 for a person who decided to continue their pregnancy.

23     Q.   Do you agree with the Academy of Medicine's

24 article you cited from extensively when it says that,

25 "The risk of serious complication increases with weeks

150

1  gestation.  As the number of weeks increase, the

2  invasiveness of the required procedures and the need

3  for deeper levels of sedation also increase"?

4      A.   Again, I'd have to review the specific

5  portion of that document that you're, you know,

6  alluding to to determine whether or not I agree with

7  that.  I think, generally speaking, you know, the

8  academy didn't -- yeah, I'll just stop there.

9      Q.   Do you agree with this statement: "The risk

10  of serious complication increases with weeks

11  gestation.  As the number of weeks increase, the

12  invasiveness of the required surgical procedure for an

13  abortion and the need for deeper levels of sedation

14  also increase"?

15      A.   That was kind of a lot of things there.  So

16  generally, you know, as a person who doesn't -- you

17  know, who recognizes the invasive nature of just

18  having a pelvic exam, I don't -- I don't know exactly

19  what the invasive portion means in that, that you're

20  referring to.  But generally, the -- again, for a

21  procedural abortion, as the pregnancy advances, the

22  risk -- the risk can increase.

23      Q.   After 11 weeks gestational age, you don't

24  perform a chemical abortion, right?

25      A.   Not after 77 days.