IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PLANNED PARENTHOOD SOUTH ATLANTIC, et al., )
)
Plaintiffs, )
)
v. )                    1:23-CV-480
)
JOSHUA STEIN, et al., )
)
Defendants )
and )
)
PHILIP E. BERGER, et al., )
)
Intervenor-Defendants. )

## ORDER

Earlier this year, in the wake of the Supreme Court's decision in *Dobbs v. Jackson Women's Health*, 142 S. Ct. 2228, 2284 (2022), the North Carolina General Assembly overhauled the state's laws on abortion. That law, as amended, reduced the availability of abortions and added more rules and prohibitions to the existing regulatory, medical, and procedural requirements. It imposed civil, quasi-criminal, and, for many of its provisions, criminal sanctions and penalties for its violation. The plaintiffs, Dr. Beverly Gray and Planned Parenthood South Atlantic (PPSAT), challenge the constitutionality of various provisions of the Act and seek a preliminary injunction prohibiting enforcement of two provisions of the Act until all of its constitutional challenges are resolved.

The plaintiffs are likely to succeed on the merits of their vagueness challenge to the requirement that providers determine and document the probable intrauterine location of a pregnancy before administering medication intended to terminate a pregnancy. The Act does not provide a clear standard by which providers can make this determination, the provision is open to differing interpretations and does not provide reasonable notice of what is prohibited, and providers are subject to arbitrary accusations that they have violated the provision and to the penalties that accompany those accusations.

The plaintiffs are also likely to succeed on the merits of their equal protection challenge to the Act's requirement that surgical abortions after 12 weeks of pregnancy must be performed in a hospital. The plaintiffs have offered uncontradicted evidence that the same medical procedures used for surgical abortions are used for miscarriage management and that the risks of those identical procedures are the same whatever their purpose. The legislature's maternal health reasons for requiring these procedures to be done in a hospital when a person who is pregnant as a result of rape or incest or with a life-limiting anomaly choses to terminate a pregnancy apply equally to the same procedures when a person chooses those procedures to manage a miscarriage. The plaintiffs have shown the absence of any rational medical basis for distinguishing between these two classes of patients and the defendant-intervenors have not offered any evidence or rationale for that distinction.

## PROCEDURAL HISTORY

On May 16, the North Carolina General Assembly enacted Senate Bill 20, entitled "An Act to Make Various Changes to Health Care Laws and to Appropriate Funds for

2

Health Care Programs." Doc. 1-1. Among other things, the Act significantly restricted access to abortions by changing and adding to the requirements of Chapter 90, Article 1i of the North Carolina General Statutes where the laws governing abortion are codified.

The plaintiffs filed a verified complaint, on behalf of themselves and their patients seeking abortions, and sought a temporary restraining order to keep the Act from going into effect on July 1, 2023. Doc. 1. They raised several constitutional challenges. *Id.*

Philip E. Berger, President Pro Tempore of the North Carolina Senate, and Timothy K. Moore, Speaker of the North Carolina House of Representatives, moved to intervene as defendants on behalf of the General Assembly. Doc. 17. The Court granted the motion. Text Order 06/24/2023; Minute Entry 06/28/2023; Doc. 32.

The General Assembly soon thereafter passed an amended version of the Act,[1] largely directed to resolving some of the ambiguities in the original Act, and the amended version was signed into law on June 29. *See* Doc. 26-1; Doc. 42 at ¶ 6. The next day, this Court denied the motion to enjoin enforcement of the Act as a whole. *See* Doc. 31. But based on vagueness concerns, the Court granted the motion for a temporary restraining order prohibiting enforcement of the intrauterine pregnancy (IUP) provision that required a "physician prescribing, administering, or dispensing an abortion-inducing drug" to "[d]ocument in the woman's medical chart the . . . existence of an intrauterine pregnancy." Doc. 31 at 8–9.

---

[1] 2023-14 N.C. Sess. Laws ("S.B. 20"), *see* Doc. 1-1, codified as amended by 2023-65 N.C. Sess. Laws ("H.B. 190"), *see* Doc. 26-1; *see generally* N.C. Gen. Stat. § 90-21.80 *et seq.*

3

The parties thereafter jointly moved to extend the temporary restraining order until after some expedited discovery and a ruling on the preliminary injunction motion. Doc. 33. The Court granted the motion, Doc. 35, and set a schedule for expedited discovery, briefing, and a hearing. Doc. 37.

The plaintiffs filed an amended verified complaint in light of the amendments to the Act passed in late June. Doc. 42. For the same reason, they filed an amended motion for a preliminary injunction. Doc. 48. They have also filed four declarations under oath in support of their motion, Doc. 49-1; Doc. 49-2; Doc. 69-1; Doc. 69-2, deposition testimony, Doc. 74-1; Doc. 74-2; Doc. 74-3; Doc. 74-4; other exhibits, and briefs. The North Carolina Attorney General agrees with the plaintiffs that a preliminary injunction is appropriate, *see* Doc. 63, and other defendants take no position. *See* Doc. 56; Doc. 58; Doc. 61; Doc. 62. The intervenors defend the constitutionality of the provisions at issue, and in opposition to the motion have filed two declarations under oath, Doc. 65-1; Doc. 65-3, various exhibits, deposition testimony, Doc. 75-2; Doc. 75-3, and briefs. The Court has reviewed the record and heard arguments on September 25.

## THE ACT

The Act defines "abortion" as a "surgical abortion or a medical abortion," N.C. Gen. Stat. § 90-21.81(1), and provides specific definitions of those phrases. § 90-21.81(1c) (defining surgical abortion), -(4e) (defining medical abortion). The Act provides that it is not unlawful to procure or cause an abortion during the first 12 weeks of a woman's pregnancy, § 90-21.81B(2), subject to extensive regulatory, procedural, and medical requirements. *See generally* § 90-21.80 *et seq.*

4

Among many other things and as relevant here, the Act requires health care providers to "[d]ocument in the woman's medical chart the probable gestational age and existence of an intrauterine pregnancy" before administering an "abortion-inducing drug." § 90-21.83B(a)(7).[2] An abortion-inducing drug is statutorily defined, § 90-21.81(1a), and includes drugs such as mifepristone and misoprostol. *Id.*

The Act makes it "unlawful after the twelfth week of a woman's pregnancy to procure or cause a miscarriage or abortion" in North Carolina. § 90-21.81A. The Act does, however, provide narrow exceptions for "surgical abortions" for specified periods of time after 12 weeks and for specified reasons. *See* discussion *infra*. Surgical abortions up to 12 weeks can be done in a clinic, § 90-21.81B(2), but if done after 12 weeks under one of the authorized exceptions, the procedure must be performed in a hospital. §§ 90-21.81B(3), -(4); -82A(c).[3] The hospitalization requirement is set to go into effect on October 1, 2023. Doc. 31 at 2–3.

