# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| PLANNED PARENTHOOD SOUTH ATLANTIC, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| JOSHUA STEIN, *et al.*, | ) | Case No. 1:23-cv-00480-CCE-LPA |
| Defendants, | ) ) ) | |
| and | ) ) | |
| PHILIP E. BERGER, *et al.*, | ) ) | |
| Intervenor-Defendants. | ) | |

## DECLARATION OF KATHERINE FARRIS, M.D., FAAFP, IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, Katherine Farris, M.D., FAAFP, declare as follows:

1.     I am a physician licensed to practice medicine in North Carolina, South Carolina, West Virginia, and Virginia. I am board-certified by the American Board of Family Physicians in family medicine and have been awarded the degree of Fellow of the American Academy of Family Physicians.

2.     I have been employed by Planned Parenthood South Atlantic ("PPSAT") since 2009 in various capacities as a medical doctor. Since July 2013, I have been PPSAT's Interim Affiliate Medical Director, then Affiliate Medical Director, then Chief Medical Officer. (From 2013 to 2015, the Planned Parenthood affiliate in North Carolina was named

1

"Planned Parenthood Health Systems, Inc."). As Chief Medical Officer, I am responsible for ensuring the high quality of the medical care that we provide to patients. In this position, I provide oversight, supervision, and leadership on all medical services we provide, including abortion. As part of my role, I collaborate with other members of PPSAT senior management to develop policies and procedures to ensure that the medical services we provide follow evidence-based guidelines and comply with all relevant laws.

3. I also provide direct medical services for PPSAT. Specifically, I provide a range of family planning and reproductive health care to patients, including (among other things) both medication and procedural abortion, as well as miscarriage care, referrals for ectopic pregnancy care, contraception, and advanced gynecological care—such as complicated intrauterine device ("IUD") and Nexplanon removals (Nexplanon is a birth control implant placed under the skin in the upper arm)—at PPSAT's North Carolina health centers in Winston-Salem, Charlotte, and Asheville (and periodically in Fayetteville, Wilmington, and Chapel Hill), as well as in the other states in which I am licensed.

4. I earned my medical degree from the Northwestern University Medical School in 2000 and completed my residency at Valley Medical Center Family Practice, where I was Chief Resident in my last year. I am often called upon to present at educational institutions as an expert in abortion care and provider advocacy.

5. The facts I state here and the opinions I offer are based on my education, my years of medical practice, my expertise as a doctor and specifically as an abortion provider, my personal knowledge, my review of PPSAT's business records, information obtained

2

through the course of my duties at PPSAT, and my familiarity with relevant medical literature and statistical data recognized as reliable in the medical profession—including but not limited to the materials cited here.

6.    A copy of my *curriculum vitae* is attached as **Exhibit 1**.

## SUMMARY OF OPINIONS

7.    I submit this Declaration in support of PPSAT's and Dr. Beverly Gray's Motion for Summary Judgment against North Carolina Session Law 2023-14 ("S.B. 20"), as amended by 2023 House Bill 190 ("H.B. 190"), which is codified at Article 1I of Chapter 90 of the North Carolina General Statutes ("the Act").

8.    I understand that the Act's Hospitalization Requirement[1] for abortions after the twelfth week of pregnancy could bar PPSAT from providing abortion care beyond twelve weeks to survivors of rape or incest or for pregnancies with a "life-limiting anomaly," despite the Act's exceptions for those circumstances. Requiring all abortions after the twelfth week of pregnancy to be performed in a hospital is contrary to the standard of care, under which abortions are routinely performed in outpatient clinic settings through twenty weeks. Indeed, PPSAT provides abortion after twelve weeks to patients with fetal diagnoses who have been referred to us *by hospital providers* because abortion appointments at our outpatient clinics may be available sooner, are often less time-consuming, and cost less than they would at the hospital. This Hospitalization Requirement

---

[1] N.C. Gen. Stat. §§ 90-21.81B(3)–(4), 90-21.82A(c), 131E-153.1.

3

is also illogical as a matter of patient health and safety because, even if the Act takes effect, licensed clinics like PPSAT's will still be allowed to perform the same procedures after twelve weeks to treat miscarriage. If interpreted to require all abortions after twelve weeks to be performed in hospitals, the Hospitalization Requirement will only serve to harm patients who have experienced sexual assault and those who are facing "life-limiting" fetal diagnoses.

9.     I further understand that the Act's Intrauterine Pregnancy ("IUP") Documentation Requirement[2] could prevent us from providing early medication abortion to patients who have a very early pregnancy that is not yet visible by ultrasound (also known as a "pregnancy of unknown location"). Not only is it safe and evidence-based to provide medication abortion to patients whose pregnancies are too early to see by ultrasound and who are at low risk of ectopic pregnancy, but preserving patients' access to this very early abortion care is all the more important given North Carolina's twelve-week ban. Denying medication abortion to patients whose pregnancies cannot yet be seen on an ultrasound will force those patients either to delay wanted care or to obtain a procedural abortion even if they have important reasons for preferring a medication-only method. Either of these alternatives subverts the patient autonomy that both patient-centered practices and medical evidence support.

10.     In particular, the Act is an attack on families with low incomes, North

---

[2] N.C. Gen. Stat. § 90-21.83B(a)(7).

Carolinians of color, and rural North Carolinians, who already face inequities in access to

medical care and who will bear the brunt of the Act's cruelties. While forced pregnancy

carries health risks for everyone, it imposes greater risks for those already suffering from

health inequities. Black women,[3] who in North Carolina are more than three times as likely

as white women to die during pregnancy,[4] will acutely feel the Act's harms. Furthermore,

North Carolinians face a critical shortage of reproductive health care providers, including

obstetrician-gynecologists, especially in rural areas.[5]

---

[3] In this declaration, I use "woman" or "women" as a short-hand for people who are or may become pregnant, but people of many gender identities, including transgender men and gender-diverse individuals, may become pregnant and seek abortion and are also harmed by the Act.

[4] *See* NC State Ctr. for Health Stats., *Trends in Maternal Mortality Statistics*, NC Dep't Health & Hum. Servs., tbl. 4 (2013), https://schs.dph.ncdhhs.gov/data/maternal/Table4_MMReport2013.pdf (available at https://schs.dph.ncdhhs.gov/data/maternal/); *2022 Health of Women and Children Report – Report Data (All States)*, Am.'s Health Rankings, (2022), https://www.americashealthrankings.org/learn/reports/2022-health-of-women-and-children-report (reporting a white maternal mortality rate of 17.3 and a Black maternal mortality rate of 52.8 per 100,000 live births); NC Health News, *Childbirth Is Still Killing Black Moms at a Higher Rate. NC Advocates, Policymakers Discuss Solutions*, Carolina Public Press, (Apr. 19, 2023), https://carolinapublicpress.org/59894/childbirth-is-still-killing-black-moms-at-a-higher -rate-nc-advocates-policymakers-discuss-solutions/.

[5] Clarissa Donnelly-DeRoven, *Filling Rural NC's Maternal Health Care Desert*, NC Health News, (May 11, 2022), https://www.northcarolinahealthnews.org/2022/05/11/filling-rural-ncs-maternal-health-care-desert/ (describing this shortage and mapping 13 rural North Carolina hospitals that closed their maternity units between 2014 and 2019); Isabella Higgins, *Legislative Gaps in Addressing Rural Women's Access to Obstetric Care in the United States: A Case Study of the North Carolina Home Birth Freedom Act*, 26 J. Trachtenburg Sch. Pub. Pol'y & Pub. Admin. at George Washington Univ. 1, 30 (2019), (reporting that about one-third of rural counties in North Carolina did not have an OB/GYN in 2017 (citing Cecil G. Sheps Ctr. for Health Servs. Rsch., *North Carolina Health Professional Supply Data*, Univ. N.C. Chapel Hill (last modified Oct. 31, 2022), https://nchealthworkforce.unc.edu/supply/)); *see generally* NC Maternal Mortality Rev.

## I. PPSAT AND ITS SERVICES

11.     PPSAT is a non-profit corporation organized under the laws of North Carolina. PPSAT offers a wide range of affordable and reliable reproductive and sexual health care services in our 15 locations across North Carolina, South Carolina, Virginia, and West Virginia. PPSAT operates ten health centers throughout North Carolina, located in Asheville, Chapel Hill, Charlotte, Durham, Fayetteville, Greensboro, Raleigh, Wilmington, and Winston-Salem. PPSAT provides a full range of reproductive and sexual health services, including: cervical cancer screenings; breast and annual gynecological exams; family planning counseling; pregnancy testing and counseling; reproductive health education; testing and treatment for sexually transmitted infections; contraception; procedural and medication abortion services and related care; prenatal consultation; primary care; gender affirming hormone therapy; vasectomies; and health care related to miscarriage. PPSAT provides care to approximately 38,000 patients at its health centers in North Carolina each year.

12.     PPSAT provides abortions at six health centers licensed under North Carolina law as abortion clinics located in Asheville, Chapel Hill, Charlotte, Fayetteville, Wilmington, and Winston-Salem. At these health centers, we provide both medication abortion through 77 days (or 11 weeks) gestation[6] as measured from the first day of the

---

Comm., *North Carolina Maternal Mortality Review Report*, NC Dep't of Health & Hum. Servs., (2021), https://wicws.dph.ncdhhs.gov/docs/2014-16-MMRCReport_ web.pdf.
        [6] Bates 0142 (chart of medication abortions provided by PPSAT from 2020 through 2023, by gestational age), attached as **Exhibit 3**.

patient's last menstrual period ("LMP") and, under S.B. 20, procedural abortion through the twelfth week. When one of S.B. 20's exceptions to the twelve-week ban applies, we may provide procedural abortion up to either 13.6 or 19.6 weeks LMP, depending on location and staffing.[7] PPSAT has been providing procedural abortions past the twelfth week of pregnancy for more than fifteen years in North Carolina.

13.    In the absence of the Hospitalization Requirement and the IUP Documentation Requirement taking effect—both are blocked for now by the Court's September 30, 2023 preliminary injunction—PPSAT will continue to provide abortion after twelve weeks to survivors of rape or incest and to patients with diagnoses of "life-limiting anomalies" and will continue to provide medication abortion to patients at low risk for ectopic pregnancy whose pregnancies are not yet visible by ultrasound.

## II.    ABORTION IS COMMON, SAFE, AND CRITICAL HEALTH CARE

### A.    Abortion Methods Performed in Outpatient Settings

14.    All methods of abortion provided at PPSAT—medication abortion, procedural abortion using aspiration, and procedural abortion by dilation and evacuation ("D&E")—are simple, straightforward medical treatments that have an extremely low complication rate, and, unlike some other office-based procedures such as vasectomies or contraceptive implant removals, involve no incisions. In North Carolina and nationwide,

---

[7]    Bates 0143–45 (chart of procedural abortions provided by PPSAT from 2020 through 2023, by gestational age), attached as **Exhibit 4**.

7

these methods are almost always provided in outpatient, office-based settings by clinicians adhering to widely accepted medical standards of care.

15.     Although aspiration abortion and D&E are both sometimes referred to as "surgical" abortion, they are not what is commonly understood to be surgery. Both aspiration abortion and D&E are done through the natural opening of the vagina and cervix and therefore involve no incisions. Both can be, and almost always are, performed in outpatient clinics like PPSAT's.

