# EXHIBIT D

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


PLANNED PARENTHOOD SOUTH   )

ATLANTIC, et al.,       )

   Plaintiffs      )

             )

    vs.        )

             )

JOSHUA STEIN, et al.,    )

   Defendants      )

             )

    and        )

             )

PHILIP E. BERGER, et al.,   )

   Intervenor-Defendants   )

REMOTE DEPOSITION

OF

SUSAN BANE, M.D., Ph.D.

January 31, 2024, 1:33 P.M.


PREPARED BY: Susan A. Hurrey, RPR

Discovery Court Reporters

and Legal Videographers, LLC

4208 Six Forks Road

Suite 1000

Raleigh, North Carolina 27609

919-424-8242

www.discoverydepo.com

1

A P P E A R A N C E S:

Counsel for the Plaintiff Beverly Gray:

                    American Civil Liberties Union Foundation
                    By: Ryan Mendias, Esquire
                    125 Broad Street, 18th Floor
                    New York, New York 10004
                    212-549-2633
                    Rmendias@aclu.org
                    ACLU Of North Carolina Legal Foundations
                    By: Jaclyn A. Maffetore, Esquire
                    P.O. Box 28004
                    Raleigh, North Carolina 27611-8004
                    919-834-3466
                    jmaffetore@acluofnc.org

Plaintiffs:

                    Planned Parenthood Federation of America
                    By: Vanessa Pai-Thompson, Esquire
                        Hannah Swanson, Esquire
                        Anjali Salvador, Esquire
                    1110 Vermont Avenue, NW
                    Suite 300
                    Washington, DC 20005
                    202-973-4800
                    vanessa.pai-thompson@ppfa.org,
                    hannah.swanson@ppfa.org,
                    vanisha.kudumuri@ppfa.org
                    Counsel for Planned Parenthood South Atlantic

Defendants:

                    North Carolina Department of Justice
                    By:  Priya Narasimhan, Esquire
                    114 West Edenton Street
                    Raleigh, North Carolina 27603
                    919-716-6421
                    pnarasimhan@ncgov.gov
                    Counsel for Attorney General Joshua Stein

2

A P P E A R A N C E S:
(continued)

                    Ward and Smith
                    By: W. Ellis Boyle, Esquire
                    751 Corporate Center Drive, Suite 300
                    Raleigh, North Carolina 27607
                    919-277-9187
                    weboyle@ardandsmith.com
                    Counsel for the North Carolina Medical Board
                    and North Carolina Board of Nursing
                    Alliance Defending Freedom
                    By: Kevin Theriot, Esquire
                    15100 N. 90th Street
                    Scottsdale, Arizona 85260
                    800-835-5233

                    Bell Davis Pitt
                    By: Kevin G. Williams, Esquire
                    100 North Cherry Street, Suite 600
                    Winston-Salem, North Carolina 27101
                    336-722-3700
                    kwilliams@belldavispitt.com
                    Counsel for the District Attorney Defendants
                    (with the exception of Jim O'Neill)

                    North Carolina Department of Justice
                    By: Michael Bulleri, Esquire
                    114 West Edenton Street
                    Raleigh, North Carolina 27603
                    919-716-6600
                    Mbulleri@ncdoj.gov
                    Counsel for the Defendant District Attorney
                    Jim O'Neill

                    North Carolina Department of Justice
                    By: Colleen Crowley, Esquire
                    114 West Edenton Street
                    Raleigh, North Carolina 27602-0629
                    919-716-0091
                    ccrowley@ncjog.gov
                    Counsel for Secretary Kinsley of the
                    Department of Health and Human Services

3

Case 1:23-cv-00480-CCE-LPA   Document 94-4   Filed 03/01/24   Page 4 of 139

A P P E A R A N C E S:

(continued)

ALSO PRESENT:

                    Valentina De Fex

                    Cecilia Dos Santos

                    Kyla Eastling, Esquire

                    Meghan Fernandez

                    Ellis Foxwood

                    Vanisha Kudumuri

                    Shealyn Massey

                    Tallin Moyer

                    Elizabeth O'Brien

                    Ella Spottswood

4

Case 1:23-cv-00480-CCE-LPA   Document 94-4   Filed 03/01/24   Page 5 of 139

I N D E X

E X A M I N A T I O N S

EXAMINATION                                                          PAGE


Examination by Ms. Pai-Thompson                                        5


Examination by Mr. Boyle                                             110

E X H I B I T S

NUMBER                   DESCRIPTION                                 PAGE


Ex-25  Dr. Bane's Expert Report and C.V.                              30

Ex-26  ASA Statement                                                 35

Ex-27  Addendum to December 2023 Report of Dr. Bane                   61

Ex-28  Textbook Pages, 109-112, 130-132, 156-159                     61

Ex-29  Desai Study                                                   83

Ex-30  Induced Abortion Provision Among a National                   93

       Sample of Obstetrician-Gynecologists

Ex-31  Immediate Complications After Medical Compared                97

       with Surgical Termination of Pregnancy

Ex-32  Letter to Editor                                             102

5

Case 1:23-cv-00480-CCE-LPA   Document 94-4   Filed 03/01/24   Page 6 of 139

1                    SUSAN BANE, M.D., Ph.D., after having been

2     first duly sworn, was examined and testified as follows:

3     BY MS. PAI-THOMPSON:

4         Q.  So Dr. Boyle -- Dr. Bane, I'm sorry.  I was of course

5     looking at Mr. Boyle's name and you'll see me drinking coffee

6     during our deposition and you'll understand why.  I'm on the

7     West Coast, so it's early for me.  Still early for me.

8              So my name is Vanessa Pai-Thompson and I am one of the

9     lawyers representing Planned Parenthood South Atlantic in this

10    case.

11        A.  Nice to meet you.

12        Q.  Nice to meet you as well.  So I'm going to begin by

13    just kind of going through some of what I'll think of as our

14    agreed ground principals for the deposition.  A lot of this

15    will be duplicative of what you went over on August 31st of

16    last year, but we just have to do it again since we're back

17    here again.

18        A.  Okay.

19        Q.  And so just beginning with your having taken an oath.

20    Do you understand that the oath that you take here in a

21    deposition is the same as taking an oath in court?

22        A.  I do.

23        Q.  And that we have our court reporter here helping us

24    today who will be taking down everything that you say and

25    everything that I or Mr. Boyle say.

1      A.  I do understand that.

2      Q.  Thanks.  And if at any point if you realize you made a

3  mistake, that's completely fine.  Just let me know and we can

4  clarify or correct anything so that you feel like the statement

5  is accurate.

6      A.  Okay.

7      Q.  Throughout the deposition, just as you have been

8  doing, since we do have a court reporter, if you can just make

9  sure that all of your responses are verbal, in words, so like

10  yes rather than uh-huh or a shake of the head.

11      A.  Okay.

12      Q.  And as we go through, I will ask you questions and you

13  finish any responsive answers to those questions.

14      A.  Okay.

15      Q.  And that as part of that, I would just ask that you

16  also let me complete my questions before beginning to respond

17  to those questions.

18      A.  I'll do that.

19      Q.  At some point if it seems like -- and I don't

20  anticipate that this will be something that will come up often,

21  if at all, but just in case, if an answer doesn't respond to my

22  question, it's possible that I will chime in just to ensure

23  that my question was clear and that we have the same

24  understanding of what I'm asking.

25      A.  Okay.

7

1      Q.  It may be that Mr. Boyle, at points during the

2   deposition, makes an objection to a question that I have asked.

3   That is for our record, but unless he instructs you not to

4   answer the question, you're still to answer the question that I

5   posed.

6      A.  Correct.

7      Q.  And we will be taking breaks.  We will endeavor to

8   take a break about every hour or so, but if you feel like you

9   need a break or I have lost track of the clock, please let me

10  know.

11     A.  I will.

12     Q.  And we won't break mid-question, but if you need a

13  break at some point, we can finish up the question that we're

14  doing and then give us a break in.

15     A.  That makes sense.

16     Q.  There are just two other things that I wanted to flag

17  for you given the forum that we're in, because if it were me

18  and this just happened, I could imagine it feeling

19  disrespectful and I just want to make sure that you don't feel

20  that way at any point during the deposition.

21     A.  Okay.

22     Q.  The first is that I will at some point probably be

23  looking down or looking away from the camera and not at you.  I

24  am someone who will always use a certain amount of paper.  So

25  like you I have some paper documents in front of me as well.

8

1   So that's not a sign that I'm not listening or a sign of

2   disrespect.  It's just that I may be looking down from time to

3   time.

4        A.   Yeah.  And I have a binder that has the documents from

5   today -- my expert report.  And then on this side is a binder

6   with the documents from the first deposition and a few overlap.

7   So if I'm going that way, that's what I'm doing.

8        Q.   Fabulous.  Thank you.  I appreciate that.  And I did

9   just want to note if everyone who is observing can just check

10  to make sure that they are muted so that we don't have any

11  break in.  I think there was one that just happened.  So if

12  folks can just double check, that would awesome.

13       The second thing is -- and this is really just to try

14  to avoid us talking over one another potentially during the

15  deposition because that makes it difficult for court reporters

16  under any circumstances, but especially in a Zoom context.  So

17  it may be that at some point I put my hand up, if for example

18  your audio goes out or I can't hear what you're saying just so

19  that I'm not talking over you.  That's not something I would

20  ever do if we were in person together and I know it might feel

21  weird.  So I just want to let you know if I do that, that's

22  why.  Just so we're keeping the transcript as clean as we can.

23       A.   Okay.

24       Q.   So I now have some of the sort of background questions

25  that feel a little bit awkward and uncomfortable to ask and I

9

1   imagine to answer but that are important for us to go through.

2   So the first is whether you're dealing with any illness that

3   would impact your memory or prevent you from being able to

4   understand my questions today?

5        A.  No, I am not.

6        Q.  Thank you.  Are you taking any substances that would

7   impact your memory or prevent you from being able to understand

8   my questions today, such as medication?

9        A.  No, I'm not.

10       Q.  Is there anything else that's currently impacting your

11  ability to understand and answer my questions today?

12       A.  No, it's not.

13       Q.  Fabulous.  Thank you.  So can you please tell us -- I

14  see that you're in an office.  What city are you located in

15  currently?

16       A.  Wilson, North Carolina.  And I'm actually in my

17  basement of my house.

18       Q.  Well, it's lovely and doesn't look like a basement.

19  So mission accomplished.

20       A.  You should see the rest of it.

21       Q.  The Zoom background is all that matters.

22       A.  Right.

23       Q.  So just from your camera view, I don't see that there

24  is any off-camera seating or anyone off camera in the room?

25       A.  No, there's not.

10

1      Q.  Thank you.

2      A.  I will note, I have a son with special needs who gets

3  off the bus at 2:30 and I share this space with him, but my

4  husband's role is to not let him down here.  But if somebody

5  comes running past -- well, actually there's nobody behind me,

6  but you might hear a few strange noises.  But we'll work on

7  avoiding that.

8      Q.  Fabulous.  And you actually foresaw my next question,

9  which was just if anyone else enters the room at any point

10  during the deposition, just let us know.  It may be that that's

11  a good time for us to take a break, if needed.  So thank you

12  for that.

13      A.  Are there only four of us on the call?

14      Q.  There are more of us on the call, but as observers.

15  So at this point there is -- in terms of screens where you

16  should see images, you should see myself, Mr. Boyle, our court

17  reporter and then yourself, if you have yourself on camera.

18      A.  Yeah.  Okay.

19      Q.  So have that view up.

20      A.  I know last time there were a lot of people, but

21  everybody was on the screen.

22      Q.  Yeah.  It's just -- I think it makes it less

23  distracting.  But yes, there are people who are observing --

24  you don't need to worry that there will be other screens

25  popping up with random questions coming from everywhere.  The

11

1   questions will be coming from me.

2                   MR. BOYLE:  Are we going to identify all the

3   other folks, the lawyers?

4                   MS. PAI-THOMPSON:  We can certainly do that and

5   I appreciate that reminder.  Why don't we do that at this

6   point.

7                   MR. BOYLE:  I might suggest -- and forgive if

8   I'm saying it wrong -- Ms. Pai-Thompson, that you might

9   represent or introduce all the various folks and then we cycle

10  through the other sort of groups of attendants just because I

11  don't know who all these other folks are.

12                  MS. PAI-THOMPSON:  Absolutely.  And I think

13  that I may also -- Hannah Swanson has just joined on video and

14  she may provide me with an assist as well.  But absolutely.  I

15  apologize for not doing that.  I think one that we observed

16  earlier we hadn't, but it's not at all intended to hide

17  information about who is here.

18                  So from my office, Planned Parenthood

19  Federation of America, on the call is Cecilia Dos Santos, Ellis

20  Foxwood, Hannah Swanson.  I'm continuing to scroll.  Shealyn

21  Massey, Valentina De Fex and Vanisha Kudumuri.

22                  And, Hannah, have I missed anyone in my

23  scrolling through?

24                  MS. SWANSON:  I don't think so.  I'll just note

25  for the record that Anjali Salvador, Vanessa Pai-Thompson and

12

1  myself are the attorneys who rendered appearances in this case

2  and everyone else is simply here as observers.

3            MS. PAI-THOMPSON:  And then I would also note

4  that Ryan Mendias who, Mr. Boyle, you have met in other

5  proceedings is also here, the ACLU and is also counsel for the

6  plaintiffs.

7            And I did notice also that Kyla Eastling with

8  our office has just joined who again, is here just observing.

9            MS. MAFFETORE:  Sorry, one last person.  Jaclyn

10 Maffetore from the ACLU of North Carolina.  I'm on the call as

11 well observing and I am counsel of record on the case.

12            MS. PAI-THOMPSON:  Thank you, Jaclyn.  And my

13 apologies.

14            MR. THERIOT:  I'm Kevin Theriot and I just

15 entered an appearance as counsel of record for the defendants.

16            MR. BOYLE:  And I'm Ellis Boyle and Mr. Theriot

17 and I are counsel on behalf of the defendant intervenors

18 legislative leaders.

19            MS. NARASIMHAN:  This is Priya Narasimhan on

20 behalf of Attorney General Stein, counsel for Attorney General

21 Stein.

22            MR. WILLIAMS:  This is Kevin Williams on behalf

23 of defendant District Attorney Jim O'Neill.

24            MR. BULLERI:  This is Michael Bulleri on behalf

25 of the North Carolina Medical Board.

13

1             MS. CROWLEY:  Colleen Crowley on behalf of the

2    Department of Health and Human Services.

3             MS. PAI-THOMPSON:  Have we covered everyone?

4    Hearing nothing I will --

5             MR. BOYLE:  Did we get Elizabeth O'Brien?  If

6    we did, I'm sorry.  I missed --

7             MS. PAI-THOMPSON:  No.  No.  Absolutely.

8             MS. NARASIMHAN:  Elizabeth O'Brien works at the

9    North Carolina Department of Justice and at least she is on the

10   Zoom so -- this is Priya Narasimhan and I will represent that

11   she represents the other defendant.

12            MS. PAI-THOMPSON:  Fabulous.  Thank you so

13   much.  I was just going to suggest that someone might have

14   stepped away and we might just break if we needed to.

15            Any other appearances that you wanted to note,

16   Mr. Boyle?

17            MR. BOYLE:  I think that covered most

18   everybody, if not everyone, hopefully.

19            MS. PAI-THOMPSON:  Perfect.  Thank you.

20   BY MS. PAI-THOMPSON:

21      Q.  So Dr. Bane, then I'm going to kind of turn back to

22   some of our initial questions.  So we have gone through who's

23   in the room with you, where you are.  Can you describe to me

24   what technology you're using to be part of this call?

25      A.  Sure.  I have a PC laptop and I think this is a Zoom

14

1   meeting.  That's it.

2       Q.  Fabulous.  Do you have any other screens or just the

3   one screen from your laptop?

4       A.  Just one.

5       Q.  Is there any other technology in the room with you?

6       A.  So I do have my phone.  It's upside down, but I do

7   have, as I mentioned, a son with special needs so I like to

8   keep it close by because he has seizures.  In case the school

9   calls me.

10      Q.  Is it on silent?

11      A.  I am getting ready to make sure.  It is.

12      Q.  Okay.  And then understanding the reasons that it's

13  important for you to have it there with you, if at any point

14  you look at the screen of the phone if something comes in, can

15  you please let us know right away?

16      A.  I will.

17      Q.  Perfect.  And then we may have follow-up questions

18  based upon that.

19      A.  Okay.  Can I do this?  So I'll turn it over, but if I

20  silence it that means I can't hear them text me.  Would it be

21  okay if I unmute it so I can have it turned over?  It will be

22  less distracting, I think.

23      Q.  Yes.  Our preference would be that the screen not be

24  facing up.  So yes, that's certainly fine.

25      A.  Okay.  I'm all set.

15

1      Q.  And then this is just kind of following up on what we

2   were talking about.  Do you agree not to communicate with

3   anyone while we're on the record, other than communications

4   that are being transcribed by the court reporter?

5      A.  Absolutely.  Yes.

6            MR. BOYLE:  Objection.

7   BY MS. PAI-THOMPSON:

8      Q.  You described the binders that you have with the

9   reports and the exhibits.  Do you have any other printed

10  documents with you?

11     A.  I have my deposition -- or my expert report, sorry.

12     Q.  Perfect.  Thank you.  Any other documents other than

13  those binders and your report?

14     A.  Not right here, no.

15     Q.  Okay.  So not visible to you?

16     A.  Correct.

17     Q.  Great.  So do you agree not to look at any documents

18  during the deposition other than when we identify a document

19  and are discussing it together on the record with the court

20  reporter?

21            MR. BOYLE:  Objection.  I'll instruct you that

22  that's not part of the rules or a requirement.  And I'll

23  instruct you that that's not -- you don't have to agree to

24  that.

25  BY MS. PAI-THOMPSON:

16

1          Q.  Do you agree that if you look at a document or a

2     source of information while we are on the record that you will

3     identify what you're looking at so that you won't be looking at

4     anything that isn't recorded by our court reporter?

5                    MR. BOYLE:  Objection.  Same objection.  She'll

6     answer questions but...

7                    MS. PAI-THOMPSON:  Sorry, I'm just looking at a

8     note to myself.

9     BY MS. PAI-THOMPSON:

10         Q.  I think that we'll follow up on this more because

11    again, I think that we will have questions about what

12    information you're relying on, and I may just ask you more

13    specific questions as we go along.

14         So moving now to -- basically since you were last here

15    on August 31, 2023.  Do you recall the deposition that you took

16    part in that day?

17         A.  I do.

18         Q.  And you recall there was a court reporter there also

19    taking a transcript at that point?

20         A.  Yes.

21         Q.  Great.  You recall that you were under oath and agreed

22    to testify truthfully there as well?

23         A.  I remember that.

24         Q.  And that you had an opportunity to review the

25    deposition transcript and make any corrections or address any

                                                                  17

1  corrections that you may have had?

2      A.  So I -- I didn't do that immediately afterwards, but I

3  noted some when I was reviewing for this and I had four or five

4  typos that -- for example, they put -- and I may have said it

5  this way, AAPLOG versus ACOG and intertwined those once and I

6  think -- it was minor things.  I think there was an is when it

7  should have been an isn't one time.  I think there were four or

8  five things and I don't think they got sent to you all.

9      Q.  I would ask if at any some point I direct you to a

10 portion of the deposition or transcript where something comes

11 up that you have not corrected in writing already, just let me

12 know.

13     A.  Thank you.

14     Q.  So other than those kind of minor, what it sounds

15 like, typographical issues, is there anything that you want to

16 change about the sworn testify that you gave previously?

17     A.  No.

18     Q.  Other than your expert report in this case, have you

19 submitted any documents in other cases, like declarations or

20 reports since your deposition on August 31st?

21         MR. BOYLE:  Let me just stop and give you an

22 instruction on that.  To the extent that you have given any

23 report such as the one you've given here that's been exchanged

24 to an opposing side like yours was in this case, you can

25 respond to that.  But if it's just an internal report or a

18

1   conversation or correspondence with some other lawyers that

2   have hired you as an expert witness and it hasn't been

3   exchanged to the other side, I will instruct you not to respond

4   and answer in the affirmative or negative for that.

5                    THE WITNESS:  Okay.  So I --

6   BY MS. PAI-THOMPSON:

7       Q.  Do you understand the question?

8       A.  Well, I think I understand it.  So no, I have not done

9   any other reports.  I did submit an addendum yesterday in this

10  case.

11      Q.  Yes.  And when you refer to that, you're referring to

12  the one-page addendum that was accompanied by some textbook

13  pages, correct?

14      A.  Yes.

15      Q.  So other than that -- and again, not including any

16  communications with attorneys, but no other documents submitted

17  in other cases?

18      A.  No.

19      Q.  Have you given any testimony in other cases, either

20  orally or in writing?

21      A.  Since August 31st?

22                    MR. BOYLE:  Object to form.

23  BY MS. PAI-THOMPSON:

24      Q.  Have you given any testimony since August 31st in

25  other cases orally?

19

1          A.  No, I have not.

2          Q.  Have you given any testimony in other cases since

3     August 31st in writing?

4          A.  No.

5          Q.  And again, these will be between August 31, 2023, your

6     deposition that day and today, have you reviewed your report

7     again?

8          A.  My expert report I wrote for today?

9          Q.  Correct.

10         A.  I have, yes.

11         Q.  When did you most recently review it?

12         A.  Again this morning.

13         Q.  Great.  Have you reviewed again the sources that you

14    cited in your report?

15         A.  I have.

16         Q.  Did you review every -- each of the citations that are

17    in your report?

18         A.  I have.

19         Q.  And did you review them in full?

20         A.  Yes.  But I don't have them memorized.

21         Q.  Memorization isn't expected.  Just checking in about

22    review.  Have you conducted any other research since your

23    deposition on August 31st related to this case?

24         A.  Well, I got the textbook that I gave you the addendum,

25    so I reviewed the textbook and, you know, my -- I have reviewed

                                                                    20

 1    the other individuals' declarations, their expert reports,

 2    their depositions, yeah.

 3        Q.  So for the textbook, did you review any pages of that

 4    textbook other than the ones that you sent us with your

 5    addendum?

 6        A.  I read a lot of the textbook.  But there were some

 7    pieces that weren't relevant to this case so...

 8        Q.  Okay.  Do you recall which portions of it you

 9    reviewed?

10        A.  I've got the book.  Do you want me to tell you the

11    chapters?

12        Q.  That would be great.  Thank you.

13        A.  So there's a forward that I reviewed, a preface I

14    reviewed.  Chapter one is Abortion in Historical Perspective.

15    Chapter two is Unintended Pregnancy and Abortion and Public

16    Health Perspective.  Chapter three is Informed Consent,

17    Counseling and Patient Preparation.  Chapter four is

18    Documenting Pregnancy and Gestational Age.  Let me look at

19    chapter five.  I reviewed chapter five.  Let me get back to the

20    table of contents.  Medical Evaluation and Management.  I

21    reviewed chapter six, Procedure Selection.  Chapter seven, Pain

22    Management.  Chapter eight, Medical Abortion and Early

23    Pregnancy.  Chapter nine, Surgical Abortion in First Trimester.

24    Chapter ten, Surgical Abortion After First Trimester.  Let me

25    look.  I skimmed the latter chapters.  Chapter 11.  Chapter 11,

                                                              21

1    Abortion by Labor Induction.  And I would say I skimmed the

2    rest of the chapters.  Let's see.  Actually I went through the

3    whole book, to be honest.

4        Q.  Great.  Well, thank you for going through that with

5    us.

6        A.  I won't say I read every single page.  But I did go

7    through the book.

8        Q.  So is it fair to say that the pages that you sent to

9    us are the ones that you judge most relevant to your opinions

10   in this case?

11       A.  I particularly wanted to -- well, I guess yes.  But

12   there were -- there are other ones.  But -- I'll say yes.

13       Q.  You say that there are other ones.  The ones that you

14   sent us are the ones that you're relying on for the purpose of

15   supporting your opinions in this case, is that correct?

16       A.  Yes.

17              MS. PAI-THOMPSON:  And I am going to just drop

18   into the chat a PDF that is -- that I'll ask to be marked as an

19   exhibit.

20   BY MS. PAI-THOMPSON:

21       Q.  We're not going to go into questions about this right

22   now, but since it's come up I just want to confirm at this

23   point that we're talking about the same document or excerpts?

24       A.  Okay.

25       Q.  And so once that has come up and you're able to open

                                                          22

1   it, if you can scroll through and let me know if that is all

2   the pages that you believe that you sent to us or if there are

3   any that seem to be missing.

4        A.  I'm trying to download it because I remember on the

5   31st, in August when we did this, I couldn't just open them.  I

6   had to download them first.  So just a second.

7        Q.  Let me know if you would like me to screenshare, if

8   that feels more efficient.

9        A.  I'm going to try.

10       Q.  And again, at this point I'm not going to be asking

11  you about the content other than reviewing that it's all of the

12  pages that you believe you sent to us.

13       A.  Yeah.  Okay.

14            (Pause.)

15       Q.  Why don't we do this just because I know how Internet

16  speeds go.  Why don't we just put a pin in this for the moment

17  and then you can go ahead and take that time to have that

18  finish downloading when we take our first break, and then we'll

19  just circle around so that we're not missing any pages.

20       A.  Okay.

21       Q.  So other than the materials that we have identified so

22  far, was there anything else that you have reviewed in

23  preparing for this case between August 31st and today?

24       A.  I reviewed Williams Obstetrics from -- which is a

25  mainstay textbook.  I wanted to refresh myself on some basic

23

1    maternal fetal circulation.  I hadn't reviewed that in a while.

2        Q.  So Williams Obstetrics about maternal fetal

3    circulation.  Were there any other portions of that that you

4    described -- or that you reviewed?

5        A.  No.  Just those areas.

6        Q.  And then other than your attorney, I'm not asking

7    about communications with counsel, have you spoken with anyone

8    about this case since August 31, 2023?

9        A.  No.  My husband, my family.  But not specifics of the

10   case.

11       Q.  When you say your family, other than your husband, who

12   did you speak with?

13       A.  I have grown children who know that I'm doing this.  I

14   have a mom who knows.  I have sisters who know I'm involved in

15   this case.  I mean, so when you say spoke about, people know

16   I'm involved in this case.  My colleagues at work know.  People

17   who -- I'm on the board at AAPLOG.  They know.  But am I

18   getting resources from them, answers from them?  No.  But

19   they're aware that I'm involved in this case.

20       Q.  Understood.  Do they know what opinions you're

21   providing in this case?

22               MR. BOYLE:  Objection.  You can answer.

23               THE WITNESS:  Did you say you can answer?

24               MR. BOYLE:  You can answer.

25               THE WITNESS:  No, they do not.

                                                              24

BY MS. PAI-THOMPSON:

Q.  So the fact of your participation, but not the substance it looks like?

A.  Correct.

MR. BOYLE:  Object to form.

BY MS. PAI-THOMPSON:

Q.  Now, you described -- or referenced earlier having read reports or materials submitted by other people in this case.  Did that include materials prepared by Dr. Christy Boraas?

A.  Yes.

Q.  And which documents -- document or documents created by Dr. Christy Boraas did you review?

A.  Her original declaration, her rebuttal and her new expert report.

Q.  Did you read all of the -- did you read all of the materials cited in those documents?

A.  Do you mean references?

Q.  Yes.

A.  No, I saw what she referenced, but I did not necessarily review every single one of them.

Q.  Did any of the information that you read in the -- or the citations that you saw that she had made in rebuttal, did any of those change any of the opinions that you provided either in writing or in your deposition on August 31st?

25

1       A.  No.

2       Q.  And when you reference the rebuttal, are you referring

3   to the rebuttal report that Dr. Boris submitted in January of

4   2024?

5       A.  No.  I'm talking about when we initially wrote our

6   explanation -- or our declarations last summer, she and Dr.

7   Farris wrote rebuttals.  That's the only thing I was aware of

8   rebuttals that they had done.

9       Q.  So you have not received a copy of a report that she

10  prepared in January of 2024?

11      A.  So I have read one thing, but I thought it was -- I

12  don't know the title of it.  I have read one thing since August

13  of hers.

14      Q.  Okay.  And we can circle back to this if we need to.

15  For Dr. Katherine Farris, can you list for us the documents

16  that you have read that she prepared as well?

17      A.  Her original declaration and her rebuttal to our

18  original declarations and then her expert report this time.

19      Q.  And when you say this time, can you tell us what month

20  you're referring to?

21      A.  It would have been December -- November, December of

22  2023.

23      Q.  Thank you.  Did you read all of the references that

24  were cited in that document?

25      A.  I noted them all, but I can't tell you yes or no that

26

1   I read every one of them.

2       Q.   And same question for the declaration that she

3   provided.  I know that you hadn't read all of them at your

4   initial deposition on August 31st.  Have you read all of her

5   references in that initial declaration since then?

6       A.   I have reviewed them, but I have not read them all.

7       Q.   Has any of the information from either her reports or

8   your review of the records change any of the opinions that you

9   have provided in this case?

10      A.   No.

11      Q.   Have you read written materials provided by Dr.

12  Timothy Johnson?

13      A.   I don't recall that I have.

14      Q.   Okay.  So you don't recall having been provided an

15  expert report from Dr. Johnson in January of 2024, is that

16  correct?

17      A.   That's correct.

18      Q.   How many hours would you say that you have spent

19  preparing your expert report at this point?

20      A.   Just my expert report?

21      Q.   Uh-huh.

22      A.   Probably 30.

23      Q.   And how many hours would you say that you have spent

24  preparing for your deposition today and -- so again, between

25  August 31st and today, how many hours would you estimate you

27

1   have spent preparing for deposition?

2       A.  So I really didn't start preparing for deposition

3   until I knew the date, which I didn't find out maybe a month or

4   so -- no, I can't remember when I found out.  Maybe -- yeah, I

5   think it was early January maybe.  So I would say around 20

6   hours or so.

