# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| PLANNED PARENTHOOD SOUTH ATLANTIC, *et al.*, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **Case No. 1:23-cv-480** |
| JOSHUA STEIN, *et al.*, | ) ) | **DEFENDANT-INTERVENORS'** |
| Defendants, | ) ) ) | **MEMORANDUM IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT** |
| and | ) ) ) | **AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR** |
| PHILIP E. BERGER and TIMOTHY K. MOORE, | ) ) ) | **SUMMARY JUDGMENT** |
| Intervenor-Defendants. | ) ) ) | |
| | ) | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

STATEMENT OF THE MATTER .................................................................... 1

STATEMENT OF FACTS ................................................................................. 2

I.    Abortion-inducing drugs are contraindicated for ectopic pregnancy. ................................................................................................ 2

II.   Second-trimester surgical abortion is distinct from surgical completion of a second-trimester miscarriage. ........................................ 4

III.  North Carolina enacts protections for fetal life and women's health. ................................................................................................... 7

IV.  Planned Parenthood sues. .................................................................... 8

QUESTIONS PRESENTED ............................................................................. 10

ARGUMENT ................................................................................................... 10

I.    The Legislative Leaders are entitled to summary judgment because there is no genuine dispute of material facts and the IUP Determination Requirement is constitutional as a matter of law. ....... 11

     A.    The IUP Determination Requirement gives abortion providers notice of what conduct is prohibited and includes sufficient standards to prevent arbitrary and discriminatory enforcement. ......................................................... 11

     B.    The IUP Determination Requirement is rationally related to the State's legitimate interest in women's health and safety. ..................................................................................... 17

II.   The Legislative Leaders are entitled to summary judgment because there is no genuine issue of material fact and the Hospitalization Requirement is constitutional as a matter of law. ...... 21

i

A.   The Hospitalization Requirement does not violate equal protection because it is rationally related to the State's legitimate interest in women's health and safety............................ 22

B.   The Hospitalization Requirement does not violate substantive due process because it is rationally related to the State's legitimate interest in women's health and safety. ........................................................................................ 30

C.   Planned Parenthood has introduced no evidence or legal arguments to support its vagueness claim................................. 30

CONCLUSION............................................................................................. 31

CERTIFICATE OF SERVICE....................................................................... 33

CERTIFICATE OF WORD COUNT ............................................................. 34

ii

# TABLE OF AUTHORITIES

**Cases**

*Bittner v. United States,*
   598 U.S. 85 (2023) .......................................................................... 13

*Carolina Youth Action Project v. Wilson,*
   60 F.4th 770 (4th Cir. 2023) ........................................................... 11

*Dobbs v. Jackson Women's Health Organization,*
   597 U.S. 215 (2022) ................................................................passim

*Doe v. Cooper,*
   842 F.3d 833 (4th Cir. 2016) ..................................................... 12, 16

*Doe v. Settle,*
   24 F.4th 932 (4th Cir. 2022) ....................................... 22, 23, 24, 25

*F.C.C. v. Beach Communications, Inc.,*
   508 U.S. 307 (1993) ................................................... 17, 21, 24, 25

*Gary-Northwest Indiana Women's Services, Inc. v. Orr,*
   496 F. Supp. 894 (N.D. Ind. 1980) .................................................. 29

*Gonzales v. Carhart,*
   550 U.S. 124 (2007) ........................................................................ 14

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972) ......................................................... 12, 14, 17

*Greenville Women's Clinic v. Bryant,*
   222 F.3d 157 (4th Cir. 2000) ........................................................... 28

*Greenville Women's Clinic v. Commissioner South Carolina Department
   of Health & Environment,*
   317 F.3d 357 (4th Cir. 2002) ........................................................... 14

*Heller v. Doe,*
   509 U.S. 312 (1993) .................................................................. 21, 27

*Hooper v. Bernalillo County Assessor,*
   472 U.S. 612 (1985) ........................................................................ 29

*June Medical Services v. Russo,*
   140 S. Ct. 2103  (2020) ................................................................... 24

iii

*Manning v. Caldwell for City of Roanoke*,
  930 F.3d 264 (4th Cir. 2019) ................................................................. 11, 12

*O'Day v. George Arakelian Farms, Inc.*,
  536 F.2d 856 (9th Cir. 1976) ................................................................. 27, 28

*Planned Parenthood of Indiana & Kentucky, Inc. v. Commissioner,
  Indiana Department of Health*,
  64 F. Supp. 3d 1235 (S.D. Ind. 2014) ........................................................... 29

*Planned Parenthood of Indiana & Kentucky, Inc. v. Marion County
  Prosecutor*,
  7 F.4th 594 (7th Cir. 2021) ................................................................. 15, 17

*Planned Parenthood of Wisconsin, Inc. v. Van Hollen*,
  738 F.3d 786 (7th Cir. 2013) ......................................................................... 28

*Plumer v. Maryland*,
  915 F.2d 927 (4th Cir. 1990) ......................................................................... 13

*Reyes v. Waples Mobile Home Park Limited Partnership*,
  91 F.4th 270 (4th Cir. 2024) ......................................................................... 10

*Richmond Medical Center for Women v. Herring*,
  570 U.S. 165 (4th Cir. 2009) ......................................................................... 17

*Stover v. Fingerhut Direct Marketing, Inc.*,
  709 F. Supp. 2d 473 (S.D.W. Va. 2009) ......................................................... 12

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ...................................................................................... 24

*United States v. Claybrooks*,
  90 F.4th 248 (4th Cir. 2024) ......................................................................... 12

*United States v. Frank*,
  8 F.4th 320 (4th Cir. 2021) ........................................................................... 13

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
  455 U.S. 489 (1982) ...................................................................................... 12

*Whole Woman's Health Alliance v. Rokita*,
  13 F.4th 595 (7th Cir. 2021) ......................................................................... 29

*Whole Woman's Health Alliance v. Rokita*,
  Nos. 21-2480 & 21-2573, 2022 WL 2663208 (7th Cir. July 11, 2022) .......... 29

*Williamson v. Lee Optical of Oklahoma, Inc.,*
  348 U.S. 483 (1955) ................................................................... 26

*Willis v. Town of Marshall,*
  275 Fed. App'x 227 (4th Cir. 2008) ............................................. 23

**Statutes**

N.C. Gen. Stat. § 131E-153.1 ...................................................... 1, 8, 22

N.C. Gen. Stat. § 14-23.7 ................................................................... 12

N.C. Gen. Stat. § 90-21.81A ............................................................... 7

N.C. Gen. Stat. § 90-21.81B ......................................................passim

N.C. Gen. Stat. § 90-21.82A ......................................................passim

N.C. Gen. Stat. § 90-21.83B ...................................................... 1, 7, 11, 16

N.C. Gen. Stat. § 90-21.88 ............................................................... 12

N.C. Gen. Stat. § 90-21.88A ............................................................ 12

Case 1:23-cv-00480-CCE-LPA   Document 98   Filed 04/01/24   Page 6 of 40

## STATEMENT OF THE MATTER

The U.S. "Constitution makes no reference to abortion, and no such right is implicitly protected by any constitutional provision." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022). For this reason, the Supreme Court held that it was "time to heed the Constitution and return the issue of abortion to the people's elected representatives." *Id.* at 232. The North Carolina General Assembly responded by protecting fetal life beginning at twelve weeks gestation, subject to certain exceptions, and by enacting reasonable health and safety measures to protect women who choose abortion.

