# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### DURHAM DIVISION

PLANNED PARENTHOOD SOUTH
ATLANTIC; BEVERLY GRAY, M.D., on
behalf of themselves and their patients seeking
abortions,

                            Plaintiffs,

v.

JOSHUA H. STEIN, Attorney General of
North Carolina, in his official
capacity; et al.

                            Defendants.

No. 1:23-CV-480

## DEFENDANT ATTORNEY GENERAL JOSHUA H. STEIN'S
## RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiffs challenge the constitutionality of two provisions of Senate Bill 20, a sweeping law restricting abortion access and curtailing women's reproductive freedom that North Carolina's General Assembly enacted last summer. Doc. 42 (First Am. Compl.); S.B. 20, 2023-24 Leg., 156th Sess. (2023), *as amended* H.B. 190, 2023-24 Leg., 156th Sess. (2023) (codified at N.C. Gen. Stat. art. 1I, ch. 90). The first provision requires abortions in cases of rape, incest, or life-limiting fetal anomalies that take place after the twelfth week of pregnancy to be performed only at a hospital, rather than at an abortion clinic. N.C. Gen. Stat. §§ 90-21.81B(3)-(4), -21.82A(c); *id.* § 131E-153.1. The

second requires a physician to "[d]ocument . . . [the] existence of an intrauterine pregnancy" before providing an abortion. *Id.* § 90-21.83B(a)(7).

This Court has already ruled that the two provisions are likely unconstitutional, and preliminarily enjoined their enforcement. Doc. 80 (Ord. Granting Preliminary Injunction) at 2, 33. The hospitalization requirement, the Court explained, likely violates the Equal Protection Clause because it restricts certain medical procedures when used to perform an abortion but does not similarly restrict those same procedures when performed for miscarriage management. *Id.* at 2. The Court also concluded that the IUP documentation requirement likely violates the Due Process Clause because it fails to provide providers reasonable notice of the conduct that it prohibits. *Id.*

Discovery has only confirmed the Court's prior conclusions. When preliminarily enjoining the hospitalization requirement, the Court observed that "[t]he plaintiffs have offered uncontradicted evidence that the same medical procedures used for surgical abortions are used for miscarriage management and that the risks of those identical procedures are the same whatever their purpose." *Id.* That remains true. The parties agree that the techniques and equipment used to perform aspiration and dilation and evacuation (D&E) for induced abortions are the same as those used when performing aspiration and D&E in miscarriage management. Doc. 94-1 (Declaration of K. Farris), ¶¶ 25, 29; Doc. 94-3 (Deposition of C. Wheeler) at 27:16-21, 82:9-14, 85:14-86:6. And the very same complications that could result from aspiration or D&E for induced abortions could also result from those same procedures when they are performed for

2

miscarriage management. Doc. 94-6 (Tr. of Preliminary Injunction Hr'g) at 120-121; Doc. 94-1, ¶¶ 25, 29; Doc. 94-3 at 147:10-21, 152:15-153:16, 154:12-155:14.

Discovery similarly failed to uncover any new medical justifications for the General Assembly's unequal treatment of these procedures. Legislative Intervenors have yet to produce any evidence that second-trimester aspirations and D&Es cannot occur safely in outpatient office-based settings. In fact, Legislative Intervenors' own expert testified that providers can and do perform second-trimester aspirations and D&Es in non-hospital settings when providing miscarriage management. Doc. 94-3 at 86:7-19, 94:4-95:10.

Nothing in the record, meanwhile, disturbs the Court's legal conclusion that the IUP documentation requirement is vague. In its preliminary injunction order, the Court noted the many questions that the requirement's text leaves unanswered, including: (1) whether a physician must determine that an intrauterine pregnancy is certain or merely "probable"; (2) whether a physician may determine that an intrauterine pregnancy is "probable" by examining the patient's medical history and blood work, or rather must necessarily perform an ultrasound; (3) whether the requirement prohibits medication abortion early in pregnancy when a pregnancy is not yet detectable by ultrasound, therefore conflicting with a different provision of S.B. 20 expressly permitting medication abortion in the first twelve weeks of pregnancy; and (4) whether those who violate the IUP documentation requirement face civil penalties, criminal penalties, or both. Doc. 80 at 18-21. Discovery has revealed no evidence that provides an answer to any of these important questions.

3

Because the undisputed record evidence confirms that the hospitalization and IUP documentation requirements are unconstitutional, the Court should grant summary judgment to the plaintiffs and permanently enjoin those provisions of S.B. 20.

