UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

| | |
|---|---|
| PLANNED PARENTHOOD SOUTH ATLANTIC; BEVERLY GRAY, M.D., on behalf of themselves and their patients seeking abortions,<br><br>      Plaintiffs,<br><br>v.<br><br>JOSHUA H. STEIN, Attorney General of North Carolina, in his official capacity; et al.<br><br>      Defendants. | No. 1:23-CV-480 |

## DEFENDANT ATTORNEY GENERAL JOSHUA H. STEIN'S RESPONSE TO INTERVENORS' CROSS-MOTION FOR SUMMARY JUDGMENT[1]

### INTRODUCTION

Last summer, North Carolina's General Assembly enacted Senate Bill 20, restricting abortion access and curtailing women's reproductive freedom. S.B. 20, 2023-24 Leg., 156th Sess. (2023), *as amended* H.B. 190, 2023-24 Leg., 156th Sess. (2023). Plaintiffs allege that two provisions of S.B. 20—the hospitalization requirement and the IUP documentation requirement—are unconstitutional. Doc. 42 (First Am. Compl.) This

---

[1] The Amended Rule 26 report in this case anticipated that Plaintiffs would move for summary judgment on March 1, 2024, and that Defendants would file any cross-motions on April 1, 2024. Doc. 82 at 5. Because the Attorney General did not ultimately file a summary-judgment motion, but rather supported Plaintiffs' motion and opposed Intervenors' cross-motion, the Attorney General filed his response to Plaintiffs' motion on April 1, 2024, and is filing his response to Intervenors' cross-motion today. All of the various parties to this case have represented that they do not object to this approach or filing schedule.

Court has already ruled that Plaintiffs are likely to succeed on the merits of these challenges and has preliminarily enjoined the provisions' enforcement. Doc. 80 (Order) at 2, 33.

The undisputed record evidence developed during discovery confirms that the hospitalization and IUP documentation requirements are unconstitutional. Intervenors' contrary arguments are unpersuasive. Accordingly, this Court should deny Intervenors' cross-motion for summary judgment.

## ARGUMENT

**I. Intervenors' Brief Confirms That the Hospitalization Requirement Violates Due Process and Equal Protection.**

**A. Rational Basis Requires Some Plausible Logical Relationship to a Governmental Interest.**

Intervenors begin their defense of the hospitalization requirement by advocating an entirely toothless rational-basis standard. Doc. 98 (Intervenors' Memorandum in Support of Cross-Motion for Summary Judgment) at 23-24. Intervenors insist that they need provide no argument or evidence that the hospitalization requirement is rationally related to a government interest or purpose. *Id.* Rather, Intervenors urge, it is sufficient to speculate why a restriction may be rationally related to some governmental interest or purpose, even if that speculation is wholly "illogical." *Id.*

Intervenors are certainly correct that rational-basis review affords legislatures significant deference. But that deference is not boundless, as Intervenors seem to believe. Where the legislature's stated (even speculative) rationales are illogical and have been

2

otherwise debunked, they are no longer entitled to deference. This is why the Supreme Court has repeatedly struck down regulations that lawmakers have sought to justify with dubious or illogical rationales. For example, in *City of Cleburne v. Cleburne Living Center, Inc.*, the city contended that a zoning ordinance prohibiting group homes for mentally challenged individuals, but allowing group homes for fraternities and nursing homes, was necessary to protect the neighborhood from the disorder resulting from a large home with numerous residents. 473 U.S. 432, 449 (1985). The Court struck that ordinance down because it was not rational to maintain that a large group home occupied by mentally challenged individuals posed a greater public safety threat than other group homes. *Id.* at 449-50; *see also Moore v. City of East Cleveland*, 431 U.S. 494, 499-500 (1977) (similarly striking down a regulation when the rationale provided was shown to be incoherent).

These precedents make clear that when the theories pressed by the defenders of a law have no conceivable basis and are discredited, courts can strike down the regulation. Without this backstop, courts would be required to swallow patently illogical rationales for governmental regulations, and plaintiffs could never bring rational-basis challenges.

