IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PLANNED PARENTHOOD SOUTH       )
ATLANTIC, et al.,              )
                               )
            Plaintiffs,        )
                               )
       v.                      )            1:23-CV-480
                               )
JOSHUA STEIN, et al.,          )
                               )
            Defendants,        )
                               )
       and                     )
                               )
PHILIP E. BERGER, et al.,      )
                               )
            Intervenor-Defendants.  )

## <u>MEMORANDUM OPINION and ORDER</u>

Catherine C. Eagles, Chief District Judge.

Following the Supreme Court's decision in *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), the North Carolina General Assembly overhauled the state's law on abortion in 2023. That law, as amended, prohibited abortions in many situations, otherwise reduced the availability of abortions, and added many more regulatory, medical, and procedural rules and requirements for an abortion to be lawful. It imposed civil, quasi-criminal, and, for many of its provisions, criminal sanctions and penalties for its violation.

The plaintiffs, Planned Parenthood South Atlantic (PPSAT) and Dr. Beverly Gray, challenged the constitutionality of various provisions of the Act. The Court refused to

enjoin the new law in its entirety but entered a preliminary injunction enjoining enforcement of two provisions: one requiring documentation of the existence or probable existence of an intrauterine pregnancy and another requiring surgical abortions after 12 weeks of pregnancy be performed in a hospital.

The parties agree that the material facts are undisputed. They filed and fully briefed cross-motions for summary judgment, which have been carefully considered.

The provision requiring providers to document the existence or probable existence of an intrauterine pregnancy before a medical abortion is unconstitutionally vague. The requirement does not give medical providers sufficient notice of the required conduct, and it does not include sufficient standards to prevent arbitrary and discriminatory enforcement. Therefore, the statute violates the plaintiffs' due process rights. The plaintiffs' motion for summary judgment as to the intrauterine pregnancy provision will be granted, and the intervenors' cross-motion for summary judgment will be denied.

The requirement that surgical abortions after 12 weeks of pregnancy be performed in a hospital does not violate the plaintiffs' constitutional rights to equal protection or due process. The plaintiffs have offered credible and largely uncontroverted medical and scientific evidence that this requirement is unnecessary to protect maternal health and safety and will unnecessarily make such abortions more dangerous for many women and more expensive. But since the Supreme Court's decision in *Dobbs*, there is no fundamental right to abortion, *see* 597 U.S. at 300, and the General Assembly need only offer rational speculation for its legislative decisions regulating abortion. The intervenors have offered such speculation, and the plaintiffs have not negated every conceivable basis

2

the General Assembly may have had for enacting the hospitalization requirement. The intervenors' motion for summary judgment as to the hospitalization requirement will be granted, and the plaintiffs' cross-motion will be denied.

## I. Procedural History

In May 2023, the North Carolina General Assembly enacted Senate Bill 20, entitled "An Act to Make Various Changes to Health Care Laws and to Appropriate Funds for Health Care Programs." Doc. 1-1. Among other things, the Act significantly restricted access to abortions by changing and adding to the requirements of Chapter 90, Article 1i of the North Carolina General Statutes where the law governing abortion is codified.

Soon thereafter, the plaintiffs filed a verified complaint on behalf of themselves and their patients seeking abortions and sought a temporary restraining order to keep the Act from going into effect on July 1, 2023. Doc. 1. They raised several constitutional challenges. *Id.* at ¶¶ 77–87.

Philip E. Berger, President *Pro Tempore* of the North Carolina Senate, and Timothy K. Moore, Speaker of the North Carolina House of Representatives, moved to intervene as defendants on behalf of the General Assembly. Doc. 17. The Court granted the motion. Text Order 06/24/2023; Minute Entry 06/28/2023; Doc. 32.

The General Assembly soon passed an amended version of the Act, largely directed to resolving some of the ambiguities in the original Act, and the amended version was signed into law on June 29, 2023. Doc. 42 at ¶ 6. The next day, this Court denied the motion to enjoin enforcement of the Act as a whole. Doc. 31. But based on

3

vagueness concerns, the Court granted the motion for a temporary restraining order prohibiting enforcement of the intrauterine pregnancy provision that required a "physician prescribing, administering, or dispensing an abortion-inducing drug" to "[d]ocument in the woman's medical chart the . . . existence of an intrauterine pregnancy." *Id.* at pp. 8–9 ¶ 1.[1]  The Court refused to issue a temporary restraining order as to the hospitalization requirement, finding it unnecessary since the provision would not go into effect until October 1, 2023.  *Id.* at p. 9 ¶ 2.

The parties thereafter jointly moved to extend the temporary restraining order pending some expedited discovery and a ruling on the preliminary injunction motion. Doc. 33.  The Court granted the motion, Doc. 35, and set a schedule for expedited discovery, briefing, and a hearing.  Doc. 37.

The plaintiffs filed an amended verified complaint in light of the amendments to the Act passed in late June 2023.  Doc. 42.[2]  For the same reason, they filed an amended motion for a preliminary injunction.  Doc. 48.  They also filed four declarations under oath in support of their motion, Doc. 49-1; Doc. 49-2; Doc. 69-1; Doc. 69-2, deposition testimony, Doc. 74-1; Doc. 74-2; Doc. 74-3; Doc. 74-4; other exhibits, and briefs.  The North Carolina Attorney General agreed with the plaintiffs, Doc. 63, and other defendants

---

[1] All page citations are to the pagination appended by the CM-ECF system.

[2] In the amended complaint, Doc. 42 at ¶¶ 82–86, the plaintiffs did not make the same broad constitutional challenges to the changes to the Abortion Law that they made in their original complaint.  Doc. 1 at ¶¶ 77–87.  Those challenges are no longer before the Court, as the amended complaint is the operative complaint, and the Court makes no decision on any of the claims originally asserted.

4

took no position. Doc. 56; Doc. 58; Doc. 61; Doc. 62. The intervenors defended the constitutionality of the provisions at issue, and in opposition to the motion filed two declarations under oath, Doc. 65-1; Doc. 65-3, various exhibits, deposition testimony, Doc. 75-2; Doc. 75-3, and briefs.

After a hearing, the Court granted the plaintiffs' amended motion for a preliminary injunction and enjoined two provisions of the law. Doc. 80 at pp. 33–34 ¶¶ 1–2. The Court found that the plaintiffs were likely to succeed on their claim that the intrauterine pregnancy (IUP) provision was unconstitutionally vague and on their claim that the requirement that surgical abortions after 12 weeks be performed in a hospital violated the equal protection clause. *Id.* at pp. 32–33.