If a physician violates any provision of Article 1i, that physician is "subject to discipline by the North Carolina Medical Board," and if a licensed health care provider violates any provision of the Article, it "shall be subject to discipline under their

---

[2] This provision was set to go into effect on July 1, Doc. 31 at 5–6, but was enjoined by a temporary restraining order. *Id.* at 8–9.

[3] The Act creates a new statutory provision, § 90-21.82A(c), which provides: "After the twelfth week of pregnancy, a physician licensed to practice medicine under this Chapter may not perform a surgical abortion as permitted under North Carolina law in any facility other than a hospital." Doc. 1-1 at 21. Another part of the same provision, § 90-21.82A(a), provides that the term "hospital" is as defined in § 131E-176. Even though § 90-21.82A(c) is not yet in effect, the Court will generally use the codified citation, rather than the citation to the Act.

5

respective licensing agency or board." § 90-21.88A. This statutory provision does not provide a state of mind or intent standard.

If a person performs an abortion in knowing or reckless violation of any provision in Article 1i, that person is subject to a civil action for damages and attorneys' fees. §§ 90-21.88(a), -(c). Physicians who perform abortions are subject to these penalties.

North Carolina provides criminal penalties for violation of its abortion laws. *See* § N.C. Gen. Stat. 14-44 *et seq.* For example, if a person does not comply with the provisions of § 90-21.81B and administers a drug to a pregnant woman or "use[s] any instrument" with the intent "to procure the miscarriage of such woman," the person is subject to prosecution for a Class I felony. §§ 14-45; 90-21.81B. Outside narrow exceptions, §§ 90-21.81B(3), -(4), it is "unlawful after the twelfth week of a woman's pregnancy to procure or cause an abortion." § 90-21.81A(a). If a physician provides a surgical abortion after 12 weeks, and the exceptions in § 90-21.81B are not applicable or the physician does not comply with other requirements necessary for the procedure to be lawful, the physician faces prosecution for a Class H felony. §§ 14-44; 90-21.81B. If a person "unlawfully causes the death of an unborn child" by "willfully and maliciously commit[ting] an act with the intent to cause the death of the unborn child," the person can be charged with a Class A felony, facing life in prison without parole. § 14-23.2.[4]

---

[4] There are other criminal provisions that do not appear to have potential applicability to the provisions challenged here. *See* § 14-44.1 (providing criminal penalties for failing to comply with the informed consent provisions for abortion in § 90-21.83A(b)(2)).

6

## FINDINGS AND DISCUSSION

### I.   STANDING

The United States Constitution limits federal courts to deciding "cases" or "controversies." U.S. CONST. art. III § 2.  For federal jurisdiction to exist, plaintiffs must establish their standing to sue. *See California v. Texas*, 141 S. Ct. 2104, 2113 (2021).  A plaintiff "must demonstrate standing with the manner and degree of evidence required at the successive stages of the litigation." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (cleaned up).  The party "must demonstrate standing for each claim and for each form of relief" it seeks. *Id.*

While a "plaintiff generally must assert his own legal rights and interests" and "cannot rest his claim to relief on the legal rights or interests of third parties," *Md. Shall Issue, Inc., v. Hogan*, 971 F.3d 199, 214 (4th Cir. 2020), there are "circumstances where it is necessary to grant a third party standing to assert the rights of another." *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004).  Litigants relying on third-party standing must show: 1) a close relationship to the person who possesses the right, and 2) that the person who possesses the right faces a hinderance in protecting his own interests. *Powers v. Ohio*, 499 U.S. 400, 411 (1991).

Standing under Article III has three elements: a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *see also TransUnion LLC*, 141 S. Ct. at 2203.  Given that this case is no longer at the pleading stage, the plaintiffs cannot rest on "mere

7

allegations" and must provide specific facts "by affidavit or other evidence," which the Courts must take as true. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up); FED. R. CIV. P. 56(e).

Dr. Gray is a physician licensed to practice medicine in North Carolina, Doc. 1 at ¶ 16, *id.* at p. 30 (verification), who currently provides a range of obstetric and gynecological services, including abortion care in hospitals and outpatient clinics. *Id.* at ¶ 24. PPSAT is a health center licensed under North Carolina law. Doc. 49-1 at ¶ 12. They seek relief on behalf of themselves and their patients who need abortions. Doc. 42 at ¶¶ 23–24. The Act explicitly says that health care providers like Dr. Gray are subject to professional discipline if they do not comply with the hospitalization and IUP provisions and that PPSAT is subject to civil penalties should it perform an abortion not in compliance with the provisions at issue. *See* discussion *supra* at 5–6. Such professional discipline constitutes a civil penalty at minimum. The credible threat of such discipline is a sufficiently imminent injury in fact traceable to the challenged provisions of the Act, and an injunction would redress that injury. *See, e.g., Am. Inst. of Certified Pub. Accts. v. IRS*, 746 F. App'x 1, 6 (D.C. Cir. 2018); *see also Mishler v. Nev. State Bd. of Med. Exam'rs*, 896 F.2d 408, 409 (9th Cir. 1990) ("a professional license is property and is protected by the Constitution"); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (injury must be "actual or imminent").

The intervenors have said that there are criminal penalties available as well, *see* Doc. 65 at 18, and the statutes provide a credible basis for criminal prosecution for their violation. *See* discussion, *supra* at 6; *infra* at 20–21. A plaintiff satisfies the injury in

fact requirement by showing "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). These plaintiffs have standing.

The plaintiffs have also shown that the Act's provisions, if they are unconstitutional, will injure their patients. The plaintiffs allege that the IUP requirement will delay access to care, arguably exposing patients to increased medical risk, Doc. 42 at ¶ 15, and the hospitalization requirement will harm patients by limiting availability of care, increasing cost of care, and delaying access to care. *Id.* at ¶ 16. The plaintiffs offer the necessary evidence to support these claims. Doc. 49-1 at ¶¶ 36, 73; Doc. 69-1 at ¶ 31. Thus, at this stage the plaintiffs also have third party standing. *June Med. Servs. LLC v. Russo*, 140 S. Ct. 2103, 2118 (2020) ("We have long permitted abortion providers to invoke the rights of their actual or potential patients in challenges to abortion-related regulations.").