16.     All abortion patients at PPSAT meet with health center staff, including the physician who will provide their abortion, before the abortion itself. All patients are screened for reproductive coercion and provided with information about the risks, benefits, and alternatives to abortion. Before providing an abortion, the physician personally confirms that their patient has knowingly and voluntarily consented to the abortion by the patient's chosen method. All patients are given detailed instructions regarding what to expect after their abortion and are encouraged to contact PPSAT's 24-hour help line, which is staffed by licensed nurses, should they have any questions or concerns.

### i.      First-Trimester Medication Abortion

17.     In a medication abortion, a patient takes medications to cause uterine contractions that empty the uterus. Medication abortion requires no anesthesia or sedation. From the time a patient receives a positive pregnancy test through 11 weeks, or 77 days, LMP, PPSAT provides the most common form of medication abortion.

8

18.     In a typical medication abortion, the patient takes a combination of two prescription drugs—mifepristone (also known as RU-486 or by its trade name, Mifeprex) and misoprostol (also known as a prostaglandin analogue or by its trade name, Cytotec)—a day or two apart. Mifepristone works by blocking the hormone progesterone, which is necessary to maintain a pregnancy. Misoprostol causes the cervix to open and the uterus to contract and empty. These same medications are offered as a treatment option to patients who have a miscarriage with retained tissue. Indeed, the process of medication abortion very closely approximates the process of miscarriage.

19.     Mifepristone and misoprostol are safe—substantially safer than Tylenol and Viagra, for example.[8] The FDA approved mifepristone, by its brand name Mifeprex, in 2000. Decades of experience with medication abortion since then have resoundingly confirmed its safety and efficacy. According to the FDA, serious adverse events (including death, hospitalization, serious infection, and bleeding requiring transfusion) among mifepristone patients are "exceedingly rare, generally far below 0.1% for any individual adverse event."[9] Indeed, earlier this year, the FDA modified its dispensing requirements for mifepristone to reflect the ever-growing body of evidence demonstrating the safety and

---

[8]    *See* Advancing New Standards in Reprod. Health, *Analysis of Medication Abortion Risk and the FDA report, "Mifepristone U.S. Post-Marketing Adverse Events Summary through 12/31/2018,"* Univ. of Cal. S.F. (2019), https://www.ansirh.org/sites/default/files/publications/files/mifepristone_ safety_4-23-2019.pdf.

[9]    Ctr. for Drug Evaluation & Rsch., *Application Number 020687Orig1s020: Medical Review(s)*, FDA, 47 (2016), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020MedR.pdf.

9

effectiveness of medication abortion.[10] While the FDA-approved labeling for mifepristone reflects its usage through 70 days LMP, there is significant evidence that supports its use through 77 days LMP, as is provided at PPSAT.[11]

20. For some patients, medication abortion offers important advantages over procedural abortion. Procedural abortion is contraindicated for patients with certain medical conditions, such as intolerance of available sedation or analgesic medications or a history of seizure disorder. And medication abortion may be preferable for patients with some clinical conditions, such as fibroids or other uterine abnormalities such as bicornuate uterus, which can make it difficult to reach the contents of the uterus during a procedural abortion. Some patients prefer medication abortion because it feels more natural to them to have their body expel the pregnancy rather than to have a provider use aspiration or instruments to empty the uterus. And some patients choose medication abortion because of fear or discomfort around a procedure involving aspiration or instruments. For example, survivors of rape and people who have experienced sexual abuse, molestation, or other trauma may choose medication abortion to feel more in control of the experience and to

---

[10]    *See Information About Mifepristone for Medical Termination of Pregnancy Through Ten Weeks Gestation*, FDA, https://www.fda.gov/drugs/postmarket-drug- safety-information-patients-and-providers/information-about-mifepristone-medical-termination-pregnancy-through-ten-weeks-gestation (last updated Mar. 23, 2023).

[11]    *See, e.g.*, Ilana G. Dzuba et al., *A Repeat Dose of Misoprostol 800 mcg Following Mifepristone for Outpatient Medical Abortion at 64–70 and 71–77 Days of Gestation: A Retrospective Chart Review*, 102 Contraception 104 (2020); Ilana G. Dzuba et al., *A Non-Inferiority Study of Outpatient Mifepristone-Misoprostol Medical Abortion at 64–70 days and 71–77 Days of Gestation*, 101 Contraception 302 (2020).

10

avoid further trauma from having instruments placed in their vaginas. In the rare event that a medication abortion is unsuccessful, the patient may require follow-up care with procedural abortion, but in the vast majority of cases a patient who prefers medication abortion will be able to use that method, saving them from an unwanted procedure or a hospital referral.

21. Additionally, the logistics of a procedural abortion may be prohibitive for some patients, especially those with lower incomes, those who have difficulty getting time off work and securing childcare, or those who live in rural areas far from facilities where procedural abortion care is provided. Some health care providers charge more for procedural abortions, meaning some patients must wait longer to get an abortion while they gather funds—if they can afford it at all. Survivors of intimate partner violence in particular may struggle to find such support, as telling their partner they are having an abortion could be dangerous. And unlike procedural abortion, medication abortion gives the patient a greater degree of control over when and where they will pass the pregnancy, including who is with them to offer support. For example, patients can time their medications so that they begin the process of passing the pregnancy—involving cramping and bleeding—when their partner is (or is not) home with them or when a family member is available to care for their children. This degree of control and predictability is an important factor for some patients.

11

### ii.    Aspiration Abortion

22.    Aspiration abortion (also known as suction curettage or dilation & curettage) entails using suction to empty the uterus. It is a straightforward procedure performed in the first and early second trimester. Before the Twelve-Week Ban took effect, PPSAT routinely provided aspiration abortion up to approximately 14 weeks LMP. For this method, a small plastic tube, called a cannula, is passed through the cervical canal. The cannula is attached to a syringe or electrical pump that creates gentle suction to empty the uterus.

23.    Prior to starting the suction procedure, the provider dilates the cervix as needed to allow the cannula to enter the uterus. An analgesic such as ibuprofen, an anti-anxiety medication such as Ativan or Valium, a local anesthetic such as Lidocaine, and/or moderate sedation may be used during or prior to the procedure.

24.    The entire procedure, including administration of local anesthesia, dilating the cervix, and aspirating the uterine contents usually takes 3 to 5 minutes. It involves no incision, cutting, or suturing.

25.    This same aspiration method is used to treat a miscarriage after embryonic or fetal demise has occurred naturally, and for pregnancies of the same gestational age there is no difference in the risk of complications between a procedure to manage early miscarriage and aspiration abortion. PPSAT currently uses this aspiration procedure for miscarriage management up to approximately 14 weeks.

### iii. D&E Abortion

26.    Dilation and evacuation, or D&E, uses a combination of gentle suction and additional instruments, including specialized forceps, to evacuate the pregnancy contents from the uterus. While we generally refer to procedures starting at 14 weeks LMP as "D&Es," before the Twelve-Week Ban took effect, instruments were routinely used in addition to suction starting around 15 weeks LMP, depending on the provider's individual practice and the patient's individual medical characteristics.

27.    Prior to the D&E procedure, the provider dilates the patient's cervix. This may be done through medications such as misoprostol, which softens the cervix, and/or through the placement of osmotic dilators in the cervix. Osmotic dilators are slender sticks made of a material that gradually swells as it absorbs moisture; as the dilators swell in the cervical opening, they cause the cervix to dilate. The provider may also use mechanical dilators or a combination of these techniques. The provider then empties the uterus using instruments or a combination of suction and instruments. When providing D&Es, PPSAT offers patients the option of local anesthesia or minimal or moderate sedation. PPSAT does not offer deep sedation or general anesthesia at its North Carolina health centers.

28.    In the early part of the second trimester, physicians may perform the cervical preparation and evacuation procedure on the same day. Later in the second trimester, the physician may start the dilation process one day before the evacuation. In most cases, PPSAT begins the dilation process for patients from 16 to 20 weeks LMP through the placement of osmotic dilators the day before evacuation. If this first appointment for

13

dilation also includes tests, examination, education and consent, it may take a few hours, though the actual procedure to place the dilators takes approximately five minutes. After this appointment, the patient then leaves the clinic and returns the next day for the evacuation procedure.

29.     Once the patient's cervix is sufficiently dilated, the entire evacuation procedure typically takes 10 to 15 minutes. Like aspiration abortion, D&E does not involve any incision, cutting, or suturing. And like aspiration, the D&E procedure is used both to provide abortion and to manage miscarriage. Notably, the risk of complications from a D&E to manage intrauterine fetal demise (i.e., a miscarriage) later in the second trimester can be higher than the risk of complications from a D&E for abortion at the same gestational age.[12]

### B.     Abortion Is One of the Safest Procedures in Medicine

30.     To the extent the Act requires abortion after twelve weeks to be provided in a hospital, or prohibits medication abortion for low-ectopic-risk patients whose

---

[12] Jennifer L. Kerns et al., *Society of Family Planning Clinical Recommendation: Management of Hemorrhage at the Time of Abortion*, Contraception, 3 (2023) ("Spontaneous fetal demise (as opposed to induced fetal asystole) is a risk factor for both hemorrhage and DIC [disseminated intravascular coagulopathy, a serious clotting disorder], conferring a nearly three times higher odds of hemorrhage and 12 times higher odds of DIC. However, the overall incidence of DIC in the setting of fetal demise is low (2%)."); Jennifer L. Kerns et al., *Disseminated Intravascular Coagulation and Hemorrhage After Dilation and Evacuation Abortion for Fetal Death*, 134 Obstetrics & Gynecology 708 (2019) ("Women undergoing D&E for fetal death are far more likely to experience DIC and hemorrhage than are women without fetal death, yet the absolute risk is low (2%).").

14

pregnancies are not yet visible by ultrasound, the Act does not improve patient health and safety.

31.     Abortion is one of the safest forms of medical care in contemporary medical practice and is safely and routinely provided in outpatient settings in countries around the world. Leading medical authorities agree that abortion is one of the safest procedures in medical practice,[13] "stand[ing] in contrast to the extensive regulatory requirements that state laws impose on the provision of abortion services."[14]

32.     In fact, major complications, defined as those requiring hospital admission, surgery, or blood transfusion, occur in just 0.23 percent of abortions performed in outpatient, office-based settings.[15]

33.     Abortion compares favorably, with a markedly lower complication rate, to other procedures routinely performed outside of a hospital setting, including:

- ●     vasectomies, a form of male birth control that involves transecting and cauterizing the vas deferens, the tubes that carry sperm, resulting in

---

[13]     Nat'l Acads. Scis., Eng'g, & Med., *The Safety and Quality of Abortion Care in the United States* 1, 77 (2018), (available at http://nap.edu/24950) ("The clinical evidence makes clear that legal abortions in the United States—whether by medication, aspiration, D&E, or induction—are safe and effective.").

[14]     *Id.*

[15]     Ushma D. Upadhyay et al., *Incidence of Emergency Department Visits and Complications After Abortion*, 125 Obstetrics & Gynecology 175, 181 (2015); *see also* Ushma D. Upadhyay et al., *Abortion-Related Emergency Room Visits in the United States: An Analysis of a National Emergency Department Sample*, 16 BMC Med. 1, 1 (2018).