7       Q.  Okay.  And then other than the time that's been

8   captured by the 30 or so hours that you spent preparing your

9   expert report and the 20 or so hours spent preparing for the

10  deposition, have you spent any other time working on this case

11  which haven't captured through those questions?

12      A.  No.

13      Q.  And you're being paid $500 per hour for your work in

14  this case.  Is that still correct?

15      A.  Yes.

16      Q.  I'm switching gears just a bit.

17      A.  Okay.

18      Q.  Did you attend the March for Life in Washington D.C.

19  on January 19th of this year?

20      A.  I did.

21      Q.  And did you attend any other events while you were in

22  D.C.?

23              MR. BOYLE:  Object to form.

24              THE WITNESS:  Yes.

25  BY MS. PAI-THOMPSON:

28

1       Q.  Did you attend any other events in Washington D.C.

2    while you were there for the March for Life?

3              MR. BOYLE:  Object to form.

4              MS. PAI-THOMPSON:  And you can answer the

5    question.

6              THE WITNESS:  Okay.  Yes, I did.

7    BY MS. PAI-THOMPSON:

8       Q.  What events did you attend?

9       A.  So I attended a reception at Heritage Foundation for

10   AAPLOG and I actually spoke there.  Sorry, it was a busy week.

11   I attended a reception at ADF and I had some internal meetings

12   that weren't events.  Some dinners, but they weren't events.

13   Those are the main things.  And of course the march is all day

14   long.

15      Q.  For the -- you said that you spoke at the AAPLOG

16   reception.  What was your talk about?

17      A.  Having courage to basically stand for what you believe

18   and fight for -- as a doctor that practices life-affirming

19   medicine, to stand for both my maternal and fetal patient.  The

20   theme of this year's march was with every woman -- for every

21   woman with every child or vice versa.  So talked about that.  I

22   talked about the past, present and future of medicine in our

23   field.  My talk was maybe three to five minutes.  So it was

24   extremely brief about what I think about the history of our

25   field, what the present and then future of our field.

29

1        Q.  When you talk about the history of our field, can you

2   -- or your field, can you tell me what the kind of -- give me

3   the gist of that.

4        A.  Yeah.  So I talked a lot about ACOG and AAPLOG's

5   relationship and how we really work together well.  We were

6   included in ACOG cog for years.  And when I say we, I mean

7   physicians who had a pro-life perspective and -- which is a lot

8   of us.  As you know, you know, from all the depositions and the

9   reports that there's a minority of physicians that actually do

10  induced abortions.  And that which actually -- we had

11  collaboration.  And unfortunately that's gone away.  And that

12  we were part of a very large special interest group in ACOG for

13  years.  ACOG special interest groups of all types and there was

14  a pro-life one.  And in 2013, unfortunately ACOG got rid of all

15  their special interest groups.  And so we had -- we formed our

16  own organization.  Even though we had the organization, we were

17  within ACOG as the special interest group.  But we're no longer

18  welcome there.  And that -- so now we're a second voice, second

19  medical organization that takes a life-affirming approach.  So

20  that was historically what I shared.

21       Q.  Thank you.  Did you discuss your involvement in this

22  case at any of the meetings or dinners that you -- I think you

23  mentioned receptions that you attended?

24       A.  I did not.

25       Q.  Who paid for your travel to Washington D.C.?

                                                              30

1       A.  I did.

2       Q.  So I know that you have your copy of your expert

3    report.  I'm going to drop it into the chat as well so that we

4    can -- and ask that it be marked as an exhibit for the purpose

5    of this deposition.  And I'm dropping in what you provided to

6    us.  So your expert report that includes your C.V. as well.

7                         -  -  -

8                (Document marked as Exhibit-25 for

9    identification.)

10                        -  -  -

11   BY MS. PAI-THOMPSON:

12      Q.  Are you able to see that?

13      A.  I am going to try a different way this time.  See if I

14   can get it.

15      Q.  We can also note, we sent to Mr. Boyle this morning

16   the PDF that we would be using for exhibits today.  So if a

17   copy that you have, that you showed printed in front of you is

18   printed from that version that he provided you, you can also

19   look at that.

20      A.  So it's not the one from today.  I mean, it's my final

21   report that I, you know, gave.  But it's not based on your

22   list.  But what I can do is easily pull up your list and

23   compare them, because I think your list is easy to pull up.

24      Q.  And since we're talking about your report that's been

25   produced to us through discovery, and I think we're talking

31

1    about the same document, we'll go ahead and just like with the

2    other -- go through some of it you can reference the paper copy

3    that you have and then we're getting pretty close to where

4    we'll take our first break, and you can follow up with the

5    downloads at that point.

6        A.  That will be fine.

7        Q.  It's going to jump around just a little bit, just so

8    that you know, because we're endeavoring not to repeat

9    information that you have already gone over in your initial

10   deposition.  So if that creates confusion at any point, please

11   let me know and I'll be sure to clarify.

12       A.  Thank you.

13       Q.  Of course.  Directing your training during medical

14   school, you never provided an induced abortion during medical

15   school, correct?

16       A.  Correct.

17       Q.  And you never provided an induced abortion during your

18   residency, correct?

19       A.  I'm going to say correct, but I want to make sure that

20   we put on the record that we're agreeing on what induced

21   abortion is, right?  So the definition when I say correct is

22   the CDC's definition, which is an intervention designed to

23   intervene for a suspected or ongoing pregnancy with the

24   intention of not having a live birth.  So the purpose of the

25   intervention is to end the life of the fetus or the embryo.  So

32

1    produce a dead baby.  I never have done either of those.

2         Q.  And for our reference, you have defined those terms,

3    and then also some other terms related to abortion in your

4    initial deposition on August 31st.  So I will -- we can have a

5    common understanding that we are using those definitions that

6    you gave.  If at some point you feel like you need to redefine

7    or clarify one of them, that's fine.  But thank you for

8    highlighting that and I'll just note that those definitions

9    that you gave will stand.

10        A.  Thank you.

11        Q.  Absolutely.  Now that we have talked, I'm missing --

12   want to make sure that we got an answer to a question.  So you

13   did not provide an induced abortion based on that definition

14   you gave us during residency, correct?

15        A.  Correct.

16        Q.  And you did not provide an induced abortion during

17   your time as a practicing physician, correct?

18        A.  Correct.

19        Q.  And just as a brief clarification on the induced

20   abortion definition, just again to ensure that we're talking

21   about -- we're using shared terms.  Just to be clear, you would

22   not include an induction abortion before viability with the

23   intent to separate the fetus from the patient's body in the

24   definition of induced abortion, is that right?

25        A.  That is correct.  I did those procedures, but my

                                                         33

1    intention was to try to save both knowing that some times the

2    unintended consequence is that the fetal patient doesn't

3    survive.

4        Q.  Okay.  But just to be clear, that -- actually I'm

5    going to withdraw that question.  So you also taught at Barton

6    College from 20 -- you also taught at Barton College, correct?

7        A.  Yes.

8        Q.  That was beginning in 2010?

9        A.  Part time and full time in 2011.

10       Q.  Correct.  And you taught there through 2023, is that

11   correct?

12       A.  Correct.

13       Q.  Have you ever taught any courses involving induced

14   abortion?

15       A.  So -- not at Barton College.  So I did teach a class

16   that was actually -- okay.  So I'm going to correct that last

17   answer.  So I taught a gen 301 class.  I think it was gen 301

18   back then.  It might have been gen 300.  It's called the

19   Capstone course in the humanities in the general education

20   curriculum where students put together critical thinking, oral

21   thinking, writing.  So actually I did teach a class.  When you

22   asked the question, I'm sorry, I was thinking medical -- not

23   Barton.  So yeah, I actually did teach one class.

24       Q.  And just so that we're clear, when you say gen 301,

25   you mean general, that's referring to the general education

34

1    requirement?

2        A.  So at Barton College we have a general education

3    curriculum and then we have a major specific curriculum.

4    Students take both.  And the Capstone course in the general

5    education curriculum is called gen.  And so students all across

6    campus could take that and I had a variety of students in that

7    class.

8        Q.  I think that if -- well, no, we still have time.

9    Sorry, I'm trying to be mindful of the clock because I'm

10   someone who can just roll on through and I don't want to do

11   that to you.

12       So I'm going to refer to your report, if you can pull

13   your copy of that and to paragraph 68 of your report.  And just

14   let me know when you're there.

15       A.  I'm here.

16       Q.  Perfect.  Thank you.  So I'm going to read a passage

17   of this to you and then I'll ask you whether I have read it

18   correctly.  And feel free to let me know if I have missed a

19   word or gotten any incorrect.

20       A.  Before you do, my phone just went off.  So let me look

21   at something real quick.  Okay.  It's not my son.

22       Q.  Great.  Thank you.  And thank you for letting us know.

23       A.  You're welcome.

24       Q.  So in your report in paragraph 68, you say in quotes,

25   as I have examined the literature related to very early

35

1   abortions, I agree with some authors that state diagnosing an

2   ectopic pregnancy as early as possible is a benefit of these

3   protocols.

4        Did I read that accurately?

5   A.  You did.

6   Q.  And you agree with your statement in your report there

7   in paragraph 68 that, quote, diagnosing an ectopic pregnancy as

8   early as possible is a benefit of those protocols, correct?

9   A.  I agree that diagnosing an ectopic pregnancy is

10  beneficial for any woman.  Where I disagree is that it

11  justifies doing an abortion without a documented IUP.

12  Q.  Thank you.  So by these protocols that you're -- that

13  reference in paragraph 68, you're referring to the medication

14  abortion protocols for pregnancies of unknown location, is that

15  correct?

16  A.  Yes.

17  Q.  Okay.

18            MS. PAI-THOMPSON:  So I am going to drop

19  another document into the chat and I will ask that this be

20  marked as an exhibit.  And this again you should have received

21  in the documents that we provided to Mr. Boyle earlier today.

22  This is a statement from ASA.  It's a statement from ASA on the

23  continuum of levels of sedation.

24                      -  -  -

25            (Document marked as Exhibit-26 for

                                                        36

1    identification.)

2                            -  -  -

3    BY MS. PAI-THOMPSON:

4        Q.  Do you have the document that I'm referring to?

5        A.  Yes, I do.

6        Q.  And have you read this document before?

7        A.  Well, I need to look at the one I referenced to make

8    sure -- it doesn't seem like this first page is the same as my

9    first page.

10       Q.  Okay.

11       A.  Do you know the number of my reference for the ASA?

12   If not, I can look.  Let's see.

13                   (Pause.)

14       A.  I'm going to just pull up my hard copy that I have.

15       Q.  And we're at footnote 45 in your report, if that's

16   helpful.

17       A.  I found that.  Thank you.

18       Q.  Yeah.  Absolutely.

19       A.  So mine starts with statement on granting privileges

20   for administration of moderate sedation to practitioners who

21   are not anesthesia professionals.  That's page one of mine.

22       Q.  All right.  I think that we have -- so let's do this.

23   Can you -- the document that I dropped in the chat is short.

24   Can you take a moment to review the first two pages of that

25   document and I will -- the questions I have I think will be --

                                                    37

1    basic enough that given your expertise we'll be fine moving

2    forward.  But let me know if after I have asked the question

3    you feel like you need more time.

4        A.  Okay.

5                    (Pause.)

6        Q.  So looking at the document that I moved into the chat,

7    just clarifying for us non-doctors in the room.  By spontaneous

8    ventilation there, that would be referring to breathing, is

9    that correct?

10       A.  Could I have a minute just to look at the document?

11       Q.  Oh, absolutely.  I'm sorry.  When you said okay, I

12   thought you meant okay, proceed.

13       A.  No.  Give me just a second.

14       Q.  Absolutely.

15                   (Pause.)

16       Q.  So let's actually, Dr. Bane, just given our time and

17   to get us to our first break, I'm actually going to do this.

18   I'm going to ask you some questions about sedation and we'll

19   just do this just independent of the document.  Just based upon

20   your knowledge and expertise.  Is that okay?

21       A.  That's fine.  But I was almost done if you want to

22   refer to the document.

23       Q.  Yeah.  Sure.  Then go for it.

24       A.  Okay.

25                   (Pause.)

38

1      A.  Okay.  You can reference it now.

2      Q.  Okay.  Thank you.  Do you agree with the description

3  of the levels of sedation that are provided in that document?

4              MR. BOYLE:  Objection.  You can answer.

5              THE WITNESS:  Could you repeat the question?

6  BY MS. PAI-THOMPSON:

7      Q.  Yes.  Do you agree with the description of the levels

8  of sedation provided in that document?

9              MR. BOYLE:  Objection.  You can answer.

10              THE WITNESS:  Yes.

11  BY MS. PAI-THOMPSON:

12      Q.  Thank you.  Do you know what kind of sedation options

13  are available at Planned Parenthood South Atlantic?

14      A.  Based on the protocols I reviewed, they have

15  documentation that you can opt for everything except general

16  anesthesia.  However, I believe it was Dr. Farris's deposition

17  that she stated that they don't actually offer deep sedation,

18  even though that is an option on their form.

19      Q.  So your understanding is that Planned Parenthood South

20  Atlantic offers minimal and moderate sedation, but not deep

21  sedation?  Have I summarized that correctly?

22      A.  That is my recollection of reviewing everything.

23      Q.  Great.  And for minimal sedation, a patient is

24  conscious throughout the sedation, is that correct?

25      A.  Conscious, yes, but sometimes asleep.

39

1      Q.  But they can be roused by verbal or physical stimuli?

2      A.  Typically, yes.

3      Q.  And same question for moderate sedation, that a

4  patient is typically conscious during the sedation, and by that

5  I mean the sedation doesn't render them unconscious?

6      A.  Correct.  Typically.  Everybody responds differently,

7  and that's the biggest concern is what you think is moderate

8  sedation can move to deep, what you think is moderate can lead

9  to someone being unarousable and that's the biggest concern

10  with sedation.

11      Q.  And you reference that can lead to a patient being

12  unarousable.  At the point that a patient was unarousable, the

13  provider would know that they were no longer in minimal or

14  moderate sedation, correct?

15          MR. BOYLE:  Objection.

16          THE WITNESS:  I would sure hope so.  There's no

17  information from the protocols that there is somebody different

18  than the person doing the induced abortion, the surgical

19  abortion that's separately monitoring the person.  So I think

20  there is concern that they may not recognize if they have moved

21  into a level of deeper sedation.  And I think that's consistent

22  with the document that I provided that that's a major concern

23  of the American Society of Anesthesiologists.

24  BY MS. PAI-THOMPSON:

25      Q.  And that's because of your understanding that there --

40

1  withdrawn.  That was going to be a confusing question, so I'm

2  going to ask it differently.  What I hear you expressing there

3  is that if there wasn't another person in the room other than

4  the provider, they might be focused on the procedure and not

5  notice.  Is that a fair summary?

6              MR. BOYLE:  Objection.

7              THE WITNESS:  I think that's one element of it

8  if they're responsible for both of those.  So when I'm in the

9  operating room I'm focused on doing my surgery and I'm trusting

10  the anesthesia professional to monitor all the various things,

11  responsiveness, airway, cardiovascular system, spontaneous

12  ventilation.  So I am -- I don't understand that that is

13  happening based on the protocols that I have seen at Planned

14  Parenthood.  Also recognizing that I have no idea all the other

15  protocols that are happening across the state knowing that, you

16  know, only about 30 percent of the surgical abortions are

17  happening -- abortions are happening at the Planned Parenthood.

18  We have many other facilities that are happening.  And so I'm

19  very concerned based on what the American Society of

20  Anesthesiologists -- they talk about individuals who are not

21  professionals having the adequate level of training to be able

22  to recognize that somebody is -- you know, got normal

23  cardiovascular function, they're spontaneously breathing.  So

24  that's my concern.

25  BY MS. PAI-THOMPSON:

                                                        41

1       Q.  Is it your opinion that only an anesthesiologist or a

2   nurse anesthetist would be qualified to provide or supervise

3   moderate sedation?

4              MR. BOYLE:  Objection.

5              THE WITNESS:  My opinion is consistent with

6   what the American Society of Anesthesiologists suggests is that

7   it takes special training and education.  In their document

8   that I cited, they talk about non-anesthesiologist sedation

9   practitioners and the special training they get.  And I don't

10  have evidence that that is occurring across the State of North

11  Carolina in our abortion clinics.

12  BY MS. PAI-THOMPSON:

13      Q.  So is it your opinion that no one else is qualified to

14  provide or supervise moderate sedation other than

15  anesthesiologists or people who are receiving that special

16  training that you just referred to?

17             MR. BOYLE:  Objection.  You can answer.

18             THE WITNESS:  So I'll reference -- I'm sorry,

19  but it doesn't have page numbers.  But under section one,

20  non-anesthesiologist sedation practitioners.  It says here that

21  non-anesthesiologist sedation practitioners may directly

22  supervise patient monitoring in the administration of sedatives

23  -- sedative and analgesic medications by a supervised sedation

24  professional.  Alternatively, a person may perform these

25  functions with the provision that the individual monitoring the

                                                            42

1    patient should be distinct from the individual monitoring the

2    diagnostic and therapeutic procedures.  Single operator

3    sedation should not be permitted and is deemed unsafe.

4              So I follow their recommendations because

5    they're the experts in anesthesiology and sedation.

6    BY MS. PAI-THOMPSON:

7        Q.  And just one clarification in the paragraph that you

8    just read.  I think -- at least what is in my printout, the

9    third line from the top of that paragraph, I think that you

10   said should be distinct from the individual monitoring the

11   diagnostic or therapeutic procedure.  Does the document

12   actually say the individual performing the diagnostic or

13   therapeutic procedure?

14       A.  I'm sorry, which line are you referencing?

15       Q.  On my printout -- let's do it this way.  It is the

16   second to last sentence.  Just before see practice guidelines

17   for moderate procedural sedation.

18       A.  Alternatively, they may personally perform these

19   functions with the provision that the individual monitoring the

20   patient should be distinct from the individual performing the

21   diagnostic or therapeutic procedure.

22       Q.  Can you tell me, what date is the last amended date on

23   the version that you have?

24       A.  2021.

25       Q.  October 13, 2021?

43

1        A.  Mine actually says October 12, 2021.

2        Q.  Okay.  Thank you.  And we are almost at our break

3    point, so I'll give you that.  So is your opinion based upon

4    anything other than what is in this ASA document that we just

5    talked about?

6                MR. BOYLE:  Object to form.

7                THE WITNESS:  Could you repeat that?

8                MS. PAI-THOMPSON:  Yes.  Absolutely.

9    BY MS. PAI-THOMPSON:

10       Q.  I'm referring back to your testimony that a person

11   should be an anesthesiologist or should have the training

12   that's referenced in this ASA document in order to provided

13   moderate sedation?

14       A.  So my opinion is --

15                MR. BOYLE:  Object to form.  You can answer.

16                THE WITNESS:  Okay.  So my opinion follows what

17   this document says as it relates to the safety of a patient.

18   This document doesn't address pain management in a patient and

19   that's also a concern for me that we -- it's hard to believe we

20   would accept a level of pain that women describe that for

21   abortions that we would not accept for other procedures, all in

22   the name of doing it in an outpatient setting.  And so I do --

23   -- I do want patients to not -- I want to control their pain as

24   much as possible, their physical pain, in the case of

25   anesthesia.

                                                              44

BY MS. PAI-THOMPSON:

Q.  Thank you.  Referring to the comments that you just made.  Do you think this is a result of abortion patients being treated less well than patients seeking other obstetric or gynecological care?

A.  I think sometimes we get -- I think there is such a desire for everything to be done in an abortion clinic, in an outpatient setting that sometimes that overrides the thought that we can more safely provide better, deeper sedation for a second trimester abortion.  Even a first trimester abortion can be very painful.  So I do think sometimes, yeah, abortion is treated differently by the people who are providing the abortions.

Q.  So is it your opinion that it would be safer to provide deep sedation to every patient obtaining a second trimester abortion?

A.  No, that's not what I'm saying.

Q.  Are you -- do you -- is it your opinion that it would be better from a pain management perspective?

MR. BOYLE:  Object to form.

THE WITNESS:  So I think you're going to -- you'll have a conversation with a woman to talk about her options and her preference.  Some patients over my 20-plus years of practicing will walk in and say there is no way I'm getting "X" procedure done unless I am asleep.  And there are

45

1   other people who want more minimum sedation.  So I do think you

2   can't -- it's a hypothetical to try to say for everyone.  But I

3   think we have to be careful that we don't sacrifice and hurt

4   women all in the name of trying to stay out of the hospital.

5   BY MS. PAI-THOMPSON:

6       Q.  Thank you.  So for the safety piece, is there anything

7   that you are basing your opinion on other than the ASA

8   guidelines that you have referenced?  And by that I mean

9   experience, other papers, things like that.

10      A.  So I have only documented in my expert report this.

11  But from an -- from a 20-plus year experience doing thousands

12  of surgeries, absolutely.  My experience definitely tells me

13  that I can concentrate more on the job that I'm responsible for

14  if I know that there's a competent person who's making sure my

15  patient stays alive.  And so, you know, that most definitely

16  influences it.  And I do care about pain management.  So it

17  would be a combination of experts like the American Society of

18  Anesthesiologists, as well as anecdotal experience as an

19  obstetrician/gynecologist.

20      Q.  Sorry, I don't mean to cut off.

21      A.  I just said obstetrician/gynecologist.

22      Q.  Yes.  So you reference experts like ASA.  Are there

23  other sources or other associations whose opinions you're

24  relying on for your opinion here?

25      A.  This is the main society that I relied on and so I'll

46

1  have to say just them in terms of a professional organization.

2  And there are studies out there also that look at, you know,

3  pain control, but I chose not to cite them.  I chose to site

4  more of -- kind of like with ACOG, practice bulletins or

5  committee opinions.  A conglomeration of the sites -- of the

6  studies that lead to a statement.

7      Q.  Okay.  And then just a couple more quick questions

8  before we'll take our first break.  So looking at general

9  anesthesia itself.  Does general anesthesia alone carry medical

10 risks?  And by alone I mean risks that are separate from

11 whatever the risks are of the procedure that the general

12 anesthesia is connected to.

13     A.  All sedation carries risks.

14     Q.  So with respect to general anesthesia, what kind of

15 risks does it carry?

16     A.  Well, for that one, you're actually intubating someone

17 and so, you know, there's a risk of intubation in terms of not

18 being properly intubated or actually tearing, for example, the

19 esophagus when someone is intubated or something like that.  So

20 there's that risk.  There's risks -- pregnant women have risk

21 for -- greater risk for aspiration than do other women that are

22 not pregnant.  You're taking someone and you're putting them in

23 such a deep sedation, there are some people that take a while

24 to come out of that and I have even had patients who have had

25 to stay intubated.  So yes, there are risks.

47

1    Q.  Thank you.  When you say that there are risks that a

2   patient might not be properly intubated, what risks does that

3   create?

4    A.  Well, if you think you're in the trachea and you're

5   actually in the esophagus the person is not going to be getting

6   adequate oxygenation and could have cardiovascular collapse,

7   stroke, a heart attack.  So you have to properly intubate

8   someone.  And then in terms of the -- it's a metal instrument

9   that people use to intubate so you can actually have tears.  It

10  can cause bleeding.  So those are the main things.

11            MR. BOYLE:  We have been going for about an

12  hour if you're at a spot where you might take a break.

13            MS. PAI-THOMPSON:  Yeah.  I just have two quick

14  follow-up questions on Dr. Bane's comments about the risks and

15  then we are at a perfect point for a break.  Thank you.

16  BY MS. PAI-THOMPSON:

17   Q.  So Dr. Bane, you mentioned that with some patients

18  they stay in deep sedation, like they have a tougher time

19  coming out and may have to remain intubated.  What are the kind

20  of risks that go along with remaining intubated?

21   A.  The biggest one is that you never get extubated, you

22  know.  And so that can lead to death.  It can lead to

23  aspiration pneumonias.  All the things that go with a long term

24  intubation.  You may have to get a trachea -- it often is a

25  sign of some underlying neuromuscular condition -- other

48

1    conditions besides neuromuscular.  But often if breathing

2    doesn't come back.  You know, I have seen it and then a patient

3    gets diagnosed with myasthenia gravis or ALS or something like

4    that.  So it's uncommon, but it can happen.  The majority of

5    people do just fine, but there are risks with general

6    anesthesia.

7        Q.  Thank you.  And then my final question before our

8    break.  For pregnant women you said that there is increased

9    risk of aspiration.  Can you describe what aspiration means,

10   what that is, kind of how that looks?

11       A.  Sure.  So, you know, if you have ever had surgery, you

12   have been told don't eat anything after midnight, maybe you can

13   drink some water, brush your teeth the next day.  So you

14   basically don't want food in the stomach because when you have

15   general anesthesia it can relax the sphincters, and there's an

16   esophageal sphincter between the stomach and the esophagus,

17   which is the tube that goes to the stomach after you swallow.

18   And so if food gets refluxed back or contents of the stomach

19   and get into the lungs, that can lead to infection.

20       Q.  Are there any other risks beyond infection of

21   aspiration?

22       A.  I'm sure there are, but not that I can recall right

23   now.

24       Q.  Perfect.  And I'm sorry that I promised one question

25   and there were two, but I do think this is a good time to take

49

1    our first break.  Should we say -- does 10 minutes feel like

2    enough?

3                    THE WITNESS:  Sure.

4                    MR. BOYLE:  Sure.

5                    MS. PAI-THOMPSON:  And then for our court

6    reporter, when we come back I'll ask just for a time check.

7                    MR. BOYLE:  I have got one hour and seven

8    minutes.

9                    MS. PAI-THOMPSON:  Great.  Thank you.  We'll

10   see everyone in 10.

11                        -   -   -

12                    (A break was taken, 2:44 p.m. - 3:00 p.m.)

13                        -   -   -

14   BY MS. PAI-THOMPSON:

15       Q.  So Dr. Bane, I'm going to be talking more about your

16   expert report.  So just in terms of what you have in front of

17   you.  And I'll be looking at paragraph 56, but referring back

18   to our earlier discussion about just ensuring that we have --

19   that we're using the same definitions so we have common

20   understand.  Just kind of a preference question for that.  So

21   can you tell us -- or just describe to us how you would define

22   a missed abortion?

23       A.  Yes.  So a missed abortion is when a woman is

24   asymptomatic, so she doesn't have any bleeding or cramping, and

25   typically we're doing an ultrasound for dating and we don't see

50

1   a heartbeat.

2       Q.  Thank you.  So in paragraph 56 of your expert report,

3   you identify some things that can happen when an embryo or

4   fetus has no cardiac activity and the pregnant person's body is

5   physiologically preparing to expel it.  Do you see the section

6   that I'm referring to?

7       A.  Yes, I do.

8       Q.  Perfect.  And is what you're describing there what can

9   happen with a missed abortion, as you just defined it?

10      A.  Would you clarify the question?  I'm sorry.

11      Q.  Sure.  So in paragraph 56 where you are talking about

12  -- these will just be examples.  We'll go back -- that --

13  sorry.  Let me just actually -- I'm going to look in my note

14  and see that I have not -- I can't just more easily ask the

15  question in a different way.  Let's actually -- I'm going to

16  withdraw the question that I had and move to another question

17  and we may circle back, but you can tell me if you feel like we

18  missed something given that.

19          So I would like to talk about some of the things that

20  you identify can be happening physiologically in a pregnant

21  person's body when they are preparing to expel an embryo or

22  fetus with no cardiac activity.  You described in your report

23  that the cervix may already be softening and partially open, is

24  that accurate?

25      A.  Yes.  I state the cervix may already be softening and

51

1  partially opening.  It's not always the case, but it can be.  I

2  have operated on women to do a D&C and they -- I go to do my

3  exam and I can already put my finger in.  Now those are not

4  women typically with a missed abortion.  Those are women that

5  usually have symptoms in terms of their cervix making those

6  changes because they'll often start spotting if their cervix is

7  starting to open.

8      Q.  And so if they -- just again so we're using the same

9  terminology.  How would you define a situation or what term

10  would you use for that, where they are having some symptoms

11  such as spotting?

12      A.  So if they don't -- if they're having those symptoms

13  and they are -- and we have diagnosed the embryo or fetus has

14  died then they -- if they're already partially open, the

15  cervix, then they would -- particularly if you can see any of

16  the products of conception, whether it's the embryo, fetus, or

17  the extra, the placenta, other tissue that's not the actually

18  embryo or fetus, you can sometimes see them at the opening.  So

19  that would be an incomplete abortion.  So she's in the middle

20  of miscarrying.

21      Q.  And I appreciate the juxtaposition there.  So you said

22  that not all patients have this softening and partially open.

23  Does that mean that some would have cervixes that are what you

24  describe as closed and thick?

25      A.  Yes.  For the cervix, yes.

52

1    Q.  Thank you.  So same paragraph of your report, in

2    paragraph 56, you say that most women will naturally expel the

3    pregnancy within two weeks and thus expected management is an

4    option given to them.  Is that an accurate summary of what's

5    there?

6    A.  Yes, it is an accurate summary.

7    Q.  And are there some miscarriages or miscarriage

8    patients who don't naturally expel the embryo or fetus within

9    two weeks?

10   A.  There are.  The data suggests that 80 percent of women

11   will miscarry within two weeks --

12   Q.  I'm sorry.

13   A.  -- on their own.

14   Q.  On their own.  Thank you.  Is there anything other

15   than those two things that we just talked about?  Is there

16   anything else about the state of the pregnant person's body

17   that is maybe different?

18   A.  Between what?  Sorry.

19   Q.  No.  No.  Absolutely.  So with the situation where

20   there is no longer embryonic or fetal cardiac activity, you say

21   that the body is preparing to expel the pregnancy, other than

22   the cervical changes and the sort of time frame that we just

23   discussed, are there other physiological changes that you see?