Plaintiffs Planned Parenthood South Atlantic and Dr. Beverly Gray (collectively, "Planned Parenthood") challenge two of those common-sense health and safety measures: (1) the requirement that a physician document in a woman's medical chart the probable existence of an intrauterine pregnancy before providing an abortion-inducing drug (but not a surgical abortion), N.C. Gen. Stat. § 90-21.83B(a)(7) (the "IUP Determination Requirement); and (2) the requirement that all abortions after the twelfth week of pregnancy be performed in a hospital, *id.* §§ 90-21.81B(3)–(4), 90-21.82A, 131E-153.1 (the "Hospitalization Requirement"). Planned Parenthood alleges that both requirements are unconstitutionally vague and irrational under the Due Process Clause and that the Hospitalization Requirement violates the Equal Protection Clause by distinguishing between abortion and miscarriage.

Because the challenged laws implicate no fundamental right and are not unconstitutionally vague, Planned Parenthood must overcome the legislature's wide discretion to regulate health care and clear the high bar of proving that

1

the laws are not rationally related to any legitimate state interest—even a speculative one. Planned Parenthood failed to make that showing here. Because no genuine issue of material fact exists and the challenged requirements are constitutional as a matter of law, this Court should grant summary judgment to Intervenor-Defendants.

## STATEMENT OF FACTS

### I. Abortion-inducing drugs are contraindicated for ectopic pregnancy.

Chemical, or medication, abortion involves the administration of two drugs to a pregnant woman: mifepristone and misoprostol. Farris Report ¶ 18, ECF No. 94-1. First, mifepristone blocks the hormone progesterone, which is necessary for the baby to grow. *Id.* Second, misoprostol induces uterine contractions, which causes the pregnant woman's body to expel her unborn child. *Id.* According to the FDA's most recent label, women taking mifepristone should expect to experience cramping and bleeding. FDA Label 16, ECF No. 65-2. Other "common side effects" include "nausea, weakness, fever/chills, vomiting, headache, diarrhea and dizziness." *Id.* at 19. But abortion-inducing drugs can also have more serious complications, including hemorrhage, infection, sepsis, and even death. *Id.* at 5.

Abortion-inducing drugs are "contraindicated in patients with . . . [c]onfirmed or suspected ectopic pregnancy." *Id.* at 4. According to Planned Parenthood's expert Dr. Katherine Farris, "[a]n ectopic pregnancy occurs when a fertilized egg implants and grows outside of the uterus," Farris Report ¶ 63 n.48, and "accounts for approximately two percent of all reported pregnancies."

2

Farris Dep. 113:8–13, 113:24–25, ECF No. 74-2. Planned Parenthood tells its patients that symptoms of early ectopic pregnancy include bleeding, dizziness, and fainting. *Id.* at 127:4–8, 127:21–128:11, 130:17–20; *see also* PUL Patient Education Form, ECF No. 74-15.

An ectopic pregnancy is extremely dangerous because it "can rupture if it is not treated." Farris Dep. 123:9–11. Symptoms of a ruptured ectopic pregnancy include severe pain, lightheadedness, and dizziness. Boraas Dep. 140:25–141:4, ECF No. 74-1; *see also* PUL Patient Education Form. "[R]uptured ectopic pregnancy" is "a significant cause of pregnancy-related mortality and morbidity." Farris Dep. 112:2–3, 113:14–25. For this reason, a patient with a confirmed or "probable ectopic pregnancy" should be referred "for immediate evaluation." *Id.* at 109:14–110:9. Abortion-inducing drugs are ineffective in treating ectopic pregnancy. *Id.* at 165:21–166:2. And "[t]here are some overlapping symptoms between the normal symptoms we expect with medication abortion and the symptoms of an ectopic pregnancy." *Id.* at 124:13–16; *see also* PUL Patient Education Form.

Planned Parenthood's expert Dr. Christy Boraas Alsleben testified that "[t]he only way to definitively diagnose an ectopic pregnancy is to see an embryo outside of the uterus with ultrasound." Boraas Dep. 126:21–23. A physician can determine whether a patient has a probable intrauterine pregnancy "as early as five weeks" by seeing a gestational sac in the uterus on an ultrasound. *Id.* at 145:10–13. The vast majority of drug-induced abortions performed by Planned Parenthood take place after 5 weeks. Ex. 3 to Farris Report, ECF No. 94-1, Medication Abortion Volume by Gestational Age. In

3

2023, Planned Parenthood performed only nine drug-induced abortions before five weeks. *Id.*

If, on the other hand, "there is no intrauterine or extrauterine pregnancy visible on transvaginal ultrasonography, but the patient has a positive pregnancy test," then she has a "pregnancy of unknown location." Boraas Report ¶ 43, ECF No. 94-2. "[T]he rate of ectopic pregnancy" in patients with pregnancies of unknown location "is higher than for pregnant people generally." Ex. 1, Boraas Rebuttal ¶ 42. Planned Parenthood administers abortion-inducing drugs to patients with pregnancies of unknown location, Farris Report ¶ 65, but not to patients with probable or definite ectopic pregnancies, Farris Dep. 109:14–110:9.

## II. Second-trimester surgical abortion is distinct from surgical completion of a second-trimester miscarriage.

After twelve weeks gestation, Planned Parenthood uses two types of surgical abortion procedures: dilation and curettage (D&C, also called suction curettage or aspiration) and dilation and evacuation (D&E). Farris Report ¶ 15. Planned Parenthood performs D&C abortions "up to approximately 14 weeks" gestation. *Id.* ¶ 22. In a D&C abortion, the physician uses suction to remove the unborn child from the mother's uterus. *Id.* Starting at fourteen weeks gestation, Planned Parenthood performs D&E abortions. *Id.* ¶ 26. In a D&E abortion, the physician uses a combination of suction and forceps to dismember the unborn child and remove the fetus from the uterus piece-by-piece. *Id.* ¶ 27; Boraas Dep. 63:16–66:6.

4

The risks of surgical abortion increase with gestational age. Farris Dep. 145:17–18. Possible complications of second-trimester surgical abortion include cervical laceration, uterine perforation, hemorrhage, infection, and death. *Id.* at 62:13–14, 64:9–11, 65:19–20, 68:3–10; Boraas Dep. 91:1–2. Although Planned Parenthood screens patients for likelihood of complications, its expert admits that it is impossible be sure whether complications may arise for a particular patient until after the abortion procedure begins. Farris Dep. 63:17–22, 64:1–3, 66:7–9. Planned Parenthood's abortion patients with severe complications sometimes have to be transferred to a hospital for treatment. *Id.* at 63:5–10; 65:14–16, 65:25–66:2; Boraas Dep. 178:20–24. Since 2020, Planned Parenthood has transferred seventeen patients to the hospital for treatment of abortion complications. Ex. 7 to Farris Report, Post 12-Week Complications Resulting in Hospital Transfer, ECF No. 94-1.