## STATEMENT OF FACTS

**A.      Medication and surgical abortions are routinely provided safely in outpatient clinics in North Carolina.**

Plaintiff Planned Parenthood South Atlantic (PPSAT) operates six outpatient women's health clinics in North Carolina.  Doc. 94-1, ¶¶ 11-12.  These clinics offer a host of family planning and reproductive health care to patients, including miscarriage care.  Doc. 94-1, ¶¶ 3, 11-12.   PPSAT also performs abortions at its outpatient clinics, using medication and other medical procedures like aspiration or D&E.  Doc. 94-1, ¶ 14. These procedures are routinely performed safely in the outpatient setting.  Doc. 94-2 (Declaration of C. Boraas Alsleben), ¶¶ 17-18; Doc. 94-3 at 174:6-176:1, 180:5-182:1.

Research shows that the rate of abortion-related complications that require hospitalization is generally estimated to be a fraction of 1 percent.  Doc. 94-1, ¶ 32. Consistent with that research, less than 1 percent of the abortions PPSAT performed from 2020-2023 resulted in a complication that required a patient to be transferred to the hospital.  Doc. 94-1, ¶ 53; *see also* Doc. 94-1 at 64, 66-67; Doc. 94-6 at 59:11-19 (Intervenors conceding that less than 1 percent of PPSAT patients required transfer).  Of the 43,339 abortions PPSAT performed at its clinics, only 34 patients had complications that required them to be transferred to a hospital.  Doc. 94-1 at pp. 54, 64, 66-67.  Only

seven of those 34 patients were actually admitted to the hospital, and every patient was treated and released in stable condition.  Doc. 94-1 at pp. 64, 66-67.

**B.**     **S.B. 20 requires post-12-week surgical abortions to be performed in a hospital, even though the same procedures are not required to be performed in a hospital for miscarriage management.**

S.B. 20 defines "abortion" as a "surgical or a medical abortion."  N.C. Gen. Stat. §§ 90-21.81(1), (4e), (9b).  S.B. 20 generally makes it unlawful to obtain an abortion after the twelfth week of pregnancy, except in certain very limited circumstances.  One of these circumstances is in cases involving rape, incest, or a "life-limiting anomaly"; in those narrow circumstances, a woman may obtain a surgical abortion after the twelfth week of pregnancy, but she can do so only at a hospital.  *Id.* §§ 90-21.81B(3), (4), -21.82A(c).

There are two primary methods of surgical abortions: aspiration (or dilation and curettage (D&C)) and D&E.  Typically, providers perform D&Cs up to the fourteenth week of pregnancy and D&Es from the thirteenth or fourteenth week of pregnancy.  Doc. 94-1, ¶ 22; Doc. 94-3 at 43:25-44:8, 51:7-52:11.  D&Cs involve using a suction instrument to empty the uterus.  Doc. 94-1, ¶ 22; Doc. 94-3 at 81:5-14.  D&Es typically require the provider to ensure that the patient is sufficiently dilated and then to use a combination of suction and other instruments to evacuate the uterus.  Doc. 94-1, ¶¶ 26-29; Doc. 94-3 at 39:23-42:3.

Both D&Cs and D&Es are also used in miscarriage management.  Doc. 94-1, ¶¶ 25, 29; Doc. 74-3 (First Deposition of M. Wubbenhorst) at 38:8-20; Doc. 94-3 at 26:7-13.  Miscarriage management is a necessary intervention in cases where a fetus stops

5

growing in utero, but the patient does not naturally expel the pregnancy tissue. Doc. 94-1, ¶ 25; Doc. 94-2 ¶ 17 n.6; Doc. 94-3 at 79:13-17. North Carolina law does not require second-trimester D&Cs and D&Es to be performed in a hospital when they are used to manage miscarriages. N.C. Gen. Stat. § 90-21.81(9b)(c). The hospitalization requirement applies only when those procedures are used to provide abortions. And, indeed, those procedures do occur in clinics (*i.e.*, outside hospitals) in cases of miscarriage management. Doc. 94-1, ¶¶ 37-38, Doc. 94-4 (Deposition of S. Bane) at 69:24-70:16.