Much as Intervenors may wish otherwise, no court has ever held that rational-basis review—which, on its face, requires *rationality*—is merely a rubber stamp for all legislative action. This Court should not be the first.

### B. The hospitalization requirement is not rationally related to maternal health and safety.

The hospitalization requirement cannot survive rational-basis review. Intervenors offer three justifications to support their theory that the requirement is rationally related to

3

maternal safety. But the evidence supports none of these justifications and demonstrates that Intervenors have drawn a wholly arbitrary line between women who undergo D&Cs or D&Es for an abortion and women who undergo those procedures for miscarriage management.

*First*, Intervenors claim that, while abortion and miscarriage patients may experience similar types of complications during a second-trimester surgical procedure, the rate of complications is higher for abortion patients. Doc. 98 at 23. But the evidence Intervenors cite does not bear that claim out. For example:

- They cite counsel's argument at the preliminary injunction hearing. *Id.* An attorney's argument is not competent evidence. *United States v. White*, 366 F.3d 291, 300 (4th Cir. 2004).

- They claim a study cited by Dr. Wubbenhorst proves that the rates of complications during second-trimester abortions are higher than second-trimester miscarriages. Doc. 98 at 23. But Dr. Wubbenhorst admitted that the cited study did not actually involve second-trimester (or later) abortions. Doc. 94-5 (Wubbenhorst Dep.) at 31:17-33:20.

- They cite Dr. Bane's testimony. Doc. 98 at 23. But, in the cited testimony, Dr. Bane does not discuss any differences between the rates of complications for second-trimester abortions and miscarriages. Doc. 94-4 (Bane Dep.) at 56:11-25.

- They cite Dr. Wheeler's report. Doc. 98 at 23. But Dr. Wheeler specifically states that she is "not aware of any research directly comparing safety of D&C or D&E"

4

performed for abortions with those performed for miscarriages. Doc. 97-3 (Wheeler Report), ¶ 50.

In sum, none of Intervenors' evidence supports their theory that the rates of complications for second-trimester abortions are higher than for second-trimester miscarriages.

*Second*, Intervenors claim that the reason the hospitalization requirement targets only abortions, and not miscarriages, is because of the "physiological differences" between the patient and fetus in the abortion context and the miscarriage context. Doc. 98 at 25. Even assuming those physiological differences exist, however, the evidence does not show that those differences bear on maternal safety. For example:

- Intervenors cite to Dr. Bane's expert report, *id.*, in which she opines that these physiological differences "*can* lead to technical differences that can impact the difficulty of the procedure" for abortions. Doc. 97-4 (Bane Report), ¶ 57 (emphasis added). But Dr. Bane never states that these potential "technical differences" lead to additional risks or complications.

- Intervenors then cite Dr. Wubbenhorst's expert report, in which she relies on two studies to opine that the complications in second-trimester abortions are greater than second-trimester miscarriages. Doc. 98 at 25 (citing Doc. 97-2 (Wubbenhorst Report), ¶¶ 90, 92-93). But Dr. Wubbenhorst never opines that any "physiological differences" lead to increased risks of complications during second-trimester abortions. Moreover, one of the studies shows that the maternal mortality rate

5

during second-trimester abortions is *lower* than the rate of mortality during second-trimester miscarriages. Doc. 94-5 at 39:10-43:11. And, as explained above, Dr. Wubbenhorst concedes that the other study did not involve second-trimester abortions. *Id.* at 31:17-33:20.

Again, none of Intervenors' evidence supports their theory that any "physiological differences" between women experiencing a miscarriage and women undergoing an abortion are correlated with increased health risks in performing second-trimester abortions.

*Third*, Intervenors claim that the hospitalization requirement ensures that any complications resulting from second-trimester abortions can be treated promptly, an efficiency they insist is needed because risks related to abortion increase as gestational age increases. Doc. 98 at 26-27. Plaintiffs' experts do not dispute that the risk of complications resulting from a D&C or D&E increases with gestational age. But there is no evidence that the increased risk of complications is limited to the abortion context. Rather, Intervenors' evidence shows only that the risks of the *procedures* increase with gestational age, regardless of the underlying *reason* for the procedures. *See, e.g.*, Docs. 97-2, ¶¶ 91-92, 94-4 at 78:11-18.