After additional time for discovery, the plaintiffs filed a motion for summary judgment, Doc. 93, and the intervenors filed a cross-motion for summary judgment. Doc. 97. The plaintiffs filed five declarations under oath in support of their motion, Doc. 94-1; Doc. 94-2; Doc. 100-1; Doc. 100-2; Doc. 100-3, deposition testimony, Doc. 94-3; Doc. 94-4; Doc. 94-5; other exhibits, and briefs. The intervenors filed declarations under oath in support of their motion, Doc. 97-2; Doc. 97-3; Doc. 97-4; other exhibits, Doc. 97-1; Doc. 97-5; Doc. 97-6; Doc. 97-7; and briefs. The Attorney General filed a response and reply in support of the plaintiffs' position, Doc. 99; Doc. 104, and the other defendants did not file any briefs. The Court held a hearing on June 5, 2024. Doc. 101.

## II. The Act

The Act defines "abortion" as a "surgical abortion or a medical abortion," N.C. Gen. Stat. § 90-21.81(1), and provides specific definitions of those phrases. § 90-

5

21.81(4e) (defining medical abortion), (9b) (defining surgical abortion). The Act provides that if extensive regulatory, procedural, and medical requirements, *see generally* § 90-21.80 *et seq.* are met, it is not unlawful to procure or cause an abortion during the first 12 weeks of pregnancy. § 90-21.81B(2).

As relevant here, the Act requires health care providers to "[d]ocument in the woman's medical chart the probable gestational age and existence of an intrauterine pregnancy" before administering an "abortion-inducing drug." § 90-21.83B(a)(7). An abortion-inducing drug is statutorily defined, § 90-21.81(1a), and includes drugs such as mifepristone and misoprostol. *Id.*

The Act makes it "unlawful after the twelfth week of a woman's pregnancy to procure or cause a miscarriage or abortion" in North Carolina. § 90-21.81A. The Act does, however, provide narrow exceptions for "surgical abortions" for specified periods of time after 12 weeks and for specified reasons. *See* discussion *infra* at 21. Surgical abortions up to 12 weeks can be done in a clinic, § 90-21.81B(2), but if done after 12 weeks under one of the authorized exceptions, the procedure must be performed in a hospital. §§ 90-21.81B(3), (4); 90-21.82A(c).

If a physician violates any provision of Article 1i, including either provision at issue here, that physician "shall be subject to discipline by the North Carolina Medical Board," and if a licensed health care provider violates any provision of the Article, it "shall be subject to discipline under their respective licensing agency or board." § 90-21.88A. This statutory provision does not provide a state of mind or intent standard.

6

If a person performs an abortion in knowing or reckless violation of any provision in Article 1i, that person is subject to a civil action for damages and attorneys' fees. §§ 90-21.88(a), (c). Physicians who perform abortions are subject to these penalties.

North Carolina provides criminal penalties for violation of its abortion law. *See* N.C. Gen. Stat. § 14-44 *et seq*. If a person administers a drug to a pregnant woman or "use[s] any instrument" with the intent "to procure the miscarriage of such woman," outside the narrow exceptions in § 90-21.81B, the person is subject to prosecution for a Class I felony. § 14-45. Outside the narrow exceptions, §§ 90-21.81B(3), (4), it is "unlawful after the twelfth week of a woman's pregnancy to procure or cause a miscarriage or abortion." § 90-21.81A(a). If a physician provides a surgical abortion after 12 weeks and the exceptions in § 90-21.81B are not applicable or the physician does not comply with other requirements necessary for the procedure to be lawful, the physician faces prosecution for a Class H felony. § 14-44. If a person "unlawfully causes the death of an unborn child" by "willfully and maliciously commit[ting] an act with the intent to cause the death of the unborn child," the person can be charged with a Class A felony, facing life in prison without parole. §§ 14-23.2(a)(1), (b)(1).

## III.    Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316

7

F.3d 516, 523 (4th Cir. 2003) (cleaned up); *see also Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 878 (4th Cir. 2023).

Here, all the material facts are undisputed. While there are disputed questions of fact, some of which will be discussed, none are material. Therefore, entry of summary judgment is appropriate.

## IV.    Intrauterine Pregnancy Provision

Subject to many restrictions and requirements, the Act allows a "medical abortion" up to 12 weeks of pregnancy. § 90-21.81B(2). The statute defines a medical abortion as "[t]he use of any medicine, drug, or other substance intentionally to terminate the pregnancy of a woman known to be pregnant," with narrow exceptions not relevant here. § 90-21.81(4e).

Among the conditions and restrictions, the Act requires that before providing an abortion-inducing drug, a physician shall "[d]ocument in the woman's medical chart the probable gestational age and existence of an intrauterine pregnancy." § 90-21.83B(a)(7). The plaintiffs contend that the IUP provision violates the Fourteenth Amendment's Due Process Clause both because it does not have a rational basis and because it is vague. Doc. 94 at 16–24.

Specifically, the plaintiffs say that the requirement to determine and document "the probable gestational age and existence of an intrauterine pregnancy," § 90-21.83B(a)(7), has no rational relationship to patient safety because it prohibits medical abortions when they are safest early in pregnancy and does not facilitate prompt screening and treatment for ectopic pregnancy. Doc. 94 at 21. The plaintiffs also say that

8

the requirement does not provide clear standards by which the provider is to make such a determination, causing serious notice problems and raising the risk of arbitrary enforcement. *Id.* at 19. The intervenors contend that medical practitioners understand the requirement, Doc. 98 at 21, and that the requirement protects the health of women with ectopic pregnancies. *Id.* at 24.

A. **Undisputed Facts**

An intrauterine pregnancy occurs when a fertilized egg implants and grows inside the uterus. Doc. 65-3 at ¶ 60. An ectopic pregnancy occurs when a fertilized egg implants and grows outside of the uterus. Doc. 49-1 at ¶ 52 n.36; Doc. 65-3 at ¶ 58.