The intervenors say that PPSAT lacks standing to challenge the hospitalization provision on behalf of their patients because "PPSAT provided no evidence of any woman seeking a post-12-week surgical abortion under one of the legal exceptions in any of their facilities since the new law went into effect." Doc. 75 at 9–10. But PPSAT offered uncontradicted evidence that it has offered post-12-week surgical abortions in its out-patient facilities in North Carolina for more than 15 years and that it would continue

9

to do so but for the hospitalization requirement. Doc. 49-1 at ¶¶ 12–13, 46. It does not have to show that it has done so within the last few months in order to establish standing.

The intervenors also contend that the plaintiffs do not have third-party standing to challenge the IUP requirement because they have not shown a close relationship with their patients. Doc. 75 at 9. But Dr. Ferris, one of the providers for PPSAT, has testified that she provides "direct medical services for PPSAT," including "both medication and procedural abortion,"[5] Doc. 49-1 at ¶ 3, and that PPSAT asks questions of each patient before administering medical abortion. *Id.* at ¶¶ 52–54. Dr. Gray says in her verified amended complaint that she provides abortion care to patients. Doc. 42 ¶ 24. The defendants' claim in its briefing that "PPSAT's Chief Medical Officer admitted that its abortion *doctors* do not spend *any* time with women before they receive the drugs," Doc. 75 at 9 (unnecessary emphasis in original), is not supported by the evidence, as the evidence cited says only that a trained PPSAT staff member reviews one particular consent form with patients. Doc. 75-2 at 13. Indeed, the witness says in the next page of the deposition that physicians sometimes review that particular form and implies physicians are involved in other aspects of the informed consent process. *Id.* at 14.

## II.  PRELIMINARY INJUNCTION STANDARD

To obtain a preliminary injunction, a party must show that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm if the injunctive relief is

---

[5] The plaintiffs use the term medication abortion, which falls within the Act's statutory definition of "medical abortion." § 90-21.81(4e). The Court will use the term medical abortion for consistency with the language of the Act.

Case 1:23-cv-00480-CCE-LPA   Document 80   Filed 09/30/23   Page 10 of 34

denied; (3) the balance of equities tips in its favor; and (4) injunctive relief would be in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 138 (4th Cir. 2023). "Satisfying these four factors is a high bar," *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 385 (4th Cir. 2017), *cert. denied*, 139 S. Ct. 67 (2018), because a preliminary injunction is "an extraordinary remedy involving the exercise of very far-reaching power." *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013) (cleaned up); *see Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020). A district court need not consider all four *Winter* factors if one is clearly absent. *See Henderson for NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018).

A plaintiff must make a "clear showing" that it is likely to prevail at trial to demonstrate it is likely to succeed on the merits. *See Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 345 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *reinstated in relevant part on remand*, 607 F.3d 355 (4th Cir. 2010). This does not require "certainty of success," *Pashby*, 709 F.3d at 321, but it is a higher standard than a showing that serious questions are presented. *See Real Truth*, 575 F.3d at 346–47.

Plaintiffs seeking preliminary injunctive relief must also show a likelihood of irreparable harm, not just a possibility. *See Winter*, 555 U.S. at 22; *Real Truth*, 575 F.3d at 346. The irreparable harm must be "neither remote nor speculative, but actual and imminent." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002).

The Court will focus its evaluation on whether the plaintiffs have established a likelihood of success on the merits. If they have, the threatened constitutional violations

11

unquestionably represent irreparable harm, *see Elrod v. Burns,* 427 U.S. 347, 373 (1976); *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc), and the intervenors have not contended otherwise. Similarly, the threatened constitutional violations would also outweigh whatever burden the injunction would impose because the defendants are "in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Legend Night Club v. Miller,* 637 F.3d 291, 302–03 (4th Cir. 2011). "[U]pholding constitutional rights is in the public interest." *Id.* at 303.

## III. INTRAUTERINE PREGNANCY REQUIREMENT

Subject to a number of restrictions and requirements, the Act authorizes what it defines as a "medical abortion" up to 12 weeks of pregnancy. The statute defines a medical abortion as "[t]he use of any medicine, drug, or other substance intentionally to terminate the pregnancy of a woman known to be pregnant," with narrow exceptions not relevant here. § 90-21.81(4e).[6]

Among the various conditions and restrictions, the Act requires that before providing an abortion-inducing drug, a physician shall "[d]ocument in the woman's medical chart the probable gestational age and existence of an intrauterine pregnancy." § 90-21.83B(a)(7). As interpreted by the legislator-intervenors, this requirement

---

[6] Excluded from the definition of medical abortions are procedures done with the intent to: "a. Increase the probability of a live birth; b) Preserve the life or health of the child; c) Remove a dead, unborn child who died as the result of (i) natural causes in utero, (ii) accidental trauma, or (iii) a criminal assault on the pregnant woman or her unborn child which causes the premature termination of the pregnancy; d. Remove an ectopic pregnancy." § 90-21.81(4e).

essentially prohibits a medical abortion until into the second month of pregnancy because a provider cannot know with certainty that the pregnancy is intrauterine in the absence of an ultrasound so showing, which cannot happen until the fifth or sixth week of pregnancy. *See* Part III.A Findings of Fact, *infra* at 13–16. The plaintiffs contend that the IUP requirement violates the Fourteenth Amendment's Due Process Clause because, *inter alia*, it is vague.

## A. FINDINGS OF FACT

The plaintiffs offer patients what they call "medication abortions" that fall within the statutory definition of a "medical abortion." Medical abortion typically involves a two-step, two medication process: a dose of mifepristone followed 24 to 48 hours later by a dose of misoprostol. Doc. 49-1 at ¶ 17; Doc. 49-2 at ¶ 21. Together these medications stop the development of the pregnancy and cause uterine contractions that expel the contents of the uterus. Doc. 49-1 at ¶ 17; Doc. 49-2 at ¶ 21.

An ectopic pregnancy occurs when a fertilized egg implants and grows outside of the uterus, Doc. 49-1 at ¶ 52 n.36; Doc. 65-3 at ¶ 58, and ectopic pregnancy accounts for approximately 2 percent of all pregnancies. Doc. 65-3 at ¶ 58; Doc. 74-2 at 113. Medical abortion is contraindicated for ectopic pregnancies because it is ineffective for treating them, since ectopic pregnancies occur outside the uterine cavity. Doc. 65-2 at 5[7]; Doc. 69-1 at ¶ 50; Doc. 69-2 at ¶ 11; Doc. 74-1 at 101.