15

hematoma formation two percent of the time while major complications requiring hospitalization occur in 0.2–0.8 percent of cases;[16]

- colonoscopies, an exam used to look for changes in the large intestine (colon) and rectum, such as swollen, irritated tissues, polyps, or cancer, with a complication rate of 1.6 percent;[17]

- wisdom teeth extraction, a surgical procedure to remove one or more of the four permanent teeth located at the back corners of the mouth, with a complication rate of 6.9 percent;[18] and

- tonsillectomies, surgical removal of the tonsils, with a complication rate of 7.9 percent.[19]

34.     Abortion is significantly safer than the alternative of carrying a pregnancy to term and giving birth, and complications related to pregnancy and childbirth are much more common than abortion-related complications.[20] The United States has the highest maternal

---

[16] Christopher E. Adams & Moshe Wald, *Risks and Complications of Vasectomy*, 36 Urologic Clinics N. Am. 331, 331 (2009).

[17] Isuru Ranasinghe et al., *Differences in Colonoscopy Quality Among Facilities: Development of a Post-Colonoscopy Risk-Standardized Rate of Unplanned Hospital Visits*, 150 Gastroenterology 103, 109 (2016).

[18] Francois Blondeau & Nach G. Daniel, *Extraction of Impacted Mandibular Third Molars: Postoperative Complications and their Risk Factors*, 73 J. Canadian Dental Ass'n 325, 325b (2007).

[19] Jack L. Paradise et al., *Tonsillectomy and Adenotonsillectomy for Recurrent Throat Infection in Moderately Affected Children*, 110 Pediatrics 7, 12 (2002).

[20] *See* Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215 (2012); Nat'l Acads. Scis., Eng'g, & Med., *supra* note 13, at 11 tbl. S-1.

Case 1:23-cv-00480-CCE-LPA   Document 94-1   Filed 03/01/24   Page 17 of 67

mortality rate among high-income countries (more than four times the rate of others in that group). Most concerningly, it is getting worse.[21] In 2021 alone, 1,205 pregnant women died of pregnancy-related causes in the United States.[22] The Centers for Disease Control and Prevention ("CDC") measure maternal mortality rates as the number of maternal deaths per 100,000 live births.[23] In 2021, the maternal mortality rate was 32.9 deaths per 100,000 live births.[24] And the maternal mortality rate in North Carolina is even higher than the national average.[25]

35.     In contrast, the CDC reported 0.43 deaths per 100,000 legal abortions from 2013 to 2019.[26] While the U.S. maternal mortality rate has significantly increased, there is no evidence that has occurred for abortion care, making legal abortion approximately 12 to 14 times safer than live birth.[27]

---

[21]     Donna L. Hoyert, *Maternal Mortality Rates in the United States, 2021*, CDC, Nat'l Ctr. for Health Stats.: Health E-Stats, 1 (2023), (available at https://www.cdc.gov/nchs/data/hestat/maternal-mortality/2021/maternal-mortality-rates-2021.htm).

[22]     *Id.*

[23]     *Id.*

[24]     *Id.*

[25]     Teddy Rosenbluth & Tyler Dukes, *Pregnancy Can Be Risky in the US. In North Carolina, the Threat of Death Is Even Higher*., News & Observer, (last updated July 28, 2023), https://www.newsobserver.com/news/state/north-carolina/article277397263.html.

[26]     Katherine Kortsmit et al., *Abortion Surveillance — United States, 2020*, 71 Morbidity & Mortality Wkly. Rep. Surveillance Summaries 1, 6 (2022).

[27]     Nat'l Acads. Scis., Eng'g, & Med., *supra note 13*, at 75; Raymond & Grimes, *supra note 20*, at 215.

36.     In North Carolina, physicians and certified nurse-midwives can deliver babies in locations other than a hospital, including at birthing centers and even in private homes.

37.     Additionally, even under S.B. 20, we can lawfully perform aspiration and D&E procedures in PPSAT's licensed outpatient clinics to empty a patient's uterus following a miscarriage, though we are prohibited from performing those same procedures in PPSAT's clinics for an abortion after the twelfth week of pregnancy. This is so despite the fact that the rates of miscarriage-treatment-related complications are *higher* than documented rates of abortion-related complications.[28]

38.     Aspiration and D&E for miscarriage management are currently performed in licensed outpatient clinics, such as PPSAT's, in ambulatory surgical centers, and in hospitals (both in operating rooms and in procedure rooms).

39.     In my experience, the main determinant of where a patient ultimately receives a miscarriage management procedure is cost—specifically, whether the patient has health insurance, and whether that insurance plan would cover the cost of a miscarriage management procedure at a given facility. Some insurance plans cover only care that is

---

[28] Advancing New Standards in Reprod. Health, *Safety of Miscarriage Treatment in Hospitals, ASCs, and Office-Based Settings,* Univ. of Cal. S.F. 1, (2018), https://www.ansirh.org/sites/default/files/publications/files/safety_of_miscarriage_treatment_jps2.pdf (citing Sarah C. M. Roberts et al., *Miscarriage Treatment-Related Morbidities and Adverse Events in Hospitals, Ambulatory Surgery Centers, and Office-Based Settings*, 16 J. Patient Safety e317, e320, e322 (2020) (observing that "[t]he rates of miscarriage treatment-related events are notably higher than published rates of abortion-related events")).

18

provided by a contracted in-network provider, such as the patient's regular OB-GYN; those patients usually end up obtaining their miscarriage management procedure at the facility where their OB-GYN practices. By contrast, patients whose insurance covers care at PPSAT often choose to obtain their miscarriage management procedure at PPSAT. And patients without insurance generally prefer to obtain their miscarriage management procedure at PPSAT because it is often far more affordable than obtaining the same procedure at a hospital.

40.     In the past, hospitals were not equipped to provide miscarriage management using aspiration outside of an operating room because they did not routinely stock or train staff to use manual vacuum aspirators (MVAs), the syringe device used to create suction for an aspiration procedure. Abortion providers have used MVAs in aspiration abortion for decades, but because MVAs are associated with abortion, hospitals were reluctant to use them for miscarriage treatment. This is another example of how abortion stigma has caused miscarriage management and abortion to be treated differently even though patients' clinical presentation and treatment needs are the same: in both circumstances, the patient needs a procedure to empty their uterus. In recent years, some hospitals have begun offering miscarriage management using MVAs, which—like the same aspiration procedure for the purpose of abortion—can be performed in a procedure room and does not require an operating room.[29]

---

[29] Lisa H. Harris et al., *Surgical Management of Early Pregnancy Failure: History, Politics, and Safe, Cost-Effective Care*, 196 Am. J. Obstetrics & Gynecology 445.e1,

19

**C.      Abortions Are Safely Performed in Outpatient, Office-Based Settings**

41.      There is no medical reason to require that all abortions after twelve weeks take place in hospitals and not abortion clinics. In North Carolina, legal abortions are safely and routinely performed in doctors' offices and outpatient health center settings, as they are throughout the country. Procedural abortions are almost always provided in an outpatient setting; nationwide, only 3% of abortions annually are performed in hospitals.[30] In addition, abortions at outpatient clinics are often more affordable, easier to navigate, and generally require considerably less time for patients than abortions in a hospital setting.

42.      According to the National Academies of Sciences, Engineering, and Medicine, "most abortions can be provided safely in office-based settings," and a hospital setting is not clinically necessary.[31] Similarly, major medical associations, including the American College of Obstetricians and Gynecologists ("ACOG") and the American Public Health Association, reject the notion that abortions should be required to be performed in hospitals.[32]

_____

(2007) (explaining that abortion stigma likely contributes to clinical-setting differences for procedural abortion and procedural management of miscarriage).

[30]  Rachel K. Jones et al., *Abortion Incidence and Service Availability in the United States, 2020*, 54 Persps. on Sexual & Reprod. Health 128, 134 (2022).

[31]  Nat'l Acads. Scis. Eng'g, & Med., *supra* note 13, at 10.

[32]  *See* Comm. on Health Care for Underserved Women, *ACOG Committee Opinion No. 815: Increasing Access to Abortion*, 136 Obstetrics & Gynecology e107, e109 (2020); Am. Pub. Health Ass'n, *Policy Statement No. 20083—Need for State Legislation Protecting and Enhancing Women's Ability to Obtain Safe, Legal Abortion Services Without Delay or Government Interference* (Oct. 2008), https://www.apha.org/policies -and-advocacy/public-health-policy-statements/policy-database/2014/07/23/09/30/need- for-state-legislation-protecting-and-enhancing-womens-ability-to-obtain-safe-legal-

43.     The technique for a procedural abortion is clinically identical whether performed in a hospital or outpatient setting, and there is no scientific evidence indicating that abortions performed in a hospital are safer than those performed in an appropriate outpatient clinic or office-based setting.[33] To the contrary, as is true for nearly every medical procedure, fewer complications are seen in settings that perform higher volumes of the same procedure,[34] making licensed abortion clinics like PPSAT's safer for most patients than most hospitals, many of which do not routinely provide abortion care. In fact, at least one study demonstrated that second-trimester terminations of pregnancy by D&E in appropriate patients in a dedicated outpatient facility can be safer and less expensive than hospital-based D&E or induction of labor.[35]

44.     The North Carolina Department of Health and Human Services inspects all abortion-providing facilities annually.[36] Abortion providers are also required to submit

---

abortion; *see also* Barbara S. Levy et al., *Consensus Guidelines for Facilities Performing Outpatient Procedures: Evidence Over Ideology*, 133 Obstetrics & Gynecology 255 (2019) (concluding, based on an analysis of available evidence, that requiring facilities performing abortion to meet standards beyond those currently in effect for all general medical offices and clinics is unjustified).

[33] Sarah C. M. Roberts et al., *Association of Facility Type with Procedural-Related Morbidities and Adverse Events Among Patients Undergoing Induced Abortions*, 319 JAMA 2497, 2502 (2018).

[34] Steve Sternberg & Geoff Dougherty, *Risks are High at Low-Volume Hospitals*, U.S. News & World Rep. (May 18, 2015), https://www.usnews.com/news/articles/ 2015/05/18/risks-are-high-at-low-volume-hospitals#:~:text=These%20large%20numbers%20of%20low,similar%20patients%20rather%20than%20by.

[35] David K. Turok et al, *Second Trimester Termination of Pregnancy: A Review by Site and Procedure Type*, 77 Contraception 155, 155 (2008).

[36] N.C. Gen Stat. § 90-21.81C(g).

reports of each abortion "within 15 days after either the (i) date of the follow-up appointment following a medical abortion, (ii) date of the last patient encounter for treatment directly related to a surgical abortion, or (iii) end of the month in which the last scheduled appointment occurred, whichever is later."[37]

45.    The features that differentiate hospitals from abortion clinics include different system operations requirements, staffing requirements, and building construction requirements.[38] Because these hospital features are irrelevant and unnecessary in the context of abortion care, they provide no medical benefit.

46.    Unlike invasive surgical procedures, aspiration abortion and D&E do not involve incisions of any kind. In North Carolina, procedures with risks similar to the risks associated with abortion—including inserting or removing an IUD; endometrial biopsy; colposcopy; hysteroscopy (scoping of the cervix and uterus); Loop Electrosurgical Excision Procedure (removing pre-cancerous cells from the cervix); and miscarriage management (which, from a clinical perspective, involves the exact same procedures and therefore the exact same types of complications as aspiration abortion and D&E, and is distinguished from those treatments only by the absence of embryonic or fetal cardiac activity)—are routinely performed in outpatient clinics and physicians' offices rather than in hospitals. And the procedures noted above with higher complication rates than abortion

---

[37] *Id.* § 90-21.93.
[38]    *Compare* 10A N.C. Admin. Code 13B.3201 (hospital requirements) *with* 10A N.C. Admin. Code 14E .0100 *et. seq.* (abortion facility requirements).