24   A.  Oh, most definitely.  So the woman will often times

25   say that she no longer has breast tenderness, she's not tired

53

1    like she was.  And that is related to a drop in hormonal

2    function.  So she's no longer feeling the symptoms of

3    pregnancy.  And she may start cramping, which is the uterus

4    preparing to expel the embryo or the fetus.  You know, I think

5    from the standpoint of when you deliver or you examine -- so

6    let me back up.  So, you know, when a woman is in her first

7    trimester and has had a miscarriage, we will offer her

8    expectant management, medication management, or surgical

9    management.  And every woman, you know, there are different

10   conversations that you have with the women regarding that.  But

11   when I have done surgical or we do -- if she's a little further

12   along, second trimester, induction, the biggest change you see

13   is actually in the embryo or the fetus because they have lost

14   their blood supply.  And so just like if you and I lose our

15   blood supply, our cells, our tissues die and we decompose, so

16   do these embryos and fetuses.  And so, you know, that's the

17   other big thing that you see in our second patient is that

18   going on.

19        Q.  Okay.  Any other physiological changes in the pregnant

20   patient?

21        A.  So we have talked about bleeding.  She may be -- maybe

22   we haven't talked about bleeding.

23        Q.  Okay.

24        A.  You know, I mentioned it, yeah.  So bleeding and

25   cramping are the biggest things.  Loss of her pregnancy

54

1    symptoms.  And then her cervix may start to open on its own.

2    And then the fact that the baby or -- the embryo, the fetus is

3    basically decomposing, autolyzing, maceration, I think, are

4    terms that we use tells us that the physiology of blood flow is

5    changing internally.  We can't see that on the outside, but the

6    evidence, the fact that she has a reduction of blood flow now

7    going to the baby is evidenced by what we see in the baby.  And

8    there are studies, for example, that show like placental

9    atrophy in women who have had a pregnancy loss in the second

10   trimester and the placenta actually gets smaller.  They do

11   expectant management for a little while and they notice the

12   volume of the placenta by ultrasound is smaller.  I can't see

13   those externally, of course.

14        Q.  Thank you.  So I'm focused now on some questions that

15   deal with gestational age.

16        A.  Okay.

17        Q.  We'll be jumping around some so we're not repeating.

18   Are you aware of any published medical research discussing the

19   comparative safety of procedural miscarriage management and

20   procedural induced abortion at the same gestational age?

21        A.  Using the term procedural, are you also -- I know

22   there's a lot of conversation about surgery versus procedure.

23   So could you say that question and replace it with surgical

24   also?

25        Q.  Absolutely.  So are you aware of any published medical

55

1  research discussing the comparative safety of surgical

2  miscarriage management and surgical induced abortion at the

3  same gestational age?

4      A.  Surgical miscarriage compared to surgical induced

5  abortion?

6      Q.  Correct.  At the same gestational age.

7      A.  I am not aware of any direct studies that compare

8  those.

9      Q.  Thank you.  Are you aware of any books or other

10  publications that compare those?

11      A.  I'm aware of a lot of conversation that happens in

12  labor and delivery, in operating rooms, among colleagues

13  anecdotally about differences that people describe.  I'm aware

14  of in textbooks conversations about the technical difficulty of

15  an induced abortion compared to a miscarriage, particularly

16  because on a miscarriage you already have a dead fetus if it's

17  second trimester and you have a live one with the first one,

18  and of course you'll have the bony structures that make for a

19  more technically difficult procedure.  And that's supported in

20  the addendum information I gave yesterday about, you know,

21  within 16, I think, to 24 hours the bones, the cortical bones

22  soften.  And I'm aware that the bones, removing them,

23  particularly the skull are -- the calvarium, which is the

24  skull, is where a lot of the cervical injury and hemorrhage can

25  come from.  That's what I'm aware of.

56

1      Q.  Thank you.  And I think that this is clear, but I just

2  want to make sure that I know that it is.  The textbook that

3  you just referred to and you mentioned the addendum, that's

4  those excerpted pages that you sent over to us and the textbook

5  we talked about earlier, correct?

6      A.  Correct.

7      Q.  Any others?

8      A.  Not off the top of my head.

9      Q.  Okay.  Thank you.  And you describe the written

10  sources and then also anecdotal kind of accounts from other

11  people.  You talk about -- you don't have personal experience

12  with this, with induced abortions since you haven't performed

13  them, correct?

14      A.  So I have a lot of personal experience with labor

15  inductions where we have second trimester either -- fetal

16  demises or I had to do previable inductions.  And the

17  difference in terms of when there has been a loss, so the fetus

18  is dead, those babies come out and sometimes their skin is

19  sloughed off.  They have macerated and their -- you can tell

20  their bones are soft.  They're kind of bent and their skulls

21  collapse.  So I do have that experience.  I don't have the

22  experience of a D&E extraction where I am removing the dead

23  fetus or living fetus.

24      Q.  And as you said, just to clarify, so no experience

25  with D&E to provide an induced abortion as you have defined

57

1   that earlier, correct?

2       A.  Correct.

3       Q.  Thank you.  So I'm going to turn now actually to the

4   textbook pages.

5       A.  Can I pause you real quickly?  So my son is home.  I'm

6   going to turn -- my phone is going crazy.  I'm going to silence

7   it real quick.  But he's home and my husband is here so I don't

8   have to worry about my phone.

9       Q.  Thank you.  I appreciate you letting us know and I'm

10  glad that he's home.

11      A.  Thank you.

12      Q.  Again, I'm turning now to the supplement and then the

13  textbook pages.  And since we're having the download issues, my

14  plan is I will refer to some of the textbook pages.  I'm not

15  going to refer to all of them.  If for some reason my reference

16  makes you think there's an issue with what we have, please let

17  me know.  But other than that, we'll just --

18      A.  And I have the book right here.

19      Q.  We'll act on our good faith that we have -- everything

20  that you think you gave us you did, and you can always follow

21  up with us and we'll ask that Mr. Boyle does if you realize

22  that there's anything you thought you provided that we didn't

23  receive.

24      A.  Okay.

25      Q.  So based upon the passages that you cited in the

                                                              58

1   supplemental source, so that supplement that you gave us, would

2   you agree that your training in miscarriage management does not

3   qualify you to provide induced abortion by aspiration or D&E?

4       A.  That's a loaded question.  Say that again.

5       Q.  Absolutely.  So based upon the passages that you have

6   cited -- and I'm just flipping here myself because I should

7   have flipped earlier -- so based upon the passages that you

8   have cited in the addendum -- and so just for reference those

9   are the passages at pages 111, 131 and 158.

10      A.  Okay.

11      Q.  So then the follow-up -- and just also flagging that

12  it's page 111 that refers specifically to training, but I want

13  to kind of key us into the different passages that we're

14  dealing with.

15      A.  Okay.

16      Q.  So based upon those passages at page 111.

17      A.  Okay.

18      Q.  And I'm going to just read from the addendum you were

19  provided, the passage that's there, which is, quote, although

20  abortion is among the most common medical needs of women, fewer

21  than half of graduating obstetrics, gynecology residents in the

22  United States have ever performed a first trimester induced

23  abortion.  And then the second section -- or second sentence

24  you have bolded in the addendum.  Training and the management

25  of incomplete spontaneous abortion is not an adequate

                                                            59

1  substitute.  So that's the passage that I'm referring to with

2  this question.

3      A.  Okay.

4      Q.  The question is would you agree that your training in

5  miscarriage management does not qualify you to provide induced

6  abortion by aspiration or D&E?

7      A.  Would you define qualify me?

8      Q.  Well -- sorry, I'm just looking back to the wording.

9  Okay.  So I'm focusing on the training and the management of

10 incomplete spontaneous abortion is not an adequate substitute.

11 So would you agree that your training in incomplete spontaneous

12 abortion is not an adequate substitute for specific training in

13 providing induced abortion by aspiration or D&E?

14     A.  That's a long sentence.  Can you simplify what you're

15 asking me?

16     Q.  Yes.  I will break it out into a few questions.  You

17 have training in the management of incomplete and spontaneous

18 abortions, correct?

19     A.  Correct.  Among other things that I'm trained to do,

20 yes.

21     Q.  For the purpose of this question.  And you have stated

22 the opinion that -- or highlighted this passage for us that

23 talks about an absence of, quote -- well, I'm going to change

24 perform to performing.  Performing a first trimester induced

25 abortion as part of an obstetric, gynecological resident's

                                                            60

1    training, correct?

2         A.   Right.   That's what it says, yes.

3         Q.   And in providing this in the addendum, you are

4    providing it to support the position that management of

5    incomplete spontaneous abortion isn't a substitute for that

6    experience performing a first trimester induced abortion in

7    residency, correct?

8         A.   I think that's simplifying it.  So I am providing it

9    to highlight the fact that they're not identical procedures.

10   And so my operative note may say that my procedure was a D&C,

11   but in all -- or a D&E for that matter.  But in all reality,

12   each procedure is technically very different.  And there's a

13   big difference between doing a D&E in the second trimester for

14   a dead fetus or a live fetus.  And that it is recognized in our

15   field that they are so different that not only do you need to

16   go to four years of training to be an ob-gyn and all the things

17   we do, that you need additional training if you're going to do

18   them and be a complex family planning fellow and get two more

19   years on top of four years.  So I am not a trained complex

20   family planning fellow.  I have not done that program.  And so

21   I don't have that training.  That's my point.

22        Q.   Okay.  Thank you.  And again, just following up, you

23   also haven't performed a first trimester induced abortion as

24   it's referred to in the passage on page 111, correct?

25        A.   All D&Cs I have done in the first trimester, the

                                                                    61

1   embryos had -- fetuses had a heartbeat.  Or didn't have a heart

2   beat.  Sorry.

3       Q.  Thank you.

4           MS. PAI-THOMPSON:  And I am going to, just so I

5   don't forget, I am going to drop into the chat and ask to have

6   marked as an exhibit the addendum first and then the textbook

7   pages second.  And again, that's for our record, but you and I

8   will see it on paper copies given the Internet.

9                       -  -  -

10          (Documents marked as Exhibit-27 and Exhibit-28

11  for identification.)

12                      -  -  -

13  BY MS. PAI-THOMPSON:

14      Q.  Do you agree that you're not qualified to provide an

15  induced abortion?

16      A.  No, I don't agree necessarily with that statement as

17  simply as it is and as flat as it is.  Because of the extensive

18  training that I have had as an ob-gyn I have a lot of skills,

19  and if I had to do one, I could -- I could work my way through

20  it probably.  But I think the complication rate -- I'm not as

21  experienced as somebody who has done them for 20 years or who

22  has done a complex family training fellowship.  Which is why I

23  think we have to be really careful about who's doing our second

24  trimester abortions here in North Carolina.  So I don't think

25  it's a black and white question the way you asked it.

1    Q.  I appreciate the followup.  And what I'm hearing you

2  say is that a provider's experience, right, like their level of

3  experience in providing a procedure is important to the safety

4  of that procedure?  Is that what you're saying?

5    A.  I think there's formal training, and obstetricians and

6  gynecologists, we are trained as surgeons.  And so I think that

7  in itself is very different than, for example, Dr. Farris who

8  is a trained family practitioner who is doing second trimester

9  abortions here in North Carolina based on informal training

10  she's received from people in the office, per her deposition.

11  And so I think we're very different in that respect.  So I

12  think it's very hard to categorize me as not qualified.

13    Q.  Thank you.  Are you aware -- well, actually, let me

14  back up.  I'm sorry.  Do you know what -- and this is a

15  mouthful for me as not a doctor, what disseminated

16  intravascular coagulation or DIC is?

17    A.  I do.

18    Q.  Can you define that for us?

19    A.  Yeah.  It's a situation that's often secondary to

20  hemorrhage in which -- so a lot of people just think our blood

21  is -- I'm not sure what people think.  But it's mainly water.

22  But it's made up of red blood cells too, but it also has

23  clotting factors in it.  And so when somebody hemorrhages they

24  will often deplete their clotting factors.  So they then don't

25  clot and throughout their entire body they can have

63

1  disseminated, which means throughout the entire body,

2  intravascular coagulation problems.

3     Q.  And can you -- when you say problems, can you say more

4  about what problems looks like in that context?

5     A.  They can bleed to death.  I mean, they literally will

6  die if you can't help them clot their blood.  And so you

7  replace -- when someone is having a hemorrhage, whether it's

8  postpartum or after an abortion, car accident, whatever, you

9  have to not just give them red blood cells in volume, you also

10  have to replace clotting factors.

11     Q.  Thank you.  Are you aware of research demonstrating

12  that the risk of -- actually, let me back up.  Is it okay if I

13  refer to disseminated intravascular coagulation as DIC so I

14  don't have to keep saying the words?

15     A.  Yeah.

16     Q.  Thank you.  Are you aware of research demonstrating

17  that the risk of DIC as a complication of D&E increases as the

18  time since fetal demise increases?

19     A.  Yes, I am aware of that, particularly in IUFDs after

20  20 weeks.

21     Q.  Just when you say IUFDs after --

22     A.  Intrauterine fetal demises.  So, yeah.

23     Q.  Would you agree that the risk for D&E for miscarriage

24  management can be higher than the risk of D&E for induced

25  abortion at the same gestational age?

                                                              64

1    A.  I'm sorry, repeat that.

2    Q.  Yeah.  Would you agree that the risk of D&E for

3  miscarriage management can be higher than the risk of D&E for

4  induced abortion at the same gestational age?

5    A.  I have to answer that anecdotally.  We don't have

6  head-to-head data.  And, you know, women all present very

7  differently.  So a woman who has had a loss, so her baby is

8  dead, the longer she goes without it being known, she does have

9  that risk for DIC, as you said.  It's extremely uncommon

10  though.  I have seen it a couple times, but it's very uncommon.

11  Whereas when you have an induced abortion it's very, very

12  different physiology that's going on when you have in a woman's

13  body and the blood flow.  So, you know, the -- the aorta is the

14  biggest artery in our body and it has these two vessels that

15  come out in our groin.  They're called our internal iliac

16  arteries.  And then our uterine arteries come off of those.

17  They're branches.  And they come off right at the cervix and

18  they travel kind of up the sides and they are huge as a term,

19  for sure, especially in C-section.  But the bigger the uterus

20  -- the uterus starts off awful small.  It's like a lemon or

21  orange.  It depends.  And then it gets basketball size at term.

22  And so as it grows, the demand for blood flow is greater.  And

23  so that demand when you have a live baby is still in place.

24  That demand goes away when the baby dies, which is why we see

25  the maceration and things like that.  As a matter of fact, the

                                                            65

blood flow is so brisk in a living baby, it's like 500 cc a

minute.  That's like a half Coke bottle, a big liter bottle in

a minute.  And that changes when we have a baby that has

already died.  And so, you know, when you look at risk of

bleeding and hemorrhage just anecdotally, it's a very different

system.  I think the other thing I would add is that -- and I

mentioned this before is a lot of the risk for hemorrhage comes

from -- and I think Dr. Boraas said this in her deposition.

You know, when she teaches residents, you know, having to be

very careful about removing the fetal parts that have bones

because they're what tear that cervix.  And that uterine artery

is juicy.  It's big.  It's right there.  So, you know, when

you're doing a second trimester induced abortion compared to --

with a dead baby the blood flow is going to be different.

        Q.  Thank you.  So going to be turning now to the textbook

pages.

        A.  Okay.

        Q.  On page 131.  Just let me know once you're there.

        A.  I'm there.

        Q.  Okay.  So do you see the underlined passage in the

second to last paragraph on the last column?

        A.  What I underlined?

        Q.  Yes.

        A.  Yes.

        Q.  Yes.  I assumed, but it came to us with the underline

1    so --

2         A.   It wasn't a used book.

3         Q.   Okay.  And this is one of the passages that you cited

4    in your addendum, correct?

5         A.   Yes.

6         Q.   And the header for the subsection that it falls under

7    is feticidal techniques, correct?

8         A.   Right.  Where they intentionally are ending the life

9    of the fetus.

10        Q.   Sorry, I'm dealing with a last bit of crud from a cold

11   so I apologize for coughing in your ear.

12        A.   I'm about a week from getting over mine.  So no

13   apologies needed.

14        Q.   Thank you.  So I'm going to read the first full

15   paragraph of that subsection and I'll ask you whether I have

16   read it correctly.

17        A.   Okay.

18        Q.   So it says the degree of softening of fetal cortical

19   bones affect the amount of dilation needed for D&E.  Softening

20   is facilitated by fetal demise.  Noticeable cortical softening

21   begins to occur as soon as 16 to 24 hours after demise.  The

22   most common pharmacological agents used to induce demise in

23   developed countries are potassium chloride, KCl, and digoxin

24   and then parentheses Chapter 12.

25             Have I read that correctly?

67

1      A.  Yes.  Although mine says Chapter 11.

2      Q.  Mine does as well and I appreciate you catching my

3   typo in my head.

4      A.  No worries.

5      Q.  So this paragraph of the textbook is referring to

6   cortical bone softening as a result of fetal demise induced by

7   the abortion provider, correct?

8      A.  Yes.  They actually, before doing the abortion, the

9   induced abortion, they actually either gave digoxin or

10  potassium chloride that immediately stops the heart and then

11  the baby dies.

12     Q.  And so to clarify, so we're not talking about a

13  situation with spontaneous fetus demise, right?

14     A.  Correct.

15     Q.  And not talking about cortical softening in that

16  context, correct?

17     A.  Not in this particular paragraph.

18     Q.  Exactly.  Are you aware of any research comparing the

19  rate of cortical softening in the D&E setting to manage

20  spontaneous abortion, as opposed to the rate of cortical

21  softening in the setting of D&E for induced abortion?

22     A.  I cannot say that I have read a study or I have looked

23  for a study.  I have read in various sources, including later

24  in this book about, you know, just the statement of cortical

25  softening after a fetus demise.  And I have definitely

                                                          68

1  witnessed it many, many times when a woman has a spontaneous

2  loss.

3      Q.  And when you say you have witnessed it many times, do

4  you mean in your experience in practice?

5      A.  Yeah.  So when doing inductions and the babies are

6  born and their heads are very crushed.

7      Q.  And for the various sources that you -- when you said

8  various sources including the textbook, what other sources are

9  you referring to?

10     A.  So throughout the years there is textbooks that we

11  have had in our training and -- gosh, various papers that --

12  where people almost -- almost like they say later, I think it's

13  158 they talk about softening of cortical bone makes it easier

14  to do it.  I'm trying to think if ACOG's second trimester

15  bulletin talks about that.  But there's a wide variety of

16  places where, you know, it's almost in passing.  This happens,

17  you know.

18     Q.  Thank you.  So I'm going to turn now to page 157 of

19  the textbook excerpt.

20     A.  Okay.

21     Q.  And again, I'm going to read a passage aloud and then

22  I'll ask you to let me know if I have read it correctly.

23     A.  All right.

24     Q.  And I'm going to be looking at the last paragraph in

25  the right-hand column.  So it says surgical evacuation of a

                                                69

1    nonviable pregnancy by suction curettage is performed in a

2    fashion similar to first trimester pregnancy termination,

3    parentheses, chapter nine.  It is readily accomplished in an

4    outpatient facility, except in cases of severe maternal disease

5    or serious pregnancy-related complications.

6         Did I read that correctly?

7    A.  You did.

8    Q.  Thank you.  And do you agree with that statement?

9    A.  So not for me personally.  I choose to do -- have

10   chosen over the years to do my first trimester miscarriages,

11   and that's what this is specifically talking about is first

12   trimester, in an ambulatory surgical center or a hospital

13   because of the risk of hemorrhage, the risk of uterine

14   perforation, anesthesia risk, pain control risk.  All those

15   things.  So I recognize that some other people may choose to do

16   them in an outpatient setting, but I do not.

17   Q.  So your practice is -- sounds likes your choice for

18   where you do this is different than what they describe there?

19   A.  Well, I think my choice and I think the majority of

20   ob-gyns actually practice in a setting -- do their miscarriages

21   first trimester in -- not in their clinics.  And I know Dr.

22   Boraas talks about that, and I even think in her C.V. she's

23   given a talk called something along the lines of don't be

24   afraid to do miscarriages outside the first trimester outside

25   of your clinic setting.  So...

                                                            70

1      Q.  So I'm going to continue on with the same paragraph in

2   157.

3      A.  Okay.

4      Q.  And we are still at the last paragraph in the

5   right-hand column.  So it says with some nonviable pregnancies,

6   the cervical softening associated with normal pregnancy is

7   absent or minimal, making mechanical dilatation more difficult.

8   Pretreatment with osmotic dilators or Misoprostol may help in

9   those circumstances, parentheses, chapter nine.

10      Did I read that correctly?

11      A.  Yes.

12      Q.  And do you agree with that statement?

13      A.  I do agree with that statement.  As we talked about

14   last hour, not all women will have -- will start having their

15   cervix changing, and so sometimes you do have to use a

16   mechanical prep, Laminaria, or the Misoprostol to help soften

17   the cervix.

18      Q.  Thank you.  And then I'm going to be continuing on in

19   that same paragraph and then into page 158.

20      A.  Okay.

21      Q.  So it says, quote, in contrast, when the spontaneous

22   abortion process has already begun, the cervix is often dilated

23   to some extent rendering mechanical dilatation easier.

24   Although placental tissue may be more tenacious and difficult

25   to evacuate with some nonviable pregnancies, no studies show an

71

1    increase in incomplete procedures for nonviable gestations

2    compared to abortion of apparently normal pregnancies.

3           Did I read that correctly?

4       A.  Yes, you did.

5       Q.  And do you agree with that statement?

6       A.  You know, I agree that -- kind of let's take it in two

7    parts.  In contrast, when the spontaneous abortion process has

8    already begun, the cervix is already dilated to some extent

9    rendering mechanical dilatation easier.  Yeah.  I mean, it's

10   always a pleasant surprise when you go in the operating room

11   and you think you're going to have to use your Pratt dilator to

12   serially dilate and wa-lah, she's already open.  It does make

13   it easier because we know that the mechanical dilatation is

14   where the potential for uterine perforation can occur.  So yes.

15          The second one, although placental tissue may be more

16   tenacious and difficult to evacuate with some nonviable

17   pregnancies, no studies show an increase in incomplete

18   procedures for nonviable gestations compared to abortion of

19   apparently normal pregnancies.  I would have to say I have not

20   seen any studies myself.  I will say this text is an older text

21   and so there may be studies now.  But I am not aware of them at

22   this moment that I have looked in particular for.

23      Q.  Thank you.  So the quote, and then you have described

24   to us, referred to cervical dilation that can make that

25   mechanical dilatation easier.  Is there any other way that the

                                                          72

1   textbook pages you provided to us identify that might make the

2   procedure technically easier with spontaneous abortion?

3       A.  Specific to these pages?  I would have to review them

4   to answer that.  Would you like me to do that?

5       Q.  I think we can come back to it.  So is there --

6   there's nothing that comes to mind at this point?

7       A.  Not specific to the pages I gave you.

8       Q.  Thank you.  Based on the passages in the textbook that

9   you cited, so those three that I reviewed at the outset,

10  including that bolded passage, would you agree that there are

11  some circumstances in which procedural management of

12  miscarriage is more difficult than a procedural induced

13  abortion?

14      A.  So that is a massively hypothetical question.  And so

15  I think every situation is unique and you can prepare and

16  expect for various technical difficulties patient by patient.

17  So I can't say -- answer that question the way you have

18  answered[sic] it.  I can say overall when you look at induced

19  abortion compared to miscarriage, there are technical

20  differences that make it more risky, particularly in the second

21  trimester to do induced abortions.

22      Q.  So let me then -- just because that was a longer

23  paragraph, I'm going to pull it back and ask a shorter

24  question.  So would you agree that there are some circumstances

25  in which procedural management of miscarriage is more difficult

73

1    than procedural induced abortion in some circumstances or any

2    circumstances?

3        A.  So procedural meaning a surgical?

4        Q.  Yes.  I'm sorry.  Yes, I will work on making that

5    change.  So would you agree that there are some circumstances

6    in which surgical management of miscarriage is more difficult

7    than surgical induced abortion?

8        A.  I can't say I would agree to that because each case is

9    unique.  But I guess I'm replicating myself, but I'll go back

10   to say that there are more inherent risks to -- when you're

11   doing an induced abortion with a live baby who -- I think it's

12   in Dr. David Grime's words, at that stage of the pregnancy is

13   tenaciously trying to stay in place.  And then a situation

14   where the fetus has already died and physiological changes are

15   already happening, particularly a change in blood flow leading

16   to the changes we see in the fetus.  So, you know, I think I

17   can only answer that globally.  But yes, can you have a

18   difficult D&C for miscarriage?  Yes.  And can you have a

19   straightforward -- D&E, I should say, for an induced abortion?

20   Yes.  But we're talking -- we're not talking about one unique

21   case.  We're talking about the overall risk.  And, you know, I

22   clearly stand by my expert report that there are much greater

23   risks due to the physiology that's going on with an induced

24   abortion.

25       Q.  Thank you.  And looking back to the inherent risks

74

1   that you just mentioned.  Are you referring to the risks that

2   are the result of less cervical dilatation in induced abortion

3   patients?

4       A.  I'm really referring to the fact that there are

5   greater risks for hemorrhage when you -- in the second

6   trimester induced abortion.  I'm talking about the fact that

7   you have bones that have not -- you're having to dismember the

8   fetus and disarticulate joints.  And that's very different when

9   you don't have a body that's already dead and macerated.

10      Q.  Are you -- but you're not aware of research -- I'm

11  sorry, let me back up.  So you have been describing the

12  experience that you have seen -- talking about the textbook.

13  You're not aware of research stating that D&E for induced

14  abortion is riskier than D&E for spontaneous abortion at the

15  same gestational age, is that correct?

16      A.  I'm not saying that I have seen a head-to-head study

17  in terms of that, but there's a whole lot of anecdotal

18  experience, even, you know, individuals who have done complex

19  family planning rotations, you know, talking about dialogue

20  with, you know, people, you know, so...

21      Q.  Thank you.  I am not trying to beat a dead horse here

22  with some of these follow-up questions.  I just want to make

23  sure that we are talking about the same thing and have a common

24  understanding of the full range of information you're talking

25  about.  And so the anecdotal experience that you're referring

75

1  to is not your own direct experience since you have never

2  provided a D&E for induced abortion, is that correct?

3       A.  So it's really reading case reports from other people,

4  it's an interest in learning about it because I care about the

5  safety of both my patients.  Unfortunately the Society For

6  Family Planning is very exclusive, so I can't become a member

7  and learn some more of these, hence I ordered this text.  It's

8  just like anything else in our field.  There's so many

9  different areas to learn about.  I'm a lifelong learner.  I'm

10 continuing to learn and want to continue to learn, and I think

11 the vast experience I have in the operating room, particularly

12 with miscarriages, as well as on labor and delivery with

13 demises or previable inductions, I think allow me to have a lot

14 of knowledge in this area.

15      Q.  And so the case reports that you reference, you

16 haven't cited those case reports or other sources in your

17 expert report, correct?

18      A.  No, I have not.

19      Q.  Can you think of any of those sources just sitting

20 here today?

21      A.  I think the one that jumps off at me is a case report

22 series of two women who had placenta previas and showing that

23 with expected management -- of course making sure they didn't

24 get DIC -- showing -- I think I mentioned this earlier, how

25 much the placenta shrinks because it losses its blood supply,

76

1    and them noting when they did the D&E procedures that they had

2    much less bleeding than they would have even expected because

3    of the placental atrophy.  That one jumps off.

4        Q.  And where was that one from?

5        A.  I could get that to you.  I don't know off the top of

6    my head.

7        Q.  Okay.  We'll ask Mr. Boyle to follow up with you about

8    that.

9        A.  Sure.

10       Q.  And you mentioned placenta previa.  So those are

11   complicated cases, is that correct?

12       A.  Well, yes.  If you have a placenta over the cervical

13   os it is complicated.  But it is -- their point that they were

14   making in it was that they could reduce the complication of

15   hemorrhage from a placenta previa by reducing the blood flow

16   and the size of the placenta.  So not immediately doing the

17   D&E.  And so what it does is you can use it to show that the

18   physiological changes that make it more risky to do a procedure

19   like induced abortion the second trimester, the physiological

20   changes that support that is what I'm using that for.

21       Q.  Thank you.  And can you think of any case studies,

22   just following up, as you sit here today, involving

23   non-complicated pregnancies to suggest that the risk of

24   hemorrhage is greater with induced abortion than with

25   spontaneous abortion?

                                                              77

1      A.  I can't think of case studies.  I have talked to MFMs

2   about it so in the past.  I have talked to general ob-gyns

3   about it.  But from a literature standpoint, I can't think of

4   something off the top of my head right now.

5      Q.  Thank you.  And then just one other from a literature

6   standpoint question.  Sorry.  Are you aware of research

7   comparing the risk of hemorrhage as a complication for D&E for

8   miscarriage management to the risks of hemorrhage as a

9   complication of D&E for induced abortion?

10     A.  Could you repeat it?  Am I aware of which?

11     Q.  Sure.  Are you aware of research comparing the risk of

12  hemorrhage as a complication of D&E for miscarriage management

13  to the risk of hemorrhage as a complication of D&E for induced

14  abortion?

15     A.  The main literature in that area is not comparing

16  those two.  It's really just showing that as gestational age

17  increases, so does risk for hemorrhage.  And so that's the

18  emphasis of those studies.

19     Q.  All right.  And when you say the main researcher of

20  those studies, are there specific studies that you're referring

21  to?

22     A.  There are.

23     Q.  Are there any -- same question.  Any that you can

24  think of as you sit here today?

25     A.  I think I document some in my expert report.

1    Q.  Are there studies that you can think of beyond that?

2   I'm just wanting to make sure that we have the universe of

3   information for that.

4    A.  I will not claim that my expert report is inclusive of

5   every study.  It's only, I think, 30 pages long.  So there are

6   other studies I have read and I just summarized.

7    Q.  Thank you.  So I'm going to return us back to the

8   textbook and back to page 158.

9    A.  All right.

10   Q.  And we are now at the top of the left-hand column in

11  the first full paragraph in that column beginning with the

12  phrase uterine evacuation.

13       Do you see what I'm referring to?

14   A.  Yeah.

15   Q.  Is this the passage that you cited to in your addendum

16  -- or a passage that you cited to in your addendum?