Dr. Monique Chireau Wubbenhorst, an "obstetrician-gynecologist with over 30 years of experience in patient care, teaching, research, health policy, public health, global health, and bioethics," explained in her expert report that "[a]bortion is neither ethically nor medically identical to miscarriage." Ex. 2, Wubbenhorst Report ¶¶ 1, 74. Dr. Catherine Wheeler, an obstetrician-gynecologist and former abortion provider, agreed, stating that unlike miscarriage, abortion involves the intentional termination of human life. Ex. 3, Wheeler Report ¶¶ 3, 15. And Dr. Susan Bane, a North Carolina obstetrician-gynecologist with over twenty years of experience, explained that although surgical abortion and surgical completion of miscarriage are similar

5

"on paper," "the actual operations themselves can be vastly different." Ex. 4, Bane Report ¶¶ 4–5, 55.

Both Planned Parenthood's experts and the Legislative Leaders' experts also recognize that "physiological differences" exist between miscarriage management and abortion. Ex. 5, Johnson Rebuttal ¶ 37; Ex. 6, Farris Rebuttal ¶ 47; Bane Report ¶ 56. In a miscarriage, "[t]he cervix may already be softening and partially open." Bane Report ¶ 56; Johnson Rebuttal ¶ 39. Moreover, in a miscarriage, the fetal bones have already begun to soften, which "affects the amount of dilation needed for D&E." Ex. 7, Bane Addendum. And at least one study shows higher rates of bleeding and infection for abortion than miscarriage, at least in the first trimester. Wubbenhorst Report ¶ 90. Regardless, "miscarriage management more typically happens in hospitals or ambulatory surgical centers," even absent state regulation. Boraas Report ¶ 20.

Planned Parenthood acknowledges the differences between hospitals and abortion clinics. As Dr. Farris explained, certain "features . . . differentiate hospitals from abortion clinics," such as "different system operations requirements, staffing requirements, and building construction requirements." Farris Report ¶ 45. For instance, unlike abortion clinics, hospitals normally have access to a blood bank, for cases when hemorrhaging patients require transfusions. Wubbenhorst Report ¶ 146. Unlike abortion clinics, hospitals can immediately switch to perform "intraabdominal surgery" when necessary to treat patients suffering uterine perforations. Boraas Dep. 178:25–179:14. And hospitals can provide deep sedation or general anesthesia. *Id.* at 75:4–14,

6

169:19–21. For these reasons, it undisputed that at least *some* second-trimester abortion patients benefit from hospital care. Farris Dep. 166:9–22.

## III. North Carolina enacts protections for fetal life and women's health.

Before S.B. 20, North Carolina law prohibited nearly all abortions after 20 weeks of pregnancy, without exceptions for rape or incest. S.B. 20 changed the law to allow abortions through the twelfth week of pregnancy, N.C. Gen. Stat. § 90-21.81A(a), and built in several exceptions which allow abortion after twelve weeks in certain circumstances: (1) "[w]hen a qualified physician determines there exists a medical emergency"; (2) "[a]fter the twelfth week and through the twentieth week of a woman's pregnancy, when the procedure is performed by a qualified physician in a suitable facility . . . when the woman's pregnancy is a result of rape or incest"; and (3) "[d]uring the first 24 weeks of a woman's pregnancy, if a qualified physician determines there exists a life-limiting anomaly." *Id.* § 90-21.81B.

S.B. 20 also enacted certain health and safety measures for lawful abortions, two of which are relevant here. First, it imposes certain requirements for "physician[s] prescribing, administering, or dispensing an abortion-inducing drug." *Id.* § 90-21.83B(a). The physician must "examine the woman in person" and fulfill certain requirements "prior to providing an abortion-inducing drug." *Id.* Among other things, the physician must "[d]ocument in the woman's medical chart the probable gestational age and existence of an intrauterine pregnancy." *Id.* § 90-21.83B(a)(7).

7

Second, S.B. 20 requires that all surgical abortions "[a]fter the twelfth week of pregnancy" must be performed by "a physician licensed to practice medicine" in "a hospital." *Id.* § 90-21.82A(c). It defines "abortion clinic" as "[a] freestanding facility, that is neither physically attached nor operated by a hospital, for the performance of abortions during the first 12 weeks of pregnancy." *Id.* § 131E-153.1(1).

## IV. Planned Parenthood sues.

On June 16, 2023, Planned Parenthood filed suit against the attorney general, several district attorneys, the secretary of the North Carolina Department of Health and Human Services, the president of the North Carolina Medical Board, and the chair of the North Carolina Board of Nursing (collectively, "the State"), challenging several provisions of S.B. 20, including the IUP Determination and Hospitalization Requirements. Compl. ¶¶ 78, 82–83, ECF No. 1. Philip E. Berger, in his official capacity as President Pro Tempore of the North Carolina Senate, and Timothy K. Moore, in his official capacity as Speaker of the North Carolina House of Representatives (collectively, the "Legislative Leaders") intervened to defend the law. Mot. to Intervene, ECF No. 17. The General Assembly then passed H.B. 190, which amended S.B. 20 and "resolved many of the issues Plaintiffs raised in their Verified Complaint." Am. Compl. ¶ 7, ECF No. 42.

As a result, Planned Parenthood filed an Amended Complaint, narrowing its legal challenge. *Id.* ¶ 13. The Amended Complaint alleges that the IUP Determination Requirement and the Hospitalization Requirement are

8

unconstitutionally vague.[1] *Id.* ¶ 83. It also alleges that the IUP Determination Requirement and the Hospitalization requirement "violate Plaintiffs' and their patients' due process rights because they . . . are not rationally related to any legitimate state interest." *Id.* ¶ 85. Finally, the Amended Complaint alleges that the Hospitalization Requirement "violates the Equal Protection Clause because it singles out . . . abortion, while allowing other similarly situated procedures, including the treatment of miscarriage[,] . . . to be provided in an outpatient setting." *Id.* ¶ 86.

On September 30, 2023, this Court entered a preliminary injunction against the IUP Determination Requirement on vagueness grounds and the Hospitalization Requirement under the Equal Protection Clause. PI Order 22, 32, 34, ECF No. 80. This Court did not address any other claims. On March 1, 2024, Planned Parenthood moved for summary judgment on its equal protection challenge to the Hospitalization Requirement[2] and its vagueness and substantive due process challenges to the IUP Determination Requirement. Pls.' Mot. for Summ. J, ECF No. 93. The Legislative Leaders file

---

[1] The Amended Complaint also included a vagueness challenge to N.C. Gen. Stat. section 90-21.81B(3), alleging that "[i]t is unclear whether Dr. Gray can provide induction abortion at the hospital after the twelfth week of pregnancy to rape and incest survivors." *Id.* ¶¶ 79, 83. But Dr. Gray voluntarily dismissed that claim. Joint Stipulation of Partial Dismissal, ECF No. 84.