There are no differences in the medical procedures and techniques used when performing D&Cs and D&Es in the miscarriage-management context versus performing D&Cs and D&Es in the abortion context. The techniques and instruments used and the placement of the instruments within the uterine cavity are the same. Doc. 94-1, ¶¶ 25, 29; Doc. 94-3 at 27:16-21, 82:9-14, 85:14-86:6.[1]

---

[1] While there are no technical differences between D&C and D&E procedures used in miscarriages and abortion, Legislative Intervenors' experts believe that there are moral and ethical differences between the two circumstances. Doc. 65-1 (Declaration of M. Wubbenhorst), ¶ 84. In addition, the Legislative Intervenors' experts also testified that these procedures are not "identical" because there may be greater blood flow and fetal movement in a pregnancy in the abortion context, which may require the provider to be more experienced in performing the same techniques in this different context. Doc. 94-4 at 60:8-21, 62:14-25, 75:4-9; 94-3 at 27:12-21, 28:7-18. Legislative Intervenors' experts did not, however, present evidence that the hospitalization requirement ensures that the providers who perform these procedures will be more experienced or that outcomes at hospitals are better. Quite the opposite—one of Legislative Intervenors' experts testified that she was aware of research showing "that D&Es performed in nonhospital settings ha[ve] lower death-to-case rates than those performed in hospitals." Doc. 74-3 at 131:22-132:1.

Nor are there any differences in the medical procedures and techniques used in performing D&Cs and D&Es for abortions in cases of rape, incest, or life-limiting anomalies versus performing those same procedures for abortions sought for any other reason. Doc. 94-3 at 107:19-108:22, 110:20-111:6, 112:9-114:8, 114:17-21.

There are also no differences between the complications that can arise from D&C and D&Es performed in the miscarriage-management context versus those procedures performed in the abortion context. In either context, these procedures can lead to hemorrhage, cervical laceration, retained products of conception, infection, uterine perforation, abnormal placentation, disseminated intravascular coagulopathy, and embolism when performed during the second trimester. Doc. 94-3 at 152:15-21. But the potential for these complications to occur is similar, whether they are performed in the miscarriage-management or abortion context. *Id.* at 147:15-21, 153:1-13, 153:23-154:3, 154:12-155:1, 155:8-14. Moreover, these complications can be treated in clinics. Doc. 94-1, ¶¶ 47, 53, 78. And, they also occur with some frequency in childbirth, as well. Doc. 94-3 at 153:14-16, 154:1-3.

In short, these procedures can occur safely during the second trimester in both outpatient, office-based settings, as well as hospitals. Doc. 94-1, ¶¶ 41-43; Doc. 94-3 at 86:7-19, 94:4-95:10 (acknowledging Legislative Intervenors' expert's partner in private practice performed these procedures in the clinic and she occasionally assisted him); Doc. 94-5 (Second Deposition of M. Wubbenhorst) at 21:25-22:4 (testifying about article stating that most second-trimester surgical abortions can be safely completed in the outpatient setting).

7

Requiring all second-semester surgical abortions to occur only in hospitals, moreover, imposes additional monetary burdens and delay on patients that office-based care would not require. Doc. 94-1, ¶¶ 83-99; Doc. 94-5 at 22:6-20 (testifying about article stating same). These delays may be particularly difficult to bear for women who are the victims of rape or incest or who face pregnancies with life-limiting anomalies and are already experiencing personal hardship or even trauma. These delays may also result in some of those women being unable to access these procedures within the time allowed by statute. Doc. 94-1, ¶¶ 83-99.

C. **S.B. 20 requires physicians to document the "probable gestational age and existence" of an intrauterine pregnancy before prescribing medication abortion, even though ultrasound cannot detect an intrauterine embryo before the fifth or sixth week of pregnancy.**

S.B. 20 also requires a physician to document "the probable gestational age and existence of an intrauterine pregnancy" before providing a medication abortion. *Id.* § 90-21.83B(a)(7). Intervenors have taken the position that this provision requires a physician to determine with certainty that a woman has an intrauterine pregnancy before proceeding with an abortion. Doc. 94-6 at 84:14-85:15.

A physician who provides a medication abortion without documenting the existence of an intrauterine pregnancy is subject to disciplinary action by the North Carolina Medical Board. N.C. Gen. Stat. § 90-14n(a)(2); *see also* Doc. 94-6 at 96:10-14. Additionally, Intervenors have at times suggested that a physician could face *criminal* penalties for failing to adhere to the IUP documentation requirement. *See* Doc. 65 at 18.

8

An intrauterine pregnancy may not be visible by ultrasound until the sixth week of pregnancy. *See* Doc. 94-1, ¶ 60. Thus, Intervenors' position places the IUP documentation requirement in potential conflict with a different provision of S.B. 20 that expressly permits medication abortion "during the first 12 weeks of a woman's pregnancy," N.C. Gen. Stat. § 90-21.81B(2).

## STATEMENT OF THE CASE

In May 2023, the North Carolina General Assembly, over Governor Cooper's veto, enacted an omnibus bill that prohibits abortion after twelve weeks of pregnancy, with a few narrow exceptions. S.B. 20, 2023-24 Leg., 156th Sess. (2023). The plaintiffs filed their Complaint shortly thereafter and moved for a TRO, alleging that numerous provisions of S.B. 20 run afoul of the Constitution. Doc. 1 (Compl.) ¶¶ 77-87.