Nevertheless, the legislature has not required *all* second-trimester D&Cs and D&Es to occur at hospitals. The legislature has instead targeted patients obtaining a medical procedure for one reason (abortion), while leaving a similarly situated group of patients obtaining the same procedure for a different reason (miscarriage management) alone. It is

6

not rational to believe that second-trimester D&Cs and D&Es performed in the abortion context require a hospital environment any more than those performed in the miscarriage context.

Still, Intervenors argue that the rational-basis test allows the legislature to enact an underinclusive regulation specifically targeting abortion care. Doc. 98 at 27. While a regulation need not be a "perfect fit," the Supreme Court forbids regulations that target a particular group with no rational basis. *Cleburne*, 473 U.S. at 449-50. And here, the rationale that Intervenors offer for targeting abortion patients—that the hospitalization requirement improves maternal safety—is illogical and has, moreover, been debunked by the evidence, which shows that abortion patients are not at any greater risk of complications than patients undergoing miscarriage management. Doc. 94-3 (Wheeler Dep.) at 152:15-21, 147:15-21, 153:1-13, 153:23-154:3, 154:12-155:2, 155:8-14. The issue with the hospitalization requirement is not that it lacks a perfect fit with maternal health and safety—it is that it lacks any fit at all.

Intervenors also misunderstand why the hospitalization requirement's application only in cases of rape, incest, and life-limiting anomalies is constitutionally suspect. Doc. 98 at 28-29. It is not about burden.[2] *Id.* at 29. The problem is that there is nothing about

---

[2] Moreover, none of the cases Intervenors rely on supports their assertion that courts have routinely upheld hospitalization requirements in the face of such burdens. *Gary-Northwest Indiana Women's Services* predates *Dobbs* and does not involve a challenge to the state's hospitalization requirement. *Gary-Northwest Ind. Women's Servs. v. Bowen*, 496 F. Supp. 894, 897 (S.D. Ind. 1980). And the Seventh Circuit in *Whole Woman's Health Alliance v. Rokita* never made any determinations about the constitutionality of the

7

the procedures used when performing D&Cs and D&Es for abortions in cases of rape, incest, or life-limiting anomalies that requires hospitalization when the procedures used for miscarriage management do not. Doc. 94-3 at 107:19-108:22, 112:9-114:8, 114:17-21; *see also* Doc. 99 (Attorney General's Resp.) at 15-18.

In sum, none of the reasons Intervenors advance rationally explain the differential treatment between abortion patients and miscarriage patients.

### C. Intervenors' new rationale misses the mark.

For the first time, Intervenors offer in their cross-motion a different basis to support the hospitalization requirement. They now argue that the legislature targeted abortions in the hospitalization requirement because miscarriage management already "more typically" occurs in hospitals and ambulatory surgical centers. Doc. 98 at 26. But that rationale does not hold up.

It is true that the legislature may permissibly tackle perceived problems in piecemeal fashion, but that is not how the General Assembly chose to proceed here. S.B. 20 not only requires D&Es and D&Cs performed for the purpose of a second-trimester abortion to be performed in a hospital, but it also specifically exempts D&Es and D&Cs performed for the purpose of miscarriage management from the statute's requirements, including the hospitalization requirement. *See* N.C. Gen. Stat. § 90-21.81. The Constitution requires the General Assembly to offer a rational basis for its choice to treat

---

hospitalization requirement—it merely remanded the case for consideration consistent with *Dobbs*. 2022 U.S. App. LEXIS 18983, at *1 (7th Cir. July 11, 2022).

abortion patients and miscarriage patients differently. But it has not provided one here. That miscarriage management already largely occurs in hospital settings might be a rational reason for statutory *silence* about where D&Es and D&Cs performed for miscarriage management must occur. But it is hardly a rational reason to *exempt* miscarriage management from the hospitalization requirement.