After five or six weeks of pregnancy, the embryo can be seen on ultrasound if it is in the uterus, but up until that point it is impossible to detect an intrauterine embryo by ultrasound. Doc. 65-1 at ¶ 239; Doc. 65-3 at ¶ 55; Doc. 74-1 at 146; Doc. 49-1 at ¶ 49. Blood tests are available to provide additional information about whether the pregnancy is intrauterine or ectopic, but they require interpretation and are not conclusive yes/no tests at this early stage of pregnancy. Doc. 65-1 at ¶ 254.

There are five general categories of pregnancy location. Doc. 94-2 at ¶ 43; Doc. 97-2 at ¶ 219. These include: 1) "definite intrauterine pregnancy" when the gestational sac and yolk sac and/or embryo are visible in the uterus; 2) "probable intrauterine pregnancy" when there is a likely gestational sac but no yolk sac visible in the uterus; 3) "pregnancy of unknown location" when there is no intrauterine or extrauterine pregnancy visible but the patient has a positive pregnancy test; 4) "probable ectopic pregnancy" when there is an inhomogeneous adnexal mass or extrauterine sac-like structure; and 5)

9

"ectopic pregnancy" when there is an extrauterine gestational sac with yolk sac or embryo visible. Doc. 94-2 at ¶ 43; *see also* Doc. 75-3 at 19; Doc. 74-2 at 112; Doc. 97-2 at ¶ 219. Ectopic pregnancies can be difficult to diagnose. Doc. 65-1 at ¶ 254.

An ectopic pregnancy cannot grow normally, and most of these embryos die. Doc. 65-3 at ¶ 58. If left untreated and the fallopian tube ruptures, the resulting internal bleeding can threaten the life of the woman. *Id.*; Doc. 75-2 at 16. Medical abortion is contraindicated for ectopic pregnancies because it is ineffective for treating them, since ectopic pregnancies occur outside the uterine cavity. Doc. 65-2 at p. 5 ¶ 4, p. 7 ¶ 5.4; Doc. 69-2 at ¶ 11; Doc. 74-1 at 101. Ectopic pregnancy accounts for approximately two percent of all pregnancies. Doc. 65-3 at ¶ 58; Doc. 74-2 at 113.

The plaintiffs offer patients what they call "medication abortions" that fall within the statutory definition of a "medical abortion." Doc. 94-1 at p. 7 ¶ 11. Medical abortion typically involves a two-step, two medication process: a dose of mifepristone followed 24 to 48 hours later by a dose of misoprostol. *Id.* at p. 9 ¶ 18; Doc. 49-2 at ¶ 21. Together these medications stop the development of the pregnancy and cause uterine contractions that empty the uterus. Doc. 49-1 at p. 9 ¶ 17; Doc. 49-2 at ¶ 21.

The 2023 label approved by the U.S. Food and Drug Administration for the medical abortion drug mifepristone (Mifeprex) states that its use is "contraindicated" for "[c]onfirmed or suspected ectopic pregnancy," Doc. 65-2 at p. 5 ¶ 4, and, in the "Warning and Precautions" summary, it says, with a reference to § 5.4 of the label, "Ectopic pregnancy: Exclude before treatment." *Id.* at p. 2. Section 5.4 of the label states that the drug is "contraindicated in patients with a confirmed or suspected ectopic pregnancy

10

because [it] is not effective for terminating ectopic pregnancies." *Id.* at p. 7 ¶ 5.4. It further cautions that "[h]ealthcare providers should remain alert to the possibility that a patient who is undergoing a medical abortion could have an undiagnosed ectopic pregnancy because some of the expected symptoms experienced with a medical abortion (abdominal pain, uterine bleeding) may be similar to those of a ruptured ectopic pregnancy." *Id.* The FDA has reported that 97 women have been diagnosed with ectopic pregnancies during medical abortion, with two deaths reported from ruptured ectopic pregnancy, but the record does not include the timeframe over which these complications occurred. Doc. 65-1 at ¶ 248.

A patient with an ectopic pregnancy who takes a medical abortion drug will not be directly harmed by the medication, and the medication itself does not exacerbate or increase the risk of complications from ectopic pregnancy. Doc. 69-1 at ¶ 50; Doc. 69-2 at ¶ 11; Doc. 74-2 at 156; Doc. 74-3 at 144 (medical abortion cannot cause an ectopic pregnancy to rupture). However, some the symptoms of a ruptured ectopic pregnancy may be similar to the expected symptoms resulting from a successful medical abortion. Doc. 65-2 at p. 7 ¶ 5.4.

When an intrauterine pregnancy cannot be confirmed by ultrasound, PPSAT's current medical protocol screens for risk of ectopic pregnancy through a set of questions about the patient's medical history and current symptoms. Doc. 49-1 at ¶ 52. Providers evaluate known risk factors during the screening, such as symptoms of pain and bleeding, history of ectopic pregnancies, past surgery on the fallopian tube, and presence of pelvic inflammatory disease. *Id.* at ¶ 52 n.36. If the initial screening indicates the patient is at

high risk of ectopic pregnancy, the plaintiffs refer them to an emergency care provider. *Id.* at ¶ 52. But if the medical screening establishes that the risk of ectopic pregnancy is low and if the patient consents, the medical abortion begins; the provider simultaneously conducts further blood work to help determine if the pregnancy is intrauterine or ectopic. *Id.* at ¶ 54. Following the FDA-approved mifepristone label instruction to remain alert to ectopic pregnancy, the plaintiffs provide these patients with a counseling form that explains the risk of ectopic pregnancy, outlines its symptoms, and instructs patients to "call us right away" if they experience any of the symptoms. Doc. 74-15. The blood work test results can take up to 24 hours to receive, Doc. 49-1 at ¶ 54, and if the results indicate a risk of ectopic pregnancy, the provider follows up with the patient. *Id.* at ¶ 55.

## B. Substantive Due Process

The plaintiffs contend that this provision violates their substantive due process rights because it has no rational basis. Doc. 42 at ¶ 85. But the undisputed evidence shows otherwise. Because the General Assembly could have rationally speculated that the IUP provision would protect maternal health by reducing the risk of unidentified ectopic pregnancies, the provision survives rational basis review.