---

[7] The Court has used the pagination appended by the CM/ECF system for this and other deposition cites, not the internal pagination used by the court reporters transcribing the deposition.

The 2023 label approved by the U.S. Food and Drug Administration for the medical abortion drug mifepristone (Mifeprex) states that its use is "contraindicated" for "confirmed or suspected ectopic pregnancy" and, in the "Warning and Precautions" summary says, with a reference to § 5.4 of the label, "Ectopic pregnancy: Exclude before treatment." Doc. 65-2 at 2, 5. Section 5.4 of the label states that the drug is "contraindicated in patients with a confirmed or suspected ectopic pregnancy because [it] is not effective for terminating ectopic pregnancies." *Id.* at 7. It further cautions that "[h]ealthcare providers should remain alert to the possibility that a patient who is undergoing a medical abortion could have an undiagnosed ectopic pregnancy because some of the expected symptoms experienced with medical abortion (abdominal pain, uterine bleeding) may be similar to those of a ruptured ectopic pregnancy." *Id.* The FDA has reported that 97 women have been diagnosed with ectopic pregnancies during medical abortion, with two deaths reported from ruptured ectopic pregnancy, but the record does not include the time frame over which these complications occurred. Doc. 65-1 at ¶ 248.

An ectopic pregnancy cannot grow normally, and most of these embryos die. Doc. 65-3 at ¶ 58. If left untreated and the fallopian tube ruptures, the resulting internal bleeding can threaten the life of the woman. *Id.*; Doc. 75-2 at 16. A patient with an ectopic pregnancy who takes a medical abortion drug will not be directly harmed by the medication, and the medication itself does not exacerbate or increase the risk of

complications from ectopic pregnancy. Doc. 69-1 at ¶ 50; Doc. 69-2 at ¶ 11; Doc. 74-2 at

156; Doc. 74-3 at 144 (medical abortion cannot cause an ectopic pregnancy to rupture).[8]

After five or six weeks of pregnancy, the embryo can be seen on ultrasound if it is

in the uterus, but up until that point it is impossible to detect an intrauterine embryo by

ultrasound. Doc. 49-1 at ¶ 49; Doc. 65-1 at ¶ 239; Doc. 65-3 at ¶ 55. Blood tests are

available to provide additional information about whether the pregnancy is intrauterine or

ectopic, but they require interpretation and are not conclusive yes/no tests at this early

stage. Doc. 65-1 at ¶ 254. Ectopic pregnancies can be difficult to diagnose, *id.*, and, as

counsel for the intervenors agreed at the September 25 hearing, the practical effect of

their interpretation of the IUP requirement would be that medical abortion is illegal up to

at least 5–6 weeks into the pregnancy.

When the intrauterine location of the pregnancy cannot be confirmed by

ultrasound, PPSAT's current medical protocol screens for risk of ectopic pregnancy

through a set of questions about the patient's medical history and current symptoms.

Doc. 49-1 at ¶¶ 52–54. Providers evaluate known risk factors during the screening, such

as symptoms of pain and bleeding, history of ectopic pregnancies, past surgery on the

fallopian tube, and presence of pelvic inflammatory disease. *Id.* at 24 n.36. If the initial

---

[8] The plaintiffs offer evidence that screening for medical abortion and follow-up testing and treatment based on a patient's medical history is as safe for the patient as screening protocols that use an ultrasound, Doc. 49-2 at ¶ 50, but the intervenors offer evidence to the contrary. Doc. 65-1 at ¶¶ 351–393. For purposes of this motion, the Court assumes that ultrasound visualization and testing before administering the medication results in better outcomes for some patients than when the plaintiffs' protocols are followed. *But see* Doc. 65-3 at ¶ 25 (testimony by intervenors' expert that women who have abortions after eight weeks are more likely to die). That assumption does not affect the vagueness analysis.

screening indicates the patient is at high risk of ectopic pregnancy, the plaintiffs refer them to an emergency care provider. *Id.* at ¶ 52. But if the medical screening establishes that the risk of ectopic pregnancy is low and if the patient consents, the medical abortion begins; the provider simultaneously conducts further blood work to help determine if the pregnancy is intrauterine or ectopic. *Id.* at ¶ 54. The blood work test results can take up to 24 hours to receive. *Id.* Following the FDA-approved mifepristone label instruction to remain alert to ectopic pregnancy, the plaintiffs provide these patients with a counseling form that explains the risk of ectopic pregnancy, outlines its symptoms, and instructs patients to "call us right away" if they experience any of the symptoms. Doc. 74-15.

If the intervenor's interpretation of the statute is correct, then the plaintiffs will be prohibited from administering medical abortion drugs to a patient who wants an abortion early in pregnancy but whose ultrasound does not yet show the intrauterine location of the pregnancy, even if the patient is at low risk of an ectopic pregnancy. *See, e.g.*, Doc. 49-1 at ¶ 48. For such patients, the Act requires no blood test for ectopic pregnancy and no treatment for the possibility of an ectopic pregnancy.

### B. VAGUENESS

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "To survive a vagueness challenge, a statute must give a person of ordinary intelligence adequate notice of what conduct is prohibited and must include sufficient standards to prevent arbitrary and discriminatory enforcement." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019) (en banc); *see also Sessions v.*

16

*Dimaya*, 138 S. Ct. 1204, 1212 (2018). A law is unconstitutionally vague if it fails to provide either notice of what is prohibited or standards for enforcing them. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *Grayned*, 408 U.S. at 108. While the Constitution does not require "mathematical certainty from our language," it does prohibit statutory language so unclear about prohibited conduct that it "may trap the innocent by not providing fair warning" or so standardless that it allows "arbitrary and discriminatory enforcement." *Greenville Women's Clinic v. Comm'r, S.C. Dep't of Health & Env't*, 317 F.3d 357, 366 (4th Cir. 2002) (quoting *Grayned*, 408 U.S. at 108, 110). In the medical context, a statute will survive a vagueness challenge if it provides physicians with "reasonable notice" as to the type of conduct that can lead to sanctions. *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 218 (4th Cir. 2002) (discussing vagueness challenge to rules governing hospital privileges).

"The degree of vagueness the Constitution tolerates . . . depends in part on the nature of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). The Due Process Clause requires "a stricter standard" of review for laws that impose criminal penalties and less clarity from "purely civil statutes because the consequences of imprecision are qualitatively less severe." *Manning*, 930 F.3d at 272–73 (cleaned up); *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 781 (4th Cir. 2023). When a challenged law is "quasi-criminal," imposing severe civil consequences, the Constitution requires a relatively strict evaluation. *Vill. of Hoffman Ests.*, 455 U.S. at 499. Quasi-criminal penalties are those sanctions that impose "significant civil and

17

administrative penalties, including fines and license revocation," *Women's Med. Ctr. of Nw. Houston v. Bell,* 248 F.3d 411, 422 (5th Cir. 2001), as is the case here.