(like vasectomies and wisdom-tooth extractions) are routinely, and without controversy, performed outside of the hospital setting throughout North Carolina.

47. Complications from abortions are exceedingly rare, both generally and at PPSAT in particular. And even in the rare event that complications arise during a procedural abortion, management can nearly always be safely and appropriately administered in the clinic where the abortion is being provided.[39]

48. For example, hemorrhage (the technical term for heavy bleeding), generally understood as losing 500 or more cubic centimeters ("ccs") of blood, is rare during a procedural abortion. A small amount of bleeding during a procedural abortion is expected and managed; the average procedural abortion patient loses less than 100 ccs of blood. For comparison, blood loss during a vaginal delivery is closer to 400 ccs in the majority of patients, and blood loss during a Cesarean section is often greater. PPSAT is equipped to treat blood loss in our clinics on the rare occasions when it is necessary to do so. Most cases of hemorrhage are managed in the clinic setting; treatment methods include providing medications (such as misoprostol, methergine, tranexamic acid, or pitocin) or mechanical interventions (such as re-suction, uterine massage, or intrauterine tamponade with a foley catheter) depending on the circumstances of the case.[40] Many of these same treatments would be provided in a hospital in similar circumstances, and they are usually adequate to

---

[39] Roberts et al., *supra* note 33; Nat'l Acads. of Scis., Eng'g, & Med., *supra* note 13.

[40] Jennifer Kerns & Jody Steinauer, *Management of Postabortion Hemorrhage*, 87 Contraception 331, 333 (2013).

treat heavy bleeding. For virtually all of the small number of patients affected, hemorrhage happens during or immediately after a procedural abortion, at which point PPSAT is able to treat the patient on-site or, in rare cases, transfer the patient to a hospital for additional care. From January 2020 through December 2023, 18 patients (0.041 percent) out of the 43,339 abortions that PPSAT provided in North Carolina were transferred to a hospital for treatment of hemorrhage following an abortion.[41]

49. Another infrequent complication of abortion is infection, but this would not develop at the time the patient is in the health center (or the hospital) for an abortion. Rather, it would manifest days after a patient has a procedural abortion or after a medication abortion patient has taken misoprostol. Upon diagnosis, oral or intramuscular antibiotics almost always resolve infection without any long-term or permanent injury to the patient. For example, if a patient later presents with symptoms of endometritis, which is inflammation of the uterine lining, we confirm endometritis with a physical exam and/or an ultrasound. We then treat the patient with an antibiotic injection, followed up by oral antibiotics. We do a follow-up appointment 48–72 hours after starting antibiotics to make sure that the patient is improving, then have them finish their course of oral antibiotics and

---

[41] *See* Bates 0141 (chart listing the number of abortions provided at PPSAT's North Carolina health centers between January 1, 2020, and December 31, 2023), attached as **Exhibit 2**; Bates 0147 (chart listing the complications resulting in hospital transfer from abortions provided through the twelfth week of pregnancy at PPSAT's North Carolina health centers between January 1, 2020, and December 31, 2023), attached as **Exhibit 6**; Bates 0148–49 (chart listing the complications resulting in hospital transfer from abortions provided after the twelfth week of pregnancy at PPSAT's North Carolina health centers between January 1, 2020, and December 31, 2023), attached as **Exhibit 7**.

24

return for another follow-up appointment within seven days. If there is retained pregnancy tissue in the uterus—which is also rare and would also not be evident until *after* the patient has left the health center (or hospital)—we offer the patient additional treatment to remove the tissue using medication or a suction procedure. This would be the same treatment as if a patient presented after having an abortion at a hospital. The use of intravenous antibiotics to treat infection arising from procedural abortion is rare, and can often be provided in an outpatient setting.

50.     Cervical lacerations from procedural abortion are also incredibly rare. When they do occur, PPSAT is able to treat them with stitches, as most cases of cervical laceration are managed in the clinic setting with suture.[42] From January 2020 through December 2023, none of PPSAT's North Carolina abortion patients required hospital transfers as a result of cervical lacerations.[43]

51.     Uterine perforation is similarly rare and would be treated with either transfer to a hospital or, if the patient is completely stable, close observation and follow-up. From January 2020 through December 2023, two of the 43,339 abortions provided at PPSAT in North Carolina—0.0046 percent—resulted in transfer to a hospital for treatment of uterine perforation.[44] Similarly, perforation of the colon (which is much more dangerous, because it exposes the membrane lining the walls of the abdominal cavity to bowel bacteria) can

---

[42] *Id.*
[43] *See* Ex. 6; Ex. 7.
[44] *See* Ex. 2; Ex. 6; Ex. 7.

occur during a colonoscopy, and colonoscopies are not required to be performed in hospitals.

52. Cases of incomplete abortion are generally managed through repeat aspiration or medication, and, at any rate, arise *after* completion of the procedure, such that even if the abortion took place in a hospital, this complication would occur only after the patient leaves the hospital setting. In fact, because the Hospitalization Requirement applies only to abortion and not to identical procedures for miscarriage management or removal of retained pregnancy tissue, patients who have retained tissue as a complication of a procedural abortion *performed in a hospital* could obtain treatment for that complication at an outpatient clinic using aspiration or D&E.

53. As discussed above, major abortion complications occur in fewer than one-quarter of one percent (0.23 percent) of abortions.[45] In the exceedingly rare event that hospitalization is needed to manage complications, patients are safely stabilized and transferred to a hospital. Overall, just 34 out of the 43,339 abortions that PPSAT performed in North Carolina between January 1, 2020, and December 31, 2023, resulted in hospital transfer (0.078 percent).[46] All were released in stable condition, and only 7 out of the 34 patients transferred were admitted.[47] These infrequent emergency transfers are not logistically difficult, since PPSAT has relationships with hospitals close to our clinics and

---

[45] Upadhyay et al., (2015), *supra* note 15, at 175.
[46] *See* Ex. 2; Ex. 5.
[47] *See* Ex. 6; Ex. 7.

26

we have clear protocols for emergency management while we are awaiting transport and for a smooth hand-off to the receiving institution.

54.     It is unreasonable, and a waste of hospital resources, to require an entire category of procedure to be performed in a hospital when there is no medical benefit for the vast majority of patients. As with any other medical procedure, whether an abortion should be provided in a hospital should be a patient-specific consideration, based on the patient's individual medical circumstances.

55.     PPSAT physicians have low abortion complication rates and superb safety records. Because PPSAT specializes in providing patient-centered, holistic sexual and reproductive health care, PPSAT patients benefit from receiving care from highly experienced and specialized providers and staff. This is particularly important for the patient population we are talking about here—survivors of sexual assault or patients with a "life-limiting" fetal anomaly, who may be more comfortable with a specialized provider like Planned Parenthood than having to navigate a hospital, especially one for which they need to travel outside of their community.

56.     PPSAT has provided abortions due to rape, incest, or life-limiting anomaly to patients in North Carolina after the twelfth week of pregnancy, both before the Twelve-Week Ban took effect and after the Court entered a preliminary injunction against the Hospitalization Requirement. PPSAT will continue to do so unless the Hospitalization Requirement takes effect.

57.    Indeed, PPSAT has received referrals from North Carolina hospital-based physicians for patients seeking abortion after twelve weeks following a fetal anomaly diagnosis. Abortions in these circumstances are almost always clinically identical to abortions where no anomaly is present. For those patients, receiving an abortion at one of PPSAT's licensed abortion clinics is just as safe as getting that care in a hospital, and moreover, for most of them, it is more accessible from a logistical and financial standpoint, particularly where insurance would not cover the patient's abortion in a hospital setting.

58.    There is no medical reason to require all abortions for "life-limiting" anomalies to be provided in a hospital, and PPSAT would continue to provide abortions to these patients after the twelfth week of pregnancy under the Act's "life-limiting anomaly" exception but for the Hospitalization Requirement.

**D.     Medication Abortion Is Safe to Provide to Patients at Low Risk of Ectopic Pregnancy Before an Intrauterine Pregnancy Can Be Documented**

59.  If the IUP Documentation Requirement requires express confirmation of an intrauterine pregnancy *before* administration of medication abortion, it will be impossible for PPSAT to comply in the early weeks of pregnancy, and accordingly impossible for us to provide medication abortion to patients at that gestational stage.

60.  Specifically, some patients present for abortions very early in pregnancy. At these early gestational stages, though the patient has a positive pregnancy test, it may be too soon to see an intrauterine gestational sac via ultrasound because the pregnancy is not yet sufficiently developed. Accordingly, if the IUP Documentation Requirement requires

28

PPSAT to document that an intrauterine pregnancy is *visible by ultrasound* before providing a medication abortion, it would prohibit PPSAT from providing medication abortion to patients who are very early in their pregnancies.

61. The Act would therefore force patients with pregnancies of unknown location either to delay their abortion until an intrauterine pregnancy can be seen by ultrasound or to undergo a procedural abortion, even if they have been determined to be at low risk for ectopic pregnancy and have decided in consultation with their provider that a medication abortion is the best option for them.

62. Medical evidence supports the safety and efficacy of providing medication abortion to low-ectopic-risk patients before the pregnancy can be seen on an ultrasound, using a protocol that *simultaneously* (1) provides medication abortion to a patient who wants it and (2) conducts further testing to rule out ectopic pregnancy. Moreover, this protocol is more patient-centered than requiring the patient to wait for medication abortion at a later date or to obtain a procedural abortion despite their preference for medication abortion. PPSAT follows this evidence-based protocol at its clinics in North Carolina.

63. Under this protocol, when a patient is seeking abortion and their pregnancy is not visible during the state-mandated pre-abortion ultrasound, PPSAT first screens the patient for risk of ectopic pregnancy (i.e., a pregnancy that has implanted outside of the uterus) by taking the patient's medical history and identifying their symptoms.[48] As part of

---

[48] An ectopic pregnancy occurs when a fertilized egg implants and grows outside of the uterus. Ectopic pregnancies require treatment to terminate the non-viable pregnancy.

Case 1:23-cv-00480-CCE-LPA    Document 94-1    Filed 03/01/24    Page 30 of 67

this screening, we obtain a detailed menstrual history, pregnancy history (including history of prior ectopic pregnancy), contraceptive history, and symptom evaluation. If we determine that the patient is at high risk of ectopic pregnancy, we refer the patient to another provider, typically an emergency department, for diagnosis and treatment.

64.  If the patient is not at high risk of ectopic pregnancy, the provider offers the patient three options for treatment: medication abortion, aspiration abortion, or a follow-up appointment at a later date to see if an intrauterine pregnancy can be seen on an ultrasound at that time. We explain the potential risks and benefits of each option, and the patient, in consultation with the physician, decides which option is best for them.

65.  If a low-ectopic-risk patient with a pregnancy of unknown location chooses medication abortion, the provider *simultaneously* provides the medication abortion *and* conducts further testing to rule out ectopic pregnancy—specifically, by drawing a blood sample to test the level of the pregnancy hormone human chorionic gonadotropin ("hCG"). These test results usually come back no more than 24 hours later.