17   A.  It is.

18   Q.  And specifically you cite the sentence that reads

19  uterine evacuation may be technically easier after fetal

20  demise.  Softening of cortical bone makes surgical extraction

21  easier.  With medical aborted patients, induction abortion

22  intervals are often shorter, parentheses, Chapter 11.  Is that

23  correct?

24   A.  Yes.

25   Q.  And did I read that correctly?

79

1        A.  You did.

2        Q.  So I'm going to continue reading in that same

3   paragraph.  Quote, regardless of the evacuation method chosen,

4   patients with second and third trimester fetal death may

5   require evaluation for coagulopathy, in addition to routine

6   preoperative laboratory tests.  Dead fetuses retained in utero

7   for four weeks or more may cause consumptive coagulopathy, a

8   condition that can lead to severe perioperative hemorrhage.

9   Clotting factor therapy prior to uterine evacuation avoids this

10  complication.

11          Did I read that correctly, other than almost certainly

12  mispronouncing coagulopathy because I can never say the word?

13       A.  It's not an easy one.  I think you did pretty good.

14  Coagulopathy.  Yes, you read it correctly.

15       Q.  Thank you.  And do you agree with that passage?

16       A.  Yes, I agree that you do not want a woman to have a

17  coagulopathy and it rarely happens.  Four weeks is an awful

18  long time.  And so, you know, most women know way beyond four

19  weeks, but you do occasionally have a woman who has DIC and you

20  have to take care of her.  But to try to generalize that to

21  mean that a missed abortion leads to a coagulopathy more easily

22  and that's what happens in real life ob-gyn is just not true.

23  But I do think it is warning you that you need to pay attention

24  to the fact that you should do lab work and make sure that a

25  woman doesn't have severe anemia, she doesn't have low

80

1  platelets, particularly if let's say she comes in and she's

2  supposed to be 20 weeks and her baby is only measuring 16

3  weeks, then that maybe died a month ago and you're going to,

4  you know, know a little bit more than that.  So fortunately,

5  this is very rare, but when it does happen, it does increase

6  her risk for hemorrhage.

7       Q.  Thank you.  And I think that you answered my next

8  question, but just so that -- just so that I'm clear.  So is

9  consumptive coagulopathy the same condition as DIC?

10      A.  Yes.

11      Q.  Thank you.  So just some general stuff about the

12  textbook and it may be that you refer to the inside cover for

13  some of this, just as a heads up.  But it was published in

14  1999, is that correct?

15      A.  Yes, it was.  And I was intentional about getting this

16  one, an old one for the purposes of today.

17      Q.  Why is that?

18      A.  A couple reasons.  One is the editors are very well

19  published and they also -- I think this was written at a time

20  that I think I'm a lot -- I was a lot less skeptical.  I think

21  they would be more honest in a way a lot of publications are

22  written today.  Not that abortion has not historically been

23  political.  But when you look at the writings, even the

24  textbooks when I was a resident in '97 to 2001, which this

25  would have been published during that time, it seemed to be

1   much more objective.  There is so much publication bias that's

2   happening right now, difficulty getting things published if --

3   if the society owns the journal and they don't have the same

4   belief structure as you.  I have lost trust sadly.  You know, I

5   have a Ph.D. and I don't think some of the integrity we used to

6   have, we still have in medicine.  I have sadly seen ACOG make

7   some changes in things that I don't think are science based.

8   And so I intentionally did an older textbook hoping to see a

9   little more objectivity.  And so, yeah, that's why I chose it.

10  And a second reason, Dr. Boraas has a book -- a chapter coming

11  out in a surgical gynecology book and she's talking about

12  surgical complications in her chapter and it's not going to be

13  published until March.  So couldn't access that one.

14      Q.  Thank you.  And I appreciate you explaining the

15  thinking behind choosing a textbook from that time period.  So

16  medical education -- medical education in 2024 isn't exactly

17  the same as in 1999, correct?

18          MR. BOYLE:  Objection.

19          THE WITNESS:  A whole lot of it is the same.  A

20  whole lot of it is the same.  Now, what's different?  Is first

21  day of my rotation, third year of medical school, I was told I

22  was entering the most unique specialty in all of medicine

23  because I got to take care of two patients simultaneously, a

24  maternal and a fetal patient.  Same thing was repeated to me

25  two years later when I was starting residency and I was an

1    intern in ob-gyn.  That's changed.  Sadly the absence of

2    acknowledgment of our fetal patient and trying to normalize

3    that has changed.  But so much of this textbook is very true

4    still today.  So I would disagree with your statement.

5    BY MS. PAI-THOMPSON:

6        Q.  Thank you.  I'm switching topics again and then I'll

7    just flag -- you may be wondering in terms of our break.  I

8    think we'll take our next break after we get through this set

9    of questions.

10       A.  That will be fine.

11       Q.  So I'm going to be talking about the subject of live

12   birth.  Are you aware of any live births that occurred

13   following a D&E procedure as opposed to an induced abortion?

14       A.  Yes.

15       Q.  Let me re-ask the question because I just want to make

16   sure I have the wording clear.  Are you aware of any live

17   births that occurred following a D&E procedure as opposed to an

18   induction abortion?

19       A.  I think it's much more common with an induction

20   abortion, which is actually why people will sometimes --

21   clinicians will use feticide before because it's the concern of

22   a live birth.  And then they would actually have -- they would

23   have failed their intention of the procedure and they would

24   have to hopefully care for that newborn.  But yes, I am aware

25   of people who have survived the other type, a dismemberment

83

1  procedure, D&E.

2      Q.  And so when you're saying that -- what -- for the

3  cases that you're aware of, how are you aware of those?

4      A.  Just have heard their story.  Like I think one is a

5  public speaker and I think doesn't have an arm.

6      Q.  Do you know at what gestational age that their live

7  birth occurred?

8      A.  I don't.

9            MS. PAI-THOMPSON:  I think this is a good time

10  for our next break.  Does 10 minutes work again?

11            THE WITNESS:  Sure.

12            MS. PAI-THOMPSON:  Mr. Boyle?

13            MR. BOYLE:  Yeah.

14            MS. PAI-THOMPSON:  And then I'll just also, for

15  our court reporter, ask for a time check when we come back.

16                     -  -  -

17            (A break was taken - 4:01 p.m. - 4:13 p.m.)

18                     -  -  -

19            MS. PAI-THOMPSON:  Dr. Bane, I'm going to

20  direct you now to the Desai study that you cited.  I'm going to

21  drop that into the chat and ask that it be marked as an exhibit

22  for the deposition, but then we'll go off of our paper copies.

23                     -  -  -

24            (Document marked as Exhibit-29 for

25  identification.)

84

1                          -   -   -

2                    THE WITNESS:  Sorry, I'm just trying to locate

3      it.

4                    MS. PAI-THOMPSON:  Absolutely.  Let me know

5      when you have it.

6                    THE WITNESS:  I have a hard copy of it.  I'll

7      pull it up.  It's fine.

8                    MS. PAI-THOMPSON:  Okay.  Let me know when you

9      have it up.

10                    THE WITNESS:  Let me just see something real

11     quick here.  Maybe it's in this one.  Do you mind just

12     screensharing it?

13                    MS. PAI-THOMPSON:  Absolutely.  For some reason

14     Acrobat is not giving me that field to screenshare.  So I think

15     what we're going to do is I will move on while I also figure

16     out why Acrobat is behaving that way.  Oh, perfect.  Actually I

17     have a colleague who is going to screenshare who is not having

18     the same issue as I am.

19                    THE WITNESS:  Okay.

20                    MS. PAI-THOMPSON:  So I think Hannah is going

21     to screenshare and let me know when you can see the document

22     up.

23                    THE WITNESS:  Not yet.  And I'm still looking

24     too.  Still just the four of us on the screen.

25                    MS. PAI-THOMPSON:  Okay.  Let's do this --

                                                              85

1  never mind.  Okay.  Fabulous.  It has taken over my entire

2  screen and that I don't want.

3  BY MS. PAI-THOMPSON:

4      Q.  All right.  So looking at -- we're going to begin with

5  the first page here.  The study that Desai and colleagues did,

6  the study's aim as it's described in the objective was not to

7  assess why providers did or didn't provide abortion, correct?

8      A.  No, that was actually not done in this study.  It was

9  actually done --

10     Q.  I'll have a follow-up question to that.  So the

11 question of why in this study, they only put that question to a

12 smaller subset of the participants, correct?

13     A.  I'd have to review it to know that they did a subset.

14 I just recall the Grossman study being able to have statistics

15 as to why.  I don't recall that in this one.

16     Q.  Okay.  Well, let's go to then table one, which is at

17 the very last page of this study.  And it will be a landscape

18 view rotation.

19         So looking at the top of the table which describes --

20 gives us the results from the study about why people didn't

21 provide abortions.  It describes the table as the percent

22 distribution of reasons cited for not providing abortion

23 referrals among obstetrician-gynecologists who do not perform

24 abortions, by type of survey response correct?

25     A.  Yeah.  Can the person make it a little bigger?  These

1    are trifocals.  I need a little more.  Yeah.  Great.  Thank

2    you.  That's plenty.

3         Q.  Okay.  So I read that correctly, right?

4         A.  You did.

5         Q.  So this is describing results from people who

6    indicated that they did not perform abortions and were then

7    asked the follow-up questions about why, correct?

8         A.  For this subset of it looks like 271 people.

9         Q.  Correct.

10         A.  There were over 800 initially.  So I'm not sure why

11    it's just this subset.

12         Q.  We'll get into that.  So looking at this 271 of all

13    respondents in that subset, you see that there are initial

14    respondents and there were 81 initial respondents.  I'm sorry,

15    58 initial respondents, correct?

16         A.  Yes.

17         Q.  And then 213 follow-up respondents, correct?

18         A.  Yeah.  But I would have to see the study to know what

19    the difference in the two are.

20         Q.  So of these smaller subsets that's discussed in table

21    one for the -- I'm going to be in the all respondents column.

22    The 16 -- it was 16 percent of that smaller subset that

23    identified personal, moral, or ethical objections, correct?

24         A.  I have a moral or ethical objection to abortion.  16

25    percent, right.

Case 1:23-cv-00480-CCE-LPA   Document 94-4   Filed 03/01/24   Page 88 of 139

1      Q.  And then of that smaller subset, 17 percent identified

2  office policy, correct?

3      A.  Office -- my office has a policy specifically against

4  discussing abortions, 17 percent.

5      Q.  Correct.  And then 14 percent identify N/A, not

6  applicable.  I have not encountered a patient seeking abortion

7  at this office, correct?

8      A.  Correct.

9      Q.  And then nine percent identified, quote, my office

10  staff is against abortion, correct?

11      A.  Correct.

12      Q.  Eight percent, I do not know any abortion providers in

13  my area, correct?

14      A.  Correct.

15      Q.  And two percent, my community is against abortion,

16  correct?

17      A.  Correct.

18      Q.  And things like office staff and community being

19  against abortion, those can be caused by abortion stigma,

20  correct?

21      A.  So, I mean --

22      Q.  My question is they can be caused.  I'm not asking you

23  to say what would occur in every case.  But they can occur

24  because of abortion stigma, correct?

25      A.  The reason why they're not done in an office?

1      Q.  Or why staff would be against.

2      A.  Well, I mean, I think the stigma is potentially more

3  on the patient side that I think has to go away in terms of I

4  think we stigmatize when we're with unplanned, unexpected

5  pregnancies.

6      Q.  My question though is about the choice that an office

7  might make.

8      A.  Okay.

9      Q.  Policy to not provide abortion could be the result of

10  community stigma in the community that that office is in,

11  correct?

12          MR. BOYLE:  Objection.  You're asking this

13  doctor what now?

14          MS. PAI-THOMPSON:  I will repeat my question.

15  BY MS. PAI-THOMPSON:

16      Q.  My question is -- and we're looking at, again, the 17

17  percent of that smaller subset that identified an office policy

18  as the reason that they don't provide abortion.  So we have

19  that 17 percent.  Okay.

20      A.  Okay.

21      Q.  For an office that is situated in a community that is

22  against abortion, that can contribute -- against abortion where

23  there is abortion stigma, that can contribute to choices around

24  office policy, such as not providing abortions, correct?

25          MR. BOYLE:  Objection.  She's not an expert --

1          MS. PAI-THOMPSON:  I'm going to object to

2    speaking objections.  If the objection is to my form, we'll

3    note that.  But my question stands and I would ask the witness

4    to answer.

5          MR. BOYLE:  Object to form.

6          THE WITNESS:  Okay.  So I can't say I agree

7    with you in terms of knowing how this person interpreted their

8    decision to do an induced abortion based on the community they

9    live in.  I can't -- I don't know what was going through that

10   person's head.  I can't claim that it was stigma that they may

11   experience.  Perhaps it is an influence of the community making

12   them think, boy, the direct and intentional killing of another

13   human, maybe that isn't a good thing to do.  But they haven't

14   got to the place where they morally or ethically object.  So I

15   really don't think I can say I know the reason is stigma.

16   BY MS. PAI-THOMPSON:

17       Q.  So I'd like to talk -- referring to -- you mentioned

18   the person who's providing the abortion and directing you again

19   to the column in table one about follow-up respondents.

20       A.  Okay.

21       Q.  At the bottom it describes -- at the very, very bottom

22   of the page that begins follow up.

23       A.  Yes.

24       Q.  And it says, quote, follow up respondents are those

25   who provided information during telephone follow-up, correct?

90

1          A.  Yes.

2          Q.  So that's giving us that the 213 out of 271

3     respondents were those who provided information during

4     telephone followup, correct?

5          A.  Yes.

6          Q.  I'm going to refer you, and then my kind colleague who

7     is helping me out, to page three.  And we'll go to the bottom

8     of the second paragraph on page three.  All right.  And in that

9     section this study describes, quote, information obtained

10    during followup was provided by office staff rather than

11    physician as surveyors were seldom, if ever, connected to the

12    physician by phone, correct?

13         A.  Yes.  That's correct.

14         Q.  So this 213 out of 271 number of follow-up

15    respondents, those are not actually opinions directly expressed

16    by the physicians to the researchers, correct?

17                    MR. BOYLE:  Objection.

18                    MS. PAI-THOMPSON:  You can answer the question.

19                    THE WITNESS:  Could you repeat it, please,

20    Vanessa?

21                    MS. PAI-THOMPSON:  Sure.  I can back up.

22    BY MS. PAI-THOMPSON:

23         Q.  So page three, the study discloses that information

24    obtained during phone followup, which is the phone followup

25    that they refer to at the bottom table one, that followup

                                                              91

1  respondents were those who provided information during

2  telephone followup, again, the bottom of page three, the page

3  that we have up, that information obtained during phone

4  followup was provided by office staff rather than physicians

5  and surveyors.

6              MR. BOYLE:  Objection.

7  BY MS. PAI-THOMPSON:

8     Q.  Seldom, if ever, connected to the physician via phone,

9  correct?

10             MR. BOYLE:  Objection.  You can answer.

11             THE WITNESS:  I agree with what you're reading.

12 I don't know if there's another question in there.

13 BY MS. PAI-THOMPSON:

14    Q.  So the question was do you agree with my reading and

15 as you -- let me actually withdraw that question.

16         So it's common as part of a study that the researchers

17 will describe their process, correct?

18    A.  The method is that process, yes.

19    Q.  And you don't have any reason to believe that in this

20 study the processes that they described in the article are

21 accurate, correct?

22             MR. BOYLE:  Objection.

23 BY MS. PAI-THOMPSON:

24    Q.  Do you have any reason to doubt that they described

25 what they did in the method section?

                                                         92

1    A.  I don't have any reason to doubt if that's what

2    they're describing.  I have a lot of concern about their

3    methodology though.

4    Q.  My question though was whether they described their

5    methodology in the method section.

6    A.  So it would have been nice to know what office staff

7    is, but you don't want me to go there yet?

8    Q.  I'm just going to refer us back then to -- and you

9    have answered this question already, that I have read correctly

10   the section where they discussed information during follow-up,

11   correct?  At page three at the bottom of the second paragraph.

12            MR. BOYLE:  Objection.

13            THE WITNESS:  So Vanessa, the only thing I

14   would agree with right now is I have some concerns about, you

15   know, the figure and this methodology, but I agree that you

16   have read that last sentence correctly.

17   BY MS. PAI-THOMPSON:

18   Q.  The study also focused only on private practice,

19   correct?

20   A.  Correct.

21   Q.  And it specifically excluded ob-gyns who practice in

22   clinics, correct?

23   A.  Practice in clinics?  What do you mean by that?  Are

24   you talking about academic?

25   Q.  What's that?  A clinic like Planned Parenthood, they

93

1    specifically excluded from this study participants -- or

2    providers who practice in clinics?

3                    MR. BOYLE:  Objection.

4                    THE WITNESS:  I would need to review to be able

5    to answer that.  I know it's private practice.

6    BY MS. PAI-THOMPSON:

7        Q.  So we're at the top of the same page, the second

8    sentence -- I'm sorry, the first sentence.  Physicians who are

9    clinic based, retired or deceased or did not provide accurate

10   contact information were excluded from the sample.  Prior to

11   mailing the survey, 29 physicians were identified as clinic

12   based and were removed from the sample, correct?

13       A.  What you're reading is correct, but I don't know how

14   they define clinic based in this study.

15       Q.  Well, we can move on and then we can go back to that.

16   I'm going to move on now to Grossman.

17       A.  Okay.

18       Q.  Yes.  And I'm going to -- do you have the paper copy

19   of that handy?

20       A.  I don't.  You'll need to share that.

21       Q.  Okay.

22                    MS. PAI-THOMPSON:  And I'm also going to drop

23   that in the chat and ask that it be moved as an exhibit.

24                        -  -  -

25                    (Document marked as Exhibit-30 for

                                                            94

1    identification.)

2                        -  -  -

3    BY MS. PAI-THOMPSON:

4        Q.  Do you have it in front of you or are we screen

5    sharing?

6        A.  I don't have anything in front of me yet, but it took

7    a minute for it to come up last time.  Here it comes.  I have

8    it.

9        Q.  Okay.  So again with Grossman, they did not identify

10   as their reason, their purpose in performing this study

11   discerning why people chose not to provide abortions, correct?

12       A.  I think that was an element of it, that they did that.

13       Q.  They did do it, but it was not identified as a

14   reason --

15               MR. BOYLE:  Can you let her finish her answer,

16   please?  She was not finished.

17               THE WITNESS:  So I think that if you look at

18   just their objective to estimate proportion of obstetricians,

19   gynecologists who provide induced abortions in the prior year

20   and document -- disaggregated by surgical and medication

21   methods and document barriers to provision of medication

22   abortion, I think that is an element of the why.

23   BY MS. PAI-THOMPSON:

24       Q.  And so it actually was -- you brought up the objective

25   piece.  It was in the documenting barriers to provision of

95

1    medication abortion.  That was actually where they asked the

2    question why, correct?

3        A.  I would need to review their methods one more time.

4        Q.  I will focus you on something as you do that.  That

5    here the smaller subset of participants they asked the why

6    question to were participants who did not provide medication

7    abortion, correct?

8        A.  I would need to review the methods to know that for

9    sure.

10       Q.  So at table four in this study.  And this is the table

11   that gives us that 34.2 percentage figure that you cite to in

12   your expert report, correct?  Or it reflects that figure.

13       A.  Could you make it a little bigger for me?  Yes.

14       Q.  Again, for the why question, it gives the heading for

15   table four that includes this data is, quote, perspectives of

16   obstetricians, gynecologists who do not provide medication

17   abortion among those who have patients seeking abortion,

18   correct?

19       A.  Correct.  That's the title.

20       Q.  So this -- according to the title, this table reflects

21   the subset of people who do not provide medication abortion and

22   were asked the why question, correct?

23       A.  Yes.

24       Q.  And in that section the most common reasons listed are

25   discussed.  And you also discuss that in paragraph 22 of your

96

1    report, correct?

2         A.  Yes.

3         Q.  And in paragraph 22 of your report you refer to that

4    34 percentage as the most common reasons for not providing

5    abortions included personal, religious or moral beliefs against

6    abortion, correct?

7         A.  Yes.

8         Q.  The study here when describing the same information

9    actually says that it is the reasons for not providing

10   medication abortion here, correct?

11        A.  Yes, I stand corrected that I left out the word

12   medication.

13        Q.  And in addition to that 34 percent that you noted

14   referenced moral reasons in that table we see that probably 19

15   percent reference practice setting restrictions?

16        A.  Yes.

17        Q.  And 16 percent reference office staff attitudes?

18        A.  Yes.

19        Q.  Do you believe that abortion providers experience more

20   or less verbal harassment than physicians who do not provide

21   abortion?

22             MR. BOYLE:  Objection.

23             THE WITNESS:  I have no way of answering

24   objectively that question.  I will tell you that there's stigma

25   in various aspects of medicine.  I'm stigmatized often being a

97

Case 1:23-cv-00480-CCE-LPA   Document 94-4   Filed 03/01/24   Page 98 of 139

1  medical director for Pregnancy Centers.  ACOG has called me

2  unethical in their issue brief about Pregnancy Centers.  So I

3  think stigma is wrong regardless of who is getting it.  But

4  whether it is somebody who is trying to practice from a

5  life-affirming approach like myself or -- I don't think

6  individuals who provide abortion should be stigmatized.  But I

7  cannot tell you they are more stigmatized than other people

8  are.

9  BY MS. PAI-THOMPSON:

10     Q.  You're not aware of any other specialty other than

11  providers who provide abortions in which physicians have been

12  murdered for the medical care they provide, are you?

13             MR. BOYLE:  Objection.

14             THE WITNESS:  I don't know the answer to that

15  question.

16             MS. PAI-THOMPSON:  I'm going to move now to the

17  Niinimaki study and the letter to the editor.  And I'm going to

18  drop both of those into the chat and ask that they be marked as

19  exhibits.

20                      -  -  -

21             (Document marked as Exhibit-31 for

22  identification.)

23                      -  -  -

24  BY MS. PAI-THOMPSON:

25     Q.  Do you have those in paper copy or do we need to --

98

1    A.  No, I actually have -- I have Niinimaki.  I don't have

2  the second part.

3    Q.  Okay.  So we will get ready to screenshare the letter

4  to the editor as needed and we'll begin with the paper itself

5  then.  So in the United States, medication abortion procedures

6  are generally a combination -- I'm going to withdraw that

7  question and ask it more clearly.

8       In the United States one commonly used regimen for

9  medication abortion is a combination of Mifepristone and

10  Misoprostol, correct?

11    A.  Yes.

12    Q.  And then another common regimen is the use of

13  Misoprostol alone, correct?

14    A.  Much less common.

15    Q.  In your discussion on August 31st in your deposition,

16  you and Ms. Salvador discussed some facets of the Niinimaki.

17  I'm not going to retread that ground, so we'll just get into a

18  few additional questions.  The study identified medication

19  abortion protocols that are available -- that are used in

20  Finland that are not those two that we just identified,

21  correct?

22    A.  Let me review it again.  I believe that they only go

23  up to 63 days.

24    Q.  So I'm asking just about the drugs that were used.

25  And specifically in one instance they say that there was a

99

1    Mifepristone-only regimen that's used in Finland?

2        A.  Yes, I do know that.

3        Q.  During the August 31st deposition, you and Ms.

4    Salvador reviewed the letter to the editor and we'll go ahead

5    -- we can screenshare that as well for our reference here.  And

6    in that deposition, do you recall discussing concessions that

7    are in the letter to the editor about limitations of the study?

8        A.  Yes, I remember just the aspect related to hemorrhage.

9    The study also looked at incomplete abortions and having to go

10   back to surgery.  But the letter saying that some of the people

11   who went to the -- to follow-up care, would it truly be

12   classified as hemorrhage as -- that was the gist of our

13   conversation.

14       Q.  Okay.  Thank you.  And do the concessions from the

15   authors of the Niinimaki study change your opinion about the

16   study's reliability as a source for your statement in paragraph

17   48 of your report that, quote, chemical abortions have a four

18   times higher risk of complications compared to surgical

19   abortions?

20       A.  I think the absolute numbers may change, but I think

21   the ratio comparing surgical abortion and medication or

22   chemical abortion, you're still going to -- and it's not just

23   this study.  I think it's the Mintua study I also reference.

24   We consistently see that there are higher complications with

25   medication abortion compared to surgical.  But I think the

1    absolute numbers would have to be reevaluated.

2        Q.  And so is your answer that it doesn't change your

3    opinion about the study's reliability as described in paragraph

4    48 or that it does?

5        A.  It impacts it, but that piece is one part of this

6    entire study.  But I still -- with the collective body of

7    research still, the fact that surgery -- I'm sorry, medication,

8    chemical abortion leads to more complications I still stand by.

9        Q.  In your opinion, in general -- is it your opinion, in

10   general, that abortion is not safe?

11       A.  Are we talking about induced abortion?

12       Q.  Yes.  I will rephrase.  It's your opinion that, in

13   general, induced abortion is not safe, correct?

14       A.  It is my opinion that we need to do a much better job

15   collecting data to make that conclusion.  I think it's an

16   assumption at this point for many different reasons that I

17   outline in my expert report.

18       Q.  And so when you say that it's an assumption, do you

19   mean that it's your assumption that it's not safe?

20       A.  It's an assumption that Dr. Boraas and Dr. Farris make

21   throughout the entirety of all of their documentation.

22       Q.  My question is not about the conclusion that abortion

23   is safe.  My question is about your opinion.  So I'll re-ask

24   the question.  And that's why I say I might need to jump in to

25   clarify if it seems like we're talking about different things.

                                                              101

1          My question is it's your opinion that, in general,

2    induced abortion is not safe, correct?

3        A.  So once again, an extremely loaded question.  So it is

4    never safe for my fetal patient, and I was taught and continue

5    to believe, the purpose of health is for -- of medicine is for

6    health and wholeness and that I have a maternal and a fetal

7    patient to take care of.  It is never safe for my fetal

8    patient.  I have grave concerns for keeping my patients safe

9    who choose to have an induced abortion, and I want to do

10   everything in my power to minimize their risk.  And so that's

11   what I can agree to you to say.

12       Q.  Thank you.

13           MS. PAI-THOMPSON:  I think that we will take a

14   break here.  Shall we do 10 minutes?

15           THE WITNESS:  Okay.

16           MS. PAI-THOMPSON:  Thank you.  If I could get

17   actually a time check from our court reporter, that would be

18   hugely appreciated as well.  Thank you.

19                        -  -  -

20           (A break was taken, 4:43 p.m. - 4:53 p.m.)

21                        -  -  -

22           MS. PAI-THOMPSON:  And I just want to confirm

23   also -- I'm sure that we -- I dropped -- I am going to --

24   because I thought I had and I hadn't, drop just for the

25   purposes of our record, the letter to the editor into the chat

                                                                102

1    and ask that it be marked as an exhibit.

2                       -  -  -

3              (Document marked as Exhibit-32 for

4    identification.)

5                       -  -  -

6    BY MS. PAI-THOMPSON:

7        Q.  Dr. Bane, you're not familiar with the training that

8    any Planned Parenthood South Atlantic receives regarding

9    administering anesthesia, are you?

10       A.  I can only talk about what -- the deposition that Dr.

11   Farris did.

12       Q.  Okay.  So no knowledge beyond that deposition?

13       A.  In the protocols -- I've reviewed the policies and

14   procedures in the protocols and there's no mention of any

15   anesthesia professionals.

16       Q.  And so my question was the extent of your knowledge

17   about the training that any Planned Parenthood South Atlantic

18   employee would receive is from exclusively from the deposition

19   of Dr. Farris, is that correct?

20       A.  From the deposition and any policies and procedures

21   that I was given to review.

22       Q.  Thank you.  And you don't know the sedation practices

23   that non-Planned Parenthood South Atlantic providers in North

24   Carolina use, correct?

25       A.  As part of this case, there was no discovery related

                                                              103

1    to that.  I can't even really talk to you about patients who

2    have gone to some of those places.

3        Q.  You don't have comprehensive information --

4                MR. BOYLE:  She's not done with her answer.

5                THE WITNESS:  Yeah.  So talking about how

6    difficult their experience was.  But I do not have any

7    documentation.  I have patient anecdotal experiences.

8                MS. PAI-THOMPSON:  Thank you.  And I am just

9    now dropping that letter into the chat.  Sorry.  My window had

10   closed out.

11   BY MS. PAI-THOMPSON:

12       Q.  Is it your testimony that only people who have

13   completed a complex family planning fellowship can safely

14   provide D&Es for induced abortion?

15       A.  It is my testimony that the purpose of the complex

16   family planning fellowship, above and beyond four years of

17   training, is that there is an additional need for second

18   trimester or third trimester abortions and then contraception

19   is the second element.  And that it is now not just resident --

20   or fellowship programs.  It's actually a board certification.

21   So based on that, it is my opinion that the American College --

22   the American Board of Ob-Gyn, excuse me, and residency programs

23   believe that it is necessary.

24       Q.  So my question isn't about what you believe they

25   believe.  My question is, is it your testimony that it's your

                                                            104

opinion that only people who have completed a complex family

planning fellowship can safely provide D&Es for induced

abortion?

A.  At what gestation are you talking about?

Q.  After the twelfth week.

A.  Okay.  So second trimester.  I -- so repeat the

question now that we have clarified the gestational age.

Q.  Is it your testimony that it's your opinion that only

people who have completed a complex family planning fellowship

can safely provide D&Es for induced abortions after the twelfth

week of pregnancy?

A.  So I can't say yes or no to that question.  There are

--

Q.  If you can't say yes or no, that's fine.  I can --

A.  Can I finish what I was going to say?  So there are

people who have 20-plus years experience and have done a

tremendous amount of them, and this is a fairly new complex

family planning program.  I think it's only become a board

certification the last few years.  So I think there are people

who have practiced a long time.  As a matter of fact, all the

editors of this book do abortions, from my understanding, or

did.  They're not all practicing right now.  And they didn't

complete the program.  And so I think that you can't just make

a blanket statement like that that I could easily say yes or no

to.  I think that it is technically a very difficult procedure,

105

¹ as many people have alluded to from reading the literature.