[2] Planned Parenthood fails to address its substantive due process and vagueness challenges to the Hospitalization Requirement in either its motion for summary judgment or its memorandum in support of that motion. So this Court may not grant summary judgment to Planned Parenthood on those claims. It may, however, grant summary judgment to the Legislative Leaders on those claims.

this memorandum in support of their cross-motion for summary judgment on *all* claims and in opposition to Plaintiffs' cross-motion for summary judgment.

## QUESTIONS PRESENTED

1.    May North Carolina exercise its traditional authority to protect the health and safety of its citizens by passing a law that requires a physician to document in a woman's medical chart the probable existence of an intrauterine pregnancy (thus excluding dangerous ectopic pregnancies) prior to providing an abortion-inducing drug that is contraindicated for a woman suffering from an ectopic pregnancy?

2.    May North Carolina exercise its traditional authority to protect the health and safety of its citizens by requiring that all surgical abortions after the twelfth week of pregnancy be performed in a hospital to ensure that a woman has immediate access to emergency care if needed?

## ARGUMENT

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 91 F.4th 270, 276 (4th Cir. 2024) (quoting Fed. R. Civ. P. 56(a)). Because no genuine issue of material fact exists and the challenged statutes are constitutional as a matter of law, this Court should grant summary judgment to the Legislative Leaders on all claims and deny Planned Parenthood's motion for summary judgment.

10

I.  **The Legislative Leaders are entitled to summary judgment because there is no genuine dispute of material facts and the IUP Determination Requirement is constitutional as a matter of law.**

The IUP Determination Requirement provides that a physician must "[d]ocument in the woman's medical chart the probable gestational age and existence of an intrauterine pregnancy" before prescribing abortion-inducing drugs. N.C. Gen. Stat. § 90-21.83B(a)(7). Planned Parenthood claims that this requirement is unconstitutionally vague and violates substantive due process. No genuine issue of material fact exists, and the IUP Determination Requirement is constitutional as a matter of law. This Court should grant the Legislative Leaders summary judgment on both claims.

A.  **The IUP Determination Requirement gives abortion providers notice of what conduct is prohibited and includes sufficient standards to prevent arbitrary and discriminatory enforcement.**

In the Fourth Circuit, "the question of a statute's vagueness is a purely legal issue that does not require additional fact-finding." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019) (en banc). Yet "[n]early every law entails some ambiguity." *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 781 (4th Cir. 2023). Thus, a statute is vague under the Due Process Clause only if it fails to "give a person of ordinary intelligence adequate notice of what conduct is prohibited" or fails to "include sufficient standards to prevent arbitrary and discriminatory enforcement." *Manning*, 930 F.3d at 272. "The degree of vagueness tolerated in a law depends in part on the type of statute." *Id.* "[I]f criminal penalties may be imposed for violations of a law, a stricter standard is applied in reviewing the statute for vagueness." *Id.* at 272–73. But "[l]ess clarity is required in purely civil statutes because the

11

consequences of imprecision are qualitatively less severe." *Id.* at 272 (cleaned up).

Even in the criminal context, "a statute need not spell out every possible factual scenario with celestial precision to avoid being struck down on vagueness grounds." *United States v. Claybrooks*, 90 F.4th 248, 255 (4th Cir. 2024) (cleaned up). Instead, a statute passes vagueness review so long as "it is clear what the [statute] as a whole prohibits." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972); *see also Doe v. Cooper*, 842 F.3d 833, 842 (4th Cir. 2016) (explaining that a statute is not vague if it has "a constitutional core"). While "a scienter requirement may mitigate a law's vagueness," *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982), "the lack of an express scienter requirement, without more, does not signify that [a statute] is impermissibly vague," *Stover v. Fingerhut Direct Mktg., Inc.*, 709 F. Supp. 2d 473, 483 (S.D.W. Va. 2009).

A physician who violates the IUP Determination Requirement is *not* subject to criminal penalties. N.C. Gen. Stat. §§ 90-21.81B (providing that drug-induced abortion is lawful during the first twelve weeks of a woman's pregnancy "*[n]otwithstanding*" North Carolina's criminal penalties for abortion (emphasis added)), 14-23.7(1) (prohibiting prosecution of "acts" that "were lawful pursuant to the provisions of" S.B. 20). Instead, SB. 20 imposes civil and licensing penalties for violations of the IUP Determination Requirement. *Id.* §§ 90-21.88, 90-21.88A. The General Assembly's use of "notwithstanding" shows that S.B. 20's lesser civil and licensing penalties

12

supersede its criminal statutes. *See United States v. Frank*, 8 F.4th 320, 331 (4th Cir. 2021).[3]

The cases cited by Planned Parenthood do not require a different reading. Planned Parenthood relies on *Bittner v. United States*, 598 U.S. 85, 102 (2023), for the proposition that "failing to provide . . . notice [of criminal penalties] makes the law impermissibly vague." Pls.' Br. 17. But *Bittner* is not a vagueness case; instead, it is a statutory interpretation case applying the rule of lenity, which holds that "statutes imposing penalties are to be 'construed strictly' against the government and in favor of individuals." *Bittner*, 598 U.S. at 101. Applied here, the rule of lenity would counsel *against* interpreting the IUP Determination Requirement to impose criminal penalties. Next, Planned Parenthood relies on a Fifth Circuit case to argue that the licensing penalties are quasi-criminal. Pls.' Br. 17–18. But the Fourth Circuit has held that administrative license revocation proceedings are *not* quasi-criminal. *See Plumer v. Maryland*, 915 F.2d 927, 931 (4th Cir. 1990). Therefore, the IUP Determination Requirement is *not* subject to the "stricter standard" of review reserved for criminal statutes, and it provides "reasonable notice" to abortion providers that they cannot be criminally prosecuted for violating the provision. *See* Pls.' Br. 17.

Regardless, the IUP Determination Requirement has a "constitutional core": Under what this Court called the "more likely" interpretation of the statute, "the provider must only determine that there is a '*probable* existence

_____

[3] The Legislative Leaders clarified at the hearing that the requirement imposes only civil and licensing penalties, Tr. 95:9–13.

of an intrauterine pregnancy.'" PI Order 19 & n.10 (emphasis added) (applying "the series-qualifier canon").[4] The Court explained that any "vagueness problem" with the IUP Determination Requirement "arises from the ambiguity about the level of certainty required for a determination of an intrauterine pregnancy before documenting that determination in the medical chart." *Id.* at 18 n.9. But the Due Process Clause does not "expect mathematical certainty from our language." *Greenville Women's Clinic v. Comm'r S.C. Dep't of Health & Env't* (*Greenville Women's Clinic II*), 317 F.3d 357, 366 (4th Cir. 2002) (quoting *Grayned*, 408 U.S. at 110). In *Greenville Women's Clinic II*, the Fourth Circuit upheld several health and safety regulations on abortion clinics because the regulations could "be followed by reasonably prudent abortion providers who are mindful of their patients' health and safety." *Id.*

Similarly, the use of a canon of statutory construction to determine the meaning of the IUP Determination Requirement does not render it unconstitutionally vague. Indeed, "the elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Gonzales v. Carhart*, 550 U.S. 124, 153 (2007). Because the series-qualifier canon leads to a constitutionally permissible reading of the IUP Determination Requirement, this Court should apply it to uphold the requirement.