Because the law contained numerous inconsistencies, contradictions, and ambiguities, the General Assembly quickly introduced a bill "to make technical and conforming changes to Session Law 2023-14" (*i.e.*, S.B. 20). H.B. 190, 2023-24 Leg., 156th Sess. (2023).

As a result of these changes and other agreements among the parties, the plaintiffs moved for a TRO only as to the IUP documentation requirement. The Court ruled that requirement was likely unconstitutionally vague and granted the plaintiffs' request to temporarily block the provision's enforcement. Doc. 31 at 6-7.

The plaintiffs then filed their Amended Complaint. Doc. 42 (First Amend. Compl.). In the Amended Complaint, they challenge the IUP documentation requirement as vague, violating due process; and the hospitalization requirement as irrational,

9

violating substantive due process and equal protection. Doc. 42 (FAC), ¶ 13. The plaintiffs also filed an amended motion for a preliminary injunction against enforcement of those two requirements. Doc. 48 (Amended Preliminary Injunction Motion); Doc. 49 (Mem. of Law in Support).

This Court granted the plaintiffs' motion. Doc. 80 at 2, 33. Specifically, the Court held that the hospitalization requirement likely violates the Equal Protection Clause because it imposes different restrictions on two different classes of people seeking the same medical procedures without any medical justification for doing so. *Id.* at 28-29. The Court also enjoined the IUP documentation requirement as likely unconstitutionally vague, in violation of the Due Process Clause. *Id.* at 22.

Discovery in this matter closed earlier this year. *See* Dkt. Entry Oct. 25, 2023 (setting scheduling order deadlines). The plaintiffs now seek summary judgment on their constitutional challenges to the hospitalization and IUP documentation requirements and a permanent injunction prohibiting enforcement of those requirements. Doc. 93.

## ARGUMENT

### I. Legal Standard

The plaintiffs move for summary judgment on their constitutional challenges to S.B. 20. Docs. 93 (Mot.), 94 (Br. in Support). A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When ruling on a motion for summary judgment, the court must view "the facts and all justifiable

10

inferences . . . in the light most favorable to the non-movant." *Med. Mut. Ins. Co. of N.C. v. Gnik*, 93 F.4th 192, 200 (4th Cir. 2024).

"The mere existence of *some* alleged factual dispute" does not preclude summary judgment. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). Instead, the dispute must be over a fact that "might affect the outcome of the case." *Med. Mut. Ins. Co. of N.C.*, 93 F.4th at 200. And the dispute must be genuine, meaning "a reasonable jury could return a verdict for the nonmoving party." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotation marks omitted). Thus, to avoid summary judgment, the nonmoving party must "adduc[e] the quantum of proof necessary to place into issue" a material fact. *Id.* at 318. The party moving for summary judgment can establish the absence of a genuine dispute of material fact by citing to specific portions of the record developed during discovery. *See* Fed. R. Civ. P. 56(c).

## II. The Plaintiffs Are Entitled to Summary Judgment on Their Challenge to S.B. 20's Hospitalization Requirement.

The plaintiffs have proven that the hospitalization requirement bears no rational relationship to maternal health outcomes. S.B. 20 requires that surgical abortions performed after the twelfth week of pregnancy in cases of rape, incest, or a life-limiting fetal anomaly can be performed only in hospitals. N.C. Gen. Stat. §§ 90-21.81B(3), (4), -21.82A(c). This hospitalization requirement does not apply to women who undergo the exact same medical procedures after the twelfth week of pregnancy for purposes of miscarriage management. *See supra* pp. 5-8. Nor does it apply to lawful surgical

11

abortions completed for any other purpose. *See id.* Because North Carolina law singles out a certain class of patients—those who seek surgical abortions after the twelfth week of pregnancy and are victims of rape or incest or are carrying a fetus with a life-limiting anomaly—and imposes burdens on this class that do not further maternal health outcomes, the law violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment.