## II. The Intrauterine Pregnancy Documentation Requirement Is Unconstitutionally Vague.

The Court should also deny Intervenors' cross-motion for summary judgment on Plaintiffs' vagueness challenge to the IUP documentation requirement. As Intervenors concede, "the question of a statute's vagueness is a purely legal issue that does not require additional fact-finding." Doc. 98 at 11 (quoting *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019) (en banc)). This Court previously ruled that Plaintiffs were likely to show that the IUP documentation requirement is unconstitutionally vague because it does not give providers fair notice of the conduct it prohibits or the consequences for engaging in the prohibited conduct. Doc. 80 at 18-22. Discovery could not—and did not—alter that legal conclusion.

Intervenors strive mightily to rewrite the IUP documentation requirement in an effort to eliminate the ambiguity inherent in the provision, or at least eliminate enough ambiguity to give the provision a so-called "constitutional core." Specifically, Intervenors urge the Court to hold that the law imposes only civil (not criminal) penalties and requires a physician to determine only the "*probable* existence of an intrauterine

9

pregnancy" before providing a woman a medication abortion. These efforts to rewrite the law fail for two primary reasons.

*First*, Intervenors' proposed construction does not actually remove the ambiguity regarding what constitutes prohibited conduct. As this Court already noted, "even if the provider need only determine the 'probable existence' of an IUP, uncertainty remains." Doc. 80 at 19. "Classic terms of degree" with "no settled usage or tradition of interpretation in law," like "probable" in the context of this case, often give rise to vagueness concerns. *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048-49 (1991). How "probable" does the existence of an intrauterine pregnancy need to be? If a physician has no reason to suspect an ectopic pregnancy, can the physician proceed with an abortion, or is additional confirmation required? Intervenors have provided their preferred answers to these questions, but nothing in the text of the statute itself mandates those particular answers. Doctors are thus left guessing as to whether their actions could run afoul of state law. The Due Process Clause forbids such a result. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

For the same reasons, the IUP documentation requirement lacks Intervenors' so-called "constitutional core." Doc. 98 at 13-14. The Fourth Circuit has held that a statute relying on standardless terms to define prohibited conduct has no "constitutional core." *Doe v. Cooper*, 842 F.3d 833, 842 (4th Cir. 2016) (holding a statute prohibiting registered sex offenders from places where minors gathered for "regularly scheduled" activities void for vagueness). If a "constitutional core" can ever save an otherwise vague statute,

10

the Fourth Circuit has explained, it is only when the statute clearly defines the prohibited conduct but when applying the statute to "marginal situations" might raise a "close question." *Id.*; *see also Parker v. Levy*, 417 U.S. 733, 755-56 (1974). That is not this case: As discussed above, the IUP documentation requirement is *always* unclear about what it demands of a physician *any time* a woman seeks a medication abortion.

Intervenors dispute this ambiguity and insist that Plaintiffs do in fact understand the IUP documentation requirement because, Intervenors say, Plaintiffs' own experts have acknowledged that a "pregnancy of unknown location" is not a "probable intrauterine pregnancy." Doc. 98 at 15-16. But Plaintiffs' experts have admitted no such thing. True, a patient with a "pregnancy of unknown location" may not have had an ectopic pregnancy conclusively ruled out, but that does not necessarily mean that an intrauterine pregnancy is not still "probable." Ectopic pregnancies remain quite rare across all pregnancies, *see, e.g.*, Doc. 94-2 (Boraas Report) ¶ 51 & n.47, and, as documented extensively in this case, intrauterine pregnancies can often be difficult to document with absolute certainty in the early weeks of pregnancy, Doc. 97-3 ¶ 63, Doc. 97-2 ¶ 196. Given those facts, a physician could quite reasonably conclude that an intrauterine pregnancy is still more likely than not (*i.e.*, "probable"), even after failing to locate a gestational sac via ultrasound. Intervenors cannot explain why such a physician could not proceed with a medication abortion under their reading of the statute.