The Due Process Clause of the Fourteenth Amendment prevents a state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. This guarantee encompasses both procedural and substantive protections. *See Kelley v. Johnson*, 425 U.S. 238, 244 (1976). When a law or regulation does not implicate a fundamental right, as here, then courts consider a substantive due

12

process challenge under rational basis review. *See Doe v. Settle*, 24 F.4th 932, 953 (4th Cir. 2022).[3]

Under rational basis, the most lenient tier of review, courts presume the validity of state laws, *see City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985), and the plaintiff must "negative every conceivable basis which might support it." *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973). Moreover, under this standard, the law does not require the state to make any showing or present any evidence, *see Settle*, 24 F.4th at 943, and courts accept the government's "rational speculation" linking the regulation to a legitimate purpose, even "unsupported by evidence or empirical data." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993). "All that is needed is an imperfect fit between a plausible reason and some legitimate end." *Settle*, 24 F.4th at 944.

Here, the plaintiffs have not negated every conceivable basis the General Assembly may have had for enacting the IUP provision. In the 2023 label approved for the medical abortion drug mifepristone, the FDA says that ectopic pregnancy should be "exclude[d] before treatment." Doc. 65-2 at p. 2. It further cautions that "some of the expected symptoms experienced with a medical abortion (abdominal pain, uterine bleeding) may be similar to those of a ruptured ectopic pregnancy." *Id.* at p. 7 ¶ 5.4. The

---

[3] "Substantive due process analysis must begin with a careful description of the asserted right." *Reno v. Flores*, 507 U.S. 292, 302 (1993) (cleaned up); *see Dep't of State v. Muñoz*, 144 S. Ct. 1812, 1822 (2024). Here, the plaintiffs have not clearly identified the asserted right. But they have made no clear argument that any fundamental right is implicated. *See Dobbs*, 597 U.S. at 300 (holding that there is no fundamental right to procure an abortion). Therefore, rational basis review is appropriate.

13

IUP provision arguably mitigates the risk that a person with an ectopic pregnancy will obtain an ineffective medication abortion, confuse the symptoms of that abortion with what is actually a ruptured ectopic pregnancy, and fail to seek timely medical care. The requirement plausibly protects maternal health and safety.

The plaintiffs say that the risk of confusing the side effects of medical abortion and symptoms of a ruptured ectopic pregnancy is low, especially because they educate patients about the symptoms and monitor them closely. Doc. 94 at 22–23. Their evidence supports this contention and is largely uncontradicted. But "a legislative choice is not subject to courtroom fact-finding," *Beach Commc'ns*, 508 U.S. at 315, nor is it the responsibility or role of the courts to replace the judgment of the legislature. *See Settle*, 24 F.4th at 943–44. Here, the General Assembly may have rationally speculated that the IUP provision would protect maternal health by reducing the risk that a few patients might mistake the side effects of a medical abortion with a ruptured ectopic pregnancy and fail to seek medical care quickly. *Beach Commc'ns*, 508 U.S. at 315.

There is no fundamental right at stake here, *see Dobbs*, 597 U.S. at 300, and rational basis review applies. The plaintiffs have not negated every conceivable basis the General Assembly may have had for enacting the IUP determination requirement.

### C.    Vagueness

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "To survive a vagueness challenge, a statute must give a person of ordinary intelligence adequate notice of what conduct is prohibited and must include sufficient

14

standards to prevent arbitrary and discriminatory enforcement." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019) (en banc); *see also Sessions v. Dimaya*, 584 U.S. 148, 155–56 (2018).

In evaluating a vagueness challenge, courts assess whether regulated parties "know what is required of them so they may act accordingly" and whether a statute is sufficiently precise "so that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *Grayned*, 408 U.S. at 108. The Due Process Clause requires that "a fair warning . . . be given to the world in language that the common world would understand, of what the law intends to do if a certain line is passed." *Bittner v. United States*, 598 U.S. 85, 102 (2023) (quoting *McBoyle v. United States*, 283 U.S. 25, 27 (1931)). While the Constitution does not require "mathematical certainty from our language," it does prohibit statutory language so unclear about prohibited conduct that it "may trap the innocent by not providing fair warning" or so standardless that it allows "arbitrary and discriminatory enforcement." *Greenville Women's Clinic v. Comm'r, S.C. Dep't of Health & Env't*, 317 F.3d 357, 366 (4th Cir. 2002) (quoting *Grayned*, 408 U.S. at 108, 110).

As everyone acknowledges, implicit in the challenged requirement that a provider "[d]ocument in the woman's medical chart the probable gestational age and existence of an intrauterine pregnancy," § 90-21.83B(a)(7), is a requirement that the provider determine that the pregnancy is intrauterine; that is, it is not ectopic. Yet this implicit requirement does not provide clear standards by which the provider is to make such a determination.

15

First, it is not clear whether the word "probable" modifies only "gestational age" or whether it modifies both "gestational age" and "existence of an intrauterine pregnancy." In other words, it is not clear if the provider must "document" the "probable gestational age" and the "probable existence of an intrauterine pregnancy," or whether the provider must document the "probable gestational age" and the "existence of an IUP."

Interpreting the provision to require a provider to document the "probable existence of an intrauterine pregnancy," as the Attorney General and Intervenors contend is appropriate, *see* Doc. 95 at 115–16; Doc. 99 at 21; Doc. 98 at 20 n.4, does not solve the vagueness problem. There is no definition of "probable existence of an intrauterine pregnancy," and the undisputed evidence shows it can reasonably be read at least two ways.

A physician might reasonably read the requirement to find "probable existence of an intrauterine pregnancy" as consistent with PPSAT's established medical protocol, which allows medical abortion before the pregnancy can be seen on an ultrasound if screening about the patient's medical history and symptoms permit a physician to determine that an ectopic pregnancy is unlikely. Doc. 49-1 at ¶¶ 51–54, Doc. 49-2 at ¶ 47. If an ectopic pregnancy is unlikely, then an IUP, the only other alternative, is likely, and the common understanding of the word "probable" means likely but not certain.[4] Or, as the intervenors contend, a provider could understand the statutory phrase

---

[4] A standard dictionary states that probable means "supported by evidence strong enough to establish presumption but not proof." *Probable*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/probable (last visited July 23, 2024).

"probable existence of an intrauterine pregnancy" to have the same meaning as "probable intrauterine pregnancy," Doc. 105 at 7, a term well-understood in the relevant medical community to mean that "there is a likely gestational sac (intrauterine echogenic sac-like structure), but no yolk sac, visible in the uterus." Doc. 94-2 at ¶ 43. Thus, there are at least two different reasonable interpretations of the phrase "probable existence of an intrauterine pregnancy."