The plaintiffs are likely to succeed on their vagueness challenge to the requirement in § 90-21.83B(a)(7) concerning intrauterine pregnancies. Implicit in the challenged requirement that a provider "[d]ocument in the woman's medical chart the probable gestational age and existence of an intrauterine pregnancy" is a requirement that the provider determine that the pregnancy is intrauterine; that is, it is not ectopic.[9] Yet this implicit requirement provides no standards by which the provider is to make this determination, and it also gives rise to contrary interpretations, causing serious notice problems and raising the risk of arbitrary enforcement. On top of those concerns, providers cannot be sure whether they are facing only civil and quasi-criminal penalties for violations or whether they are facing criminal sanctions.

First, the statute is unclear as to whether the provider must determine that the existence of an intrauterine pregnancy is "probable" or whether some other standard of certainty is required. The Act requires providers to determine "probable gestational age and existence of an intrauterine pregnancy" before administering medication. The intervenors say the word "probable" does not apply to the determination of an IUP and

_____

[9] The parties refer to this provision consistently as the "IUP documentation requirement," and one could read the statute to simply require documentation of the provider's current knowledge of the location of the pregnancy, such that writing "unknown," or "uncertain" or "unable to determine" would comply. But no party has suggested this reading, and it does not seem a particularly reasonable interpretation. As challenged here, the provision is better described as the "IUP determination requirement," as the vagueness problem arises from the provision's ambiguity about the level of certainty required for a determination of an intrauterine pregnancy before documenting that determination in the medical chart.

18

contend that the provider must determine there is an IUP with certainty. Doc. 65 at 20. At oral argument, the Attorney General, following rules of statutory construction summarized by Justice Scalia and Bryan Garner,[10] asserted that the provider must only determine that there is a "probable existence of an intrauterine pregnancy." While the latter interpretation seems more likely, it is not clear.

Second, even if the provider need only determine the "probable existence" of an IUP, uncertainty remains. A physician might reasonably read the instruction to find "probable existence of intrauterine pregnancy" as consistent with PPSAT's established medical protocol for safely administering medical abortion before the pregnancy can be seen on an ultrasound but where screening about the patient's medical history and symptoms permit a physician to determine that an ectopic pregnancy is unlikely. Doc. 49-1 at ¶¶ 51–52, Doc. 49-2 at ¶ 47. This would be a logical interpretation of the text because the common understanding of the word "probable" means likely but not certain.[11] But the intervenors have offered evidence from other physicians tending to indicate that the plaintiffs' current approach is "clinically deficient," Doc. 65-1 ¶ 261, and reading the Act to require a provider to "rule out" ectopic pregnancy before the medication is given. *Id.* at ¶ 260. The FDA's label for mifepristone does not seem to

---

[10] *See* ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 147 (2012) (Under the series-qualifier canon, "when there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive . . . modifier normally applies to the entire series.").

[11] A standard dictionary states that probable means "supported by evidence strong enough to establish presumption but not proof." *Probable*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/probable (last visited Sept. 25, 2023).

definitely clear this up, as it is read in contrary ways by the medical witnesses who have testified. The label warns in the summary section that ectopic pregnancy should be "[e]xclude[d] before treatment." *Id.* at 2. But in the section that the summary references, the label says that the medication can safely be administered even if an ectopic pregnancy cannot be definitively ruled out, so long as the patient is appropriately monitored. Doc. 65-2 at 7. The Act itself provides no standards for how certain the provider must be before documenting the probable existence of an intrauterine pregnancy.[12]

Third, the vagueness problem is enhanced in light of another part of the Act, which explicitly permits medical abortion through the first 12 weeks of pregnancy, *see* § 90-21.81B(2). Yet the intervenors' interpretation, as their counsel acknowledged at the September 25 hearing, would in fact ban medical abortion early in pregnancy. This goes beyond a regulatory requirement that must be met and constitutes a prohibition. Providers cannot know if medical abortion is authorized at any point through the twelfth week, as the statute explicitly says, or if the procedure is implicitly banned early in pregnancy.

Finally, there is even a degree of uncertainty over whether providers who do not comply with this provision face only civil and quasi-criminal sanctions or whether

---

[12] The plaintiffs have presented evidence that PPSAT usese five categories when evaluating whether the risk of an ectopic pregnancy is too high for a medical abortion. Doc. 75-3 at 19. One of these categories is "probable intrauterine pregnancy." *Id.* But there is nothing in the statute to indicate that the legislature meant to adopt PPSAT's understanding of this word, especially since the intervenors' experts read the statute to require providers to "rule out" ectopic pregnancy, Doc. 65-1 at ¶ 260; Doc. 65-3 at ¶ 68, a higher degree of certainty than PPSAT's definition of "probable."

20

criminal sanctions are also available. The plaintiffs and the Attorney General agree that the Act provides potential criminal penalties for physicians, and as the Court's summary earlier, *see* discussion, *supra* at 6, shows, that seems likely. But the Intervenors have taken inconsistent positions; in their brief, they say it does impose criminal penalties, Doc. 65 at 18, but at the recent hearing, they took the position that it only imposed civil penalties.

Providers are entitled to "reasonable notice" of whether they can be criminally prosecuted for violating this provision. *See, e.g., Johnson v. U.S.,* 576 U.S. 591, 596 (2015). And whether applying the strict standard required when criminal prosecution is a possibility or the relatively strict standard when quasi-criminal sanctions are possible, the IUP requirement in the Act is unconstitutionally vague.

The intervenors maintain that the IUP requirement is not vague because "each of the possible criminal penalties include a scienter requirement." Doc. 65 at 18. A scienter requirement can generally help ameliorate vagueness concerns about a statutory provision that imposes criminal penalties. *See Hill v. Colorado*, 530 U.S. 703, 732 (2000). But the intervenors have not identified what scienter requirement applies to what act,[13] nor have

---

[13] The Supreme Court has been very attentive to scienter requirements in criminal statutes over the past few years, parsing statutory language carefully and relying on the presumption in favor of scienter for various elements of various crimes. *See, e.g., Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019) (discussing the scienter requirement for prosecution for possession of a firearm by a prohibited person); *Ruan v. United States*, 142 S. Ct. 2370, 2377–78 (2022) (discussing the scienter requirement for prosecution for unlawfully distributing controlled substances); *McFadden v. United States*, 576 U.S. 186 (2015) (same); *Elonis v. United States*, 575 U.S. 723, 734 (2015) (discussing the scienter requirement for prosecution for issuing threatening communications).