66.  If the blood test results indicate that the patient's hCG levels are sufficiently high (indicating a more developed pregnancy), this may be evidence of ectopic pregnancy. At that point, even if the patient has already taken the medications for medication abortion,

---

Research has shown that it is safe and effective to screen for ectopic pregnancy by considering known risk factors—including symptoms such as pain and bleeding, history of ectopic pregnancies, past surgery on the fallopian tube, and presence of pelvic inflammatory disease. *See* Ushma D. Upadhyay et al., *Outcomes and Safety of History-Based Screening for Medication Abortion: A Retrospective Multicenter Cohort Study*, 182 JAMA Internal Med. 482 (2022).

the provider will offer the patient the option of returning for an aspiration procedure as a means of *both* testing for ectopic pregnancy and completing the abortion. If the patient with high hCG levels opts for aspiration, then following that procedure, the provider will examine the aspirated uterine contents to see if gestational tissue is identifiable— confirming that the pregnancy was intrauterine and that the abortion is complete. If the patient with high hCG levels does not opt for aspiration, or if a gestational sac is not identifiable following aspiration, the provider may refer the patient for further ectopic evaluation, usually in an emergency department.

67.   If, however, the patient's hCG levels are low (indicating a pregnancy at a very early gestational age), the patient's hCG levels are tested again 48–72 hours after taking the misoprostol.

68.   Whether or not the patient's hCG levels have decreased more than 50% after the abortion is evidence of whether the pregnancy has been terminated by the medication abortion, the pregnancy is in the uterus and continuing to grow, or there is still a possibility of ectopic pregnancy. Patients whose hCG levels have not decreased sufficiently are further evaluated for ectopic pregnancy, including, where medically indicated, through referral to a hospital provider.

69.   Administration of medication abortion according to this protocol has been shown to be safe and effective in terminating the pregnancy.[49] And at least one study found

---

[49] *See, e.g.*, Alisa B. Goldberg et al., *Mifepristone and Misoprostol for Undesired Pregnancy of Unknown Location*, 139 Obstetrics & Gynecology 771 (2022); Karen

that this protocol leads to earlier exclusion of ectopic pregnancy than waiting to see if an intrauterine pregnancy can be detected later.[50]

70. If a low-ectopic-risk patient with a pregnancy of unknown location were referred to a hospital for ectopic evaluation instead of receiving a medication abortion according to this protocol, in most cases the hospital would perform the very same serial hCG testing that, under the protocol, PPSAT performs simultaneously with the medication abortion. Referring a low-ectopic-risk patient with a pregnancy of unknown location for ectopic evaluation instead of providing a medication abortion per this protocol therefore does not lead to earlier or more accurate diagnosis of ectopic pregnancy. Instead, it only delays the patient's abortion.

71. The ability to provide immediate abortion care for patients with pregnancies of unknown location offers important benefits to those patients without compromising their safety. While mifepristone is contraindicated for patients with confirmed or suspected ectopic pregnancy, this is not because there is any safety issue with the provision of medication abortion to a patient with an ectopic pregnancy. Rather, mifepristone is contraindicated because it does not treat ectopic pregnancy—i.e., it is not effective, but it

Borchert et al., *Medication Abortion and Uterine Aspiration for Undesired Pregnancy of Unknown Location: A Retrospective Cohort Study*, 122 Contraception 109980 (2023); I. Bizjak et al., *Efficacy and Safety of Very Early Medical Termination of Pregnancy: A Cohort Study*, 124 BJOG: Int'l J. Obstetrics & Gynaecology 1993 (2017); Philip Goldstone et al., *Effectiveness of Early Medical Abortion Using Low-Dose Mifepristone and Buccal Misoprostol in Women With No Defined Intrauterine Gestational Sac*, 87 Contraception 855 (2013).
[50] Goldberg et al., *supra* note 49, at 771.

is also not harmful. PPSAT's protocol for treating patients whose pregnancies are too early to see by ultrasound and who are at low risk of ectopic pregnancy ensures both the timely provision of abortion care *and* that the patient receives further testing to identify or rule out ectopic pregnancy.

72.  We ensure that patients remain alert to the possibility of ectopic pregnancy by providing tailored education and follow-up to those who receive medication abortion according to this protocol. Only patients with low risk of ectopic pregnancy are eligible for this treatment, and all of these patients are educated on ectopic pregnancy signs and symptoms to watch for so that they can contact the clinic for further guidance or even report to the emergency department if needed. Each patient in this situation leaves the clinic with a plan for when to do their next blood test. We warn patients, both verbally and in writing, that an untreated ectopic pregnancy could result in their death, and we conduct multiple follow-up phone calls. If the provider evaluating the patient has a clinical suspicion of ectopic pregnancy, medication abortion is not offered; rather, the patient is immediately referred for further ectopic evaluation and management.

73.  Access to early abortion care is all the more important given the Act's twelve-week ban, which is already in effect in North Carolina. Delaying their abortion may not be possible for some patients, since scheduling constraints due to clinic capacity and personal matters such as work and childcare might force them past the twelve-week mark and prevent them from accessing abortion altogether. Further restrictions on access to abortion in North Carolina and surrounding states will put even more pressure on us to

33

provide timely care to our patients.

74.     Furthermore, banning medication abortion, but not procedural abortion, for low-ectopic-risk patients with pregnancies of unknown location is arbitrary and unnecessary. It puts patients in a position of opting for a procedural abortion even though they feel that a medication abortion is best for them. Aspiration abortion is not the best option for every patient, and it is vital to make the full range of medically appropriate options available to patients.

75.     Further, PPSAT sometimes has clinic days on which, for staffing reasons, it is able to offer medication abortion but not procedural abortion. Eliminating the option of medication abortion for some patients would reduce the availability of appointments at PPSAT health centers for them, thus hampering their access to abortion.

## III.     ABORTION STIGMA IN NORTH CAROLINA

76.     While the majority of North Carolinians did not support the law challenged in this case,[51] abortion remains politically stigmatized. People seeking abortions, and the physicians and other health care providers who care for them, face regular prejudice and harassment.

77.     People seeking abortions in outpatient clinics in North Carolina often have to pass by anti-abortion protesters before they are able to obtain care. I am aware of no

---

[51] Steve Doyle, *Poll Says Most North Carolinians Don't Support Abortion Restrictions Recently Passed by General Assembly*, Fox 8 (May 11, 2023) https://myfox8.com/news/north-carolina/poll-says-most-north-carolinians-dont-support-abortion-restrictions-recently-passed-by-general-assembly/.

other medical procedures where the patients are subject to protests and harassment while in the process of seeking care. My colleagues and I have seen patients arrive for their abortion appointments visibly rattled by their encounters with these protesters, who deliberately attempt to make abortion patients feel shame and regret about their decision to have an abortion and lie to patients about the safety of abortion to frighten them. When someone has an abortion at a North Carolina hospital, some medical personnel and administrative staff might refuse to participate in the procedure—something that would never happen if the same procedure were being performed to treat a miscarriage. And I understand that other medical providers sometimes express disapproval of abortion when patients seek follow-up care after an abortion, such as for aspiration of retained tissue after a medication abortion.

78.     Abortion providers in North Carolina experience abortion stigma in the form of baseless assumptions that physicians who provide abortion are not skilled physicians, that we do not provide quality medical care, and that we do not care about patient safety. This unfounded stereotype has permeated the testimony submitted in this case so far by Dr. Wubbenhorst and Dr. Bane. For example, Dr. Wubbenhorst baselessly asserted in her declaration at the preliminary-injunction stage that "abortionists [the derogatory term she uses instead of "physicians"] refuse to manage their complications." To the contrary, my abortion-providing colleagues and I are highly trained medical professionals who are proud to provide evidence-based, patient-centered medical care (including appropriate treatment for the rare complications resulting from abortion). We provide abortion because it is part

of comprehensive obstetric and gynecological medical care, and because people deserve to be able to access this care in a compassionate, judgment-free medical setting.

79.    Abortion providers in North Carolina can experience professional penalties or retaliation due to our work performing abortions. As in other areas of medicine, physicians who provide abortion often work at multiple sites—for example, at a public hospital as well as at a private medical group or outpatient clinic. Potential employers may refuse to hire a physician who provides abortion at another site, or may include contractual provisions limiting a new employee's ability to provide abortion even in their capacity at a different employer. Some of these employers are institutionally opposed to abortion; others are merely fearful that anti-abortion protesters will harass their patients and staff if they learn that an abortion provider works for them. This discourages physicians from providing abortion even if they would otherwise want to. And physicians who do provide abortion sometimes feel professional pressure to conceal or omit mention of that part of their practice, even when they are not formally prohibited from providing abortion.

80.    In addition to the risk of professional retaliation, abortion providers in North Carolina also face a constant threat of harassment and even physical violence. Abortion providers in other states have been assaulted and murdered, and abortion clinics have been set on fire. According to the National Abortion Federation, since 1977, there have been 11 murders, 42 bombings, 200 arsons, 531 assaults, 492 clinic invasions, 375 burglaries, and thousands of other incidents of criminal activities directed at abortion clinic patients,

36

providers, and volunteers.[52] Threats have increased since *Dobbs*, particularly in states where abortion remains legal: for example, incidents of stalking targeting abortion clinic staff and patients increased 229% from 2021 to 2022.[53] As a result, abortion providers in North Carolina go to great lengths to maintain the confidentiality of their home addresses. For example, I am aware of some abortion providers who purchased their home through an anonymized legal entity like a trust or an LLC to avoid creating a public record that links their name with a street address. Some abortion providers even choose not to register to vote, because doing so would create a public record of their home address.

81.    At PPSAT, we train providers not to arrive at the clinic wearing scrubs, because anti-abortion protesters sit outside the clinic hoping to identify medical staff in order to target them for harassment. One physician who provides abortions at PPSAT also works at a hospital, and anti-abortion activists littered the hospital parking lot with flyers identifying her as an abortion provider. We tell abortion providers to consider taking a different route to and from work every day so that they cannot be tracked. During particularly contentious times, we have had conversations about getting bullet-proof jackets for PPSAT physicians.

82.    Abortion providers in North Carolina worry constantly that their loved ones will be targeted because of their relationship with someone who performs abortions. Many

---

[52] *2022 Violence & Disruption Statistics*, National Abortion Federation 1, 2 (2022), https://prochoice.org/wp-content/uploads/2022-VD-Report-FINAL.pdf.
[53] *Id*. at 2, 7.

37

physicians who provide abortion care choose not to speak publicly, professionally, or socially about this aspect of their work outside of a narrow, trusted circle. This is not out of shame or embarrassment, but rather to minimize the risk of violent threats or harassment against themselves and their families. I know physicians who decided not to take their spouse's last name in marriage in order to protect their spouse and future children from anti-abortion harassment. These physicians have decided to have different last names than their children as a direct result of abortion stigma.

## IV. IMPACT ON PPSAT PATIENTS

### A. Impact of the Hospitalization Requirement on Survivors of Rape or Incest and Patients with "Life-Limiting" Fetal Anomalies

83. If the Hospitalization Requirement means that PPSAT cannot provide abortion after the twelfth week of pregnancy even under the Act's exceptions for survivors of rape or incest and for people diagnosed with "life-limiting" fetal anomalies, it will limit the number of providers available to these patients, increasing the expense of abortion and delaying or denying their access to desperately needed care. These heightened barriers will force patients who are already facing personal hardship and even trauma due to the circumstances of their pregnancies to remain pregnant against their will even longer—all without any medical benefit.

84. It should go without saying that it is vitally important to preserve access to abortion after the twelfth week of pregnancy for survivors of rape or incest, and for patients who have received a diagnosis of a "life-limiting" fetal anomaly.