² And it is a fact that our governing bodies think that we need

³ additional training beyond four years is consistent with that.

⁴     Q.  Thank you.  So I'm going to refer back to the

⁵ textbook.  And you described that you intentionally chose a

⁶ textbook from 1999.  You intentionally chose a textbook from

⁷ 1999, and knowing that it might not reflect the current state

⁸ of medical practice, is that correct?

⁹     A.  No, that's not correct at all.  If you recall, I said

¹⁰ that the names are very respected and well-known in ob-gyn.  So

¹¹ that drew me to it.  And then what drew me to it also is the

¹² fact that I felt that perhaps they would write it from a more

¹³ objective standpoint than what I see so much of what's being

¹⁴ written today.  I knew there would be a critique of how old it

¹⁵ is and I think there are some things in there that they might

¹⁶ say we don't know this, and now I kind of can go oh, yeah, we

¹⁷ do.  But there are many things in there that are the same as

¹⁸ what we do now.

¹⁹     Q.  So is it your opinion that everything -- just the

²⁰ textbook pages that you sent us, not the entire textbook, but

²¹ the textbook pages you sent to us reflects current medical

²² practice?

²³     A.  Well, once again, I think you're trying to

²⁴ oversimplify the situation.  For example, I think the data have

²⁵ changed where they say that I think it was 50 percent have not

1  received training in first trimester abortions.  Now that

2  number is lower.  And so I think there are some shifts in even

3  then.  They -- medication abortion, chemical abortion was --

4  you know, it wasn't -- Mifepristone wasn't approved until 2000

5  and so this is written in 1999.  There's a very fascinating

6  statement in the first or second chapter that states that if

7  medication abortion can happen before implantation, then maybe

8  we'll call it contraception one day.  And I find that

9  fascinating because ACOG has now changed the beginning of

10  pregnancy to implantation.  So some of the story lines that I

11  see historically playing out, the stage was set in this book.

12      Q.  What's the basis for your belief that women receive

13  inadequate pain management during second trimester abortion?

14      A.  Well, I didn't -- if I came across as saying that

15  every woman receives inadequate pain management, then I will

16  pull back on that statement.  I don't believe every woman does.

17  I believe that pain management takes a second seat to trying to

18  get abortions often done in a setting where you cannot do deep

19  sedation or general anesthesia.  That's the point that I made.

20  And I also anecdotally have had patients who have talked about

21  that they did not feel like they were adequately managed with

22  their pain with their surgical abortions.  From reading, I

23  think it was Dr. Wheeler and Dr. Rubinhorse's expert reports,

24  they cite studies of inadequate pain management.  I did not

25  site those studies.  So it's multiple reasons.  But do I

1    believe a woman can get adequate pain management?  Yes, I do.

2        Q.  Thank you.  And you referred to the studies that Dr.

3    Wheeler and Dr. Rubinhorse relied on.  Did you review those

4    studies or just see the citations?

5        A.  I just saw the citations.

6        Q.  Thank you.  Was it your practice when you were

7    providing care, was it your practice to provide either deep

8    sedation or general anesthesia to every patient who you

9    provided a D&E?

10       A.  I didn't provide the anesthesia.  The anesthesiologist

11   or nurse anesthetist -- the anesthesia professional provided

12   that.  And I would say the majority chose general anesthesia.

13       Q.  And so referring to practice statements and committee

14   opinions that we have kind of talked about through this

15   deposition.  You agree that practice statements and committee

16   opinions are the result of a review of the relevant literature,

17   correct?

18       A.  That's what they should be based on.

19       Q.  And them being based upon that allows them to

20   represent something close to a professional consensus, correct?

21       A.  Could you define what you mean by a professional

22   consensus?

23       Q.  A general consensus among the providers for whom the

24   body issuing the practice statement or committee opinion.

25       A.  So I wouldn't necessarily agree with that statement.

1    I would agree that it is a -- it should be that.  It should be

2    a consensus of membership.  It's not always consensus of

3    membership.  At the bottom of committee opinions they'll have

4    the individuals who actually were on that committee and made

5    that decision.  And so I think a ACOG, while it does a lot of

6    great work in areas -- some areas, I think in the -- their

7    abortion statement they don't represent a consensus of their

8    membership.

9        Q.  And you referenced ACOG'S statements, you don't

10   believe they represent a consensus?

11       A.  Not all of them.  Just --

12       Q.  Yes.  That's going to be my follow-up question to

13   clarify.  That's, as you were talking about earlier there,

14   statements that refer to policy about abortion, correct?

15       A.  Correct.  And so, you know, I'm watching like a hawk

16   if they -- if they make statement changes that are -- seem to

17   be politically driven instead of science driven.  And I think

18   their abortion policy -- the way they changed it from after

19   viability they did not support abortion for a healthy fetus.

20   And as soon as the Dobbs leak came out they changed it to full

21   with no barriers and no limitations.  And that was like the

22   Dobbs leak.  That wasn't even the Dobbs decision.  So those

23   types of things are not professional and do not show integrity.

24   And those are the things that I'm very concerned about.

25       Q.  Thank you.  And you sort of jumped and corrected -- I

                                                            109

1   was talking about -- you said not all ACOG statements and have

2   described how you disagree with their policy statements.  You

3   generally think that the technical medical information that

4   they include is accurate?

5       A.  We'd have to go statement by statement.  But the ones

6   I chose to include in my expert report, I fully support the

7   position they gave.

8       Q.  And that was 191 and 193, right?

9       A.  I think 191 was my first declaration.  193 for this

10  one where they did an interim update.

11      Q.  Thank you.  Do you have any reason to believe that a

12  patient is more likely to see a CFP trained physician at a

13  hospital than at an outpatient abortion clinic?

14      A.  You say CFP trained, are you talking about fellowship

15  trained?

16      Q.  Sorry.  Yes.  Yes.

17      A.  So could you ask me that question again?

18      Q.  Absolutely.  Do you have any reason to believe that a

19  patient is more likely to see a complex family planning

20  fellowship trained physician at a hospital than at an

21  outpatient abortion clinic?

22      A.  I don't know the percentage of those individuals that

23  go into academic positions.  I know Dr. Boraas does a lot of

24  her procedures in the hospital.  But I don't know the

25  statistics for what their -- where their graduates go.

110

1    Q.  Thank you.

2            MS. PAI-THOMPSON:  And I have no further

3    questions at this time.

4    BY MR. BOYLE:

5    Q.  Doctor, good afternoon.  My name is Ellis Boyle and I

6    represent the defendant intervenor legislative leaders and I

7    would just like to ask a few questions.  Could you please tell

8    us if you have any concerns with the Desai conclusions from

9    that study?

10    A.  So we never got to kind of what my concerns were, but

11    I think from a methodological standpoint they have very

12    different ways that they are getting to their data, and the

13    fact that one is a survey that's likely anonymous versus a

14    telephone call.  We know that individuals are more honest and

15    feel free to give their opinions when they're doing an

16    anonymous survey or a survey that no one -- they don't have to

17    attach their name to it, versus I pick up the phone and I say

18    hey, why don't you do medication abortions was the table -- was

19    it medication abortions for that particular study?  And so I --

20    I have a problem with that.  And then, you know, I do think

21    that there are multiple reasons why ob-gyn physicians do not

22    choose to do abortions, but I think we have to be careful that

23    just -- while a third of them stated specifically I have moral

24    or ethical objections, the fact that they have chosen a

25    practice which they knew didn't do them, then that's also an

                                                        111

1    indirect reason that -- they knew they weren't going to be able

2    to do them, so that also goes towards those numbers.  And so I

3    think we just have to weed out and cipher out that study

4    better, which we didn't really go into.

5        Q.  And not to be too broad, but there were some other

6    studies that you were asked about in the textbook.  Was there

7    anything that you wanted to followup and say -- that you would

8    like to have the opportunity to say now about what you were

9    asked about for the previous three hours?

10               MS. PAI-THOMPSON:  Objection to form.

11               THE WITNESS:  Not that comes -- I can think of

12   right now.

13               MR. BOYLE:  Okay.  I don't have any further

14   questions.  Thank you.

15               MS. PAI-THOMPSON:  I have no further questions

16   either.  Thank you.

17               MR. BOYLE:  Anyone else?

18               MR. BULLERI:  I do not have any questions.

19   Thank you.

20                    -  -  -

21               (Witness excused.)

22                    -  -  -

23               (Deposition concluded 5:11 p.m.)

24                    -  -  -

25

                                                        112

1                    CERTIFICATE OF REPORTER

2    STATE OF NORTH CAROLINA     )

3    COUNTY OF ALAMANCE          )

4                I, Susan A. Hurrey, RPR, the officer before

5    whom the foregoing remote deposition was taken, do hereby

6    certify that the witness whose testimony appears in the

7    foregoing deposition was duly sworn by me; that the testimony

8    of said witness was taken by me to the best of my ability and

9    thereafter reduced to typewriting under my direction; that the

10   witness reserves the right to read and sign the transcript of

11   the deposition prior to filing; that I am neither counsel for,

12   related to, nor employed by any of the parties to the action in

13   which this deposition was taken; and further, that I am not a

14   relative or employee of any attorney or counsel employed by the

15   parties thereto, nor financially or otherwise interested in the

16   outcome of the action.

17                This the 13th day of February, 2024.

18

19                       _____

20                       SUSAN A. HURREY, RPR

                         Notary Public #201826800211

21

22

23

24

25

113

1          I, SUSAN BANE, M.D., Ph.D., do hereby state

2          under oath that I have read the above and

3          foregoing deposition in its entirety and that

4          the same is a full, true and correct transcript

5          of my testimony, subject to the attached list of

6          corrections, if any.

7

8

9                                    _____

10                                   SUSAN BANE, M.D., Ph.D.

11

12

13    STATE OF_____

14    COUNTY OF_____

15

16         Sworn to and subscribed before me this_____day

17    of_____, 20_____.

18

19                        _____

20                         Notary Public

21

22         My commission expires:_____

23

24

25

                                                        114

# E R R A T A   S H E E T

PAGE          LINE                                    CORRECTION

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____


     I, _____, after having read the

foregoing transcript of my deposition, wish to make the above

corrections.

          SIGNATURE_____

          DATE_____

115

**A**

**AAPLOG** 18:5
24:17 29:10,15
**AAPLOG's** 30:4
**ability** 10:11
113:8
**able** 10:3,7
22:25 31:12
41:21 86:14
94:4 112:1
**aborted** 79:21
**abortion** 5:11
21:14,15,22,23
21:24 22:1
32:14,17,21
33:3,13,16,20
33:22,24 34:14
36:11,14 40:18
40:19 42:11
45:3,7,10,10
45:11,16 50:22
50:23 51:9
52:4,19 55:20
56:2,5,15
57:25 59:3,20
59:23,25 60:6
60:10,12,13,25
61:5,6,23
62:15 64:8,25
65:4,11 66:13
68:7,8,9,20,21
71:22 72:2,7
72:18 73:2,13
73:19 74:1,7
74:11,19,24
75:2,6,14,14
76:2 77:19,24
77:25 78:9,14
79:21 80:21
81:22 83:13,18
83:20 86:7,22
87:24 88:6,10
88:12,15,19,19
88:24 89:9,18
89:22,22,23
90:8,18 95:22
96:1,7,17,17
96:21 97:6,10
97:19,21 98:6
99:5,9,19

100:21,22,25
101:8,10,11,13
101:22 102:2,9
104:14 105:3
107:3,3,7,13
109:7,14,18,19
110:13,21
**abortions** 30:10
36:1 41:16,17
44:21 45:13
57:12 60:18
62:24 63:9
73:21 86:21,24
87:6 88:4
89:24 95:11,19
97:5 98:11
100:9,17,19
104:18 105:10
105:21 107:1
107:18,22
111:18,19,22
**absence** 60:23
83:1
**absent** 71:7
**absolute** 100:20
101:1
**absolutely** 12:12
12:14 14:7
16:5 33:11
37:18 38:11,14
44:8 46:12
53:19 55:25
59:5 85:4,13
110:18
**academic** 93:24
110:23
**accept** 44:20,21
**access** 82:13
**accident** 64:8
**accompanied**
19:12
**accomplished**
10:19 70:3
**accounts** 57:10
**accurate** 7:5
51:24 53:4,6
92:21 94:9
110:4
**accurately** 36:4
**acknowledgm...**

83:2
**ACLU** 2:7 13:5
13:10
**ACOG** 18:5
30:4,6,12,13
30:14,17 47:4
82:6 98:1
107:9 109:5
110:1
**ACOG's** 69:14
109:9
**Acrobat** 85:14
85:16
**act** 58:19
**action** 113:12,16
**activity** 51:4,22
53:20
**add** 66:6
**addendum** 5:18
19:9,12 20:24
21:5 56:20
57:3 59:8,18
59:24 61:3
62:6 67:4
79:15,16
**addition** 80:5
97:13
**additional** 61:17
99:18 104:17
106:3
**address** 17:25
44:18
**adequate** 41:21
48:6 59:25
60:10,12 108:1
**adequately**
107:21
**ADF** 29:11
**administering**
103:9
**administration**
37:20 42:22
**affect** 67:19
**affirmative** 19:4
**afraid** 70:24
**afternoon** 111:5
**age** 21:18 55:15
55:20 56:3,6
64:25 65:4
75:15 78:16

84:6 105:7
**agents** 67:22
**ago** 81:3
**agree** 16:2,17,23
17:1 36:1,6,9
39:2,7 59:2
60:4,11 62:14
62:16 64:23
65:2 70:8
71:12,13 72:5
72:6 73:10,24
74:5,8 80:15
80:16 90:6
92:11,14 93:14
93:15 102:11
108:15,25
109:1
**agreed** 6:14
17:21
**agreeing** 32:20
**ahead** 23:17
32:1 100:4
**aim** 86:6
**airway** 41:11
**al** 1:3,6,8
**ALAMANCE**
113:3
**alive** 46:15
**Alliance** 3:7
**allow** 76:13
**allows** 108:19
**alluded** 106:1
**aloud** 69:21
**ALS** 49:3
**Alternatively**
42:24 43:18
**ambulatory**
70:12
**amended** 43:22
**America** 2:12
12:19
**American** 2:3
40:23 41:19
42:6 46:17
104:21,22
**amount** 8:24
67:19 105:17
**analgesic** 42:23
**anecdotal** 46:18
57:10 75:17,25

104:7
**anecdotally**
56:13 65:5
66:5 107:20
**anemia** 80:25
**anesthesia** 37:21
39:16 41:10
44:25 47:9,9
47:12,14 49:6
49:15 70:14
103:9,15
107:19 108:8
108:10,11,12
**anesthesiologist**
42:1 44:11
108:10
**anesthesiologi...**
40:23 41:20
42:6,15 46:18
**anesthesiology**
43:5
**anesthetist** 42:2
108:11
**Anjali** 2:13
12:25
**anonymous**
111:13,16
**answer** 7:21 8:4
8:4 10:1,11
17:6 19:4
24:22,23,24
29:4 33:12
34:17 39:4,9
42:17 44:15
65:5 73:4,17
74:17 90:4
91:18 92:10
94:5 95:15
98:14 101:2
104:4
**answered** 81:7
93:9
**answered[sic**
73:18
**answering** 97:23
**answers** 7:13
24:18
**anticipate** 7:20
**aorta** 65:13
**apologies** 13:13

67:13
**apologize** 12:15
  67:11
**apparently** 72:2
  72:19
**appearance**
  13:15
**appearances**
  13:1 14:15
**appears** 113:6
**applicable** 88:6
**appreciate** 9:8
  12:5 52:21
  58:9 63:1 68:2
  82:14
**appreciated**
  102:18
**approach** 30:19
  98:5
**approved** 107:4
**area** 76:14 78:15
  88:13
**areas** 24:5 76:9
  109:6,6
**Arizona** 3:8
**arm** 84:5
**arteries** 65:16
  65:16
**artery** 65:14
  66:11
**article** 92:20
**ASA** 5:17 36:22
  36:22 37:11
  44:4,12 46:7
  46:22
**asked** 8:2 34:22
  38:2 62:25
  87:7 96:1,5,22
  112:6,9
**asking** 7:24
  23:10 24:6
  60:15 88:22
  89:12 99:24
**asleep** 39:25
  45:25
**aspect** 100:8
**aspects** 97:25
**aspiration** 47:21
  48:23 49:9,9
  49:21 59:3

60:6,13
**assess** 86:7
**assist** 12:14
**associated** 71:6
**associations**
  46:23
**assumed** 66:25
**assumption**
  101:16,18,19
  101:20
**asymptomatic**
  50:24
**Atlantic** 1:3 2:17
  6:9 39:13,20
  103:8,17,23
**atrophy** 55:9
  77:3
**attach** 111:17
**attached** 114:5
**attack** 48:7
**attend** 28:18,21
  29:1,8
**attendants**
  12:10
**attended** 29:9,11
  30:23
**attention** 80:23
**attitudes** 97:17
**attorney** 2:25
  3:13,18 13:20
  13:20,23 24:6
  113:14
**attorneys** 13:1
  19:16
**audio** 9:18
**August** 6:15
  17:15 18:20
  19:21,24 20:3
  20:5,23 23:5
  23:23 24:8
  25:25 26:12
  27:4,25 33:4
  99:15 100:3
**authors** 36:1
  100:15
**autolyzing** 55:3
**available** 39:13
  99:19
**Avenue** 2:14
**avoid** 9:14

**avoiding** 11:7
**avoids** 80:9
**aware** 24:19
  26:7 55:18,25
  56:7,9,11,13
  56:22,25 63:13
  64:11,16,19
  68:18 72:21
  75:10,13 78:6
  78:10,11 83:12
  83:16,24 84:3
  84:3 98:10
**awesome** 9:12
**awful** 65:20
  80:17
**awkward** 9:25

_____

**B**

**B** 5:12
**babies** 57:18
  69:5
**baby** 33:1 55:2,7
  55:7 65:7,23
  65:24 66:1,3
  66:14 68:11
  74:11 81:2
**back** 6:16 14:21
  21:19 26:14
  34:18 44:10
  49:2,18 50:6
  50:17 51:12,17
  54:6 60:8
  63:14 64:12
  73:5,23 74:9
  74:25 75:11
  79:7,8 84:15
  91:21 93:8
  94:15 100:10
  106:4 107:16
**background**
  9:24 10:21
**Bane** 1:12 5:18
  6:1,4 14:21
  38:16 48:17
  50:15 84:19
  103:7 114:1,10
**Bane's** 5:16
  48:14
**barriers** 95:21
  95:25 109:21

**Barton** 34:5,6
  34:15,23 35:2
**based** 15:18
  31:21 33:13
  38:19 39:14
  41:13,19 44:3
  58:25 59:5,7
  59:16 63:9
  73:8 82:7 90:8
  94:9,12,14
  104:21 108:18
  108:19
**basement** 10:17
  10:18
**basic** 23:25 38:1
**basically** 17:14
  29:17 49:14
  55:3
**basing** 46:7
**basis** 107:12
**basketball** 65:21
**beat** 62:2 75:21
**beginning** 6:19
  7:16 34:8
  79:11 107:9
**begins** 67:21
  90:22
**begun** 71:22
  72:8
**behalf** 13:17,20
  13:22,24 14:1
**behaving** 85:16
**belief** 82:4
  107:12
**beliefs** 97:5
**believe** 23:2,12
  29:17 39:16
  44:19 92:19
  97:19 99:22
  102:5 104:23
  104:24,25
  107:16,17
  108:1 109:10
  110:11,18
**Bell** 3:10
**beneficial** 36:10
**benefit** 36:2,8
**bent** 57:20
**BERGER** 1:8
**best** 113:8

**better** 45:9,19
  101:14 112:4
**Beverly** 2:2
**beyond** 49:20
  79:1 80:18
  103:12 104:16
  106:3
**bias** 82:1
**big** 54:17 61:13
  66:2,12
**bigger** 65:19
  86:25 96:13
**biggest** 40:7,9
  48:21 54:12,25
  65:14
**binder** 9:4,5
**binders** 16:8,13
**birth** 32:24
  83:12,22 84:7
**births** 83:12,17
**bit** 9:25 28:16
  32:7 67:10
  81:4
**black** 62:25
**blanket** 105:24
**bleed** 64:5
**bleeding** 48:10
  50:24 54:21,22
  54:24 66:5
  77:2
**blood** 54:14,15
  55:4,6 63:20
  63:22 64:6,9
  65:13,22 66:1
  66:14 74:15
  76:25 77:15
**board** 3:5,6
  13:25 24:17
  104:20,22
  105:18
**bodies** 106:2
**body** 33:23 51:4
  51:21 53:16,21
  63:25 64:1
  65:13,14 75:9
  101:6 108:24
**bolded** 59:24
  73:10
**bone** 68:6 69:13
  79:20

**bones** 56:21,21
    56:22 57:20
    66:10 67:19
    75:7
**bony** 56:18
**book** 21:10 22:3
    22:7 58:18
    67:2 68:24
    82:10,11
    105:21 107:11
**books** 56:9
**Boraas** 25:10,13
    66:8 70:22
    82:10 101:20
    110:23
**Boris** 26:3
**born** 69:6
**bottle** 66:2,2
**bottom** 90:21,21
    91:7,25 92:2
    93:11 109:3
**Box** 2:8
**boy** 90:12
**Boyle** 3:3 5:8 6:4
    6:25 8:1 11:16
    12:2,7 13:4,16
    13:16 14:5,16
    14:17 16:6,21
    17:5 18:21
    19:22 24:22,24
    25:5 28:23
    29:3 31:15
    36:21 39:4,9
    40:15 41:6
    42:4,17 44:6
    44:15 45:20
    48:11 50:4,7
    58:21 77:7
    82:18 84:12,13
    89:12,25 90:5
    91:17 92:6,10
    92:22 93:12
    94:3 95:15
    97:22 98:13
    104:4 111:4,5
    112:13,17
**Boyle's** 6:5
**branches** 65:17
**break** 8:8,9,12
    8:13,14 9:11

11:11 14:14
    23:18 32:4
    38:17 44:2
    47:8 48:12,15
    49:8 50:1,12
    60:16 83:7,8
    84:10,17
    102:14,20
**breaks** 8:7
**breast** 53:25
**breathing** 38:8
    41:23 49:1
**brief** 29:24
    33:19 98:2
**brisk** 66:1
**broad** 2:4 112:5
**brought** 95:24
**brush** 49:13
**Bulleri** 3:16
    13:24,24
    112:18
**bulletin** 69:15
**bulletins** 47:4
**bus** 11:3
**busy** 29:10

——————
**C**
——————
**C** 2:1 3:1 4:6
**C-section** 65:19
**C.V** 5:16 31:6
    70:22
**call** 11:13,14
    12:19 13:10
    14:24 107:8
    111:14
**called** 34:18
    35:5 65:15
    70:23 98:1
**calls** 15:9
**calvarium** 56:23
**camera** 8:23
    10:23,24 11:17
**campus** 35:6
**Capstone** 34:19
    35:4
**captured** 28:8
    28:11
**car** 64:8
**cardiac** 51:4,22
    53:20

**cardiovascular**
    41:11,23 48:6
**care** 45:5 46:16
    76:4 80:20
    82:23 83:24
    98:12 100:11
    102:7 108:7
**careful** 46:3
    62:23 66:10
    111:22
**Carolina** 1:1,23
    2:7,8,19,22 3:4
    3:5,6,12,15,17
    3:20,22 10:16
    13:10,25 14:9
    42:11 62:24
    63:9 103:24
    113:2
**carries** 47:13
**carry** 47:9,15
**case** 6:10 7:21
    13:1,11 15:8
    18:18,24 19:10
    20:23 21:7
    22:10,15 23:23
    24:8,10,15,16
    24:19,21 25:9
    27:9 28:10,14
    30:22 44:24
    52:1 74:8,21
    76:3,15,16,21
    77:21 78:1
    88:23 103:25
**cases** 18:19
    19:17,19,25
    20:2 70:4
    77:11 84:3
**catching** 68:2
**categorize** 63:12
**cause** 48:10 80:7
**caused** 88:19,22
**cc** 66:1
**ccrowley@ncj...**
    3:23
**CDC's** 32:22
**Cecilia** 4:13
    12:19
**cells** 54:15 63:22
    64:9
**center** 3:3 70:12

**Centers** 98:1,2
**certain** 8:24
**certainly** 12:4
    15:24 80:11
**CERTIFICATE**
    113:1
**certification**
    104:20 105:19
**certify** 113:6
**cervical** 53:22
    56:24 71:6
    72:24 75:2
    77:12
**cervix** 51:23,25
    52:5,6,15,25
    55:1 65:17
    66:11 71:15,17
    71:22 72:8
**cervixes** 52:23
**CFP** 110:12,14
**change** 18:16
    25:24 27:8
    54:12 60:23
    74:5,15 100:15
    100:20 101:2
**changed** 83:1,3
    106:25 107:9
    109:18,20
**changes** 52:6
    53:22,23 54:19
    66:3 74:14,16
    77:18,20 82:7
    109:16
**changing** 55:5
    71:15
**chapter** 21:14
    21:15,16,17,19
    21:19,21,21,22
    21:23,24,25,25
    67:24 68:1
    70:3 71:9
    79:22 82:10,12
    107:6
**chapters** 21:11
    21:25 22:2
**chat** 22:18 31:3
    36:19 37:23
    38:6 62:5
    84:21 94:23
    98:18 102:25

104:9
**check** 9:9,12
    50:6 84:15
    102:17
**checking** 20:21
**chemical** 100:17
    100:22 101:8
    107:3
**Cherry** 3:11
**child** 29:21
**children** 24:13
**chime** 7:22
**chloride** 67:23
    68:10
**choice** 70:17,19
    89:6
**choices** 89:23
**choose** 70:9,15
    102:9 111:22
**choosing** 82:15
**chose** 47:3,3
    82:9 95:11
    106:5,6 108:12
    110:6
**chosen** 70:10
    80:3 111:24
**Christy** 25:9,13
**cipher** 112:3
**circle** 23:19
    26:14 51:17
**circulation** 24:1
    24:3
**circumstances**
    9:16 71:9
    73:11,24 74:1
    74:2,5
**citations** 20:16
    25:23 108:4,5
**cite** 47:3 79:18
    96:11 107:24
**cited** 20:14
    25:17 26:24
    42:8 58:25
    59:6,8 67:3
    73:9 76:16
    79:15,16 84:20
    86:22
**city** 10:14
**Civil** 2:3
**claim** 79:4 90:10

clarification
  33:19 43:7
clarified 105:7
clarify 7:4 32:11
  33:7 51:10
  57:24 68:12
  101:25 109:13
clarifying 38:7
class 34:15,17
  34:21,23 35:7
classified 100:12
clean 9:22
clear 7:23 33:21
  34:4,24 57:1
  81:8 83:16
clearly 74:22
  99:7
clinic 45:7 70:25
  93:25 94:9,11
  94:14 110:13
  110:21
clinicians 83:21
clinics 42:11
  70:21 93:22,23
  94:2
clock 8:9 35:9
close 15:8 32:3
  108:20
closed 52:24
  104:10
clot 63:25 64:6
clotting 63:23,24
  64:10 80:9
coagulation
  63:16 64:2,13
coagulopathy
  80:5,7,12,14
  80:17,21 81:9
Coast 6:7
coffee 6:5
cog 30:6
Coke 66:2
cold 67:10
collaboration
  30:11
collapse 48:6
  57:21
colleague 85:17
  91:6
colleagues 24:16

56:12 86:5
collecting
  101:15
collective 101:6
Colleen 3:21
  14:1
College 34:6,6
  34:15 35:2
  104:21
column 66:21
  69:25 71:5
  79:10,11 87:21
  90:19
combination
  46:17 99:6,9
come 7:20 22:22
  22:25 47:24
  49:2 50:6
  56:25 57:18
  65:15,16,17
  73:5 84:15
  95:7
comes 11:5
  15:14 18:10
  66:7 73:6 81:1
  95:7 112:11
coming 11:25
  12:1 48:19
  82:10
comments 45:2
  48:14
commission
  114:22
committee 47:5
  108:13,15,24
  109:3,4
common 33:5
  50:19 59:20
  67:22 75:23
  83:19 92:16
  96:24 97:4
  99:12,14
commonly 99:8
communicate
  16:2
communicatio...
  16:3 19:16
  24:7
community
  88:15,18 89:10

89:10,21 90:8
  90:11
comparative
  55:19 56:1
compare 31:23
  56:7,10
compared 5:23
  56:4,15 66:13
  72:2,18 73:19
  100:18,25
comparing
  68:18 78:7,11
  78:15 100:21
competent 46:14
complete 7:16
  105:23
completed
  104:13 105:1,9
completely 7:3
complex 61:18
  61:19 62:22
  75:18 104:13
  104:15 105:1,9
  105:17 110:19
complicated
  77:11,13
complication
  62:20 64:17
  77:14 78:7,9
  78:12,13 80:10
complications
  5:23 70:5
  82:12 100:18
  100:24 101:8
comprehensive
  104:3
concentrate
  46:13
conception
  52:16
concern 40:7,9
  40:20,22 41:24
  44:19 83:21
  93:2
concerned 41:19
  109:24
concerns 93:14
  102:8 111:8,10
concessions
  100:6,14

concluded
  112:23
conclusion
  101:15,22
conclusions
  111:8
condition 48:25
  80:8 81:9
conditions 49:1
conducted 20:22
confirm 22:22
  102:22
confusing 41:1
confusion 32:10
conglomeration
  47:5
connected 47:12
  91:11 92:8
conscious 39:24
  39:25 40:4
consensus
  108:20,22,23
  109:2,2,7,10
Consent 21:16
consequence
  34:2
consistent 40:21
  42:5 106:3
consistently
  100:24
consumptive
  80:7 81:9
contact 94:10
content 23:11
contents 21:20
  49:18
context 9:16
  64:4 68:16
continue 71:1
  76:10 80:2
  102:4
continued 3:1
  4:7
continuing
  12:20 71:18
  76:10
continuum
  36:23
contraception
  104:18 107:8

contrast 71:21
  72:7
contribute 89:22
  89:23
control 44:23
  47:3 70:14
conversation
  19:1 45:22
  55:22 56:11
  100:13
conversations
  54:10 56:14
copies 62:8
  84:22
copy 26:9 31:2
  31:17 32:2
  35:13 37:14
  85:6 94:18
  98:25
Corporate 3:3
correct 7:4 8:6
  16:16 19:13
  20:9 22:15
  25:4 27:16,17
  28:14 32:15,16
  32:18,19,21
  33:14,15,17,18
  33:25 34:6,10
  34:11,12,16
  36:8,15 38:9
  39:24 40:6,14
  56:6 57:5,6,13
  58:1,2 60:18
  60:19 61:1,7
  61:24 67:4,7
  68:7,14,16
  75:15 76:2,17
  77:11 79:23
  81:14 82:17
  86:7,12,24
  87:7,9,15,17
  87:23 88:2,5,7
  88:8,10,11,13
  88:14,16,17,20
  88:24 89:11,24
  90:25 91:4,12
  91:13,16 92:9
  92:17,21 93:11
  93:19,20,22
  94:12,13 95:11