---

[4] In its preliminary injunction order, this Court stated that the Legislative Leaders "say the word 'probable' does not apply to the determination of an IUP and contend that the provider must determine there is an IUP with certainty." PI Order 18–19. The Legislative Leaders' counsel clarified at the hearing that the Legislative Leaders "would not oppose" either reading of the statute. Tr. 85:1–12.

14

This Court defined "probable" as "supported by evidence *strong enough to establish presumption* but not proof." PI Order 19 n.11 (emphasis added). The record shows there is no ambiguity. Planned Parenthood's experts understand the meaning of the term "probable" as applied to intrauterine pregnancy. *See Planned Parenthood of Ind. & Ky., Inc. v. Marion Cnty. Prosecutor*, 7 F.4th 594, 604 & n.5 (7th Cir. 2021) (holding that requiring a physician to exercise reasonable medical judgment does not render a statute vague). Dr. Boraas explained in her report that "a patient has a 'probable intrauterine pregnancy' if there is a likely gestational sac (intrauterine echogenic sac-like structure), but no yolk sac, visible in the uterus." Boraas Report ¶ 43. If both the gestational sac and yolk sac are visible in the uterus, then the "patient has a 'definite intrauterine pregnancy.'" *Id.* In contrast, "a patient has a 'pregnancy of unknown location' if there is no intrauterine or extrauterine pregnancy visible on transvaginal ultrasonography, but the patient has a positive pregnancy test." *Id.* Such a patient *could* have "an early intrauterine pregnancy that is not yet visible," but she could also have "an ectopic pregnancy that is not yet visible." Farris Dep. 111:4–11.

It is patients falling into this third category—pregnancies of unknown location—to whom Planned Parenthood claims it is unsure whether it may provide early medication abortion. Am. Compl. ¶¶ 58, 61. In its brief, Planned Parenthood argues (for the first time) that "the law does not indicate whether" its screening protocol for "patients with pregnancies of unknown location" "is legally sufficient to satisfy the IUP [Determination] Requirement." Br. in Supp. of Pls.' Mot. for Summ. J. 18–19, ECF No. 94. But that argument

contradicts its own experts' testimony, who admit that a patient with a pregnancy of unknown location has neither a probable intrauterine pregnancy nor a probable ectopic pregnancy. Farris Dep. 110:20–24; Boraas Report ¶ 43. Planned Parenthood does not simply presume that patients in this third category have intrauterine pregnancies; instead, it "conducts further testing to rule out ectopic pregnancy." Farris Report ¶ 62. What the statute prohibits is the *simultaneous* provision of abortion-inducing drugs to patients who have pregnancies of unknown location (but not confirmed or probable intrauterine pregnancies). *See* N.C. Gen. Stat. § 90-21.83B(a) (requiring that the physician determine the probable existence of an intrauterine pregnancy "*prior* to providing an abortion-inducing drug" (emphasis added)). At bottom, Planned Parenthood's problem with the language is not that it is vague—its own experts understand it—it is that the IUP Determination Requirement obligates it and its physicians to conduct more testing in some cases before administering abortion-inducing drugs.

This prohibition does not conflict with section 90-21.81B, which allows abortion-inducing drugs "during the first 12 weeks of a woman's pregnancy" only "subject to the provisions of this Article." *Id.* § 90-21.81B. Those provisions include section 90-12.83B and its IUP Determination Requirement. Those two provisions work in tandem—physicians may administer abortion-inducing drugs during the first twelve weeks of pregnancy *only if* they first comply with the IUP Determination Requirement.

In sum, the IUP Determination Requirement is not vague because it has a "constitutional core," *see Cooper*, 842 F.3d at 842. In other words, the statute

16

as a whole unambiguously prohibits prescribing an abortion-inducing drug to patients with a pregnancy of unknown location. *See Grayned*, 408 U.S. at 110. That defeats Planned Parenthood's pre-enforcement facial vagueness challenge. *See Richmond Med. Ctr. for Women v. Herring*, 570 U.S. 165, 177 (4th Cir. 2009) (upholding Virginia's partial birth abortion statute because it was "plain as to how . . . liability may be avoided"); *Planned Parenthood of Ind. & Ky.,* 7 F.4th at 605 (upholding abortion complications reporting statute imposing criminal penalties against pre-enforcement facial challenge because it had a "discernable core" and "no evidence has been, or could be, introduced to indicate whether the [Act] has been enforced in a discriminatory manner").

Because the IUP Determination Requirement is not unconstitutionally vague as a matter of law, this Court should grant summary judgment to the Legislative Leaders on Planned Parenthood's vagueness challenge.

## B. The IUP Determination Requirement is rationally related to the State's legitimate interest in women's health and safety.

In *Dobbs*, the Supreme Court held that "rational-basis review is the appropriate standard" for challenges to "state abortion regulations." 597 U.S. at 300. Under rational-basis review, "[a] law regulating abortion . . . is entitled to a strong presumption of validity." *Id.* at 301 (cleaned up). Thus, "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993). The statute "must be sustained if there is a rational basis on which the legislature could have thought that it would serve legitimate state interests." *Dobbs*, 597 U.S. at 301.

17

The IUP Determination Requirement easily clears that bar because it is rationally related to the State's legitimate interest in "the protection of maternal health and safety." *Id*. All parties agree that "ruptured ectopic pregnancy" is "a significant cause of pregnancy-related mortality and morbidity," Farris Dep. 112:2–3, 113:14–25, and that abortion-inducing drugs are "contraindicated in patients with . . . [c]onfirmed or suspected ectopic pregnancy." FDA Label 4.[5] They also agree that "[t]here are some overlapping symptoms between the normal symptoms we expect with medication abortion and the symptoms of an ectopic pregnancy," Farris Dep. 124:13–16, and that "[t]he only way to definitively diagnose an ectopic pregnancy" is through ultrasound. Boraas Dep. 126:21–23; *see also* Ex. 8, ACOG Bulletin No. 193, Tubal Ectopic Pregnancy e92 ("The minimum diagnostic evaluation of a suspected ectopic pregnancy is a transvaginal ultrasound evaluation and confirmation of pregnancy."). So the General Assembly could have rationally concluded that requiring physicians to determine that a probable intrauterine pregnancy exists *before* prescribing abortion-inducing drugs would protect women with an undiagnosed ectopic pregnancy from confusing the symptoms of an early ectopic pregnancy with the normal side effects of abortion-inducing drugs and failing to receive treatment until it is too late.

---

[5] Planned Parenthood mistakenly purports that the FDA Label provides that "the medication can safely be administered *even if* an ectopic pregnancy cannot be definitively ruled out." Pls.' Mem. 22; *see also* PI Order 20. Quite the opposite: the FDA warns providers that "the presence of an ectopic pregnancy may have been missed even if the patient underwent ultrasonography." FDA Label 6.