A.    **The appropriate test applicable to the plaintiffs' due process and equal protection challenges is whether the hospitalization requirement rationally furthers a legitimate state interest.**

The Fourteenth Amendment prohibits "depriv[ing] any person of life, liberty, or property, without due process of law" and "deny[ing] to any person . . . the equal protection of the laws." U.S. Const. amend. XIV, § 1. In the wake of the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 236, 240 (2022), "regulation of abortion is not a sex-based classification," and the right to an abortion is no longer a fundamental right. Consequently, whether as a matter of equal protection or due process, state action relating to regulating abortion is typically governed by the same standard of review as other "health and safety measures"—rational basis review. *Dobbs*, 597 U.S. at 237, 300; *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440-42 (1985) (reserving heightened scrutiny only for classifications related to race, alienage, national origin, or gender). Under this standard, laws restricting access to abortion are generally constitutional so long as they "rationally advance[] a reasonable and identifiable governmental objective." *Schweiker v. Wilson*, 450 U.S. 221, 235 (1981); *see also City of Cleburne*, 473 U.S. at 440 ("[L]egislation is presumed to be

valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.").

More specifically, to address the plaintiffs' due process claim, this Court must ask whether the hospitalization requirement advances an identifiable governmental objective or has only a tangential relationship to legitimate state interests. *Moore v. City of East Cleveland*, 431 U.S. 494, 500 (1977). And to address the plaintiffs' equal protection claim, this Court must decide whether people who are seeking surgical abortions in cases of rape, incest, or life-limiting anomalies are being treated differently from others who are similarly situated with no rational basis for the difference in treatment. *In re Premier Auto. Servs.*, 492 F.3d 274, 283 (4th Cir. 2007).

While rational-basis review is a deferential standard to be sure, it is "not a toothless one." *Mathews v. Lucas*, 427 U.S. 495, 510 (1976); *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 314 (1976). The Supreme Court has not hesitated to strike down restrictions that have only a tangential relationship with legitimate state interests. For example, the Court struck down a zoning ordinance that prohibited a group home for mentally challenged individuals but allowed group homes for fraternities and nursing homes, holding that it was irrational to treat mentally challenged individuals differently from others living in a group home. *City of Cleburne*, 473 U.S. at 449-50. The Court has also struck down a housing regulation that did not allow joint families to live in single-family dwellings because it concluded that it was irrational to differentiate between family structures. *Moore*, 431 U.S. at 500. And the Court showed no solicitude to the State when it provided tax exemptions only to those Vietnam veterans who resided in the

13

State before a certain date because that retrospective preference bore no rational relationship to encouraging Vietnam veterans to move to the State in the future. *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 622 (1985). When a State restricts a particular group of people in a manner that does not further a state interest—and especially when that restriction targets only a particular group, while leaving another similarly situated group untouched—that law cannot stand.

**B.     The hospitalization requirement fails the rational-basis test under both the Due Process and Equal Protection Clauses.**

Legislative Intervenors have maintained that the only interest the hospitalization requirement was enacted to support is the protection of maternal health and safety. Doc. 65 at 2. But discovery has established that the restriction imposed by the hospitalization requirement bears no rational relationship to this interest. That requirement regulates women seeking care for purposes of abortion differently from women seeking that same care for purposes of miscarriage management, and yet Legislative Intervenors have put forward no evidence that could justify such a distinction.

The hospitalization requirement regulates a certain class of patient: those women who are pregnant and seek second-trimester abortions in cases of rape, incest, or life-limiting anomalies. This class of patient is similarly situated to another class of patient: those ending their pregnancies in the second trimester because they have miscarried. Yet only those patients in the first class—those seeking abortions—are required to access that

healthcare in a hospital setting.[2]  The plaintiffs have shown that there is no reason for this.

*First*, it is undisputed that the surgical procedures used to abort fetuses in the second-trimester—D&Cs and D&Es—are the same as the surgical procedures used to manage miscarriages that occur in the second trimester.  Doc. 94-1, ¶¶ 25, 29; Doc. 74-3 at 38:8-20 (Legislative Intervenors' expert explaining the use of D&C procedures in second-trimester miscarriage management); 94-3 at 26:10-13 (Legislative Intervenors' expert explaining the use of D&E procedures in second-trimester miscarriage management).  There are, in fact, no differences between the medical procedures and techniques used when performing second-trimester D&Cs and D&Es in the miscarriage-management context and the abortion context.[3]  The clinical techniques and instruments

---

[2]      In response, Legislative Intervenors have previously argued that the hospitalization requirement does not regulate *who* may receive these second-trimester abortions but rather, only *where* these second-trimester abortions can take place.  But, as this Court has already held, that is untrue.  Doc. 80 at 30.  Patients who require miscarriage management are able to procure second-trimester procedures in clinics if they so choose, including in instances of rape, incest, or life-limiting anomaly.  Therefore, the General Assembly has created a distinction based on the reason for obtaining a certain medical procedure—not based on the fact that these procedures are taking place in the cases of rape, incest, or life-limiting anomaly.