Relatedly, although Intervenors claim that they read the IUP documentation requirement to require only a "probable" intrauterine pregnancy, it is not clear how the

standard they advocate could be satisfied absent a "definite" intrauterine pregnancy. Intervenors seem to contend that any time a physician cannot confirm an intrauterine pregnancy via ultrasound, an intrauterine pregnancy is not yet "probable." But requiring physicians to document a gestational sac via ultrasound amounts to requiring them to confirm a *definite* intrauterine pregnancy. Intervenors' proposed saving construction is therefore undermined entirely.

*Second*, Intervenors' proposed construction also fails to eliminate the uncertainty about whether a physician risks criminal penalties if she violates the IUP documentation requirement. Intervenors argue that because § 90-21.81B provides that "drug-induced abortion is lawful during the first twelve weeks of a woman's pregnancy '*[n]otwithstanding'* North Carolina's criminal penalties for abortion," a physician who violates the IUP documentation requirement "is *not* subject to criminal penalties." Doc. 98 at 12 (quoting N.C. Gen. Stat. § 90-21.81B).

But that is not quite what § 90-21.81B says. Instead, the statute provides that it is not unlawful for a physician to provide a woman a medication abortion during the first 12 weeks of her pregnancy "[n]otwithstanding" the criminal penalties "*and subject to the provisions of this Article*." N.C. Gen. Stat. § 90-21.81B (emphasis added). Thus, the statute could plausibly be—and is perhaps best—read to say that the provision of medication abortion in a manner inconsistent with the provisions of S.B. 20 (including the IUP documentation requirement) can subject a physician to criminal penalties.

12

Perhaps this is why, in the early stages of this case, Intervenors themselves took the position that violating the IUP documentation requirement can subject a physician to criminal penalties. Doc. 65 at 18. If the very legislators who passed the IUP documentation requirement are uncertain whether it imposes criminal liability, it seems inevitable that physicians will lack any confidence about what the legal consequences of their actions might be.

In sum, Intervenors' saving construction fails to remedy the notice problems inherent in the IUP documentation requirement. Intervenors' cross-motion for summary judgment on Plaintiffs' vagueness argument should therefore be denied.

## CONCLUSION

For the reasons stated above, this Court should deny Intervenors' cross-motion for summary judgment.

Dated: June 1, 2024.　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　JOSHUA H. STEIN
　　　　　　　　　　　　　　　　　　　　Attorney General

　　　　　　　　　　　　　　　　　　　　Sarah G. Boyce
　　　　　　　　　　　　　　　　　　　　Deputy Attorney General and
　　　　　　　　　　　　　　　　　　　　General Counsel
　　　　　　　　　　　　　　　　　　　　N.C. State Bar 56896
　　　　　　　　　　　　　　　　　　　　sboyce@ncdoj.gov

　　　　　　　　　　　　　　　　　　　　Sripriya Narasimhan
　　　　　　　　　　　　　　　　　　　　Deputy General Counsel
　　　　　　　　　　　　　　　　　　　　N.C. State Bar 57032
　　　　　　　　　　　　　　　　　　　　snarasimhan@ncdoj.gov

13

South A. Moore
Deputy General Counsel
N.C. State Bar 55175
smoore@ncdoj.gov

Amar Majmundar
Senior Deputy Attorney General
N.C. State Bar 24668
amajmundar@ncdoj.gov

Stephanie A. Brennan
Special Deputy Attorney General
N.C. State Bar 35955
sbrennan@ncdoj.gov

*Counsel for Defendant Attorney General Stein*

North Carolina Dept. of Justice
P.O. Box 629
Raleigh, NC 27602
Phone: 919-716-6900
Fax: 919-716-6758

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with Local Rule 7.3(d) because, excluding the parts of the brief exempted by Rule 7.3(d) (cover page, caption, signature lines, and certificates of counsel), this brief contains fewer than 3,125 words. This brief also complies with Local Rule 7.1(a).

/s/Sarah G. Boyce
Sarah G. Boyce
Deputy Attorney General
and General Counsel