The risk of arbitrary and uneven enforcement is also a factor, *FCC*, 567 U.S. at 253, and it is high here. Law enforcement officials may not be familiar with the medical community's understanding of the term "probable intrauterine pregnancy." *See supra* at 9. The District Attorney defendants, all of whom are elected law enforcement officials in North Carolina, and the North Carolina Medical Board and Board of Nursing defendants have remained silent on the meaning of "probable existence of an intrauterine pregnancy," and on whether criminal penalties are available if the provision is violated. *See* discussion *infra* at 20. Elected officials hold wide-ranging moral and political opinions about abortion, and the political environment in a particular jurisdiction might also affect how law enforcement officials evaluate their role and responsibilities under this vague provision. The due process clause requires statutes to be sufficiently precise "so that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC*, 567 U.S. at 253. That is not the case with the IUP provision.

The intervenors contend that because there is a standard medical definition of "probable intrauterine pregnancy," the statute is not vague. Doc. 105 at 7–8. First, nothing in the statute indicates that the General Assembly meant for the statutory phrase

17

"probable existence of an intrauterine pregnancy" to carry the same meaning as the medical term "probable intrauterine pregnancy," Doc. 94-2 at ¶ 43, nor is there any evidence that it would be so interpreted by the North Carolina Medical Board. Second, and similarly, there is no language in the Act giving a provider notice that the medical category "pregnancy of unknown location" could not fall within the meaning of "probable existence of an intrauterine pregnancy;" as discussed *supra* at 11–12, there are ways other than an ultrasound for a provider to determine that an ectopic pregnancy is unlikely and thus that an intrauterine pregnancy is "probable." Finally, there is a real possibility physicians like Dr. Gray could face criminal charges, since the provision will be interpreted by persons outside of the medical profession and unfamiliar with medical terminology when they assess whether to bring criminal charges against persons who provide medical abortions.

The intervenors also contend that the IUP provision is not vague because when viewed as a whole, it has a clear meaning. Doc. 98 at 22–23 (citing *Doe v. Cooper*, 842 F.3d 833, 842 (4th Cir. 2016)). In *Cooper*, the court stated that "statutes that require a person to conform his conduct to an imprecise but comprehensible normative standard" are constitutional if they "apply without question to certain activities even though their application in marginal situations may be a close question," and that only statutes that specify "no standard of conduct" are unconstitutionally vague. *Cooper*, 842 F.3d at 842 (cleaned up). Applying that framework, the court held that a statute prohibiting registered sex offenders from being within 300-feet of certain locations was

unconstitutionally vague because those locations were not defined and a reasonable person could not determine their meaning. *Id.* at 838, 843.

The vagueness problem here is at least as acute as in *Cooper*. The IUP provision not only leaves a medical provider to guess whether she must document the "existence of an intrauterine pregnancy" or "probable existence of an intrauterine pregnancy," but it never defines either term. There are at least two reasonable interpretations, as discussed *supra* at 16–17. Because a reasonable person, whether a medical provider or a law enforcement officer, cannot reasonably determine the meaning of the provision, and because it is subject to arbitrary enforcement, it is unconstitutionally vague.

The intervenors also contend that physicians like Dr. Gray are only subject to civil and administrative penalties and thus that this degree of vagueness is tolerable. Doc. 98 at 17–18. As the intervenors correctly say, *id.*, the due process clause requires less clarity from "purely civil statutes" than criminal statutes "because the consequences of imprecision are qualitatively less severe." *Manning*, 930 F.3d at 272; *see Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 781 (4th Cir. 2023).

But this argument ignores the fact that significant administrative penalties like license revocations, which are unquestionably a possibility here, are quasi-criminal. *See In re Gillespie*, No. 23-CV-1819, 2023 WL 7548181, at *1 (4th Cir. Nov. 14, 2023) (unpublished) (noting that disciplinary proceedings against an attorney are "of a quasi-criminal nature" and citing *In re Ruffalo*, 390 U.S. 544, 551 (1968)); *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 422 (5th Cir. 2001). Because the Act provides that a physician or health care provider who violates the Act is subject to discipline by the

19

North Carolina Medical Board or other "respective licensing agency or board," § 90-21.88A, the standard of review is stricter than that imposed on purely civil statutes. *See Manning,* 930 F.3d at 273 (noting that "even laws that nominally impose only civil consequences warrant a 'relatively strict test' for vagueness if the law is 'quasi-criminal' and has a stigmatizing effect"); *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 ("prohibitory and stigmatizing effect" of admittedly "quasi-criminal" ordinance relevant to the vagueness analysis).[5]

The argument also ignores the real possibility that law enforcement officers and prosecutors could reasonably read the Abortion Law as authorizing criminal charges against a doctor who provides a medical abortion without the requisite degree of certainty, whatever that degree is, over whether there is the existence or probable existence of an intrauterine pregnancy. Indeed, early in the preliminary injunction proceedings, the intervenors interpreted the law to provide criminal penalties, Doc. 65 at 18, and that is how the Attorney General maintains the Abortion Law could be interpreted. Doc. 99 at 22–23; Doc. 104 at 12. The District Attorney defendants have remained silent on this issue. The fact that it is not clear whether criminal penalties apply compounds the vagueness problem.[6]

---

[5] *Plumer v. Maryland*, cited by the intervenors, *see* Doc. 98 at 19, involved driver's licenses, not professional medical licenses. 915 F.2d 927, 931 (4th Cir. 1990).

[6] The intervenors also contend that the "lesser civil and licensing penalties supersede its criminal statutes" because § 90-21.81B provides that medical abortion is lawful during the first 12 weeks of pregnancy "[n]otwithstanding North Carolina's criminal penalties for abortion." Doc. 98 at 18–19. But the Intervenors overlook that § 90-21.81B says more; abortion is legal during the first twelve weeks "[n]otwithstanding any of the provisions of [North Carolina's

20

The IUP provision in the Act does not withstand either a strict or relatively strict review and thus is unconstitutionally vague. The General Assembly is not required to draft its statutes with "mathematical certainty," *Greenville Women's Clinic*, 317 F.3d at 366, but the IUP provision's high degree of ambiguity does not give providers with sufficient notice of the required conduct. *See Manning*, 930 F.3d at 272. And providers are not the only ones left guessing about how to comply with the law; law enforcement officials also face those uncertainties, and the plaintiffs and other providers run the real risk that those officials will enforce the provision "in an arbitrary or discriminatory way." *FCC*, 567 U.S. at 253.