21

they explained how the scienter requirement here counteracts any vagueness issue in this specific context. And in any event, the scienter requirements provide no protection to a physician from arbitrary criminal enforcement if the physician intends to administer a medical abortion but cannot figure out the precise actions required, allowed, and prohibited under the law.

The intervenors also contend that a state official can easily determine whether the statute has been violated by "check[ing] the 'woman's medical chart' to see whether the physician '[d]ocument[ed] . . . the existence of an intrauterine pregnancy.'" *Id.* at 20. This circular argument is not persuasive. The statute is not particularly unclear about documentation, *see supra* note 9, but it is unclear about the degree of certainty required in order for a provider to determine the existence, or probable existence, of an IUP in order to document it.

The legislature is not required to draft its statutes with "mathematical precision," but the IUP requirement's high degree of ambiguity does not provide the fair warning the law requires and runs the risk of leading to the inconsistent and arbitrary enforcement the law prohibits. *See Johnson*, 576 U.S. at 597-598. The plaintiffs are likely to prevail on their claim that the IUP requirement is unconstitutionally vague in violation of the Due Process Clause.

## IV.   HOSPITALIZATION REQUIREMENT

Up to the twelfth week of pregnancy, and subject to numerous requirements and restrictions, a woman can obtain a medical abortion or a surgical abortion in a doctor's office or clinic. § 90-21.81B(2); *see generally* § 90-21.80 *et seq.* After the twelfth week

22

of pregnancy, a woman cannot obtain a medical abortion. § 90-21.81B(2). If she is pregnant as a result of rape or incest or if there exists a "life-limiting anomaly," and before specified weeks of pregnancy pass, she may be able to obtain a surgical abortion, but only in a hospital. §§ 90-21.81B(3), -(4), -82A(c); N.C. Gen. Stat. § 131E-176. The statute defines a "surgical abortion" as "[t]he use or prescription of any instrument or device intentionally to terminate the pregnancy of a woman known to be pregnant," unless the intent of the use of the device is to:

> a. Increase the probability of a live birth; b. Preserve the life or health of the child; c. Remove a dead, unborn child who died as the result of (i) natural causes in utero, (ii) accidental trauma, or (iii) a criminal assault on the pregnant woman or her unborn child which causes the premature termination of the pregnancy; d. Remove an ectopic pregnancy.

§ 90-21.81(1c). The plaintiffs contend, *inter alia*, that the hospitalization requirement violates the Equal Protection clause of the Fourteenth Amendment. Doc. 42 at ¶¶ 85–86.

## A. FINDINGS OF FACT

There are two methods of abortion that use an instrument intentionally to terminate the pregnancy of a woman known to be pregnant and thus fall within the statutory definition of a surgical abortion: aspiration, which medically can typically be performed up to approximately 14 weeks of pregnancy, and dilation and evacuation (D&E), which is available after approximately 14 weeks of pregnancy. Doc. 49-1 at ¶¶ 15, 21, 25, 26.

The same two procedures are used for miscarriage management. *Id.* at ¶¶ 24, 28, 41 (averring that surgical abortion procedures are "identical" to procedures for

23

miscarriage management); Doc. 49-2 at ¶ 24. Miscarriage management is required when a person's body does not naturally expel the pregnancy tissue after miscarriage or when a pregnancy stops growing, as evident from the absence of embryonic or fetal cardiac activity. *Id.* at 10 n.7. When so used, these two procedures are not statutorily prohibited or unlawful because the purpose of the procedure is to "[r]emove a dead, unborn child who died." § 90-21.81(1c)(c).

There are a number of risks from aspiration and D&E, including bleeding, hemorrhaging, infection, damage to the uterus and other organs, cervical laceration, uterine perforation, pulmonary embolism, and death. Doc. 65-1 at ¶¶ 80, 136, 152; Doc. 74-1 at 33–36, 91–93 (speaking generally of all induced abortions). These risks exist whether the procedures constitute a surgical abortion as defined by the statute or whether they are done for miscarriage management and thus are not defined as abortions under the Act. Doc. 74-1 at 174–75 (identifying cervical lacerations, uterine perforation, infection, and hemorrhage as potential complications from miscarriage management procedures). Not all of these complications occur immediately, and some can occur after the patient leaves the clinic or hospital. Doc. 49-1 ¶ 41. Since the hospitalization requirement only applies to abortion and not to identical procedures for miscarriage management or removal of retained pregnancy tissue, patients who have retained tissue as a complication of a surgical abortion performed in a hospital could obtain treatment for that complication at an outpatient clinic using aspiration or D&E. *Id.*

Major complications requiring hospital admission can occur during surgical abortions. *Id.* at ¶ 31. At all gestational ages, complications requiring transfer from a

clinic to a hospital arose in only 31 of the 38,795 surgical abortions the plaintiffs performed in North Carolina in the last three and half years, Doc. 69-2 at ¶ 8, which is well under a tenth of one percent. Doc. 74-12; Doc. 74-14; Doc. 75-6.[14] Only 7 of those patients required admission, and all 31 were released in stable conditions. Doc. 69–2 ¶ 8. Of the 31 patients requiring transfers, only 17 involved procedures with patients at the post-12-week gestational age. Doc. 74-12. The plaintiffs have experienced no logistical difficulties with these infrequent transfers. Doc. 69-2 ¶ 8.

The risk of complications from aspiration and from D&E increases with gestational age. Doc. 49-2 at ¶ 27; Doc. 65-1 at ¶¶ 38–42; Doc. 65-3 ¶ 35, Doc. 74-1 at 150; Doc. 74-2 at 146. For pregnancies of the same gestational age, there is no difference in the risk of complications between a procedure to manage early miscarriage and aspiration abortion. Doc. 49-1 ¶ 24.