Case 1:23-cv-00480-CCE-LPA   Document 94-1   Filed 03/01/24   Page 39 of 67

85.     Thousands of North Carolinians suffer sexual abuse each year.[54] Because of the non-consensual nature of rape and incest, these survivors are at heightened risk of unwanted pregnancy. And the traumatic circumstances of the pregnancy may increase the urgency of access to abortion. The physical aspects of pregnancy, including the sense of losing control of one's body, can be particularly traumatic for patients who have experienced a forcible loss of control of their bodies or their lives. For these survivors, pregnancy can trigger flashbacks, dissociative episodes, and other symptoms of re-traumatization.[55] Survivors experiencing mental health challenges may decide they are not healthy enough to parent a child (or an additional child, if they are within the roughly 62% of North Carolina abortion patients who already have children).[56]

86.     It is already hard for those who have experienced intimate partner violence to access abortion care in many instances. In particular, it can be difficult if not impossible

---

[54] *Sexual Violence in North Carolina, 2018-2019*, NC Dep't of Health & Hum. Servs., (May 2021), https://injuryfreenc.dph.ncdhhs.gov/preventionResources/docs/BRFSS-SV-Factsheet-Final.pdf (reporting that over 940,000 North Carolina adults have ever experienced sexual violence); Council for Women & Youth Involvement, *Sexual Assault in North Carolina July 2021–June 2022*, NC Dep't of Admin., (2022), https://ncadmin.nc.gov/cfwyi/2021-2022-dvsa-statistical-briefpdf-0/download?attachment (reporting that the North Carolina Department of Administration's Council for Women and Youth Involvement provided sexual-assault support services to 11,933 clients between July 2021 and June 2022).
[55] L. G. Ward, *Trauma-Informed Perinatal Healthcare for Survivors of Sexual Violence*, 34 J. Perinatal & Neonatal Nursing 199 (2020).
[56] Katherine Kortsmit et al., *Abortion Surveillance — United States, 2019*, Morbidity & Mortality Wkly. Rep. Surveillance Summaries 1, 22 tbl. 8 (2021) (reporting that in 2019, 37.4% of North Carolina abortion patients had zero previous live births; 23.9% had one previous live birth; 19.8% had two; 10.5% had three; and 8.5% had four or more).

39

for people experiencing intimate partner violence to escape their partner's physical, emotional, and financial control long enough to access an abortion without compromising their confidentiality. In cases where they have been physically isolated from the community, they may not be able to leave their homes to seek routine medical care in the hours or days directly following the assault, let alone have access to transportation or the financial means to access abortion providers or follow-up services. At the same time, research has indicated that women who are denied a wanted abortion, when compared to those who are able to obtain abortions, face a greater likelihood of continued physical violence from the man involved in the pregnancy.[57]

87.    Even when survivors are able to access abortion, the process of finding a way to do so can delay them substantially, making them more likely to need abortion after twelve weeks of pregnancy. Survivors of repeated abuse may also be unsure of the gestational age of their pregnancies, so they may present to outpatient clinics for the state-mandated informed consent visit but find they are already beyond their twelfth week of pregnancy. If the Hospitalization Requirement applies to patients seeking abortion due to rape or incest, those patients would have to be referred to a hospital provider, despite the clinic being able to safely provide the care, forcing patients who have already experienced trauma to share their stories with additional providers.

---

[57] Sarah C.M. Roberts et al., *Risk of Violence From the Man Involved in the Pregnancy After Receiving or Being Denied an Abortion*, 12 BMC Med. 1, 5 (2014).

40

88.     Meanwhile, patients who are diagnosed with a fetal anomaly usually receive this diagnosis after the twelfth week of pregnancy, since the screening and diagnostic procedures for anomalies are generally conducted in the second trimester, and structural anomalies may not be identified by ultrasound until the eighteenth or twentieth week of pregnancy.

89.     Requiring abortion after twelve weeks to be provided in hospitals will reduce these patients' access to care. Most obviously, patients required to seek abortions in a hospital will have fewer options for care due to the fact that many hospitals do not provide abortion.[58]

90.     In addition, abortions at hospitals are generally much more expensive than they would be at PPSAT. Though hugely variable, abortions in hospitals can cost thousands of dollars. Given that only one in three Americans can comfortably cover a $400 emergency expense, the financial burden of an abortion at a hospital will be insurmountable for many would-be patients.[59] At PPSAT, the cost of an abortion varies based on gestational age from $625 to $2146—a fraction of the cost charged by some hospitals—and PPSAT

---

[58] *See* Comm. on Health Care for Underserved Women, *supra* note 32, at e108 (recognizing that "many hospitals and health care systems limit the scope of reproductive health care for a range of reasons"); *see also* David L. Eisenberg & V. C. Leslie, *Threats to Reproductive Health Care: Time for Obstetrician-Gynecologists to Get Involved*, 216 Am. J. Obstetrics & Gynecology 256, 256 (2017) (observing that "health care institutions limit the scope of reproductive health care because of hospital policies, financial pressures, and a desire to limit negative press").

[59] Bd. Governors Fed. Reserve Sys., *Economic Well-Being of U.S. Households in 2021*, 1, 36 (2022), https://www.federalreserve.gov/publications/files/2021-report-economic-well-being-us-households-202205.pdf.

endeavors to work with patients to ensure that they can obtain the care they need, irrespective of their financial circumstances. As I mentioned above, some of the abortions that PPSAT provides are for patients who have been referred to us by hospital providers. Many of those patients prefer to receive an abortion at PPSAT because receiving one in a hospital would be prohibitively expensive.

91.     Due to cost alone, if a patient could find a hospital willing to provide their abortion, hospital treatment would not be feasible for many of PPSAT's patients. Arranging for transportation, childcare, and taking time off work to come to PPSAT is challenging enough. A majority of patients seeking abortion are already parents. Many have multiple jobs or jobs with inflexible or unpredictable schedules with no paid sick leave. Some are compromised by physical and/or mental health conditions or struggle with a substance use disorder.

92.     Patients who are able to get an appointment at a hospital may also face lengthy wait times, added stress, complicated paperwork and other logistical requirements, loss of confidentiality, and possibly increased medical risk from clinicians who provide abortion care infrequently. Particularly when deep sedation or general anesthesia is used—as is done at some hospitals, but not at PPSAT's clinics—the total appointment time, post-procedure recovery time, staffing and facility requirements, costs, and procedure risks increase, without any medical benefit to the patient.

42

93.     Studies demonstrate that increased barriers to abortion access increase the likelihood a patient will not receive an abortion at all.[60] In addition, delay of any kind is particularly concerning because, while abortion is safe, its risks increase with gestational age, as does the invasiveness of the procedure and the need for deeper levels of sedation.

94.     Moreover, some hospitals may provide abortion using practices that are not patient-centered. Because only 3% of abortions nationwide are provided in hospitals, physicians who primarily practice in a hospital setting are likely less experienced in procedural abortion, particularly D&Es (given that most abortions occur before the point in pregnancy when D&Es are generally provided). Patients seeking abortions at a hospital may therefore be limited, either expressly or functionally, to the induction abortion method, even though induction can be far more expensive, time-consuming, and physically arduous for the patient as compared to D&E.

95.     Specifically for survivors of rape or incest, abortion care in a licensed abortion clinic offers particular benefits related to the specialized setting. At PPSAT, for example, all staff are trained to recognize and counteract abortion stigma, and clinicians are trained to provide trauma-informed care for patients who have experienced intimate partner violence—such as special considerations when performing a physical exam for those patients, and what words to use in their clinical interactions. One such trauma-

---

[60]     *See e.g.*, Benjamin P. Brown et al., *Association of Highly Restrictive State Abortion Policies With Abortion Rates, 2000-2014*, 3 JAMA Network Open 1, 1 (2020) ("A highly restrictive legislative climate, when compared with a less restrictive one, was associated with . . . a 17% decrease [in] the median abortion rate….").

43

informed practice is offering the patient the opportunity to remain conscious during the procedure; while some survivors may prefer general anesthesia (which some hospitals administer as a matter of course for abortion patients), others wish to avoid the experience of being told after waking up from sedation what has happened to their body, with no firsthand memory of the procedure itself.

96.     PPSAT always provides patients an opportunity to speak privately with clinic staff to ensure that they are able to discuss their circumstances candidly and confidentially. In particular, we screen patients for intimate partner violence without anyone else in the room, including the patient's parent or partner. If a patient indicates that they fear violence if they do not obtain an abortion, staff will offer to engage law enforcement. If the patient feels that involving law enforcement would increase rather than lessen the danger they are in, we will provide the patient with a safe area in the health center from which they may reach out to resources we suggest in order to develop a safety plan. If a patient indicates that they are being threatened and would not otherwise want an abortion, we will not perform one.

97.     And when receiving care at a licensed abortion clinic, survivors and patients diagnosed with fetal anomalies can trust that their care team—from the administrative staff at the front desk to the physician performing their procedure—will not judge their reproductive decision making, whether they decide to continue or end the pregnancy. While there are of course excellent physicians and staff providing compassionate, patient-centered care in hospital settings, too, patients are *more likely* to encounter stigma and

44

judgment from physicians and staff at a hospital than at a licensed abortion clinic in North Carolina. Requiring people to go to a hospital for their abortion deprives them of the option to receive care in the specialized, supportive environment that a licensed abortion clinic offers.

98.    Indeed, many abortion providers specifically choose to work in outpatient clinics because we know we will be providing care in settings where all of the patient-facing staff are supportive and non-judgmental of that care and where the care will be much more affordable to patients.

99.    For all of these reasons, limiting access to abortion for survivors of rape or incest and for patients with "life-limiting" fetal anomalies would cause great harm even to those patients who are able to access abortion in a North Carolina hospital. For many others, the Hospitalization Requirement would put that care out of reach within North Carolina, such that the only remaining options will be to travel out of state to get an abortion or to attempt to manage their abortion outside of the medical system. Still others will be forced to remain pregnant and ultimately give birth against their will.

### B.    Impact of the IUP Documentation Requirement on Access to Early Abortion

100.    If PPSAT is unable to offer medication abortion to patients with pregnancies of unknown location, this too will be devastating for patients. This is especially so because the Act already imposes a requirement that patients make two trips to a health center to access care (in addition to the follow-up appointment that must now be scheduled for

medication abortion patients). If we cannot provide medication abortion to low-ectopic-risk patients while simultaneously doing further testing to exclude ectopic pregnancy, as supported by the best medical evidence and principles of patient-centered care, these patients may need to make another, wholly medically unnecessary trip, which will further delay their access to care. Early access to care is always preferable, but even more so because the Act bans almost all abortions after twelve weeks.

101.    In my own practice, I see a patient with a pregnancy of unknown location at least once a week. Based on my experience providing abortion in states that have enacted early gestational age bans—for example, South Carolina, where a six-week ban was in effect for roughly 50 days in the summer of 2022 and has been in effect again as of August 2023—I expect that the number of patients who come to PPSAT in North Carolina for a medication abortion before their pregnancy is visible by ultrasound will increase now that the twelve-week ban is in effect. If the IUP Documentation Requirement prevents us from providing evidence-based abortion care to these patients, it will only delay their access to abortion without any effect on the speed or accuracy of ectopic pregnancy diagnosis.

102.    It is important to note, however, that while patients who are able to recognize their pregnancies early on and *also* have resources and flexibility (in work schedules, caregiving obligations, and access to transportation) may be able to come to PPSAT earlier in pregnancy than they might have before the twelve-week ban took effect, patients who do not recognize their pregnancies immediately and those lacking resources and flexibility

46

will not be able to come in any sooner, and in fact will be delayed in accessing abortion by the Act's many other medically unnecessary restrictions.