96:2,7,12,18
96:19,22 97:1
97:6,10 99:10
99:13,21
101:13 102:2
103:19,24
106:8,9 108:17
108:20 109:14
109:15 114:4
**corrected** 18:11
97:11 109:25
**CORRECTION**
115:3
**corrections**
17:25 18:1
114:6 115:21
**correctly** 35:18
39:21 67:16,25
69:22 70:6
71:10 72:3
79:25 80:11,14
87:3 93:9,16
**correspondence**
19:1
**cortical** 56:21
67:18,20 68:6
68:15,19,20,24
69:13 79:20
**coughing** 67:11
**counsel** 2:2,17
2:25 3:5,13,18
3:24 13:5,11
13:15,17,20
24:7 113:11,14
**Counseling**
21:17
**countries** 67:23
**COUNTY** 113:3
114:14
**couple** 47:7
65:10 81:18
**courage** 29:17
**course** 6:4 29:13
32:13 34:19
35:4 55:13
56:18 76:23
**courses** 34:13
**court** 1:1,19
6:21,23 7:8
9:15 11:16

16:4,19 17:4
17:18 50:5
84:15 102:17
**cover** 81:12
**covered** 14:3,17
**cramping** 50:24
54:3,25
**crazy** 58:6
**create** 48:3
**created** 25:12
**creates** 32:10
**critical** 34:20
**critique** 106:14
**Crowley** 3:21
14:1,1
**crud** 67:10
**crushed** 69:6
**curettage** 70:1
**current** 106:7,21
**currently** 10:10
10:15
**curriculum**
34:20 35:3,3,5
**cut** 46:20
**cycle** 12:9

---

## D

**D** 5:1
**D&C** 52:2 61:10
74:18
**D&Cs** 61:25
**D&E** 57:22,25
59:3 60:6,13
61:11,13 64:17
64:23,24 65:2
65:3 67:19
68:19,21 74:19
75:13,14 76:2
77:1,17 78:7,9
78:12,13 83:13
83:17 84:1
108:9
**D&Es** 104:14
105:2,10
**D.C** 28:18,22
29:1 30:25
**data** 53:10 65:6
96:15 101:15
106:24 111:12
**date** 28:3 43:22

43:22 115:23
**dating** 50:25
**David** 74:12
**Davis** 3:10
**day** 17:16 20:6
29:13 49:13
82:21 107:8
113:17 114:16
**days** 99:23
**DC** 2:15
**De** 4:12 12:21
**dead** 33:1 56:16
57:18,22 61:14
65:8 66:14
75:9,21 80:6
**deal** 55:15
**dealing** 10:2
59:14 67:10
**death** 48:22 64:5
80:4
**deceased** 94:9
**December** 5:18
26:21,21
**decision** 30:8
109:5,22
**declaration**
25:14 26:17
27:2,5 110:9
**declarations**
18:19 21:1
26:6,18
**decompose**
54:15
**decomposing**
55:3
**deemed** 43:3
**deep** 39:17,20
40:8 45:15
47:23 48:18
107:18 108:7
**deeper** 40:21
45:9
**defendant** 3:18
13:17,23 14:11
111:6
**defendants** 1:6
2:19 3:13
13:15
**Defending** 3:7
**define** 50:21

52:9 60:7
63:18 94:14
108:21
**defined** 33:2
51:9 57:25
**definitely** 46:12
46:15 53:24
68:25
**definition** 32:21
32:22 33:13,20
33:24
**definitions** 33:5
33:8 50:19
**degree** 67:18
**deliver** 54:5
**delivery** 56:12
76:12
**demand** 65:22
65:23,24
**demise** 64:18
67:20,21,22
68:6,13,25
79:20
**demises** 57:16
64:22 76:13
**demonstrating**
64:11,16
**Department**
2:19 3:15,20
3:25 14:2,9
**depends** 65:21
**deplete** 63:24
**deposition** 1:10
6:6,14,21 7:7
8:2,20 9:6,15
11:10 16:11,18
17:15,25 18:10
18:20 20:6,23
25:25 27:4,24
28:1,2,10 31:5
32:10 33:4
39:16 63:10
66:8 84:22
99:15 100:3,6
103:10,12,18
103:20 108:15
112:23 113:5,7
113:11,13
114:3 115:20
**depositions** 21:2

30:8
**Desai** 5:20 84:20
86:5 111:8
**describe** 14:23
44:20 49:9
50:21 52:24
56:13 57:9
70:18 92:17
**described** 16:8
24:4 25:7
51:22 72:23
86:6 92:20,24
93:4 101:3
106:5 110:2
**describes** 86:19
86:21 90:21
91:9
**describing** 51:8
75:11 87:5
93:2 97:8
**description** 5:14
39:2,7
**designed** 32:22
**desire** 45:7
**developed** 67:23
**diagnosed** 49:3
52:13
**diagnosing** 36:1
36:7,9
**diagnostic** 43:2
43:11,12,21
**dialogue** 75:19
**DIC** 63:16 64:13
64:17 65:9
76:24 80:19
81:9
**die** 54:15 64:6
**died** 52:14 66:4
74:14 81:3
**dies** 65:24 68:11
**difference** 57:17
61:13 87:19
**differences**
56:13 73:20
**different** 31:13
40:17 51:15
53:17 54:9
59:13 61:12,15
63:7,11 65:12
66:5,14 70:18

120

75:8 76:9
82:20 101:16
101:25 111:12
**differently** 40:6
41:2 45:12
65:7
**difficult** 9:15
56:19 71:7,24
72:16 73:12,25
74:6,18 104:6
105:25
**difficulties**
73:16
**difficulty** 56:14
82:2
**digoxin** 67:23
68:9
**dilatation** 71:7
71:23 72:9,13
72:25 75:2
**dilate** 72:12
**dilated** 71:22
72:8
**dilation** 67:19
72:24
**dilator** 72:11
**dilators** 71:8
**dinners** 29:12
30:22
**direct** 18:9 56:7
76:1 84:20
90:12
**directing** 32:13
90:18
**direction** 113:9
**directly** 42:21
91:15
**director** 98:1
**disaggregated**
95:20
**disagree** 36:10
83:4 110:2
**disarticulate**
75:8
**discerning** 95:11
**discloses** 91:23
**discovery** 1:19
31:25 103:25
**discuss** 30:21
96:25

**discussed** 53:23
87:20 93:10
96:25 99:16
**discussing** 16:19
55:18 56:1
88:4 100:6
**discussion** 50:18
99:15
**disease** 70:4
**dismember** 75:7
**dismemberment**
83:25
**disrespect** 9:2
**disrespectful**
8:19
**disseminated**
63:15 64:1,13
**distinct** 43:1,10
43:20
**distracting**
11:23 15:22
**distribution**
86:22
**District** 1:1,1
3:13,18 13:23
**Dobbs** 109:20,22
109:22
**doctor** 29:18
63:15 89:13
111:5
**document** 16:18
17:1 22:23
25:12 26:24
31:8 32:1
36:19,25 37:4
37:6,23,25
38:6,10,19,22
39:3,8 40:22
42:7 43:11
44:4,12,17,18
78:25 84:24
85:21 94:25
95:20,21 98:21
103:3
**documentation**
39:15 101:21
104:7
**documented**
36:11 46:10
**documenting**

21:18 95:25
**documents** 8:25
9:4,6 16:10,12
16:17 18:19
19:16 25:12,12
25:17 26:15
36:21 62:10
**doing** 7:8 8:14
9:7 12:15
24:13 36:11
40:18 41:9
44:22 46:11
50:25 61:13
62:23 63:8
66:13 68:8
69:5 74:11
77:16 111:15
**Dos** 4:13 12:19
**double** 9:12
**doubt** 92:24
93:1
**download** 23:4,6
58:13
**downloading**
23:18
**downloads** 32:5
**Dr** 5:16,18 6:4,4
14:21 25:9,13
26:3,6,15
27:11,15 38:16
39:16 48:14,17
50:15 63:7
66:8 70:21
74:12 82:10
84:19 101:20
101:20 103:7
103:10,19
107:23,23
108:2,3 110:23
**drew** 106:11,11
**drink** 49:13
**drinking** 6:5
**Drive** 3:3
**driven** 109:17
109:17
**drop** 22:17 31:3
36:18 54:1
62:5 84:21
94:22 98:18
102:24

**dropped** 37:23
102:23
**dropping** 31:5
104:9
**drugs** 99:24
**due** 74:23
**duly** 6:2 113:7
**duplicative** 6:15

---

**E**

**E** 1:8 2:1,1 3:1,1
4:6,6 5:1,2,12
115:1,1,1
**ear** 67:11
**earlier** 12:16
25:7 36:21
50:18 57:5
58:1 59:7
76:24 109:13
**early** 6:7,7 21:22
28:5 35:25
36:2,8
**easier** 69:13
71:23 72:9,13
72:25 73:2
79:19,21
**easily** 31:22
51:14 80:21
105:24
**Eastling** 4:14
13:7
**easy** 31:23 80:13
**eat** 49:12
**ectopic** 36:2,7,9
**Edenton** 2:21
3:16,21
**editor** 5:25
98:17 99:4
100:4,7 102:25
**editors** 81:18
105:21
**education** 34:19
34:25 35:2,5
42:7 82:16,16
**efficient** 23:8
**eight** 21:22
88:12
**either** 19:19
25:25 27:7
33:1 57:15

68:9 108:7
112:16
**element** 41:7
95:12,22
104:19
**Elizabeth** 4:20
14:5,8
**Ella** 4:21
**Ellis** 3:3 4:16
12:19 13:16
111:5
**embryo** 32:25
51:3,21 52:13
52:16,18 53:8
54:4,13 55:2
**embryonic**
53:20
**embryos** 54:16
62:1
**emphasis** 78:18
**employed**
113:12,14
**employee** 103:18
113:14
**encountered**
88:6
**endeavor** 8:7
**endeavoring**
32:8
**ensure** 7:22
33:20
**ensuring** 50:18
**entered** 13:15
**entering** 82:22
**enters** 11:9
**entire** 63:25
64:1 86:1
101:6 106:20
**entirety** 101:21
114:3
**esophageal**
49:16
**esophagus** 47:19
48:5 49:16
**especially** 9:16
65:19
**Esquire** 2:4,7,12
2:13,13,20 3:3
3:7,11,16,21
4:14

121

estimate 27:25
95:18
et 1:3,6,8
ethical 87:23,24
111:24
ethically 90:14
evacuate 71:25
72:16
evacuation
69:25 79:12,19
80:3,9
evaluation 21:20
80:5
events 28:21
29:1,8,12,12
everybody 11:21
14:18 40:6
evidence 42:10
55:6
evidenced 55:7
Ex-25 5:16
Ex-26 5:17
Ex-27 5:18
Ex-28 5:19
Ex-29 5:20
Ex-30 5:21
Ex-31 5:23
Ex-32 5:25
exactly 68:18
82:16
exam 52:3
Examination
5:4,6,8
examine 54:5
examined 6:2
35:25
example 9:17
18:4 47:18
55:8 63:7
106:24
examples 51:12
exception 3:14
excerpt 69:19
excerpted 57:4
excerpts 22:23
exchanged
18:23 19:3
excluded 93:21
94:1,10
exclusive 76:6

exclusively
103:18
excuse 104:22
excused 112:21
exhibit 22:19
31:4 36:20
62:6 84:21
94:23 103:1
Exhibit-25 31:8
Exhibit-26
36:25
Exhibit-27
62:10
Exhibit-28
62:10
Exhibit-29
84:24
Exhibit-30
94:25
Exhibit-31
98:21
Exhibit-32
103:3
exhibits 16:9
31:16 98:19
expect 73:16
expectant 54:8
55:11
expected 20:21
53:3 76:23
77:2
expel 51:5,21
53:2,8,21 54:4
experience 46:9
46:11,12,18
57:11,14,21,22
57:24 61:6
63:2,3 69:4
75:12,18,25
76:1,11 90:11
97:19 104:6
105:16
experienced
62:21
experiences
104:7
expert 5:16 9:5
16:11 18:18
19:2 20:8 21:1
25:15 26:18

27:15,19,20
28:9 31:2,6
46:10 50:16
51:2 74:22
76:17 78:25
79:4 89:25
96:12 101:17
107:23 110:6
expertise 38:1
38:20
experts 43:5
46:17,22
expires 114:22
explaining 82:14
explanation
26:6
expressed 91:15
expressing 41:2
extensive 62:17
extent 18:22
71:23 72:8
103:16
externally 55:13
extra 52:17
extraction 57:22
79:20
extremely 29:24
65:9 102:3
extubated 48:21

———————
F
Fabulous 9:8
10:13 11:8
14:12 15:2
86:1
facets 99:16
facilitated 67:20
facilities 41:18
facility 70:4
facing 15:24
fact 25:2 55:2,6
61:9 65:25
75:4,6 80:24
101:7 105:20
106:2,12
111:13,24
factor 80:9
factors 63:23,24
64:10
failed 83:23

fair 22:8 41:5
fairly 105:17
faith 58:19
falls 67:6
familiar 103:7
family 24:9,11
61:18,20 62:22
63:8 75:19
76:6 104:13,16
105:1,9,18
110:19
far 23:22
Farris 26:7,15
63:7 101:20
103:11,19
Farris's 39:16
fascinating
107:5,9
fashion 70:2
February
113:17
Federation 2:12
12:19
feel 7:4 8:8,19
9:20,25 33:6
35:18 38:3
50:1 51:17
107:21 111:15
feeling 8:18 54:2
feels 23:8
fellow 61:18,20
fellowship 62:22
104:13,16,20
105:2,9 110:14
110:20
felt 106:12
Fernandez 4:15
fetal 24:1,2
29:19 34:2
53:20 57:15
64:18,22 66:10
67:18,20 68:6
79:19 80:4
82:24 83:2
102:4,6,7
feticidal 67:7
feticide 83:21
fetus 32:25
33:23 51:4,22
52:13,16,18

53:8 54:4,13
55:2 56:16
57:17,23,23
61:14,14 67:9
68:13,25 74:14
74:16 75:8
109:19
fetuses 54:16
62:1 80:6
fewer 59:20
Fex 4:12 12:21
field 29:23,25,25
30:1,2 61:15
76:8 85:14
fight 29:18
figure 85:15
93:15 96:11,12
filing 113:11
final 31:20 49:7
financially
113:15
find 28:3 107:8
fine 7:3 15:24
32:6 33:7 38:1
38:21 49:5
83:10 85:7
105:14
finger 52:3
finish 7:13 8:13
23:18 95:15
105:15
finished 95:16
Finland 99:20
100:1
first 6:2 8:22 9:6
10:2 21:23,24
23:6,18 32:4
37:8,9,24
38:17 45:10
47:8 50:1 54:6
56:17 59:22
60:24 61:6,23
61:25 62:6
67:14 70:2,10
70:11,21,24
79:11 82:20
86:5 94:8
107:1,6 110:9
five 18:3,8 21:19
21:19 29:23

flag 8:16 83:7
flagging 59:11
flat 62:17
flipped 59:7
flipping 59:6
Floor 2:4
flow 55:4,6
  65:13,22 66:1
  66:14 74:15
  77:15
focus 96:4
focused 41:4,9
  55:14 93:18
focusing 60:9
folks 9:12 12:3,9
  12:11
follow 17:10
  32:4 43:4
  58:20 77:7
  90:22,24
follow-up 15:17
  48:14 59:11
  75:22 86:10
  87:7,17 90:19
  90:25 91:14
  93:10 100:11
  109:12
following 16:1
  61:22 77:22
  83:13,17
follows 6:2
  44:16
followup 63:1
  91:4,10,24,24
  91:25 92:2,4
  112:7
food 49:14,18
footnote 37:15
foregoing 113:5
  113:7 114:3
  115:20
foresaw 11:8
forget 62:5
forgive 12:7
Forks 1:21
form 19:22 25:5
  28:23 29:3
  39:18 44:6,15
  45:20 90:2,5
  112:10

formal 63:5
formed 30:15
fortunately 81:4
forum 8:17
forward 21:13
  38:2
found 28:4
  37:17
Foundation 2:3
  29:9
Foundations 2:7
four 11:13 18:3
  18:7 21:17
  61:16,19 80:7
  80:17,18 85:24
  96:10,15
  100:17 104:16
  106:3
Foxwood 4:16
  12:20
frame 53:22
free 35:18
  111:15
Freedom 3:7
front 8:25 31:17
  50:16 95:4,6
full 20:19 34:9
  67:14 75:24
  79:11 109:20
  114:4
fully 110:6
function 41:23
  54:2
functions 42:25
  43:19
further 54:11
  111:2 112:13
  112:15 113:13
future 29:22,25

_____ G _____

G 3:11
gears 28:16
gen 34:17,17,18
  34:24 35:5
general 2:25
  13:20,20 34:19
  34:25,25 35:2
  35:4 39:15
  47:8,9,11,14

49:5,15 78:2
  81:11 101:9,10
  101:13 102:1
  107:19 108:8
  108:12,23
generalize 80:20
generally 99:6
  110:3
gestation 105:4
gestational
  21:18 55:15,20
  56:3,6 64:25
  65:4 75:15
  78:16 84:6
  105:7
gestations 72:1
  72:18
getting 15:11
  24:18 32:3
  45:25 48:5
  67:12 81:15
  82:2 98:3
  111:12
gist 30:3 100:12
give 8:14 18:21
  30:2 38:13
  44:3 64:9
  111:15
given 8:17 18:22
  18:23 19:19,24
  20:2 38:1,16
  51:18 53:4
  62:8 70:23
  103:21
gives 86:20
  96:11,14
giving 85:14
  91:2
glad 58:10
globally 74:17
go 7:12 10:1
  17:13 22:6,21
  23:16,17 32:1
  32:2 38:23
  48:20,23 51:12
  52:2 61:16
  72:10 74:9
  84:22 86:16
  89:3 91:7 93:7
  94:15 99:22

100:4,9 106:16
  110:5,23,25
  112:4
goes 9:18 49:17
  65:8,24 112:2
going 6:12,13
  9:7 12:2 14:13
  14:21 22:4,17
  22:21 23:9,10
  31:3,13 32:7
  32:19 34:5,16
  35:12,16 36:18
  37:14 38:17,18
  41:1,2 45:21
  48:5,11 50:15
  51:13,15 54:18
  55:7 58:3,6,6,6
  58:15 59:18
  60:23 61:17
  62:4,5 65:12
  66:14,15 67:14
  69:18,21,24
  71:1,18 72:11
  73:23 74:23
  79:7 80:2 81:3
  82:12 83:11
  84:19,20 85:15
  85:17,20 86:4
  87:21 90:1,9
  91:6 93:8
  94:16,18,22
  98:16,17 99:6
  99:17 100:22
  102:23 105:15
  106:4 109:12
  112:1
good 11:11
  49:25 58:19
  80:13 84:9
  90:13 111:5
gosh 69:11
gotten 35:19
governing 106:2
graduates
  110:25
graduating
  59:21
granting 37:19
grave 102:8
gravis 49:3

Gray 2:2
great 16:17
  17:21 20:13
  21:12 22:4
  35:22 39:23
  50:9 87:1
  109:6
greater 47:21
  65:22 74:22
  75:5 77:24
Grime's 74:12
groin 65:15
Grossman 86:14
  94:16 95:9
ground 6:14
  99:17
group 30:12,17
groups 12:10
  30:13,15
grown 24:13
grows 65:22
guess 22:11 74:9
guidelines 43:16
  46:8
gynecological
  45:5 60:25
gynecologists
  63:6 95:19
  96:16
gynecology
  59:21 82:11

_____ H _____

H 5:12 115:1
half 59:21 66:2
hand 9:17
handy 94:19
Hannah 2:13
  12:13,20,22
  85:20
hannah.swans...
  2:16
happen 49:4
  51:3,9 81:5
  107:7
happened 8:18
  9:11
happening
  41:13,15,17,17
  41:18 51:20

74:15 82:2
**happens** 56:11
69:16 80:17,22
**harassment**
97:20
**hard** 37:14
44:19 63:12
85:6
**hawk** 109:15
**head** 7:10 57:8
68:3 77:6 78:4
90:10
**head-to-head**
65:6 75:16
**header** 67:6
**heading** 96:14
**heads** 69:6 81:13
**health** 3:25 14:2
21:16 102:5,6
**healthy** 109:19
**hear** 9:18 11:6
15:20 41:2
**heard** 84:4
**hearing** 14:4
63:1
**heart** 48:7 62:1
68:10
**heartbeat** 51:1
62:1
**help** 64:6 71:8
71:16
**helpful** 37:16
**helping** 6:23
91:7
**hemorrhage**
56:24 63:20
64:7 66:5,7
70:13 75:5
77:15,24 78:7
78:8,12,13,17
80:8 81:6
100:8,12
**hemorrhages**
63:23
**Heritage** 29:9
**hey** 111:18
**hide** 12:16
**higher** 64:24
65:3 100:18,24
**highlight** 61:9

**highlighted**
60:22
**highlighting**
33:8
**hired** 19:2
**Historical** 21:14
**historically**
30:20 81:22
107:11
**history** 29:24
30:1
**home** 58:5,7,10
**honest** 22:3
81:21 111:14
**hope** 40:16
**hopefully** 14:18
83:24
**hoping** 82:8
**hormonal** 54:1
**horse** 75:21
**hospital** 46:4
70:12 110:13
110:20,24
**hour** 8:8 28:13
48:12 50:7
71:14
**hours** 27:18,23
27:25 28:6,8,9
56:21 67:21
112:9
**house** 10:17
**huge** 65:18
**hugely** 102:18
**human** 3:25
14:2 90:13
**humanities**
34:19
**Hurrey** 1:18
113:4,19
**hurt** 46:3
**husband** 24:9,11
58:7
**husband's** 11:4
**hypothetical**
46:2 73:14

_____
**I**
**idea** 41:14
**identical** 61:9
**identification**

31:9 37:1
62:11 84:25
95:1 98:22
103:4
**identified** 23:21
87:23 88:1,9
89:17 94:11
95:13 99:18,20
**identify** 12:2
16:18 17:3
51:3,20 73:1
88:5 95:9
**iliac** 65:15
**illness** 10:2
**images** 11:16
**imagine** 8:18
10:1
**Immediate** 5:23
**immediately**
18:2 68:10
77:16
**impact** 10:3,7
**impacting** 10:10
**impacts** 101:5
**implantation**
107:7,10
**important** 10:1
15:13 63:3
**inadequate**
107:13,15,24
**include** 25:9
33:22 110:4,6
**included** 30:6
97:5
**includes** 31:6
96:15
**including** 19:15
68:23 69:8
73:10
**inclusive** 79:4
**incomplete**
52:19 59:25
60:10,11,17
61:5 72:1,17
100:9
**incorrect** 35:19
**increase** 72:1,17
81:5
**increased** 49:8
**increases** 64:17

64:18 78:17
**independent**
38:19
**indicated** 87:6
**indirect** 112:1
**individual** 42:25
43:1,10,12,19
43:20
**individuals**
41:20 75:18
98:6 109:4
110:22 111:14
**individuals'**
21:1
**induce** 67:22
**induced** 5:21
30:10 32:14,17
32:20 33:13,16
33:19,24 34:13
40:18 55:20
56:2,4,15
57:12,25 59:3
59:22 60:5,13
60:24 61:6,23
62:15 64:24
65:4,11 66:13
68:6,9,21
73:12,18,21
74:1,7,11,19
74:23 75:2,6
75:13 76:2
77:19,24 78:9
78:13 83:13
90:8 95:19
101:11,13
102:2,9 104:14
105:2,10
**induction** 22:1
33:22 54:12
79:21 83:18,19
**inductions** 57:15
57:16 69:5
76:13
**infection** 49:19
49:20
**influence** 90:11
**influences** 46:16
**informal** 63:9
**information**
12:17 17:2,12

25:22 27:7
32:9 40:17
56:20 75:24
79:3 90:25
91:3,9,23 92:1
92:3 93:10
94:10 97:8
104:3 110:3
**Informed** 21:16
**inherent** 74:10
74:25
**initial** 14:22
27:4,5 32:9
33:4 87:13,14
87:15
**initially** 26:5
87:10
**injury** 56:24
**inside** 81:12
**instance** 99:25
**instruct** 16:21
16:23 19:3
**instruction**
18:22
**instructs** 8:3
**instrument** 48:8
**integrity** 82:5
109:23
**intended** 12:16
**intent** 33:23
**intention** 32:24
34:1 83:23
**intentional**
81:15 90:12
**intentionally**
67:8 82:8
106:5,6
**interest** 30:12,13
30:15,17 76:4
**interested**
113:15
**interim** 110:10
**intern** 83:1
**internal** 18:25
29:11 65:15
**internally** 55:5
**Internet** 23:15
62:8
**interpreted** 90:7
**intertwined** 18:5

124

intervals 79:22
intervene 32:23
intervenor 111:6
Intervenor-De...
  1:9
intervenors
  13:17
intervention
  32:22,25
Intrauterine
  64:22
intravascular
  63:16 64:2,13
introduce 12:9
intubate 48:7,9
intubated 47:18
  47:19,25 48:2
  48:19,20
intubating 47:16
intubation 47:17
  48:24
involved 24:14
  24:16,19
involvement
  30:21
involving 34:13
  77:22
issue 58:16
  85:18 98:2
issues 18:15
  58:13
issuing 108:24
IUFDs 64:19,21
IUP 36:11

J

Jaclyn 2:7 13:9
  13:12
January 1:13
  26:3,10 27:15
  28:5,19
Jim 3:14,19
  13:23
jmaffetore@a...
  2:9
job 46:13 101:14
Johnson 27:12
  27:15
joined 12:13
  13:8

joints 75:8
Joshua 1:6 2:25
journal 82:3
judge 22:9
juicy 66:12
jump 32:7
  101:24
jumped 109:25
jumping 55:17
jumps 76:21
  77:3
Justice 2:19 3:15
  3:20 14:9
justifies 36:11
juxtaposition
  52:21

K

Katherine 26:15
KCl 67:23
keep 15:8 64:14
keeping 9:22
  102:8
Kevin 3:7,11
  13:14,22
key 59:13
killing 90:12
kind 6:13 14:21
  16:1 18:14
  30:2 39:12
  47:4,14 48:19
  49:10 50:20
  57:10,20 59:13
  65:18 72:6
  91:6 106:16
  108:14 111:10
Kinsley 3:24
knew 28:3
  106:14 111:25
  112:1
know 7:3 8:10
  9:20,21 11:10
  11:20 12:11
  15:15 18:12
  20:25 23:1,7
  23:15 24:13,14
  24:15,16,17,20
  26:12 27:3
  30:8,8 31:2,21
  32:8,11 35:14

35:18,22 37:11
38:2 39:12
40:13 41:16,22
46:14,15 47:2
47:17 48:22
49:2,11 54:4,6
54:9,16,24
55:21 56:20
57:2 58:9,17
63:14 65:6,13
66:4,9,9,12,18
68:24 69:16,17
69:22 70:21
72:6,13 74:16
74:21 75:18,19
75:20,20 77:5
80:18,18 81:4
81:4 82:4 84:6
85:4,8,21
86:13 87:18
88:12 90:9,15
92:12 93:6,15
94:5,13 96:8
98:14 100:2
103:22 106:16
107:4 109:15
110:22,23,24
111:14,20
knowing 34:1
41:15 90:7
106:7
knowledge
38:20 76:14
103:12,16
known 65:8
knows 24:14
Kudumuri 4:17
12:21
kwilliams@be...
3:13
Kyla 4:14 13:7

L

lab 80:24
labor 22:1 56:12
57:14 76:12
laboratory 80:6
Laminaria
71:16
landscape 86:17

laptop 14:25
15:3
large 30:12
lawyers 6:9 12:3
19:1
lead 40:8,11
47:6 48:22,22
49:19 80:8
leaders 13:18
111:6
leading 74:15
leads 80:21
101:8
leak 109:20,22
learn 76:7,9,10
76:10
learner 76:9
learning 76:4
left 97:11
left-hand 79:10
Legal 1:20 2:7
legislative 13:18
111:6
lemon 65:20
let's 22:2 37:12
37:22 38:16
43:15 51:15
72:6 81:1
85:25 86:16
letter 5:25 98:17
99:3 100:4,7
100:10 102:25
104:9
letting 35:22
58:9
level 40:21 41:21
44:20 63:2
levels 36:23 39:3
39:7
Liberties 2:3
life 28:18 29:2
32:25 67:8
80:22
life-affirming
29:18 30:19
98:5
lifelong 76:9
likes 70:17
limitations
100:7 109:21

line 43:9,14
115:3
lines 70:23
107:10
list 26:15 31:22
31:22,23 114:5
listed 96:24
listening 9:1
liter 66:2
literally 64:5
literature 35:25
78:3,5,15
106:1 108:16
little 9:25 32:7
54:11 55:11
81:4 82:9
86:25 87:1
96:13
live 32:24 56:17
61:14 65:23
74:11 83:11,12
83:16,22 84:6
90:9
living 57:23 66:1
LLC 1:20
loaded 59:4
102:3
locate 85:2
located 10:14
location 36:14
long 29:14 48:23
60:14 79:5
80:18 105:20
longer 30:17
40:13 53:20,25
54:2 65:8
73:22
look 10:18 15:14
16:17 17:1
21:18,25 31:19
35:20 37:7,12
38:10 47:2
51:13 66:4
73:18 81:23
95:17
looked 68:22
72:22 100:9
looking 6:5 8:23
8:23 9:2 17:3,3
17:7 38:6 47:8