18

Planned Parenthood argues that the IUP Determination Requirement is irrational because "it prohibits patients from obtaining abortions at the point in pregnancy when abortion is safest." Pls.' Br. 21. But that statement is false[6]—nobody claims that the IUP Determination Requirement applies to surgical abortions. Farris Report ¶¶ 61, 74; Wheeler Report ¶ 64. That distinction makes sense because surgical abortion allows the physician to examine the removed tissue to determine whether it contains the fetus (ruling out ectopic pregnancy). Wubbenhorst Report ¶ 251; Farris Report ¶ 66. Planned Parenthood's experts present no evidence that performing a surgical abortion is more dangerous than abortion-inducing drugs at the same gestational age in the first trimester. Instead, they argue that some patients might prefer medication abortion and that Planned Parenthood "has clinic days on which it, for staffing reasons, it is able to offer medication abortion but not procedural abortion." Boraas Report ¶ 44; Farris Report ¶¶ 74–75. But these alleged burdens are irrelevant under *Dobbs*, 597 U.S. at 280–86 (rejecting undue burden test as unworkable).

Planned Parenthood also argues that the IUP Determination Requirement is irrational because "it does nothing to facilitate prompt screening and treatment for ectopic pregnancy." Pls.' Br. 21. But the

---

[6] Contrary to Planned Parenthood's assertion, the Legislative Leaders never "concede[d] that [the IUP Determination Requirement] will force some patients to obtain medication abortions later in pregnancy." Pls.' Br. 21. Instead, they stated that "Plaintiffs *allege* that a small number of women may be required to wait a few more days to ensure that chemical abortion drugs can be safely administered to them." Def.-Intervenors' Supp. Br. 10, ECF No. 75 (emphasis added).

19

requirement *does* facilitate prompt screening for ectopic pregnancy by requiring additional ultrasounds *before* abortion-inducing drugs may be administered. Regardless, the General Assembly could have rationally concluded that a woman with a pregnancy of unknown location who seeks a drug-induced abortion but cannot have one due to inconclusive ultrasound findings would either (1) have a surgical abortion, meaning that the physician could determine whether she has an ectopic pregnancy by examining the removed tissue; or (2) return to the clinic for serial follow-up ultrasounds to obtain a drug-induced abortion until she had a confirmed intrauterine or ectopic pregnancy. Farris Report ¶ 61. A woman who is prescribed an abortion-inducing drug, on the other hand, might "believe she is no longer pregnant" and "may not return for follow up." Wubbenhorst Report ¶¶ 228–29. That woman might confuse the symptoms of an early ectopic pregnancy with the expected bleeding and cramping from the abortion-inducing drugs. That confusion could lead to delayed treatment for the ectopic pregnancy and even death.

Rather than denying that at least some women will fail to return for follow up, Planned Parenthood's experts counter that "nothing in the IUP D[etermination] Requirement requires patients to return for follow-up or seek care elsewhere." Farris Rebuttal ¶ 54; Boraas Rebuttal ¶ 52. Even if some patients fail to follow up for further evaluation after an ultrasound shows they have a pregnancy of unknown location, that does not excuse prescribing a contraindicated drug to those patients. "[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an

20

imperfect fit between means and ends." *Heller v. Doe*, 509 U.S. 312, 321 (1993). Here, the General Assembly could have rationally concluded that women are more likely to return for follow-up treatment if they know that they are still pregnant.

Planned Parenthood's protocol for pregnancies of unknown location actually delays detection of ectopic pregnancy, Pls.' Br. 23, when compared to surgical abortion. Dr. Wheeler directly explained in her report that "the most expedient method" of determining whether an undesired pregnancy is ectopic is "proceeding to aspiration D&C with evaluation for products of conception," Wheeler Report ¶¶ 73, 78. Even if Planned Parenthood's protocol might lead to an earlier diagnosis of ectopic pregnancy in some cases, that does not justify its safety risks. Bane Report ¶ 68; Bane Dep. 36:9–11, ECF No. 94-4. "[T]hose attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it." *Beach Commc'ns*, 508 U.S. at 315 (cleaned up). At least some rational health and safety reasons justify the IUP Determination Requirement. Because Planned Parenthood has failed to negate every possible rational basis for the IUP Determination Requirement, this Court should grant summary judgment to the Legislative Leaders.

## II. The Legislative Leaders are entitled to summary judgment because there is no genuine issue of material fact and the Hospitalization Requirement is constitutional as a matter of law.

Surgical abortion after twelve weeks gestation is lawful in North Carolina when "performed by a qualified physician in a suitable facility in accordance with [section] 90-21.82A when the woman's pregnancy is a result

21

of rape or incest," "when a qualified physician determines there exists a medical emergency," or "if a qualified physician determines there exists a life-limiting anomaly." N.C. Gen. Stat. § 90-21.81B. Section 90-21.82A provides that "[a]fter the twelfth week of pregnancy, a physician . . . may not perform a surgical abortion as permitted under North Carolina law in any facility other than a hospital." *Id.* § 90-21.82A(c). Surgical abortions during the first twelve weeks of pregnancy, on the other hand, may be performed "in a hospital, an ambulatory surgical facility, or an abortion clinic." *Id.* § 90-21.82A(b). "Abortion clinic" is defined as "[a] freestanding facility, that is neither physically attached nor operated by a hospital, for the performance of abortions during the first 12 weeks of pregnancy." *Id.* §§ 90-21.82A(a); 131E-153.1(1).

Planned Parenthood challenges these requirements under the Due Process and Equal Protection Clauses. Am. Compl. ¶¶ 85–86. It also challenges subsections 90-21.81B(3) and (4)—but not sections 90-21.82A or 131E-153.1—as unconstitutionally vague. *Id.* ¶ 83. Because there is no genuine issue of material fact and the Hospitalization Requirement is constitutional as a matter of law, the Court should grant summary judgment for the Legislative Leaders on all three claims.

## A. The Hospitalization Requirement does not violate equal protection because it is rationally related to the State's legitimate interest in women's health and safety.

The Equal Protection Clause "embodies a simple principle of government: '[A]ll persons similarly situated should be treated alike.'" *Doe v. Settle*, 24 F.4th 932, 939 (4th Cir. 2022). The Fourth Circuit has "distilled that aspirational standard into a two-part test," *id.*: "First, a plaintiff must prove

22

that he has been treated differently from others who are similarly situated to him." *Id.* "Second, if he makes out that initial showing, the court must consider whether the classification can be justified under the appropriate level of constitutional scrutiny." *Id.* Planned Parenthood failed on both accounts.

This Court previously held that the Hospitalization Requirement "treats women who have miscarriages differently from women who seek" abortion. PI Order 30. Experts on both sides disagree on that point. *Compare* Wubbenhorst Report ¶ 74 ("Abortion is neither ethically nor medically identical to miscarriage.") *with* Farris Report ¶ 46 ("[F]rom a clinical perspective, [miscarriage management] involves the exact same procedures and therefore the exact same types of complications as aspiration abortion and D&E."); *see also Willis v. Town of Marshall*, 275 Fed. App'x 227, 233 (4th Cir. 2008) (explaining that whether "a plaintiff . . . is similarly situated to those who have been treated differently is a factual issue for a jury"). And while abortion patients and miscarriage patients may experience similar *types* of complications, the Legislative Leaders contest the proposition that the *rate* of complications is the same for both procedures. Tr. 121:3–7, ECF No. 94-6; *see also* Wubbenhorst Report ¶ 90 (identifying study showing higher rates of bleeding and infection "for medical and surgical abortion than for treatment of miscarriage"); Bane Dep. 56:11–25 (citing textbook contrasting miscarriage and abortion); Wheeler Report ¶ 50 (explaining that "underlying clinical conditions may alter the risks and difficulty of the procedure").