[3]      Legislative Defendants' experts believe that while the technical procedures involved in miscarriage-management and abortions are the same, these procedures are not "identical" because there may be greater blood flow or fetal movement in a pregnancy in the abortion context, which may require the provider to be more experienced in performing the same techniques in this different context.  Doc. 94-4 at 60:8-20, 62:16-25, 75:4-9; 94-3 at 27:12-21, 28:7-18.  But these experts did not express a view that the hospitalization requirement ensures that the providers who perform these procedures will be more experienced.  Nor did they cite data or research showing that the risks of complications requiring supplies and infrastructure available only at hospitals are indeed

15

used and the placement of the instruments within the uterine cavity when performing

second-trimester D&Cs and D&Es are the same in both contexts.  Doc. 94-1, ¶¶ 25, 29;

94-3 at 27:16-21, 82:9-14, 85:14-86:6 (Legislative Intervenors' expert conceding same).

Moreover, the medical procedures and techniques used when performing D&Cs

and D&Es for abortions in cases of rape, incest, or life-limiting anomalies are the same

procedures as those used for abortions sought for any other reason.  Doc. 94-3 at 107:19-

108:22; 112:9-114:8; 114:17-21 (Legislative Intervenors' expert conceding same).  There

is nothing about abortions in the context of rape, incest, or fetal abnormalities that would

require providers to implement different clinical procedures or techniques in the

termination of the pregnancy.

*Second*, it is also undisputed that there are no differences between the

complications that can arise from D&Cs and D&Es performed in the miscarriage-

management context and those performed in the abortion context.  The potential

complications of hemorrhage, cervical laceration, retained products of conception,

infection, uterine perforation, abnormal placentation, disseminated intravascular

coagulopathy, and embolism exist in all second-trimester terminations, regardless of

whether the pregnancy is terminated by abortion or through miscarriage.  Doc. 94-3 at

152:15-21, 147:15-21, 153:1-13, 153:23- 154:3, 154:12-155:2, 155:8-14 (Legislative

Intervenors' expert conceding this point).

---

greater for abortions because of the increased blood flow or fetal movement in the
pregnancy.

*Third*, second-trimester D&Cs and D&Es can occur safely in both outpatient, office-based settings, as well as hospitals. Doc. 94-1, ¶¶ 41-43; Doc. 94-3 at 86:7-19, 94:4-95:10 (Legislative Intervenors' expert conceding that a partner in her practice performed these procedures in clinic and she had, at times, assisted him); Doc. 94-5 at 21:25-22:4 (Legislative Intervenors' expert conceding the point). Clinics safely performed those procedures after the twelfth week of pregnancy before S.B. 20 was passed. Doc. 94-1, ¶ 22. And, in fact, providers still perform second-trimester D&Cs and D&Es in clinics in cases of miscarriage management. Doc. 94-4 at 69:24-70:16 (Legislative Intervenors' expert conceding same).

Legislative Intervenors have provided no evidence to show that it is rational to require second-trimester D&Cs and D&Es to be performed in a hospital in cases involving rape, incest, or fetal anomalies, but to allow providers to perform the *same procedures* with a *risk of the same complications* at similar gestational ages in a non-hospital setting if the purpose is to manage a miscarriage.

Nor have they provided any evidence that the same procedures cannot safely occur in non-hospital settings. In fact, the uncontroverted evidence shows that providers can and do manage miscarriages that arise during the second-trimester with D&Cs and D&Es in clinics. Doc. 94-4 at 69:24-70:16 (Legislative Intervenors' expert conceding the same point).

The plaintiffs' uncontroverted evidence also establishes that this differential treatment comes at a cost to a patient population that is particularly vulnerable: those carrying pregnancies resulting from rape or incest or involving a life-limiting anomaly.

17

The plaintiffs have shown that the hospitalization requirement imposes significant additional monetary burdens and delays on patients that office-based care would not require. Doc. 94-1, ¶¶ 83-99; Doc. 94-5 at 22:6-20. In cases of rape, incest, or life-limiting anomaly, when the woman might already be experiencing personal hardship or even trauma, these delays may cause even greater burdens. These delays may also result in making it impossible for some of these women to access these procedures within the time allowed by statute. Doc. 94-1, ¶¶ 83-99. Moreover, the plaintiffs' evidence shows that D&Es are more safely performed in clinics, often because physicians practicing in clinics have more experience performing those procedures. Doc. 94-1, ¶ 43 & n.35; Doc. 74-3 at 131:22-132:1 (Legislative Intervenors' expert testifying about a study concluding that D&Es performed in nonhospital settings had lower death-to-case rates than those performed in hospitals).