The Court will grant the plaintiffs' motion for summary judgment on their claim that the IUP provision is unconstitutionally vague in violation of the due process clause. The intervenors' motion for summary judgment will be denied.

## V.      Hospitalization Requirement

Up to the twelfth week of pregnancy, and subject to numerous requirements and restrictions, a woman can obtain a medical abortion or a surgical abortion in a doctor's office or clinic. § 90-21.81B(2); *see generally* § 90-21.80 *et seq*. After the twelfth week of pregnancy, a woman cannot obtain a medical abortion. § 90-21.81B(2). If she is pregnant as a result of rape or incest or if there exists a "life-limiting anomaly," and

---

criminal penalties for abortion], <u>and subject to the provisions of this Article</u>." § 90-21.81B (emphasis added). Thus, as the Attorney General points out, the Act could be read to mean that a person who provides a medical abortion in a way that is inconsistent with the Act, including its IUP documentation requirement, could be subject to criminal penalties for an unlawful abortion. *See* Doc. 104 at 12.

21

before specified weeks of pregnancy pass, she may be able to obtain a surgical abortion after the twelfth week, but only in a hospital. §§ 90-21.81B(3), (4); 90-21.82A(c); N.C. Gen. Stat. § 131E-176(13) (defining "hospital"). The statute defines a "[s]urgical abortion" as "[t]he use or prescription of any instrument or device intentionally to terminate the pregnancy of a woman known to be pregnant," unless the intent of the use of the device is to:

> a. Increase the probability of a live birth;
> b. Preserve the life or health of the child;
> c. Remove a dead, unborn child who died as the result of (i) natural causes in utero, (ii) accidental trauma, or (iii) a criminal assault on the pregnant woman or her unborn child which causes the premature termination of the pregnancy;
> d. Remove an ectopic pregnancy.

§ 90-21.81(9b). The plaintiffs contend that the hospitalization requirement violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment. Doc. 42 at ¶¶ 85–86.[7]

## A.    Undisputed Facts

There are two methods of abortion that use an instrument intentionally to terminate the pregnancy of a woman known to be pregnant and thus fall within the statutory definition of a surgical abortion: aspiration, which medically can typically be performed up to approximately 14 weeks of pregnancy, and dilation and evacuation

---

[7] The plaintiffs have abandoned their claim, Doc. 42 at ¶ 83, that the hospitalization requirement violates the due process clause for vagueness, Doc. 100 at 24 n.10, but they have not abandoned their substantive due process claim. *Id.* at 17 n.5; *see infra* at 30.

(D&E), which is available after approximately 14 weeks of pregnancy. Doc. 49-1 at ¶¶ 15, 21, 25.

The same two procedures are used for miscarriage management. *Id.* at ¶¶ 24, 28, 41 (undisputed testimony that surgical abortion procedures are "identical" to procedures for miscarriage management); Doc. 49-2 at ¶ 24. Miscarriage management is required when a person's body does not naturally expel the pregnancy tissue after miscarriage or when a pregnancy stops growing, as evident from the absence of embryonic or fetal cardiac activity. *Id.* at 10 n.7. When so used, these two procedures are not statutorily prohibited or unlawful because the purpose of the procedure is to "[r]emove a dead, unborn child who died." § 90-21.81(9b)(c).

Whether performing an aspiration or D&E procedure for abortion or for miscarriage management, physicians use the same equipment and clinical techniques. Doc. 94-1 at p. 13 ¶ 25, p. 15 ¶ 29; Doc. 94-3 at 27, 82. The placement of the medical instruments within the uterine cavity is the same. Doc. 94-3 at 83. There are no differences in the medical techniques when performing aspiration and D&E procedures for abortions in cases of rape, incest, or life-limiting anomalies than when performed for any other reason. *See id.* at 111–12, 115–16, 185; Doc. 94-1 at p. 29 ¶ 57.

There are physiological differences in the cervix between some patients presenting for miscarriage management and some patients presenting for abortion. Doc. 97-5 at ¶¶ 37–39; Doc. 97-4 at ¶ 56; Doc. 97-6 at ¶ 47. In some miscarriage management patients, fetal cortical bone has softened naturally before the procedure. Doc. 97-7 at 2.

23

There are risks from these procedures, whatever their purpose, including bleeding, hemorrhaging, infection, damage to the uterus and other organs, cervical laceration, uterine perforation, pulmonary embolism, and death. Doc. 65-1 at ¶¶ 80, 136, 152; Doc. 74-1 at 33–36, 91–93 (speaking generally of all induced abortions). While rare, major complications requiring hospital admission can occur during surgical abortions, both before and after the twelve-week mark. At all gestational ages, complications requiring transfer from a clinic to a hospital arose in only 34 of the 43,339 surgical abortions the plaintiffs performed in North Carolina between January 1, 2020, and December 31, 2023, which is well under a tenth of one percent. Doc. 94-1 at pp. 27–28 ¶ 53. Only seven of those patients required admission, and all 34 were released in stable conditions. *Id.* Of the 34 patients requiring transfers, only 17 were patients at the post-12-week gestational age. *Id.* at pp. 66–67. The plaintiffs have experienced no logistical difficulties with these infrequent transfers. *Id.* at pp. 27–28 ¶ 53.

The risk of complications from aspiration and from D&E increases with gestational age. Doc. 49-2 at ¶ 27; Doc. 65-1 at ¶¶ 38–42; Doc. 65-3 at ¶ 35; Doc. 74-1 at 150; Doc. 74-2 at 146. The rate of such complications between women presenting for abortion and women presenting for miscarriage management is comparable, and in some circumstances, second-trimester miscarriage management has a greater rate of complication than second-trimester abortion at the same gestational age due to the risk of disseminated intravascular coagulation. Doc. 94-1 at p. 15 ¶ 29, p. 19 ¶ 37; Doc. 100-1 at ¶¶ 51–52; Doc. 100-2 at ¶ 27; Doc. 94-4 at 65, 80–82.