For many years, aspiration and D&E procedures have primarily and routinely been performed in clinics, not in hospitals. *Id.* at ¶¶ 36, 40. The procedures are the same whether undertaken in a hospital or outpatient setting. *Id.* at ¶¶ 38, 40. To date, the plaintiffs regularly perform these procedures in their own clinics after 12 weeks, *id.* at ¶¶ 12, 36, sometimes on referral from hospitals. *Id.* at ¶ 46. There may be patient-specific reasons why some patients need the procedures to be performed in a hospital, *id.*

---

[14] Of the 38,795 abortions PPSAT performed in North Carolina from January 2020 through June 2023, not limited by gestational age, 522 patients suffered from various complications, including hemorrhage, pain/bleeding, and infection. Doc. 74-13 at 2. Of the 522 patients suffering from a complication, 31 required transferring to a hospital. Doc. 74-13 at 2. 31/38,795 = .08%.

at ¶ 44, and in the second-trimester, these procedures are often handled in a hospital when undertaken for miscarriage management by physicians who work in hospitals. Doc. 74-3 at 116.

There is credible evidence, including at least one study, that second-trimester surgical abortions in outpatient facilities are safer than in hospitals, Doc. 49-1 at ¶ 38; Doc. 74-3 at 132–33,[15] and the American College of Obstetricians and Gynecologists and the American Public Health Association have endorsed the view that it is unnecessary to require abortions to be performed in hospitals. Doc. 49-1 at ¶ 37.

Surgical abortions in hospitals are more expensive, logistically difficult, and more time-consuming for the patients than abortions in clinics, which will result in delay and increase the gestational age of the pregnancy, and thus the maternal health risks, when the abortion occurs. *Id.* at ¶¶ 36, 70; Doc. 69-1 at ¶ 31; Doc. 65 at 26. These issues, particularly cost, may prevent some women pregnant as a result of rape or incest or facing a life-limiting anomaly from obtaining a surgical abortion within the time limits prescribed by the statute.

### B. EQUAL PROTECTION

The Equal Protection Clause of the Fourteenth Amendment prohibits any state from "deny[ing] to any person within its jurisdiction the equal protection of the laws."

---

[15] The intervenors' expert, Dr. Wubbenhorst, characterizes this evidence as "limited," Doc. 65-1 at ¶ 186, but another study she otherwise relies on, Doc. 65-1 at ¶ 39, also found that D&E abortions performed in nonhospital settings had lower death to case rates than those performed in hospitals. Doc. 74-3 at 132–33. The intervenors have cited no evidence contrary to the plaintiffs' evidence.

26

U.S. CONST. amend. XIV, § 1. Generally, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Unlike laws that treat similarly situated people differently based on race, alienage, national origin, or gender, which trigger a heightened standard of review, federal courts do not closely scrutinize legislative enactments that distinguish "characteristics relevant to interests the State has the authority to implement." *Id.* at 441–42. Courts apply this lower level of scrutiny out of respect for the separation of powers. *Id.*

Last year, the Supreme Court held that "regulation of abortion is not a sex-based classification and is thus not subject to the heightened scrutiny that applies to such classifications" and that it is "governed by the same standard of review as other health and safety measures." *Dobbs*, 142 S. Ct. at 2245–46 (cleaned up). When a plaintiff is not a member of any suspect class and no fundamental right is at play, "it must prove that it has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. *In re Premier Auto. Servs., Inc.*, 492 F.3d 274, 283 (4th Cir. 2007) (cleaned up).

When assessing plaintiffs' claim that they are being treated differently than "similarly situated" groups, courts ask if the groups are alike based on the relevant legislative purpose. *See Williams v. Vermont*, 472 U.S. 14, 23–24 (1985). "A classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation." *Eisenstadt v. Baird*, 405 U.S. 438, 447 (1972) (cleaned up); *see, e.g., Catherine H. Barber*

27

*Mem'l Shelter, Inc. v. Town of N. Wilkesboro Bd. of Adjustment*, 576 F. Supp. 3d 318, 338 (W.D.N.C. 2021) (noting that the proper similarly-situated inquiry does not assess whether the plaintiffs are different than other groups in any way, but rather whether there are differences between groups that relate to the purpose of the challenged law).

The plaintiff must then demonstrate that "the disparity in treatment cannot be justified under rational basis review." *Id.* at 339–40. Under this most lenient tier of review, courts presume the validity of state laws, *see City of Cleburne*, 473 U.S. at 446, and a plaintiff relying on a rational basis review to challenge a law must "negative every conceivable basis which might support it." *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973). To justify a law under rational basis review, the law does not require the state to come forward with an exquisite evidentiary record, and the court will be satisfied with the government's rational speculation linking the regulation to a legitimate purpose, even "unsupported by evidence or empirical data." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993).

The parties agree that the Court must evaluate the plaintiffs' Fourteenth Amendment claims under rational basis review and that "the protection of maternal health and safety," the only interest the intervenors, speaking on behalf of the General Assembly, have put forth, Doc. 65 at 2, is a legitimate state interest. Doc. 49 at 11; Doc. 65 at 8.

The evidence to date establishes that women who need an aspiration or D&E procedure are intentionally treated differently depending on the reason they need the procedure. If performed for miscarriage management after 12 weeks of pregnancy,

28

neither aspiration nor D&E must be performed in a hospital.[16]  § 90-21.82A(c).  But if

performed for the purpose of terminating a pregnancy when a woman is pregnant as a

result of rape or incest or there exists a life-limiting anomaly, the Act requires the

procedure to be done in a hospital after 12 weeks of pregnancy.  §§ 90-21.82A(c); 131E-

176.  The plaintiffs' evidence establishes without contradiction that there is no rational

medical reason for this distinction, and the intervenors have offered no explanation or

evidence – that is, no rational basis – for this differing treatment.

The intervenors contend that because the risk of complications from these

procedures is higher at later gestational ages, it is rational to require the procedures to be

performed in a hospital, where complications can be better addressed.  Doc. 65 at 9.  But

they offer no explanation for why physicians must perform these procedures in a hospital

if the purpose is to accomplish an abortion but may conduct the exact same procedures

with the exact same risks in a clinic or doctor's office if the purpose is to manage a

miscarriage.  *See City of Cleburne*, 473 U.S. at 449–50 (rejecting health and safety

justification for requiring group of mentally disabled persons to obtain special use permit

because similarly situated groups vulnerable to same health risks were not required to

obtain permit); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) (refusing public

---

[16] As noted supra at page 23, the statute excludes miscarriage management from the definition of a surgical abortion and thus from the hospitalization requirement.  § 90-21.81(1c) (excluding removal of "a dead, unborn child who died as the result of (i) natural causes in utero, (ii) accidental trauma, or (iii) a criminal assault on the pregnant woman or her unborn child which causes the premature termination of the pregnancy" from the definition of statutory abortion.)

29

health and nutrition justification for Food Stamp Act amendment restricting assistance only to households of related persons).