103.    In these ways (and many others), the Act is not only harmful to our patients, but also impairs PPSAT's and its physicians' ability to practice our profession and to satisfy our personal and professional missions and obligations to provide high-quality, evidence-based comprehensive sexual and reproductive health care to people in North Carolina.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/23/2024

Katherine A. Farris, M.D., FAAFP

# EXHIBIT 1

## Employment

**Planned Parenthood South Atlantic**                          Winston-Salem/Raleigh, NC

Chief Medical Officer: April 2020 – present
> Duties of Affiliate Medical Director with increased focus on strategic planning, oversight of new service lines including Primary Care and telehealth, and increased advocacy work in support of PPSAT mission.

Affiliate Medical Director: December 2014 – April 2020
> Clinical, policy, and administrative oversight of all licensed staff and clinical services for 14 health centers located throughout NC, SC, VA, and WV, including developing and implementing medical protocols, ensuring regulatory compliance, and overseeing quality of care provided.

Laboratory Director: December 2014 – present
> Oversight of non-waived laboratories WS, NC; AVL, NC; WILM, NC; CLT, NC; waived laboratory VIE, WV

Infection Control Professional: 2014-present
> Serves as consultant and expert on any infection prevention concerns as per medical training.

Interim Abortion Facility Administrator: December 2019 – March 2020

Acting Vice President of Patient Services: March – June 2016; May – August 2017
> Oversight of administrative and operational departmental functions including regulatory compliance and financial solvency for 14 health centers located throughout NC, SC, VA, and WV including direct and indirect supervision of management and non-licensed staff within the health centers.

Interim Affiliate Medical Director: July 2013 – December 2014

Reproductive Health Care: September 2009-present
> Provision of comprehensive family planning services to women of all ages as well as STI counseling, testing and treatment to men and women.

PPFA Succession Planning Task Force, Member: April 2017 – March 2021
> Task force was charged with addressing some of the systemic challenges of abortion provider training and recruitment at Planned Parenthood affiliates.

Medical Directors Council (MeDC), Mentor: 2015 – present
> Serve as mentor to new Medical Directors/Chief Medical Officers at other PPFA Affiliates.

BetterHealth IT Board of Directors,
> Member: September 2020 – present
> Chair, Compliance Task Force: January 2023 – present
> Board member for the organization responsible for providing revenue cycle services and supporting and rolling out Epic electronic medical records system across PPFA affiliates.

*(Prior to merger and name change January 2015, organization was named Planned Parenthood Health Systems, Inc.)*

**Heywood Medical Group/Henry Heywood Hospital**             Westminster/Gardner, MA

Family Practice/Obstetrics: August 2003 – May 2007
> Meetinghouse Family Practice; 16 Wyman Rd.; Westminster, MA  01473
> > Provision of full-spectrum family medicine including comprehensive family planning and reproductive health care.

**Planned Parenthood League of Massachusetts**              Boston/Worcester, MA

Reproductive Health Care: August 2003 – May 2007
> Provision of comprehensive family planning services to women of all ages.


## Education

**Valley Medical Center Family Practice Residency**          Renton, WA

Chief Resident: 2002-2003
Residency: 2001-2003

Internship: 2000-2001
**Northwestern University Medical School**                                        Chicago, IL
   Degree: MD, 1995-2000
**Northwestern University College of Arts and Sciences**                          Evanston, IL
   Degree: BA, 1991-1995
   Major: Molecular and Cellular Biology        Minor: Religion Studies

Certifications/Special Training
   **Physician for Reproductive Health**, Leadership Training Academy Fellow 2018-2019
   **Basic Life Support/AED**, Provider: renewed 11/2023
   **Title X Family Planning Program Training,** Provider: 2015
   **CLIA Laboratory Director Training**, Training for non-waived laboratory director: 2013
   **Single-rod Hormonal Implant Insertion Training**, Provider: 2011, Certificate #30001820273

Professional Organizations / Positions
   **American Academy of Family Physicians** (AAFP): 1995-present
   **North Carolina Academy of Family Physicians**: 2007-present
   **National Abortion Federation** (NAF): 2003-2005, 2018-present
   **Physicians for Reproductive Health**: 2018-present
   **American College of Obstetricians and Gynecologists**: 2020-present
   **Massachusetts Academy of Family Physicians**: 2003-2007
   **Washington Academy of Family Physicians** (WAFP): 2000-2003
   **American Medical Women's Association** (AMWA): 1995-2000
         Northwestern University Chapter President: 1997-1998
         Vice-President: 1996-1997

Licenses
   **NC Physician License**, active: 143375-2009
   **WV Physician License**, active: 26126
   **VA Physician License,** active: 0101265486
   **SC Physician License,** active: MMD.84073 MD
   **American Board of Family Physicians**, Board Diplomate, Fellow

Honors/Awards
   **Fellow of the American Academy of Family Physicians** – Awarded December 2023
         The Degree of Fellow recognizes AAFP members who have distinguished themselves among their
         colleagues, as well as in their communities, by their service to family medicine, by their advancement
         of health care to the American people, and by their professional development through medical
         education and research. Fellows of the AAFP are recognized as champions of family medicine. They are
         the physicians who make family medicine the premier specialty in service to their community and
         profession. From a personal perspective, being a Fellow signifies not only 'tenure' but additional work
         in your community, within organized medicine, within teaching, and a greater commitment to
         continuing professional development and/or research.
   **Sylvia Clark Award for Creativity in Clinical Services** – Recipient 2023
         Honors a clinical services provider team from a Planned Parenthood affiliate who, through their
         creativity in clinical services, have demonstrated special commitment and ingenuity in applying the
         PPFA mission to ensure access to reproductive and sexual health care for all.
   **Press Ganey Patient Experience Top Performing Provider** 2020
         Ranked in the top 10% of providers across the country for providing the highest level of patient
         experience.
   **2002 Roy Virak Memorial Family Practice Resident Scholarship** Recipient
         Awarded by the Washington Academy of Family Practice on the basis of academic achievement,
         excellence in patient care, and strong service to the community.

# EXHIBIT 2

| Abortion Volume by Method | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Asheville | Chapel Hill | Charlotte | Fayetteville | Wilmington | Winston-Salem |
| | Medication | 486 | 1121 | 780 | 1302 | 433 | 1017 |
| | Procedural | 337 | 1202 | 440 | 705 | 262 | 421 |
| 01/20-12/20 | **Total** | **823** | **2323** | **1220** | **2007** | **695** | **1438** |
| | Medication | 565 | 1486 | 1019 | 1419 | 521 | 1020 |
| | Procedural | 346 | 1283 | 449 | 603 | 283 | 538 |
| 01/21-12/21 | **Total** | **911** | **2769** | **1468** | **2022** | **804** | **1558** |
| | Medication | 1063 | 1782 | 1378 | 1836 | 672 | 1057 |
| | Procedural | 634 | 1775 | 682 | 822 | 387 | 661 |
| 01/22-12/22 | **Total** | **1697** | **3557** | **2060** | **2658** | **1059** | **1718** |
| | Medication | 1617 | 1343 | 1290 | 1565 | 880 | 1005 |
| | Procedural | 1000 | 1645 | 896 | 1077 | 463 | 731 |
| 01/23-12/23 | **Total** | **1657** | **2988** | **2186** | **2642** | **1343** | **1736** |

Bates 0141

# EXHIBIT 3

| | | Medication Abortion Volume by Gestational Age | | | | | |
|---|---|---|---|---|---|---|---|
| | | Asheville | Chapel Hill | Charlotte | Fayetteville | Wilmington | Winston-Salem |
| | Under 5 weeks | 1 | 0 | 0 | 3 | 1 | 6 |
| | 5 weeks | 43 | 98 | 57 | 109 | 20 | 126 |
| | 6 weeks | 117 | 298 | 213 | 362 | 72 | 308 |
| | 7 weeks | 140 | 270 | 219 | 332 | 110 | 232 |
| | 8 weeks | 98 | 235 | 171 | 252 | 122 | 179 |
| | 9 weeks | 54 | 143 | 75 | 161 | 68 | 107 |
| | 10 weeks | 31 | 70 | 43 | 69 | 36 | 52 |
| 01/2020-12/20 | 11 weeks | 2 | 7 | 2 | 14 | 4 | 7 |
| | Under 5 weeks | 3 | 0 | 1 | 1 | 0 | 3 |
| | 5 weeks | 39 | 163 | 48 | 71 | 15 | 69 |
| | 6 weeks | 120 | 428 | 270 | 334 | 75 | 256 |
| | 7 weeks | 133 | 345 | 279 | 334 | 129 | 233 |
| | 8 weeks | 130 | 263 | 215 | 311 | 133 | 208 |
| | 9 weeks | 87 | 167 | 132 | 199 | 102 | 156 |
| | 10 weeks | 50 | 106 | 72 | 146 | 64 | 80 |
| 01/21-12/21 | 11 weeks | 3 | 14 | 2 | 23 | 3 | 15 |
| | Under 5 weeks | 2 | 0 | 2 | 10 | 2 | 0 |
| | 5 weeks | 61 | 181 | 66 | 180 | 37 | 70 |
| | 6 weeks | 208 | 465 | 290 | 441 | 162 | 244 |
| | 7 weeks | 237 | 384 | 355 | 407 | 156 | 240 |
| | 8 weeks | 242 | 329 | 293 | 398 | 136 | 242 |
| | 9 weeks | 187 | 243 | 230 | 221 | 101 | 166 |
| | 10 weeks | 112 | 155 | 130 | 157 | 77 | 88 |
| 01/22-12/22 | 11 weeks | 14 | 25 | 12 | 22 | 1 | 7 |
| | Under 5 weeks | 3 | 0 | 0 | 4 | 2 | 0 |
| | 5 weeks | 113 | 69 | 34 | 75 | 18 | 46 |
| | 6 weeks | 261 | 272 | 171 | 294 | 124 | 173 |
| | 7 weeks | 364 | 359 | 269 | 395 | 186 | 231 |
| | 8 weeks | 373 | 266 | 330 | 330 | 241 | 220 |
| | 9 weeks | 292 | 233 | 300 | 284 | 161 | 194 |
| | 10 weeks | 186 | 130 | 168 | 159 | 140 | 125 |
| 01/23-12/23 | 11 weeks | 25 | 14 | 18 | 24 | 8 | 16 |