125

50:17 60:8
69:24 74:25
85:23 86:4,19
87:12 89:16
**looks** 25:3 49:10
64:4 87:8
**lose** 54:14
**loss** 54:25 55:9
57:17 65:7
69:2
**losses** 76:25
**lost** 8:9 54:13
82:4
**lot** 6:14 11:20
21:6 30:4,7
55:22 56:11,24
57:14 62:18
63:20 66:7
75:17 76:13
81:20,20,21
82:19,20 93:2
109:5 110:23
**lovely** 10:18
**low** 80:25
**lower** 107:2
**lungs** 49:19

───────────

**M**

**M** 5:2
**M.D** 1:12 6:1
114:1,10
**macerated** 57:19
75:9
**maceration** 55:3
65:25
**Maffetore** 2:7
13:9,10
**mailing** 94:11
**main** 29:13
46:25 48:10
78:15,19
**mainstay** 23:25
**major** 35:3
40:22
**majority** 49:4
70:19 108:12
**making** 46:14
52:5 71:7 74:4
76:23 77:14
90:11

**manage** 68:19
**managed** 107:21
**management**
21:20,22 44:18
45:19 46:16
53:3 54:8,8,9
55:11,19 56:2
59:2,24 60:5,9
60:17 61:4
64:24 65:3
73:11,25 74:6
76:23 78:8,12
107:13,15,17
107:24 108:1
**march** 28:18
29:2,13,20
82:13
**marked** 22:18
31:4,8 36:20
36:25 62:6,10
84:21,24 94:25
98:18,21 103:1
103:3
**Massey** 4:18
12:21
**massively** 73:14
**materials** 23:21
25:8,9,17
27:11
**maternal** 24:1,2
29:19 70:4
82:24 102:6
**matter** 61:11
65:25 105:20
**matters** 10:21
**Mbulleri@nc...**
3:18
**mean** 24:15
25:18 30:6
31:20 34:25
40:5 46:8,20
47:10 52:23
64:5 69:4 72:9
80:21 88:21
89:2 93:23
101:19 108:21
**meaning** 74:3
**means** 15:20
49:9 64:1
**meant** 38:12

**measuring** 81:2
**mechanical** 71:7
71:16,23 72:9
72:13,25
**medical** 3:5 5:23
13:25 21:20,22
30:19 32:13,14
34:22 47:9
55:18,25 59:20
79:21 82:16,16
82:21 98:1,12
106:8,21 110:3
**medication** 10:8
36:13 54:8
95:20,21 96:1
96:6,16,21
97:10,12 99:5
99:9,18 100:21
100:25 101:7
107:3,7 111:18
111:19
**medications**
42:23
**medicine** 29:19
29:22 82:6,22
97:25 102:5
**meet** 6:11,12
**meeting** 15:1
**meetings** 29:11
30:22
**Meghan** 4:15
**member** 76:6
**membership**
109:2,3,8
**Memorization**
20:21
**memorized**
20:20
**memory** 10:3,7
**Mendias** 2:4
13:4
**mention** 103:14
**mentioned** 15:7
30:23 48:17
54:24 57:3
66:7 75:1
76:24 77:10
90:17
**met** 13:4
**metal** 48:8

**method** 80:3
92:18,25 93:5
**methodological**
111:11
**methodology**
93:3,5,15
**methods** 95:21
96:3,8
**MFMs** 78:1
**Michael** 3:16
13:24
**mid-question**
8:12
**middle** 1:1 52:19
**midnight** 49:12
**Mifepristone**
99:9 107:4
**Mifepristone-...**
100:1
**mind** 73:6 85:11
86:1
**mindful** 35:9
**mine** 37:19,21
44:1 67:12
68:1,2
**minimal** 39:20
39:23 40:13
71:7
**minimize** 102:10
**minimum** 46:1
**minor** 18:6,14
**minority** 30:9
**Mintua** 100:23
**minute** 38:10
66:2,3 95:7
**minutes** 29:23
50:1,8 84:10
102:14
**miscarriage**
53:7 54:7
55:19 56:2,4
56:15,16 59:2
60:5 64:23
65:3 73:12,19
73:25 74:6,18
78:8,12
**miscarriages**
53:7 70:10,20
70:24 76:12
**miscarry** 53:11

**miscarrying**
52:20
**Misoprostol**
71:8,16 99:10
99:13
**mispronouncing**
80:12
**missed** 12:22
14:6 35:18
50:22,23 51:9
51:18 52:4
80:21
**missing** 23:3,19
33:11
**mission** 10:19
**mistake** 7:3
**moderate** 37:20
39:20 40:3,7,8
40:14 42:3,14
43:17 44:13
**mom** 24:14
**moment** 23:16
37:24 72:22
**monitor** 41:10
**monitoring**
40:19 42:22,25
43:1,10,19
**month** 26:19
28:3 81:3
**moral** 87:23,24
97:5,14 111:23
**morally** 90:14
**morning** 20:12
31:15
**mouthful** 63:15
**move** 40:8 51:16
85:15 94:15,16
98:16
**moved** 38:6
40:20 94:23
**moving** 17:14
38:1
**Moyer** 4:19
**multiple** 107:25
111:21
**murdered** 98:12
**muted** 9:10
**myasthenia** 49:3

───────────

**N**

126

N 2:1 3:1,8 4:6
5:1,2,2
N/A 88:5
name 6:5,8
44:22 46:4
111:5,17
names 106:10
Narasimhan
2:20 13:19,19
14:8,10
National 5:21
naturally 53:2,8
necessarily
25:21 62:16
108:25
necessary
104:23
need 8:9,12
11:24 26:14
33:6 37:7 38:3
61:15,17 80:23
87:1 94:4,20
96:3,8 98:25
101:14,24
104:17 106:2
needed 11:11
14:14 67:13,19
99:4
needs 11:2 15:7
59:20
negative 19:4
neither 113:11
neuromuscular
48:25 49:1
never 32:14,17
33:1 48:21
76:1 80:12
86:1 102:4,7
111:10
new 2:5,5 25:14
105:17
newborn 83:24
nice 6:11,12
93:6
Niinimaki 98:17
99:1,16 100:15
nine 21:23 70:3
71:9 88:9
noises 11:6
non-anesthesi...

42:8,20,21
non-complicat...
77:23
non-doctors
38:7
non-Planned
103:23
nonviable 70:1
71:5,25 72:1
72:16,18
normal 41:22
71:6 72:2,19
normalize 83:2
North 1:1,23 2:7
2:8,19,22 3:4,5
3:6,11,12,15
3:17,20,22
10:16 13:10,25
14:9 42:10
62:24 63:9
103:23 113:2
Notary 113:20
114:20
note 9:9 11:2
12:24 13:3
14:15 17:8
31:15 33:8
51:13 61:10
90:3
noted 18:3 26:25
97:13
notice 13:7 41:5
55:11
Noticeable 67:20
noting 77:1
November 26:21
number 5:14
37:11 91:14
107:2
numbers 42:19
100:20 101:1
112:2
nurse 42:2
108:11
Nursing 3:6
NW 2:14
_____
**O**
O 5:2
O'Brien 4:20

14:5,8
O'Neill 3:14,19
13:23
oath 6:19,20,21
17:21 114:2
ob-gyn 61:16
62:18 80:22
83:1 104:22
106:10 111:21
ob-gyns 70:20
78:2 93:21
object 19:22
25:5 28:23
29:3 44:6,15
45:20 90:1,5
90:14
objection 8:2
16:6,21 17:5,5
24:22 39:4,9
40:15 41:6
42:4,17 82:18
87:24 89:12,25
90:2 91:17
92:6,10,22
93:12 94:3
97:22 98:13
112:10
objections 87:23
90:2 111:24
objective 82:1
86:6 95:18,24
106:13
objectively
97:24
objectivity 82:9
observed 12:15
observers 11:14
13:2
observing 9:9
11:23 13:8,11
obstetric 45:4
60:25
obstetrician-g...
5:22 86:23
obstetrician/g...
46:19,21
obstetricians
63:5 95:18
96:16
obstetrics 23:24

24:2 59:21
obtained 91:9,24
92:3
obtaining 45:15
occasionally
80:19
occur 67:21
72:14 88:23,23
occurred 83:12
83:17 84:7
occurring 42:10
October 43:25
44:1
off-camera
10:24
offer 39:17 54:7
offers 39:20
office 10:14
12:18 13:8
63:10 88:2,3,3
88:7,9,18,25
89:6,10,17,21
89:24 91:10
92:4 93:6
97:17
officer 113:4
oh 38:11 53:24
85:16 106:16
okay 6:18 7:6,11
7:14,25 8:21
9:23 11:18
15:12,19,21,25
16:15 19:5
21:8 22:24
23:13,20 26:14
27:14 28:7,17
29:6 34:4,16
35:21 36:17
37:10 38:4,11
38:12,20,24
39:1,2 44:2,16
47:7 54:19,23
55:16 57:9
58:24 59:10,15
59:17 60:3,9
61:22 64:12
66:17,20 67:3
67:17 69:20
71:3,20 77:7
85:8,19,25

86:1,16 87:3
89:8,19,20
90:6,20 94:17
94:21 95:9
99:3 100:14
102:15 103:12
105:6 112:13
old 81:16 106:14
older 72:20 82:8
once 18:5 22:25
66:18 102:3
106:23
one-page 19:12
ones 21:4 22:9
22:12,13,13,14
110:5
ongoing 32:23
open 22:25 23:5
51:23 52:7,14
52:22 55:1
72:12
opening 52:1,18
operated 52:2
operating 41:9
56:12 72:10
76:11
operative 61:10
operator 43:2
opinion 42:1,5
42:13 44:3,14
44:16 45:14,18
46:7,24 60:22
100:15 101:3,9
101:9,12,14,23
102:1 104:21
105:1,8 106:19
108:24
opinions 22:9,15
24:20 25:24
27:8 46:23
47:5 91:15
108:14,16
109:3 111:15
opportunity
17:24 112:8
opposed 68:20
83:13,17
opposing 18:24
opt 39:15
option 39:18

53:4
**options** 39:12
  45:23
**oral** 34:20
**orally** 19:20,25
**orange** 65:21
**order** 44:12
**ordered** 76:7
**organization**
  30:16,16,19
  47:1
**original** 25:14
  26:17,18
**os** 77:13
**osmotic** 71:8
**outcome** 113:16
**outline** 101:17
**outpatient** 44:22
  45:8 70:4,16
  110:13,21
**outset** 73:9
**outside** 55:5
  70:24,24
**overall** 73:18
  74:21
**overlap** 9:6
**overrides** 45:8
**oversimplify**
  106:24
**owns** 82:3
**oxygenation**
  48:6

---

**P**

**P** 2:1,1 3:1,1 4:6
  4:6
**p.m** 1:13 50:12
  50:12 84:17,17
  102:20,20
  112:23
**P.O** 2:8
**page** 5:4,14 22:6
  37:8,9,21
  42:19 59:12,16
  61:24 66:18
  69:18 71:19
  79:8 86:5,17
  90:22 91:7,8
  91:23 92:2,2
  93:11 94:7

---

115:3
**pages** 5:19 19:13
  21:3 22:8 23:2
  23:12,19 37:24
  57:4 58:4,13
  58:14 59:9
  62:7 66:16
  73:1,3,7 79:5
  106:20,21
**Pai-Thompson**
  2:12 5:6 6:3,8
  12:4,8,12,25
  13:3,12 14:3,7
  14:12,19,20
  16:7,25 17:7,9
  19:6,23 22:17
  22:20 25:1,6
  28:25 29:4,7
  31:11 36:18
  37:3 39:6,11
  40:24 41:25
  42:12 43:6
  44:8,9 45:1
  46:5 48:13,16
  50:5,9,14 62:4
  62:13 83:5
  84:9,12,14,19
  85:4,8,13,20
  85:25 86:3
  89:14,15 90:1
  90:16 91:18,21
  91:22 92:7,13
  92:23 93:17
  94:6,22 95:3
  95:23 98:9,16
  98:24 102:13
  102:16,22
  103:6 104:8,11
  111:2 112:10
  112:15
**paid** 28:13 30:25
**pain** 21:21 44:18
  44:20,23,24
  45:19 46:16
  47:3 70:14
  107:13,15,17
  107:22,24
  108:1
**painful** 45:11
**paper** 8:24,25

---

32:2 62:8
  84:22 94:18
  98:25 99:4
**papers** 46:9
  69:11
**paragraph**
  35:13,24 36:7
  36:13 43:7,9
  50:17 51:2,11
  53:1,2 66:21
  67:15 68:5,17
  69:24 71:1,4
  71:19 73:23
  79:11 80:3
  91:8 93:11
  96:25 97:3
  100:16 101:3
**parentheses**
  67:24 70:3
  71:9 79:22
**Parenthood** 1:3
  2:12,17 6:9
  12:18 39:13,19
  41:14,17 93:25
  103:8,17,23
**part** 7:15 14:24
  16:22 17:16
  30:12 34:9
  60:25 92:16
  99:2 101:5
  103:25
**partially** 51:23
  52:1,14,22
**participants**
  86:12 94:1
  96:5,6
**participation**
  25:2
**particular** 68:17
  72:22 111:19
**particularly**
  22:11 52:15
  56:15,23 64:19
  73:20 74:15
  76:11 81:1
**parties** 113:12
  113:15
**parts** 66:10 72:7
**passage** 35:16
  59:19 60:1,22

---

61:24 66:20
  69:21 73:10
  79:15,16 80:15
**passages** 58:25
  59:5,7,9,13,16
  67:3 73:8
**passing** 69:16
**patient** 21:17
  29:19 34:2
  39:23 40:4,11
  40:12 42:22
  43:1,20 44:17
  44:18 45:15
  46:15 48:2
  49:2 54:17,20
  73:16,16 82:24
  83:2 88:6 89:3
  102:4,7,8
  104:7 108:8
  110:12,19
**patient's** 33:23
**patients** 44:23
  45:3,4,23
  47:24 48:17
  52:22 53:8
  75:3 76:5
  79:21 80:4
  82:23 96:17
  102:8 104:1
  107:20
**pause** 23:14
  37:13 38:5,15
  38:25 58:5
**pay** 80:23
**PC** 14:25
**PDF** 22:18 31:16
**people** 11:20,23
  24:15,16 25:8
  42:15 45:12
  46:1 47:23
  48:9 49:5
  56:13 57:11
  63:10,20,21
  69:12 70:15
  75:20 76:3
  83:20,25 86:20
  87:5,8 95:11
  96:21 98:7
  100:10 104:12
  105:1,9,16,19

---

106:1
**percent** 41:16
  53:10 86:21
  87:22,25 88:1
  88:4,5,9,12,15
  89:17,19 97:13
  97:15,17
  106:25
**percentage**
  96:11 97:4
  110:22
**perfect** 14:19
  15:17 16:12
  35:16 48:15
  49:24 51:8
  85:16
**perforation**
  70:14 72:14
**perform** 42:24
  43:18 60:24
  86:23 87:6
**performed**
  57:12 59:22
  61:23 70:1
**performing**
  43:12,20 60:24
  60:24 61:6
  95:10
**period** 82:15
**perioperative**
  80:8
**permitted** 43:3
**person** 9:20 13:9
  40:18,19 41:3
  42:24 44:10
  46:14 48:5
  86:25 90:7,18
**person's** 51:4,21
  53:16 90:10
**personal** 57:11
  57:14 87:23
  97:5
**personally** 43:18
  70:9
**perspective**
  21:14,16 30:7
  45:19
**perspectives**
  96:15
**Ph.D** 1:12 6:1

82:5 114:1,10
**pharmacologi...**
67:22
**PHILIP** 1:8
**phone** 15:6,14
35:20 58:6,8
91:12,24,24
92:3,8 111:17
**phrase** 79:12
**physical** 40:1
44:24
**physician** 33:17
91:11,12 92:8
110:12,20
**physicians** 30:7
30:9 91:16
92:4 94:8,11
97:20 98:11
111:21
**physiological**
53:23 54:19
74:14 77:18,19
**physiologically**
51:5,20
**physiology** 55:4
65:12 74:23
**pick** 111:17
**piece** 46:6 95:25
101:5
**pieces** 21:7
**pin** 23:16
**Pitt** 3:10
**place** 65:23
74:13 90:14
**placenta** 52:17
55:10,12 76:22
76:25 77:10,12
77:15,16
**placental** 55:8
71:24 72:15
77:3
**places** 69:16
104:2
**Plaintiff** 2:2
**plaintiffs** 1:4
2:11 13:6
**plan** 58:14
**Planned** 1:3
2:12,17 6:9
12:18 39:13,19

41:13,17 93:25
103:8,17
**planning** 61:18
61:20 75:19
76:6 104:13,16
105:2,9,18
110:19
**platelets** 81:1
**playing** 107:11
**pleasant** 72:10
**please** 8:9 10:13
15:15 32:10
58:16 91:19
95:16 111:7
**plenty** 87:2
**pnarasimhan...**
2:24
**pneumonias**
48:23
**point** 7:2,19
8:13,20,22
9:17 11:9,15
12:6 15:13
17:19 18:9
22:23 23:10
27:19 32:5,10
33:6 40:12
44:3 48:15
61:21 73:6
77:13 101:16
107:19
**points** 8:1
**policies** 103:13
103:20
**policy** 88:2,3
89:9,17,24
109:14,18
110:2
**political** 81:23
**politically**
109:17
**popping** 11:25
**portion** 18:10
**portions** 21:8
24:3
**posed** 8:5
**position** 61:4
110:7
**positions** 110:23
**possible** 7:22

36:2,8 44:24
**postpartum** 64:8
**potassium** 67:23
68:10
**potential** 72:14
**potentially** 9:14
89:2
**power** 102:10
**practice** 43:16
47:4 69:4
70:17,20 93:18
93:21,23 94:2
94:5 97:15
98:4 106:8,22
108:6,7,13,15
108:24 111:25
**practiced** 105:20
**practices** 29:18
103:22
**practicing** 33:17
45:24 105:22
**practitioner**
63:8
**practitioners**
37:20 42:9,20
42:21
**Pratt** 72:11
**preface** 21:13
**preference**
15:23 45:23
50:20
**pregnancies**
36:14 71:5,25
72:2,17,19
77:23 89:5
**pregnancy** 5:24
21:15,18,23
32:23 36:2,7,9
53:3,21 54:3
54:25 55:9
70:1,2 71:6
74:12 98:1,2
105:11 107:10
**pregnancy-rel...**
70:5
**pregnant** 47:20
47:22 49:8
51:4,20 53:16
54:19
**preoperative**

80:6
**prep** 71:16
**Preparation**
21:17
**prepare** 73:15
**prepared** 1:18
25:9 26:10,16
**preparing** 23:23
27:19,24 28:1
28:2,8,9 51:5
51:21 53:21
54:4
**present** 4:10
29:22,25 65:6
**Pretreatment**
71:8
**pretty** 32:3
80:13
**prevent** 10:3,7
**previa** 77:10,15
**previable** 57:16
76:13
**previas** 76:22
**previous** 112:9
**previously** 18:16
**principals** 6:14
**printed** 16:9
31:17,18
**printout** 43:8,15
**prior** 80:9 94:10
95:19 113:11
**private** 93:18
94:5
**privileges** 37:19
**Priya** 2:20 13:19
14:10
**pro-life** 30:7,14
**probably** 8:22
27:22 62:20
97:14
**problem** 111:20
**problems** 64:2,3
64:4
**procedural**
43:17 55:19,20
55:21 73:11,12
73:25 74:1,3
**procedure** 21:21
41:4 43:11,13
43:21 45:25

47:11 55:22
56:19 61:10,12
63:3,4 73:2
77:18 83:13,17
83:23 84:1
105:25
**procedures**
33:25 43:2
44:21 61:9
72:1,18 77:1
99:5 103:14,20
110:24
**proceed** 38:12
**proceedings**
13:5
**process** 71:22
72:7 92:17,18
**processes** 92:20
**produce** 33:1
**produced** 31:25
**products** 52:16
**professional**
41:10 42:24
47:1 108:11,20
108:21 109:23
**professionals**
37:21 41:21
103:15
**program** 61:20
105:18,23
**programs**
104:20,22
**promised** 49:24
**properly** 47:18
48:2,7
**proportion**
95:18
**protocols** 36:3,8
36:12,14 39:14
40:17 41:13,15
99:19 103:13
103:14
**provide** 12:14
33:13,16 42:2
42:14 45:9,15
57:25 59:3
60:5 62:14
86:7,21 89:9
89:18 94:9
95:11,19 96:6

96:16,21 97:20
98:6,11,12
104:14 105:2
105:10 108:7
108:10
**provided** 25:24
27:3,9,11,14
31:5,18 32:14
32:17 36:21
39:3,8 40:22
44:12 58:22
59:19 73:1
76:2 90:25
91:3,10 92:1,4
108:9,11
**provider** 40:13
41:4 68:7
**provider's** 63:2
**providers** 86:7
88:12 94:2
97:19 98:11
103:23 108:23
**providing** 24:21
45:12 60:13
61:3,4,8 63:3
86:22 89:24
90:18 97:4,9
108:7
**provision** 5:21
42:25 43:19
95:21,25
**public** 21:15
84:5 113:20
114:20
**publication** 82:1
**publications**
56:10 81:21
**published** 55:18
55:25 81:13,19
81:25 82:2,13
**pull** 31:22,23
35:12 37:14
73:23 85:7
107:16
**purpose** 22:14
31:4 32:24
60:21 95:10
102:5 104:15
**purposes** 81:16
102:25

**put** 9:17 18:4
23:16 32:20
34:20 52:3
86:11
**putting** 47:22

---
**Q**

**qualified** 42:2
42:13 62:14
63:12
**qualify** 59:3
60:5,7
**question** 7:22,23
8:2,4,4,13 11:8
19:7 27:2 29:5
33:12 34:5,22
38:2 39:5 40:3
41:1 49:7,24
50:20 51:10,15
51:16,16 55:23
59:4 60:2,4,21
62:25 73:14,17
73:24 78:6,23
81:8 83:15
86:10,11,11
88:22 89:6,14
89:16 90:3
91:18 92:12,14
92:15 93:4,9
96:2,6,14,22
97:24 98:15
99:7 101:22,23
101:24 102:1,3
103:16 104:24
104:25 105:7
105:12 109:12
110:17
**questions** 7:12
7:13,16,17
9:24 10:4,8,11
11:25 12:1
14:22 15:17
17:6,11,13
22:21 28:11
37:25 38:18
47:7 48:14
55:14 60:16
75:22 83:9
87:7 99:18
111:3,7 112:14

112:15,18
**quick** 35:21 47:7
48:13 58:7
85:11
**quickly** 58:5
**quote** 36:7 59:19
60:23 71:21
72:23 80:3
88:9 90:24
91:9 96:15
100:17
**quotes** 35:24

---
**R**

**R** 2:1 3:1 4:6
115:1,1
**Raleigh** 1:23 2:8
2:22 3:4,17,22
**random** 11:25
**range** 75:24
**rare** 81:5
**rarely** 80:17
**rate** 62:20 68:19
68:20
**ratio** 100:21
**re-ask** 83:15
101:23
**read** 21:6 22:6
25:8,16,16,22
26:11,12,16,23
27:1,3,4,6,11
35:16,17 36:4
37:6 43:8
59:18 67:14,16
67:25 68:22,23
69:21,22 70:6
71:10 72:3
79:6,25 80:11
80:14 87:3
93:9,16 113:10
114:2 115:19
**readily** 70:3
**reading** 76:3
80:2 92:11,14
94:13 106:1
107:22
**reads** 79:18
**ready** 15:11 99:3
**real** 35:21 58:5,7
80:22 85:10

**reality** 61:11
**realize** 7:2 58:21
**really** 9:13 28:2
30:5 62:23
75:4 76:3
78:16 90:15
104:1 112:4
**reason** 58:15
82:10 85:13
88:25 89:18
90:15 92:19,24
93:1 95:10,14
110:11,18
112:1
**reasons** 15:12
81:18 86:22
96:24 97:4,9
97:14 101:16
107:25 111:21
**rebuttal** 25:14
25:23 26:2,3
26:17
**rebuttals** 26:7,8
**recall** 17:15,18
17:21 21:8
27:13,14 49:22
86:14,15 100:6
106:9
**receive** 58:23
103:18 107:12
**received** 26:9
36:20 63:10
107:1
**receives** 103:8
107:15
**receiving** 42:15
**reception** 29:9
29:11,16
**receptions** 30:23
**recognize** 40:20
41:22 70:15
**recognized**
61:14
**recognizing**
41:14
**recollection**
39:22
**recommendati...**
43:4
**record** 8:3 12:25

13:11,15 16:3
16:19 17:2
32:20 62:7
102:25
**recorded** 17:4
**records** 27:8
**red** 63:22 64:9
**redefine** 33:6
**reduce** 77:14
**reduced** 113:9
**reducing** 77:15
**reduction** 55:6
**reevaluated**
101:1
**refer** 19:11
35:12 38:22
58:14,15 64:13
81:12 91:6,25
93:8 97:3
106:4 109:14
**reference** 26:2
32:2 33:2
36:13 37:11
39:1 40:11
42:18 46:22
58:15 59:8
76:15 97:15,17
100:5,23
**referenced** 25:7
25:20 37:7
44:12 46:8
97:14 109:9
**references** 25:18
26:23 27:5
**referencing**
43:14
**referrals** 86:23
**referred** 42:16
57:3 61:24
72:24 108:2
**referring** 19:11
26:2,20 34:25
36:13 37:4
38:8 44:10
45:2 50:17
51:6 60:1 68:5
69:9 75:1,4,25
78:20 79:13
90:17 108:13
**refers** 59:12

130

**reflect** 106:7
**reflects** 96:12,20
  106:21
**refluxed** 49:18
**refresh** 23:25
**regarding** 54:10
  103:8
**regardless** 80:3
  98:3
**regimen** 99:8,12
  100:1
**related** 20:23
  33:3 35:25
  54:1 100:8
  103:25 113:12
**relates** 44:17
**relationship**
  30:5
**relative** 113:14
**relax** 49:15
**relevant** 21:7
  22:9 108:16
**reliability**
  100:16 101:3
**relied** 46:25
  108:3
**religious** 97:5
**relying** 17:12
  22:14 46:24
**remain** 48:19
**remaining** 48:20
**remember** 17:23
  23:4 28:4
  100:8
**reminder** 12:5
**remote** 1:10
  113:5
**removed** 94:12
**removing** 56:22
  57:22 66:10
**render** 40:5
**rendered** 13:1
**rendering** 71:23
  72:9
**repeat** 32:8 39:5
  44:7 65:1
  78:10 89:14
  91:19 105:6
**repeated** 82:24
**repeating** 55:17

**rephrase** 101:12
**replace** 55:23
  64:7,10
**replicating** 74:9
**report** 5:16,18
  9:5 16:11,13
  18:18,23,25
  20:6,8,14,17
  25:15 26:3,9
  26:18 27:15,19
  27:20 28:9
  31:3,6,21,24
  35:12,13,24
  36:6 37:15
  46:10 50:16
  51:2,22 53:1
  74:22 76:17,21
  78:25 79:4
  96:12 97:1,3
  100:17 101:17
  110:6
**reporter** 6:23
  7:8 11:17 16:4
  16:20 17:4,18
  50:6 84:15
  102:17 113:1
**reporters** 1:19
  9:15
**reports** 16:9
  18:20 19:9
  21:1 25:8 27:7
  30:9 76:3,15
  76:16 107:23
**represent** 12:9
  14:10 108:20
  109:7,10 111:6
**representing** 6:9
**represents** 14:11
**require** 80:5
**requirement**
  16:22 35:1
**research** 20:22
  55:18 56:1
  64:11,16 68:18
  75:10,13 78:6
  78:11 101:7
**researcher**
  78:19
**researchers**
  91:16 92:16

**reserves** 113:10
**residency** 32:18
  33:14 61:7
  82:25 104:22
**resident** 81:24
  104:19
**resident's** 60:25
**residents** 59:21
  66:9
**resources** 24:18
**respect** 47:14
  63:11
**respected**
  106:10
**respond** 7:16,21
  18:25 19:3
**respondents**
  87:13,14,14,15
  87:17,21 90:19
  90:24 91:3,15
  92:1
**responds** 40:6
**response** 86:24
**responses** 7:9
**responsible** 41:8
  46:13
**responsive** 7:13
**responsiveness**
  41:11
**rest** 10:20 22:2
**restrictions**
  97:15
**result** 45:3 68:6
  75:2 89:9
  108:16
**results** 86:20
  87:5
**retained** 80:6
**retired** 94:9
**retread** 99:17
**return** 79:7
**review** 17:24
  20:11,16,19,22
  21:3 25:13,21
  27:8 37:24
  73:3 86:13
  94:4 96:3,8
  99:22 103:21
  108:3,16
**reviewed** 20:6