Even if genuine dispute of fact remains as to whether miscarriage patients and abortion patients are similarly situated for purposes of the

23

Hospitalization Requirement, that dispute is not material to this case because Planned Parenthood's equal protection claim fails *as a matter of law* under the second part of the test. Under *Dobbs*, the appropriate level of constitutional scrutiny is rational-basis review. 597 U.S. at 236–37. In the equal protection context, that means that "[a] challenger must show there is no rational relationship between the disparity of treatment and some legitimate governmental purpose." *Settle*, 24 F.4th at 943 (cleaned up). But the State "need not make any showing; no evidence of any kind is required; reasonable speculation is enough." *Id.* "Nor is there any place in rational-basis review to question the wisdom or logic of a state's legislation; rough line-drawing, even 'illogical' or 'unscientific' line drawing, is often necessary to governing." *Id.*; *see also June Med. Servs. v. Russo*, 140 S. Ct. 2103, 2136 (2020) (Roberts, C.J., concurring in the judgment) (explaining that the "traditional rule" is that "state and federal legislatures [have] wide discretion to pass legislation in areas where there is medical and scientific uncertainty").

The Supreme Court "hardly ever strikes down a policy as illegitimate under rational basis scrutiny." *Trump v. Hawaii*, 585 U.S. 667, 705 (2018). Courts may do so only when "it is impossible to discern a relationship to legitimate state interests or that the policy is inexplicable by anything but animus." *Id.* at 706 (cleaned up). Because Planned Parenthood has failed "to negative every conceivable basis which might support" the Hospitalization Requirement, *see Beach Commc'ns*, 508 U.S. at 315, and has introduced no evidence of animus, it has failed to meet its burden under the Equal Protection Clause.

24

In its preliminary injunction order, this Court asked the Legislative Leaders to "offer" more "explanation or evidence . . . for th[e] differing treatment" between miscarriage and abortion. PI Order 29. The Legislative Leaders have now produced such evidence. It is uncontested that there are "physiological differences" between miscarriage management and abortion. Johnson Rebuttal ¶ 37; Farris Rebuttal ¶ 47; Bane Report ¶ 56. These differences include the softening and partial opening of the cervix and the softening of fetal bones during a miscarriage. Bane Report ¶ 56; Johnson Rebuttal ¶ 39; Bane Addendum.

What Planned Parenthood contests is whether these physiological differences "make aspiration or D&E *riskier* for induced abortion" than for miscarriage management. Johnson Rebuttal ¶ 37. The Legislative Leaders have introduced evidence that it does. Bane Report ¶¶ 55–57; Wubbenhorst Report ¶¶ 90, 92–93. But that factual dispute is not material under the rational basis test. Again, the Legislative Leaders were not required to introduce any evidence at all. *Beach Commc'ns*, 508 U.S. at 315; *Settle*, 24 F.4th at 943. It is enough that the General Assembly *could* have concluded that surgical management of second-trimester miscarriage is less dangerous than second-trimester surgical abortion because the fetal bones have already softened and the cervix may be partially open. What this means practically is that because the General Assembly presented evidence to support the Hospitalization Requirement, it prevails under the rational basis test. This Court may not second guess that evidence by comparing it to Planned

25

Parenthood's evidence. That the Legislative Leaders did offer evidence only confirms that the Hospitalization Requirement is rational.

Moreover, Planned Parenthood's experts confirmed that the General Assembly's choice was rational. As one of its experts testified, "miscarriage management more typically happens in hospitals or ambulatory surgical centers," even absent state regulation. Boraas Report ¶ 20; *see also* Wheeler Report ¶ 23; Bane Report ¶ 54; Wubbenhorst Report ¶¶ 81–82. Under the rational basis test, the General Assembly "may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955). Thus, the General Assembly could rationally conclude that its health and safety rationale applies with less force in the miscarriage context because so many of those procedures *already* take place in the hospital.

Like the IUP Determination Requirement, the Hospitalization Requirement is rationally related to the State's legitimate interest in "the protection of maternal health and safety." *Dobbs*, 597 U.S. at 301. Everyone agrees that abortion becomes more dangerous as gestational age increases, Farris Dep. 145:17–18, and that second-trimester abortions can result in serious complications, *id.* at 62:13–14, 64:9–11, 65:19–20, 68:3–10; Boraas Dep. 91:1–2. Nobody denies that hospitals have different safety features than abortion clinics, Farris Report ¶ 45, and that at least *some* second-trimester abortion patients would benefit from hospital care, Farris Dep. 166:9–22. No one can know for sure which patients will experience complications until a surgical procedure begins. *Id.* at 63:17–22, 64:1–3, 66:7–9. That's why Planned

26

Parenthood must transfer some of its patients to a hospital to treat severe complications. *See* Post 12-Week Complications Resulting in Hospital Transfer.

The General Assembly could have rationally concluded that requiring second-trimester abortions to take place in a hospital would benefit women's health and safety by ensuring that they are treated in a facility ready and able to handle any complications that may arise. Planned Parenthood admits that "there are excellent physicians and staff providing compassionate, patient-centered care in hospital settings." Pls.' Br. 15. It nevertheless claims that "the Hospitalization Requirement would harm patients" because they "are more likely to encounter an inexperienced abortion provider at a North Carolina hospital." *Id.* But that claim lacks any factual foundation; on the contrary, "the University of North Carolina Memorial Hospital has performed hundreds of abortions over the last few years." Wubbenhorst Report ¶ 175. And many times, physicians who perform abortions at clinics also perform abortions in hospitals, including Plaintiff Dr. Gray. Am. Compl. ¶ 24.

Not every woman that undergoes a second-trimester surgical abortion will experience complications, but the rational-basis test does not require a "[]perfect fit between means and ends." *Heller*, 509 U.S. at 321. The out-of-circuit cases cited by Planned Parenthood do not require otherwise. In *O'Day v. George Arakelian Farms, Inc.*, the Ninth Circuit explicitly recognized that "[l]egislative categories need not be drawn with 'mathematical nicety' . . . for classification necessarily involves approximation." 536 F.2d 856, 860 (9th Cir. 1976). It then struck down the federal statute at issue not only because it was

27

"grossly excessive" in some cases, but also because it was "wholly inadequate" in the remaining cases. *Id.* And in *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, the Seventh Circuit struck down Wisconsin's admitting privileges requirement under the undue burden test, not the rational basis test. 738 F.3d 786, 791 (7th Cir. 2013). Although the court noted in dicta that "[a]n issue of equal protection of the laws is lurking in this case," *id.* at 790, that statement conflicts with the Fourth Circuit's holding that States may rationally "distinguish[] between abortion services and other medical services when regulating physicians or women's healthcare." *Greenville Women's Clinic v. Bryant* (*Greenville Women's Clinic I*), 222 F.3d 157, 173 (4th Cir. 2000).