In sum, the plaintiffs have shown that the hospitalization requirement imposes restrictions on people who seek D&Cs or D&Es in cases of rape, incest, or fetal anomalies that are unique to that group and are motivated solely because of the reason these women require those procedures. Similarly situated people who seek out *the same procedures* for miscarriage management are not so restricted. This is true even though the potential complications of D&Cs and D&Es are the same whether they are obtained for abortions or miscarriage management. No maternal health objective is furthered by restricting access to these medical procedures *only* in the abortion context. As a result, the hospitalization requirement runs afoul of both the Equal Protection and Due Process Clauses of the Fourteenth Amendment and should be permanently enjoined.

18

**III.    The Plaintiffs Are Entitled to Summary Judgment on Their Challenge to S.B. 20's Intrauterine Pregnancy-Documentation Requirement.**

Under S.B. 20, providers who prescribe medication abortion must first "[d]ocument in the woman's medical chart the probable gestational age and existence of an intrauterine pregnancy."  N.C. Gen. Stat. § 90-21.83B(a)(7).  This Court should grant summary judgment to the plaintiffs on their vagueness challenge to this requirement under the Due Process Clause.

At the preliminary-injunction stage, this Court held that the plaintiffs were likely to show that the law is unconstitutionally vague for two main reasons.  First, the Court explained that the law fails to give providers fair notice of the conduct that the law prohibits.  Doc. 80 at 18-20; *accord FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  And second, the Court explained that the law fails to give providers fair notice of the consequences that flow from violating the law.  Doc. 80 at 20-22; *accord Johnson v. United States*, 576 U.S. 591, 596 (2015).  Discovery has not cast doubt on either conclusion.  After all, vagueness is a "purely legal issue." *Manning v. Caldwell*, 930 F.3d 264, 272 (4th Cir. 2019) (en banc).  As a result, deciding whether a statute is unconstitutionally vague "does not require additional fact-finding," *id.*, and this Court should permanently enjoin this requirement at this time.

*First*, the IUP documentation requirement does not give providers fair notice of what conduct it prohibits.  Part of the confusion derives from the provision's ambiguous syntax.  As this Court has explained, "the statute is unclear as to whether the provider must determine that the existence of an intrauterine pregnancy is 'probable' or whether

19

some other standard of certainty is required." Doc. 80 at 18. Consistent with that conclusion, the parties have offered competing interpretations of the requirement throughout this litigation. Intervenors have argued, on most occasions, that the term "probable" modifies only the term "gestational age," and that providers must therefore confirm the existence of an intrauterine pregnancy with certainty before prescribing medication abortion. *See* Doc. 65 at 20. But at the preliminary-injunction hearing, Intervenors conceded that the term "probable" *could* be read as modifying both the terms "gestational age" and "existence of an intrauterine pregnancy"—meaning that providers need only determine that there is a "*probable* existence of an intrauterine pregnancy" to satisfy the requirement. Doc. 94-6 at 85. This latter interpretation was also the one advanced by the Attorney General at the preliminary-injunction hearing. Doc. 80 at 19 & n.10. These competing interpretations of the provision's grammatical structure—and in particular, Intervenors' apparently shifting position on the possible meanings of the statute, *compare* Doc. 65 at 20, *with* Doc. 94-6 at 85—underscore the vagueness inherent in the law. Reading only the text of the IUP documentation requirement, healthcare providers cannot possibly know with any confidence whether they are permitted to proceed with performing an abortion after confirming a probable intrauterine pregnancy or whether more certainty is required.

Worse still, even accepting *either* of the potential grammatical constructions, the IUP documentation requirement generates still more vagueness problems. If the law indeed demands certainty about an intrauterine pregnancy before an abortion can proceed, as Intervenors say, then the broader statute is internally inconsistent. The

20

plaintiffs have shown—and Intervenors have not disputed—that in the early stages of pregnancy, it may be impossible to detect an intrauterine embryo by ultrasound. *See* Doc. 94 at 8 (Plaintiffs' brief in support of motion for summary judgment, collecting record citations). In those circumstances, when it is simply too early to confirm an intrauterine pregnancy with absolute certainty, the law would effectively bar prescribing medication abortion. Doc. 94-6 at 86 (counsel for Intervenors making this concession at the preliminary-injunction hearing). Yet that outcome would be flatly inconsistent with the law's express allowance of medication abortion "during the first 12 weeks of a woman's pregnancy." N.C. Gen. Stat. § 90-21.81B(2). Providers therefore "cannot know if medical abortion is authorized at any point through the twelfth week, as the statute explicitly says, or if the procedure is implicitly banned early in pregnancy." Doc. 80 at 20. This statutory conflict further exacerbates the law's vagueness problem. *See Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048 (1991) ("grammatical structure" of conflicting rules left individuals to "guess" at the law's "contours" and was thus unconstitutionally vague).