24

For many years, aspiration and D&E procedures performed to induce abortions have primarily and routinely taken place in clinics, not in hospitals. Doc. 49-1 at ¶¶ 36, 40. When undertaken for miscarriage management in the second trimester, these procedures typically take place in a hospital. Doc. 74-3 at 116; Doc. 94-2 at ¶ 20; Doc. 97-2 at ¶¶ 81–82. The procedures are the same whether undertaken in a hospital or outpatient setting. Doc. 49-1 at ¶ 38. To date, the plaintiffs regularly perform these procedures in their own clinics after 12 weeks, *id.* at ¶¶ 12, 36, sometimes on referral from hospitals. *Id.* at ¶ 46; Doc. 94-1 at p. 29 ¶ 57. There may be patient-specific reasons why some patients need hospitalization for the procedures. Doc. 49-1 at ¶ 44.

Surgical abortions in hospitals are more expensive, logistically difficult, and more time-consuming for patients than those performed in clinics, and such financial and logistical challenges may result in delay and increase the gestational age of the pregnancy, and thus the maternal health risks, by the time the abortion occurs. *Id.* at ¶¶ 36, 70; Doc. 69-1 at ¶ 31; Doc. 94-1 at p. 42–43 ¶ 90, p. 44 ¶ 94. These issues, particularly cost, may prevent some women pregnant as a result of rape or incest or facing a life-limiting anomaly from obtaining a surgical abortion within the time limits prescribed by the statute. The American College of Obstetricians and Gynecologists and the American Public Health Association have endorsed the view that it is unnecessary to require abortions to be performed in hospitals. Doc. 49-1 at ¶ 37.

## B. Equal Protection

The Equal Protection Clause of the Fourteenth Amendment prohibits any state from "deny[ing] to any person within its jurisdiction the equal protection of the laws."

U.S. CONST. amend. XIV, § 1. Generally, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 440. Unlike laws that treat similarly situated people differently based on race, alienage, national origin, or sex, which trigger a heightened standard of review, federal courts do not closely scrutinize legislative enactments that distinguish "characteristics relevant to interests the State has the authority to implement." *Id.* at 441–42. Courts apply a lower level of scrutiny out of respect for the separation of powers. *Id.*

The Supreme Court has held that "regulation of abortion is not a sex-based classification and is thus not subject to the heightened scrutiny that applies to such classifications" and that it is "governed by the same standard of review as other health and safety measures." *Dobbs*, 597 U.S. at 236–37 (cleaned up). To succeed on an equal protection challenge where no fundamental right is at play, the plaintiff "must prove that it has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *In re Premier Auto. Servs., Inc.*, 492 F.3d 274, 283 (4th Cir. 2007) (cleaned up). The parties agree that the plaintiffs' Fourteenth Amendment claim is subject to rational basis review and that "the protection of maternal health and safety," the only interest the intervenors, speaking on behalf of the General Assembly, have put forth, Doc. 65 at 2; Doc. 98 at 28, is a legitimate state interest. Doc. 49 at 11; Doc. 65 at 8; Doc. 94 at 11; Doc. 98 at 31.

The evidence establishes without dispute that there are "classifications" here. Women presenting for abortion and women presenting for miscarriage management are

26

similarly situated because they seek access to the same aspiration and D&E procedures. Doc. 94-1 at p. 13 ¶ 25, p. 15 ¶ 29; Doc. 94-3 at 27, 82. And women who need an aspiration or D&E procedure are intentionally treated differently depending on the personal reason they need the procedure. If performed for miscarriage management after 12 weeks of pregnancy, neither aspiration nor D&E must be performed in a hospital. § 90-21.82A(c).[8] But if performed for the purpose of terminating a pregnancy when a woman is pregnant as a result of rape or incest or there exists a life-limiting anomaly, the Act requires the procedure to be done in a hospital after 12 weeks of pregnancy. *Id.*

But different treatment is not enough for the plaintiffs to prevail. They must show that there is no rational basis for the different treatment. When courts apply the most lenient tier of review, rational basis, they presume the validity of state laws, *see City of Cleburne*, 473 U.S. at 440, and the plaintiff must "negative every conceivable basis which might support it." *Lehnhausen*, 410 U.S. at 364. The state has no burden to make any showing or present any evidence, *see Settle*, 24 F.4th at 943, and courts are satisfied with the government's rational speculation linking the regulation to a legitimate purpose, even "unsupported by evidence or empirical data." *Beach Commc'ns*, 508 U.S. at 315.

Here, the plaintiffs have not negated every conceivable basis the General Assembly may have had for adopting the hospitalization requirement. Major

---

[8] As noted *supra* at 21–22, the statute excludes miscarriage management from the definition of a surgical abortion and thus from the hospitalization requirement. § 90-21.81(9b)(c) (excluding removal of "a dead, unborn child who died as the result of (i) natural causes in utero, (ii) accidental trauma, or (iii) a criminal assault on the pregnant woman or her unborn child which causes the premature termination of the pregnancy" from the definition of surgical abortion).

27

complications requiring transfer and admission to a hospital sometimes, though rarely, occur during surgical abortions, and Doc. 94-1 at p. 27 ¶ 53, and the risk of complications from such procedures increases with gestational age. Doc. 49-2 at ¶ 27; Doc. 65-1 at ¶¶ 38–42; Doc. 65-3 at ¶ 35, Doc. 74-1 at 150; Doc. 74-2 at 146. It is impossible to be sure whether complications may arise for a particular patient until after the abortion procedure begins. Doc. 74-2 at 64–65, 67. During the second trimester, aspiration and D&E procedures performed for miscarriage management typically take place in a hospital, Doc. 74-3 at 116; Doc. 94-2 at ¶ 20; Doc. 97-2 at ¶¶ 81–82, but the same procedures for abortions are primarily and routinely performed in outpatient clinics. Doc. 49-1 at ¶¶ 36, 40. The hospitalization requirement for women seeking abortion after 12 weeks of pregnancy, when the rate of complications is higher, arguably reduces maternal health risk for abortion patients who experience major complications because they will already be in a hospital and not require transferring.

The plaintiffs have offered substantial evidence that abortions performed in outpatient clinics are just as safe as, and sometimes safer than, those performed in hospitals, and that the risk of complications requiring hospitalization is tiny.[9] If that were the issue, the plaintiffs would no doubt prevail, as the intervenors have not credibly

---

[9] As noted *supra* at 23–24, complications requiring transfer from a clinic to a hospital arose in only 34 of the 43,339 surgical abortions the plaintiffs performed in North Carolina between January 1, 2020, and December 31, 2023, Doc. 94-1 at pp. 27–28 ¶ 53, only seven were actually admitted, *id.,* and only 17 involved procedures with patients at the post-12-week gestational age who would have been subject to the hospitalization requirement. *Id.* at pp. 66–67.

undermined this evidence.[10]  The plaintiffs have also produced uncontroverted evidence that the hospitalization requirement is likely to result in delay, thus increasing the risk of complications and risks to maternal health.  *See, e.g.*, Doc. 94-1 at p. 43 ¶ 92, p. 44 ¶ 93. But because a legislative enactment "is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data," courts will not weigh the legislature's policy considerations and choices.  *Beach Commc'ns*, 508 U.S. at 315–16.