The intervenors assert that the plaintiffs have not established that they are being treated differently than similarly situated groups because the Act does not distinguish between "a particular class of patients . . . or a class of physicians," but rather between "suitable facilities based on the gestational age of the fetus and attendant risks." Doc. 65 at 14 (cleaned up). But this is not so; the legislature has distinguished between patients based on the reason the patient needs or wants the procedure, not based on any medical difference between the procedures or on differing risks. In *Eisenstadt*, for example, the Supreme Court's rational basis inquiry did not assess a contraceptive prohibition as distinguishing between medical or pharmaceutical products; instead, the Court asked how the regulation treated married and unmarried classes of people seeking access to the medication. *Eisenstadt*, 405 U.S. at 450–52. So, too, in *City of Cleburne*, the Court's rational basis analysis focused on how the regulation extended benefits differently to classes of people based on cognitive ability. *City of Cleburne*, 473 U.S. at 449–50. Here, the legislature distinguishes between women based on their reason for seeking this medical treatment and treats women who have had miscarriages differently from women who seek the same medical procedures because of rape or incest or fetal anomalies.

In their briefing, the intervenors also rely on the statement by the Fourth Circuit in *Greenville Women's Clinic v. Bryant* as creating a *per se* presumption of rationality in the equal protection context when the state distinguishes between abortion and other medical services. Doc. 65 at 15. But a presumption is just a presumption; it does not mean courts

30

are precluded from a rational basis analysis. And the court in *Bryant* did conduct a rational basis evaluation, as it explicitly considered whether the classification there was "related to its purpose of protecting the health of abortion patients." *Bryant*, 222 F.3d 157, 174 (4th Cir. 2000). To the extent that the intervenors are saying that abortion regulation should be given more deference even than rational basis, that argument is inconsistent with the holding in *Dobbs* that abortion laws are "governed by the same standard of review as other health and safety measures." *Dobbs*, 142 S. Ct. at 2245–46.[17]

The intervenors maintain that the legislature need not deal with every conceivable risk at once and that the legislature "may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." Doc. 65 at 15–16; *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 489 (1955). But nothing in *Lee Optical* says that it is constitutionally acceptable for the legislature to treat women who undergo the exact same medical procedure differently based solely on the reason they are seeking the procedure and not based on any health and safety rationale.[18] Here, the plaintiffs have presented compelling and largely uncontradicted evidence that the procedures for post-12-week surgical abortions and for miscarriage management are identical and carry the same risks. The legislature, through the intervenors, has offered

---

[17] At the September 25 hearing, the intervenors recognized that abortion regulation should be evaluated under the same rational basis test as any other health and safety law.

[18] This is not a question limited to abortion but could arise with many medical and dental procedures. For example, if the intervenors are correct, it would seem the legislature could, without any medical reason or other rational basis, require persons who choose a particular surgery for cosmetic reasons to have that surgery in the hospital while allowing persons undergoing the same surgery with the same risks to treat a medical condition to have the procedure in a doctor's office.

31

no reason for this different treatment. The harm to women pregnant as a result of rape or incest or who face life-limiting anomalies is obvious, as the differing treatment increases the costs and can delay treatment, which results in surgical abortions occurring later in pregnancy when the risks to maternal health are higher.

The plaintiffs will likely carry the heavy burden of overcoming the presumed rational basis for the hospitalization requirement.

## V.  SEVERABILITY

Section 90-21.92 of the Act contains a severability clause, which reads:

> If any one or more provision, section, subsection, sentence, clause, phrase, or word of this Article or the application thereof to any person or circumstance is found to be unconstitutional, the same is hereby declared to be severable, and the balance of this Article shall remain effective, notwithstanding such unconstitutionality. The General Assembly hereby declares that it would have passed this Article, and each provision, section, subsection, sentence, clause, phrase, or word thereof, irrespective of the fact that any one or more provision, section, subsection, sentence, clause, phrase, or word be declared unconstitutional.

§ 90-21.92.

This severability clause constitutes clear legislative intent to preserve as much of the Act as possible in the instance of specific provisions being found unconstitutional. At this stage, the plaintiffs only seek an injunction as to specific sections of the Act.  Doc. 42 at 27.  The preliminary injunction will be limited to these two specific provisions.

## CONCLUSION

The plaintiffs have established a likelihood of success on their Fourteenth Amendment Due Process Clause challenge to the Act's requirement that providers

32

document the probable intrauterine location of a pregnancy before administering medication intended to terminate the pregnancy, presenting a compelling argument that the provision is unconstitutionally vague. The plaintiffs have also established a likelihood of success on their Fourteenth Amendment Equal Protection Clause challenge to the Act's requirement that surgical abortions after 12 weeks of pregnancy be performed in a hospital. The Court need not address the plaintiffs' other arguments.

Having demonstrated that the Act likely poses a direct threat to their constitutional rights and those of their patients, the plaintiffs also have established that they would be irreparably harmed. *See Elrod*, 427 U.S. at 373; *Leaders of a Beautiful Struggle*, 2 F.4th at 346. And the balance of equities tips in the plaintiffs' favor because defendants are "in no way harmed by issuance of a preliminary injunction which prevents [them] from enforcing" the provisions of the Act that are "likely to be found unconstitutional." *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003); *see also Winter*, 555 U.S. at 20. Furthermore, it is in the public interest for statutes that likely violate constitutional rights to be enjoined from being enforced. *Legend Night Club*, 637 F.3d at 302–03. Thus, sections 90-21.83B(a)(7) (IUP provision); and 90-21.81B(3), -(4), 90-21.82A(c) (hospitalization requirement) must be enjoined in their entirety, pending final resolution of the plaintiffs' claims or further order of this Court.

It is **ORDERED** that:

1. The plaintiffs' amended motion for a preliminary injunction, Doc. 48, is **GRANTED**.

33

2. Upon receipt of this Order, each and every defendant, their agents, and successors in office are **RESTRAINED, ENJOINED**, and **FORBIDDEN** from enforcing—by civil action, criminal proceeding, administrative action or proceeding, or any other way—the provision in the Act requiring determination and documentation of an intrauterine pregnancy, § 90-21.83B(a)(7), and the provision in the Act requiring surgical abortions to be performed in a hospital after twelve weeks, §§ 90-21.81B(3), -(4), 90-21.82A(c).

3. In its discretion, the Court **WAIVES** the bond requirement.

4. The original motion for a preliminary injunction, Doc. 11, is **DENIED** as moot, having been supplanted by an amended motion.

This the 30th day of September, 2023.

UNITED STATES DISTRICT JUDGE

34