Bates 0142

# EXHIBIT 4

| | | Procedural Abortion Volume by Gestational Age | | | | | |
|---|---|---|---|---|---|---|---|
| | | Asheville | Chapel Hill | Charlotte | Fayetteville | Wilmington | Winston-Salem |
| 01/20-12/20 | Under 5 weeks | 1 | 0 | 0 | 3 | 1 | 0 |
| | 5 weeks | 14 | 33 | 9 | 22 | 3 | 17 |
| | 6 weeks | 51 | 112 | 68 | 91 | 29 | 64 |
| | 7 weeks | 55 | 155 | 73 | 97 | 37 | 51 |
| | 8 weeks | 53 | 114 | 69 | 84 | 45 | 54 |
| | 9 weeks | 32 | 93 | 45 | 72 | 30 | 48 |
| | 10 weeks | 34 | 80 | 35 | 80 | 36 | 38 |
| | 11 weeks | 38 | 98 | 51 | 93 | 35 | 52 |
| | 12 weeks | 29 | 70 | 42 | 67 | 25 | 43 |
| | 13 weeks | 30 | 62 | 30 | 54 | 21 | 40 |
| | 14 weeks | 1 | 82 | 18 | 42 | 0 | 14 |
| | 15 weeks | 0 | 46 | 0 | 0 | 0 | 0 |
| | 16 weeks | 0 | 51 | 0 | 0 | 0 | 0 |
| | 17 weeks | 0 | 64 | 0 | 0 | 0 | 0 |
| | 18 weeks | 0 | 51 | 0 | 0 | 0 | 0 |
| | 19 weeks | 0 | 36 | 0 | 0 | 0 | 0 |
| | 20 weeks | 0 | 38 | 0 | 0 | 0 | 0 |
| | 21 weeks | 0 | 17 | 0 | 0 | 0 | 0 |
| | Under 5 weeks | 0 | 0 | 0 | 2 | 0 | 0 |
| | 5 weeks | 15 | 40 | 7 | 14 | 2 | 19 |
| | 6 weeks | 50 | 136 | 64 | 78 | 18 | 66 |
| | 7 weeks | 46 | 115 | 77 | 57 | 29 | 71 |
| | 8 weeks | 61 | 85 | 53 | 92 | 49 | 79 |
| | 9 weeks | 44 | 70 | 49 | 70 | 32 | 61 |
| | 10 weeks | 27 | 55 | 36 | 45 | 37 | 45 |
| | 11 weeks | 43 | 107 | 59 | 91 | 52 | 71 |
| | 12 weeks | 36 | 97 | 57 | 75 | 33 | 68 |
| | 13 weeks | 24 | 65 | 34 | 41 | 31 | 41 |
| | 14 weeks | 0 | 92 | 13 | 38 | 0 | 16 |
| | 15 weeks | 0 | 75 | 0 | 0 | 0 | 1 |

Bates 0143

| | | Asheville | Chapel Hill | Charlotte | Fayetteville | Wilmington | Winston-Salem |
|---|---|---|---|---|---|---|---|
| | | | **Procedural Abortion Volume by Gestational Age** | | | | |
| 01/21-12/21 | 16 weeks | 0 | 72 | 0 | 0 | 0 | 0 |
| | 17 weeks | 0 | 96 | 0 | 0 | 0 | 0 |
| | 18 weeks | 0 | 57 | 0 | 0 | 0 | 0 |
| | 19 weeks | 0 | 56 | 0 | 0 | 0 | 0 |
| | 20 weeks | 0 | 37 | 0 | 0 | 0 | 0 |
| | 21 weeks | 0 | 28 | 0 | 0 | 0 | 0 |
| 01/22-12/22 | Under 5 weeks | 1 | 2 | 0 | 3 | 0 | 0 |
| | 5 weeks | 10 | 59 | 7 | 38 | 4 | 28 |
| | 6 weeks | 42 | 179 | 57 | 104 | 35 | 85 |
| | 7 weeks | 58 | 144 | 88 | 112 | 61 | 89 |
| | 8 weeks | 93 | 122 | 86 | 100 | 51 | 102 |
| | 9 weeks | 82 | 128 | 86 | 88 | 49 | 78 |
| | 10 weeks | 52 | 88 | 68 | 47 | 35 | 43 |
| | 11 weeks | 111 | 143 | 89 | 128 | 65 | 102 |
| | 12 weeks | 87 | 97 | 108 | 105 | 51 | 68 |
| | 13 weeks | 66 | 110 | 68 | 58 | 35 | 43 |
| | 14 weeks | 25 | 135 | 25 | 39 | 1 | 23 |
| | 15 weeks | 4 | 108 | 0 | 0 | 0 | 0 |
| | 16 weeks | 2 | 117 | 0 | 0 | 0 | 0 |
| | 17 weeks | 1 | 116 | 0 | 0 | 0 | 0 |
| | 18 weeks | 0 | 94 | 0 | 0 | 0 | 0 |
| | 19 weeks | 0 | 86 | 0 | 0 | 0 | 0 |
| | 20 weeks | 0 | 26 | 0 | 0 | 0 | 0 |
| | 21 weeks | 0 | 21 | 0 | 0 | 0 | 0 |
| | Under 5 weeks | 0 | 0 | 0 | 1 | 0 | 0 |
| | 5 weeks | 7 | 30 | 13 | 18 | 3 | 16 |
| | 6 weeks | 43 | 126 | 36 | 95 | 21 | 62 |
| | 7 weeks | 110 | 176 | 78 | 150 | 56 | 100 |
| | 8 weeks | 126 | 150 | 139 | 134 | 38 | 106 |

Bates 0144

| Procedural Abortion Volume by Gestational Age | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Asheville | Chapel Hill | Charlotte | Fayetteville | Wilmington | Winston-Salem |
| | 9 weeks | 119 | 133 | 150 | 126 | 74 | 88 |
| | 10 weeks | 127 | 115 | 102 | 126 | 51 | 77 |
| | 11 weeks | 182 | 157 | 145 | 176 | 87 | 119 |
| | 12 weeks | 142 | 145 | 149 | 167 | 79 | 114 |
| | 13 weeks | 78 | 65 | 52 | 45 | 22 | 37 |
| | 14 weeks | 34 | 114 | 15 | 39 | 3 | 12 |
| | 15 weeks | 17 | 74 | 0 | 0 | 0 | 0 |
| | 16 weeks | 6 | 79 | 0 | 0 | 0 | 0 |
| | 17 weeks | 7 | 92 | 0 | 0 | 0 | 0 |
| | 18 weeks | 2 | 99 | 0 | 0 | 0 | 0 |
| 01/23-12/23 | 19 weeks | 0 | 69 | 0 | 0 | 0 | 0 |

Bates 0145

# EXHIBIT 5

| Complications from 01/2020 - 12/2023* | |
|---|---|
| **Type of Complication** | **Count** |
| Allergic Reaction | 2 |
| Hemorrhage | 27 |
| Hematometra | 2 |
| Incomplete AB/Retained POCs/Debris | 210 |
| Laceration | 1 |
| Medication Error | 2 |
| Minor Infection | 10 |
| Ongoing/Unintended Pregnancy | 201 |
| Other Injury (incl. nausea, dizziness, etc) | 16 |
| Pain/Bleeding | 105 |
| Perforation | 4 |
| Seizures/Vaso-vagal Reaction | 6 |
| Serious Infection | 7 |
| Spontaneous Abortion | 2 |
| Thromboembolic Events | 1 |
| **TOTAL** | **596**** |

*Chart represents total number of complications, not total number of patients with complications. Some patients may have had more than one complication.
** Of these, 34 required transfer to a hospital.

Bates 0146

# EXHIBIT 6

| Pre 12-week Complications Resulting in Hospital Transfer for 1/1/2020-12/31/2023 | | | | | |
|---|---|---|---|---|---|
| Complication | Weeks LMP | Type of AB | Health Center | Year | Hospital Status |
| Incomplete AB | 6 | Medication | Asheville Health Center | 2020 | Treated & released in stable condition |
| Incomplete AB | 9 | Medication | Winston-Salem Health Center | 2020 | Admitted for treatment & released in stable condition |
| Seizure | 10 | Procedural | Chapel Hill Health Center | 2020 | Treated & released in stable condition |
| Bleeding/Hemorrhage | 11 | Procedural | Winston-Salem Health Center | 2020 | Treated & released in stable condition |
| Incomplete AB | 9 | Medication | Winston-Salem Health Center | 2021 | Treated & released in stable condition |
| Seizure | 8 | Medication | Wilmington Health Center | 2021 | Treated & released in stable condition |
| Perforation | 7 | Procedural | Chapel Hill Health Center | 2021 | Treated & released in stable condition |
| Bleeding/Hemorrhage | 9 | Procedural | Fayetteville Health Center | 2021 | Treated & released in stable condition |
| Perforation | 8 | Procedural | Chapel Hill Health Center | 2021 | Admitted for treatment & released in stable condition |
| Bleeding/Hemorrhage | 6 | Procedural | Chapel Hill Health Center | 2021 | Admitted for treatment & released in stable condition |
| Bleeding/Hemorrhage | 11 | Procedural | Winston-Salem Health Center | 2021 | Treated & released in stable condition |
| Bleeding/Hemorrhage | 8 | Procedural | Chapel Hill Health Center | 2022 | Treated & released in stable condition |
| Incomplete AB | 10 | Medication | Chapel Hill Health Center | 2022 | Admitted for treatment & released in stable condition |
| Incomplete AB | 10 | Medication | Wilmington Health Center | 2023 | Treated & released in stable condition |
| Allergic Reaction | 10 | Procedural | Chapel Hill Health Center | 2023 | Treated & released in stable condition |
| Bleeding/Hemorrhage | 10 | Procedural | Chapel Hill Health Center | 2023 | Treated & released in stable condition |
| Bleeding/Hemorrhage | 6 | Procedural | Chapel Hill Health Center | 2023 | Treated & released in stable condition |

Bates 0147

# EXHIBIT 7

| Post 12-week Complications Resulting in Hospital Transfer for 1/1/2020-12/31/2023 | | | |
|---|---|---|---|
| Complication | Weeks LMP | Health Center | Year | Hospital Status |
| Bleeding/Hemorrhage | 14 | Chapel Hill Health Center | 2020 | Treated & released in stable condition |
| Incomplete AB | 13 | Winston-Salem Health Center | 2020 | Treated & released in stable condition |
| Bleeding/Hemorrhage | 21 | Chapel Hill Health Center | 2020 | Admitted for treatment & released in stable condition |
| Incomplete AB | 14 | Chapel Hill Health Center | 2020 | Treated & released in stable condition |
| Incomplete AB | 13 | Winston-Salem Health Center | 2020 | Treated & released in stable condition |
| Bleeding/Hemorrhage | 15 | Chapel Hill Health Center | 2021 | Treated & released in stable condition |
| Incomplete AB | 12 | Asheville Health Center | 2021 | Treated & released in stable condition |
| Bleeding/Hemorrhage | 15 | Chapel Hill Health Center | 2022 | Admitted for treatment & released in stable condition |
| Bleeding/Hemorrhage | 17 | Chapel Hill Health Center | 2022 | Treated & released in stable condition |
| Bleeding/Hemorrhage | 19 | Chapel Hill Health Center | 2022 | Treated & released in stable condition |
| Incomplete AB | 19 | Chapel Hill Health Center | 2022 | Treated & released in stable condition |
| Bleeding/Hemorrhage | 14 | Asheville Health Center | 2022 | Treated & released in stable condition |

Bates 0148

| Post 12-week Complications Resulting in Hospital Transfer for 1/1/2020-12/31/2023 | | | | |
|---|---|---|---|---|
| **Complication** | **Weeks LMP** | **Health Center** | **Year** | **Hospital Status** |
| Bleeding/Hemorrhage | 17 | Chapel Hill Health Center | 2023 | Treated & released in stable condition |
| Bleeding/Hemorrhage | 17 | Chapel Hill Health Center | 2023 | Treated & released in stable condition |
| Bleeding/Hemorrhage | 19 | Chapel Hill Health Center | 2023 | Treated & released in stable condition |
| Bleeding/Hemorrhage | 17 | Chapel Hill Health Center | 2023 | Admitted for treatment & released in stable condition |
| Syncope | 19 | Chapel Hill Health Center | 2023 | Treated & released in stable condition |

Bates 0149