20:13,25,25
  21:9,13,14,19
  21:21 23:22,24
  24:1,4 27:6
  39:14 73:9
  100:4 103:13
**reviewing** 18:3
  23:11 39:22
**rid** 30:14
**right** 10:22
  15:15 16:14
  22:21 32:21
  33:24 37:22
  49:22 58:18
  61:2 63:2
  65:17 66:12
  67:8 68:13
  69:23 78:4,19
  79:9 82:2 86:4
  87:3,25 91:8
  93:14 105:22
  110:8 112:12
  113:10
**right-hand**
  69:25 71:5
**risk** 47:17,20,20
  47:21 49:9
  64:12,17,23,24
  65:2,3,9 66:4,7
  70:13,13,14,14
  74:21 77:23
  78:7,11,13,17
  81:6 100:18
  102:10
**riskier** 75:14
**risks** 47:10,10
  47:11,13,15,20
  47:25 48:1,2
  48:14,20 49:5
  49:20 74:10,23
  74:25 75:1,5
  78:8
**risky** 73:20
  77:18
**Rmendias@ac...**
  2:6
**Road** 1:21
**role** 11:4
**roll** 35:10
**room** 10:24 11:9

14:23 15:5
  38:7 41:3,9
  72:10 76:11
**rooms** 56:12
**rotation** 82:21
  86:18
**rotations** 75:19
**roused** 40:1
**routine** 80:5
**RPR** 1:18 113:4
  113:19
**Rubinhorse**
  108:3
**Rubinhorse's**
  107:23
**rules** 16:22
**running** 11:5
**Ryan** 2:4 13:4

―――――――

**S**

**S** 2:1 3:1 4:6 5:2
  5:12 115:1
**sacrifice** 46:3
**sadly** 82:4,6
  83:1
**safe** 101:10,13
  101:19,23
  102:2,4,7,8
**safely** 45:9
  104:13 105:2
  105:10
**safer** 45:14
**safety** 44:17
  46:6 55:19
  56:1 63:3 76:5
**Salvador** 2:13
  12:25 99:16
  100:4
**sample** 5:22
  94:10,12
**Santos** 4:13
  12:19
**save** 34:1
**saw** 25:20,23
  108:5
**saying** 9:18 12:8
  45:17 63:4
  64:14 75:16
  84:2 100:10
  107:14

131

says 42:20 44:1
44:17 61:2
67:18 68:1
69:25 71:5,21
90:24 97:9
school 15:8
32:14,15 82:21
science 82:7
109:17
Scottsdale 3:8
screen 11:21
15:3,14,23
85:24 86:2
95:4
screens 11:15,24
15:2
screenshare
23:7 85:14,17
85:21 99:3
100:5
screensharing
85:12
scroll 12:20 23:1
scrolling 12:23
seat 107:17
seating 10:24
second 9:13 23:6
30:18,18 38:13
43:16 45:10,15
54:12,17 55:9
56:17 57:15
59:23,23 61:13
62:7,23 63:8
66:13,21 69:14
72:15 73:20
75:5 77:19
80:4 82:10
91:8 93:11
94:7 99:2
104:17,19
105:6 107:6,13
107:17
secondary 63:19
Secretary 3:24
section 42:19
51:5 59:23
91:9 92:25
93:5,10 96:24
sedation 36:23
37:20 38:18

39:3,8,12,17
39:20,21,23,24
40:3,4,5,8,10
40:14,21 42:3
42:8,14,20,21
42:23 43:3,5
43:17 44:13
45:9,15 46:1
47:13,23 48:18
103:22 107:19
108:8
sedative 42:23
sedatives 42:22
see 6:5 10:14,20
10:23 11:16,16
22:2 31:12,13
37:12 43:16
50:10,25 51:5
51:14 52:15,18
53:23 54:12,17
55:5,7,12 62:8
65:24 66:20
74:16 79:13
82:8 85:10,21
87:13,18 97:14
100:24 106:13
107:11 108:4
110:12,19
seeking 45:4
88:6 96:17
seen 41:13 49:2
65:10 72:20
75:12,16 82:6
seizures 15:8
seldom 91:11
92:8
Selection 21:21
sense 8:15
sent 18:8 21:4
22:8,14 23:2
23:12 31:15
57:4 106:20,21
sentence 43:16
59:23 60:14
79:18 93:16
94:8,8
separate 33:23
47:10
separately 40:19
serially 72:12

series 76:22
serious 70:5
Services 3:25
14:2
set 15:25 83:8
107:11
setting 44:22
45:8 68:19,21
70:16,20,25
97:15 107:18
seven 21:21 50:7
severe 70:4 80:8
80:25
shake 7:10
share 11:3 94:20
shared 30:20
33:21
sharing 95:5
She'll 17:5
Shealyn 4:18
12:20
shifts 107:2
short 37:23
shorter 73:23
79:22
show 55:8 71:25
72:17 77:17
109:23
showed 31:17
showing 76:22
76:24 78:16
shrinks 76:25
side 9:5 18:24
19:3 89:3
sides 65:18
sign 9:1,1 48:25
113:10
SIGNATURE
115:22
silence 15:20
58:6
silent 15:10
similar 70:2
simplify 60:14
simplifying 61:8
simply 13:2
62:17
simultaneously
82:23
single 22:6 25:21

43:2
sisters 24:14
sit 77:22 78:24
site 47:3 107:25
sites 47:5
sitting 76:19
situated 89:21
situation 52:9
53:19 63:19
68:13 73:15
74:13 106:24
six 1:21 21:21
size 65:21 77:16
skeptical 81:20
skills 62:18
skimmed 21:25
22:1
skin 57:18
skull 56:23,24
skulls 57:20
sloughed 57:19
small 65:20
smaller 55:10,12
86:12 87:20,22
88:1 89:17
96:5
Smith 3:2
society 40:23
41:19 42:6
46:17,25 76:5
82:3
soft 57:20
soften 56:22
71:16
softening 51:23
51:25 52:22
67:18,19,20
68:6,15,19,21
68:25 69:13
71:6 79:20
somebody 11:4
40:17 41:22
62:21 63:23
98:4
son 11:2 15:7
35:21 58:5
soon 67:21
109:20
sorry 6:4 13:9
14:6 16:11

17:7 29:10
34:22 35:9
38:11 42:18
43:14 46:20
49:24 51:10,13
53:12,18 60:8
62:2 63:14
65:1 67:10
74:4 75:11
78:6 85:2
87:14 94:8
101:7 104:9
110:16
sort 9:24 12:10
53:22 109:25
sounds 18:14
70:17
source 17:2 59:1
100:16
sources 20:13
46:23 57:10
68:23 69:7,8,8
76:16,19
South 1:3 2:17
6:9 39:13,19
103:8,17,23
space 11:3
speak 24:12
speaker 84:5
speaking 90:2
special 11:2 15:7
30:12,13,15,17
42:7,9,15
specialty 82:22
98:10
specific 17:13
35:3 60:12
73:3,7 78:20
specifically
59:12 70:11
79:18 88:3
93:21 94:1
99:25 111:23
specifics 24:9
speeds 23:16
spent 27:18,23
28:1,8,9,10
sphincter 49:16
sphincters 49:15
spoke 24:15

29:10,15
**spoken** 24:7
**spontaneous**
   38:7 41:11
   59:25 60:10,11
   60:17 61:5
   68:13,20 69:1
   71:21 72:7
   73:2 75:14
   77:25
**spontaneously**
   41:23
**spot** 48:12
**spotting** 52:6,11
**Spottswood** 4:21
**staff** 88:10,18
   89:1 91:10
   92:4 93:6
   97:17
**stage** 74:12
   107:11
**stand** 29:17,19
   33:9 74:22
   97:11 101:8
**standpoint** 54:5
   78:3,6 106:13
   111:11
**stands** 90:3
**start** 28:2 52:6
   54:3 55:1
   71:14
**starting** 52:7
   82:25
**starts** 37:19
   65:20
**state** 36:1 41:15
   42:10 51:25
   53:16 106:7
   113:2 114:1,13
**stated** 39:17
   60:21 111:23
**statement** 5:17
   7:4 36:6,22,22
   37:19 47:6
   62:16 68:24
   70:8 71:12,13
   72:5 83:4
   100:16 105:24
   107:6,16
   108:24,25

109:7,16 110:5
   110:5
**statements**
   108:13,15
   109:9,14 110:1
   110:2
**states** 1:1 59:22
   99:5,8 107:6
**stating** 75:13
**statistics** 86:14
   110:25
**stay** 46:4 47:25
   48:18 74:13
**stays** 46:15
**Stein** 1:6 2:25
   13:20,21
**stepped** 14:14
**stigma** 88:19,24
   89:2,10,23
   90:10,15 97:24
   98:3
**stigmatize** 89:4
**stigmatized**
   97:25 98:6,7
**stimuli** 40:1
**stomach** 49:14
   49:16,17,18
**stop** 18:21
**stops** 68:10
**story** 84:4
   107:10
**straightforward**
   74:19
**strange** 11:6
**Street** 2:4,21 3:8
   3:11,16,21
**stroke** 48:7
**structure** 82:4
**structures** 56:18
**students** 34:20
   35:4,5,6
**studies** 47:2,6
   55:8 56:7
   71:25 72:17,20
   72:21 77:21
   78:1,18,20,20
   79:1,6 107:24
   107:25 108:2,4
   112:6
**study** 5:20 68:22

68:23 75:16
   79:5 84:20
   86:5,8,11,14
   86:17,20 87:18
   91:9,23 92:16
   92:20 93:18
   94:1,14 95:10
   96:10 97:8
   98:17 99:18
   100:7,9,15,23
   100:23 101:6
   111:9,19 112:3
**study's** 86:6
   100:16 101:3
**stuff** 81:11
**subject** 83:11
   114:5
**submit** 19:9
**submitted** 18:19
   19:16 25:8
   26:3
**subscribed**
   114:16
**subsection** 67:6
   67:15
**subset** 86:12,13
   87:8,11,13,22
   88:1 89:17
   96:5,21
**subsets** 87:20
**substance** 25:3
**substances** 10:6
**substitute** 60:1
   60:10,12 61:5
**suction** 70:1
**suggest** 12:7
   14:13 77:23
**suggests** 42:6
   53:10
**Suite** 1:22 2:14
   3:3,11
**summarized**
   39:21 79:6
**summary** 41:5
   53:4,6
**summer** 26:6
**supervise** 42:2
   42:14,22
**supervised**
   42:23

**supplement**
   58:12 59:1
**supplemental**
   59:1
**supply** 54:14,15
   76:25
**support** 61:4
   77:20 109:19
   110:6
**supported** 56:19
**supporting**
   22:15
**supposed** 81:2
**sure** 7:9 8:19
   9:10 14:25
   15:11 32:11,19
   33:12 37:8
   38:23 40:16
   46:14 49:11,22
   50:3,4 51:11
   57:2 63:21
   65:19 75:23
   76:23 77:9
   78:11 79:2
   80:24 83:16
   84:11 87:10
   91:21 96:9
   102:23
**surgeons** 63:6
**surgeries** 46:12
**surgery** 41:9
   49:11 55:22
   100:10 101:7
**surgical** 5:24
   21:23,24 40:18
   41:16 54:8,11
   55:23 56:1,2,4
   56:4 69:25
   70:12 74:3,6,7
   79:20 82:11,12
   95:20 100:18
   100:21,25
   107:22
**surprise** 72:10
**survey** 86:24
   94:11 111:13
   111:16,16
**surveyors** 91:11
   92:5
**survive** 34:3

**survived** 83:25
**Susan** 1:12,18
   6:1 113:4,19
   114:1,10
**suspected** 32:23
**swallow** 49:17
**Swanson** 2:13
   12:13,20,24
**switching** 28:16
   83:6
**sworn** 6:2 18:16
   113:7 114:16
**symptoms** 52:5
   52:10,12 54:2
   55:1
**system** 41:11
   66:6

---

                 **T**

**T** 5:2,12 115:1,1
**table** 21:20
   86:16,19,21
   87:20 90:19
   91:25 96:10,10
   96:15,20 97:14
   111:18
**take** 6:20 8:8
   11:11 23:17,18
   32:4 35:4,6
   37:24 47:8,23
   48:12 49:25
   72:6 80:20
   82:23 83:8
   102:7,13
**taken** 6:19 50:12
   84:17 86:1
   102:20 113:5,8
   113:13
**takes** 30:19 42:7
   107:17
**talk** 29:16,23
   30:1 41:20
   42:8 45:22
   51:19 57:11
   69:13 70:23
   90:17 103:10
   104:1
**talked** 29:21,22
   30:4 33:11
   44:5 53:15

54:21,22 57:5
71:13 78:1,2
107:20 108:14
**talking** 9:14,19
16:2 22:23
26:5 31:24,25
33:20 50:15
51:11 68:12,15
70:11 74:20,20
74:21 75:6,12
75:19,23,24
82:11 83:11
93:24 101:11
101:25 104:5
105:4 109:13
110:1,14
**talks** 60:23
69:15 70:22
**Tallin** 4:19
**taught** 34:5,6,10
34:13,17 102:4
**teach** 34:15,21
34:23
**teaches** 66:9
**tear** 66:11
**tearing** 47:18
**tears** 48:9
**technical** 56:14
73:16,19 110:3
**technically**
56:19 61:12
73:2 79:19
105:25
**techniques** 67:7
**technology**
14:24 15:5
**teeth** 49:13
**telephone** 90:25
91:4 92:2
111:14
**tell** 10:13 21:10
26:19,25 30:2
43:22 50:21
51:17 57:19
97:24 98:7
111:7
**tells** 46:12 55:4
**ten** 21:24
**tenacious** 71:24
72:16

**tenaciously**
74:13
**tenderness**
53:25
**term** 48:23 52:9
55:21 65:18,21
**termination**
5:24 70:2
**terminology**
52:9
**terms** 11:15 33:2
33:3,21 47:1
47:17 48:8
50:16 52:5
55:4 57:17
75:17 83:7
89:3 90:7
**testified** 6:2
**testify** 17:22
18:16
**testimony** 19:19
19:24 20:2
44:10 104:12
104:15,25
105:8 113:6,7
114:5
**tests** 80:6
**text** 15:20 72:20
72:20 76:7
**textbook** 5:19
19:12 20:24,25
21:3,4,6 23:25
57:2,4 58:4,13
58:14 62:6
66:15 68:5
69:8,19 73:1,8
75:12 79:8
81:12 82:8,15
83:3 106:5,6,6
106:20,20,21
112:6
**textbooks** 56:14
69:10 81:24
**thank** 9:8 10:6
10:13 11:1,11
13:12 14:12,19
16:12 18:13
21:12 22:4
26:23 30:21
32:12 33:7,10

35:16,22,22
36:12 37:17
39:2,12 44:2
45:2 46:6 48:1
48:15 49:7
50:9 51:2 53:1
53:14 55:14
56:9 57:1,9
58:3,9,11
61:22 62:3
63:13 64:11,16
66:15 67:14
69:18 70:8
71:18 72:23
73:8 74:25
75:21 77:21
78:5 79:7
80:15 81:7,11
82:14 83:6
87:1 100:14
102:12,16,18
103:22 104:8
106:4 108:2,6
109:25 110:11
111:1 112:14
112:16,19
**Thanks** 7:2
**theme** 29:20
**therapeutic** 43:2
43:11,13,21
**therapy** 80:9
**thereto** 113:15
**Theriot** 3:7
13:14,14,16
**thick** 52:24
**thing** 9:13 26:7
26:11,12 54:17
66:6 75:23
82:24 90:13
93:13
**things** 8:16 18:6
18:8 29:13
41:10 46:9
48:10,23 51:3
51:19 53:15
54:25 60:19
61:16 65:25
70:15 82:2,7
88:18 101:25
106:15,17

109:23,24
**think** 6:13 9:11
11:22 12:12,15
12:24 14:17,25
15:22 17:10,11
18:6,6,7,8 19:8
28:5 29:24
30:22 31:23,25
34:17 35:8
37:22,25 40:7
40:8,19,21
41:7 43:8,9
45:3,6,6,11,21
46:1,3 48:4
49:25 54:4
55:3 56:21
57:1 58:16,20
61:8 62:20,23
62:24 63:5,6
63:11,12,20,21
66:6,8 69:12
69:14 70:19,19
70:22 72:11
73:5,15 74:11
74:16 76:10,13
76:19,21,24
77:21 78:1,3
78:24,25 79:1
79:5 80:13,23
81:7,19,20,20
82:5,7 83:8,19
84:4,5,9 85:14
85:20 89:2,3,4
90:12,15 95:17
95:17,22 98:3
98:5 100:20,20
100:23,25
101:15 102:13
105:18,19,23
105:25 106:2
106:15,23,24
106:25 107:2
107:23 109:5,6
109:17 110:3,9
111:11,20,22
112:3,11
**thinking** 34:20
34:21,22 82:15
**third** 43:9 80:4
82:21 104:18

111:23
**thought** 26:11
38:12 45:8
58:22 102:24
**thousands** 46:11
**three** 21:16
29:23 73:9
91:7,8,23 92:2
93:11 112:9
**time** 9:2,3 11:11
11:20 18:7
23:17 26:18,19
28:7,10 31:13
33:17 34:9,9
35:8 38:3,16
48:18 49:25
50:6 53:22
64:18 80:18
81:19,25 82:15
84:9,15 95:7
96:3 102:17
105:20 111:3
**times** 34:1 53:24
65:10 69:1,3
100:18
**Timothy** 27:12
**tired** 53:25
**tissue** 52:17
71:24 72:15
**tissues** 54:15
**title** 26:12 96:19
96:20
**today** 6:24 9:5
10:4,8,11 20:6
20:8 23:23
27:24,25 31:16
31:20 36:21
76:20 77:22
78:24 81:16,22
83:4 106:14
**told** 49:12 82:21
**top** 43:9 57:8
61:19 77:5
78:4 79:10
86:19 94:7
**topics** 83:6
**tougher** 48:18
**trachea** 48:4,24
**track** 8:9
**trained** 60:19

61:19 63:6,8
110:12,14,15
110:20
**training** 32:13
41:21 42:7,9
42:16 44:11
59:2,12,24
60:4,9,11,12
60:17 61:1,16
61:17,21 62:18
62:22 63:5,9
69:11 103:7,17
104:17 106:3
107:1
**transcribed** 16:4
**transcript** 9:22
17:19,25 18:10
113:10 114:4
115:20
**travel** 30:25
65:18
**treated** 45:4,12
**tremendous**
105:17
**trifocals** 87:1
**trimester** 21:23
21:24 45:10,10
45:16 54:7,12
55:10 56:17
57:15 59:22
60:24 61:6,13
61:23,25 62:24
63:8 66:13
69:14 70:2,10
70:12,21,24
73:21 75:6
77:19 80:4
104:18,18
105:6 107:1,13
**true** 80:22 83:3
114:4
**truly** 100:11
**trust** 82:4
**trusting** 41:9
**truthfully** 17:22
**try** 9:13 23:9
31:13 34:1
46:2 80:20
**trying** 23:4 35:9
46:4 69:14

**74:13** 75:21
83:2 85:2 98:4
106:23 107:17
**tube** 49:17
**turn** 14:21 15:19
58:3,6 69:18
**turned** 15:21
**turning** 58:12
66:15
**twelfth** 105:5,10
**two** 8:16 21:15
37:24 48:13
49:25 53:3,9
53:11,15 61:18
65:14 72:6
76:22 78:16
82:23,25 87:19
88:15 99:20
**type** 83:25 86:24
**types** 30:13
109:23
**typewriting**
113:9
**typically** 40:2,4
40:6 50:25
52:4
**typo** 68:3
**typographical**
18:15
**typos** 18:4

———————

**U**

**uh-huh** 7:10
27:21
**ultrasound**
50:25 55:12
**unarousable**
40:9,12,12
**uncomfortable**
9:25
**uncommon** 49:4
65:9,10
**unconscious**
40:5
**underline** 66:25
**underlined**
66:20,22
**underlying**
48:25
**understand** 6:6

**6:20** 7:1 10:4,7
10:11 19:7,8
41:12 50:20
**understanding**
7:24 15:12
33:5 39:19
40:25 75:24
105:21
**Understood**
24:20
**unethical** 98:2
**unexpected** 89:4
**unfortunately**
30:11,14 76:5
**unintended**
21:15 34:2
**Union** 2:3
**unique** 73:15
74:9,20 82:22
**United** 1:1 59:22
99:5,8
**universe** 79:2
**unknown** 36:14
**unmute** 15:21
**unplanned** 89:4
**unsafe** 43:3
**update** 110:10
**upside** 15:6
**use** 8:24 48:9
52:10 55:4
71:15 72:11
77:17 83:21
99:12 103:24
**usually** 52:5
**uterine** 65:16
66:11 70:13
72:14 79:12,19
80:9
**utero** 80:6
**uterus** 54:3
65:19,20

———————

**V**

**Valentina** 4:12
12:21
**Vanessa** 2:12
6:8 12:25
91:20 93:13
**vanessa.pai-th...**
2:16

**Vanisha** 4:17
12:21
**vanisha.kudu...**
2:17
**variety** 35:6
69:15
**various** 12:9
41:10 68:23
69:7,8,11
73:16 97:25
**vast** 76:11
**ventilation** 38:8
41:12
**verbal** 7:9 40:1
97:20
**Vermont** 2:14
**versa** 29:21
**version** 31:18
43:23
**versus** 18:5
55:22 111:13
111:17
**vessels** 65:14
**viability** 33:22
109:19
**vice** 29:21
**video** 12:13
**Videographers**
1:20
**view** 10:23 11:19
86:18
**visible** 16:15
**voice** 30:18
**volume** 55:12
64:9
**vs** 1:5

———————

**W**

**W** 3:3
**wa-lah** 72:12
**walk** 45:24
**want** 8:19 9:9,21
18:15 21:10
22:22 32:19
33:12 35:10
38:21 44:23,23
46:1 49:14
57:2 59:12
75:22 76:10
80:16 83:15

**86:2** 93:7
102:9,22
**wanted** 8:16
14:15 22:11
23:25 112:7
**wanting** 79:2
**Ward** 3:2
**warning** 80:23
**Washington**
2:15 28:18
29:1 30:25
**wasn't** 41:3 67:2
107:4,4 109:22
**watching** 109:15
**water** 49:13
63:21
**way** 8:20 9:7
18:5 31:13
43:15 45:24
51:15 62:19,25
72:25 73:17
80:18 81:21
85:16 97:23
109:18
**ways** 111:12
**we'll** 11:6 17:10
23:18 32:1,4
38:1,18 47:8
50:9 51:12
55:17 58:17,19
58:21 77:7
83:8 84:22
87:12 90:2
91:7 99:4,17
100:4 107:8
**we're** 6:16 8:13
8:17 9:22 16:3
22:21,23 23:19
30:17,18 31:24
31:25 32:3,8
32:20 33:20,21
34:24 37:15
50:19,25 52:8
55:17 58:13
59:13 63:11
68:12 74:20,20
74:21 85:15
86:4 89:4,16
94:7 101:25
**weboyle@ard...**

3:5
**weed** 112:3
**week** 29:10
  67:12 105:5,11
**weeks** 53:3,9,11
  64:20 80:7,17
  80:19 81:2,3
**weird** 9:21
**welcome** 30:18
  35:23
**well-known**
  106:10
**went** 6:15 22:2
  35:20 100:11
**weren't** 21:7
  29:12,12 112:1
**West** 2:21 3:16
  3:21 6:7
**Wheeler** 107:23
  108:3
**white** 62:25
**wholeness** 102:6
**wide** 69:15
**Williams** 3:11
  13:22,22 23:24
  24:2
**Wilson** 10:16
**window** 104:9
**Winston-Salem**
  3:12
**wish** 115:20
**withdraw** 34:5
  51:16 92:15
  99:6
**withdrawn** 41:1
**witness** 19:2,5
  24:23,25 28:24
  29:6 39:5,10
  40:16 41:7
  42:5,18 44:7
  44:16 45:21
  50:3 82:19
  84:11 85:2,6
  85:10,19,23
  90:3,6 91:19
  92:11 93:13
  94:4 95:17
  97:23 98:14
  102:15 104:5
  112:11,21

113:6,8,10
**witnessed** 69:1,3
**woman** 29:20,21
  36:10 45:22
  50:23 53:24
  54:6,9 65:7
  69:1 80:16,19
  80:25 107:15
  107:16 108:1
**woman's** 65:12
**women** 44:20
  46:4 47:20,21
  49:8 52:2,4,4
  53:2,10 54:10
  55:9 59:20
  65:6 71:14
  76:22 80:18
  107:12
**wondering** 83:7
**word** 35:19
  80:12 97:11
**wording** 60:8
  83:16
**words** 7:9 64:14
  74:12
**work** 11:6 24:16
  28:13 30:5
  62:19 74:4
  80:24 84:10
  109:6
**working** 28:10
**works** 14:8
**worries** 68:4
**worry** 11:24
  58:8
**wouldn't** 108:25
**write** 106:12
**writing** 18:11
  19:20 20:3
  25:25 34:21
**writings** 81:23
**written** 27:11
  57:9 81:19,22
  106:14 107:5
**wrong** 12:8 98:3
**wrote** 20:8 26:5
  26:7
**www.discover...**
  1:25

**X**

**X** 5:1,2,12 45:25

**Y**

**yeah** 9:4 11:18
  11:22 21:2
  23:13 28:4
  30:4 34:23
  37:18 38:23
  45:11 48:13
  54:24 63:19
  64:15,22 65:2
  69:5 72:9
  79:14 82:9
  84:13 86:25
  87:1,18 104:5
  106:16
**year** 6:16 28:19
  46:11 82:21
  95:19
**year's** 29:20
**years** 30:6,13
  45:24 61:16,19
  61:19 62:21
  69:10 70:10
  82:25 104:16
  105:16,19
  106:3
**yesterday** 19:9
  56:20
**York** 2:5,5

**Z**

**Zoom** 9:16
  10:21 14:10,25

**0**

**1**

**1:33** 1:13
**10** 50:1,10 84:10
  102:14
**100** 3:11
**1000** 1:22
**10004** 2:5
**102** 5:25
**109-112** 5:19
**11** 21:25,25 68:1
  79:22
**110** 5:8

**111** 59:9,12,16
  61:24
**1110** 2:14
**114** 2:21 3:16,21
**12** 44:1 67:24
**125** 2:4
**13** 43:25
**130-132** 5:19
**131** 59:9 66:18
**13th** 113:17
**14** 88:5
**15100** 3:8
**156-159** 5:19
**157** 69:18 71:2
**158** 59:9 69:13
  71:19 79:8
**16** 56:21 67:21
  81:2 87:22,22
  87:24 97:17
**17** 88:1,4 89:16
  89:19
**18th** 2:4
**19** 97:14
**191** 110:8,9
**193** 110:8,9
**1999** 81:14
  82:17 106:6,7
  107:5
**19th** 28:19

**2**

**2:30** 11:3
**2:44** 50:12
**20** 28:5,9 34:6
  62:21 64:20
  81:2 114:17
**20-plus** 45:23
  46:11 105:16
**2000** 107:4
**20005** 2:15
**2001** 81:24
**2010** 34:8
**2011** 34:9
**2013** 30:14
**201826800211**
  113:20
**202-973-4800**
  2:15
**2021** 43:24,25
  44:1

**2023** 5:18 17:15
  20:5 24:8
  26:22 34:10
**2024** 1:13 26:4
  26:10 27:15
  82:16 113:17
**212-549-2633**
  2:5
**213** 87:17 91:2
  91:14
**22** 96:25 97:3
**24** 56:21 87:18
**271** 87:8,12 91:2
  91:14
**27101** 3:12
**27602-0629** 3:22
**27603** 2:22 3:17
**27607** 3:4
**27609** 1:23
**27611-8004** 2:8
**28004** 2:8
**29** 94:11

**3**

**3:00** 50:12
**30** 5:16 27:22
  28:8 41:16
  79:5
**300** 2:14 3:3
  34:18
**301** 34:17,17,24
**31** 1:13 17:15
  20:5 24:8
**31st** 6:15 18:20
  19:21,24 20:3
  20:23 23:5,23
  25:25 27:4,25
  33:4 99:15
  100:3
**336-722-3700**
  3:12
**34** 97:4,13
**34.2** 96:11
**35** 5:17

**4**

**4:01** 84:17
**4:13** 84:17
**4:43** 102:20
**4:53** 102:20

**4208** 1:21
**45** 37:15
**48** 100:17 101:4

## 5

**5** 5:6
**5:11** 112:23
**50** 106:25
**500** 66:1
**56** 50:17 51:2,11
  53:2
**58** 87:15
**5OO** 28:13

## 6

**600** 3:11
**61** 5:18,19
**63** 99:23
**68** 35:13,24 36:7
  36:13

## 7

**751** 3:3

## 8

**80** 53:10
**800** 87:10
**800-835-5233**
  3:9
**81** 87:14
**83** 5:20
**85260** 3:8

## 9

**90th** 3:8
**919-277-9187**
  3:4
**919-424-8242**
  1:24
**919-716-0091**
  3:22
**919-716-6421**
  2:23
**919-716-6600**
  3:17
**919-834-3466**
  2:9
**93** 5:21
**97** 5:23 81:24

# DISCOVERY

COURT REPORTERS AND LEGAL VIDEOGRAPHERS

## ERRATA SHEET FOR THE DEPOSITION OF:

Deponent:  Susan Bane, M.D., Ph.D.

Case Name:  Planned Parenthood South Atlantic, et al. v. Joshua Stein, et al.

Date of Deposition:  01/31/2024

## CORRECTIONS:

2          4

| Page | Line | Now Reads: | Should Read: | Reason Therefor: |
|------|------|------------|--------------|------------------|
| 30 | 6 | included in ACOG cog | Included in ACOG | Extra word |
| 48 | 24 | trachea | tracheostomy | Wrong word |
| 69 | 6 | is | are | Grammar |
| 73 | 18 | answered | asked | Wrong word |
| 75 | 16 | I am not saying | I am saying | Incorrect |
| 107 | 23 | Rubinhorse's | Dr. Wubbenhorst | Spelling |
| 108 | 3 | Rubinhorse's | Dr. Wubbenshorst | Spelling |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Signature of Deponent __*Susan Bane*_____  Date: _2/26/2024_

ND:4875-5970-8073, v. 1