Planned Parenthood argues that "[t]he Hospitalization Requirement is especially irrational because it applies only to survivors of rape and incest and patients with grave fetal diagnoses." Pls.' Br. 13. But that claim is simply false: the Hospitalization Requirement applies to *all* surgical abortions "[a]fter the twelfth week of pregnancy." N.C. Gen. Stat. § 90-21.82A(c). Included in that are abortions performed after twelve weeks in cases of medical emergency, abortions performed on survivors of rape or incest, and abortions performed on patients with grave fetal diagnoses. *Id.* § 90-21.81B(1). The Hospitalization Requirement relies on the increased risks associated with second-trimester abortions, not the reason for the pregnancy or abortion. *See* Wheeler Report ¶¶ 31, 34–35. While Planned Parenthood claims that the law focuses on the *reason* for the abortion weeks, it instead focuses on *when* the abortion is performed, without regard to how the pregnancy occurred or the health of the

28

baby or mother. In other words, it treats all second trimester abortion patients equally.

Regardless, Planned Parenthood's alleged burdens on patient access have no relevance under the rational basis test. *See Dobbs*, 597 U.S. at 280–86. Under *Dobbs*, any alleged "burden" is a policy issue for the legislature to assess. *Id.* at 2272–73. The cases cited by Planned Parenthood do not require otherwise. In *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. Dep't of Health*, a district court invalidated Indiana's abortion clinic licensing law *as applied to* a clinic providing only abortion-inducing drugs, not second-trimester surgical abortions. 64 F. Supp. 3d 1235, 1257 (S.D. Ind. 2014). Indiana's hospitalization requirement for second-trimester abortions, on the other hand, has been upheld multiple times. *Gary-Northwest Ind. Women's Servs., Inc. v. Orr*, 496 F. Supp. 894 (N.D. Ind. 1980) (upholding Indiana's hospitalization requirement under *Roe*), *affirmed*, 451 U.S. 934 (1981) (summary decision); *Whole Woman's Health All. v. Rokita*, 13 F.4th 595, 598 (7th Cir. 2021) (staying injunction against hospitalization requirement under undue burden test); *Whole Woman's Health All. v. Rokita*, Nos. 21-2480 & 21-2573, 2022 WL 2663208, at *1 (7th Cir. July 11, 2022) (vacating and remanding judgment against hospitalization requirement under *Dobbs*).

The Supreme Court's decision in *Hooper v. Bernalillo County Assessor* neither concerned abortion nor suggested that courts should weigh the policy benefits and burdens of a challenged law. Instead, it struck down the challenged New Mexico statute, which provided tax benefits to New Mexico veterans who established residence in the state before May 8, 1976, because it

did not even "*plausibly*" achieve the State's purpose of "encourag[ing] veterans to move to the State." 472 U.S. 612, 619 (1985) (emphasis added). Planned Parenthood has not met its burden of showing that the Hospitalization Requirement has no plausible relation to the State's health and safety objective. Therefore, this Court should grant summary judgment to the Legislative Leaders on Planned Parenthood's equal protection claim.

**B. The Hospitalization Requirement does not violate substantive due process because it is rationally related to the State's legitimate interest in women's health and safety.**

Planned Parenthood fails to address its substantive due process claim against the Hospitalization Requirement in either its Motion for Summary Judgment or its Brief in Support of that Motion. Regardless, the Hospitalization Requirement is rational under the Due Process Clause for the same reasons that it is rational under the Equal Protection Clause. *See supra* Part II.A. Therefore, this Court should grant summary judgment to the Legislative Leaders on Planned Parenthood's due process claim.

**C. Planned Parenthood has introduced no evidence or legal arguments to support its vagueness claim.**

In its Amended Complaint, Planned Parenthood alleges that "the Hospitalization Requirement in N.C. Gen. Stat. § 90-21.81B(3) and (4) . . . fail[s] to give Plaintiffs fair notice of the requirements of the Act and encourage[s] arbitrary and discriminatory enforcement." Am. Compl. ¶ 83. But nothing in Planned Parenthood's Amended Complaint, preliminary injunction filings, summary judgment filings, or evidence in support explains its vagueness theory. On the contrary, Planned Parenthood admits that the

30

Hospitalization Requirement applies to second-trimester abortions falling under both the rape and incest exception, N.C. Gen. Stat. § 90-21.81B(3), and the life-limiting anomaly exception, *id.* § 90-21.81B(4). *See* Pls.' Br. 13. Thus, Planned Parenthood knows what the law unambiguously requires. Because Planned Parenthood has introduced neither evidence nor legal arguments in support of its vagueness claim against the Hospitalization Requirement, this Court should grant summary judgment to the Legislative Leaders.

## CONCLUSION

No genuine issue of *material* fact remains, and each of Planned Parenthood's claims fails as a matter of law. The IUP Determination Requirement is not vague and is rationally related to the State's legitimate interest in women's health and safety because it prevents providers from prescribing abortion drugs to patients who may have ectopic pregnancies. Similarly, the Hospitalization Requirement is not vague and is rationally related to the State's legitimate health and safety interest because it ensures that women having dangerous second-trimester abortions are in the safest setting best able to deal with life-threatening complications. For these reasons, the Legislative Leaders respectfully request that this Court grant summary judgment in their favor on all claims and deny Planned Parenthood's motion for summary judgment.

31

RESPECTFULLY SUBMITTED THIS 1st day of April, 2024.

s/ W. Ellis Boyle
W. Ellis Boyle
N.C. State Bar I.D. No. 33826
email: docket@wardandsmith.com*
email: weboyle@wardandsmith.com
**
WARD AND SMITH, P.A.
Post Office Box 7068
Wilmington, NC 28406-7068
Tel.: (910) 794-4800
Fax: (910) 794-4877

* This email address must be used in
order to effectuate service under the
Federal Rules of Civil Procedure

** Email address to be used for all
communications other than service

s/ Erin M. Hawley
Erin M. Hawley***
DC Bar No. 500782
ehawley@adflegal.org
Erik C. Baptist***
DC Bar No. 490159
ebaptist@adflegal.org
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
Tel.: (202) 393-8690
Fax: (202) 347-3622

Julia C. Payne***
AZ Bar No. 038773
jpayne@adflegal.org
Kevin H. Theriot***
AZ Bar No. 030446
ktheriot@adflegal.org
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Tel.: (480) 388-8028
Fax: (480) 444-0028

*** Notice of Special Appearance
Filed

Attorneys for Intervenor-Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on April 1, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*s/ Erin M. Hawley*
Erin M. Hawley

33

**CERTIFICATE OF WORD COUNT**

I hereby certify that the foregoing brief complies with LR 56.1(c) and the Court's text order of October 24, 2023, adopting the parties' Amended Joint Rule 26(f) Report. The foregoing brief contains 8,671 words.

<u>*s/ Erin M. Hawley*</u>
Erin M. Hawley