Alternatively, even if the statute requires only the "probable" existence of an intrauterine pregnancy, as the Attorney General contends, the law is still too vague to satisfy due process. As the Court previously explained, the law "provides no standards for how certain the provider must be before documenting the probable existence of an intrauterine pregnancy." Doc. 80 at 20; *accord Gentile*, 501 U.S. at 1048-49 (a rule's use of a "classic term[ ] of degree" with "no settled usage or tradition of interpretation in law" was a sign of its vagueness); *Manning*, 930 F.3d at 274-75 (similar). Must

21

providers affirmatively *rule out* an ectopic pregnancy, as Intervenors have maintained? Doc. 80 at 19; *see* Doc. 94-6 at 85. Or may the plaintiffs follow their "established medical protocol" to "determine that an ectopic pregnancy is *unlikely*"? Doc. 80 at 19 (emphasis added). These are not factual questions, and, thus, discovery could not—and did not—provide an answer to the Court's concerns about the law's many ambiguities.

*Second*, compounding these problems, the intrauterine pregnancy requirement also fails to give providers fair notice of the consequences that flow from violating the law. S.B. 20 provides that a physician who violates its terms "shall be subject to discipline by the North Carolina Medical Board." N.C. Gen. Stat. § 90-21.88A. The law also provides for civil remedies, including a damages action "against the person who performed the abortion in knowing or reckless violation of this Article." *Id.* § 90-21.88(a). But the law is unclear as to whether these *civil* remedies are exclusive of other *criminal* penalties for violations of the State's abortion laws in other sections of the General Statutes. *Compare id.* § 14-44 (class H felony to "willfully administer" an abortion-inducing drug or "use or employ any instrument" to perform an abortion); *id.* § 14-45 (class I felony for any person who "shall administer" "any medicine, drug or anything whatsoever, with intent thereby to procure the miscarriage of such woman"), *with id.* § 90-21.81B ("[n]otwithstanding" sections 14-44 and 14-45, and "subject to the provisions of this Article, it shall not be unlawful to procure or cause a miscarriage or an abortion" under four enumerated circumstances). Intervenors have taken inconsistent positions on this question, arguing initially that the law imposes criminal penalties, Doc. 65 at 18, but later contending that the law imposes only civil penalties. Doc. 94-6 at 95. As the Court

explained in its preliminary-injunction order, providers "are entitled to 'reasonable notice' of whether they can be criminally prosecuted for violating this provision." Doc. 80 at 21. Yet the law is entirely unclear on this critical point.

Scienter requirements do not ameliorate the vagueness here. In addition to taking inconsistent positions on whether violating the intrauterine pregnancy requirement imposes civil and criminal penalties, Intervenors "have not identified what scienter requirement applies to what act, nor have they explained how the scienter requirement here counteracts any vagueness issue in this specific context." Doc. 80 at 21-22. Discovery has not remedied this failing—nor could it. Because the IUP documentation requirement's constitutional flaws are fundamentally legal, not factual, no amount of factfinding could resolve the Court's previously articulated concerns. The plaintiffs are therefore entitled to summary judgment on their vagueness challenge to the IUP documentation requirement.

## CONCLUSION

For the reasons stated above, this Court should grant the plaintiffs summary judgment and permanently enjoin enforcement of the hospitalization and IUP documentation requirements.

Dated: April 1, 2024.                       Respectfully submitted,

JOSHUA H. STEIN
Attorney General

Sarah G. Boyce
Deputy Attorney General and
General Counsel

23

N.C. State Bar 56896
sboyce@ncdoj.gov

Sripriya Narasimhan
Deputy General Counsel
N.C. State Bar 57032
snarasimhan@ncdoj.gov

South A. Moore
Deputy General Counsel
N.C. State Bar 55175
smoore@ncdoj.gov

Amar Majmundar
Senior Deputy Attorney General
N.C. State Bar 24668
amajmundar@ncdoj.gov

Stephanie A. Brennan
Special Deputy Attorney General
N.C. State Bar 35955
sbrennan@ncdoj.gov

*Counsel for Defendant Attorney General Stein*

North Carolina Dept. of Justice
P.O. Box 629
Raleigh, NC 27602
Phone: 919-716-6900
Fax: 919-716-6758

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with Local Rule 7.3(d) because, excluding the parts of the brief exempted by Rule 7.3(d) (cover page, caption, signature lines, and certificates of counsel), this brief contains fewer than 6,250 words. This brief also complies with Local Rule 7.1(a).

Sripriya Narasimhan
Deputy General Counsel