Here, the General Assembly may have rationally speculated[11] that the hospitalization requirement would protect maternal health by reducing risks to some women who seek a surgical abortion after 12 weeks and experience major complications from the procedure.  They may have also speculated that the requirement would provide women seeking abortions the same level of safety most women seeking miscarriage management already receive when undergoing the same procedures in hospital settings.

_____

[10] The intervenors offer only a conclusory assertion by one physician that these procedures are "more risky" when done to accomplish an abortion than when done for miscarriage management, with no applicable supporting studies or data.  Doc. 94-4 at 74.

[11] Courts are unquestionably not the appropriate place for the exercise of legislative judgments.  But one might reasonably question why "rational speculation" is enough to justify a legislative decision on matters subject to medical studies and science.  There are many cases where legislative bodies have been able to defend their health and safety decisions with science, not just speculation.  *See, e.g.*, *Bauer v. Summey*, 568 F. Supp. 3d 573, 597 (D.S.C. 2021) (refusing to preliminarily enjoin city and county COVID-19 vaccine requirements that were "based on reliable science and medicine" because they are likely to survive rational basis review and discussing medical evidence); *Talleywhacker, Inc. v. Cooper*, 465 F. Supp. 3d 523, 538 (E.D.N.C. 2020) (refusing to preliminarily enjoin state executive order requiring continued closure of entertainment and fitness facilities during COVID-19 pandemic where medical evidence showed "risk of spreading COVID-19 [was] higher" at such businesses than others, like restaurants, permitted to reopen).  But "rational speculation" is the general standard established by the Supreme Court.  *Beach Commc'ns*, 508 U.S. at 315.

29

The plaintiffs have not negated every conceivable basis the General Assembly may have had for passing the hospitalization requirement. The plaintiffs' motion for summary judgment on their equal protection claim addressed to the hospitalization requirement will be denied. The intervenors' motion for summary judgment will be granted.

### C. Substantive Due Process

The plaintiffs alleged that the hospitalization requirement violates the Due Process Clause of the Fourteenth Amendment. Doc. 42 at ¶ 85. They ask for summary judgment on the substantive due process claim because the rational basis analysis is the same for both the substantive due process and equal protection claims. Doc. 100 at 17 n.5.

Because the underlying rational basis review is the same for both claims and because the plaintiffs have not negated every conceivable basis the General Assembly may have had for enacting the hospitalization requirement, the intervenors' motion for summary judgment on the plaintiffs' substantive due process claim against the hospitalization requirement will be granted. The plaintiffs' motion for summary judgment on the substantive due process claim will be denied. The intervenors' motion for summary judgment will be granted.

## V. Severability

Section 90-21.92 of the Act contains a severability clause, which reads:

> If any one or more provision, section, subsection, sentence, clause, phrase, or word of this Article or the application thereof to any person or circumstance is found to be unconstitutional, the same is hereby declared to be severable, and the balance of this Article shall remain effective, notwithstanding such unconstitutionality. The General Assembly hereby declares that it would have passed this Article, and each provision, section, subsection, sentence, clause, phrase, or word

thereof, irrespective of the fact that any one or more provision, section, subsection, sentence, clause, phrase, or word be declared unconstitutional.

§ 90-21.92.

This severability clause constitutes clear legislative intent to preserve as much of the Act as possible if a specific provision is found to be unconstitutional. At this stage, the plaintiffs seek a permanent injunction only of specific sections of the Act. Doc. 94 at 24. The permanent injunction will be limited to the IUP provision only.

## VI. Conclusion

The North Carolina General Assembly amended the state's law on abortion last year following the Supreme Court's decision in *Dobbs*. One of the challenged provisions narrowing access to abortion is unconstitutional, but the plaintiffs' other challenge does not succeed.

The provision requiring providers to document the existence or probable existence of an intrauterine pregnancy violates the plaintiffs' constitutional due process rights. The provision does not give medical providers notice of the conduct it requires, nor does it include sufficient standards to prevent arbitrary and discriminatory enforcement. The plaintiffs' motion for summary judgment directed to enforcement of this provision will be granted, and the intervenors' cross-motion for summary judgment will be denied.

The provision requiring that surgical abortions after 12 weeks of pregnancy be performed in a hospital does not violate the plaintiffs' constitutional due process or equal protection rights. There is no fundamental right to abortion, and the General Assembly may have rationally speculated that the hospitalization requirement protects maternal

31

health and safety of a few women. The intervenors' motion for summary judgment directed to enforcement of the hospitalization requirement will be granted, and the plaintiffs' cross-motion will be denied.

It is **ORDERED** that:

1. The plaintiffs' motion for summary judgment, Doc. 93, is **GRANTED in part** as to the IUP provision, § 90-21.83B(a)(7), and is otherwise **DENIED**.

2. The defendant-intervenors' cross-motion for summary judgment, Doc. 97, is **GRANTED in part** as to the hospitalization requirement, §§ 90-21.81B(3), (4); § 90-21.82A(c), and is otherwise **DENIED**.

3. Pending entry of a permanent injunction, the preliminary injunction entered September 30, 2023, Doc. 80, remains in place to the extent it prohibits each and every defendant, their agents, and successors in office from enforcing – by civil action, criminal proceeding, administrative action or proceeding, or any other way – the provision requiring documentation of the existence or probable existence of an intrauterine pregnancy before prescribing, administering, or dispensing an abortion-inducing drug, § 90-21.83B(a)(7).

4. The preliminary injunction entered September 30, 2023, Doc. 80, is **VACATED** to the limited extent that it enjoined the requirement that surgical abortions after 12 weeks of pregnancy be performed in a hospital, §§ 90-21.81B(3), (4); § 90-21.82A(c).

5. Final judgment and a permanent injunction will be entered separately as time permits.

This the 26th day of July, 2024.

_____
UNITED STATES DISTRICT JUDGE